## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DC PRESERVATION LEAGUE, | |
| DAVE ROBERTS, | |
| and | |
| ALEX DICKSON, | |
| *Plaintiffs*, | Case No. _____ |
| *vs.* | |
| UNITED STATES DEPARTMENT OF THE INTERIOR; | |
| DOUG BURGUM, in his official capacity as Secretary of the Interior; | |
| NATIONAL PARK SERVICE; | |
| and | |
| JESSICA BOWRON, in her official capacity as "Comptroller Exercising the Delegated Authority of the Director" of the National Park Service, | |
| *Defendants.* | |

## PLAINTIFFS' COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

1. In 1897, Congress "made and declared a public park" on the publicly owned land now known as East Potomac Park in the District of Columbia, directing that it "be forever held and used as a park for the recreation and pleasure of

1

the people." Act of Mar. 3, 1897, ch. 375, 29 Stat. 624. That vision has endured for nearly 129 years—a period that spans 66 Congresses and 23 presidential administrations. This administration's recent conduct, however, threatens to gut Congress's promise and wrest the Park from the people.

2.    For more than a century, East Potomac Park has been home to East Potomac Golf Course, widely renowned as one of the nation's most historically and culturally significant municipal golf courses. Cities throughout America have looked to East Potomac Golf Course as the template for a strong municipal golf system open to all. In 1941, East Potomac played a pivotal role in the push for racial integration when three Black men played at the golf course amidst protests and jeers from white patrons. The next day, the Secretary of the Interior ordered that the park be open to all people, marking an important step toward the integration of public parks and spaces in Washington, D.C.

3.    East Potomac Golf Course's 18-hole course was designed by the preeminent golf course architect Walter J. Travis, whose designs (including such jewels of American golf as Westchester Country Club in New York, Hollywood Golf Club in New Jersey, and Cape Arundel Golf Club in Maine) remain deeply influential on modern course architecture. Patterned after the classic "links" courses of Scotland, which relied heavily on natural land features, Travis's course at East Potomac offered an egalitarian design open to a variety of skill levels. At its opening in 1919, the fee to play was 25 cents.

4.  For decades, the Department of the Interior (Interior) and National Park Service (NPS) have maintained East Potomac Park primarily for recreational purposes, broadly accessible to the general public at an affordable fee. That practice has been consistent with Travis's historic design, Congress's intent in establishing the park, and NPS's conservation mandate. 54 U.S.C. § 100101(1). In 1973, East Potomac Park was added to the National Register of Historic Places, in recognition of the significance of its landscape, landscape architecture, and recreation and culture.

5.  Thousands of D.C.-area residents rely on East Potomac Park for recreation every year. In 2025, East Potomac Golf Course hosted nearly 125,000 rounds of golf—up from about 58,000 in 2019. To this day, East Potomac Golf Course remains one of the most affordable golf courses in the region and one of the easiest ways to play a Walter Travis design in America. In addition, East Potomac Park's athletic facilities include tennis courts, playing fields, and roads and trails for cyclists and runners.

6.  East Potomac Park also offers rich opportunities for birdwatching and fishing. It is host to more than 250 species of birds, including bald eagles and migratory species, and the surrounding waters support abundant populations of bass, catfish, and carp.

7.  Plaintiffs in this case live and work in this community. Two of the Plaintiffs are D.C.-area residents who play recreational golf at East Potomac Golf Course and enjoy all that East Potomac Park has to offer. For them and the

other everyday people who visit or play there, it is a historic, fun, affordable municipal golf course, set in a beautiful public park. They are exactly whom the park and golf course were meant for when Congress protected it. The other Plaintiff is a non-profit organization whose purpose is protecting, enhancing, and preserving Washington's historic and built environment; its members, like this case's individual Plaintiffs, rely on and love East Potomac Park and East Potomac Golf Course for its unique historic, recreational, aesthetic, and communal qualities.

8.    In 2025, though, Interior and NPS abandoned their longstanding, deliberate approach to maintaining the historic design and public accessibility of East Potomac Park and East Potomac Golf Course.

9.    In keeping with President Trump's efforts to remake the public spaces of Washington, D.C., in his image, Interior and NPS decided to destroy East Potomac Golf Course and to build in its place a championship-style golf course suitable for professional tournaments. Such courses tend to be large and sprawling, with exaggerated features, inflated maintenance costs, and difficult elements beyond the skill of most recreational players. The envisioned course would be of a piece with the numerous championship-style golf courses that President Trump, who fancies himself an avid golfer, owns elsewhere.

10. Predictably, the cost of a tee time at such a venue would inflate accordingly. The new golf course, to be built atop East Potomac Golf Course's remains, would reportedly be named "Washington National Golf Course."

11. Defendants have already taken several steps to implement this Washington National plan. Among them, NPS began dumping 30,000 cubic yards of fill on East Potomac Golf Course.[1] As NPS explained in a Categorical Exclusion Documentation Form (CE Form) and an Assessment of Actions Having an Effect on Historic Properties (Historic Assessment) published on October 16, the fill would consist of debris from the demolition of the East Wing of the White House and would be "stored and subsequently incorporated" into golf course "improvements."

12. Less than a week later, construction crews began the unannounced demolition of the East Wing of the White House, dumping the resulting dirt, debris, and wreckage onto East Potomac Golf Course. That debris included wires, pipes, bricks, and other materials—apparently untested for pollutants or contaminants, and all within a light breeze's reach of the park's golfers.

13. Shortly after the dumping began, and to further implement the Washington National plan, Interior and NPS abruptly held in default and terminated the lease held since 2020 by National Links Trust (NLT), a non-profit organization previously entrusted with stewardship of East Potomac Golf Course.

---

[1] In landscaping and other terrain modification, "fill" generally means loose material used to modify terrain, whether by leveling it or altering elevations.

14. Those steps implement the plan Defendants have adopted to transform East Potomac Park in a way that will irrevocably and significantly harm the quality of the human environment, affect historic property, violate NPS's conservation mandate, and thwart East Potomac Park's purpose as "a park for the recreation and pleasure of the people," Act of Mar. 3, 1897, ch. 375, 29 Stat. 624.

15. The National Environmental Policy Act (NEPA) required Defendants to consider and mitigate these harmful impacts before they began dumping thousands of cubic yards of potentially contaminated dirt and debris on the East Potomac Golf Course. Defendants failed to meet those obligations. NEPA also required Defendants to consider and mitigate those significant effects before they abandoned their longstanding approach to managing East Potomac Park and East Potomac Golf Course in favor of the Washington National plan, including the substantial construction and costs to the human environment that plan will entail. Again, Defendants failed to do so. Furthermore, the National Historic Preservation Act (NHPA) required Defendants to consider the effects of these undertakings on the East Potomac Park Historic District and its historic features, including East Potomac Golf Course. Again, Defendants failed to do so. And Defendants' actions violate NPS's statutory conservation mandate and Congress's directive for East Potomac Park. Defendants' actions should be set aside under the Administrative Procedure Act (APA), and Defendants should be preliminarily

and permanently enjoined from further implementing the Washington National plan, including but not limited to dumping debris and other refuse, until they comply with their legal obligations.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under federal law, including the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.*, the National Historic Preservation Act, 54 U.S.C. § 300101, *et seq.*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

17. Venue is proper in this district under 28 U.S.C. § 1391(e) because Plaintiff Dave Roberts resides in this District, a substantial part of the events and omissions giving rise to these claims occurred in this District, and Defendants are agencies, officers, or employees of the United States acting in their official capacity.

## PARTIES

18. Plaintiff DC Preservation League is a non-profit, tax-exempt § 501(c)(3) membership organization with its principal office in Washington, D.C. DCPL's mission is to preserve, protect, and enhance the built environment of Washington, D.C., through advocacy and education. DCPL's members live, work, and recreate throughout the District, including in and around East Potomac Park. DCPL has at least one member that lives around, works

around, and recreates in and around East Potomac Park and the facilities at
East Potomac Golf Course. DCPL also has at least one member who regularly
uses, views, and enjoys East Potomac Park and East Potomac Golf Course for
their recreational values, their historic values, their communal values, and
their aesthetic values; who plans to continue using, viewing, and enjoying
East Potomac Park and East Potomac Golf Course in enjoyment of those
qualities; and who has interests in the same that are injured by the
Defendants. DCPL and its members have longstanding interests in the
preservation of East Potomac Park, including East Potomac Golf Course.
DCPL and its members would, if given the opportunity, participate in NEPA
and NHPA processes for the debris dumping and the Washington National
plan, including by reviewing environmental documents, submitting
comments, and engaging in Section 106 consultation. Defendants' failure to
initiate and complete those processes deprives DCPL and its members of
procedural rights and information to which they are legally entitled and
directly impairs their ability to protect their historical, aesthetic,
recreational, communal, professional, economic, and organizational interests
in the Park.

19. Plaintiff Dave Roberts has been a resident of Washington, D.C., since 1998.
He is a recreational golfer and has been playing golf at East Potomac Golf
Course regularly for more than 20 years. He regularly uses the facilities at
East Potomac Golf Course, including but not limited to the golf courses, and

he plans to continue doing so. His aesthetic, recreational, cultural, and communal interests in East Potomac Golf Course are being harmed and will continue to be harmed by Defendants' actions.

20. Plaintiff Alex Dickson is a resident of Arlington, Virginia. He is a recreational golfer and has been playing golf at East Potomac Golf Course regularly for more than 10 years. He regularly uses the facilities at East Potomac Golf Course, including but not limited to the White Course and other golf courses, and he plans to continue doing so. His aesthetic, recreational, cultural, and communal interests in East Potomac Golf Course are being harmed and will continue to be harmed by Defendants' actions.

21. Defendant Department of the Interior is a federal agency headquartered at 1849 C Street, NW, Washington, D.C. 20240. It is led by the Secretary of the Interior, whose responsibilities include "the supervision of public business related to" the National Park Service and all public lands, 43 U.S.C. § 1457(11), (13), including East Potomac Park and East Potomac Golf Course.

22. Defendant Doug Burgum is Secretary of the Interior. He is sued in his official capacity. Defendant Burgum "is charged with the supervision of public business related to" the National Park Service and all public lands. 43 U.S.C. § 1457(11), (13). As such, he is responsible for the supervision of public business related to East Potomac Park, including East Potomac Golf Course.

23. Defendant National Park Service is a bureau of the Department of the Interior, which is a federal agency headquartered at 1849 C Street, NW,

Washington, D.C. 20240. NPS is responsible for "promot[ing] and regulat[ing] the use of the National Park System," 54 U.S.C. § 100101(a), which includes East Potomac Park (a subunit of the National Mall and Memorial Parks).

24. Defendant Jessica Bowron assumed the role of Acting Director of the National Park Service on or about January 20, 2025. More recently, she has been referred to as the "Comptroller Exercising the Delegated Authority of the Director." *Compare* 5 U.S.C. § 3345, *et seq.* She is sued in her official capacity. The Director is responsible for "the supervision, management, and control of [National Park] System units." 54 U.S.C. § 100302(a)(3).

## LEGAL BACKGROUND

25. Congress enacted NEPA to protect the environment by requiring federal agencies to "take a hard look at the environmental consequences *before* taking a major action." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983) (emphasis added). Specifically, where a proposed action "has a reasonably foreseeable significant effect on the quality of the human environment," 42 U.S.C. § 4336(b)(1), NEPA requires the agency to prepare an "environmental impact statement" (EIS) "address[ing] the significant environmental effects of [the] proposed project and identify[ing] feasible alternatives." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 184 (2025); 42 U.S.C. § 4332. A draft EIS must be published for public review and comment on the proposed action's potential environmental impacts and alternatives. 42 U.S.C. § 4336a(c).

26. Where the agency does not know whether a proposed action will have significant effects on the environment, or where the agency concludes the action will not have a reasonably foreseeable significant effect, the agency must prepare an "environmental assessment" (EA) setting forth for public review the basis of the agency's determination that no EIS is necessary. *Id.* § 4336(b)(2).

27. In limited circumstances, an agency may determine that a proposed action falls within a "categorical exclusion" and is thus exempt from the default requirement that the agency prepare an EA or EIS. *Id.* Categorical exclusions are a subset of actions, designated by an agency, which "a bureau has determined normally do not significantly affect the quality of the human environment." 43 C.F.R. § 46.205. If a proposed action does not meet the criteria for any designated categorical exclusion, then the proposed action must be analyzed in an EA or EIS. *Id.* § 46.205(a).

28. Even if the criteria for a categorical exclusion apply to a given action, however, an agency has an additional obligation to evaluate the action for extraordinary circumstances in which "a normally excluded action may have a significant effect." 43 C.F.R. § 46.205(c)(1). If the Responsible Official determines that an action might meet any of the exceptions delineated by the agency, extraordinary circumstances exist and the agency must prepare an EA or EIS. *Id.* § 46.215.

29. Although NEPA does not impose substantive restrictions on agency action, its procedural requirements "inevitably bring pressure to bear on agencies to respond to the needs of environmental quality" and "ensure[] that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (quotation marks and citation omitted).

30. Like NEPA, the NHPA "is a 'stop, look, and listen' provision" that "requires federal agencies to take into account the effect of their actions" on historic properties, including "structures eligible for inclusion in the National Register of Historic Places." *Illinois Commerce Comm'n v. ICC*, 848 F.2d 1246, 1261 (D.C. Cir. 1988). Specifically, "NHPA's Section 106 requires federal agencies to 'take into account the effect of' their 'undertaking[s] on any historic property.'" *United Keetoowah Band of Cherokee Indians v. FCC*, 933 F.3d 728, 733 (D.C. Cir. 2019) (citing 54 U.S.C. § 306108).

31. Under Section 106, "[t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to approval, of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108.

32. An "undertaking" under section 106 is any "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . those carried out with Federal financial assistance; and those requiring a Federal permit, license, or approval." 54 U.S.C. § 300320.

33. In fulfilling the Section 106 obligation, agencies must "consult with certain stakeholders in the potentially affected areas." *City of Phoenix, Ariz. v. Huerta*, 869 F.3d 963, 971 (D.C. Cir. 2017). The head of the relevant federal agency must "afford the [Advisory Council on Historic Preservation] a reasonable opportunity to comment with regard to the undertaking." 54 U.S.C. § 306108. The agency also must consult with the public, whose "views . . . are essential to informed Federal decisionmaking in the section 106 process." 36 C.F.R. § 800.2(d)(1). Accordingly, before undertaking a project, an agency must generally "provide the public with information about an undertaking and its effects on historic properties and seek public comment and input." *Id.* § 800.2(d)(2). "If an agency determines that no historic structures will be adversely affected, it still has to 'notify all consulting parties' . . . and give them any relevant documentation." *City of Phoenix*, 869 F.3d at 971 (citing 36 C.F.R. § 800.5(c)).

34. Both NEPA and the NHPA are enforceable through the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* Under the APA, a court must set aside final agency action that was taken "without observance of procedure

required by law," 5 U.S.C. § 706(2)(D), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A). *Id.* An agency acts arbitrarily or capriciously if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## FACTUAL BACKGROUND

I.  **FOR DECADES, DEFENDANTS MAINTAINED EAST POTOMAC PARK FOR RECREATIONAL PURPOSES, BROADLY ACCESSIBLE TO THE GENERAL PUBLIC AND CONSISTENT WITH WALTER TRAVIS'S ORIGINAL GOLF COURSE DESIGN**

### A. The History of East Potomac Park and East Potomac Golf Course

35.  East Potomac Park occupies a publicly owned, man-made island just south of the National Mall that was once part of the underwater Potomac River Flats and was reclaimed by the U.S. Army Corps of Engineers in the late nineteenth century. Congress declared the infilled land a public park in 1897, decreeing that it should be "forever held and used as a park for the recreation and pleasure of the people." Act of Mar. 3, 1897, ch. 375, 29 Stat. 624.

36.  Today, the vast majority of the park's 330 acres are used for recreation, including not only East Potomac Golf Course but also tennis courts and a

playground. Japanese cherry trees, pines, and other flowering trees frame a road, scenic walkways, and bike trails around the perimeter of the island down to Hains Point, a 15-acre open green space at the southern tip of the park boasting panoramic views of the Anacostia and Potomac Rivers. The park regularly hosts running races, guided bird walks, fishing events, and picnics.

37.   At the heart of the park is the 210-acre East Potomac Golf Course. From its opening, its innovative design made it a leading example of an enjoyable, accessible American municipal golf course.

38.   Every venue where golf is played is unique. From Augusta National in Georgia to the local pitch-and-putt, no two courses are exactly the same.

39.   In golf's earliest days centuries ago, courses presented players with whatever challenges the land itself offered: natural undulations, sandy hazards, and varied ground cover.

40.   By the time the game arrived in the United States in the 1890s, however, the nation's first golf courses mostly reflected the prevailing Victorian style of the day: often symmetrically designed and penal in nature—requiring rigorous execution of specific, demanding shots—and almost always aesthetically out of place in their landscapes.

41.   In the early 1900s, a small group of influential golf course architects revolutionized the art of course design by emphasizing more minimalist, natural designs: golf courses truer to the game's heritage, with designs that

relied on the natural shape and features of the land. These architects—including Alister MacKenzie, who designed Augusta National, Donald Ross (Pinehurst No. 2 in North Carolina), A.W. Tillinghast (Bethpage Black in New York), and William Flynn (Shinnecock Hills in New York)—ushered in the Golden Age of American golf architecture.

42. Among the titans of this period was Walter J. Travis, a decorated player in his own right who won three United States Amateur titles between 1900 and 1903. Travis popularized a style of design far closer to golf's Scottish origins than America's early Victorian designs. His designs balanced strategic elements and designs forcing precise play with rugged mounding, thoughtfully located hazards, and complex greens.

43. Through this architectural philosophy, Travis captured a design style that characterized the era's greatest courses, including East Potomac: difficult for aggressive elite players, yet playable for unskilled beginners. For example, by designing greens that invite shots played along the ground, Travis's designs accommodate novice golfers' mis-hits and putts from off the green while confounding elite players with the sheer variety of available strategies.

44. Travis's design was ideally suited to the rise of municipal public golf courses. By the 1920s, golf had soared in popularity. But it remained a sport enjoyed mostly by society's elite. Equipment was expensive, and most high-quality golf courses were owned by private clubs and carried high access fees.

45. The solution lay in municipally owned golf courses that were open to the public at affordable rates—notably, though, on a segregated basis. The number of such courses exploded in the United States in the 1920s.

46. Among them was Travis's course at East Potomac. After years of demand for a public golf course in the nation's capital, the course opened at East Potomac Park in 1919 to great acclaim. Nestled among some of the oldest Japanese cherry trees in the District, the course debuted as a nine-hole design, with a twist: like the Old Course at St. Andrews in Scotland, Travis's layout was reversible, with tees, greens, and hazards carefully arranged to allow playing the course both clockwise and counterclockwise. The course was an instant success. In 1921 alone, East Potomac logged more than 65,000 rounds—a staggering number, even by modern standards. The fee to play was 25 cents.

47. To accommodate the demand, in 1921-1922, Travis designed another nine holes, again on a reversible layout. With two reversible nines, East Potomac offered four available nine-hole loops—a feat of both architecture and construction. Today, these 18 holes collectively form East Potomac's "Blue Course."

48. A third nine-hole layout opened at East Potomac in early 1925 (today called the "White Course"), possibly designed by William Flynn, another Golden Age giant. This addition fueled further public interest. In 1927, East Potomac tallied more than 155,000 rounds played.

49. East Potomac's accessible course design contributed to an egalitarian spirit. The Blue and White Courses were soon joined by a third 1920s-era nine-hole course (the "Red Course") of short par-3 holes particularly well suited for beginners or for more seasoned players looking for a quick round. In 1931, one of the first miniature golf courses in the United States opened at East Potomac, featuring miniature replicas of the White House, Capitol, and Mount Vernon. A version of the course is still operating today and beloved by local families.

50. East Potomac Golf Course was, however, glaringly inegalitarian in one critical respect in its early decades: it was originally a racially segregated course, open only to whites except during limited hours one day a week.

51. In protest, three Black golfers—Asa Williams, George Williams, and Cecil R. Shamwell, members of the Royal Golf Club—demanded the right to play at East Potomac in 1941. After they were initially denied admission, they returned with police protection to play a round amid jeers and insults from white onlookers.[2] The next day, Secretary of the Interior Harold Ickes issued an order opening the course to all players. Black golfers attempting to play at East Potomac continued to face intimidation and harassment, and segregation remained the de jure rule at other public courses until after the Supreme Court's 1954 decisions in *Bolling v. Sharpe* and *Brown v. Board of Education*. But the 1941 protest and response at East Potomac marked an

---

[2] *See* NPS, *Golf Course as Classroom: University of Pennsylvania at East Potomac Park*, https://perma.cc/UKF7-XKAG.

inflection point in the struggle for equal access to public spaces and national parks in the United States.

52.    In recent years, East Potomac Golf Course has remained an irreplaceable asset for public golf in Washington, D.C. It offers affordable rates and is accessible to players of all skill levels. A weekend round at East Potomac's Blue Course costs $48. In contrast, a Sunday morning round at Laurel Hill Golf Club—a municipal golf course in Fairfax County, Virginia—costs $89.[3] Many semi-private, public-access courses in the D.C. area cost even more, and the cost and other barriers to membership at most private clubs are still more prohibitive.

53.    Many golfers from the District and neighboring areas played their first rounds at East Potomac. Many others from across America visit East Potomac Golf Course when in Washington to play at one of Walter Travis's most important designs. And together with the other open spaces, recreational facilities, and natural landscapes of East Potomac Park, East Potomac Golf Course has been central to making the Park an invaluable resource for the whole community as a "park for the recreation and pleasure of the people."

54.    East Potomac Park is listed on the National Register of Historic Places, with East Potomac Golf Course as a contributing feature.[4]

---

[3] Fairfax County Golf, *Showing Tee Times for Feb. 15, 2026,* (Feb. 15, 2026) https://perma.cc/26L3-YRAB
[4] East and West Potomac Parks HD (Exhibit A).

**B. Defendants' Longstanding Administration of East Potomac Park**

55. Defendants are charged with the responsibility to "promote and regulate the use of the National Park Syste by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(1). The National Park System includes "any area of land and water administered by the Secretary, acting through the Director, for park, monument, historic, parkway, recreational, or other purposes." *Id.* § 100501. East Potomac Park is one such area administered by Defendants.

56. For decades, Interior and NPS have administered East Potomac Park in a manner consistent with the park's historic character and Congress's mandate that it be "forever held and used . . . for the recreation and pleasure of the people." While that status quo has always allowed for necessary upkeep and rehabilitation, including at East Potomac Golf Course, Defendants have consistently and repeatedly—until recently—expressed and maintained a commitment in official records, publications, and practice to that management approach and to preserving Walter Travis's historic design.

57. In 1982, for example, Interior and NPS released a Draft Development Concept Plan/Environmental Assessment (Exhibit B) ("1982 Draft DCP"),

which addressed the need for adjustments to accommodate the increasing public "demand for close-to-home recreation." Ex. B at 2. The 1982 Draft DCP set out a commitment to retaining the park's "general recreational open space purpose." *Id.* And although some participants in public planning discussions had suggested replacing Travis's layout with a "championship-type 18-hole course," NPS did not include that approach in its proposal. *Id.* at 1. Instead it proposed only minor restorations such as "rehabilitat[ing] [the] course to improve tee boxes and site drainage, add[ing] new plantings & sand traps; mark[ing], and sign[ing] the three separate nine hole courses," and removal of some holes while retaining the original Blue and White courses without change *Id.* at 4 (Alternative B Proposal). Even that limited change was not adopted.

58. In 2017, NPS published a Cultural Landscapes Inventory ("CLI") of the natural and cultural assets at East Potomac Park (Exhibit C).

59. The CLI recounts with great specificity the history behind East Potomac's existing golf course designs, Ex. C at 4, positing that "[t]he layouts of all three courses at East Potomac Park have been substantially altered since" 1941, but that East Potomac Golf Course's cultural landscape nonetheless "retains integrity" from that period. *Id.* at 5; *see also id.* at 6 (noting East Potomac Golf Course's "continued integrity of feeling and association"). Indeed, the CLI found the total yardage of Travis's original Blue Course to be 6,599 yards in 2016—nearly the same as its original yardage of 6,244 yards,

with the growth reflecting small adjustments to account for advances in golf
equipment.[5] The CLI concluded, in accordance with the determination of the
superintendent of the National Mall and Memorial Parks ("NAMA"), that
East Potomac Golf Course falls within the category of NAMA assets that
"[m]ust be [p]reserved and [m]aintained." Ex. C at 12.

60. In June 2019, Interior and NPS released a Cultural Landscape Report
("CLR") for the District's three municipal golf courses (East Potomac Golf
Course, Langston Golf Course, and Rock Creek Golf Course) (Exhibit D). The
CLR again expressed the intent to maintain East Potomac Golf Course's
longstanding historic design: "While NPS acknowledges that changes might
be necessary to make repairs and/or to accommodate modern playing
standards, these treatment guidelines have been developed to support
modernization that is consistent with the original design intent for each golf
course."

61. The CLR reinforced that NPS's goal for East Potomac Park has turned at all
times on maintaining the golf courses' historic quality. The CLR
acknowledged that "the individual designs of the [Blue, White, and Red]
courses have been modified in order to accommodate changing trends and
tastes in the sport of golf." For example, "[h]azards ha[d] shifted location or
[been] removed entirely, the routing of courses ha[d] been modified, the
placement of fairways and holes ha[d] shifted to accommodate the driving

---

[5] *East Potomac Golf Links*, playDCgolf (2026), https://perma.cc/2EFT-BQAF.

ranges, trees [had been] introduced along the fairway corridors, and cart paths and social trails ha[d] developed and disappeared." Ex. D at 88. But "the overall design and layout of East Potomac Golf Course" still "correspond[ed] to the overall form of the course from the period of significance and recall[ed the cultural landscape's history as a 20th century public, links-style golf course." *Id.* The CLR concluded that the three courses were "[e]ssential" to "design integrity at East Potomac Golf Course." Ex. D at 88.

62. This faithfulness to the historic design of East Potomac Golf Course, the CLR stated, reflects "an egalitarian institution within the city of Washington, D.C., as originally intended." Ex. D at 90. The three original courses were thus "a character-defining feature of the golf course." *Id.*

63. In 2020, after undertaking a competitive bidding process, NPS entered into a 50-year lease with the National Links Trust ("NLT") to operate the District's three municipal golf courses, including East Potomac. In announcing the award of the lease, NPS underscored that "NLT plan[ned] to restore East Potomac Golf Course to Walter Travis's design" while making capital improvements and restoring the clubhouse.[6] The lease agreement would thus provide "long-term care to these historic courses and affordable opportunities to golf in our nation's capital," consistent with Defendants' longstanding

---

[6] NPS, *National Park Service signs 50-year lease with National Links Trust for historic golf courses*, (Oct. 2, 2020), https://perma.cc/ZA4F-FMTF.

commitment to maintain East Potomac Park as a recreational space open to the whole community and preserve East Potomac Golf Course's historic design.

64. In the more than five years since, NLT has worked to improve all three of Washington D.C.'s municipal golf courses, including East Potomac, while navigating the complicated federal bureaucracy associated with making those improvements. NLT has made many important improvements at all three courses, including East Potomac.

65. Since NLT assumed management of East Potomac Golf Course, playing conditions improved dramatically as NLT undertook the work the 2019 CLR acknowledged would be necessary. Fairway turf is healthier. Greens are smoother and more resilient to everyday wear and tear. Daily maintenance is more consistent. Invasive vegetation and dead brush have been removed from throughout and around the golf course, allowing improved air flow to keep the grass healthy and creating unobstructed views beyond the golf course's perimeter. It has become again what it was always intended to be: a natural landscape, a social gathering place, and a centerpiece of the community.

## II. DEFENDANTS ABRUPTLY ABANDON THE STATUS QUO AT EAST POTOMAC PARK TO IMPLEMENT THE NEWLY ADOPTED WASHINGTON NATIONAL PLAN

66. Since taking office for a second term, President Trump has undertaken or threatened a host of efforts to remake significant monuments, memorials, and public spaces in Washington, D.C. in his image and the image of his

various properties—including golf clubs—elsewhere, without regard to laws intended to preserve those spaces for their intended purposes as cultural, historical, or environmental resources for all the people.

67. Among those measures, on or about August 1, 2025, Defendant Burgum and Interior Solicitor William Doffermyre met with President Trump to discuss abandoning Walter Travis's historic design at East Potomac Golf Course and replacing it with an exclusive high-end, championship-style golf destination designed to attract major professional tournaments such as the Ryder Cup and the U.S. Open.[7] Interior leadership reportedly proposed naming the new course the "Washington National Golf Course."[8] Defendants thereafter decided to abandon the longstanding status quo at East Potomac Park in favor of the Washington National plan.

68. In furtherance of the Washington National plan, Defendant Burgum proposed dumping the debris and dirt from destruction of the East Wing onto East Potomac Golf Course, so that the debris could be used as fill when construction begins on the new design. According to the Wall Street Journal, President Trump "told Burgum he thought the idea was brilliant."[9]

[7] Garrett Morrison, *The National Links Trust's Battle with the Trump Administration, Explained*, Fried Egg Golf (Jan. 5, 2026), https://perma.cc/S535-R2B4.
[8] Meridith McGraw, *Trump's Next Renovation Target: D.C.'s Golf Courses*, (Dec. 12, 2025), https://perma.cc/9WPP-5YUK.
[9] *Id.*

69. In October 2025, President Trump demolished the historically significant East Wing of the White House with little warning to make way for a new ballroom more suited to President Trump's taste.

70. In preparation for the debris dumping, on October 16, 2025, Defendants published a Categorical Exclusion Documentation Form (Exhibit E) concluding that the dumping, storage, and use at East Potomac of approximately 30,000 cubic yards of debris from destruction of the White House's East Wing was categorically excluded from NEPA's requirements, and thus did not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS).[10] Defendants asserted that the dumping, storage, and use of the debris—described as "clean fill"—constituted "[l]andscaping and landscape maintenance in previously disturbed or developed areas" subject to a NEPA categorical exclusion.[11] *See* DOI Handbook of NEPA Procedures, Appendix 2, National Parks Service, Categorical Exclusion 12.5(c)(19) (June 2025).

71. The CE Form represented that the fill materials "will be tested and verified as clean prior to placement, eliminating the risk of introducing contaminants." Exhibit E. Photographs show that the debris contained wires, pipes, and other materials that appear to have come from the East Wing itself. There is no indication that this debris, much of which dates to periods with common usage of asbestos, lead paint, and other hazards in

---

[10] NPS, Categorical Exclusion Documentation Form (CE Form).
[11] *Id.*

construction, was tested for hazards or cleaned, and the speed with which it

was moved from the East Wing to East Potomac probably precluded any

testing or cleaning. (It also is not clear, nor does the CE Form indicate, what

"cleaning" would entail.)



A dump truck enters a makeshift dump site after dropping soil and debris from the East Wing of the White House at the East Potomac Golf Course in Washington, October 23, 2025.
Jessica Koscielniak/Reuters

72.

73.   Images and videos further show that the chain-link and plastic-mesh fences

are the only structures separating golfers from the heaps of dirt and debris.



A golfer tees off as a dump truck exits a makeshift dump site after dropping soil and debris from the East Wing of the White House, where U.S. President Donald Trump's proposed ballroom is being built, at the East Potomac Golf Course in Washington, D.C., U.S., October 23, 2025. REUTERS/Jessica Koscielniak TPX IMAGES OF THE DAY

74.

75. By its own terms, the October 16, 2025 CE Form applied only to the dumping and did not address Defendants' abandonment of East Potomac Park's longstanding status quo and adoption of the Washington National plan. In particular, the October 16, 2025 CE Form did not address Defendants' decision to deviate from that status quo in favor of an exclusive championship-style professional golf course, including the massive changes to the land that would be required to build it, nor the effect on the human environment of replacing the existing natural landscape. To the contrary, the October 16, 2025 CE Form asserted that the existing golf course operation would be maintained and that there would "not" be "new construction or a change in land use." Exhibit E.

76. On the same day that it issued the October 16, 2025 Environmental Assessment, NPS issued the Historic Assessment, purporting to comply with its obligations under the NHPA. Like the October 16, 2025 CE Form, the Historic Assessment addressed only the dumping of East Wing debris and did not address or acknowledge Defendants' abandonment of the East Potomac Park status quo or the Washington National plan. To the contrary, NPS acknowledged that part of East Potomac Golf Course's historic significance is that it has been "maintained as a designed landscape *retaining its layout,* circulation, grading, and vegetation." Exhibit F (Assessment of Actions Having an Effect on Historic Properties) (emphasis added).

77. Shortly thereafter, in furtherance of their decision to adopt and implement the Washington National plan, Defendants began dumping the East Wing debris on East Potomac Golf Course, to serve as fill in their planned redesign. Tom Fazio, a golf course designer who met with President Trump at the White House in November, tacitly confirmed the debris's purpose: "[Trump] said he needed a place to put the dirt, and the [East Potomac] course could use it anyhow."[12]

78. On information and belief, Fazio has already visited East Potomac Golf Course for the purpose of preparing to design the Washington National course to replace East Potomac's current layout.

---

[12] Michael Bamberger, *President Trump could talk golf for hours. Ask his go-to course designer,* Golf.com (Dec. 12, 2025), https://perma.cc/EV2Z-8G58.

79. Fazio previously co-designed two 18-hole courses at Trump National Golf Club in northern Virginia, among others. Mr. Fazio's style contrasts sharply with the minimalist design philosophy that inspired Walter Travis at East Potomac Golf Course. "I don't believe nature can make great golf all by itself," Mr. Fazio is reported to have said. "I think it's pretty obvious that you need to shape the land forms to create a quality golf setting and to produce acceptable shot values. That's where a golf course designer earns his keep."

80. To date, several thousand cubic yards of dirt, rubble, and debris from the demolition of the White House's East Wing have been hauled to East Potomac and dumped on the White Course. On information and belief, the dumping is ongoing and is expected to continue through the end of February. The CE Form published by NPS indicates that the dumping will total 30,000 cubic yards. Further, the CE Form states that the material is to be "stored and subsequently incorporated" as fill into golf course "improvements." Exhibit E.

81. Experts have raised alarms that the East Wing may have contained asbestos and lead paint.[13] Under regulations promulgated by the Occupational Safety and Health Administration (OSHA), insulation and surfacing material found in buildings constructed prior to 1981 are presumed to contain asbestos. 29

---

[13] In January, the Asbestos Disease Awareness Organization—after failing to receive a response to requests under the Freedom of Information Act (FOIA)—brought suit to compel disclosure of documents relating to the release and removal of asbestos during the East Wing demolition. *See* Complaint, *Asbestos Disease Awareness Ass'n. v. NPS*, No. 1:26-cv-00029 (D.D.C. Jan. 7, 2026), ECF No. 1.

C.F.R. § 1910.1001(b) (2026). The East Wing was constructed in 1902 and renovated in 1942. The White House reportedly did not obtain an asbestos identification and removal permit from the District of Columbia prior to razing the East Wing.[14] Treasury Security Scott Bessent has acknowledged that "maybe parts of the East Wing could have been asbestos."[15] According to reports, the company responsible for East Wing demolition work did not have an asbestos abatement license in the District of Columbia. In a letter to that company, Senator Edward Markey stated that the East Wing's "age and construction era make it overwhelmingly likely that asbestos-containing materials, lead-based paint, and other hazardous substances were present."[16]

82. On October 29, 2025, further implementing the Washington National plan, the National Park Service delivered to NLT a notice of default on its lease. Just over two months later, on December 31, 2025, NPS terminated NLT's lease.

83.  On January 11, 2026, President Trump confirmed that the Washington National plan has been adopted and is already in motion. During a press gaggle aboard Air Force One, a reporter asked, "What's your plan for East Potomac? Are you going to renovate the golf course?" Trump responded, "Yeah, we're gonna make it a beautiful, world-class, U.S. Open-caliber course.

---

[14] Ellie Borst, Heather Richards, *White House dodged East Wing asbestos permits*, E&E News by Politico, (Dec. 01, 2025), https://perma.cc/Y3SR-6C23.
[15] Meet the Press, *'This is moving at warp speed': Scott Bessent defends East Wing demolition*, NBC News (Oct. 26, 2025), https://perma.cc/N4CJ-WGY3.
[16] Edward J. Markey, U.S. Senate Letter (Oct. 30, 2025), https://perma.cc/8ZDW-RKG6.

Ideally, we're gonna have major tournaments there and everything else. It's going to bring a lot of business into Washington."[17]

### III. THE DUMPING OF DEBRIS AND ADOPTION OF THE WASHINGTON NATIONAL PLAN CONSTITUTE MAJOR FEDERAL ACTIONS REQUIRING AN ENVIRONMENTAL ANALYSIS UNDER NEPA AND UNDERTAKINGS REQUIRING HISTORIC PRESERVATION ANALYSIS UNDER NHPA

84. Converting East Potomac Golf Course to a "championship-style" course will necessarily entail far more than mere aesthetic changes and adjusted pin placements. It will require destruction of the Travis-designed course and leave the whole of East Potomac Park unrecognizable.

85. Implementing the Washington National plan will require overhaul of all or nearly all the footprint currently occupied by East Potomac's 36 holes and miniature golf course—and perhaps all of East Potomac Park. These changes will likely entail, at a minimum, removal or relocation of hundreds of trees, substantial modification of terrain, and replacement of the site's existing clubhouse.

86. Consistent with the nature of championship courses and Tom Fazio designs in particular, execution of Defendants' Washington National plan will most likely also entail the construction of water hazards, including potentially by destroying existing roadways, modifying terrain and landscaping, and reclaiming land.

---

[17] Forbes Breaking News, *'It's Going To Bring A Lot Of Business': Trump Teases Renovations For East Potomac Golf Course,* YouTube (Jan. 12, 2026), https://perma.cc/LH8E-LGHX.

87. Defendants have indicated that, in furtherance of their plan, they intend to use the debris that has already been dumped at East Potomac Park from the wreckage of the White House's East Wing as fill for a championship-style course. Doing so will introduce foreign organic and inorganic materials into the land, potentially causing heavy metals and other toxins to leach into the soil and groundwater, altering the chemistry of the soil and water, harming the ecosystems of both the Park and the Potomac River, and posing risks to human health.

88. The dumping of debris and implementation of the Washington National plan will each have a reasonably foreseeable significant adverse effect on the quality of the human environment, both on East Potomac Golf Course itself and on the surrounding open spaces and recreational areas of East Potomac Park.

89. The reclaimed land occupied by East Potomac Park, which is already eroding, has a high water table susceptible to flooding and fluctuating water levels. Modifying the terrain and tree coverage or introducing new artificial water features, as Defendants intend to do, will aggravate existing erosion and flooding risks.

90. Defendants' actions will also affect historic property, including the East Potomac Park Historic District and the historic East Potomac Golf Course, a major contributing resource to the Park's historic character.

91.  Defendants' adoption and implementation of the Washington National plan constitutes an "undertaking" under Section 106 of the NHPA. On information and belief, it is being funded in whole or in part under the direct or indirect jurisdiction of a federal agency, Interior and NPS.

92.  Likewise, the dumping of debris from the White House East Wing at East Potomac Golf Course—both as a discrete activity and as a component of Defendants' Washington National plan—is an "undertaking."

93.  East Potomac Park is listed on the National Register of Historic Places, therefore making it "historic property." 54 U.S.C. § 300308. Eliminating the public accessibility, landscape, terrain, and design elements of East Potomac Golf Course—including the greens, bunkers, and fairways shaped and carefully by the course's architect—will irreparably harm that historic property.  Indeed, it will destroy it.

## IV.    DEFENDANTS FAILED TO COMPLY WITH NEPA AND NHPA

94.  Defendants' decision to abandon their longstanding management of East Potomac Park according to its historic design and egalitarian use and instead adopt the Washington National plan to replace the existing Golf Course with an elite championship-style course is a major federal action that has reasonably foreseeable significant effects on the quality of the human environment. The dumping of debris from the East Wing demolition at East Potomac Park for "storage" and use on East Potomac Golf Course is likewise

a major federal action that has reasonably foreseeable significant effect on the quality of the human environment.

95.    NEPA accordingly required Defendants to prepare and make available for public comment an Environmental Impact Statement before adopting the Washington National plan and before dumping the East Wing debris. Defendants failed to do so.

96.    Alternatively, NEPA obligated Defendants to prepare an Environmental Assessment to determine the effects of the Washington National plan and the dumping of debris on the human environment and to set forth for public review the basis of Defendants' conclusion that no EIS was required. Defendants failed to do so.

97.    Had Defendants conducted the required review and published an EA or EIS in regard to their adoption of the Washington National plan and the dumping of debris, that document would be publicly available. 42 U.S.C. § 4332(2)(C)(v) (EIS "shall be made available . . . to the public"); 42 U.S.C. § 4336(b)(2) (EA must be a "public document"). No such document is available.

98.    The October 16, 2025 CE Form does not acknowledge or address the adoption of the Washington National plan and therefore did not satisfy Defendants' NEPA obligations in regard to the Washington National plan. And as to the dumping of debris, the October 16, 2025 CE Form did not satisfy Defendants' NEPA obligations for the independent reasons that it 1) relied on incorrect factual premises in concluding that the action fell within

the scope of Categorical Exclusion 12.5(c)(19), and 2) failed to account for the extraordinary circumstances present at East Potomac Park.

99.  In fact, by implementing the Washington National plan, Defendants have fundamentally altered the status quo at East Potomac Park, in a manner that will significantly affect the quality of the human environment and rob the community of a priceless resource for open and accessible recreation for all the people.

100. Defendants were likewise obligated to "complete the [NHPA] section 106 process 'prior to the approval of the expenditure of any Federal funds on the'" Washington National plan or the dumping of debris, each of which constitutes an "'undertaking'" under the NHPA. 36 C.F.R. § 800.1 (quoting 54 U.S.C. § 306108). They failed to do so.

101.  Defendants' only effort to feign compliance with NHPA was the October 16 Historic Assessment, which posited that dumping 30,000 cubic yards of dirt in the middle of the White Course would be "generally consistent with routine grounds maintenance" and would have "no adverse effect" on East Potomac Park. In so concluding, NPS asserted that the dumping of East Wing debris would not "[a]lter or remove features/elements of a historic setting or environment (inc. terrain)" nor "[a]dd non-historic features/elements (inc. visual, audible, or atmospheric) to a historic setting or cultural landscape."

102. The October 16 Historic Assessment does not acknowledge or address the adoption of the Washington National plan and therefore did not satisfy

Defendants' obligations under the NHPA in regard to the Washington National plan. And as to the dumping of debris, the October 16, 2025 Historic Assessment did not satisfy Defendants' NHPA obligations because it misrepresented the nature of the actions and improperly accounted for the impact of future mitigation efforts.

## LEGAL CLAIMS

### COUNT 1:
### Administrative Procedure Act
### (NEPA, as to the Washington National Plan)
### 5 U.S.C. § 706(2)(A), (C), (D)

103. Plaintiffs reallege and reincorporate by reference the paragraphs above.

104. The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

105. Defendants' adoption and implementation of the Washington National plan is a final agency action subject to review under the Administrative Procedure Act. 5 U.S.C. § 704.

106. Defendants' adoption and implementation of the Washington National plan is a "major Federal action significantly affecting the quality of the human environment" within the meaning of 42 U.S.C. § 4332.

107. Before taking that major federal action, Defendants were required to comply with NEPA by preparing an EIS or EA, or by setting forth for public review

the basis of any categorical exclusion determination or finding of no

significant impact. By failing to take any of those steps, Defendants violated

NEPA.

108. Accordingly, Defendants' actions were not in accordance with NEPA,

exceeded statutory authority, and were taken without observance of

procedures required by NEPA, all in violation of the APA.

**COUNT 2:**
**Administrative Procedure Act**
**(NHPA, as to the Washington National Plan)**
**5 U.S.C. § 706(2)(A), (C), (D)**

109. Plaintiffs reallege and reincorporate by reference the paragraphs above.

110. The Administrative Procedure Act provides a remedy to "hold unlawful and

set aside agency action, findings, and conclusions found to be . . . not in

accordance with law," "in excess of statutory jurisdiction, authority, or

limitations," or "without observance of procedure required by law." 5 U.S.C. §

706(2)(A), (C), (D).

111. Defendants' adoption and implementation of the Washington National plan is

a final agency action subject to review under the Administrative Procedure

Act. 5 U.S.C. § 704.

112. Defendants' adoption and implementation of the Washington National plan is

an undertaking having effect on historic property, within the meaning of 54

U.S.C. § 306108.

113. Prior to that undertaking, Defendants were required to comply with NHPA

by taking that effect into account, consulting with the public, and affording

the Advisory Council on Historic Preservation a reasonable opportunity to comment. By failing to take those steps, Defendants violated the NHPA.

114. Accordingly, Defendants' actions were not in accordance with NHPA, exceeded statutory authority, and were taken without observance of procedure required by NHPA, all in violation of the APA.

**COUNT 3:**
**Administrative Procedure Act**
**(NPS Organic Act and Act of Mar. 3, 1897,**
**as to the Washington National plan)**
**5 U.S.C. § 706(2)(A)**

115. Plaintiffs reallege and reincorporate by reference the paragraphs above.

116. The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

117. Defendants' adoption and implementation of the Washington National plan is a final agency action subject to review under the Administrative Procedure Act. 5 U.S.C. § 704.

118. Under the NPS organic act, Defendants are obligated to administer East Potomac Park and East Potomac Golf Course so as to "conserve the scenery, natural and historic objects, and wild life in the [National Park] System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(1).

119. Defendants' adoption and implementation of the Washington National plan impairs the enjoyment of the scenery, natural and historic objects, and wildlife of East Potomac Park and fails to leave them unimpaired for the enjoyment of future generations, in violation of NPS's organic act.

120. Defendants' adoption and implementation of the Washington National plan likewise violates Congress's mandate that East Potomac Park "be forever held and used as a park for the recreation and pleasure of the people." Act of Mar. 3, 1897, ch. 367, 29 Stat. 622.

121. Defendants offered no satisfactory explanation, substantial evidence, or reasoned basis for abandoning the longstanding status quo at East Potomac Park and made no attempt to reconcile their actions with their legal obligations under the NPS organic acts. Defendants failed to take account of reliance interests and other significant aspects of the problem, including the extent to which their actions would impair the enjoyment of the scenery, natural and historic objects, and wild life of East Potomac Park and impair its use as a park for the recreation and pleasure of the people.

122. Accordingly, Defendants' actions were arbitrary and capricious, an abuse of discretion, and contrary to law.

## COUNT 4:
## Administrative Procedure Act
## (as to the Washington National Plan)
## 5 U.S.C. § 706(2)(A)

123. Plaintiffs reallege and reincorporate by reference the paragraphs above.

124. The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary [and] capricious." 5 U.S.C. § 706(2)(A).

125. Defendants' adoption and implementation of the Washington National plan is final agency action subject to review under the Administrative Procedure Act, 5 U.S.C. § 704.

126. Defendants' adoption and implementation of the Washington National plan was unsupported by any satisfactory explanation, substantial evidence, or reasoned basis. In taking that action, Defendants failed to take account of reliance interests and other significant aspects of the problem, including adverse effects on the environment and historic property and the elimination of East Potomac Golf Course as a shared recreational asset available to the whole community.

127. Accordingly, Defendants acted arbitrarily and capriciously, in violation of the APA.

**COUNT 5:**
**Administrative Procedure Act**
**(NEPA, as to the Debris Dumping)**
**5 U.S.C. § 706(2)(A), (C), (D)**

128. Plaintiffs reallege and reincorporate by reference the paragraphs above.

129. The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

130. Defendants' dumping of East Wing debris at East Potomac Park is a final agency action under the Administrative Procedure Act. 5 U.S.C. § 704.

131. Defendants' dumping of East Wing debris at East Potomac Park is an agency action that either (1) has a reasonably foreseeable significant effect on the quality of the human environment; or (2) whose significance on the quality of the human environment is unknown. *See* 42 U.S.C. § 4336(b)(1), (2).

132. The dumping is not an action that is excluded from environmental review pursuant to one of DOI's categorical exclusions, another agency's categorical exclusions, or another provision of law. *See* 42 U.S.C. § 4336(b)(2). Consequently, the dumping cannot proceed without an EA or EIS. *See* 43 C.F.R. § 46.205(a).

133. Contrary to Defendants' explanation, the dumping was not "analogous to
ongoing landscaping and landform maintenance performed routinely by the
golf course operator."[18]

134. Even if the criteria for a categorical exclusion did apply to the dumping, this
situation presents extraordinary circumstances, as defined by 43 C.F.R. §
46.205, in which "a normally excluded action may have a significant effect."
43 C.F.R. § 46.205 (c), (c)(1). As a result, the dumping cannot proceed without
an EA or EIS.  Id. § 46.215.

135. By justifying the dumping through Categorical Exclusion 12.5(c)(19),
Defendants' action was not in accordance with NEPA, exceeded statutory
authority, and was taken without observance of procedure required by NEPA,
all in violation of the APA.

**COUNT 6:**
**Administrative Procedure Act**
**(NHPA, as to Debris Dumping)**
**5 U.S.C. § 706(2) (A), (C), (D)**

136. Plaintiffs reallege and reincorporate by reference the paragraphs above.

137. The Administrative Procedure Act provides a remedy to "hold unlawful and
set aside agency action, findings, and conclusions found to be . . . not in
accordance with law," "in excess of statutory jurisdiction, authority, or
limitations," or "without observance of procedure required by law." 5
U.S.C. § 706(2)(A), (C), (D).

---

[18] CE Form.

138. Defendants' dumping of East Wing debris at East Potomac Park is a final agency action under the Administrative Procedure Act. 5 U.S.C. § 704.

139. Defendants' dumping of East Wing debris at East Potomac Park is an undertaking having effect on historic property, within the meaning of 54 U.S.C. § 306108.

140. Prior to that undertaking, Defendants were required to comply with NHPA by taking that effect into account, consulting with the public, and affording the Advisory Council on Historic Preservation a reasonable opportunity to comment.

141. By failing to take any of those steps, Defendants' actions were not in accordance with NHPA, exceeded statutory authority, and were taken without observance of procedure required by NHPA, all in violation of the APA.

### COUNT 7:
### Administrative Procedure Act
### (NPS Organic Act, as to the Debris Dumping)
### 5 U.S.C. § 706(2)(A)

142. Plaintiffs reallege and reincorporate by reference the paragraphs above.

143. The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

144. Defendants' dumping dirt and debris from the East Wing destruction project is a final agency action subject to review under the Administrative Procedure Act. 5 U.S.C. § 704.

145. Under the NPS organic act, Defendants are obligated to administer East Potomac Park and East Potomac Golf Course so as to "conserve the scenery, natural and historic objects, and wild life in the [National Park] System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(1).

146. Defendants' dumping of dirt and debris from the East Wing demolition impairs the enjoyment of the scenery, natural and historic objects, and wildlife of East Potomac Park and fails to leave them unimpaired for the enjoyment of future generations, in violation of NPS's organic act.

147. Defendants offered no satisfactory explanation, substantial evidence, or reasoned basis for abandoning the longstanding status quo at East Potomac Park and made no attempt to reconcile their actions with their legal obligations under the NPS organic acts. Defendants failed to take account of reliance interests and other significant aspects of the problem, including the extent to which their actions would impair the enjoyment of the scenery, natural and historic objects, and wildlife of East Potomac Park and impair its use as a park for the recreation and pleasure of the people.

148. Accordingly, Defendants' actions were arbitrary and capricious, an abuse of discretion, and contrary to law.

## COUNT 8:
## Administrative Procedure Act
## (Debris Dumping):
## 5 U.S.C. § 706(2)(A)

149. Plaintiffs reallege and reincorporate by reference the paragraphs above.

150. The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary [and] capricious." 5 U.S.C. § 706(2)(A).

151. Defendants' dumping of East Wing debris at East Potomac Park is a final agency action subject to review under the Administrative Procedure Act. 5 U.S.C. § 704.

152. Defendants' dumping of East Wing debris at East Potomac Park was unsupported by any satisfactory explanation, substantial evidence, or reasoned basis. In taking that action, Defendants failed to take account of reliance interests and other significant aspects of the problem, including adverse effects on the environment and the historic character of the East Potomac Historic District and East Potomac Golf Course as a shared historic and cultural asset available to the whole community.

153. NPS's conclusions in the CE Form and Historic Assessment, including but not limited to that dumping 30,000 cubic yards of debris and foreign material on a golf course is "routine maintenance" and that would not alter any

elements of the historic property, are so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

154. Accordingly, Defendants acted arbitrarily and capriciously in violation of the APA.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs request that the Court grant the following relief:

1. Declare that Defendants' adoption and implementation of the Washington National plan and abandonment of their longstanding management of East Potomac Park and East Potomac Golf Course for recreational purposes consistent with East Potomac Golf Course's historic design violates the Administrative Procedure Act, the National Environmental Policy Act, the National Historic Preservation Act, the Act of Mar. 3, 1897, and the NPS Organic Acts;

2. Set aside and vacate Defendants' decision to adopt and implement the Washington National plan;

3. Set aside and vacate the CE Form and the Historic Assessment, and any and all authorizations concerning the dumping of East Wing debris at East Potomac Park;

4. Preliminarily and permanently enjoin the Defendants from further implementing the Washington National plan until Defendants have complied with the National Environmental Policy Act and the National Historic Preservation Act, including but not limited to:

a. Enjoining Defendants from dumping additional dirt, debris, or other refuse from the East Wing construction project at East Potomac Golf Course or elsewhere at East Potomac Park;

b. Enjoining Defendants to remove from East Potomac Park the dirt, debris, rubble, and other refuse from the East Wing destruction project;

c. Enjoining Defendants from further ground disturbance at East Potomac Golf Course or elsewhere at East Potomac Park;

d. Enjoining Defendants from adopting or implementing any new land-use plans, general management plans, development concept plans, materially altered use, or the like concerning East Potomac Golf Course or East Potomac Park;

e. Enjoining Defendants from segmenting the challenged action into discrete components for purposes of avoiding NEPA or NHPA review;

f. Enjoining Defendants from further implementing the termination of the National Links Trust's lease;

g. Enjoining Defendants from reassigning the lease for East Potomac Golf Course to any other entity;

h. Enjoining Defendants from ejecting National Links Trust or any of its employees, agents, or assigns from East Potomac Golf Course;

i. Enjoining Defendants from closing East Potomac Golf Course;

j.  Enjoining Defendants from further developing, altering, or implementing any projects at East Potomac Golf Course or East Potomac Park that rely on or are facilitated by the dirt, debris, or other refuse from the East Wing construction project;

k.  Enjoining Defendants from further reliance on the CE Form or the Historic Assessment;

l.  Enjoining Defendants to preserve the existing physical condition of East Potomac Park and East Potomac Golf Course and all documents, studies, plans, and communications related to land-use planning, fill placement, or golf course redesign; and

m.  Enjoining any connected or facilitating actions related to the above relief.

5.  Pursuant to 5 U.S.C. § 705, stay the adoption of the Washington National plan, including Defendants' implementation of the Washington National plan;

6.  Award Plaintiff reasonable attorney's fees pursuant to 28 U.S.C. § 2412(b);

7.  Award all other relief as the Court may deem just and proper.

RESPECTFULLY SUBMITTED this Thirteenth day of February 2026.

Abbe David Lowell [Bar No. 358651]
Jack Bolen*
Angela Reilly*
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowelland
associates.com
JBolen@lowellandassociates.com
AReilly@lowellandassociates.com

Norman L. Eisen [Bar No. 435051]]
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 601-8678
norman@democracydefenders.org

*Application for admission pending or
admission *pro hac vice* forthcoming

*/s/Will Bardwell*
Will Bardwell (Bar No. 90006120)
Mark B. Samburg (Bar No. 1018533)
Catherine M.A. Carroll (Bar No. 497890)
Robin F. Thurston (Bar No. 7268942)
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
wbardwell@democracyforward.org
msamburg@democracyforward.org
ccarroll@democracaryforward.org
rthurston@democracyforard.org

*Counsel for Plaintiffs*