## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DC PRESERVATION LEAGUE, *et al.*, | |
| *Plaintiffs*, | |
| *vs.* | Case No. 1:26-cv-477 |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | |
| *Defendants*. | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY UNDER 5 U.S.C. § 705 OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION

East Potomac Park is a National Register historic district significant for landscape architecture, public recreation, and the historic East Potomac Golf Course. This historic district reflects more than aesthetic choices; it embodies more than 100 years of continuous public recreational use within congressionally protected parkland. That landscape is protected by a web of federal statutes. Abandoning their legal obligations, Defendants have rushed to redesign that landscape, and they have already taken drastic steps to implement that unlawful plan—including by dumping some 30,000 cubic yards of foreign, potentially hazardous material on the Golf Course. Unless immediately paused, further implementation will physically alter and degrade a recognized historic resource, fundamentally transform the character of the park, and significantly affect the human environment, in flagrant disregard of the statutory safeguards enacted by Congress.

The National Environmental Policy Act, National Historic Preservation Act, and National Park Service Organic Act all constrain this behavior. Those laws are being trampled, irreparably harming the historic district and its users. This Court should stay or enjoin Defendants' actions.

## STATEMENT OF FACTS

### A.  "A Model Public Playground."

President Trump owns a portfolio of high-end golf courses across the world. Most of those courses are not open to the public. The small handful that do accept public play are financially out of reach for most people. At Trump Turnberry in Scotland, a morning round of 18 holes in June will cost a non-resident more than $1,300.[1] At Trump National Doral in Florida, a round on the famous Blue Monster course can exceed $700 in price.[2] And at Trump National Golf Club Los Angeles, a sunrise tee time on Presidents Day weekend cost $1,195. Ex. A.

---

[1] James Colgan, *Turnberry is launching one of golf's priciest green fees. Here's why*, GOLF (Aug. 17, 2024), https://perma.cc/AX66-RHTN

[2] Ryan Ballengee, *How much does it cost to play golf at Trump Doral and the Blue Monster?*, GOLF News (April 4, 2025), https://perma.cc/2AHN-JAZE

East Potomac Golf Course in Washington is, and always has been, a different sort of golf course.  A weekend round on East Potomac's historic 18-hole Blue Course costs $48; even less during the week.  If you arrive hungry, a pre-round cup of coffee and a bacon, egg, and cheese sandwich will cost you $8.75.  On any given day, you are just as likely to bump into a member of Congress as you are a middle-class father taking his daughter out for the first round of her life – the former having no more claim to a tee time than the latter.  Perhaps more than any other golf course in America, East Potomac is a golf course of the people, by the people, and for the people.

"From its earliest origins, East Potomac Park was meant to be a model public playground." Ex. B at Section 8, Page 68 (quotation marks omitted).  The Park's land, reclaimed from the Potomac River, was formally dedicated by Congress on March 3, 1897, with a mandate that it be "made and declared a public park... to be forever held and used as a park for the recreation and pleasure of the people."  29 Stat. 622, 624 (1897).  The Supreme Court later traced the title of the Potomac River waterbeds to the 1632 Charter of Maryland, concluding that the sovereign held the land not as a private landlord, but as a "public trust... for the benefit of the whole community." *Morris v. United States*, 174 U.S. 196, 227 (1897).

When the Park was completed in 1911, golf remained a privilege available to the few: nearly all proper courses were owned by private clubs.  Upon the Park's opening, though, Washington residents clamored for a municipal golf course open to public play – which would fit perfectly within the Park's congressionally stated purpose.  Ex. C.

The task was given to one of the Twentieth Century's greatest golf course architects, Walter Travis.  Travis was part of a small but influential group of golf course architects in the early 1900s who pushed golf course design away from artificial-looking Victorian designs toward more

natural-looking "minimalist" designs that fit within golf courses' existing landscapes.[3]  Travis's designs balanced strategic and penal elements with rugged mounding, thoughtfully located hazards, and complex greens.  Travis's first nine holes at East Potomac opened in 1919; by 1922, nine more had opened, creating two loops.  Both loops at the course came with a literal twist, inspired by the Old Course at St. Andrews in Scotland: Travis's loops could be played reversibly, either clockwise or counterclockwise, effectively creating 36 holes of golf.  His courses offered an egalitarian design open to a variety of skill levels – difficult for aggressive elite players, yet playable for unskilled beginners.  For instance, his greens invited shots played along the ground, which accommodate novice golfers' mis-hits and putts from off the green, but also delight elite players with many available strategies.  Today, these holes make up East Potomac Golf Course's 18-hole "Blue Course."  Another nine-hole set (now the "White Course") opened in 1925.  A much shorter, beginner-level nine-hole course consisting of par-3 holes opened soon thereafter; today, it is East Potomac's "Red Course."  East Potomac Golf Course remains a 36-hole facility to this day.

In 1931, an 18-hole "miniature golf" course opened.  Today, it is America's oldest continuously operating mini-golf course.  The mini-golf course is formally recognized as a Contributing Site under the East and West Potomac Park District's entry in the National Register of Historic Places, mirroring the status of the regulation-size courses.  Ex. B at Section 7, Page 51.

   B.  "An Egalitarian Institution Within the City of Washington, D.C., as Originally Intended."

East Potomac Golf Course's cultural importance extends beyond the 36 plastic cups cut into the ground.  For more than 20 years, East Potomac Golf Course was segregated—open to white players only.  In 1941, though, three Black golfers—Asa Williams, George Williams, and

---

[3] *See generally* Thomas MacWood, "Arts and Crafts Golf Part I," Golf Club Atlas (Apr. 6, 2009), available at https://perma.cc/4LBC-UZ8S.

Cecil R. Shamwell—demanded to play at East Potomac.  They were denied but returned with police protection to play amid jeers and insults from white players.  The Secretary of the Interior issued an order the next day opening the course to all.  That order did not end the intimidation and harassment that Black players faced, but the three golfers' effort made East Potomac Golf Course one of the earliest segregated municipal golf courses to integrate—a policy not achieved at many other municipal golf courses until after the Supreme Court's significant desegregation decisions of the 1950s.  *See Mayor & City Council of Baltimore City v. Dawson*, 350 U.S. 877 (1955) (per curiam) (racial segregation at public park held unconstitutional); *Holmes v. Atlanta*, 350 U.S. 879 (1955) (per curiam) (racial segregation at municipal golf course held unconstitutional).

Through decades before and since, Defendants have maintained East Potomac Park and East Potomac Golf Course consistent with the Park's congressional directive, NPS's conservation and non-impairment mandates under 54 U.S.C. § 100101, and the historic character of the Park – including maintaining and operating East Potomac Golf Course consistent with its historic origin.  Defendants have repeatedly documented that commitment for at least 40 years.

In 1982, Interior and NPS released a *Draft Development Concept Plan/Environmental Assessment*, which addressed the need for adjustments to accommodate the increasing public "demand for close-to-home recreation."  Ex. D at 2.  The 1982 Draft DCP set out a commitment to retaining the park's "general recreational open space purpose."  *Id.*  Although some participants in public planning discussions had suggested replacing Travis's layout with a "championship-style 18-hole course," NPS did not include that approach in its proposal.  *Id.* at 1.  Even the more restrained proposals were not adopted.  Ex. D at 4 (Alternative B Proposal).

In 2017, NPS published a *Cultural Landscapes Inventory* of the natural and cultural assets at East Potomac Park, underscoring NPS's commitment to East Potomac Golf Course.  Ex. E.  The

CLI's purpose was to provide "the means to describe cultural landscapes on an individual or collective basis at the park" and "an analytical tool to judge accomplishment and accountability." Ex. E at 1. The CLI recounted with great specificity the history behind East Potomac's existing golf course designs. Ex. E at 4. The CLI acknowledged that "[t]he layouts of all three courses at East Potomac Park have been substantially altered since" 1941, but that East Potomac Golf Course's cultural landscape "retains integrity" from that period. *Id.* at 5. *See also id.* at 6 (noting East Potomac Golf Course's "continued integrity of feeling and association"). The CLI also included the determination of the National Mall and Memorial Park (NAMA)'s then-superintendent that East Potomac Golf Course falls within the category of NAMA assets that "Must be Preserved and Maintained." Ex. E at 12.

In June 2019, Interior and NPS released a *Cultural Landscape Report* ("CLR") for the District's three municipal golf courses (East Potomac Golf Course, Langston Golf Course, and Rock Creek Golf Course). Ex. F. The CLR explicitly determined that the trio of courses located within East Potomac Park "is a character-defining feature of the golf course," Ex. F at 91, and is "[e]ssential" to the "design integrity at East Potomac Golf Course." Ex. F at 88. The CLR was unambiguous in expressing NPS's intent to stick by East Potomac Golf Course's longstanding, historic design: "While NPS acknowledges that changes might be necessary to make repairs and/or to accommodate modern playing standards, these treatment guidelines have been developed to support modernization that is consistent with the original design intent." *Id.* at 3.

Relatedly, the CLR reinforced NPS's longstanding goal for East Potomac Park to maintain the golf courses' historic quality. The CLR acknowledged that "the individual designs of the [Blue, White, and Red] courses have been modified in order to accommodate changing trends and tastes in the sport of golf." Ex. F at 88. For example, "[h]azards ha[d] shifted location or [been] removed

entirely, the routing of courses ha[d] been modified, the placement of fairways and holes ha[d] shifted to accommodate the driving ranges, trees [had been] introduced along the fairway corridors, and cart paths and social trails ha[d] developed and disappeared." Ex. F at 88. But "the overall design and layout of East Potomac Golf Course" still "correspond[ed] to the overall form of the course from the period of significance and recall[ed] the cultural landscape's history as a 20th century public, links-style golf course." *Id.* The CLR concluded that the three courses were "[e]ssential" to "design integrity at East Potomac Golf Course." Ex. F at 88. This faithfulness to the historic design of East Potomac Golf Course, the CLR stated, reflects "an egalitarian institution within the city of Washington, D.C., as originally intended." Ex. F at 90.

The intention expressed by the CLR was at the heart of NPS's 2020 decision regarding the operation of East Potomac, when, after a competitive bidding process, NPS signed a 50-year lease with the National Links Trust ("NLT") to operate the District's three municipal golf courses, including East Potomac. NPS underscored that NLT "plan[ned] to restore East Potomac Golf Course to Walter Travis's design," make capital improvements, and restore the clubhouse. Ex. G. The agreement thus provided "long-term care to these historic courses and affordable opportunities to golf in our nation's capital," consistent with Defendants' longstanding commitment to maintain East Potomac Park as a recreational space open to the whole community and preserve East Potomac Golf Course's historic design.

In the more than five years since, NLT has worked to improve all three courses while navigating the complicated federal bureaucracy associated with making those improvements. *See generally* Roberts Decl. at ¶¶14-15. NLT's improvements have revived East Potomac as a social gathering place, open and inviting to both golfers and nongolfers alike. Its clubhouse, the East Potomac Park Field House – a Contributing Building for the National Register nomination –

includes a pro shop and a small café, Potomac Grille. *See* Roberts Decl. at ¶15 ("One of the things that NLT has done well is making East Potomac more than just a golf course. . . . People come out just to buy a snack, a drink, and then hang out on the steps in front of the clubhouse. Giving people a place to hang out after the round has made a big difference to the way people use that space."); Dickson Decl. at ¶6 ("Other times, I go there just to get a half smoke or a beer."). Since NLT assumed management of East Potomac Golf Course, playing conditions have improved dramatically, *see* Roberts Decl. at ¶ 14, and the course has again become what it was intended to be: a natural landscape, a social gathering place, and a centerpiece of the community.

C.  <u>"Yeah, We're Gonna Make It a Beautiful, World-Class, U.S. Open-Caliber Course. Ideally, We're Gonna Have Major Tournaments There and Everything Else."</u>

All that changed in 2025. On or about August 1, 2025, at a meeting with Interior Solicitor William Doffermyre and President Trump, Defendant Secretary of the Interior Doug Burgum proposed a radical plan at odds with the century of history at East Potomac Park: destroy East Potomac's Red, White, and Blue Courses, along with the Park's recreational character, in favor of a sprawling 18-hole course designed to host major professional events, to be called "Washington National Golf Course." Soon thereafter, abandoning their commitment to Congress's mandate, Defendants adopted and began to implement the Washington National plan.[4]

1.  <u>The East Wing Debris Dumping</u>

The first step in implementing the Washington National plan was to deliver dirt, debris, and other refuse of unknown content from the demolition of the White House's East Wing for use as fill material in building the Washington National Golf Course. Reports of dump trucks traveling

---

[4] Garrett Morrison, *The National Links Trust's Battle with the Trump Administration, Explained*, The Fried Egg (Jan. 5, 2026), https://perma.cc/DND9-7G8P; Reese Gorman, "Inside Trump's Takeover of D.C.'s Golf Courses," News of the United States (Feb. 6, 2026), available at https://www.notus.org/donald-trump/trump-golf-couse-takeover-potomac-rock-creek (last viewed Feb. 15, 2026).

between the White House and East Potomac Park began circulating in October 2025.[5]  The Park is relatively flat land; building a golf course difficult enough and large enough to host major professional tournaments will require building up the course's surface, in order to allow for rolling terrain.  To do that, construction will require material to "fill" the space above the Park's current surface.  "[Trump] said he needed a place to put the dirt, and the course could use it anyhow," golf architect Tom Fazio told golf writer Michael Bamberger.  "He's a construction guy."[6]

In an attempt to reconcile the dumping with federal oversight requirements and shield the broader Washington National plan from the same, on October 16, 2025, NPS issued two documents purporting to comply with the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA).  In each document, NPS asserted that the dumping was excluded from review because there would be no construction or change to the land use.

First, NPS's Categorical Exclusion Documentation Form (CE Form), Ex. H, concluded that dumping and storing 30,000 cubic yards of debris from the White House's East Wing demolition was categorically excluded from NEPA's requirements (and thus did not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS)) because the debris' dumping, storage, and use were "[l]andscaping and landscape maintenance in previously disturbed or developed areas."  Ex. H at 1; *see also* Ex. I, DOI Handbook of NEPA Procedures, Appendix 2, National Parks Service, Categorical Exclusion 12.5(c)(19) (June 2025) (hereinafter, "DOI NEPA Handbook 12.5(c)(19)").  The CE Form did not address or acknowledge the Washington National plan.

Second, purporting to comply with the NHPA, NPS issued an Assessment of Actions

---

[5] Alan Bastable, *Why is the White House Carting Dirt to a Golf Course? It's a D.C. Mystery*, Golf.com (Oct. 28, 2025), https://perma.cc/ZRB7-AXQX.
[6] Michael Bamberger, *President Trump Could Talk Golf for Hours. Ask His Go-To Course Designer,* Golf.com (Dec. 12, 2025), https://perma.cc/5N63-NFB6.

Having an Effect on Historic Properties. Ex. N. That Assessment provided that the 30,000 cubic yards of dirt would be used for "improvements" to East Potomac Golf Course. Ex. N at 1. It concluded that dumping this refuse on the White Course would have "No Adverse Effect," Ex. N at 3, because (among other reasons) the dumping would not "[a]lter . . . features/elements of a historic setting or environment (inc. terrain);" would not "[a]dd non-historic features/elements (inc. visual . . .) to a historic setting or cultural landscape;" and would not "[b]egin or contribute to deterioration of historic features, terrain, setting, [or] landscape elements." Ex. N at 3-4.

A few days later, Defendants caused delivery of the debris to begin. It was dumped, by the truckful, onto East Potomac's nine-hole White Course.[7]

### 2. Lease Termination and Suspension of Plans to Restore the Reversible Courses

Even after the dumping, implementing the Washington National plan faced a hurdle: East Potomac Golf Course (and Washington D.C.'s other two municipal golf courses) remained under a 50-year lease to the National Links Trust. Ex. M (NLT Lease). Defendants, therefore, set out to strip control of East Potomac from NLT. On October 29, 2025—just days after beginning to dump trucks full of dirt onto East Potomac's White Course—the National Park Service delivered to NLT a notice of default on its lease. On December 31, 2025, in further implementation of the Washington National plan, NPS terminated NLT's lease.[8]

### 3. The New Course Design

In further implementation of the Washington National plan, administration officials met in November 2025 with Tom Fazio, a golf course architect with a long career of designing golf courses in the style favored by President Trump.[9] Among other courses, Fazio co-designed two

---

[7] Bastable, *supra* at n.5.
[8] Morrison, *supra* at n.4.
[9] Morrison, *supra* at n.4.

18-hole courses at Trump National Golf Club in northern Virginia.  Fazio visited the White House during the same trip for a two-hour lunch with President Trump.[10]  Fazio has visited East Potomac Golf Course for the purpose of preparing to design Washington National on top of East Potomac.[11]

More recently, President Trump himself confirmed that Defendants have adopted and begun to implement the Washington National plan.  During a press gaggle aboard Air Force One on January 11, 2026, a reporter asked, "What's your plan for East Potomac? Are you going to renovate the golf course?" Trump responded, "Yeah, we're gonna make it a beautiful, world-class, U.S. Open-caliber course.  Ideally, we're gonna have major tournaments there and everything else. It's going to bring a lot of business into Washington."[12]

These actions – dumping the East Wing dirt onto the White Course, terminating NLT's lease, meeting with a golf course architect regarding the design of the new course, and public statements confirming that East Potomac Golf Course will be changed from its historic 36-hole design into a championship-style professional venue – confirm that Defendants adopted the Washington National plan and took these actions in furtherance of that plan.  But Defendants did not follow the mandatory statutory processes before doing so.

## LEGAL STANDARDS

A plaintiff must make the same four familiar showings to obtain either a stay under 5 U.S.C. § 705 or a preliminary injunction: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Global Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).  Where

---

[10] Bamberger, *supra* at n.6.
[11] Morrison, *supra* at n.4.
[12] Forbes Breaking News, *'It's Going To Bring A Lot Of Business': Trump Teases Renovations for East Potomac Golf Course*, YouTube (Jan. 12, 2026),https://perma.cc/4BUC-F9RY.

the government opposes preliminary relief, the third and fourth factors merge. *Id.* "The same factors governing the issuance of a preliminary injunction govern the issuance of relief under section 705." *District of Columbia v. Trump*, __ F.Supp.3d __ 2025 WL 3240331 (D.D.C. 2025).

A.  Governing Provisions of Law

1.  National Environmental Policy Act

The National Environmental Policy Act (NEPA) has a "dual mission . . . to generate federal attention to environmental concerns and to reveal that federal consideration for public scrutiny." *Minisink Residents for Env. Pres. and Safety v. FERC*, 762 F.3d 97, 112 (D.C. Cir. 2014) (internal quotation marks and citation omitted).  Congress enacted NEPA to require that federal agencies "take a hard look at the environmental consequences before taking a major action." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983) (citation modified).

Specifically, where a proposed action "has a reasonably foreseeable significant effect on the quality of the human environment," 42 U.S.C. § 4336(b)(1), NEPA requires the agency to prepare an "environmental impact statement" (EIS) "address[ing] the significant environmental effects of [the] proposed project and identify[ing] feasible alternatives." *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S. 168, 173 (2025); 42 U.S.C. § 4332. A draft EIS must be published for public review and comment on the proposed action's potential environmental impacts and alternatives.  42 U.S.C. § 4336a(c).  NEPA does not impose substantive restrictions on agency action, but its procedural requirements "inevitably bring pressure to bear on agencies to respond to the needs of environmental quality" and "ensure[] that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (quotation marks and citation omitted).

If the agency does not know whether a proposed action will have significant effects on the environment, or if it concludes the action will not have a reasonably foreseeable significant effect, the agency must prepare an "environmental assessment" (EA) setting forth for public review the basis of the agency's determination that no EIS is necessary.  42 U.S.C.§ 4336(b)(2).

In limited circumstances, an agency may determine that a proposed action falls within a "categorical exclusion[]" and is thus exempt preparing an EA or EIS.  *Id.*  Categorical exclusions are a subset of actions, designated by an agency, which "a bureau has determined normally do not significantly affect the quality of the human environment."  43 C.F.R. § 46.205.  If a proposed action does not meet the criteria for any designated categorical exclusion, then the proposed action must be analyzed in an EA or EIS.  *Id.* § 46.205(a).

Even if the criteria for a categorical exclusion apply to a given action, an agency still must evaluate the action for extraordinary circumstances in which "a normally excluded action may have a significant [] effect."  43 C.F.R. § 46.205(c)(1).  If the Responsible Official determines that an action might meet any of the exceptions delineated by the agency, extraordinary circumstances exist, and the agency must prepare an EA or EIS.  *Id.* § 46.215.

### 2.   National Historic Preservation Act

Like NEPA, the NHPA "is a 'stop, look, and listen' provision" requiring agencies "to take into account the effect of their actions" on historic property.  *Illinois Commerce Comm'n v. ICC*, 848 F.2d 1246, 1261 (D.C. Cir. 1988).  Under the NHPA, 54 U.S.C. § 300101, *et seq.*, "[t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking . . . shall [ ] prior to the approval of the expenditure of any Federal funds on the undertaking . . . take into account the effect of the undertaking on any historic property" and "afford the Council a reasonable opportunity to comment with regard to the undertaking."  *Id.* §

306108.

Advisory Commission on Historic Preservation regulations require agencies to assess whether an action "may" have an "adverse effect" on historic property, including effects on the property's "location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1). Examples of adverse effects include "[p]hysical destruction of or damage to all or part of the property," 36 C.F.R. § 800.5(a)(2)(i); "[a]lteration of a property, including restoration [or] rehabilitation . . . that is not consistent with . . . 36 CFR part 68," 36 C.F.R. § 800.5(2)(ii); and "[c]hange of the character of the property's use or of physical features within the property's setting that contribute to its historic significance." *Id.* § 800.5(a)(2)(iv).

When an adverse effect is found, agencies must consult with the State Historic Preservation Officer, the Advisory Council on Historic Preservation, and other consulting parties to resolve the adverse effect. 54 U.S.C. § 306108; 36 C.F.R. § 800.6. *See City of Phoenix, Ariz. v. Huerta*, 869 F.3d 963, 971 (D.C. Cir. 2017) (agencies "must consult with certain stakeholders in the potentially affected areas"). The agency also must consult with the public, whose "views . . . are essential to informed Federal decisionmaking in the section 106 process." 36 C.F.R. § 800.2(d)(1). Accordingly, before undertaking a project, an agency must generally "provide the public with information about an undertaking and its effects on historic properties and seek public comment and input." *Id.* § 800.2(d)(2). "If any agency determines that no historic structures will be adversely affected, it still has to 'notify all consulting parties' . . . and give them any relevant documentation." *City of Phoenix*, 869 F.3d at 971 (citing 36 C.F.R. § 800.5(c)).

### 3. NPS Organic Act and the Act of 1897

"NPS is also bound by specific statutory mandates that define the Service's mission and impose independent requirements upon the agency." *Greater Yellowstone Coal. v. Kempthorne*,

577 F. Supp. 2d 183, 189–90 (D.D.C. 2008). NPS's paramount duty is to "promote and regulate the use of the National Park System by means and measures that . . . conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a).

"[T]he Park Service has further bound its own discretion [in implementing the Organic Act mandates] through the adoption of Management Policies." *Davis v. Latschar*, 202 F.3d 359, 366 (D.C. Cir. 2000). The Management Policies emphasize NPS's distinct (i) conservation, and (ii) non-impairment mandates. *See Nat'l Parks Conservation Ass'n v. United States Dep't of the Interior*, No. CV 20-3706 (RC), 2024 WL 1344450, at *15 (D.D.C. Mar. 29, 2024). The first mandate, which is "to conserve park resources and values," is the "fundamental purpose of the national park system." Ex. J, Management Policies § 1.4.3. The non-impairment mandate requires NPS to prohibit activities that impair park "resources and values." *Id.* at § 1.4.4.

Congress reaffirmed in 1978 that the "promotion and regulation of the various System units shall be consistent with and founded in the purpose established by subsection (a), to the common benefit of all the people of the United States." 54 U.S.C. § 100101(b)(2). This amendment directs that the administration of park units "shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress." *Id.* Courts recognize these mandates as enforceable standards. *Greater Yellowstone Coalition v. Kempthorne*, 577 F. Supp. 2d 183, 194 (D.D.C. 2008).

NPS's Management Policies are specific as to what constitutes impairment. An impact on park resources or value is "more likely to constitute impairment" if the resource of value is "key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park," or is

"identified in the park's general management plan or other relevant NPS planning documents as being of significance." Ex. J at 11 (Management Policies § 1.4.5).

The Management Policies set a strict procedural requirement for such determinations:

Before approving a proposed action that could lead to an impairment of park resources and values, an NPS decision-maker must consider the impacts of the proposed action and *determine, in writing, that the activity will not lead to an impairment of park resources and values. Id.* § 1.4.7 (emphasis added).

This determination requires, among other things, consideration of "any environmental assessments or environmental impact statements required by [NEPA]," "consultations required under section 106 of the [NHPA]" and "the results of civic engagement and public involvement activities relating to the decision." Management Policies § 1.4.7.

NPS has further interpreted the Organic Act to prohibit uses which cause "unacceptable impacts," defining these as "impacts that, individually or cumulatively, would:

Be inconsistent with a park's purposes or values, or impede the attainment of a park's desired future conditions for natural and cultural resources as identified through the park's planning process, or create an unsafe or unhealthful environment for visitors or employees, or diminish opportunities for current or future generations to enjoy, learn about, or be inspired by park resources or values, or unreasonably interfere with park programs or activities, or an appropriate use, or the atmosphere of peace and tranquility, or the natural soundscape maintained in wilderness and natural, historic, or commemorative locations within the park.

Management Policies § 1.4.7.1.

NPS is explicit that "[p]ark purposes are found in the general laws pertaining to the national park system, as well as the enabling legislation or proclamation establishing each unit. In the administration of mandated uses [including those directed in park enabling legislation], park managers must allow the use[.]" Management Policies § 1.4.3.1. In its own words, the agency's obligations under the Organic Act must be interpreted in light of the 1897 Act's specific mandate that East Potomac Park be "forever held" for public pleasure. 29 Stat. 624.

4.   Administrative Procedure Act

NEPA and the NHPA are enforceable through the Administrative Procedure Act ("APA"),
under which a court must set aside final agency action that was taken "without observance of
procedure required by law," 5 U.S.C. § 706(2)(D), "in excess of statutory jurisdiction, authority,
or limitations, or short of statutory right," *id.* § 706(2)(C), or "arbitrary, capricious, an abuse of
discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).  "On such conditions as
may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . .
may issue all necessary and appropriate process . . . to preserve status or rights pending conclusion
of the review proceedings. *Id.* § 705.

An "agency action is 'not in accordance with law' if it violates some extant federal statute
or regulation." *Ovintiv v. Haaland*, 665 F.Supp.3d 59, 72 (D.D.C. 2023).  An agency acts
arbitrarily or capriciously if it "has relied on factors which Congress has not intended it to consider,
entirely failed to consider an important aspect of the problem, offered an explanation for its
decision that runs counter to the evidence before the agency, or is so implausible that it could not
be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n
v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**ARGUMENT FOR 5 U.S.C. § 705
OR PRELIMINARY INJUNCTION**

A.  Plaintiffs are Likely to Succeed on the Merits

a.  The Plaintiffs Have Standing

Plaintiffs are two individual golfers and a historic preservation membership nonprofit
organization.  Plaintiffs Dave Roberts and Alex Dickson have recreational, aesthetic, historical,
and communal interests in East Potomac Park and East Potomac Golf Course that are injured by
both Defendants' decision to implement the Washington National plan and by dumping

16

construction debris on the White Course.  Plaintiff DC Preservation League has associational standing to sue on behalf of its members, who likewise have particularized recreational, aesthetic, historic, and communal interests in East Potomac Park and East Potomac Golf Course that are injured by Defendants' actions.  Furthermore, Plaintiff DC Preservation League has organizational standing because Defendants' actions impede opportunities to solicit donations and memberships and require diversion of its resources.  All Plaintiffs have been denied their procedural rights to protect concrete interests through the procedural rights afforded them by NEPA and the NHPA.

To establish standing, a plaintiff must show an injury in fact that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical;" a "causal connection between the injury and the conduct complained of;" and that the injury likely will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  "It is well established that environmental plaintiffs adequately allege standing 'when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.'" *Ctr. for Biological Diversity v. DOI*, 144 F.4th 296, 305 (D.C. Cir. 2025) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 183 (2000)); *see also Calif. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1049 (D.C. Cir. 2019) (finding standing because reasonable fear of harm from hazardous waste pollution caused petitioners reduced enjoyment of the outdoors).  A plaintiff also adequately alleges standing for a procedural-rights claim by showing that the defendant's actions omitted a procedural requirement and that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest.  *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 664-65 (D.C. Cir. 1996).  Those standards are met here.

1. Plaintiffs Have Suffered and Will Continue Suffering Concrete, Particularized Injuries.

The dumping of debris and implementation of the Washington National plan have already injured, or will imminently injure, every Plaintiff in concrete and particularized ways. Where a plaintiff asserts a procedural violation such as an agency's failure to comply with NEPA or the NHPA, they must show "the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *Fla. Audubon Soc.*, 94 F.3d at 664 (regarding NEPA). "Aesthetic and recreational injuries" are actionable injuries in suits alleging NEPA violations. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013). Interfering with visitors' "appreciati[on]" of a site's "history" also supports standing. *Sierra Club v. Jewell*, 764 F.3d 1, 5 (D.C. Cir. 2014) (plaintiffs "who observe it for purposes of . . . appreciating its history[ ] would suffer a concrete and particularized injury"). So does interference with a person's emotional attachment to a social interaction, so long as the plaintiff actually intends to engage in such actions. *See Am. Society for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 337 (D.C. Cir. 2003) ("emotional attachment" to an elephant that plaintiff "would like to 'visit' again" "takes his claim out of the category of a generalized interest in ensuring the enforcement of the law"). All three Plaintiffs have such interests. Specifically:

a. <u>DC Preservation League</u>

Plaintiff DC Preservation League's membership includes individuals who have suffered and will continue to suffer particularized injuries, and DC Preservation League has associational standing to assert claims on their behalf. An organization has associational standing if (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

First, DC Preservation League includes members with particularized interests that are harmed by Defendants' actions; its mission of "preserving the historic and cultural resources of the District of Columbia" and "advocat[ing] for the protection, enhancement, and celebration of Washington's built environment" is germane to its members' interests, Miller Decl. ¶¶ 4--5; and its members' individual participation is not necessary. *Un. Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546 (1996) ("'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members" (quoting *Hunt*, 432 U.S. at 343)). "Several" of its members "often visit East Potomac Park to go walking. They enjoy walking there, and they have plan[s] to continue doing so." Miller Decl. ¶ 20. Because of East Potomac Park's flat land, "East Potomac's landscape [is] particularly important to our members." *Id.* Furthermore, "[s]everal" of DC Preservation League's members "regularly play golf at East Potomac Golf Course and plan to continue doing so." Miller Decl. ¶ 21. "A number of those members specifically enjoy East Potomac Golf Course's history, architecture, landscape, and recreational opportunities while playing golf at East Potomac Golf Course." *Id.* DC Preservation League's executive director, Rebecca Miller – who herself is a member – "plan[s] to take" her son bicycling at East Potomac Park. Miller Decl. ¶ 22. Miller enjoys taking him there "because it is flat and easy to teach a kid how to ride a bike." *Id.* She also "enjoy[s] looking at the Japanese cherry trees and the landscape as a whole at East Potomac Park and East Potomac Golf Course," and she "plan[s] to continue visiting East Potomac Park to look at" the trees. *Id.* Second, the League's mission of "preserving the historic and cultural resources of the District of Columbia" and "advocat[ing] for the protection, enhancement, and celebration of Washington's built environment" is germane to its members' interests. Miller Decl. ¶¶ 4-5. Third, its members' individual participation is not necessary because the League seeks injunctive

relief.  *Un. Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546 (1996).

DC Preservation League also has suffered and will continue suffering particularized injuries as an organization.  *See Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (plaintiff seeking organizational standing "must show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision").  For instance, the League hosts a historic sites app with 67 different self-guided tours, including thematic tours such as a recreation-themed tour.  Miller Decl. ¶ 6.  East Potomac Golf Course is part of that tour.  Miller Decl. ¶ 7.  If East Potomac Golf Course or East Potomac Park were altered significantly, the League "would have to change [its] app and website to remove the listings."  Miller Decl. ¶ 8.  The League also has plans to host an on-site program at East Potomac Golf Course later this year, Miller Decl. ¶ 9, in fulfillment of the organization's mission to educate the public about Washington's architectural and cultural heritage.  Miller Decl. ¶ 5.  DC Preservation League would have accepted donations at the East Potomac program; such donations typically bring in about $15,000-$20,000 per year for the organization.  Miller Decl. ¶ 11.  If East Potomac is altered significantly, the organization would lose this opportunity to solicit donations and change its plans for the on-site program. Miller Decl. ¶ 11.

Furthermore, DC Preservation League has suffered injury to its procedural rights.  NEPA and the NHPA, 42 U.S.C. § 4336a(c), 42 U.S.C. § 4336(b)(2), 36 C.F.R. § 800.1, *et seq.*, each accord Plaintiffs the right to receive information about proposed projects and to provide comments on them in order to protect their interests in continued recreational use and aesthetic enjoyment of East Potomac Park, and specifically the East Potomac Golf Course.  *See Lujan*, 497 U.S. 871, 886 (1990) (recognizing such interests as among the sorts of interests NEPA protects); *Lemon v. Geren*,

514 F.3d 1312, 1315 (D.C. Cir. 2008) (finding NHPA meant to protects one's interest in ability to visit and enjoy a historic site). DC Preservation League "participates frequently in the comment process for reviews of undertakings under Section 106 of the National Historic Preservation Act." Miller Decl. ¶ 14. "Based on past experience," Miller "expect[s] that DC Preservation League would have been a consulting party on any NHPA Section 106 review for an undertaking at East Potomac Golf Course." Miller Decl. ¶ 16. "If a Section 106 review had been conducted for changes to East Potomac, DC Preservation League would have offered feedback on the preservation of East Potomac Golf Course's historic character and public access." Miller Decl. ¶ 17. If Defendants had afforded this procedural right to the League and its members, then Defendants could have taken into account the effect of the dumping and the Washington National plan on their interests and taken steps to "ameliorate[] what plaintiffs see as damage to an historic site they visit and enjoy. *Lemon*, 514 F.3d at 1315.

### b. Individual Plaintiffs

Plaintiff Dave Roberts plays golf at East Potomac "frequently." Roberts Decl. ¶ 2. He enjoys recreational and aesthetic benefits from East Potomac Golf Course. *See, e.g.*, Roberts Decl. ¶ 13 ("For the past five years, the greens at East Potomac have been in impeccable shape. For public golfers like me, that's the biggest thing that you want: an opportunity to have putts that roll true."); Roberts Decl. ¶ 14 ("I didn't realize it until NLT took over the course, but before they came along at East Potomac, there was almost no connection between the golf course and the surrounding area. . . . [E]ven though the Potomac River is right there, you couldn't see it. Now, it's omnipresent. . . . It's all added up to make East Potomac a great golf experience."). He enjoys a sense of community. Roberts Decl. ¶ 15 ("You don't just play and go home. It's more communal than that."). Roberts plans to continue going to East Potomac Golf Course. Roberts Decl. ¶ 25 ("I

plan to keep playing golf at East Potomac just as frequently as I do now. But if the golf course is turned into something different, then my interest in East Potomac's recreational value and aesthetic value would be injured, and I would go far less, if at all."). Implementing the Washington National plan will injure Roberts' interests. Roberts Decl. ¶ 21 ("If it happens, then I don't think I'd ever go back. It wouldn't be the same. It will have cost me a golf course that I think is a lot of fun to play. It wouldn't look the same to me. It wouldn't feel historically important to me anymore."). The debris has already harmed Roberts's enjoyment and aesthetic interests. Roberts Decl. ¶ 24. Roberts wants East Potomac's current designs to stay in place, so that he can continue playing them that way. Roberts Decl. ¶ 27. Defendants' implementation of the Washington National plan already has injured Roberts by forcing him to abandon summer plans for his son. Roberts Decl. ¶ 23.

Plaintiff Alex Dickson considers East Potomac his "home course," Dickson Decl. ¶ 5; visits East Potomac "at least a few times a month, often more," Dickson Decl. ¶ 6; and "plan[s] to keep playing East Potomac as often as [he] currently do[es]." Dickson Decl. ¶ 21. Dickson also plans to take his youngest son to East Potomac to start playing golf, "because the way it is now is perfect for teaching a kid how to play golf." Dickson Decl. at ¶ 14. Dickson is worried about the effects of inhaling particles from the potentially hazardous debris at the White Course, though. "I am also concerned about the large mounds of debris I have seen sitting on the course. I worry about what I, my family, and my friends are being exposed to while we play. Being near this debris for hours raises real questions about whether it is safe to be that close to that material." Dickson Decl. ¶ 22. *Calif. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1049 (D.C. Cir. 2019) (standing where reasonable fear of harm from pollution caused petitioners reduced enjoyment).

Dickson describes East Potomac Golf Course and the park as a whole as "beautiful."

Dickson Decl. ¶ 6.  Dickson likes East Potomac Golf Course's "historical importance."  Dickson Decl. ¶¶ 12, 13.  "To me," Dickson says, "East Potomac is one of the most beautiful places in Washington, due to the inherent appearance of the park and golf courses, which the work of the National Links Trust has only improved.  Turning it into a championship-style course built to attract a major professional tournament would ruin that beauty."  Dickson Decl. ¶18.  Likewise, "[i]f East Potomac is converted into what the President has described, the beauty, fun, history, accessibility, and the sense of community that bring [him] and others to the course will be lost." Dickson Decl. ¶19.  *See also* Dickson Decl. ¶14 ("[T]urning this into a single championship course means losing two public courses that I and other people can actually play.").

Implementing the Washington National plan would injure all these interests by irreversibly displacing the source of all three Plaintiffs' interests.

2.  Plaintiffs' Injuries are Directly Traceable to Defendants' Failure to Comply with NEPA, NHPA, and the NPS Organic Act

For a plaintiff to show a "causal connection" between their injury and a defendant's conduct, their injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Lujan*, 504 U.S. at 560 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)); *Fla. Audubon Soc.*, 94 F.3d at 665.  Where, as here, a plaintiff's procedural rights are at stake, "an adequate causal chain must contain at least two links: one connecting the omitted [procedural obligation] to some substantive government decision that may have been wrongly decided because of the lack of [procedural compliance] and one connecting that substantive decision to the plaintiff's particularized injury."  *Id.* at 668 (failure to generate EIS in a NEPA case).  In this case, the causal chain is easily established.  Despite not complying with either NEPA or NHPA, Defendants adopted and have begun to implement the Washington National plan, as evidenced and furthered

23

by their dumping of debris from the East Wing demolition and their termination of NLT's lease, as well as public statements confirming the plan to construct a new championship-style golf course. Without performing the rigorous reviews that NEPA and the NHPA require, Defendants wrongly decided to move forward with that decision despite the significant harms their actions will inflict on the human environment and East Potomac Park's historic character.    Likewise, the implementation of the Washington National plan is injuring the Plaintiffs' interests in East Potomac Golf Course by impairing the parkland, in violation of the NPS Organic Act's conservation and non-impairment mandates and East Potomac Park's enabling statute.

3.    A Favorable Ruling Will Redress Plaintiffs' Injuries

A ruling that Defendants' implementation violates the NPS Organic Act would prevent the Washington National plan from going forward, thereby preventing injury to Plaintiffs' interests. A ruling in their favor on the NEPA or NHPA claims would require Defendants to stop further implementation of the Washington National plan and further debris dumping on East Potomac Golf Course until they evaluate their environmental impacts, taken account of their historic effects, and considered reasonable alternatives – including not moving forward at all.    *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013) ("if [agency] is required to adequately consider each environmental concern, it could change its mind about" its decision); *see also Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005) ("To show causation and redressability in their procedural-rights case, [plaintiffs] need not demonstrate that, but for the procedural defect, the final outcome . . . would have been different.").

B.    Defendants' Dumping of East Wing Debris and their Adoption and Implementation of the Washington National Plan are Final Agency Actions

APA review is available when plaintiffs have been "'adversely affected or aggrieved . . . by some final agency action." *Fla. Audubon Soc.* (quoting *Lujan*, 497 U.S. at 882-83).  For agency

action to be "final" under the APA, the action must (1) "mark the 'consummation' of the agency's decisionmaking process," and (2) "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997). In APA challenges for failure to satisfy NEPA requirements, the "major Federal action[ ] significantly affecting the quality of the human environment" is the final agency action. *Karst Env. Educ. and Prot., Inc. v. EPA*, 475 F.3d 1291, 1296 (D.C. Cir. 2007) ("just as the 'final agency action' in a NEPA claim must be a 'major federal action,' the 'final agency action' in an NHPA claim must be a 'federal undertaking'"). As the D.C. Circuit has recognized, the threshold analysis of the availability of an APA claim thus "tends to merge . . . with the merits of a plaintiff's NEPA claim." *Foundation on Economic Trends v. Lyng*, 943 F.2d 79, 85 (D.C. Cir. 1991). "Similar federal involvement is required . . . under the NHPA" for an APA claim to ripen – i.e., upon the undertaking itself. *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 197 n.7 (D.C. Cir. 2003).

Here, Defendants have taken two major Federal actions: (1) adoption and implementation of the Washington National plan, and (2) dumping large volumes of untested foreign debris from the demolition of the White House's East Wing onto East Potomac Golf Course, as a component of the Washington National plan. As evidenced by the fact that Defendants have already begun implementing the plan, each of these actions satisfy both *Bennett* prongs: Defendants arrived at a final decision to adopt the plan and dump debris from the East Wing, and legal consequences flowed from that decision (including Defendants' authorizing the transport of debris from the East Wing and terminating the NLT lease). Moreover, as discussed below, each action constituted a "major Federal action" to which Defendants' NEPA obligations attached and an "undertaking" triggering Defendants' NHPA obligations. Defendants' failure to satisfy those obligations is thus

reviewable under the APA.  *Karst*, 475 F.3d at 1296; *see also Mineta*, 333 F.3d at 197 n.7.

4. Defendants' Adoption and Implementation of the Washington National Plan and the Dumping of Debris are Major Federal Actions Under NEPA

NEPA requires federal to include in all proposals for "major Federal actions significantly affecting the quality of the human environment, a detailed [environmental impact] statement [EIS] by the responsible official." *Earthworks v. Dep't of the Interior*, 105 F.4th 449, 458 (D.C. Cir. 2024) (quoting 42 U.S.C. § 4332(2)(C)).  There "is no litmus test for whether something qualifies as major federal action," *Indian River C'nty v. Rogoff*, 201 F. Supp. 3d 1, 15 (D.D.C. 2016), but the term broadly "includes actions with effects that may be major and which are potentially subject to Federal control and responsibility." *Sierra Club v. Dep't of Agriculture*, 777 F.Supp.2d 44, 57 (D.D.C. 2011) (internal quotation and citations omitted).[13]  *See also Comm. for Auto. Resp. v. Solomon*, 603 F.2d 992, 1002-03 (D.C. Cir. 1979) (NEPA review "normally is triggered when there is a proposal to change the status quo").

Ordinary statutory interpretation leaves no doubt that both Defendants' implementation of the Washington National plan and the debris dumping are major Federal actions.  "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Gross v. FBL Financial Services, Inc.*, 557 U.S.167, 175 (2009) (internal quotation marks omitted).  "Major" means "notable or conspicuous in effect or scope." *Major*, Merriam-Webster Online.  The overhaul of a registered and protected historic site, in an environmentally significant location, fully abrogating decades of cultural, historic, and environmental protection and introducing

---

[13] NEPA's statutory definition, 42 U.S.C. § 4336e, exclusively concerns whether an action is "Federal." *See Friends of the Everglades, Inc. v. Sec. of U.S. Dep't of Homeland Security*, No. 25-12873, 2025 WL 2598567 (11th Cir. Sept. 4, 2025) ("Congress amended § 4336e to clarify 'the amount of federal involvement necessary to trigger the applicability of NEPA.'") (quoting *United States v. S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994)).

environmental risk, cannot fairly be considered anything but notable and conspicuous in both effect and scope.  The same is true of the debris dumping: it is conspicuous and accordingly has been the subject of widespread media coverage.[14]  And the definition of action: "a thing done;" or "the accomplishment of a thing usually over a period of time" squarely describes both the decision to abandon decades of consistent management of East Potomac and the steps already taken in furtherance of doing so, including the action of dumping 30,000 cubic yards of debris on the Golf Course from the destruction of the East Wing.  *Action*, Merriam-Webster Online.

This common-sense reading of the statute's plain language aligns with prior caselaw determining whether challenged activities constituted major federal actions under NEPA.  *See, e.g, Idaho Conservation League v. Bonneville Power Admin.*, 826 F.3d 1173, 1175 (9th Cir. 2016) ("A federal action that may have significant environmental impacts need not 'also be "major" in an economic or some other nonenvironmental sense to trigger the EIS requirement.") (quoting *City of Davis v. Coleman*, 521 F.2d 661, 673 n.15 (9th Cir. 1975)); *see also City and Cnty. of San Francisco v. U.S.*, 615 F.2d 498, 500 (1980) ("An EIS must be prepared if 'substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor.") (quoting *Davis*, 521 F.2d at 673) (internal quotation marks and citation omitted).  The existing body of caselaw—which has overwhelmingly concerned whether challenged actions are sufficiently federal in nature, *see, e.g.*, *Macht v. Skinner*, 916 F.2d 13 (D.C. Cir. 1990)—generally relied on regulations issued by the Council on Environmental Quality, which provided definitions guiding NEPA eligibility determinations.  The CEQ recently rescinded those regulations by way of an interim final rule. *Removal of National Environmental Policy Act Implementing Regulations*, 90 Fed. Reg. 10610 (Feb. 25, 2025); 91 Fed. Reg. 618 (Jan. 8, 2026)

---

[14] *See, e.g.*, Bastable, *supra* at n.5; *see also* Shawn McCreesh, *Why is Trump Dumping East Wing Rubble in a Public Park?,* N.Y. Times (Feb. 19, 2026), https://archive.ph/mGfYb.

(Final Rule). The Department of the Interior followed suit on July 3, 2025, mostly rescinding its own regulations implementing NEPA, but leaving in place its *Handbook of National Environmental Policy Act Implementing Procedures* Ex. O, Handbook. *National Environmental Policy Act Implementing Regulations*, 90 Fed. Reg. 29498 (Jul. 3, 2025). The Handbook provides that "the terms 'major' and 'Federal action' each have independent force," Handbook at 2, but does not provide any guidance on the meaning of "major" or "action." Plaintiffs are not aware of any court to have considered the meaning of "major federal action" since the rescission took effect.

Despite rescinding its NEPA regulations, CEQ has not taken the position (nor has any court) that the regulations did not fairly interpret NEPA. To the contrary, on February 19, 2025, CEQ Chief of Staff Katherine R. Scarlett circulated a memorandum to federal agencies in which she advised: "[A]lthough CEQ is rescinding its NEPA implementing regulations at 40 C.F.R. parts 1500-1508, agencies should consider voluntarily relying on those regulations in completing ongoing NEPA reviews or defending against challenges to reviews completed while those regulations were in effect." Council on Environmental Quality, *Implementation of the National Environmental Policy Act*, Feb. 19, 2025. In the absence of those regulations, and in the wake of the Supreme Court's decision in *Loper Bright Enters. v. Raimondo*, it falls to the Court to "say what the law is." 603 U.S. 369, 385 (2024) (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)). Nevertheless, the rescinded regulations, which first took effect in 1979, *see* 43 Fed. Reg. 55,978 (Nov. 29, 1978), are instructive as to a reasonable interpretation of NEPA, as "the longstanding practice of the government—like any other interpretive aid—can inform [a court's] determination of what the law is." *Id.* (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014)) (internal quotation marks and citations omitted). Those regulations, like ordinary principles of statutory interpretation, would have left no doubt that the adoption and implementation of the

Washington National plan and the dirt dumping are each major Federal actions.

Under the CEQ regulations, "actions" under NEPA included the "[a]doption of programs, such as a group of concerted actions to implement a specific policy or plan," and "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area." 40 C.F.R. 1508.18(b)(3), (4). Defendants' dumping of presumably contaminated dirt to be used as fill and the termination of NLT's lease are concerted actions implementing the Washington National plan that was confirmed by President Trump. And those actions also make clear that Defendants adopted the Washington National plan—itself an "action" under NEPA.

These actions would plainly have qualified as "major" under CEQ regulations: "[m]ajor reinforces but does not have a meaning independent of significantly," 40 C.F.R. 1508.18, and "[s]ignificantly as used in NEPA requires considerations of both context and intensity." 40 C.F.R. 1508.27 (internal quotation marks omitted). "[T]he significance of an action must be analyzed in several contexts such as . . . the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale." 40 C.F.R. 1508.27(a). And "[t]he following should be considered in evaluating intensity: . . . [u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, . . . [t]he degree to which the effects on the quality of the human environment are likely to be highly controversial . . . [t]he degree to which the action may adversely affect . . . sites . . . listed in . . . the National Register of Historic Places." 40 C.F.R. 1508.27(b). There is little question that implementing the Washington National plan, in light of both context and intensity, is major: it will fundamentally alter the footprint of East Potomac Golf Course and all of East Potomac Park, introducing substantial environmental risk. The dirt dumping already has done so: it has changed the appearance of the golf course, Roberts

Decl. ¶ 24, and has introduced into a sensitive ecosystem materials that, as explained *infra*, are legally presumed to contain asbestos. 29 C.F.R. § 1910.1001(b).

And both the Washington National plan and the dirt dumping are Federal: they were proposed by a federal official (Burgum) to a federal official (the president), adopted by Defendants, and implemented by Defendants, including by dumping debris from a federal construction project, terminating a federal lease, confirming plans to construct a new golf course on federal land.[15]

> 5. <u>Defendants' Adoption and Implementation of the Washington National Plan and Dumping of Debris are Undertakings Affecting Historic Property Under the NHPA</u>

Section 106 of NHPA requires that federal agencies "take into account the effect . . . on any historic property" prior to "any undertaking." 54 U.S.C. § 306108. An "undertaking" is a "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . those carried out with Federal financial assistance; and those requiring a Federal permit, license, or approval." 54 U.S.C. § 300320. Any site listed on the National Register of Historic Places is a "historic property." 54 U.S.C. § 300308.

The Washington National plan and East Wing debris dumping fit cleanly within NHPA's definition of "undertaking." Both have been carried out under the jurisdiction and with the approval of Defendants Interior and NPS, which directed fleets of dump trucks to deposit 30,000 cubic yards of material from the demolition of the East Wing—which is also under the jurisdiction of NPS—and was necessarily supported at least in part with federal financial assistance. Equally clear is that East Potomac Park, East Potomac Golf Course, the miniature golf course, and the Field House are "historic property": East Potomac Park District is listed on the National Register, with East Potomac Golf Course, the miniature golf course, and the Field House all listed as contributing

---

[15] YouTube, Forbes Breaking News, https://www.youtube.com/watch?v=HimZCincvMI (last visited Feb. 15, 2026).

features. 54 U.S.C. § 300308 ("historic property" defined as "any . . . historic district, building, structure, or object included on, or eligible for inclusion on, the National Register, including artifacts, records, and material remains relating to the district, site, building, structure, or object").

    C.   <u>Defendants' Adoption and Implementation of the Washington National Plan and Dumping of Debris were Contrary to Law and Taken Without Complying with NEPA</u>

The Washington National plan and debris dumping will have "reasonably foreseeable significant effect[s] on the quality of the human environment." 42 U.S.C. § 4335(b)(1). Converting East Potomac to the sort of course the President described—a course suitable for hosting the U.S. Open and other major professional tournaments—is no small task. At a minimum, it will entail moving several hundred thousand cubic yards of soil, if not more. By comparison, at Shadow Creek Golf Course in Nevada, which was designed by Mr. Fazio and built on a flat site like East Potomac, Mr. Fazio moved at least three million cubic yards of soil – enough to bury the entire National Mall under six feet of dirt. Ex. K (Story of Shadow Creek article in USGA Green Section Record). Implementing the Washington National plan also will result in the destruction of culturally significant and historically protected golf courses, removal (and likely death) of an unknowable number of trees, and enormous terrain modification at unrecognizable odds with the current landscape. Given the Park's precarious condition, these changes will present substantial risk of flooding or erosion. And integrating the East Wing debris (both on its own, and as part of the Washington National Plan) and its unknown contents into the soil also will likely cause pollutants to leach into the Park's high water table.[16]

The D.C. Circuit has repeatedly found that NEPA's concern for "the quality of the human environment" extends to more than just textbook pollution. Meaningful changes to landscapes,

---

[16] Andrew Streitz and Byron Adams, *Best Management Practices And Data Needs For Groundwater Protection*, Minn. Pollution Control Agency (April 2019) , https://perma.cc/8TJG-5A2F (explaining risk of groundwater pollution from surface dumping of construction debris).

particularly on federal lands, affect the quality of the human environment.  *See Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C. Cir. 1983) ("decision to allow surface disturbing activities" within national forest "is the point at which the environmental impacts of such activities must be evaluated").  Dumping 30,000 cubic yards of debris onto an operating golf course, and then constructing a golf course, with the significant earth-moving and disturbance of the natural landscape, vistas, and wildlife attendant thereto, are nothing if not decisions to allow surface disturbing activities; the fact that the Washington National plan will use fill proves the point.

East Potomac Park sits on a fragile landscape.  As reclaimed land, it is continually being eroded into the Potomac and Anacostia Rivers and the Washington Channel.  As a narrow island, its already high water table is particularly susceptible to fluctuation from tides and water levels.[17] Modifying the terrain and tree coverage, or introducing new artificial water features, could aggravate existing erosion and flooding risks. Defendants' plan also will dramatically change East Potomac Golf Course's landscape, aesthetic value, communal value, and historic value – all to the detriment of Plaintiffs and the very people whom Congress intended the park to benefit.

Indeed, converting East Potomac to the sort of course contemplated by the Washington National plan already has (via the dirt dumping) exposed golfers, plants, soil, and animals to foreign and potentially toxic materials.  Using dirt and debris from the East Wing's demolition has introduced foreign organic and inorganic materials into the land, likely with heavy metals and other toxins leaching into the soil and groundwater.  If the debris contains asbestos and heavy metals as expected, it has already and continues to alter the chemistry of the soil and water, harm

---

[17] Ex. P (Monumental Core Framework Plan – Enhance the Waterfront Experience) at 48 ("As reclaimed land, East Potomac Park is slowly sinking and its seawalls are crumbling.  A 1950s hydrology study found that the island had sunk three and a half feet since it was first created.  Today, high tides and flooding frequently submerge the seawalls, and approximately 80 percent of the park lies within the 100-year floodplain; future sea-level rise would further threaten the park, altering its configuration and ultimate use.").

the ecosystems of both the Park and the Potomac River, and pose active risks to human health. In addition to significantly affecting the quality of the human environment, these changes will contribute to flooding and erosion risk which pose a potentially devastating risk to the quality— and indeed, the continued availability of—the human environment of East Potomac.

Because the Washington National plan and dumping of debris will have "reasonably foreseeable significant effect[s] on the quality of the human environment" Defendants were required to prepare and issue an EIS, 42 U.S.C. § 4336(b)(1), and allow for public comment on it, *id.* § 4336a(c). And even if the dirt dumping and Washington National plan would not have reasonably foreseeable significant effects on the quality of the human environment — or if the significance of their impacts was not known — Defendants were required to prepare an EA, which is statutorily required to be a "public document." 42 U.S.C. § 4336(b)(2). In other words, no matter what effects the Washington National plan and the dumping of dirt and debris from the East Wing will have on the human environment, Defendants were required to undertake *some* public process—whether it be an EIS or an EA. There is no evidence that Interior or NPS (or any other federal agency) did so.

Defendants' failure cannot be excused on the ground that the dirt dumping or the implementation of the Washington National plan fall within any of Interior's enumerated exceptions from mandatory EIS or EA processes. The categorical exclusions available to Interior concern certain types of legislative proposals; data collection; educational activities; changes to internal Department finances, personnel, organization, and operations; and adoptions of broad environmental policies requiring individualized processes for specific implementations. *See* 43 C.F.R. 46.210. None applies here.

Defendants' only attempt to feign compliance with NEPA is memorialized in the

*Categorial Exclusion Documentation Form* ("CE Form") executed by NPS on October 16, 2025. Ex. H.  The CE Form did not address the full Washington National plan; it addressed only the dumping.  The CE Form therefore did not fulfill Defendants' NEPA obligations with respect to the plan.  As to the dumping, the CE form was also inadequate.  It determined only that the dumping was excluded from NEPA because, in its view, the dumping amounted to "[l]andscaping and landscape maintenance in previously disturbed or developed areas."  *See* Ex. H at 1.  This is facially absurd.  Dumping 30,000 cubic yards of potentially contaminated building materials and dirt is not "landscaping."  Defendants thus failed to observe the "procedure required by law."  5 U.S.C. § 706(2)(D).

Defendants' analysis in the CE Form was also arbitrary and capricious.  5 U.S.C. § 706(2)(A).  "Reliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking."  *Missouri Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1075 (D.C. Cir. 2003).  An agency action is also arbitrary and capricious where it "rests upon a factual premise that is unsupported by substantial evidence," *Genuine Parts Co. v. EPA*, 890 F.3d 304, 346 (D.C. Cir. 2018).  Here, Defendants' conclusion that dumping East Wing debris and incorporating it into the course could be excused as "routine landscaping and maintenance actions" relied on a series of false premises and unsupported assumptions.  Ex. H at 1.

First, the CE Form erroneously stated that the materials dumped onto the golf course would be "clean fill"—soil "tested and verified as clean prior to placement, eliminating the risk of introducing contaminants."  Ex. H at 1.  Photographs and first-hand accounts squarely contradict that representation.  Photographs show wires, rebar, and other inorganic materials from the East Wing.[18]  The East Wing was constructed in 1902 and renovated in 1942.  Under regulations

---

[18] McCreesh, *supra* at n.14.

promulgated by the Occupational Safety and Health Administration (OSHA), insulation and surfacing material found in buildings constructed prior to 1981 are presumed to contain asbestos. *See* 29 C.F.R. § 1910.1001(b) (2026).  Yet the White House reportedly did not obtain an asbestos identification and removal permit from the District of Columbia prior to razing the East Wing.[19] According to media reports, the company responsible for East Wing demolition work did not have an asbestos abatement license in the District of Columbia.[20]  Even Treasury Secretary Scott Bessent has acknowledged that "maybe parts of the East Wing could have been asbestos."[21]  Those toxic pollutants may now be leaching into the soil and groundwater at East Potomac—a possibility that the CE Form "entirely failed to consider."  *State Farm*, 463 U.S. at 43.[22]

Further, Defendants relied on the flawed assumption that the dumping and incorporation of East Wing construction materials would be "temporary, limited in scope, and easily reversible," CE Form 2, as well as "analogous to ongoing maintenance performed routinely by the golf course operator," Ex. H at 1.  Each of these foundational premises was mistaken.  The incorporation of 30,000 cubic yards dirt and debris into a golf course for "contour correction" and "infill," CE Form 1, is neither "temporary" nor "easily reversible," Ex. H at 2.  Instead, removing fill materials that have been incorporated into the terrain requires heavy machinery and major subsurface disturbance.  And reversing the effects by purifying the soil and groundwater of toxins, pollutants, and foreign substances is even more arduous—if not outright impossible.

NPS also erred in asserting that although the dumping would take place within a

---

[19] Ellie Borst, Heather Richards, *White House dodged East Wing asbestos permits*, E&E News by Politico, (Dec. 01, 2025), https://perma.cc/Y3SR-6C23.

[20] *Id.*

[21] Meet the Press, *'This is moving at warp speed': Scott Bessent defends East Wing demolition*, NBC News (Oct. 26, 2025), https://perma.cc/N4CJ-WGY3.

[22] In January, the Asbestos Disease Awareness Organization sued to compel disclosure of documents relating to the release and removal of asbestos during East Wing demolition.  *See* Complaint, *Asbestos Disease Awareness Ass'n. v. NPS*, No. 1:26-cv-00029 (D.D.C. Jan. 7, 2026), ECF No. 1.

"contributing resource of the East Potomac Historic District," it was insignificant to any historic property because it was "within areas that have already been extensively modified"—i.e., "mowed" and "landscaped." Ex. H at 3. According to the CE Form, the fact that the landscape had been altered from its natural state (apparently, as it existed before the river dredging), meant that any further changes would not have ramifications the Park's historical significance. But the golf course is itself, as a Contributing Site, among the reasons that East Potomac is a Historic District. Ex. B at Section 7, Page 56. And that golf course had not been "extensively modified" at the time the CE Form was published. Contrary to the CE Form's analysis, the relevant baseline for determining whether an historic area has "been extensively modified" is the time at which it was added to the National Register of Historic places—in this case, 1973—not some time before the golf course ever existed.

Once the CE Form is stripped of its factual misstatements, false premises, and erroneous assumptions, it is clear that the categorical exclusion for "landscaping and landscape maintenance" does not cover a plan conceived by the Secretary of the Interior to dump 30,000 cubic yards of untested, potentially toxic dirt and debris onto a historic golf course. In any event, even if the dumping and incorporation of the East Wing debris somehow constituted "landscaping and landscape maintenance" within the meaning of CE 12.5(c)(19), NPS was still obligated to evaluate extraordinary circumstances in which "a normally excluded action may have a significant effect." 43 C.F.R. § 46.205(c)(1). If the Responsible Official determines that an action *may* meet any of the exceptions delineated by the agency, extraordinary circumstances exist and the agency must prepare an EA or EIS despite the applicability of the exclusion. *Id.* § 46.215.

NPS's dumping, storage, and incorporation of East Wing debris implicated numerous "extraordinary circumstances." Under NPS regulations, extraordinary circumstances exist for

actions that *may* have significant impacts on (a) "public health or safety," or (b) "such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands . . . national natural landmarks . . . floodplains; national monuments; migratory birds; and other ecologically significant or critical areas." 43 C.F.R. § 46.215(a), (b). Here, the potential presence of asbestos and lead paint plainly threatens significant impacts on public health and safety.  Not only is East Potomac Golf Course part of a "cultural resource, "national monument," and "park, recreation or refuge land," it also sits on a 100-year floodplain and is home to more migratory bird species than perhaps any other area in the District of Columbia.  According to NPS's own website, East Potomac is "important in the urban ecosystem and the most species rich area at the National Mall and Memorial Parks"[23] A 2023-25 avifauna survey by the District of Columbia Department of the Environment, Division of Fisheries and Wildlife determined that "[t]he geographic location and land formation of East Potomac Park makes it a key migration corridor for birds utilizing confluence of the Potomac and Anacostia Rivers," with the golf course having the highest density of breeding Yellow Warblers anywhere in the city. Ex. L at 11-12.

Further, extraordinary circumstances exist where an individual action may "[h]ave a direct relationship to other actions that implicate potentially significant environmental effects," or may "have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places." *Id.* § 46.215(e), (f).  NPS's dumping and incorporating dirt and debris has a "direct relationship" with the Washington National plan, which will have "significant environmental effects."  Moreover, the incorporation of the dirt and debris to change the contours of the golf course will constitute a significant impact on this historic property.  It is inconceivable that this action would not implicate the "extraordinary circumstances" defined by NPS's own

---

[23] National Parks Service, *Wildlife at Hains Point*, (Jan. 26, 2023), https://perma.cc/97R3-T7G7.

regulations.  "Where there is substantial evidence in the record that exceptions to the categorical exclusion may apply, the agency must at the very least explain why the action does not fall within one of the exceptions."  *California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002).  Yet the CE Form cursorily dismissed the possibility of extraordinary circumstances in less than one page of analysis. Ex. H 3.  This was arbitrary and capricious, as well as "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).

Defendants had to undertake some form of NEPA process. They undertook none.  The dirt dumping and the implementation of the Washington National plan therefore violate NEPA, were undertaken without observance of procedure required by NEPA, or both, and should be set aside.

D.  <u>Defendants Unlawfully Adopted and Implemented the Washington National Plan and Dumped Debris Without Observing the Procedures Required by the NHPA</u>

As discussed above, NHPA regulations require agencies to assess whether an undertaking will have an "adverse effect" on historic property, including "[p]hysical destruction of or damage to all or part of the property," 36 C.F.R. § 800.5(a)(2)(i); "[a]lteration of a property, including restoration [or] rehabilitation . . . that is not consistent with . . . [ ]36 CFR part 68[ ]," 36 C.F.R. § 800.5(2)(ii); and "[c]hange of the character of the property's use or of physical features within the property's setting that contribute to its historic significance."  *Id.* § 800.5(a)(2)(iv).

Against these requirements, the necessity of reviewing the dumping and the Washington National plan and debris dumping under NHPA is unmistakable.  The very purpose of the Washington National plan is to alter East Potomac Park and East Potomac Golf Course, and to change their character (including by eliminating the historic Walter Travis layout), workmanship, feeling, and association.  Similarly, dumping 30,000 cubic yards of dirt onto a golf course damages it and changes the character of its use and physical features. *See* Roberts Decl. ¶ 24.

As with NEPA, Defendants' only gesture toward compliance with NHPA touched only on

the dirt dumping, Historic Assessment Form, Ex. N, and did not address the broader Washington

National plan. It therefore could not satisfy Defendants' NHPA obligations with respect to the plan.

And as to the dumping, the Historic Assessment is facially untenable: it admits to dumping 30,000

cubic yards of dirt onto a historic landscape, but concludes that the dumping does not impair

historic property because the dumping would not "[a]lter . . . features/elements of a historic setting

or environment (inc. terrain);" would not "[a]dd non-historic features/elements (inc. visual . . .) to

a historic setting or landscape;" and would not "[b]egin to contribute to deterioration of historic

features, terrain, setting, [or] landscape elements." Ex. N at 3-4.  None of this is correct. Dumping

30,000 cubic yards on the ground necessarily alters terrain and adds non-historic visual elements

to a landscape.  And when that dirt contains solid debris (and presumably contains asbestos), the

dirt also begins to contribute to deterioration of historic terrain, setting, and landscape elements.

Because Defendants' undertaking has affected and will affect historic property, NHPA required

them to take a number of steps, including accounting for the undertaking's effects on historic

property, consulting with the public, and affording the Advisory Council on Historic Preservation

a reasonable opportunity to comment.  Defendants did none of this.  Accordingly, they acted

without observance of the procedures required by and in violation of the NHPA.

E.   Defendants' Actions Violate the Organic Act and Congress's Directive for East
     Potomac Park

Defendants have likewise violated the Organic Act and the Act of 1897.  The Organic Act

imposes dual directives: the NPS must affirmatively "conserve" park resources and ensure they

remain "unimpaired" for future generations.  54 U.S.C. § 100101(a).  The conservation mandate

is a "non-discretionary duty" to protect park scenery, natural objects, and wildlife.  *Id.*  NPS's

Management Policies establish a strict, non-discretionary procedural hurdle: before approving any

action that "could lead to an impairment," a decision-maker must "determine, in writing, that the

activity will not lead to an impairment." Ex. J at 12. Defendants violated these duties in three ways.[24]

First, by converting East Potomac into a disposal site for 30,000 cubic yards of demolition waste, Defendants have abandoned their duty to conserve the scenery and natural integrity of the park. This refuse fundamentally degrades what NPS must protect. The dumping further violates the non-impairment mandate, harming a resource that is "key to the natural or cultural integrity of the park" and creating an "unsafe or unhealthful environment." Management Policies §§ 1.4.5, 1.4.7.1. By introducing debris that threatens to leach into the soil and surrounding waters, Defendants have created an unhealthy environment that endangers visitors and the local wildlife and intrudes on the Park's beauty. NPS policy is clear that these are "unacceptable impacts" prohibited by the Organic Act. *See* Ex. J 12 (Management Policies § 1.4.7.1).

Second, adopting and implementing the Washington National plan without a non-impairment determination likewise violates those requirements. NPS has already designated East Potomac Golf Course as an essential feature that "Must be Preserved and Maintained." CLI at 12. By adopting a plan to raze these historic courses and implement a professional-tier venue without a reasoned, written determination, Defendants have abused their discretion in managing East Potomac Park. *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 104-05 (D.D.C. 2006). NPS cannot avoid this by finalizing the Washington National plan outside of required procedures, which also must include NEPA and NHPA review. Ex. J at 12 (Management Policies § 1.4.7). Defendants similarly failed to provide a non-impairment determination for the debris dumping, trying instead to cabin their East Wing debris dumping as routine maintenance.

---

[24] The APA provides the standard of review for determining whether the NPS has complied with the substantive mandates of the Organic Act and park-enabling statutes. *See Grunewald v. Jarvis*, 776 F.3d 893, 901 (D.C. Cir. 2015) (applying the APA standard to determine whether NPS actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' under the Organic Act and the park enabling statute)."

Third, the Organic Act's dual mandate to conserve park resources and ensure they remain unimpaired is strictly governed by the Act of March 3, 1897.  NPS is explicit that "park purposes are found in the general laws pertaining to the national park system, as well as the enabling legislation," and that "in the administration of mandated uses, park managers must allow the use." Management Policies § 1.4.3.1.  Here, the 1897 Act provides the purpose for East Potomac Park: it must be "forever held and used as a park for the recreation and pleasure of the people."  29 Stat. 622, 624.  The Washington National plan directly violates and impairs these values and fails to conserve the park's egalitarian character as required by this enabling mandate. The debris dumping also violates this directive.  Piling material that is legally presumed to contain asbestos, and likely containing other hazardous materials, onto East Potomac is a reckless endangerment of the community that violates the fundamental promise of a public park: that these spaces are preserved for the well-being of the people, not as hazardous repositories.  Taken individually or together, these violations are "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## B.  Plaintiffs are Likely to Suffer Irreparable Harm Without a Stay or Injunction.

Defendants have adopted and begun to implement a plan that will degrade the human environment and displace a National Register historic district, including multiple contributing resources within it: the East Potomac Golf Course, the miniature golf course, and the Field House. Each is a contributing site or building within the district's historic framework.  The proposed displacement would permanently alter the land, its historic layout, and these recognized resources' setting, in both visible and unseeable ways.  The three golf courses will be gone; the ground, landscape, and vistas will be irrevocably altered; and 30,000 cubic yards of debris likely containing asbestos and other pollutants will be integrated into the soil of reclaimed land with a high water

table adjoining a major waterway and supporting a wide variety of trees and wildlife.

Once those changes occur, they cannot be undone; some (the dumping) have already begun. Those injuries will be irreversible – not only because the displaced sites cannot be reconstructed in their historic form, or because asbestos cannot be recalled, but because the NHPA and NEPA require informed review *before* "resources have been committed or the die otherwise cast." *Robertson*, 490 U.S. at 349. And the NPS Organic Act prevents it altogether when it impairs federal parkland's "scenery [and] natural and historic objects." 54 U.S.C. § 100101(a).

If the Washington National plan's implementation continues unchecked, the statutory safeguards that Congress imposed to constrain Defendants' lawless behavior will be thwarted by the very behavior they were meant to constrain. "Demolish first, assess the environmental and historic consequences later or (never)" renders NEPA, the NHPA, and the NPS Organic Act toothless. Preliminary relief is therefore necessary to preserve both the historic landscape and human environment of East Potomac Park and East Potomac Golf Course and Plaintiffs' right to a meaningful review process *before* harmful action occurs.

"When a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009); *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (procedural injury plus injury to aesthetic interest showed irreparable harm). This is true even when a plaintiff shows only that the major Federal action "will have *some* environmental impacts, even if the extent of those impacts are not fully known." *Id.* (emphasis in original). "Environmental injury, by its [very] nature, . . . is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 545 (1987). Plaintiffs have made such a showing. Displacement and

alteration of East Potomac Park's landscape and contributing resources will injure the aesthetic, recreational, and other interests that Plaintiffs have asserted. These changes will be "permanent," *Amoco*, 480 U.S. at 545, and without any remedy at law.

Likewise, an NHPA violation portends irreparable harm where "[n]o remedy at law is available to compensate plaintiffs" if the undertaking proceeds and makes after-the-fact compliance a formality. *Nat'l Trust for Hist. Pres. in U.S. v. FDIC* No. 93-0904-HHG, 1993 WL 328134, *3 (D.D.C. May 7, 1993) (citing *Gettysburg Battlefield Pres. Ass'n v. Gettysburg Coll.*, 799 F. Supp. 1571, 1576-77, 1580-81 (M.D. Pa. 1992), *aff'd*, 989 F.2d 487 (3rd Cir. 1993)).

Defendants' NEPA and NHPA violations injure Plaintiffs procedurally, and their implementation of the Washington National plan will further injure Plaintiffs' natural, aesthetic, recreational, and communal interests in East Potomac Park and East Potomac Golf Course. *See* Roberts Decl., Dickson Decl., and Miller Decl. Additionally, implementing the Washington National plan would (by design) result in permanent changes to the landscape of East Potomac Park and East Potomac Golf Course's landscape, including the removal of trees and substantial increase to the flooding risk of Hains Point and the existing footprint of East Potomac.

Furthermore, the dumping and Washington National plan damage the specific resource values that the Organic Act and Act of 1897 mandate be preserved at East Potomac Park. Irreparable harm occurs in this context when an agency's actions threaten a "permanent loss of those lands to public access and enjoyment." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 306, 324 (D.C. Cir. 1987). Plaintiffs have delineated specific ways in which Defendants' actions have caused "substantial adverse effects on scenery, wildlife, recreation, and other environmental values." *Id.* By contaminating the Park with debris and razing the historic golf course, Defendants are causing irreparable harm in the form of "immediate and direct physical damage to public land"

that "substantially impair[s] resource values." *Id.*

C.  The Balance of the Equities and Public Interest Favor Preliminary Relief

"[T]he Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks and citations omitted).  "There is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (citing *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).  "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA . . . –that govern their existence and operations."  *Id.* (internal quotation marks and citations omitted).

But even if this Court were to balance Defendants' interests as if they were private parties, Defendants would suffer only modest delay from a stay or preliminary injunction—delay that is required by law to ensure that the environmental and historic harms the Washington National plan will precipitate are considered *before* the plan is implemented further.  Even if implementation of the Washington National plan is delayed, the inconvenience of that delay is far outweighed by the permanent, irreversible injury that would be inflicted on Plaintiffs and to a historic public resource whose land was set aside by Congress "to be forever held and used as a park for the recreation and pleasure of the people."  Act of Mar. 3, 1897, ch. 367, 29 Stat. 622.

If Defendants continue implementing the Washington National plan throughout the pendency of this case, the implementation will occur without the informed decisionmaking that the NHPA and NEPA require.  NEPA required Defendants to consider and mitigate the Washington National plan's harmful impacts *before* they began dumping thousands of cubic yards of potentially contaminated dirt and debris.  The NHPA required Defendants to consider the effects

of their undertaking *before* moving forward with a plan to remake historic parkland.  The further Defendants proceed with implementing the Washington National plan, the more irreversible the plan's consequences will become – and the more useless an after-the-fact NEPA or NHPA assessment will become.  This would leave the Court without an opportunity for a meaningful decision. Stays under § 705 and preliminary injunctions exist to avoid precisely that outcome.  *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (purpose of preliminary injunction is "to preserve the relative positions of the parties until a trial on the merits can be held").

## CONCLUSION

The Court should stay or preliminarily enjoin the Defendants to the scope requested in the Motion and Complaint.

RESPECTFULLY SUBMITTED this Twenty-Third day of February 2026.

Abbe David Lowell [Bar No. 358651]
Jack Bolen*
Angela Reilly*
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
adlowell@lowellandassociates.com
jbolen@lowellandassociates.com
areilly@lowellandassociates.com

Norman L. Eisen [Bar No. 435051]
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 601-8678
norman@democracydefenders.org

*Application for admission pending or admission *pro hac vice* forthcoming

*/s/Mark B. Samburg*
Mark B. Samburg (Bar No. 1018533)
Will Bardwell (Bar No. 90006120)
Catherine M.A. Carroll (Bar No. 497890)
Robin F. Thurston (Bar No. 7268942)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
wbardwell@democracyforward.org
msamburg@democracyforward.org
ccarroll@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*