### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DC PRESERVATION LEAGUE, *et al.*,<br><br>　　　　　Plaintiffs,<br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>　　　　　Defendants. | Civil Action No. 1:26-cv-477-ACR |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR STAY OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

    I.     Factual Background ............................................................................. 2

          A.    East Potomac Park and East Potomac Golf Course ................................... 2

          B.    The NPS Leases East Potomac Golf Course to National Links Trust ........ 4

          C.    Fill Material from the East Wing is Proposed for Necessary
               Landscaping and the NPS Conducts the Appropriate Analyses.................. 5

          D.    The NPS Implements Protective Measures, Monitoring, and
               Evaluation ................................................................................................ 7

               1.    The NPS's Protective Measures ........................................... 7

               2.    The NPS's Monitoring and Evaluation Plan .................................. 8

          E.    The President and Defendants Begin Exploring Proposals for
               Further Improving East Potomac Golf Course ....................................... 10

          F.    NLT Defaults on its Lease and is Terminated as Lessor .......................... 10

    II.    Procedural Background.......................................................................... 10

    III.    Legal Background.................................................................................11

          A.    The National Environmental Policy Act .....................................................11

          B.    The National Historic Preservation Act ................................................... 12

          C.    The National Park Service Organic Act..................................................... 13

          D.    The Administrative Procedure Act............................................................. 14

LEGAL STANDARD ................................................................................................... 15

ARGUMENT ................................................................................................................ 16

    I.    Plaintiffs are Not Likely to Succeed on the Merits of their Claims...................... 16

          A.    Plaintiffs Lack Standing to Bring their Claims......................................... 16

                1.    Plaintiffs' Fail to Allege an Injury for Standing Purposes ............ 17

          a.      Plaintiffs Fail to Allege Injury for their Proposal Claims ................................................................................. 17

          b.      Plaintiffs Fail to Allege Injury for their Landscaping Claims ................................................................................. 22

     2.      Plaintiffs Claimed Injuries are Not Traceable to Defendants' Conduct ................................................................... 24

     3.      Plaintiffs' Claimed Injuries are not Redressable ........................... 26

   B.     Plaintiffs are Otherwise Not Likely to Succeed on the Merits of their Proposal Claims ...................................................................... 28

     1.      Plaintiffs' Proposal Claims are Unripe ......................................... 28

     2.      Plaintiffs' Proposal Claims Fail to Challenge Final Agency Action ............................................................................................. 30

     3.      Defendants' Preparatory Activities Do Not Trigger NEPA or NHPA ............................................................................................ 33

   C.     Plaintiffs are Otherwise Not Likely to Succeed on the Merits of their Landscaping Claims .............................................................. 33

     1.      Defendants Complied with NEPA ................................................. 33

     2.      Defendants Complied with Section 106 of the NHPA .................. 37

     3.      Defendants Complied with the Organic Act ................................. 39

II.    Plaintiffs Will Not Suffer Imminent Irreparable Harm Absent a Preliminary Injunction ............................................................................................. 42

III.   The Balance of Harms and the Public Interest Weigh Against Injunctive Relief ....................................................................................................... 44

IV.   If an Injunction is Granted, Plaintiff Should be Required to Post a Bond ............ 45

CONCLUSION .......................................................................................................... 45

# TABLE OF AUTHORITIES

Page(s)

**Other Authorities**

*Abbott Labs v. Garner*,
  387 U.S. 136 (1967)...................................................................................................... 29

*Abdullah v. Obama*,
  753 F.3d 193 (D.C. Cir. 2014) ...................................................................................... 42

*Am. Legion v. Am. Humanist Ass'n*,
  588 U.S. 29 (2019)........................................................................................................ 20

*Am. Petroleum Inst. v. EPA*,
  683 F.3d 382 (D.C. Cir. 2012) ...................................................................................... 29

*Atl. States Legal Found. v. EPA*,
  325 F.3d 281 (D.C. Cir. 2003) ...................................................................................... 29

*Bennett v. Spear*,
  520 U.S. 154 (1997)................................................................................................. 31, 32

*Bicycle Trails Council of Marin v. Babbitt*,
  82 F.3d 1445 (9th Cir. 1996).......................................................................................... 14

*Biden v. Texas*,
  597 U.S. 785 (2022)................................................................................................. 31, 32

*Blue Ridge Env't Def. League v. NRC*,
  716 F.3d 183  (D.C. Cir. 2013) ...................................................................................... 37

*California v. Texas*,
  593 U.S. 659 (2021)....................................................................................................... 24

*City of Alexandria v. Slater*,
  198 F.3d 862 (D.C. Cir. 1999) ...................................................................................... 12

*City of Evanston v. N. Ill. Gas Co.*,
  381 F. Supp. 3d 941 (N.D. Ill. 2019) ............................................................................ 43

*CityFed Fin. Corp. v. Off. of Thrift Supervision*,
  58 F.3d 738 (D.C. Cir. 1995) ........................................................................................ 42

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013).......................................................................................... 17, 18, 19

*Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*,
  15 F. Supp. 2d 1 (D.D.C. 1997) .................................................................................... 45

*Ctr. for Biological Diversity v. Fed. Aviation Admin.*,
  804 F. Supp. 3d 86 (D.D.C. 2025) ................................................................................ 34

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
    144 F4th 296 (D.C. Cir. 2025) ....................................................................... 21

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
    563 F.3d 466 (D.C. Cir. 2009) ............................................................... 21, 33

*Ctr. for Democracy & Tech. v. Trump*,
    507 F. Supp. 3d 213 (D.D.C. 2020) ............................................................ 27

*Daingerfield Island Protective Soc'y v. Babbitt*,
    40 F.3d 442 (D.C. Cir. 1994) ..................................................................... 14

*Dalton v. Specter*,
    511 U.S. 462 (1994) ................................................................................... 32

*Davis v. Latschar*,
    202 F.3d 359 (D.C. Cir. 2000) ............................................................... 13, 40

*Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*,
    85 F. Supp. 3d 250 (D.D.C. 2015) ............................................................ 30

*Devia v. Nuclear Regul. Comm'n*,
    492 F.3d 421 (D.C. Cir. 2007) ................................................................... 29

*Doe v. Doe Agency*,
    608 F. Supp. 2d 68 (D.D.C. 2009) ............................................................ 28

*Envt'l Def. Fund v. FERC* ("EDF"),
    2 F.4th 953 (D.C. Cir. 2021) .................................................... 19, 20, 23, 24

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ............................................................................... 18, 24

*Fisheries Survival Fund v. Jewell*,
    236 F. Supp. 3d 332 (D.D.C. 2017) ...................................................... 42, 44

*Food & Water Watch v. FERC*,
    28 F.4th 277 (D.C. Cir. 2022) ............................................................... 19, 26

*Food & Water Watch v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ......................................................... 17, 20, 22

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ................................................................................... 32

*Freedom Watch, Inc. v. McAleen*,
    442 F. Supp. 3d 180 (D.D.C. 2020) ............................................................ 18

*Fund for Animals, Inc. v. BLM*,
    460 F.3d 13 (D.C. Cir. 2006) ..................................................................... 31

*Garcia v. Acosta*,
    393 F. Supp. 3d 93 (D.D.C. 2019) ............................................................ 28

*Greater Yellowstone Coalition v Kempthorne*,
   577 F. Supp. 2d 183 (D.D.C. 2008) ........................................................................ 14

*Grunewald v. Jarvis*,
   776 F.3d 893 (D.C. Cir. 2015) ................................................................................ 39

*Harris Cnty. v. Kennedy*,
   786 F. Supp. 3d 194 (D.D.C. 2025) ........................................................................ 15

*Humane Soc. of U.S. v. Babbitt*,
   46 F3d 93 (D.C. Cir. 1995) .................................................................................... 24

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ............................................................................................... 19

*In re Navy Chaplaincy*,
   534 F.3d 756 (D.C. Cir. 2008) ............................................................................... 23

*Indian River Cnty. v. U.S. Dep't of Transp.*,
   945 F.3d 515 (D.C. Cir. 2019) ............................................................................... 12

*Info. Ctr. v. Dep't of Justice*,
   15 F. Supp. 3d 32 (2014) ........................................................................................ 42

*Karst Env't Eudc. & Prot., Inc. v. EPA*,
   475 F.3d 1291 (D.C. Cir. 2007) ....................................................................... 14, 32

*Katz v. Georgetown Univ.*,
   246 F.3d 685 (D.C. Cir. 2001) ............................................................................... 15

*Kimelman v. Garland*,
   588 F. Supp. 3d 84 (D.D.C. 2022) ......................................................................... 27

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) ............................................................................................... 27

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
   780 F. Supp. 3d 135 (D.D.C. 2025) ........................................................................ 15

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ..................................................................................... 17, 24, 25

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ............................................................................................... 30

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) ......................................................................................... 12, 14

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ............................................................................................... 15

*Munaf v. Geren*,
   553 U.S. 674 (2008) ............................................................................................... 15

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior,*
538 U.S. 803 (2003)..................................................................................................28

*Nat'l Parks Conservation Ass'n v. Jewell,*
965 F. Supp. 2d 67 (D.D.C. 2013) ................................................................ 13, 40, 41

*Nat'l Parks Conservation Ass'n v. Semonite,*
282 F. Supp. 3d 284 (D.D.C. 2017) ................................................................... 44

*Nat'l Treasury Emps. Union v. United States,*
101 F.3d 1423 (D.C. Cir. 1996) ........................................................................ 29

*New York Republican State Comm. v. SEC,*
927 F. 3d 499 (D.C. Cir. 2019) ........................................................................ 19

*Nken v. Holder,*
556 U.S. 418 (2009)........................................................................................... 15

*Norton* v. *S. Utah Wilderness All.,*
542 U.S. 55 (2004)............................................................................................. 30

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n,*
45 F.4th 291 (D.C. Cir. 2022) .......................................................................... 37

*Pennsylvania v. DeVos,*
480 F. Supp. 3d 47 (D.D.C. 2020) ................................................................... 15

*Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.,*
656 F. Supp. 3d 137 (D.D.C. 2023) ................................................................. 19

*Pub. Citizen v. Office of United States Trade Representative,*
970 F.2d 916 (1992)........................................................................................... 32

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,*
489 F.3d 1279 (D.C. Cir. 2007) ....................................................................... 22

*R.J. Reynolds Tobacco Corp. v. U.S. Food & Drug Admin.,*
810 F.3d 827 (D.C. Cir. 2016) .......................................................................... 28

*River Runners for Wilderness v. Martin,*
593 F.3d 1064 (9th Cir. 2010)........................................................................... 14

*Robbins v. U.S. Dep't of Hous. & Urb. Dev.,*
72 F. Supp. 3d 1 (D.D.C. 2014) ....................................................................... 25

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989)........................................................................................... 12

*Schindler Elevator Corp. v. Washington Metro. Transit Auth.,*
514 F. Supp. 3d 197 (D.D.C. 2020) ................................................................. 16

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*
605 U.S. 168 (2025).............................................................11, 12, 32, 34, 35, 36

*Sierra Club v. EPA*,
   793 F. Supp. 3d 158 (D.D.C. 2025) ....................................................................... 43

*Sierra Club v. FERC*,
   827 F.3d 59 (D.C. Cir. 2016) ................................................................................ 19

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976)................................................................................................ 17

*Soundboard Ass'n v. FTC*,
   888 F.3d 1261 (D.C. Cir. 2018) ........................................................................... 31

*Spectrum Leasing Corp. v. United States*,
   764 F.2d 891 (D.C. Cir. 1985) ............................................................................. 27

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)........................................................................................ 16, 17

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83  (1998).............................................................................................. 26

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014).............................................................................................. 19

*Texas v. United States*,
   523 U.S. 296 (1998).............................................................................................. 28

*Toilet Goods Ass'n v. Gardner*,
   387 U.S. 158 (1967).............................................................................................. 29

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021).............................................................................................. 17

*Twin Rivers Paper Co. LLC v. Securities & Exchange Comm'n*,
   934 F.3d 607 (D.C. Cir. 2019) ............................................................................. 42

*United States v. Chem. Found., Inc.*,
   272 U.S. 1 (1926)................................................................................................. 32

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,
   529 U.S. 765 (2000).............................................................................................. 26

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519 (1978).............................................................................................. 34

*W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*,
   302 F. Supp. 2d 672 (S.D. Tex. 2004).................................................................. 43

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008)............................................................................................ 15, 44

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ............................................................................. 42

**Statutes**

28 U.S.C. § 1491............................................................................................................ 29

42 U.S.C. § 4332(2)(C).................................................................................................. 13

42 U.S.C. § 4336............................................................................................................ 13

42 U.S.C. § 4336(a)(2)................................................................................................... 36

42 U.S.C. § 4336(b)....................................................................................................... 36

42 U.S.C. §§ 4336(a)..................................................................................................... 37

5 U.S.C. § 551(13).................................................................................................... 32, 33

5 U.S.C. § 705............................................................................................................... 17

5 U.S.C. § 706(2)(A)..................................................................................................... 16

54 U.S.C. § 100101(a) .............................................................................................. 15, 42

54 U.S.C. § 300320........................................................................................................ 14

54 U.S.C. § 306108................................................................................................ 23, 35, 39

**Rules**

Fed. R. Civ. P. 65(c) ...................................................................................................... 47

**Regulations**

36 C.F.R. § 800.14 ................................................................................................ 39, 40, 41

36 C.F.R. § 800.14(b)..................................................................................................... 14

36 C.F.R. §§ 800.1-.6...................................................................................................... 39

36 C.F.R. 60.15 ............................................................................................................. 27

36 C.F.R. part 18 ........................................................................................................... 26

36 C.F.R. Part 800 (2025) .............................................................................................. 14

43 C.F.R. § 46.205(c)...................................................................................................... 38

43 C.F.R. § 46.215(a)-(i)................................................................................................. 38

**TABLE OF EXHIBITS**

| | | |
|---|---|---|
| Ex. 1 | Declaration of Jennifer T. Nersesian | |
| | Ex. A | Dewberry Report |
| | Ex. B | NEPA Categorical Exclusion Documentation Form |
| | Ex. C | NHPA Assessment of Actions Having an Effect on Historic Properties |
| | Ex. D | NPS 2008 Nationwide Programmatic Agreement |
| | Ex. E | ESA No Effect Determination |
| | Ex. F | FWS Species List |
| | Ex. G | NPS Conceptual Stockpile Plan |
| | Ex. H | East Potomac Park Golf Course Grading Plan |
| | Ex. I | NPS Stormwater Pollution Prevention Plan |
| | Ex. J | EPA December 2, 2025, Notification |
| | Ex. K | NPS Monitoring and Evaluation Plan prepared by Jacobs Engineering Group |
| | Ex. L | Maryland Department of the Environment Fact Sheet on Clean Imported Fill Materials |
| Ex. 2 | Declaration of Jessica Bowron | |
| | Ex. A | NPS Lease # NCR-3060-19-001 |
| | Ex. B | NPS Notice of Default |
| | Ex. C | NPS Termination Letter |
| Ex. 3 | Aerial Image Approximating Location of Stockpile | |

**INTRODUCTION**

Plaintiffs claim they need emergency relief to stop the Federal Government from deliberating on how to improve the golf course in East Potomac Park.  Plaintiffs also ask the Court to order the government—again, as part of an emergency injunction—to remove piles of dirt that have been stored in East Potomac Park for roughly five months.  Neither claim supports the extraordinary relief that Plaintiffs seek.  Rather, both claims have fatal jurisdictional defects and fail on the merits.

First, the *possibility* that the President may improve the golf course fails to establish the necessary injury to demonstrate standing, much less that any action by the Court can redress those hypothetical harms.  The Court need go no further.  At its founding, East Potomac Park was a preeminent golf course, capable of hosting everyday players, Presidents, and even high-profile tournaments.  And Defendants are developing a concept to restore the course to that tradition.  But at this point, there is no final decision on improvements, a construction timeline, or a legal justification.  Plaintiffs' claims thus do not challenge final agency action and are unripe.  Rather than issue an advisory opinion on Plaintiffs' concerns about a nascent golf course improvement concept, the Court should withhold review to avoid judicial entanglement in ongoing processes.

Second, Plaintiffs' challenge to the National Park Service's (NPS) placement of fill also fails.  For decades NPS has been entrusted to oversee and ensure that East Potomac Park— including East Potomac Golf Course—best serves the public.  As part of carrying out those responsibilities, NPS conducted the requisite National Environmental Policy Act and historical analyses before storing any fill in East Potomac Park.  What is more, the NPS tested the fill for contaminants confirming its safety and suitability before and after it arrived at East Potomac Park. Thus, Plaintiffs' claimed injuries tethered to health concerns fail, and their claims fail on the merits.

1

In sum, Plaintiffs moved to preliminarily stop Defendants from even entertaining any proposal to further improve East Potomac Golf Course and to enjoin Defendants' ongoing soil storage and maintenance activities. But Plaintiffs cannot satisfy any of the preliminary injunction factors, and their motion should be denied. Moreover, the Court may dismiss Plaintiffs' claims because Plaintiffs' motion reveals the Court lacks subject matter jurisdiction over them.

## BACKGROUND

### I.     Factual Background

#### A.     East Potomac Park and East Potomac Golf Course

The story of East Potomac Park is one of constant change. The area now known as East Potomac Park is located on part of what was known in the nineteenth century as the "Potomac Flats." Nat. Park Serv. Cultural Landscapes Inventory, East Potomac Golf Course, 3 (2017) ("CLI").[1] At the direction of Congress, the U.S. Army Corps of Engineers filled the area for purposes of flood control and public health, and to store spoils from dredging the Washington Channel of the Potomac River. *Id.* 3, 24-25; The Condition of the Potomac River Front of Washington, S. Misc. Doc. No. 47-133, at 1-3 (1882). On March 3, 1897, Congress officially established a public park on the former Potomac Flats, renaming it "Potomac Park." Act of Mar. 3, 1897, ch. 375, 29 Stat. 624; 54 S. Rept. No. 1327 (1897); 54 H.R. Rept. No. 2708 (1897).

Constructed on East Potomac Park in 1920, East Potomac Golf Course helped transform what had been marshy mud flats into a remarkable place of public recreation. Hosting high-profile events—including the 1923 United States Golf Association's Public Links Tournament—quickly became a part of the Course's founding DNA. CLI 47.

---

[1] The CLI is publicly available on the NPS's website at https://irma.nps.gov/DataStore/DownloadFile/583046.

Over the years, East Potomac Golf Course underwent a series of alterations and renovations to both expand it and to respond to flooding concerns. *See* CLI 25-31 (explaining that various courses and other features have been added, redesigned, reconstructed, and even removed entirely since the Park's inception). Because the Course is comprised of fill and located largely within the 100-year floodplain,[2] the Course and surrounding facilities were (and are) at constant risk of flooding. *See* CLI 29-30, 59, 61 (recounting how the Course flooded in 1936 and again in 1942, closing it for nearly eight months). By the end of the 1940s, East Potomac Park had settled *six feet* since its creation in the 1890s, prompting the Corps to again dredge the Potomac River and pump silt onto sections of the Park. *Id.* 62. Even the miniature golf course had to be elevated by eighteen inches. *Id.* 112. But over the next several decades, flooding and drainage issues remained a constant problem, periodically inundating the Course with stormwater. *Id.* 62, 64.

In recent years, East Potomac Park has been inundated with high tides and wave run-up. Those problems contribute to erosion and deterioration of the seawall, walkways, railings, storm drain outfalls, utility crossings, and trees and other vegetation. Ex. 1, Nersesian Decl. ¶ 6. In 2011, the NPS (which manages the Park) commissioned a study from Dewberry Engineers examining options for rehabilitating the Park's seawalls. The study found that "many areas along the seawall are already failing due to the combination of past settlement and washout of fill." *Id.* ¶ 7, Ex. A.

In 2017, the NPS concluded that because of natural and human forces, the Course was only in fair condition and without necessary maintenance to address impacts from weather, sea level rise, and tidal flooding, it would continue to deteriorate. CLI 152-53.

---

[2] *See* Nersesian Decl. at Ex. H, East Potomac Park Golf Course Grading Plan, 2 (indicating the location of the 100-year FEMA floodplain).

In 2019, the NPS prepared a Cultural Landscape Report ("Report") for three NPS-managed golf courses in the District of Columbia, including the East Potomac Golf Course.  Ex. 1, Nersesian Decl. ¶ 8.[3]  The Report recommended numerous adjustments to the East Potomac Golf Course's topography, including significant drainage, leveling, and restoration work.  *Id.* ¶ 9 (citing Report 173, 175, 182, 189).  The Report also recommended "topdressing"—that is, applying thin layers of additional soil to existing turf to encourage healthy growth and ensure a firm and smooth playing surface.  Report at 94-96, 173-74, 189-90, 272-73.

**B.      The NPS Leases East Potomac Golf Course to National Links Trust**

On September 30, 2020, the Department of the Interior leased East Potomac Golf Course, Langston Golf Course, and Rock Creek Park Golf Course to the National Links Trust ("NLT").  *See* Ex. 2, Bowron Decl., ¶ 6, Ex. A.

Along with making regular rent payments, *id.* Ex. A at 10-11, the lease obligated NLT to make substantial improvements to all three locations including, at East Potomac Golf Course, rebuilding and redesigning the courses and constructing a new driving range, putting course, and paths.  *Id.* ¶¶ 7-8, Ex. A at 14-15, Ex. D.  NLT was responsible for all upgrades, undertaking capital improvements, and maintaining the grounds in good condition.  *Id.* Ex. A at 18-28.

After executing the 2020 NLT lease, and in light of the 2011 Dewberry seawall report and the 2019 Report, the NPS and NLT began considering options for renovating the East Potomac Park Golf Course and the larger East Potomac Park, some of which would require a considerable amount of new fill material.  Ex. 1, Nersesian Decl. ¶ 13.

---

[3] Cultural Landscape Report, National Park Service Golf Courses in the District of Columbia, East Potomac Park, Langston, and Rock Creek: Treatment Guidelines, June 2019, https://npshistory.com/publications/nace/clr-golf-courses-2019.pdf.

In 2024, in coordination with NLT, the NPS began discussing with DC Water, a public utility that serves the District of Columbia, the possibility that the NPS might accept 400,000 to 1,000,000 cubic yards of material generated from planned DC Water tunneling projects to use as fill at East Potomac Park.  *Id.* ¶ 14.  The NPS informed DC Water that it intended to revisit this idea later in the decade, in part to allow time for the tunneling projects to advance.  *Id.*

**C.     The NPS Decides to Use Fill Material from the East Wing for Landscaping at East Potomac and Considers Environmental and Historic Impacts**

On July 31, 2025, the White House announced plans to modernize the East Wing of the White House and construct a new White House State Ballroom.  Excavation in support of the East Wing Modernization Project is expected to result in the removal of at least 30,000 cubic yards of soil from the White House grounds.  Ex. 1, Nersesian Decl. ¶ 15.  This material consists both of native soil and of fill that was placed on the White House grounds throughout its history.  *Id.*  The approximately 30,000 cubic yards expected to be excavated from the White House grounds and transported to East Potomac Park is more than an order of magnitude smaller than the volume of material that the NPS previously discussed acquiring from DC Water for use in East Potomac Park, and it is equivalent to less than one inch of soil spread across the Park's 330 acres.  *Id.* ¶ 16.

The NPS worked closely with NLT to identify a location to stockpile the soil until it could be beneficially reused at the Park.  The stockpile location was identified and ultimately selected to avoid interfering with site infrastructure and continued recreational use of the golf course, and because it would be accessible to trucks for soil deliveries.  *Id.* ¶ 18.[4]

On October 16, 2025, to document its compliance with the National Environmental Policy Act ("NEPA"), the NPS completed a categorical exclusion documentation form ("CE form") for

---

[4] An aerial photograph showing the approximate location of the stockpile between the 4, 5, and 9 holes of the White Course is attached for illustrative purposes at Exhibit 3.

the soil storage project.  *Id.* ¶ 19, Ex. B.  The CE form explains that "[e]xcavation for the East Wing Modernization Project at the White House will yield approximately 30,000 cubic yards of soil," and that "[t]here is interest in using this soil at East Potomac Park where some level of infill is planned as part of improvements to be made by the Golf Course lessee."  The proposed action included "temporary storage" of "clean fill on previously disturbed and maintained areas of the East Potomac Golf Course" for later reuse.  *Id.* ¶ 20, Ex. B at 1.

The NPS concluded that the proposed soil storage project was "consistent with CE 12.5(C)(19), which covers 'landscaping and landscape maintenance in previously disturbed or developed areas,'" because the soil was expected to be used for "contour correction, drainage improvement, and turf establishment," which "represent[] maintenance and minor modification of an existing managed landscape, not new construction or a change in land use." *Id.* ¶ 21, Ex. B at 1. The NPS further documented that "[t]he soil will be tested and verified as clean prior to placement, eliminating the risk of introducing contaminants." *Id.*  The NPS also concluded that no extraordinary circumstances existed to warrant further analysis.  *Id.* ¶ 22, Ex. B at 3.

Also on October 16, 2025, to document its compliance with Section 106 of the National Historic Preservation Act ("NHPA"), the NPS completed an "Assessment of Actions Having an Effect on Historic Properties" ("Assessment") for the soil storage project.  *Id.* ¶ 23, Ex. C.  The Assessment documented the NPS's consideration of the effects of the proposed project on historic properties and the NPS's finding that the project would have "No Adverse Effect" on any historic properties. *Id.* ¶ 24, Ex. C at 3.  The NPS found that the project was eligible for streamlined review under the NPS's 2008 Nationwide Programmatic Agreement with the Advisory Council on Historic Preservation ("ACHP") and the National Conference of State Historic Preservation Officers.  *Id.*  The NPS explained that because "all historic property identification has been

previously completed, the activity is generally consistent with routine grounds maintenance, the placement of fill will not significantly alter the design of the course (cultural landscape) and will result in No Adverse Effect to the historic property." *Id.*; *id.* Ex. D ("2008 Programmatic Agreement").[5]

On October 18, 2025, personnel from Clark Construction (the general contractor for the White House East Wing Modernization Project) began to implement the site preparation measures specified in the conceptual stockpile plan, including laying down temporary material for the haul road. *Id.* ¶ 27. Two days later on October 20, the first loads of soil from the East Wing Modernization Project were delivered to the prepared stockpile site. *Id.* ¶ 29.[6]

**D.      The NPS Implements Protective Measures, Monitoring, and Evaluation**

**1.      The NPS's Protective Measures**

As stockpiling began, Clark Construction and the NPS implemented various environmental, health, safety, and security measures consistent with the NPS's conceptual stockpile plan and grading erosion, and sediment control plan. *See supra* n.5. Clark Construction placed flagger personnel; installed chain-link fencing, silt protection of adjacent stormwater grates, and tree protection zones; and began regular street-sweeping and street-washing along haul routes. Ex. 1, Nersesian Decl. ¶ 33. The NPS implemented various oversight measures, including weekly

---

[5] The NPS also completed several other necessary compliance measures, including informal consultation with the U.S. Fish and Wildlife Service, *id.* ¶ 25, Ex. E-F; a conceptual stockpile plan in consultation with the District of Columbia Department of Energy and Environment, *id.* ¶ 26, Ex. G; and a grading, erosion, and sediment control plan, *id.* ¶ 28, Ex. H.

[6] Afterward, the NPS continued to take appropriate compliance measures. For example, on November 19, 2025, the NPS completed a stormwater pollution prevention plan and submitted a notice of intent to the Environmental Protection Agency ("EPA") to rely on the EPA's 2022 Construction General Permit. *Id.* ¶¶ 30-31. The EPA notified the NPS on December 2, 2025, that the notice of intent had been accepted. *Id.* ¶ 31. Ex. J.

site inspections and daily field monitoring by NPS staff and contractors.  *Id.* ¶ 34.  The NPS will also apply temporary and permanent seeding to the stockpile to prevent erosion.  *Id.* ¶ 32.

### 2. The NPS's Plan for Extensively Monitoring and Evaluating Fill That Goes to East Potomac Park

The NPS also developed a robust monitoring and evaluation plan to ensure that all soil transported from the White House grounds for storage at East Potomac Park is clean and suitable for temporary storage at the Park, and for long-term landscaping use.  *Id.* ¶ 36.  This monitoring and evaluation plan ensures that the arriving soil is tested for the presence of potential contaminants of concern (COCs), and that results indicating the presence of COCs are evaluated against conservative thresholds to ensure that the soil is clean and suitable for its intended use.  *Id.*

The NPS's monitoring and evaluation plan is generally described in a technical memorandum prepared on the NPS's behalf by NPS contractor Jacobs Engineering Group on October 24, 2025.  *Id.* ¶ 37, Ex. K.

Consistent with that plan, before soil leaves the White House site, Clark Construction conducts onsite testing to identify evidence of contamination.  *Id.* ¶ 38.  Clark Construction has been providing these testing results and reports to the government on a monthly basis.  *Id.*  To date, no test has indicated any contamination.  *Id.*  In the event of a positive test result, the soil would not be delivered to the East Potomac Golf Course.  *Id.*

Once the soil arrives at East Potomac Park, Clark Construction sorts through the material to remove any debris that may have been inadvertently transported along with the soil from the White House grounds, such as metal pipes.  *Id.* ¶ 42.  Clark Construction then transports any such debris out of the Park for disposal.  *Id.*  While this segregated debris has at times been placed temporarily on Park grounds while awaiting removal, this debris is not part of the fill material that the NPS is storing at the Park.  *Id.*

8

After removal of any debris, the NPS evaluates the incoming soil using a protocol it developed, based on a list of COCs developed by the State of Maryland for ensuring the suitability of clean imported fill material. *Id.* ¶ 39. Those COCs include volatile organic compounds; semivolatile organic compounds; polychlorinated biphenyls; pesticides; herbicides; petroleum hydrocarbons; asbestos; and heavy metals. *Id.* In addition to the COCs listed by the State of Maryland, the NPS is also testing the incoming soil for asbestos. *Id.* ¶ 40. While the frequency of sample collection has varied, the NPS collects an average of at least one sample for every 1,000 cubic yards of arriving fill material, consistent with recommendations included in the Maryland Department of the Environment's fact sheet on clean imported fill materials. *Id.* ¶ 44, Ex. L.[7]

The NPS then evaluates the COC levels in the incoming soil in light of these metrics: (1) the levels of the same COCs found in ten baseline samples collected from locations near the material storage site at East Potomac Park, (2) conservative human health screening values published by the EPA for residential soil, and (3) NPS screening values for ecological receptors. Id. ¶ 41. If the soil's COC levels exceed the baseline samples and the screening values, NPS may conduct further analysis of soil from the stockpile. *Id.* Then, if the NPS determines based on this holistic evaluation that the soil would pose an unacceptable risk to human health or the environment, it would take further action. *Id.*

The NPS's testing to date indicates that the levels of COCs in the incoming soil are very similar to levels in the existing soil at East Potomac Park, and that the material is clean and suitable

---

[7] On February 25, 2026, the NPS executed a new contract with its environmental monitoring contractor to replace the preexisting technical services contract under which the contractor has performed sampling, testing, and analysis for this project. Ex. 1, Nersesian Decl. ¶ 45. The new contract is similar to the preexisting contract, but will also require the contractor to develop a sampling and analysis plan specifically for the East Potomac Park storage project, which will include a quality assurance project plan. *Id.* The new contract requires the contractor to prepare human health and ecological risk assessments, based on the results of its testing and analysis. *Id.*

for temporary storage at the Park and for the material's long-term intended use as part of the Park's landscaping. *Id.* ¶ 46. To date, no asbestos has been detected in the incoming soil. *Id.* ¶ 47.

E. **The President and Defendants Begin Considering Proposals for Further Improving East Potomac Golf Course**

Meanwhile, separate from the NPS's decision to temporarily store and later reuse clean fill material for anticipated ground maintenance, President Donald J. Trump has expressed interest in making East Potomac Golf Course even better. By September 2025, a conceptual proposal called the "Washington National Golf Project" and/or the "America 250 Golf Project" contemplated that the President and the Secretary of the Interior, using charitable contributions and in collaboration with NLT, would renovate the Rock Creek Park, Langston, and East Potomac golf courses. Bowron Decl. ¶ 9. The proposal contemplated that these NPS golf courses would remain affordable and accessible consistent with the terms set forth in NLT's Lease. *Id.*

F. **NLT Defaults on its Lease and is Terminated as Lessor**

On October 29, 2025, after the landscaping project began, the Department of the Interior and the NPS notified NLT that it was in default based on NLT's failure to make required initial improvements. *Id.* ¶¶ 8, 10, Ex. B. Department officials made extensive efforts to meet and confer with NLT. *Id.* ¶ 11. During that time, the Department discovered NLT had failed to pay millions in rent. *Id.* On December 30, 2025, the Department terminated NLT's Lease. *Id.* ¶ 12, Ex. C.

II. **Procedural Background**

On February 13, 2026, nearly four months after Defendants began storing fill material at East Potomac Park—but *before* Defendants have made any decision regarding further redesign of

10

or improvement to East Potomac Golf Course—Plaintiffs filed their Complaint.  Compl. Dkt. No. 1 (corrected and refiled at Dkt. No. 5-1).

Plaintiffs' Complaint presents two categories of claims.  First, Plaintiffs' "Proposal Claims" (Counts I, II, and III) allege that a proposal to modify and improve East Potomac Golf Course violated the Administrative Procedure Act ("APA"), NEPA, the NHPA, and the NPS's Organic Act.  Second, Plaintiffs' "Landscaping Claims" (Counts IV, V, and VI), allege that Defendants' decision to store and place clean fill material on East Potomac Golf Course also violated those same statutes.  Plaintiffs request expansive relief, seeking, for example, a positive injunction requiring the removal of fill material from East Potomac Park, and further injunctive relief that would prevent Defendants from developing *any* future project at the Park and even force Defendants to provide relief to NLT—a third party not before the Court.  Compl. 47-49.

Ten days later, on February 23, Plaintiffs filed the present Motion for Stay or, in the Alternative, Preliminary Injunction ("Motion").  Dkt. No. 8.

## III.    Legal Background

### A.    The National Environmental Policy Act

NEPA focuses governmental and public attention on environmental effects from any proposed "major Federal action[]."  42 U.S.C. § 4332(2)(C).  But NEPA "does not mandate particular results."  *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 179 (2025) (citation omitted).  It prescribes a process to ensure that federal decision-makers consider, and that the public is informed about, potential environmental consequences of proposed projects.  *Id.*

To achieve these dual purposes, NEPA requires that agencies prepare an environmental review document.  42 U.S.C. § 4336. A categorical exclusion satisfies an agency's NEPA review requirement where an agency has determined that it falls within the category of actions that do not

have significant environmental effects. *Id.* § 4336(a)(2); *see id.* § 4336e(1) (defining a "categorical exclusion" as "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment"). The NPS's categorical exclusions are published in Section 12.5, Chapter 12, Part 516 of the Department of the Interior's Departmental Manual ("516 DM 12").[8]

While agency NEPA compliance may take various forms, judicial review of agency NEPA compliance is deferential. *Seven Cnty.*, 605 U.S. at 180; *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989). Under NEPA, agencies may decide that "other values outweigh the environmental costs" and may move forward with a proposed action so long as they undergo the necessary process. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). The court's role is "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Indian River Cnty. v. U.S. Dep't of Transp.*, 945 F.3d 515, 527 (D.C. Cir. 2019) (citation omitted).

**B.     The National Historic Preservation Act**

Like NEPA, Section 106 of the NHPA is "essentially a procedural statute" that does not impose substantive standards but "requires that agencies 'take into account the effect of [an] undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register [of Historic Places].'" *City of Alexandria v. Slater*, 198 F.3d 862, 871 (D.C. Cir. 1999) (alteration in original) (citing 16 U.S.C. § 470f (1999), *recodified at* 54

---

[8] The relevant portion of the Department of the Interior's Departmental Manual is publicly available at, https://www.doi.gov/document-library/departmental-manual/516-dm-12-managing-nepa-process-national-park-service.

U.S.C. § 306108).  An undertaking is any "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency."  54 U.S.C. § 300320.

The Advisory Council on Historic Preservation ("ACHP") regulations detail the process for federal agency compliance with Section 106.  *See* 36 C.F.R. Part 800 (2025).  The ACHP regulations expressly authorize an agency to enter into programmatic agreements with the ACHP to govern its Section 106 obligations in certain situations.  36 C.F.R. § 800.14(b).  In 2008, the NPS, the ACHP, and the National Conference of State Historic Preservation Officers entered into a Programmatic Agreement to govern the NPS's Section 106 compliance for parks nationwide.  Ex. 1, Nersesian Decl., Ex. D.  Among other provisions, the 2008 Programmatic Agreement authorized a Streamlined Review Process, whereby, if the NPS Section 106 Coordinator determines certain criteria are met, no further Section 106 consultation is required unless specifically requested by specific parties.  *See id.*

### C.    The National Park Service Organic Act

The "fundamental purpose" of the National Park System is "to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of" those resources "in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  54 U.S.C. § 100101(a) ("Organic Act").  The NPS's mandate is to "promote and regulate the use of the National Park System by means and measures that conform to th[at] fundamental purpose."  *Id.*

Even so, "[b]ecause the Organic Act is silent as to the specifics of park management," the NPS has "especially broad discretion" in its implementation of the Organic Act's mandate.  *Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000); *see Nat'l Parks Conservation Ass'n v. Jewell*, 965 F. Supp. 2d 67, 84 (D.D.C. 2013) (citing this language from *Davis* and noting that "[h]owever,

the NPS Organic Act prohibits uses which impair park resources and values" (citations omitted); *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1454 (9th Cir. 1996) (the NPS is "empowered with the authority to determine what uses of park resources are proper and what proportion of the park's resources are available for each use") (citations omitted). Courts must "uphold the [NPS]'s exercise of this discretion unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Daingerfield Island Protective Soc'y v. Babbitt*, 40 F.3d 442, 446 (D.C. Cir. 1994) (citation omitted).

The NPS's 2006 Management Policies ("NPS Policies") provide a guide to managing the National Park System.[9] Although section 1.4 serves as the NPS's official interpretation of the Organic Act, the NPS Policies are "intended only to improve the internal management of the National Park Service," and "they are not intended to, and do not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States . . . ."[10] NPS Policies at 4.

### D.    The Administrative Procedure Act

NEPA, the NHPA, and the NPS Organic Act do not provide a private right of action and thus any judicial review is governed by the APA. *See Karst Env't Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007). The APA authorizes a reviewing court to "hold unlawful and set aside" final agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh*, 490 U.S. at 378.

---

[9] The NPS Policies are publicly available at
https://www.nps.gov/subjects/policy/upload/MP_2006_amended.pdf.

[10] While the NPS Policies were treated as enforceable in *Greater Yellowstone Coalition v Kempthorne*, 577 F. Supp. 2d 183, 190, n.1 (D.D.C. 2008), because the NPS had conceded the issue in that case, they have subsequently been confirmed to be non-enforceable. *See River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1071-73 (9th Cir. 2010).

**<u>LEGAL STANDARD</u>**

A "preliminary injunction is an 'extraordinary and drastic remedy.'" *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). An injunction should be entered only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable injury in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Id.* at 20; *see also Katz v. Georgetown Univ.*, 246 F.3d 685, 687-88 (D.C. Cir. 2001). "The last two factors merge when the government is a party." *Harris Cnty. v. Kennedy*, 786 F. Supp. 3d 194, 203 (D.D.C. 2025) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009). A movant "has the burden to show that all four [*Winter*] factors, taken together, weigh in favor of the injunction." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 169 (D.D.C. 2025) (alteration in original) (citation omitted); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (recognizing that the movant must carry its burden "*by a clear showing*" (citation omitted)).

Similarly, 5 U.S.C. § 705 directs that a reviewing court, "to the extent necessary to prevent irreparable injury, . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." *Id.* The factors governing the issuance of a preliminary injunction "also govern the issuance of a stay under Section 705 of the APA." *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 58 (D.D.C. 2020) (citation omitted).

When considering a motion for a preliminary injunction, if it becomes apparent to the court that it lacks jurisdiction over plaintiffs' claims, the court may dismiss plaintiffs' claims in whole

or in part.  *See, e.g.*, *Schindler Elevator Corp. v. Washington Metro. Transit Auth.*, 514 F. Supp. 3d 197, 212 (D.D.C. 2020) (denying plaintiff's motion for preliminary injunction and dismissing plaintiff's claims sua sponte after concluding plaintiff was not entitled to any relief).

## ARGUMENT

Plaintiffs seek extraordinary relief in the form of an injunction prohibiting alleged agency implementation of two distinct initiatives.  But one is purely hypothetical.  The other is occurring (and is no more an emergency than it was four months ago, when the agency began executing it) but is consistent with applicable law.  Faced with these insurmountable obstacles, Plaintiffs rely on speculation and confusingly attempt to shoehorn one action into the other.  But Plaintiffs have failed to demonstrate a likelihood of success on either their Proposal Claims or their Landscaping Claims and otherwise fail to satisfy the necessary factors to secure preliminary injunctive relief. Furthermore, because Plaintiffs' Motion reveals they lack standing, the Court lacks jurisdiction over their claims, and Plaintiffs' claims must be dismissed.

## I.      Plaintiffs are Not Likely to Succeed on the Merits of their Claims

Plaintiffs lack standing to bring either their Proposal Claims or their Landscaping Claims. Even if Plaintiffs had standing, Plaintiffs still cannot demonstrate a likelihood of success on the merits because their Proposal Claims are unripe and fail to challenge a final agency action subject to judicial review.  Finally, their Landscaping Claims fail to allege any violation of federal law.

### A.      Plaintiffs Lack Standing to Bring their Claims

To have standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016).  Because "standing is not dispensed in gross; . . . plaintiffs must demonstrate standing

16

for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citation omitted).

### 1. Plaintiffs Fail to Allege an Injury for Standing Purposes

Plaintiffs allege no actual or imminent injury to establish standing. To establish injury in fact, a plaintiff must show "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)) (internal quotation marks omitted). If a plaintiff's alleged injuries are forward-looking, the plaintiff must show "a material risk of future harm" that is "sufficiently imminent and substantial." *TransUnion LLC*, 594 U.S. at 435. The injury must be "*certainly* impending," and allegations of "*possible* future injury" fail to establish standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation modified).

Plaintiffs allege injuries that are not "actual or imminent, [but instead] conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (citation omitted). This dooms both their Proposal Claims and their Landscaping Claims.

### a. Plaintiffs Fail to Allege Injury for Their Proposal Claims

Plaintiffs' alleged injuries in support of their Proposal Claims are speculative and not imminent. Instead, they rest on hypothetical future decisions by agency Defendants and assume those decisions will be harmful to their interests.

***Organizational Standing.*** To determine if an organization has standing to sue in its own right, courts conduct the same inquiry as in the case of an individual plaintiff. *Food & Water Watch v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). "[A]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art[icle] III." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976). Rather, an organization

17

must show that the defendant's conduct "directly affected and interfered with [its] core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).  The D.C. Preservation League ("League") has not done so.

The League alleges that it may "have to change [its] app and website."  Mem. 20, Dkt. No. 8-1; Miller Decl. ¶¶ 7-8, Dkt. No. 8-5.  The League concedes its choice to take those actions would happen only "*[i]f* East Potomac Park and East Potomac Golf Course were significantly altered," Miller Decl. ¶ 8 (emphasis added), and *if* a future agency decision rendered the Park ineligible for listing on the National Register of Historic Places, *id.* Decl. ¶ 7.  But the League cannot demonstrate how its hypothetical and voluntary decision to update its app and website would in any way interfere with its core business activities; nor has it shown that such a contingent possibility is imminent.  *See Hippocratic Med.*, 602 U.S. at 395; *see also Freedom Watch, Inc. v. McAleen*, 442 F. Supp. 3d 180, 188 (D.D.C. 2020) (injury "requires the defendant's conduct to inhibit the organization's 'daily operations'").

The League also claims it would have to "change its plans" for hosting a September 2026 fundraiser at the Course.  Mem. 20.  But the League never explains why future improvement plans would prevent it from hosting its event.  For example, the League does not allege that it ever made this request, that its request was granted, or that it would be denied after improvement plans.  This theory, like the web-and-app theory, is neither actual nor imminent.  Separately, such financial impacts premised on speculation would not support an injury for standing.  *See Clapper*, 568 U.S. at 416 (recognizing that plaintiffs lack an injury for standing purposes where their alleged harms are "based on costs they incurred in response to a speculative threat").

***Associational Standing.***  Plaintiffs are challenging *future* conduct, so they must show that some concrete harm is either "certainly impending" or that there is a "substantial risk" it will occur,

18

which in the standing context means that it must be "sufficiently imminent." *N.Y. Republican State Comm. v. SEC*, 927 F.3d 499, 504 (D.C. Cir. 2019) (quoting *Clapper*, 568 U.S. at 410–14, and *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)); *see also Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 151 (D.D.C. 2023) (discussing requirement to allege "sufficiently imminent" harm is "hard to meet where the harm-causing event is still subject to regulatory processes and approvals" (citation modified)). And because the League relies on associational standing, which is satisfied if one of the association's "members would otherwise have standing to sue in their own right," *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), the League's unnamed member must allege an injury-in-fact that likewise meets Article III's particularity and imminence requirements. Both the individual Plaintiffs and the League fail to meet those requirements.

Because the individual Plaintiffs and the League allege aesthetic harms from the proposed activities, including the landscaping activities, they must show that "[their] specific aesthetic interests" are harmed, by describing their particular "use[] and enjoy[ment] [of] the land" beyond "mere incidental viewership," and they must further identify how they will have to "alter [their] behavior." *Env't Def. Fund v. FERC* ("*EDF*"), 2 F.4th 953, 969–70 (D.C. Cir. 2021). Thus, the D.C. Circuit has found standing existed where a plaintiff alleged that construction of a pipeline over property where he frequently fished, boated, and hunted would diminish his ability to do those things. *Sierra Club v. FERC*, 827 F.3d 59, 66 (D.C. Cir. 2016); *see also Food & Water Watch v. FERC*, 28 F.4th 277, 283–84 (D.C. Cir. 2022) (finding standing where construction would cause noise and pollution that would impair "financial value" and "peaceful enjoyment" of nearby property). But it concluded that a plaintiff lacked standing to vindicate an aesthetic interest when she did "not even allege that she c[ould] see the new [construction] from her property," which was

19

more than "half a mile" away, and attested only that "she must look at an 'eyesore' several times per week when driving past."[11]  *EDF*, 2 F.4th at 968–70.  She "neither altered her behavior nor explained why she has any particularized connection to the land," reducing her "alleged aesthetic injuries" to "nothing more than generalized grievances, which cannot support standing." *Id*.

Individual Plaintiffs here fare no better than the *EDF* plaintiffs.  Plaintiff Roberts claims his "interest in East Potomac's recreational value and aesthetic value" would be harmed, but only "*if* the golf course is turned into something different."  Roberts Decl. ¶ 22, Dkt. No. 8-6 (emphasis added).  Similarly, Plaintiff Dickson claims his appreciation for the Course's "beauty, fun, history, accessibility, and . . . sense of community" will be harmed "*[i]f* East Potomac is converted into what the President has described."  Dickson Decl. at ¶ 23, Dkt. No. 8-4 (emphasis added).  But Plaintiffs offer no facts alleging that Defendants have in fact made any decision, that such decision would "alter" East Potomac Golf Course, or that such alterations would be "significant" and harmful to their interests in any way.  And "plaintiffs 'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'" *Food & Water Watch*, 808 F.3d at 918.

Together, Plaintiffs non-existent injuries rest on a series of logical leaps.

First, they posit the existence of a "Washington National plan" based only on (1) an alleged meeting in which Secretary Burgum "proposed" using fill material from the East Wing Modernization Project for East Potomac Park, Compl. ¶¶ 67-68; (2) President Trump's alleged response that the "idea was brilliant," *id.* ¶ 68; (3) a visit to the course by a golf course designer,

---

[11] The D.C. Circuit found "nothing in the existing case law to suggest that a person who incidentally views something unpleasant has suffered an injury-in-fact for purposes of standing." *EDF*, 2 F.4th at 970; *see also Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 84 (2019) (Gorsuch, J., concurring in the judgment) ("Offended observer standing cannot be squared with this Court's longstanding teachings about the limits of Article III.").

*id* ¶ 78; and (4) President Trump's aspirational remarks that the federal government intends to improve the aesthetics and capabilities of East Potomac Golf Course, *id.* ¶ 83. But if every preliminary step in agency deliberations were enough to cause an imminent, non-speculative injury under Article III, the standing inquiry would be meaningless.

Second, Plaintiffs conclude without evidence that Defendants made decisions "adopt[ing] and implement[ing]" a "plan" concerning East Potomac Golf Course without ever identifying what those decisions may have been. *E.g.*, *id.* ¶ 91.

Third, they speculate that Tom Fazio will be hired to design this "plan."[12] *Id*. ¶ 86.

And fourth, they speculate that this unseen, undesigned plan will contain features or otherwise affect the Course in a way they will find objectionable or harmful. *Id.* ¶¶ 86, 89.

In other words, Plaintiffs' claimed injuries are not only contingent on future, unidentified agency decisions, but they are also devoid of any indication that those decisions and resulting injuries are certain or imminent.

Plaintiffs also allege injury to procedural rights provided by NEPA and the NHPA. Mem. 20-21. "However, even a plaintiff claiming procedural injury must show how the agency's error could affect her 'concrete interests.'" *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 304 (D.C. Cir. 2025) (citation omitted). Plaintiffs have no right to be involved in any review that has not even begun. Plaintiffs argue that they should have had a chance to participate in the NEPA and Section 106 processes for the conceptual "Washington National Plan." But what they claim is a legal violation is instead indicative of the fact that no such agency action has occurred or is imminent. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d

---

[12] Perhaps no allegation embodies the speculative nature of Plaintiffs' injuries more than this. If the "plan" must still be designed, then there is clearly no approved "plan" at all, let alone one that Defendants have begun implementing.

466, 480 (D.C. Cir. 2009) ("[A]n agency's NEPA obligations mature only once it reaches a 'critical stage of a decision which will result in "'irreversible and irretrievable commitments of resources' to an action that will affect the environment.'"") (citation omitted); 54 U.S.C. § 306108 (requiring consideration of effects on historic property only "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license"). As to the conceptual proposal, Defendants have not committed to any action that would trigger obligations to conduct NEPA or Section 106 compliance, let alone taken steps to implement such undeveloped plans.

### b.    Plaintiffs Fail to Allege Injury for their Landscaping Claims

Plaintiffs' alleged injuries in support of their Landscaping Claims also fail to establish standing necessary to bring those claims.

Plaintiff Dickson alleges an increased risk of harm from exposure to the fill stockpile. Dickson Decl. ¶ 22 (alleging that he is "concerned about the large mounds of debris" and "whether it is safe to be that close to that material"). But because increased-risk-of-harm injuries are often remote and speculative, to allege an injury for standing purposes, a plaintiff must "show '*both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account.'" *Food & Water Watch*, 808 F.3d at 914 (quoting *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007).

Dickson offers no facts that raise his concerns above the level of rank speculation. He offers no basis for concluding that the presence of the fill stockpile substantially increases his risk of harm from chemical contaminants or that there is a substantial probability he will be harmed given that increased risk. Plaintiff only questions whether the *East Wing* may have contained asbestos, Compl. ¶ 81, but provides no allegation—beyond mere speculation—that the excavated fill material that is being stockpiled contains any asbestos, let alone enough to substantially

22

increase his risk of harm, or that there is a substantial probability he will be harmed from that increased risk. Plaintiffs point to photographs containing debris adjacent to the stockpile, but that material was clearly segregated from the soil prior to storage, in anticipation of offsite disposal consistent with the NPS's monitoring and evaluation plan. *See* Ex. 1, Nersesian Decl. ¶ 42, Ex. I at 7, 27, Ex. K at Standard Operating Procedures 077-078.

Simply put, Plaintiff fails to plausibly allege any basis for concluding that Defendants' decision to place clean fill on the Course has caused injury in the form of an increased risk of harm. To the contrary, the NPS has confirmed that the fill material is indeed being tested and that all results to date indicate that the levels of contaminants in the incoming fill material is very similar to the background levels in the existing soil at East Potomac Park. *Id.* ¶ 46.

Plaintiff Roberts asserts aesthetic and emotional harms, but those also fall short. For example, he claims the stockpile harms "how the golf course looks and feels to [him]," claiming the stockpile is "a big, ugly pile of dirt" that "looks terrible." Roberts Decl. ¶ 22. But generalized claims that construction constitutes an "eyesore" are insufficient to establish concrete and particularized injuries for standing purposes. *EDF*, 2 F.4th at 969; *see also In re Navy Chaplaincy*, 534 F.3d 756, 763 (D.C. Cir. 2008) (such "mere personal offense to government action does not give rise to standing to sue").[13] While Roberts claims the temporary access road and dirt pile "basically severs the White Course in two," Roberts Decl. ¶ 22, he never alleges that the stockpile (placed in the void between holes 4, 5, and 9) somehow forecloses his use of the Course or otherwise harms his ability to play it. Roberts' "alleged aesthetic injuries reflect nothing more

---

[13] While Plaintiffs' criticisms are not sufficient for standing purposes, upon conclusion of stockpiling, the NPS intends to seed the stockpile, further reducing any temporary effects. Nersesian Decl. ¶ 33.

than generalized grievances, which cannot support standing." *EDF*, 2 F.4th at 970 (citing *Lujan*, 504 U.S. at 573-74).

And to the extent that Plaintiff Roberts claims emotional harms because he "felt violated," Roberts Decl. ¶ 24, by the pile of dirt, such feelings do not rise to the level of a constitutional injury for standing purposes. *See Humane Soc. of U.S. v. Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995) (noting that general emotional harm "cannot suffice for injury-in-fact for standing purposes").

As for the League, its declarant does not describe *any* injury attributable to the presence of the stockpile at East Potomac Golf Course. *See* Miller Decl. ¶ 18. Plaintiff's counsel attempts to assert in its briefing that "dumping" fill material had an effect on "their interests," Mem. 21, but Plaintiff never identifies those concrete interests or how the temporary storage of fill material for potential future improvements of the Course has harmed those interests.

**2.     Plaintiffs' Claimed Injuries are Not Traceable to Defendants' Conduct**

Even if Plaintiffs could establish an injury stemming from the Department of the Interior's deliberations on tentative proposals or the placement of fill material—and they cannot—Plaintiffs still fail to show that such injury is "fairly traceable" to Defendants' "allegedly unlawful conduct." *California v. Texas*, 593 U.S. 659, 669 (2021). "Like the injury in fact requirement, the causation requirement screens out plaintiffs who were not injured by the defendant's action." *Hippocratic Med.*, 602 U.S. at 383. It precludes speculative or attenuated links in the causal chain between the government's alleged action and the plaintiff's supposed injury. *Id.*

Even if Plaintiffs could establish an injury based on the potential future redesign of the East Potomac Golf Course, the links in the causal chain between that alleged injury and the challenged decisions here are too attenuated to support standing. Plaintiffs have challenged an alleged proposal by the President and subsequent deliberations by Defendants to enhance East Potomac

Golf Course. But for those activities even theoretically to cause imminent injury, a litany of events would have to occur. Defendants would need to, at minimum, identify a potential qualifying lessee, negotiate agreed-to lease terms, and determine that the lease and proposed activities under the lease meet all the applicable requirements of 36 C.F.R. part 18. Bowron Decl. ¶ 15. Next, the NPS or a new lessee would need to contract for architectural and design services. *Id.* ¶ 17. Then, before a new lessee could undertake large-scale redevelopment, the NPS would undertake (like it undertook for Rock Creek Park)[14] compliance with NEPA, Section 106, Section 7 of the Endangered Species Act, compliance with the Organic Act, and any other applicable laws and regulations. *Id.* ¶¶ 16, 18-21. Depending on the nature and scope of any such projects, the requisite compliance process could also include review and approval by the National Capital Planning Commission and the U.S. Commission on Fine Arts, which advises the government on design and aesthetics for public buildings, monuments, parks, and other structures. *Id.* ¶ 22. And of course, Plaintiffs would have to find the final designs objectionable. None of these steps have occurred, *id.* ¶ 14, and Plaintiffs offer no facts to plausibly conclude that they have. *See Robbins v. U.S. Dep't of Hous. & Urb. Dev.*, 72 F. Supp. 3d 1, 7 (D.D.C. 2014) ("The causation standard asks for a 'fairly traceable' injury and not an attenuated connection." (quoting *Lujan*, 504 U.S. at 560-61)).

Similarly, the League's claimed future injuries in the form of voluntary changes *it* may make to its app and website are predicated on the same assumptions *and* the assumption that someone will petition NPS for the removal of East Potomac Park from the National Register of

---

[14] *See* Rehabilitation of the Rock Creek Park Golf Course, Document List, National Park Service, https://parkplanning.nps.gov/documentsList.cfm?projectID=112141. Many of the first major developments required by the 2020 NLT lease rehabilitated Rock Creek Park Golf Course. Before those actions could be taken, the NPS, in cooperation with NLT, conducted the appropriate analyses and complied with applicable environmental laws including NEPA and Section 106 of the NHPA.

Historic Places, 36 C.F.R. 60.15, and that the NPS Keeper of the National Register will decide it is in fact ineligible based on implementation of that design.

And while Defendants have placed fill material on East Potomac Golf Course, tracing that action to Plaintiffs' alleged injuries would also require breaks in the causal chain.  For example, Defendants would need to make further decisions to place *contaminated*, not clean fill within the Park, or expand the stockpile in a way that would foreclose Plaintiffs' ability to use the Course.[15]

For much the same reason Plaintiffs cannot satisfy the injury prong of standing by showing imminent injury, they cannot satisfy the traceability prong either.  Their non-existent injuries are too attenuated from the only steps Defendants are alleged to have actually taken.

### 3.     Plaintiffs' Claimed Injuries are not Redressable

To satisfy the redressability requirement, a plaintiff must demonstrate "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000).  "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 107 (1998).

Here, East Potomac Golf Course needs significant maintenance and improvements to restore it to the world-class course that it once was.  In 2017, the NPS concluded that it was only in fair condition and showed "clear evidence of minor disturbances and deterioration."  CLI 152. The NPS also concluded that "without the appropriate corrective action," the Course will "degrade to a poor condition." *Id.*  Indeed, NLT—which Plaintiffs impermissibly seek to have reinstated as

---

[15] To the extent that Plaintiffs claim the storage of fill material is "segmented" from and indicative of its Washington National Plan, any redesign of the Course, if it happens, would be a separate action from the fill storage because the soil storage has independent utility for routine landscaping and is not premised on the assumption that any particular redesign will occur. *See Food & Water Watch*, 28 F.4th 291-92 (concluding independent utility of projects justified separate analyses).

lessor—was obligated under its lease to perform millions of dollars' worth of upgrades to the Course. Thus, even if the Court were to grant Plaintiffs all the relief they seek, the Course would still undergo significant changes and maintenance requiring fill material. Because East Potomac Golf Course would undergo changes "no matter how the Court resolves [Plaintiffs'] claims," Plaintiff cannot satisfy the redressability requirement. *Kimelman v. Garland*, 588 F. Supp. 3d 84, 89 (D.D.C. 2022)).

Finally, the Court lacks jurisdiction insofar as Plaintiffs seek to secure relief on behalf of NLT. *See* Mot. 3 f.-h., Dkt. 8. Plaintiffs ask the Court enjoin termination of NLT's lease and its reassignment—in essence, "the classic contractual remedy of specific performance." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). Under the Tucker Act, 28 U.S.C. § 1491, those claims must be brought in the Court of Federal Claims. 28 U.S.C. § 1491. Second, Plaintiffs lack standing to bring those claims on NLT's behalf and Plaintiffs make no attempt to establish third-party standing. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (citation omitted) (A plaintiff generally "must assert [its] own legal rights and interests, and cannot rest [its] claim to relief on the legal rights or interest of third parties"); *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213 (D.D.C. 2020) (outlining elements for third-party standing, including that "there must exist some hindrance to the third party's ability to protect his or her own interests"). Therefore, the Court is without authority to provide the redress Plaintiffs seek.

***

In sum, Plaintiffs lack standing to bring their claims. Because standing is essential for the Court to exercise its Article III jurisdiction, the Court should deny the motion and dismiss Plaintiffs' Complaint sua sponte.

**B.      Plaintiffs Are Otherwise Not Likely to Succeed on the Merits of their Proposal Claims**

Even if the Court were to find Plaintiffs have standing to bring their Proposal Claims, Plaintiffs cannot show a likelihood of success on the merits of those claims because they are unripe and do not challenge any final agency action.

**1.      Plaintiffs' Proposal Claims are Unripe**

Plaintiffs' challenge to an inchoate proposal to redesign the golf course is not ripe. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Doe v. Doe Agency*, 608 F. Supp. 2d 68, 72 (D.D.C. 2009) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003) (citation omitted).

In effect, "[t]he ripeness doctrine subsumes two inquiries: first, the Article III requirement of standing, which requires a plaintiff to allege *inter alia* an injury-in-fact that is 'imminent' or 'certainly impending,' and, second, 'prudential reasons for refusing to exercise jurisdiction.'" *Garcia v. Acosta*, 393 F. Supp. 3d 93, 103 (D.D.C. 2019) (citation modified); *R.J. Reynolds Tobacco Corp. v. U.S. Food & Drug Admin.*, 810 F.3d 827, 830 (D.C. Cir. 2016) ("Both doctrines . . . focus on contingencies that may render the risk of harm too slight.").

Plaintiffs' Proposal Claims are constitutionally unripe for the same reasons that Plaintiffs lack standing to bring those claims—they have shown no actual or imminent injury caused by the Department of the Interior's preliminary deliberations that is redressable by this Court.

28

Plaintiffs' Proposal Claims also fail on the prudential front.  "[T]he doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to, and then, only once."  *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012).  In evaluating ripeness, courts look to "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Abbott Labs v. Garner*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  Under the fitness prong of this test, courts must consider "[1] whether [the claim] is 'purely legal, [2] whether consideration of the issue would benefit from a more concrete setting, and [3] whether the agency's action is sufficiently final.'"  *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (citation omitted).  Under the hardship prong, courts must ask whether the challenged administrative action is likely to have a direct and immediate effect on the "primary conduct" of the plaintiff.  *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967).  Plaintiffs fail under both prongs.

As to the fitness prong, Plaintiffs' Proposal Claims are not purely legal.  Rather, they require further factual development, including retention of a new lessee, development of a new design, and compliance with applicable environmental laws before Defendants will authorize that final agency action at all.  *See Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007) ("[W]hen an agency decision may never have 'its effects felt in a concrete way by the challenging parties,' the prospect of entangling ourselves in a challenge to such a decision is an element of the fitness determination as well."  (quoting *Abbott Labs*, 387 U.S. at 148-149)).  Defendants may decide to implement a future hypothetical design, or they may not.  *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996) (recognizing "the rational underlying the ripeness doctrine: [i]f we do not decide it now, we may never need to").

29

Uncertainty as to whether and how the President's proposal will even occur likewise eliminates any hardship to Plaintiffs. Plaintiffs suffer no hardship from deferred judicial review. If Defendants undertake a final agency action based on the President's proposal, Plaintiffs—assuming other jurisprudential requirements are met—can bring claims challenging that action at that time. But delayed review is, by definition, no hardship itself. *See Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*, 85 F. Supp. 3d 250, 272-73 (D.D.C. 2015). Any judicial review should await an actual final decision following Defendant's internal deliberations and completion of whatever level of NEPA, Section 106, and other compliance Defendants undertake. It should not be based on Plaintiff's speculation as to what that decision and accompanying compliance will be. Indeed, Defendants' renovations to Rock Creek Park Golf Course illustrate how that process may play out. *See supra* n.14.

At minimum, Defendants should be permitted to deliberate on any conceptual proposal, develop potential paths forward, conduct the appropriate analyses, and make a decision that would turn that concept into a reality. Until these various hypotheticals crystalize into a definite operational plan, Plaintiffs' claims are unripe and judicial review should be withheld.

### 2. Plaintiffs' Proposal Claims Fail to Challenge Final Agency Action

Plaintiffs' complaint against the *concept* of an improved golf course does not challenge final agency action as it must to demonstrate likelihood of success. "Agency action," as used in the APA, is a term of art, referring to an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). It requires "circumscribed, discrete agency action[]" on the part of agency defendants. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("Under the

terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm").

And the APA limits review of "agency action" to "final agency action." *Id.* § 704. "Final agency action" is action that (1) "mark[s] the 'consummation' of the agency's decisionmaking process," and (2) creates legal "rights or obligations," with "direct and appreciable legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). The action "must not be of a merely tentative or interlocutory nature." *Id*. (emphasis added).

Whether an agency has taken final agency action is a legal determination—it is not a question appropriate for judicial fact-finding drawn from public statements. *See, e.g.*, *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267-68 (D.C. Cir. 2018) (reviewing de novo court's finding that an FTC staff letter was final agency action). Nonbinding expressions of agency intent cannot be converted into final agency action simply by mislabeling them as plans for or promises of future agency action. *See Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 18-22 (D.C. Cir. 2006) (agency plan is unreviewable insofar as it reflects only a nonbinding statement of something the agency intends to do in the future). And allegations of only "an abstract decision apart from specific agency action" will not suffice. *Biden v. Texas*, 597 U.S. 785, 809 (2022).

Here, Plaintiffs fail to identify any agency action on the part of Defendants—let alone a *final* agency action—necessary to support their Proposal Claims. Plaintiffs fail to identify any Department of the Interior or NPS rule, order, license, or approval authorizing the redevelopment of the East Potomac Golf Course. 5 U.S.C. § 551(13).

Instead, they ask the Court to infer a decision from the President allegedly complimenting an "idea" by the Secretary of the Interior, Compl. ¶ 68, the President's aspirational statements of

31

future intent, *id.* ¶ 83, and a separate decision to use clean fill material for future landscaping improvements in East Potomac Park, *id.* ¶ 70.

But the President is not an agency. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). The President's actions—and the mere utterances alleged here—"are not reviewable under the APA." *Dalton v. Specter*, 511 U.S. 462, 470 (1994). And Courts may not infer an unwritten, unrecorded decision from a collection of lawful, routine activities. *See Biden*, 597 U.S. at 809-10.

Nor are the activities identified by Plaintiffs substitutes by themselves for final agency action. Far from the "consummation" of the agency's decisionmaking process, they reflect that process in action—discussions among agency officials and the President exploring how best to improve the East Potomac Golf Course. Finality turns on legal consequences—whether the agency has bound itself or altered rights or obligations of another. *Bennett*, 520 U.S. at 178. As described above, however, before any final agency action could be taken here, the NPS would first need to pursue a host of preliminary activities within its management discretion. *See* Bowron Decl. ¶¶ 14-20. And should Defendants advance the President's proposal further, Defendants should be granted the leeway to take those implementation steps here. *See United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.") (citation omitted).[16]

---

[16] Even if Defendants were required to conduct NEPA or NHPA analysis at this preliminary stage (and they are not), the failure to prepare a NEPA or NHPA document cannot alone be the final agency action subject to review under the APA—a separate final agency action must be challenged. *See Seven Cnty*, 605 U.S. at 180; *Pub. Citizen v. Office of United States Trade Representative*, 970 F.2d 916, 918 (1992) ("refusal to prepare an EIS is not itself a final agency action for purposes of APA review").

**3.    Defendants' Preparatory Activities Do Not Trigger NEPA or NHPA**

Even if Plaintiffs could satisfy the requirements of ripeness and final agency action, their Proposal Claims still would be unlikely to succeed on the merits, because the procedural requirements they invoke do not apply until a project reaches the point of certain real-world consequences. "[A]n agency's NEPA obligations mature only once it reaches a 'critical stage of a decision which will result in "'irreversible and irretrievable commitments of resources' to an action that will affect the environment.'" *Ctr. for Biological Diversity*, 563 F.3d at 480 (citation omitted). Likewise, an agency must comply with the Section 106 process only "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license." 54 U.S.C. § 306108.

Plaintiffs identify no irretrievable commitment of resources to golf course redevelopment that would trigger NEPA, nor any approved expenditure or licensure that would trigger a Section 106 obligation. Nor could they, since the project they challenge is purely hypothetical and therefore has required no funding or license.

**C.    Plaintiffs are Otherwise Not Likely to Succeed on the Merits of their Landscaping Claims**

Aside from standing, Plaintiffs' allegations in support of their Landscaping Claims fail to even state a claim for relief, let alone establish a likelihood of success necessary to warrant preliminary injunctive relief.

**1.    Defendants Complied with NEPA**

Defendants reasonably determined that the storage and placement of clean fill material at East Potomac Park fell within a categorical exclusion and that no extraordinary circumstances existed, eliminating the need for further analysis.  This is all the process NEPA required.

33

In some cases, agencies are required to prepare either an EIS or an EA with respect to a proposed action. 42 U.S.C. § 4336(b). That choice turns on whether the proposed action has a reasonably foreseeable significant effect on the quality of the human environment. *Id.* But the preparation of an EA or EIS is not required—and the agency remains in compliance with NEPA— where the agency determines "the proposed agency action is excluded pursuant to one of the agency's categorical exclusions." 42 U.S.C. § 4336(a)(2). In other words, where an agency determines that a category of actions "normally does not significantly affect the quality of the human environment," *id.* § 4336e(1), and a proposed action falls within such a category and no extraordinary circumstances exist, no environmental review document is required.

When a court is tasked with reviewing these agency determinations, its review "is a limited one." *Seven Cnty.* 605 U.S. at 185 (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978)). "The bedrock principle of judicial review in NEPA cases . . . [is] [d]eference." *Id.*

Thus, an agency's determination that a proposed action falls within a categorical exclusion is entitled to substantial deference. *See id.* ("NEPA does not authorize a court to 'interject itself within the area of discretion . . . as to the choice of the action to be taken' by the agency." (citation modified) (citation omitted); *see also Ctr. for Biological Diversity v. Fed. Aviation Admin.*, 804 F. Supp. 3d 86, 94-95 (D.D.C. 2025) (recognizing that *Seven County*'s central principle of deference in the NEPA cases was not limited to the choice and scope of an EIS). The Supreme Court has cautioned that a reviewing court should not "micromanage" such an agency choice so long as it "fall[s] within a broad zone of reasonableness." *Seven Cnty.*, 605 U.S. at 183. In short, the agency's final decision to which its NEPA analysis pertains need only be "reasonable and reasonably explained." *Id.* at 180.

34

Here, Defendants reasonably decided to temporarily store clean fill from the East Wing Modernization Project on the East Potomac Golf Course for later reuse and reasonably explained that decision. Ex. 1, Nersesian Decl. Ex. B. In light of the agency's monitoring and evaluation plan, The NPS's categorical exclusion form demonstrates that the NPS adequately considered the environmental effects of its action and provides an adequate basis for the agency's decision not to conduct a more exhaustive environmental analysis. *Id.*

Section 12.5 of the Department of the Interior Departmental Manual identifies those proposed actions that the Department has determined "normally do[] not significantly affect the quality of the human environment," and are thus excluded from NEPA's environmental document requirement. 42 U.S.C. §§ 4336(a), 4336e(1). They include actions related to development, such as "[l]andscaping and landscape maintenance in previously disturbed or developed areas." 516 DM 12.5(C)(19).

Here, the proposed action consisted of the "temporary storage" of "clean fill on previously disturbed and maintained areas of the East Potomac Golf Course" for later reuse. Nersesian Decl. Ex. B at 1. Since infill was "planned as part of improvements" reflected in NLT's lease then in effect, the NPS reasonably concluded the fill material could be used for landscaping purposes, even without identifying a specific future use. *Id.*; *see* Ex. 2, Bowron Decl. Ex. A at Ex. D 1-2 (requiring that, among other things, that courses would be redesigned and rebuilt and other elements would be constructed). And given that East Potomac Park was constructed entirely of fill material and has undergone repeated renovations, *see supra* 2-3, the NPS reasonably concluded that it qualified as a "disturbed or developed area." Ex. 1, Nersesian Decl. Ex. B at 1.

The NPS reasonably justified this conclusion. The NPS explained that "[t]he proposed use of soil for contour correction, drainage improvement, and turf establishment represents

35

maintenance and minor modification of an existing managed landscape, not new construction or a change in land use." *Id.* Further, the NPS explained that the Course itself was artificially constructed, the soil would be tested and verified as clean before placement, and the proposed action was responsive to a need for fill, would occur in areas that had been extensively modified, and would have only incidental and negligible effects on endangered species. *Id.* Ex. B at 1-2.

The NPS also reasonably concluded that no extraordinary circumstances required additional NEPA analysis. *Id.* Ex. B at 2. Department of the Interior regulations, 43 C.F.R. § 46.205(c), recognize that a normally excluded action "may have a significant environmental effect and require additional analysis." *Id.* Section 46.215 identifies nine categories of extraordinary circumstances. 43 C.F.R. § 46.215(a)-(i). The NPS explained that none of those circumstances applied to the action here.

In their Motion, Plaintiffs complain that the proposed action fell under extraordinary circumstances (a), (b), (e), and (f). Those circumstances include actions that have "significant impacts" on public health or safety, historic or cultural resources, or properties listed on the National Register of Historic Places—or that are directly related to "other actions that implicate potentially significant environmental effects." But those concerns do not apply to actions, like the placement of clean fill on already filled land, that have no significant effects and by which no other directly related agency action, beyond speculative future actions, is implicated. Thus, the NPS reasonably determined that no extraordinary circumstances applied to the proposed action. And while Plaintiffs may insist that the NPS should have presented more facts to prove a negative, "[t]he agency is better equipped to assess what facts are relevant to the agency's own decision than a court is." *Seven Cnty.*, 605 U.S. at 181.

In sum, the NPS reasonably concluded that the proposed action fell within a categorical exclusion and reasonably explained its decision.

### 2.     Defendants Complied with Section 106 of the NHPA

Plaintiffs are also unlikely to succeed on the merits of their Section 106 Landscaping Claim.  Like NEPA, Section 106 of the NHPA is procedural, and claims brought under Section 106 are analyzed under the APA's arbitrary-and-capricious standard.  *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 299 (D.C. Cir. 2022).  Under that deferential standard, an agency's determinations under Section 106 will be upheld "so long as the agency's decision is 'reasoned and rational.'"  *Id.* (citation omitted).  The NPS's efforts here easily satisfy this standard, and Plaintiffs fail to allege any facts demonstrating otherwise.

Broadly speaking, Section 106 of the NHPA and its implementing regulations require that agencies consider the effect of an undertaking on historic properties through a multi-step process of initiation, identification, assessment, and efforts to resolve adverse effects, involving consultation with interested parties.  *See* 54 U.S.C. § 306108; 36 C.F.R. §§ 800.1-.6.

But this process can also be satisfied through program alternatives.  36 C.F.R. § 800.14. For example, the ACHP and an agency official may negotiate a programmatic agreement.  *Id.* § 800.14(b).   The regulations authorize the use of a programmatic agreement in certain circumstances, including "[w]here routine management activities are undertaken at Federal installations, facilities, or other land-management units."  *Id.* § 800.14(b)(iv).

The NPS negotiated a nationwide programmatic agreement to govern its compliance with Section 106.  Ex. 1, Nersesian Decl. Ex. D.  That 2008 Programmatic Agreement provides for a streamlined review process, whereby, if a proposed action satisfies certain criteria, no further consultation is required unless specifically requested by certain parties.  *Id.* Ex. D at 9.

To be eligible for streamlined review, a proposed undertaking must generally satisfy three requirements. First, it must be an activity eligible for streamlined review. *Id.* Eligible activities include routine grounds maintenance. *Id.* Ex. D at 15. Second, all historic properties within the undertaking's area of potential effects must have been previously identified and evaluated. *Id.* Ex. D at 9-10. And third, the agency Section 106 Coordinator must have reviewed the undertaking and certified that its effects on historic properties or properties eligible for the National Register will not be adverse. *Id.* Ex. D at 10.

As shown in its Assessment of Actions Having an Effect on Historic Properties, the NPS reasonably concluded that the proposed landscaping action was eligible for streamlined review and reasonably explained its decision. First, the NPS's cultural resource specialist explained that the proposed action was "consistent with routine grounds maintenance [because] the placement of fill will not significantly alter the design of the course." *Id.* Ex. C at 3. Second, the NPS determined that the area of potential effects in and around East Potomac Golf Course had previously been surveyed to identify historic properties. *Id.* Ex. C at 1; *see* CLI 1; *see also* Report 9. Third, the NPS concluded that this routine storage of fill material for future landscaping uses would have no adverse effect on historic properties. Ex. 1, Nersesian Decl. Ex. C at 2-3.

Struggling against this backdrop, Plaintiffs simply disagree with the NPS's "no adverse effect" conclusion. Plaintiffs argue that the temporary stockpile "alters terrain" and "contribute[s] to deterioration" of historic elements. Mem. 39. But Plaintiffs' assertion proves too much. All landscaping—especially incomplete landscaping—alters terrain to some degree, and in a Park composed entirely of fill, all landscaping could be deemed to "contribute to deterioration of historic terrain." *Id.* This does not constitute an adverse effect. The NPS is entitled to deference for its expert opinion about what effects on an NPS Park are adverse. Plaintiffs are not. Moreover,

38

Plaintiffs ignore the availability of Streamlined Review, and aside from conclusory statements, provide no basis for concluding the NPS's actions were improper.

In sum, the NPS's decisionmaking was not arbitrary and capricious. Rather, the NPS reasonably concluded the proposed action—storage and placement of fill material—was eligible for Streamlined Review and reasonably explained its conclusion in its Assessment. Section 106 of the NHPA required nothing more.

### 3.    Defendants Complied with the Organic Act

Like their NEPA and NHPA claims, Plaintiffs cannot show a likelihood of success on the merits of their claim that the NPS violated the Organic Act by temporarily storing clean fill material in East Potomac Park. Plaintiffs allege that the soil storage project (which they inaccurately refer to as "debris dumping") "would impair the enjoyment of the scenery, natural and historic objects, and wildlife" of the Park. Compl. ¶ 146. But it is now clear from their Motion that this claim rests solely upon *their enjoyment* of the Park.

Plaintiffs' Organic Act argument relies on speculation about the impacts of soil storage and future actions, rather than any concrete examples of current impacts on park resources and values, Mem. 40-41, and thus seems driven by Plaintiffs' "emotional attachment to a social interaction" rather than actual impact analysis. Mem. 18. Whatever the relevance of such interests for standing analysis, they are not relevant to environmental impact analysis. *See Grunewald v. Jarvis*, 776 F.3d 893, 906 (D.C. Cir. ) ("The [NPS] was not required to consider the psychological harm that some visitors may suffer from simply knowing" about impacts that had otherwise been analyzed, and rejecting plaintiffs' effort to "recast their psychic injuries as concerns relating to visitor experience and the human environment").

The Organic Act directs the NPS to "conserve the scenery, natural and historic objects, and wild life" within the parks in a manner that "will leave them unimpaired for the enjoyment of future generations."  54 U.S.C. § 100101(a).  But "[b]ecause the Organic Act is silent as to the specifics of park management, the Secretary has especially broad discretion on how to implement his statutory mandate."  *Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000).  The NPS has therefore developed management policies to interpret the Organic Act and guide its management decisions.  NPS Policies, ¶ 1.4.1.  The NPS Policies also permit the NPS to issue supplementary instructions and guidance to further their implementation.  *Id.* 5.

Impairment is a high standard, and impacts alone do not necessarily equal impairment. Rather, an impairment "is an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources and values, including the opportunities that otherwise would be present for the enjoyment of those resources or values."  *Jewell*, 965 F. Supp. 2d at 84 (citation omitted).  Whether there is impairment "depends on the particular resources and values that would be affected; the severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question and other impacts."  NPS Policies § 1.4.5.

NPS guidance only requires the preparation of a separate written non-impairment determination for proposed actions requiring an EA or EIS.  *See* Guidance for Non-Impairment and the NPS NEPA Process, National Park Service 1, April 2025 ("NPS Guidance").[17]  That is because proposed actions, that are reviewed using a categorical exclusion have no potential for significant impacts, i.e., impacts that rise to the level of impairment.  And this is borne out by the

---

[17] The NPS Guidance is publicly available at https://www.nps.gov/subjects/nepa/upload/Guidance-for-Non-Impairment-Determinations-and-the-NEPA-Process-Apr-2025_508.pdf.

CE Documentation Form which demonstrates that the soil storage project has "No Potential for Significant Impacts to Sensitive Resources." Ex. 2, Nersesian Decl. Ex. B at 2.

Plaintiffs argue that the soil storage "threatens to leach into the soil and surrounding waters" and "create[s] an unhealthy environment." Mem. 40. But, other than offering a series of conclusory statements, Plaintiffs provide no basis to conclude either that those effects would result from the NPS's action or that such effects would "harm the integrity of park resources and values." *Jewell*, 965 F. Supp. 2d at 84.

Plaintiffs also contend that the NPS's soil stockpiling conflicts with the March 3, 1897, Act of Congress creating Potomac Park. Mem. 41. But here again, Plaintiffs provide no basis for concluding that this activity is inconsistent with the Park's purpose as a place for recreation and pleasure by the public. Indeed, as shown by the history of changes, renovations, additions, and subtractions made at East Potomac Park, *see* CLI 25-31, ordinary construction efforts and improvements have long been a feature of East Potomac Park and help promote—not negate—its place as a site for public recreation.

Insofar as Plaintiffs also argue that the "Washington National plan" violates the Organic Act, Mem. 40, such claim is unripe and premature for the reasons stated above. No decision has been made and no final agency action has occurred. *See* Bowron Decl. ¶ 14; *see also* NPS Policies § 1.4.7 (limiting NPS decisionmaker's obligation to only the consideration of impacts "[b]efore *approving* a proposed action," not when potential actions are being internally deliberated (emphasis added)).

In short, Plaintiffs' Organic Act claims are not likely to succeed on the merits.[18]

---

[18] Despite a few stray mentions of the Organic Act's conservation mandate, Plaintiffs do not appear to be making any separate argument on that point and do not cite any authorities supporting any Organic Act argument apart from the alleged impairment. Nor have they pled any such claim, *see*

41

## II.    Plaintiffs Will Not Suffer Imminent Irreparable Harm Absent a Preliminary Injunction

Plaintiffs also cannot demonstrate—with respect to any of their claims—that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014).  This is true for three reasons.  First, Plaintiffs' delay in bringing their request for preliminary injunctive relief weighs strongly against granting their Motion.  Second, as shown above, any potential redevelopment of East Potomac Golf Course of the type Plaintiffs supposedly fear, is not only purely speculative, but also premature.  Third, the temporary storage and subsequent placement of fill material is, by definition, not irreparable harm.

The "standard for irreparable harm is particularly high in the D.C. Circuit." *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017).  If a party makes no showing of imminent irreparable injury, the Court may deny the motion for injunctive relief without considering the other factors.  *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).  In particular, the movant "must demonstrate that the claimed injury is 'both certain and great' and that the alleged harm is 'actual and not theoretical.'" *Elec. Priv. Info. Ctr. v. Dep't of Justice*, 15 F. Supp. 3d 32, 44 (2014) (citation omitted).  And, "because 'the court must decide whether the harm will *in fact* occur[,]' a party seeking injunctive relief must 'substantiate the claim.'"  *Id.* (citation omitted).  Plaintiffs fall well short of this high standard.

---

Complaint ¶¶ 119-21 (referring only to impairment). Any such argument is therefore waived. *See Twin Rivers Paper Co. LLC v. Securities & Exchange Comm'n*, 934 F.3d 607, 615 (D.C. Cir. 2019) ("an argument is forfeited if the petitioners were obscure on the issue in their opening brief") (citations omitted). In any event, the actions at issue here were carried out for the purpose of visitor enjoyment and fall well within NPS's "especially broad discretion" under the Organic Act, as described above.

First, Plaintiffs' delay of four months before bringing their Motion "'implies a lack of urgency and irreparable harm.'" *Sierra Club v. EPA*, 793 F. Supp. 3d 158, 165 (D.D.C. 2025) (citation omitted). Plaintiffs premise their claims on alleged events that occurred sometime between the beginning of August 2025 and the end of October 2025. *See* Compl. ¶¶ 67-77. On October 20, 2025, the first loads of soil arrived at East Potomac Park. Nersesian Decl. ¶ 30. Plaintiffs waited to file their Motion, however, until February 23, 2026—126 days later. Courts in this Circuit have held that shorter delays weigh against a finding of irreparable harm. *Sierra Club*, 793 F. Supp. 3d at 165 (noting delays of two months, 44 days, and 100 days were "inexcusable").

Second, Plaintiffs cannot show a likelihood of irreparable harm for the same reasons they lack standing to bring their claims. Plaintiffs cannot identify *any* injury to support their claims— least of all one that is certain to occur. In short, Plaintiffs' alleged harms are speculative, premature, and insufficient to constitute irreparable harm.

Even if Plaintiffs could establish an alleged injury—and they cannot—such an injury would still not entitle them to relief. Effects from the temporary storage of fill material are not sufficiently irreparable to merit relief. *See W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*, 302 F. Supp. 2d 672, 684 (S.D. Tex. 2004) (finding that "temporary effects" caused by construction do not amount to irreparable harm because the time construction will occur "is not permanent or of long duration"). Similarly, Plaintiffs provide no plausible basis to conclude that chemicals are present in the fill to such an extent that there is an imminent risk of harm. *See, e.g.*, *City of Evanston v. N. Ill. Gas Co.*, 381 F. Supp. 3d 941, 962-65 (N.D. Ill. 2019) (denying request for preliminary injunction because injury from chemical exposure was speculative).

Plaintiffs assert that Defendants should have conducted NEPA and Section 106 analyses "*before*" committing resources or otherwise implementing design changes to East Potomac Golf

43

Course.  Mot. 42.  But no resources have been committed and no design changes have been approved.  Bowron Decl. ¶ 14.  Without a concrete, identifiable injury, Plaintiffs are left purely with an allegation of procedural harm.  But "procedural harm standing alone is insufficient to constitute irreparable harm." *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 290 (D.D.C. 2017); *see also Fisheries Survival Fund*, 236 F. Supp. 3d at 336.  Plaintiffs are, in effect, seeking to halt the agency decisionmaking process before it even has a chance to get off the ground.  Such allegations fail to satisfy Plaintiffs' heavy burden of demonstrating irreparable harm sufficient to warrant the exceptional relief of a preliminary injunction.

### III.    The Balance of Harms and the Public Interest Weigh Against Injunctive Relief

Plaintiffs have not shown a likelihood of success on the merits and therefore this Court need not consider the balance of harms and the public interest if an injunction were to issue.  If, however, the Court were to do so, the Court "'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (citation omitted).  Here, those equities weigh in Defendants' favor.

Plaintiffs' highly speculative harms arising from the potential future alteration of the East Potomac Golf Course are far outweighed by the intrusive effect an injunction would have on new agency decisionmaking and agency discretion.  Allowing Defendants the operative space to first deliberate and develop responses to the President's proposal ensures Defendants' decisionmaking is sound, legally correct, and considers environmental effects and effects on historic properties consistent with applicable law.

Enjoining Defendants from temporarily storing fill material for later reuse likewise would weigh against the public interest.  Much of the East Potomac Golf Course routinely floods, and fill material will be required to simply maintain and improve the landscape.  *See, e.g.*, CLI 152.  That

44

material is being screened and tested to ensure its suitability for such improvements. *See* Nersesian Decl. ¶¶ 36-47, 49. Moreover, requiring Defendants to find another location to temporarily store East Wing fill material or dispose of it entirely—perhaps miles outside the District of Columbia— would likely cause Defendants to incur additional costs of millions of dollars. *Id.* ¶¶ 50-51. This balancing is only more pronounced in Defendants' favor when it comes to Plaintiffs' demand for the removal of dirt currently in place. *See Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (recognizing that where a moving party seeks to alter the status quo and command an affirmative act, it must meet a higher standard). And, as explained above, the Court is without power to grant any relief to NLT.

For these reasons, the balance of the harms and the public interest also weigh against preliminary injunctive relief.

## IV.    If an Injunction is Granted, Plaintiff Should be Required to Post a Bond

Before a court may award preliminary injunctive relief, a plaintiff must post a compensatory security bond. Fed. R. Civ. P. 65(c). If the Court concludes that injunctive relief is warranted, the Court should require Plaintiffs to post a security in an amount that the Court considers proper to reflect potential litigation and agency compliance costs.

### CONCLUSION

For these reasons, Plaintiffs cannot establish any of the factors necessary to obtain preliminary injunctive relief. Defendants respectfully request that this Court deny Plaintiffs' Motion. Because Plaintiffs lack standing and the Court thus lacks subject matter jurisdiction, the Court could dismiss this case even before Defendants' responsive pleading deadline.

Respectfully submitted this 6th day of March 2026.

ADAM R. F. GUSTAFSON
Principal Deputy Assistant Attorney General

45

U.S. Department of Justice
Environment & Natural Resources Division

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

 */s/ Michael K. Robertson*

MICHAEL K. ROBERTSON
Trial Attorney (DC Bar No. 1017183)
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
4 Constitution Square
150 M Street NE
Washington, DC 20002
Tel: (202)-305-9609
Email: Michael.Robertson@usdoj.gov

*Attorneys for Federal Defendants*

46