# Declaration of Jennifer T. Nersesian

# Exhibit A

# Dewberry Report

**National Park Service**
**U.S. Department of the Interior**

**NATIONAL CAPITAL REGION**
**DESIGN AND CONSTRUCTION**
**BRANCH**
**WASHINGTON, D.C.**



# Phased Rehabilitation Plan
# Historic Washington Sea

## Task Five - Initial Rehabilitation Plan

**East Potomac Park, West Potomac Park & Tidal Basin**

**National Mall and Memorial Parks (NAMA), Washington, DC**

**Task Five FINAL SUBMISSION**
**August 2011**



**Prepared by**
**Dewberry & Davis LLC**
**Fairfax, VA**

**PMIS No. 98463**
**Contract No.  C3000050004**
**Task Order No. 08**

**National Park Service**
**U.S. Department of the Interior**



*8/15/2011*

# TABLE OF CONTENTS

**List of Figures and Tables**                                                ii

  **A.  EXECUTIVE SUMMARY**                                        1

  **B.  INTRODUCTION**                                             4

  **C.  BACKGROUND**                                               5

  **D.  TOP OF WALL SURVEY**                                       8

  **E.  CONDITION SURVEY RESULTS**                                 11

  **F.  SEAWALL REPAIR OPTIONS**                                   16

  **G.  SEAWALL ELEVATION OPTIONS  & RECOMMENDATIONS**             40

  **H.  SEAWALL REPAIR RECOMMENDATION**                           44

  **I.   DEMONSTRATION AREA  RECOMMENDATIONS**                    49

  **J.   REHABILITATION PHASING PLAN**                            56


**APPENDIX 1 – SEAWALL HEIGHT COMPARISON (1988 TO 2009) (11 X 17)**
**APPENDIX 2 – PRESENTATION PLAN SHEETS (11 X 17)**
**APPENDIX 3 – SEAWALL CONDITION PHOTO DOCUMENTATION (11X17)**
**APPENDIX 4A – TOPSIDE DAMAGE MATRIX**
**APPENDIX 4B – WATER-SIDE DAMAGE MATRIX**
**APPENDIX 4C – COMPOSITE DAMAGE MATRIX**
**APPENDIX 5 – SEAWALL REPAIR OPTIONS DRAWINGS AND COST ESTIMATES**
**APPENDIX 6 – INUNDATION MODEL OUTPUT  (11 X 17)**
**APPENDIX 7 – SEAWALL ELEVATION TABLE AND GRAPHIC (11 X 17)**
**APPENDIX 8 – DRAWINGS OF CANDIDATE DEMONSTRATION PROJECT
                      LOCATIONS     (11 X 17)**
**APPENDIX 9 – SEAWALL REPAIR PHASE TABLE AND GRAPHIC  (11 X 17)**
**APPENDIX 10 – GEOWEB APPLICATION DATA**
**APPENDIX 11 – LIVING SHORELINE DESIGN – CONFERENCE PROCEEDINGS**



8/15/2011

# LIST OF FIGURES AND TABLES

**Figures**                                                              **Page**

1.  Assumed section of existing wall from historical documents    5
2.  Existing wall at area repaired with pre-cast concrete cap doweled    6
    into the sidewalk
3.  Option 1 gravity wall with cast face block and micropile foundation    17
4.  Cast face block wall similar to that proposed for option 1    18
5.  Option 1A Gravity wall with stone face and micropile foundation    20
6.  Option 2A Soldier Pile Wall Outboard of Existing Wall    21
7.  Option 2B Soldier Pile Wall Inboard of Existing Wall    24
8.  Option 2C Soldier Pile Wall on Centerline of Existing Wall    26
9.  Option 3 Gravity wall with spread footing    28
10. Option 4 Tie-back wall with spread footing    30
11. Option 5 Rip-rap revetment    32
12. Option 6 Geo-Web planted face with micropile foundation    34
13. Living Shoreline Profile    36
14. Option 7A Living Shoreline Plan for Continuous Option    37
15. Option 7B Living Shoreline Plan for Segmented Option    38
16. Cast face block wall possible in several options    47
17. 500 foot stations with sheet number key plan    50
18. Typical damage in candidate demonstration area 1    51
19. Typical damage in candidate demonstration area 2    52
20. Typical damage in candidate demonstration area 3    53
21. Typical damage in candidate demonstration area 4    54


**Tables**

1.  Affected park features at incremental levels of flooding    41
2.  Preferred phasing plan    56
3.  Extended phasing plan    57



## A. EXECUTIVE SUMMARY

The report contains a condition assessment and repair recommendations for the stone seawall that surrounds East Potomac Park in Southwest, Washington, DC.  The seawall, and its associated resources that will be impacted by repairs, are listed in the National Register of Historic Places under the nomination entitled "East and West Potomac Parks Historic District."[1]

The prior reports provided under this task included the existing condition assessment of the seawall including photographs of seawall and sidewalk damage, assessments of loss of fill and what was believed to be on-going settlement of the East Potomac Park.  The prior report also highlighted inundation impacts on buildings, roadways, trees and the golf course to consider in the selection of a recommended wall height which is part of this Task.

This report is a stand-alone document which includes both a condition assessment of the seawall and topside features at the seawall and provides an analysis of the options available to the National Park Service for rehabilitation.  Preliminary geotechnical exploration was performed at East Potomac Park as part of this Task Order as reported in the Geotechnical Report dated July 22, 2011.  Due to the very wide spacing of the boring sites, the geotechnical exploration is preliminary.  As segments of the wall are approved for renovation more closely spaced borings and additional sampling and testing will be required to finalize pile selection and detailed design.  However, the geotechnical report does provide a great deal of useful information and the earlier Task FIVE SUBMISSION dated February 2010 has been edited to incorporate this information.

Section D discusses the top of wall survey that was conducted and the comparison of that data to the previous survey done in 1988.  Section E provides a condition assessment of the seawall based on photographs and both landward and waterside inspections conducted in the Fall of 2009.  The scope of work does not allow an additional detailed inspection and photo documentation of the seawall.  Because inundation and erosion are now the major causes of damage the relative condition of the 2009 assessments should still be reasonable though additional damage has occurred.

Section F provides discussion on the 7 conceptual options we have created and a summary of the pros and cons of each potential solution.  Section G discusses the options for the height of the seawall and recommends the height to be used in the rehabilitation.  Section H provides our recommendations for the type of wall and supporting arguments for the recommendation.

Our recommendation for wall type depends on the height of the wall in the section being rehabilitated.  If the height of the new wall is over one foot higher than the height of the existing seawall we recommend that Option 1, a deep foundation option, be used to prevent settlement. Where the new wall height is one foot or less higher than the existing seawall we recommend that option 3, a spread footing option, be used because it is the same wall as option 1 just with a different foundation; therefore, the entire seawall will have a consistent appearance.  Both options recommended propose using cast face blocks to simulate the appearance of the historic seawall.   We believe the photos we include of cast face block on another project (See figure 4,

---

[1] "East and West Potomac Park," National Register of Historic Places Nomination Form [Entered in the National Register of Historic Places: 30 November 1973].



page 18) demonstrate this approach is appropriate for this project.  If the cast face block is not acceptable to the NCPC or the SHPO, then our recommendation for a permanent solution would be the same structural options using a stone façade made from the stone salvaged from the existing historical seawall.

Although we present three "non wall" options, including two "soft" or bio-engineering solutions as requested by the NPS, we do not recommend any of these options (Options 5, 6 and 7).  Our reluctance to recommend one of these solutions is primarily due to safety and security concerns from this type of sloped construction, but also from our understanding that such a significant deviation from the character of the listed historic seawall could trigger an environmental impact statement with some stakeholders potentially holding up the entire project while that issue is resolved.

We believe that the Potomac River side of the park is particularly vulnerable to various problems using a "non-wall" solution.  There is considerably more current, scour and wave run up on the river side.  These conditions would potentially damage the structure, would tend to "snag" debris and generally have a high maintenance requirement.  The regime for a "non-wall" solution, if used at all, would have to be on the Washington Channel side from approximately station 10155+00 to 10170+00 (with no loss of parking) or between 10155+00 and station 178+50 if the parking area between station 10170 and 10173 can be sacrificed.

The determination of the optimum seawall elevation is constrained by the existing infrastructure, tree plantings and differential settlement which has already taken place.  The original statement of work directed us to provide a top-of-wall height that would provide protection from a 50-year event.  To provide 50-year protection to the entire park would require a wall elevation of between 9 and 10 feet above mean sea level (MSL).  This height of a seawall would not be feasible in terms of benefit-cost considerations, as discussed in Section G.  We have looked at the inundation data, the existing infrastructure and trees behind the wall and have recommended wall heights to prevent frequent overtopping, but when overtopped, provide a drainage path when flood waters recede.

If a guarantee of 50- or 100-year protection for specific buildings or clusters of buildings is required, we recommend rather than attempting to protect the entire park from flooding that the individual buildings or clusters of buildings be protected by individual seawalls or earth berms.  These can be low height walls or berms adjusted based on the current elevation of the buildings; they can be aesthetically pleasing and could perform dual functions as a force protection barrier, if desired.  Looking at the inundation data for buildings, such distributed walls or berms may be as low as 2 to 3 feet to provide up to 100-year flood level protection.  Such distributed walls or berms would be more cost effective than trying to protect the entire peninsula from flooding.  Because Ohio Drive would be under water at this flood stage it may be possible to enter and exit from the Interstate ramp if acceptable to District of Columbia Department of Transportation for emergency situations and official vehicles only.

Our recommendations for the elevation of the seawall on the perimeter of the peninsula is based on integrating goals of limiting inundation, limiting construction cost, reducing impact on roadways, trees and other infrastructure behind the wall as well as drainage of Hains Point.

 **Dewberry**

2

We discuss our recommendations in section H and list the recommended wall heights in both tabular and graphical form in Appendix 7 of this report.

The key plan and recommended phasing of the rehabilitation of the entire seawall is laid out in Section J.  Because many areas along the seawall are already failing due to the combination of past settlement and washout of fill, and loss of wall integrity our preferred rehabilitation phasing plan to is complete construction as quickly as possible.  This is the preferred plan.  Due to the high cost of construction for the rehabilitation of the seawall it may not be possible to complete construction in as few phases as the preferred plan recommends.  Alternatively we have presented an extended phasing plan in Section J of 19 roughly equal phases.  By creating smaller phases the project could use an acquisition strategy of one or more phases in any particular fiscal year, depending on availability of funds.  These two phasing plans are detailed in Appendix 9.  Note that the costs shown on the tables in Appendix 9 are in 2009 dollars and are only Rough Order of Magnitude (ROM) estimates.  When detailed design is completed for the first phase of the rehabilitation project a detailed budget estimate using solicited market pricing will refine the estimate.



## B. INTRODUCTION

The NPS seeks to develop a comprehensive, phased repair strategy for the historic seawall bounded by the Potomac River and Washington Channel.  The intended use of the park at Hains Point protected by the seawall includes recreation and pleasure, which is supported by walkways, a golf course, fishing areas, park benches, and viewing areas.  Much of the walkways are surrounded by various trees and an inland roadway that parallels the walkway and adjacent seawall.

Progressive deterioration of the seawall from erosion and repeated inundation (from high tides and wave run-up) has caused numerous problems including river bank erosion, loss of vegetation, inundation of trees, failure at storm drain outfalls and other utility crossings as well as damage to  concrete walkways, and railing instability. This has caused the stone and concrete walls, walks and interior sections of the park to be undermined. The long-term effect has created uneven walking surfaces and sidewalk voids resulting in tripping hazards for the many visitors to the park. Many areas of the seawall, caps, sidewalks and railings have been structurally compromised. With daily tidal flooding of portions of the riverfront walkways, visitors who are unfamiliar with high water events find themselves having to walk in the street and compete with vehicular traffic when they are unexpectedly unable to use the sidewalk. Moreover, drainage piping and swales have become distorted and ineffective by gradual, but consistent ground movement or erosion.

Current remedial activities consist of short-term treatments, such as re-grading swales, filling holes, shoreline debris clean-up, railing repairs, patching walks and roads, cutting and replanting drowned trees, and, in several cases, substituting tree species that tolerate greater amounts of groundwater. Current actions have not been sufficient to preclude repeated damage and threats to the integrity of the park's historic landscape.

The National Capital Planning Commission's 2009 Monumental Core Framework Plan (Framework Plan) incorporates recommended developments and improvements for East Potomac Park.  The proposals in the plan that most impact the seawall repair study are the construction near the north end of the island of a canal between the Washington Channel and the Potomac River and development of "a waterfront esplanade and reclaim wetland habitat along portions of the park shoreline."  The plan specifically recommends that the seawall and walkways along the Potomac River edge be reconstructed and improved "to reduce the impact of periodic flooding and to create a pleasant and welcoming esplanade."  The Framework Plan calls for reinforcing the Washington Channel-side seawall with "a sustainable solution" that would incorporate native vegetation, wetlands, infill earth removed from the canal construction, and rock as a "bioengineered shoreline." [2]

*LINK TO MORE FRAMEWORK PLAN INFO:*
*http://ncpc.gov/April2009/Main(T2)/Publications(Tr2)/iframpages/monumental_core_framework_plan_a.aspx*

---

[2] National Capital Planning Commission and Commission of Fine Arts, *Monumental Core Framework Plan*, 2009, pp. 46 – 57.

 **Dewberry**

8/15/2011

## C. BACKGROUND

East Potomac Park was originally a tidal flat of alluvial silt located southeast of the existing railroad bridge. In 1897, Congress created a public park there; named Potomac Park, it occupied an area "formerly known as the Potomac Flats" which had been reclaimed with fill dredged from the bottom of the Potomac River starting in 1870. [3]

Erected in stages between 1884 and 1913, the seawall enclosing the park was originally a dry-laid, cut-stone masonry wall built on top of a stone rip rap foundation. The rip rap foundation was reportedly constructed by excavating a 6-foot-deep-by-20-foot-wide trench in the existing bottom, laying a "mattress" of woven vegetation in the bottom then covering the "mattress" with stone rip rap. A slightly angled stone masonry wall was built approximately 6 feet high upon the stone rip rap foundation. The wall was subsequently mortared as a repair, but the mortar has since dissolved.[4] The base of the wall was approximately 4 feet wide while the top was approximately 2'-6" wide. Our estimate of the construction from station 10048+50 to station 10134+14.8 and from station 10184+28.8 to 10247+45.7 is shown in the section below. See Appendix A for the key plan and stations on East Potomac Park and drawing sheet numbers from 1988 survey.



**Figure 1: Assumed section of existing wall from historical documents**

The rip rap foundation was indicated to have been completed between 1884 and 1891. The masonry wall was completed by 1913 to an approximate elevation of 7 feet above mean low water[5]. On August 30, 1911 the grade in East Potomac Park was indicated as reaching 14 feet above mean low tide in the center and 11 feet on the sides[6]. In 1950, National Park Service engineers calculated that the land had settled 3.5 feet since it was first filled. They also calculated that it was settling at a rate of 1/2 inch per year, with no sign that the settlement

---

[3] Gordon Chapell, "Historic Resource Study – East and West Potomac Parks: A History", June 1973, page 66
[4] Gordon Chapell, "Historic Resource Study – East and West Potomac Parks: A History", June 1973, pages 35-36
[5] Annotated Guide For The Washington Seawall Drawing by Robert J. Hughes, 1985
[6] Chapell, Page 93



would ever end[7]; however, as will be discussed in more detail in the next section consolidation and settlement no longer appear to be a factor in the continuing deterioration of the seawall.

Sometime in the past during one of the repairs to the seawall a precast concrete cap was placed and mortared to the top of the wall. We were not able to find the original design drawings for this repair. The sidewalks were replaced and doweled into the cap. This repair took place from station 10134+14.8 to station 10184+28.8 (5,014 L.F.). Our estimate of the construction is shown below.



**Figure 2:  Existing wall at area repaired with pre-cast concrete cap doweled into sidewalk**

This repair raised the height of the wall and attached the sidewalk to the concrete cap with dowels. The seawall on the Washington Channel side of the Park has the largest exposed height and our calculations indicate that without the anchoring associated with the sidewalk/cap dowels, the wall may overturn. The original joint between the cap and side walk was filled with expansion joint material. This expansion joint material has since disappeared leaving the joint open. There is no indication that any geotechnical or filter fabric was installed as part of the work; therefore, when the joint deteriorated it allowed water to erode the fill below the side walk which is then lost through the open seawall masonry joints.

Given the existing condition of the seawall there appears to be 3 mechanisms affecting the seawall at East Potomac Park.

---

[7] Chappell, Page 165



8/15/2011

1.    Settlement caused by primary and secondary consolidation of the alluvial soils below the dredge material and of the dredge material itself.  The preliminary geotechnical report of July 2011 indicates there is a very thick zone of "weak soils," typically to a depth of 82 to 92 feet.

2.    Loss of fill through the deteriorated or missing masonry wall joints due to hydraulic pressure.

3.    Loss of fill through open storm water pipe joints and through unsealed pipe or cable penetrations through the seawall.

In summary, we believe the main cause of the settlement is due to primary consolidation of the very thick underlying soil layers of weak soils, possibly as much as 3 to 5 feet since the wall was constructed.  Records indicate that this settlement slowed progressively from the ½ inch per year seen in the first forty years the wall was in place to where there was essentially no difference in wall height between 1988 and 2009.  This is consistent with the geotechnical report determination of the duration of primary consolidation.  Primary consolidation is still a major concern for any wall repair if the new wall is higher than the current top of wall elevation in that area.  Building up the wall height will increase the surcharge on the soil and lead to primary consolidation of the new load.  The original settlement damaged the seawall construction which was already susceptible to erosion and washout,  Settlement or mechanical damage such as floating debris increased erosion exacerbating the settlement and accelerating the failure of the wall and the sidewalk.

 **Dewberry**

7

8/15/2011

## D.  TOP OF WALL SURVEY

If the settlement calculations in 1950 described by Chappell were correct then by the time of the 1988 survey an additional 1.58 feet of elevation would have been lost by that time. Assuming the original wall was built to an elevation of between 7 and 11 feet above mean low water based on the historical information, and settlement continued at ½ inch per year the top of wall elevation in 1988 should be at an elevation between 1.9 and 5.9 feet above mean low water.  Based on the 1988 topographic survey, the top of wall elevation varies between 1.9 feet and 5.66 feet above mean low water which agrees quite closely with the anticipated settlement of ½ inch per year predicted by NPS in Chappell.

As part of this task Dewberry sent a field survey team to the field on two separate occasions. These surveys were of a limited area in February, 2008 and the entire length of the seawall in February, 2009.

During the week of February 12, 2008, Dewberry performed a Topography survey and obtained spot elevations along the Top of Seawall on a portion of land within East Potomac Park.  The limits of survey was a strip of topography 1000 feet in length bounded by Ohio Drive and the seawall along the Potomac River.  The survey resulted in cross sections at approximately 50 foot intervals between the southerly curb along Ohio Drive and included ground elevations, sidewalk and top of seawall.  This survey was from station 10124+50 to 10134+50.

Dewberry recovered, verified and used existing NPS monuments for both horizontal and vertical data in performing the survey.  Dewberry occupied NPS monuments 805HV86013, 805HV86014 and 805HV86016 using a Topcon Total Station instrument.  The maximum vertical difference of field observations versus published monuments was 0.10 foot between the three monuments.

The week of February 5, 2009 thru February 20, 2009, Dewberry conducted a field survey to obtain horizontal and vertical locations along the top of seawall beginning near the Tidal basin approximately 650' North of the George Mason Memorial Bridge, thence southerly along the Potomac River to Hains Point, encompassing East Potomac Park and returning along the Washington Channel to the inlet/outlet near U.S. Route 1 and the NCP Central Headquarters.

During the course of this survey, Dewberry collected top of wall data using a Trimble R8 GNSS GPS receiver (Global Positioning Survey) and a Topcon Total Station instrument in the performance of our work.

Again, Dewberry recovered, verified and used existing NPS control monuments during the course of the survey.  A network of G.P.S. points were tied to the NPS monuments using V.R.S. (Virtual Reference System) control checks and a site calibration determined to verify horizontal and vertical data used within the site limits.

When performing the site calibration we recovered forty-one (41) existing NPS monuments. Monuments 805HVSEBASERM3, 805HVLEN9, 805HV86010, 805HV88002 and 805HV89027 were held for the horizontal alignment and monument 805HV89027 was held for



8/15/2011

the vertical elevation. The maximum horizontal difference observed between the (5) monuments was 0.03' and the maximum vertical difference was 0.01'. Additionally, the total station instrument was used to establish temporary control points adjacent to the working area for profiling the top of wall locations.

NPS monuments used for the Conventional Total Station locations were: 805HVLEN6, 801HV86009, 808HV86001, 805HV86003, 805HV86004, 805HV86005, 805HV88002, 805HV86010, 805HV86011, 805HV86012, 805HV86014, 805HV86015, 805HV86017, 805HV86006, 805HV86007, 805HV86009, 805HV86019, 805HVLEN9, 805HV89027, 805HV86036. The maximum vertical differences between these monuments was less than 0.10 foot. The spot elevations and description of each point located was placed on the AutoCAD file.

With nearly 20 years between top-of-wall surveys if the 1950 NPS prediction were still valid one would have expected nearly 10 inches of additional settlement. Appendix 1 shows a graphical comparison of the 1988 and 2009 wall height. The field notes and specifics of the controls for the 1988 survey were not available. What this data shows is that there is essentially no difference between the two surveys with the exception of areas with severe deterioration where there is a pronounced change between the two data sets. In all other areas the difference is only one or two tenths of a foot and is often higher in the new survey compared to the old. We are confident that there is no heave or uplift mechanism going on along the seawall. We believe the differences in elevation are more in the controls and details of the surveys and not the consolidation (or heave) of the soil.

If the historical record of the initial elevation of the seawall being from 7 to 11 feet above sea level there has been significant settlement in the past, but that is no longer the case. This is not inconsistent with the behavior of dredge fill materials. When a significant surcharge is placed on the expansive soil it will consolidate; however, if the surcharge load remains the same consolidation will asymptotically approach its maximum consolidation for that surcharge. The comparison of the survey data in Appendix 1 would indicate that the seawall is now on the "flat part of the curve" where consolidation, though not theoretically zero has stopped from a practical standpoint.

The geotechnical report of July 2011 calculates that the duration of primary consolidation of the soils at the park would be expected to be in the asymptotic stage by 1988 which supports the finding of little or no difference in wall height between the 1988 and 2009 surveys. Secondary consolidation continues for a much longer period, but is normally not a major factor unless the soil has a high percentage of organic material. The geotechnical data generally found very little organic material other than a peat layer at one boring location. Such pockets of organic material could contribute to significant differential settlement over an extended period of time. This is true in that all areas will undergo similar primary consolidation in reaction ot the load. The non-organic soils will see little secondary consolidation while the "pocket" of organic material undergoes potentially significant secondary consolidation leading to a differential settlement between the two areas.

The substantial difference shown between the two surveys in areas like station 10117+90 or 10129+00 to 10129+70 are local failures due to erosion or other deterioration. Section G will


**Dewberry**

8/15/2011

discuss the recommended final seawall elevation. If the replacement wall is essentially the height of the present wall then further consolidation may not be a major concern and a less expensive shallow foundation should be effective, as long as more extensive geotechnical investigation does not indicate large pockets of organic material. For sections of the wall at the west end of the park the wall heights following rehabilitation will need to be higher than the existing to provide needed protection from inundation. Adding height to the wall will add new surcharge to the underlying soils. Based on the geotechnical report of July 2011 raising the wall could lead to significant new primary consolidation. Deep foundations that bear on the "competent material" below the soft soil are indicated at any location where the new wall height is one foot or more higher than the current wall elevation (based on 2009 survey).



8/15/2011

## E.  SEAWALL CONDITION SURVEY RESULTS

Dewberry employees conducted a visual condition survey along the top portion of the seawall in East Potomac Park.  The perimeter drawings from the 1988 topographic survey performed by Dewberry & Davis and Greenhorne & O'Mara, Inc. were used to note the conditions along the seawall.  The findings of the survey are annotated on the drawings in Appendix 2.  There are notes to indicate the location and embedded pictures to show particularly egregious situations. A more systematic presentation of photo documentation is provided in Appendix 3 with top side damage on the top of the page and water-side damage on the bottom of the page.

A Damage Matrix was created to try to systematically portray the condition of the top side, water side and the composite condition.  The Damage Matrix is included at Appendix 4.  The damage assessment was done without subsurface investigation or geotechnical study, but was conducted by experienced field engineers and should be a useful tool for a "snap shot" in time of the relative condition of the Seawall broken down into 50 foot segments.  The rating system used is as follows (a copy is also at the beginning of Appendix 4).

- 1 Significant damage to concrete walkway, Block wall. Major washout of soil, foundation
- 2 Damage to concrete walkway. Missing Blocks. Erosion, washout of soil and foundation
- 3 Some damage to concrete walkway and block wall. Small sinkholes or voids
- 4 Fair condition. Minor wear to concrete walkway or block wall
- 5 Good condition

Individual ratings of 1 or 2 are of serious concern

A composite damage rating of 1 to 2.5 is considered **RED** in imminent need of rehabilitation

A composite damage rating of 2.6 and less than or equal to  4.0 is YELLOW and should be in the planning cycle for rehabilitation

A composite damage rating of 4.5 or less will likely require some interim maintenance and should be in the long range plan for major rehabilitation

The drawings in Appendix 2, the photo documentation in Appendix 3 and the Damage Condition Matrix in Appendix 4 all reflect the stationing identified in exhibit 2 of a document titled "Report on the Condition of and Recommended Repair of the Seawall" prepared by the Baltimore District Corps of Engineers.  We added 10,000 to the stationing in accordance with NPS instructions so that the Inlet Bridge abutment became 10048+50 versus 48+50 identified by the Corps report.  This is to avoid negative stationing for the seawall along the Tidal Basin.  The stationing is taken from the top water side edge of the seawall.  Traditionally the boundary between the East and West Potomac Parks is at the Railroad Bridge which starts on the Potomac River at approximately station 10065+00 and finishes on the Washington Cannel at approximately station 10253+07.5.  The total linear feet of seawall from the eastern edge of the Railroad Bridge on the Potomac River and the Railroad Bridge abutment on the Washington Channel is approximately 18,807 feet.  The length of the seawall from the Inlet Bridge to the Railroad Bridge abutment is approximately 20,458 feet.



8/15/2011

Using the rating scheme outlined above only 5.1% of the 50 foot segments evaluated in Appendix 4 had a composite rating of **RED** and all but one of these **RED** areas is contained within one of the four possible demonstration project areas. These four areas are discussed in Section I and are highlighted in Composite Damage Matrix, Appendix 4C. All of the damage matrices have been color coded to make the **RED** and <mark>YELLOW</mark> areas stand out from the rest. The Composite Damage Matrix (4C) is interesting because it clearly shows that although in the worst areas there tends to be significant damage in both the topside and water-side, there is a number of locations where there are significant problems topside (<mark>YELLOW</mark> rating between 2.6 and 4.0) while the waterside rating is better than a 4.0. This is most likely due to washout of fines through the joints in the stone wall. With structural damage to the wall itself the washout is more immediate and dramatic, but with no measures to prevent washout of fines (like geotechnical fabric) topside damage in sections where the waterside is in good visual condition will occur over time and create the topside damage that is most prevalent. Burrowing animals also contribute to this, but washout of fines is seen as the major mechanism in these areas. There are some of the inverse situation as well (waterside in <mark>YELLOW</mark> and topside has a rating better than 4.0). Most of these sections are between Buckeye and Park Headquarters. We did not see records of marjor maintenance work on the topside in this area, but that is a possible reason that the topside currently rates in better condition than the corresponding waterside. There are 88 fifty foot segments where either topside or water-side is <mark>YELLOW</mark>, but the other has a better rating than 4.0. In all there are 412 segments evaluated in the Damage Matrices. Some observations:

- There is a total of 19 **RED** topside segments (4.61%)
- There is a total of 26 **RED** water-side segments (6.31%)
- There is a total of 21 **RED** segments for composite rating (5.1%), but only 7 of those segments are rated **RED** for both topside and water-side in the same segments, at the tip of the point (4 segments) and from 10129+50 to 130+50 (3 segments)
- There is a total of 169 <mark>YELLOW</mark> topside segments (41.02%) of which 87 are in segments where the water-side rating is better than 4.0.
- There is a total of 99 YELLOW water-side segments (24.03%) of which 22 are in segments where the topside rating is better than 4.0.

An 8 foot wide concrete sidewalk, next to or cast on top of the seawall begins approximately at station 10049+17 until station 10051+09 where it becomes a 10 foot wide concrete sidewalk. The 10 foot wide concrete sidewalk continues to follow the perimeter of East Potomac Park until it ends at station 10247+45.7 on the Washington Channel side near the fence surrounding the Headquarters buildings. Steel pipe railing with steel posts at 10 feet on center are set one 1 foot back from the edge of the seawall. As the pictures below (and many more in Appendices 2 and 3) indicate the railing is in poor condition. The railing is heavily rusted and as Task 2 documented is contaminated with peeling lead based paint.



 

It is our opinion that the sidewalk was originally constructed either level or slightly sloped toward the river. The edge of the sidewalk was originally cast on top of the seawall stone from station 10048+50 to station 10134+14.8 and from station 10184+28.8 to 10247+45.7 to match the face of the seawall. A repair which installed a pre-cast concrete cap from station 10134+14.8 to station 10184+28.8 changed the sidewalk width to 7.5 feet but matched the land side edge of the 10 foot walk because of the 2.5 foot wide cap. The sidewalk appears to be reinforced by ½" diameter bars at 12" on center each way which is currently helping the concrete bridge voids. Based on our observations we believe that most of the sidewalk has voids which have formed from loss of fill and bedding. The void areas we were able to measure varied from 6 to 27 inches deep at the back of the seawall.

 

At the present time the sidewalk generally has a negative slope away from the seawall up to 10 degrees in some locations from loss of fill through the seawall. There are numerous areas with asphalt patches where maintenance personnel have filled in holes in the sidewalk to prevent injuries to pedestrians. Many of these patches have in turn sunken below the side walk from soil loss. Many of the pipe railing posts have broken out of the concrete sidewalk and are either free hanging or have been field modified and secured by maintenance personnel to prevent their loss. These areas are delineated on the drawings in Appendix 2 with additional photos in Appendix 3.



 

We also observed what appeared to be burrowing animal holes next to the back of the side walk and extending under the walk which is also contributing to the loss of fill.

 

In areas where utilities such as storm water outfalls, electrical conduits, telephone conduits and force main sewers either penetrated the masonry stone wall or were bored under or through the rip



rap foundation, the sidewalk evidences settlement or loss of fill.  In the case of the storm water piping, the loss of fill may also be caused by open pipe joints which should be investigated further, since this is a separate causative factor from washout at the penetration through the seawall and/or foundation.  A camera sled could be used inside the storm drains to investigate the pipe joints. During the design of the first phase to be rehabilitated the designer must inspect each storm pipe penetration by boat in that section to see if we can observe any source for loss of fill through the joints in that section of wall.

The seawall itself was originally built of dry stone masonry and later repaired by the addition of mortar in the joints.  This mortar has dissolved over the years and allowed the hydrostatic pressure of floods and the river to dislodge the stone in certain areas.  This is especially evident at areas which were disturbed by boring of under ground electrical, telephone and force sewer main piping such as those shown below.  All of the utility crossings are delineated on the drawings in Appendix 2.

 

Electrical Crossing                    Sanitary Force Main Crossing



 

Several sections of the seawall have settled significantly allowing frequent flooding of the sidewalk, this is especially true between approximately station 10126+50 and 10134+14.8 at the ramp on the Potomac River. The seawall also is flooded between approximately station 10236+00 and station 10249+80 on the Washington Channel side near the Headquarters Building. This flooding cannot be easily fixed due to the elevations of the fixed infrastructure behind the seawall such as roads, manholes and trees. Adding additional height to the wall was recommended during its original construction but was not performed due to lack of funds.

Attachment 2 is a plan summary of the condition survey we performed and updated on the plan sheets from the 1988 topographic survey. Attachment 3 is seawall condition photo documentation of our observations as well as previous NPS personnel observations.



## F.  SEAWALL REPAIR OPTIONS

Dewberry marine engineers have conceptualized seven (7) options for the National Park Service to consider.  Four (4) are "hard" wall options in which the seawall is replaced to appear similar to its original historical construction even though the details of the structure vary considerably from the current wall.  Two (2) are "softer," non wall options which remove the seawall entirely yet provide some protection from flooding and embankment erosion.  The last option is a "living wall" design which can be done either continuously or as a segmented design.  This final option (option 7 discussed below) may be the type of solution that the National Capital Planning Commission's 2009 Monumental Core Framework Plan had in mind for at least portions of the Washington Channel side of the park in calling for a "sustainable solut8ion."  The recommended elevations of the walls/embankments will be discussed in section "G". SEAWALL ELEVATION OPTIONS and RECOMMENDATIONS".  The selection of the wall elevation is essentially independent from the structural options discussed below.

All of the options shown are based on the height of wall at the deepest portion of the existing wall (where the water depth is the greatest) for which that option would be recommended, which is the worst case height condition for the wall due to several factors.  The actual height of the wall from the foundation varies from section to section.  Each option shows an estimated cost per lineal foot to install this option.  These estimates are Rough Order of Magnitude (ROM) estimates.  The estimated costs are to make assessments between options and are not intended to be programming or budgeting cost estimates.    Cost estimates are currently based on experience and Means but during detailed design when more detailed (more closely spaced borings) geotechnical information is available pricing for the candidate deep foundation types can be solicited on major components to improve the accuracy of the estimate.

The  "hard" options provide the same safety and security as the existing wall construction.  The "soft" options provide a significantly different appearance from the historical seawall.  The soft solutions will require considerations of different safety, security and maintenance concerns from a traditional wall solution, and may trigger an Environmental Assessment (EA) or and Environmental Impact Statement (EIS) due to being an Fundamental change to the historic fabric of the listed seawall.  Small scale sketches of each option are included in the text below and a ROM cost per linear foot, but a larger version of each option and an accompanying cost estimate are provided in Appendix 5.  Each option shows the top of wall and sidewalk elevation the same as the soil behind the wall, but the actual grade varies considerably as well as the surrounding infrastructure  and trees.  The grade coming off of the sidewalk could be sloped to allow the wall to be higher than roadways or other infrastructure, though there may be some adverse impacts, particularly on trees. Final grades and storm drainage will be major factors for the detailed design phase for each section. The following options are provided for consideration:



8/15/2011

**<u>Option 1</u>**

Option 1 is a permanent "hard" solution to the seawall which will eliminate future settlement and provides additional features to prevent loss of fill, voids and when raised to elevations discussed in the next section, will minimize flooding and embankment erosion.

**Figure 3 – Option 1 Gravity Wall with**
**Cast Face Block & Micropile Foundation**
Estimated cost per linear foot = $4,226

This option includes a micro pile foundation with a pile cap for support of the new wall with two pile "bents" on approximately eight foot spacing. The estimated cost is based on piles of 120 feet to be conservative due to limited borings and a very thick soft soil layer. Piles wil get all bearing capacity from the underlying competent soils. The minimum pile diameter will be part of detailed design by should not be less than 12 inches due to the lack of lateral support in the very thick soft layer. A steel jacket through the existing rip-rap will prevent significant down drag on the micro piles after the wall is completed. The wall is called a gravity wall because the sheer weight of the wall resting on the pile cap is what resists the overturning moment of the soil being restrained by the wall. The micro piles minimize or eliminate the settlement problem which is not currently a problem (based on the top of wall survey data); however, settlement will again be an issue where the wall is raised to reduce the incidence of flooding.



OPTION 1

This option will require excavation approximately 20 feet back from the existing wall and a cofferdam to demolish the esisting wall and install the pile cap and lower portion of the wall. To minimize damage to landscaping and impact on traffic in the park it is assumed that the piles will be driven from a barge. If pile driving is done from the land side extensive protection and restoration of landscaping would be required. This will be an issue for the excavation and construction equipment on the landside and the actual construction technique should be left to the construction contractor as a "means and methods," but the cost of the barge in the estimate would be offset by higher costs for protection of sod areas and trees, traffic control and landscaping restoration. Based on this, the current estimate is a good tool to compare options.

The wall shown is a gravity wall with a filter fabric to prevent loss of soil thereby preventing voids behind the wall and below the sidewalk. If there are storm drains or other utility penetrations of the wall, it is particularly important that filter fabric be carefully placed around the penetration

 **Dewberry**

18                                                                                                    8/15/2011

and the pipe where it runs through the backfill material.  Utility penetrations are a significant factor in some of the most severely damaged areas of the seawall.  The construction of the penetration and proper use of filter fabric to prevent migration of soil fines through the wall or through leaky joints in storm drains will be particularly critical to the long term integrity of the wall.  The face of the wall is concrete cast-face blocks with a similar appearance to the historic existing wall.  The appearance of this type of wall is shown in the photos below from another project.  The horizontal location of the face of the new wall is in the same location as the existing which will minimize permitting requirements with the Corps of Engineers.

**Figure 4 - Cast face block wall similar to**

that proposed for Option 1

Positives:
1. Simulated stone, cast concrete facing approximates the visual appearance of the existing wall.
2. Permanent wall settlement solution regardless of wall height relative to the current wall
3. Low maintenance requirements
4. Existing stone may be salvaged for reuse  in park or foundation enhancement
5. Permitting requirements minimized
6. Fewer  trees are lost than most other options since the excavation behind the current wall is limited
7. Difficult access by water to park or park to water

Negatives:
1. Highest construction cost of the "hard" solutions (using cast face block)
2. Requires full removal and replacement of the existing historic seawall and its associated features.
3. State Historic Preservation Office and National Capital Planning Commission may prefer reuse of historic stone to simulated stone face.
4. Requires a cofferdam for foundation construction



19                                                                                          8/15/2011

5.  The pile foundation will keep the wall itself from settling, but if the wall height is increased significantly, the surcharge (weight of soil) behind the wall could lead to settlement behind the wall causing damage to the sidewalk or other infrastructure.



8/15/2011

## **Option 1A**

Option 1A as the number suggests is a variation of option 1.  This is the same gravity wall with micro pile foundation, the only difference is that the stone from the existing wall is salvaged and reused as a façade face for the wall.  This will likely require that some of the stone be cut to be used as a façade.  Case face block can be used (option 1) below mean low water since this portion of the wall will rarely if ever be seen.

**Figure 5 – Gravity Wall with Stone Face
and Micropile Foundation**
Estimated cost per linear foot = $4,536

Since this is structurally the same solution as option 1 the discussion in the first three paragraphs for option 1.  This option also shares most of the same positives and negatives as option 1.  The differences in this regard are:



OPTION 1A

Positives:
1. Historic existing stone is reused as the facade
2. Closest visual match to the existing historic wall.  Reuse of historic stone to face the wall will have the least impact on the historic resource.
3. Likely more attractive to SHPO and NCPC by reuse of historic seawall stones, particularly on the Potomac side of the park.

Negatives:

1. Highest construction cost of the "hard" solutions (reusing the historic stone)
2. Requires full removal and replacement of the existing historic seawall and its associated features.
3. Requires a cofferdam for foundation construction
4. The pile foundation will keep the wall itself from settling, but if the wall height is increased significantly, the surcharge (weight of soil) behind the wall could lead to settlement behind the wall causing damage to the sidewalk or other infrastructure.  State Historic Preservation Office or National Capital Planning Commission may prefer reuse of historic stone to simulated stone face.



8/15/2011

## Option 2

Option 2 is a "hard" wall solution that also uses a deep foundation; however, in this case the solution uses driven soldier piles with precast concrete sheet pile or lagging between the soldier piles to create the wall.  Since the piles are driven and the spacing of the piles has a relatively low tolerance so that the precast sheet pile will interlock with the soldier piles, we do not believe it is feasible to drive the piles through the existing rip-rap foundation rubble under the current wall. Therefore the wall would have to move either 10 to 12 feet outboard of its current location (if the piles are driven outboard of the rip-rap foundation) or 10 to 12 feet inboard of its current location, or the rip rap would have to be removed to the level of the native soil along the alignment of the piles.  We will discuss these options more below.

## Option 2A

Option 2A is placing the soldier piles outboard of the rip-rap foundation, approximately 10-12feet outboard of the current wall.

**Figure 6 – Soldier Pile wall outboard of existing seawall**
Estimated cost per linear foot = $4,053 with cast face and $4,363 with reused stone



OPTION 2A



As mentioned previously the spacing of the precast concrete piles is sensitive so that the precast sheet pile will interlock with the soldier piles to form a wall. Due to the thickness of the soft soil the piles will require splicing. Due to the depth the splices must also transmit moment since the soft soil will provide little or no lateral support for the piles. Detailed geotechnical work with much more closely spaced borings is required to get accurate pile lengths before ordering the piles. The length and placement accuracy of the piles is also critical for the precast beams that form the "masonry ledge." This beam will allow the salvaged stone from the existing wall to be placed as a façade supported by the precast beam. Alternatively, a cast face "faux stone" like that proposed on option 1 could be used at a substantial savings over salvaging, cutting and placing the reused stone from the current wall. For estimating purposes the cost of salvaging and reusing the existing stone as a façade is the difference in cost between options 1 and 1A or about $310 per lineal foot.

Moving the wall 10 to 12 feet outboard of the current wall would encroach into the Potomac River or the Washington Channel. It would create a significant amount of additional land in the park, but would definitely require a Environmental Impact Statement. Getting the required permits from the Corps of Engineers is not assured and even if successful would be extremely time consuming.

Moving the wall outboard will require substantial fill material for the "new land." As shown in figure 6 there would be stone placed from the top of the existing rip-rap foundation stone to mean low water and select fill material from mean low water to below the top of the new wall (under the new sidewalk). For a 1,000 lineal foot section of this type of wall, this would add 1,500 to 2,000 cubic yards of stone and 5,000 to 6,000 cubic yards of select fill.

The soldier piles would be driven into the competent deeper soils and provide the same long term protection against settlement of the wall provided by option 1. Because the wall is outboard of the existing wall this option would have by far the smallest impact on existing infrastructure and trees behind the seawall.

Positives:
1. Permanent wall settlement solution regardless of wall height relative to the current wall
2. Low maintenance requirements
3. Since this option is not going through rip-rap do not need added cost of jacketing the piles through this zone.
4. Existing stone may be salvaged for reuse in park or for a façade on the wall
5. No cofferdam is required but must "muck out" before placing stone behind new wall
6. The lowest impact on existing trees and infrastructure.
7. Difficult access by water to park or park to water
8. Creates additional park land

Negatives:
1. Second highest construction cost of the three variations soldier piles Requires full removal and replacement of the existing historic seawall and its associated features.
2. Requires significant fill of rock and select fill.
3. Encroaching into Potomac River or Washington Channel so permit may not be obtained


**Dewberry**

23

8/15/2011

4. Will definitely require an environmental impact statement (EIS)
5. The pile foundation will keep the wall itself from settling, but being outboard most of the soil has not seen the primary consolidation that the soil under or inboard of the wall has so it may have substantial settlement, causing damage to the sidewalk or other infrastructure transiting the area such as storm drains.



24                                                           8/15/2011

**Option 2B**

This option is the same structural solution but moves the soldier piles driven inboard of the existing rip-rap foundation, or approximately 10 to 12 feet inboard of the existing wall. Figure 7 shows this option graphically. Since the piles are well behind the existing wall they can be driven without significant excavation; however, excavation will be required to place the precast sheet pile and the precast beams to hold the cast face block or the reused stone façade. Soil currently behind the existing wall but now outboard of the new soldier pile wall will need to be excavated to at least mean low water or the bottom of the precast beam, whichever is lowest.

Since locations where this option might be used will have higher wall height than the existing wall, there will be a requirement for fill behind the new, higher wall as it ties back to the prevailing grade. Although there will be substantial material removed between the existing wall and the new wall, it is not likely that this will meet the gradation and moisture content required for select fill; therefore, it is assumed that this will have to be removed from the site and select fill brought in as required to meet grading requirements.

**Figure 7 – Soldier Pile wall inboard of existing seawall**
Estimated cost per linear foot = $3,798 with cast face and $4,108` with reused stone



 **Dewberry**

25                                        8/15/2011

Positives:
1. Permanent wall settlement solution regardless of wall height relative to the current wall
2. Low maintenance requirements
3. Existing stone may be salvaged for reuse in park or for a façade on the wall
4. Soldier piles can be driven without excavation but must excavate to place precast beams and interlocking sheet pile.
5. Since the piles are driven inland no cofferdam is required, though dewatering will be required during construction.
6. Difficult access by water to park or park to water

Negatives:
1. Lowest cost of construction of the deep foundation solutions Not encroaching, but still significantly changing the shoreline of the Potomac River or Washington Channel so permit still may not be obtained
2. Requires full removal and replacement of the existing historic seawall and its associated features to below mean low water (or further if required by permit).
3. Will definitely require an environmental impact statement (EIS)
4. Since the new wall is so far inboard there is a high impact on trees and infrastructure, particularly where the new wall height is significantly higher than the existing seawall and/or the infrastructure behind the wall is not significantly higher then the seawall.
5. The pile foundation will keep the wall itself from settling, but if the wall height is increased significantly, the surcharge (weight of soil) behind the wall could lead to additional primary consolication  behind the wall causing damage to the sidewalk or other infrastructure.  This is less than option 2A but similar to Option 1, 1A and 2C.


**Dewberry**

26

8/15/2011

**Option 2C**

This is structurally the same as A and B, but because the soldier piles cannot be driven through the existing stone rip-rap foundation all of that stone directly under the wall must be removed down to the underlying soil.  This keeps the new seawall on the same alignment as the current wall which will make permitting much more likely, but the cost of excavating all the rock under the wall will make this option cost as much as option 2A and also may have more execution risk because even though all stone is thought to be excavated, an unforeseen condition could be encountered where a large stone that had sunk into the sub-bottom is hit during the pile driving operation.

**Figure 8 – Soldier Pile wall on centerline of  existing seawall**
Estimated cost per linear foot = $4,082 with cast face and $4,392 with reused stone



OPTION 2C

Positives:
1. Permanent wall settlement solution regardless of wall height relative to the current wall
2. Low maintenance requirements
3. Existing stone may be salvaged for reuse in park or for a façade on the wall
4. Difficult access by water to park or park to water
5. On existing alignment so should obtain permit with no more than EA – by far the easiest to permit of the soldier pile options

 **Dewberry**

27                                                                          8/15/2011

6.  Fewer  trees are lost than most other options (except 2B) since the excavation behind the current wall is limited


Negatives:
1.  Highest construction cost of the soldier pile solutions due to the cost of removing the rip rap foundation so that the soldier piles can be accurately placed and driven.
2.  Requires full removal and replacement of the existing historic seawall and its associated features.
3.  The pile foundation will keep the wall itself from settling, but if the wall height is increased significantly the surcharge (weight of soil) behind the wall could lead to settlement behind the wall causing damage to the sidewalk or other infrastructure.
4.  The piles will keep the wall from settling but if the wall height is increased significantly, the surcharge (weight of soil) behind the wall could lead to additional primary consolication  behind the wall causing damage to the sidewalk or other infrastructure. This is less than option 2A but similar to Option 1, 1A and 2B.



8/15/2011

## Option 3

Option 3 is a "hard" solution that can be considered in areas where the recommended wall height for the new wall is approximately equal to the existing seawall, and detailed geotechnical investigation does not indicate significant pockets of organic material beneath the wall. This stipulation is because the foundation on this wall would be subject to settlement if the new wall is significantly higher than the existing seawall (new primary consolidation) or if there are thick pockets of organic material (on-going secondary consolidation concern). Section D shows that historically the seawall has settled significantly since it was built, but there has been little or no settlement between the surveys in 1988 and 2009. If the height recommended for the new wall is approximately the same as the existing seawall the surcharge (weight) on the underlying soils will be essentially the same as it is now and settlement should not be a major factor. Similar to the other options discussed so far, this will also require geotechnical fabric and other features to prevent loss of fill or voids.

**Figure 9 – Gravity Wall w/ Spread Footing**
Estimated cost per linear foot = $2,027 with cast face
$2,337 with reused stone facade

Like option 1, this is a gravity wall so the weight of the wall sitting on the concrete footing is what is resisting the overturning moment of the soil behind the wall. This option includes a concrete spread footing foundation cast on a lean concrete "mud mat" which is directly on the existing stone rubble foundation. The mud mat allows accurate placement of reinforcing steel which is required in the foundation to support the new wall. With reinforcement in the concrete footing, the foundation will be much more effective at distributing the wall loads to minimize the differential settlement problem which affected the existing wall in the past when settlement was more prevalent.



This option will also require excavation approximately 20 feet back from the existing wall. The wall shown is a gravity wall with a filter fabric to prevent loss of soil thereby preventing voids behind the wall and below the sidewalk. The face of the wall is the same as proposed in option 1, concrete cast-face blocks made to look as close as possible to the original historic appearance of the existing wall. The face of the new wall is in the same location as the existing seawall which will minimize permitting requirements with the Corps of Engineers. An option "3A" could be developed by using the existing stone as a façade for this option. Similar to the difference between option 1A and option 1B, this would increase the cost of construction by approximately $310 per lineal foot.

 **Dewberry**

Positives:
1. Lowest construction cost of the "hard" wall solutions
2. Permanent solution if settlement is not an issue (i.e., if the height of the new wall is approximately the same as the existing seawall)
3. Lower maintenance requirements than existing seawall
4. Existing stone may be salvaged for reuse in park or foundation enhancement or the stone may be used as a façade on the new wall
5. Permitting requirements minimized
6. Tree loss lowest except for option 2A which moves the wall outboard
7. Difficult access by water to park or park to water

Negatives:
1. Not a solution where new wall height is higher than existing seawall. Settlement will be progressively worse the higher the new wall is relative to the existing (higher increase in surcharge on underlying soils).
2. Requires full removal and replacement of the existing historic seawall and its associated features.
3. Even with reinforcement in the footing, differential settlement along the wall is much more likely than with a pile foundation.
4. Requires a cofferdam for foundation construction
5. Does not provide a solution for soil settlement due to consolidation behind wall



8/15/2011

### Option 4

Option 4 is a "hard" solution which like option 3 is a solution that can be considered in areas where the recommended wall height for the new wall is approximately equal to the existing seawall. This is not a solution to seawall settlement which will be experienced if this option is used and the seawall is significantly higher than the existing seawall, or if detailed geotechnical evaluation shows significant pockets of organic material. This option also requires geotechnical fabric and other features to prevent loss of fill and voids.

**Figure 10 – Tie-Back Wall with Spread Footing Foundation**
Estimated cost per linear foot = $3,058 with cast face and $3,368 with reused stone

This option includes a concrete spread footing foundation cast on a lean concrete "mud mat" which is directly on the existing stone rubble foundation. The mud mat allows accurate placement of reinforcing steel which is required in the foundation to support the new wall. With reinforcment in the concrete footing, the foundation will distribute the wall loads to minimize the differential settlement problem which may have contributed to damage to the wall when the wall was experiencing significant settlement (from construction until the 1960s to perhaps as late as the 1980s.



The wall section is thinner in this case because it is a tied-back wall while options 1-3 are gravity walls. There is geogrid reinforcing fabric attached to the wall. The weight of the soil on the geogrid fabric prevents the wall from overturning rather than the weight of the wall itself. This option will require excavation approximately 30 feet back from the existing wall to construct the geogrid reinforcing fabric. The wall shown also uses filter fabric between the wall and the backfill and between the backfill and the native soil to prevent loss of soil thereby preventing voids behind the wall and below the sidewalk. The face of the wall can be either the cast face block (faux stone) or a façade that reuses the stone in the existing historical wall. As previously noted the concrete cast-face blocks made to look as close as possible the original historic appearance of the existing wall are approximately $310 per lineal foot less expensive than salvaging, cleaning, cutting and fitting the stone from the existing wall. The face of the new wall is in the same location as the existing wall which will minimize permitting requirements with the Corps of Engineers.

Positives:
1. Less costly than deep foundations
2. Permanent solution if settlement is not an issue (i.e., if the height of the new wall is approximately the same as the existing seawall and no pockets of organic materials)



8/15/2011

3. If historic stone is reused in facing the new wall will provide a close visual match to the existing historic wall.
4. Lower maintenance requirements than existing
5. Existing stone may be salvaged for reuse  in park or foundation enhancement or the stone may be used as a façade on the new wall
6. Permitting requirements minimized
7. Difficult access by water to park or park to water

Negatives:
1. Not a solution where new wall height is higher than existing seawall.  Settlement will be progressively worse the higher the new wall is relative to the existing (new primary consolidation due to increase in surcharge on underlying soils).
2. Even with reinforcement in the footing, differential settlement along the wall is much more likely than with a pile foundation.
3. Requires full removal and replacement of the existing historic seawall and its associated features.
4. Requires a cofferdam for foundation construction
5. Does not provide a solution for soil settlement due to consolidation behind wall
6. Moderate to high tree loss depending on required excavation – excavation required is directly related to wall height from footing to top of wall – typically 3 to 4 times the height of the wall.  May impact roadways and utilities.

 **Dewberry**

8/15/2011

**Option 5**

Option 5 is a commonly used revetment, "non-wall" solution but it provides additional features to prevent loss of fill, voids, and when raised to elevations discussed in the next section, will minimize flooding and embankment erosion; however, if placed at a height significantly higher than the existing seawall the increased surcharge on the underlying soils could make settlement a problem. The slope and the edges of the rock in the rip rap will tend to collect debris in flood stage and could be labor intensive to clean as debris becomes wedged into the stones.

**Figure 11 – Rip-Rap Revetment on Existing Foundation**
Estimated cost per linear foot = $770 as shown, $825 with sidewalk and railing



This option includes a riprap slope, which will lower the concentrated load from the wall on the foundation. This option will require excavation approximately 20 feet back from the existing wall. Several layers of filter fabric are used between the native soil and the base for the rip-rap and between the base and the rip-rap to prevent loss of soil thereby preventing voids behind the slope. A sidewalk is not shown but may be included at the top of the slope with a railing for approximately an additional $55 per lineal foot. If the sidewalk is in the vicinity of the top of the "wall," a railing would be required to be placed to keep people from inadvertently wandering onto the slope. In this option, the existing historic wall is completely removed and the stones reused as riprap or elsewhere in the park for other uses such as benches or walls. The riprap slope is an environmentally sound solution commonly used in the watershed which should not be difficult to permit.

Positives:
1. Lowest construction cost of all of the  solutions
2. Provides habitat for marine/mammal organisms
3. Existing stone may be salvaged for reuse  in park or slope construction
4. Permitting requirements minimized
5. Settlement will not be noticeable in a rip rap configuration and the filter fabric should keep voids from forming even if there is some movement
6. Does not require cofferdam for construction
7. Other areas on the Potomac and Anacostia use a similar approach to shore stabilization

 **Dewberry**

8/15/2011

Negatives:

1. Frequent maintenance for cleaning (river debris) and slope adjustment will be required.
2. Requires full removal and replacement of the existing historic seawall and its associated feature; the wall will not be replaced.
3. This and other non-wall solutions will have the greatest impact on the historic park setting which will draw criticism from SHPO and NCPC, since it differs from the historic and is not sustainable per the NCPC Framework Plan.
4. Reduces land available for pedestrian use.
5. Animal use of the slope (i.e. muskrats) will increase and may undermine slope, including damage to geotechnical fabric.
6. Easy access by water to park or park to water by scrambling up/down the slope.
7. Park Patrons tempted to launch boats or other water craft from land over the face of the revetment.

 **Dewberry**

8/15/2011

### Option 6

Option 6 is a "semi-soft" solution which is really a hybrid with a pile foundation toe to support the structure to prevent slope settlement and provide additional features to prevent loss of fill, voids and when raised to elevations discussed in the next section will minimize flooding and embankment erosion.

**Figure 12 – Geoweb Planted Face with Concrete Toe and Micropile Foundation**
Estimated cost per linear foot = $4,048
$4,103 with sidewalk and railing

This option includes a micro pile foundation with a pile cap similar to option 1 and slope retaining wall for support of the mechanically stabilized slope. This toe will prevent movement or undermining of the foundation. The micro piles eliminate settlement as a problem if this option is chosen where the new wall height is greater than the existing seawall height. This option includes a geo-textile erosion control fabric with planting cells such as the GEOWEB cellular confinement system shown in Appendix 10.

This option will require excavation approximately 20 feet back from the existing wall. Several layers of filter fabric are used to prevent loss of soil thereby preventing voids behind the slope. The planting cells, when fully established with appropriate species, will also stabilize the face. A sidewalk is not shown but may be included at the top of the slope. If the sidewalk is placed in the vicinity of the top of the slope a railing will be required for safety. The cost of sidewalk and railing is approximately $55 per lineal foot. In this option, the existing historic wall is completely removed and the stones reused as riprap or elsewhere in the park for other type uses such as benches or walls. The planting slope option is an environmentally sound solution used in many similar applications.



OPTION 6

Since the existing seawall is a listed historic structure the State Historic Preservation Office (SHPO) and/or the National Capitol Planning Commission (NCPC) may object, particularly on the Washington Channel side of the park where the seawall is part of the view shed from the other side of the channel.

Positives
1. Permanent slope settlement solution
2. Lower maintenance requirements than Option 5, but significantly higher than the wall options
3. Existing stone may be salvaged for reuse  in the park or slope construction
4. Minimizes tree loss



5. Provides habitat for marine/mammal organisms
6. Slope will be planted with vegetation to prevent erosion. Once plantings are established will have the appearance of a more natural shoreline
7. Depending on final design might meet the sustainability requirement of the NCPC Framework Plan for sections on the Washington Channel side of the park, though the plan seems to favor something more like option 7.

Negatives:
1. Pile foundation stabilizes the toe, but settlement can restart in areas where the wall height has been increased due to increase in surcharge on underlying soils.
2. Frequent maintenance for cleaning (river debris) and slope adjustment may be required.
3. Requires full removal and replacement of the existing historic seawall and its associated feature; the wall will not be replaced.
4. This and other non-wall solutions will have the greatest impact on the historic park setting which will draw criticism from SHPO.
5. Reduces land available for pedestrian use if sidewalk and railing are not installed
6. Animal use of the slope (i.e. muskrats) will increase and may undermine slope, including damage to geotechnical fabric.
7. Easy access by water to park or park to water/up/down the slope
8. Park Patrons tempted to launch small watercraft like canoes from land side over the face of the slope.

## Option 7

Option 7 is a Living Shoreline design. Although this would be classified as a "soft" or sustainable solution since it appears to be most like a natural shoreline, it is actually a hybrid. It is a hybrid because it requires a hard "toe" to protect the shoreline from erosion and scour. To ease permitting with the Corps of Engineers the toe of the structure is assumed to be at the same point as the existing seawall location. The living shoreline could be used on the Potomac River side of the park, but this is a much higher energy environment than the Washington Channel and would likely be harder to get the shoreline established and be much higher maintenance cost for debris removal and other maintenance. The top of the slope would define the "top of wall" and should still follow the recommended heights of G. Replacing the historic seawall with the living shoreline could present an issue in getting approval from SHPO, though it seems in keeping with the NCPC Framework Plan that calls for a sustainable approach on the Washington Channel side of the park. Selection of one of the living shoreline options for any portion of the rehabilitation of the seawall will likely trigger an EIS since it is a fundamental change from the existing historic seawall.

As indicated on figure 13 below the success of the living shoreline requires the correct species be planted and that the slope of this area be approximately 10 to 1. That means that if this solution were used where the new "wall height" being proposed is over six feet the slope behind the wall would be sixty to seventy feet. In most areas there is not this much room from the existing seawall



8/15/2011

to the curb of roadway.  The existing street lights are outboard of the curb so those would also be impacted by this design.

**Figure 13 – Living Shoreline Profile for either Continuous or Segmented Option**



LIVING SHORELINE – PROFILE
SCALE: NOT TO SCALE

### Option 7A

Option 7A uses the profile above and is a continuous application of the living seawall as shown in the plan view in figure 14 below.  The height of the weirs is set between normal mean high water and mean low water so that there is a regular tidal flush of the shoreline.  In flood events the entire toe structure will be overtopped.

If the this option is placed on the Potomac River side of the park high flows following significant rainfall in the Potomac River catchment area will subject the shoreline to flow and erosion.  This could damage the plants on the slope, particularly in the first several years when the plantings would be maturing.  Since the weir is set between normal high water and low water as floods recede this large sloped area would likely be inundated with debris that comes down river and hang up on the planting and ultimately is trapped by the toe as the flood water recedes.

 **Dewberry**

8/15/2011

**Figure 14 – Living Shoreline Plan for either Continuous Option**
Estimated cost per linear foot = $2,052 cost for infrastructure changes **not** included



Positives
  1. The foundation makes the weir elevation essentially fixed since the load of the toe is equal to or less than the existing wall.
  2. Existing stone may be salvaged for reuse  in the park
  3. Provides habitat for marine/mammal organisms
  4. Slope will be planted with vegetation to prevent erosion.  Once plantings are established will have the appearance of a more natural shoreline and appears what NCPC had in mind for portions of the Washington Channel side in the Framework Plan.

Negatives:
  1. Frequent maintenance for cleaning (river debris) and slope adjustment or replacing damaged vegetation may be required, particularly in first few years after construction
  2. Requires full removal and replacement of the existing historic seawall and its associated feature;  the wall will not be replaced.
  3. This and other non-wall solutions will have the greatest impact on the historic park setting which will draw criticism from SHPO and NCPC.
  4. 10 to 1 slope will impact roadway and lighting if used in many areas
  5. Leaves no area for pedestrian walkway unless it moves to other side of roadway in these areas.
  6. Animal use of the slope (i.e. muskrats) will increase and may undermine slope, including damage to geotechnical fabric.
  7. Easy access by water to park or park to water/up/down the slope
  8. Park Patrons tempted to launch small watercraft like canoes from land side over the face of the slope.



**Option 7B**

Option 7B uses the same profile as Option 7A shown in figure 13 above, although the profile would essentially be a hemisphere . This option is a Segmented Living Shoreline. As the name implies and as is shown in figure 15 below, there are "pockets" of living shoreline behind each weir. Between segments one of the "hard" wall options would be used.   This option would also require an EIS since it is a fundamental change to the existing historical seawall.

The toe that holds the weir will actually place less load on the underlying soils than the existing wall does since even in some of the areas where the existing seawall has settled significantly it is still above mean high tide. That is why this solution is placed on a spread footing foundation; however, with the segmented living wall a traditional wall is used between segments, and must transition from the toe height to the height of the seawall in that area. To prevent settlement due to increased surcharge, if the segmented wall is used where the new wall height is higher than the existing by more than a foot, a pile foundation should be used (like that used in option 1). This would require pile foundation for approximately 50% of the segment. A spread footing can be used on the other 50% of the segment since the toe and transitioning wall height will not increase the surcharge on the underlying soils. As can be seen in looking at the difference in cost between option 1 and 3 the cost of a deep foundation adds $1,090 per lineal foot for that portion which requires it.

**Figure 15 – Living Shoreline Plan for either Continuous Option**

Estimated cost per linear foot = $2,084 cost for infrastructure changes **not** included

Estimated cost in deeper areas with partial pile foundation =$3,174

Positives

1. The foundation makes the weir elevation essentially fixed since the load of the toe is equal to or less than the existing wall.  Any changes of the slope would not impact the vegetation or upland infrastructure
2. Existing stone may be salvaged for reuse  in the park
3. Provides habitat for marine/mammal organisms
4. Slope will be planted with vegetation to prevent erosion.  Once plantings are established the segment behind the weir will have the appearance of a more natural shoreline

Negatives:

1. Frequent maintenance for cleaning (river debris) and slope adjustment or replacing damaged vegetation may be required, particularly in first few years after construction
2. Requires full removal and replacement of the existing historic seawall and its associated feature;  the wall will not be replaced.
3. This and other non-wall solutions will have the greatest impact on the historic park setting which will draw criticism from SHPO and NCPC.
4. 10 to 1 slope will impact roadway and lighting if used in many areas
5. Segmented gives a disjointed appearance and complicates construction due to transitions
6. Leaves no area for pedestrian walkway unless it moves to other side of roadway in these areas while areas between segments could have sidewalk and railing thereby forcing pedestrians to loop around each segment, likely requiring them to cross the roadway.
7. Animal use of the slope (i.e. muskrats) will increase and may undermine slope, including damage to geotechnical fabric.
8. Easy access by water to park or park to water/up/down the slope in the segment area
9. Park Patrons tempted to launch small watercraft like canoes from land side over the face of the slope.



## G. SEAWALL ELEVATION OPTIONS & RECOMMENDATIONS

The selection of a repair option or several different options for different conditions along the existing seawall must weigh a variety of factors including durability, compatibility with historic character of the park, operations & maintenance, safety & security, and of course cost. As demonstrated in Section D there is virtually no change in the top of wall elevation between the surveys done in 1988 and 2009, except where obvious washout or other failure mechanisms are governing. From historical documents and even the difference in top of wall elevation between the 1950 and 1977 surveys consolidation settlement was still an issue. We believe that if the recommended wall height is within one foot of the existing seawall height there is no need to incur the expense of installing a deep foundation; however, where the recommended wall height is greater than a foot higher than the current seawall a deep foundation should be used since the new, higher wall will increase the surcharge on the underlying soils and settlement will again be a problem.

The initial statement of work indicated that the seawall should be rehabilitated by increasing its height to provide flood protection for the 50-year flood event. As stated previously, this level of protection if applied over the entire seawall length would have enormous impact on trees, roadways and drainage infrastructure and would create significant drainage issues even at flood levels short of those that would overtop the wall. In short, as discussed earlier we firmly believe it would not be feasible to have a 50-year flood wall from a benefit-cost perspective. Our analysis of the situation indicates that there are several major factors that must be considered when recommending a top-of-wall height. The various categories Dewberry used to determine the design seawall elevation included:

- Event Based
- Probability Based
- Park Management
- Affected Features

**Event Based Records** – Based on these records, the design elevation should be in a range from approximately 6 feet to 10 feet (referenced to MSL).

**Probability Based** –Based on these records, the design elevation should be in a range from approximately 6 feet to 9 feet (referenced to NAVD88), which would protect for events ranging from 10-year to 50-year frequencies.

**Park Management** – Based on previous meeting with Dewberry and NPS park rangers, design criteria should also include management preferences for the park. As is the case with historic preservation objectives, these would be more concerned with the management preferences of the shoreline areas versus "protecting" to some level of inundation or prevention of wave overtopping. In addition, these preferences lean more towards "softer" solutions and natural stabilization techniques versus traditional "brick and mortar", or engineered "hard" solutions. However, as previously noted for historic preservation goals, any "soft" solutions should consider event or probabilistic based design criteria mentioned previously in order to be sustainable (i.e., withstand some level of expected flooding, wave overtopping, or erosion).



8/15/2011

In order to evaluate the most suitable seawall crest elevation, Dewberry conducted an incremental inundation damage assessment. This involved simulating inundation boundaries according to approximate inundation levels of 6-9 feet. Designing to levels below 6 feet would barely exceed current seawall elevations and would not be cost effective. Likewise, the benefits to be gained designing to higher elevations (e.g., above 9 feet) would not be effective based on benefits (or damages reduced for such low-probability events) versus high costs not only of the wall but of the impacts on infrastructure and trees. The optimum design elevation is based on a reasonable seawall crest elevation, which protects features during future events (i.e., reduces future expected damages for more frequent, or more probable events), preserves historic and park management values, and is cost effective to construct.

**Affected Features (Damages)** – Numerous features exist in the parks that are worth protecting. A reasonable approach to narrow design choices involves an evaluation of the incremental benefits and costs to protect some of the larger, or more significant features subject to the hazards and deteriorating conditions associated with the seawall. These features include the trees (habitats), golf course fairways (recreation), drainage inlets (utilities), buildings (structures), and roadways (transportation). Appendix 6 presents "screen shots" showing incremental damages to these features for each level of potential inundation from 6 feet to 9 feet. Table 3 summarizes affected (i.e., damaged) features for each level of inundation. In addition, the incremental inundation images were used to develop inundation animations, which depict increasing levels of impact as magnitudes of flooding increase. The video loops have been included on the CD submitted with this Report.

| Affected and Unaffected Features | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Flood Stage (ft)** | **Trees** | | **Golf Course Fairways** | | **Drainage Inlets** | | **Buildings** | | **Park Rds / Prkg Lots (Ac)** | |
| | 4,644 | | 36 | | 272 | | 17 | | 34.2 | |
| | Affected | Unaffected | Affected | Unaffected | Affected | Unaffected | Affected | Unaffected | Affected (Ac) | Unaffected (Ac) |
| 6 | 1,462 | 3,182 | 22 | 14 | 152 | 120 | 2 | 15 | 10.0 | 24.2 |
| 7 | 2,193 | 2,451 | 27 | 9 | 203 | 69 | 2 | 15 | 18.2 | 16.0 |
| 8 | 2,935 | 1,709 | 31 | 5 | 218 | 54 | 9 | 8 | 22.1 | 12.2 |
| 9 | 3,402 | 1,242 | 36 | 0 | 236 | 36 | 10 | 7 | 24.5 | 9.8 |

| Flood Stage (ft) | **Trees** | | **Golf Course Fairways** | | **Drainage Inlets** | | **Buildings** | | **Park Rds / Prkg Lots (Ac)** | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 4,644 | | 36 | | 272 | | 17 | | 34.2 | |
| | Affected | Unaffected | Affected | Unaffected | Affected | Unaffected | Affected | Unaffected | Affected (Ac) | Unaffected (Ac) |
| 6 | 31.5% | 68.5% | 61.1% | 38.9% | 55.9% | 44.1% | 11.8% | 88.2% | 29.3% | 70.7% |
| 7 | 47.2% | 52.8% | 75.0% | 25.0% | 74.6% | 25.4% | 11.8% | 88.2% | 53.3% | 46.7% |
| 8 | 63.2% | 36.8% | 86.1% | 13.9% | 80.1% | 19.9% | 52.9% | 47.1% | 64.5% | 35.5% |
| 9 | 73.3% | 26.7% | 100.0% | 0.0% | 86.8% | 13.2% | 58.8% | 41.2% | 71.5% | 28.5% |

**Table 1** – Affected park features at incremental levels of flooding.

With the exception of buildings, approximately 30% (~one third) or more of the features (i.e., trees, golf fairways, drainage inlets, parking lots, and roads) are affected by inundation equal or



greater than 6 feet.  These impacts are considered minor (based on a damage scale of Some→Minor→Major→Significant→Catastrophic).  With one more foot of flooding, or at 7 feet of inundation, approximately a 50% or half of these features are affected by inundation, a major level of impact.  Significant impacts occur with further levels of inundation at 8 feet, where over 50% of the buildings are inundated and approximately two-thirds or more of other features are impacted.  At 9 feet of flooding, significant to catastrophic inundation occurs including up to 10 of the 17 buildings.

Based on the Effected Park Features, Table 1 above the following observations can be made:

1. At a flood elevation of 6' = 88% of the buildings are at an elevation higher than 6 feet and would be unaffected (a wall at 6' protects the remaining 12% of the buildings for 100% protection for a 6 foot above MSL flood event)
2. At a flood elevation of 7' = 88% of the buildings are at an elevation higher than 7 feet and would be unaffected.  Note that the added wall height did not protect any additional structures.
3. At a flood elevation of 8' = 47% of the East Potomac Park's buildings are at an elevation higher than that and would be unaffected (a wall at 8' protects the remaining 53% for 100% for a 8 foot above MSL flood event)
4. At a flood elevation of 9' = 40% of the East Potomac Park's buildings would be unaffected (a wall at 9' would protect the remaining 60% for 100% for a 9 foot above MSL flood event)

The required wall height gets a different answer depending on the approach.  Based on historical data back to 1936 the top-of-wall elevation should be at 10'.  Based on probability the elevation should be at 9' for a 50 year event.  Based on affected hard structures (buildings) the elevation should be 8' or greater.  The 8' elevation provides our lower bound to prevent impacts to buildings in the park, but would have significant impacts on trees and infrastructure.

The existing top of wall maximum elevation is 5.66' above MSL and the existing minimum top of wall elevation is 1.9' above MSL.  Due to the differential settlement which has taken place over time the highest elevation of 5.66' is near the railroad bridge over the Potomac river and it gradually descends along the Potomac toward Hains Point.  From Hains Point it gradually rises to a little over 4' along the Washington Channel near station 10282.  From there it gradually descends until it is as low as 1.9' near the Central Headquarters Building at 900 Ohio Drive.

The existing road system pavement elevation ranges from 7.67 to 3.  In order to raise the seawall to elevation 9 we would add from 3.5' to 7' to the existing wall height.  This would require one or more of the following actions:

1. Increase the height of the backfill, existing pavement, existing light fixtures, existing manholes, remove all the trees and replant at the new elevation.
2. Increase the height of the backfill and slope in toward the center of the park (edge of curb), remove and replant all the trees on the perimeter between the road and seawall, raise all affected manholes.  Add pump system to drain storm water from the park.
3. Leave elevation of park perimeter essentially unchanged by creating a free standing wall that is higher than the infrastructure behind the wall and add a pump system to drain storm



8/15/2011

water from park.  Most of the views of the river and channel will be blocked by the seawall, and a "fortress" appearance would result.

4. Provide a raised platform walk way behind the seawall for pedestrians with stairs every 100 feet to access the park or provide periodic "viewing platforms", and provide a pump system to drain storm water from the park.

The existing elevations drain water from the center toward the perimeter and toward Hains Point.  A one size elevation does not fit all parts of the park perimeter.  Based on the Affected Park Features, a wall elevation of 6 will protect all but 2 buildings from a 6' flood stage.  A wall elevation of 9 will protect all of the buildings from a 9' flood stage.  Rather than build a seawall high enough to protect the entire park, we would suggest building lower separate concrete walls to protect the individual buildings or clusters of buildings, nearly half of which are already above the 100 year flood stage and would not need such a secondary wall.  In this case, the storm sewer system, open to the river, must have back flow preventers installed to prevent the river from back flooding within the protective walls.  This would be more economical than trying to raise the perimeter seawall.  Our recommendation is to vary the elevations of the top of the seawall from 6.3 to 4 based on the existing drainage patterns as listed in Appendix 7.  Essentially storms larger than 6 feet above MSL would overtop the wall but would naturally drain toward the point as the flood waters recede.  Most of the buildings are above the 50-year flood level elevation, but those that are not could be protected with a berm or wall that provided the additional protection at a lesser cost than raising the entire seawall and installing a pump system.

One possible alternative for wall heights which is also presented in Appendix 7 is to provide a wall that is higher than the surrounding infrastructure on the Washington Channel from the railroad bridge to about station 10220 at the golf course parking area.  These alternative wall heights are listed on a separate table and graphic in Appendix 7.  As stated above this would have a free standing wall section above the ground surface.  The portion of seawall behind the Park Headquarters and immediately adjacent to that area does not have sidewalk adjoining the wall.  From review of the inundation maps that were created it appears that a 6.3 foot high wall in this area would provide protection to a flood up to that level.  However, if this alternative were selected it would make the backflow devices on the storm drains in the Capital Police HQ area critical features.  The entire area has settled to the point where it would be well below the top of wall and if the backflow devices did not work, it would flood the entire area.  As noted above, it would also require a pump system to remove water from behind the wall.  The pumps would be necessary not only when the wall was actually overtopped, but also when the gravity head from the storm drains in this area is less than the head on the backflow device from the channel.  The ROM estimate for the higher wall and pumping system would be a premium of 25% over the ROM costs listed for the recommended wall option.

 **Dewberry**

8/15/2011

## H. SEAWALL REPAIR RECOMMENDATION

The selection of the wall rehabilitation option is predominately independent of the recommendation for the top of wall elevation, which is why that is a separate discussion in the previous section. It is also feasible to use different options for different sections of seawall; however, there could be issues at the transition between wall types, particularly if one section has a deep micro-pile foundation and the adjacent section does not.

In making a recommendation, it is instructive to look at what the major failure modes of the existing wall have been. The major failure mode seen virtually everywhere along the existing seawall is settlement of underlying soils. Bedrock or at least highly consolidated, competent soils are 90 feet below mean sea level (MSL) or greater and any deep foundation would have to penetrate well into this layer to develop the required bearing capacity. As section C describes there is organic material and dredge spoils that were highly compressible (e.g., unconsolidated muds, silts, and sands); however, as the comparison data in Appendix 1 shows settlement has essentially stopped. If the new wall height is no more than 1 foot higher than the existing seawall then settlement will not be an issue since the new wall will place essentially the same load on the underlying soils and further consolidation at this load level will be minimal.

Historically, settlement rates have been as high as ½ inch per year, and likely much higher than that in the first ten years after construction. If the recommended wall height is greater than one foot higher than the existing seawall then a deep foundation should be strongly considered. For new wall heights more than one foot greater than the existing wall consolidation will occur from the increased surcharge on the underlying soils which have proven to be highly compressible. Not only will there be settlement, but likely differential settlement which would be even more likely to cause damage to the new wall. The recommended solution to sections with higher recommended wall heights is to have a micro-pile foundation that is drilled through the existing stone foundation and jacketed in this zone to prevent down drag on the micro pile due to settlement of the rip rap and the high friction factor of the rip rap. The piles will provide either a point-bearing pile on bedrock (most likely on the west end of the park) or friction in highly consolidated underlying competent soils. Depth of penetration in the competent soils will be determined in final design but based on the preliminary geotechnical information would appear to be at least 10 feet into this layer and likely 15 feet or more to develop the required pile capacity. Drilling may stop when the competent material is reached and the pile driven to a prescribed blow count. Alternatively drilling could continue at a smaller diameter in the competent material and then driven so that the installed pile will develop maximum friction capacity in this layer. Options 1 and 6 have this type of foundation which addresses the settlement solution and will be the most permanent; however, not unexpectedly, they are more expensive options. In addition to drilled micro-piles would be soldier piles in Option 2. Soldier piles use pre-cast concrete piles which have the greatest durability, but are difficult to splice and this option requires accurate depth determination so that the masonry ledge will be at a consistent height.

Another significant failure mode is wash out of material from behind the wall. This has been the primary cause of damage in the time between the 1988 and 2009 surveys. This occurs due to water passing through the wall and carrying soil with it. As mortar is lost or stones are displaced, wash out is accelerated. Burrowing animals also contribute to this failure mode. To mitigate this failure mode, all of the options presented include the use of two layers of geotechnical fabric



8/15/2011

directly behind the wall.  This fabric allows water to pass through but not soil.  The material is quite tough – resistant to deterioration over time - and is difficult to puncture.  Two layers are used at the wall as added assurance that laps or holes caused during construction in one layer do not create a potential spot for washout to occur.  The single layer between native soil and backfill behind the wall is not to prevent washout, but to prevent migration of fines from the native soil on the point – predominately dredge fill which is fine grained – into the select fill placed as part of the rehabilitation..

Another major source for washout in the existing wall has been utility penetrations through the wall.  Cable crossings as well as the sanitary line  should ideally be at or below the foundation of the rehabilitated wall section.  If a pile foundation is used, this would actually tend to protect the utility from having the wall impinge on it and potentially shear the utility.  For storm drains or other features that must penetrate the wall, protection is primarily an issue of having a good design detail and ensuring that the construction contractor's quality control installs the penetration in accordance with the design.  Penetrations must be fully grouted and the geotechnical fabric behind the wall firmly bound to the pipe or cable penetrating the wall to give a continuous filter which allows water to pass but prevents washout, even if there are cracks or subsequent failure of the grout around the penetration.  This is a concern that is common to all of the rehab options.  The filter fabric should be wrapped around storm pipes as far back as they are exposed by the construction activity.  Wrapping the storm water pipes is important because there are often leaks at the joints of the pipe, or suck leaks will occur in the future.  When there is a gap in the joint it allows soil to seep into the storm water pipe and be washed out into the river or channel.

For storm drains in the western end of the park, it will be necessary to have check valves in the storm drains.  It is of little value to build up the wall to prevent flooding if the storm drains themselves become a flow path for flood water to get behind the wall.

There are over 20,000 lineal feet of seawall in East Potomac Park.  Even with the lower cost solutions the rehabilitation of the entire seawall is a major undertaking and will likely be done in many phases.  Our phasing recommendations are discussed in Section J.  Since the phased repairs could take many years to accomplish, one consideration is to choose a rehabilitation option where the first phase is still in reasonable condition when the last phase of the project is completed.  All the deep foundation options are permanent solutions and the spread footing foundations are also permanent solutions if the new wall height is no more than one foot higher than the existing wall.  That tends to recommend a deep foundation for the west end of the park where the recommended wall heights are higher and allow for the use of less costly spread footings where the wall height is similar to the existing – basically 1,000 feet from Hains Point on the Potomac side and 2,000 feet from the point on the Washington Channel side.

We do not recommend any of the "non-wall" solutions (options 5, 6 and 7).  Besides the relatively short useful life of option 5, all of these solutions will require higher maintenance efforts and costs (e.g., they are "debris catchers" that will require maintenance attention immediately following every significant rain event even if well below the level that would overtop the wall).  There are a number of locations in the greater Washington area that use a shoreline solution similar to each of the non-wall options, but they are not replacing a historic seawall.



Although option 6 could be applied in higher wall height areas since it has a deep pile foundation, all of the non-wall options are significant deviations from the existing historic wall. Under the National Environmental Policy Act (NEPA) a repair of the wall by any of the "hard" solutions should qualify as a Categorical Exclusion under NEPA since they are a restoration of the original design intent, so long as the Section 106 consultation agrees that the final recommended solution is sufficiently similar to the historic wall. For the various wall solutions the worst case (from a cost perspective) would be to require the reuse of the stone from the historic seawall as a façade for the new wall. If this is a requirement it is estimated to add $310 per lineal foot to the construction cost of the wall.

The NCPC Framework Plan calls for a sustainable shoreline on the Washington Channel side, and Option 7A could be applied. The option proposes placing the weir on the alignment of the current wall and the 1 to 10 slope would essentially take the slope back to the curb as the "wall height" to resist inundation (the curb elevations are equal or higher than the recommended wall heights in almost all areas). Parking areas would be lost in the 1 to 10 slope, and some grade changes would be required. A large number of current trees would be lost since they would be in the area to be cut to provide the slope. Alternatively a hybrid solution of Options 5 and 7A could be applied in this area. Option 5 with rock rip-rap at from the current channel bottom to the mean higher high water line to take tidal cycles, wave run up and boat wakes, and then the living shoreline 1 to 10 slope from mean higher high water to the intended wall height (curb).

In a hybrid Option 5/Option 7A solution it might be possible to move the rock rip rap outboard of the existing seawall alignment. The area outboard of the existing seawall has not been previously loaded and would see substantial primary consolidation. However, the rock rip rap would only extend up to mean high water so the loading would be moderate. Additional stone could be added in the future to provide the shoreline protection if settlement exposes too much of the slope. The 7A portion of 1 vertical to 10 horizontal slope would generally place no new load since the slope would continue back to current roadway curbs and those are already at the desired elevation. If the permit allows moving outboard of the current wall alignment it may be possible to retain parking, perhaps some diagonal spaces instead of the pull off areas that now exist. This would be a design issue during detailed design.

The two photos below are from another project and indicate what the cast-block block concrete finish would look like such as is proposed in all the wall options. Contractor quality control will be important to a finish that is acceptable as a simulation of the historical stone. Part of this quality control would be the requirement that the contractor provide a mock-up of the wall section that can reviewed and approved by NPS and other interested stakeholders before actually placing any in the final wall construction. NCPC and/or SHPO may make review and approval of the mock-up a condition before giving final approval. In many ways quality control of the cast-face block is not as difficult a quality issue of reusing the existing stone either as whole blocks or a cut face veneer. There is also the issue with reuse that with many sections damaged it may be difficult to recover sufficient stone from the existing wall to complete the entire façade.





**Figure 16 – Cast Face Block Facing can be used on all Wall Options**

**RECOMMENDED REHABILITATION OPTION**

Based on the discussion above, we recommend Option 1 as the preferred solution for the rehabilitation of the historic seawall on the west end of the park.  This would be from station 10048+50 at the inlet bridge by the Tidal basin to station 10137+00 on the Potomac River side of the park and from station 170+00 (about 2,000 feet from Hains Point) to the inlet at station 253. From a structural and longevity standpoint, this is the best option.  Option 1 is a permanent solution that will give generations of satisfactory service for the visitors to the park.  We believe that this is the lowest maintenance cost option.  The wall will repel debris until it is overtopped.  The cast-face block can be tied into the gravity wall by reinforcing dowels so that this option should not lose individual blocks as may be the case if the existing historic stone blocks were reused either as blocks or cut face veneer.  Therefore, we believe the appearance will be acceptable relative to the historic seawall, yet be less costly and at least provide equal or better performance for the face of the wall.

For the section near the point (from station 10137 to station 170+00) where the recommended wall height is just 4 feet above mean low water, the lowest recommended, so that the entire park will drain following a flood event.   For this section we recommend Option 3 with cast face block. This is essentially the same wall as option 1 but with a shallow, spread footing rather than the more costly deep micro-pile foundation.  This has the added advantage that the appearance of adjacent sections should have exactly the same camber and appearance and make placement of construction joints between wall sections straight forward.



8/15/2011

**ALTERNATIVE REHABILITATION RECOMMENDATION**

As discussed previously we do not recommend use of a non-wall solution; however, the NCPC Framework Plan seems to favor an option 7A type approach on the Washington Channel side. If the Park Service feels strongly that a "soft" solution should be part of the rehabilitation plan, the alternative recommendation would be to place a Continuous Living Shoreline, Option 7A, from station 10155 (500 feet on the Washington Channel side of Hains Point) to station 10170+00. The low wall height of this section would allow the Living Shore Line to be built without impacting any parking or street lighting. If more Living Seawall is desired and the Park is willing to give up the pull-off parking area between stations 10170 and 10173 then the Continuous Living Shoreline could be used from station 10155 all the way to station 10178+50.

To extend any further to the west would impact the roadway and lighting since the wall recommended wall height is greater and, therefore, the 10 to 1 slope behind the Living Shoreline would extend to or beyond the curb on the roadway. If USACE will approve encroachment into the Washington Channel the hybrid Option 5/ Option 7A solution could be extended all the way to Buckeley Drive. Due to the low elevation of the Park Headquarters it is really not feasible to extend the living shoreline concept further than Buckeley Drive. As discussed in Section G there are alternative wall heights possible for the area near the Park Headquarters, but due to the close proximity of the building to the seawall a "hard solution" is required for this area. The primary determinants are whether the wall will be higher to provide greater flood protection versus the cost of an active (pump) solution to clear water when the water level rises. Such a pumping system with check valves to prevent backflow would have to handle any rainfall when the water level in the channel was within 12 inches below the current top of wall elevation since at that point normal gravity storm drains would not be effective and may make flooding more frequent than it is currently.



8/15/2011

## I.  DEMONSTRATION AREA RECOMMENDATIONS

The statement of work suggested recommending a demonstration project area of approximately 500 feet that could be completed to verify design and cost estimates and be used to build support for full funding of rehabilitation for the entire seawall.  The condition assessment in Task 3 made it abundantly clear that the entire seawall needs rehabilitation.  The goals for a demonstration project are:

1. The section recommended should be in egregious condition needing immediate attention to mitigate losses or eliminate safety hazards
2. Located in a high visibility area where park visitors will see the project and the benefits that would be achieved if more of the seawall were rehabilitated.

 **Dewberry**

8/15/2011

**Figure 17 – 500 Foot Stations with Sheet Number Key Plan**



500 FOOT STATIONS WITH SHEET NUMBER KEY PLAN

Station 10124+50 to 10134+14.8

1. The **first area** we recommend to be repaired is from station 10124+50 on plan sheet 28 to the beginning of the pre-cast cap at station 10134+14.8 on plan sheet 31b. This is approximately 964.8 linear feet of seawall. This area is not only severely deteriorated but the top of wall elevation varies from 1.9 to 3.22. The land approximately 20 feet behind the wall is being eroded into the river and there are concrete barriers in place to prevent additional erosion. This area floods on a daily basis and the precast cap portion of the seawall is 2.25 feet higher than the top of the seawall prior to station 10134+14.8. The top and elevation of seawall at this location is shown in photos below:

**Figure 18 – Typical Damage Station 10124+50 to 10134+14.8 – Potential Demo Area 1**

 



 



Station 10243+50 to 10253+07.5

2.  The **second area** we recommend to be repaired is from station 10243+50 on plan sheet 61a to the beginning of the Railroad Bridge abutment at station 10253+07.5 on plan sheet 4 from the Jefferson Memorial plans.  This is approximately 957.5 linear feet of seawall. This area is not only severely deteriorated but the top of wall elevation varies from 1.9 to 3.66.  The sidewalk was previously removed from a portion of this area.  This area floods on a daily basis and is directly behind the Headquarters Building.  The top and elevation of seawall at this location is shown in photos below:

**Figure 19 – Typical Damage Station 10243+50 to 10253+07.5 – Potential Demo Area 2**



8/15/2011




Headquarters Building and end of sidewalk        View toward Railroad Bridge






Station 10048+50 to 10058+50

3.  The **third area** we recommend to be repaired is from station 10048+50 on plan sheet 8a of the Jefferson Memorial Plans at the Inlet Bridge abutment to station 10058+50 on plan sheet 5a. This is approximately 1000 linear feet of seawall. This area is not only severely deteriorated below the sidewalk but the seawall face has lost many masonry stones. The sidewalk has been asphalted in large patches to fill in sink holes. This area is also a very visible by



pedestrians because of its location adjacent to the Inlet Bridge.  The top and elevation of seawall at this location is shown in photos below:

**Figure 20 – Typical Damage Station 10048+50 to 10058+50 – Potential Demo Area 3**



Station 10148+00 to 10153+50

4.  The **fourth area** we recommend to be repaired is from station 10148+00 to station 10153+00 on plan sheet 34a.  This is approximately 500 linear feet of seawall.  Hains Point is centered at station 10150+50 and a sewer force main tunnels under the foundation and across the river at this point.  The sidewalk area has collapsed into a void below the slab. This area of the seawall is one which was repaired using a pre-cast concrete



8/15/2011

cap, this area is also where the largest exposed height of wall is located (deepest water depth).  The top and elevation of seawall at this location is shown in photos below:

**Figure 21 – Typical Damage Station 10148+00 to 10153+50 – Potential Demo Area 4**

 

Hains Point and Sewer Force Main area

 



PHASE 4 SEAWALL
REPLACEMENT
STATION 10148+00
TO 10153+00

KEY PLAN FOR PHASE 4

**DEMONSTRATION AREA RECOMMENDATION**

Of the demonstration area candidates, area 1 is arguably in the worst condition.  Erosion has extended



56    8/15/2011

well behind the wall forcing jersey barriers to be placed to try to mitigate the erosion. On the other hand, area 1 is well out on the point and would not be as visible to visitors or commuters as areas 2 or 3, which are at the two entrances of the park. As a "show case" project area 1 is particularly difficult since vehicular traffic is one way so you must transit three quarters of the way around the park to get to the project site.

Area 2 is at the Park Headquarters building at 900 Ohio Avenue near the railroad bridge. As the photos on page 52 above document, this area is in very poor condition, and its proximity to the Jefferson Memorial and the entrance of the park definitely make it a high visibility area. One drawback for this area as the demonstration project is that the topography of the area is so low due to past settlement. With the recommended wall heights for this area the benefits of a completed project might not be judged worth the investment since the area would still be subject to significant flooding as even minor floods would "end run" the new section of wall and inundate the area. If the alternative wall height solution is chosen then area 2 is not a good candidate as a demonstration project. For the alternative wall height solution to work the entire section of wall from the railroad bridge to the golf course parking area as well as the associated backflow devices and pumping system must be placed as a system or flood waters would simply "end run" the wall and once trapped the flood waters would be very slow to recede.

Area 3 is also at the entrance of the park on the Potomac side. As the photos on page 53 above document, this area is also in very poor condition and is routinely inundated due to its low present elevation. Even though the wall in this area is very low, the land and infrastructure behind it is not low like it is by the Park HQ. If the demonstration area were built a small berm perpendicular to the seawall at the end of the new construction could prevent the "end run" of the new wall. Its location makes it one of the most highly used pedestrian areas in the park which makes it one of the highest visibility areas for a demonstration project. Being at the entrance of the park, site visits for officials that might have budget or programming authority or other interested parties can easily and quickly be arranged.

Area 4 is the very tip of Hains Point. As the photos document this area is in very poor condition, so much so that barricades have been placed to restrict pedestrian traffic due to undermining of the sidewalk. Although the point is a prominent feature from a boat off shore this area probably gets less pedestrian traffic than any of the other candidate demonstration areas and is some distance from the road which would make it difficult to "show case" unless drive on mats were placed to protect the grass to allow vehicular traffic to the area.

Dewberry's recommendation for a demonstration project is area 3. In addition to being a high visibility area, it is a logical starting point if the repair of the seawall can be placed on a relative fast track which would provide the lowest overall rehabilitation cost by keeping work in progress until completed.



## J.  REHABILITATION PHASING PLAN

As the Task 3 report documented the entire seawall in East Potomac Park requires rehabilitation as soon as funds can be made available.  As discussed in section G above, the candidate sections for the demonstration project all demonstrate incipient failure.  Several have barricades to prevent approaching the wall in parts of these areas due to the level of deterioration.  Despite the need, the cost of the rehabilitation will necessitate phasing of the project to complete the work.  We have considered two phasing approaches.  In the preferred phasing we have split the entire replacement into five phases, hoping to secure funding in five consecutive fiscal years.  The other approach splits the entire seawall into nineteen roughly equal phases.  In this approach multiple phases could be constructed in the same fiscal year or in the worst case construction might be limited to a single phase in a fiscal year or even skipping a year.  These two phasing plans are shown in tabular and graphical form in Appendix 9.

TABLE 2 PREFERRED PHASING PLAN W/ RECOMMENDED WALL HEIGHTS

| Phase | Beginning Station | Ending Station | Length of Phase | Drawing Sheets | Top of Wall Elev | ROM Cost Preferred Option |
|---|---|---|---|---|---|---|
| | | | | | | |
| 1 | 10048+50 | 10058+50 | 1,000 | 3a to 5a | 6.3 | $4,226,000 |
| 2 | 10058+50 | 10107+15 | 4,865 | 5a to 21a | 6.3 | $20,560,000 |
| 3 | 10204+42 | 10253+07 | 4,865 | 47a to 64 | 4.5 to 6.3 | $20,560,000 |
| 4 | 10107+15 | 10155+80 | 4,865 | 21a to 35a | 6.3 to 4.0 | $16,645,000 |
| 5 | 10155+80 | 10204+42 | 4,862 | 35a to 47a | 4.0 to 6.3 | $17,424,000 |
| | | | | | | |
| | | | 20,457 | | | $79,414,000 |

In the preferred phasing plan we would start with the recommended demonstration area discussed in section H.  This area is 1,000 lineal feet from station 10048+50 on plan sheet 8a of the Jefferson Memorial Plans at the Inlet Bridge abutment to station 10058+50 on plan sheet 5a.  The rest of the phases are approximately one fourth of the remaining seawall in each phase.  The second phase is immediately adjacent to phase 1 from station 10058+50 to station 10107+15, a length of 4,865 lineal feet.  To maximize the protection of the buildings at the park the 3rd phase is from the railroad bridge at station 10253+07 to approximately 1,000 feet beyond the golf course parking lot to station 10204+42,

Phase 3 can be built to the recommended wall heights which minimizes the impact on infrastructure and trees behind the wall or to the alternative wall heights discussed in Section G.  Only in the preferred phasing will allow the alternative wall height to be used.  Since much of the area behind the wall in this phase is very low, if the wall is built to the higher levels the entire section as well as the pumping system must be built as a single project to be effective.  If the higher wall section did not extend all the way past the golf parking structure rising flood water would simply go around the wall.  By extending past the golf course parking lot the natural topography of the park will keep inundation from going around the wall as was shown in the inundation study which is included in Appendix 6.

 **Dewberry**

8/15/2011

Phase 4 would move back to the Potomac side of the park picking up at the end of where phase 2 ended at station 10107+15 and extending to station 1055+80. This phase completes the Potomac side of the park and wraps around Hains Point. Phase 4 is also 4,865 feet. The final phase fills all the remaining rehabilitation between the ends of phases 2 and 4 from station 10155+80 to station 10204+42,

**EXTENDED PHASING**

### Table 3 EXTENDED PHASING PLAN

| Phase | Beginning Station | Ending Station | Length of Phase | Drawing Sheets | Top of Wall Elev | ROM Cost Preferred Option |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
| 1 | 10048+50 | 10058+50 | 1,000 | 3a to 5a | 6.3 | $4,226,000 |
| 2 | 10243+50 | 10253+07 | 957 | 61a to 64 | 4.5 | $4,045,000 |
| 3 | 10124+50 | 10137+00 | 1,250 | 28a to 31a | 4.5 | $5,283,000 |
| 4 | 10147+00 | 10155+15 | 815 | 31a & 34a | 4.0 | $3,448,000 |
| 5 | 10058+50 | 10068+50 | 1,000 | 5a to 8a | 6.3 | $4,226,000 |
| 6 | 10068+50 | 10078+50 | 1,000 | 8a to 11a | 6.3 | $4,226,000 |
| 7 | 10078+50 | 10088+50 | 1,000 | 11a to 15a | 6.3 | $4,226,000 |
| 8 | 10088+50 | 10098+50 | 1,000 | 15a to 19a | 6.3 | $4,226,000 |
| 9 | 10098+50 | 10108+50 | 1,000 | 19a to 21a | 6.3 to 6.0 | $4,226,000 |
| 10 | 10108+50 | 10118+50 | 1,000 | 21a to 25a | 6.0 to 5.5 | $4,226,000 |
| 11 | 10118+50 | 10124+50 | 600 | 25a to 28a | 5.5 | $2,536,000 |
| 11A | 10137+00 | 10147+00 | 1,000 | 31a & 34a | 4.0 | $2,030,000 |
| 12 | 10232+50 | 10243+50 | 1,100 | 56a to 61a | 4.5 to 5.5 | $4,660,000 |
| 13 | 10221+50 | 10232+50 | 1,100 | 54a to 56a | 5.5 to 6.0 | $4,660,000 |
| 14 | 10210+50 | 10221+50 | 1,100 | 48a to 54a | 6.0 to 6.3 | $4,660,000 |
| 15 | 10199+50 | 10210+50 | 1,100 | 46a to 48a | 6.3 to 6.0 | $4,660,000 |
| 16 | 10188+50 | 10199+50 | 1,100 | 43a to 46a | 6.0 | $4,660,000 |
| 17 | 10177+50 | 10188+50 | 1,100 | 40a to 43a | 6.0 to 4.5 | $4,660,000 |
| 18 | 10166+50 | 10177+50 | 1,100 | 37a to 40a | 4.5 to 4.0 | $2,230,000 |
| 19 | 10155+15 | 10166+50 | 1,135 | 35a to 37a | 4.0 | $2,300,000 |
|  |  |  |  |  |  |  |
|  |  |  | 20,457 |  |  | $79,414,000 |

While the preferred phasing has a total of five phases the extended phasing plan has nineteen phases. This plan is not necessarily intended to indicate that it will take 19 years or longer to complete all phases. Phases can be combined in a single construction contract, or made as options to give flexibility for the acquisition strategy. For rehabilitation of a long wall section one approach would be to start at one end and work on adjacent sections until the entire wall is completed. Since all four of the candidate demonstration areas are already badly deteriorated and present a risk of even more severe damage as well as safety concerns for park visitors these four areas were made the first four phases even though they are not adjacent. Demonstration area 4, the tip of Hains Point,



8/15/2011

was increased from the area designated in Section I and Appendix 8 to make it more consistent in size with the other phases in this phasing plan.

Since the Potomac side of the park is the more aggressive environment for flow and wave run-up, that side is systematically phased after the four demonstration areas are completed. Phases 5 through 11 are the 5,600 lineal feet between the end of phase 1 (demonstration area 3) and phase 3 (demonstration area 1). Phase 11A is the in-fill between phase 3 (demonstration area 1) and phase 4 (an enlarged demonstration area 4 including the tip of Hains Point) and 11A can either be done with 11 or as a separate phase.

Following completion of the Potomac side of the park the phasing plan moves back to pick up at the end of phase 2 by the Park Headquarters building (demonstration area 2) and systematically moves from phase 12 through 19 to complete the Washington Channel side of the park. As noted above unless phase 2, 12, 13 and 14 are completed as a single project the alternative wall height solution discussed in Section H cannot be used.

An alternative for the extended phasing approach to maximize flood protection to the buildings at the west end of the park would be as follows:
- Phases 1-4 still go first as these areas are already in failure
- Phases 5-7 to maximize protection of buildings on the Potomac side of the park
- Phases 12-14 to maximize protection of buildings on the Washington Channel side of the park
- Phases 8-11 to complete the Potomac side of the park
- Phases 15-19 to complete the Washington Channel side of the park



8/15/2011

# Declaration of Jennifer T. Nersesian

# Exhibit B

# NEPA Categorical Exclusion Documentation Form



**National Park Service**
**U.S. Department of the Interior**

National Capital Regional Office
**Date: 10/16/2025**

# Categorical Exclusion Documentation Form (CE Form)

**Project:** EWM-Soil/Fill
**PEPC Project Number:** 133318
**Description of Action (Project Description):**

Excavation for the East Wing Modernization Project at the White House will yield approximately 30,000 cubic yards of soil. There is interest in using this soil at East Potomac Park where some level of infill is planned as part of improvements to be made by the Golf Course lessee. The proposed action involves **temporary storage and later reuse of clean fill** on **previously disturbed and maintained areas** of the East Potomac Golf Course. The site has been continuously graded, mowed, and used for recreation for more than a century.

**Project Locations:**

**Location**

| | | | |
|---|---|---|---|
| **County:** | District of Columbia | **State:** | DC |

There are no required mitigations identified.

**CE Citation:** 12.5(C)(19) (formerly 3.3.C.16) Landscaping and landscape maintenance in previously disturbed or developed areas.

**CE Justification:**

The proposed action involves relocating and reusing approximately 30,000 cubic yards of clean fill generated from the White House East Wing Modernization Project to East Potomac Park Golf Course, a long-established and previously developed landscape. The material will be stored and subsequently incorporated into ongoing golf course improvements within areas that are already disturbed, graded, and maintained as part of the existing golf course operation.

This action is consistent with CE 12.5(C)(19), which covers 'landscaping and landscape maintenance in previously disturbed or developed areas.' The proposed use of soil for contour correction, drainage improvement, and turf establishment represents maintenance and minor modification of an existing managed landscape, not new construction or a change in land use. The following factors support this determination:

1. Previously Disturbed Setting: East Potomac Park was artificially constructed from dredged fill in the early 20th century and has been continuously used as a golf course, driving range, and recreational landscape for over a century. The proposed fill placement will occur within these previously developed and managed areas, not in undisturbed natural habitats.

2. Limited Scale and No Significant Environmental Effects: The activity involves no new structures, utilities, or permanent facilities, and no vegetation removal beyond temporary grass disturbance. The soil will be tested and verified as clean prior to placement, eliminating the risk of introducing contaminants.

3. Consistency with Ongoing Landscape Maintenance: The reuse of fill supports existing maintenance goals— improving turf stability, drainage, and surface contouring—analogous to ongoing landscaping and landform maintenance performed routinely by the golf course operator.

4. No Potential for Significant Impacts to Sensitive Resources:

- Cultural Resources: The project will occur within a contributing resource of the East Potomac Park Historic District, but within areas that have already been extensively modified. The activity is expected to result in no adverse effect under Section 106.

- Biological Resources: The site is mowed, landscaped, and non-habitat for listed species. Any incidental effects (e.g., noise, temporary disturbance) are negligible and can be addressed through informal ESA consultation.

- Floodplain Management: If fill is placed within the mapped floodplain, the NPS will need to complete a Statement of Findings under DO-77-2 to document compliance with EO 11988 and EO 13690.

- District Environmental Compliance: Coordination with DOEE will ensure compliance with D.C. stormwater and erosion control regulations.

5. No Extraordinary Circumstances (per 43 CFR 46.215): The action does not have the potential for significant adverse impacts on public health, safety, cultural, historic, or natural resources; does not introduce new environmental effects; and is consistent with prior uses and maintenance practices.

6. Temporary and Reversible Nature: The soil storage and reuse are temporary, limited in scope, and easily reversible, further reinforcing that the activity falls squarely within the scope of routine landscaping and maintenance actions contemplated by CE 12.5(C)(19).

**Decision: I find that the action fits within the categorical exclusion above. Therefore, I am categorically excluding the described project from further NEPA analysis. No extraordinary circumstances apply.**

**Signature**

Superintendent: _Kevin J. Griess_  SUPERINTENDENT
National Mall and Memorial Parks
National Park Service

**Date:** Oct 16, 2025

**Extraordinary Circumstances:**

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| **A.** Have significant impacts on public health or safety? | No | All safety precautions will be in place as activities are implemented. |
| **B.** Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands; floodplains; national monuments; migratory birds; and other ecologically significant or critical areas? | No | The project will occur within a contributing resource of the East Potomac Park Historic District, but within areas that have already been extensively modified. The activity is expected to result in no adverse effect under Section 106. The site is mowed, landscaped, and non-habitat for listed species. Any incidental effects (e.g., noise, temporary disturbance) are negligible and can be addressed through informal ESA consultation. |
| **C.** Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks? | No | No, The project does not have highly uncertain or potentially significant environmental effects or involve unique or unknown environmental risks. |
| **D.** Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects? | No | This project is a one-time operational activity with no implications for future projects or broader management actions. It does not establish precedent, create commitment, or represent a decision in principle about future actions with potentially significant effects. |
| **E.** Have a direct relationship to other actions that implicate potentially significant environmental effects? | No | The project is an independent, site-specific maintenance action that has no direct relationship to other actions with potentially significant environmental effects. It does not contribute to cumulative impacts or broader interdependent projects. |
| **F.** Have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by the bureau? | No | The undertaking will not have significant impacts on properties listed in or eligible for listing on the National Register of Historic Places. Effects are minor, temporary, and mitigated through established avoidance and restoration measures. |
| **G.** Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species? | No | The project will have no measurable or significant impacts on any listed or proposed species or designated Critical Habitat. The action area is fully developed and managed as turf and recreation space, and no adverse habitat effects are expected. |
| **H.** Significantly limit access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites? | No | The project will have no effect on Indian sacred sites or their use because no such sites are known or present within the project area, and no change in access or integrity will result. |
| **I.** Contribute to potentially significant effects resulting from the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or from other actions that promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act)? | No | The proposed action will not introduce, spread, or promote noxious weeds or non-native invasive species. All materials will be verified as clean, and disturbed areas will be promptly stabilized with appropriate vegetation |

# Declaration of Jennifer T. Nersesian

# Exhibit C

# NHPA Assessment of Actions Having an Effect on Historic Properties



**National Park Service**
**U.S. Department of the Interior**

**National Capital Regional Office**
**Date: 10/16/2025**

# ASSESSMENT OF ACTIONS HAVING AN EFFECT ON HISTORIC PROPERTIES

## A. DESCRIPTION OF UNDERTAKING

**1. Park:** National Capital Regional Office

**2. Project Description:**

**Project Name:**  EWM-Soil/Fill
**Prepared by:**  Tammy Stidham    **Date Prepared:**  10/16/2025    **Telephone:**  202-619-7474
**PEPC Project Number:**  133318
**Locations:**

    **County, State:**  District of Columbia, DC

**Describe project:**

Excavation for the East Wing Modernization Project at the White House will yield approximately 30,000 cubic yards of soil. There is interest in using this soil at East Potomac Park where some level of infill is planned as part of improvements to be made by the Golf Course lessee.

**Area of potential effects (as defined in 36 CFR 800.16[d])**

East Potomac Park Golf Course - the area where the soil storage/ fill is being placed. Adjacent viewsheds and circulation routes affected by truck access, staging, or visual change. Any associated landscape features (paths, tree lines, seawalls, bridges, or roadways) that contribute to the East Potomac Park Historic District

**3. Has the area of potential effects been surveyed to identify historic properties?**

**No**

 **Yes**

**4. Potentially Affected Resource(s):**

**Archeological Resources Present:** No

**Archeological Resources Notes:**   No archeological resources are known. Area is all fill (made-land).

**Historical Structures/Resources Present:** Yes

**Historical Structures/Resources Notes:**   1. East Potomac Park Historic District (NRIS #97001676) Listing: National Register of Historic Places, December 15 1997 Period of Significance: 1917-1945 Level of Significance: National

Significance: Major reclamation and landscape project by the U.S. Army Corps of Engineers using Potomac River dredge; a key example of early-20th-century park planning.

Contributing Features Within the APE: East Potomac Golf Course (18-, 9-, and miniature courses); 1930s WPA clubhouse and maintenance facilities; Ohio Drive SW and internal roads; seawalls and riprap shoreline; tree allees, lawns, and open spaces defining the designed landscape.

2. East Potomac Golf Course (Contributing Resource) Date: Established 1918; expanded 1920s-30s; current layout 1935-40.

Significance: Among the nations earliest public courses and first in the NPS system; embodies City Beautiful and Recreation Movement ideals; built on dredged fill and maintained as a designed landscape retaining its layout, circulation, grading, and vegetation integrity

Potential Effects: Fill placement may slightly alter contours, drainage, or vegetation, subtly affecting landscape character and spatial relationships. No adverse effect with mitigation.

3. Seawalls and Shoreline Structures (Contributing Resources) Date: 1917-1920 (U.S. Army Corps of Engineers)

Significance: Core component of the man-made island; exemplifies early 20th-century river engineering and defines the districts physical integrity and boundaries.

Potential Effects: No adverse effect.

4. Circulation System - Ohio Drive SW and Park Roads (Contributing Resources) Date: 1917-1930 alignment.

Significance: Formal approach and circulation pattern envisioned in the McMillan Plan; retains historic alignment, width, and relationship to the golf landscape and shoreline.

Potential Effects: Truck hauling may cause temporary vibration, compaction, or wear on historic surfaces; apply avoidance and monitoring to prevent adverse effects.

**Cultural Landscapes Present:** Yes

**Cultural Landscapes Notes:**   Within the golf course area, several landscape characteristics are recognized as contributing elements of the historic district, including:

Landform: The engineered island topography, including low terraces and mounded fairways;

Vegetation: Designed tree rows, shade tree groupings, and open turf expanses;

Spatial Organization: Relationships between fairways, greens, paths, and vistas toward the Potomac and Washington Channel;

Small-Scale Features: Benches, paths, and signage consistent with the historic park character.
Changes to grading or vegetation within these elements may affect the landscape integrity if not handled sensitively.

**Ethnographic Resources Present:** No

**5. The proposed action will: (check as many as apply)**

No  Destroy, remove, or alter features/elements from a historic structure

No  Replace historic features/elements in kind

No  Add non-historic features/elements to a historic structure

No  Alter or remove features/elements of a historic setting or environment (inc. terrain)

No  Add non-historic features/elements (inc. visual, audible, or atmospheric) to a historic setting or cultural landscape

No  Disturb, destroy, or make archeological resources inaccessible

No  Disturb, destroy, or make ethnographic resources inaccessible>

No  Potentially affect presently unidentified cultural resources

No  Begin or contribute to deterioration of historic features, terrain, setting, landscape elements, or archeological or ethnographic resources

No  Involve a real property transaction (exchange, sale, or lease of land or structures)

Other (please specify): _____

**6. Supporting Study Data:**
**(Attach if feasible; if action is in a plan, EA or EIS, give name and project or page number.)**

## B. REVIEWS BY CULTURAL RESOURCE SPECIALISTS

The park 106 coordinator requested review by the park's cultural resource specialist/advisors as indicated by check-off boxes or as follows:

**[ X ] 106 Advisor**
**Name:** Jason Theuer
**Date:** 10/16/2025
**Comments:** WHHO grounds are exempt from Section 106 Review. Placement of fill at East Potomac Golf Course is eligible for streamlined review since all historic property identification has been previously completed, the activity is generally consistent with routine grounds maintenance, the placement of fill will not significantly alter the design of the course (cultural landscape) and will result in No Adverse Effect to the historic property.

***Check if project does not involve ground disturbance* [    ]**
**Assessment of Effect:** ___No Potential to Cause Effect    ___No Historic Properties Affected    _X_ No Adverse Effect    ___Adverse Effect
**Recommendations for conditions or stipulations:**

**Doc Method:** Streamlined Review
**Activity:**
 5. Routine Grounds Maintenance

**No Reviews From**: Curator, Archeologist, Historical Architect, Historian, Other Advisor, Anthropologist, Historical Landscape Architect

## C. PARK SECTION 106 COORDINATOR'S REVIEW AND RECOMMENDATIONS

**1. Assessment of Effect:**

| | |
|---|---|
| _____ | No Potential to Cause Effects |
| _____ | No Historic Properties Affected |
| __X__ | No Adverse Effect |
| _____ | Adverse Effect |

**2. Documentation Method:**

**[    ] Standard 36 CFR Part 800 Consultation**
Further consultation under 36 CFR Part 800 is needed.

**[ X ] Streamlined Review Under the 2008 Servicewide Programmatic Agreement (PA)**
The above action meets all conditions for a streamlined review under section III of the 2008 Servicewide PA for Section 106 compliance.

**Applicable Activities:**

5. Routine Grounds Maintenance.

**[    ] Program Comment on Stewardship and Management of National Park Service Mission 66-Era Facilities (1945-1972)**
The above action meets all of the requirements of this Program Comment for Section 106 compliance and required documents have been uploaded.

**[    ] Undertaking Related to Park Specific or Another Agreement**
The proposed undertaking is covered for Section 106 purposes under another document such as a park, region or statewide agreement established in accord with 36 CFR 800.7 or 36 CFR 800.14.

**3. Consultation Information**

**SHPO Required:**
**SHPO Sent:**
**SHPO Received:**

**THPO Required:** No
**THPO Sent:**
**THPO Received:**

**SHPO/THPO Notes:**

    **Advisory Council Participating:** No
    **Advisory Council Notes:**
    **Additional Consulting Parties:** No

**4. Stipulations and Conditions:** Following are listed any stipulations or conditions necessary to ensure that the assessment of effect above is consistent with 36 CFR Part 800 criteria of effect or to avoid or reduce potential adverse effects.

**5. Mitigations/Treatment Measures:** Measures to prevent or minimize loss or impairment of historic/prehistoric properties: (Remember that setting, location, and use may be relevant.)

    No Assessment of Effect mitigations identified.

**6. Assessment of Effect Notes:**

**D. RECOMMENDED BY PARK SECTION 106 COORDINATOR:**

**Compliance Specialist:**

**NHPA Specialist**  JASON THEUER  Digitally signed by JASON THEUER
Date: 2025.10.16 13:05:09 -04'00'
Jason Theuer  _____  **Date:** _____

**E. SUPERINTENDENT'S APPROVAL**

The proposed work conforms to the NPS *Management Policies* and *Cultural Resource Management Guideline*, and I have reviewed and approve the recommendations, stipulations, or conditions noted in Section C of this form.

**Superintendent:** KEVIN GRIESS

Signature Digitally signed by KEVIN GRIESS
Date: 2025.10.16 17:12:26 -04'00'

**Date:** _____

# Declaration of Jennifer T. Nersesian

# Exhibit D

# NPS 2008 Nationwide Programmatic Agreement

PROGRAMMATIC AGREEMENT AMONG THE
NATIONAL PARK SERVICE
(U.S. DEPARTMENT OF THE INTERIOR),
THE ADVISORY COUNCIL ON HISTORIC PRESERVATION,
AND THE NATIONAL CONFERENCE OF STATE HISTORIC
PRESERVATION OFFICERS FOR COMPLIANCE WITH SECTION 106
OF THE NATIONAL HISTORIC PRESERVATION ACT

I.       RESPONSIBILITIES, QUALIFICATIONS AND TRAINING        2

II.      CONSULTATION        6

III.     STREAMLINED REVIEW PROCESS        9

IV.      STANDARD REVIEW PROCESS        20

V.       NATIONAL HISTORIC LANDMARKS        21

VI.      INADVERTENT DISCOVERIES        21

VII.     EMERGENCY ACTIONS        22

VIII.    REVIEW AND MONITORING OF PA IMPLEMENTATION        22

IX.      SUBSEQUENT AGREEMENTS        24

X.       DISPUTE RESOLUTION        24

XI.      MONITORING AND TERMINATION        25

XII.     SEVERABILITY        25

XIII.    ANTI-DEFICIENCY ACT STATEMENT        26

This Page Intentionally Blank

**PROGRAMMATIC AGREEMENT AMONG THE
NATIONAL PARK SERVICE
(U.S. DEPARTMENT OF THE INTERIOR),
THE ADVISORY COUNCIL ON HISTORIC PRESERVATION,
AND THE NATIONAL CONFERENCE OF STATE HISTORIC
PRESERVATION OFFICERS FOR COMPLIANCE WITH SECTION 106
OF THE NATIONAL HISTORIC PRESERVATION ACT**

**WHEREAS,** the National Park Service (NPS) plans for, operates, manages, and administers the National Park System (System) and is responsible for identifying, preserving, maintaining, and interpreting the historic properties of the System unimpaired for the enjoyment of future generations in accordance with the 1916 National Park Service Organic Act, the NPS Management Policies (2006), and applicable NPS Directors Orders; and

**WHEREAS,** the operation, management, and administration of the System entail undertakings that may affect historic properties (as defined in 36 CFR Part 800), which are therefore subject to review under Sections 106, 110(f) and 111(a) of the National Historic Preservation Act as amended (NHPA) (16 USC 470 *et seq.*) and the regulations of the Advisory Council on Historic Preservation (ACHP) (36 CFR Part 800); and

**WHEREAS,** the NPS has established management policies, director's orders, standards, and technical information designed for the identification, evaluation, documentation, and treatment of historic properties consistent with the spirit and intent of the NHPA; and

**WHEREAS,** the NPS has a qualified staff of cultural resource specialists to carry out programs for historic properties; and

**WHEREAS,** the purpose of this Programmatic Agreement (PA) is to establish a program for compliance with Section 106 of the NHPA and set forth a streamlined process  when agreed upon criteria are met and procedures are followed; and

**WHEREAS,** signature and implementation of this PA does not invalidate park-, Region-, or project-specific memoranda of agreement (MOA) or programmatic agreements negotiated for Section 106 purposes prior to the effective date of this PA; and

**WHEREAS,** Federally recognized Indian Tribes are recognized by the U.S. government as sovereign nations in treaties and as unique political entities in a government-to-government relationship with the United States; and

**WHEREAS,** the NPS has conducted a series of "listening" meetings with Indian Tribes, has requested the input of a number of Native Advisors in the process of preparing this PA, and has held consultation meetings with Federally recognized Indian Tribes, Native Hawaiian organizations, and other parties on the content of the PA; and

**WHEREAS**, 36 CFR 800.2 (c)(2)(i)(A) and (B) provide for consultation with Indian Tribes on the same basis as the State Historic Preservation Officer (SHPO) when an undertaking will occur on or affect historic properties on tribal lands; and

**WHEREAS**, in accordance with 36 CFR 800.14(b)(2)(iii), a PA shall take effect on tribal lands only when the designated representative of the tribe is a signatory to the agreement; and

**WHEREAS**, for those parks located partly or wholly within tribal lands, the NPS has invited the applicable Tribal Historic Preservation Officer (THPO) or Indian Tribe to sign this PA as an Invited Signatory; and

**WHEREAS**, the NPS has consulted with the NCSHPO and the ACHP regarding ways to ensure that NPS operation, management, and administration of the Parks provide for management of the Parks' historic properties in accordance with the intent of NPS policies, director's orders and Sections 106, 110, 111, and 112 of the NHPA.

**NOW, THEREFORE**, the NPS, the NCSHPO, the ACHP, and the signatory tribes mutually agree that the NPS will carry out its Section 106 responsibilities with respect to operation, management, and administration of the Parks in accordance with the following stipulations.

## PURPOSE AND NEED

NPS park operations, management, and administration require a large number of low-impact or repetitive activities on a daily basis that have the potential to affect properties listed in or determined eligible for the National Register of Historic Places and require consultation under Section 106. This PA provides an efficient process for compliance with Section 106 for daily NPS park operations, management, and administration activities. It establishes two processes for Section 106 review: a "streamlined" review process for designated undertakings that meet established criteria and a "standard" review process for all other undertakings. This PA also provides programmatic procedures and guidance for other activities related to the Section 106 compliance process, including identification of resources, consultation, and planning.

The NPS shall ensure the following measures are implemented.

## I.    RESPONSIBILITIES, QUALIFICATIONS, AND TRAINING

The following sections list the responsibilities and required qualifications for those individuals responsible for implementing this PA.

## A.    Responsibilities

1.    Director, National Park Service

The Director has policy oversight responsibility for the agency's historic preservation program.  The Director, through the Deputy Director for Operations, executes this PA for the NPS and provides policy level oversight within the NPS to ensure that stipulations of the PA are met.

2.    Associate Director for Cultural Resources

The Associate Director for Cultural Resources (ADCR) provides national leadership for policy implementation through establishing standards and guidance for managing cultural resources within the Parks.  The ADCR works with the NPS regions and parks to ensure and support compliance with the stipulations of this PA and provides accountability to the signatories of this PA with regard to its implementation.  The ADCR is responsible for working with Regions and Parks to develop and fund training needs related to Section 106 and the implementation of the PA.  The ADCR in cooperation with the regions and parks, is responsible for issuing a guidance document for this agreement within 12 months of its execution.  At the time of execution of this PA, the ADCR also holds the title of Federal Preservation Officer (FPO).

3.    Regional Directors

The Regional Director is the line manager for all Superintendents within his/her region.  The Regional Director is responsible for policy oversight, strategic planning, and direction for parks and programs within the region and reports to the Director through the NPS Deputy Director for Operations.  Review and support of Park and Superintendent implementation of this PA and training to achieve Section 106 compliance is the responsibility of the Regional Director.

4.    Regional Section 106 Coordinators

The Regional Section 106 Coordinators work with parks and other NPS offices to provide support for Section 106 compliance and implementation of this PA.  The Regional Section 106 Coordinators provide guidance materials and technical assistance for implementing the PA and assist the parks to meet the training, reporting, and consultation requirements of the PA.

5.    Superintendents

Superintendents are the responsible agency officials as defined in 36 CFR 800.2(a) for purposes of Section 106 compliance and the implementation of this PA.

Each Superintendent shall do the following within his/her park:

3

a.  Designate a Park Section 106 Coordinator and a Cultural Resource Management (CRM) Team meeting the necessary qualifications;

b.  Develop and maintain relationships with Federally recognized Indian Tribal governments and Native Hawaiian organizations (if applicable);

c.  Develop and maintain relationships with SHPOs/THPOs;

d.  Ensure early coordination among the Section 106 Coordinator, the CRM Team, and other park and regional staff, concessioners, park partners, neighboring communities, groups affiliated with park resources, and others in the planning of projects and activities that may affect historic properties;

e.  Ensure that Section 106 consultation with the SHPO/THPO and other consulting parties is initiated early in the planning stages of any given undertaking, when the widest feasible range of alternatives is available for consideration;

f.  Ensure that the Park Section 106 Coordinator, CRM Team Members and the park cultural resources staff receives the NHPA training needed to carry out their responsibilities.  Provide opportunities for other involved staff to receive NHPA training as funding and opportunities permit.

6.  Park Section 106 Coordinator

The Park Section 106 coordinator provides day-to-day staff support for Section 106 activities and serves as liaison among park personnel, the NPS Regional Office, NPS Centers, and others involved in undertakings.  The coordinator makes recommendations to the Superintendent regarding the appropriate course of action under this PA, including whether a project constitutes a Section 106 undertaking.

7.  Cultural Resource Management (CRM) Team

The CRM Team shall provide expertise and technical advice to the Superintendent and the Park Section 106 Coordinator for purposes of Section 106 compliance and implementation of this PA.

**B.    Qualifications**

1.  Park Section 106 Coordinator

The Superintendent shall designate at least one (1) person to act as the park's Section 106 Coordinator, whose Section 106 responsibilities are specified, as appropriate.   The designee may be chosen from the park staff, other NPS parks, NPS archeological and preservation centers, and the NPS Regional Office.  The Park Section 106 Coordinator shall have an appropriate combination of professional training and/or experience to effectively carry out the responsibilities of the position.

4

2.      Cultural Resource Management (CRM) Team

The Superintendent shall designate a CRM Team with expertise to fulfill and implement the requirements of this PA, whose Section 106 responsibilities are specified, as appropriate.

      a.      Subject matter experts chosen must be appropriate to the resource types found in the park.  Therefore, the number of individuals who comprise the CRM Team is not static and will be appropriate to include all necessary disciplines.  Multi-disciplinary reviews of proposed undertakings are recommended.

      b.      CRM Team members may be on the park staff or in other parks, or from NPS Regional Offices, NPS Centers, Federally recognized Indian Tribes, Native Hawaiian organizations, or elsewhere in the public or private sector.

      c.      CRM Team members who are federal employees shall meet the qualifications for the applicable discipline as defined in Appendix E to NPS-28:  Cultural Resource Management Guideline.  CRM Team members who are representing Federally recognized Indian Tribes may be traditional cultural authorities, elders, and others experienced in the preservation of tribal culture.  All other CRM team members, who are not federal employees or representing a Federally recognized Indian Tribe, must meet the Professional Qualification Standards in the Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation.

## C.      Training

Periodic training on Section 106 compliance issues and the provisions of this PA is needed to maintain an understanding of the requirements of each.  Such training may be accessed through the NPS, the ACHP, SHPOs/THPOs, Indian Tribes, Native Hawaiian organizations, other Federal or state agencies or private industry.  Training may be in a classroom setting, electronic media, meetings, or other formats that allow for the conveyance of information.  The NPS Washington Office, in consultation with the NPS parks, regions, and training centers, will work with the ACHP and NCSHPO to establish options for training in accordance with this PA, within 12 months from the time of execution of this PA.

1.      All Superintendents and Section 106 coordinators will be notified of the opportunity to receive training on the provisions of this programmatic agreement once it has been made available by the NPS Washington Office.  The NPS ADCR will work with the Regional 106 coordinators to accomplish this training throughout the Regions and parks within 12 months of its availability.

2.      Superintendents will report on Section 106 training received by Superintendents and park staff as part of the biennial report (Section VIII.B of this agreement).

5

## II.    CONSULTATION

### A.    Consultation with Federally Recognized Indian Tribes and, THPOs, and Native Hawaiian Organizations

Government-to-government consultation with Federally recognized Indian Tribes and consultation with Native Hawaiian organizations shall occur at the Superintendent level and be initiated during planning and prior to undertaking an activity, program or project that may affect historic properties of significance to Federally recognized Indian tribes or Native Hawaiian organizations.  Maintaining an on-going consultative relationship with THPOs and/or staff of Federally recognized Indian Tribes and Native Hawaiian organizations is essential.

1.    Consultation on Undertakings off Tribal Lands

Superintendents shall identify, compile a list of, and consult with Federally recognized Indian Tribes, THPOs and Native Hawaiians that are known to have aboriginal lands within the park boundaries, assert an interest in historic properties within the park boundaries, or have lands or interest in lands adjacent to the park.

a.    Such consultation will be in accordance with 36 CFR 800.2(c)(2)(ii), NPS Director's Order 75A:  Public Engagement and Public Involvement, and with Sections III and IV of this PA.

b.    Each Superintendent, with the assistance of park and Regional Office ethnographers, will be responsible for identifying aboriginal lands within the park boundary, working cooperatively with the appropriate Federally recognized Indian Tribes and Native Hawaiian organizations.

c.    Superintendents, in consultation with the Park Section 106 Coordinator and the CRM Team, shall establish a process and develop consultation agreements, where appropriate, that provide for early coordination between the park and Federally recognized Indian tribes, THPOs, and/or Native Hawaiian organizations in identification and evaluation of historic properties and the planning of projects and activities that may affect historic properties.

d.    Identification and evaluation of historic properties on aboriginal lands must be based upon consultation with the appropriate traditionally associated communities.

2.    Consultation on Undertakings on Tribal Lands

For those undertakings that either occur on tribal lands or will otherwise have the potential to affect historic properties on tribal lands, including cumulative impacts from collectively significant actions taking place over a period of time, the Superintendent shall consult with that tribe on the same basis as he or she consults with the SHPO.

6

a.     Where the Tribe has assumed the SHPO's responsibility for Section 106 pursuant to Section 101(d)(2) of the NHPA, the Superintendent shall consult with the THPO in lieu of the SHPO, except as provided for in Section 101(d)(2)(D)(iii).

b.     Where the Tribe has not assumed the SHPO's responsibility for Section 106, the Superintendent shall consult with the Tribe's designated representatives in addition to and on the same basis as the SHPO. The Tribe shall have the same rights of consultation and concurrence as the SHPO.

3.     Applicability of this PA on Tribal Lands

When a park is located partly or wholly within the boundaries of tribal lands, and the tribe has not signed this PA as an Invited Signatory, any undertaking that may occur on those tribal lands shall require consultation with the Tribe and/or THPO in accordance with 36 CFR Part 800, and the provisions of this PA are not applicable.

A tribe may sign this PA by written notification to the Director of such intent, signed by the THPO, Indian tribe, or a designated representative of the tribe. Once such a written and signed notification is received by the Director, the provisions of this PA will be applicable to undertakings occurring on those lands where a park is located partly or wholly within the boundaries of that particular tribe's tribal lands.

4.     Development of Agreements to Facilitate Government-to-Government Consultation with Federally recognized Indian Tribes and Consultation with Native Hawaiian Organizations

Development of consultation protocols, memoranda of agreement and programmatic agreements is encouraged. Such agreements may be negotiated between Superintendents and Federally recognized Indian Tribes, THPOs, or Native Hawaiian organizations and may be independent of or supplement this PA. For example, such agreements may be specific to a project, plan, or park activity, or may set forth specific consultation protocols between the park and a specific tribe or group of Native peoples. Superintendents will provide an informational copy of all agreements to the Regional Section 106 Coordinator and to the ACHP and appropriate SHPO/THPO in accordance with 36 CFR 800.2(c)(2)(ii)(E).

**B.     Consultation with SHPOs**

Consultation with SHPOs on projects reviewed in accordance with the Standard Review Process will occur in accordance with the procedures set forth in Section IV of this PA. Consultation with SHPOs on implementation of this PA will occur biennially in accordance with Section VIII of this PA.

7

**C.     Consultation with Local Governments and Applicants for Federal Assistance, Licenses, Permits, and Other Approvals**

Where appropriate, the Superintendent shall actively seek the views and comments of local governments and certified local governments.  Those seeking Federal assistance, licenses, permits, or other approvals are entitled to participate as a consulting party as defined in 36 CFR 800.2(c)(4) and will be consulted, as applicable.

**D.     Consultation with the Public**

Superintendents will consult with interested members of the public.

**E.     General Consultation Provisions**

1.     Section 110 Inventory of Historic Properties

The parks implement a program to identify, evaluate, and, when appropriate, nominate historic properties to the National Register of Historic Places in accordance with Section 110(a)(2)(d) of the NHPA.  Research and testing of all types of historic properties for purposes of identification and evaluation must be limited to the minimum necessary to obtain the required inventory and evaluative information.   Early coordination on the identification and evaluation of historic properties should be undertaken with Federally recognized Indian Tribes or Native Hawaiian organizations, as appropriate, utilizing tribal knowledge and expertise wherever applicable.  Knowledge and data from appropriate sources of expertise should be utilized, including SHPOs, local governments, Indian Tribes, Pacific Islanders, and national and local professional and scientific organizations. Inventory records should be periodically reviewed and updated, as necessary, to ensure data on historic properties, including condition information, is current, and any previous evaluations of significance remain accurate.

2.     Information Sharing:  Historic Property Inventories

Parks, NPS Regional Offices, NPS Centers, and SHPOs will share information with each other regarding inventories of historic properties and historic contexts developed, as well as other reports and research results related to historic properties in the parks, whenever such studies become available.  In addition, parks, NPS Regional Offices, and NPS Centers will make such information available to interested Federally recognized Indian Tribes, THPOs, and Native Hawaiian organizations.  Federally recognized Indian Tribes who are signatories to this PA will, likewise, make such information available to NPS parks and Regional Offices, as appropriate.  Information will be shared with the understanding that sensitive information will be withheld by the recipient of the information from public disclosure pursuant to Section 304 of NHPA and other applicable laws.  Procedures for information sharing and format for information (i.e. electronic, hard copy, etc.) should be agreed upon between the parties.

3.    Notification of Park Section 106 Coordinator

The National Park Service will provide contact information on Section 106 coordinators to Indian Tribes, SHPOs/THPOs, and Native Hawaiian organizations for each park through the Regional Office from the Regional 106 Coordinator within six months of this PA and updated biennially.

4.    Review and comment on guidance and training documents

The ADCR will consult with the ACHP and NCSHPO in the development of training materials and guidance for this PA.

## F.    Development of Agreements to Facilitate Consultation

Development of consultation protocols, memoranda of agreement, and programmatic agreements is encouraged.  Such agreements may be negotiated between Superintendents and organizations or governments and may be independent of or supplement this PA.  For example, such agreements may be specific to a project, plan, or park activity, or may set forth specific consultation protocols between the park and a specific group, state, or local government. Superintendents will provide an informational copy of all agreements to the Regional Section 106 Coordinator and to the ACHP and appropriate SHPO/THPO in accordance with 36 CFR 800.2(c)(2)(ii)(E).

## III.    STREAMLINED REVIEW PROCESS

Where the Park Section 106 Coordinator determines the following criteria are met for a proposed undertaking, no further consultation is required unless otherwise specifically requested by the SHPO/THPO, Federally recognized Indian Tribe(s) or Native Hawaiian organization(s), or the ACHP.

## A.    Criteria for Using the Streamlined Review Process

All of the following criteria must be met in order to use the Streamlined Review Process:

1.    The proposed undertaking must be an activity eligible for streamlined review, listed in Section III.C of this PA.  These undertakings shall be known as "streamlined activities" for purposes of reference and replace the term "nationwide programmatic exclusions" set forth in the 1995 Programmatic Agreement between the NPS, the ACHP, and the NCSHPO; and

2.    Identification and evaluation of all types of historic properties within the project area of potential effect (APE) must have been previously undertaken, sufficient to assess effects on those resources (with the exception of V.C (16)).   Identification and evaluation of historic properties of religious and cultural significance to Indian tribes and Native Hawaiian organizations must be based upon consultation

9

with those entities.  All properties within the APE must have previously been evaluated for eligibility to the National Register of Historic Places and the SHPO/THPO must have concurred with the eligibility determination.   Inventory records should be periodically reviewed and updated, as necessary, to ensure data on historic properties, including condition information, is current, and any previous evaluations of significance remain accurate; and

3. The Section 106 Coordinator, in consultation with appropriate members of the CRM Team must have reviewed the project and certified that the effects of the proposed undertaking on historic properties on or eligible for the National Register will ***not be adverse*** based on criteria in 36 CFR 800.5, including consideration of direct, indirect, and cumulative effects.  The Effect Finding must be "No Historic Properties Affected" or "No Adverse Effect".

## B.     Streamlined Review Process

1. *Evaluate Whether the Proposed Undertaking is Eligible for Streamlined Review:* The Park Section 106 Coordinator, in consultation with appropriate members of the CRM Team, determines whether the proposed undertaking is an activity listed as an undertaking eligible for streamlined review in Section III.C of this PA.  If not, compliance for the undertaking must be accomplished through the Standard Review Process, outlined in Section IV of this PA.

2. *Identify the Undertaking's Area of Potential Effect (APE):*  The Park Section 106 Coordinator, in consultation with members of the CRM Team with expertise in the appropriate discipline(s), determines the project's APE, taking into account direct, indirect, and cumulative effects.

3. *Identify Historic Properties within APE:*  The Park Section 106 Coordinator, in consultation with members of the CRM Team with expertise in the appropriate discipline(s), identifies the location, number, and significance of historic properties within the APE.   If properties are located within the APE that have not yet been documented or evaluated for eligibility for the National Register of Historic Places, or if the SHPO/THPO has not yet concurred with the eligibility determination, compliance for the undertaking must be accomplished through the Standard Review Process, outlined in Section IV of this PA.

4. *Evaluate Effect of Undertaking on Historic Properties in APE:*  The Park Section 106 Coordinator, in consultation with members of the CRM Team with expertise in the appropriate discipline(s), evaluates the effect of the proposed undertaking and cumulative effects on historic properties, applying the Criteria of Adverse Effect set forth in 36 CFR 800.5(a)(1)

5. *Document Streamlined Review Process:* If, after following steps one through four (1-4) listed above, the Park Section 106 Coordinator determines no historic properties are within the APE, or the proposed undertaking would result in a

10

determination of "no historic properties affected" or "no adverse effect", no further consultation is required. The Park Section 106 Coordinator shall document the determination as follows:

    a.    The Streamlined Review process will be documented using the NPS "Assessment of Actions Having an Effect on Cultural Resources" form, or another appropriate format. Parks are encouraged to use Servicewide automated project planning and tracking systems, such as the NPS Planning, Environment and Public Comment (PEPC) system, to track and document Section 106 compliance activities.

    b.    Documentation will include the comments of each member of the CRM Team involved in the review process and the signature of the Superintendent. Electronic signatures are acceptable.

    c.    Documentation will be permanently retained by the Park Section 106 Coordinator for review by consulting parties and to facilitate the preparation of the Annual Report.

    d.    Annual Report: An annual report of all undertakings reviewed using the Streamlined Review process will be prepared by the Park Section 106 Coordinator, using existing and readily available data sources and reporting systems such as the NPS Planning, Environment and Public Comment (PEPC) system, for transmittal to the SHPO/THPO.

## C.    Undertakings Eligible for Streamlined Review

1.    <u>Preservation Maintenance and Repair of Historic Properties</u>: The Streamlined Review Process is intended to be used for:

- Mitigation of wear and deterioration of a historic property to protect its condition without altering its historic character;
- Repairing when its condition warrants with the least degree of intervention including limited replacement in-kind;
- Replacing an entire feature in-kind when the level of deterioration or damage of materials precludes repair; and
- Stabilization to protect damaged materials or features from additional damage.

Use of the Streamlined Review Process is limited to actions for retaining and preserving, protecting and maintaining, and repairing and replacing in-kind, as necessary, materials and features, consistent with the Secretary of the Interior's Standards for the Treatment of Historic Properties (Standards) and the accompanying guidelines.

Emergency stabilization, including limited replacement of irreparably damaged features or materials and temporary measures that prevent further loss of historic

11

material or that correct unsafe conditions until permanent repairs can be accomplished, may use the Streamlined Review Process. For archeological sites and cultural landscapes, the Streamlined Review Process may also be used for work to moderate, prevent, or arrest erosion.

If the project activities include ground disturbance, archeological monitoring may be appropriate throughout the ground disturbing activities, in accordance with any recommendation of the CRM Team. When monitoring is recommended, members of any appropriate Federally recognized Indian Tribes or Native Hawaiian organizations may be invited to participate in monitoring.

The Streamlined Review Process may be used for routine repairs necessary to continue use of a historic property, but it is not intended to apply to situations where there is a change in use or where a series of individual projects cumulatively results in the complete rehabilitation or restoration of a historic property. If an approved treatment plan exists for a given historic property (such as a historic structure report, cultural landscape report, or preservation maintenance plan), the proposed undertaking needs to be in accordance with that plan. This streamlined activity includes the following undertakings, as well as others that are comparable in scope, scale, and impact:

a. Removal of non-historic debris from an abandoned building.
b. Cleaning and stabilizing of historic structures, features, fences, stone walls, plaques, and cannons using treatment methods that do not alter or cause damage to historic materials.
c. Repainting in the same color as existing, or in similar colors or historic colors based upon an approved historic structure report, cultural landscape report, or a historic paint color analysis.
d. Removal of non-historic, exotic species according to Integrated Pest Management principles when the species threatens cultural landscapes, archeological sites, or historic or prehistoric structures.
e. Energy improvements limited to insulation in the attic or basement, and installation of weather stripping and caulking.
f. In-kind repair and replacement of deteriorated pavement, including, but not limited to, asphalt, concrete, masonry unit pavers, brick, and stone on historic roads, paths, trails, parking areas, pullouts, etc.
g. Repair or limited in-kind replacement of rotting floorboards, roof material, or siding. Limited in-kind replacement refers to the replacement of only those elements of the feature that are too deteriorated to enable repair, consistent with the Standards.
h. In-kind replacement of existing gutters, broken or missing glass panes, retaining walls, and fences.

2. <u>Rehabilitation and/or Minor Relocation of Existing Trails, Walks, Paths, and Sidewalks</u>: The Streamlined Review Process may be used for undertakings proposed on existing non-historic trails, walks, paths, and/or sidewalks that are

located within previously disturbed areas and do not exceed the depth of the previous disturbance. The Streamlined Review Process may also be used for undertakings proposed on existing historic trails, walks, paths, and/or sidewalks, provided that the proposed undertaking is conducted in accordance with an approved treatment plan (such as a historic structure report, cultural landscape report, or preservation maintenance plan).

If the project activities include ground disturbance, archeological monitoring may be appropriate throughout the ground disturbing activities, in accordance with any recommendation of the CRM Team. When monitoring is recommended, members of any appropriate Federally recognized Indian Tribes or Native Hawaiian organizations may be invited to participate in monitoring.

This streamlined activity includes the following undertakings, as well as others that are comparable in scope, scale, and impact:

a.    In-kind regrading, graveling, repaving, or other maintenance treatments of all existing trails, walks and paths within existing disturbed alignments.

b.    Minor realignment of trails, walks, and paths where the ground is previously disturbed as determined by a qualified archeologist.

c.    Changing the material or color of existing surfaces using materials that are recommended in an approved treatment plan or in keeping with the cultural landscape.

d.    Construction of water bars following the recommendations of an approved treatment plan or in keeping with the cultural landscape.

3.    <u>Repair/Resurfacing/Removal of Existing, Roads, Trails, and Parking Areas</u>:

The Streamlined Review Process may be used as follows:

a.    Existing roads, trails, parking areas, and associated features that have been determined not eligible for the National Register in consultation with the SHPO/THPO, may be repaired or resurfaced in-kind or in similar materials as long as the extent of the project, including staging areas, is contained within the existing surfaced areas. The repair or resurfacing cannot exceed the area of the existing road surface and cannot exceed the depth of existing disturbance.

b.    Existing roads, trails, parking areas, and associated features, that have been determined eligible for the National Register in consultation with the SHPO/THPO, may be repaired or resurfaced in-kind. The project, including staging areas, cannot exceed the area of the existing surface and cannot exceed the depth of existing disturbance.

c.    Existing surfaced areas may be expanded or new surfaces constructed if the extent of new surfacing can be demonstrated to occur on land that has been disturbed by prior excavation or construction and has been shown not to contain buried historic properties. New or expanded surface may not be

an addition to, or continuation of, existing surfaces that are listed in or eligible for the National Register and all project activities, including staging areas, must be located in non-historic areas to be eligible for streamlined review.

d. Existing surfaced areas may be removed if the surfaced area is not a historic property, it is not located within a historic property and all project activities, including staging areas, will occur on land that has been disturbed by prior excavation or construction and has been shown not to contain buried historic properties.

4. Health and Safety Activities: The Streamlined Review Process may be used for health and safety activities that do not require the removal of original historic elements or alteration of the visual character of the property or area.

If the project activities include ground disturbance, archeological monitoring may be appropriate throughout the ground disturbing activities, in accordance with any recommendation of the CRM Team. When monitoring is recommended, members of any appropriate Federally recognized Indian Tribes or Native Hawaiian organizations may be invited to participate in monitoring.

This streamlined activity includes the following undertakings, as well as others that are comparable in scope, scale, and impact:

a. Sampling/testing historic fabric to determine hazardous content, e.g. lead paint, asbestos, radon.

b. Limited activities to mitigate health and safety problems that can be handled without removal of historic fabric, surface treatments, or features that are character-defining elements, or features within previously disturbed areas or areas inventoried and found not to contain historic properties.

c. Testing of soil and removal of soil adjacent to buried tanks, provided the project does not exceed the area of existing disturbance and does not exceed the depth of existing disturbance, as determined by a qualified archeologist.

d. Removal of oil or septic tanks within previously disturbed areas or areas inventoried and found not to contain historic properties.

e. Removal of HAZMAT materials within previously disturbed areas or areas inventoried and found not to contain historic properties.

f. Safety activities related to black powder regulations.

g. Replacement of septic tanks and systems in previously disturbed areas, or areas inventoried and found not to contain historic properties.

h. Common pesticide treatments.

i. Removal of both natural and anthropogenic surface debris following volcanic activity, tropical storms, hurricanes, tornados, or similar major weather events, provided removal methods do not include ground disturbance or otherwise cause damage to historic properties.

5.  <u>Routine Grounds Maintenance</u>:  The Streamlined Review Process may be used for routine grounds maintenance activities.  If an approved treatment plan exists for a given historic property (such as a historic structure report, cultural landscape report, or preservation maintenance plan), the proposed undertaking needs to be in accordance with that plan.

    If the project activities include ground disturbance, archeological monitoring may be appropriate throughout the ground disturbing activities, in accordance with any recommendation of the CRM Team.  When monitoring is recommended, members of any appropriate Federally recognized Indian Tribes or Native Hawaiian organizations may be invited to participate in monitoring.

    This streamlined activity includes the following undertakings, as well as others that are comparable in scope, scale, and impact:

    a.  Grass replanting in same locations with approved species.
    b.  Woodland and woodlot management (including tree trimming, hazard tree removal, thinning, routine removal of exotic species that are not a significant component of a cultural landscape, stump grinding).
    c.  Maintaining existing vegetation on earthworks, trimming trees adjacent to roadways and other historic roads and trails.
    d.  Routine maintenance of gardens and vegetation within cultural landscapes with no changes in layout or design.
    e.  Routine grass maintenance of cemeteries and tombstones with no tools that will damage the surfaces of stones (i.e. weed whips).
    f.  Trimming of major specimen trees needed for tree health or to address critical health/safety conditions.
    g.  Routine roadside and trail maintenance and cleanup with no ground disturbance.
    h.  Planting of non-invasive plant species in non-historic areas.
    i.  Removal of dead and downed vegetation using equipment and methods that do not introduce ground disturbance.
    j.  Replacement of dead, downed, overgrown, or hazard trees, shrubs, or other vegetation with specimens of the same species.
    k.  Replacement of invasive or exotic landscape plantings with similar non-invasive plants.
    l.  Routine lawn mowing, leaf removal, watering, and fertilizing.
    m.  Routine orchard maintenance and pruning.

6.  <u>Battlefield Preservation and Management</u>:  The Streamlined Review Process *may be used only if* the park has approved planning documents (General Management Plan, cultural landscape report, treatment plan) that specify preservation and management protocols for the subject battlefield.

15

If the project activities include ground disturbance, archeological monitoring may be appropriate throughout the ground disturbing activities, in accordance with any recommendation of the CRM Team. When monitoring is recommended, members of any appropriate Federally recognized Indian Tribes or Native Hawaiian organizations may be invited to participate in monitoring.

Consistent with that plan(s), activities include:

a.  Maintenance and preservation work limited to retaining, protecting, repairing, and replacing in-kind materials and features that contribute to the National Register significance of the battlefield landscape.

b.  Earthworks maintenance to prevent erosion and ensure preservation of existing profile, based on current and accepted practices identified in "Sustainable Military Earthworks Management" found on the NPS Cultural Landscape Currents website.

c.  Removal of hazard trees with no ground disturbance and with use of stump grinding provided the grinding is limited to the diameter of the stump and a depth of no greater than 6 inches.

d.  Repairing eroded or damaged sections of earthworks in-kind following archeological documentation and recordation in appropriate NPS inventory and management databases resulting in complete, accurate, and reliable records for those properties.

e.  Maintaining a healthy and sustainable vegetative cover.

7.  <u>Hazardous Fuel and Fire Management</u>: The Streamlined Review Process *may be used only if* the park has an approved fire management plan or forest management plan.

If the project activities include ground disturbance, archeological monitoring may be appropriate throughout the ground disturbing activities, in accordance with any recommendation of the CRM Team. When monitoring is recommended, members of any appropriate Federally recognized Indian Tribes or Native Hawaiian organizations may be invited to participate in monitoring.

Following completion of activities under this section, post-burn inspection and monitoring should be conducted by a qualified archeologist to ensure no archeological sites were impacted or previously unknown sites revealed.

Consistent with the approved fire management plan or forest management plan, this streamlined activity includes the following undertakings, as well as others that are comparable in scope, scale, and impact:

a.  Removal of dead and downed vegetation, outside of historic districts, cultural landscapes, and archeological sites, using equipment and methods that do not introduce ground disturbance beyond documented natural or historic disturbance.

16

b. Removal of dead and downed vegetation, as well as trees and brush located within historic properties, if the vegetation does not contribute to the significance of the historic property and equipment and methods are used that do not introduce ground disturbance beyond documented natural or historic disturbance.

c. Forest management practices, including thinning of tree stands, outside of historic districts, cultural landscapes, and archeological sites, using equipment and methods that do not introduce ground disturbance beyond documented natural or historic disturbance.

d. Restoration of existing fire line disturbances, such as hand lines, bulldozer lines, safety areas, helispots, and other operational areas.

e. Slope stabilization, to include reseeding with native seeds, replanting with native plants and/or grasses, placement of straw bales, wattles, and felling of dead trees when the root ball is left intact and in situ.

8. <u>Installation of Environmental Monitoring Units</u>: The Streamlined Review Process may be used for the placement of small-scale, temporary or permanent monitoring units, such as weather stations, termite bait stations, water quality, air quality, or wildlife stations, in previously disturbed areas, as determined by a qualified archeologist, or areas inventoried and found not to contain historic properties. Borings must be limited to pipes less than 2 inches in diameter and surface samples to less than 12 inches in size and minimal in number.

9. <u>Maintenance or Replacement of Non-Historic Utility Lines, Transmission Lines, and Fences</u>: If the project activities include ground disturbance, archeological monitoring may be appropriate throughout the ground disturbing activities, in accordance with any recommendation of the CRM Team. When monitoring is recommended, members of any appropriate Federally recognized Indian Tribes or Native Hawaiian organizations may be invited to participate in monitoring.

This streamlined activity includes the following undertakings, as well as others that are comparable in scope, scale, and impact:

a. Maintenance or replacement of buried linear infrastructure in previously disturbed areas. The area of previous disturbance must be documented by a qualified archeologist and must coincide with the route of the infrastructure in its entirety.

b. Replacement of non-historic materials, provided the undertaking will not impact adjacent or nearby historic properties and is not located in a historic property, or visible from an above-ground historic property.

c. Maintenance or replacement of infrastructure, such as old water distribution systems, that has been determined to be not eligible for the National Register, in consultation with the SHPO/THPO.

d. Maintenance of above-ground infrastructure.

17

     e.      Replacement of above-ground infrastructure provided the undertaking is not located in a historic property or visible from an above-ground historic property.

     f.      Enhancement of a wireless telecommunications facility, including the updating of mechanical equipment, provided the activities do not involve excavation nor any increase to the size of the existing facility.

10.    Erection of Signs, Wayside Exhibits, and Memorial Plaques:  If an approved treatment plan exists for a given historic property (such as a historic structure report, cultural landscape report, or preservation maintenance plan), the proposed undertaking needs to be in accordance with that plan.  If the project activities include ground disturbance, archeological monitoring may be appropriate throughout the ground disturbing activities, in accordance with any recommendation of the CRM Team.  When monitoring is recommended, members of any appropriate Federally recognized Indian Tribes or Native Hawaiian organizations may be invited to participate in monitoring.

This streamlined activity includes the following undertakings, as well as others that are comparable in scope, scale, and impact:

     a.      Replacement of existing signage in the same location with similar style, scale and materials.

     b.      New signs that meet NPS standards, e.g. at entrance to the park or related to the park's interpretive mission, provided the sign is not physically attached to a historic building, structure, or object (including trees) and the sign is to be located in previously disturbed areas or areas inventoried and found not to contain historic properties.

     c.      Replacement of interpretive messages on existing signs, wayside exhibits, or memorial plaques.

     d.      Small developments such as paved pads, benches, and other features for universal access to signs, wayside exhibits, and memorial plaques in previously disturbed areas or areas inventoried and found not to contain historic properties.

     e.      Temporary signage for closures, repairs, detours, safety, hazards, etc. in previously disturbed areas or areas inventoried and found not to contain historic properties.

     f.      Memorial plaques placed within established zones that allow for such placement.

11.    Culvert Replacement:  The Streamlined Review Process may be used when culvert replacement will occur within existing cut and fill profiles, and:

     a.      The existing culvert and/or associated road, rail bed, or cultural landscape has been determined not eligible for the National Register, either individually or as a contributing element to a historic district or cultural landscape, in consultation with the SHPO/THPO; or

b.    The existing culvert is less than 50 years old.

12.    <u>Reburial of Human Remains and Other Cultural Items Subject to the Native American Graves Protection and Repatriation Act (NAGPRA)</u>:  The Streamlined Review Process may be used for the reburial of human remains and other cultural items subject to NAGPRA.   The Streamlined Review Process may only be used when:

a.    The reburial is in previously disturbed areas and does not introduce ground disturbance beyond documented disturbance; or
b.    The reburial is in previously inventoried areas found to not contain historic properties.

Any reburial in NPS-administered areas must be in conformance with NPS policies on cemeteries and burials including cultural resource policies.

13.    <u>Meeting Accessibility Standards in Historic Structures and Cultural Landscapes</u>: The Streamlined Review Process may only be used for the following undertakings intended to meet accessibility standards:

a.    Reconstruction or repair of existing wheel chair ramps and sloped walkways provided the undertaking does not exceed the width or depth of the area of previous disturbance.
b.    Upgrading restroom interiors in historic structures within existing room floor area to achieve accessibility, unless the historic features and/or fabric of the restroom contribute to the historic significance of the structure.

14.    <u>Mechanical, Electrical and Plumbing Systems</u>:  The Streamlined Review Process may be used as follows for activities related to mechanical, electrical, and plumbing systems.  Such systems may include HVAC systems, fire detection and suppression systems, surveillance systems, and other required system upgrades to keep park lands and properties functional and protected.

a.    Park areas, landscapes, buildings, and structures that have been determined not eligible for the National Register in consultation with the SHPO/THPO, may undergo installation of new systems or repair/ upgrading of existing systems in accordance with the Streamlined Review Process.
b.    Properties that have been determined eligible for the National Register in consultation with the SHPO/THPO may undergo limited upgrading of mechanical, electrical, and plumbing systems.  However, the Streamlined Review Process may not be used for the installation of new systems or complete replacement of these systems.  If proposed activities include the removal of original historic elements or alter the visual character or the property's character-defining materials, features, and spaces, then the Streamlined Review Process may not be used.

19

c.  If the project activities include ground disturbance, archeological monitoring may be appropriate throughout the ground disturbing activities, in accordance with any recommendation of the CRM Team. When monitoring is recommended, members of any appropriate Federally recognized Indian Tribes or Native Hawaiian organizations may be invited to participate in monitoring.

15.  <u>Acquisition of Lands for Park Purposes</u>:  The Streamlined Review Process may be used for the acquisition of land for park purposes, including additions to existing parks.  The second criterion for use of the Streamlined Review Process (identification and evaluation of all types of historic properties within the project APE; see Section III.A.2) does not apply to this activity, provided the acquisition does not include any further treatment or alteration of properties, since access to land for inventory and evaluation prior to NPS acquisition may be limited.  Any known or potential historic properties on the land acquired should be protected from demolition by neglect.  Pursuant to 36 CFR 800.5(a)(2)(vi), demolition by neglect constitutes an adverse effect.  If any undertakings are proposed in conjunction with the acquisition that have the potential to affect historic properties, the Streamlined Review Process may not be used.

16.  <u>Leasing of Historic Properties</u>:  The Streamlined Review Process may be used provided all treatment of historic properties proposed in relation to the leasing action is consistent with undertakings eligible for Streamlined Review, set forth in Section III.C of this PA.  The Streamlined Review Process may not be used where there is a change of use or where a series of individual projects cumulatively results in the complete rehabilitation or restoration of a historic property.

## D.    Adding to List of Undertakings Eligible for Streamlined Review

Any proposed additions or revisions to the list of undertakings eligible for streamlined review must be developed through a region-, state- or park-specific Programmatic Agreement and pursuant to 36 CFR 800.14(b).  The Regional Director or Superintendent, as appropriate, will develop such agreements with SHPOs/THPOs, in consultation with Federally recognized Indian Tribes and the ACHP or others, as appropriate.  If such an agreement is developed by the Superintendent, s/he will notify the Regional Director.  Regional Directors will report the development of supplemental, region-, state-, or park-specific programmatic agreements to the Director on an annual basis.  The NPS FPO will maintain records on supplemental agreements and provide annual notification of any such agreements to all signatories to this agreement.

## IV.    STANDARD REVIEW PROCESS

All undertakings that do not qualify for streamlined review as described in Section III above, will be reviewed in accordance with 36 CFR Part 800.  Superintendents are responsible for compliance with these regulations.  Compliance may also be accomplished through park- and/or project-specific programmatic agreements.  Specific activities required will be undertaken by the

Park Section 106 Coordinator, in consultation with appropriate members of the CRM Team. Parks are encouraged to use Servicewide automated project planning and tracking systems, such as the NPS Planning, Environment and Public Comment (PEPC) system, to track and document Section 106 compliance activities and to make such automated systems accessible to compliance partners, including SHPOs/THPOs, Federally recognized Indian Tribes, Native Hawaiian organizations, and/or the ACHP. If a park executes a MOA or PA with consulting parties to resolve adverse effects, the Superintendent will provide an informational copy of the agreement to the Regional Section 106 Coordinator.

## V.     NATIONAL HISTORIC LANDMARKS

The NHPA provides heightened protection for designated National Historic Landmarks (NHLs) through Section 110(f) and the NHPA's implementing regulations (36 CFR 800.10). Specifically, the NHPA requires that Federal agencies shall, to the maximum extent possible, undertake planning and actions necessary to minimize harm to any NHL that may be directly and adversely affected by an undertaking.

Where the other criteria as listed in Section III.A are met, proposed undertakings that may affect a designated NHL may follow the Streamlined Review Process. Where preliminary planning activities indicate that a proposed undertaking has the potential to have an adverse effect on an NHL, prior to initiating a formal consultation process, the Superintendent will initiate an internal review process in accordance with NPS Management Policies to determine alternatives to avoid or minimize the adverse effects and to assess the possibility of impairment.

## VI.     INADVERTENT DISCOVERIES

In the event that historic properties are inadvertently encountered during an undertaking for which review has been previously conducted and completed under Section III or Section IV of this PA, or through other events such as erosion or animal activity, the Superintendent will notify the SHPO/THPO, Federally Recognized Indian Tribe(s), and or Native Hawaiian organization, as appropriate, within 48 hours, or as soon as reasonably possible. The Superintendent in consultation with the Section 106 Coordinator and the appropriate members of the CRM Team, will make reasonable efforts to avoid, minimize, or mitigate adverse effects on those historic properties in consultation with the SHPO/THPO, Federally recognized Indian Tribe (s), and/or Native Hawaiian organization (s), as appropriate. If human remains or other cultural material that may fall under the provisions of NAGPRA are present, the Superintendent will comply with NAGPRA and ARPA. The Superintendent will ensure that any human remains are left in situ, are not exposed, and remain protected while compliance with NAGPRA, ARPA, or other applicable federal, state, and/or local laws and procedures is undertaken.

## VII.  EMERGENCY ACTIONS

Emergencies are those actions deemed necessary by the Superintendent as an essential and immediate response to a disaster or emergency declared by the President, a tribal government, or the Governor of a State, or another immediate threat to life or property.  Emergency actions are only those actions required to resolve the emergency at that time and they are limited to undertakings that will be started within thirty (30) days after the emergency has been declared. Such emergency actions will be consistent with the NPS Environmental Safeguards Plan for All-Hazards Emergencies and any other approved servicewide emergency response plans.  The Superintendent will notify the SHPO/THPO within 24 hours of the declared emergency or as soon as conditions permit.

## VIII.  REVIEW AND MONITORING OF PA IMPLEMENTATION

The purpose of the PA review and monitoring process is to ensure NPS protection of historic properties in its stewardship.  This is accomplished through the review of undertakings that were completed during the reporting period, review of programmed undertakings, review of implementation of the PA, and review of completion of training requirements.

### A.    Superintendents Biennial Review and Monitoring Meeting

In order to foster cooperative relations, each Superintendent will, at a minimum, invite consulting parties to a review meeting every two years (biennial), with the first meeting initiated within six months of the signing of this PA by all parties.  If all parties agree that such a meeting is not necessary at that time, the meeting may be waived.  However, Superintendents shall remain responsible for initiating biennial meetings in subsequent years.  More frequent meetings may be appropriate based on specific park circumstances and therefore an alternative meeting schedule may be established, if mutually agreed upon by the parties.

1.    Meetings may be conducted in any mutually agreeable location and/or format, including in- person, video conferencing or teleconferencing.

2.    The primary invitees to each park's biennial review and monitoring meeting will include the applicable SHPO/THPO, Federally recognized Indian Tribes, and Native Hawaiian organizations with an interest in that park's properties. Superintendents may also consider inviting other interested parties, including Pacific Islanders, concessioners, lessees, friends groups, historic societies, or gateway communities, as appropriate.

3.    Superintendents may instead choose to meet individually with some parties, particularly those that have strong interest in specific historic properties.

4.    Attendance and meeting minutes will be recorded and distributed to all invited parties after the conclusion of the meeting.

22

5. Specific discussion items may include the following:

   a. Any documentation pursuant to this PA.
   b. Any inventories of historic properties developed in the previous two years, or opportunities for future inventory and research, as well as other reports and research results related to historic properties.
   c. Programmed undertakings that are scheduled, or are likely to be scheduled, for the next two fiscal years.
   d. Provisions of this PA as well as any project- or program-specific Memoranda of Agreement or Programmatic Agreements.
   e. Training received by park staff during the reporting period and opportunities for cooperative training arrangements.
   f. Names of and contact information for the Park Section 106 Coordinator and the CRM Team Members.

## B.    Superintendents Reporting to NPS Regional Directors

In order to inform park program review and potential ACHP evaluation of PA implementation, Superintendents will report biennially to Regional Directors on implementation of the PA.   The Biennial Report shall include the streamlined review data prescribed in Section III B of this PA, training completed and basic data demonstrating compliance with the provisions of this PA as outlined in the guidance document for this agreement (Section I.A.2). ACHP, SHPOs, or THPOs may request hard copies of biennial reports.

## C.    Park Section 106 Program Review by NPS Regional Directors, SHPOs, THPOs, and the ACHP

1. The Regional Director may, at his/her discretion, initiate a review of a park's implementation of this PA.  The ACHP, either at its own discretion, or upon request of a Federally recognized Indian Tribe, SHPO/THPO, or Native Hawaiian organization, may at any time raise with the appropriate Regional Director any programmatic or project matters where they wish the Regional Director to review a Park Superintendent's Section106 decisions.  The Regional Director will consult with the ACHP, and the Regional Director shall provide a written response to the ACHP, and where applicable, the SHPO or THPO, that documents the outcome of the consultation and the resolution.  The Regional Director has the option to suspend a park's use of this PA, and subsequently reinstate it as appropriate.

2. Documentation of NPS Section106 reviews not already provided to SHPOs, THPOs, and the ACHP will be available for review by the ACHP and the appropriate SHPO/THPO upon request.  Individual SHPOs/THPOs who wish to review this documentation are responsible for specifying scheduling, frequency, and types of undertakings of concern to them.

23

**D.    NPS Regional Directors Reporting to the Director of the NPS**

Regional Directors will report biennially to the Director on implementation of this PA within his/her region. Each Regional Biennial Report will be submitted within six (6) months following receipt of Park Biennial Reports by the Regional Director as required in Section VIII.B of this PA. A hardcopy of the biennial reports will be sent to the ACHP and upon request from a SHPO or THPO.

**IX.    SUBSEQUENT AGREEMENTS**

A.    Upon execution of this PA, Superintendents are encouraged to evaluate their park's programs and discuss with SHPOs/THPOs, Federally recognized Indian Tribes, Native Hawaiian organizations, and/or the ACHP ways to develop supplemental programmatic agreements for park undertakings that would otherwise require numerous individual requests for comments.

B.    Development of programmatic agreements specific to a project, plan, or park may be negotiated between Superintendents and SHPOs/THPOs, Federally recognized Indian Tribes, Native Hawaiian organizations, the ACHP, and/or other consulting parties where appropriate, pursuant to 36 CFR 800.14(b), and may be independent of or supplement this PA. Superintendents will provide an informational copy of all agreements to the Regional Section 106 Coordinator.

C.    Memoranda of agreement developed to resolve adverse effects for specific projects shall be negotiated between Superintendents and SHPOs/THPOs, Federally recognized Indian Tribes, Native Hawaiian organizations, and/or the ACHP, pursuant to 36 CFR 800.6(c), and shall be independent of this PA  Superintendents will provide an informational copy of all agreements to the Regional Section 106 Coordinator.

**X.    DISPUTE RESOLUTION**

A.    Should disputes arise, the Superintendent, SHPO/THPO, and/or the ACHP will consult with the objecting parties to resolve the objection.  All work that is the subject of the dispute will stop until the dispute is resolved in accordance with the procedures in this section.  If the dispute cannot be resolved, all documentation relevant to the dispute will be forwarded to the parties named above.  If the SHPO/THPO objects to a Park Superintendent's decision, the information will be forwarded to the Regional Director.  If the National Park Service objects to the SHPO/THPO's opinion, the information will be forwarded to the ACHP.  If the Regional Director cannot resolve a SHPO/THPO objection, the Regional Director will forward to the ACHP relevant documentation not previously furnished to the ACHP and notify the Director of the dispute. Within thirty (30) days after receipt of all pertinent documentation, the ACHP will either:

24

1.      Provide the Regional Director with a recommendation, with an information copy provided to the Director, which the Regional Director will take into account in reaching a final decision regarding the dispute; or

2.      Notify the Regional Director that it will comment to the Director pursuant to the provisions of 36 CFR 800.7 and proceed to comment.  Any ACHP comment provided in response to such a request will be taken into account by the NPS with reference to the subject of the dispute.

B.      In the event the ACHP does not respond within thirty (30) days of receipt of all pertinent documentation, the Regional Director may proceed with his or her recommended resolution.

C.      At the request of any individual, agency, or organization, the ACHP may provide the NPS with an advisory opinion regarding the substance of any finding, determination, or decision made in accordance with this PA or regarding the adequacy of the NPS' compliance with Section 106 and this PA.


## XI.    MONITORING AND TERMINATION

A.      The NPS will convene a meeting of the signatories to this PA within two (2) years of execution of the PA and as needed thereafter, to review implementation of the terms of this PA and determine whether revisions or amendments are needed.  Meetings may be conducted in any mutually agreeable location and/or format, including in-person, video conferencing, or teleconferencing.  If revisions or amendments are needed, the parties will consult in accordance with 36 CFR 800.14.

B.      This PA may be amended when such an amendment is agreed to in writing by all signatories.  When major revisions are proposed to NPS policies that will affect the manner in which the NPS carries out its Section 106 responsibilities, the signatories shall consult to determine whether an amendment to this PA is needed.  Any amendments will be effective on the date a copy signed by all of the signatories is filed with the ACHP.

C.      Any party to this PA may terminate it by providing ninety (90) days notice to the other parties, provided that the parties will consult during the period prior to termination to seek agreement on amendments or other actions that would avoid termination.  Termination by any Federally recognized Indian Tribe signatory will be limited to termination of this PA on the tribal lands of the subject tribe.  In the event of termination, the NPS will comply with 36 CFR Part 800 with regard to individual undertakings otherwise covered by this PA.


## XII.   SEVERABILITY

A.      If any section, subsection, paragraph, sentence, clause, or phrase in this PA is, for any reason, held to be unconstitutional or invalid or ineffective, such decision shall not affect the validity or effectiveness of the remaining portions of this PA.

25

B.     If any section, subsection, paragraph, sentence, clause, or phrase in this PA is, for any reason, held to be unconstitutional or invalid or ineffective, the signatories shall consult to determine whether an amendment to this PA is needed.

## XIII.   ANTI-DEFICIENCY ACT STATEMENT

The stipulations of this Agreement are subject to the provisions of the Anti-Deficiency Act (31 U.S.C. 1341 (1998). If compliance with the Anti-Deficiency Act alters or impairs NPS ability to implement the stipulations of this Agreement, NPS will consult in accordance with the dispute resolution, amendment or termination stipulations as specified in Sections X and XI of this PA.

ADVISORY COUNCIL ON HISTORIC PRESERVATION

BY:_____ DATE: __11/14/08__
CHAIRMAN

NATIONAL PARK SERVICE

BY:_____ DATE: __11/14/08__
DIRECTOR

NATIONAL CONFERENCE OF STATE HISTORIC PRESERVATION OFFICERS

BY:_____ DATE: _11-14-2008_
PRESIDENT

26

# Declaration of Jennifer T. Nersesian

# Exhibit E

# ESA No Effect Determination



# United States Department of the Interior

**FISH AND WILDLIFE SERVICE**
Chesapeake Bay Ecological Services Field Office
177 Admiral Cochrane Drive
Annapolis, MD 21401-7307
Phone: (410) 573-4599 Fax: (410) 266-9127



In Reply Refer To:                                                                    10/16/2025 16:23:39 UTC
Project code: 2026-0005511
Project Name: East Potomac Soils

Federal Nexus: yes
Federal Action Agency (if applicable): National Park Service

**Subject:**   Record of project representative's no effect determination for 'East Potomac Soils'

Dear Patrick Campbell:

This letter records your determination using the Information for Planning and Consultation (IPaC) system provided to the U.S. Fish and Wildlife Service (Service) on October 16, 2025, for 'East Potomac Soils' (here forward, Project). This project has been assigned Project Code 2026-0005511 and all future correspondence should clearly reference this number. **Please carefully review this letter.**

### Ensuring Accurate Determinations When Using IPaC

The Service developed the IPaC system and associated species' determination keys in accordance with the Endangered Species Act of 1973 (ESA; 87 Stat. 884, as amended; 16 U.S.C. 1531 et seq.) and based on a standing analysis. All information submitted by the Project proponent into IPaC must accurately represent the full scope and details of the Project.

Failure to accurately represent or implement the Project as detailed in IPaC or the **Northern Long-eared Bat and Tricolored Bat Range-wide Determination Key (Dkey)**, invalidates this letter. *Answers to certain questions in the DKey commit the project proponent to implementation of conservation measures that must be followed for the ESA determination to remain valid.*

### Determination for the Northern Long-Eared Bat and/or Tricolored Bat

Based upon your IPaC submission and a standing analysis, your project has reached the following effect determinations:

| Species | Listing Status | Determination |
|---|---|---|
| Northern Long-eared Bat (*Myotis septentrionalis*) | Endangered | No effect |

Project code: 2026-0005511          IPaC Record Locator: 777-171594916          10/16/2025 16:23:39 UTC

| | | |
|---|---|---|
| Tricolored Bat (*Perimyotis subflavus*) | Proposed Endangered | No effect |

Federal agencies must consult with U.S. Fish and Wildlife Service under section 7(a)(2) of the Endangered Species Act (ESA) when an action *may affect* a listed species. Tricolored bat is proposed for listing as endangered under the ESA, but not yet listed. For actions that may affect a proposed species, agencies cannot consult, but they can *confer* under the authority of section 7(a)(4) of the ESA. Such conferences can follow the procedures for a consultation and be adopted as such if and when the proposed species is listed. Should the tricolored bat be listed, agencies must review projects that are not yet complete, or projects with ongoing effects within the tricolored bat range that previously received a NE or NLAA determination from the key to confirm that the determination is still accurate.

To make a no effect determination, the full scope of the proposed project implementation (action) should not have any effects (either positive or negative), to a federally listed species or designated critical habitat. Effects of the action are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action. (See § 402.17).

Under Section 7 of the ESA, if a federal action agency makes a no effect determination, no consultation with the Service is required (ESA §7). If a proposed Federal action may affect a listed species or designated critical habitat, formal consultation is required except when the Service concurs, in writing, that a proposed action "is not likely to adversely affect" listed species or designated critical habitat [50 CFR §402.02, 50 CFR§402.13].

**Other Species and Critical Habitat that May be Present in the Action Area**

The IPaC-assisted determination key for the northern long-eared bat and tricolored bat does not apply to the following ESA-protected species and/or critical habitat that also may occur in your Action area:

- Monarch Butterfly *Danaus plexippus* Proposed Threatened

You may coordinate with our Office to determine whether the Action may affect the animal species listed above and, if so, how they may be affected.

**Next Steps**

If there are no updates on listed species, no further consultation/coordination for this project is required with respect to the species covered by this key. However, the Service recommends that project proponents re-evaluate the Project in IPaC if: 1) the scope, timing, duration, or location of the Project changes (includes any project changes or amendments); 2) new information reveals the Project may impact (positively or negatively) federally listed species or designated critical habitat; or 3) a new species is listed, or critical habitat designated. If any of the above conditions

occurs, additional coordination with the Service should take place to ensure compliance with the Act.

If you have any questions regarding this letter or need further assistance, please contact the Chesapeake Bay Ecological Services Field Office and reference Project Code 2026-0005511 associated with this Project.

Project code: 2026-0005511                IPaC Record Locator: 777-171594916                10/16/2025 16:23:39 UTC

**Action Description**

You provided to IPaC the following name and description for the subject Action.

**1. Name**

East Potomac Soils

**2. Description**

The following description was provided for the project 'East Potomac Soils':

Temporary storage of dirt from a construction site.

The approximate location of the project can be viewed in Google Maps: https://www.google.com/maps/@38.8677464,-77.0252946780528,14z



Project code: 2026-0005511          IPaC Record Locator: 777-171594916          10/16/2025 16:23:39 UTC

# DETERMINATION KEY RESULT

Based on the information you provided, you have determined that the Proposed Action will have no effect on the species covered by this determination key. Therefore, no consultation with the U.S. Fish and Wildlife Service pursuant to Section 7(a)(2) of the Endangered Species Act of 1973 (87 Stat. 884, as amended 16 U.S.C. 1531 *et seq.*) is required for those species.

# QUALIFICATION INTERVIEW

1. Does the proposed project include, or is it reasonably certain to cause, intentional take of listed bats or any other listed species?

   **Note:** Intentional take is defined as take that is the intended result of a project. Intentional take could refer to research, direct species management, surveys, and/or studies that include intentional handling/encountering, harassment, collection, or capturing of any individual of a federally listed threatened, endangered or proposed species?

   *No*

2. Is the action area wholly within Zone 2 of the year-round active area for northern long-eared bat and/or tricolored bat?

   **Automatically answered**
   *No*

3. Does the action area intersect Zone 1 of the year-round active area for northern long-eared bat and/or tricolored bat?

   **Automatically answered**
   *No*

4. Does any component of the action involve leasing, construction or operation of wind turbines? Answer 'yes' if the activities considered are conducted with the intention of gathering survey information to inform the leasing, construction, or operation of wind turbines.

   *No*

5. Is the proposed action authorized, permitted, licensed, funded, or being carried out by a Federal agency in whole or in part?

   **Note for projects in Pennsylvania**: Projects requiring authorization under Section 404 of the Clean Water Act and/or Section 10 of the Rivers and Harbors Act would be considered as having a federal nexus. Since the U.S. Army Corps of Engineers (Corps) has issued the Pennsylvania State Programmatic General Permit (PASPGP), which may be verified by the PA Department of Environmental Protection or certain Conservation Districts, the need to receive a Corps authorization to perform the work under the PASPGP serves as a federal nexus. As such, if proposing to use the PASPGP, you would answer 'yes' to this question.

   *Yes*

6. Is the Federal Highway Administration (FHWA), Federal Railroad Administration (FRA), or Federal Transit Administration (FTA) funding or authorizing the proposed action, in whole or in part?

   *No*

7. Are you an employee of the federal action agency or have you been officially designated in writing by the agency as its designated non-federal representative for the purposes of Endangered Species Act Section 7 informal consultation per 50 CFR § 402.08?

   **Note:** This key may be used for federal actions and for non-federal actions to facilitate section 7 consultation and to help determine whether an incidental take permit may be needed, respectively. This question is for information purposes only.

   *Yes*

8. Is the lead federal action agency the Environmental Protection Agency (EPA) or Federal Communications Commission (FCC)? Is the Environmental Protection Agency (EPA) or Federal Communications Commission (FCC) funding or authorizing the proposed action, in whole or in part?

   *No*

9. Is the lead federal action agency the Federal Energy Regulatory Commission (FERC)?

   *No*

10. [Semantic] Is the action area located within 0.5 miles of a known bat hibernaculum or winter roost? Note: The map queried for this question contains proprietary information and cannot be displayed. If you need additional information, please contact your state wildlife agency.
    **Automatically answered**
    *No*

11. Does the action area contain any winter roosts or caves (or associated sinkholes, fissures, or other karst features), mines, rocky outcroppings, or tunnels that could provide habitat for hibernating bats?

    *No*

12. Will the action cause effects to a bridge?

    **Note:** Covered bridges should be considered as bridges in this question.

    *No*

13. Will the action result in effects to a culvert or tunnel at any time of year?

    *No*

Project code: 2026-0005511            IPaC Record Locator: 777-171594916            10/16/2025 16:23:39 UTC

14. Are trees present within 1000 feet of the action area?

**Note:** If there are trees within the action area that are of a sufficient size to be potential roosts for bats answer "Yes". If unsure, additional information defining suitable summer habitat for the northern long-eared bat and tricolored bat can be found in Appendix A of the USFWS' Range-wide Indiana Bat and Northern long-eared bat Survey Guidelines at: https://www.fws.gov/media/range-wide-indiana-bat-and-northern-long-eared-bat-survey-guidelines.

*Yes*

15. Does the action include the intentional exclusion of bats from a building or building-like structure? **Note:** Exclusion is conducted to deny bats' entry or reentry into a building. To be effective and to avoid harming bats, it should be done according to established standards. If your action includes bat exclusion and you are unsure whether northern long-eared bats or tricolored bats are present, answer "Yes." Answer "No" if there are no signs of bat use in the building/structure. If unsure, contact your local Ecological Services Field Office to help assess whether northern long-eared bats or tricolored bats may be present. Contact a Nuisance Wildlife Control Operator (NWCO) for help in how to exclude bats from a structure safely without causing harm to the bats (to find a NWCO certified in bat standards, search the Internet using the search term "National Wildlife Control Operators Association bats"). Also see the White-Nose Syndrome Response Team's guide for bat control in structures.

*No*

16. Does the action involve removal, modification, or maintenance of a human-made building-like structure (barn, house, or other building) **known or suspected to contain roosting bats?**

*No*

17. Will the action cause construction of one or more new roads open to the public?

For federal actions, answer 'yes' when the construction or operation of these facilities is either (1) part of the federal action or (2) would not occur but for an action taken by a federal agency (federal permit, funding, etc.).

*No*

18. Will the action include or cause any construction or other activity that is reasonably certain to increase average night-time traffic permanently or temporarily on one or more existing roads? **Note:** For federal actions, answer 'yes' when the construction or operation of these facilities is either (1) part of the federal action or (2) would not occur but for an action taken by a federal agency (federal permit, funding, etc.). .

*Yes*

Project code: 2026-0005511          IPaC Record Locator: 777-171594916          10/16/2025 16:23:39 UTC

19. Will the increased vehicle traffic occur on any road that lies between any two areas of contiguous forest that are each greater than or equal to 10 acres in extent and are separated by less than 1,000 feet? Bats may cross a road by flying between forest patches that are up to 1,000 feet apart.

    **Note:** "Contiguous forest" of 10 acres or more may includes areas where multiple forest patches are separated by less than 1,000 feet of non-forested area if the forested patches, added together, comprise at least 10 acres.

    *No*

20. Will the proposed Action involve the creation of a new water-borne contaminant source (e.g., leachate pond, pits containing chemicals that are not NSF/ANSI 60 compliant)?

    **Note:** For information regarding NSF/ANSI 60 please visit https://www.nsf.org/knowledge-library/nsf-ansi-standard-60-drinking-water-treatment-chemicals-health-effects

    *No*

21. Will the proposed action involve the creation of a new point source discharge from a facility other than a water treatment plant or storm water system?

    *No*

22. Will the action include drilling or blasting?

    *No*

23. Will the action involve military training (e.g., smoke operations, obscurant operations, exploding munitions, artillery fire, range use, helicopter or fixed wing aircraft use at night)?

    *No*

24. Will the proposed action involve the use of herbicides or pesticides (e.g., fungicides, insecticides, or rodenticides)?

    *No*

25. Will the action include or cause activities that are reasonably certain to cause chronic or intense nighttime noise (above current levels of ambient noise in the area) in suitable summer habitat for the northern long-eared bat or tricolored bat during the active season?

    Chronic noise is noise that is continuous or occurs repeatedly again and again for a long time. Sources of chronic or intense noise that could cause adverse effects to bats may include, but are not limited to: road traffic; trains; aircraft; industrial activities; gas compressor stations; loud music; crowds; oil and gas extraction; construction; and mining.

    **Note:** Additional information defining suitable summer habitat for the northern long-eared bat and tricolored bat can be found in Appendix A of the USFWS' Range-wide Indiana Bat and Northern long-eared bat Survey Guidelines at: https://www.fws.gov/media/range-wide-indiana-bat-and-northern-long-eared-bat-survey-guidelines.

    *No*

Project code: 2026-0005511          IPaC Record Locator: 777-171594916          10/16/2025 16:23:39 UTC

26. Does the action include, or is it reasonably certain to cause, the use of permanent or temporary artificial lighting within 1000 feet of suitable northern long-eared bat or tricolored bat roosting habitat?

   **Note:** Additional information defining suitable summer habitat for the northern long-eared bat and tricolored bat can be found in Appendix A of the USFWS' Range-wide Indiana Bat and Northern long-eared bat Survey Guidelines at: https://www.fws.gov/media/range-wide-indiana-bat-and-northern-long-eared-bat-survey-guidelines.

   *No*

27. Will the action include tree cutting or other means of knocking down or bringing down trees, tree topping, or tree trimming?

   *No*

28. Will the proposed action result in the use of prescribed fire?

   **Note:** If the prescribed fire action includes other activities than application of fire (e.g., tree cutting, fire line preparation) please consider impacts from those activities within the previous representative questions in the key. This set of questions only considers impacts from flame and smoke.

   *No*

29. Does the action area intersect the northern long-eared bat species list area?

   **Automatically answered**
   *Yes*

30. [Semantic] Is the action area located within 0.5 miles of radius of an entrance/opening to any known NLEB hibernacula or winter roost? Note: The map queried for this question contains proprietary information and cannot be displayed. If you need additional information, please contact your State wildlife agency.

   **Automatically answered**
   *No*

31. [Semantic] Is the action area located within 0.25 miles of a culvert that is known to be occupied by northern long-eared or tricolored bats? **Note:** The map queried for this question contains proprietary information and cannot be displayed. If you need additional information, please contact your State wildlife agency.

   **Automatically answered**
   *No*

Project code: 2026-0005511          IPaC Record Locator: 777-171594916          10/16/2025 16:23:39 UTC

32. [Semantic] Is the action area located within 150 feet of a documented northern long-eared bat roost site?

    Note: The map queried for this question contains proprietary information and cannot be displayed. If you need additional information, please contact your State wildlife agency.Have you contacted the appropriate agency to determine if your action is within 150 feet of any documented northern long-eared bat roosts?

    Note: A document with links to Natural Heritage Inventory databases and other state-specific sources of information on the locations of northern long-eared bat roosts is available here. Location information for northern long-eared bat roosts is generally kept in state natural heritage inventory databases – the availability of this data varies by state. Many states provide online access to their data, either directly by providing maps or by providing the opportunity to make a data request. In some cases, to protect those resources, access to the information may be limited.

    **Automatically answered**
    *No*

33. Is suitable summer habitat for the northern long-eared bat present within 1000 feet of project activities?
    If unsure, answer "Yes."

    **Note:** Additional information defining suitable summer habitat for the northern long-eared bat and tricolored bat can be found in Appendix A of the USFWS' Range-wide Indiana Bat and Northern long-eared bat Survey Guidelines at: https://www.fws.gov/media/range-wide-indiana-bat-and-northern-long-eared-bat-survey-guidelines.

    *No*

34. Does the action area intersect the tricolored bat species list area?
    **Automatically answered**
    *Yes*

35. Is the action area located within 0.5-mile of radius of an entrance/opening to any known tricolored bat hibernacula or winter roost?

    Note: The map queried for this question contains proprietary information and cannot be displayed. If you need additional information, please contact your state wildlife agency.
    **Automatically answered**
    *No*

36. [Semantic] Is the action area located within 0.25 miles of a culvert that is known to be occupied by northern long-eared or tricolored bats? **Note:** The map queried for this question contains proprietary information and cannot be displayed. If you need additional information, please contact your State wildlife agency.
    **Automatically answered**
    *No*

Project code: 2026-0005511          IPaC Record Locator: 777-171594916          10/16/2025 16:23:39 UTC

37. Is suitable summer habitat for the tricolored bat present within 1000 feet of project activities?
(If unsure, answer ""Yes."")

**Note:** If there are trees within the action area that may provide potential roosts for tricolored bats (e.g., clusters of leaves in live and dead deciduous trees, Spanish moss (Tillandsia usneoides), clusters of dead pine needles of large live pines) answer ""Yes."" For a complete definition of suitable summer habitat for the tricolored bat, please see Appendix A in the Service's Range-wide Indiana Bat and Northern long-eared Bat Survey Guidelines.

*No*

38. Do you have any documents that you want to include with this submission?

*No*

Project code: 2026-0005511          IPaC Record Locator: 777-171594916                    10/16/2025 16:23:39 UTC

# PROJECT QUESTIONNAIRE

Project code: 2026-0005511          IPaC Record Locator: 777-171594916                    10/16/2025 16:23:39 UTC

Project code: 2026-0005511          IPaC Record Locator: 777-171594916          10/16/2025 16:23:39 UTC

# IPAC USER CONTACT INFORMATION

Agency:  National Park Service
Name:    Patrick Campbell
Address: 1100 Ohio Drive SW
City:    Washington DC
State:   DC
Zip:     20242
Email    █████████████████
Phone:   ████████

# Declaration of Jennifer T. Nersesian

# Exhibit F

# FWS Species List



# United States Department of the Interior



**FISH AND WILDLIFE SERVICE**
Chesapeake Bay Ecological Services Field Office
177 Admiral Cochrane Drive
Annapolis, MD 21401-7307
Phone: (410) 573-4599 Fax: (410) 266-9127

In Reply Refer To:                                                    10/16/2025 16:17:28 UTC
Project Code: 2026-0005511
Project Name: East Potomac Soils

Subject:  List of threatened and endangered species that may occur in your proposed project
location or may be affected by your proposed project

To Whom It May Concern:

The enclosed species list identifies threatened, endangered, proposed, and candidate species, as
well as proposed and final designated critical habitat, that may occur within the boundary of your
proposed project and/or may be affected by your proposed project. The species list fulfills the
requirements of the U.S. Fish and Wildlife Service (Service) under section 7(c) of the
Endangered Species Act (Act) of 1973, as amended (16 U.S.C. 1531 *et seq.*).

New information based on updated surveys, changes in the abundance and distribution of
species, changed habitat conditions, or other factors could change this list. Please feel free to
contact us if you need more current information or assistance regarding the potential impacts to
federally proposed, listed, and candidate species and federally designated and proposed critical
habitat. Please note that under 50 CFR 402.12(e) of the regulations implementing section 7 of the
Act, the accuracy of this species list should be verified after 90 days. This verification can be
completed formally or informally as desired. The Service recommends that verification be
completed by visiting the IPaC website at regular intervals during project planning and
implementation for updates to species lists and information. An updated list may be requested
through the IPaC system by completing the same process used to receive the enclosed list.

The purpose of the Act is to provide a means whereby threatened and endangered species and the
ecosystems upon which they depend may be conserved. Under sections 7(a)(1) and 7(a)(2) of the
Act and its implementing regulations (50 CFR 402 *et seq.*), Federal agencies are required to
utilize their authorities to carry out programs for the conservation of threatened and endangered
species and to determine whether projects may affect threatened and endangered species and/or
designated critical habitat.

A Biological Assessment is required for construction projects (or other undertakings having
similar physical impacts) that are major Federal actions significantly affecting the quality of the
human environment as defined in the National Environmental Policy Act (42 U.S.C. 4332(2)
(c)). For projects other than major construction activities, the Service suggests that a biological

evaluation similar to a Biological Assessment be prepared to determine whether the project may affect listed or proposed species and/or designated or proposed critical habitat. Recommended contents of a Biological Assessment are described at 50 CFR 402.12.

If a Federal agency determines, based on the Biological Assessment or biological evaluation, that listed species and/or designated critical habitat may be affected by the proposed project, the agency is required to consult with the Service pursuant to 50 CFR 402. In addition, the Service recommends that candidate species, proposed species and proposed critical habitat be addressed within the consultation. More information on the regulations and procedures for section 7 consultation, including the role of permit or license applicants, can be found in the "Endangered Species Consultation Handbook" at:

https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf

**Migratory Birds**: In addition to responsibilities to protect threatened and endangered species under the Endangered Species Act (ESA), there are additional responsibilities under the Migratory Bird Treaty Act (MBTA) and the Bald and Golden Eagle Protection Act (BGEPA) to protect native birds from project-related impacts. Any activity resulting in take of migratory birds, including eagles, is prohibited unless otherwise permitted by the U.S. Fish and Wildlife Service (50 C.F.R. Sec. 10.12 and 16 U.S.C. Sec. 668(a)). For more information regarding these Acts, see https://www.fws.gov/program/migratory-bird-permit/what-we-do.

It is the responsibility of the project proponent to comply with these Acts by identifying potential impacts to migratory birds and eagles within applicable NEPA documents (when there is a federal nexus) or a Bird/Eagle Conservation Plan (when there is no federal nexus). Proponents should implement conservation measures to avoid or minimize the production of project-related stressors or minimize the exposure of birds and their resources to the project-related stressors. For more information on avian stressors and recommended conservation measures, see https://www.fws.gov/library/collections/threats-birds.

In addition to MBTA and BGEPA, Executive Order 13186: *Responsibilities of Federal Agencies to Protect Migratory Birds*, obligates all Federal agencies that engage in or authorize activities that might affect migratory birds, to minimize those effects and encourage conservation measures that will improve bird populations. Executive Order 13186 provides for the protection of both migratory birds and migratory bird habitat. For information regarding the implementation of Executive Order 13186, please visit https://www.fws.gov/partner/council-conservation-migratory-birds.

We appreciate your concern for threatened and endangered species. The Service encourages Federal agencies to include conservation of threatened and endangered species into their project planning to further the purposes of the Act. Please include the Consultation Code in the header of this letter with any request for consultation or correspondence about your project that you submit to our office.

Attachment(s):

- Official Species List

- USFWS National Wildlife Refuges and Fish Hatcheries
- Wetlands

# OFFICIAL SPECIES LIST

This list is provided pursuant to Section 7 of the Endangered Species Act, and fulfills the requirement for Federal agencies to "request of the Secretary of the Interior information whether any species which is listed or proposed to be listed may be present in the area of a proposed action".

This species list is provided by:

**Chesapeake Bay Ecological Services Field Office**
177 Admiral Cochrane Drive
Annapolis, MD 21401-7307
(410) 573-4599

# PROJECT SUMMARY

Project Code:          2026-0005511
Project Name:          East Potomac Soils
Project Type:          Landfill - Solid Waste
Project Description:   Temporary storage of dirt from a construction site.
Project Location:

The approximate location of the project can be viewed in Google Maps: https://www.google.com/maps/@38.8677464,-77.0252946780528,14z



Counties:  District of Columbia County, District of Columbia

Project code: 2026-0005511                                    10/16/2025 16:17:28 UTC

# ENDANGERED SPECIES ACT SPECIES

There is a total of 3 threatened, endangered, or candidate species on this species list.

Species on this list should be considered in an effects analysis for your project and could include species that exist in another geographic area. For example, certain fish may appear on the species list because a project could affect downstream species.

IPaC does not display listed species or critical habitats under the sole jurisdiction of NOAA Fisheries[1], as USFWS does not have the authority to speak on behalf of NOAA and the Department of Commerce.

See the "Critical habitats" section below for those critical habitats that lie wholly or partially within your project area under this office's jurisdiction. Please contact the designated FWS office if you have questions.

---

1. NOAA Fisheries, also known as the National Marine Fisheries Service (NMFS), is an office of the National Oceanic and Atmospheric Administration within the Department of Commerce.

## MAMMALS

| NAME | STATUS |
|------|--------|
| Northern Long-eared Bat *Myotis septentrionalis*<br>　　No critical habitat has been designated for this species.<br>　　Species profile: https://ecos.fws.gov/ecp/species/9045 | Endangered |
| Tricolored Bat *Perimyotis subflavus*<br>　　No critical habitat has been designated for this species.<br>　　Species profile: https://ecos.fws.gov/ecp/species/10515 | Proposed Endangered |

## INSECTS

| NAME | STATUS |
|------|--------|
| Monarch Butterfly *Danaus plexippus*<br>　　There is **proposed** critical habitat for this species. Your location does not overlap the critical habitat.<br>　　Species profile: https://ecos.fws.gov/ecp/species/9743 | Proposed Threatened |

## CRITICAL HABITATS

THERE ARE NO CRITICAL HABITATS WITHIN YOUR PROJECT AREA UNDER THIS OFFICE'S JURISDICTION.

YOU ARE STILL REQUIRED TO DETERMINE IF YOUR PROJECT(S) MAY HAVE EFFECTS ON ALL ABOVE LISTED SPECIES.

# USFWS NATIONAL WILDLIFE REFUGE LANDS AND FISH HATCHERIES

Any activity proposed on lands managed by the National Wildlife Refuge system must undergo a 'Compatibility Determination' conducted by the Refuge. Please contact the individual Refuges to discuss any questions or concerns.

THERE ARE NO REFUGE LANDS OR FISH HATCHERIES WITHIN YOUR PROJECT AREA.

# WETLANDS

Impacts to NWI wetlands and other aquatic habitats may be subject to regulation under Section 404 of the Clean Water Act, or other State/Federal statutes.

For more information please contact the Regulatory Program of the local U.S. Army Corps of Engineers District.

Please note that the NWI data being shown may be out of date. We are currently working to update our NWI data set. We recommend you verify these results with a site visit to determine the actual extent of wetlands on site.

RIVERINE
- R1UBV

## IPAC USER CONTACT INFORMATION

Agency:  National Park Service
Name:    Patrick Campbell
Address: 1100 Ohio Drive SW
City:    Washington DC
State:   DC
Zip:     20242
Email
Phone:

# Declaration of Jennifer T. Nersesian

# Exhibit G

# NPS Conceptual Stockpile Plan



EPP GOLF COURSE STOCKPILE AREA