# Declaration of Jessica Bowron

# Exhibit A



**LEASE**

Between

**U.S. DEPARTMENT OF INTERIOR**
**National Park Service**

And

**NATIONAL LINKS TRUST,**
**a District of Columbia nonprofit**
**corporation**

For the Premises known as East Potomac
Golf Course, Rock Creek Golf Course and
Langston Golf Course

# NPS Lease# NCR-3060-19-001

**Executed September 30, 2020**

**Covering the period October 5, 2020 through September 30, 2070**

## Table of Contents

Section 1. DEFINITIONS                                                    5

Section 2. LEASE OF PREMISES                                             8

  2.1. Lease of Premises; Reservation of Rights                 8

  2.2. Waiver                                                    9

  2.3. Easements                                                 9

  2.4. Ownership of the Premises                                 9

  2.5. Historic Property                                         9

Section 3. ACCEPTANCE OF THE PREMISES                                    9

  3.1. As Is Condition of the Premises                          9

  3.2. Lessee's Due Diligence                                   9

  3.3. Inventory and Condition Report                           9

Section 4. LEASE TERM AND ABANDONMENT                                   10

  4.1. Lease Term                                               10

  4.2. Abandonment                                              10

Section 5. RENT                                                         10

  5.1. Net Lease and Rent Payments                              10

  5.4. Percentage Rent                                          11

  5.5. Rent Reconsideration                                     11

  5.6    Rent Offsets                       12

Section 6. USES OF PREMISES                                             12

  6.1.  Authorized Uses                                         12

  6.2. Changes to Authorized Uses                               13

  6.3. Applicable Laws                                          13

  6.4. Forbidden Uses                                           13

  6.5. Site Disturbance                                         13

  6.6. Protection of Cultural and Archeological Resources.      14

  6.7. Signs                                                    14

  6.8. Permits and Approvals                                    14

  6.9. Alterations                                              14

Section 7. RECORDS AND AUDITS                                           14

Section 8. INITIAL IMPROVEMENTS BY LESSEE                               15

Section 9. CONSTRUCTION APPROVAL                                        15

| | |
|---|---|
| 9.1. In General | 15 |
| 9.2. Enforced Delays | 15 |
| 9.3. Utilities During Construction | 15 |
| 9.4. Site Inspection | 15 |
| 9.5. Approval of Construction | 16 |
| 9.6. Construction Documents | 16 |
| 9.7. General Scope of Lessor's Review | 16 |
| 9.8. Changes to Approved Construction Documents | 16 |
| 9.9. Special Considerations for Historic Property | 17 |
| 9.10. Evidence of Adequate Funds | 17 |
| 9.11. Building Permit | 17 |
| 9.12. Construction Completion Procedures | 17 |
| 9.13. Lessor's Right to Utilize Construction Documents (Optional) | 17 |
| Section 10. MAINTENANCE AND REPAIR | 18 |
| 10.1. Lessee's Responsibilities | 18 |
| 10.2. Maintenance Plan | 19 |
| 10.3. Preservation Maintenance Plan | 19 |
| 10.4. Maintenance Reserve Account  SECTION DELETED | 20 |
| Section 11. UTILITIES | 20 |
| Section 12. HAZARDOUS MATERIALS | 20 |
| Section 13. INSURANCE AND INDEMNIFICATION | 21 |
| 13.1. Insurance During the Lease Term | 21 |
| 13.2. Insurance Requirements Modification | 21 |
| 13.3. Disposition of Insurance Proceeds | 21 |
| 13.4. Inadequate Insurance Coverage | 21 |
| 13.5. Indemnity | 21 |
| Section 14. DAMAGE OR DESTRUCTION | 22 |
| 14.1. Damage or Destruction; Duty to Restore | 22 |
| 14.2. No Termination; No Effect on Rental Obligation | 22 |
| Section 15. LIENS | 22 |
| 15.1. No Power in Lessee to Create | 22 |
| 15.2. Discharge of Liens by Lessee | 22 |
| 15.3. No Consent or Waiver by Lessor | 23 |

Section 16. ASSIGNMENTS AND ENCUMBRANCES                           23

    16.1. Assignments                                             23

    16.2. Encumbrances                                            23

Section 17. DEFAULTS AND LESSOR'S REMEDIES                         24

    17.1. Termination for Default                                 24

    17.2. Bankruptcy                                              24

    17.3. No Waiver                                               24

    17.4. Lessor's Right to Cure Defaults                         24

Section 18.    SURRENDER AND HOLDING OVER                       25

    18.1. Surrender of the Premises                               25

    18.2. Holding Over                                            25

Section 19. EQUAL OPPORTUNITY LAWS                                 25

Section 20. NOTICES                                               25

Section 21. GENERAL PROVISIONS                                    26

| | |
|---|---|
| Exhibit A | Site Plans showing Leased Premises |
| Exhibit B | Insurance Requirements |
| Exhibit C | Inventory and Condition Report |
| Exhibit D | Initial Improvements |
| Exhibit E | Maintenance Plan (to be added upon NPS approval) |
| Exhibit F | Preservation Plan (to be added upon NPS approval) |
| Exhibit G | Use and Ownership of Intellectual Property |
| Exhibit H | Certain Commitments |

**THIS LEASE is made and entered into by and between the United States Department of the Interior, acting through the National Park Service, an agency of the United States of America (Lessor), and National Links Trust, a District of Columbia nonprofit corporation (Lessee).**

**WITNESSETH THAT:**

**WHEREAS, Congress designated National Capital Parks East, National Mall and Memorial Parks, and Rock Creek Park (Park Areas) as units of the national park system;**

**WHEREAS, the Park Areas contain property that has been determined suitable for leasing under 36 Code of Federal Regulations Part 18; and 54 USC 306121;**

**WHEREAS, the Lessor has determined that the use and occupancy of the property that is made available under this Lease is consistent with the Park Areas' General Management Plan and the requirements of Part 18 of Title 36 of the Code of Federal Regulations;**

**WHEREAS, the Lessee is a nonprofit, 501(c) (3) tax-exempt corporation whose mission is, among other things, to promote affordable and accessible golf, preserve and/or restore historic and significant golf course architecture, and engage with local communities through educational programming at municipal golf courses throughout the United States of America, including the Golf Courses (as defined in Section 2.1); and**

**WHEREAS, the Lessee desires to lease the Premises on the terms and conditions set forth in this Lease;**

**NOW THEREFORE, in consideration of their mutual promises, the Lessor and Lessee hereby agree as follows:**

## Section 1. DEFINITIONS

**As used in this Lease, the following defined terms are applicable to both singular and plural forms.**

**1.1. Additional Rent** - refers to all forms of Rent required by this Lease other than the Rent required by Section 5 hereof.

**1.2. Alterations –** means any construction, modifications, rehabilitation, reconstruction, and/or restoration of the Premises other than Initial Improvements. For clarity, Alterations include, but are not limited to, replacement of Fixtures.

**1.3 Applicable Laws –** means all present and future laws, statutes, requirements, ordinances, judgments, regulations, and administrative and judicial determinations (that are applicable by their own terms to the Premises or the Lessee), even if unforeseen or extraordinary, of every governmental or quasi-governmental authority, court or agency claiming jurisdiction over the Premises now or hereafter enacted or in effect (including, but not limited to, Part 18 and the Park Areas' General Management Plan, environmental laws and those relating to accessibility to, usability by, and discrimination against, disabled individuals), and all covenants, restrictions, and conditions now or

hereafter of record which may be applicable to the Lessee or to all or any portion of the Premises, or to the use, occupancy, possession, operation, maintenance, alteration, repair or restoration of any of the Premises, even if compliance therewith necessitates structural changes to the Premises or results in interference with the use or enjoyment of all or any portion of the Premises.

**1.4  Reserved.**

**1.5 Approved Costs** – means costs (including  General and Administrative Costs) approved by Lessor as being no higher than those prevailing in the locality of the Premises, required for the construction of Initial Improvements or Alterations, and otherwise reasonable.

**1.6 Assignment** - means the transfer, whether it is direct or indirect, voluntary or by operation of law, assignment, sale, or conveyance, of the Lessee's leasehold estate, or the Lessee's rights under this Lease in whole or part. Such transfer may be designated as a sale, conveyance, or an assignment. The sale, conveyance, or assignment (including by consolidation, merger or reorganization) of a controlling interest in the Lessee (if such entity is a corporation), or any sale or other transfer of a controlling interest in the partnership interests (if such entity is a partnership), whether in a single transfer or in a series of related transfers, and whether directly or by sales or transfers of underlying partnership or corporate ownership interests, is an Assignment. For a corporate entity, the term "controlling interest" means an interest, beneficial or otherwise, of sufficient outstanding voting securities or capital of the Lessee so as to permit exercise of managerial authority over the actions and operations of the Lessee. For a partnership, limited partnership, joint venture, limited liability company, or individual entrepreneur, "controlling interest" means the beneficial ownership of the capital assets of the Lessee so as to permit exercise of managerial authority over the actions and operations of the Lessee**.**

**1.7 Commencement Date** – means the first day of the Lease term as stated in Section 4 of this Lease.

**1.8 Construction Documents** – means any and all plans and specifications prepared for the construction of the Initial Improvements or any Alterations.

**1.9 Encumbrance** – means the direct or indirect, voluntary or by operation of law, encumbrance, pledge, mortgage, or other hypothecation of the Lessee's interest or rights under this Lease and/or the Premises or Lessee's leasehold estate.

**1.10 Expiration Date** – means the last day of the Lease Term as stated in Section 4 of this Lease.

**1.11 Fixtures** – means all non-removable equipment and furniture, and apparatuses permanently attached to, in, or on the Premises.

**1.12 General and Administrative Costs** – means costs necessary for the construction of Initial Improvements or Alterations that are not directly related to labor and building materials.  Such costs may include, but are not limited to, architecture, engineering, planning, including compliance with the National Environmental Policies Act (NEPA, 42 USC 4321 et seq.), and permits.

**1.13 Golf Course** – has the meaning set forth in Section 2.1(a) of this Lease.

**1.14 Hazardous Materials** – means any material or other substance: (a) that requires investigation or correction under Applicable Laws; (b) that is or becomes defined as a hazardous waste, hazardous substance, pollutant, or contaminant, under Applicable Laws; (c) that is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic, or otherwise hazardous, and is or becomes regulated under Applicable Laws; (d) that, without limitation of the foregoing, contains gasoline, diesel

DocuSign Envelope ID: 519ZDA84-5614-4127-9D53-44B4B9CD0667

fuel or other petroleum hydrocarbons; (e) that, without limitation of the foregoing, contains polychlorinated biphenyls (PCBs), asbestos or urea formaldehyde foam insulation; or (f) without limitation of the foregoing, contains radon gas.

**1.15 Hazardous Materials Occurrence** –means any use, treatment, keeping, storage, sale, release, disposal, migration, transport, or discharge of any Hazardous Materials from, on, under, or into the Premises or other Park Areas property that occurs during the Lease Term.

**1.16 Historic Property** – means building(s) and land located within the boundaries of the Park Areas that are part of a pre-historic or historic district or site included on, or eligible for inclusion on the National Register of Historic Places.

**1.17 Improvements –** refers collectively to any Alterations and Initial Improvements.

**1.18 Initial Improvements –** means the construction, modifications, rehabilitation, reconstruction, and/or restoration of the Premises as may be described in Section 8 of this Lease.

**1.19 Interest Rate** – means the percentage of interest charged based on the current value of funds to the United States Treasury that is published annually in the "Federal Register" or successor publication.

**1.20 Inventory and Condition Report** – means Exhibit C to this Lease that lists both maintained landscapes and built assets that have been assigned NPS Asset Numbers. The report also describes the condition of these maintained landscapes and built assets as of the Commencement Date.

**1.21 Lease Term** – is the term of this Lease as stated in Section 4 of this Lease.

**1.22 Lease Year –** means a year of the Lease Term. The first Lease Year shall commence on the Commencement Date and shall end on the expiration of the twelfth (12th) full calendar month following thereafter. Each subsequent Lease Year shall commence on the next day following the expiration of the preceding Lease Year, and shall end on the expiration of the twelfth (12th) full calendar month following thereafter, or on the last day of the Lease Term, whichever occurs first.

**1.23 Management Agreement** – means an agreement entered into by Lessee with a professional golf facility management company for the management and operation of the Golf Courses.  A Management Agreement may be a single agreement for the entire Premises or one of several agreements for one or more of the Golf Courses or with one or more managers, as same may be entered into by Lessee from time to time.

**1.24 Notice of Default –** means an instrument in writing from the Lessor to Lessee providing notice that the Lessee is in default of the Lease.

**1.25 NPS 28 -** means the National Park Service document entitled "Cultural Resource Management Guideline" which is hereby made a part of this Lease by reference.

**1.26 Park Areas –** means those areas within the designated park system units of the National Mall (NAMA), National Capital Parks East (NACE), and Rock Creek Park (ROCR).

**1.27 Part 18 –** means Part 18 of Volume 36 of the Code of Federal Regulations.

**1.28 Personal Property** – means all furniture, equipment, appliances, and apparatus placed in or on the Premises that are neither permanently attached to nor form a part of the Premises and expressly do not include Fixtures.

**1.29 Reserved.**

**1.30 Premises** – means the portion of the Park Areas occupied by the Golf Courses as described in Section 2 of this Lease.

**1.31 Preservation Maintenance Plan** – is a document that sets forth a plan for the Lessee's repair and maintenance of Historic Property on the Premises.

**1.32 Rent** - means the monthly rent to be paid Lessor by Lessee described in Section 5 of this Lease and any Additional Rent this Lease may require.

**1.33 Secretary's Treatment Standards** – shall mean the Secretary of the Interior's Treatment Standards for Historic Property (36 Code of Federal Regulations Part 68) that are hereby made a part of this Lease by reference.

**1.34 Sublease -** means an agreement under which the Lessee grants a person or entity (a Sublessee) the right to use, occupy, or possess a portion of the Premises.

**1.35 Termination Date** – means the date this Lease may be terminated or cancelled in accordance with its terms prior to the Expiration Date.

## Section 2. LEASE OF PREMISES

### 2.1. Lease of Premises; Reservation of Rights

a)  The Lessor hereby leases and demises to the Lessee under the authority of Part 18, and the Lessee hereby leases, upon and subject to the covenants and agreements contained in this Lease, from the Lessor, the Premises described as follows: East Potomac Golf Course, Langston Golf Course, and Rock Creek Golf Course (each of the foregoing is sometimes referred to herein individually as a "Golf Course" and collectively as the "Golf Courses"). The boundaries of the Premises are graphically shown more particularly on Exhibit A, attached hereto and incorporated herein.

b)  This Lease and Lessee's use of the Premises shall be subject to all Applicable Laws, and all liens, encumbrances, restrictions, rights and conditions of law or of record or otherwise.

c)    During the Term, Lessor shall have the right, at reasonable times and (except in case of emergency) following reasonable advance notice to the Lessee, to enter and to permit any governmental agency, public or private utilities and other persons to enter upon the Premises as may be necessary for the purposes of (1) the administration of this Lease and/or the Park Areas or (2) the preparation for and solicitation of any future leasing or other commercial opportunities on the Premises, as determined by the Lessor, and to close the Premises when immediate danger to life or property is discovered.

d)  Lessor hereby reserves and retains exclusive rights to all oil, gas, hydrocarbons, and other minerals in, under, or on the Premises and ownership of any current or future water rights applicable to the Premises.

### 2.2. Waiver

Lessee hereby waives any claims for damages for any injury or inconvenience to or interference with Lessee's use and occupancy of the Premises, any loss of occupancy or quiet enjoyment of the Premises or any other loss, in each case occasioned by the Lessor's rightful exercise of its rights pursuant to this Lease or by the Lessor's actions taken for the management and protection of the Park Areas' resources and visitors as required by statute, regulation, or policy.

### 2.3. Easements

Nothing contained in this Lease shall give or be deemed to give the Lessee a right to grant any type of easement or right-of-way affecting the Premises. Lessor agrees to execute, if otherwise appropriate as reasonably determined by the Lessor, such easements for utilities as Lessee shall require in connection with the use and operation of the Premises.

### 2.4. Ownership of the Premises

This Lease does not vest in the Lessee any fee interest in the Premises. Title to the Premises at all times is with and shall remain solely with the Lessor.

### 2.5. Historic Property

The Premises are Historic Property.

## Section 3. ACCEPTANCE OF THE PREMISES

### 3.1. As Is Condition of the Premises

The Lessee agrees to lease the Premises in their existing "as is" condition and acknowledges that in entering into this Lease, the Lessee does not rely on, and the Lessor does not make any express or implied representations or warranties as to any matters including, without limitation, any characteristics of the Premises or improvements thereon, the suitability of the Premises for the intended use, the likelihood of deriving trade from or other characteristics of the Park Areas, the economic or programmatic feasibility of the Lessee's use and occupancy of the Premises, [or Hazardous Materials on or in the vicinity of the Premises].

### 3.2. Lessee's Due Diligence

Prior to entering into this Lease, the Lessee in the exercise of due diligence has made a thorough, independent examination of the Premises and all matters relevant to the Lessee's decision to enter into this Lease, and the Lessee is thoroughly familiar with all aspects of the Premises and is satisfied that they are in an acceptable condition and meet the Lessee's needs, subject to the terms and conditions hereof.

### 3.3. Inventory and Condition Report

In the exercise of its due diligence, Lessee has taken into account Exhibit C - Inventory and Condition Report, attached hereto as Exhibit C and incorporated herein by reference, and acknowledges that it is complete and accurate.

## Section 4. LEASE TERM AND ABANDONMENT

### 4.1. Lease Term

The Lease Term shall be a period of up to fifty (50) years commencing on [October 1, 2020] (the "**Commencement Date**"), and expiring at 11:59 P.M. on such date which is the earlier of (i) September 30, 2070 (the "**Expiration Date**") or such earlier date as this Lease may be terminated in accordance with its terms or written consent of the parties (the "**Termination Date**"). The Lessee shall have the option, in its sole discretion, to terminate the Lease at the end of each of the tenth (10th), twentieth (20th), twenty-fifth (25th), thirtieth (30th) and fortieth (40th) Lease Year following the Commencement Date, by providing the Lessor with written notice of its intent to terminate the Lease no less than two (2) years before the end of the Lease Year in which the Lease is to terminate. For example, if the Lessee wishes to terminate the Lease at the end of the tenth (10th) Lease Year (that is, as of September 30, 2030), it must so notify the Lessor prior to September 30, 2028. The Lessor may also terminate the Lease if the Lessee fails to complete a material portion of the Initial Improvements (if submitted and approved) in accordance with the schedule (including applicable grace or cure periods) set forth in the Construction Documents.

### 4.2. Abandonment

The Lessee shall occupy the Premises during the entire Lease Term, provided that the Lessee may opt to close any of the Golf Courses from November 1 to March 31 of any Lease Year. If it fails to do so, the Lessee may be determined as in default for abandoning the Premises. Occupancy of any Golf Course, or portion thereof, is not required if the Lessor reasonably determines it infeasible because of the construction of Improvements. For clarity, the temporary closure of all or any part of a Golf Course due to such factors as extreme weather events, governmental action, a force majeure event (including but not limited to epidemics or pandemics), or Repair and Replacement of damage or destruction of the Premises, shall not constitute a failure to occupy or abandonment of the Premises.

## Section 5. RENT

### 5.1. Net Lease and Rent Payments

(a)  Except as provided in Section 5.6, all Rent shall be absolutely net to Lessor without any abatement, deduction, or counterclaim. Lessee shall pay all costs, expenses and charges of every kind and nature relating to the Premises including, without limitation, all taxes and assessments; provided, however, that Lessee shall not be obligated to pay any cost, expense or charge of Lessor relating to the Premises except as otherwise expressly provided in this Lease.

(b)  All Rent payments consisting of $10,000 or more shall be deposited electronically by the Lessee using the Treasury Financial Communications System. At Lessor's option, Rent payments of less than $10,000 shall be payable by wire transfer or other electronic means to such account as Lessor may from time to time designate. Interest at the Interest Rate will be assessed on overdue Rent payments. The Lessor may also impose penalties for late Rent payments to the extent authorized by Applicable Law.

(c)  The Lessor may choose to, but is not obligated to, issue Lessee a bill of collection identifying Rent due and owing, though any failure of the Lessor to do so shall not alleviate Lessee's obligation to remit Rent due and owing pursuant to the terms of this Lease.

**5.2. Annual Rent SECTION DELETED**

**5.3. CPI Adjustment SECTION DELETED**

**5.4. Percentage Rent**

(a) The Lessee shall pay to the Lessor as Percentage Rent an amount of money equal to 16 % of the Lessee's Gross Revenues for the preceding month of the Lease Term. Percentage Rent shall be due on a monthly basis at the end of each month of the applicable Lease Year during the Lease Term and shall be paid by the Lessee within fifteen (15) calendar days after the last day of the applicable month.

(b) Gross Revenues Defined

Gross Revenues means the entire amount of Lessee's revenues (and the revenues of any Affiliate of Lessee) derived from this Lease or any Sublease hereunder, such amount as determined in accordance with generally accepted accounting principles consistently applied. Gross revenues (i) include, as applicable and without limitation, revenue derived from the following operations of the Golf Courses: greens fees, cart fees, pro shop sales, club rental fees, lesson fees (net of any fees paid to independent contractors), miniature golf fees, driving range fees, food and beverage sales, liquor sales, revenue generated from space rentals and from meetings, banquets, parties, receptions, tournaments and other group gatherings, and receipts from all mechanical or other vending devices placed on the Premises by the Lessee or under authority from the Lessee; and (ii) expressly exclude (A) applicable excise, sales, occupancy and use taxes, or similar government charges collected directly from patrons or guests, or as part of the sales price of any goods, services or displays, such as gross receipts, admission or similar taxes; (B) receipts from the financing, refinancing, sale, master lease, debt incurred, government funding or other disposition of any asset of Lessee or its contractors; (C) proceeds of any insurance, judgment or other award; and (D) amounts derived from a Sublessee's gross revenue and paid by the Sublessee to the Lessee for purposes of relaying those amounts to the Lessor as Percentage Rent. The term "Affiliate of Lessee" as used in this section means any person or entity directly or indirectly controlling, controlled by, or under common control with Lessee, or, any entity owned in whole or part, directly or indirectly, by Lessee.

**5.5. Rent Reconsideration**

(a) The Rent required by this Lease shall be subject to adjustment at the request of the Lessor after the end of the five (5), ten (10), fifteen (15), twenty (20), thirty (30), and forty (40) Lease Years of this Lease, and at the request of the Lessee at any time during the Term, in order to maintain the Rent under this Lease in an amount and structure consistent with "fair market value rent." "Fair market value rent" for the purposes of this section means the most probable rent, as of a specific date, in cash or in terms equivalent to cash, for which the Premises, under the terms and conditions of this Lease, should rent for its highest and best permitted use after reasonable exposure in a competitive market under all conditions requisite to a fair leasing opportunity, with the Lessor and the Lessee each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.  Such determination must take into consideration any restrictions on the use of the Premises or terms of the Lease that limit the value and/or the highest and best use of the Premises; any past Improvements constructed or installed by the Lessee prior to Rent adjustment, with the Lessor's approval, and consistent with the terms of this Lease; and, any future Improvements to be constructed or installed by the Lessee after Rent adjustment.

(b) Within sixty (60) days after the applicable Lease Year (in the case of the Lessor), or at any time (in the case of the Lessee), the Lessor or Lessee may request a Rent adjustment by providing written notice to the other party. Within thirty (30) days after providing or receiving a written request for a Rent adjustment, the Lessor will, as applicable, either submit an appraisal request to the Department of the Interior's Appraisal and Valuation Services Office, or its successor, for an appraisal to determine the "fair market value rent" of the Premises, or initiate a market study or other valuation process allowed for under NPS policy to determine "fair market value rent.". The requesting party will be responsible for the cost of any appraisal, market study, or other valuation process initiated under this section.

(c) On the Commencement Date, the Lessor shall initiate a request for an appraisal as if the appraisal was requested in accordance with Section 5.5(b).

### 5.6    Rent Offsets

(a)        Lessor approved Initial Improvements:

        The Lessor will offset Rent for Approved Costs of Initial Improvements incurred by the Lessee (i) in accordance with the method and schedule set forth in Exhibit D (Initial Improvements by Lessee) to this Lease and (ii) as otherwise reasonably agreed by the Lessor and Lessee from time to time, provided that, no Rent Offsets may be made in the absence of such an agreement.

 (b)        Lessor approved Alterations:

        The Lessee may request and, the Lessor may approve, Rent Offsets for Approved Costs of Alterations incurred by the Lessee on a project-by-project basis in accordance with the requirements of this Lease. The method and timing of such Rent Offsets will be agreed to by the Lessor and Lessee from time to time, provided that, no Rent Offsets may be made in the absence of such an agreement.

 (c)        Approved Rent Offsets in excess of the balance due and owing for Percentage Rent in any given Lease Year shall be credited to the Lessee and available for future Rent Offsets.

 (d)        The Lessee shall have no right or claim of compensation of any nature from the Lessor in the event of a termination, assignment, or expiration of this Lease in circumstances where the Approved Costs of Initial Improvements and/or Alterations have not been earned by the Lessee to offset Annual Rent as of the date of such termination, assignment, or expiration of this Lease.

(e)      There shall be no Rent Offsets allowed for the first Twelve Thousand Five Hundred Dollars ($12,500) of the Percentage Rent monthly. Percentage Rent due above and beyond this figure are subject to Rent Offsets as set forth above.

## Section 6. USES OF PREMISES

### 6.1. Authorized Uses

 The Lessee may utilize the Premises only for the following purposes:

Any and all legal purposes that are usual and customary to the operation of a golf course and related facilities, such purposes to include, without limitation, operation of and/or provision of services relating or incidental to golf-related events, including tournaments, retail golf shops, restaurants, food

services, on-premises sale and consumption of alcoholic beverages (subject to NPS approval), driving range, miniature golf, training facilities, and such other uses, amenities, and services consistent with those being offered at comparable and/or superior public golfing facilities located in Maryland, Virginia, and the District of Columbia. Without limiting the generality of the foregoing, Lessee is authorized to (a) determine, establish and implement all operational and managerial policies, procedures and schedules; (b) establish and implement all playing fee categories and rates; (c) implement grounds maintenance practices that adhere, where reasonably practical, to all environmental laws as they pertain to golf courses; (d) hire, train, and supervise all employees; (d) organize and provide fee-based and complimentary golf lessons for all levels of playing ability and age groups; (f) provide merchandise, food and beverage sales for individuals, golf-related events and groups; (g) utilize the Premises for private events, including social and fundraising events (which shall be subject to Lessor approval to the extent they would preclude public use of any golf course for more than one (1) day or would require Lessor assistance necessitating a special use permit); (h) supervise and direct all phases of advertising and business promotions; and (i) establish accounting, reporting, banking and payroll procedures for the individual facilities and for the managerial entity as a whole.

### 6.2. Changes to Authorized Uses

The Lessee may amend or change approved uses subject to the prior written approval of the Lessor (which shall not be unreasonably withheld, conditioned or delayed). No change of the uses of the Premises shall be approved unless the Lessor, among other matters, determines the proposed use to be consistent with Part 18, the Park Areas' General Management Plan, all other Applicable Laws, and that the proposed change will not have an adverse impact on the Lessor's ability to manage and protect the Park Areas' resources and visitors.

### 6.3. Applicable Laws

The Lessee shall comply with all Applicable Laws in its use and occupancy of the Premises.

### 6.4. Forbidden Uses

In no event shall the Premises be used for any purpose that is not permissible under Part 18 or, even if so permissible, may be dangerous to life, limb, property or public health; that in any manner causes or results in a nuisance; that is of a nature that it involves substantial hazard, such as the manufacture or use of explosives, chemicals or products that may explode, or that otherwise harms the health or welfare of Park Areas resources and/or visitors; or that results in any discharge of Hazardous Materials in, on or under the Premises.

### 6.5. Site Disturbance

Lessee shall neither cut any timber nor remove any other landscape features of the Premises such as shrubs or bushes without Lessor's prior written consent, which consent shall not be unreasonably withheld; provided, however, that the foregoing shall not prohibit Lessee from performing landscape maintenance in accordance with accepted professional standards of landscape management practice, including the removal of (i) trees, shrubs or bushes that are dead, below the height specified, or with a diameter less than specified, in the Lessee Maintenance Plan and (ii) any limbs that would interfere with mowing equipment or intended ball flight for a golf hole. The Lessee shall conduct no mining or drilling operations, remove no sand, gravel or similar substances from the ground, and commit no waste of any kind without Lessor's prior written consent, which shall be in Lessor's sole discretion.

**6.6. Protection of Cultural and Archeological Resources.**

The Lessee shall ensure that any protected sites and archeological resources within the Park Areas are not disturbed or damaged by the Lessee except in accordance with Applicable Laws and only with the prior written approval of the Lessor. Lessor represents that all known protected sites and archeological resources located within the Premises are noted in the Cultural Landscape Report, Cultural Landscape Inventory, or Historic Resource Study that were developed for the Golf Courses and provided as part of the Request for Proposals dated 07/01/2019, as amended. Discoveries of any archeological resources by the Lessee shall be promptly reported to the Lessor. The Lessee shall cease work or other disturbance, which may impact any protected site or archeological resource until the Lessor may grant approval to continue upon such terms and conditions as the Lessor deems necessary to protect the site or resource.

**6.7. Signs**

The Lessee may not post signs on the Premises of any nature without the Lessor's prior written approval, which shall not be unreasonably withheld, conditioned or delayed. Any approval of a sign that may be given by the Lessor shall specify the type, size, and other appropriate conditions concerning its display. The Lessor may post signs on the Premises as appropriate for the administration of the Park Areas.

**6.8. Permits and Approvals**

Except as otherwise may be provided in this Lease, the Lessee shall be solely responsible for obtaining, at its expense, any permit or other governmental action necessary to permit its activities under this Lease.

**6.9. Alterations**

The Lessee shall not make any Alterations of any nature to the Premises without the express written approval of the Lessor, which shall not be unreasonably withheld, conditioned or delayed.

## Section 7. RECORDS AND AUDITS

The Lessee shall provide the Lessor and its agents and affiliates, including without limitation, the Comptroller General of the United States, access to all books and records relating to the Premises and Lessee's use of the Premises under this Lease for the purpose of conducting audits to verify the Lessee's compliance with the terms and conditions of this Lease for any of the five (5) preceding Lease Years. The Lessee shall keep and make available to the Lessor these books and records at a location in the Premises. The Lessee shall, if requested by the Lessor, provide the Lessor with complete information and data concerning the Lessee's operations and operating results, including without limitation, information and data regarding all operations including but not limited to revenue producing activities, expenditures for which rent offsets are requested and financial transactions related to compliance with the terms and conditions of this Lease.

Lessee shall provide the Lessor, annually, a set of audited financials within 120 days of the end of Lessee's fiscal year, commencing with the fiscal year ending December 31, 2021.

## Section 8. INITIAL IMPROVEMENTS BY LESSEE

If otherwise granted approval by the Lessor under the terms of this Lease, Lessee hereby agrees to commence and engage diligently in the construction of the Initial Improvements described in Exhibit D (Initial Improvements by Lessee) in accordance with the schedule set forth therein and the Construction Documents approved by Lessor.

## Section 9. CONSTRUCTION APPROVAL

### 9.1. In General

All Improvements (Initial Improvements and Alterations), if any, shall be undertaken at the Lessee's sole expense and only with the Lessor's prior written approval, which shall not be unreasonably withheld, conditioned or delayed. All work shall be performed in a good and workmanlike manner and with materials of at least the quality and standard of materials used in comparable facilities in the locale of the Park Areas. The Lessee shall undertake Improvements in strict accordance with Applicable laws and with approved Construction Documents. The Lessee shall, upon request, furnish the Lessor a correct copy of any contract with the Lessee's general contractor, architects, or consultants. The Lessor shall require the Lessee not to occupy specified portions of or all of the Premises during the construction of Improvements if reasonably determined by the Lessor as necessary for the protection of human health or safety. Note that 36 CFR 18.12(i) does not allow the construction of new buildings or structures under Part 18 leases except for minor additions, buildings and structures determined by NPS to be necessary for the support of the activities authorized by the applicable lease.

### 9.2. Enforced Delays

The Lessee shall not be considered in default in the event of an enforced delay in the construction of Improvements due to unforeseeable causes beyond the Lessee's control and without any fault or negligence on the part of the Lessee. Such enforced delays include, without limitation, public enemies, war, invasion, insurrection, rebellion, riots, fires, floods, epidemics, pandemics, quarantine restrictions, government-caused delays (other than those arising from the rightful exercise of the Lessor's approval rights under this Lease), strikes, lockouts, freight embargoes, shortage of materials, and unusually severe weather. In the event of an enforced delay, the time or times for construction of Improvements will be extended by the period of the enforced delay.

### 9.3. Utilities During Construction

In the preparation of proposed Construction Documents, the Lessee shall review utility plans for the location of existing utilities that may be affected by any Improvements. The Lessee is required to obtain all necessary utility plans and permits from the appropriate public utility companies.

### 9.4. Site Inspection

The Lessor shall be entitled to have on the Premises at reasonable times during the construction of Improvements an inspector or representative who may observe all aspects of the work on the Premises, but shall not, and shall have no right to, issue directions regarding performance of any construction to Lessee's contractors or subcontractors. Any issues noted by Lessor's inspector shall be addressed to Lessee in writing. No inspection performed or not performed by the Lessor shall be deemed to give the Lessor any responsibility or liability with respect to the construction work, its prosecution or design,

or, be deemed to constitute a waiver of any of the Lessee's obligations under this Lease or be construed as an approval or acceptance of the Improvements (or portions thereof). The Lessee shall maintain on the Premises during construction, current, annotated Construction Documents for inspection by the Lessor.

### 9.5. Approval of Construction

The Lessee must request in writing advance permission from the Lessor to undertake Improvements. The request must include:

> (a) proposed concept drawings and, if Lessor approves such drawings, proposed Construction Documents;

> (b) evidence of the availability of funding for the Improvements;

> (c) documentation that required construction insurance is in effect; and

> (d) other information as may reasonably be required by the Lessor.

### 9.6. Construction Documents

The proposed Construction Documents submitted to the Lessor must be complete and reasonably satisfactory to Lessor as showing all material elements of the Improvements. When proposed Construction Documents are approved by the Lessor, they become an Exhibit to this Lease without further action.

### 9.7. General Scope of Lessor's Review

The Lessor will not approve proposed Construction Documents unless it is able to determine, among other matters, that the proposed Improvements are appropriate for the Park Areas and consistent with the requirements of Part 18, the Park Areas' General Management Plan and other Applicable laws. Review and approval of proposed Improvements is subject to any required compliance with the National Environmental Policies Act (NEPA, 42 USC 4321 et seq.) and, if the project affects Historic Property, Section 106 of the National Historic Preservation Act (Section 106, 16 USC 470f). The Lessor's approval shall not be unreasonably withheld, conditioned or delayed.

### 9.8. Changes to Approved Construction Documents

Any material change in the approved Construction Documents and any material deviation in actual construction from these documents are subject to Lessor's prior written approval (which shall not be unreasonably withheld, conditioned or delayed) under the procedures stated in this Section. An approved change order will be issued by Lessor if proposed changes are approved.

### 9.9. Special Considerations for Historic Property

If proposed Improvements relate to Historic Property, the Lessor will not approve proposed Construction Documents unless it is able to determine that they comply with the Secretary of the

Interior's Standards for the Treatment for Historic Properties (Preservation Standards) NPS 28, and any conditions that may be imposed on the Improvements through the operation of other Applicable Laws, including, without limitation, NEPA and Section 106.  The Lessor's approval shall not be unreasonably withheld, conditioned or delayed.

### 9.10. Evidence of Adequate Funds

As a condition to the approval of the construction of Improvements, the Lessee must demonstrate to the reasonable satisfaction of the Lessor with appropriate documentation that it has available to it funds adequate to undertake and complete the project in accordance with all terms and conditions of the approved Construction Documents.

### 9.11. Building Permit

Lessee shall not commence Improvements until such time as Lessor may issue a Building Permit as evidence of approval of the Construction Documents, if necessary. The Building Permit shall contain necessary and appropriate terms and conditions for the construction of the Improvements.

### 9.12. Construction Completion Procedures

Upon completion of any Improvements, the Lessee shall submit to the Lessor (in formats specified by the Lessor):

(a) a notice of completion;

(b) if requested by Lessor, satisfactory evidence of the payment of all expenses, liabilities, and liens arising out of or in any way connected with such Improvements;

(c) a complete set of "as built" drawings showing all revisions and substitutions during the construction period, including field changes and the final location of all mechanical equipment, utility lines, ducts, outlets, structural members, walls, partitions and other significant features of such Improvements; and

(d) a complete inventory of all Fixtures in or on the Premises as of the completion of such Improvements.

Upon approval by the Lessor of the completion of the Improvements, the Lessor will issue a Certificate of Completion, including authorization to occupy the affected portion of Premises.

### 9.13. Lessor's Right to Utilize Construction Documents

(a)    In the event of expiration or termination of this Lease, the Lessee shall assign and deliver to the Lessor as Lessor's sole property all architectural, engineering and other plans, drawings, specifications and studies relating to the Premises. In order to assure Lessor that it will have the legal right to use such plans, drawings, specifications and the like if Lessor becomes entitled to such items, Lessee shall include in its agreements with architects, engineers and other professionals who prepared such items and who have any proprietary rights with respect to such items (including the right to use thereof in connection with the Premises) provisions whereby Lessee and Lessor shall have the right to use such plans and other materials in connection with the Premises. In furtherance and not in limitation thereof, Lessee (referred to below as "Owner") shall include in such agreements the following

provisions:

The drawings, specifications and other documents prepared by the Architect for this Project ("Documents") are instruments of the Architect's service and, unless otherwise provided, the Architect shall be deemed the author of these Documents and shall retain all common law, statutory and other reserved rights, including the copyright. For the purpose of completing this Project or for any other purpose, Architect and its consultants hereby (i) grant to Owner and the National Park Service an irrevocable, fully paid-up, perpetual, worldwide license to copy and use such Documents for completion of this Project or for any other purpose and (ii) consent to the use by Owner and the National Park Service, and of the modification by other design professionals retained by Owner and the National Park Service, of the Documents.

The Architect will have no responsibility or liability to the Owner or the National Park Service with respect to any modification to the Documents made by the Owner or National Park Service or any other design professional retained by the Owner or National Park Service. Furthermore, except where the Architect is found to be liable for such claim, damage or loss, the Owner shall hold Architect harmless from any such claim, damage or loss arising out of (a) the modification of the Documents by Owner or the National Park Service or another design professional. The Owner and the National Park Service shall be permitted to retain copies, including reproducible copies, of the Documents for information and reference in connection with the use and occupancy of the Project.

Notwithstanding the foregoing, Architect acknowledges and consents to the use and ownership by the National Park Service, or its designees or assignees, of said Documents in accordance with the Lease between the Owner (as Lessee) and the National Park Service (as Lessor) for the Premises leased to Lessee and Architect agrees to deliver copies of the Documents to the National Park Service upon written request from the National Park Service, provided that the National Park Service agrees to pay the Architect's reasonable duplication expenses.

## Section 10. MAINTENANCE AND REPAIR

### 10.1. Lessee's Responsibilities

The Lessee shall be solely responsible for the repair and maintenance of the Premises during the Lease Term. This responsibility includes, without limitation:

(a) the performance of all repairs, maintenance, replacement, upgrading, capital improvements, (whether structural or non-structural, foreseen or unforeseen, ordinary or extraordinary) necessary to maintain the Premises and the improvements thereon in good order, condition, and repair (excluding ordinary wear and tear) in a manner consistent with the operation of comparable facilities in the locale of the Park Areas and in compliance with all Applicable Laws;

(b) the replacement, as they become worn out or obsolete, of all Personal Property and Fixtures;

(c) housekeeping and routine and periodic work scheduled to mitigate wear

and deterioration without altering the appearance of the Premises;

(d) the repair or replacement in-kind of broken or worn out elements, parts or surfaces so as to keep the existing appearance of the Premises;

(e) scheduled inspections of all building systems on the Premises;

(f) maintaining the grounds of the Premises in good condition, including, without limitation, regular grass mowing, managed lawn and ornamental plantings, and avoidance or removal of unsightly storage or parking of materials, equipment, or vehicles; and

(g) paying to the proper authority, when and as the same become due and payable by the Lessee, all taxes and assessments imposed by federal, state, or local agencies applicable to the Premises or the Lessee's activities on the Premises.

At East Potomac Golf Course, the Lessor will maintain all trees, signs, light poles, and drinking fountains between the fence line and the sidewalk as depicted on Exhibit A.

Notwithstanding the foregoing, Lessee shall not be responsible for repairs of any part of electrical or gas systems beyond Lessee's meters, or any other utility systems not associated with Lessee's operations, unless necessary due to Lessee's actions.

## 10.2. Maintenance Plan

The Lessee shall submit to the Lessor for its approval (which shall not be unreasonably withheld, conditioned or delayed), within thirty (30) calendar days of the Commencement Date, a Lessee Maintenance Plan (to be included as Exhibit E to the Lease). The Lessor, with the Lessee's consent (which shall not be unreasonably withheld, conditioned or delayed), may make reasonable modifications to the plan from time to time to reflect changing maintenance and repair needs of the Premises.

## 10.3. Preservation Maintenance Plan

The Lessee shall submit to the Lessor for its approval (which shall not be unreasonably withheld, conditioned or delayed), within thirty (30) calendar days of the Commencement Date, a Preservation Maintenance Plan (to be included as Exhibit F to the Lease). The Lessee shall repair and maintain all portions of the Premises that are Historic Property in accordance with the Preservation Maintenance Plan. The Lessor, with the Lessee's consent (which shall not be unreasonably withheld, conditioned or delayed), may make reasonable modifications to the plan from time to time to reflect changing maintenance and repair needs of the Premises as appropriate and consistent with the requirements of the Preservation Standards and NPS 28.

## 10.4. Maintenance Reserve Account SECTION DELETED

## Section 11. UTILITIES

The Lessee at its sole expense shall make all arrangements with appropriate utility providers (including the Lessor where applicable), for all utilities furnished to the Premises, including, without limitation, gas, electricity, other power, water, cable, telephone and other communication services, sewage, and waste removal. Any utility service provided by Lessor will be subject to the Lessor's established policies and procedures for provision of utility services to third parties.

## Section 12. HAZARDOUS MATERIALS

The following provisions apply to Hazardous Materials associated with the Premises:

(a) No Hazardous Materials shall be used, treated, kept, stored, sold, released, discharged or disposed of, from, on, about, under or into the Premises except in compliance with all Applicable Laws and as approved by the Lessor in writing (which approval shall not be unreasonably withheld, conditioned or delayed); provided, however, that the foregoing shall not prohibit Lessee from using or storing on the Premises reasonable quantities of Hazardous Materials used in the ordinary course of the operation, maintenance, repair or replacement of any portion of the Premises or the construction of any Improvements, and Lessee's consent shall not be required therefor, as long as all of the Hazardous Materials are documented, used, managed, kept, stored, and disposed of in accordance with all Applicable Laws;

(b) The Lessee shall use, manage, treat, keep, store, release, discharge and dispose of its approved Hazardous Materials in accordance with all Applicable Laws. The Lessee is responsible for timely acquisition of any permits required for its Hazardous Materials and related activities and will be fully responsible for compliance with the provisions and conditions of such permits;

(c) If any Hazardous Materials Occurrence caused by Lessee results in any contamination of the Premises, other Park Areas property or neighboring property, the Lessee shall promptly take all actions at its sole expense as are required to comply with Applicable Laws and to allow the Premises or such other property to be used free of any use restriction imposed under Applicable Laws as a result of the Hazardous Materials Occurrence. Except in cases of emergency, the Lessor's written approval (which shall not be unreasonably withheld, conditioned or delayed) of such actions shall first be obtained;

(d) Lessee at its expense shall be responsible for the abatement of Hazardous Materials in accordance with Applicable Laws in, on, or under the Premises due to the activities of Lessee, its employees, agents, contractors, guests or invitees occurring from and after the Commencement Date; and

(e) If the Lessee discovers any unapproved Hazardous Materials in or on the Premises or becomes aware of a Hazardous Materials Occurrence related to the Premises, Lessee shall immediately notify the Lessor.

## Section 13. INSURANCE AND INDEMNIFICATION

### 13.1. Insurance During the Lease Term

At all times during the Lease Term and at the Lessee's sole expense, it shall obtain and keep in force for the benefit of the Lessee and Lessor the insurance coverages set forth in Exhibit B to this Lease under the terms and conditions of Exhibit B.

### 13.2. Insurance Requirements Modification

If the Lessor at any time, but not more than annually, reasonably believes that the limits or extent of coverage, conditions, deductibles or self-insurance retention, with respect to any of the insurance required by this Lease are insufficient for a prudent owner of property of the nature of the Premises, the Lessor may determine, by giving the Lessee sixty (60) days written notice, the proper and reasonable limits and extent of coverage, deductibles, conditions, and self-insurance retention limits for such insurance and such insurance shall thereafter be carried by the Lessee until changed pursuant to the provisions of this section.

### 13.3. Disposition of Insurance Proceeds

All insurance proceeds received by or payable with respect to damage or destruction of the Premises (except proceeds of insurance covering business interruption or loss or damage of the Lessee's Personal Property), less actual expenses incurred in connection with their collection, shall be held by the Lessee and distributed in accordance with the terms of Section 14.1.

### 13.4. Inadequate Insurance Coverage

The Lessee's responsibilities under this Lease for the repair or replacement of the Premises assumes full risk and responsibility for any inadequacy of insurance coverage or any failure of insurers. No approval by the Lessor of any insurer, or the terms or conditions of any policy, or any coverage or amount of insurance, or any deductible amount shall be construed as a representation by the Lessor of the solvency of the insurer or the sufficiency of any policy or any coverage or amount of insurance or deductible.

### 13.5. Indemnity

The Lessee shall indemnify, defend, save and hold the United States of America, its employees, successors, agents and assigns, harmless from and against, and reimburse the United States of America for any and all claims, demands, damages, injuries, losses, penalties, fines, costs, liabilities, causes of action, judgments, and expenses incurred in connection with or arising in any way out of Lessee's (including its officers, employees, agents, successors, assigns, licensees, and invitees) (1) action or failure to take required action under this Lease; (2) use, occupancy or manner of use or occupancy of the Premises; (3) design, construction, or maintenance of any improvements on the Premises; (4) maintenance of the Premises; or (5) causation of any accident or occurrence on the Premises; provided, however, that the Lessee shall not be liable to the extent that the damages, expenses, claims or suits result from willful misconduct or negligence of the United States of America, or its employees, contractors, or agents; provided, further, that the United States of America shall be liable only to the extent such claims are covered by the Federal Tort Claims Act (28 USC 2671 et seq.). The provisions of this section shall survive the Expiration Date or Termination Date of this Lease.

## Section 14. DAMAGE OR DESTRUCTION

### 14.1. Damage or Destruction; Duty to Restore

If the Premises or any portion thereof are damaged or destroyed at any time during the Lease Term, one of the following will occur:

(a) the Lessee, subject to the prior written approval of the Lessor (which shall not be unreasonably withheld, conditioned or delayed), shall as promptly as reasonably practicable and with all due diligence repair or replace the damaged or destroyed Premises to the condition that existed prior to the damage or destruction; or

(b) the Lessor may terminate this Lease without liability and the Lessee shall pay to Lessor as Additional Rent the insurance proceeds resulting from the damaged or destroyed Premises; or

(c)  the Lessee may request termination of this Lease without liability (except to the extent the Lessee caused such damage or destruction). Lessee must provide the request by written notice to the Lessor within three hundred sixty (360) days of the date of casualty. The decision by the Lessor regarding termination shall be reasonable and not unduly delayed or conditioned. If termination is approved by Lessor any insurance proceeds not yet applied will be paid to Lessor as Additional Rent.

### 14.2. No Termination; No Effect on Rental Obligation

No loss or damage by fire or other cause resulting in either partial or total destruction of the Premises, the improvements thereon, or any other property on the Premises shall operate to terminate this Lease except as provided in Section 14.1 of this Lease. No such loss or damage shall affect or relieve the Lessee from the Lessee's obligation to pay the Rent required by this Lease, unless this Lease is terminated as provided in Section 14.1, and in no event shall the Lessee be entitled to any prorated return or refund of Rent paid hereunder. Unless this Lease is terminated under Section 14.1, no such loss or damage shall relieve or discharge the Lessee from the payment of taxes, assessments, or other charges as they become due and payable, or from performance of other terms and conditions of this Lease.

## Section 15. LIENS

### 15.1. No Power in Lessee to Create

The Lessee shall have no power to take any action that may create or be the foundation for any lien, mortgage or other encumbrance upon the reversion, fee interest or other estate of the Lessor or of any interest of the Lessor in the Premises, except as otherwise may be expressly approved by the Lessor in writing in accordance with the terms of this Lease, such Lessor approval not to be unreasonably withheld, conditioned or delayed.

### 15.2. Discharge of Liens by Lessee

The Lessee shall not suffer or permit any liens known to the Lessee to stand against the Premises for any reason. If a lien is filed against the Premises, Lessee shall cause it to be discharged of record or bonded over within sixty (60) calendar days after notice to the Lessee of filing the lien. If the Lessee fails to discharge or bond over and contest the lien within this period and the failure shall continue for a period of fifteen (15) calendar days after notice by the Lessor, then, in addition to any other right or remedy of the Lessor, the Lessor may, but shall not be required, to procure the discharge of the lien either by paying the amount claimed to be due, by deposit in court, or by bonding. All amounts paid or deposited by the Lessor for any of these purposes, and all other expenses of the Lessor and all

necessary disbursements in connection with them, shall become due and payable forthwith by the Lessee to the Lessor upon written demand therefore as Additional Rent.

### 15.3. No Consent or Waiver by Lessor

Nothing in this Lease shall be deemed to be or be construed in any way as constituting the consent or request of the Lessor, expressed or implied, by inference or otherwise, to any person, firm or corporation, for performance of any labor or the furnishing of any materials in connection with the Premises.

## Section 16. ASSIGNMENTS AND ENCUMBRANCES

### 16.1. Assignments

(a)   The Lessee shall not effectuate an Assignment of this Lease, in whole or in part, or any real property on the Premises, nor Sublease any portion of the Premises to a Sublessee or any part thereof or any property thereon, nor grant any interest, privilege or license whatsoever in connection with this Lease without the express prior written permission of the Lessor. Approval of any such Assignment, Sublease or grant is at the discretion of the Lessor and in no event shall the Lessor grant an approval unless it is able to determine that the proposed assignee or, Sublessee or grantee is financially and managerially capable of carrying out the applicable terms of this Lease. Neither a Management Agreement, nor vendor agreements entered into by Lessee or its manager, shall constitute an assignment or sublease. As of the Commencement Date, Lessee has entered into, or intends to enter into, a Management Agreement with Honours Golf Company, L.L.C. and Troon Golf, L.L.C. with respect to management of the entire Premises.

(b)   The Lessor has an unconditional right to assign this Lease or any or all of its rights and obligations under it at any time.

### 16.2. Encumbrances

The Lessee may not effectuate an Encumbrance on the Premises without the prior written permission of the Lessor. Approval of any Encumbrance is at the discretion of the Lessor and in no event shall an encumbrance be approved unless the Lessor is able to determine that it only grants its holder, in the event of a foreclosure, to assume the responsibilities of the Lessee under this Lease or to select a qualified new lessee subject to the written approval of the Lessor, and that it does not grant its holder any rights to alter or amend in any manner the terms and conditions of this Lease.

## Section 17. DEFAULTS AND LESSOR'S REMEDIES

### 17.1. Termination for Default

The Lessor may terminate this Lease for default if the Lessee fails to keep and perform any of the terms and conditions of this Lease, provided that the Lessor shall first give the Lessee written notice of at least thirty (30) calendar days in the case of monetary defaults and forty-five (45) calendar days in the case of non-monetary defaults of the Lessor's intention to terminate if the default is not cured within the applicable time period, provided that if any non-monetary default is of a nature to require more than forty-five (45) days for cure, as reasonably determined by the Lessor, this Lease shall not terminate if the Lessee undertakes procedures to cure the default within such forty-five (45) day period and thereafter diligently pursues such efforts to cure to completion, as reasonably determined by the Lessor. If the Lessor terminates this Lease, all of the rights of the Lessee under this Lease and

in the Premises shall terminate except for such rights as expressly survive termination.

### 17.2. Bankruptcy

The Lessor may terminate this Lease, in its discretion, in the event of a filing or execution of: (a) a petition in bankruptcy by or against the Lessee which is not dismissed within ninety (90) calendar days of its filing; (b) a petition seeking relief of the same or different kind under any provision of the Bankruptcy Act or its successor; (c) an assignment for the benefit of creditors; (d) a petition or other proceeding against the Lessee for the appointment of a trustee, receiver or liquidator; or (e) the taking by any person of the leasehold created by this Lease or any part thereof upon execution, attachment or other process of law.

### 17.3. No Waiver

No failure by the Lessor to insist upon strict performance of any of the terms and conditions of this Lease or to exercise any right or remedy upon a default, and no acceptance by the Lessor of full or partial rent during the continuance of any default shall constitute a waiver of any default or of such terms and conditions. No terms and conditions of this Lease may be waived or modified except by a written instrument executed by the Lessor. No waiver of any default shall affect or alter this Lease, but each and every term and condition of this Lease shall continue in full force and effect with respect to any other then existing or subsequent default.

### 17.4. Lessor's Right to Cure Defaults

If a default occurs under the terms of this Lease and the Lessee fails to correct the default within the applicable grace period, the Lessor may choose to correct the default (entering upon the Premises for such purposes if necessary), and the Lessor shall not be liable or in any way responsible for any loss, disturbance, inconvenience, or damage resulting to the Lessee as a result and the Lessee shall pay to Lessor upon demand the entire such expense of the correction as Additional Rent, including, without limitation, compensation to the agents, consultants and contractors of the Lessor and related expenses. The Lessor may act upon shorter notice or no notice at all if necessary in the Lessor's judgment to meet an emergency situation or governmental time limitation or to protect the Lessor's interest in the Premises.

## Section 18.   SURRENDER AND HOLDING OVER

### 18.1. Surrender of the Premises

(a) On or before the Expiration Date or Termination Date of this Lease, the Lessee shall surrender and vacate the Premises, remove Lessee's Personal Property, and return the Premises, including the Fixtures, to as good order and condition as that existing upon the Commencement Date, or, if applicable, as that existing upon completion of any Improvements by the Lessee, excepting only ordinary wear and tear not caused by Lessee's failure to perform its obligations under this Lease with respect to maintenance or repair of the Premises, or where Lessee has exercised, and the Lessor has approved, its request to terminate this Lease under Section 14.1.

(b) For these purposes, the Lessor and Lessee shall prepare Exhibit C – Inventory and Condition Report of the Premises to constitute the basis for settlement by the Lessee to the Lessor for Lessor's Fixtures, or elements of the Premises shown to be lost, damaged or destroyed. Any such Fixtures, or other elements of the Premises shall be either replaced or returned to the condition required under this

Section by the Lessee, ordinary wear and tear excepted, or, at the election of the Lessor, reimbursement made therefor by the Lessee at the then current market value thereof.

## 18.2. Holding Over

This Lease shall end upon the Expiration Date or Termination Date and any holding over by the Lessee or the acceptance by the Lessor of any form of payment of rent or other charges after such date shall not constitute a renewal of this Lease or give the Lessee any rights under this Lease or in or to the Premises.

## Section 19. EQUAL OPPORTUNITY LAWS

The Lessee and Lessee's agents shall comply with the requirements of (a) Title VII of the Civil Rights Act of 1964 (as amended), as well as Executive Order 11246 of September 24, 1965, as amended by Executive Order 11375 of October 13, 1967; (b) Title V, Sections 503 and 504 of the Rehabilitation Act of September 26, 1973, Public Law 93-112 (as amended), which prohibits discrimination on the basis of disability and requires government contractors and subcontractors to take affirmative action to employ and advance in employment qualified handicapped individuals; (c) 41 C.F.R. Chapter 60, which prescribes affirmative action requirements for government contractors and subcontractors; (d) the Age Discrimination in Employment Act of December 15, 1967 (as amended); (e) the Americans with Disabilities Act, 42 U.S.C. Sections 12101 et seq.; (f) and all other Applicable Laws relating to nondiscrimination in employment and in providing facilities and services to the public. The Lessee shall do nothing in advertising for employees that will prevent those covered by these laws from qualifying for such employment. In addition, the Lessee shall comply with the requirements of Executive Order 13658 - Establishing a Minimum Wage for Contractors, and its implementing regulations, including the applicable contract clause, which are incorporated by reference into this Lease as if fully set forth herein (available at https://federalregister.gov/a/2014-23533).

## Section 20. NOTICES

Except as otherwise provided in this Lease, any notice, consent or other communication required or permitted under this Lease shall be in writing and shall be deemed to have been duly given or made as follows: (a) if sent by registered or certified mail in the United States return receipt requested, upon receipt; (b) if sent designated for overnight delivery by nationally recognized overnight air courier (such as Federal Express, UPS or DHL), one (1) business day after sending; or (c) if otherwise actually personally delivered, when delivered, provided that such notices, consents or other communications are delivered to the following addresses (or to such other or further addresses as the parties may designate by notice given in accordance with this section):

If to the Lessor:

Chief of Commercial Services
National Capital Region
National Park Service
1100 Ohio Drive SW
Washington, DC  20242

If to the Lessee:

Michael McCartin, President
National Links Trust
331 7th Street, N.E.
Washington, D.C. 20002

**Section 21. GENERAL PROVISIONS**

The following general provisions apply to this Lease:

(a) The Lessor is not for any purpose a partner or joint venture participant of the Lessee in the development or operation of the Premises or in any business conducted on the Premises. Lessor under no circumstances shall be responsible or obligated for any losses or liabilities of the Lessee. The Lessee shall not publicize, or otherwise circulate, promotional or other material of any nature that states or implies endorsement of the Lessee or its services or products by the Lessor or any other governmental agency.

(b) This Lease shall not, nor be deemed, nor construed to confer upon any person or entity, other than the parties hereto, any right or interest, including, without limiting the generality of the foregoing, any third party beneficiary status or any right to enforce any provision of this lease.

(c) This Lease provides no right of renewal or extension to the Lessee, nor does it provide the Lessee with the right to award of a new lease upon termination or expiration of this Lease. No rights shall be acquired by virtue of this Lease entitling the Lessee to claim benefits under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Public Law 91-646.

(d) The Lessee warrants that no person or selling agency has been employed or retained to solicit or secure this Lease upon an agreement or understanding for a commission, percentage, brokerage or contingent fee. For breach or violation of this warranty, the Lessor shall have the right to terminate this Lease for default.

(e) In case any one or more of the provisions of this Lease shall for any reason be held to be invalid, such invalidity shall not affect any other provision of this Lease, and this Lease shall be construed as if the invalid provisions had not been contained in this Lease.

(f) All Exhibits that may be referenced in this Lease are hereby attached to and incorporated in this Lease:

> **EXHIBIT A:   Site Plans Showing Leased Premises**
> **EXHIBIT B:   Insurance Requirements**
> **EXHIBIT C:   Inventory and Condition Report**
> **EXHIBIT D:   Initial Improvements by Lessee**
> **EXHIBIT E:   Maintenance Plan**
> **EXHIBIT F:   Preservation Maintenance Plan**
> **EXHIBIT G:   Use and Ownership of Intellectual Property**
> **EXHIBIT H:   Certain Commitments**

(g) Time is of the essence to this Lease and all of its terms and conditions.

(h) The laws of the United States shall govern the validity, construction and effect of this Lease.

(i) This Lease constitutes the entire agreement between the Lessor and Lessee with respect to its subject matter and supersedes all prior offers, negotiations, oral and written. This Lease may not be amended or modified in any respect except by an instrument in writing signed by the Lessor and Lessee.

(j) The voluntary sale or other surrender of this Lease by the Lessee to the Lessor, or a mutual cancellation, or the termination by the Lessor pursuant to any provision of this Lease, shall not work a merger, but, at the option of the Lessor, shall either terminate any or all existing subleases hereunder or operate as an assignment to Lessor of any or all of subleases.

(k) If more than one Lessee is named in the Lease, each Lessee shall be jointly and severally liable for performance for the obligations of this Lease.

(l) Any and all remedies available to Lessor for the enforcement of the provisions of this Lease are cumulative and are not exclusive, and Lessor shall be entitled to pursue either the rights enumerated in this Lease or remedies authorized by law, or both. Lessee shall be liable for any costs or expenses incurred by Lessor in enforcing any term of this Lease, or in pursuing legal action for the enforcement of Lessor's rights, including, but not limited to, court costs. Lessor shall be liable for costs or expenses incurred by Lessee in enforcing terms of this Lease, or in pursuing legal action for the enforcement of Lessee's rights, including, but not limited to, court costs; provided that Lessor shall only be liable for such costs or expenses to the extent otherwise permitted by Federal law and where such liability would not constitute a violation of the Anti-Deficiency Act (31 U.S.C. § 1341) or bind Lessor to any sum in excess of the appropriation made by Congress for that fiscal year or administratively allocated for the subject matter of this Lease.

(m) The Lessee shall not construct new buildings or structures on the Premises, except that, with the prior written approval of the Lessor, as described in Section 9 of this Lease, the Lessee may construct minor additions, buildings and/or structures determined by the Lessor to be necessary for the support of the uses authorized by this Lease.

(n) Nothing contained in this Lease shall be construed as binding the Lessor to expend, in any fiscal year, any sum in excess of the appropriation made by Congress for that fiscal year or administratively allocated for the subject matter of this Lease, or to involve the Lessor in any contract or other obligation for the future expenditure of money in excess of such appropriations. Nothing in this Lease shall be construed as preventing the cancellation of this Lease by the Lessor in the exercise of sovereign authority otherwise provided by Applicable Laws.

(o) Lessee agrees to adhere to Certain Commitments as described in Exhibit H.

[*Signatures on the following page*]

**IN WITNESS WHEREOF, the Area Director, National Capital Area, National Park Service, acting on behalf of the United States, in the exercise of the delegated authority from the Secretary of the Interior, as Lessor; and the Lessee have executed this Lease by proper persons thereunto duly authorized as of the date heretofore written.**

**LESSOR**
**THE UNITED STATES DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE**

**By** _Lisa A Mendelson -Telmini_
**Area Director (Acting)**
**Interior Region 1 - National Capital Area**
**National Park Service**


**LESSEE**
**NATIONAL LINKS TRUST**


**By** _____
**Title** President _____

NPS LEASE# NCR-3060-19-001     EXHIBIT A - SITE PLANS SHOWING LEASED PREMISES

East Potomac Golf Course
National Mall & Memorial Parks - East Potomac Park



*Project Boundary for East Potomac Park Golf Course Cultural Landscape Inventory.*

Rock Creek Golf Course
Rock Creek Park



*Project Boundary for Rock Creek Golf Course Cultural Landscape Inventory.*

NPS LEASE# NCR-3060-19-001   EXHIBIT A - SITE PLANS SHOWING LEASED PREMISES

Langston Golf Course

National Capital Parks-East - Anacostia Park

**Site Plan**



*Langston Golf Course site plan and existing conditions.*

**EXHIBIT B:  Insurance Requirements**

During the term of this Lease, the Lessee shall maintain the following insurance coverage (where applicable as determined by the Lessor) under the following general terms and conditions and under such specific terms and conditions as the Lessor may further require with respect to each particular insurance policy.

**1. In general.**

(a) Property Insurance - An all risk or special form, including fire, flood, vandalism and malicious mischief insurance. The amount of such insurance shall be the full insurable value of the Premises. All such policies shall specify that proceeds shall be payable whether or not any damaged or destroyed improvements are actually rebuilt.

 (b) Worker's Compensation and Employer's Liability Insurance - Worker's compensation insurance in the statutory amounts and coverage required under worker's compensation, disability and similar employee benefit laws applicable to the Premises and to the Lessee's use and occupancy of the Premises; and employer's liability insurance, with limits of not less than _____ ($) for bodily injury per incident and _____ ($) aggregate, or such higher amounts as may be required by law.

(c) General Liability - Comprehensive Farm Liability and/or Commercial General Liability through one or more primary and umbrella liability policies against claims for bodily injury and property damage occurring on the Premises, the improvements thereon, or the streets, curbs or sidewalks adjoining the Premises, with such limits as may be required by the Lessor, but in any event not less than one-million dollars ($1,000,000) per incident and three-million dollars ($3,000,000) aggregate for the Premises. Such insurance shall insure the performance by the Lessee of its indemnity obligations under this Lease.

(d) Other - All other insurance that the Lessee should maintain to adequately protect the Premises, Lessor, and Lessee.

**2. Insurance During Construction**

At all times during a Construction, the Lessee at its sole expense, shall obtain and keep in force for the benefit of the Lessee and Lessor the following insurance coverages:

(a)  If requested by Lessor at any time, performance and payment bonds approved by the Lessor, which bonds shall cover payment of all obligations arising under all contracts let in connection with a Construction and guaranteeing performance and payment under the applicable contracts, and payment in full of all claims for labor performed and materials supplied under such contracts.  The bonds shall be issued by a responsible surety company, licensed to do business in the state where the Park Area is located, in an amount not less than the amount of the respective contracts, including without limitation, amounts for cost overruns, price increases, change orders, forced delays and the like, and shall remain in effect until the entire work under the contracts is completed; and

(b) To the extent not covered by other property insurance maintained by the Lessee, comprehensive "all risk" or "special form" builder's risk insurance, including vandalism and malicious mischief, covering the Construction, all materials and equipment stored at the Premises and furnished under a construction contract, and all materials and equipment that are in the process of fabrication at the

1

Premises of any third party or that have been placed in due course of transit to the Premises when such fabrication or transit is at the risk of, or when title to or an insurable interest in such materials or equipment, has passed to the Lessee, such insurance to be written on a completed value basis in an amount not less than the full estimated replacement cost of the Construction.

**3. Conditions of Insurance**

(a) The policy or policies required under this section shall provide that in the event of loss, the proceeds of the policy or policies shall be payable to the Lessee to be used solely for the repair or replacement of the property damaged or destroyed, as approved and directed by the Lessor, with any balance of the proceeds not required for repair or replacement; provided, however, that the insurer, after payment of any proceeds to the Lessee, will have no obligation or liability with respect to the use or disposition of the proceeds by the Lessee.

(b) All property and liability insurance policies shall name the United States of America as an additional insured.

(c) All of the insurance required by this section and all renewals shall be issued by one or more companies of recognized responsibility licensed to do business in the state in which the Park Area is located with a financial rating of at least a Class B+ (or equivalent) status, as rated in the most recent edition of Best's Insurance Reports (or equivalent) or as otherwise acceptable to the Lessor.

(d) All insurance policies shall provide that such policies shall not be cancelled, terminated or altered without thirty (30) days prior written notice to the Lessor. The Lessee must provide to the Lessor a copy of each policy and a certificate of the policy executed by a properly qualified representative of the insurance company evidencing that the required insurance coverage is in full force and effect on or before the Commencement Date, and annually thereafter. The Lessee shall maintain all policies provided throughout the Lease Term and the Lessee shall renew such policies before the expiration of the term of the policy.

(e)   If the Lessor at any time, but not more than annually, believes that the limits or extent of coverage, deductibles or self insurance retention, with respect to any of the insurance required by this section are insufficient for a prudent owner of property of the nature of the Premises, the Lessor may determine the proper and reasonable limits and extent of coverage, deductibles and self insurance retention limits for such insurance and such insurance shall thereafter be carried by the Lessee until changed pursuant to the provisions of this section.

(f)   The Lessee assumes full risk and responsibility for any inadequacy of insurance coverage or any failure of insurers.  No approval by the Lessor of any insurer, or the terms or conditions of any policy, or any coverage or amount of insurance, or any deductible amount shall be construed as a representation by the Lessor of the solvency of the insurer or the sufficiency of any policy or any coverage or amount of insurance or deductible.

(g) The Lessee and Lessee's Agents shall not do anything, or permit anything to be done, in or about the Premises or on adjacent or nearby property that would invalidate or be in conflict with the provisions of any fire or other insurance policies covering the Premises or result in a refusal by insurance companies of good standing to insure the Premises in the amounts required under this section.

**EXHIBIT C: INVENTORY AND CONDITION REPORT - EXISTING CONDITIONS**

| Park Area | Asset Type | Asset Name | Size | NPS Asset # | Condition |
|---|---|---|---|---|---|
| NACE | Parking Lot | Langston Driving Range Access/Parking Lot | 297,000 Sq Ft | 51904 | FAIR |
| NACE | Road | Langston Service Road | 0.17 Mi | 51923 | FAIR |
| NACE | Parking Lot | Langston Golf Course Parking | 460,350 Sq Ft | 52129 | FAIR |
| NACE | Building | Langston Club House | 5,880 Sq Ft | 88702 | FAIR |
| NACE | Building | Langston Maintenance Building | 1,290 Sq Ft | 88703 | POOR |
| NACE | Maintained Landscape | Langston Golf Course (18 Hole) | 145 Acres | 93702 | FAIR |
| NACE | Building | Rain Shelter 1 | 240 Sq Ft | 107810 | FAIR |
| NACE | Building | Rain Shelter 2 | 243 Sq Ft | 107812 | FAIR |
| NACE | Building | Cart Storage | 2,107 Sq Ft | TBD-002 | GOOD |
| NACE | Parking Lot | Unpaved Parking Lot | 40,500 Sq Ft | TBD-003 | POOR |
| NACE | Fuel System | Langston Golf Course Fuel System (concrete and bollards only) | 1 ea | TBD-005 | GOOD |
| NAMA | Parking Lot | Golf Course Parking Lot | 142,380 Sq ft | 49868 | FAIR |
| NAMA | Building | Pro Shop/Snack Bar/Field House | 11,371 Sq Ft | 88692 | POOR |
| NAMA | Building | Starter Booth | 124 Sq Ft | 88693 | GOOD |
| NAMA | Building | Cart Storage | 3,025 Sq Ft | 88694 | GOOD |
| NAMA | Building | Maintenance Building | 7,030 Sq Ft | 88695 | FAIR |
| NAMA | Building | Storage Building | 1,828 Sq St | 88696 | GOOD |
| NAMA | Building | Driving Range Building | 31,714 Sq Ft | 88697 | FAIR |
| NAMA | Building | Mini Golf Concessions Building | 295 Sq Ft | 98007 | GOOD |
| NAMA | Maintained Landscape | East Potomac Golf Course | 201 Acres | 98093 | FAIR |
| NAMA | Fuel System | Golf Course Fuel System (concrete and bollards only) | 1 ea | 106890 | FAIR |
| NAMA | Building | Equipment Storage Shed | 785 Sq Ft | 114597 | POOR |
| NAMA | Building | Shed near Generator | 60 Sq Ft | 114599 | FAIR |
| NAMA | Building | Rain Shelter White Course near Green #2 | 240 Sq Ft | 114600 | FAIR |
| NAMA | Building | Rain Shelter White Course North of Tee #9 | 217 Sq Ft | 114601 | FAIR |
| NAMA | Building | Rain Shelter Red Course between #5 Green and #8 Tee | 236 Sq Ft | 114602 | FAIR |
| NAMA | Building | Rain Shelter 3 Hole Practice Course North of #1 Red Tee | 238 Sq Ft | 114603 | FAIR |
| NAMA | Building | Rain Shelter Blue Course between Tee #4 and #15 Green | 182 Sq Ft | 114604 | FAIR |

| NAMA | Building | Rain Shelter Blue Course South of Green #2 | 238 Sq Ft | 114605 | FAIR |
|---|---|---|---|---|---|
| NAMA | Building | Rain Shelter Blue Course South of Green #11 | 239 Sq Ft | 114606 | FAIR |
| NAMA | Building | Rain Shelter Blue Course North of Tee #13 | 202 Sq Ft | 114607 | FAIR |
| NAMA | Parking Lot | Starter Booth Unpaved Cart Parking | 1,350 Sq Ft | TBD-006 | FAIR |
| NAMA | Parking Lot | Cart Shed Unpaved Parking | 4,160 Sq St | TBD-007 | FAIR |
| NAMA | Road | Maintenance Building Unpaved Access Road | 0.25 Mi | TBD-008 | FAIR |
| NAMA | Parking Lot | Equipment Shed Unpaved Employee Parking | 9,900 Sq Ft | TBD-009 | FAIR |
| NAMA | Parking Lot | Maintenance Building Paved Parking | 6,975 Sq Ft | TBD-010 | FAIR |
| ROCR | Building | Rock Creek Clubhouse | 4,534 Sq Ft | 26121 | FAIR |
| ROCR | Road | Rock Creek Golf Course Access Road - RT206 | 0.32 Mi | 27711 | FAIR |
| ROCR | Road | Rock Creek Golf Course Road - RT401 | 0.45 Mi | 29322 | FAIR |
| ROCR | Parking Lot | Rock Creek Golf Course Parking - RT903 | 189,000 Sq Ft | 51731 | POOR |
| ROCR | Building | Golf Course Storage and Maintenance Building | 2,421 Sq Ft | 93051 | POOR |
| ROCR | Maintained Landscape | Rock Creek Golf Course | 58 Acres | 112700 | FAIR |
| ROCR | Fuel System | Rock Creek Golf Course Fuel System (concrete and bollards only) | 1 ea | TBD-004 | GOOD |

# EXHIBIT D
# INITIAL IMPROVEMENTS

If otherwise granted approval by the Lessor under the terms of this Lease, the Lessee hereby agrees to commence and engage diligently in the construction of the Initial Improvements described below in accordance with the listed schedule (timeframes are general and subject to change due to compliance timeframes or other circumstances) and the Construction Documents approved by Lessor.

Initial Improvements (subject to Lessor approval):
- 11/2020 – 12/2020
    - Baseline improvements to facilities at East Potomac and Langston
    - Short-term fixes to infrastructure and vegetation management at Langston
- 01/2021 – 06/2022
    - Construct a new practice area, featuring a new lighted driving range at ROCR
    - Rebuild ROCR maintenance facility
    - Redevelop ROCR clubhouse, including space for First Tee and educational programming
    - Construct a 9-hole regulation length golf course that recaptures as many features as possible from holes that were a part of the original 18-hole *William Flynn* design on the site at ROCR
    - Construct a high quality 9-hole Par 3 courses utilizing the space generally occupied by the existing back nine at ROCR
    - Construct 18 hole putting course at ROCR
    - Where appropriate, develop public hiking trails that connect the ROCR clubhouse to existing trail networks in Rock Creek Park.
    - Engage Gil Hanse to provide golf course design and construction services at ROCR
- 10/2022 – 06/2024
    - Renovate the existing 18-hole golf course at Langston
    - Construct an 18-hole putting course at Langston
    - Renovate the practice areas and driving range at Langston
    - Build a new miniature golf course at Langston
    - Where appropriate, develop a public hiking trail through the golf course property that connects the Kingman Island hiking trail to the US Arboretum trails
    - Engage Beau Welling Design to provide golf course design and construction services at Langston
- 10/2024 – 10/2027
    - Pursue historic preservation via the thorough restoration of the once-celebrated *Walter Travis* design at East Potomac Golf Course (to include reversibility of play)
    - Redesign and rebuild White Course at East Potomac
    - Redesign and rebuild Red Course at East Potomac
    - Construct New Driving Range at East Potomac

1

- o Rebuild maintenance area at East Potomac
  - o Construct an 18-hole putting course at East Potomac
  - o Complete preservation and restoration of East Potomac Clubhouse
  - o Research the original design of the miniature golf course at East Potomac and restore elements of the original design where practical and appropriate
  - o Develop paths at East Potomac where needed and bike rack options for bicyclists
  - o Maintain existing footgolf grounds at East Potomac after the start of the lease and explore incorporating footgolf into the scope of the improvement projects
  - o Maintain the existing parking footprint at East Potomac Golf Course but, as the NPS moves forward with its plans to introduce metered parking on the road that circles East Potomac Park (Ohio Drive SW), NLT will closely monitor the impact of metered parking on the spaces specifically reserved for patrons using the golf, pool, and clubhouse facilities. Should it be determined that visitors are using reserved parking spaces and not using the facilities as a way to avoid the metered parking spaces, NLT plans to add a gated system to the reserved parking areas.
  - o Provide a more seamless transition between the golf course landscape and the surrounding East Potomac Park landscape by installing a more open, visually pleasing type of fencing that better supports the wildlife management objectives of the NPS
  - o Engage Tom Doak and Renaissance Golf Design to provide golf course design and construction services at East Potomac
- 10/2020 – 10/2028
  - o NLT commits to address the 317 initial deferred maintenance items identified by the National Park Service in Attachment D to the Request for Proposal during the first eight years of the Master Lease. Working with Troon Golf, LLC, NLT will track its efforts to address the deferred maintenance by implementing a Computerized Maintenance Management System (CMMS) with features and functionality that are generally equivalent to those used in National Park Service concession contracts for large operations.

**Exhibit E – Under development, not yet complete**

**Exhibit F – Under development, not yet complete**

# EXHIBIT G
## Use and Ownership of Intellectual Property

The National Park Service (NPS) administers an assortment of treasured American properties and resources across the country. The unique nature of an NPS lease blends commercial enterprise with the treasured historic, cultural, and natural assets that the Director is responsible for protecting. The Director's responsibilities include the protection of associated names, logos, and branding for these public assets.

Consequently, the NPS asserts trademark rights to the names, brands, logos, and other source identifiers related to National Park System units, facilities, parks, and programs, including the following list of marks related to the leased Premises (the "Marks"):

- Langston Golf Course
- Langston Clubhouse
- Langston Grill
- Rock Creek Golf Course
- East Potomac Park Golf Course
- East Potomac Golf Course
- East Potomac Mini Golf
- Hains Point Golf Course
- Potomac Grill

**(a) License Grant**

The NPS hereby grants to the Lessee a royalty-free, non-exclusive, non-transferable license to use the Marks for the Lease Term, solely in accordance with the authorized uses set forth in the Lease in a manner that promotes NPS goals and values as stated herein. The Lessee has the right to sub-license Marks only for the purposes of carrying out the authorized uses set forth in the Lease and under same or substantially similar terms as contained herein. Any use of any Mark intended to identify the NPS, or the Premises, shall inure to the benefit of the NPS. The NPS reserves its exclusive rights to enforce and police its trademark rights against any party. This license shall cease upon termination or expiration of the Lease, or as otherwise determined by the Director or by law. This license does not constitute a compensable interest to the Lessee. The NPS reserves all rights to, and this license expressly excludes, all NPS marks not listed above, including "National Park Service," "Anacostia Park," "National Mall and Memorial Parks," "Rock Creek Park," the NPS ranger uniform, and the Arrowhead Symbol. Nothing herein restricts the Lessee from utilizing any NPS marks in a manner constituting a fair use. This Exhibit may be amended by mutual written agreement of the parties for purposes of adding, removing, or modifying the list of Marks herein.

**(b) Merchandise, Services, and Branding**

The Director reserves the right to determine and control the nature, type, and quality of merchandise and branding that incorporate the Marks, if any, to be sold, provided, or implemented by the Lessee. The NPS agrees to collaborate with the Lessee to jointly pursue

potential merchandising and branding opportunities under the Lease, so long as those opportunities are consistent with law and policy, support the NPS's goals and values, and will not harm the NPS's rights in the Marks.

**(c) Quality Control and Goodwill**

The Lessee acknowledges that the maintenance of the high quality of the services, materials, products, and merchandise produced, sold or otherwise prepared for public dissemination pursuant to or in order to carry out the authorized uses set forth in the Lease, as well as the control by the NPS over their nature, quality, and manner of delivery or distribution, are material conditions of the Lease. The Lessee shall maintain the distinctiveness of the Marks, the image of the NPS brand, and the image and high quality of the services, materials, products, and merchandise bearing the Marks licensed herein. Marks may be used and appear together with other marks used in connection with Lease-related goods and services but must stand by themselves. If the Lessee violates the terms of this Exhibit G, the Lessee shall immediately cease use of a Mark used in association with the authorized uses set forth in the Lease on request of the NPS.

**(d) Rights and Ownership**

The Lessee acknowledges that the NPS is the sole and exclusive owner of all right, title and interest in and to its Marks, and to those not licensed under this Exhibit G, as well as to all combinations, forms, and derivatives, which must be approved by the Director or their designee (such approval not to be unreasonably delayed). The Lessee further acknowledges, represents and warrants that it has not acquired and shall not acquire (whether by operation of law, by this Lease, or otherwise) any right, title, interest or ownership (collectively "Ownership Rights") in or to any Marks or any part thereof. Should any Ownership Rights become vested in the Lessee, the Lessee agrees to assign, and hereby assigns, all such Ownership Rights to the NPS free of consideration. The Lessee shall immediately provide and execute all documents reasonably requested by the NPS to effectuate and record each such assignment. The Lessee shall not, during the Lease Term or at any time thereafter, do anything which, in the NPS's sole judgment, could in any way damage the validity and subsistence of the Marks. The Lessee shall not attack, dispute, or challenge the NPS's Ownership Rights in or to the Marks or the validity of this license, nor shall the Lessee assist others in so doing.

# EXHIBIT H
# CERTAIN COMMITMENTS

Lessee commits to the following:

(a) Lessee will maintain affordable fee structures. Affordability will be achieved in three ways:

1. <u>Index to comparable facilities</u>: The cost to play at the Golf Courses will be firmly maintained at a level comparable to or below equivalent public courses nationally and in the local area. To that end, Lessee will continuously monitor green fees at comparable local and national public golf courses in order to create and maintain a Comprehensive Market Analysis ("CMA") database that will be used as a reference for setting the fee structure at the Golf Courses.

2. <u>Entry level product offerings</u>: The short course options at Rock Creek Golf Course and East Potomac Golf Course, where beginners (especially young players) grow into the game, will be among the lowest-cost options for golf in the DC-MD-VA region.

3. <u>Price schedules and discount opportunities</u>: Lessee will employ strategies to mitigate cost as a barrier to play including dynamic pricing, youth/student pricing, senior pricing, school and seasonal passes, veterans' and active duty military discounts, special pricing for the disabled and frequent player discounts.

(b) Beginning in 2021, Lessee will create an annual Affordability and Accessibility Report that will outline the sources and methods used to set the fee structures for the Golf Courses in each calendar year, including how the fee structures compare to those tracked in the CMA database of comparable public courses.

(c) Within the first year after the Commencement Date, Lessee will work with the *First Tee of Greater Washington*, *Golf My Future My Game*, and *Youth on Course* to continue existing programming or establish new programming at the Golf Courses.

(d) Lessee will work with the *PGA of America*, *US Kids Golf* and comparable organizations to establish additional youth programming at the Golf Courses.

(e) Within the first year after the Commencement Date, Lessee will establish and actively market summer golf camps for local youth.

(f) Using the *Modified Rules of Golf*, developed by the United States Golf Association, Lessee will put clear procedures and policies in place to support players with disabilities.

(g) Pre-improvement projects at each facility (within the first 6 months after the Commencement Date) will include:

1. Where appropriate and allowable given the current golf course design and infrastructure, Lessee will ensure the courses and practice facilities are accessible and there is a continuous course routing;

2. Lessee will work with Troon Golf, LLC or its successor (hereinafter "Management Company") to develop a training program for staff members who will assist golfers with disabilities;

1

NPS LEASE#NCR-3060-19-001                EXHIBIT H                CERTAIN COMMITTMENTS

3. Lessee will work with its Management Company to make visitors with disabilities aware of rule modifications established by the USGA and R&A;

4. Single rider golf carts specially designed for golfers with disabilities, (including arm amputees) will be available at each course.

(h) Post-improvement projects at each facility will include:

1. A minimum of least one tee box on each hole of each course that will be able to accommodate the use of a golf cart;

2. Lessee will design green complexes so that they can be reasonably accessed by golf carts;

3. Lessee will ensure all practice facilities (including putting greens and ranges) and weather shelters at each facility (where applicable) are accessible and have accommodations for individuals with disabilities.

(i) There will be dedicated instruction areas at all three golf courses and the Management Company will retain PGA and/or USGTF teaching professionals to lead individual and group lessons.

(j) Driving ranges will normally be staffed by at least one person to oversee tokens, merchandise and food and beverage sales, retrieve balls from the range, clean balls and range stalls, and provide appropriate customer service and security to users of the ranges.

(k) Lessee will hire the following positions:

1. *Executive Director* – a full-time, year-round position responsible for the overall management and direction of the National Links Trust. The Executive Director will be a member of the board of the National Links Trust and sit on the executive committee of the board. Lessee will hire the Executive Director by the Commencement Date.

2. *Operating Officer (Master Lease Project Manager)* — a full-time, year-round position which serves as the day-to-day liaison between National Links Trust leadership, partners, and the Management Company leadership.

(l) The Management Company will hire the following positions:

1. *General Manager/Chief Operating Officer* — this is a full-time, year-round position which directs and oversees all aspects of the Golf Courses, including activities among park visitors, employees, and the community. The Management Company will hire the General Manager/Chief Operating Officer by the Commencement Date.

2. *Director of Agronomy* — this is a full-time, year-round position which oversees the maintenance of the courses and ensures that turf grass is repaired and maintained to established standards.

3. *Director of Facilities* — this is a full-time, year-round position which oversees the Golf Courses' grounds and buildings, upkeep, repairs, and maintenance.

NPS LEASE#NCR-3060-19-001            EXHIBIT H            CERTAIN COMMITTMENTS

4.  *Director of Golf (three)* — these positions are full-time, year-round positions, which oversee golf operations at each course including tournaments, rules, tee sheet activity, retail and merchandise operations, range operations, bag storage, player service operations, golf instruction programs, cart fleet, and locker rooms. For clarity, if a given course is closed for restoration/renovation, a Director of Golf is not required at that course during the period of closure.

(m)   Lessee and its Management Company will follow industry best practices – including the use of Troon Golf, L.L.C. proprietary scientific approach to agronomy which relies on organic, nature-friendly compounds, and prudent chemical use, as available – and be dedicated to improved water efficiency, limited chemical use, and conservation of natural resources.

(n) In addition to adhering to recycling and waste management regulations of the District of Columbia, Lessee will implement the *Sustainable DC 2.0 Plan* as a mandate for waste management efforts throughout the facilities.

(o) Lessee will prepare and implement the following plans within the first full calendar year of the Lease and update such plans as needed:

1.  A Golf Course Forest Management Plan at Rock Creek Golf Course that will ensure the property's two distinct historic environments will be managed appropriately and complement the golf course; and

2.  Vegetation Management Plans at all three Golf Courses.

(p) Lessee, working with its Management Company, will implement the following systems to manage various components of the operations for the Golf Courses. With respect to each system below, Lessee and its Management Company will begin to implement the systems at each facility after the Commencement Date and commits to have certifications in place for a given facility within one year of that facility fully reopening after the proposed Initial Improvement projects:

1.  An environmental management system (ISO 14001) that will document all operational aspects and impacts and all associated regulatory obligations and local community requirements;

2.  An energy management system based on the international standard ISO 50001. Through this management system Lessee and its Management Company will (i) identify all uses of energy (e.g., purchased electricity and fuel for stationary and mobile systems) as well as all renewable energy sources (ii) document all energy used and enter this information and data into a common database so that reports may be generated for the management team to track the effectiveness of energy conservation measures and generate reports;

3.  A water efficiency management system based on the international standard ISO 46001 which will be used to identify all water sources, water uses, set goals, and achieve systematic reductions through engineering and operational changes; and

4.  A safety management system based on the international standard ISO 45001 under which all hazards are identified and associated risks evaluated.

(q) Lessee, working with its Management Company, will develop an *Annual Greenhouse Gas Emissions Inventory Report* using the methods prescribed by the international standard ISO 14064-

3

NPS LEASE#NCR-3060-19-001                 EXHIBIT H                 CERTAIN COMMITTMENTS

1 at the end of the first full calendar year of the Lease Term and use this as its baseline year. Lessee will prepare updated *Annual Greenhouse Gas Emissions Inventory Reports* every year thereafter to demonstrate reduced use of purchased electricity, reduced use of fuel, increased use of renewable energy sources, and reduced generation of greenhouse gas emissions.

(r) Lessee and its Management Company will implement a program within the first 90 days of the Lease Term that contains operating procedures that align with the eleven points of National Park Service requirements, including:

1. Developing an Agronomic Plan annually for the next year's activities. The *Agronomic Plan* will lay out fertilizer, mowing, cultural, and anticipated Integrated Pest Management ("IPM") activity;

2. Educating key employees in the premise of Lessee's IPM program;

3. Maintaining accurate and consistent records of all pest management activities;

4. Conducting a site assessment and identifying historical and current weather patterns, physical conditions, cultural practices, and chemical inputs;

5. Developing a site-specific pest knowledge base which includes identifying current pest species, evaluating plant selection, and connecting with local properties to understand pest species in the geographical area;

6. Creating "Scouting Maps" to maintain records when monitoring the property, including population levels and phenological data;

7. Determining action thresholds for each pest species including consideration for economic and customer user impact;

8. Reviewing pest management options (cultural, biological, mechanical, and chemical) with an emphasis on cultural controls and a detailed list explaining methods such as irrigation practices, mowing, compaction control, plant selection, site preparation, etc.;

9. All control options will be integrated and implemented with pesticides being applied as a last resort when other methods have failed and significant pest damage is likely;

10. Following any pest control practice, a thorough evaluation will be conducted determining the effectiveness and records will be kept describing successes or failures; and

11. Key employees (assistants, horticulturist, spray techs, irrigators, mechanics, and foreman) will be educated in Lessee's IPM program and will educate the rest of the staff to be aware of abnormalities.

(t) Lessee will establish an *Annual Management Plan* to guide management of the Golf Courses. The scope of the *Annual Management Plan* will include goals and objectives for visitor-facing amenities such as golf-related revenue, retail merchandising, food and beverage services, as well as building maintenance and golf course maintenance.

4

(u) Lessee will develop and implement a comprehensive *Annual Marketing Plan. Lessee* will offer an expanded benefit version of "*Frequent Player Card*" for active, retired veteran and reservist military personnel, modeled off of the successful "*Patriot Troon Card*" and "Troon's Troops" programs.

(v) Lessee will create a YouTube channel to showcase longer-form video updates about construction progress, as well as substantive and informative discussions on the architectural and strategic design elements of the Golf Courses. Lessee will communicate ongoing activity at the properties by participating in a golf-themed podcast series.

(w) Lessee will collaborate with the Lessor in developing golf course-specific brand identities that reflect the unique histories at the Golf Courses. This work will result in the creation of new logos for each Golf Course, providing an individual brand for signage, printed materials such as scorecards and cart signs, and retail merchandise. The use and ownership of Lessor Intellectual Property as part of this commitment will be governed by Exhibit G.

# Declaration of Jessica Bowron

# Exhibit B



OFFICE OF THE SOLICITOR

# UNITED STATES
## DEPARTMENT OF THE INTERIOR
WASHINGTON

October 29, 2025

Michael McCartin
President
National Links Trust
331 7th Street, N.E.
Washington, D.C. 20002

**Re: *Notice of Default - NPS Lease# NCR-3060-19-001***

Dear Michael:

The purpose of this letter is to provide National Links Trust ("NLT") formal notice of default and intent to terminate NPS Lease# NCR-3060-19-001 for failure to make the Initial Improvements described in Exhibit D and Construction Documents in accordance with the schedules set forth therein.  I look forward to continuing our discussions on this matter and sincerely hope we can find a mutually acceptable path forward in the days ahead.

Respectfully,

William L. Doffermyre
Solicitor

# Declaration of Jessica Bowron

# Exhibit C



# United States Department of the Interior
### OFFICE OF THE SOLICITOR
Washington, D.C.  20240

December 30, 2025

Michael McCartin, President
National Links Trust
331 7th Street, N.E.
Washington, D.C. 20002

### *Re: Notice of Termination - NPS Lease # NCR-3060-19-001*

Dear Michael:

The National Park Service hereby terminates NPS Lease # NCR-3060-19-001 executed September 2020 (the "Master Lease"), effective immediately. The Master Lease required National Links Trust ("NLT") to make substantial (tens of millions of dollars) initial capital improvements at each of the three NPS National Capital Region golf courses:  East Potomac Park, Rock Creek Park, and Langston Golf Course.  The Master Lease required that these "Initial Improvements" be made in the initial years of the contract as follows:

- o <u>Rock Creek Park:</u> A full renovation and restoration of Rock Creek Park golf course, along with a new clubhouse, driving range and putting course to be completed by June of 2022.  Approximately 3.5 years after the deadline for the Rock Creek Park golf project to be complete and reopened to the public, **NLT has not commenced substantial construction activities for this project.**

- o <u>Langston:</u> A full renovation and restoration of Langston golf course, along with a new putting course, practice area and driving range, to be completed by June 2024.  Approximately 1.5 years after this project was to be complete, **NLT has not commenced construction of this project.**

- o <u>East Potomac Park:</u> A full renovation and restoration of the East Potomac golf courses, as well as a renovated clubhouse, driving range and putting course, to be commenced by October 2024.  Over a year later, **NLT has not yet started this project**—other than a standalone renovation of the East Potomac miniature golf course.  NLT's cure proposal submitted in recent weeks demonstrates that NLT has no plans to commence this project in the foreseeable future, let alone complete the project by the October 2027 date set forth in the Master Lease.

As you know, NPS has provided NLT every opportunity to present a reasonable and credible cure proposal during the 45-day period following the issuance of the October 29, 2025 default notice.  Yet in the multiple in-person meetings, teleconferences, and written submissions during the cure period, NLT failed to provide NPS with reasonable assurances that NLT has the

necessary funding, ability, or plan in place to fulfill its capital-investment obligations under the Master Lease. Indeed, since the October 29 default notice was issued, NLT has not proposed a path forward for any of the three major restoration and redevelopment projects consistent with the terms of the Master Lease.[1] All of the cure proposals were explicitly conditioned on NPS first agreeing to substantially amend the Master Lease in a manner that would minimize NLT's contractual commitments and capital-investment obligations going forward. *See* NLT Proposals. That request, along with newly proposed terms and conditions associated with the Langston and East Potomac projects that directly contradict the Master Lease, amounts to a repudiation of the lease agreement by NLT. *Id*.

Accordingly, NPS hereby terminates the Master Lease pursuant to Section 4, Section 17, and Section 21 of the Master Lease. NPS officials will reach out in the days ahead to discuss an orderly transition process in general and to address the specific issues identified below arising from this termination.

**\*\*\*\*\*\*\*\***

1. **NLT Owes Millions of Dollars in Unpaid Rent to NPS – *Section 5.1***

NPS leadership has recently discovered that NLT owes NPS millions of dollars in unpaid rent. The Master Lease requires NLT to pay 16% of gross revenue each month in rental payments to NPS. NLT has generated over $55 million in gross revenue over the past 5 years. Yet NLT has only paid approximately $630,000 in rent to date, which amounts to less than 1.5% of NLT's gross revenues.

NPS's ongoing review has revealed that, on at least two dozen occasions over the past five years, NLT did not pay a single dollar of monthly rent in clear violation of the terms of the Master Lease. And, in the months in which rent was paid, NLT only paid a small fraction of what was owed to NPS pursuant to Section 5 of the Master Lease. Our current calculations indicate that NLT owes NPS at least $2.3 million in unpaid rent, and may owe NPS as much as $8.8 million in unpaid rent in the final analysis.[2] NPS officials will reach out in the days ahead for a mutual review of all of NLT's historical monthly gross revenues, along with any authorized Rent Offset documentation for Approved Costs NLT incurred under the Master Lease, so the Parties can determine the precise amount of unpaid rent NLT owes NPS under the Master Lease.

---

[1] *See* Letter from Chairman of NLT to Secretary of the Interior of Nov. 20, 2025 (asserting that path forward requires "one NPS signature" amending the Master Lease); Letter from NLT Litigation Counsel to Solicitor of Department of the Interior of Nov. 21, 2025 (asserting that the "first step" for NLT to move forward is for NPS approve a substantial amendment to the Master Lease); Email from NLT Litigation Counsel to Deputy Solicitor for National Parks of Dec. 3, 2025 (specifying Lease Amendment terms and conditions that would, *inter alia*, remove all project completion deadlines in Exhibit D from the Master Lease) (collectively, the "NLT Proposals").

[2] The unpaid rent range reflected above is a preliminary calculation based on NPS's ongoing review and remains subject to change. As discussed, the precise amount of unpaid rent will require an accounting of NLT's monthly gross revenues, along with an accounting by the Parties of any approved Rent Offsets NLT was entitled to claim pursuant to Section 5.6. Although NPS will work with NLT to calculate the precise amount of unpaid rent owned under the contract, NPS reserves the right to seek additional damages and other appropriate remedies arising from NLT's default pursuant to the terms and conditions of the Master Lease and/or as otherwise provided by applicable law.

**2.  Transfer of Project Documents to NPS – *Section 9.13***

Under Section 9.13, NLT is required to transfer to NPS "all architectural, engineering and other plans, drawings, specifications and studies relating to the Premises" upon termination of the lease. *Id*.  NPS officials will be in touch in the days ahead to discuss a comprehensive transfer of all required files.

**3.  Removal of Personal Property and Transfer of Golf Operations – *Section 18***

Although this Lease termination is effectively immediately, NPS will work with NLT to develop a mutually agreeable transition plan allowing NLT to remain as a "holdover" lessee for a reasonable period of time, such that NLT has sufficient time to remove its personal property from the three parks, otherwise comply with the surrender requirements set forth in Section 18, and allow the Parties to proceed with an orderly transition of golf course operations.

Please know that this letter is not intended to be a complete statement of the facts, the Department's legal position, or its rights or remedies, all of which are expressly preserved.

Respectfully,

William L. Doffermyre
Solicitor


cc:  Jessica Bowron, Comptroller, exercising the delegated
       authority of the Director, National Park Service
     Frank Lands, Deputy Director, National Park Service
     Noah Hoggatt, Deputy Solicitor, Parks and Wildlife