IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DC PRESERVATION LEAGUE, et al.,

Plaintiffs,

vs.

DEPARTMENT OF INTERIOR, et al.,

Defendants.

Civil Action No. 1:26-cv-0477

Washington, DC
March 11, 2026

3:01 p.m.

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE ANA C. REYES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs: **MARK SAMBURG**
**WILL BARDWELL**
**ROBIN THURSTON**
Democracy Forward Foundation
PO Box 34553
Washington, DC 20043

**ABBE LOWELL**
**JOHN BOLEN**
Lowell & Associates, PLLC
1250 H Street, NW, 2nd Floor
Washington, DC 20005

**NORMAN EISEN**
Democracy Defenders Fund
600 Pennsylvania Ave, SE #15180
Washington, DC 20003

For the Defendants: **MICHAEL ROBERTSON**
DOJ-ENRD
150 M Street, NE
Washington, DC 20002

Court Reporter: **JEFF HOOK**, Official Court Reporter
U.S. District & Bankruptcy Courts
333 Constitution Avenue, NW
Washington, DC 20001

**P R O C E E D I N G S**

**DEPUTY CLERK:** This is civil action 26-477, D.C. Preservation League, et al., vs. Department of Interior, et al. Would the parties identify themselves for the record, beginning with plaintiffs' counsel.

**MR. SAMBURG:** Good afternoon, Your Honor. Mark Samburg for all plaintiffs. I'm joined at counsel table, as you noted, by a virtual army: Will Bardwell, Abbe Lowell, Norm Eisen, Robin Thurston and Jack Bolen.

**THE COURT:** Is Mr. Lowell pulling, like, all of the intelligence down; like you guys were actually ready to go and intelligent and capable lawyers, and then he came on the scene and now the average is down?

**MR. SAMBURG:** You know, I think, unfortunately, the internal workings of counsel team are privileged. I'm just going to have to stay safe.

**THE COURT:** All right.

**MR. ROBERTSON:** And good afternoon, Your Honor. Michael Robertson on behalf of the defendants.

**THE COURT:** Hello. One second -- and stay up here for a moment. Did you -- were you the main drafter of the opposition brief?

**MR. ROBERTSON:** Yes, Your Honor.

**THE COURT:** How much help did you have?

**MR. ROBERTSON:** A moderate amount of help from my

colleagues.

**THE COURT:** Who is here on -- who's here from the DOJ?

**MR. ROBERTSON:** I have Steve Bartel, our assistant section chief, Bradley Craigmyle, our DAG, and I have Adam Gustafson, our PDAAG -- Principal Deputy Assistant Attorney General, sorry.

**THE COURT:** This was one of the more exceptional government briefs I have seen in three years on the bench. The fact that Mr. Robertson did this largely on his own in two weeks is remarkable. I thought the writing was spectacular. The analysis was -- I haven't decided who is right or wrong, but the analysis was spot on. The fact that he was able to collect not only the information and the law to support the brief but also two extensive declarations with a lot of exhibits is sort of the model government work.

**MR. ROBERTSON:** Thank you, Your Honor.

**THE COURT:** And it is to be commended, and I hope you pass that back to whomever. You're with the Environment and Natural Resources Division?

**MR. ROBERTSON:** Yes, Your Honor.

**THE COURT:** How long have you been there?

**MR. ROBERTSON:** Four years.

**THE COURT:** Four years. Well, I'm not going to tell DOJ how to do its job, but I'm telling you they could

use you at Federal Programs. I mean, I doubt you guys want to give him up, but he would be phenomenal at Federal Programs. I'm getting a lot of head shakings no back there. Okay, please be seated.

**MR. ROBERTSON:** Thank you, Your Honor.

**THE COURT:** Obviously, the plaintiffs' brief was excellent as well; I'm not taking anything away from that. So I'm reliably informed that there are a significant portion of people on social media who think that it's a national disgrace that a gay woman, such as myself, is on the bench, and that I'm -- and because of that, I'm totally incompetent to do my job. I became worried for those people when I got this case because I got concerned that they would think to themselves, well, I mean, she's totally incompetent on the law, but maybe the silver lining of having a gay woman on the bench is that she will know something about golf, and she will not screw up this case. And I hate to disappoint them, yet again, I know nothing about golf whatsoever. So I will have to take direction from you all on the golf issues.

I do, contrary to some belief, know something about the APA, and I have read the briefs. I will be honest that I had intended to spend a large portion of my weekend reading not just the briefs but the case law. Unfortunately, as I was minding my own business on Saturday,

walking and texting at the same time, I ran into a tree limb, which scratched my cornea. If you ever had a scratched cornea, you know it is the most painful thing that one can endure, and it's constant pain for about 48 hours. I was basically writhing in pain all weekend. One of my friends was with me, and I told her that if she took a video of me writhing in pain, she could probably sell it, like, pay-per-view for a lot of people online. But she was a good friend and did not do that. But rest assured, I unfortunately did not have a chance to dig into the case law, although I do think I know sort of some of what the issues are.

So here's how I propose to proceed today -- and unfortunately because of my weekend, we're definitely going to have another hearing, I think, and we'll have that in short order. I have a number of questions. They're not law-type questions, they're more factual type questions. You know, it's not sort of digging into the case law, but some more factual-type questions. I do want to give the plaintiffs a chance, because they haven't a filed their reply brief yet, to respond to some of the government's points. I'm most interested in the ripeness argument and the final agency action.

Is that you, Mr. Craig? You're Greg Craig? You're there. You're just hanging out today?

**MR. CRAIG:** (From the gallery) Yes.

**THE COURT:** It's nice to see you. Greg Craig was one of my mentors at the firm; very nice to have him here.

So I have a number of questions. I want to hear from the plaintiffs on final agency action and ripeness. I think ripeness really combines with standing in some ways, so I think we can take those as one, and then I'll give the government the chance to respond. First, I have a number of questions and they're in no particular order. So I think probably what makes most sense is to have Mr. Robertson and someone from plaintiffs' counsel come up, and I'll just ask them and then we can go through that. That might handle or deal with some of the ripeness issues. And then after that, I will let you all talk. And then I'm hopeful that we can figure out a way to proceed in a quick but manageable way.

**MR. SAMBURG:** Your Honor, if it would be okay, to the extent it's possible some of the questions might be better answered by Mr. Bardwell, we might --

**THE COURT:** Whoever wants to talk can talk.

**MR. SAMBURG:** Perfect, thank you.

**THE COURT:** So the first is, what is the current status of the terminated lease with NLT? It's still terminated, I take it?

**MR. SAMBURG:** That's plaintiffs' understanding, yes.

**THE COURT:** And has NLT sued on that lease?

**MR. SAMBURG:** Not to my awareness. As far as I know, NLT has not brought any action.

**THE COURT:** Okay. I'm kind of -- I'm unsure how you -- my understanding is that the plaintiffs want me to reinstate the lease as one of the -- that some of the relief you seek -- and I'm just sort of totally at a loss as to how I could possibly -- how you all have standing to bring a suit on behalf of NLT's lease when they haven't yet, and even if you did, how on earth I could figure all that out.

**MR. SAMBURG:** So understanding that you flagged the final agency action as a question of some concern for you, if we could just sort of accept for the moment, just for the discussion, that there's final action agency in the adoption of what we call the Washington National Plan. It's our view that the cancellation of the lease is a necessary piece of that final agency action; that in order to implement the Washington National Plan, among other steps, the lease needed to be canceled. And so in invalidating that final agency action, we think that relief could, in fact, extend to uncancelling the lease, if you will.

**THE COURT:** Okay. I mean, it just seems to me rather odd that I would be looking at whether or not the lease should be canceled or not canceled. I mean, I'm sure if NLT had brought a lawsuit -- and the fact that they

didn't speaks volumes; maybe they're just still planning to, I don't know -- the government would have any number of defenses, not just whatever they've identified so far. So I understand I might have to get into that as part of whether there was final agency action. But in terms of like the relief, I mean, I think even if I were to agree with you that the plan can't go into effect, I don't think that necessarily means that as part of that, that NLT just gets its lease back.

So what I would like to do is for you all to think about whether that's relief that you actually think that you can get because it's something we can take off the table -- not take off the table whether it's part and parcel of a plan and in bad faith, but to take off the table me undoing the lease. Because I just think that that raises a host of issues, not the least of which is I would have to think NLT would have to be a necessary party to that or at least be invited to intervene. So I just want you all to think about that.

**MR. SAMBURG:** Understood, Your Honor.

**THE COURT:** I mean, someone -- I mean, as I understand it, part of the issue is that we need somebody operating the land and no one does that yet, right, there's no new lease with someone yet?

**MR. ROBERTSON:** That's correct, Your Honor. And

I'm happy to sit back at counsel table and let my colleague --

**THE COURT:** No, no, no, you guys -- I did a lot of international arbitration. Has anyone here done international arbitration? In international arbitration, they have a thing called hot tubbing. I don't know why it's hot tubbing. But what they do is they have both experts -- experts from both sides testify at the same time so that the arbitrators can ask both of them questions. And it freaks out lawyers because what happens is that the experts geek out and start talking to each other and agreeing on stuff. So I want both of you up because otherwise you're going to be up and down; so just stay up.

So someone's going to have to operate there, and the government could, in good faith, lease it to somebody else. That doesn't necessarily mean that it would then -- that person would have to adopt the plan that you all think exists, right? I mean, that person could be directed to continue with whatever the old plan was.

**MR. SAMBURG:** I mean, I think our view, Your Honor, would be that if the Washington National Plan is in fact in place, it would likely be a condition of any newly-awarded lease that they participate in the Washington National Plan.

**THE COURT:** Well, yeah, fair. But that doesn't

have to be NLT, I mean, that could be AMCO.

**MR. SAMBURG:** Well, I think, in fact, it won't be NLT; I think you're correct. The analogy that I would draw on this is imperfect, I admit. But if we think about a conventional APA case -- let's say we're here challenging a promulgated notice and comment rule, and in the time since it went into effect, the agency took some actions on the basis of that rule, enforcement actions, what have you. I think it would be sort of within normal scope to expect to invalidate those actions if the rule were invalidated. So I think that's the analogy that we're drawing, is sort of an offshoot of the final agency action that violates 705.

**THE COURT:** Well, I think that you all should think about whether that's really something that you want me focused on right now.

**MR. SAMBURG:** We will absolutely take it back.

**THE COURT:** Okay. Mr. Robertson, in your opposition, you noted that the current -- your view is that it's a proposal, not a plan?

**MR. ROBERTSON:** Yes, Your Honor.

**THE COURT:** Can we just call it the plan and the proposal and we'll all know what we're talking about? Okay. You noted in your opposition that the proposal contemplated that these NPS golf courses would remain affordable and accessible. I understand it's not final agency action yet,

but would there be something -- or could there be something in a final agency action that made that enforceable such that if they became unaffordable and inaccessible, the public would have a right to relief?

**MR. ROBERTSON:** I guess that's difficult to say, Your Honor, since we're still -- the agency is still kind of deciding what it wants to do here. So I hate to speculate on what it may do in terms of affordability. But I'll just point out, there are plenty of world-class public courses around the country that are also affordable. I know Your Honor said you're not into golf.

**THE COURT:** Not at all.

**MR. ROBERTSON:** Torrey Pines is a world-class course, and the cheapest -- I think last the time I checked, it was $44 to play there.

**THE COURT:** Where is that?

**MR. ROBERTSON:** It's out in California.

**THE COURT:** Okay.

**MR. ROBERTSON:** So it's not out of realm of possibility that perhaps a plan gets developed here to turn this into a fantastic world-class course, and it stays affordable for people here in D.C. and around the country.

**THE COURT:** Okay. Do you have any view on that?

**MR. SAMBURG:** I would say, first of all, as I think Your Honor knows, affordability is only one part of

the picture, right. A transformation of the course raises other problems.

**THE COURT:** Yeah, it becomes harder for the average person to be able to use the course.

**MR. SAMBURG:** It does. It makes it less playable, but it also destroys the historic nature of the course, all the cultural value, all of those sort of important things. I will say, you know, understanding that Torrey Pines exists, there's another notable public course that has double digit fees as opposed to triple digit fees that is nevertheless a champion-caliber course. My understanding is that those courses are extraordinarily unusual. The fact that there are, as far as I know two, suggests that there are some real difficulties with operating a course with that sort of operating expense at those sort of green fees. It's harder and more expensive to run a course like that.

**THE COURT:** Yeah, I mean, the problem with that argument is it really just dovetails into Mr. Robertson's point that this is all kind of ephemeral right now because we don't actually have a plan so we don't know if it's affordable or not affordable, right. I mean, you're saying, well, there's only two in the world -- in the country, so this must be incredibly difficult. And I imagine Mr. Robertson's response would be it's possible, and we don't know if that's -- you know, if the current plan -- or

the current proposal will look to those plans, figure out how they were able to do it and try to replicate it.

**MR. SAMBURG:** Understood, Your Honor. I do think that when we say, though, that we don't have a plan, first of all, I think plaintiffs' view is that there is a plan and that that plan is --

**THE COURT:** I mean, I know that you think that there's a plan. But so far as I understand it -- and you correct me if I'm wrong -- and we might have to have, you know, some evidentiary hearings on this, there's no actual design plan. It's not like someone has gone nine, 18 courses or whatnot -- holes, not courses. It's not like someone has said we have, you know, these 18 holes. The first five are par three, the second five are par six, and then the last eight are par four. And they have -- one of them has a sand trap thingamajig, and one of them has trees, and one of them has a lake, right. And we don't know how much green there is versus how much putting green there is.

There's none of that, is that fair, to your knowledge?

**MR. SAMBURG:** Yes, that is -- that matches plaintiffs' understanding. I think what we would say is that there is a point somewhere short of someone placing a completed architectural diagram for a course on the desk of the head of National Park Service where we have final agency

action. And we just think we would cross that intermediate point --

**THE COURT:** Where is that point because -- what's your view as to what that point is and where we are? Because I have to say -- and again, Mr. Robertson wrote an excellent brief, and it was convincing. And, you know, he has good arguments. I mean, it's not like he was dressing up bad arguments; he also has good arguments. But I find it hard to take away from where we are right now as to what the plan is. According to what I read in the declaration, all we have right now -- and correct me if I'm wrong, is we have -- there's definitely landfill on there. They're definitely going to change, I guess, the hills or the course landscape. I mean, apparently that's definitely going to change, although it's unclear how or where or when. And what else do we have so far?

**MR. SAMBURG:** So I don't want to jump Your Honor's question, but I think part of what was so valuable about Mr. Robertson's brief is it did a very nice job of elucidating what I think the key difference between plaintiffs' position and defendants' position is. And if I could --

**THE COURT:** Okay. Well, why don't -- why don't we save that for your reply. I mean, I just want to get through these questions.

**MR. SAMBURG:** No, but I think it goes to that question.

**THE COURT:** Yeah, okay, go ahead.

**MR. SAMBURG:** I think that what really the difference is here is a purely factual dispute. I think we've alleged a set of facts that, if they are taken to be true, suggest a very different set of circumstances than if Mr. Robertson's pled facts are taken to be true.

**THE COURT:** But let's say I believe everything that you tell me, and we have an evidentiary hearing and I think your witnesses are all more credible than his hypothetically, and I agree with you. What's your sort of best point as to where we are right now in the planning? Like, what is on the table right now?

**MR. SAMBURG:** So I think we have a few. The first is that the dirt is on the course, and it's there for what are now unspecified purposes. The purposes of the dirt no longer match the categorical exemption form. They're there for some purpose to be determined, which --

**THE COURT:** But I think we know the purpose. The purpose is to -- I mean, your allegation is it's landfill to change the landscape of the course. I mean, I think he agreed with you on that, right?

**MR. ROBERTSON:** Yes, Your Honor, the CATEX says it's landscape-related use for landscaping purposes.

**THE COURT:** But we don't know what the landscape looked like, I guess.

**MR. SAMBURG:** Well, I think the CATEX form, Your Honor, suggests that it won't change the parameters and shapes of the course.

**THE COURT:** Okay.

**MR. SAMBURG:** And our position, based on public reporting, is that that is its purpose; it is there to change the shape of the course; to be used not as sort of repair fill or fill-in fill, but to generally fill -- and I can never remember the correct word and I keep reverting to terraform, terraform the course into --

**THE COURT:** Like the video games. Like, remember those old-style video games where you actually had to like type things in and it was always terraform?

**MR. SAMBURG:** Science fictional novels for me, Your Honor, but same phenomenon.

**THE COURT:** Right, yeah.

**MR. SAMBURG:** That's our understanding of what the dirt is doing there, that's one. Two -- and I think this is maybe the most indicative, is we have multiple statements from both the President and White House spokespeople that this is what they are doing. Not they're thinking about it, not we're considering these plans, but we are going to build a championship course on that site. I can read those

quotes; we've cited them in our papers.

**THE COURT:** But let's -- but a couple of problems with that. One, as Mr. Robertson points out, President Trump is not an agency, right, and he's not binding the agency. I mean, he can say we have those plans, and maybe that would be a basis for you to inquire of the agency, I want these plans in discovery for sure, no question. But that's one issue Mr. Robertson points out, too, as a matter of law. And then as a matter of fact, I mean, all presidents at times say things are going to happen for sure and then, you know, they don't happen.

**MR. SAMBURG:** Sure, but I do think that this president's statements on the course have to be read in conjunction with the movement of 30,000 cubic yards of fill with the visits from Tom Fazio and with the cancellation of the NLT lease. And I understand we disagree about the reason for the NLT lease, but I think if you accept plaintiffs' view, the cancellation reasons that Mr. Robertson describes are pretextual. And this is about a move towards the Washington National Golf Course plan. And that, if correct, I think, is pretty indisputably final agency action.

**THE COURT:** But why would that be final agency action? I mean, I guess I'm a little bit lost that that would be final agency action. They have an idea as to what

they want to do. You can call it a plan; you can call it an idea; you can call it written in stone, whatever. And they've taken debris from one part of D.C. that has to go somewhere, and they've put it in -- so far as I understand from Mr. Robertson, and this could be wrong, a small portion of -- I think it was the white course, of the white course at Hains Point, they've fenced it off. But none of that ties, so far as I understand it, the administration to anything, right. I mean, it doesn't tie them to having to go forward on whatever plan you think they have. It doesn't tie them to keeping the debris there. So I'm still not even sure how that's final agency action.

**MR. SAMBURG:** I suppose, Your Honor, when it comes to renovating a golf course, we could say that nothing ties the government to renovate the golf course until the golf course is literally finished. At any point they could walk away. I think once they start taking --

**THE COURT:** Well, I don't think that's fair because, I mean, if you had a memorandum from the director that said: I have consulted with so and so and so and so, and here's what we plan to do, we plan to create a world-class golf course where people can come and play if they're professional players and enjoy it, and whatever you say they're going to do. That's in a memo. And then he directs, you know: We have this plan from Mr. Fazio that

we're going to implement, it's attached as Exhibit 1, and then he says to his agency: Go implement this memorandum. That you know would be final agency action even though -- I mean, presumably even though the agent head before, you know, things get started could always change his mind. But that's a far, far cry from what we have here, at least based on your allegations, and I understand you get discovery.

**MR. SAMBURG:** Well, I think -- I do think that the allegation that the lease was canceled in furtherance of this plan is a lot closer to what you're describing in terms of a sort of irrevocable moment in time. I also think that to the extent the analogy -- and I think the analogy is a smart one, that this would be the secretary issuing a memo saying this is the plan, right. We know that final agency action -- one of the indicia of a final agency action is a decision by the agency head. What we have is the President approving a plan presented by the Secretary of the Interior to do this, and that seems to me to be --

**THE COURT:** I think what you have is the President saying: I want a world-class golf course in D.C. So far as I can tell, at least from what's in front of me now, you have that plus Mr. Fazio showing up at the course and having a two-hour lunch with Mr. -- with President Trump. And you have the -- I think the director saying something along the lines of: We have a plan to make it -- you know, to change

it.

**MR. SAMBURG:** Well, what we've alleged -- and I do think these details are somewhat important, are that Secretary Burgum and another member of senior leadership at Interior met with the President and proposed creating a world-class golf course on East Potomac and using the White House fill in furtherance of doing so. And the fact that they've taken those steps suggests that that's in fact what they're doing.

**THE COURT:** But we would need discovery on that, right?

**MR. SAMBURG:** We would, and when we get to my argument, Your Honor, I'm going to --

**THE COURT:** And by we I mean you.

**MR. SAMBURG:** Yes, although --

**THE COURT:** I'm thankfully not in the world of discovery anymore.

**MR. SAMBURG:** -- I hope you would at least like what the discovery turned up. But I think we would get --

**THE COURT:** I will neither like nor dislike it. I could care less about what happens with this golf course, other than that we follow the -- I don't mean to be flippant.

**MR. SAMBURG:** No, of course.

**THE COURT:** I understand it's important to a lot

of people. I do not mean to be flippant, what I mean is all I want to do is make sure that we're following the law when whatever we do with the golf course gets done.

**MR. SAMBURG:** I should have said I would hope Your Honor would find the discovery useful, whatever it is that we would uncover. I do think when we get to my argument, Your Honor, I'm going to suggest that perhaps some portions of our current motion are in fact potentially premature if we weren't to seek extra-record discovery in the interim. And we're going to advocate for that, so I think we're in agreement with you.

**THE COURT:** Well, Mr. Robertson, do we know if there's more landfill to come or are we done?

**MR. ROBERTSON:** Yes, Your Honor, there is.

**THE COURT:** How much and when?

**MR. ROBERTSON:** May I comment on just two things?

**THE COURT:** Yeah, sure, go ahead.

**MR. ROBERTSON:** One, I mean, I just want to pull back. This is administrative record case, so they're entitled --

**THE COURT:** That's my next question, so you'll get a chance on that.

**MR. ROBERTSON:** Okay. Second, I think my colleague mentioned their concern is that this fill has been placed, stockpiled in place on the golf course, and they

weren't sure what was going to happen with it. I think that's kind of the crux of this in that if something is going to happen with this fill, further stuff needs to happen at the agency, even if it's simply, you know, okay, we're going to use this fill to recreate some bunkers that are already on the course. All those plans, whether it's completely redesign and overhaul this course and use this fill, as they seem to allege, or conduct ordinary maintenance activities with it, all of those things could still happen, but those needs to be developed at the agency and that kind of plan needs to come forward first.

**THE COURT:** So what more landfill is to come and when is it supposed to get there --

**MR. ROBERTSON:** So Your Honor --

**THE COURT:** -- and where is it gong to be put?

**MR. ROBERTSON:** -- as I understand it, trucks still arriving every day.

**THE COURT:** And so the trucks come and dump out how much, do we know?

**MR. ROBERTSON:** I'm not sure how much is within each truck, but approximately 28,000 cubic yards has been placed as of right now.

**THE COURT:** And do we know if we're going to double that, triple that?

**MR. ROBERTSON:** No, no, Your Honor. We anticipate

a few thousand above 30,000. But the CATEX anticipated approximately 30,000, and we think it's going to be well within that range.

**THE COURT:** So let's say presumably under 35,000?

**MR. ROBERTSON:** Capping out at 40 maybe. If I could add a little color to this, Your Honor. There is a difference when fill is excavated and it's compacted and then when it's placed because it kind of swells up. And so when you -- when's it's like down on the ground and has stuff on top of it, it looks like one size and then you go to place it, it expands and looks like another size. So that's why the size difference we say is about 30,000, but it's going to be a little bit above that in terms of what gets placed. But that's what gets excavated, and so that's why it's approximately 30,000.

**THE COURT:** But we're not talking we're doubling -- we're within where we are, and we might expand it a bit, but not by many times -- or not even by time and a half?

**MR. ROBERTSON:** Yes, Your Honor, and just expanded by the natural functioning of dirt.

**THE COURT:** Do you have any idea of when that's, like, anticipated to be completed by?

**MR. ROBERTSON:** I do not, Your Honor. Just off of the top of my head doing the calculations, though, this

started way back in October and we're only now just here. There's only -- we're at least two-thirds done.

**THE COURT:** All right. I was going to ask next about the administrative record issue, but that's going to, I think, take a lot more time so I'm going to skip that for now. But I'll let you address that.

Why a four-month delay?

**MR. SAMBURG:** Your Honor, as I think my friend has mentioned, the CEE form provides a pretty reasonable explanation for the dumping of the dirt. We think that the intervening events -- so the cancellation of the lease, the statements from the President, Mr. Fazio's visit, some of the changes with regards to the condition of the dirt, that's what suggested to us that the dumping of the dirt was something more than the what the CEE suggested it to be. So until we had indications of the Washington National Plan writ large, I don't necessarily know that there was a meaningful claim to be brought against the dirt.

**THE COURT:** All right. Well, thank you not for bringing a TRO.

**MR. SAMBURG:** You're welcome, Your Honor.

**THE COURT:** So Mr. Robertson, at the opposition at your page 25, you had a long, and I thought useful, discussion of what has to happen before any plan can be approved. It was a pretty long list, but let me ask you

this: Do you know where the agency is in the design planning process?

**MR. ROBERTSON:** I think it's -- right now, it's a concept and an idea, and they're still trying to figure out what it could even look like if they want to go forward with it at all.

**THE COURT:** Do you know if there's like a team dedicate to looking at this?

**MR. ROBERTSON:** I'm not aware of any of that, Your Honor.

**THE COURT:** So you must be -- I mean, obviously you have two declarations. There must be someone in the agency who has this on their to do list. Do you know who that would be?

**MR. ROBERTSON:** I don't know if it's on a to do list necessarily or if it still just -- if it comes up in discussions in meetings about what we should do or how we ought to implement this idea, and how can get it to an eventual action that could happen one day.

**THE COURT:** Okay. And this might be premature, but in the hopes of getting people together on this, if there's not yet a design plan, I mean, is there any -- could you all have any discussion about giving people in the community, including plaintiffs, input into what that design plan would be before it was finalized? I mean, it seems to

me that -- I mean, look, if at the end of the day -- and I don't know that they will or have, I don't know. But if at the end of the day the agency does what they're supposed to do in terms of following the law and following the APA, you know, the fact that the course now becomes more difficult for amateurs to use and maybe prohibitively expensive, if the agency follows the law and that's allowed and they do the environmental assessment plan -- they say you already have, but let's say I agree that they have or they do more, I'm not going to be able to do much about that.

But it does seem that now that they know what you all are concerned about, and you know that they're potentially moving forward, it seems like a better use of everyone's time is to talk to each other and see if you can reach some agreement that since we are early in this process, you know, the public and maybe the plaintiffs as part of a settlement agreement could have meaningful say or review of the plans.

**MR. ROBERTSON:** 100 percent, Your Honor. I think our declarants speak to this in that if there is eventually some kind of agency action to completely overhaul and redesign this course, it's necessarily going to be preceded by the correct kind of environmental reviews and engaged with the community in consultation. But we are just so far from even getting there at this point. But certainly that

type of step would happen, if this comes to fruition.

**MR. SAMBURG:** I have the same understanding, Your Honor. I think provided the defendants end up complying with the NHPA at the appropriate time, there is a meaningful opportunity for the comments you've described.

**THE COURT:** Okay. I understand that there's a dispute as to whether or not the stockpile that's currently there is environmentally a-okay or environmentally horrible or we just don't know one way or the other. That's a factual dispute amongst you all, right. And my understanding from the plaintiffs' brief is that the company that put in the fill I guess did not get an asbestos sign-off from the D.C. government?

**MR. ROBERTSON:** That's correct, Your Honor.

**THE COURT:** But your view, your understanding, your declarant's understanding is that it's all safe and that you've done testing?

**MR. ROBERTSON:** Yes, Your Honor. As of this morning, the most recent check, there's no asbestos and the contaminants are still at background level. And I think our point kind of goes a little bit further, that they don't actually have plausible allegations to establish standing for that kind of toxic exposure.

**THE COURT:** I know, but let's put that aside.

**MR. ROBERTSON:** Put that aside, for sure.

**THE COURT:** All right. The testing that was done -- and I know that there were exhibits, has that been made public?

**MR. ROBERTSON:** I'm not sure if it's been made public, Your Honor. I'd have to confer with the agency.

**THE COURT:** All right.

**MR. ROBERTSON:** If I can just briefly, Your Honor, if it has been made public, we haven't been able to locate it.

**THE COURT:** I mean, one thing that we might do to maybe calm -- not calm them down, maybe sort of think about whether or not the dispute that we think is here is actually here is maybe produce that to them in some sort of protective order, right. That's something that we could at least take away as a first step from this. Because I agree that if we have sort of an environmental issue, to me, that's the most concrete harm that I'm seeing from these papers. And putting aside whether they have standing, if that's not actually an issue, it may be better for everyone to know that. If there is an issue, it would be better for everyone to know that. So you guys talk about that and think about if that's something you all can agree to after today.

And the plaintiffs I think, Mr. Robertson, put in the most current assessment of the course was that it was

quote, unquote fair in terms of its condition, and that if nothing was done to it, it would fall to poor. Do you know what I'm talking about?

**MR. ROBERTSON:** I do, Your Honor. That's a 2017 report.

**THE COURT:** Do you all agree with that or not agree with that? Basically, my bottom line question is do you agree that there's going to have to be some improvements on the course?

**MR. ROBERTSON:** Yes, the course does need maintenance. And I would point to a subsequent analysis from 2019 which discussed the fact that the improvements could be made consistent with the course's historical design and cultural value, you know, drainage improvements, erosion prevention. As much as you're not a golfer, I am not an environmentalist, but the necessary steps to protect the course and to protect East Potomac Park, it was the view in 2019 of the -- I believe it's called a cultural resource inventory, but I may have that wrong, that those improvements could be made while preserving the course.

**THE COURT:** All right. So it seems like we're all in agreement that -- and I don't want to overstate the government's con -- it's not a concession, don't freak out. But it does seem to me that we're all in agreement that either the fill that's there now from the East Wing is or

ideally would be environmentally sound and/or at least we would know if it was not environmentally sound. Everyone can agree with that, right?

**MR. ROBERTSON:** I think so, Your Honor, if I follow.

**MR. SAMBURG:** Yes, Your Honor.

**THE COURT:** And it sounds like we all agree that the course needs some maintenance and some course correction to make sure it doesn't fall into further -- into disrepair, right, we're all agreed some changes have to be made?

**MR. SAMBURG:** Yes, Your Honor.

**THE COURT:** And we're all agreed that right now, there's no one -- there's no company that's leased to do that? Because NLT's lease has been voided and no one new has come in to do it. We're all agreed on that?

**MR. ROBERTSON:** Yes.

**MR. SAMBURG:** Yes.

**THE COURT:** Okay. Mr. Robertson, do you know if any -- if the agency has been working -- have they put out an RFP, request for proposals, to get someone else to come in? Like, who is maintaining it right now?

**MR. ROBERTSON:** So my understanding is that NLT is still maintaining the course without a lease right now. But if all these changes that we're talking about would have to take place, as we kind of detail in the brief, we have to

either -- we'd have to find a new lessee or reengage with NLT. We'd have to go through all of those steps first, and then we'd have to actually design what this redesign looks like. And then we'd have to do the environmental review, environmental compliance. Then at some point down the road we get to a decision to actually transform the course, but we're --

**THE COURT:** No, okay, okay. So basically the bottom line is right now, NLT is sort of doing it month-to-month like a renter?

**MR. ROBERTSON:** You can still go out and play the course, and I understand they're the ones allowing folks to do that there, but they're currently operating without a lease. We would still need to revisit that process before further steps could happen, whether it's a new lessee or NLT.

**THE COURT:** Do you know if the white course is still playable? That was like a -- I think -- hold on. As I understood it, that was the -- where the rubble is and is a nine-hole course?

**MR. ROBERTSON:** Yes, Your Honor, my understanding is that Exhibit 3 of our brief --

**THE COURT:** Yeah, I saw that.

**MR. ROBERTSON:** That kind of shows where this stockpile is located.

**THE COURT:** Right.

**MR. ROBERTSON:** And there are three holes that kind of surround it. So this is being placed in a void in between those holes, and it was selected for that purpose so it allowed the holes to still be playable and still be enjoyed. So that's why it's in that particular location.

**THE COURT:** What does it do to your par score if you hit the ball into the landfill?

**MR. ROBERTSON:** I'm not sure what the out-of-bounds rules are now, but I'd have to go out and check.

**THE COURT:** Okay. But, I mean, you would say it's not -- you don't want to be playing golf -- I mean, one of the reasons you go play golf is because it's gorgeous outside and the scenery, and you don't want to do it next to a landfill.

**MR. ROBERTSON:** Especially at East Potomac, Your Honor. So I think it impedes all of that, and also the environmental risk and all the other harms you don't need me to list.

**THE COURT:** All right. Those are my questions I have except for the following -- and you can be seated, Mr. Robertson.

**MR. ROBERTSON:** Thank you, Your Honor.

**THE COURT:** Thank you. It does seem to me that we

might -- I take your point that the landfill issue is sort of part and parcel to the final plan issue. It does seem to me, though, we have two different regulatory schemes, right. We have the NEPA that the landfill issue squarely impacts or -- impacts, and then we have the -- whether there's a golf course for a new plan. And that seems to me more goes to the NHPA and NPS Organic Act, right?

**MR. ROBERTSON:** I think the NEPA, Your Honor, still also speaks to the macro-question of the Washington National Plan, that it still will alter the ability to enjoy the human environment.

**THE COURT:** All right. Well, those were my prepared factual questions. Chances are I will interrupt you, but feel free to argue what you would like. And just for my edification, I think responding to the opposition brief -- and I'll let you file a reply obviously if you want, would be helpful for me.

**MR. SAMBURG:** Certainly. I appreciate it, Your Honor. As I mentioned during the question and answer, I think part of what was helpful about Mr. Robertson's brief is that it really crystalized the difference between the defendants' position and the plaintiffs' position. I think what you have here are two distinct stories of what's going on with regards to East Potomac. You've got our story, right, and our story is there's a meeting where leadership

of the Department of Interior says to the President of the United States, who is known to be an enthusiast of championship-style golf courses: Let's plow under East Potomac, this historic course with cultural value that's been protected for a century, and let's build a course in your preferred image. As part of that, they say to him: We can use the dirt from the ballroom project as part of that. And his response is enthusiastic, and immediately debris starts getting moved over for this purpose. The President then goes on television -- well, goes on YouTube at a press conference and says: We're going to do this. You know, we have very affirmative, clear statements from the President. His preferred golf course designer is brought in to sort of spearhead the project. And then they cancel NLT's lease because NLT is in the way. That's our version of the story.

And Mr. Robertson's version of the story is very different, right. He says the same meeting happens, but the meeting is limited to the question of whether or not the debris from the ballroom should be used for minor maintenance at East Potomac; the sort of maintenance that I think we all would agree is acceptable, the sort of flood prevention, stabilization that we discussed earlier. The President approves this plan, although it's not entirely clear why the Secretary of the Interior would need to ask the President about trucking the dirt from the ballroom

project to East Potomac. And then the dirt starts going over.

Separately, Tom Fazio comes and looks at the course. Maybe there were some informal discussions about something down the line, but separately he comes and looks. Then, for reasons that are unrelated to NLT's opposition to this plan, NLT's lease is canceled. And despite the fact that the purported reason --

**THE COURT:** Hold on, was there an allegation that NLT was opposed to the plan? I didn't see that.

**MR. SAMBURG:** I think we've alleged that NLT was in the way -- I shouldn't say opposed, that NLT was an obstruction to the plan because the terms of NLT's lease require a consistent operation of an historic golf course, a cultural course.

**THE COURT:** Okay, but my understanding is if NLT still had the lease -- I mean, there might be changes to the course, but if they still had the lease, they would still be operating it, right?

**MR. SAMBURG:** I believe that's correct, Your Honor. This might be a place where Mr. Bardwell would be better equipped to talk about the golf course details, if that's okay.

**THE COURT:** Yeah, well, if you just remind me to get back to that because I'll forget.

**MR. SAMBURG:** Okay. And then, Your Honor, after dismissing NLT, again, in the defendants' telling, they retain NLT to continue to run all three courses despite the fact that the alleged cancellation is due to $6,000,000 in back rent and failure to perform a number of lease terms.

**THE COURT:** Well, I mean, someone has to do it.

**MR. SAMBURG:** Someone does have to do it. But I'm not a golf course operator, and it strikes me that if someone shorted me $6,000,000 in rent and failed to perform on a number of other terms, they might not be my first choice to continue to operate my golf courses.

**THE COURT:** Okay.

**MR. SAMBURG:** So if our story's right, Your Honor, I think, as I read defendants' brief, even defendants would agree that we're entitled to relief, right. I think this is the entirely thrust --

**THE COURT:** Well, I don't think that they would be -- I don't think that they would say you would be entitled to relief under their version. What about their version would entitle you to relief?

**MR. SAMBURG:** Sorry, under our version. I apologize, I misspoke.

**THE COURT:** Oh, sorry.

**MR. SAMBURG:** No, I apologize. Under our version of events, I think even the defendants would agree that

we're entitled to relief in the form of NEPA compliance, NHPA compliance, et cetera. And importantly --

**THE COURT:** Even if there's no final agency action?

**MR. SAMBURG:** I'm sorry, Your Honor?

**THE COURT:** Even if there is no final agency action or accepting that there is final agency action?

**MR. SAMBURG:** Accepting that there is, but I think under our version of the facts, we feel that there is final agency action in the adoption of the plan, as you and I have already discussed to some degree. And I think that's sort of the thrust of Ms. Bowron's entire declaration, the person exercising the authority as the Director of the National Parks Service. The thrust of her entire declaration is that when the time comes, they will comply with NEPA and NHPA.

So I think all that's really left is to answer the question of whether our story is right. And what I want to sort of point out here is we've alleged what we've alleged based on public reporting, based on the President's own words. And the defendants have alleged what they've alleged based on information that's uniquely in their possession. So here's what we, I think, can agree on factually. There is a dirt pile in the middle of East Potomac, and there is still dirt being added to it. I think we actually disagree with Mr. Robertson's characterization of how much dirt is

left. I think we think it's probably slightly more than he's describing. But regardless, there's some dirt that needs to be added, and that is ongoing.

**THE COURT:** Do you agree that it's fenced off?

**MR. SAMBURG:** I do agree that it's fenced off.

**THE COURT:** And you agree that it's not impacting physically any of the current holes, putting aside eyesore whatever, and putting aside environmental impact?

**MR. SAMBURG:** I suppose it depends on how bad of a golfer someone is, but I'll say for most people it's probably fine.

**THE COURT:** Okay.

**MR. SAMBURG:** So Your Honor, if we could cabin the sort of continued dirt dumping for a second and talk about everything else?

**THE COURT:** Sure.

**MR. SAMBURG:** Plaintiffs' view at this point is that there is simply too much of a factual dispute between our version, based on public information and the President's words, and the defendants' version, based on information that they have, for this Court to make an assessment of what's correct.

**THE COURT:** Well, I agree with that. We have a heated agreement that I do not have enough information about yet.

**MR. SAMBURG:** So our intention, Your Honor, is to move for extra-record, expedited discovery into those questions. I'm happy to talk about that now or happy to briefly talk about the dirt dumping first, whatever would make more sense for you.

**THE COURT:** Well, I guess my question is -- because I do think you have a really difficult road to hoe on irreparable harm at a minimum and sort of public interest. I'm wondering whether it doesn't just make a lot more sense just to have an incredibly expedited discovery summary judgment schedule and just get to a quick evidentiary hearing, and then I think there's -- I now know a lot about preliminary and permanent injunctions, more than I did, say, 14 months ago.

**MR. SAMBURG:** Sure.

**THE COURT:** And I now know that there's a civil procedure rule in which the Court can combine the permanent injunction hearing with a hearing on the merits, and it basically just becomes one. So then you're really just down to the merits of the case. I'm wondering if maybe that's a better approach for everybody. I'm not going to put you on the spot to answer that right now.

**MR. SAMBURG:** Well, I mean, I'll certainly give you my impression. I'd like to obviously confer with co-counsel. I'm sure all five of them are shooting daggers

into my back.

**THE COURT:** They're not; they're shooting daggers at me.

**MR. SAMBURG:** My view on that, Your Honor, would be if we were able to get the necessary discovery, that might in fact be a very efficient way of resolving this. Because I think regardless of the precise channel, plaintiffs think the next step on everything that we've alleged, with the exception of the ongoing dumping, is discovery. And so if that's in service of a subsequent sort of combined proceeding, I think that's efficient. And it may well be that defendants' version of the story is what's borne out by discovery, and then I think we have a different conversation.

**THE COURT:** Okay. And fair that other than the dumping that has occurred and the ongoing dumping, and whether the ongoing dumping is materially going to change what's already occurred -- and I'm not going to make them take it all back, that's unlikely to happen, there's no other irreparable harm, right?

**MR. SAMBURG:** That's currently ongoing?

**THE COURT:** Right.

**MR. SAMBURG:** That's correct, we do not believe there's any currently ongoing irreparable harm besides the continued dumping.

**THE COURT:** Okay.

**MR. SAMBURG:** So, I mean, Your Honor, would it be helpful for me to talk about the dumping quickly and sort of wrap that up and then talk about discovery?

**THE COURT:** Yeah, I think it would be helpful for you to just wrap up the discussion on the dumping, and then talk to me about why and whether I'm allowed to add -- to permit extra-record discovery -- extra administrative record discovery.

And you haven't filed an administrative record yet? I mean, that's not a criticism; you've had two weeks.

**MR. ROBERTSON:** No, Your Honor.

**THE COURT:** All right. Do you have any idea of when you'll be able to do that by?

**MR. ROBERTSON:** Your Honor, our position would be that we would move to dismiss on standing grounds before any administrative record would need to be compiled here. I think we're getting way far ahead.

**THE COURT:** Why don't you humor me and tell me if you had to put together an administrative record, how long it would take you to do that.

**MR. ROBERTSON:** I'm guessing here, Your Honor, a couple of weeks.

**THE COURT:** All right. I suggest -- I might order, but I suggest for right now that the agency start

compiling the record. Because the chances of me dismissing this on standing grounds, based on what I've seen so far, are not what I would say substantial, although I haven't made my decision yet, okay. And I don't want to be -- what we're not going to do is delay merits while we figure out sort of the precursor issues, all right?

**MR. ROBERTSON:** Understood, Your Honor.

**THE COURT:** And especially because, Mr. Robertson, a lot of the standing issues are part and parcel to the merits issues, especially with respect to final agency action and whether there has been agency action. And as I now know, I have jurisdiction to determine my jurisdiction. So I would have standing to move forward with some discovery even if I'm just focused on the standing issue. All right, go ahead.

**MR. SAMBURG:** So looking at just the ongoing dumping, Your Honor, I don't think -- and I may be wrong, but I don't believe the defendants dispute that that claim would be ripe. I don't think that they dispute that it is a reviewable final agency action to have dumped a bunch of dirt --

**THE COURT:** Correct, Mr. Robertson, you don't dispute that that's final agency action?

**MR. ROBERTSON:** The dumping of the dirt, no.

**THE COURT:** Okay.

**MR. SAMBURG:** Your Honor, at that point, I think we can just jump ahead to the regular 705 and PI factors. And if we want to start with likelihood of success on the merits, I think the CEE -- which I've recently learned by the environmental folks is called the CATEX, and I think that sounds really cool. I think the CATEX is inadequate, Your Honor, and insofar as it's inadequate, that's inherently a NEPA violation. It describes the dumping as temporary. It describes the dirt as clean. And it also describes the dumping of the dirt as easily reversible. And I think there are problems --

**THE COURT:** But those are all factual disputes, right?

**MR. SAMBURG:** Well, I think, to easily reversible, Ms. Bowron's declarations actually resolve the factual dispute. She said that it would cost somewhere between 2.7 and $5.4 million to move the dirt that's currently on the grounds.

**THE COURT:** Well, they're not saying it would be inexpensive, they were just saying it would be easy to do. The trucks took them; the trucks can take them away.

**MR. SAMBURG:** But I have to believe that the cost is somewhat wrapped up in the description of something as easily reversible, right.

**THE COURT:** That's actually a great legal

question. I'm sure there's some case law on that, but I don't know it.

**MR. SAMBURG:** Sadly, I don't either, Your Honor. On the NHPA, the historic assessment form which was filed we think is also inadequate. It determined that there would be no alteration to a historic setting and then proceeded to dump enough dirt -- I did this math, to cover the fair territory of Fenway and one yard of dirt in the middle of a historic setting.

**THE COURT:** Well played; well played.

**MR. SAMBURG:** I'm also a Sox fan, Your Honor; it's actually genuine.

**THE COURT:** Wait, you said you were a Red Sox fan?

**MR. SAMBURG:** I am.

**THE COURT:** I was --

**MR. SAMBURG:** Would you like me to hold for summary judgment?

**THE COURT:** I was at a party the other day, and one of my friends, who is a big Cubs fan, came up to me and said, "Thank you for Alex Bregman." I was like, "Oh, you just ruined my entire night."

**MR. SAMBURG:** That's a rough one, Your Honor. In 2003, my college roommate was a Cubs fan. To us, it was --

**THE COURT:** Oh, was that the Lester trade? Oh no, that was --

**MR. SAMBURG:** The Lester trade was much later. But they both had deep post season runs. We had a lot of fun, and then neither of us won it.

**THE COURT:** We won it the next year. Yeah, I was despondent when Lester got traded to the Cubs. My best friend was like, "You really need to get a life." Go ahead, sorry. Golf, not baseball.

**MR. SAMBURG:** No, it's fine. I won't invoke Theo Epstein. On the NHPA, Your Honor, the historic assessment form, as I said, said no alteration to an historic setting, then they dump all this dirt. It also indicated, and I think this is important, that the dirt would be available for use consistent with NLT's intent, and NLT's no longer in the picture. So I think that --

**THE COURT:** Well, my guess is what they meant was the intent with respect to whatever was agreed in the current plan or lease, right, Mr. Robertson?

**MR. ROBERTSON:** Yes, even the old lease anticipated completely redesigning two of the courses.

**THE COURT:** Okay.

**MR. SAMBURG:** But I think the fact that it anticipated some sort of use for improvement by a lessee is complicated by the fact that there's now no lessee and no one in a position to make a call on how to use that dirt for those improvements. And then, of course, there's the

Organic Act --

**THE COURT:** But that sort of speaks directly to Mr. Robertson's final agency point. I mean, that sort of fatally -- well, not fatally, but it undercuts your final agency action point. It certainly -- right?

**MR. SAMBURG:** It undercuts -- sorry, just to be clear, Your Honor, it undercuts our final agency action point with regard to the plan as a whole?

**THE COURT:** Right. I mean, if the argument is we don't know because there's no lessee what's going to happen with this dirt, fair enough. But if we don't know what's going to happen with the dirt, that's entirely Mr. Robertson's point on the final plan, we don't -- there's no plan; no one knows.

**MR. SAMBURG:** Well, I think this is where we get back to the question of where along the spectrum from when someone had the idea to, you know, the final tee is placed -- or whatever the last thing someone does when building a golf course happens, does final agency action occur. And I think you can still be short of the point you're describing and still have final agency action.

**THE COURT:** All right, fair enough.

**MR. SAMBURG:** And then on the Organic Act, I think the notion that this is impairing the enjoyment of East Potomac, I think Your Honor's correct --

**THE COURT:** They would have, Mr. Robertson, standing on that point, right? I mean, I think I've seen a lot of case law in other cases that with respect -- I'm going to let you answer that, but with respect to enjoyment of environment, that is standing grounds if the membership organization can show that some of their members would be impacted by that, and they do have declarations by individuals in the membership. And I remember this because I had a case involving willow birds and a different case involving boreo horses, and the law as I recall it in both of those cases with respect to the standing issue was that the changing of the environment could constitute standing purposes.

**MR. ROBERTSON:** Sorry, would you like me to respond now, Your Honor, on this point?

**THE COURT:** Yeah.

**MR. ROBERTSON:** May I approach?

**THE COURT:** Yeah, you can just stay up here.

**MR. ROBERTSON:** So we would submit that there is no standing even there, Your Honor, for the stockpiling claims, as we'll call them. And I think there's two key points with this, is that, one, this is temporary.

**THE COURT:** Well, temporary, I mean, you know, if I want to go play golf tomorrow and it's going to impact my ability to enjoy it tomorrow, I mean, that would go to

redressability, but why would that go to standing?

**MR. ROBERTSON:** Because that is just a generalized grievance that anybody would have, it's not particularized to them.

**THE COURT:** No, no --

**MR. ROBERTSON:** If I could provide an analogy, Your Honor, it might help.

**THE COURT:** Sure.

**MR. ROBERTSON:** All of us live in D.C. and love the National Mall. You've probably been on it many times. You've probably seen the Reflecting Pool when it's been drained and it's empty. If that regular maintenance that NPS does -- National Parks Service does to drain the Reflecting Pool and rehabilitate it and fill it back up again, if me jogging by the Reflecting Pool -- because I love to jog by there, and it's empty is enough for a constitutional injury, that essentially means that anyone who visits all of our national parks, which are constantly undergoing maintenance, is going to have a constitutional injury. And I don't think standing's meant to open the courthouse doors to 300,000,000 plus park visitors at our 400 national parks around the country.

So where this has to be capped is that this is just temporary maintenance on this facility that has to happen. And that type of effect on your aesthetic does not

rise to the level of a constitutional injury, it is too generalized and not particular. So that is our position on --

**THE COURT:** What if it's not regular maintenance, though? I mean, his argument is that this was not just regular maintenance. And presumably with respect to the standing issue, I mean, yes, maybe it would open up standing to everyone running by who does that on a regular basis -- and back when I had knees, I did that, but that doesn't mean -- but you would still need some sort of claim, right. I mean, that's not all that gets you standing. You would still need -- I mean, if it was just the regular maintenance that was done day in and day out, you wouldn't have the rest of the things that you need for standing.

**MR. ROBERTSON:** I think all of those things that still have to happen is just so speculative that we just don't know what that is going to turn into. There is an independent basis for this fill to be used here, and I think that's kind of our point that we'll -- let's let the agency process play out, figure out what happens first.

**THE COURT:** All right, thank you. Keep going.

**MR. SAMBURG:** Your Honor, if I can just briefly respond on the temporary dirt pile before I circle back. By Ms. -- and I apologize, I don't know whether she's here, if I mispronounce her name, Ms. Nersesian, the NPS official who

oversees the region. By her description, what's going on with the what she calls stockpile of dirt, is that they're going to temporarily and permanently seed it to prevent erosion. It just strikes me that if the dirt pile is temporary, I would not describe what I'm doing as permanently seeding it with presumably plant growth to prevent erosion.

**THE COURT:** But weren't you complaining that part of the problem with the course or with the area is that it's subject to corrosion? I mean, shouldn't you be happy they're doing that?

**MR. SAMBURG:** So I don't think that seeding the dirt pile, which as I understand the map is nowhere near any of the waterways, will prevent erosion of the land, which is near the waterways. I think --

**THE COURT:** Okay, so what --

**MR. SAMBURG:** -- it's to prevent the dirt pile from dissipating. And so --

**THE COURT:** Of dissipating, I'm sorry, I don't understand. To where?

**MR. SAMBURG:** Literally sort of flattening and drifting down onto the course, which is --

**THE COURT:** Well, it seems like you would want that too, right?

**MR. SAMBURG:** I think it's preferable than leaving

it there sort of --

**THE COURT:** Well, you can't have standing from the fact that something that you want to happen is happening.

**MR. SAMBURG:** No, I'm not suggesting that the seeding provides standing. I'm suggesting that the fact that she describes permanent seeding on the dirt pile, I think --

**THE COURT:** Well, while it's there, but once you take the dirt pile away, you take the seeding away.

Are you here, ma'am? No, she's not here.

**MR. SAMBURG:** I'm sorry, no, Your Honor. Oh, Ms. Nersesian, I'm sorry. I just think it calls into question just how temporary the dirt pile is. It strikes me the better analogy to the Reflecting Pool would be we drain the Reflecting Pool for maintenance, and in the process we also cut the pipes that we use to refill it with the understanding that at some point we can come back and reconnect the pipes.

**THE COURT:** And then we're just going to fill it with a bunch of dirt from the East Wing of the White House, that would be your best analogy?

**MR. SAMBURG:** I suppose, yeah. And then if you permanently seed it, the whole Mall will be green and you'll have consistent design. So on irreparable harm, again -- having sort of discussed the merits, on irreparable harm,

again, I think we would disagree with defendants' characterization of how much dirt is left, but I think that actually sort of goes to the point. No one --

**THE COURT:** I mean, the harm has been done, right. I mean, I don't think you're going to face -- I mean, to the extent that there's a bunch of dirt there now, and there's going to be a bit more dirt in the next couple of months, I just don't see that that -- I mean, it's presumably still ugly; it's presumably still an environmental risk. It's just all the same thing, there's just a little bit more of it.

**MR. SAMBURG:** Yes, Your Honor, I think it's more of it. I think it becomes larger; it becomes uglier; it becomes more of an obstruction. I think that the environmental risk, to the extent there is one, is probably --

**THE COURT:** I just don't -- I mean, okay. I mean, you're just not going to -- I mean, I'm just very skeptical that as a matter of fact and law I can sort of say stop the trucks because right now it's -- you know, it is what it is and I can't undo it, but I can stop it becoming worse. I just don't think it's going to materially change based on what I've heard so far.

**MR. SAMBURG:** So I do think -- and recognizing that defendants have made representations about the toxicity

and volatility of the soil, I do think that if there's an environmental risk to the soil, every time a trump -- truck, excuse me, dumps a truckload of dirt on the pile, that creates an exposure risk that is unique from the pile merely being there.

**THE COURT:** But isn't that exposure risk the same as it would be if the pile stayed where it is right now? I mean, both are in D.C.

**MR. SAMBURG:** No, Your Honor. So I'm saying that I think the actual act of moving the dirt -- when you dump dirt out of a truck and it kicks up in the air as you dump it onto the pile, that that likely is creating a unique exposure risk. And so if dirt is sedentary on the East Wing or if it's being moved to some other site that isn't used by a bunch of --

**THE COURT:** But isn't it going to be moved somewhere? I mean, it's not just going to stay at the East Wing, right? Either they're going to move it to Hains Point, which is where the golf courses are, or they're going to move it to some other area somewhere presumably in D.C. But let's say Virginia agrees to take all of this dirt, all those environmental risks would still occur.

**MR. SAMBURG:** I guess I would say two things, Your Honor. The first is depending on where they're dumped, there may not be environmental risks to people in the

proximity because it may not be a golf course where people are --

**THE COURT:** Yeah, but it's going to be a problem for somebody.

**MR. SAMBURG:** Well, I mean, it depends. A sufficiently non-person used area, I think you would be able to mitigate that risk.

**THE COURT:** All right. But the soil or the whatever or the air would still be impacted one way or the other.

**MR. SAMBURG:** It would, Your Honor. But, I mean, the second thing I would say is my clients use East Potomac. My clients don't use a different wooded area somewhere in Virginia that may or may not be commonly used -- unless they do, in which case maybe I'll be back.

**THE COURT:** Okay.

**MR. SAMBURG:** But as of now, they don't. Just briefly on the balance of the equities -- oh, and I'm sorry, Your Honor, one last point on irreparable harm. To the extent we do think the cost of moving dirt comes into the ease of removing the dirt, presumably adding more dirt will up the 2.7 to $5.4 million cost of removing the dirt should Your Honor at a later point find that it's illegally there. I was just flagging that.

**THE COURT:** Another great use of my tax dollars,

you know, but they've got to be used for something. Go ahead.

**MR. SAMBURG:** That's fair. Your Honor, on balance of the equities, we think this one is very easy. It's a modest delay for whatever they plan to use the dirt for, for removing the dirt from the East Wing, from getting it there. In exchange, we're preventing unlawful conduct. And as I said, they can cart the dirt somewhere else.

**THE COURT:** Is there any reason that the dirt has to be moved right now, Mr. Robertson? I mean, I assume you have a contract with dirt moving trucks. But other than whatever that is, is there a reason that it has to be moved now?

**MR. ROBERTSON:** This may be me speculating, Your Honor, but I'm assuming there's to construction plans, when construction plans are built, there's certain float built in, but certain things have to happen in certain --

**THE COURT:** Yeah, and the construction --

**MR. ROBERTSON:** -- strict timelines and --

**THE COURT:** -- plans for the East Wing have been approved by Judge Leon, right?

**MR. ROBERTSON:** I'm sorry, Your Honor?

**THE COURT:** There was litigation to stop the plans, but just going off the news, I think those plans were okayed.

**MR. ROBERTSON:** I believe that's correct, Your Honor.

**MR. SAMBURG:** So unless Your Honor has anything else on the dumping, I'm happy to the move to the extra-record discovery question, which I know is -- so extra-record discovery is appropriate in some set of APA cases that look a lot like this, the sort of atypical APA cases where we're not talking about an agency rule, an agency guidance document, something like that. And the final agency action that we've alleged here, as I've said, is the decision to construct a new golf course.

I think if we look at other cases where extra-record discovery has been permitted, much of the purpose of that extra-record discovery in an APA case is to figure out the contours of the final agency action where it isn't, again, a written policy, a written rule, et cetera. And that's this case, Your Honor, because as we've discussed --

**THE COURT:** Do you have any D.C. Circuit cases on that that I can look at?

**MR. SAMBURG:** Yeah, I'd point you to Hispanic Affairs Project v. Acosta 901 F.3d --

**THE COURT:** Hold on, you have to go quiet -- you have to go slower for him --

**MR. SAMBURG:** I'm so sorry.

**THE COURT:** -- and for me and for my clerk. Not my clerk, she's fabulous, but for me and for him. 901 F.3d what?

**MR. SAMBURG:** 378.

**THE COURT:** Okay.

**MR. SAMBURG:** Marshall County Health Care, 988 F.2d 1221. And it's not a D.C. Circuit case, it's a D.C. District case, but I would also point you to Judge Bates' decision on discovery in AFL v. Department of Labor, which embarrassingly despite litigating it -- oh, here we go, 778 F.Supp.3d 56.

**THE COURT:** I think I've read that one, okay.

**MR. SAMBURG:** That's a very well-litigated case, Your Honor.

**THE COURT:** Yeah.

**MR. SAMBURG:** So I think once we're in the realm of extra-record discovery being permissible, it's a five-factor test that the Court considers. Factor one is whether there's a preliminary injunction motion pending, which of course there is. Factor two is the purpose of the discovery, which generally weighs in favor of the plaintiff when the purpose is to support a PI, as it is here. Because as I think I've explained, our view is we have a set of facts, they have a different set of facts, and if it's our set of facts, we think we prevail. Factor three is the

breadth of the discovery requests. We obviously can't evaluate that until we propound them, but we would, I promise, attempt to keep them as narrow as possible.

**THE COURT:** You will keep them as narrow as possible.

**MR. SAMBURG:** Yes, we we will, Your Honor. Factor four is the burden upon defendants. Again, similarly difficult to evaluate. But as Your Honor mentioned, some of that could be test results that they already have. It could be entry on land to test the dirt ourselves, not particularly burdensome. And five is how far in advance of typical expedited discovery the requests come. Generally that comes into play if a motion to dismiss is already pending, which as you know it is not.

I would just broadly outline the six categories of things we would want to learn.

**THE COURT:** Okay.

**MR. SAMBURG:** You know, I'm happy to --

**THE COURT:** Is this the six categories of things overall or just for the dirt?

**MR. SAMBURG:** No, this is overall.

**THE COURT:** Okay, great. Okay, yes, please do.

**MR. SAMBURG:** So one is we'd want to know whether the dirt is clean. We've already discussed, I think, some of the ways we'd want to get at that. I'm happy, if it

would be useful, to talk about why we think there's a factual dispute on that.

**THE COURT:** No, no, there's clearly a factual dispute on that. You think it's not clean; they think it's clean.

**MR. SAMBURG:** Second, we'd want to know why the dirt is there, what the intended use and purpose of the dirt is and how long it will be there. Three is we would like know what's going on with course architects like Mr. Fazio, whether they've been paid, whether their visits were paid. Four is we would want to understand about the nature of the lease cancellation, whether the stated reasons were pretextual or whether the cancellation was in fact, as defendants claim, about back rent and failure to perform improvements.

**THE COURT:** So, I mean, I'm not going to get into a sideshow on why there was a lease cancellation. So, I mean, to the extent I allow extra-record discovery with respect to anything that includes the lease cancellation, it's going to be very, very narrow. Like, for example, were they in fact $6,000,000 late on their rent, and was that a basis under the lease to void it, right.

**MR. SAMBURG:** Understood, Your Honor, and I think even that limited discovery would be useful in resolving some of these disputes. Five, we would want some

information regarding the August meeting where we contend that the Department of Interior proposed exactly this plan and the President approved it.

**THE COURT:** Where was that meeting?

**MR. SAMBURG:** My understanding is it took place in the White House.

**THE COURT:** It was an August 2025 meeting?

**MR. SAMBURG:** Yes.

**THE COURT:** At the White House?

**MR. SAMBURG:** Yes, Your Honor.

**THE COURT:** And the director was involved?

**MR. SAMBURG:** No, Your Honor, the Secretary of the Interior and I believe the general counsel of the department were involved. And six, and finally, as you alluded to, Ms. Bowron in her declaration describes the fact that there are plans that are currently being considered, that she has general awareness of that, and that her understanding is they're still in the conceptual phase. We'd like to try to understand what's actually happening there rather than a secondhand description that plans are being considered and she understands them to be in the conceptual phase.

**THE COURT:** Okay. Talk to me a bit about -- well, I don't know if we need to get into sort of the legal analysis on the final agency action other than for you to know that I am skeptical based on what I've seen so far even

if your view of the facts is correct. We'll have further argument on that, and I have not made up my mind, I'm just telling you kind of where I am.

**MR. SAMBURG:** Appreciate it.

**THE COURT:** And that one of the things that struck me as I was reading your brief, and as I started to read Mr. Robertson's brief, is that you sort of had -- I've never heard of this before -- I thought I hadn't heard of this before, what I characterized in my notes as sort of an implied final agency action. And Mr. Robertson, with his excellent brief, actually anticipated that, and in his opposition at 31 he cited two cases, Funds for Animals v. BLM from the D.C. Circuit and Biden v. Texas from the U.S. Supreme Court basically for the proposition each in that if it's sort of non-reviewable -- nonbinding statements, that that does not, as a matter of law, constitute final agency action.

So I would just encourage you to address that argument because -- I mean, I think BLM presents more of a problem than in Biden v. Texas. Because in Biden v. Texas, it was sort of a -- they were saying it is a final agency action because it's a memo. If it was something else, it wouldn't be, but that was certainly not the holding. But I just think for future a discussion, that's something that I think is going to be really important for you all to

address.

**MR. SAMBURG:** We appreciate the direction, Your Honor. If we do end up submitting a reply, we'll be sure to address that.

**THE COURT:** Okay.

**MR. SAMBURG:** If I could just briefly say, I do think that there is law that makes clear that you can infer the existence of a final agency action from actions consistent with it. I think there's Venetian Casino in this circuit. If you'd like the cite, I do have that.

**THE COURT:** Yeah, go ahead.

**MR. SAMBURG:** Venetian Casino is 530 F.3d 925. And then not to return once again to June Bates' decision in --

**THE COURT:** I mean, he is a smart guy.

**MR. SAMBURG:** Yes, he is, Your Honor.

**THE COURT:** He is thorough and very smart, so it's never a bad idea to cite him.

**MR. SAMBURG:** His denial of the motion to dismiss in AFL v. DOL, again, I think addresses that same question.

**THE COURT:** Okay. Is there anything else before we leave today that you want to address or discuss?

**MR. SAMBURG:** I think unless Your Honor wants to hear argument about a bond, which I think would be premature --

THE COURT: About a what?

MR. SAMBURG: About a bond.

THE COURT: I'm not going to impose a bond.

MR. SAMBURG: Okay. Then no, Your Honor, nothing further. Thank you.

THE COURT: I mean, if I have to -- if Mr. Robertson tells me I have to, you know, I'm sure Mr. Lowe has a dollar on him or something -- sorry, Lowell. I totally screwed up your name.

All right, Mr. Robertson, so you can talk about whatever you want to talk about. I'm sort of fully focused right now as to how most effectively to move this case forward, and so my current thought is that -- and I know you want to make your standing motion to dismiss, and you can make whatever motion you want and I'll consider it. And you don't -- I have in my standing order that before you file a dispositive motion, you have to file a pre-motion, a four-page thingamajig. You don't have to do that. You can just go straight to your motion to dismiss, if you would like and on whatever briefing schedule you want. But in the meantime, I am going to consider the question of extra-record discovery, and I am going to ask you all to put together an administrative record. If there's as little has happened as you think has happened, then it will not take you very long and it will not be a burden. I think we can

move things faster if you do that.

And then -- so I want to hear your arguments on extra-record discovery, and then I want you all -- I'm going to take a break, and then I want you all to discuss -- and if you don't come to a conclusion, that's fine, but I want you all to discuss whether or not it makes sense instead of moving through this preliminary injunction, et cetera, et cetera, if we just get straight to, you know, whatever discovery is allowed, if any, summary judgment briefing and an evidentiary hearing. And we can move very quickly; you know, however quickly you guys want to move, we can move. But I think that probably makes more sense, but obviously you do you.

**MR. ROBERTSON:** Fair enough, Your Honor.

**THE COURT:** But I do want to hear from you on the extra-record discovery.

**MR. ROBERTSON:** So I don't think -- I think we would strongly push back that they're not entitled to any extra-record discovery.

**THE COURT:** And on what basis?

**MR. ROBERTSON:** I mean, they've claimed here two final agency actions. And they're -- if we are under their assumption that the concept and idea of generating this within the agency is somehow final agency action, I'm not sure what that would even look like. But I think they've

also -- I think my colleague kind of just conceded that it's not final agency action. Because one of the six things he said they wanted were the things that -- he said the word plans that Interior was considering. Well, if we're still considering various plans about what to actually do here with this course, there's still final agency action.

**THE COURT:** I think his point, my guess if I were him, is that that's all well and good for you to say that and to have a declarant say they're not aware of a plan. But he wants -- you know, he wants to be able to -- he wants the government to say we looked for documents, there are none, or we looked for documents and here are the documents, and lo and behold, there is -- Mr. Fazio has submitted a design and, you know, he's -- basically he wants to trust but verify.

**MR. ROBERTSON:** And I think based on kind of speculative facts that they've alleged, I think -- and the fact that we've conceded that if a design were to go forward, this litany of things that have to take place, I think that is our position that it's indicative that there is no final agency action here. But to go back to the extra-record evidence piece of it, Your Honor, I think -- the way we've handled this in the past is they would file a motion for extra-record evidence after we submit our A.R. We would respond with what they're entitled to and Your

Honor would rule. I think we would want the opportunity to submit anything on the papers.

**THE COURT:** That would be fair. So why don't we do this: Why don't you figure out how long it will take you to get together the A.R. I can't imagine it will be more than a week or two given all of the work you've already done. And so far as you're concerned, you know, there's not much there. And if -- we can make this like -- I don't want to call it A.R. light -- hold on, but I know that when you put together an administrative record, all kinds of things have to be done and people have to sign off on things or whatever. So maybe if you could see how quickly you could -- how much -- how difficult it would be to get together what would be an administrative record and just, you know, we agree on a process by where you get that to them but it's not the official administrative record. You know, we could do something like that.

**MR. ROBERTSON:** I --

**THE COURT:** I know you're hesitating because in your head you want to file your motion to dismiss, and you think we should go through that process before we get into the merits, and you think I'm putting the cart before the horse. And I know that that's what you're thinking right now, and it's not an unfair thought. But here's the thing: I just want to move this forward.

MR. ROBERTSON: I understand.

THE COURT: I don't want months and months of delay because we were fighting over a standing issue that, in my mind, is very wrapped up with the merits issues. We're going to have to address -- we're going to have -- this discovery or this -- what I'm asking you to turn over for the -- it's probably -- even if I was just focused only on standing because of some of the arguments that you have made and the arguments that they have made will be relevant to that anyway. And so I just want to do it all at once. I am not prejudging your standing arguments.

MR. ROBERTSON: Okay. So if I understand Your Honor correctly -- maybe I don't understand Your Honor's direction about where you want to --

THE COURT: Oh, sorry. So I think -- here's what I think should happen. I do think -- I do agree that you have a right to brief extra-record discovery. I think what should happen is that you guys should come together on a briefing schedule for how you want this case to move forward, right. Ideally we would skip a motion -- well, we would -- ideally what we would is either some discovery, whether it be only this limited administrative record discovery in quotation marks or that and the administrative and extra-administrative record discovery. And then we jump from that into either summary judgment briefing and you can

combine your motion to dismiss with the summary judgment brief, and then we have, you know, an evidentiary hearing if we need one, if I deny summary judgment because I think there are material issues in dispute, or we would go straight to the evidentiary hearing, however you guys want to do it. My goal is basically to figure out how to efficiently get them a little bit of information that they would be entitled to, if they were entitled to the administrative record, allow you a chance to brief extra-administrative record issues, get briefing on your motion to dismiss or summary judgment, have an evidentiary hearing and get this moved forward.

Part of why I want to do this this way is because if you talk to them and agree to provide, for example, voluntarily under a protective order the testing that has been done and they look at it and they're calmer about everything -- I don't want to use -- I don't mean to be pejorative. If they are -- I can never say the word, assuage.

**MR. ROBERTSON:** Assuaged.

**THE COURT:** Assuaged by it, then perhaps -- and if they're assuaged by what you give them that in fact, okay, this isn't as far along as we thought, we could probably head a bunch of this off at the pass, right. So that's another reason that I want to just do it this way.

**MR. ROBERTSON:** May I also propose, just off the top of my head here, if that's the way we're going, you know, maybe there's discussions that can be had between the parties if --

**THE COURT:** By all means.

**MR. ROBERTSON:** If one day there are going to be changes and we're willing to let -- do environmental compliance and have them consult on it, that could be something we could explore.

**THE COURT:** By all means you guys talk.

**MR. ROBERTSON:** So it may be premature.

**THE COURT:** Yeah, I think it would be a great idea if now knowing what I kind of think about where we are and what they're concerned about and the excellent work that you have done, if you guys can talk and figure out if there's a way forward that doesn't involve me, I would be thrilled.

**MR. ROBERTSON:** Okay. Then Your Honor, I'll confer with opposing counsel. But I would be remiss, on the brief I did have assistance with colleagues who are not here.

**THE COURT:** Thank them for me as well.

**MR. ROBERTSON:** I will be sure to pass along your kind words. Thank you.

**THE COURT:** And the paralegals, too. Because the attorneys always get all the glory, but the paralegals have

to do a ton of the work, especially when you have declarations involved. All right. So does that give everyone sort of like room to think through and talk to each other? And maybe you guys can send me a JSR in either one or two weeks, you guys figure it out. And if you need me for anything, again, let me know. I can get on the phone very quickly. I can get on video very quickly. If there's like a minor issue that would help you guys move things along, I think that would be good. Just let me know, and I'm always happy to meet with you all.

**MR. ROBERTSON:** Yes, Your Honor.

**THE COURT:** Go ahead.

**MR. SAMBURG:** Your Honor, just quickly --

**THE COURT:** Oh, you were going to talk to me about something, right?

**MR. SAMBURG:** Mr. Bardwell was.

**MR. BARDWELL:** Your Honor, if we're looking at summary judgment proceedings, at some point I think we can figure it out then.

**THE COURT:** Okay, great.

**MR. BARDWELL:** Just two housekeeping matters with that plan, Your Honor. I think it would be helpful for us if the Court would be willing to set a date for a JSR rather than relying on us.

**THE COURT:** Okay. You guys can talk in a week,

right? Well, what's today? Wednesday. What's next Friday, the 20th?

**MR. BARDWELL:** Friday the 20th.

**THE COURT:** Friday the 20th, JSR.

**MR. BARDWELL:** And then just to confirm, Your Honor, because I think under D.C. local rules, we would be expected to now file a reply in support of our pending PI this Friday, we're going to waive that I assume or you're going to ask us to waive that?

**THE COURT:** I'm not going to stop you all from waiving it. I'm not going to stop you all from filing it. I think it will be redundant and unnecessary given that it's going to be outpaced by events.

**MR. BARDWELL:** Understood.

**THE COURT:** But he can do him, you can do you. If you file it, I will read it.

**MR. BARDWELL:** Okay, thank you.

**THE COURT:** But I do want you all to file -- as part of your briefing, I want the government to give you all what would more or less be the administrative record, brief -- like figure out a time for that. But I do want you to file a motion on extra-record discovery because I think that Mr. Robertson is right that he is entitled to --

**MR. BARDWELL:** Brief it.

**THE COURT:** -- brief that issue.

**MR. BARDWELL:** Would you like that on the same timeline as the JSR?

**THE COURT:** Whatever you guys want, I don't care. I'm here either way.

**MR. BARDWELL:** Thank you, Your Honor.

**THE COURT:** Anything else?

**MR. BARDWELL:** No, Your Honor.

**THE COURT:** Okay. If anyone out there wants to bring me a baseball dispute, please do.

(Proceedings adjourned at 4:51 p.m.)

# C E R T I F I C A T E

I, **Jeff M. Hook, Official Court Reporter,** certify that the foregoing is a true and correct transcript of the record of proceedings in the above-entitled matter.

March 26, 2026

**DATE**

[signature]

**Jeff M. Hook**

DEPUTY CLERK: [1] 2/2
MR. BARDWELL: [10] 70/17 70/21 71/3 71/5 71/14 71/17 71/24 72/1 72/5 72/7
MR. CRAIG: [1] 6/1
MR. ROBERTSON: [79]
MR. SAMBURG: [118]
THE COURT: [203]

$

$44 [1] 11/15
$5.4 [2] 43/17 54/22
$5.4 million [2] 43/17 54/22
$6,000,000 [3] 36/4 36/9 59/21

0

0477 [1] 1/4

1

1 [1] 19/1
100 [1] 26/19
100 percent [1] 26/19
11 [1] 1/5
1221 [1] 57/7
1250 [1] 1/17
14 [1] 39/14
150 [1] 1/22
15180 [1] 1/19
18 [2] 13/11 13/13
1:26 [1] 1/4
1:26-cv-0477 [1] 1/4

2

2.7 [2] 43/16 54/22
20001 [1] 1/25
20002 [1] 1/22
20003 [1] 1/20
20005 [1] 1/17
2003 [1] 44/23
20043 [1] 1/14
2017 [1] 29/4
2019 [2] 29/12 29/18
2025 [1] 60/7
2026 [1] 1/5
20th [3] 71/2 71/3 71/4
25 [1] 24/23
26 [1] 2/2
26-477 [1] 2/2
28,000 [1] 22/21
28,000 cubic [1] 22/21
2nd [1] 1/17

3

3 [1] 31/22
30,000 [5] 17/14 23/1 23/2 23/12 23/15
30,000 cubic [1] 17/14
300,000,000 [1] 48/21
31 [1] 61/12
333 [1] 1/24
34553 [1] 1/14
35,000 [1] 23/4
378 [1] 57/4
3:01 [1] 1/6

4

40 [1] 23/5
400 [1] 48/22
477 [1] 2/2
48 [1] 5/4
4:51 [1] 72/10
4:51 p.m [1] 72/10

5

530 [1] 62/12
56 [1] 57/11

6

600 [1] 1/19

7

705 [2] 10/12 43/2
778 [1] 57/10

9

901 [2] 56/22 57/2
925 [1] 62/12
988 [1] 57/6

A

A.R [3] 65/24 66/5 66/9
ABBE [2] 1/15 2/8
ability [2] 33/10 47/25
able [9] 3/14 12/4 13/2 26/10 28/8 40/5 41/14 54/6 65/10
above [3] 23/1 23/13 73/5
above-entitled [1] 73/5
absolutely [1] 10/16
accept [2] 7/13 17/17
acceptable [1] 34/21
accepting [2] 37/7 37/8
accessible [1] 10/25
According [1] 14/10
Acosta [1] 56/22
act [4] 33/7 46/1 46/23 53/10
action [46] 1/3 2/2 5/23 6/5 7/3 7/12 7/14 7/17 7/20 8/5 10/12 10/25 11/2 14/1 17/22 17/24 17/25 18/12 19/3 19/15 19/15 25/19 26/21 37/4 37/7 37/7 37/10 42/11 42/11 42/20 42/23 46/5 46/7 46/19 46/21 56/10 56/15 60/24 61/10 61/17 61/22 62/8 64/24 65/2 65/6 65/21
actions [5] 10/7 10/8 10/10 62/8 64/22
activities [1] 22/9
actual [2] 13/10 53/10
actually [17] 2/11 8/11 12/20 16/14 27/22 28/12 28/19 31/3 31/6 37/24 43/15 43/25 44/12 52/3 60/19 61/11 65/5
Adam [1] 3/5
add [2] 23/6 41/7
added [2] 37/24 38/3
adding [1] 54/21
address [6] 24/6 61/18 62/1 62/4 62/22 67/5
addresses [1] 62/20
adjourned [1] 72/10
administration [1] 18/8
administrative [16] 21/19 24/4 41/8 41/10 41/17 41/20 63/23 66/10 66/14 66/16 67/22 67/23 67/24 68/9 68/10 71/20
admit [1] 10/4
adopt [1] 9/17
adoption [2] 7/15 37/10
advance [1] 58/11
advocate [1] 21/10
aesthetic [1] 48/25
Affairs [1] 56/22
affirmative [1] 34/12
affordability [2] 11/8 11/25
affordable [5] 10/24 11/10 11/22 12/21 12/21
AFL [2] 57/9 62/20
afternoon [2] 2/6 2/18
again [11] 4/18 14/5 36/2 48/15 51/24 52/1 56/16 58/7 62/13 62/20 70/6
against [1] 24/18
agency [64] 5/23 6/5 7/12 7/14 7/17 7/20 8/5 10/7 10/12 10/25 11/2 11/6 13/25 17/4 17/5 17/6 17/22 17/23 17/25 18/12 19/2 19/3 19/14 19/15 19/16 22/4 22/10 25/1 25/13 26/3 26/7 26/21 28/5 30/19 37/3 37/6 37/7 37/10 41/25 42/10 42/11 42/20 42/23 46/3 46/5 46/7 46/19 46/21 49/19 56/8 56/9 56/10 56/15 60/24 61/10 61/16 61/21 62/8 64/22 64/24 65/2

**A**

**agency... [2]** 65/6 65/21
**agent [1]** 19/4
**ago [1]** 39/14
**agree [21]** 8/6 15/12 26/9 28/15 28/22 29/6 29/7 29/8 30/3 30/7 34/21 36/15 36/25 37/22 38/4 38/5 38/6 38/23 66/15 67/16 68/14
**agreed [5]** 15/23 30/10 30/12 30/15 45/16
**agreeing [1]** 9/11
**agreement [6]** 21/11 26/15 26/17 29/22 29/24 38/24
**agrees [1]** 53/21
**ahead [9]** 15/3 21/17 41/18 42/15 43/2 45/6 55/2 62/11 70/12
**air [2]** 53/11 54/9
**al [4]** 1/3 1/6 2/3 2/4
**Alex [1]** 44/20
**allegation [3]** 15/21 19/9 35/9
**allegations [2]** 19/7 27/22
**allege [1]** 22/8
**alleged [11]** 15/6 20/2 35/11 36/4 37/18 37/18 37/20 37/20 40/9 56/10 65/17
**allow [2]** 59/18 68/9
**allowed [4]** 26/7 32/5 41/7 64/9
**allowing [1]** 31/12
**alluded [1]** 60/14
**along [5]** 19/24 46/16 68/23 69/22 70/9
**alter [1]** 33/10
**alteration [2]** 44/6 45/10
**although [5]** 5/11 14/15 20/15 34/23 42/3
**always [4]** 16/15 19/5 69/25 70/10
**amateurs [1]** 26/6
**AMCO [1]** 10/1
**among [1]** 7/18
**amongst [1]** 27/10
**amount [1]** 2/25
**ANA [1]** 1/9
**analogy [7]** 10/3 10/11 19/12 19/12 48/6 51/14 51/21
**analysis [4]** 3/12 3/13 29/11 60/24
**Animals [1]** 61/12
**answered [1]** 6/18
**anticipate [1]** 22/25
**anticipated [5]** 23/1 23/23 45/19 45/22 61/11
**anymore [1]** 20/17
**APA [6]** 4/22 10/5 26/4 56/6 56/7 56/14
**apologize [3]** 36/22 36/24 49/24
**apparently [1]** 14/14
**APPEARANCES [1]** 1/11
**appreciate [3]** 33/18 61/4 62/2
**approach [2]** 39/21 47/17
**appropriate [2]** 27/4 56/6
**approved [3]** 24/25 55/21 60/3
**approves [1]** 34/23
**approving [1]** 19/17
**approximately [3]** 22/21 23/2 23/15
**arbitration [3]** 9/4 9/5 9/5
**arbitrators [1]** 9/9
**architects [1]** 59/9
**architectural [1]** 13/24
**area [4]** 50/9 53/20 54/6 54/13
**argue [1]** 33/14
**argument [9]** 5/22 12/18 20/13 21/6 46/9 49/5 61/2 61/19 62/24
**arguments [7]** 14/7 14/8 14/8 64/2 67/8 67/9 67/11
**army [1]** 2/8
**around [3]** 11/10 11/22 48/22
**arriving [1]** 22/17
**asbestos [2]** 27/12 27/19
**aside [5]** 27/24 27/25 28/18 38/7 38/8
**assessment [5]** 26/8 28/25 38/21 44/4 45/9
**assistance [1]** 69/19
**assistant [2]** 3/4 3/6
**Associates [1]** 1/16
**assuage [1]** 68/19
**assuaged [3]** 68/20 68/21 68/22
**assume [2]** 55/10 71/8
**assuming [1]** 55/15
**assumption [1]** 64/23
**assured [1]** 5/9
**attached [1]** 19/1
**attempt [1]** 58/3
**Attorney [1]** 3/6
**attorneys [1]** 69/25
**atypical [1]** 56/7
**August [2]** 60/1 60/7
**August 2025 [1]** 60/7
**authority [1]** 37/13
**available [1]** 45/12
**Ave [1]** 1/19
**Avenue [1]** 1/24
**average [2]** 2/13 12/4
**awarded [1]** 9/23
**aware [2]** 25/9 65/9
**awareness [2]** 7/2 60/17
**away [7]** 4/7 14/9 18/17 28/15 43/21 51/9 51/9

**B**

**back [20]** 3/19 4/3 8/9 9/1 10/16 21/19 24/1 35/25 36/5 40/1 40/19 46/16 48/14 49/9 49/23 51/17 54/15 59/14 64/18 65/21
**background [1]** 27/20
**bad [4]** 8/14 14/8 38/9 62/18
**balance [2]** 54/18 55/3
**ball [1]** 32/8
**ballroom [3]** 34/7 34/19 34/25
**Bankruptcy [1]** 1/24
**BARDWELL [5]** 1/12 2/8 6/18 35/21 70/16
**Bartel [1]** 3/4
**baseball [2]** 45/7 72/9
**based [11]** 16/7 19/6 37/19 37/19 37/21 38/19 38/20 42/2 52/22 60/25 65/16
**basically [7]** 5/5 29/7 31/8 39/19 61/14 65/14 68/6
**basis [6]** 10/8 17/6 49/8 49/18 59/22 64/20
**Bates' [2]** 57/8 62/13
**became [2]** 4/12 11/3
**becomes [6]** 12/3 26/5 39/19 52/13 52/13 52/14
**becoming [1]** 52/21
**beginning [1]** 2/5
**behalf [2]** 2/19 7/9

**B**

**behold [1]** 65/13
**belief [1]** 4/21
**bench [3]** 3/9 4/11 4/16
**besides [1]** 40/24
**best [3]** 15/13 45/5 51/21
**better [7]** 6/18 26/13 28/19 28/20 35/22 39/21 51/14
**Biden [3]** 61/13 61/20 61/20
**big [1]** 44/19
**binding [1]** 17/4
**birds [1]** 47/9
**bit [8]** 17/24 23/13 23/18 27/21 52/7 52/10 60/22 68/7
**BLM [2]** 61/13 61/19
**BOLEN [2]** 1/16 2/9
**bond [3]** 62/24 63/2 63/3
**boreo [1]** 47/10
**borne [1]** 40/13
**both [8]** 9/7 9/8 9/9 9/12 16/22 45/2 47/10 53/8
**bottom [2]** 29/7 31/9
**bounds [1]** 32/10
**Bowron [1]** 60/15
**Bowron's [2]** 37/12 43/15
**Box [1]** 1/14
**Bradley [1]** 3/5
**breadth [1]** 58/1
**break [1]** 64/4
**Bregman [1]** 44/20
**brief [22]** 2/22 3/15 4/6 5/21 14/6 14/19 27/11 30/25 31/22 33/16 33/20 36/14 61/6 61/7 61/11 67/17 68/2 68/9 69/19 71/21 71/24 71/25
**briefing [6]** 63/20 64/9 67/19 67/25 68/10 71/19
**briefly [5]** 28/7 39/4 49/22 54/18 62/6
**briefs [3]** 3/9 4/22 4/24
**bring [2]** 7/8 72/9
**bringing [1]** 24/20
**broadly [1]** 58/15
**brought [4]** 7/3 7/25 24/18 34/13
**build [2]** 16/24 34/5
**building [1]** 46/19
**built [2]** 55/16 55/16
**bunch [5]** 42/20 51/20 52/6 53/15 68/24
**bunkers [1]** 22/5
**burden [2]** 58/7 63/25
**burdensome [1]** 58/11
**Burgum [1]** 20/4
**business [1]** 4/25

**C**

**C [4]** 1/9 2/1 73/1 73/1
**cabin [1]** 38/13
**calculations [1]** 23/25
**caliber [1]** 12/11
**California [1]** 11/17
**call [8]** 7/15 10/21 18/1 18/1 18/2 45/24 47/21 66/9
**called [3]** 9/6 29/18 43/5
**calls [2]** 50/2 51/12
**calm [2]** 28/11 28/11
**calmer [1]** 68/16
**came [2]** 2/12 44/19
**can [58]** 5/4 6/7 6/12 6/14 6/19 8/12 8/12 9/9 10/21 16/11 16/25 17/5 18/1 18/1 18/2 18/22 19/21 24/24 25/18 26/14 28/7 28/22 30/3 31/11 32/22 34/7 37/22 39/17 43/2 43/21 46/20 47/6 47/18 49/22 51/17 52/19 52/21 55/8 56/20 62/7 63/10 63/14 63/18 63/25 64/10 64/11 66/8 67/25 68/18 69/3 69/15 70/4 70/6 70/7 70/18 70/25 71/15 71/15
**cancel [1]** 34/14
**canceled [5]** 7/19 7/24 7/24 19/9 35/7
**cancellation [9]** 7/16 17/15 17/18 24/11 36/4 59/12 59/13 59/17 59/19
**capable [1]** 2/12
**capped [1]** 48/23
**Capping [1]** 23/5
**care [3]** 20/21 57/6 72/3
**cart [2]** 55/8 66/22
**case [20]** 4/13 4/17 4/24 5/10 5/18 10/5 21/19 39/20 44/1 47/3 47/9 47/9 54/15 56/14 56/17 57/7 57/8 57/13 63/12 67/19
**cases [7]** 47/3 47/11 56/7 56/8 56/12 56/19 61/12
**Casino [2]** 62/9 62/12
**categorical [1]** 15/18
**categories [2]** 58/15 58/19
**CATEX [5]** 15/24 16/3 23/1 43/5 43/6
**CEE [3]** 24/9 24/15 43/4
**century [1]** 34/5
**certain [3]** 55/16 55/17 55/17
**certainly [5]** 26/25 33/18 39/23 46/5 61/23
**certify [1]** 73/4
**cetera [4]** 37/2 56/16 64/7 64/8
**challenging [1]** 10/5
**champion [1]** 12/11
**champion-caliber [1]** 12/11
**championship [2]** 16/25 34/3
**championship-style [1]** 34/3
**chance [5]** 5/10 5/20 6/8 21/22 68/9
**chances [2]** 33/13 42/1
**change [9]** 14/13 14/15 15/22 16/4 16/9 19/5 19/25 40/17 52/22
**changes [5]** 24/13 30/10 30/24 35/17 69/7
**changing [1]** 47/12
**channel [1]** 40/7
**characterization [2]** 37/25 52/2
**characterized [1]** 61/9
**cheapest [1]** 11/14
**check [2]** 27/19 32/11
**checked [1]** 11/14
**chief [1]** 3/5
**choice [1]** 36/11
**circle [1]** 49/23
**circuit [4]** 56/19 57/7 61/13 62/10
**circumstances [1]** 15/7
**cite [2]** 62/10 62/18
**cited [2]** 17/1 61/12
**civil [3]** 1/3 2/2 39/16
**claim [4]**

## C


**claim... [4]** 24/18 42/18 49/10 59/14
**claimed [1]** 64/21
**claims [1]** 47/21
**class [6]** 11/9 11/13 11/21 18/22 19/20 20/6
**clean [4]** 43/9 58/24 59/4 59/5
**clear [4]** 34/12 34/24 46/7 62/7
**clearly [1]** 59/3
**clerk [2]** 57/1 57/2
**clients [2]** 54/12 54/13
**closer [1]** 19/10
**co [1]** 39/25
**co-counsel [1]** 39/25
**colleague [3]** 9/2 21/24 65/1
**colleagues [2]** 3/1 69/19
**collect [1]** 3/14
**college [1]** 44/23
**color [1]** 23/6
**COLUMBIA [1]** 1/1
**combine [2]** 39/17 68/1
**combined [1]** 40/11
**combines [1]** 6/6
**commended [1]** 3/18
**comment [2]** 10/6 21/16
**comments [1]** 27/5
**commonly [1]** 54/14
**community [2]** 25/24 26/24
**compacted [1]** 23/7
**company [2]** 27/11 30/13
**compiled [1]** 41/17
**compiling [1]** 42/1
**complaining [1]** 50/8
**completed [2]** 13/24 23/23
**completely [3]** 22/7 26/21 45/19
**compliance [4]** 31/5 37/1 37/2 69/8
**complicated [1]** 45/23
**comply [1]** 37/15
**complying [1]** 27/3
**con [1]** 29/23
**conceded [2]** 65/1 65/18
**concept [2]** 25/4 64/23
**conceptual [2]** 60/18 60/21
**concern [2]** 7/12 21/24
**concerned [4]** 4/13 26/12 66/7 69/14
**concession [1]** 29/23
**conclusion [1]** 64/5
**concrete [1]** 28/17
**condition [3]** 9/22 24/13 29/1
**conduct [2]** 22/8 55/7
**confer [3]** 28/5 39/24 69/18
**conference [2]** 1/9 34/11
**confirm [1]** 71/5
**conjunction [1]** 17/14
**consider [2]** 63/15 63/21
**considered [2]** 60/16 60/20
**considering [3]** 16/24 65/4 65/5
**considers [1]** 57/18
**consistent [5]** 29/13 35/14 45/13 51/24 62/9
**constant [1]** 5/4
**constantly [1]** 48/18
**constitute [2]** 47/12 61/16
**Constitution [1]** 1/24
**constitutional [3]** 48/17 48/19 49/1
**construct [1]** 56/11
**construction [3]** 55/15 55/16 55/18
**consult [1]** 69/8
**consultation [1]** 26/24
**consulted [1]** 18/20
**contaminants [1]** 27/20
**contemplated [1]** 10/23
**contend [1]** 60/1
**continue [3]** 9/19 36/3 36/11
**continued [2]** 38/14 40/25
**contours [1]** 56/15
**contract [1]** 55/11
**contrary [1]** 4/21
**conventional [1]** 10/5
**conversation [1]** 40/14
**convincing [1]** 14/6
**cool [1]** 43/6
**cornea [2]** 5/2 5/3
**correction [1]** 30/8
**correctly [1]** 67/13
**corrosion [1]** 50/10
**cost [4]** 43/16 43/22 54/20 54/22
**counsel [8]** 2/5 2/7 2/15 6/11 9/1 39/25 60/13 69/18
**country [4]** 11/10 11/22 12/22 48/22
**County [1]** 57/6
**couple [3]** 17/2 41/23 52/7
**course [67]** 11/14 11/21 12/1 12/4 12/6 12/9 12/11 12/14 12/16 13/24 14/13 15/16 15/22 16/5 16/9 16/12 16/25 17/13 17/20 18/6 18/6 18/14 18/15 18/16 18/22 19/20 19/22 20/6 20/21 20/24 21/3 21/25 22/6 22/7 26/5 26/22 28/25 29/9 29/10 29/17 29/20 30/8 30/8 30/23 31/6 31/12 31/17 31/20 33/6 34/4 34/5 34/13 35/4 35/14 35/15 35/18 35/22 36/8 45/25 46/19 50/9 50/22 54/1 56/11 57/20 59/9 65/6
**course's [1]** 29/13
**courses [10]** 10/24 11/9 12/12 13/12 13/12 34/3 36/3 36/11 45/19 53/19
**COURT [9]** 1/1 1/23 1/23 38/21 39/17 57/18 61/14 70/23 73/3
**courthouse [1]** 48/21
**Courts [1]** 1/24
**cover [1]** 44/7
**Craig [3]** 5/24 5/24 6/2
**Craigmyle [1]** 3/5
**create [1]** 18/21
**creates [1]** 53/4
**creating [2]** 20/5 53/12
**credible [1]** 15/11
**criticism [1]** 41/11
**cross [1]** 14/1
**crux [1]** 22/2
**cry [1]** 19/6
**crystalized [1]** 33/21
**cubic [2]** 17/14 22/21
**Cubs [3]** 44/19 44/23 45/5
**cultural [5]** 12/7 29/14 29/18 34/4 35/15
**current [9]** 6/21 10/18 12/25 13/1 21/8 28/25 38/7 45/17 63/13
**currently [6]**

**C**

**currently... [6]** 27/7 31/13 40/21 40/24 43/17 60/16
**cut [1]** 51/16
**cv [1]** 1/4

**D**

**D [1]** 2/1
**D.C [13]** 2/2 11/22 18/3 19/20 27/13 48/9 53/8 53/20 56/19 57/7 57/7 61/13 71/6
**DAG [1]** 3/5
**daggers [2]** 39/25 40/2
**date [2]** 70/23 73/9
**day [8]** 22/17 25/19 26/1 26/3 44/18 49/13 49/13 69/6
**DC [7]** 1/3 1/5 1/14 1/17 1/20 1/22 1/25
**deal [1]** 6/13
**debris [4]** 18/3 18/11 34/8 34/19
**decided [1]** 3/12
**deciding [1]** 11/7
**decision [6]** 19/16 31/6 42/4 56/11 57/9 62/13
**declarant [1]** 65/9
**declarant's [1]** 27/16
**declarants [1]** 26/20
**declaration [4]** 14/10 37/12 37/14 60/15
**declarations [5]** 3/15 25/12 43/15 47/7 70/2
**dedicate [1]** 25/8
**deep [1]** 45/2
**defendants [11]** 1/7 1/21 2/19 27/3 36/14 36/25 37/20 42/18 52/25 58/7 59/14
**defendants' [7]** 14/21 33/22 36/2 36/14 38/20 40/12 52/1
**Defenders [1]** 1/19
**defenses [1]** 8/3
**definitely [4]** 5/14 14/12 14/13 14/14
**degree [1]** 37/11
**delay [4]** 24/7 42/5 55/5 67/3
**Democracy [2]** 1/13 1/19
**denial [1]** 62/19
**deny [1]** 68/3
**department [6]** 1/6 2/3 34/1 57/9 60/2 60/13
**depending [1]** 53/24
**depends [2]** 38/9 54/5
**Deputy [1]** 3/6
**describe [1]** 50/5
**described [1]** 27/5
**describes [6]** 17/19 43/8 43/9 43/10 51/6 60/15
**describing [3]** 19/10 38/2 46/21
**description [3]** 43/23 50/1 60/20
**design [9]** 13/11 25/1 25/22 25/24 29/13 31/3 51/24 65/14 65/18
**designer [1]** 34/13
**desk [1]** 13/24
**despite [3]** 35/7 36/3 57/10
**despondent [1]** 45/5
**destroys [1]** 12/6
**detail [1]** 30/25
**details [2]** 20/3 35/22
**determine [1]** 42/12
**determined [2]** 15/19 44/5
**developed [2]** 11/20 22/10
**diagram [1]** 13/24
**difference [5]** 14/20 15/5 23/7 23/12 33/21
**different [7]** 15/7 33/3 34/17 40/13 47/9 54/13 57/24
**difficult [6]** 11/5 12/23 26/5 39/7 58/8 66/13
**difficulties [1]** 12/14
**dig [1]** 5/10
**digging [1]** 5/18
**digit [2]** 12/10 12/10
**directed [1]** 9/18
**direction [3]** 4/19 62/2 67/14
**directly [1]** 46/2
**director [4]** 18/19 19/24 37/13 60/11
**directs [1]** 18/25
**dirt [60]** 15/16 15/17 16/20 23/21 24/10 24/13 24/14 24/18 34/7 34/25 35/1 37/23 37/24 37/25 38/2 38/14 39/4 42/21 42/24 43/9 43/10 43/17 44/7 44/8 45/11 45/12 45/24 46/11 46/12 49/23 50/2 50/4 50/13 50/17 51/6 51/9 51/13 51/20 52/2 52/6 52/7 53/3 53/10 53/11 53/13 53/21 54/20 54/21 54/21 54/22 55/5 55/6 55/8 55/9 55/11 58/10 58/20 58/24 59/7 59/7
**disagree [3]** 17/16 37/24 52/1
**disappoint [1]** 4/18
**discovery [38]** 17/7 19/7 20/10 20/17 20/19 21/5 21/9 39/2 39/10 40/5 40/10 40/13 41/4 41/8 41/9 42/13 56/5 56/6 56/13 56/14 57/9 57/17 57/21 58/1 58/12 59/18 59/24 63/22 64/3 64/9 64/16 64/19 67/6 67/17 67/21 67/23 67/24 71/22
**discuss [3]** 62/22 64/4 64/6
**discussed [6]** 29/12 34/22 37/11 51/25 56/18 58/24
**discussion [5]** 7/14 24/24 25/23 41/6 61/24
**discussions [3]** 25/17 35/4 69/3
**disgrace [1]** 4/10
**dislike [1]** 20/20
**dismiss [8]** 41/16 58/13 62/19 63/14 63/19 66/20 68/1 68/11
**dismissing [2]** 36/2 42/1
**dispositive [1]** 63/17
**dispute [13]** 15/5 27/7 27/10 28/12 38/18 42/18 42/19 42/23 43/16 59/2 59/4 68/4 72/9
**disputes [2]** 43/12 59/25
**disrepair [1]** 30/9
**dissipating [2]** 50/18 50/19
**distinct [1]** 33/23
**DISTRICT [5]** 1/1 1/1 1/10 1/24 57/8
**Division [1]** 3/20
**document [1]** 56/9
**documents [3]** 65/11 65/12 65/12
**DOJ [3]** 1/21 3/3 3/25
**DOJ-ENRD [1]** 1/21

**D**

**DOL [1]** 62/20
**dollar [1]** 63/8
**dollars [1]** 54/25
**done [13]** 9/4 21/3 21/13 24/2 27/17 28/2 29/2 49/13 52/4 66/7 66/11 68/16 69/15
**doors [1]** 48/21
**double [2]** 12/10 22/24
**doubling [1]** 23/17
**doubt [1]** 4/1
**dovetails [1]** 12/18
**down [9]** 2/11 2/13 9/13 23/9 28/11 31/5 35/5 39/19 50/22
**drafter [1]** 2/21
**drain [2]** 48/13 51/14
**drainage [1]** 29/14
**drained [1]** 48/12
**draw [1]** 10/3
**drawing [1]** 10/11
**dressing [1]** 14/7
**drifting [1]** 50/22
**due [1]** 36/4
**dump [5]** 22/18 44/7 45/11 53/10 53/11
**dumped [2]** 42/20 53/24
**dumping [16]** 24/10 24/14 38/14 39/4 40/9 40/16 40/16 40/17 40/25 41/3 41/6 42/17 42/24 43/8 43/10 56/4
**dumps [1]** 53/3
**during [1]** 33/19

**E**

**E [4]** 2/1 2/1 73/1 73/1
**earlier [1]** 34/22
**early [1]** 26/15
**earth [1]** 7/10
**ease [1]** 54/21
**easily [3]** 43/10 43/14 43/24
**East [16]** 20/6 29/17 29/25 32/17 33/24 34/3 34/20 35/1 37/23 46/24 51/20 53/13 53/17 54/12 55/6 55/20
**easy [2]** 43/20 55/4
**edification [1]** 33/15
**effect [3]** 8/7 10/7 48/25
**effectively [1]** 63/12
**efficient [2]** 40/6 40/11
**efficiently [1]** 68/7
**eight [1]** 13/15
**EISEN [2]** 1/18 2/9
**either [8]** 29/25 31/1 44/3 53/18 67/21 67/25 70/4 72/4
**else [9]** 9/16 14/16 30/20 38/15 55/8 56/4 61/22 62/21 72/6
**elucidating [1]** 14/20
**embarrassingly [1]** 57/10
**empty [2]** 48/12 48/16
**encourage [1]** 61/18
**end [4]** 26/1 26/3 27/3 62/3
**endure [1]** 5/4
**enforceable [1]** 11/2
**enforcement [1]** 10/8
**engaged [1]** 26/23
**enjoy [3]** 18/23 33/10 47/25
**enjoyed [1]** 32/6
**enjoyment [2]** 46/24 47/4
**enough [6]** 38/24 44/7 46/11 46/22 48/16 64/14
**ENRD [1]** 1/21
**enthusiast [1]** 34/2
**enthusiastic [1]** 34/8
**entire [3]** 37/12 37/14 44/21
**entirely [3]** 34/23 36/16 46/12
**entitle [1]** 36/20
**entitled [10]** 21/20 36/15 36/19 37/1 64/18 65/25 68/8 68/8 71/23 73/5
**entry [1]** 58/10
**environment [4]** 3/19 33/11 47/5 47/12
**environmental [14]** 26/8 26/23 28/16 31/4 31/5 32/19 38/8 43/5 52/9 52/15 53/2 53/22 53/25 69/7
**environmentalist [1]** 29/16
**environmentally [4]** 27/8 27/8 30/1 30/2
**ephemeral [1]** 12/19
**Epstein [1]** 45/9
**equipped [1]** 35/22
**equities [2]** 54/18 55/4
**erosion [4]** 29/14 50/4 50/7 50/14
**especially [4]** 32/17 42/8 42/10 70/1
**essentially [1]** 48/17
**establish [1]** 27/22
**et [8]** 1/3 1/6 2/3 2/3 37/2 56/16 64/7 64/7
**evaluate [2]** 58/2 58/8
**even [20]** 7/10 8/6 18/11 19/3 19/4 22/4 23/18 25/5 26/25 36/14 36/25 37/3 37/6 42/14 45/18 47/20 59/24 60/25 64/25 67/7
**events [3]** 24/11 36/25 71/13
**eventual [1]** 25/19
**eventually [1]** 26/20
**everybody [1]** 39/21
**everyone [5]** 28/19 28/21 30/2 49/8 70/3
**everyone's [1]** 26/14
**evidence [2]** 65/22 65/24
**evidentiary [7]** 13/10 15/10 39/12 64/10 68/2 68/5 68/11
**exactly [1]** 60/2
**example [2]** 59/20 68/14
**excavated [2]** 23/7 23/14
**excellent [4]** 4/7 14/6 61/11 69/14
**except [1]** 32/22
**exception [1]** 40/9
**exceptional [1]** 3/8
**exchange [1]** 55/7
**excuse [1]** 53/3
**exemption [1]** 15/18
**exercising [1]** 37/13
**Exhibit [2]** 19/1 31/22
**Exhibit 1 [1]** 19/1
**Exhibit 3 [1]** 31/22
**exhibits [2]** 3/16 28/2
**existence [1]** 62/8
**exists [2]** 9/18 12/9
**expand [1]** 23/17
**expanded [1]** 23/20
**expands [1]** 23/11
**expect [1]** 10/9
**expected [1]** 71/7
**expedited [3]** 39/2 39/10 58/12
**expense [1]** 12/15
**expensive [2]** 12/16 26/6
**experts [3]**

**E**

**experts... [3]** 9/7 9/8 9/10
**explained [1]** 57/23
**explanation [1]** 24/10
**explore [1]** 69/9
**exposure [4]** 27/23 53/4 53/6 53/13
**extend [1]** 7/21
**extensive [1]** 3/15
**extent [6]** 6/17 19/12 52/6 52/15 54/20 59/18
**extra [20]** 21/9 39/2 41/8 41/8 56/5 56/6 56/13 56/14 57/17 59/18 63/22 64/3 64/16 64/19 65/22 65/24 67/17 67/24 68/10 71/22
**extra-administrative [2]** 67/24 68/10
**extra-record [17]** 21/9 39/2 41/8 56/5 56/6 56/13 56/14 57/17 59/18 63/22 64/3 64/16 64/19 65/22 65/24 67/17 71/22
**extraordinarily [1]** 12/12
**eyesore [1]** 38/7

**F**

**F [1]** 73/1
**F.2d [1]** 57/7
**F.3d [3]** 56/22 57/2 62/12
**F.Supp.3d [1]** 57/11
**fabulous [1]** 57/2
**face [1]** 52/5
**facility [1]** 48/24
**fact [26]** 3/10 3/13 7/21 7/25 9/22 10/2 12/12 17/9 20/7 20/8 21/8 26/5 29/12 35/7 36/4 40/6 45/21 45/23 51/3 51/5 52/19 59/13 59/21 60/15 65/18 68/22
**factor [5]** 57/18 57/18 57/20 57/25 58/6
**factors [1]** 43/2
**facts [8]** 15/6 15/8 37/9 57/24 57/24 57/25 61/1 65/17
**factual [10]** 5/17 5/19 15/5 27/10 33/13 38/18 43/12 43/15 59/2 59/3
**factual-type [1]** 5/19
**factually [1]** 37/22
**failed [1]** 36/9
**failure [2]** 36/5 59/14
**fair [11]** 9/25 13/19 18/18 29/1 40/15 44/7 46/11 46/22 55/3 64/14 66/3
**faith [2]** 8/14 9/15
**fall [2]** 29/2 30/9
**fan [4]** 44/11 44/13 44/19 44/23
**fantastic [1]** 11/21
**far [18]** 7/2 8/3 12/13 13/8 14/16 18/4 18/8 19/6 19/6 19/20 26/24 41/18 42/2 52/23 58/11 60/25 66/7 68/23
**faster [1]** 64/1
**fatally [2]** 46/4 46/4
**favor [1]** 57/21
**Fazio [6]** 17/15 18/25 19/22 35/3 59/9 65/13
**Fazio's [1]** 24/12
**Federal [2]** 4/1 4/2
**feel [2]** 33/14 37/9
**fees [3]** 12/10 12/10 12/15
**fenced [3]** 18/7 38/4 38/5
**Fenway [1]** 44/8
**few [2]** 15/15 23/1
**fictional [1]** 16/16
**fighting [1]** 67/3
**figure [13]** 6/15 7/10 13/1 25/4 42/5 49/20 56/15 66/4 68/6 69/15 70/5 70/19 71/21
**file [9]** 33/16 63/16 63/17 65/23 66/20 71/7 71/16 71/18 71/22
**filed [3]** 5/20 41/10 44/4
**filing [1]** 71/11
**fill [16]** 16/10 16/10 16/10 16/10 17/14 20/7 21/24 22/3 22/5 22/8 23/7 27/12 29/25 48/14 49/18 51/19
**fill-in [1]** 16/10
**final [45]** 5/23 6/5 7/12 7/14 7/17 7/20 8/5 10/12 10/25 11/2 13/25 17/21 17/23 17/25 18/12 19/3 19/14 19/15 33/2 37/3 37/6 37/7 37/9 42/10 42/20 42/23 46/3 46/4 46/7 46/13 46/17 46/19 46/21 56/10 56/15 60/24 61/10 61/16 61/21 62/8 64/22 64/24 65/2 65/6 65/21
**finalized [1]** 25/25
**finally [1]** 60/14
**find [4]** 14/8 21/5 31/1 54/23
**fine [3]** 38/11 45/8 64/5
**finished [1]** 18/16
**firm [1]** 6/3
**first [13]** 6/8 6/21 11/24 13/4 13/14 15/15 22/11 28/15 31/2 36/10 39/4 49/20 53/24
**five [6]** 13/14 13/14 39/25 57/18 58/11 59/25
**five-factor [1]** 57/18
**flagged [1]** 7/11
**flagging [1]** 54/24
**flattening [1]** 50/21
**flippant [2]** 20/23 21/1
**float [1]** 55/16
**flood [1]** 34/21
**Floor [1]** 1/17
**focused [4]** 10/15 42/14 63/11 67/7
**folks [2]** 31/12 43/5
**follow [2]** 20/22 30/5
**following [4]** 21/2 26/4 26/4 32/22
**follows [1]** 26/7
**foregoing [1]** 73/4
**forget [1]** 35/25
**form [6]** 15/18 16/3 24/9 37/1 44/4 45/10
**forward [12]** 1/13 18/10 22/11 25/5 26/13 42/13 63/13 65/19 66/25 67/20 68/12 69/16
**Foundation [1]** 1/13
**four [7]** 3/23 3/24 13/15 24/7 58/7 59/11 63/18
**four-month [1]** 24/7
**four-page [1]** 63/18
**freak [1]** 29/23
**freaks [1]** 9/9
**free [1]** 33/14
**Friday [4]** 71/1 71/3 71/4 71/8
**friend [3]** 5/9

**F**

**friend... [2]** 24/8 45/6
**friends [2]** 5/6 44/19
**front [1]** 19/21
**fruition [1]** 27/1
**fully [1]** 63/11
**fun [1]** 45/3
**functioning [1]** 23/21
**Fund [1]** 1/19
**Funds [1]** 61/12
**further [6]** 22/3 27/21 30/9 31/15 61/1 63/5
**furtherance [2]** 19/9 20/7
**future [1]** 61/24

**G**

**G [1]** 2/1
**gallery [1]** 6/1
**games [2]** 16/13 16/14
**gay [2]** 4/10 4/15
**geek [1]** 9/10
**general [3]** 3/7 60/13 60/17
**generalized [2]** 48/2 49/2
**generally [3]** 16/10 57/21 58/12
**generating [1]** 64/23
**genuine [1]** 44/12
**gets [6]** 8/8 11/20 21/3 23/14 23/14 49/11
**given [2]** 66/6 71/12
**giving [1]** 25/23
**glory [1]** 69/25
**goal [1]** 68/6
**goes [6]** 15/1 27/21 33/6 34/10 34/10 52/3
**golf [30]** 4/17 4/18 4/20 10/24 11/11 17/20 18/14 18/15 18/15 18/22 19/20 20/6 20/21 21/3 21/25 32/13 32/14 33/6 34/3 34/13 35/14 35/22 36/8 36/11 45/7 46/19 47/24 53/19 54/1 56/11
**golfer [2]** 29/15 38/10
**gong [1]** 22/15
**good [8]** 2/6 2/18 5/8 9/15 14/7 14/8 65/8 70/9
**gorgeous [1]** 32/14
**government [9]** 3/9 3/16 6/8 8/2 9/15 18/15 27/13 65/11 71/19
**government's [2]** 5/21 29/23
**government's con [1]** 29/23
**great [5]** 43/25 54/25 58/22 69/12 70/20
**green [4]** 12/15 13/18 13/18 51/23
**Greg [2]** 5/24 6/2
**grievance [1]** 48/3
**ground [1]** 23/9
**grounds [4]** 41/16 42/2 43/18 47/5
**growth [1]** 50/6
**guess [9]** 11/5 14/13 16/2 17/24 27/12 39/6 45/15 53/23 65/7
**guessing [1]** 41/22
**guidance [1]** 56/9
**Gustafson [1]** 3/6
**guy [1]** 62/15
**guys [14]** 2/11 4/1 9/3 28/21 64/11 67/18 68/5 69/10 69/15 70/4 70/5 70/8 70/25 72/3

**H**

**H [1]** 1/17
**Hains [2]** 18/7 53/18
**half [1]** 23/19
**handle [1]** 6/12
**handled [1]** 65/23
**hanging [1]** 5/25
**happen [19]** 17/10 17/11 22/1 22/3 22/4 22/10 24/24 25/19 27/1 31/15 40/19 46/10 46/12 48/25 49/16 51/3 55/17 67/16 67/18
**happened [2]** 63/24 63/24
**happening [2]** 51/3 60/19
**happens [5]** 9/10 20/21 34/17 46/19 49/20
**happy [8]** 9/1 39/3 39/3 50/10 56/4 58/18 58/25 70/10
**hard [1]** 14/9
**harder [2]** 12/3 12/16
**harm [8]** 28/17 39/8 40/20 40/24 51/24 51/25 52/4 54/19
**harms [1]** 32/19
**hate [2]** 4/17 11/7
**head [8]** 4/3 13/25 19/4 19/16 23/25 66/20 68/24 69/2
**Health [1]** 57/6
**hear [4]** 6/4 62/24 64/2 64/15
**heard [3]** 52/23 61/8 61/8
**hearing [9]** 5/15 15/10 39/12 39/18 39/18 64/10 68/2 68/5 68/12
**hearings [1]** 13/10
**heated [1]** 38/24
**Hello [1]** 2/20
**help [4]** 2/24 2/25 48/7 70/8
**helpful [5]** 33/17 33/20 41/3 41/5 70/22
**here's [5]** 5/13 18/21 37/22 66/24 67/15
**hesitating [1]** 66/19
**hills [1]** 14/13
**Hispanic [1]** 56/21
**historic [8]** 12/6 34/4 35/14 44/4 44/6 44/9 45/9 45/10
**historical [1]** 29/13
**hit [1]** 32/8
**hoe [1]** 39/7
**hold [5]** 31/18 35/9 44/16 56/23 66/9
**holding [1]** 61/23
**hole [1]** 31/20
**holes [6]** 13/12 13/13 32/2 32/4 32/5 38/7
**honest [1]** 4/22
**Honor [105]**
**Honor's [3]** 14/17 46/25 67/13
**HONORABLE [1]** 1/9
**HOOK [3]** 1/23 73/3 73/9
**hope [3]** 3/18 20/18 21/4
**hopeful [1]** 6/14
**hopes [1]** 25/21
**horrible [1]** 27/8
**horse [1]** 66/23
**horses [1]** 47/10
**host [1]** 8/15
**hot [2]** 9/6 9/7
**hour [1]** 19/23
**hours [1]** 5/4
**House [5]** 16/22 20/7 51/20 60/6 60/9
**housekeeping [1]** 70/21
**human [1]** 33/11
**humor [1]** 41/19
**hypothetically [1]** 15/12

**I**

**idea [10]**

**I**

**idea... [10]** 17/25 18/2 23/22 25/4 25/18 41/13 46/17 62/18 64/23 69/12
**ideally [3]** 30/1 67/20 67/21
**identified [1]** 8/3
**identify [1]** 2/4
**illegally [1]** 54/23
**image [1]** 34/6
**imagine [2]** 12/23 66/5
**immediately [1]** 34/8
**impact [2]** 38/8 47/24
**impacted [2]** 47/7 54/9
**impacting [1]** 38/6
**impacts [2]** 33/4 33/5
**impairing [1]** 46/24
**impedes [1]** 32/18
**imperfect [1]** 10/4
**implement [4]** 7/18 19/1 19/2 25/18
**implied [1]** 61/10
**important [5]** 12/7 20/3 20/25 45/12 61/25
**importantly [1]** 37/2
**impose [1]** 63/3
**impression [1]** 39/24
**improvement [1]** 45/22
**improvements [6]** 29/8 29/12 29/14 29/20 45/25 59/15
**inaccessible [1]** 11/3
**inadequate [3]** 43/6 43/7 44/5
**includes [1]** 59/19
**including [1]** 25/24
**incompetent [2]** 4/12 4/14
**incredibly [2]** 12/23 39/10
**independent [1]** 49/18
**indicated [1]** 45/11
**indications [1]** 24/16
**indicative [2]** 16/21 65/20
**indicia [1]** 19/15
**indisputably [1]** 17/21
**individuals [1]** 47/8
**inexpensive [1]** 43/20
**infer [1]** 62/7
**informal [1]** 35/4
**information [7]** 3/14 37/21 38/19 38/20 38/24 60/1 68/7
**informed [1]** 4/8
**inherently [1]** 43/8
**injunction [3]** 39/18 57/19 64/7
**injunctions [1]** 39/13
**injury [3]** 48/17 48/20 49/1
**input [1]** 25/24
**inquire [1]** 17/6
**insofar [1]** 43/7
**instead [1]** 64/6
**intelligence [1]** 2/11
**intelligent [1]** 2/12
**intended [2]** 4/23 59/7
**intent [2]** 45/13 45/16
**intention [1]** 39/1
**interest [1]** 39/9
**interested [1]** 5/22
**interim [1]** 21/9
**INTERIOR [9]** 1/6 2/3 19/17 20/5 34/1 34/24 60/2 60/13 65/4
**intermediate [1]** 14/1
**internal [1]** 2/15
**international [3]** 9/4 9/5 9/5
**interrupt [1]** 33/13
**intervene [1]** 8/18
**intervening [1]** 24/11
**invalidate [1]** 10/10
**invalidated [1]** 10/10
**invalidating [1]** 7/19
**inventory [1]** 29/19
**invited [1]** 8/18
**invoke [1]** 45/8
**involve [1]** 69/16
**involved [3]** 60/11 60/14 70/2
**involving [2]** 47/9 47/10
**irreparable [6]** 39/8 40/20 40/24 51/24 51/25 54/19
**irrevocable [1]** 19/11
**isn't used [1]** 53/14
**issue [15]** 8/22 17/8 24/4 28/16 28/19 28/20 33/1 33/2 33/4 42/14 47/11 49/7 67/3 70/8 71/25
**issues [10]** 4/20 5/12 6/13 8/16 42/6 42/9 42/10 67/4 68/4 68/10
**issuing [1]** 19/13
**it there [1]** 51/1

**J**

**Jack [1]** 2/9
**JEFF [3]** 1/23 73/3 73/9
**job [3]** 3/25 4/12 14/19
**jog [1]** 48/16
**jogging [1]** 48/15
**JOHN [1]** 1/16
**joined [1]** 2/7
**JSR [4]** 70/4 70/23 71/4 72/2
**JUDGE [3]** 1/10 55/21 57/8
**judgment [8]** 39/11 44/17 64/9 67/25 68/1 68/3 68/11 70/18
**jump [3]** 14/17 43/2 67/24
**June [1]** 62/13
**jurisdiction [2]** 42/12 42/12

**K**

**keep [4]** 16/11 49/21 58/3 58/4
**keeping [1]** 18/11
**key [2]** 14/20 47/21
**kicks [1]** 53/11
**kind [19]** 7/4 11/6 12/19 22/2 22/11 23/8 26/21 26/23 27/21 27/23 30/25 31/24 32/3 49/19 61/3 65/1 65/16 69/13 69/23
**kinds [1]** 66/10
**knees [1]** 49/9
**knowing [1]** 69/13
**knowledge [1]** 13/20
**known [1]** 34/2
**knows [2]** 11/25 46/14

**L**

**Labor [1]** 57/9
**lake [1]** 13/17
**land [3]** 8/23 50/14 58/10
**landfill [8]** 14/12 15/21 21/13 22/12 32/8 32/16 33/1 33/4
**landscape [4]** 14/14 15/22 15/25 16/1
**landscape-related [1]** 15/25
**landscaping [1]** 15/25
**large [2]** 4/23 24/17
**largely [1]** 3/10
**larger [1]** 52/13
**last [4]** 11/14 13/15 46/18 54/19
**late [1]** 59/21
**later [2]** 45/1 54/23
**law [16]** 3/14 4/15 4/24 5/11

**L**

**law... [12]** 5/17 5/18 17/9 21/2 26/4 26/7 44/1 47/3 47/10 52/19 61/16 62/7
**law-type [1]** 5/17
**lawsuit [1]** 7/25
**lawyers [2]** 2/12 9/10
**leadership [2]** 20/4 33/25
**LEAGUE [2]** 1/3 2/3
**learn [1]** 58/16
**learned [1]** 43/4
**lease [32]** 6/22 7/1 7/6 7/9 7/16 7/19 7/21 7/24 8/9 8/15 8/24 9/15 9/23 17/16 17/17 19/9 24/11 30/14 30/23 31/14 34/14 35/7 35/13 35/17 35/18 36/5 45/17 45/18 59/12 59/17 59/19 59/22
**leased [1]** 30/13
**least [8]** 8/16 8/17 19/6 19/21 20/18 24/2 28/15 30/1
**leave [1]** 62/22
**leaving [1]** 50/25
**left [3]** 37/16 38/1 52/2
**legal [2]** 43/25 60/23
**Leon [1]** 55/21
**less [3]** 12/5 20/21 71/20
**lessee [5]** 31/1 31/15 45/22 45/23 46/10
**Lester [3]** 44/24 45/1 45/5
**level [2]** 27/20 49/1
**life [1]** 45/6
**light [1]** 66/9
**likelihood [1]** 43/3
**likely [2]** 9/22 53/12
**limb [1]** 5/2
**limited [3]** 34/18 59/24 67/22
**line [3]** 29/7 31/9 35/5
**lines [1]** 19/25
**lining [1]** 4/15
**list [4]** 24/25 25/13 25/16 32/20
**litany [1]** 65/19
**literally [2]** 18/16 50/21
**litigated [1]** 57/13
**litigating [1]** 57/10
**litigating it [1]** 57/10
**litigation [1]** 55/23
**little [7]** 17/24 23/6 23/13 27/21 52/10 63/23 68/7
**live [1]** 48/9
**lo [1]** 65/13
**local [1]** 71/6
**locate [1]** 28/8
**located [1]** 31/25
**location [1]** 32/6
**long [7]** 3/22 24/23 24/25 41/20 59/8 63/25 66/4
**longer [2]** 15/18 45/13
**look [8]** 13/1 25/5 26/1 56/7 56/12 56/20 64/25 68/16
**looked [3]** 16/2 65/11 65/12
**looking [4]** 7/23 25/8 42/16 70/17
**looks [5]** 23/10 23/11 31/3 35/3 35/5
**loss [1]** 7/7
**lost [1]** 17/24
**lot [13]** 3/16 4/3 5/8 9/3 19/10 20/25 24/5 39/9 39/13 42/9 45/2 47/3 56/7
**love [2]** 48/9 48/16
**Lowe [1]** 63/8
**LOWELL [5]** 1/15 1/16 2/8 2/10 63/8
**lunch [1]** 19/23

**M**

**M [3]** 1/22 73/3 73/9
**ma'am [1]** 51/10
**macro [1]** 33/9
**macro-question [1]** 33/9
**main [1]** 2/21
**maintaining [2]** 30/21 30/23
**maintenance [12]** 22/9 29/11 30/8 34/20 34/20 48/12 48/19 48/24 49/4 49/6 49/12 51/15
**makes [5]** 6/10 12/5 62/7 64/6 64/12
**Mall [2]** 48/10 51/23
**manageable [1]** 6/15
**many [2]** 23/18 48/10
**map [1]** 50/13
**March [1]** 1/5
**MARK [2]** 1/12 2/6
**marks [1]** 67/23
**Marshall [1]** 57/6
**match [1]** 15/18
**matches [1]** 13/21
**material [1]** 68/4
**materially [2]** 40/17 52/22
**math [1]** 44/7
**matter [5]** 17/8 17/9 52/19 61/16 73/5
**matters [1]** 70/21
**may [14]** 11/8 21/16 28/19 29/19 40/12 42/17 47/17 53/25 54/1 54/14 54/14 55/14 69/1 69/11
**maybe [18]** 4/15 8/1 16/21 17/5 23/5 26/6 26/16 28/11 28/11 28/13 35/4 39/20 49/7 54/15 66/12 67/13 69/3 70/4
**mean [72]** 4/1 4/14 7/22 7/24 8/6 8/21 8/21 9/16 9/18 9/20 10/1 12/17 12/21 13/7 14/7 14/14 14/24 15/21 15/22 17/5 17/9 17/24 18/9 18/19 19/4 20/14 20/22 21/1 21/1 21/18 25/11 25/22 25/25 26/1 28/10 32/12 32/13 35/17 36/6 39/23 41/2 41/11 46/3 46/9 47/2 47/23 47/25 49/5 49/7 49/10 49/11 49/12 50/10 52/4 52/5 52/5 52/8 52/17 52/17 52/18 53/8 53/17 54/5 54/11 55/10 59/16 59/18 61/19 62/15 63/6 64/21 68/17
**meaningful [3]** 24/18 26/17 27/4
**means [4]** 8/8 48/17 69/5 69/10
**meant [2]** 45/15 48/20
**meantime [1]** 63/21
**media [1]** 4/9
**meet [1]** 70/10
**meeting [6]** 33/25 34/17 34/18 60/1 60/4 60/7
**meetings [1]** 25/17
**member [1]** 20/4
**members [1]** 47/6
**membership [2]** 47/5 47/8
**memo [3]** 18/24 19/13 61/22
**memorandum [2]** 18/19 19/2
**mentioned [4]** 21/24 24/9 33/19 58/8
**mentors [1]** 6/3
**merely [1]** 53/4

**M**

**merits [8]** 39/18 39/20 42/5 42/10 43/4 51/25 66/22 67/4
**met [1]** 20/5
**MICHAEL [2]** 1/21 2/19
**middle [2]** 37/23 44/8
**might [15]** 6/12 6/17 6/18 8/4 13/9 23/17 25/20 28/10 33/1 35/17 35/21 36/10 40/6 41/24 48/7
**million [2]** 43/17 54/22
**mind [3]** 19/5 61/2 67/4
**minding [1]** 4/25
**minimum [1]** 39/8
**minor [2]** 34/19 70/8
**mispronounce [1]** 49/25
**misspoke [1]** 36/22
**mitigate [1]** 54/7
**model [1]** 3/16
**moderate [1]** 2/25
**modest [1]** 55/5
**moment [3]** 2/21 7/13 19/11
**month [3]** 24/7 31/10 31/10
**months [4]** 39/14 52/7 67/2 67/2
**more [25]** 3/8 5/17 5/19 12/16 15/11 21/13 22/12 24/5 24/15 26/5 26/9 33/6 38/1 39/5 39/10 39/13 52/7 52/10 52/12 52/14 54/21 61/19 64/12 66/5 71/20
**morning [1]** 27/19
**most [9]** 5/3 5/22 6/10 16/21 27/19 28/17 28/25 38/10 63/12
**motion [15]** 21/8 57/19 58/13 62/19 63/14 63/15 63/17 63/17 63/19 65/24 66/20 67/20 68/1 68/11 71/22
**move [16]** 17/20 39/2 41/16 42/13 43/17 53/18 53/20 56/4 63/12 64/1 64/10 64/11 64/11 66/25 67/19 70/8
**moved [6]** 34/9 53/14 53/16 55/10 55/12 68/12
**movement [1]** 17/14
**moving [5]** 26/13 53/10 54/20 55/11 64/7
**Mr. [42]** 2/10 3/10 5/24 6/10 6/18 10/17 12/18 12/24 14/5 14/19 15/8 17/3 17/8 17/19 18/5 18/25 19/22 21/12 24/22 28/24 30/18 32/23 33/20 34/16 35/21 37/25 42/8 42/22 45/17 46/3 46/13 47/1 55/10 59/9 61/7 61/10 63/7 63/8 63/10 65/13 70/16 71/23
**Mr. Bardwell [3]** 6/18 35/21 70/16
**Mr. Craig [1]** 5/24
**Mr. Fazio [4]** 18/25 19/22 59/9 65/13
**Mr. Lowe [1]** 63/8
**Mr. Lowell [1]** 2/10
**Mr. Robertson [22]** 3/10 6/10 10/17 14/5 17/3 17/8 17/19 18/5 21/12 24/22 28/24 30/18 32/23 42/8 42/22 45/17 47/1 55/10 61/10 63/7 63/10 71/23
**Mr. Robertson's [10]** 12/18 12/24 14/19 15/8 33/20 34/16 37/25 46/3 46/13 61/7
**Ms. [3]** 37/12 43/15 60/15
**Ms. Bowron [1]** 60/15
**Ms. Bowron's [2]** 37/12 43/15
**much [15]** 2/24 13/18 13/18 21/15 22/19 22/20 26/10 29/15 37/25 38/18 45/1 52/2 56/13 66/8 66/13
**multiple [1]** 16/21
**must [3]** 12/23 25/11 25/12
**myself [1]** 4/10

**N**

**N [1]** 2/1
**name [2]** 49/25 63/9
**narrow [3]** 58/3 58/4 59/20
**national [14]** 4/10 7/15 7/18 9/21 9/24 13/25 17/20 24/16 33/10 37/13 48/10 48/13 48/18 48/22
**natural [2]** 3/20 23/21
**nature [2]** 12/6 59/11
**NE [1]** 1/22
**near [2]** 50/13 50/15
**necessarily [5]** 8/8 9/16 24/17 25/16 26/22
**necessary [4]** 7/16 8/17 29/16 40/5
**need [14]** 8/22 20/10 29/10 31/14 32/19 34/24 41/17 45/6 49/10 49/12 49/14 60/23 68/3 70/5
**needed [1]** 7/19
**needs [5]** 22/3 22/10 22/11 30/8 38/3
**neither [2]** 20/20 45/3
**NEPA [5]** 33/4 33/8 37/1 37/15 43/8
**Nersesian [2]** 49/25 51/12
**nevertheless [1]** 12/11
**new [6]** 8/24 30/14 31/1 31/15 33/6 56/11
**newly [1]** 9/23
**newly-awarded [1]** 9/23
**news [1]** 55/24
**next [7]** 21/21 24/3 32/15 40/8 45/4 52/7 71/1
**NHPA [6]** 27/4 33/7 37/2 37/15 44/4 45/9
**nice [3]** 6/2 6/3 14/19
**night [1]** 44/21
**nine [2]** 13/11 31/20
**nine-hole [1]** 31/20
**NLT [21]** 6/22 7/1 7/3 7/25 8/8 8/16 10/1 10/3 17/16 17/17 30/22 31/2 31/9 31/16 34/15 35/10 35/11 35/12 35/16 36/2 36/3
**NLT's [8]** 7/9 30/14 34/14 35/6 35/7 35/13 45/13 45/13
**non [2]** 54/6 61/15
**non-person [1]** 54/6
**non-reviewable [1]** 61/15
**nonbinding [1]** 61/15
**none [3]** 13/19 18/7 65/12
**Norm [1]** 2/9
**normal [1]** 10/9
**NORMAN [1]** 1/18
**notable [1]** 12/9
**noted [3]** 2/8 10/18 10/23
**notes [1]** 61/9
**notice [1]**

**N**

**notice... [1]** 10/6
**notion [1]** 46/24
**novels [1]** 16/16
**nowhere [1]** 50/13
**NPS [4]** 10/24 33/7 48/13 49/25
**number [6]** 5/16 6/4 6/8 8/2 36/5 36/10
**NW [2]** 1/17 1/24

**O**

**O [1]** 2/1
**obstruction [2]** 35/13 52/14
**obviously [6]** 4/6 25/11 33/16 39/24 58/1 64/12
**occur [2]** 46/20 53/22
**occurred [2]** 40/16 40/18
**October [1]** 24/1
**odd [1]** 7/23
**off [12]** 8/12 8/13 8/14 18/7 23/24 27/13 38/4 38/5 55/24 66/11 68/24 69/1
**official [4]** 1/23 49/25 66/16 73/3
**offshoot [1]** 10/12
**okayed [1]** 55/25
**old [3]** 9/19 16/14 45/18
**old-style [1]** 16/14
**once [5]** 18/17 51/8 57/16 62/13 67/10
**one [46]** 2/20 3/8 5/4 5/5 6/3 6/7 7/6 8/23 11/25 13/15 13/16 13/17 16/20 17/3 17/8 18/3 19/13 19/15 21/18 23/10 25/19 27/9 28/10 30/13 30/14 32/13 39/19 44/8 44/19 44/22 45/24 46/14 47/22 52/3 52/15 54/9 54/19 55/4 57/12 57/18 58/23 61/5 65/2 68/3 69/6 70/4
**ones [1]** 31/12
**ongoing [7]** 38/3 40/9 40/16 40/17 40/21 40/24 42/16
**online [1]** 5/8
**only [7]** 3/14 11/25 12/22 24/1 24/2 67/7 67/22
**open [2]** 48/20 49/7
**operate [2]** 9/14 36/11
**operating [5]** 8/23 12/14 12/15 31/13 35/19
**operation [1]** 35/14
**operator [1]** 36/8
**opportunity [2]** 27/5 66/1
**opposed [3]** 12/10 35/10 35/12
**opposing [1]** 69/18
**opposition [7]** 2/22 10/18 10/23 24/22 33/15 35/6 61/12
**order [7]** 5/16 6/9 7/17 28/14 41/25 63/16 68/15
**ordinary [1]** 22/8
**Organic [3]** 33/7 46/1 46/23
**organization [1]** 47/6
**otherwise [1]** 9/12
**ought [1]** 25/18
**ourselves [1]** 58/10
**out [34]** 5/25 6/15 7/10 9/10 9/11 11/9 11/17 11/19 13/1 17/3 17/8 22/18 23/5 25/4 29/23 30/19 31/11 32/10 32/10 37/18 40/13 42/5 49/13 49/20 49/20 53/11 56/15 66/4 68/6 69/15 70/5 70/19 71/21 72/8
**outline [1]** 58/15
**outpaced [1]** 71/13
**outside [1]** 32/15
**over [4]** 34/9 35/2 67/3 67/6
**overall [2]** 58/20 58/21
**overhaul [2]** 22/7 26/21
**oversees [1]** 50/1
**overstate [1]** 29/22
**own [3]** 3/10 4/25 37/19

**P**

**P [1]** 2/1
**p.m [2]** 1/6 72/10
**page [2]** 24/23 63/18
**paid [2]** 59/10 59/10
**pain [3]** 5/4 5/5 5/7
**painful [1]** 5/3
**papers [3]** 17/1 28/18 66/2
**par [4]** 13/14 13/14 13/15 32/7
**paralegals [2]** 69/24 69/25
**parameters [1]** 16/4
**parcel [3]** 8/13 33/2 42/9
**park [3]** 13/25 29/17 48/21
**parks [4]** 37/14 48/13 48/18 48/22
**part [16]** 8/4 8/8 8/13 8/22 11/25 14/18 18/3 26/17 33/2 33/20 34/6 34/7 42/9 50/8 68/13 71/19
**participate [1]** 9/23
**particular [3]** 6/9 32/6 49/2
**particularized [1]** 48/3
**particularly [1]** 58/11
**parties [2]** 2/4 69/4
**party [2]** 8/17 44/18
**pass [3]** 3/19 68/24 69/22
**past [1]** 65/23
**pay [1]** 5/8
**pay-per-view [1]** 5/8
**PDAAG [1]** 3/6
**pejorative [1]** 68/18
**pending [3]** 57/19 58/14 71/7
**Pennsylvania [1]** 1/19
**people [12]** 4/9 4/12 5/8 11/22 18/22 21/1 25/21 25/23 38/10 53/25 54/2 66/11
**people are [1]** 54/2
**per [1]** 5/8
**percent [1]** 26/19
**Perfect [1]** 6/20
**perform [3]** 36/5 36/9 59/14
**perhaps [3]** 11/20 21/7 68/21
**permanent [3]** 39/13 39/17 51/6
**permanently [3]** 50/3 50/6 51/23
**permissible [1]** 57/17
**permit [1]** 41/8
**permitted [1]** 56/13
**person [5]** 9/17 9/18 12/4 37/12 54/6
**phase [2]** 60/18 60/21
**phenomenal [1]** 4/2
**phenomenon [1]** 16/17
**phone [1]** 70/6
**physically [1]** 38/7
**PI [3]** 43/2 57/22 71/7
**picture [2]** 12/1 45/14
**piece [2]** 7/17 65/22
**pile [12]** 37/23 49/23 50/4 50/13 50/17 51/6 51/9 51/13 53/3 53/4 53/7

**P**

**pile... [1]** 53/12
**Pines [2]** 11/13 12/8
**pipes [2]** 51/16 51/18
**place [7]** 9/22 21/25 23/11 30/25 35/21 60/5 65/19
**placed [6]** 21/25 22/22 23/8 23/14 32/3 46/18
**placing [1]** 13/23
**plaintiff [1]** 57/21
**plaintiffs [10]** 1/4 1/12 2/7 5/20 6/5 7/5 25/24 26/16 28/24 40/8
**plaintiffs' [11]** 2/5 4/6 6/11 6/24 13/5 13/22 14/21 17/18 27/11 33/22 38/17
**plan [51]** 7/15 7/18 8/7 8/14 9/17 9/19 9/21 9/24 10/19 10/21 11/20 12/20 12/25 13/4 13/5 13/6 13/8 13/11 14/10 17/20 18/1 18/10 18/21 18/21 18/25 19/10 19/14 19/17 19/25 22/11 24/16 24/24 25/22 25/25 26/8 33/2 33/6 33/10 34/23 35/7 35/10 35/13 37/10 45/17 46/8 46/13 46/14 55/5 60/2 65/9 70/22
**plan is [1]** 13/6
**planning [3]** 8/1 15/13 25/2
**plans [15]** 13/1 16/24 17/5 17/7 22/6 26/18 55/15 55/16 55/20 55/24 55/24 60/16 60/20 65/4 65/5
**plant [1]** 50/6
**plausible [1]** 27/22
**play [7]** 11/15 18/22 31/11 32/14 47/24 49/20 58/13
**playable [3]** 12/5 31/18 32/5
**played [2]** 44/10 44/10
**players [1]** 18/23
**playing [1]** 32/13
**please [3]** 4/4 58/22 72/9
**pled [1]** 15/8
**plenty [1]** 11/9
**PLLC [1]** 1/16
**plow [1]** 34/3
**plus [2]** 19/22 48/21
**PO [1]** 1/14
**point [34]** 11/9 12/19 13/23 14/2 14/3 14/4 15/13 18/7 18/16 26/25 27/21 29/11 31/5 33/1 37/18 38/17 43/1 46/3 46/5 46/8 46/13 46/20 47/2 47/15 49/19 51/17 52/3 53/19 54/19 54/23 56/21 57/8 65/7 70/18
**points [4]** 5/22 17/3 17/8 47/22
**policy [1]** 56/16
**Pool [5]** 48/11 48/14 48/15 51/14 51/15
**poor [1]** 29/2
**portion [3]** 4/9 4/23 18/5
**portions [1]** 21/7
**position [9]** 14/21 14/21 16/7 33/22 33/22 41/15 45/24 49/2 65/20
**possession [1]** 37/21
**possibility [1]** 11/20
**possible [4]** 6/17 12/24 58/3 58/5
**possibly [1]** 7/8
**post [1]** 45/2
**potentially [2]** 21/8 26/13
**Potomac [10]** 20/6 29/17 32/17 33/24 34/4 34/20 35/1 37/23 46/25 54/12
**pre [1]** 63/17
**pre-motion [1]** 63/17
**preceded [1]** 26/22
**precise [1]** 40/7
**precursor [1]** 42/6
**preferable [1]** 50/25
**preferred [2]** 34/6 34/13
**prejudging [1]** 67/11
**preliminary [3]** 39/13 57/19 64/7
**premature [4]** 21/8 25/20 62/25 69/11
**prepared [1]** 33/13
**presented [1]** 19/17
**presents [1]** 61/19
**PRESERVATION [2]** 1/3 2/3
**preserving [1]** 29/20
**President [13]** 16/22 17/3 19/16 19/19 19/23 20/5 24/12 34/1 34/9 34/12 34/23 34/25 60/3
**president's [3]** 17/13 37/19 38/19
**presidents [1]** 17/10
**press [1]** 34/10
**presumably [8]** 19/4 23/4 49/6 50/6 52/8 52/9 53/20 54/21
**pretextual [2]** 17/19 59/13
**pretty [3]** 17/21 24/9 24/25
**prevail [1]** 57/25
**prevent [4]** 50/3 50/7 50/14 50/17
**preventing [1]** 55/7
**prevention [2]** 29/15 34/22
**Principal [1]** 3/6
**privileged [1]** 2/15
**probably [10]** 5/7 6/10 38/1 38/11 48/10 48/11 52/16 64/12 67/7 68/23
**problem [4]** 12/17 50/9 54/3 61/20
**problems [3]** 12/2 17/2 43/11
**procedure [1]** 39/17
**proceed [2]** 5/13 6/15
**proceeded [1]** 44/6
**proceeding [1]** 40/11
**proceedings [3]** 70/18 72/10 73/5
**process [7]** 25/2 26/16 31/14 49/20 51/15 66/15 66/21
**produce [1]** 28/13
**professional [1]** 18/23
**Programs [2]** 4/1 4/3
**prohibitively [1]** 26/6
**project [4]** 34/7 34/14 35/1 56/22
**promise [1]** 58/3
**promulgated [1]** 10/6
**proposal [4]** 10/19 10/22 10/23 13/1
**proposals [1]** 30/20
**propose [2]** 5/13 69/1
**proposed [2]** 20/5 60/2
**proposition [1]** 61/14
**propound [1]** 58/2
**protect [2]** 29/16 29/17
**protected [1]** 34/5
**protective [2]** 28/14 68/15
**provide [2]** 48/6 68/14
**provided [1]**

**P**

**provided... [1]** 27/3
**provides [2]** 24/9 51/5
**proximity [1]** 54/1
**public [11]** 11/4 11/9 12/9 16/7 26/16 28/3 28/5 28/8 37/19 38/19 39/8
**pull [1]** 21/18
**pulling [1]** 2/10
**purely [1]** 15/5
**purported [1]** 35/8
**purpose [10]** 15/19 15/20 15/21 16/8 32/4 34/9 56/14 57/20 57/22 59/7
**purposes [4]** 15/17 15/17 15/25 47/13
**push [1]** 64/18
**put [11]** 18/4 22/15 27/12 27/24 27/25 28/24 30/19 39/21 41/20 63/22 66/10
**putting [5]** 13/18 28/18 38/7 38/8 66/22

**Q**

**quick [2]** 6/15 39/11
**quickly [7]** 41/3 64/10 64/11 66/12 70/7 70/7 70/13
**quiet [1]** 56/23
**quotation [1]** 67/23
**quote [1]** 29/1
**quotes [1]** 17/1

**R**

**R [2]** 2/1 73/1
**raises [2]** 8/15 12/1
**ran [1]** 5/1
**range [1]** 23/3
**rather [3]** 7/23 60/19 70/23
**reach [1]** 26/15
**read [8]** 4/22 14/10 16/25 17/13 36/14 57/12 61/6 71/16
**reading [2]** 4/24 61/6
**ready [1]** 2/11
**real [1]** 12/14
**really [11]** 6/6 10/14 12/18 15/4 33/21 37/16 39/7 39/19 43/6 45/6 61/25
**realm [2]** 11/19 57/16
**reason [5]** 17/17 35/8 55/9 55/12 68/25
**reasonable [1]** 24/9
**reasons [4]** 17/18 32/14 35/6 59/12
**recall [1]** 47/10
**recent [1]** 27/19
**recently [1]** 43/4
**recognizing [1]** 52/24
**reconnect [1]** 51/18
**record [35]** 2/4 21/9 21/19 24/4 39/2 41/8 41/8 41/10 41/17 41/20 42/1 56/5 56/6 56/13 56/14 57/17 59/18 63/22 63/23 64/3 64/16 64/19 65/22 65/24 66/10 66/14 66/16 67/17 67/22 67/24 68/9 68/10 71/20 71/22 73/5
**recreate [1]** 22/5
**Red [1]** 44/13
**redesign [3]** 22/7 26/22 31/3
**redesigning [1]** 45/19
**redressability [1]** 48/1
**redundant [1]** 71/12
**reengage [1]** 31/1
**refill [1]** 51/16
**Reflecting [5]** 48/11 48/14 48/15 51/14 51/15
**regard [1]** 46/8
**regarding [1]** 60/1
**regardless [2]** 38/2 40/7
**regards [2]** 24/13 33/24
**region [1]** 50/1
**regular [6]** 43/2 48/12 49/4 49/6 49/8 49/12
**regulatory [1]** 33/3
**rehabilitate [1]** 48/14
**reinstate [1]** 7/6
**related [1]** 15/25
**relevant [1]** 67/9
**reliably [1]** 4/8
**relief [9]** 7/6 7/20 8/6 8/11 11/4 36/15 36/19 36/20 37/1
**relying [1]** 70/24
**remain [1]** 10/24
**remarkable [1]** 3/11
**remember [3]** 16/11 16/13 47/8
**remind [1]** 35/24
**remiss [1]** 69/18
**removing [3]** 54/21 54/22 55/6
**renovate [1]** 18/15
**renovating [1]** 18/14
**rent [4]** 36/5 36/9 59/14 59/21
**renter [1]** 31/10
**repair [1]** 16/10
**replicate [1]** 13/2
**reply [5]** 5/21 14/24 33/16 62/3 71/7
**report [1]** 29/5
**Reporter [3]** 1/23 1/23 73/3
**reporting [2]** 16/8 37/19
**representations [1]** 52/25
**request [1]** 30/20
**requests [2]** 58/1 58/12
**require [1]** 35/14
**resolve [1]** 43/15
**resolving [2]** 40/6 59/24
**resource [1]** 29/18
**Resources [1]** 3/20
**respect [7]** 42/10 45/16 47/3 47/4 47/11 49/6 59/19
**respond [5]** 5/21 6/8 47/15 49/23 65/25
**responding [1]** 33/15
**response [2]** 12/24 34/8
**rest [2]** 5/9 49/13
**results [1]** 58/9
**retain [1]** 36/3
**return [1]** 62/13
**reversible [3]** 43/10 43/14 43/24
**reverting [1]** 16/11
**review [2]** 26/18 31/4
**reviewable [2]** 42/20 61/15
**reviews [1]** 26/23
**revisit [1]** 31/14
**REYES [1]** 1/9
**RFP [1]** 30/20
**right [82]**
**ripe [1]** 42/19
**ripeness [4]** 5/22 6/5 6/6 6/13
**rise [1]** 49/1
**risk [8]** 32/19 52/9 52/15 53/2 53/4 53/6 53/13 54/7
**risks [2]** 53/22 53/25
**road [2]** 31/5 39/7
**ROBERTSON [24]** 1/21 2/19 3/10 6/10 10/17 14/5 17/3 17/8 17/19 18/5

## R

**ROBERTSON... [14]** 21/12 24/22 28/24 30/18 32/23 42/8 42/22 45/17 47/1 55/10 61/10 63/7 63/10 71/23
**Robertson's [10]** 12/18 12/24 14/19 15/8 33/20 34/16 37/25 46/3 46/13 61/7
**ROBIN [2]** 1/13 2/9
**room [1]** 70/3
**roommate [1]** 44/23
**rough [1]** 44/22
**rubble [1]** 31/19
**ruined [1]** 44/21
**rule [7]** 10/6 10/8 10/10 39/17 56/8 56/16 66/1
**rules [2]** 32/10 71/6
**run [2]** 12/16 36/3
**running [1]** 49/8
**runs [1]** 45/2

## S

**S [1]** 2/1
**Sadly [1]** 44/3
**safe [2]** 2/16 27/16
**SAMBURG [2]** 1/12 2/7
**same [9]** 5/1 9/8 16/17 27/2 34/17 52/10 53/6 62/20 72/1
**sand [1]** 13/16
**Saturday [1]** 4/25
**save [1]** 14/24
**saw [1]** 31/23
**saying [8]** 12/21 19/14 19/20 19/24 43/19 43/20 53/9 61/21
**scene [1]** 2/13
**scenery [1]** 32/15
**schedule [3]** 39/11 63/20 67/19
**schemes [1]** 33/3
**Science [1]** 16/16
**scope [1]** 10/9
**score [1]** 32/7
**scratched [2]** 5/2 5/3
**screw [1]** 4/17
**screwed [1]** 63/9
**SE [1]** 1/19
**season [1]** 45/2
**seated [2]** 4/4 32/22
**second [6]** 2/20 13/14 21/23 38/14 54/12 59/6
**secondhand [1]** 60/20
**secretary [5]** 19/13 19/17 20/4 34/24 60/12
**section [1]** 3/5
**sedentary [1]** 53/13
**seed [2]** 50/3 51/23
**seeding [5]** 50/6 50/12 51/5 51/6 51/9
**seeing [1]** 28/17
**seek [2]** 7/7 21/9
**seem [5]** 22/8 26/11 29/24 32/25 33/2
**seems [7]** 7/22 19/18 25/25 26/13 29/21 33/6 50/23
**selected [1]** 32/4
**sell [1]** 5/7
**send [1]** 70/4
**senior [1]** 20/4
**sense [5]** 6/10 39/5 39/10 64/6 64/12
**separately [2]** 35/3 35/5
**service [4]** 13/25 37/14 40/10 48/13
**set [7]** 15/6 15/7 56/6 57/23 57/24 57/25 70/23
**setting [3]** 44/6 44/9 45/10
**settlement [1]** 26/17
**shakings [1]** 4/3
**shape [1]** 16/9
**shapes [1]** 16/5
**shooting [2]** 39/25 40/2
**short [3]** 5/16 13/23 46/20
**shorted [1]** 36/9
**show [1]** 47/6
**showing [1]** 19/22
**shows [1]** 31/24
**sides [1]** 9/8
**sideshow [1]** 59/17
**sign [2]** 27/13 66/11
**sign-off [1]** 27/13
**significant [1]** 4/8
**silver [1]** 4/15
**similarly [1]** 58/7
**simply [2]** 22/4 38/18
**sit [1]** 9/1
**site [2]** 16/25 53/14
**six [5]** 13/14 58/15 58/19 60/14 65/2
**size [3]** 23/10 23/11 23/12
**skeptical [2]** 52/18 60/25
**skip [2]** 24/5 67/20
**skip a [1]** 67/20
**slightly [1]** 38/1
**slower [1]** 56/24
**small [1]** 18/5
**smart [3]** 19/13 62/15 62/17
**social [1]** 4/9
**soil [3]** 53/1 53/2 54/8
**somebody [3]** 8/22 9/15 54/4
**somehow [1]** 64/24
**someone [14]** 6/11 8/21 8/24 13/11 13/13 13/23 25/12 30/20 36/6 36/7 36/9 38/10 46/17 46/18
**someone's [1]** 9/14
**somewhat [2]** 20/3 43/23
**somewhere [7]** 13/23 18/4 43/16 53/17 53/20 54/13 55/8
**sorry [15]** 3/7 36/21 36/23 37/5 45/7 46/6 47/14 50/19 51/11 51/12 54/18 55/22 56/25 63/8 67/15
**sort [45]** 3/16 5/11 5/18 7/7 7/13 10/9 10/11 12/7 12/15 12/15 15/12 16/9 19/11 28/11 28/13 28/16 31/9 33/1 34/13 34/20 34/21 37/11 37/18 38/14 39/8 40/10 41/3 42/6 45/22 46/2 46/3 49/10 50/21 51/1 51/25 52/3 52/19 56/7 60/23 61/7 61/9 61/15 61/21 63/11 70/3
**sound [2]** 30/1 30/2
**sounds [2]** 30/7 43/6
**Sox [2]** 44/11 44/13
**speak [1]** 26/20
**speaks [3]** 8/1 33/9 46/2
**spearhead [1]** 34/14
**spectacular [1]** 3/12
**spectrum [1]** 46/16
**speculate [1]** 11/7
**speculating [1]** 55/14
**speculative [2]** 49/16 65/17
**spend [1]** 4/23
**spokespeople [1]** 16/22
**spot [2]** 3/13 39/22
**squarely [1]** 33/4
**stabilization [1]** 34/22
**standing [26]** 6/6 7/8 27/22 28/18 41/16 42/2 42/9

**S**

**standing... [19]** 42/13 42/14 47/2 47/5 47/11 47/12 47/20 48/1 49/7 49/7 49/11 49/14 51/2 51/5 63/14 63/16 67/3 67/8 67/11
**standing's [1]** 48/20
**start [4]** 9/11 18/17 41/25 43/3
**started [3]** 19/5 24/1 61/6
**starts [2]** 34/9 35/1
**stated [1]** 59/12
**statements [5]** 16/21 17/13 24/12 34/12 61/15
**STATES [3]** 1/1 1/10 34/2
**status [2]** 1/9 6/22
**stay [5]** 2/16 2/20 9/13 47/18 53/17
**stayed [1]** 53/7
**stays [1]** 11/21
**step [3]** 27/1 28/15 40/8
**steps [5]** 7/18 20/8 29/16 31/2 31/15
**Steve [1]** 3/4
**still [34]** 6/22 8/1 11/6 11/6 18/11 22/10 22/17 25/4 25/16 27/20 30/23 31/11 31/14 31/18 32/5 32/5 33/9 33/10 35/17 35/18 35/18 37/24 46/20 46/21 49/10 49/12 49/16 52/8 52/9 53/22 54/9 60/18 65/4 65/6
**stockpile [3]** 27/7 31/25 50/2
**stockpiled [1]** 21/25
**stockpiling [1]** 47/20
**stone [1]** 18/2
**stop [5]** 52/19 52/21 55/23 71/10 71/11
**stories [1]** 33/23
**story [6]** 33/24 33/25 34/15 34/16 37/17 40/12
**story's [1]** 36/13
**straight [3]** 63/19 64/8 68/5
**Street [2]** 1/17 1/22
**strict [1]** 55/19
**strict timelines [1]** 55/19
**strikes [3]** 36/8 50/4 51/13
**strongly [1]** 64/18
**struck [1]** 61/5
**stuff [3]** 9/11 22/3 23/10
**style [2]** 16/14 34/3
**subject [1]** 50/10
**submit [3]** 47/19 65/24 66/2
**submitted [1]** 65/13
**submitting [1]** 62/3
**subsequent [2]** 29/11 40/10
**substantial [1]** 42/3
**success [1]** 43/3
**sued [1]** 7/1
**sufficiently [1]** 54/6
**suggest [4]** 15/7 21/7 41/24 41/25
**suggested [2]** 24/14 24/15
**suggesting [2]** 51/4 51/5
**suggests [3]** 12/13 16/4 20/8
**suit [1]** 7/9
**summary [8]** 39/11 44/17 64/9 67/25 68/1 68/3 68/11 70/18
**support [3]** 3/15 57/22 71/7
**suppose [3]** 18/13 38/9 51/22
**supposed [2]** 22/13 26/3
**Supreme [1]** 61/14
**sure [22]** 7/24 17/7 17/10 17/12 18/12 21/2 21/17 22/1 22/20 27/25 28/4 30/9 32/9 38/16 39/15 39/25 44/1 48/8 62/3 63/7 64/25 69/22
**surround [1]** 32/3
**swells [1]** 23/8

**T**

**T [2]** 73/1 73/1
**table [6]** 2/7 8/12 8/13 8/14 9/1 15/14
**talk [22]** 6/14 6/19 6/19 26/14 28/21 35/22 38/14 39/3 39/4 41/3 41/4 41/7 59/1 60/22 63/10 63/11 68/14 69/10 69/15 70/3 70/14 70/25
**talking [6]** 9/11 10/22 23/16 29/3 30/24 56/8
**tax [1]** 54/25
**team [2]** 2/15 25/7
**tee [1]** 46/17
**television [1]** 34/10
**telling [3]** 3/25 36/2 61/3
**tells [1]** 63/7
**temporarily [1]** 50/3
**temporary [7]** 43/9 47/22 47/23 48/24 49/23 50/5 51/13
**terminated [2]** 6/22 6/23
**terms [9]** 8/5 11/8 19/10 23/13 26/4 29/1 35/13 36/5 36/10
**terraform [3]** 16/12 16/12 16/15
**territory [1]** 44/8
**test [3]** 57/18 58/9 58/10
**testify [1]** 9/8
**testing [3]** 27/17 28/1 68/15
**Texas [3]** 61/13 61/20 61/20
**texting [1]** 5/1
**thankfully [1]** 20/16
**Theo [1]** 45/8
**thingamajig [2]** 13/16 63/18
**thinking [2]** 16/23 66/23
**thirds [1]** 24/2
**thorough [1]** 62/17
**though [6]** 13/4 19/3 19/4 23/25 33/3 49/5
**thought [6]** 3/11 24/23 61/8 63/13 66/24 68/23
**thousand [1]** 23/1
**three [6]** 3/9 13/14 32/2 36/3 57/25 59/8
**thrilled [1]** 69/16
**thrust [3]** 36/16 37/12 37/14
**THURSTON [2]** 1/13 2/9
**tie [2]** 18/9 18/11
**ties [2]** 18/8 18/14
**timeline [1]** 72/2
**timelines [1]** 55/19
**times [3]** 17/10 23/18 48/10
**today [5]** 5/13 5/25 28/23 62/22 71/1
**together [7]** 25/21 41/20 63/23 66/5 66/10 66/14 67/18
**told [1]** 5/6
**Tom [2]** 17/15 35/3
**tomorrow [2]** 47/24 47/25
**ton [1]** 70/1
**took [4]** 5/6

**T**

**took... [3]** 10/7 43/21 60/5
**top [3]** 23/10 23/25 69/2
**Torrey [2]** 11/13 12/8
**totally [4]** 4/11 4/14 7/7 63/9
**towards [1]** 17/20
**toxic [1]** 27/23
**toxicity [1]** 52/25
**trade [2]** 44/24 45/1
**traded [1]** 45/5
**transcript [2]** 1/9 73/4
**transform [1]** 31/6
**transformation [1]** 12/1
**trap [1]** 13/16
**tree [1]** 5/1
**trees [1]** 13/16
**triple [2]** 12/10 22/24
**TRO [1]** 24/20
**truck [3]** 22/21 53/2 53/11
**trucking [1]** 34/25
**truckload [1]** 53/3
**trucks [6]** 22/16 22/18 43/21 43/21 52/20 55/11
**true [3]** 15/7 15/8 73/4
**trump [3]** 17/4 19/23 53/2
**trust [1]** 65/14
**try [2]** 13/2 60/18
**trying [1]** 25/4
**tubbing [2]** 9/6 9/7
**turn [3]** 11/20 49/17 67/6
**turned [1]** 20/19
**two [21]** 3/11 3/15 12/13 12/22 16/20 19/23 21/16 24/2 25/12 33/3 33/23 41/11 45/19 47/21 53/23 57/20 61/12 64/21 66/6 70/5 70/21
**two-hour [1]** 19/23
**two-thirds [1]** 24/2
**type [6]** 5/17 5/17 5/19 16/15 27/1 48/25
**typical [1]** 58/12

**U**

**U.S [2]** 1/24 61/13
**uglier [1]** 52/13
**ugly [1]** 52/9
**unaffordable [1]** 11/3
**uncancelling [1]** 7/21
**unclear [1]** 14/15
**uncover [1]** 21/6
**under [10]** 23/4 34/3 36/19 36/21 36/24 37/9 59/22 64/22 68/15 71/6
**undercuts [3]** 46/4 46/6 46/7
**undergoing [1]** 48/19
**understands [1]** 60/21
**understood [6]** 8/20 13/3 31/19 42/7 59/23 71/14
**undo [1]** 52/21
**undoing [1]** 8/14
**unfair [1]** 66/24
**unfortunately [4]** 2/14 4/25 5/10 5/14
**unique [2]** 53/4 53/12
**uniquely [1]** 37/21
**UNITED [3]** 1/1 1/10 34/2
**unlawful [1]** 55/7
**unless [3]** 54/14 56/3 62/23
**unlikely [1]** 40/19
**unnecessary [1]** 71/12
**unquote [1]** 29/1
**unrelated [1]** 35/6
**unspecified [1]** 15/17
**unsure [1]** 7/4
**unusual [1]** 12/12
**up [26]** 2/20 4/2 4/17 6/11 9/12 9/13 9/13 14/8 19/22 20/19 23/8 25/16 27/3 41/4 41/6 43/23 44/19 47/18 48/14 49/7 53/11 54/22 61/2 62/3 63/9 67/4
**upon [1]** 58/7
**use [18]** 4/1 12/4 15/25 22/5 22/7 26/6 26/13 34/7 45/13 45/22 45/24 51/16 54/12 54/13 54/25 55/5 59/7 68/17
**used [7]** 16/9 34/19 49/18 53/14 54/6 54/14 55/1
**useful [4]** 21/5 24/23 59/1 59/24
**using [1]** 20/6

**V**

**v [7]** 56/22 57/9 61/12 61/13 61/20 61/20 62/20
**valuable [1]** 14/18
**value [3]** 12/7 29/14 34/4
**various [1]** 65/5
**Venetian [2]** 62/9 62/12
**verify [1]** 65/15
**version [10]** 34/15 34/16 36/19 36/20 36/21 36/24 37/9 38/19 38/20 40/12
**versus [1]** 13/18
**video [4]** 5/6 16/13 16/14 70/7
**view [14]** 5/8 7/16 9/20 10/18 11/23 13/5 14/4 17/18 27/15 29/17 38/17 40/4 57/23 61/1
**violates [1]** 10/12
**violation [1]** 43/8
**Virginia [2]** 53/21 54/14
**virtual [1]** 2/8
**visit [1]** 24/12
**visitors [1]** 48/21
**visits [3]** 17/15 48/18 59/10
**void [2]** 32/3 59/22
**voided [1]** 30/14
**volatility [1]** 53/1
**volumes [1]** 8/1
**voluntarily [1]** 68/15
**vs [2]** 1/5 2/3

**W**

**Wait [1]** 44/13
**waive [2]** 71/8 71/9
**waiving [1]** 71/11
**walk [1]** 18/16
**walking [1]** 5/1
**wants [8]** 6/19 11/7 62/23 65/10 65/10 65/10 65/14 72/8
**Washington [13]** 1/5 1/14 1/17 1/20 1/22 1/25 7/15 7/18 9/21 9/23 17/20 24/16 33/9
**waterways [2]** 50/14 50/15
**way [15]** 6/15 6/15 24/1 27/9 34/15 35/12 40/6 41/18 54/9 65/23 68/13 68/25 69/2 69/16 72/4
**ways [2]** 6/6 58/25
**Wednesday [1]** 71/1
**week [2]** 66/6 70/25
**weekend [3]** 4/23 5/5 5/14
**weeks [4]** 3/11 41/11 41/23 70/5
**weighs [1]** 57/21
**welcome [1]** 24/21
**well-litigated [1]** 57/13

**W**

**weren't [3]** 21/9 22/1 50/8
**what's [14]** 14/3 15/12 19/21 33/23 38/22 40/12 40/18 46/10 46/11 50/1 59/9 60/19 71/1 71/1
**whatnot [1]** 13/12
**whatsoever [1]** 4/19
**when's [1]** 23/9
**white [8]** 16/22 18/6 18/6 20/6 31/17 51/20 60/6 60/9
**who's [1]** 3/2
**whole [2]** 46/8 51/23
**whomever [1]** 3/19
**willing [2]** 69/7 70/23
**willow [1]** 47/9
**Wing [6]** 29/25 51/20 53/13 53/18 55/6 55/20
**within [5]** 10/9 22/20 23/3 23/17 64/24
**without [2]** 30/23 31/13
**witnesses [1]** 15/11
**woman [2]** 4/10 4/16
**won [2]** 45/3 45/4
**wondering [2]** 39/9 39/20
**wooded [1]** 54/13
**word [3]** 16/11 65/3 68/18
**words [3]** 37/20 38/20 69/23
**work [4]** 3/16 66/6 69/14 70/1
**working [1]** 30/19
**workings [1]** 2/15
**world [8]** 11/9 11/13 11/21 12/22 18/22 19/20 20/6 20/16
**world-class [6]** 11/9 11/13 11/21 18/22 19/20 20/6
**worried [1]** 4/12
**worse [1]** 52/21
**wrap [2]** 41/4 41/6
**wrapped [2]** 43/23 67/4
**writ [1]** 24/17
**writhing [2]** 5/5 5/7
**writing [1]** 3/11
**written [3]** 18/2 56/16 56/16
**wrong [6]** 3/13 13/9 14/11 18/5 29/19 42/17
**wrote [1]** 14/5

**Y**

**yard [1]** 44/8
**yards [2]** 17/14 22/21
**year [1]** 45/4
**years [3]** 3/9 3/23 3/24
**YouTube [1]** 34/10