**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DC PRESERVATION LEAGUE, *et al.*,<br><br>       Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>       Defendants. | Civil Action No. 1:26-cv-477-ACR |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND .............................................................................................................. 2

    I.     Factual Background ............................................................................. 2

    II.    Procedural Background.......................................................................... 4

    III.   Legal Background ................................................................................ 5

LEGAL STANDARD ....................................................................................................... 5

    I.     Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) ........................................ 5

    II.    Judicial Review Under the Administrative Procedure Act .................................... 6

ARGUMENT ................................................................................................................... 8

    I.     Plaintiffs Lack Standing to Bring their Claims ....................................................... 8

         A.     Plaintiffs Fail to Allege an Injury Necessary to Establish Standing ........... 8

             1.     The D.C. Preservation League Fails to Allege Injury for Purposes of Organizational Standing................................................. 9

             2.     The D.C. Preservation League Fails to Allege Injury for Purposes of Associational Standing................................................. 13

             3.     Individual Plaintiffs Fail to Allege Injury Necessary to Maintain their Proposal Claims .................................................... 14

             4.     Individual Plaintiffs Fail to Allege Injury Necessary to Maintain their Landscaping Claims .............................................. 17

                 a.     Individual Plaintiffs Fail to Allege Facts Plausibly Demonstrating an Increased-Risk-of-Harm Injury ........... 17

                 b.     Individual Plaintiffs Fail to Allege Facts Plausibly Demonstrating an Aesthetic or Emotional Injury ............. 20

         B.     Plaintiffs' Claimed Injuries are Not Traceable to Defendants' Conduct.................................................................................................... 23

         C.     Plaintiffs' Claimed Injuries are Not Redressable .................................... 26

    II.    Plaintiffs' Proposal Claims Fail to State a Claim................................................ 27

A.    Plaintiffs' Proposal Claims Fail to Challenge Final Agency Action ......... 28

B.    Plaintiffs' Proposal Claims Are Unripe...................................................... 32

C.    Defendants' Deliberations and Proposal Do Not Trigger NEPA or NHPA .................................................................................................... 35

III.    Plaintiffs' Landscaping Claims Fail to State a Claim ........................................... 36

A.    Plaintiffs Fail to Plausibly Allege a Violation of NEPA .......................... 36

B.    Plaintiffs Fail to Plausibly Allege a Violation of Section 106 of the NHPA .................................................................................................... 40

C.    Plaintiffs Fail to Plead a Cause of Action under the Organic Act............. 42

IV.    Plaintiffs are Not Entitled to Extra-Record Discovery to Correct their Pleading Deficiencies............................................................................................. 44

CONCLUSION............................................................................................................................. 45

# TABLE OF AUTHORITIES

Page(s)

**Other Authorities**

*Abbott Labs v. Garner*,
387 U.S. 136 (1967)..................................................................................................... 33

*Abebio v. G4S Gov't Solutions, Inc.*,
72 F. Supp. 3d 254 (D.D.C. 2014) ............................................................................... 6

*Am. Legion v. Am. Humanist Ass'n*,
588 U.S. 29 (2019)....................................................................................................... 21

*Am. Petroleum Inst. v. EPA*,
683 F.3d 382 (D.C. Cir. 2012) .................................................................................... 33

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................. 6, 37, 41, 42, 45

*Atl. States Legal Found. v. EPA*,
325 F.3d 281 (D.C. Cir. 2003) .................................................................................... 33

*Bark v. U.S. Forest Serv.*,
37 F. Supp. 3d 41 (D.D.C. 2014) ...................................................................... 7, 30, 32

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................................... 6

*Bennett v. Spear*,
520 U.S. 154 (1997)................................................................................................ 28, 32

*Biden v. Texas*,
597 U.S. 785 (2022)..................................................................................................... 29

*Biodiversity Assocs. v. U.S. Forest Serv. Dep't of Agriculture*,
226 F. Supp. 2d 1270 (D. Wy. 2002)........................................................................... 30

*Brady Campaign to Prevent Gun Violence v. Salazar*,
612 F. Supp. 2d 1 (D.D.C. 2009) ................................................................................ 12

*California v. Texas*,
593 U.S. 659 (2021)..................................................................................................... 23

*Canaza v. Platek*,
No. CV 25-303-BAH, 2026 WL 811234 (D. Md. March 24, 2026)........................... 30

*Cent. Delta Water Agency v. U.S. Fish & Wildlife Serv.*,
653 F. Supp. 2d 1066 (E.D. Cal. 2009)....................................................................... 30

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....................................................................................... 9, 11, 14, 15

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) .................................................................... 32

*Common Purpose USA, Inc. v. Obama*,
227 F. Supp. 3d 21 (D.D.C. 2016) .............................................................. 13

*Consumers for Auto Reliability & Safety v. Fed. Trade Comm'n*,
No. 17-cv-0540 (KBJ), 2021 WL 4050876 (D.D.C. Sept. 6, 2021) ........................................ 19

*Cowtown Found., Inc. v. U.S. Dep't of Agric.*,
638 F. Supp. 3d 1 (D.D.C. 2022) .................................................... 5, 6, 13, 14, 36, 43

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
144 F.4th 296 (D.C. Cir. 2025) .................................................................... 12

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
563 F.3d 466 (D.C. Cir. 2009) .................................................................. 12, 36

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
585 F. Supp. 3d 63 (D.D.C. 2022) .............................................................. 10

*Ctr. for Democracy & Tech. v. Trump*,
507 F. Supp. 3d 213 (D.D.C. 2020) ........................................................ 11, 27

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ..................................................................................... 5

*Dalton v. Specter*,
511 U.S. 462 (1994) .................................................................................... 30

*Davis v. Latschar*,
202 F.3d 359 (D.C. Cir. 2000) .................................................................... 43

*Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*,
85 F. Supp. 3d 250 (D.D.C. 2015) .............................................................. 34

*Devia v. Nuclear Regul. Comm'n*,
492 F.3d 421 (D.C. Cir. 2007) .................................................................... 34

*Doe v. Doe Agency*,
608 F. Supp. 2d 68 (D.D.C. 2009) .............................................................. 32

*Env't Def. Fund v. FERC*,
(*EDF*), 2 F.4th 953 (D.C. Cir. 2021) ....................................................... 20, 21

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ............................................................................. 9, 11, 24

*Food & Water Watch v. FERC*,
28 F.4th 277 (D.C. Cir. 2022) ................................................................ 20, 25

*Food & Water Watch v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ........................................................... 9, 10, 11, 18

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ................................................................................... 30

*Freedom Watch, Inc. v. McAleen*,
   442 F. Supp. 3d 180 (D.D.C. 2020) ............................................................11

*Fund for Animals v. Williams*,
   391 F. Supp. 2d 132 (D.D.C. 2005) ....................................................... 31, 32

*Fund for Animals, Inc. v. U.S. Bureau of Land Management*,
   460 F.3d 13 (D.C. Cir. 2006) ...................................................................... 29

*Garcia v. Acosta*,
   393 F. Supp. 3d 93 (D.D.C. 2019) ............................................................... 33

*Gerber Prods. Co. v. Perdue*,
   254 F. Supp. 3d 74 (D.D.C. 2017) ............................................................ 7, 45

*Grunewald v. Jarvis*,
   776 F.3d 893 .............................................................................................. 42

*Gulf Coast Maritime Supply, Inc. v. United States*,
   867 F.3d 123 (D.C. Cir. 2017) ...................................................................... 5

*Hormel Foods Corp. v. U.S. Dep't of Agric.*,
   808 F. Supp. 2d 234 (D.D.C. 2011) ................................................... 7, 28, 32

*Humane Soc. of U.S. v. Babbitt*,
   46 F.3d 93 (D.C. Cir. 1995) ........................................................................ 23

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ................................................................................... 13

*In re Navy Chaplaincy*,
   534 F.3d 756 (D.C. Cir. 2008) ..................................................................... 21

*Int'l Acad. of Oral Med. & Toxicology v. U.S. Food & Drug Admin.*,
   195 F. Supp. 3d 243 (D.D.C. 2016) .............................................................. 19

*Jewel v. Nat'l Security Agency*,
   965 F. Supp. 2d 1090 (N.D. Cal. 2013) ................................................... 43, 44

*Karst Env't Educ. & Prot., Inc. v. EPA*,
   475 F.3d 1291 (D.C. Cir. 2007) ..................................................................... 6

*Kimelman v. Garland*,
   588 F. Supp. 3d 84 (D.D.C. 2022) ....................................................... 27, 29, 30

*Knapp Med. Ctr. v. Hargan*,
   875 F.3d 1125 (D.C. Cir. 2017) ..................................................................... 5

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) ................................................................................... 27

v

*Liew v. Sanders*,
    737 F. Supp. 3d 30 (D.D.C. 2024) ................................................................ 2

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................ 5, 8, 21, 25

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................ 28, 31

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ................................................................ 7

*Marshall Cnty. Health Care Auth. v. Shalala*,
    988 F.2d 1221 (D.C. Cir. 1993) ................................................................ 45

*Mashack v. Jewell*,
    149 F. Supp. 3d 11 (D.D.C. 2016) ................................................................ 25, 27, 35

*N.Y. Republican State Comm. v. SEC*,
    927 F.3d 499 (D.C. Cir. 2019) ................................................................ 14

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior*,
    538 U.S. 803 (2003) ................................................................ 33

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) ................................................................ 34

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ................................................................ 28

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
    45 F.4th 291 (D.C. Cir. 2022) ................................................................ 40

*Pearson v. District of Columba*,
    644 F. Supp. 2d 23 (D.D.C. 2009) ................................................................ 2, 3, 4

*People for Ethical Treatment of Animals, Inc. v. Perdue*,
    464 F. Supp. 3d 300 (D.D.C. 2020) ................................................................ 5

*Petro-Chem Processing, Inc. v. EPA*,
    866 F.2d 433 (D.C. Cir. 1989) ................................................................ 25

*Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*,
    656 F. Supp. 3d 137 (D.D.C. 2023) ................................................................ 14, 16

*Pub. Citizen v. Office of U.S. Trade Representative*,
    970 F.2d 916 (1992) ................................................................ 32

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
    489 F.3d 1279 (D.C. Cir. 2007) ................................................................ 18, 19

*R.J. Reynolds Tobacco Corp. v. U.S. Food & Drug Admin.*,
    810 F.3d 827 (D.C. Cir. 2016) ................................................................ 33

*Rempfer v. Sharfstein*,
  583 F.3d 860 (D.C. Cir. 2009) .................................................................................... 45

*Robbins v. U.S. Dep't of Hous. & Urb. Dev.*,
  72 F. Supp. 3d 1 (D.D.C. 2014) ................................................................................. 25

*Safari Club Int'l v. Jewell*,
  111 F. Supp. 3d 1 (D.D.C. 2015).................................................................................. 7

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
  605 U.S. 168 (2025)............................................................................... 7, 32, 37, 38, 40

*Sierra Club v. FERC*,
  827 F.3d 59 (D.C. Cir. 2016) ..................................................................................... 20

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976)......................................................................................................... 9

*Soundboard Ass'n v. FTC*,
  888 F.3d 1261 (D.C. Cir. 2018) ................................................................................. 28

*Spectrum Leasing Corp. v. United States*,
  764 F.2d 891 (D.C. Cir. 1985) ................................................................................... 27

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)............................................................................................ 8, 9, 14

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998)............................................................................................. 5, 26, 29

*Stewart v. Nat'l Educ. Ass'n*,
  471 F.3d 169 (D.C. Cir. 2006) ..................................................................................... 6

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)..................................................................................................... 12

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014)..................................................................................................... 14

*Texas v. United States*,
  523 U.S. 296 (1998)..................................................................................................... 32

*Toilet Goods Ass'n v. Gardner*,
  387 U.S. 158 (1967)..................................................................................................... 33

*Town of Ogden Dunes v. U.S. Dep't of the Interior*,
  No. 2:20-CV-34, 2022 WL 715549 (N.D. Ind. March 10, 2022) ............................. 38

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021)............................................................................................ 8, 9, 13

*Trudeau v. FTC*,
  456 F.3d 178 (D.C. Cir. 2006) ............................................................................... 7, 28

*United States v. Chem. Found., Inc.*,
    272 U.S. 1 (1926) .................................................................................................... 31

*United Transp. Union v. I.C.C.*,
    891 F.2d 908 (D.C. Cir. 1989) ................................................................................. 16

*Urb. Sustainability Directors Network v. U.S. Dep't of Agric.*,
    No. 25-1775, 2025 WL 2374528 (Aug. 14, 2025) .................................................... 45

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,
    529 U.S. 765 (2000) ................................................................................................. 26

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ................................................................................................. 37

*Whitman v. Am. Trucking Ass'ns,*
    *Inc.*, 531 U.S. 457 (2001) ........................................................................................ 29

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ................................................................................................. 15

*WildEarth Guardians v. Provencio*,
    272 F. Supp. 3d 1136 (D. Ariz. 2017) ...................................................................... 13

*Williams v. Lew*,
    77 F. Supp. 3d 129 (D.D.C. 2015) ............................................................................ 15

**Statutes**

28 U.S.C. § 1491 ............................................................................................................... 27

42 U.S.C. § 4336(a)(2) ...................................................................................................... 37

42 U.S.C. § 4336(b) ........................................................................................................... 37

42 U.S.C. §§ 4336(a) ......................................................................................................... 38

5 U.S.C. § 551(13) ........................................................................................................ 28, 29

5 U.S.C. § 702 ...................................................................................................................... 7

5 U.S.C. § 704 .................................................................................................................... 28

5 U.S.C. § 706(2)(A) ............................................................................................................ 7

54 U.S.C. § 100101(a) ....................................................................................................... 43

54 U.S.C. § 306108 .................................................................................................. 12, 36, 41

**Rules**

Fed. R. Civ. P. 12(h)(3) ....................................................................................................... 6

Federal Rule of Civil Procedure 12(b)(6) ..................................................................... 27, 37

Federal Rules of Civil Procedure 12(b)(1) ..................................................................... 5, 6

**Regulations**

36 C.F.R. § 800.14 ........................................................................................................ 41

36 C.F.R. §§ 800.1-.6 .................................................................................................... 41

36 C.F.R. 60.15 .............................................................................................................. 25

36 C.F.R. part 18 ........................................................................................................... 24

43 C.F.R. § 46.205(c) ..................................................................................................... 39

43 C.F.R. § 46.215 ......................................................................................................... 39

43 C.F.R. § 46.215(a)-(i) ............................................................................................... 39

**INTRODUCTION**

Displeased with press reports about how a golf course renovation was being planned, Plaintiffs ask this Court to make them superintendents of the project.  But the project is still nascent.  Despite Plaintiffs' concerns about the details of a future renovation, there was a golf course at East Potomac Park before government deliberations began, and there will still be a golf course at East Potomac Park after the project is planned, and, if approved, implemented.  Plaintiffs may disagree with these future renovation decisions, but that is no reason to cast aside bedrock principles of constitutional standing and administrative law.  This Court should reject Plaintiffs' invitation to become golf-course-architect-in-chief of this still-developing project.

Unsurprisingly, given this factual pattern, Plaintiffs' challenge suffers from several fatal flaws and must be dismissed. First, Plaintiffs have not alleged facts satisfying the necessary requirements for Article III standing.  They have not alleged a constitutionally recognized injury, traceable to Defendants conduct, and redressable by this Court.  The Court is thus without jurisdiction to reach the merits and other matters in this case.

Second, even if Plaintiffs could establish standing and even if their allegations are taken as true, they do not plausibly state a claim for relief.  Instead, Plaintiffs' allegations reveal that they are challenging an idea—an idea to renovate East Potomac Golf Course.  This proposal continues to be deliberated within the Executive Branch and, assuming it is implemented one day, will result in future discrete agency action.  But Plaintiffs identify no such action now, as they must, at the pleading stage.  Their claims are thus premature and unripe.  Plaintiffs' remaining allegations attacking an agency decision to stockpile clean fill material for landscaping maintenance fail to demonstrate any noncompliance with applicable law.

1

Plaintiffs, in effect, are attempting to use one legitimate agency action as a gateway to reach into the deliberative and administrative functioning of the federal government.    But the Administrative Procedure Act does not authorize fishing expeditions.    Plaintiffs must present allegations in the first instance to establish standing and state plausible claims for relief as to a discrete, final agency action.  They have not done so and their claims must therefore be dismissed.

## BACKGROUND

### I.    Factual Background

In Defendants' Response in Opposition to Plaintiffs' Motion for Stay Or, in the Alternative, Preliminary Injunction, Dkt. No. 26 ("Resp. in Opp'n"), Defendants discussed in detail the facts underlying this case drawn from official government records and documents referenced in Plaintiffs' Complaint.  *Id.* 2-11.  Defendants incorporate by reference the information provided therein and only include here, for the Court's convenience, the following abbreviated summary.[1]

Created from the dredges of the Potomac River, the East Potomac Golf Course has undergone constant change over the decades.  Today, as evidenced by multiple government reports,[2] East Potomac Park and East Potomac Golf Course are in a state of deterioration and in need of significant maintenance, rehabilitation, and reconstruction.

---

[1] The Court may take judicial notice of facts drawn from official government records and materials incorporated by reference in Plaintiffs' Complaint without converting Defendants' Motion to Dismiss into one for summary judgment.  *See, e.g.*, *Liew v. Sanders*, 737 F. Supp. 3d 30, 34 n.1 (D.D.C. 2024); *Pearson v. District of Columba*, 644 F. Supp. 2d 23, 29 (D.D.C. 2009).

[2] *See, e.g.*, Cultural Landscapes Inventory, East Potomac Golf Course National Mall & Memorial Parks – East Potomac Park, Nat'l Park Serv. (2017) ("CLI") https://irma.nps.gov/DataStore/DownloadFile/583046; Cultural Landscape Report, National Park Service Golf Courses in the District of Columbia, East Potomac Park, Langston, and Rock Creek: Treatment Guidelines, Nat'l Park Serv. (June 2019) ("CLR") https://npshistory.com/publications/nace/clr-golf-courses-2019.pdf.

2

In 2020, the National Park Service ("NPS") leased East Potomac Golf Course to the National Links Trust ("NLT"). *Id.* 4. Among NLT's obligations under the lease were significant construction and improvement projects at East Potomac Golf Course. *Id.* 4-5.

In October 2025, in furtherance of a range of anticipated maintenance and landscaping activities, the NPS decided to stockpile approximately 30,000 cubic yards of clean fill material from the East Wing Modernization Project in East Potomac Park. *Id.* 5-10. In reaching that decision, the NPS completed the appropriate analyses and compliance measures. *Id.* 5-7. The NPS also implemented various protective measures consistent with supporting plans and implemented a robust monitoring and evaluation plan to ensure that the soil is clean and suitable for temporary storage and eventual long-term use at the Park. *Id*. 7-9.

Around this same time, President Trump and agency officials began discussing whether East Potomac Golf Course and other NPS golf courses within Washington, D.C. could be further improved. *Id.* 10. By September 2025, NPS was informed of a conceptual proposal under consideration called the "Washington National Golf Project" and/or the "America 250 Golf Project." *Id.* The idea was that the President and the Secretary of the Interior, using charitable contributions, would work in collaboration with NLT and NPS to renovate Washington, D.C.'s three NPS golf courses—including East Potomac Golf Course—while keeping them affordable and accessible, consistent with the terms set forth in NLT's lease. *Id.* By late October 2025, NPS leadership was informed that negotiations with NLT regarding the proposed "Washington National Golf Project" and/or "America 250 Golf Project" were not progressing towards a formal agreement. On December 30, 2025, the Department of the Interior terminated NLT's lease. *Id.* 10. The Department and NPS had notified NLT that it was in default based on its failure to make

3

required initial improvements, and while engaging in efforts to meet and confer with NLT, learned that NLT had failed to pay millions in rent.  *Id.*

To date, NPS is continuing to explore future plans for the management of the three golf courses, including the East Potomac Golf Course, but all such proposals are still in the conceptual phase.  *See id*.  No proposed plans have been finalized or approved.

## II.    Procedural Background

Plaintiffs filed their Complaint on February 13, 2026, and effected service on or about February 24, 2026.  Plaintiffs' Complaint presents two categories of claims challenging two purported agency decisions.  First, Plaintiffs' "Proposal Claims" (Counts 1-4) allege that agency officials developed a conceptual proposal to modify and improve East Potomac Golf Course in violation of the Administrative Procedure Act ("APA"), the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), and the NPS's Organic Act.  Second, Plaintiffs' "Landscaping Claims" (Counts 5-8) allege that Defendants' decision to store and place clean fill material on East Potomac Golf Course violated those same statutes.

Plaintiffs request expansive relief.  They seek, for example, a positive injunction requiring the removal of the fill material from East Potomac Park, and further injunctive relief that would prevent Defendants from developing *any* future project at the Park and that would force Defendants to provide relief to NLT—a third party not before the Court.  Compl. 47-49, Dkt. No. 5-1.

On February 23, 2026, Plaintiffs filed a Motion for Stay or, in the Alternative, Preliminary Injunction.  Dkt. No. 8.  On March 11, 2026, the Court conducted a status conference to consider Plaintiffs' Motion.  *See* Tr. of Status Conference, Dkt. No. 31 ("Tr.").  On April 7, 2026, the Parties submitted a Joint Status Report outlining a briefing schedule for Defendants' present Motion.

4

### III.     Legal Background

Defendants incorporate by reference their summation of the relevant provisions of NEPA, the NHPA, the NPS's Organic Act, and the APA provided in their Response in Opposition.  Resp. in Opp'n 11-14.

### LEGAL STANDARD

### I.     Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)

Before a court can reach the merits of a case, it must determine whether the plaintiff has properly invoked the court's jurisdiction.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause.").  This necessarily includes determining whether the plaintiff has established standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  And because federal courts are presumed to lack jurisdiction, once challenged, "the party asserting federal jurisdiction . . . has the burden of establishing it." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006).

Federal Rule of Civil Procedure 12(b)(1) provides defendants with the appropriate vehicle for challenging a plaintiff's standing and the court's subject-matter jurisdiction.  *E.g.*, *Cowtown Found., Inc. v. U.S. Dep't of Agric.*, 638 F. Supp. 3d 1, 6 (D.D.C. 2022).  In such cases, "the Court must treat 'the undisputed facts within or outside the pleadings as true,' and draw 'all reasonable inferences' in the plaintiff's favor."  *People for Ethical Treatment of Animals, Inc. v. Perdue*, 464 F. Supp. 3d 300, 307 (D.D.C. 2020) (quoting *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017)) (citation omitted).  But the court must "disregard any legal conclusions, legal contentions couched as factual allegations, and unsupported factual allegations within the complaint."  *Gulf Coast Maritime Supply, Inc. v. United States*, 867 F.3d 123, 128 (D.C. Cir.

2017).  If in considering a Rule 12(b)(1) motion the court determines it lacks subject-matter jurisdiction, "the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).

Rule 12(b)(6) authorizes defendants to move to dismiss a complaint that fails to state a claim for which relief may be granted.  *Id.*  "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678.  Nor will allegations that fail "to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  But "the Court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint, nor legal conclusions cast in the form of factual allegations."  *Cowtown Found., Inc.*, 638 F. Supp. 3d at 7 (citation modified).  Such unsupported factual allegations and mere legal conclusions are disregarded.  *See, e.g. Abebio v. G4S Gov't Solutions, Inc.*, 72 F. Supp. 3d 254, 257 (D.D.C. 2014) (citing *Iqbal*, 556 U.S. at 679).

"In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice."  *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006).

## II.    Judicial Review Under the Administrative Procedure Act

Challenges to agency compliance with NEPA, the NHPA, and the NPS Organic Act must be brought pursuant to the APA.  *See Karst Env't Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007).  The APA provides a right of judicial review to "[a] person suffering legal wrong

because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. The APA defines "agency action" as including "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13).

But not all agency actions and decisions are reviewable. Only "[a]gency action made reviewable by statute and *final* agency action for which there is no other adequate remedy in a court are subject to judicial review." *Id.* § 704 (emphasis added). Mere "preliminary, procedural, or intermediate agency action" is not reviewable. *Id.*

The APA authorizes the reviewing court to "hold unlawful and set aside" final agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Under this deferential standard, "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180 (2025).

If a complaint survives a motion to dismiss, "[j]udicial review . . . is limited to the administrative record that was before the agency at the time it made its decision." *Safari Club Int'l v. Jewell*, 111 F. Supp. 3d 1, 3 (D.D.C. 2015). Plaintiffs are not entitled to extra-record discovery to show that an agency's action is final prior to a ruling on a motion to dismiss. *Gerber Prods. Co. v. Perdue*, 254 F. Supp. 3d 74, 85 (D.D.C. 2017) (citing *Trudeau v. FTC*, 456 F.3d 178, 184 (D.C. Cir. 2006)). Rather, where a complaint rests on speculation and fails to allege facts plausibly showing a final agency action, "a plaintiff simply has no cause of action under the APA." *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014); *see also Hormel Foods Corp. v.*

7

*U.S. Dep't of Agric.*, 808 F. Supp. 2d 234, 242 (D.D.C. 2011) (recognizing that motions to dismiss APA actions on finality grounds are analyzed under Federal Rule of Civil Procedure 12(b)(6)).

## ARGUMENT

Plaintiffs lack standing to bring either their Proposal Claims or their Landscaping Claims. But even if Plaintiffs could establish standing at the motion to dismiss stage, Plaintiffs fail to state a claim on which relief can be granted. Plaintiffs' Proposal Claims fail to allege final agency action and are unripe. Instead, Plaintiffs' Proposal Claims present allegations of textbook preliminary agency decisionmaking that is unreviewable under the APA. And both Plaintiffs' Proposal Claims and Landscaping Claims otherwise fail to plausibly allege any violation of federal law.

## I.    Plaintiffs Lack Standing to Bring their Claims

To have standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). Because "standing is not dispensed in gross; . . . plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citation omitted).

Plaintiffs the D.C. Preservation League ("League"), Dave Roberts, and Alex Dickson, all fail to allege facts sufficient to establish Article III standing.

### A.    Plaintiffs Fail to Allege an Injury Necessary to Establish Standing

To establish injury in fact, a plaintiff must show "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560) (citation modified). If a plaintiff's

alleged injuries are forward-looking, the plaintiff must show "a material risk of future harm" that is "sufficiently imminent and substantial." *TransUnion LLC*, 594 U.S. at 435. The injury must be "*certainly* impending," and allegations of "*possible* future injury" fail to establish standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation modified).

When plaintiff organizations and individuals are involved, injury can be demonstrated through any one of three ways: organizational standing, associational standing, or individual standing. But standing must still be established for each claim presented and each form of relief sought. Plaintiffs here fail on all fronts. They allege injuries that are neither "actual or imminent" nor "concrete and particularized," but instead, are "conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (citation omitted). For this reason alone, their claims must be dismissed.

### 1.    The D.C. Preservation League Fails to Allege Injury for Purposes of Organizational Standing

To determine if an organization has standing to sue in its own right, courts conduct the same inquiry as that of an individual plaintiff. *Food & Water Watch v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). An organization must show that the defendant's conduct "directly affected and interfered with [its] core business activities." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). "[A]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art[icle] III." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976). The League must satisfy this standard for its Proposal Claims, Landscaping Claims, and each form of relief it seeks; but it has not done so.

The League offers three bases for asserting organizational injury, none of which withstand scrutiny.[3]  Miller Decl. ¶ 18, Dkt. No. 8-5.  For example, the League claims that because of Defendants' activities, it may "have to change [its] app and website."  *Id.* ¶¶ 7-8.  Similarly, the Leagues claims it may "change its plans" for hosting a September 2026 fundraiser at the Course.  Mem. 20, Dkt. No. 8-1 (citing Miller Decl. ¶ 11).  The League also maintains that it has suffered a procedural injury by not being involved in the NHPA Section 106 process for any redesign of East Potomac Golf Course.  Miller Decl. ¶¶ 14-18.  But for several reasons, none of these purported injuries demonstrate that the League has suffered any injury for standing purposes.

First, the League admits that its purported substantive harms are only speculative and hypothetical.  Specifically, the League concedes that any changes to its website and app would only occur "*[i]f* East Potomac Park and East Potomac Golf Course were significantly altered,*"* Miller Decl. ¶ 8 (emphasis added); and *if* a future agency decision rendered the Park ineligible for listing on the National Register of Historic Places, *id.*  ¶ 7.  But neither of those acts is alleged to have occurred or to be imminent.  Indeed, no party disputes that an extensive list of steps would first have to take place before any redesign could be implemented.  *See* Bowron Decl. ¶¶ 15-23, Dkt. No. 26-4; Tr. 30:22-31:7, 32:25-33:11, 36:24-37:15.  And any redesign proposal of the scope which the League fears would almost certainly constitute a major Federal action under NEPA and a federal undertaking under the NHPA, requiring the corresponding level of public involvement and consultation.  *Id.* ¶¶ 18-19.  These activities have not even been planned, let alone have occurred and their outcome discerned.  In effect, the League has challenged preliminary agency

---

[3] In their Complaint, Plaintiffs allege no injuries beyond mere conclusory statements.  *See* Compl. ¶¶ 18-20.  But the Court may look to declarations and affidavits at the preliminary injunction stage to confirm that plaintiffs lack standing at the Rule 12(b)(1) motion stage.  *See, e.g.*, *Food & Water Watch, Inc.*, 808 F.3d at 918; *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 70-71 (D.D.C. 2022).

discussions that "only set[] a course of government processes into motion," *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 222 (D.D.C. 2020).  Its future injury from one possible outcome of those discussions cannot support an injury in fact.  *See id.* at 223.

Second, even if the League were to take these steps now—change its app, website, and fundraiser location in anticipation of a potential agency action that may or may not occur—its self-inflicted injuries cannot establish standing.  "[P]laintiffs 'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'"  *Food & Water Watch, Inc.*, 808 F.3d at 919 (quoting *Clapper*, 568 U.S. at 416).

Third, the League cannot demonstrate how these hypothetical, self-inflicted harms in any way interfere with its core business activities; nor has it shown that such a contingent possibility is imminent.  *See Hippocratic Med.*, 602 U.S. at 395; *see also Freedom Watch, Inc. v. McAleen*, 442 F. Supp. 3d 180, 188 (D.D.C. 2020) (injury "requires the defendant's conduct to inhibit the organization's 'daily operations'").  The League provides no basis for concluding that changes to its app and website would somehow interfere with its core business activities.  The same is true for its alleged September 2026 fundraiser.  The League never explains how simply consideration by agency officials of a proposal to renovate East Potomac Golf Course prevents it from hosting its event.  The League never alleges that it requested to host this fundraiser, that its request was granted, or that its request was denied after agency officials began deliberations.  Moreover, the League effectively concedes that this fundraiser could be hosted elsewhere.  Miller Decl. ¶ 9 (acknowledging that the League has hosted similar programs at Langston Golf Course in the past).  To the extent the League has decided on its own to change its plans, and fears an impact to its fundraising revenue, such financial impacts premised on speculation cannot support an injury for standing.  *See Clapper*, 568 U.S. at 416 (recognizing that plaintiffs lack an injury for standing

11

purposes where their alleged harms are "based on costs they incurred in response to a speculative threat").

The League is left only with its allegation that it has suffered a procedural injury to rights provided by Section 106 of the NHPA.  Miller Decl. ¶ 18.  But "a procedural right *in vacuo* . . . is insufficient to create Article III standing."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see also Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 304 (D.C. Cir. 2025) ("[A] plaintiff claiming procedural injury must show how the agency's error could affect her 'concrete interests.'" (citation omitted)).

Plus, the League has no right to be involved in any review that has not even begun. Plaintiffs argue that they should have had a chance to participate in the NEPA and Section 106 processes for the conceptual "Washington National Plan."  But what they claim is a legal violation is instead indicative of the fact that no such agency action has occurred or is imminent.  *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009) ("[A]n agency's NEPA obligations mature only once it reaches a 'critical stage of a decision which will result in "'irreversible and irretrievable commitments of resources' to an action that will affect the environment.'" (citation omitted)); 54 U.S.C. § 306108 (requiring consideration of effects on historic property only "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license").  As to the conceptual proposal, Defendants have not committed to any action that would trigger obligations to conduct NEPA or Section 106 compliance, let alone taken steps to implement such undeveloped plans.  And by law, the League cannot demonstrate a right to participate in agency actions that are subject to a Categorical Exclusion or that do not require further Section 106 review because they are taken pursuant to a programmatic agreement.  *See, e.g.*, *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F.

12

Supp. 2d 1, 23 n.15 (D.D.C. 2009) ("[N]o such requirement exists in NEPA . . . ."); *WildEarth Guardians v. Provencio*, 272 F. Supp. 3d 1136, 1165-66 (D. Ariz. 2017) (explaining that a programmatic agreement satisfies the agency's Section 106 consultation responsibilities).

### 2.     The D.C. Preservation League Fails to Allege Injury for Purposes of Associational Standing

Without standing on its own behalf, the League must rely on associational standing. Under a theory of associational standing, "a Plaintiff must show that: 1) at least one of the organization's members has standing to sue in her own right; 2) the interests the organization seeks to protect in its lawsuit are germane to the organization's purpose; and 3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Common Purpose USA, Inc. v. Obama*, 227 F. Supp. 3d 21, 27 (D.D.C. 2016) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). And the organization's member—like an individual plaintiff—must establish standing for each claim asserted and each form of relief sought. *TransUnion LLC*, 594 U.S. at 431. The League fails on the first prong.

At the outset, the League cannot rely on purported injuries to unnamed members. The League claims only that "[s]everal of DC Preservation League's members" and "[a] number of those members" enjoy walking in East Potomac Park and playing golf at East Potomac Golf Course. Miller Decl. ¶¶ 20-21. "These vague allegations do not allow the court to discern if sufficient facts apply to any particular individual to establish that he or she suffered a concrete and particularized injury that was caused by Federal Defendants and is redressable by the Court." *Cowtown Found., Inc.*, 638 F. Supp. 3d at 12 (finding organization failed to establish standing by simply alleging injuries on behalf of "some members").

The only member the League identifies is Executive Director, Rebecca Miller. She alleges that she enjoys visiting and biking within East Potomac Park and appreciates certain aesthetic

13

elements of the Park.  Miller Decl. ¶ 22.  But Director Miller does not describe *any* injury to these interests (or the interests of the League's other members for that matter) attributable to either Defendants' conceptual proposal to somehow renovate East Potomac Golf Course or the presence of the stockpile at the Course.  *See id.*

Presumably, Director Miller is concerned that some future redesign of East Potomac Golf Course will affect these interests in a way she finds objectionable.  But to challenge such *future* conduct, the League and Director Miller must show that some concrete harm is either "certainly impending" or that there is a "substantial risk" it will occur, which in the standing context means that it must be "sufficiently imminent."  *N.Y. Republican State Comm. v. SEC*, 927 F.3d 499, 504 (D.C. Cir. 2019) (quoting *Clapper*, 568 U.S. at 410–14, and *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)); *see also Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 151 (D.D.C. 2023) (discussing requirement to allege "sufficiently imminent" harm is "hard to meet where the harm-causing event is still subject to regulatory processes and approvals" (citation modified)).  The League and Director Miller fail to allege an injury in fact that meets Article III's particularity and imminence requirements.[4]

### 3.    Individual Plaintiffs Fail to Allege Injury Necessary to Maintain their Proposal Claims

Like the League, to have standing to bring their Proposal Claims, individual plaintiffs Dave Roberts and Alex Dickson must allege a "concrete and particularized" injury that is "actual or imminent," *Spokeo*, 578 U.S. at 339, and attributable to the agency's alleged decision to begin

---

[4] Plaintiffs' counsel attempts to fill this gap in briefing at least as to NPS's decision to temporarily stockpile clean fill.  Counsel asserts that "dumping" fill material had an effect on "their interests," Mem. 21, but the League and Director Miller never identify how the temporary storage of fill material for potential future improvements has harmed those interests.

considering possible renovations to East Potomac Golf Course. But like the League, individual plaintiffs do not identify any injury that is above the hypothetical or speculative level.

Individual Plaintiffs only allege *future* injury associated with their Proposal Claims. Plaintiff Roberts alleges his "interest in East Potomac's recreational value and aesthetic value" would be harmed, but only "*if* the golf course is turned into something different." Roberts Decl. ¶ 25, Dkt. No. 8-6 (emphasis added). Similarly, Plaintiff Dickson claims his appreciation for the Course's "beauty, fun, history, accessibility, and . . . sense of community" will be harmed "*[i]f* East Potomac is converted into what the President has described." Dickson Decl. at ¶ 19, Dkt. No. 8-4 (emphasis added). But "threatened injury must be *certainly impending* to constitute injury in fact." *Clapper*, 568 U.S. at 409 (citation modified). "'[A]llegations of *possible* future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Plaintiffs' allegations constitute the quintessential "*possible* future injury." Plaintiffs' fears are predicated upon a hypothetical decision to renovate East Potomac Golf Course. But "several speculative contingences must occur before plaintiff is harmed by [a redesign of East Potomac Golf Course]." *Williams v. Lew*, 77 F. Supp. 3d 129, 133 (D.D.C. 2015). As noted above, several steps would first have to occur at the agency before any such decision on a redesign of East Potomac Golf Course could be approved. *See* Bowron Decl. ¶¶ 15-23. Putting aside the agency's compliance processes, at minimum, Plaintiffs would need to allege facts plausibly demonstrating that a design to renovate East Potomac Golf Course has been drafted, that design would "alter" the Golf Course, those alterations would be "significant" or harmful to their interests, a decision to approve the design has been made, and that alterations based on that design were imminent (as evidenced by, for example, the allocation of agency resources). But Plaintiffs allege none of these facts. Rather, Plaintiffs Roberts and Dickson's speculative fears about what a future agency

15

decision to redesign and improve the Golf Course *might* look like based on only a present idea to come up with such designs in the future do not create a "certainly impending" injury to establish standing. *See, e.g.*, *Pharm. Res. & Manuf. of Am.*, 656 F. Supp. 3d at 151 ("When a future injury depends on a pending agency approval," the imminence requirement demands plaintiff allege whether the agency will approve it, when it will approve it, and what the terms will be.).

Plaintiffs, for their part, allege that a decision *has* been made and their injury is thus more imminent than it may appear. But courts must distinguish "allegations of facts . . . from allegations that are really predictions." *United Transp. Union v. I.C.C.*, 891 F.2d 908, 912 (D.C. Cir. 1989).

Here, the only facts Plaintiffs allege to support their theory simply demonstrate that the agency is in the midst of the decisionmaking process. Take first Plaintiffs' allegation of a "Washington National plan." Plaintiffs base their allegation on the following: (1) an alleged meeting in which Secretary Burgum "proposed" using fill material from the East Wing Modernization Project for East Potomac Park, Compl. ¶¶ 67-68; (2) President Trump's alleged response that the "idea was brilliant," *id.* ¶ 68; (3) a visit to the course by a golf course designer, *id* ¶ 78; and (4) President Trump's aspirational remarks that the federal government intends to improve the aesthetics and capabilities of East Potomac Golf Course, *id.* ¶ 83. Contrary to Plaintiffs' contention that these facts "confirmed that the Washington National plan has been adopted and is already in motion," at most, they indicate that the agency has come up with an idea, subsequent agency deliberation and factfinding is underway, and the President has reacted positively to those preliminary steps. But if an idea, followed by agency deliberations and Presidential encouragement were enough to cause an imminent, non-speculative injury under Article III, the standing inquiry would be meaningless.

16

The remainder of Plaintiffs' allegations are pure speculation and assumption.  For example, Plaintiffs allege Defendants "adopt[ed] and implement[ed]" a "plan" concerning East Potomac Golf Course, *e.g., id.* ¶ 91, but this allegation is entirely conclusory.  Without any actual "plan" to point to, Plaintiffs are left to layer speculation on top of speculation, guessing that a potential future plan "will likely entail" removal of trees, *id.* ¶ 85, "will most likely also entail the construction of water hazards, including potentially" various modifications, *id.* ¶ 86, and the cost to play "[p]redictably, . . . would inflate accordingly," *id.* ¶ 10.  But missing from Plaintiffs' allegations are any factual basis for these predictions or that development and implementation of this "plan" is somehow imminent.

In other words, Plaintiffs' Proposal Claims are premised on injuries that are contingent on future, unidentified agency decisions, and devoid of any indication that those decisions and resulting injuries are certain or imminent.

### 4.    Individual Plaintiffs Fail to Allege Injury Necessary to Maintain their Landscaping Claims

In support of their Landscaping Claims attacking the temporary stockpile of clean fill, Plaintiffs Dickson and Roberts allege a mix of future and present injuries in the form of an increased risk of harm and aesthetic and emotional injuries.  But here too, Plaintiffs fail to allege sufficient facts to show those injuries are sufficiently concrete, particularized, and actual or imminent.

### a.    Individual Plaintiffs Fail to Allege Facts Plausibly Demonstrating an Increased-Risk-of-Harm Injury

Increased-risk-of-harm injuries are often remote and speculative.  Accordingly, where a plaintiff alleges injury in the form of an increased risk of harm, the plaintiff must plausibly show two elements to have standing and survive a motion to dismiss.  The plaintiff must "show '*both* (i)

a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account.'" *Food & Water Watch, Inc.*, 808 F.3d at 914. To satisfy this *substantial* standard, a plaintiff cannot rely on cursory assumptions. This is because, "the constitutional requirement of imminence . . . necessarily compels a very strict understanding of what increases in risk and overall risk levels can count as 'substantial.'" *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1296 (D.C. Cir. 2007)). Thus, "the proper way to analyze an increase-risk-of-harm claim is to consider the ultimate alleged harm—such as death, physical injury, or property damage . . . —as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently 'imminent' for standing purposes." *Id.* at 1298.

Applying this framework here, Plaintiff Dickson must plausibly allege that NPS's decision to stockpile clean fill material has substantially increased the risk of an ultimate harm, and that there is a substantial likelihood, given that heightened risk, that he will actually suffer the alleged injury. *See id.* at 1296. Plaintiff Dickson has not met this burden.

Plaintiff Dickson alleges an increased risk of harm from the potential exposure to contaminants (like asbestos) that he fears may be in the fill stockpile. Dickson Decl. ¶ 22 (alleging that he is "concerned about the large mounds of debris" and "whether it is safe to be that close to that material"). Therefore, applying this framework, to constitute an imminent injury for standing purposes, Plaintiff Dickson must allege facts plausibly showing, at minimum, the level of a contaminant that poses a substantial increased risk to human health, generally; that it is substantially probable that this level of that contaminant is present in the fill stockpile (and not in background levels at the Golf Course); and that transmission of that level of contaminant (by e.g.,

18

air or water) to him is sufficiently imminent.[5]  Plaintiff's unsubstantiated "concern[s], *id.*, will not suffice.

But Plaintiff Dickson offers no such facts.  Instead, he only questions whether the *East Wing* may have contained asbestos, Compl. ¶ 81, but provides no allegations—beyond mere speculation—plausibly showing that the excavated fill material that is being stockpiled contains any contaminant, let alone enough to substantially increase his risk of harm, or that there is a substantial probability he will be harmed from that increased risk.  Plaintiffs point to photographs containing debris adjacent to the stockpile, but that material was clearly segregated from the soil prior to storage in anticipation of offsite disposal consistent with the NPS's monitoring and evaluation plan.  *See* Nersesian Decl. ¶ 42, Ex. I at 7, 27, Ex. K at Standard Operating Procedures 077-078, Dkt. Nos. 26-1, 26-3.  And even if it were not disposed offsite, merely presenting photographs of debris cannot satisfy the heightened increased-risk-of-harm standard.

In short, Plaintiffs' claims of increased-risk-of-harm are entirely unsubstantiated.  Courts in this Circuit demand far more to establish standing on this basis and survive a motion to dismiss. *See, e.g.*, *Int'l Acad. of Oral Med. & Toxicology v. U.S. Food & Drug Admin.*, 195 F. Supp. 3d 243, 266 (D.D.C. 2016) (granting motion to dismiss where plaintiff's expert "offer[ed] neither support . . . nor explanation" for "bald assertion" that plaintiff would be exposed to dangerous levels of chemicals); *Consumers for Auto Reliability & Safety v. Fed. Trade Comm'n*, No. 17-cv-0540 (KBJ), 2021 WL 4050876, at *11 (D.D.C. Sept. 6, 2021) (granting motion to dismiss where plaintiffs' statistics and reports failed to plausibly allege increased risk of harm from unrepaired used cars).

---

[5] To the extent Plaintiffs claim an increased risk of financial injury, this same framework applies and their allegations fall far short of plausibly showing such an increased risk is imminent.

19

**b.**     **Individual Plaintiffs Fail to Allege Facts Plausibly Demonstrating an Aesthetic or Emotional Injury**

Without any factual basis for showing an increased-risk-of-harm injury from the fill stockpile, individual Plaintiffs are left with their alleged aesthetic and emotional injuries. But Plaintiffs' allegations fail to establish standing for at least three reasons. First, Plaintiffs' assert little more than *eyesore* complaints that cannot establish standing in this Circuit. Second, Plaintiffs' alleged injury from observing temporary features necessary for on-going maintenance cannot rise to the level of constitutional injury. Third, Plaintiffs' alleged emotional injuries are simply incapable of establishing standing as a matter of law.

To have standing based on aesthetic harms, Plaintiffs must show that "[their] specific aesthetic interests" are harmed, by describing their particular "use[] and enjoy[ment] [of] the land" beyond "mere incidental viewership," and they must further identify how they will have to "alter [their] behavior." *Env't Def. Fund v. FERC* (*EDF*), 2 F.4th 953, 969–70 (D.C. Cir. 2021). Thus, the D.C. Circuit has found standing existed where a plaintiff alleged that construction of a pipeline over property where he frequently fished, boated, and hunted would diminish his ability to do those things. *Sierra Club v. FERC*, 827 F.3d 59, 66 (D.C. Cir. 2016); *see also Food & Water Watch v. FERC*, 28 F.4th 277, 283–84 (D.C. Cir. 2022) (finding standing where construction would cause noise and pollution that would impair "financial value" and "peaceful enjoyment" of nearby property). But it concluded that a plaintiff lacked standing to vindicate an aesthetic interest when she did "not even allege that she c[ould] see the new [construction] from her property," which was more than "half a mile" away, and attested only that "she must look at an 'eyesore' several times per week when driving past."[6] *EDF*, 2 F.4th at 968–70. She "neither altered her behavior nor

_____

[6] The D.C. Circuit found "nothing in the existing case law to suggest that a person who incidentally views something unpleasant has suffered an injury-in-fact for purposes of standing." *EDF*, 2 F.4th

20

explained why she has any particularized connection to the land," reducing her "alleged aesthetic injuries" to "nothing more than generalized grievances, which cannot support standing." *Id.*

Individual Plaintiffs here fare no better than the *EDF* plaintiff.  For example, Plaintiff Roberts claims the stockpile harms "how the golf course looks and feels to [him]," claiming it is "a big, ugly pile of dirt" that "looks terrible."  Roberts Decl. ¶ 22.  He also claims the temporary access road and stockpile "basically sever[] the White Course in two." *Id.*

Plaintiff Roberts improperly extrapolates the presence of the stockpile at a particular location (placed in the void created between holes 4, 5, and 9 of the White Course) and generalizes it to his experience of the entire Course.  Plaintiffs never allege the stockpile is visible from everywhere on the Course.  They never allege the stockpile prohibits play at East Potomac Park, on the White Course, or even on holes 4, 5, and 9 of the White Course.  And they never allege any particularized interest in the fenced-in site where the stockpile is actually located.  In effect, their allegations are little more than a complaint that they "must look at an 'eyesore' several times per [golf round] when driving [or playing] past." *EDF*, 2 F.4th at 968-70.  Such generalized claims of passing by an "eyesore" are insufficient to establish concrete and particularized injuries for standing purposes. *EDF*, 2 F.4th at 969; *see also In re Navy Chaplaincy*, 534 F.3d 756, 763 (D.C. Cir. 2008) (such "mere personal offense to government action does not give rise to standing to sue").  Plaintiffs' "alleged aesthetic injuries reflect nothing more than generalized grievances, which cannot support standing." *EDF*, 2 F.4th at 970 (citing *Lujan*, 504 U.S. at 573-74).

---

at 970; *see also Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 84 (2019) (Gorsuch, J., concurring in the judgment) ("Offended observer standing cannot be squared with this Court's longstanding teachings about the limits of Article III.").

The stockpile is also a temporary feature necessary for required maintenance. It is undisputed that East Potomac Golf Course is in need of maintenance. Tr. 29:10-11.[7] It is also undisputed that although the ultimate end-use of the stockpile has not been determined, the stockpile is temporary.[8] Observing temporary features that are incident to future maintenance projects cannot rise to the level of constitutional injury. Rather, they are an anticipated and expected by-product of modern everyday life not particularized to any one individual. To recognize that a plaintiff has standing to challenge not the ultimate outcome of a maintenance project, but the preliminary staging of materials that will later be the subject of a future decision, would throw out the standing doctrine and throw open the courthouse doors to millions with generalized complaints.

To put it into perspective, NPS manages over 400 units within the National Park System and routinely receives over 300 million visitors a year.[9] Each of those units requires ongoing maintenance to ensure Park resources are conserved and enjoyed by the visiting public. This could take the form of road maintenance, trail maintenance, landscaping, or other facility maintenance. Often, these projects require materials to be staged or stockpiled on site, before maintenance activities begin. And, facilities may be off limits to the public or temporarily closed while maintenance activities are underway. Take for instance, America's oldest National Park— Yellowstone National Park. Yellowstone contains over 15 miles of wooden boardwalks which

---

[7] Indeed, any golf course is required to undergo some level of annual, periodic, and routine maintenance to keep the course playable.

[8] At the hearing, Plaintiffs' counsel puzzlingly suggested that because NPS will "permanently seed" the stockpile, the stockpile is not temporary. Tr. 50:3. Plaintiffs cannot have it both ways. They cannot cry foul that the stockpile may be later incorporated into some future redesign while also crying foul that it is permanently in place. Rather, the better and common-sense reading of Regional Director Nersesian's declaration is that the stockpile will be seeded to prevent erosion of the stockpile while the soil is being temporarily stored on site. *See* Nersesian Decl. ¶ 33.

[9] *See* Visitation Numbers, NPS, https://www.nps.gov/aboutus/visitation-numbers.htm.

require annual maintenance.[10]  But even if park visitors may be disappointed by seeing pallets of lumber during their visit, that disappointment does not create a constitutional injury for standing purposes.  But under Plaintiffs' theory, each of Yellowstone's over 4 million visitors would have standing to bring suit.  Plaintiffs offer no basis for concluding such ephemeral "injuries" are sufficient to establish standing.[11]

Finally, to the extent that Plaintiff Roberts claims emotional harms because he "felt violated," Roberts Decl. ¶ 24, by the stockpile, such feelings do not rise to the level of a constitutional injury for standing purposes. *Humane Soc. of U.S. v. Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995) (general emotional harm "cannot suffice for injury-in-fact for standing purposes").

\* \* \*

In sum, on the face of their allegations, Plaintiffs have not identified any injury actual or imminent and concrete and particularized that can form the basis of any of their claims.  For this reason alone, their claims must be dismissed.

### B.    Plaintiffs' Claimed Injuries are Not Traceable to Defendants' Conduct

Even if Plaintiffs could establish an injury stemming from either agency officials deliberating potential proposals or the placement of fill material—and they cannot—Plaintiffs still fail to show that such injury is "fairly traceable" to Defendants' "allegedly unlawful conduct." *California v. Texas*, 593 U.S. 659, 669 (2021).  "Like the injury in fact requirement, the causation

---

[10] Roads & Trails, Park Facts, Yellowstone, NPS, https://www.nps.gov/yell/planyourvisit/parkfacts.htm.

[11] This is not to say that a plaintiff may not suffer an aesthetic injury sufficient to bring suit from the ultimate end project once designed—whether that be a redesigned boardwalk or a redesigned golf course.  Repairs are one thing; acts in preparation of repairs are another.  But as discussed *supra* 16 and *infra* 29, the problem with Plaintiffs' Proposal claims is that any improvements to East Potomac Golf Course—whether they be minor, significant, or something in between—are still being deliberated at the agency and no final agency action has occurred.

23

requirement screens out plaintiffs who were not injured by the defendant's action." *Hippocratic Med.*, 602 U.S. at 383. It precludes speculative or attenuated links in the causal chain between the government's alleged action and the plaintiff's supposed injury. *Id.*

The links in the causal chain between any alleged injury and the challenged decisions here are too attenuated to support standing. Take first, Plaintiffs' Proposal Claims. Plaintiffs have challenged an alleged proposal and subsequent deliberations by Defendants to redesign East Potomac Golf Course. But for those activities even theoretically to cause imminent injury, a litany of events would have to occur. Defendants would need to, at minimum, identify a potential qualifying lessee, negotiate agreed-to lease terms, and determine that the lease and proposed activities under the lease meet all the applicable requirements of 36 C.F.R. part 18. Bowron Decl. ¶ 15. Next, the NPS or a new lessee would need to contract for architectural and design services. *Id.* ¶ 17. Then, the NPS would undertake—like it undertook for Rock Creek Park[12]—compliance with NEPA, Section 106, Section 7 of the Endangered Species Act, the Organic Act, and any other applicable laws and regulations. *Id.* ¶¶ 16, 18-21. Depending on the nature and scope of any such project, the requisite compliance process could also include review and approval by the National Capital Planning Commission and the U.S. Commission on Fine Arts, which advises the government on design and aesthetics for public buildings, monuments, parks, and other structures. *Id.* ¶ 22. And of course, Plaintiffs would have to find the final designs objectionable.[13] Plaintiffs

---

[12] *See* Rehabilitation of the Rock Creek Park Golf Course, Document List, National Park Service, https://parkplanning.nps.gov/documentsList.cfm?projectID=112141. Many of the first major developments required by the 2020 NLT lease rehabilitated Rock Creek Park Golf Course. Before those actions could be taken, the NPS, in cooperation with NLT, conducted the appropriate analyses and complied with applicable environmental laws including NEPA and Section 106 of the NHPA.
[13] Indeed, presumably, Plaintiffs will have no criticisms if, after deliberations, the Defendants decide to implement a design that would renovate East Potomac Golf Course in a way that

offer no facts to plausibly conclude that these steps have occurred.  *See Robbins v. U.S. Dep't of Hous. & Urb. Dev.*, 72 F. Supp. 3d 1, 7 (D.D.C. 2014) ("The causation standard asks for a 'fairly traceable' injury and not an attenuated connection." (quoting *Lujan*, 504 U.S. at 560-61)).

Similarly, the League's claimed future injuries in the form of voluntary changes it may make to its app and website are predicated on the same assumptions *and* others.  The League must also assume that someone will petition NPS for the removal of East Potomac Park from the National Register of Historic Places, *see* 36 C.F.R. 60.15; that the NPS Keeper of the National Register will decide it is in fact ineligible based on implementation of that design; and that the League will then impose those changes on itself.  To make those changes now, the League's alleged injury would be self-inflicted and "so completely due to the [League's] own fault as to break the causal chain."  *Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (citation modified).

And while Defendants have placed fill material on East Potomac Golf Course, tracing that action to Plaintiffs' alleged injuries would also require breaks in the causal chain.  For example, Defendants would need to have made decisions to place *contaminated*, not clean, fill within the Park (which they have not), or to expand the stockpile in a way that would foreclose Plaintiffs' ability to use the Course and cause a particularized injury (which they also have not).[14]  But such decisions have not occurred and are necessarily not before the Court.

---

enhances its historic character and restores features (like sand traps) lost to time.  But those deliberations are still underway.

[14] To the extent that Plaintiffs claim the storage of fill material is "segmented" from and indicative of the alleged Washington National plan, any redesign of the Course, if it happens, would be a separate action from the fill storage because the soil storage has independent utility for routine landscaping or other future projects, and if it is used for redesign of the Course, its use is not premised on the assumption that any particular redesign will occur.  *See Food & Water Watch*, 28 F.4th 291-92 (concluding independent utility of projects justified separate analyses); *Mashack v. Jewell*, 149 F. Supp. 3d 11, 31 (D.D.C. 2016) (rejecting similar segmentation argument).

For much the same reason Plaintiffs cannot satisfy the injury prong of standing by showing imminent injury, they cannot satisfy the traceability prong either. Their non-existent injuries are too attenuated from the only steps Defendants are alleged to have taken.

### C.    Plaintiffs' Claimed Injuries are Not Redressable

To satisfy the redressability requirement, a plaintiff must demonstrate "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.*, 523 U.S. at 107. Here, Plaintiffs seek to remove the stockpile and enjoin any further changes to East Potomac Park. Compl. 47-49 (Prayer for Relief). But the Course will require maintenance and fill material regardless of whether the Court grants relief. For other relief, the Court simply lacks authority to provide it.

All parties agree East Potomac Golf Course is in need of maintenance. *See* Tr. 30:7-11. Indeed, East Potomac Golf Course is in need of significant maintenance and improvements to restore it to the world-class course that it once was. In 2017, the NPS concluded that the Course was only in fair condition and showed "clear evidence of minor disturbances and deterioration." CLI 152. The NPS also concluded that "without the appropriate corrective action," the Course will "degrade to a poor condition." *Id.* Consistent with this assessment, in 2019, NPS recommended substantial rehabilitation efforts that could require significant amounts of fill. *E.g.*, CLR 189 (recommending reconstruction of "rolling terrain and sand traps, bunkers and 'humps and hollows'"). In fact, NLT—which Plaintiffs impermissibly seek to have reinstated as lessor— was obligated under its lease to perform millions of dollars' worth of upgrades to the Course, including the "[r]edesign and rebuild" of the Course and other construction projects. Bowron Decl.

26

Ex. A at Ex. D 1-2, Dkt. No. 26-5.  Thus, even if the Court were to grant Plaintiffs all the relief they seek, the Course would still undergo significant changes and maintenance, likely requiring fill material.  Because East Potomac Golf Course would undergo changes "no matter how the Court resolves [Plaintiffs'] claims," Plaintiff cannot satisfy the redressability requirement.  *Kimelman v. Garland*, 588 F. Supp. 3d 84, 89 (D.D.C. 2022).

Finally, the Court lacks jurisdiction insofar as Plaintiffs seek to secure relief on behalf of NLT.  *See* Mot. 3 f.-h.  Plaintiffs ask the Court to enjoin termination of NLT's lease and its reassignment—in essence, "the classic contractual remedy of specific performance."  *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985).  Under the Tucker Act, 28 U.S.C. § 1491, those claims must be brought in the Court of Federal Claims.  28 U.S.C. § 1491.  Moreover, Plaintiffs lack standing to bring those claims on NLT's behalf and Plaintiffs make no attempt to establish third-party standing.  *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (A plaintiff generally "must assert [its] own legal rights and interests, and cannot rest . . . on the legal rights or interest of third parties" (citation omitted)); *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213 (D.D.C. 2020) (outlining elements for third-party standing); *see also Mashack*, 149 F. Supp. 3d at 33 n.8 (recognizing court could not order new concessions contract).  Therefore, the Court is without authority to provide the redress Plaintiffs seek.

* * *

In sum, Plaintiffs lack standing to bring their claims.  Because standing is essential for the Court to exercise its Article III jurisdiction, the Court must dismiss Plaintiffs' claims.

## II.    Plaintiffs' Proposal Claims Fail to State a Claim

Even if the Court were to find Plaintiffs have standing to bring their Proposal Claims, Federal Rule of Civil Procedure 12(b)(6) serves as an independent basis for their dismissal.

27

Plaintiffs' Proposal Claims lack facial plausibility because they do not challenge any final agency action and are unripe.

### A.      Plaintiffs' Proposal Claims Fail to Challenge Final Agency Action

Unless judicial review is sought pursuant to specific statutory authorization, the APA limits judicial review to "final agency action." 5 U.S.C. § 704. "Agency action," as used in the APA, is a term of art, referring to an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). It requires "circumscribed, discrete agency action[]" on the part of agency defendants. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm").

"Final agency action" is action that (1) "mark[s] the 'consummation' of the agency's decisionmaking process," and (2) creates legal "rights or obligations," with "direct and appreciable legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). The action "must not be of a merely tentative or interlocutory nature." *Id*.

"Finality" is not jurisdictional. *Trudeau v. FTC*, 456 F.3d 178, 184 (D.C. Cir. 2006). It goes to whether a plaintiff has alleged a valid cause of action under the APA. *Id.* at 185; *see also Hormel Foods Corp.*, 808 F. Supp. 2d at 243 ("[F]inality is a 'threshold question' that determines whether judicial review is available." (citation omitted)). Whether an agency has taken final agency action is a *legal* determination—it is not a question appropriate for judicial fact-finding drawn from public statements. *See, e.g.*, *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267-68 (D.C. Cir. 2018) (reviewing de novo court's finding that FTC letter was final agency action).

Here, Plaintiffs identify no final agency action to ground their Proposal Claims. Instead, they ask the Court to infer one from disparate alleged statements and activities. Those allegations

28

include: a meeting "to discuss" the Golf Course, Compl. ¶ 67; the President complimenting an "idea" by the Secretary of the Interior, Compl. ¶ 68; the President's aspirational statements of future intent, *id.* ¶ 83; a separate decision to use clean fill material for future landscaping improvements in East Potomac Park, *id*. ¶ 70; and a golf course designer supposedly visiting East Potomac Golf Course, *id.* ¶ 78. But Plaintiffs' approach suffers from several incurable problems.

First, Plaintiffs fail to identify any *agency action* on the part of Defendants—let alone a *final* agency action—necessary to support their Proposal Claims. Plaintiffs identify various Presidential and agency activities but fail to identify any Department of the Interior or NPS rule, order, license, or approval authorizing the redevelopment of the East Potomac Golf Course. 5 U.S.C. § 551(13). This is in direct contravention of the Supreme Court's limitation in *Norton* and *Lujan* that APA claims must be directed at particular, discrete, agency action. In other words, "an abstract decision apart from specific agency action" is not reviewable. *Biden v. Texas*, 597 U.S. 785, 809 (2022).

Plaintiffs' theory of agency action is effectively foreclosed by the D.C. Circuit's opinion in *Fund for Animals, Inc. v. U.S. Bureau of Land Management*, 460 F.3d 13 (D.C. Cir. 2006). There, the D.C. Circuit recognized that "agency action" as used in the APA "is not so all-encompassing as to authorize . . . judicial review over everything done by an administrative agency." *Id.* at 83 (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001)). "Much of what an agency does is in anticipation of agency action." *Id.* at 83-84. Like the circumstances alleged here, agencies do not engage in agency action where they simply "prepare proposals, . . . meet with . . . interested groups, and engage in a wide variety of activities that comprise the common business of managing government programs." *Id.* at 84. And like the budget proposal and land use plans analyzed in *Fund for Animals, Inc. v. BLM*, a proposal to renovate East Potomac Golf Course is

29

"generally unreviewable; it is only specific actions implementing the [proposal] that are subject to judicial scrutiny." *Id.* at 85. Other courts faced with similar allegations of purported agency plans and proposals have reached the same conclusion.[15]

Second, the President is not an agency. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). To the extent Plaintiffs contend the President's statements to Secretary Burgum or the press evidence a decision *he* made to direct the agency to explore ways to renovate East Potomac Golf Course, that decision cannot constitute agency action. The President's actions—and the mere utterances alleged here—"are not reviewable under the APA." *Dalton v. Specter*, 511 U.S. 462, 470 (1994).

Third, even if one could characterize Plaintiffs' allegations as identifying an *agency* decision to develop a future proposal to renovate East Potomac Park, that decision would not reflect the consummation of the agency's decisionmaking process necessary for final agency action. Rather, it reflects that process in action—discussions among agency officials and the President exploring how best to improve East Potomac Golf Course. Such nonbinding expressions of agency intent cannot be converted into final agency action simply by mislabeling them as plans for or promises of future agency action. *See, e.g.*, *Bark*, 37 F. Supp. 3d at 50 (plaintiffs cannot "attach[] a 'policy' label to their own amorphous description of the [agency's] practices. . . . [A] final agency action requires more").

---

[15] *See, e.g.*, *Canaza v. Platek*, No. CV 25-303-BAH, 2026 WL 811234, *8 (D. Md. March 24, 2026) (concluding plaintiffs challenge to alleged "scheme" to refuse visas under statutory provision did not qualify as discrete, final agency action); *Cent. Delta Water Agency v. U.S. Fish & Wildlife Serv.*, 653 F. Supp. 2d 1066, 1089-93 (E.D. Cal. 2009) (concluding that conservation plan and related preliminary activities were not final agency action); *Biodiversity Assocs. v. U.S. Forest Serv. Dep't of Agriculture*, 226 F. Supp. 2d 1270, 1314 (D. Wy. 2002) (concluding that agency plans for future timber sales were neither agency action nor final agency action).

In many ways, Plaintiffs' Proposal Claims are on all fours with *Fund for Animals v. Williams*, 391 F. Supp. 2d 132 (D.D.C. 2005). In *Fund for Animals v. Williams* (not to be confused with *Fund for Animals, Inc. v. U.S. Bureau of Land Managment*), plaintiffs sought to challenge various long-term "goals" announced by the U.S. Fish & Wildlife Service in its five-year Strategic Plan. The D.C. District Court concluded that the agency simply declaring these objectives "does not constitute a final agency action because implementation of the goals announced . . . entails 'subsequent discretionary actions requiring separate and independent decisionmaking that are divorced from the prior decision.'" 391 F. Supp. 2d at 137 (quoting *Lujan*, 497 U.S. at 893). Specifically, the court highlighted that prior to implementing these goals, "regional agency officials must (1) prepare a management plan for the particular refuge, (2) issue a NEPA-mandated EIS or an EA, (3) conduct a Section 7 Endangered Species Act evaluation, and (4) draft refuge-specific regulations." *Id.* at 138.

The same is true here. Before any abstract proposal that Defendants renovate or redesign East Potomac Park could transform into final agency action, NPS would first need to pursue a host of preliminary activities within its management discretion. *See* Bowron Decl. ¶¶ 14-20. No party disputes that these steps, like NEPA or Section 106 compliance and course-specific design, would occur. And should Defendants advance this proposal further, Defendants should be granted the leeway to take those implementation steps and take specific action here. *See United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." (citation omitted)).[16] But at this time, mere

---

[16] Moreover, the failure to prepare a NEPA or NHPA document cannot alone be the final agency action subject to review under the APA—a separate final agency action must be challenged. *See*

"announcement of the goal[]"—or in this case a concept for a golf course—". . . is not a final agency action." *Fund for Animals*, 391 F. Supp. 2d. at 138.

Fourth, Plaintiffs cannot identify how a decision by Defendants to develop a proposal for renovating East Potomac Park in any way creates binding legal obligations. Finality turns on legal consequences—whether the agency has bound itself or altered rights or obligations of another. *Bennett*, 520 U.S. at 178. But Plaintiffs point to no agency determination that imposes any obligations on them or denies them any right. *Cf. Hormel Foods Corp.*, 808 F. Supp. 2d at 245-46 (concluding agency letter was not final agency action where letter stated agency was still "considering how best to proceed").

Taken together, Plaintiffs' allegations, even if true, amount to little more than "generalized complaints about agency behavior." *Bark*, 37 F. Supp. 3d at 50 (quoting *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006)). These complaints are not reviewable under the APA.

## B.    Plaintiffs' Proposal Claims Are Unripe

Plaintiffs' challenge to an inchoate proposal to redesign the golf course is not ripe. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Doe v. Doe Agency*, 608 F. Supp. 2d 68, 72 (D.D.C. 2009) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its

---

*Seven Cnty*, 605 U.S. at 180; *Pub. Citizen v. Office of U.S. Trade Representative*, 970 F.2d 916, 918 (1992) ("refusal to prepare an EIS is not itself a final agency action for [APA] purposes").

effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003) (citation omitted).

In effect, "[t]he ripeness doctrine subsumes two inquiries: first, the Article III requirement of standing, which requires a plaintiff to allege *inter alia* an injury-in-fact that is 'imminent' or 'certainly impending,' and, second, 'prudential reasons for refusing to exercise jurisdiction.'" *Garcia v. Acosta*, 393 F. Supp. 3d 93, 103 (D.D.C. 2019) (citation modified); *R.J. Reynolds Tobacco Corp. v. U.S. Food & Drug Admin.*, 810 F.3d 827, 830 (D.C. Cir. 2016) ("Both doctrines . . . focus on contingencies that may render the risk of harm too slight.").

Plaintiffs' Proposal Claims are constitutionally unripe for the same reasons that Plaintiffs lack standing to bring those claims—they have shown no actual or imminent injury caused by the Department of the Interior's preliminary deliberations that is redressable by this Court.

Plaintiffs' Proposal Claims also fail on the prudential front. "[T]he doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to, and then, only once." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012). In evaluating ripeness, courts look to "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs v. Garner*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Under the fitness prong of this test, courts must consider "[1] whether [the claim] is 'purely legal, [2] whether consideration of the issue would benefit from a more concrete setting, and [3] whether the agency's action is sufficiently final.'" *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (citation omitted). Under the hardship prong, courts must ask whether the challenged administrative action is likely to have a direct and immediate effect on the "primary conduct" of the plaintiff. *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967). Plaintiffs fail under both prongs.

33

As to the fitness prong, Plaintiffs' Proposal Claims are not purely legal. Rather, they require a series of future agency activities that have yet to occur, including identification of a new lessee, consummation of a lease, development of a new design, and compliance with applicable environmental laws before Defendants will authorize a final agency action. At any one of these stages, this idea may die on the vine. *See Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007) ("[W]hen an agency decision may never have 'its effects felt in a concrete way by the challenging parties,' the prospect of entangling ourselves in a challenge to such a decision is an element of the fitness determination as well." (citation modified)). Defendants may one day decide to implement a future hypothetical design, or they may not. *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996) (recognizing "the rationale underlying the ripeness doctrine: [i]f we do not decide it now, we may never need to").

Uncertainty as to whether and how the President's proposal will even occur likewise eliminates any hardship to Plaintiffs. Plaintiffs suffer no hardship from deferred judicial review. If Defendants undertake a final agency action based on the President's proposal, Plaintiffs— assuming other jurisprudential requirements are met—can bring claims challenging that action at that time. But delayed review is, by definition, no hardship itself. *See Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*, 85 F. Supp. 3d 250, 272-73 (D.D.C. 2015). Any judicial review should await an actual final decision following Defendants' internal deliberations and completion of whatever level of NEPA, Section 106, and other compliance Defendants undertake. It should not be based on Plaintiffs' speculation as to what that decision and accompanying compliance will be. Indeed, Defendants' renovations to Rock Creek Park Golf Course illustrate how that process may play out. *See supra* n.14.

34

This Court's decision in *Mashack v. Jewell*, 149 F. Supp. 3d 11 (D.D.C. 2016), is directly on point. In *Mashack*, plaintiffs alleged the NPS violated the APA by allowing a concessioner's contract to expire, temporarily closing a marina, and purportedly planning to permanently remove marina infrastructure. *Id.* at 18-19. The D.C. District Court correctly rejected plaintiffs' attempt to merge discrete past and future agency actions into "part of [a] larger decision-making process." *Id.* at 30. The Court concluded that even when agency officials had informed the public of their intentions, where there was no formal decision and the agency represented that any future permanent decision would be accompanied by the requisite NEPA and NHPA compliance, the agency had "not yet bound itself . . . in a way that would warrant review of those actions at this stage." *Id.* at 33. Like the potential permanent closure of the marina in *Mashack*, any claim concerning potential permanent renovation of East Potomac Park "is not ripe." *Id.*

At minimum, Defendants should be permitted to deliberate any conceptual golf course proposal, develop potential paths forward, conduct the appropriate analyses, and make a decision that would turn that concept into a reality. And they should be permitted to conduct these deliberations without Plaintiffs or the Court inserting itself into the administrative process. Until these various hypotheticals crystallize into a definite operational plan, Plaintiffs' claims are unripe and judicial review should be withheld.

### C.      Defendants' Deliberations and Proposal Do Not Trigger NEPA or NHPA

Even if Plaintiffs could satisfy the requirements of final agency action and ripeness, their Proposal Claims still would be unlikely to succeed on the merits, because the procedural requirements they invoke do not apply until a project reaches the point of certain real-world consequences. "[A]n agency's NEPA obligations mature only once it reaches a 'critical stage of a decision which will result in "'irreversible and irretrievable commitments of resources' to an action

35

that will affect the environment.'" *Ctr. for Biological Diversity*, 563 F.3d at 480 (citation omitted). Likewise, an agency must comply with the Section 106 process only "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license." 54 U.S.C. § 306108.

Plaintiffs identify no irretrievable commitment of resources to golf course redevelopment that would trigger NEPA, nor any approved expenditure or licensure that would trigger a Section 106 obligation. Nor could they, since the project they challenge is purely hypothetical and therefore has required no funding or license.

## III.    Plaintiffs' Landscaping Claims Fail to State a Claim

Plaintiffs also challenge a separate agency decision to temporarily stockpile clean fill material at East Potomac Park. But Plaintiffs' allegations centered on the stockpiling decision amount to little more than legal conclusions and fail to state a plausible claim for relief necessary to overcome Rule 12(b)(6).

### A.    Plaintiffs Fail to Plausibly Allege a Violation of NEPA

Defendants reasonably determined that the storage and placement of clean fill material at East Potomac Park fell within a categorical exclusion and that no extraordinary circumstances existed, eliminating the need for further analysis.

Plaintiffs allege that Defendants stockpiled fill material pursuant to a categorical exclusion that permits "[l]landscaping and landscape maintenance in previously disturbed or develop areas." Compl. ¶ 70. Most of Plaintiffs remaining allegations are simply a sleight of hand; they attempt to assert that the CE was inadequate for another purpose, while failing to provide any facts alleging that it was inadequate for purposes of stockpiling fill material. Instead, Plaintiffs merely present "legal conclusions cast in the form of factual allegations." *Cowtown Found., Inc.*, 638 F. Supp. 3d

36

at 7. For example, Plaintiffs simply conclude that the agency's "debris dumping" is "a major federal action" and "has a reasonably foreseeable significant effect on the quality of the human environment," *id.* ¶ 94; that NEPA required Defendants to prepare an EIS or EA, *id.* ¶ 95-96; and that stockpiling does not fall within a categorical exclusion or is subject to extraordinary circumstances, *id.* ¶ 99; *see also id.* ¶¶ 132-134; Mem. 37, Dkt. 8-1 (arguing that extraordinary circumstances (a), (b), (e), and (f) applied). But on a Rule 12(b)(6) motion, Plaintiffs' legal conclusions and conclusory statements must be disregarded. *See Iqbal*, 556 U.S. at 678. They cannot be a substitute for factual allegations plausibly showing that the NPS's decision to stockpile clean fill material pursuant to a CE was unlawful.

Under NEPA, in some cases, agencies are required to prepare either an EIS or an EA with respect to a proposed action. 42 U.S.C. § 4336(b). That choice turns on whether the proposed action has a reasonably foreseeable significant effect on the quality of the human environment. *Id.* But the agency remains in compliance with NEPA where the agency determines "the proposed agency action is excluded pursuant to one of the agency's categorical exclusions." 42 U.S.C. § 4336(a)(2). In other words, where an agency determines that a category of actions "normally does not significantly affect the quality of the human environment," *id.* § 4336e(1), and a proposed action falls within such a category and no extraordinary circumstances exist, no environmental review document is required.

Here, the courts' review of the agency's determination "is a limited one." *Seven Cnty.* 605 U.S. at 185 (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978)). An agency's determination that a proposed action falls within a categorical exclusion is entitled to substantial deference. *See id.* To survive a Rule 12(b)(6) motion to dismiss, a plaintiff cannot rest on legal conclusions but must provide facts plausibly showing a categorical exclusion

37

was improperly applied. *Cf. Town of Ogden Dunes v. U.S. Dep't of the Interior*, No. 2:20-CV-34, 2022 WL 715549, at *11 (N.D. Ind. March 10, 2022). Plaintiffs provide no factual allegations to plausibly show that the NPS's decision to stockpile clean fill material pursuant to the CE was anything other than "reasonable and reasonably explained." *Id.* at 180.

Defendants reasonably decided to temporarily store clean fill from the East Wing Modernization Project on the East Potomac Golf Course for later reuse and reasonably explained that decision. Nersesian Decl. Ex. B. In light of the agency's monitoring and evaluation plan, the NPS's CE form demonstrates that the NPS adequately considered the environmental effects of its action and it provides an adequate basis for the agency's decision not to conduct a more exhaustive environmental analysis. *Id.*

Section 12.5 of the Department of the Interior Departmental Manual identifies those proposed actions that the Department has determined "normally do[] not significantly affect the quality of the human environment," and are thus excluded from NEPA's environmental document requirement. 42 U.S.C. §§ 4336(a), 4336e(1). They include actions related to routine land management, such as "[l]andscaping and landscape maintenance in previously disturbed or developed areas." 516 DM 12.5(C)(19).

Here, the proposed action consisted of the "temporary storage" of "clean fill on previously disturbed and maintained areas of the East Potomac Golf Course" for later reuse. Nersesian Decl. Ex. B at 1. Since infill was "planned as part of improvements" reflected in NLT's lease then in effect, the NPS reasonably concluded the fill material could be used for landscaping purposes, even without identifying a specific future use. *Id.*; *see* Ex. 2, Bowron Decl. Ex. A at Ex. D 1-2 (requiring that, among other things, that courses would be redesigned and rebuilt and other elements would be constructed). And given that East Potomac Park was constructed entirely of

38

fill material and has undergone repeated renovations, *see supra* 2, the NPS reasonably concluded that it qualified as a "disturbed or developed area." Nersesian Decl. Ex. B at 1.

The NPS reasonably justified this conclusion. The NPS explained that "[t]he proposed use of soil for contour correction, drainage improvement, and turf establishment represents maintenance and minor modification of an existing managed landscape, not new construction or a change in land use." *Id.* Further, the NPS explained that the Course itself was artificially constructed, the soil would be tested and verified as clean before placement, and the proposed action was responsive to a need for fill, would occur in areas that had been extensively modified, and would have only incidental and negligible effects on endangered species. *Id.* Ex. B at 1-2.

The NPS also reasonably concluded that no extraordinary circumstances required additional NEPA analysis. *Id.* Ex. B at 2. Department of the Interior regulations, 43 C.F.R. § 46.205(c), recognize that a normally excluded action "may have a significant environmental effect and require additional analysis." *Id.* Section 46.215 identifies nine categories of extraordinary circumstances. 43 C.F.R. § 46.215(a)-(i).

Plaintiffs complain that the NPS's activities fell under extraordinary circumstances (a), (b), (e), and (f). *See* Mem. 37. Those circumstances include actions that have "significant impacts" on public health or safety, historic or cultural resources, or properties listed on the National Register of Historic Places—or that are directly related to "other actions that implicate potentially significant environmental effects." 43 C.F.R. § 46.215. But those concerns do not apply to the placement of clean fill on already filled land, which has no significant effects and by which no other directly related agency action, beyond speculative future actions, is implicated. Thus, the NPS reasonably determined that no extraordinary circumstances applied to the proposed action. And while Plaintiffs may insist that the NPS should have presented more facts to prove a negative,

39

"[t]he agency is better equipped to assess what facts are relevant to the agency's own decision than a court is." *Seven Cnty.*, 605 U.S. at 181.

In sum, Plaintiffs' factual allegations, even if true, provide no basis to plausibly conclude that the NPS's decision to stockpile clean fill material pursuant to the CE was unlawful.

**B.       Plaintiffs Fail to Plausibly Allege a Violation of Section 106 of the NHPA**

Plaintiffs also fail to state a Section 106 Landscaping Claim that would plausibly entitle them to relief.  Like NEPA, Section 106 of the NHPA is procedural, and claims brought under Section 106 are analyzed under the APA's arbitrary-and-capricious standard.  *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 299 (D.C. Cir. 2022).  Under that deferential standard, an agency's determinations under Section 106 will be upheld "so long as the agency's decision is 'reasoned and rational.'"  *Id.* (citation omitted).

Like their NEPA claims, Plaintiffs allege that the NPS issued an Assessment of Actions Having an Effect on Historic Properties ("Assessment") and concede that this form addressed the stockpiling of fill material at East Potomac Park.  Compl. ¶ 76.  Plaintiffs allege, without any substantiation, that the Historic Assessment "misrepresented the nature" of the stockpiling.  *Id.* ¶ 102.  Again, nearly all of Plaintiffs' allegations as to the stockpiling of fill material, are mere legal conclusions couched as factual assertions.  Plaintiffs conclude the stockpiling, "as a discrete activity," is an undertaking under the NHPA, *id.* ¶ 92; and that the NHPA required Defendants to engage in consultation and the opportunity for public comment, *id.* ¶ 140.  But Plaintiffs provide no factual allegations to plausibly conclude that the NPS's Historic Assessment did not satisfy the NPS's Section 106 obligations.

Broadly speaking, Section 106 of the NHPA and its implementing regulations require that agencies consider the effect of an undertaking on historic properties through a multi-step process

of initiation, identification, assessment, and efforts to resolve adverse effects, involving consultation with interested parties. *See* 54 U.S.C. § 306108; 36 C.F.R. §§ 800.1-.6. This process can be satisfied through program alternatives. 36 C.F.R. § 800.14. For example, the ACHP and an agency official may negotiate a programmatic agreement. *Id.* § 800.14(b). The regulations authorize the use of a programmatic agreement in certain circumstances, including "[w]here routine management activities are undertaken . . . ." *Id.* § 800.14(b)(iv).

The NPS negotiated a nationwide programmatic agreement to govern its compliance with Section 106. Nersesian Decl. Ex. D. That 2008 Programmatic Agreement provides for a streamlined review process, whereby, if a proposed action satisfies certain criteria, no further consultation is required unless specifically requested by certain parties. *Id.* Ex. D at 9.[17]

Here, Plaintiffs allege that on October 16, 2025, Defendants completed an Assessment to satisfy their NHPA Section 106 obligations. Compl. ¶ 76. They further allege that the Assessment stated that the stockpiling of clean fill material would be "consistent with routine grounds maintenance," have "no adverse effect," and would not alter or remove historic features or add non-historic features to the landscape. *Id.* ¶ 101. But they present no other factual allegations to show these determinations were improper, only their own legal conclusions that the Court need not consider for Rule 12(b)(6) purposes. *See Iqbal*, 556 U.S. at 678.

As shown in its Assessment, the NPS reasonably concluded that the proposed landscaping action was eligible for streamlined review and reasonably explained its decision. First, the NPS's

---

[17] To be eligible for streamlined review, a proposed undertaking must generally satisfy three requirements. First, it must be an activity eligible for streamlined review. *Id.* Eligible activities include routine grounds maintenance. *Id.* Ex. D at 15. Second, all historic properties within the undertaking's area of potential effects must have been previously identified and evaluated. *Id.* Ex. D at 9-10. And third, the agency Section 106 Coordinator must have reviewed the undertaking and certified that its effects on historic properties or properties eligible for the National Register will not be adverse. *Id.* Ex. D at 10.

cultural resource specialist explained that the proposed action was "consistent with routine grounds maintenance [because] the placement of fill will not significantly alter the design of the course." Nersesian Decl. Ex. C at 3.  Second, the NPS determined that the area of potential effects in and around East Potomac Golf Course had previously been surveyed to identify historic properties.  *Id.* Ex. C at 1; *see* CLI 1; *see also* CLR 9.  Third, the NPS concluded that this routine storage of fill material for future landscaping uses would have no adverse effect on historic properties.  Nersesian Decl. Ex. C at 2-3.

Plaintiffs fail to allege any factual basis for concluding the Assessment—as it related to the stockpiling decision—failed to satisfy NPS's Section 106 obligations.  Therefore, Plaintiffs' claim must be dismissed under Rule 12(b)(6) as a matter of law.

### C.    Plaintiffs Fail to Plead a Cause of Action under the Organic Act

Like their NEPA and NHPA claims, Plaintiffs have not plausibly alleged that the NPS violated the Organic Act by temporarily storing clean fill material in East Potomac Park.  Plaintiffs allege that the project (which they inaccurately refer to as "debris dumping") "would impair the enjoyment of the scenery, natural and historic objects, and wildlife" of the Park.  Compl. ¶ 147.

Plaintiffs' Complaint does little more than allege in conclusory fashion that stockpiling fill material impairs the enjoyment of East Potomac Park and this violates the Organic Act.  Compl. ¶¶ 145-47.  Plaintiffs' argument relies on speculation about the impacts of soil storage and future actions, rather than any concrete examples of current impacts on park resources and values, Mem. 40-41, and thus seems driven by Plaintiffs' "emotional attachment to a social interaction" rather than actual impact analysis, Mem. 18.  Whatever the relevance of such interests for standing analysis, they are not relevant to environmental impact analysis.  *See Grunewald v. Jarvis*, 776 F.3d 893, 906 (D.C. Cir. ) ("The [NPS] was not required to consider the psychological harm that

some visitors may suffer from simply knowing" about impacts that had otherwise been analyzed, and rejecting plaintiffs' effort to "recast their psychic injuries as concerns relating to visitor experience and the human environment"). Plaintiffs have simply failed to identify nonspeculative impacts to park resources or values as a result of the Landscaping Project or proposal that could give rise to an impairment claim under the NPS Organic Act.[18]

Impairment is a high standard, and impacts alone do not necessarily equal impairment. Rather, an impairment "is an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources and values, including the opportunities that otherwise would be present for the enjoyment of those resources or values." *Jewell*, 965 F. Supp. 2d at 84 (citation omitted). Whether there is impairment "depends on the particular resources and values that would be affected; the severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question and other impacts." NPS Policies § 1.4.5.

NPS guidance only requires the preparation of a separate written non-impairment determination for proposed actions requiring an EA or EIS. *See* Guidance for Non-Impairment and the NPS NEPA Process, National Park Service 1, April 2025 ("NPS Guidance").[19]  That is

---

[18] The Organic Act direct the NPS to "conserve the scenery, natural and historic objects, and wild life" within the parks in a manner that "will leave them unimpaired for the enjoyment of future generations."  54 U.S.C. § 100101(a).  But "[b]ecause the Organic Act is silent as to the specifics of park management, the Secretary has especially broad discretion on how to implement his statutory mandate."  *Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000).  The NPS has therefore developed policies to interpret the Organic Act and guide its management decisions. NPS Policies, ¶ 1.4.1, https://www.nps.gov/subjects/policy/upload/MP_2006_amended.pdf. The NPS Policies permit issuance of supplementary instructions and guidance to further their implementation.  *Id.* 5.

[19] The NPS Guidance is publicly available at https://www.nps.gov/subjects/nepa/upload/Guidance-for-Non-Impairment-Determinations-and-the-NEPA-Process-Apr-2025_508.pdf.

because proposed actions that are reviewed using a categorical exclusion have no potential for significant impacts, much less for impacts that rise to the level of impairment.  And, here, this is borne out by the CE which demonstrates that the soil storage project has "No Potential for Significant Impacts to Sensitive Resources."  Nersesian Decl. Ex. B at 2.

Plaintiffs argue that the soil storage "threatens to leach into the soil and surrounding waters" and "create[s] an unhealthy environment."  Mem. 40.  But, other than offering a series of conclusory statements, Plaintiffs provide no factual basis to conclude either that those effects would result from the NPS's action or that such effects would "harm the integrity of park resources and values."  *Jewell*, 965 F. Supp. 2d at 84.  Indeed, the Course remains open and available for play.[20]

Like their Landscaping NEPA and NHPA claims, Plaintiffs Landscaping Organic Act claim lacks the requisite factual basis that must be pled to show Plaintiffs are plausibly entitled to relief.[21] Thus, Plaintiffs' claim that that the NPS's stockpiling violated the Organic Act must be dismissed.[22]

## IV.    Plaintiffs are Not Entitled to Extra-Record Discovery to Correct their Pleading Deficiencies

At the March 11, 2026, status conference, Plaintiffs indicated that they wished to seek extra-record evidence to demonstrate standing or to find final agency action.  Tr.  58:23-60:21.  To

---

[20] In earlier briefing, Plaintiffs contended that the NPS's soil stockpiling conflicts with the March 3, 1897, Act of Congress creating Potomac Park.  Mem. 41.  But here again, Plaintiffs provide no basis for concluding that this activity is inconsistent with the Park's purpose as a place for recreation and pleasure by the public.  Indeed, as shown by the history of changes, renovations, additions, and subtractions made at East Potomac Park, *see* CLI 25-31, ordinary construction efforts and improvements—including ones that require fill materials—have long been a feature of East Potomac Park and help promote—not negate—its place as a site for public recreation.
[21] Insofar as Plaintiffs also argue that the "Washington National plan" violates the Organic Act, such claim is unripe and premature for the reasons stated above.  *See also* Resp. in Opp'n 41.
[22] Plaintiffs have waived any separate argument pertaining to the Organic Act's conservation mandate.  *See* Resp. in Opp'n 41 n.18.

44

the extent Plaintiffs may reiterate those demands in opposition to Defendants' Motion to Dismiss, Plaintiffs' position is flawed for at least four reasons. First, Plaintiffs' Complaint must contain adequate factual allegations. Where plaintiffs fail to establish jurisdiction or state a claim for relief on the *face* of their Complaint, they are not entitled to extra-record discovery. *Iqbal*, 556 U.S. at 686 ("Because respondent's complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise."). Second, in an APA case where the court's review is confined to the administrative record, plaintiffs are not entitled to preliminary discovery to substantiate their own injury or demonstrate finality. *See Gerber*, 254 F. Supp. 3d at 85; *see also Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009). Third, to the extent Plaintiffs are entitled to any extra-record evidence, they must make the requisite showing on a motion before the Court *after* production of the Administrative Record. *E.g.*, *Urb. Sustainability Directors Network v. U.S. Dep't of Agric.*, No. 25-1775, 2025 WL 2374528, *41 (Aug. 14, 2025). And fourth, nothing about that inquiry warrants withholding a ruling on Defendants' motion to dismiss. *Rempfer*, 583 F.3d at 865 ("[T]here is 'no inherent barrier to reaching the merits' at the motion to dismiss stage." (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993))).

## CONCLUSION

For these reasons, Plaintiffs lack standing and the Court thus lacks subject matter jurisdiction. Plaintiffs otherwise fail to state a claim for relief that is plausible on its face. Therefore, Defendants respectfully request that this Court grant Defendants' Motion.

Respectfully submitted this 10th day of April 2026.

**ADAM R. F. GUSTAFSON**

Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

BRADLEY CRAIGMYLE

45

Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

/s/ Michael K. Robertson

MICHAEL K. ROBERTSON
Trial Attorney (DC Bar No. 1017183)
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
4 Constitution Square
150 M Street NE
Washington, DC 20002
Tel: (202)-305-9609
Email: Michael.Robertson@usdoj.gov

*Attorneys for Federal Defendants*

46