## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DC PRESERVATION LEAGUE, *et al.*,<br><br>*Plaintiffs*,<br><br>*vs.*<br><br>UNITED STATES DEPARTMENT OF THE<br>INTERIOR, *et al.*,<br><br>*Defendants*. | Case No. 1:26-cv-477 |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR AN EMERGENCY STATUS CONFERENCE AND IN FURTHER
## SUPPORT OF PLAINTIFFS' MOTION FOR A SECTION 705 STAY OR,
## IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

UPDATES......................................................................................................................................3

    Illustrations of Washington National Golf Course .......................................................3

    Test Results ...................................................................................................................5

SUPPLEMENTAL ARGUMENT..................................................................................................10

CONCLUSION...............................................................................................................................13

i

# TABLE OF AUTHORITIES

**Cases**

*Nat'l Trust for Historic Pres. v. Nat'l Park Serv.*, No. 25-4316, 2026 WL 87779 (D.D.C.
Mar. 31, 2026)..................................................................................................................1

**Other Authorities**

Nat'l Park Serv., Soil Testing Data - Jacobs Engineering, Index, https://perma.cc/JV3P-
9TR2..................................................................................................................................8

Reese Gorman, *Trump Will Take Over a Central D.C. Golf Course Starting This Week*,
NOTUS (May 1, 2026), https://perma.cc/Y2VU-FS25 (last viewed May 2, 2026)....................1

Rick Maese & Dan Diamond, *Trump Fundraiser Shares Plans for 'Garden of Heroes,'*
*Golf Course as Takeover Looms*, Wash. Post (May 2, 2026), https://perma.cc/32VV-
FXUB (last viewed May 2, 2026)....................................................................................1, 3

Sniff Leak Testing, Cincinnati Test Systems, https://perma.cc/RZ3G-V3NE ..............................7

Soil Testing Data – Jacobs Engineering, Planning, Environment, and Public Comment,
National Park Service, available at
https://parkplanning.nps.gov/showFile.cfm?sfid=845064&projectID=133318 and
https://parkplanning.nps.gov/showFile.cfm?sfid=845075&projectID=133318..................7, 8, 9

From the moment Plaintiffs filed this lawsuit, Defendants insisted that any plan to renovate East Potomac Golf Course was in its infancy—little more than office chatter nowhere near finalization.  As late as April 30, Defendants maintained in a declaration that the "management of the East Potomac Golf Course is unchanged" and that "no formal decision has been made regarding the nature and scope of any renovations." Declaration of Jessica Bowron (Dkt. 38-2) ¶¶ 5, 13.

Less than 24 hours later, on Friday evening, May 1, the D.C. news website NOTUS reported that the Trump administration will close East Potomac Golf Course at the end of the day on Sunday, May 3, and begin construction—including tree-clearing—on Monday, May 4, "in line with the National Park Service's pre-approved plans."[1]  The article goes on to confirm that "major renovations"[2] are expected to be led by golf course architect Tom Fazio.  In mere hours, then, Defendants' supposedly hypothetical concepts[3] will turn into bulldozers—much as the White House's East Wing was demolished "without advance notice or apparent approval." *Nat'l Trust for Historic Pres. v. Nat'l Park Serv.*, No. 25-4316, 2026 WL 87779, *2 (D.D.C. Mar. 31, 2026) (Leon, J.).  NOTUS's reporting was subsequently corroborated by a *Washington Post* story on Saturday, May 2, which reported that private fundraising efforts are underway to destroy East Potomac and to build on its ruins a "championship golf course."[4]  The fundraising brochure—which Plaintiffs have obtained and append as an exhibit hereto—confirms

---

[1] Reese Gorman, *Trump Will Take Over a Central D.C. Golf Course Starting This Week*, NOTUS (May 1, 2026), https://perma.cc/Y2VU-FS25 (last viewed May 2, 2026).
[2] *Id.*
[3] About two hours after the NOTUS story broke, Plaintiffs' counsel e-mailed Defense counsel to ask whether the story was true. As of early afternoon on Sunday, May 3, Defense counsel had not responded.
[4] Rick Maese & Dan Diamond, *Trump Fundraiser Shares Plans for 'Garden of Heroes,' Golf Course as Takeover Looms*, Wash. Post (May 2, 2026), https://perma.cc/32VV-FXUB (last viewed May 2, 2026).

Defendants' intent to transform East Potomac Park into an unrecognizable venue bearing no resemblance to its historic design and replete with features that will significantly affect the quality of the human environment. Indeed, an initial review of the results of tests conducted on the dirt Defendants have stockpiled[5] indicate that dangerous toxins have already been introduced into the landscape.

Plaintiffs took on faith that Defendants would abide by this Court's admonition on April 9, 2026, not to "get to a point where . . . it's too late, too many things have happened" and things are "moving forward and we can't . . . stop the trains." Apr. 9 Hrg. Tr. 18:23. Largely on that basis, Plaintiffs agreed—in consultation with Defendants' counsel—to defer further briefing on their pending motion for a § 705 stay or preliminary injunction and to brief Defendants' pending motion to dismiss and Plaintiffs' forthcoming motion for extra-record discovery at a relatively deliberate pace. But Plaintiffs' faith has proven misplaced. Without emergency relief, a national park recorded in the National Register of Historic Places will be razed—all with Defendants having treated compliance with the National Environmental Policy Act, Section 106 of the National Historic Preservation Act, and the National Parks Service's organic act as box-checking exercises to be completed after the fences have already gone up.

Trust is no longer an option. As it did with the East Wing, the administration has chosen arbitrariness over abiding by the law. Defendants' assurances that lengthy decisionmaking and legal compliance lie ahead are a ruse. And without emergency preliminary relief, they will

---

[5] On May 1, 2026, Defendants released test results from the debris that they spent months dumping from the White House East Wing demolition project. Plaintiffs' review of those results is incomplete, but their preliminary review suggests dangerous levels of lead, mercury, arsenic, and carcinogens. The results further indicate that Defendants were aware of these dangerous pollutants as early as October 28, 2025, and continued the debris dumping nevertheless. As a result of this eleventh-hour disclosure, Plaintiffs may seek to amend their complaint.

continue running roughshod over both East Potomac Park and the law until the golf course and the Park have met the East Wing's fate.

## UPDATES

Because of this matter's urgency, Plaintiffs incorporate their earlier motion for a 705 stay or, alternatively, a preliminary injunction.  Dkt. 8-1.  However, important updates further corroborate—if not prove—that Plaintiffs correctly alleged Defendants have finalized their commitment to the Washington National plan.

### Illustrations of Washington National Golf Course

At this Court's video status conference on April 9, 2026, Plaintiffs' counsel informed the Court of the existence of illustrated renderings of a completed Washington National.  At that point, Plaintiffs' counsel had not yet seen the renderings.  However, they have since been the subject of reporting in *The Washington Post*.[6]

The scope and precision of the renderings are astonishing.  They show the finished project to be everything that Plaintiffs have alleged the Washington National plan called for: a huge, single 18-hole course occupying all of East Potomac Park—including the site of what is now Hains Point—with multiple water hazards and a new clubhouse.  This alone would be a remarkable rebuttal of Defendants' promises.  But the renderings' context is even more astonishing.

Attached to this Motion as Exhibit A is an 11-page fundraising document entitled *The National Garden of American Heroes Foundation: Pledge Agreement*.  Plaintiffs' understanding is that it has already been circulated to a tight circle of the President's wealthy donors.  The Pledge Agreement's principal focus is a garden that would occupy what is now West Potomac

---

[6] Maese & Diamond, *supra* note 4.

Park.  It would contain dozens of statues of prominent characters in American history.  The Pledge Agreement includes several illustrations of the garden.

But the Pledge Agreement does not stop at statues.  It avers that the private foundation leading the fundraising effort also "will lead the comprehensive redevelopment" of East Potomac Park.  Ex. A at 8.  Among the Pledge Agreement's several realistic illustrations are four renderings that include Washington National Golf Course.  They appear on pages 3 (captioned "East Potomac Park Reimagined"), 4 ("East Potomac Park with a Championship Golf Course"), 6 ("An Aerial from Virginia"), and 7 ("The National Mall").  The renderings show most of Washington National's holes occupying the footprint currently occupied by East Potomac's Blue Course, its Red Course, and the public park area at Hains Point.  The remainder of Washington National will be routed where the White Course's nine holes currently sit.  *See id.*  In other words, constructing Washington National will destroy Hains Point and East Potomac Golf Course's historic design, just as Plaintiffs allege in their Complaint.  *Compare* Ex. A at 4 *with* Compl. (Dkt. 1) at ¶ 84 (alleging Washington National plan "will . . . leave the whole of East Potomac Park unrecognizable") *and* ¶ 85 ("Implementing the Washington National plan will require overhaul of all or nearly all the footprint currently occupied by East Potomac's 36 holes and miniature golf course—and perhaps all of East Potomac Park.  These changes will likely entail, at a minimum, removal or relocation of hundreds of trees, substantial modification of terrain, and replacement of the site's existing clubhouse.").

All four renderings show a new, palatial clubhouse in place of East Potomac's current field house—itself a contributing building to East Potomac Golf Course's place in the National Register of Historic Places,[7] *see* Exhibit B to Pls.' Original Mot. for Stay (Dkt. 8-9) at 4.  The

---

[7] So is the miniature golf course – which the Pledge Agreement's illustrations appear to omit.

Washington National clubhouse appears in the style of clubhouses at Trump National Golf Club Bedminster, Trump National Golf Club Hudson Valley, and Trump National Golf Club Charlotte.

The Pledge Agreement concludes by asking for a "binding commitment of payment" to an entity called The National Garden of American Heroes Foundation, which was founded in 2026, is "seeking status as a 501(c)(3) tax-exempt, nonprofit organization," and has obtained a Tax ID number. The Pledge Agreement directs questions to Meredith O'Rourke, who served as head of the Trump campaign's fundraising team in 2024. The Pledge Agreement offers donors the choice to remain anonymous. Finally, the Pledge Agreement represents that donors' financial gifts "will be used" to support the Foundation's founding projects, including the comprehensive redevelopment of East Potomac Park.

**Test Results**

In litigation before Judge Leon concerning construction of the White House ballroom, Defendants submitted a declaration from Director of White House Management and Administration Joshua Fisher, who attested that the demolished East Wing included "toxic substances spread throughout the structure, including asbestos and lead based paint." Ex. A to Suppl. Mem. (Dkt. 30-1) ¶ 9, *Nat'l Trust for Historic Pres. v. Nat'l Park Serv.*, No. 25-cv-4316 (D.D.C. Mar. 31, 2026). From the demolition of the East Wing came the 37,000 cubic yards[8] of what Defendants have repeatedly called "clean fill" that has since been dumped on East Potomac Golf Course. Notwithstanding that declaration, from this case's earliest moments, Defendants have resisted Plaintiffs' characterization of the East Wing refuse as "rubble" or "dirt." Instead,

---

[8] *See* Declaration of Jennifer Nersesian (Dkt. 38-1) ¶ 10. This total exceeds Defendants' original estimate of 30,000 cubic yards by nearly 25 percent.

Defendants have preferred calling it "clean fill." Defs.' Mem. in Opp'n to Pls.' Mot. for Stay (Dkt. 26) at 26 ("And while Defendants have placed fill material on East Potomac Golf Course, tracing that action to Plaintiffs' alleged injuries would also require breaks in the causal chain. For example, Defendants would need to make further decisions to place *contaminated*, not clean fill within the Park . . . .") (emphasis in original) (hereinafter "Stay Opp'n"). Defendants pointed to the Categorical Exclusion that they granted themselves on October 16, 2025, which promised a careful stewardship of the debris. *See* Ex. H to Pls.' Original Mot. for Stay (Dkt. 8-15) at 2.

Any reliance on Defendants' characterizations appears also to be misplaced. Test results released by Defendants on Friday, May 1, suggest the Defendants dumped a cocktail of contaminants – and despite indications of the refuse's contents, they continued dumping it.

Defendants' test results appear to show at least three problems.[9]

The first red flag is that Defendants did not follow the protocol that their Categorical Exclusion promised to use: namely, that "[t]he soil will be tested and *verified as clean prior to placement*, eliminating the risk of introducing contaminants." *Id.* (emphasis added). But Defendants' contractor at the East Wing, Clark Construction, relied on "sniffer" soil tests prior to the transportation of soil to the East Potomac Golf Course. Decl. of Jennifer T. Neresian (Dkt. 38-1) at ¶ 6 ("photoionization detector"). Sniffer tests can reveal vapors coming off soils, but they are unhelpful for detecting metals like lead or other contaminants that do not evaporate at

---

[9] Plaintiffs are in the process of obtaining expert review of the results to evaluate the underlying sampling and testing methodology, and to better ascertain the scope and severity of the problems posed by the contaminated refuse dumped at East Potomac. Due to the short window of time between gaining access to those results and learning of the imminence of Defendants' actions, that review has not yet been completed.

normal temperatures.[10]  Even less helpful was Clark Construction's reliance on

"supplement[al] . . . visual and olfactory observations of the soil."  Declaration of Jennifer

Nersesian (Dkt. 38-1) ¶ 6.  In other words, they looked at it and smelled it—hardly a reliable

method for detecting odorless contaminants.

Second, it appears that Defendants began dumping their so-called "clean fill" for more

than a week before they began testing *at all*. Although the Cat Ex promised testing "prior to

placement," Defendants' first test results come from samples collected on October 28.[11]  But by

Defendants' own admission, they began dumping the dirt more than a week prior—on October

20—and began constructing the haul road from dirt on October 18.  Ex. A (Declaration of

Jennifer Nersesian) to Stay Opp'n (Dkt. 26-1), at 8.  Of course, the most pollutant-saturated

rubble likely would have arrived in Defendants' earliest truckloads, full of rubble and dirt that

had been closest to the East Wing's base (and now rests at the bottom of the stockpile, closest to

East Potomac's water table).  Indeed, NPS's contractor, Jacobs Engineering Group, Inc., did not

prepare its technical memorandum setting out a testing protocol until October 24, *id.* ¶ 9, and did

not collect "baseline" samples—i.e., the samples intended to capture the preexisting background

levels—until October 28, *see* (Nat'l Park Serv., Soil Testing Data - Jacobs Engineering, Index at

1, https://perma.cc/JV3P-9TR2).

---

[10] *See* Sniff Leak Testing, Cincinnati Test Systems, https://perma.cc/RZ3G-V3NE (last viewed May 2, 2026) (sniffer test is "a basic method of *tracer gas leak detection* that uses a sniffer probe to detect the presence of tracer gas and pinpoint an area that is leaking") (emphasis added).

[11] Soil Testing Data – Jacobs Engineering, Planning, Environment, and Public Comment, National Park Service, available at https://parkplanning.nps.gov/showFile.cfm?sfid=845064&projectID=133318 (test results compared to thresholds for birds, invertebrates, mammals, and plants, from Oct. 28-Nov. 12, 2025); and https://parkplanning.nps.gov/showFile.cfm?sfid=845075&projectID=133318 (test results compared to thresholds for carcinogenic soil levels, *et al.*, from Oct. 28-Nov. 12, 2025).

Third, even by the time Defendants got around to testing the dirt, the results of those tests should have been alarming.  On October 28, Defendants took 17 samples of dirt they had already dumped at East Potomac.  They appear to have detected the presence of above-acceptable limits of a multitude of contaminants: lead, mercury, arsenic, petroleum byproducts, and more.  Among the test results:

- Lead: Defendants set the acceptable limits for birds at 11 milligrams per kilogram of soil, mammals at 56 mg/kg,[12] and 200 mg/kg for daily exposure to a child.[13]  Every stockpile sample between October 28 and November 12 showed lead levels at 14 mg/kg or higher; four samples revealed levels at 90 mg/kg or higher, including one at an estimated 400 mg/kg—twice the maximum acceptable exposure for a human child.

- Arsenic: Defendants set a level of 0.68 mg/kg as carcinogenic; 0.77 mg/kg as unsafe to ingest; and 5.5 as unsafe for skin contact.[14] Of the 14 samples taken from the rubble pile between October 28 and November 12, all but one registered at 2.7 or higher, and four registered above 5.0—including an estimated 13 on November 1.

- Benzo(a)pyrene: This is a highly toxic, carcinogenic hydrocarbon formed from incomplete combustion.  It is found in coal tar, cigarette smoke, and engine exhaust. Defendants set a limit of 110 micrograms[15] (ug) per kilogram as carcinogenic.[16]  On October 28, one sample registered 610 ug/kg.  The next day, a sample showed 980 ug/kg. From October 31 through November 1, three samples showed 190 ug/kg, 660 ug/kg, and

---

[12] *Supra* n.11 (first link).
[13] *Supra* n.11 (second link).
[14] *Supra* n.11 (second link).
[15] A microgram is one-billionth of a kilogram.
[16] *Supra* n.11 (second link).

580 ug/kg.  On November 6, a sample registered 1,400 ug/kg.  On November 12 (more than three weeks into the dumping), a sample showed 1,1000 ug/kg.

Defendants have represented that testing began (belatedly) on October 28.[17]  Defendants' own notes on the spreadsheets of test results indicate their awareness of results above actionable levels.[18]  Despite these results indicating they were dumping what appear to be actionable levels of carcinogens and other pollutants onto a federal parkland abutting the Potomac River, Defendants continued dumping evidently toxic material for nearly six months.

All those potential toxins, and many more, now appear to sit at the bottom of Defendants' trash heap, close to East Potomac's high water table.  When Plaintiffs filed this lawsuit, Defendants castigated Plaintiffs' concern that golfers near the dumpsite could be breathing in dangerous pollutants.  *See, e.g.*, Stay Opp'n at 22 ("Plaintiff Dickson alleges an increased risk of harm from exposure to the fill stockpile.  . . .  Dickson offers no facts that raise his concerns above the level of rank speculation.  He offers no basis for concluding that the presence of the fill stockpile substantially increases his risk of harm from chemical contaminants . . . .").  In hindsight, it appears that this argument was not only disingenuous—it was also dangerous.

In short, adopting the Washington National plan (including, but as evidenced by the Pledge Agreement obviously not limited to the debris dumping) is a decision that is final, and its implementation has begun.  That is the beginning and the end of this case.  After months of obfuscation, Defendants are now trying to speedrun their plan, and must be stayed or enjoined from doing so.

---

[17] *See supra* n.11 (either link).
[18] *supra* n.11 (first link, notes tab).

**SUPPLEMENTAL ARGUMENT**

Defendants' central argument against Plaintiffs' efforts to pause the destruction of East Potomac has been that many decisions still lie between this moment and what Defendants would describe as a "formal" final decision. An architect must be selected and detailed designs approved, they say. NEPA and Section 106 boxes must be checked, they say.[19] *See generally* Stay Opp'n at 24-25. But Defendants do not need to have made specific design choices to have taken a reviewable final action. Whether the greens will be seeded with rye or Bermuda grass, or whether the bunkers will be filled with native or imported sand, or whether the cart path will be paved with asphalt or concrete, the point that Plaintiffs have reiterated all along—and which the Pledge Agreement proves—is that Defendants have decided to fundamentally transform East Potomac Golf Course's character by eliminating the course's historic design and public recreational purpose in favor of a championship-style golf course. Ex. A at 4. *See also* Pls.' Mem. in Supp. of Mot. for Stay (Dkt. 8-1) at 11 (responding to question "What's your plan for East Potomac? Are you going to renovate the golf course?", President Trump said, "Yeah, we're gonna make it a beautiful, world-class, U.S. Open-caliber course. Ideally, we're gonna have major tournament there and everything."). Defendants have offered one response to Plaintiffs' original motion for a § 705 stay or preliminary injunction: "there's nothing to see here." That defense—that no decision had been made to adopt or implement the Washington National plan and that, therefore, Plaintiffs variously lack standing, brought an unripe case, or do not challenge

---

[19] Consider the upside-down nature of this argument. Defendants say that Plaintiffs cannot sue them (yet) because Defendants have not complied with NEPA and Section 106. But the point of this suit is that Defendants have decided to implement the Washington National plan without performing the reviews that those laws require. Defendants' stated intention to go through the motions of NEPA and Section 106 "compliance" to paper a decision they have already committed to should not give them cover to proceed with implementation of their plan and defer judicial review until it is too late.

final agency action—has always been contravened by the public reporting on which Plaintiffs' allegations relied. It is now only further belied by the new revelations about just how far the Washington National plan's implementation has advanced.

If, as has now been further confirmed, Defendants have made a final decision to undertake the Washington National plan, that by itself resolves essentially every argument Defendants raised in opposition to Plaintiffs' motion for a stay or preliminary injunction.[20] Plaintiffs' claims as to the Washington National plan would be indisputably ripe, Defendants' NEPA and NHPA obligations would be indisputably triggered, and Defendants would—by their own concession—not have satisfied those obligations. And Defendants' various arguments about Plaintiffs' standing fare no better: Plaintiffs' injuries have never been hypothetical, and their certainty is only clearer now. By the same token, Defendants' argument that dumping clean dirt on East Potomac poses no harm to Plaintiffs is irrelevant in the face of reality: dumping a greater volume of toxic dirt on East Potomac certainly does so. And the Cat Ex that Defendants completed to give themselves permission to dump that dirt now plainly appears to rest on false premises—i.e., that the dirt would be clean and that its purpose would be limited to use in routine landscaping consistent with the Golf Course's historic design.

Plaintiffs' original allegations, and the original public reporting on which they relied would, if true, also resolve all of Defendants' arguments. Little surprise, then, that Defendants' opposition to Plaintiffs' motion for preliminary relief rested on an alternate factual narrative,

---

[20] Defendants' intervening motion to dismiss should pose no obstacle to resolving Plaintiffs' motion. To require resolution of that motion before making a decision on preliminary relief would allow any defendant to functionally delay any requested preliminary relief by filing even a perfunctory motion to dismiss. Moreover, as Plaintiffs will demonstrate in their forthcoming motion for extra-record discovery and their opposition to Defendants' motion to dismiss, Defendants' motion to dismiss rests heavily on assertions of fact that contradict the allegations of the Complaint, the Pledge Agreement, and other public reporting.

11

supported by two thin declarations that contradicted widely reported information and the explicit statement of the President of the United States. But there is now further evidence available to the Court which makes clear that Defendants have committed to the Washington National plan. With that evidence, the Court no longer needs to weigh two credible narratives to evaluate Plaintiffs' claims. In particular, Plaintiffs' allegations have been corroborated in several essential aspects.

*First*, the fundraising document for the Washington National plan (Exhibit A) shows complete renderings of the exact sort of championship-style golf course Plaintiffs described in their complaint and motion, and, perhaps more importantly, requests a "binding commitment of payment" that "will be used" to support the course's "comprehensive redevelopment." The binding agreement stipulates that any remaining terms, in the event of a donor's death, will be borne by the donor's estate. Irrevocable fundraising, conducted in support of a commitment to undertake the exact plan—already rendered—which Plaintiffs allege Defendants have already adopted and begun to implement, leaves no question that Defendants have made a decision to implement that plan.

*Second*, Defendants' test results (released only after substantial resistance) indicate that the dirt dumped at East Potomac might be highly contaminated and dangerous. This makes clear that Plaintiffs' feared environmental and exposure injuries are, in fact, concrete and ongoing.

More troublingly, however, the objective evidence now available undermines the two declarations offered by Defendants in opposition to Plaintiffs' motion. The test results contradict the claim that the dirt "is clean and suitable for temporary storage at the park, and for the material's long-term intended use as part of the park's landscaping." Nersesian Decl. (Dkt. 26-1) ¶ 46. And the completed renderings of and fundraising in support of the exact golf course the

President declared Defendants are going to build make clear that the plan is not "still in the conceptual phase." Declaration of Jessica Bowron (Dkt. 26-4) ¶ 14. In the face of these contraventions of central statements within Defendants' declarations, the Court should reasonably view the balance of the declarations with skepticism.

## CONCLUSION

The Court should set an emergency status conference and should stay or preliminarily enjoin the implementation of the Washington National plan. Said order should be of the scope requested in Plaintiffs' pending Motion and Complaint and should, at a minimum, stay Defendants from closing East Potomac Golf Course or undertaking any steps toward implementing the plan other than routine maintenance, and from dumping any additional fill from the East Wing project within East Potomac Park. To the extent the Court will require additional time to consider the pending motion or hold a status conference, a temporary stay to preserve the status quo would be appropriate.

RESPECTFULLY SUBMITTED this Third day of May 2026.

Abbe David Lowell [Bar No. 358651]
Jack Bolen*
Angela Reilly*
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
adlowell@lowellandassociates.com
jbolen@lowellandassociates.com
areilly@lowellandassociates.com

Norman L. Eisen [Bar No. 435051]
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003

*/s/ Will Bardwell*
Will Bardwell (Bar No. 90006120)
Mark B. Samburg (Bar No. 1018533)
Catherine M.A. Carroll (Bar No. 497890)
Robin F. Thurston (Bar No. 7268942)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
wbardwell@democracyforward.org
msamburg@democracyforward.org
ccarroll@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*

13

Tel: (202) 601-8678
norman@democracydefenders.org

*Application for admission pending or
admission *pro hac vice* forthcoming

14