**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| DC PRESERVATION LEAGUE, *et al.*, | : | |
| *Plaintiffs*, | : | |
| *vs.* | : | Case No. 1:26-cv-477 |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | : | |
| *Defendants*. | : | |

**PLAINTIFFS' MEMORANDUM
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

I.   Background ................................................................................................... 2

II.  Legal Standard ............................................................................................. 6

III. Argument ...................................................................................................... 7

A.   Plaintiffs Have Standing to Challenge Both the Washington National Plan's Adoption and Implementation and the Dumping of More Than 30,000 Cubic Yards of Contaminated Construction Debris ................................................................................. 8

1.   The Aesthetic, Recreational, Historic, and Communal Interests of Dave Roberts, Alex Dickson, and DC Preservation League's Members are Injured by the Washington National Plan and the Debris Dumping ....................................................... 9

a.  Plaintiff's Injuries are Actionable .......................................................... 10

b.  Defendants Caused Plaintiffs' Injuries ................................................... 16

c.  Injunctive Relief Would Redress Plaintiffs' Injuries ............................. 17

2.   DCPL Has Associational Standing to Assert Its Members' Injuries, Because Protecting East Potomac Golf Course is Germane to DCPL's Purpose and the Participation of Those Members is Not Necessary ....................................................... 18

3.   DCPL Also Has Standing in its Own Right Because Defendants' Actions Harm the Organization Itself ............................................................................... 19

B.   The Complaint Alleges a Decision to Convert East Potomac Golf Course from a Recreational-Style Golf Course to a Championship-Style Golf Course Constituting Final Agency Action, and Plaintiffs' Challenge to that Decision is Ripe ................... 21

1.   Defendants' Decision to Convert East Potomac from a Recreational-Style, 36-Hole Facility to an 18-Hole, Championship-Style Professional Venue is Final Agency Action ............................................................................................. 22

2.   Plaintiffs' Claims Challenging Defendants' Decision to Adopt the Washington National Plan, and Their Ongoing Implementation of It, is Ripe ............................... 26

C.   The Complaint Plausibly Alleges that the Debris Dumping Violated NEPA, NHPA, and the NPS Organic Act ............................................................................... 30

1.  NEPA ............................................................................................................ 31

2.  NHPA ........................................................................................................... 32

3.  NPS Organic Act ......................................................................................... 34

D.  Plaintiffs' Request for Extra-Record Discovery is Already Before the Court ............. 37

CONCLUSION ......................................................................................................................... 37

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abbott Laby's v. Gardner*,
387 U.S. 136 (1967) .................................................................................. 27

*Am. Petroleum Inst. v. EPA*,
683 F.3d 382 (D.C. Cir. 2012) ................................................................ 27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................ 6, 8, 16, 21

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*,
901 F. Supp. 2d 19 (D.D.C. 2012) ........................................................ 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................... 6

*Bennett v. Spear*,
520 U.S. 154 (1997), *aff'd*, 746 F.3d 468 (D.C. Cir. 2014) ............... 19, 23, 26

*Cherokee Nation v. U.S. Dep't of the Interior*,
643 F. Supp. 3d 90 (D.D.C. 2022) ................................................... 16, 20

*City of Phoenix, Ariz. v. Huerta*,
869 F.3d 963 (D.C. Cir. 2017) ......................................................... 33, 34

*Coal. for Underground Expansion v. Mineta*,
333 F.3d 193 (D.C. Cir. 2003) .............................................................. 22

*Comm. for Auto Resp. v. Solomon*,
603 F.2d 992 (D.C. Cir. 1979) .............................................................. 29

*Comm. of 100 on Fed. City v. Foxx*,
87 F. Supp. 3d 191 (D.D.C. 2015) ........................................................ 30

*Ctr. for Biological Diversity v. Dep't of the Interior*,
144 F.4th 296 (D.C. Cir. 2025) ............................................................. 10

*Dalton v. Specter*,
511 U.S. 462 (1994) ............................................................................... 25

*Davis v. Latschar,*
　　202 F.3d 359 (D.C. Cir. 2000) ................................................................................ 35

*Earthworks v. Dep't of the Interior,*
　　105 F.4th 449 (D.C. Cir. 2024) .............................................................................. 29

*EEOC v. St. Francis Xavier Parochial Sch.,*
　　117 F.3d 621 (D.C. Cir. 1997)................................................................................. 22

*Env't Def. Fund v. FERC,*
　　2 F.4th 953 (D.C. Cir. 2021) ...................................................................... 11, 13, 14

*Farmer v. U.S. Env't Protection Agency,*
　　805 F. Supp. 3d 253 (D.D.C. 2025) ........................................................................ 37

*FDA v. Alliance for Hippocratic Medicine,*
　　602 U.S. 367 (2024)................................................................................................ 17

*Florida Audubon Soc. v. Bentsen,*
　　94 F.3d 658 (D.C.Cir. 1996) .................................................................................. 17

*Food & Water Watch, Inc. v. Vilsack,*
　　808 F.3d 9805 (D.C. Cir. 2015) ....................................................................... 14, 16

*Foundation on Economic Trends v. Lyng,*
　　943 F.2d 79 (D.C. Cir. 1991) .................................................................................. 22

*Freedom Watch, Inc. v. McAleenan,*
　　442 F. Supp. 3d 180 (D.D.C. 2020) ....................................................................... 20

*Friends of Animals v. Jewell,*
　　828 F.3d 989 (D.C. Cir. 2016) ............................................................................... 20

*Friends of Capital Crescent Trail v. Fed. Transit Admin.,*
　　No. 17-1811, 2019 WL 1046889 (D.D.C. Mar. 5, 2019).................................... 22

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.,*
　　528 U.S. 167 (2000)......................................................................................... 10, 14

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
　　460 F.3d 13 (D.C. Cir. 2006) .................................................................................. 24

*Gordon v. Nat'l Youth Work All.,*
　　675 F.2d 356 (D.C. Cir. 1982) .................................................................................. 9

*Haase v. Sessions*,
    835 F.2d 902 (D.C. Cir. 1987) ............................................................................... 9

*Herbert v. Nat'l Acad. of Scis.*,
    974 F.2d 192 (D.C. Cir. 1992) .............................................................................. 37

*Hohri v. United States*,
    782 F.2d 227 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987)................. 6

*Hunt v. Washington State Apple Advert. Comm'n*,
    432 U.S. 333 (1977).............................................................................................. 18

*Ill. Com. Comm'n v. ICC*,
    848 F.2d 1246 (D.C. Cir. 1988) ............................................................................ 32

*Karst Env. Educ. and Prot., Inc. v. EPA*,
    475 F.3d 1291 (D.C. Cir. 2007) ............................................................................ 22

*League of Un. Latin Am. Citizens v. Exec. Off. of President*,
    808 F. Supp. 3d 29 (D.D.C. 2025) ........................................................................ 37

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014).............................................................................................. 22

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)........................................................................................... 8, 16

*Mashack v. Jewell*,
    149 F. Supp. 3d 11 (D.D.C. 2016) ........................................................................ 28

*Mizell v. SunTrust Bank*,
    26 F. Supp. 3d 80 (D.D.C. 2014) .......................................................................... 12

*N.Y. Republican State Comm. v. SEC*,
    927 F.3d 499 (D.C. Cir. 2019) .............................................................................. 12

*Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*,
    No. 20-3706, 2024 WL 1344450 (D.D.C. Mar. 29, 2024)................................... 35

*Nat'l Pub. Radio, Inc. v. Trump*,
    ___ F. Supp. 3d ___, No. 25-1674, 2026 WL 877434 (D.D.C. Mar. 31, 2026)............... 27

*Nat'l Trust for Historic Pres. in the U.S. v. Nat'l Park Serv.*,
    ___ F. Supp. 3d ___, No. 25-4316, 2026 WL 533420 (D.D.C. Feb. 26, 2026) ............... 14

*NRDC v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020) ............................................................................ 26

*Nycal Offshore Development Corp. v. Haaland*,
    No. 19-966 (RBW), 2021 WL 6049915 (D.D.C. Dec. 21, 2021) .................................... 22

*Parker v. District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007) ............................................................................ 6

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015) ...................................................................... 19, 20

*Pub. Citizen Health Rsch. Grp. v. Comm'r, FDA*,
    740 F.2d 21 (D.C. Cir. 1984) ........................................................................ 27, 28

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ....................................................................... 24

*Robbins v. U.S. Dep't of Hous. & Urb. Dev.*,
    72 F. Supp. 3d 1 (D.D.C. 2014), *aff'd sub nom.*, *Robbins v. Castro,* No. 14-
    5298, 2015 WL 3372527 (D.C. Cir. May 6, 2015) .................................................... 16

*Rodriguez v. Toro*,
    No. 24-0738 (ABJ), 2026 WL 710220 (D.D.C. Mar. 13, 2026) ....................................... 6

*Sierra Club v. Department of Transportation*,
    125 F.4th 1170 (D.C. Cir. 2025)......................................................................... 14

*Sierra Club v. FERC*,
    827 F.3d 59 (D.C. Cir. 2016) ....................................................................... 13, 14

*Sierra Club v. Morton*,
    405 U.S. 727 (1972)...................................................................................... 14

*Soundboard Ass'n v. FTC*,
    888 F.3d 1261 (D.C. Cir. 2018) ..................................................................... 22, 23

*Sparrow v. United Air Lines, Inc.*,
    216 F.3d 1111 (D.C. Cir. 2000)........................................................................... 6

*Sprint Communications Co. v. APCC Servs., Inc.*,
    554 U.S. 269 (2008)...................................................................................... 17

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)...................................................................................... 27

*Sw. Airlines Co. v. Dep't of Transp.*,
    832 F.3d 270 (D.C. Cir. 2016) ......................................................................... 25

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    661 F.3d 66 (2011) ............................................................................................ 30

*Thomas v. Un. Carbide Agric. Prods. Co.*,
    473 U.S. 568 (1985)........................................................................................... 27

*Valambhia v. United Republic of Tanzania*,
    964 F.3d 1135 (D.C. Cir. 2020)..................................................................... 1, 31

*Venetian Casino Resort L.L.C. v. EEOC*,
    530 F.3d 925 (D.C. Cir. 2008) ........................................................................ 24

*WildEarth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013) ........................................................................ 10

*Williamson v. Tucker*,
    645 F.2d 404 (5th Cir. 1981) .......................................................................... 37

*Zimmerman v. Al Jazeera America, LLC*,
    246 F. Supp. 3d 257 (D.D.C. 2017) ............................................................... 12

**FEDERAL STATUTES & REGULATIONS**

36 C.F.R.
    § 800.2........................................................................................................... 33
    § 800.5..................................................................................................... 33, 34
    § 800.6........................................................................................................... 33

42 U.S.C.
    § 4332........................................................................................................... 29
    § 4336........................................................................................................... 29
    § 4336e..................................................................................................... 29, 31
43 C.F.R.
    § 46.215................................................................................................... 29, 32

54 U.S.C.
    § 100101................................................................................................... 34, 35
    § 300101......................................................................................................... 32
    § 300308......................................................................................................... 30
    § 300320................................................................................................... 29, 30
    § 306108................................................................................................... 29, 33

Fed. R. Civ. P.
 Rule 12 ................................................................................................ 3, 6, 9, 11, 22

## OTHER AUTHORITIES

Birder's Guide to Maryland & DC, East Potomac Park (Hains Point), West Potomac
 Park & the Tidal Basin, https://perma.cc/6H8Q-M99P (last visited May 28,
 2026) ................................................................................................................ 32

U.S. Fish & Wildlife Serv., *Rufa Red Knot (Calidris canutus rufa)*, ECOSphere,
 https://perma.cc/B55W-SHKC (last visited May 28, 2026) ............................................. 32

U.S. Golf Ass'n, Rules of Golf at Rule 1.1, https://perma.cc/7K2R-WWZV (last
 visited May 28, 2026) ................................................................................................ 1

**INTRODUCTION**

Golf's first rule is that a player must "[p]lay the course as they find it, and [p]lay the ball as it lies."[1]  Rather than confront the hazard in which they find themselves, though, Defendants move the ball: they distort Plaintiffs' claims and recast allegations to fit arguments that do not apply here.  But on a motion to dismiss, a complaint's allegations must be taken as true, with all reasonable inferences drawn in Plaintiffs' favor.  *Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1137 (D.C. Cir. 2020).  So read, the Complaint shows that Plaintiffs are entitled to move forward.  It alleges plausibly that Defendants illegally dumped more than 30,000 cubic yards of contaminated construction debris and have decided upon and begun to implement a plan to convert East Potomac Golf Course from a 36-hole, recreational-style facility to a single, 18-hole championship-style venue for professional tournaments (the "Washington National plan") – all in violation of the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA" or "Section 106"), the National Park Service Organic Act, and the Act of March 3, 1897.

Defendants urge that no decision has been reached and no plan has been adopted. But as detailed below, Plaintiffs' well pled allegations plausibly claim that Defendants have in fact decided upon and adopted the Washington National plan and have begun implementing it, including through massive and unlawful debris dumping on the Course. Accordingly, their alleged injuries are sufficiently imminent to plead standing and ripeness, and they have plausibly alleged final agency action as well as the necessary elements to state claims for violations of NEPA, the NHPA, the Organic Act, and the Act of March 3, 1897. The Court may resolve the

---

[1] U.S. Golf Ass'n, *Rules of Golf* at Rule 1.1, https://perma.cc/7K2R-WWZV (last visited May 28, 2026).

1

pending motion on the allegations in the Complaint alone. Even so, ever since Defendants filed the instant motion, additional facts have developed in the record reinforcing the accuracy of Plaintiffs' allegations and making clear that the challenged plan is final and underway. Not least, Secretary Burgum recently made a public announcement "unveil[ing] the design plan for the East Potomac Golf Links renovation." ECF No. 50-1. Those facts corroborate Plaintiffs' argument that Defendants' threshold defenses are as divorced from reality as they are from Plaintiffs' allegations.

Plaintiffs do not ask the Court to reinstate the National Links Trust's lease. Plaintiffs have no desire to nitpick East Potomac Golf Course's (publicly released, by now) design. All Plaintiffs want is for Defendants not to destroy a federal parkland – or, at the very least, not to do it before studying that plan's environmental and historic consequences.

The Court should deny the motion to dismiss.

## I.    Background.

When Defendants began implementing a plan to destroy East Potomac Golf Course and replace it with a championship-style professional venue, two golfers and a local historical preservation group filed this suit to protect their aesthetic, recreational, historic, and communal interests in the golf course. Their Complaint asked the Court to prevent East Potomac's destruction – or, alternatively, to enjoin its destruction until Defendants performed the review processes required by NEPA and Section 106 of the NHPA. Broadly, the Complaint alleged several Administrative Procedure Act claims arising from two final agency actions: (1) Defendants' decision to adopt and implement the Washington National plan, and (2) Defendants' dumping of the East Wing's demolition debris at East Potomac Golf Course. Both actions deviate wildly from Defendants' decades-long practice of preserving East Potomac's three golf

courses consistent with their original intent as recreational-style layouts catered to locals – a commitment that Defendants have repeatedly documented.  *See, e.g.*, ECF No. No.1 ¶¶ 56-62.

Defendants followed with this Motion to Dismiss.  Defendants argue that Plaintiffs failed to establish standing – and, thus, that their Complaint should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  Defendants further argue, under Rule 12(b)(6), that Plaintiffs failed to state a claim upon which relief can be granted because Plaintiffs failed to allege final agency actions.

Because a motion to dismiss tests only a complaint's facial sufficiency, the focus is on Plaintiffs' well pled allegations.  Plaintiffs' Complaint alleged:

- That Defendants had developed, adopted, and begun implementing the Washington National plan, by which they would destroy East Potomac Golf Course's historic, recreational-style design in favor of an upscale, championship-style venue for hosting professional tournaments, ECF No. 1 ¶ 67;

- That the 30,000 cubic yards of debris from the East Wing's destruction would be used as fill for the new golf course's construction, *id.* ¶ 68;

- That the East Wing debris dumped by Defendants onto the golf course likely contained lead and other hazardous substances, *id.* ¶¶ 81, 87;

- Pursuant to the Washington National plan, Defendants terminated the National Links Trust's 50-year lease at D.C.'s three municipal golf courses to prevent the nonprofit's interference with the planned redevelopment of East Potomac, *id.* ¶ 82;

- That President Trump himself had confirmed the adoption of the Washington National plan, *id.* ¶ 83;

- That architect Tom Fazio had begun preparing a redesign for the Washington National plan, *id*. ¶ 79;

- That Fazio's design would destroy East Potomac's three historic, recreational-style golf courses, *id.* ¶ 85;

- That Fazio's design would call for significant tree removal and terrain modification. *Id.*

Defendants denied it all.  In their telling, Defendants were only "deliberating" on "the *possibility*" of a "nascent" "concept."  ECF No. 26 at 1 (emphasis in original).  They characterized President Trump's comments on the plan as "aspirational," *id.* at 21, and Plaintiffs' harms as "hypothetical."  *Id.* at 1.  They claimed that NLT's termination was unrelated and that the group had been a bad tenant.  *Id.* at 10.  Fazio's involvement, they said, was "speculat[ion]," *id.*, and that he had not designed a replacement for East Potomac.  *Id.* at 21 ("this unseen, undesigned plan").

Defendants also denied that the East Wing debris dumped at East Potomac was hazardous.  They called it "clean fill," *see id.* at 6; claimed that it was "tested" and "confirm[ed]" as "safe[ ]" "before and after it arrived at East Potomac Park," *id.* at 10; and would be "beneficial[ ]."  *Id.* at 5.  Allegations to the contrary, Defendants said, were "mere speculation," *id.* at 22, as were health concerns.  *Id.* at 22 ("Dickson offers no facts that raise his concerns above the level of rank speculation.").

As this case has progressed, factual revelations have confirmed Plaintiffs' allegations across the board.  Defendants do have a plan, and President Trump's top campaign fundraiser, Meredith O'Rourke, is soliciting donations for it.  ECF 47-1 at 8.  Those donations "will be used" to fund the project.  *Id.*  Secretary Burgum (like President Trump) has publicly confirmed the plan's existence. ECF No. 49-1.  Fazio has indeed produced a design, which Secretary

4

Burgum announced with fanfare. ECF No. 50. The National Park Service will lead the renovation. ECF No. 49-1. It will result in "a top-tier 18-hole championship golf course capable of hosting pre-eminent tournament golf." *Id.* The design will install large water hazards and require significant tree removal. ECF No. 50. Meanwhile, NLT (supposedly an unreliable tenant) will return to manage D.C.'s other municipal golf courses – but will remain out of the way at East Potomac. ECF No. 49-1.

Furthermore, the assurances on which NPS relied to categorically exclude the debris dumping from NEPA review are, by now, untenable. The Categorical Exclusion justification, which can apply to a category of federal actions that do not have a significant impact on the human environment, represented that the debris "will be tested and verified as clean prior to placement, eliminating the risk of introducing contaminants." ECF No. 1-7 at 1. But results from Defendants' own tests on the debris pile (which now substantially surpasses Defendants' original assurance of 30,000 cubic yards, *see* ECF No. 38-1 ¶ 10) show concerning levels of arsenic, hydrocarbons, and other dangerous pollutants – including lead. *Compare* ECF No. 1 ¶¶ 81, 87. The debris was not, in fact, "confirm[ed]" "safe[ ]" before *or* after dumping. One of Defendants' contractors likely wasn't testing for the right contaminants at all, ECF No. 26-1 ¶ 38, and Defendants' own records suggest that the other contractor delayed testing for *eight days* after dump trucks began arriving. ECF No. 47-1 at 9. When the second contractor finally began testing, the results were alarming, yet the Categorical Exclusion Form insisted that the dumping had "No Potential for Significant Impacts to Sensitive Resources," ECF No. 1-7 at 3, on land with a notoriously high water table where contaminants could migrate into groundwater. ECF No. 1 ¶ 89.

The motion to dismiss should be denied.

## II.    Legal Standard

Defendants seek dismissal under both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Rule 12(b)(1) governs dismissal for "lack of subject-matter jurisdiction," and Rule 12(b)(6) does the same for "failure to state a claim upon which relief can be granted."  In either instance, a court considering a motion to dismiss must "treat the complaint's factual allegations as true . . . and must grant plaintiff[s] the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation omitted).  "[W]hen considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim." *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007).  In assessing the sufficiency of a complaint challenged under Rule 12(b)(6), "detailed factual allegations" are not necessary, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but "a complaint must contain sufficient factual matter accepted as true 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), (quoting *Twombly*, 550 U.S. at 570). Thus, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, though a motion to dismiss may properly be denied even where "recovery is very remote and unlikely." *Id.* at 556.

Furthermore, "[w]hen considering a motion to dismiss for lack of jurisdiction [under Rule 12(b)(1)], unlike when deciding a motion to dismiss under Rule 12(b)(6), the court 'is not limited to the allegations of the complaint.'  Rather, a court may consider materials outside the pleadings to resolve the question of whether it has jurisdiction to hear the case." *Rodriguez v. Toro*, No. 24-0738 (ABJ), 2026 WL 710220, at *6 (D.D.C. Mar. 13, 2026) (quoting *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987)).

6

### III.    Argument

This case is about the most consequential decision that Defendants have made about East Potomac Park in more than 100 years: to abandon their practice of preserving the Park's 36-hole, recreational-style golf courses in favor of adopting a plan to develop an 18-hole championship-style venue for professional tournaments in violation of NPS's Organic Act and the Act of March 3, 1897, and without the reviews required by NEPA and NHPA.  One of Defendants' steps in implementing that plan – dumping a giant pile of contaminated debris from the East Wing's demolition – ran afoul of the same legal restrictions.

Nearly all Defendants' arguments are rooted in a refusal to accept the Complaint's allegations as true.  First, Defendants simply deny that they have adopted the Washington National plan, notwithstanding detailed allegations to the contrary.  Second, they argue that they complied with NEPA and NHPA before dumping more than 30,000 cubic yards of contaminated debris and dirt at East Potomac by categorically excluding that dumping from review.  Under the governing law and relevant standard of review, though, all of Defendants' arguments fail.

First, based on the factual allegations pled, Plaintiffs have standing to challenge both the Washington National plan and the dumping of contaminated debris.  The individual Plaintiffs allege concrete, impending injuries that are traceable to the Defendants and redressable by a court judgment.  The organizational Plaintiff has both associational standing to sue on behalf of its members, and it has organizational standing to vindicate its own rights: DCPL alleges concrete, impending injuries to its members, as well as to itself, that are traceable to Defendants and redressable by this Court.

7

Second, Plaintiffs allege facts that, if proven, would satisfy all elements for judgment in their favor. Defendants have consummated their decision to adopt the Washington National plan, and legal consequences have flowed from that decision.

Third, the Complaint plausibly alleges that Defendants acted arbitrarily and capriciously and contrary to law by failing to adequately review the debris dumping under NEPA and NHPA, and by acting in violation of the National Park Service Organic Act and the Act of March 3, 1897.

Despite the weight of the evidence accumulating in the record, the truth of Plaintiffs' allegations (nearly undeniable, by now) is not yet even the point. For now, the point is this: assuming Plaintiffs' allegations are *credited*, then their claims for relief certainly are *plausible*. *Iqbal*, 556 U.S. at 678. Just as certainly, considering the record evidence alongside the pleadings establishes facts that plausibly establish jurisdiction. That is all that a Complaint needs to survive a motion to dismiss: factual allegations that, if proven true, would allow judgment for the plaintiff. That Plaintiffs' allegations essentially *have* been proven true is icing on the cake: the Court would have needed to assume as much anyway to resolve Defendants' Motion to Dismiss. Plaintiffs' Complaint passes that scrutiny.

### A. Plaintiffs Have Standing to Challenge Both the Washington National Plan's Adoption and Implementation and the Dumping of More Than 30,000 Cubic Yards of Contaminated Construction Debris

To establish standing, the Complaint must allege (1) an injury that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical;" (2) a "causal connection between the injury and the conduct complained of;" and (3) that the injury likely will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The Complaint makes such allegations, both for the Washington National plan as a whole and as

8

to the debris pile, and subsequent developments have confirmed those allegations. *See Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) ("In 12(b)(1) proceedings, it has long been accepted that the judiciary may make 'appropriate inquiry' beyond the pleadings to 'satisfy itself on authority to entertain the case.'") (quoting *Gordon v. Nat'l Youth Work Alliance*, 675 F.2d 356, 362-63 (D.C. Cir. 1982)).

The subject of this case is a historic, recreational-style, 36-hole golf facility in Washington, D.C. One Plaintiff is an organization that exists to preserve D.C.'s historic sites. The other two Plaintiffs are local golfers who frequently play the course. All of them allege facts sufficient to establish concrete interests in the golf course and injuries that would result from its planned destruction pursuant to the Washington National plan and the debris dumping that has already occurred. Plaintiffs also allege that their injuries are traceable to Defendants (because Defendants adopted and are both implementing the Washington National plan and are responsible for the debris dumping) and that their injuries are redressable by a court decision (because the Court can enjoin Defendants' unlawful behavior).

> ### 1. The Aesthetic, Recreational, Historic, and Communal Interests of Dave Roberts, Alex Dickson, and DC Preservation League's Members are Injured by the Washington National Plan and the Debris Dumping

Mr. Roberts and Mr. Dickson play golf at East Potomac as often as life allows. ECF No. 1 ¶¶ 19-20. For them, East Potomac is more than just 36 tiny holes in the ground. It's a place that *means something*. They enjoy its beauty. They enjoy playing golf there. They feel welcome there. They're not historians, but East Potomac Golf Course is a place where they feel like part of history just from being around it. *See id.*

9

Similarly, DCPL's[2] members "live, work, and recreate throughout the District, including in and around East Potomac Park." *Id.* ¶ 18.  Some of them like to go walking at East Potomac. *See id.*  Others play golf there.  *Id.*  DCPL's members particularly enjoy being at East Potomac Golf Course because of its deep history.  *Id.*  They enjoy activities, recreate there, enjoy the beautiful views, and enjoy being part of the community of other people walking, playing, and being together.  *Id.* ¶¶ 7, 18.  To them, East Potomac isn't just 300 acres of untaken real estate; as it has been for more than 100 years, East Potomac is "an invaluable resource for the whole community as a 'park for the recreation and pleasure of the people." *Id.* ¶ 53 (quoting Act of March 3, 1897).

### a.  Plaintiffs' Injuries are Actionable

"It is well established that environmental plaintiffs adequately allege standing 'when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.'"  *Ctr. for Biological Diversity v. Dep't of the Interior*, 144 F.4th 296, 305 (D.C. Cir. 2025) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 183 (2000)).  *See also WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013).  As for the plan as a whole: destroying East Potomac Golf Course's 36-hole, recreational-style arrangement in favor of an ahistorical, 18-hole championship-style venue for professional tournaments, removing trees, warping its landforms, and jamming in unnatural water features would injure Mr. Dickson's and DCPL members' aesthetic and recreational interests in East Potomac's recreational-style arrangement, and their

---

[2] DCPL's claim to associational standing requires it to begin by showing that at least one member would have standing in their own right.  *Infra* at 18.  Given their overlapping interests, this brief discusses DCPL members' standing alongside the individual plaintiffs.  The remainder of DCPL's associational standing is discussed *infra*.

enjoyment of its historic character. Roberts's, Mr. Dickson's, and DCPL members' aesthetic and recreational interests in East Potomac's recreational-style arrangement, and their enjoyment of its historic character. ECF No. 1 ¶¶ 18-20. Likewise, as to the debris pile, dumping more than 30,000 cubic yards of polluted debris and dirt into a giant heap on a golf course interferes with their interests: it's ugly, it interferes with the course's trademark views, it's not part of the original design, and it endangers visitors' health. *Id.*

Defendants do not contest that the changes wrought by the Washington National plan are sufficient to injure these Plaintiffs' aesthetic and recreational interests; they contest only their imminence. *See* ECF No. 34-1 at 15 ("Plaintiffs' allegations constitute the quintessential '*possible* future injury.'") (emphasis in original); *id.* at 16 ("Here, the only facts Plaintiffs allege to support their theory simply demonstrate that the agency is in the midst of the decisionmaking process."). As to the dirt pile, Defendants argue that Mr. Roberts and Mr. Dickson merely allege that the pile is an "eyesore," which (according to Defendants) is not a true injury to their aesthetic interests. ECF No. 34-1 at 20 (citing *Env't Def. Fund v. FERC*, 2 F.4th 953, 969-70 (D.C. Cir. 2021)). These arguments share a common flaw: they do not accept the Complaint's allegations as true, and they do not credit reasonable inferences in Plaintiffs' favor.

For the purpose of the 12(b)(1) standard, the Complaint adequately alleges implementation (and thus, actionable injuries). ECF No. 1 ¶ 67 ("Defendants thereafter decided to abandon the longstanding status quo at East Potomac Park in favor of the Washington National plan"); *id.* ¶ 82 (implementation included terminating National Links Trust's lease); *id.* ¶ 83 (President Trump confirming decision); *id.* ¶ 68 (implementation included dumping East Wing debris); *id.* ¶ 84 (implementing Washington National plan "will require destruction of the Travis-designed course and leave the whole of East Potomac Park unrecognizable"). Plaintiffs therefore

11

do not allege a "possible" future injury, as Defendants portray – they allege concrete injury that is "certainly impending." *N.Y. Republican State Comm. v. SEC*, 927 F.3d 499, 504 (D.C. Cir. 2019). Defendants disagree, such as by portraying President Trump's comments as "aspirational." ECF No. 34-1 at 16. Where a statement is susceptible to competing interpretations, though, a motion to dismiss must assume the plaintiff's favored interpretation. *Zimmerman v. Al Jazeera America, LLC*, 246 F. Supp. 3d 257, 285 (D.D.C. 2017) (Jackson, J.) ("[W]hen faced with two, equally plausible interpretations of the record facts . . . '[t]he court must view the complaint in a light most favorable to the plaintiff.'" (quoting *Mizell v. SunTrust Bank*, 26 F. Supp. 3d 80, 85 (D.D.C. 2014)).

Defendants also argue that the debris pile causes no concrete injury. ECF No. 34-1 at 17. But Plaintiffs allege that the debris pile injures several of their interests: (1) aesthetic, ECF No. 1 ¶ 84 (Washington National plan, which includes dumping, will "leave the whole of East Potomac Park unrecognizable"); *id.* ¶ 87 (dumping as part of Washington National plan); (2) recreational, *id.* ¶ 88 (dumping will adversely affect "the surrounding open spaces and recreational areas of East Potomac Park"); *id.* ¶ 99 (implementing Washington National plan, which includes dumping, will "rob the community of a priceless resource for open and accessible recreation for all the people"); (3) historic, *id.* ¶¶ 35-54 (park and golf course's historical significance); *id.* ¶ 90 ("Defendants' actions will also affect historic property") and (4) risks to their health. *Id.* ¶ 12 (plan's implementation includes "dumping . . . dirt, debris, and wreckage" that was "apparently untested for pollutants or contaminants, and all within a light breeze's reach of the park's golfers"), *id.* ¶ 81 (asbestos, lead, and "other hazardous substances"), *id.* ¶ 87 ("introduc[ing] foreign organic and inorganic materials into the land" "pos[es] risks to human health").

Contrary to Defendants' contention, Plaintiffs' aesthetic injuries are not a mere "eyesore." ECF No. 34-1 at 20. *See* ECF No. 1 ¶ 12 (debris pile "included wires, pipes, bricks, and other materials"); *id.* ¶¶ 72, 74 (photos of dump trucks, loose rubble, etc.). And the case on which they rely does not stand for the proposition that an alleged aesthetic injury is assessed based on the quality or significance of the aesthetic change. Rather the plaintiff there lacked standing because the relevant declarant never indicated that "she derived aesthetic value from the land as it had existed before the construction," such as through her use and enjoyment of it. *Env't Def. Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021).

Plaintiffs here make all those allegations, though. Mr. Dickson, Mr. Roberts, and DCPL's members frequently play recreational golf at East Potomac. ECF No. 1 ¶¶ 7, 18. They plan to continue doing so. *Id.* ¶¶ 18-20. And Defendants' ultimate use of the dirt pile (irrespective of its pollution) in the Washington National plan will certainly impede Plaintiffs' use of East Potomac Golf Course. As a necessary component of the Washington National plan, then, the dirt pile injures Mr. Roberts's, Mr. Dickson's, and DCPL members' aesthetic interests. *See* ECF No. 1 ¶ 61 (East Potomac's "landscape" part of its historical significance); *id.* ¶ 65 (healthy turf, smooth greens, views beyond golf course now unobstructed); *id.* ¶ 84 (Washington National plan's implementation will involve "aesthetic changes" and "leave the whole of East Potomac Park unrecognizable").

Defendants argue that Plaintiffs should have alleged that the dirt pile "is visible from everywhere on the Course," and that it interferes with play. ECF No. 34-1 at 21. (This says nothing about the dirt pile's role in the larger Washington National plan.) They cite no authority for the proposition that aesthetic and recreational interests in parkland are meaningful only if that injury is omnipresent throughout that parkland. Nor could they. In *Sierra Club v. FERC*, 827

13

F.3d 59 (D.C. Cir. 2016), the plaintiff organization had standing because one of its members "fish[ed], boat[ed], and seasonally duck hunt[ed] frequently around" lakes and a river where tanker traffic would increase.  Invariably, tankers did not interfere with the boater at all times on every square inch of the waters; but since he "frequently" used the waters, increased tanker traffic injured his aesthetic and recreational interests.  *Id.* at 66.  Similarly, in *Sierra Club v. Department of Transportation*, 125 F.4th 1170 (D.C. Cir. 2025), increased train traffic sufficiently injured homeowners' enjoyment of "nearby scenic areas."  *Id.* at 1180.  There is no indication (nor could one expect there to be) that trains traveled at all times when they used those scenic areas and injured their interests at every minute.  The key was that the boater and homeowners "use[d] the affected area and [were] persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).  Likewise, Mr. Roberts, Mr. Dickson, and DCPL's members use East Potomac and are the "type of person[s]" whose interests in its aesthetic value are lessened.  *Nat'l Trust for Historic Pres. in the U.S. v. Nat'l Park Serv.*, ___ F. Supp. 3d ___, No. 25-4316, 2026 WL 533420, at *4 (D.D.C. Feb. 26, 2026) (Leon, J.).  In contrast, the *Environment Defense Fund* plaintiff's experiences with the metering station were fleeting.

Defendants also dispute the Complaint's allegations that the debris pile is a health risk. They rely on the rule that plaintiffs alleging "the possibility of increased-risk-of-harm" must allege "(i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 9805, 914 (D.C. Cir. 2015) (emphases in original).  While Defendants attack the declaration that Mr. Dickson submitted in support of Plaintiffs' motion to stay, ECF No. 34-1 at 18-19 (citing ECF No. 8-4),

14

the relevant inquiry also includes allegations in the Complaint.  The Complaint alleges that the debris dumped by Defendants was "apparently untested for pollutants or contaminants, and all within a light breeze's reach of the park's golfers;" ECF No. 1 ¶ 12; that the dumping created "harmful impacts," *id.* ¶ 15; that "[t]here is no indication that this debris, much of which dates to periods with common usage of asbestos, lead paint, and other hazards in construction, was tested for hazards or cleaned, and the speed with which it was moved from the East Wing to East Potomac *probably* precluded any testing or cleaning," *id.* at 71 (emphasis added); that "[e]xperts have raised alarms that the East Wing might have contained asbestos and lead paint," *id.* ¶ 81; that the materials used in the East Wing's construction "are *presumed* to contain asbestos," *id.* (emphasis added); that incorporating the dirt pile into the rest of East Potomac "*will* introduce foreign organic and inorganic materials into the land," including "heavy metals and other toxins" (i.e., that such contaminants are present in the dirt pile) which will "pos[e] risks to human health" (emphasis added), *id.* ¶ 87; and "has a reasonably foreseeable significant effect on the quality of the human environment."  *Id.* ¶ 131.

Record evidence has since proven that Plaintiffs' fears were reasonable.  *Supra* at 5 (results of Defendants' testing).  In other words, the Complaint alleges that Mr. Dickson, Mr. Roberts, and DCPL members frequently play at a golf course within dangerous proximity of debris from a building contaminated with materials that are dangerous to human health; that the debris went untested for contaminants for more than a week;[3] and that the debris includes "foreign organic and inorganic materials," including "heavy metals and other toxins" that "pos[e]

---

[3] Defendants' test results (which, of course, were released only after the Court ordered it) indicate that testing at East Potomac did not begin until October 28, 2025.  *See* ECF No. 38-1 ¶ 9 (follow link to PEPC website; select "Soil Testing Data – Jacobs Engineering;" click on fifth link for file named *NPS_EWE ALEII (4AL-ECO) Validated_01162026*.xlsx)).

risks to human health." *Id.* ¶ 87.  Recreating near a massive pile of contaminated debris plausibly alleges "(i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Food & Water Watch,* 808 F.3d at 914 (emphases in original). *See also Iqbal*, 556 U.S. at 678 (court reviewing for facial plausibility must afford plaintiffs "the reasonable inference that the defendant is liable for the misconduct alleged").

### b. Defendants Caused Plaintiffs' Injuries

Plaintiffs have also adequately alleged a "causal connection between the injury and the conduct complained of," i.e. that the injury is "fairly traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  "Generally, this is a 'but for' test – if some part of the alleged injury would not have occurred, or will not occur, but for the challenged action, then the injury is fairly traceable to the challenged action." *Cherokee Nation v. U.S. Dep't of the Interior*, 643 F. Supp. 3d 90, 106 (D.D.C. 2022).  Here, none of Plaintiffs' alleged injuries would occur without the dirt dumping and the Washington National plan: not their aesthetic and recreational injuries, nor their historic and communal injuries, nor their increased risk of harm from the polluted debris pile.

Defendants' causation argument simply rehashes their imminence argument on injury and is unpersuasive for the same reasons. They do not point to any intervening event or other actor that has contributed to the injuries Plaintiffs allege, as would typically be required to defeat causation. *Robbins v. U.S. Dep't of Hous. & Urb. Dev.*, 72 F. Supp. 3d 1, 6 (D.D.C. 2014), *aff'd sub nom.*, *Robbins v. Castro*, No. 14-5298, 2015 WL 3372527 (D.C. Cir. May 6, 2015) ("Causation, or traceability, examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, [caused] the particularized injury of the plaintiff;

16

[thus] causation focus[es] on whether a particular party is appropriate.") (quoting *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 663-64 (D.C. Cir. 1996)).

Despite Defendants' protestations that a "litany of events" still lie between the present moment and Plaintiffs' injuries, the Complaint alleges otherwise: that Defendants have adopted and are implementing the Washington National plan (and dumped the debris pile). In other words, it is the but for cause of Plaintiffs' injuries. That Defendants think not enough things have happened is immaterial.

### c. Injunctive Relief Would Redress Plaintiffs' Injuries

"The second and third standing requirements – causation and redressability – are often 'flip sides of the same coin.'" *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 380 (2024) (quoting *Sprint Communications Co. v. APCC Service, Inc.*, 554 U.S. 269, 288 (2008). A favorable decision would redress Plaintiffs' injuries, because setting aside the decision to adopt and implement the Washington National plan (including by any use of the dirt pile) would likewise stop Plaintiffs' injuries from the overhaul of East Potomac, and clearing the debris pile (or, at the very least, preventing further dumping) would end the various injuries it currently causes Plaintiffs. Put differently: since Defendants are causing Plaintiffs' injuries (causation), enjoining them would stop Plaintiffs' injuries (redressability).

Defendants respond by arguing that "the Course will require maintenance and fill material regardless of whether the Court grants relief." ECF No. 34-1 at 26. That is irrelevant. All golf courses require regular maintenance, but NPS's own management practices at East Potomac have always required that its maintenance be consistent with its original design and intent. *See* ECF No. 1 ¶¶ 58-60. The point is that the challenged actions, crediting Plaintiffs' claims on the merits, are not routine maintenance. Plaintiffs do not seek to freeze the course in

amber, but instead seek to ensure that the substantial actions alleged are appropriately considered and required processes are followed.   Even assuming East Potomac's maintenance requires fill, that fact says nothing about *this fill* – i.e., contaminated debris from a construction site dumped by the ton in a pile, without meaningful reviews under NEPA or NHPA.

> **2.   DCPL Has Associational Standing to Assert Its Members' Injuries, Because Protecting East Potomac Golf Course is Germane to DCPL's Purpose and the Participation of Those Members is Not Necessary**

DCPL adequately alleges associational standing because (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  DCPL meets all those requirements, both for the Washington National plan as a whole and for the dirt pile.  ECF No. 1 ¶ 18. Defendants do not meaningfully dispute DCPL's associational standing beyond rehashing their arguments that DCPL's individual members lack cognizable injuries and suggesting that DCPL has failed to identify individual members who have been injured.  But the Complaint plainly alleges that "at least one" DCPL member "lives around, works around, and recreates in and around East Potomac Park," that "at least one member . . . regularly uses, views, and enjoys East Potomac Park . . . [and] plans to continue using, viewing, and enjoying East Potomac Park." *Id.* Defendants do not suggest – nor could they – that Plaintiffs need to identify these members by name at this stage, nor that they need to submit a declaration from these members to prove allegations the Court must treat as true for purposes of a motion to dismiss.  *See Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 31 (D.D.C. 2012) (Jackson, J.) ("At the pleading stage, the Court presumes that general allegations encompass the specific facts

necessary to support the claim, so the plaintiff need not identify an affected member by name.")
(citing *Bennett v. Spear*, 520 U.S. 154, 167-68 (1997)), *aff'd*, 746 F.3d 468 (D.C. Cir. 2014).

Furthermore, DCPL members' interest in the enjoyment of East Potomac Golf Course's historic

nature is obviously specific to its existing, historic design.  Destruction of that design would

injure that interest.  *See* ECF No. 1 ¶ 18 (at least one DCPL member "regularly uses, views, and

enjoys East Potomac Park and East Potomac Golf Course for their recreational values, their

historic values, their communal values, and their aesthetic values").

### 3. DCPL Also Has Standing in its Own Right Because Defendants' Actions Harm the Organization Itself

An organization can demonstrate standing in its own right if it satisfies the same three

requirements as individuals.  *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,

797 F.3d 1087, 1094 (D.C. Cir. 2015) (organizational standing where group deprived of "key

information that it relies on to educate the public").  Here, DCPL alleges both procedural and

informational injuries. Specifically, DCPL alleges that is "ha[s] longstanding interests in the

preservation of East Potomac Park, including East Potomac Golf Course."  ECF No. 1 ¶ 18.  If

Defendants had performed their obligations under NEPA and NHPA, DCPL would have

participated in those processes both as to the Washington National plan and as to the dirt pile.  *Id.*

Defendants' failure deprived DCPL of both procedural rights *and* information – without which,

DCPL's ability to protect interests in East Potomac Park are impaired.  *Id.*  Plaintiffs' motion for

a stay goes even further, by explaining that destroying East Potomac would require DCPL to

change its website and app (which provide self-guided tours about D.C.'s historic sites, including

East Potomac), and also would require DCPL to cancel a public event at East Potomac Golf

Course in September (at which DCPL likely would have gained new members and received

donations).  ECF No. 8-1 at 20; ECF No. 8-5 ¶¶ 11-13.  *See also generally* ECF No. 1 ¶ 18.  This

19

too would injure DCPL by impeding the group's activities, with a consequent drain on its resources. *PETA*, 797 F.3d at 1100.

Defendants do not address the *Complaint's* allegation that DCPL's cognizable interest in preserving East Potomac Golf Course is impaired. Defendants take no issue with the procedural injuries that DCPL alleges; nor do Defendants dispute that they have deprived DCPL of information required to be published by statute and accordingly impaired its work. This alone is enough to establish standing. *Id.* at 1094.

Instead, Defendants address only injuries discussed in Plaintiffs' *motion to stay*, arguing that changing DCPL's app and website would be a voluntary choice that cannot be blamed on Defendants, "nor has [DCPL] shown that such a contingent possibility is imminent." ECF No. 26 at 18. Even if the Court needed to reach these arguments (which it need not, given the other bases for standing discussed above), neither of those arguments holds water. First, destroying East Potomac would injure DCPL because it would "inhibit" the group's "daily operations." *Freedom Watch, Inc. v. McAleenan*, 442 F. Supp. 3d 180, 188 (D.D.C. 2020). Using publicly available information to protect and promote historically significant spaces is central to DCPL's work, *see Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (deprivation of information is a concrete injury), and maintaining the self-guided tours on the website and app are part of DCPL's daily operations.[4] Changing those resources would cost DCPL time that it

---

[4] Defendants do not contend that these two things are not concrete injuries – only that they are speculative, self-inflicted, and would not interfere with DCPL's core business activities. ECF No. 34-1 at 10-11. Furthermore, if DCPLC is faced with the necessity of removing East Potomac from its public-facing resources, that result would not occur but for Defendants' decision to implement the Washington National plan. *See Cherokee Nation v. U.S. Dep't of the Interior*, 643 F. Supp. 3d 90, 106 (D.D.C. 2022) (identifying causal connection "is a 'but for' test – if some part of the alleged injury would not have occurred, or will not occur, but for the challenged action, then the injury is fairly traceable to the challenged action").

could be spending on other work.  And of course, de-listing East Potomac would be a *permanent* loss to the self-guided tours.[5]  As for the September event, Defendants say that DCPL "never explains why future improvement plans would prevent it from hosting its event."[6]  ECF No. 26 at 18.  But Plaintiffs do not allege an "improvement plan" – they allege the course's destruction. Absent Defendants' self-serving recharacterization, the answer is self-evident: a historical preservation society cannot hold a public educational event about East Potomac Golf Course in front of its ruins (especially when it has been deprived information about the same that it otherwise would have acquired).  It would be the golf equivalent of giving baseball history buffs a tour of the parking lot where Ebbets Field once stood.

As to standing's second and third requirements, DCPL meets them for the same reason its members would: Defendants are the ones creating DCPL's injury, and a judgment in Plaintiffs' favor would prevent that injury.  *Supra* at 17.

### B. The Complaint Alleges a Decision to Convert East Potomac Golf Course from a Recreational-Style Golf Course to a Championship-Style Golf Course Constituting Final Agency Action, and Plaintiffs' Challenge to that Decision is Ripe.

The Complaint alleges that Defendants adopted and are implementing a plan to destroy a historic, 36-hole recreational golf facility and to replace it with an 18-hole, ahistoric championship venue for professional tournaments.  The indicia of finality, as alleged in the Complaint, spells the failure of Defendants' argument that Plaintiffs' claims against the

---

[5] Defendants argue that implementing the Washington National plan might not render East Potomac Park ineligible for the National Register of Historic Places.  ECF No. at 18 (describing changes to website and app as "hypothetical and voluntary decisions" and only "a contingent possibility").  But it certainly is *plausible* that transforming the park so significantly would affect its place in the Register.  *See Iqbal*, 556 U.S. at 678.  As to the golf course itself (not the Park as a whole), obviously a historic preservation group would not keep East Potomac Golf Course on those resources *when it no longer exists*.

[6] Describing a golf course's destruction as an "improvement plan" is an interesting perspective.

Washington National plan are untimely. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) ("In determining whether a complaint fails to state a claim [under Rule 12(b)(6)], we may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice."). *See also Nycal Offshore Development Corp. v. Haaland*, No. 19-966 (RBW), 2021 WL 6049915 (D.D.C. Dec. 21, 2021) ("The Secretary's final agency action argument is properly considered under Rule 12(b)(6).") (relying on *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018)); *Friends of Capital Crescent Trail v. Fed. Transit Admin.*, No. 17-1811, 2019 WL 1046889, at *3 n.3 (D.D.C. Mar. 5, 2019) (same for prudential standing) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014)).

Defendants argue (1) that the Complaint identifies no final agency action and (2) that Plaintiffs' claims are not ripe. Both arguments are incorrect.

### 1. Defendants' Decision to Convert East Potomac from a Recreational-Style, 36-Hole Facility to an 18-Hole, Championship-Style Professional Venue is Final Agency Action

In an APA challenge for a NEPA violation, "the 'final agency action' required by the APA must also be a 'major federal action' under NEPA." *Karst Env. Educ. and Prot., Inc. v. EPA* 475 F.3d 1291, 1295 (D.C. Cir. 2007). The D.C. Circuit has recognized that the threshold analysis of an APA claim's availability "tends to merge . . . with the merits of a plaintiff's NEPA claim." *Foundation on Economic Trends v. Lyng*, 943 F.2d 79, 85 (D.C. Cir. 1991). And because "the 'final agency action' in an NHPA claim must be a 'federal undertaking,'" *Karst*, 475 F.3d at 1296, "[s]imilar federal involvement is required . . . under the NHPA" as well for an APA claim to ripen. *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 197 n.7 (D.C. Cir. 2003). For purposes of the APA, "[a]gency actions are final if two independent conditions are met: (1)

22

the action 'mark[s] the consummation of the agency's decisionmaking process' and is not 'of a merely tentative or interlocutory nature,' and (2) it is an action 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

The Complaint alleges precisely such an action with regard to the adoption and implementation of the Washington National plan: namely, the decision to abandon Defendants' century-old commitment to East Potomac Golf Course's 36-hole, recreational arrangement in favor of an 18-hole, championship-style professional venue.  ECF No. 1 ¶ 67.[7]  That certain details remain unresolved does not change that Plaintiffs alleged (and subsequent developments have demonstrated) that Defendants have made a final decision to overhaul East Potomac and have taken steps to do so.  Notably, Defendants do not contest that if this decision had been made as Plaintiffs allege in their complaint, it would constitute final agency action.

The Complaint clearly (and repeatedly) alleges facts sufficient for the Court to conclude that the decision meets the requisite elements of finality.  First, Plaintiffs have alleged facts satisfying the first *Bennett* prong that the decision constituted the consummation of Defendants' decisionmaking.  *Id.* ("Defendants thereafter decided to abandon the longstanding status quo at East Potomac Park in favor of the Washington National plan."); *id.* ¶ 68 (dumping debris was "[i]n furtherance of the Washington National plan"); *id.* ¶ 82 (terminating NLT's lease "further implement[ed] the Washington National plan"); *id.* ¶ 83 (Trump confirming "plan" to "renovate the golf course").  And the Complaint also alleges facts that satisfy the second *Bennett* prong that legal consequences have flowed from that decision: the termination of NLT's lease, *id.* ¶ 82; and

---

[7] Defendants conceded that "[t]he dumping of the dirt" constituted final agency action at the March 11 status conference, Tr. 42:22-24, and do not dispute it in their Motion to Dismiss.

engaging Fazio to design the Washington National course. *Id.* ¶ 78 (Fazio visited East Potomac "for the purpose of preparing to design the Washington National course and replace East Potomac's current layout"). *See also id.* ¶ 77 (Fazio confirming that debris to be "use[d]" in redesign plan).

Defendants argue that the dirt dumping, the termination of NLT's lease, President Trump's confirmation of the plan's finality, and Fazio's engagement are "disparate alleged statements and activities." ECF No. 34-1 at 28. At most, Defendants say, they have "simply 'prepare[d] proposals, . . . me[t] with . . . interested groups, and engage[d] in a wide variety of activities that comprise the common business of managing government programs." ECF No. 34-1 at 29. Taken in the light most favorable to Plaintiffs, though (as required at this stage), the Complaint's allegations make plausible that the pieces of the plan's implementation are not disconnected, and that they reveal the final decision that Plaintiffs allege Defendants to have made. And, of course, "[a]gency action . . . need not be in writing to be final and judicially reviewable," *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015), and may be inferred from a consistent pattern of government conduct, even when the government denies that the action exists. *Id.* at 176. *See also Venetian Casino Resort L.L.C. v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) ("adopting [a] policy" is final agency action, not subsequent memorialization, though subsequent memorialization is "relevant" to understand the policy).

Defendants' reliance on *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13 (D.C. Cir. 2006), is misplaced. In *Fund for Animals*, the D.C. Circuit concluded that a budget request made by the Bureau of Land Management was not an agency action subject to APA review because it merely outlined "the goals and methods of an administrative program." *Id.* at 20. In sharp contrast, Plaintiffs allege that Defendants have made a concrete decision regarding

24

the destruction of a historically protected property, and that they have in fact taken actions which are part of implementing that decision. That is not a statement of goals and methods; that is a final decision with appreciable legal consequences.

Defendants also point out that the President is not an agency – and, therefore, that his actions are unreviewable under the APA. ECF No. 34-1 at 30 (citing *Dalton v. Specter*, 511 U.S. 462, 470 (1994). That is irrelevant. The Complaint alleges that the President endorsed the Washington National plan and confirmed its existence, but that Defendants are responsible for the plan's creation and implementation. ECF No. 1 ¶ 67 ("Interior leadership reportedly proposed"); *id.* ("Defendants thereafter decided to abandon the longstanding status quo at East Potomac Park in favor of the Washington National plan."). That Plaintiffs cannot (and do not) challenge Presidential action under the APA does not mean that Presidential statements cannot shed light on what Departments subject to his supervision have determined to do.

Next, Defendants say that there has been no "consummation of the agency's decisionmaking process for final agency action" and that the decisionmaking process is merely "in action." ECF No. 34-1 at 30. They argue that many things must happen before the Washington National plan's approval is final agency action, such as NEPA and NHPA review and deciding on a "course-specific design." This misses the point. The whole point of Plaintiffs' NEPA and NHPA claims is that Defendants have not reviewed the Washington National plan as required by those statutes. That failure is not a shield, but a liability. At any rate, the fact that an agency might revisit a decision or change its mind does not mean that a final agency action is not final. "In assessing whether a particular agency action qualifies as final for purposes of judicial review, [courts] look[ ] to the way in which the agency subsequently treats the challenged action." *Sw. Airlines Co. v. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016). An agency

25

action is final when it "is not itself subject to further consideration by the agency." *NRDC v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020).  The Complaint clearly alleges that Defendants are treating adoption of the Washington National plan as "not itself subject to further consideration," *id.*, even if certain design specifics still must be made."  *See, e.g.*, ECF No. 1 ¶ 67 ("Defendants thereafter decided to abandon the longstanding status quo at East Potomac Park in favor of the Washington National plan."); *id.* ¶ 77 (Defendants acting "in furtherance of their decision to adopt and implement the Washington National plan").

Finally, Defendants argue that Plaintiffs "cannot identify how a decision by Defendants to develop a proposal for renovating East Potomac Park in any way creates binding legal obligations."  ECF No. 34-1 at 32.  Again, the Complaint does not allege that Defendants are *developing* a proposal.  It alleges that the Washington National plan *has been adopted* and is being implemented.  ECF No. 1 ¶¶ 77, 82 (actions "implement[ing]" decision to convert East Potomac).  And that decision carries with it legal consequences, including the termination of NLT's lease, the retention of Tom Fazio, NEPA and NHPA obligations, obligations on government actors to effectuate the plan, and alterations to Plaintiffs' rights as users and enjoyers of East Potomac.  Notably, Defendants don't contest that many of these are the kind of legal consequences that meet the second *Bennett* factor, instead returning again and again to their unpersuasive claim that there is no plan.

### 2. Plaintiffs' Claims Challenging Defendants' Decision to Adopt the Washington National Plan, and Their Ongoing Implementation of It, is Ripe

Defendants argue that Plaintiffs' claims against the Washington National plan "are constitutionally unripe for the same reasons that Plaintiffs lack standing to bring those claims – they have shown no actual or imminent injury caused by the Department of the Interior's

26

preliminary deliberations that is redressable by this Court." ECF No. 34-1 at 33. *See also id.* at 44 n.21 (arguing that Organic Act claim against Washington National plan is unripe). For reasons already discussed, Plaintiffs do allege injury, and they have standing. *Supra* at 8-21. Accordingly, Plaintiffs' claims concerning the Washington National plan are constitutionally ripe.

Defendants also challenge prudential ripeness. ECF No. 34-1 at 33. "The prudential ripeness doctrine directs federal courts to consider 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Nat'l Pub. Radio, Inc. v. Trump*, ___ F. Supp. 3d ___, No. 25-1674, 2026 WL 877434, at *17 (D.D.C. Mar. 31, 2026) (Moss, J.) (quoting *Abbott Laby's v. Gardner*, 387 U.S. 136, 149 (1967). Defendants omit the Supreme Court's doubts about the doctrine's vitality. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) ("To the extent respondents would have us deem petitioners' claims nonjusticiable 'on grounds that are "prudential," rather than constitutional,' '[t]hat request is in some tension with our recent reaffirmation of the principle that "a federal court's obligation to hear and decide" cases within its jurisdiction "is virtually unflagging."'"). At any rate, a case survives scrutiny for prudential ripeness when its issues "will not be clarified by further factual development." *Thomas v. Un. Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985). "[T]he fitness of an issue 'depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.'" *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012). In other words, prudential ripeness militates against "reviewing 'tentative' agency positions." *Id.* (quoting *Pub. Citizen Health Rsch. Grp. v. Comm'r, FDA*, 740 F.2d 21, 31 (D.C. Cir. 1984)). In contrast,

27

"definitive" agency decisions do not raise prudential ripeness concerns.  *Pub. Citizen Health Rsch.*, 740 F.2d at 31.

In this case, the Complaint alleges that Defendants' decision to transform East Potomac from a 36-hole, recreational-style facility to an 18-hole, championship-style professional venue is definitive, not tentative.  *See, e.g.*, ECF No. 1 ¶ 77 (Defendants acting "in furtherance of their decision to adopt and implement the Washington National plan").  Furthermore, withholding a decision would inflict great hardship to Plaintiffs: the Complaint alleges that Defendants are implementing a plan, and doing so in a manner that will permanently injure several legal interests.  There is no reason to wait.

Defendants seek refuge in *Mashack v. Jewell*, 149 F. Supp. 3d 11 (D.D.C. 2016), but the contrasts between that case and this case's facts rebut Defendants' assertions.  In *Mashack*, boaters sued to prevent the temporary closure of a marina owned by NPS.  *Id.* at 15.  Defendants' implementation of the Washington National plan, though, will be permanent, not temporary.  The *Mashack* Court credited NPS's representation that it would be required to perform NEPA and Section 106 analyses before implementing their plan, but the agency made that promise "*before* disturbing the physical environment at the marina." *Id.* at 16 (emphasis added).  Here, though, Defendants' implementation of the Washington National plan has already begun *and* has physically disturbed the golf course.  (Notably, even with weaker facts than Plaintiffs' Complaint alleges, the *Mashack* Court rejected the government's request to dismiss for lack of prudential standing. *Id.* at 22.)

As to the Washington National plan, Defendants briefly argue that Plaintiffs have not alleged facts that trigger NEPA or NHPA, although they do not contest that those obligations would apply to the Plan absent their ripeness argument and other threshold defenses.  In any

28

event, their ripeness argument as to these legal obligations is wrong for the same reasons their other threshold arguments are wrong: as alleged in the Complaint, Defendants have made a final decision to adopt and have begun implementing the Washington National plan.  NEPA requires federal agencies to include in all proposals for "major Federal actions significantly affecting the quality of the human environment, a detailed [environmental impact] statement by the responsible official."  *Earthworks v. Dep't of the Interior*, 105 F.4th 449, 458 (D.C. Cir. 2024) (quoting 42 U.S.C. § 4332(2)(C)).  *See also Comm. for Auto Resp. v. Solomon*, 603 F.2d 992, 1002-03 (D.C. Cir. 1979) (NEPA review "normally is triggered when there is a proposal to change the status quo").  An agency may forgo NEPA analysis if its proposed action is subject to a "categorical exclusion," 42 U.S.C. § 4336(a)(2) – that is, if it is the sort of action "that a Federal agency has determined normally does not significantly affect the quality of the human environment."  *Id.* § 4336e(1).  However, even if an action otherwise would qualify for a categorical exclusion, it still must undergo a NEPA review in "extraordinary circumstances."  43 C.F.R. § 46.215.  The Complaint clearly alleges the Washington National plan is a major Federal action affecting the quality of the human environment, and that both it and the debris dumping present extraordinary circumstances that make them ineligible for a categorical exclusion.

Plaintiffs' NHPA claim regarding the Washington National plan is also ripe. That Section requires that federal agencies "take into account the effect . . . on any historic property" prior to "any undertaking."  54 U.S.C. § 306108.  An "undertaking" is a "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . those carried out by or on behalf of the Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license, or approval."  54 U.S.C. § 300320(1)-(3).  A "historic property" is "any prehistoric or historic district, site, building,

29

structure, or object included on, or eligible for inclusion on, the National Register, including artifacts, records, and material remains relating to the district, site, building, structure, or object." 54 U.S.C. § 300308.  Both the debris dumping and the Washington National plan triggered this obligation.  East Potomac Park is a National Register site, and East Potomac Golf Course is a site thereon.  *Id.*  Furthermore, the Complaint alleges that both the dumping and the Washington National plan are projects carried out on behalf of Defendant agencies.  54 U.S.C. § 300320. Defendants say that the Complaint does not allege an approved expenditure or licensure that would trigger NHPA.  But the Complaint alleges that Defendants dumped the East Wing debris in service to the Washington National plan's implementation, and was necessarily supported at least in part with federal financial assistance.  Were it not so, Defendants would not have performed (ostensibly) a NHPA review of the debris dumping.  (At the very least, it may reasonably be inferred from the Complaint that Defendants' NHPA review of the debris dumping was triggered by an expenditure of federal funds.)

### C. The Complaint Plausibly Alleges that the Debris Dumping Violated NEPA, NHPA, and the NPS Organic Act

Compliance with NEPA and NHPA are not box-checking exercises.  Each requires agencies to stop and take a genuinely "hard look" at the reasonably foreseeable consequences of a plan.  *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 75 (2011).  Agencies can begin those processes with a preferred outcome, but it cannot be a predetermined one. *Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 205-06 (D.D.C. 2015).[8]

---

[8] Defendants' arguments that Plaintiffs have failed to state a claim under NEPA, Section 106, or the NPS Organic Act with reference to the Washington National plan are limited to their arguments concerning ripeness, final agency action, and whether NEPA and Section 106 have been triggered.

### 1.  NEPA

The Complaint alleges that Defendants improperly relied on a Categorical Exclusion for dumping 30,000 cubic yards of debris and other contaminated material at East Potomac Golf Course.  ECF No. 1 ¶¶ 128-35.  That Categorical Exclusion applies to landscaping and landscape maintenance in previously disturbed or developed areas.  ECF No. 1-7 at 1.  Defendants reasoned that the dumping was "analogous to ongoing landscaping and landform maintenance performed routinely by the golf course operator." *Id.*  That is wrong.  Dumping 30,000 cubic yards of contaminated dirt and debris into a giant pile on the middle of a golf course is not landscaping. *See Valambhia*, 964 F.3d at 1137 (all reasonable inferences drawn in plaintiffs' favors).  And at any rate, agencies may not rely on categorical exclusions except for actions that "normally do[ ] not significantly affect the quality of the human environment."  42 U.S.C. § 4336e(1).

Defendants also acted unreasonably and erroneously by deeming East Potomac Golf Course to be a "disturbed or developed area."  ECF No. 8-15 at 2 (Categorical Exclusion Form). Defendants attempted to justify the decision on the ground that this categorical exclusion was available because "East Potomac Park was constructed entirely of fill material and has undergone repeated renovations."  ECF No. 34-1 at 38-39.  But the allegations in the Complaint make it plausible that that reasoning is inapplicable, making the invocation of this categorical exclusion incorrect.  First, East Potomac Park was constructed entirely of dredged river bottom, not debris and dirt from a construction site.  *See* ECF No. 1 ¶ 35.  By Defendants' reasoning, East Potomac Park could be a dumping ground for any amount of refuse (including but not limited to dirt) from anywhere.  Second, East Potomac Golf Course's maintenance has always been consistent with its original design – which did not include giant debris piles.  *See* ECF No. 1 ¶ 59.

31

Defendants resist Plaintiffs' allegations that the dumping fell under extraordinary circumstances that precluded them from invoking a categorical exclusion.  ECF No. 34-1 at 39.  But they base their entire argument on the assumption that the debris and dirt were "clean fill."  *Id.*  The Complaint's allegations (and the fact record) make the alternate conclusion plausible.  *See, e.g.*, ECF No. 1 ¶¶ 12, 71, 72, 81, 87.  Furthermore, when extraordinary circumstances are present, categorical exclusions are unavailable.  43 C.F.R. § 46.215.  This case involves at least three extraordinary circumstances.  Two apply by virtue of East Potomac's legal status: (1) "significant impacts on natural resources and unique geographic characteristics as historic or cultural resources . . .  [or] park, recreation or refuge lands," *id.* § 46.215(b); and (2) actions that "[h]ave significant impacts on properties listed . . . on the National Register of Historic Places."  *Id.* § 46.215(f).  And East Potomac triggers at least a third extraordinary circumstance as well:  Section 46.215(b) also applies to actions significantly impacting "migratory birds."  East Potomac Park is one of D.C.'s most prominent stopovers for migratory birds[9] – likely including the Rufa Red Knot, which is designated as a Threatened Species.[10]  *See also* § 46.215(g) (extraordinary circumstances where action would "[h]ave significant impacts on species listed . . . on the List of Endangered or Threatened Species.").

### 2.  NHPA.

Like NEPA, the NHPA "is a 'stop, look, and listen' provision" requiring agencies "to take into account the effect of their actions" on historic property.  *Ill. Com. Comm'n v. ICC*, 848 F.2d 1246, 1261 (D.C. Cir. 1988).  Under the NHPA, 54 U.S.C. § 300101, *et seq.*, "[t]he head of

---

[9] *See* Birder's Guide to Maryland & DC, *East Potomac Park (Hains Point), West Potomac Park & the Tidal Basin*, https://perma.cc/6H8Q-M99P (last visited May 28, 2026).
[10] U.S. Fish & Wildlife Serv., *Rufa Red Knot (Calidris canutus rufa)*, ECOSphere, https://perma.cc/B55W-SHKC (last visited May 28, 2026).

any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking . . . shall [ ] prior to the approval of the expenditure of any Federal funds on the undertaking . . . take into account the effect of the undertaking on any historic property" and "afford the [Advisory Council on Historic Preservation] a reasonable opportunity to comment with regard to the undertaking." *Id.* § 306108.

The Commission's regulations require agencies to assess whether an action "may" have an "adverse effect" on historic property, including effects on the property's "location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1). Examples of adverse effects include "[p]hysical destruction of or damage to all or part of the property," *Id.* § 800.5(a)(2)(i); "[a]lteration of a property, including restoration [or] rehabilitation . . . that is not consistent with . . . 36 CFR part 68," *Id.* § 800.5(a)(2)(ii); and "[c]hange of the character of the property's use or of physical features within the property's setting that contribute to its historic significance." *Id.* § 800.5(a)(2)(iv).

When an adverse effect is found, agencies must consult with the State Historic Preservation Officer, the Advisory Council on Historic Preservation, and other consulting parties to resolve the adverse effect. 54 U.S.C. § 306108; 36 C.F.R. § 800.6. *See City of Phoenix, Ariz. v. Huerta*, 869 F.3d 963, 971 (D.C. Cir. 2017) (agencies "must consult with certain stakeholders in the potentially affected areas"). The agency also must consult with the public, whose "views . . . are essential to informed Federal decisionmaking in the section 106 process." 36 C.F.R. § 800.2(d)(1). Accordingly, before undertaking a project, an agency must generally "provide the public with information about an undertaking and its effects on historic properties and seek public comment and input." *Id.* § 800.2(d)(2). "If an agency determines that no historic structures will be adversely affected, it still has to 'notify all consulting parties' . . .

33

and give them any relevant documentation." *City of Phoenix*, 869 F.3d at 971 (citing 36 C.F.R. § 800.5(c)).

Defendants' purported NHPA review concluded that the giant debris pile would be "consistent with routine grounds maintenance," would have "no adverse effect," and would not "[a]lter or remove historic features/elements of a historic setting or environment (inc. terrain)," nor "[a]dd non-historic features/elements (inc. visual, audible, or atmospheric) to a historic setting or cultural landscape." ECF No. 1 ¶ 101. Defendants accuse Plaintiffs of "present[ing] no other factual allegations to show these determinations were improper." ECF No. 34-1 at 41.

It is difficult to square this with any fair reading of the Complaint. The Complaint alleges that East Potomac is a historically significant golf course, due largely to the architect's expert arrangement of landforms and other terrain features. ECF No. 1 ¶¶ 41-43. This is not a subjective judgment: the Park is listed on the National Register of Historic Places. *Id.* ¶ 93. Giant debris piles were not among the landforms that earned East Potomac its place in the National Register. Moreover, dumping 30,000 cubic yards of contaminated construction debris is simply not landscaping or "consistent with routine grounds maintenance." *See* ECF No. 1 ¶ 59 (East Potomac has "retain[ed] integrity" from its original design and purpose). *See also* ECF 1-7 at 1 (debris not to be used in "new construction or a change in land use"); ECF 1-8 at 2 (dumping "may *slightly* alter contours") (emphasis added). The dumping departed from these assurances.

### 3. NPS Organic Act

The National Park Service Organic Act requires NPS to "conserve the scenery, natural and historic objects, and wild life in the [National Park] System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. §

100101(a). The Complaint plausibly alleges that both the dumping of more than 30,000 cubic yards of contaminated debris and the Washington National plan as a whole violate this obligation. Defendants argue otherwise as to the debris.

NPS has "bound its own discretion [in implementing the Organic Act mandates] through the adoption of Management Policies." *Davis v. Latschar*, 202 F.3d 359, 366 (D.C. Cir. 2000). The Management Policies emphasize NPS's distinct (i) conservation, and (ii) non-impairment mandates. *See Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*, No. 20-3706, 2024 WL 1344450, at *15 (D.D.C. Mar. 29, 2024). The first mandate, which is "to conserve park resources and values," is the "fundamental purpose of the national park system." ECF No. 8-17 at 4. The non-impairment mandate requires NPS to prohibit activities that impair park "resources and values." *Id.* at 5.

NPS's Management Policies are specific as to what constitutes impairment. An impact on park resources or values is "more likely to constitute impairment" if the resource or value is "key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park," or is "identified in the park's general management plan or other relevant NPS planning documents as being of significance." ECF No. 8-17 at 5.

The Management Policies set a strict procedural requirement for such determinations:

> Before approving a proposed action that could lead to an impairment of park resources and values, an NPS decision-maker must consider the impacts of the proposed action and *determine, in writing, that the activity will not lead to an impairment of park resources and values.*

*Id.* at 6 (emphasis added).

NPS has further interpreted the Organic Act to prohibit uses which cause "unacceptable impacts," defining these as "impacts that, individually or cumulatively, would:

> [b]e inconsistent with a park's purposes or values, or impede the attainment of a park's desired future conditions for natural and cultural resources as identified

35

through the park's planning process, or create an unsafe or unhealthful environment for visitors or employees, or diminish opportunities for current or future generations to enjoy, learn about, or be inspired by park resources or values, or unreasonably interfere with park programs or activities, or an appropriate use, or the atmosphere of peace and tranquility, or the natural soundscape maintained in wilderness and natural, historic, or commemorative locations within the park.

*Id.*

Defendants argue that the Complaint "fail[s] to identify nonspeculative impacts to park resources or values as a result of the [debris dumping] or [Washington National plan] that could give rise to an impairment claim under the NPS Organic Act." ECF No. 34-1 at 43. That is wrong. East Potomac Golf Course's 36-hole, recreational-style arrangement is "key to the natural or cultural integrity" of East Potomac Park. ECF No. 8-17 at 5. The Park's nomination form for the National Register of Historic Places says as much. ECF No. 8-9 at 4 (East Potomac Park Golf Course is a "contributing site" to Park's nomination for National Register). NPS's June 2019 Cultural Landscape Report recorded the goal of "support[ing] modernization that is consistent with the original design intent for each golf course," ECF No. 1 ¶ 60, and that the three-course arrangement was "[e]ssential" to "design integrity at East Potomac Golf Course." *Id.* ¶ 61. *See also id.* ¶ 62 (three-course layout "a character-defining feature of the golf course"). *See also id.* ¶ 59 (2017 Cultural Landscapes Inventory identified East Potomac Golf Course as falling within National Mall and Memorial Parks assets that "[m]ust be [p]reserved and [m]aintained"). The Complaint certainly alleges that Defendants' plans and actions plausibly are "inconsistent with [East Potomac Park]'s purposes or values," ECF No. 8-17 at 6 (including by destroying the historic Walter Travis design, converting East Potomac's 36-hole recreational-style layout into a single 18-hole, championship-style course, injecting ahistorical landforms and features, and converting it from a parkland focused on people into a venue designed to attract professional tournaments).

36

**D. Plaintiffs' Request for Extra-Record Discovery is Already Before the Court.**

Defendants argue that Plaintiffs are not entitled to extra-record discovery to support their opposition to the motion to dismiss.  ECF No. 34-1 at 44-45.  Plaintiffs filed a motion on that subject on May 14, 2026.  ECF No. 51.  The memorandum supporting that motion provides all Plaintiffs' views on the matter: that the core of this case is a factual dispute, and Defendants' only response to Plaintiffs' claims are to dispute the Complaint's allegations.  This brief therefore will not repeat those arguments at length, except to reiterate that

> should the trial court look beyond the pleadings, it must bear in mind what procedural protections could be required to assure that a full airing of the facts pertinent to a decision on the jurisdictional question may be given to all parties. Indeed, this Court has previously indicated that ruling on a Rule 12(b)(1) motion may be improper before the plaintiff has had a chance to discover the facts necessary to establish jurisdiction. *Collins v. New York Central System*, 327 F.2d 880 (D.C. Cir. 1963).  In many instances it may be necessary to hold evidentiary hearings in resolving particularly complicated factual disputes rather than to rely on affidavits alone.

*Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198 (D.C. Cir. 1992) (citing *Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir. 1981)).

## CONCLUSION

The motion to dismiss should be denied.  If the Court disagrees and grants the motion in whole or in part, Plaintiffs respectfully request that the dismissal be without prejudice, so that Plaintiffs can amend or supplement the Complaint to cure any deficiency.  *See League of Un. Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 88 (D.D.C. 2025) (dismissing without prejudice where no final agency action); *Farmer v. U.S. Env't Prot. Agency*, 805 F. Supp. 3d 253, 261 (D.D.C. 2025) (same).  This would be particularly appropriate because of the fact developments that have occurred since the Complaint's filing.  *See Herbert*, 974 F.2d at 198.

RESPECTFULLY SUBMITTED this Twenty-Eighth day of May 2026.

Abbe David Lowell (Bar No. 358651)
Caleb Hayes-Deats (Bar No. 1643213)
Jack Bolen*
Angela Reilly*
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
adlowell@lowellandassociates.com
chayes-deats@lowellandassociates.com
jbolen@lowellandassociates.com
areilly@lowellandassociates.com


Norman L. Eisen (Bar No. 435051)
Lindsay Zimliki (Bar No. 475890)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 601-8678
norman@democracydefenders.org
lindsay@democracydefenders.org
*Application for admission pending, or
admitted *pro hac vice*

*/s/ Will Bardwell*
Will Bardwell (Bar No. 90006120)
Mark B. Samburg (Bar No. 1018533)
Catherine M.A. Carroll (Bar No. 497890)
Robin F. Thurston (Bar No. 7268942)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
wbardwell@democracyforward.org
msamburg@democracyforward.org
ccarroll@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*