**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DC PRESERVATION LEAGUE, *et al.*,

        Plaintiffs,

v.

UNITED STATES DEPARTMENT OF THE
INTERIOR, *et al.*,

        Defendants.

Civil Action No. 1:26-cv-477-ACR

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

ARGUMENT ................................................................................................................................... 2

    I.       Plaintiffs Cannot Overcome Rule 12(b) with Their Own Conclusory
           Statements .......................................................................................................... 2

    II.      Plaintiffs Have Not Established Standing .......................................................... 4

         A.     Plaintiffs' Alleged Aesthetic Harms Do Not Support a Constitutional
               Injury .................................................................................................... 5

         B.     Plaintiffs' Allegations Do Not Support an Increased-Risk-of-Harm
               Theory of Injury ................................................................................... 9

         C.     Plaintiffs Do Not Establish Associational or Organizational Standing
               on Behalf of the D.C. Preservation League .............................................. 10

    III.    Plaintiffs Have Not Identified a Final Agency Action to Support Their
           Unripe Proposal Claims ...................................................................................... 12

         A.     The Challenged Decision to Pursue a Potential Redesign of East
               Potomac Golf Course is Not Agency Action ............................................ 13

         B.     The Challenged Decision to Pursue a Potential Redesign of East
               Potomac Golf Course is Not Final ........................................................... 14

          C.     Plaintiffs' Claims Challenging Defendants' Decision to Pursue a
               Potential Redesign of East Potomac Golf Course are Unripe.................. 19

    IV.    Plaintiffs' Fail to Plausibly Show Defendants' Decision to Stockpile Fill
           Material Violated NEPA, the NHPA, or the NPS's Organic Act .......................... 22

    V.      Plaintiffs are Not Entitled to Discovery .............................................................. 24

CONCLUSION .............................................................................................................................. 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967) ................................................................................................ 20

*Air Excursions LLC v. Yellen*,
  66 F.4th 272 (D.C. Cir. 2023) ............................................................................. 2, 4, 5

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................................... 2, 3, 4, 5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................... 2

*Bennett v. Spear*,
  520 U.S. 154 (1997) ..................................................................................... 14, 17, 19

*City of Philadelphia v. Sec'y U.S. Dep't of Interior*,
  Case No. 26-1348, 2026 WL 1755493 (3d Cir. June 18, 2026) ............................... 18

*Community Fin. Servs. Assoc. of Am., Ltd. v. Fed. Deposit Ins. Corp.*,
  132 F. Supp. 3d 98 (D.D.C. 2015) .......................................................................... 17

*DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*,
  76 F.3d 1212 (D.C. Cir. 1996) ................................................................................. 13

*Envt'l Def. Fund v. Fed. Energy Regul. Comm'n ("EDF")*,
  2 F.4th 953 (D.C. Cir. 2021) ............................................................................. 6, 7, 8

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ................................................................................... 9

*Found. on Econ. Trends v. Lyng*,
  943 F.2d 79 (D.C. Cir. 1991) ................................................................................... 10

*Fund for Animals, Inc. v. U.S. Bureau of Land Management*,
  460 F.3d 13 (D.C. Cir. 2006) ............................................................................. 13, 14

*Gulf Coast Mar. Supply, Inc. v. United States*,
  867 F.3d 123 (D.C. Cir. 2017) ................................................................................... 2

*Herbert v. National Academy of Sciences*,
  974 F.2d 192 (D.C. Cir. 1992) ................................................................................. 24

*Kareem v. Haspel*,
  986 F.3d 859 (D.C. Cir. 2021) ................................................................................... 2

*Mashack v. Jewell*,
  149 F. Supp. 3d 11 (D.D.C. 2016) ..................................................................... 20, 21

*Mayo v. Reynolds*,
  875 F.3d 11 (D.C. Cir. 2017)..................................................................................... 15

*Nat'l Parks Conservation Ass'n v. Jewell*,
  965 F. Supp. 2d 67 (D.D.C. 2013) ........................................................................... 24

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998)......................................................................................... 15, 20

*People for the Ethical Treatment of Animals v. U.S. Department of Agriculture*,
  797 F.3d 1087 (D.C. Cir. 2015) ............................................................................10, 11

*Platte River Whooping Crane Critical Habitat Maintenance Trust v. Fed. Energy Regul. Comm'n*,
  962 F.2d 27 (D.C. Cir. 1992) ..................................................................................... 6

*Pub. Citizen v. Off. of U.S. Trade Representative*,
  970 F.2d 916 (D.C. Cir. 1992) ............................................................................ 14, 15

*RCM Techs., Inc. v. U.S. Dep't of Homeland Sec.*,
  614 F. Supp. 2d 39 (D.D.C. 2009) ...................................................................... 18, 19

*Shrimpers & Fisherman of RGV v. Texas Comm'n on Envt'l Quality*,
  968 F.3d 419 (5th Cir. 2020)..................................................................................... 9

*Sierra Club v. Envt'l Prot. Agency*,
  955 F.3d 56 (D.C. Cir. 2020) ............................................................................ 17, 18

*Sierra Club v. Federal Energy Regulatory Commission*,
  827 F.3d 59 (D.C. Cir. 2016) ..................................................................................... 8

*Soundboard Ass'n v. Fed. Trade Comm'n*,
  888 F.3d 1261 (D.C. Cir. 2018) ............................................................................... 15

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)................................................................................................. 10

*Sw. Airlines Co. v. U.S. Dep't of Transp.*,
  832 F.3d 270 (D.C. Cir. 2016) ................................................................................. 15

*Turlock Irr. Dist. v. Fed. Energy Regul. Comm'n*,
  786 F.3d 18 (D.C. Cir. 2015) ..................................................................................... 6

*WildEarth Guardians v. Provencio*,
  272 F. Supp. 3d 1136 (D. Ariz. 2017) ..................................................................... 23

**Statutes**

5 U.S.C § 551(13) .......................................................................................................... 13

5 U.S.C. § 704.................................................................................................................. 13

**Regulations**

36 C.F.R. § 800.14(b)...................................................................................................... 23

iii

## **INTRODUCTION**

Plaintiffs filed suit to block the development of a plan within the Department of the Interior—not a final agency decision.  We are now approaching a year since the plan's alleged inception.  Unsurprisingly, Plaintiffs cannot show any constitutional injury because the challenged plan continues to be deliberated and has not reached the consummation of the agency decisionmaking process.  As a result, they are left to argue that walking past a temporary (now grass-covered) stockpile of dirt amounts to an Article III injury.  Meanwhile, Defendants continue to deliberate whether and how to renovate or redesign East Potomac Golf Course so that it can be enjoyed by future generations, all while following the administrative and legal steps that must be completed before a final decision to approve any redesign can be made.

With every public-facing reflection of this iterative agency process, Plaintiffs demand that it be halted because they fear they may not like the outcome.  But Plaintiffs do not exercise veto power over what federal agencies can and cannot deliberate.   And nothing in Plaintiffs' Memorandum in Opposition demonstrates otherwise.  Plaintiffs' arguments suffer from several insurmountable problems.  First, Plaintiffs impermissibly blur the line between well-pleaded factual allegations and their own conclusions at the Motion to Dismiss Stage.  Second, Plaintiffs' arguments do not cure their lack of standing.  Third, the heart of Plaintiffs' challenge does not allege a final agency action under the Administrative Procedure Act ("APA") that is ripe for adjudication. And fourth, while their allegations fail to plausibly allege any violation of law, their claims critical of Defendants' decision to temporarily stockpile soil are premised on their tandem claims attacking Defendants' proposal to potentially renovate or redesign East Potomac Golf Course.  Once that leg is knocked away, Plaintiffs' stockpiling claims have nothing to stand on.

1

Accordingly, Plaintiffs' attempted interference with the administrative decisionmaking process must come to an end and their Complaint must be dismissed.

## ARGUMENT

### I.    Plaintiffs Cannot Overcome Rule 12(b) with Their Own Conclusory Statements

As an initial matter, a fundamental flaw permeates throughout Plaintiffs' Memorandum in Opposition: Plaintiffs evade the Rule 12(b) standard, countering Defendants' arguments not with well-pleaded allegations found in their Complaint, but with their own conclusory statements and unfounded assertions that cannot be credited.  Once these conclusions are properly brushed aside, Plaintiffs' remaining factual allegations cannot sustain any of their claims.

At the motion to dismiss stage, courts do not accept a plaintiff's entire narrative of the case as gospel.  Rather, they only accept "*well-pleaded* factual allegations as true and draw all *reasonable* inferences from those allegations in the plaintiff's favor." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (emphasis added) (quoting *Kareem v. Haspel*, 986 F.3d 859, 865 (D.C. Cir. 2021)).  Courts must reject mere conclusory statements and unreasonable and unsupported inferences.  *See id.*  They must also reject a plaintiff's "labels and conclusions" masquerading as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  A complaint that simply "tenders 'naked assertions[s]' devoid of 'further factual enhancement'" *id.* (quoting *Twombly*, 550 U.S. at 557), must be dismissed.

In considering Defendants' Motion to Dismiss, the Court must "hom[e] in on the 'well-pleaded, nonconclusory factual . . . nub of [Plaintiffs' claims],' if any." *Gulf Coast Mar. Supply, Inc. v. United States*, 867 F.3d 123, 133 (D.C. Cir. 2017) (Brown, J. concurring).  Here, those facts outlining a purported decision to redesign East Potomac Golf Course are sparse at best.  Plaintiffs

allege that on or about August 1, 2025, Secretary Burgum attended a meeting with President Trump and the former Solicitor of the Interior to discuss redesigning East Potomac Golf Course, Compl. ¶ 67; Secretary Burgum proposed using fill excavated from the East Wing Modernization Project at the Golf Course, *id.* ¶ 68; President Trump told Secretary Burgum the "*idea* was brilliant," *id.* (emphasis added); and afterward, President Trump told the press that he wanted to make the Golf Course "a beautiful, world-class, U.S. Open-caliber course[,]" *id.* ¶ 83.

At most, the only reasonable—if not obvious—inference that can be drawn from these alleged facts is that around this time, Defendants conceived of an idea to potentially renovate or redesign East Potomac Park Golf Course. Defendants' Declarant, Jessica Bowron, has confirmed this to be the case.[1] *E.g.*, Bowron Supp. Decl. ¶ 4, Dkt. No. 38-2. Similarly, the only reasonable inference that can be drawn from Plaintiffs' allegations concerning the stockpile is that Defendants knew they would be acquiring soil, knew the Golf Course needed soil for all sorts of maintenance and renovations, and let one problem solve another. The Supreme Court has counseled that such reasonable and obvious explanations undercut any plausible finding of illegality. *See Iqbal*, 556 U.S. at 682 ("As between that 'obvious alternative explanation' for the arrests, . . . and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion.") (citation omitted).

With so few well-pleaded facts to rely on, Plaintiffs are forced in their Memorandum in Opposition to fall back on a sleight of hand. Rather than identify well-pleaded facts plausibly demonstrating that Defendants approved of a final design to reconfigure East Potomac Golf Course

_____

[1] Plaintiffs' arguments rest on only unreasonable inferences drawn from these limited facts. *See* Defs.' Mem. in Opp'n 18, Dkt. No. 54. And even if Plaintiffs' unreasonable inferences could be credited, they have identified no irreversible and irretrievable commitment of resources that would trigger the environmental compliance obligations they demand be enforced here.

3

that is causing or will imminently cause them injury, Plaintiffs reach for their own "labels and conclusions." *Iqbal*, 556 U.S. at 678.  They insist that the Court need look no further than their assertions that Defendants have "adopted and are implementing" an unidentified "plan to destroy" East Potomac Golf Course.  Pls.'  Mem. in Opp. 21, Dkt. No. 53.  But the Court cannot take Plaintiffs' oft repeated statements as true because these are not well-pleaded factual allegations at all.  They do not, for example, describe the scope and nature of a particular alleged redesign, when it will occur, or how it will affect the existing environment.  They are, instead, Plaintiffs own "labels and conclusions" that they have inserted in lieu of factual allegations plausibly demonstrating Defendants acted unlawfully.  *See Iqbal*, 556 U.S. at 678.

This defect is pervasive in Plaintiffs' Memorandum in Opposition.  Each time Plaintiffs come up empty with facts to establish standing, demonstrate a ripe final agency action, or show plausible success on the merits, they fall back on this empty rhetoric.[2]  It is an easy tell.  At each stop, the Court should "begin 'by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"  *Air Excursions*, 66 F.4th at 278 (quoting *Iqbal*, 556 U.S. at 679).  Once Plaintiffs' allegations are appropriately viewed through the Rule 12(b) lens, it becomes clear that dismissal is required.

## II.    Plaintiffs Have Not Established Standing

Casting aside Plaintiffs' conclusory gloss, Plaintiffs' *factual* allegations concern two purported agency decisions: the first, a decision to begin exploring ways to renovate and redesign East Potomac Golf Course; and the second, a decision to stockpile fill material at the Golf Course. But Plaintiffs have not shown that either decision has caused them a constitutionally cognizable

---

[2] So much so that they repeat some variation of their "adopted" and "implementing" conclusory labels some several dozen times.

injury redressable by the Court, as is necessary to establish standing.  Plaintiffs toss out various theories of injury and standing, claiming aesthetic, recreational, and historic harms; an increased-risk-of-harm; and associational and organizational standing on behalf of the D.C. Preservation League ("League").  But none of these theories clear the constitutional standing bar on the facts alleged.  *See, e.g.*, *Air Excursions*, 66 F.4th at 278 ("The plausibility standard requires 'more than a sheer possibility' that the plaintiff has standing to sue.") (quoting *Iqbal*, 556 U.S. at 678).

### A.       Plaintiffs' Alleged Aesthetic Harms Do Not Support a Constitutional Injury

Take first, Plaintiffs' claims of aesthetic injury from the decision to pursue a potential renovation or redesign of East Potomac Golf Course.  Plaintiffs allege that they use and enjoy East Potomac Park in various capacities.  Pls.' Mem. in Opp'n 9-10.  Defendants do not dispute these factual allegations.  But Plaintiffs never explain how an *idea* conceived of in August 2025 to perhaps renovate or redesign the Golf Course in any way impairs these interests.  Nor can they because *potential* renovations or redesigns cannot injury anyone.

Instead, Plaintiffs argue that this idea has resulted in a current and final plan to "destroy[]" the Golf Course.  *Id.* at 10.  They claim this supposed "plan" includes "destroying" the golf course, removing trees, "warping its landforms," and adding water features.  *Id.*  But Plaintiffs never put any factual meat on these conclusory bones.  Indeed, Plaintiffs' Complaint never alleges *any* facts to substantiate whether these changes have occurred or will imminently occur.  Are they referring to a partial image from promotional materials released not by Defendants but by the National Garden of American Heroes Foundation, long after (according to Plaintiffs' theory) the alleged August 2025 decision?  Or perhaps the rudimentary conceptual design (that is again post-decisional in Plaintiffs' view) volunteered by Tom Fazio and posted to social media by Secretary

5

Burgum?[3]  Plaintiffs shy away from this factual vacuum and never say because they cannot identify with any specificity any agency action approving a plan to redesign the Golf Course that would impair their interests and cause them injury.  In essence, Plaintiffs fear that Defendants may be *considering* redesign features they may not like.  But Defendants' mere deliberation cannot constitute harm to Plaintiffs that is concrete, particularized, actual, or imminent.  This theory fails both because it is hypothetical and because it relies on an offended-observer theory that is inconsistent with Circuit precedent.  *See, e.g.*, *Turlock Irr. Dist. v. Fed. Energy Regul. Comm'n*, 786 F.3d 18, 24 (D.C. Cir. 2015) (recognizing that an alleged harm that "hypothesizes as to the outcome of future legal proceedings, . . . is . . . 'too speculative to invoke the jurisdiction of an Art[icle] III Court.'") (quoting *Platte River Whooping Crane Critical Habitat Maintenance Trust v. Fed. Energy Regul. Comm'n*, 962 F.2d 27, 35 (D.C.Cir.1992)); *Envt'l Def. Fund v. Fed. Energy Regul. Comm'n* ("*EDF*"), 2 F.4th 953, 969-70 (D.C. Cir. 2021) (rejecting drive-by "eyesore" complaints as Article III injury).

Second, Plaintiffs' claim of injury to their aesthetic, recreational, and historic interests from the soil stockpile fairs no better.[4]  Their claim that the now grass-covered stockpile is "ugly" or interferes periodically with their views when they play the Golf Course are exactly the sort of

---

[3] Even public reporting acknowledges that Secretary Burgum's social media post "does not make clear" the nature of any final design capable of implementation.  Dan Merica, *Trump's plan for golf course threatens pillar of D.C. cycling culture*, Wash. Post (June 6, 2026) (https://www.washingtonpost.com/dc-md-va/2026/06/06/trumps-plans-golf-course-threaten-pillar-dc-cycling-culture/).

[4] To the extent that Plaintiffs now argue they have also suffered distinct injuries to their "recreational" and "historical" interests from the stockpile, these are simply repackaged aesthetic interests by another name.  Regardless of the label, Plaintiffs have not identified a constitutionally cognizable injury to those interests because of the decision to stockpile fill material at East Potomac Park.

"eyesore" complaints the D.C. Circuit has found insufficient to confer standing. *EDF*, 2 F.4th at 969-70.[5]

Plaintiffs' attempts to distinguish *EDF* fall short. Plaintiffs argue they suffered aesthetic injuries because of the temporary presence of debris, loose rubble, dump trucks, and a dirt pile on the Golf Course. Pls.' Mem. in Opp'n 13. And yet, Plaintiffs never allege that they were playing golf when debris, rubble, or dump trucks were present near the stockpile such that their aesthetic interests could have been harmed from those temporary objects. Further, with stockpiling now completed, these incidences to construction of the stockpile are not redressable. *EDF*, 2 F.4th at 969 (explaining that "any alleged injuries . . . suffered during the now-completed construction of the pipeline and metering station cannot support standing for want of redressability"). That leaves only the existing stockpile, but there is "nothing in the existing case law to suggest that a person who incidentally views something unpleasant has suffered an injury-in-fact for purposes of standing." *Id.* at 970.

The critical fact in *EDF* was that the plaintiff merely passed by the subject metering station. She "neither altered her behavior nor explained why she has any particularized connection to the land on which the metering station now sits." *Id.* So too here. Plaintiffs, at most, pass by the soil stockpile when playing a round of golf or recreating at East Potomac Park. But "mere incidental

---

[5] Plaintiffs' claims of aesthetic injury here are harder to square than the aesthetic injuries alleged in *EDF*. Whereas in *EDF* the plaintiff complained of having to view an industrial metering station, Plaintiffs, in effect, complain of having to view a now-green hill amid a sea of green hills, trees, uplifts, and depressions, set beside parking lots, maintenance buildings, and the occasional restroom, all within a Park that has undergone continuous change and development since its inception. *See* Cultural Landscape Report, National Park Service Golf Courses in the District of Columbia, East Potomac Park, Langston, and Rock Creek: Treatment Guidelines 9-37, Nat'l Park Serv. (June 2019) ("CLR") https://npshistory.com/publications/nace/clr-golf-courses-2019.pdf. For many decades East Potomac Park has undergone significant changes without incident, and a temporary soil stockpile should be no different.

viewership of something unappealing" is not an injury in fact. *Id.* The stockpile sits within a void between holes 4, 5, and 9 of the White Course. Plaintiffs do not allege that they can no longer play those holes. Nor do Plaintiffs allege that the stockpile has altered their behavior or their ability to play those holes because it has not. The stockpile is not sitting in the middle of a fairway where they must play over, around, or through it. And Plaintiffs present no allegation that they had a "particularized connection" to the empty space where the stockpile is now located. They only assert that the "ultimate use of the dirt pile" will impede their use of the Golf Course. Pls.' Mem. in Opp'n 13. But the "ultimate use" and placement of dirt from the stockpile have not yet been determined and is not before the Court. Any possible injury from the "ultimate use" of the stockpile is therefore speculative, hypothetical, and not imminent.

Plaintiffs attempt to rely on *Sierra Club v. Federal Energy Regulatory Commission*, 827 F.3d 59 (D.C. Cir. 2016), which the *EDF* Court itself distinguished. In *Sierra Club*, the D.C. Circuit found the plaintiff had alleged a sufficient injury because the proposed natural gas terminal would increase tanker traffic in the locations where he liked to recreate, force him to abide by the Coast Guard's exclusion zone around tankers, and thereby diminish his use and enjoyment of the waterways. *EDF*, 2 F.4th at 970. In other words, in *Sierra Club*, the plaintiff's behavior would be altered and his enjoyment of the area diminished. Similar allegations, however, are absent here.

In a last gasp to try to distinguish *EDF*, Plaintiffs claim the plaintiff's experiences there "were fleeting." Pls.' Mem. in Opp'n 14. But the *EDF* plaintiff alleged that she passed by the metering station at issue "approximately three times per week." 2 F.4th at 968. Plaintiffs do not allege that they play the White Course with any such frequency and only argue that they play "as often as life allows." Pls.' Mem. in Opp'n 9. Like the plaintiff's alleged injuries in *EDF*, Plaintiffs'

8

alleged aesthetic injuries are vague, non-particularized, and "reflect nothing more than generalized grievances, which cannot support standing." *EDF*, 2 F.th at 970.

> **B.      Plaintiffs' Allegations Do Not Support an Increased-Risk-of-Harm Theory of Injury**

Any doubt that Plaintiffs failed to allege standing on an increased-risk-of-harm theory has now been laid to rest.  Plaintiffs continue to put forth no allegations or argument that the stockpile presents a substantially increased risk and substantial probability of harm.  *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015).  They allege no facts showing that anyone has been harmed by the stockpile in the many months since its creation.  They allege no facts showing that anyone has been similarly harmed from the removal of the East Wing.  They allege no facts—expert or otherwise—showing the level of contaminants, means of transmission, proximity, duration of exposure, or frequency of exposure necessary to pose an increased risk, generally.  They allege no facts showing that they in turn use the Golf Course with that requisite level of proximity, duration, or frequency.  And they allege no facts to support their claim that walking past a dirt pile while playing a round of golf puts them at *any* risk of harm.  *Cf. Shrimpers & Fisherman of RGV v. Texas Comm'n on Envt'l Quality*, 968 F.3d 419, 425 (5th Cir. 2020) (rejecting increased-risk-of-harm claims on standing grounds where petitioners offered "no evidence of the extent to which . . . risks [specific to petitioners] would be increased . . . by the expected emissions").  Instead, they simply point to their own speculative and conclusory statements that the stockpile somehow endangers their health or poses an increased risk of harm. Pls.' Mem. in Opp'n 14-16.  These claims remain unsupported by concrete factual allegations. Any claim of injury on this basis is therefore conjectural and insufficiently concrete, particularized, and imminent to establish constitutional standing.

**C.      Plaintiffs Do Not Establish Associational or Organizational Standing on Behalf of the D.C. Preservation League**

Plaintiffs' attempt to assert associational or organizational standing on behalf of the D.C. Preservation League fares no better.

Plaintiffs gesture that the League has one member one who generically "recreates in . . . East Potomac Park" and one who "regularly uses . . . East Potomac Park." Pls.' Mem. in Opp'n 18. But Plaintiffs provide no facts showing how these unnamed and unidentified members use East Potomac Park, or how that use has been harmed either by Defendants deliberating about a redesign of the Park (which theoretically could enhance those uses) or by the temporary stockpiling of fill material. The League's theory of associational standing is even weaker than the individual Plaintiffs' theory.

As for their claim of organizational standing, this too fails. The League points to its allegations claiming it has suffered procedural and informational injuries and argues "[t]his alone is enough to establish standing." Pls.' Mem. in Opp'n 20. This is incorrect. Reliance on alleged procedural or informational injury without an injury to other concrete interests is insufficient to satisfy Article III's injury-in-fact requirement. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."); *Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 84 (D.C. Cir. 1991) (recognizing that the D.C. Circuit has "never sustained an organization's standing in a NEPA case solely on the basis of 'informational injury'"). Even in *People for the Ethical Treatment of Animals v. U.S. Department of Agriculture*, 797 F.3d 1087 (D.C. Cir. 2015), relied on by Plaintiffs, the D.C. Circuit found standing where the challenged action deprived plaintiff of information *and* "precluded PETA

10

from preventing cruelty to and inhumane treatment of . . . animals[.]" *Id.* at 1094. Here, the League has asserted no such core activities that it has been precluded from carrying out.

Moreover, even if Plaintiffs could sustain a theory of standing on these purported injuries in the abstract, Plaintiffs cannot show any right to information or right to be involved in the agency decisionmaking process at the inception of the agency's deliberations.

Left without any procedural or informational injuries, Plaintiffs point to non-imminent, hypothetical harms tethered to their own "labels and conclusions" that Defendants have decided to "destroy" East Potomac Park. But there are no allegations that East Potomac Park *is* being destroyed or that a redesign plan suggesting as much has been drafted, finalized, and approved. Nor is there any argument—eleven months after the purported decision—that the League has changed its website or has canceled a public event at the Golf Course (although it is not even alleged that the League has sought authorization from NPS to conduct an event). And Plaintiffs cannot refute that any decision on the League's part to change its website or not host a fundraiser would be self-inflicted. The League does little more than fall back on its unsupported conditional scenario: *If* East Potomac Park is "destroy[ed]," *then* its members would be injured. But they point to no alleged injury they have suffered now or that is sufficiently imminent to have an injury for standing purposes.

* * *

As for the traceability and redressability prongs of the standing analysis, Defendants largely stand on the arguments in their opening brief. Any injuries Plaintiffs may theoretically suffer in the future—whether changes to their website or to their interests in East Potomac Park—

11

would, at this early stage of the deliberative process in particular, be self-inflicted and not caused by Defendants' purported August 2025 decision.[6]

Plaintiffs' claims of informational and procedural injury also raise an important issue of redressability.  What little factual allegations Plaintiffs do have—and what Defendants have acknowledged—is that deliberations are underway to decide whether and to what extent to renovate East Potomac Park.  In terms of information and process, Defendants have now twice promised that they will comply with all environmental laws and provide the required legal process that Plaintiffs demand before any final decision is made.  *See* Bowron Decl. ¶¶ 16-24, Dkt. No. 26-4; Bowron Supp. Decl. ¶ 13, Dkt. No. 38-2.  And, generally, the cure for defects in process is remand of the decision back to the agency for correction.  But it's clear Plaintiffs do not want process.  They want to be inserted into agency deliberations and for Plaintiffs—not the NPS, not the Department of the Interior, and not the Secretary of the Interior—to be the ones conducting those deliberations and making choices as to whether and how to renovate the Golf Course.  The inability to attain this goal is not a constitutional injury, let alone one the Court can redress.

## III.    Plaintiffs Have Not Identified a Final Agency Action to Support Their Unripe Proposal Claims

If the Court finds Plaintiffs have standing to challenge the alleged August 2025 decision to pursue a potential renovation or redesign of East Potomac Golf Course, that is not the end of Plaintiffs' threshold problems.  Because they have brought their claims under the APA and are not challenging an agency action made reviewable by statute, they must tie their claims to (1) an

---

[6] For purposes of this Rule 12(b) Motion to Dismiss, Defendants do not dispute Plaintiffs' factual allegation that the alleged decision to pursue a renovation of East Potomac Golf Course occurred in August 2025.

agency action, (2) that is final, 5 U.S.C. § 704, and as with any claim, (3) their claim must not be unripe.  Plaintiffs' factual allegations satisfy none of these requirements.

### A. The Challenged Decision to Pursue a Potential Redesign of East Potomac Golf Course is Not Agency Action

Plaintiffs' Memorandum in Opposition does not seriously engage with a basic problem underlying their APA claims: the challenged decision to renovate or redesign East Potomac Park is not a discrete *agency action*, much less *final* agency action.  5 U.S.C § 551(13) (defining "agency action").  Plaintiffs skirt the issue almost entirely and try to bypass *Fund for Animals, Inc. v. U.S. Bureau of Land Management*, 460 F.3d 13 (D.C. Cir. 2006), which is controlling here.

Plaintiffs try to distinguish *Fund for Animals* by characterizing its holding as limited to a budget request that was merely "a statement of goals and methods," while a decision to redesign a golf course is, according to Plaintiffs, "a concrete decision."  Pls.' Mem. in Opp'n 24-25.  Not so.

The budget request in *Fund for Animals* merely "represent[ed]" what was challenged in that case: the agency strategy or "plan" to address wild horse and burro problems.  460 F.3d at 21. And even so, the D.C. Circuit explicitly stated that its holding was not limited to budget requests but was "of a piece with this court's consistent refusal to review agency orders 'that do[] not [themselves] adversely affect complainant but only affect[] his rights adversely on the contingency of future administrative action.'"  *Id.* at 22 (quoting *DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996)).

Whether a plaintiff challenges an agency plan to manage wild horses or an agency plan to redesign a golf course, "the plans themselves are generally unreviewable; it is only specific actions implementing the plans that are subject to judicial scrutiny."  *Id.* at 21.  The D.C. Circuit recognized that all sorts of preliminary agency activity—whether termed a strategy, a plan, a proposal, or an

13

idea—is "what an agency does in anticipation of agency action," *id.* at 19-20, and is not subject to judicial review.

Without any meaningful way to distinguish *Fund for Animals*' holding, Plaintiffs resort to their familiar label that the challenged decision here is distinguishable as one of "destruction," Pls.' Mem. in Opp'n 25.  But "there is 'considerable legal distance'" between preliminary steps to implement a golf course redesign and "the actual removal" (or in this case renovation) of that golf course.  *Fund for Animals*, 460 F.3d at 22.  In other words, while Plaintiffs lean heavily on their allegation that the alleged decision is "being implemented" as if to say that is enough to show agency action (and final agency action), the D.C. Circuit has made clear that it is not.

Peeling back Plaintiffs' self-serving "labels and conclusions" and looking only to their well-pleaded factual allegations—that agency officials conceived of an idea to redesign East Potomac Golf Course—it is clear Plaintiffs' Proposal Claims fail to allege agency action at all. Plaintiffs Proposal Claims are therefore not justiciable under the APA.  *Fund for Animals* is controlling, and Plaintiffs' Proposal Claims must be dismissed.

### B.      The Challenged Decision to Pursue a Potential Redesign of East Potomac Golf Course is Not Final

Even if the Court could divine an agency action to support Plaintiffs' Proposal Claims, Plaintiffs cannot show a *final* agency action necessary to ward off dismissal.  In prior argument and in their Memorandum in Opposition, Plaintiffs misconstrue and otherwise fail to satisfy either finality prong outlined in *Bennett v. Spear*, 520 U.S. 154 (1997).

First, to constitute final agency action, the challenged decision "must mark the 'consummation' of the agency's decisionmaking process."  *Id.* at 177-78 (citation omitted). Almost by definition, a decision that marks only the *start* of a multi-step decisionmaking process cannot also represent its consummation. *See Pub. Citizen v. Off. of U.S. Trade Representative*, 970

14

F.2d 916, 919 (D.C. Cir. 1992) (explaining that "the time for judicial intervention is" not at the genesis of a proposal, but when the agency "report or recommendation on the proposal is made"). In determining where a challenged action falls along this continuum, courts look to "[t]he decisionmaking processes set out in an agency's governing statutes and regulations," *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1268 (D.C. Cir. 2018), and "the way in which the agency subsequently treats the challenged action," *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016).

Here, other than referencing NEPA and the NHPA at large, Plaintiffs point to no statutory or regulatory provisions that would indicate the challenged decision attained any level of finality at the time of filing their Complaint. *See* Pls.' Mem. in Opp'n 25. And for the reasons stated in Defendants' opening brief, the decision simply to pursue the redesign of a golf course is not sufficiently defined to trigger NEPA's nor Section 106's requirements. Defs.' Mot. to Dismiss 35-36, Dkt. No. 34; *see also Pub. Citizen*, 970 F.2d at 920 ("[C]ourts routinely dismiss NEPA claims in cases where agencies are merely contemplating a particular course of action but have not actually taken any final action at the time of suit."); *Mayo v. Reynolds*, 875 F.3d 11, 22 (D.C. Cir. 2017) ("An environmental analysis that occurs too early in the planning process may lack 'meaningful information' necessary for informed consideration.").

In terms of the agency's treatment of the decision, Defendants have been consistent and transparent that further interim steps in the decisionmaking process remain and are legally required to reach any final agency action.[7] *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729

---

[7] The Court can also be comforted by the fact that Ms. Bowron has twice sworn, that these additional steps—including NEPA and Section 106 compliance—must first occur here before the agency can make a final decision on whether and how to renovate East Potomac Golf Course. *See* Bowron Decl. ¶¶ 16-24, Dkt. No. 26-4; Bowron Supp. Decl. ¶ 13, Dkt. No. 38-2. Her most recent declaration makes clear that Defendants are working their way through that

15

(1998) (setting "goals . . . does not itself authorize" final agency action).  This state of affairs is also supported by the fact that it is now nearly eleven months since the alleged decision, and Plaintiffs still do not argue or allege that there has been groundbreaking, construction activity, or any other indication that a final decision has been reached on any redesign.

In response, Plaintiffs argue only that their "Complaint clearly alleges" that Defendants are not treating the initial decision to pursue a potential golf course renovation as subject to further consideration.  Pls.' Mem. in Opp'n 26.  But in support, Plaintiffs cite no facts to substantiate this contention.  Plaintiffs allege no facts showing that when the alleged decision was made, agency Defendants had formulated any sort of plan to redesign East Potomac Park with the requisite specificity necessary for NEPA and Section 106 to attach.  Which holes would be removed?  What features would be added?  Where will the tee boxes go?  How many will there be?  Will they be elevated?  If so, by how much?  What types of grasses would be used?  Will there be cart paths?  Where will they go?  Plaintiffs do not allege that any of these or other questions were answered.  Nor do they allege any concrete actions taken by Defendants since the alleged decision was made that would substantiate Defendants' alleged intransigence; without such allegations, the argument that the initial decision is not subject to further consideration is a mere conclusory assertion.  Plaintiffs allege only that Defendants discussed redesigning East Potomac Golf Course and President Trump thought the idea was brilliant and wanted to make the course beautiful.

Remarkably, Plaintiffs' post-Complaint extra-record submissions undercut their own argument.  Plaintiffs have asked the Court to take notice of two different conceptual images portraying a potential future East Potomac Golf Course.  *Compare* Emergency Mot. for Status

---

decisionmaking process.  *See* Bowron Supp. Decl. ¶¶ 7-8 (describing pathways NPS had been considering and guidance received).

Conference Ex. A, Dkt. No. 47-2 *with* Notice of Factual Development, Dkt. No. 50-1.  One is a set of partial images in a pledge agreement by non-party the National Garden of American Heroes Foundation, while the other is a low-resolution rendering of an image volunteered by a golf course designer and posted to social media by Secretary Burgum.  The pictures display two different conceptual images of a redesigned East Potomac Golf Course.  Plaintiffs argue they do not wish to "nitpick" these designs.  Pls.' Mem. in Opp'n 2.  But what is obvious from these disparate images and their lack of detail is that no final agency action has been taken with respect to any design, and that the agency decisionmaking process, as Ms. Bowron explained, is still ongoing.

Nor do Plaintiffs dispute that the steps in the redesign process identified by Ms. Bowron are required before the agency can reach a decision on any redesign proposal.  Instead, they sidestep the issue by conceding that "certain details remain unresolved."  Pls.' Mem. in Opp'n 23.  At minimum, before any redesign proposal can become final, designs must be developed with sufficient definition and detail to enable environmental and historic preservation review, those reviews must be completed, and a decision must be made to move forward with renovating the Golf Course consistent with any selected design.  None of those interim steps have occurred because this proposal remains in its infancy.  And then, of course, once they do occur, the agency must make a final decision to move forward with the project.

Second, Plaintiffs fail to satisfy the second *Bennett* prong, which dictates that agency actions "cannot be viewed as 'final agency action' under § 704 of the APA unless they . . . either determine 'rights or obligations' or result in 'legal consequences.'"  *Community Fin. Servs. Assoc. of Am., Ltd. v. Fed. Deposit Ins. Corp.*, 132 F. Supp. 3d 98, 119 (D.D.C. 2015) (quoting *Bennett*, 520 U.S. at 178).  This requires "a pragmatic approach . . . focusing on how agency pronouncements actually affect regulated entities."  *Sierra Club v. Envt'l Prot. Agency*, 955 F.3d

17

56, 63 (D.C. Cir. 2020). Where an agency plan permits officials to exercise their discretion, legal rights and obligations have not been determined, "even if officials are 'encouraged' to act a certain way." *RCM Techs., Inc. v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 2d 39, 46 (D.D.C. 2009).

Here, Plaintiffs are not regulated parties and the challenged agency decision "imposes no obligations, prohibitions or restrictions on" Plaintiffs. *Sierra Club*, 955 F.3d at 63. They "do[] not have any statutory, property, or contractual rights that empower" them to select how the Golf Course should be renovated. *City of Philadelphia v. Sec'y U.S. Dep't of Interior*, Case No. 26-1348, 2026 WL 1755493, *13 (3d Cir. June 18, 2026).

In trying to satisfy the second *Bennett* prong, Plaintiffs offer only their own legal conclusions; unidentified and hypothetical "alterations" to their "rights as users"; the fact that NLT's lease has been terminated; and the fact that Tom Fazio purportedly visited East Potomac Golf Course. Pls.' Mem. in Opp'n 26. But the nature of those supposed "alterations" to their "rights as users" is entirely unclear, more so in light of the undisputed fact that nearly a year has elapsed and the Golf Course is still open. NLT, meanwhile, is not a party to this case and its legal rights are not the Plaintiffs' to assert; moreover, it cannot be seriously disputed that the termination of NLT's lease was a direct consequence of NLT's default and the Department's Notice of Termination, not the purported August 2025 decision to pursue a redesign of the Golf Course. *See* Bowron Decl. ¶¶ 10-12, Exs. B-C, Dkt. No. 26-4.[8] As for Mr. Fazio's alleged visit to the Golf Course, Plaintiffs have not alleged that his visit had any effect on their rights; even if this alleged visit had in some way interfered with Plaintiffs' use of the course, however, such "practical consequences" of a decision to pursue a potential redesign of the Golf Course cannot satisfy the

---

[8] The Court may take judicial notice of the Department of Interior's Notice of Default and Notice of Termination as they are incorporated by reference in Plaintiffs' Complaint. *See* Compl. ¶ 82.

18

*Bennett* test.   *See, e.g.*, *RCM Techs., Inc.*, 614 F. Supp. 2d at 46 (recognizing that legal consequences did not flow from the agency's action "even if practical consequences do").

At oral argument on April 9, 2026, Plaintiffs attempted to frame the final agency action inquiry as asking whether the agency decisionmaking "train has begun moving down the tracks," and stated that they "believe it's quite far down the tracks." Tr. 10:10-11. Plaintiffs' analogy was legally incorrect. Rather, after an agency first conceives of a plan, the decisionmaking "train" may leave the station and make numerous stops along the way (design approvals, environmental review, and so on). But under *Bennett*, only when the train reaches its final destination and comes to a complete stop is there final agency action. *See Bennett*, 520 U.S. at 177-78 (requiring that the challenged decision "must mark the '*consummation*' of the agency's decisionmaking process" (emphasis added).

Following Plaintiffs' logic leads only to an absurd conclusion. If embarking on a decisionmaking process were sufficient to sustain a legal challenge, then every decisionmaking process could be embroiled in litigation before a final decision has been made, bringing government to a standstill. This cannot be the waiver of sovereign immunity Congress had in mind when passing the APA. Here, no matter how many interim stops the train has made to date, many still remain and the challenged decision—at the initial point of departure—is not final agency action.

C.      **Plaintiffs' Claims Challenging Defendants' Decision to Pursue a Potential Redesign of East Potomac Golf Course are Unripe**

For many of the same reasons that Plaintiffs fail to identify a final agency action to maintain their Proposal Claims, Plaintiffs' Proposal Claims are not ripe. Plaintiffs would suffer no hardship if court consideration were withheld nor are the issues fit for judicial intervention. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).

19

In terms of hardship, the alleged "plan" to redesign East Potomac Golf Course has none of the imprimatur of an agency decision ripe for agency review. It "do[es] not command anyone to do anything or to refrain from doing anything; . . . [it] do[es] not grant, withhold, or modify any formal legal license, power, or authority; . . . [it] does not subject anyone to any civil or criminal liability; . . . [it] create[s] no legal rights or obligations." *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 733.

In terms of fitness, judicial intervention now would interfere with Defendants' ability to define and refine any proposal to renovate East Potomac Golf Course. "And, here, the possibility that further consideration will actually occur before the Plan is implemented is not theoretical, but real." *Id.* at 735; *see* Bowron Supp. Decl. ¶ 13, Dkt. No. 38-2. Moreover, the Court would benefit from further factual development to understand the scope of any eventual redesign and what its environmental and historical effects might be, not to mention the nature of the environmental and historic preservation review completed by Defendants, before considering whether Defendants adequately satisfied their NEPA and Section 106 obligations in light of those effects.

In response, Plaintiffs do little more than double-down on their conclusory statements and labels, insisting that "Defendants are implementing a plan" and therefore, the agency decision to pursue a renovation or redesign is "definitive, not tentative." Pls.' Mem. in Opp'n. 28. But the relevant question is not whether Defendants are exploring such a plan—this is not disputed. The relevant question is whether that decision, at the start of the decisionmaking process, has caused Plaintiffs hardship and whether judicial review is warranted now. On both counts, the answer is no.

Plaintiffs' inability to separate this case from *Mashack v. Jewell*, 149 F. Supp. 3d 11 (D.D.C. 2016), is fatal. Plaintiffs offer only two bases for distinguishing *Mashack*, and neither has merit.

20

First, Plaintiffs argue the marina closure in *Mashack* was temporary, but a redesign of East Potomac Golf Course will be permanent. Pls.' Mem. in Opp'n 28. This misses the mark. The court in *Mashack* distinguished between the temporary closure of the marina, which it reviewed on the merits, and the acknowledged, but non-final agency plans to *permanently* remove marina infrastructure from the site. *See* 149 F. Supp. 3d at 27, 32-33. It is that alleged plan to permanently remove marina infrastructure that is analogous to the alleged plan to "permanently" remove East Potomac Golf Course in its current form (and replace it with a golf course with an alternative design). Just as the *Mashack* plaintiffs' challenge to that alleged plan was unripe because NPS continued to deliberate it, *id.* at 33, so too is Plaintiffs' challenge here.[9]

Second, Plaintiffs contend the NPS's saving grace in *Mashack* was that it promised to conduct NEPA and NHPA analyses before conducting ground disturbing activities at the marina, whereas here, NPS has already placed the soil stockpile. Pls.' Mem. in Opp'n 28. Yet NPS *did* conduct the required NEPA and NHPA analyses before placing the soil stockpile. *See* AR1672-74 (Categorical Exclusion Documentation Form), Dkt. No. 46-9; AR1646-50 (NHPA Historical Assessment), Dkt. No. 46-6. Aside from placing the stockpile, remediating the access road to the stockpile, and removing a handful of hazardous trees—all under their own compliance documentation—NPS has not conducted any ground disturbing activities, and Plaintiffs identify none. What NPS has promised to do here, as it did in *Mashack*, is conduct the requisite NEPA and NHPA analyses before those activities are approved and occur. Plaintiffs offer no concrete factual allegations that would support their speculation that Defendants would not comply with their legal obligations to conduct the necessary compliance.

---

[9] Indeed, *Mashack* highlights that NPS could conduct the appropriate NEPA and NHPA analyses necessary to temporarily close East Potomac Park, and Plaintiffs' challenge to any potential permanent redesign would still be unripe.

21

**IV.    Plaintiffs' Fail to Plausibly Show Defendants' Decision to Stockpile Fill Material Violated NEPA, the NHPA, or the NPS's Organic Act**

Besides lacking standing, all of Plaintiffs' Stockpiling Claims fail for an independent reason.  Plaintiffs' NEPA, NHPA, and NPS Organic Act claims rest on a belief that the soil stockpiling is an extension of a larger "plan" to redesign East Potomac Park, and therefore, the NEPA and Section 106 analyses conducted are inadequate.  But once Plaintiffs' Proposal Claims are pushed aside on standing, final agency action, ripeness, and merits grounds—as they must be— Plaintiffs' Stockpiling Claims cannot stand on their own two feet.  Plaintiffs do not put forth any serious grounds for their Stockpiling Claims independent of the challenged decision to renovate or redesign East Potomac Golf Course.  In other words, if Plaintiffs' Proposal Claims fail, their Stockpiling Claims fail with them.

Regardless, the individual Stockpiling Claims fail on their own terms.  With respect to its NEPA claim, Plaintiffs argue Categorical Exclusion 12.5(C)(19) covering "[l]andscaping and landscape maintenance in previously disturbed or developed areas" is inapplicable because stockpiling "30,000 cubic yards of . . . dirt . . . is not landscaping."  Pls.' Mem. in Opp'n 31.  But inherent in the ability to conduct landscaping activities is the ability to take preparatory steps in anticipation of that activity.  According to Plaintiffs' theory, placing mulch around a flower bed would be landscaping subject to a categorical exclusion; but bringing a bag of mulch onsite and placing it next to the flower bed would require separate environmental analysis.  This is nonsensical and invades areas soundly within NPS's area of agency expertise.

Plaintiffs also reach to argue that East Potomac Park is not a "disturbed or developed area" per categorical exclusion 12.5(C)(19).  East Potomac Park is not an untouched, virgin landscape.  It is a manmade island that has undergone decades of development.  *See* CLR 9-37, *supra* n.5.  It

22

cannot seriously be disputed that East Potomac Park is a "disturbed or developed area" by any definition.

Finally, although nominally identifying three "extraordinary circumstances" that may preclude a categorical exclusion, Plaintiffs allege no facts showing how the stockpile causes significant impacts sufficient to constitute an extraordinary circumstance. The Golf Course remains open; the holes around the stockpile remain open; and Plaintiffs do not allege otherwise. They do not even allege that the stockpile interferes with play. Any effect is therefore not significant.

As for Plaintiffs' Stockpiling NHPA Claim, Plaintiffs do not even mention the Programmatic Agreement applicable here. Their silence speaks volumes. Plaintiffs muster no argument to refute the fact that NPS satisfied its Section 106 obligations by following the process laid out in its Programmatic Agreement. *See* 36 C.F.R. § 800.14(b); *see also WildEarth Guardians v. Provencio*, 272 F. Supp. 3d 1136, 1165-66 (D. Ariz. 2017). And Plaintiffs ignore that the stockpile is temporary, with the dirt to be incorporated into the Golf Course under subsequent decisionmaking—and with it any necessary Section 106 compliance—that will determine where and for what specific purposes the soil will be used.

Plaintiffs' Stockpiling Organic Act claim also fails for several reasons. An isolated stockpile of landscaping material is not "key to the integrity of the park or to opportunities to enjoy the park," Pls.' Mem. in Opp'n 35, and other than their own conclusory allegations, Plaintiffs provide no facts to find otherwise. There is no allegation that the stockpile has caused the course to close or even that it has caused the three holes surrounding the stockpile to close. It is undisputed that East Potomac Golf Course must undergo maintenance. *See, e.g.*, Bowron Decl. ¶ 12, Ex. C, Dkt. No. 26-4; Ex. C, Exhibit D Initial Improvements, Dkt. No. 26-5 (obligating NLT to

23

"[r]edesign and rebuild" both the White Course and the Red Course at East Potomac Park among other projects); Cultural Landscapes Inventory, East Potomac Golf Course National Mall & Memorial Parks – East Potomac Park, Nat'l Park Serv. 152 (2017).[10]  It is soundly within NPS's discretion to determine where and how to stockpile lumber, gravel, dirt, and other necessary building materials in anticipation of maintenance activities, in a manner that lessens impacts on the resource while making them reasonably available and balancing agency demands. *See Nat'l Parks Conservation Ass'n v. Jewell*, 965 F. Supp. 2d 67, 84 (D.D.C. 2013).  Far from constituting any actionable impairment of park resources, the allegations presented are consistent with NPS's responsibility to maintain East Potomac Golf Course for the enjoyment of the public.

## V.    Plaintiffs are Not Entitled to Discovery

For the reasons stated in Defendants' Memorandum in Opposition, Dkt. No. 54, Plaintiffs are not entitled to any discovery.  Defendants only note here that Plaintiffs' reference to *Herbert v. National Academy of Sciences*, 974 F.2d 192 (D.C. Cir. 1992), is inapt for two reasons.

First, *Herbert*—if it is relevant at all—applies only to factual attacks, not facial attacks like Defendants' Motion to Dismiss.  Although not necessary for the decision, in *Herbert*, the D.C. Circuit explained that there are typically three ways in which a court may adjudicate a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.  The court may dispose of the motion "on [1] the complaint standing alone. . . ; [2] the complaint supplemented by undisputed facts evidenced in the record, or [3] the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* at 198.  In the first two scenarios, the court "will not need to decide among conflicting factual positions, taking instead the undisputed facts within or *outside* the pleadings as true." *Id.* (emphasis added).  In other words, in a Rule 12(b)(1) facial attack, the

---

[10] https://irma.nps.gov/DataStore/DownloadFile/583046.

court may rely on facts on which it can take judicial notice or facts that are otherwise undisputed, even if outside the Complaint, like for example, in a supporting declaration. The *Herbert* Court advised that when there are *disputed* jurisdictional facts that are intertwined with the merits, a court may—but need not—defer the jurisdictional question until the merits.

Here, however, Defendants have brought a facial attack. Plaintiffs' allegations in their Complaint on their face fail to establish standing, a ripe final agency action, and otherwise fail to state a claim. Defendants do not dispute, for example, that President Trump is reported to have said he wanted to make the Golf Course "a beautiful, world-class, U.S. Open-caliber course." Compl. ¶ 83. Nor do they dispute that Plaintiffs enjoy playing golf or otherwise recreating at East Potomac Park. *E.g.*, *id.* ¶ 19. What Defendants dispute, however, is Plaintiffs affixing their own conclusory labels to these facts and passing these conclusions off as supposed facts.

Second, to the extent that *Herbert* is still good law, the dicta cited by Plaintiffs has been overtaken by more recent Supreme Court and D.C. Circuit cases. As explained in Defendants' Memorandum in Opposition, those cases demand that the Court first consider Defendants' Motion to Dismiss on threshold standing and final agency action grounds before it can turn to any consideration of Plaintiffs' request for discovery. *See* Defs.' Mem. in Opp'n 9-11, Dkt. No. 54. *Id.* Proper adjudication of those issues requires that Plaintiffs claims be dismissed.

## CONCLUSION

Despite Plaintiffs' reliance on their own conclusory statements and allegations, Plaintiffs lack standing, fail to allege a ripe final agency action in support of their Proposal Claims, and otherwise fail to state a claim on which relief can be granted. Accordingly, Defendants ask this Court to grant Defendants' Motion and Dismiss Plaintiffs' Complaint.

Respectfully submitted this 25th day of June 2026.

**ADAM R. F. GUSTAFSON**

Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Michael K. Robertson*

MICHAEL K. ROBERTSON
Trial Attorney (DC Bar No. 1017183)
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
4 Constitution Square
150 M Street NE
Washington, DC 20002
Tel: (202)-305-9609
Email: Michael.Robertson@usdoj.gov

*Attorneys for Federal Defendants*