**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DC PRESERVATION LEAGUE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | Case No. 1:26-cv-477-ACR |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| THE INTERIOR, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

**BRIEF OF THE WALTER J. TRAVIS SOCIETY AS *AMICUS CURIAE* IN SUPPORT
OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Civil Procedure 7.1, the Walter J. Travis Society states that it is a nonprofit organization. It has no parent corporation, and no publicly held corporation owns ten percent or more of its stock.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

INTEREST OF AMICUS CURIAE ......................................................................................1

SUMMARY OF ARGUMENT ............................................................................................1

ARGUMENT ........................................................................................................................3

    I.   What Is at Stake: East Potomac Is a Designed Historic Work, and Its Plans Survive. ........3

    II.  The Stockpile Now on the Course Was Not, on the Allegations, "Routine" Anything.......6

    III. The Documentary Record Defeats the Premise of the Agency's "No Adverse Effect" and Categorical-Exclusion Findings. ......................................................................................7

        A.  The Agency's Own Records Document the Design, and Prescribe How to Treat It. ....8

        B.  Section 106: The Record Belies the Agency's "Will Not Significantly Alter the Design" Finding. .................................................................................................9

        C.  NEPA: The Same Record Bears on Whether the Categorical Exclusion and 'No Extraordinary Circumstances' Findings Were Reasonable. ...............................................11

    IV.  The Agency Cannot Treat the Plan as Real Enough to Justify the Stockpile, Yet Too Hypothetical to Review.........................................................................................13

CONCLUSION...................................................................................................................14

## TABLE OF AUTHORITIES

*Cases*

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................7

*City of Phoenix v. Huerta*, 869 F.3d 963 (D.C. Cir. 2017) .......................................................10

*Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421 (D.C. Cir. 2007) .............................................13

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989) ..............................................................12

*Mashack v. Jewell*, 149 F. Supp. 3d 11 (D.D.C. 2016) ............................................................13

*Nevada v. Dep't of Energy*, 457 F.3d 78, 92-93 (D.C. Cir. 2006) .............................................12

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291 (D.C. Cir. 2022) ......................9

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ..........................................12

*Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66 (D.C. Cir. 2011) .............12, 13

*Statutes and Regulations*

54 U.S.C. § 306108 ...................................................................................................................9

36 C.F.R. § 68.2 ......................................................................................................................10

36 C.F.R. § 800.5 ................................................................................................................9, 10

43 C.F.R. § 46.215 .............................................................................................................11, 12

*Other Authorities*

The Secretary of the Interior's Standards for the Treatment of Historic Properties (36 C.F.R. pt. 68) ................................................................................................................8, 10, 11

Cultural Landscapes Inventory, East Potomac Golf Course, Nat'l Park Serv. (2017) ..2, 4, 5, 8, 12

Cultural Landscape Report, NPS Golf Courses in the District of Columbia (June 2019)………….

……………………………………………………………………………2, 5, 8, 9, 10, 11

Walter J. Travis Society, Travis the Architect, https://travissociety.com/Travis-The-Architect.......

.............................................................................................................................2, 4, 5

**INTEREST OF AMICUS CURIAE**

The Walter J. Travis Society (the "Society") is a nonprofit organization founded in 1994 to document, preserve, and promote the work of Walter J. Travis.[1] Travis was a leading amateur golfer of the early twentieth century and one of the architects who defined what is now called the Golden Age of American golf course design. The Society holds and has studied copies of Travis's original design drawings for the course, and it offers those documents, and the expertise to read them, to assist the Court. Its members know the course firsthand; they travel to play East Potomac's original routing because of the design this brief describes.

The Society takes no position on the parties' other disagreements, and it does not enter the factual dispute over whether the stockpiled fill is clean or contaminated. Its contribution is narrower: the historic design of East Potomac, which it has studied and can document where the parties cannot.

**SUMMARY OF ARGUMENT**

This case arises from two related actions at East Potomac Park Golf Course, a historic course on the Potomac in the District. First, the National Park Service trucked some 30,000 cubic yards of demolition debris from the White House East Wing onto the course and heaped it there, treating the placement as routine maintenance exempt from environmental and historic-preservation review. Second, the agency has advanced a plan to redesign the course, which it describes as only a concept. Plaintiffs allege the agency unlawfully avoided the review that the National Historic Preservation Act and the National Environmental Policy Act require. The

---

[1] Pursuant to LCvR 7(o) and FRAP 29(a)(4)(E), no party's counsel authored this brief in whole or in part. No party, no party's counsel, and no person other than the *amicus*, its members, and its counsel contributed money intended to fund its preparation or submission. All parties were timely notified; their positions on the accompanying motion for leave are stated there.

1

Society writes to supply what those statutes turn on: what the historic design of East Potomac is, and why it matters.

The Society does not ask the Court to decide who should redesign East Potomac, or to freeze the course as it stood in 1920. Courses evolve; the Park Service says so itself.[2] What the Park Service cannot do is change a historic course while treating the law as if it were not there. On that question, the Society offers three points.

First, the Court should understand what kind of thing East Potomac is. It is not raw acreage or simple parkland. It is a designed work. A golf architect named Walter Travis laid it out in 1917 on flat, man-made ground reclaimed from the river, and he made it interesting not by moving earth but by where he placed his obstacles and how he shaped his greens.[3] The Park Service itself lists the course as a contributing element of a National Register historic district and identifies its three-course, 36-hole arrangement as character-defining.[4] The point for a non-golfer is simple: the historic value of East Potomac lies in Travis's design, not in its raw materials.

Second, and most useful to the Court, the design is not lost. Travis's plans survive. The Society holds copies of Travis's original hole drawings, including the reversible plans.[5] Much of

---

[2] Nat'l Park Serv., Golf Course as Classroom: University of Pennsylvania at East Potomac Park (last updated May 4, 2022), https://www.nps.gov/articles/golf-course-classroom-university-of-pennsylvania.htm (the Park Service's researchers concluded that a golf landscape "is designed to change," and that "major aspects of Travis and Flynn's designs have been altered," even as the course retains "the feeling of a public course from the Golden Age of Golf"). The Society cites this NPS source not to concede that anything goes, but to show why the surviving design record matters: it is what distinguishes change consistent with the original design from change that erases it.

[3] Walter J. Travis Society, *Travis the Architect*, https://travissociety.com/Travis-The-Architect (last visited June 2026) (East Potomac Park Golf Club, designed with Dr. Walter S. Harban in 1917, listed among Travis's reversible courses; the Society received digital copies of the original Travis hole drawings, including the reversible plans, in Fall 2016); *see also* Walter J. Travis Society, *Society News*, https://travissociety.com/society-news/ (last visited June 2026) (the original hole drawings, dated by the Society's documentation to 1917, show Travis's plan for reversible play).

[4] Cultural Landscapes Inventory, East Potomac Golf Course, Nat'l Park Serv. (2017) 5, 26, cited at Defs.' Mem. 12 (East Potomac Park Golf Course listed on the National Register in 1973, updated 2001, as a contributing site to the East and West Potomac Parks Historic District, with a period of significance of 1917-1941). The Society understands the three-course arrangement to be among the essential features the agency's own record identifies. *See* CLR 88; *see also* CLI 74.

[5] Travis the Architect, *supra* note 3.

2

the rest of his plan is in the public record, including annotated routing maps and period aerial photography of the finished course.[6] That single fact undercuts the premise of two agency findings the Complaint challenges. The agency's Section 106 "no adverse effect" finding rests on the conclusion that the fill "will not significantly alter the design of the course." Defs.' Mem. 52 (quoting Nersesian Decl. Ex. C at 3). And its NEPA categorical exclusion rests on the premise that placing 30,000 cubic yards of fill is "maintenance and minor modification of an existing managed landscape" that will work no design change. Defs.' Mem. 48-49. Both findings are testable against Travis's original design, and Plaintiffs have plausibly alleged that both are wrong.

Third, the agency cannot have the plan both ways. It tells the Court the redevelopment is only a "concept" too hypothetical to review. *See* Defs.' Mem. 41, 42. Yet it justified dumping the fill by pointing to that same redevelopment, explaining that the material was "planned as part of improvements" and would be reused as infill. *Id.* 49 (quoting Nersesian Decl. Ex. B at 1). An agency may not treat a plan as real enough to justify physical changes to a historic course while disclaiming it as too speculative to review.

**ARGUMENT**

**I.      What Is at Stake: East Potomac Is a Designed Historic Work, and Its Plans Survive.**

This brief does not retread the standing, finality, and ripeness arguments the parties have joined. It speaks to something underneath them: East Potomac is a historic place of real significance, its design survives in documented form, and a change to such a place cannot escape the review the preservation laws require.

---

[6] Alan Bastable, *Trump wants a new-look golf course in D.C. Preservationists have another idea*, GOLF.com (June 12, 2026), https://golf.com/travel/courses/trumps-dc-muni-golf-cries-preservation/ (reporting that much of Travis's plan "not only exists but is available in the public record," including sketches of all eighteen holes, annotated routing maps, and aerial photography of the completed course, which the publication reviewed).

3

In 1917, the federal officials who oversaw the new parkland at Hains Point hired Walter J. Travis, a former national amateur champion and prominent course architect, to design a golf course on the reclaimed river flat. *See* CLI 26.[7] Travis laid out an eighteen-hole, links-style course. The first nine opened on July 8, 1920; the second nine followed in 1923. CLI 47-48. The course hosted a national championship, the U.S. Amateur Public Links, in 1923, the same year its eighteen holes were completed. CLI 47-48. It later became a site in the desegregation of federally owned golf, a history the Park Service treats as part of the course's significance. CLI 5 (period of significance 1917-1941; significance in Recreation and in the desegregation of federal courses). Travis designed or remodeled some fifty courses over his career, and his work helped define what is now called the Golden Age of American golf design.[8]

The land Travis was given was flat and featureless, a dredged river bottom just above the tide. He created interest the way the best architects of his era did: by placing obstacles strategically and by shaping greens that rolled and undulated and were closely guarded by bunkers.[9] He also took advantage of where the course sat. Travis oriented the holes so that play unfolds against views of the Washington Monument and the city's landmarks, sightlines no other Travis course enjoys. And he gave the course an unusual feature: he routed it so it could be played in two directions, an idea borrowed from the Old Course at St Andrews that also spread wear across heavily used turf. *See* CLI 26 (Travis's "original design calls for a traditional links-style course that could accommodate reversible play"). For the non-golfer, the short point is this: the historic value of East

---

[7] Cultural Landscape Report, National Park Service Golf Courses in the District of Columbia: East Potomac Park, Langston, and Rock Creek: Treatment Guidelines, Nat'l Park Serv. (June 2019), cited at Defs.' Mem. 12 n.2 and Compl. ¶¶ 60-62. The Society does not address the contamination dispute over the stockpiled material, which the parties join on other grounds. Its submission concerns the design and historic character of the course, which is implicated whether the fill is clean.
[8] Travis the Architect, *supra* note 3 (the Society identifies fifty-one original or redesign course projects by Travis, tracking his advisory consultations separately).
[9] Travis the Architect, *supra* note 3.

4

Potomac lies in the arrangement, the placement of features on the ground, not in the dirt itself. Change the arrangement and you change the historic resource.

The course's historic status is not in dispute, and the Court need not take the Society's word for it. The Park Service's own 2017 Cultural Landscapes Inventory ("CLI") states that East Potomac Park Golf Course "was listed on the National Register of Historic Places in 1973 (updated in 2001), as a contributing site to the East and West Potomac Parks Historic District." CLI 5. The same document identifies the three-course, 36-hole arrangement as an essential feature, and the Park Service's 2019 Cultural Landscape Report ("CLR") set the goal of "support[ing] modernization that is consistent with the original design intent for each course."[10] This is the agency's own record, now before the Court.  *See* Defs.' Mem. 12 & n.2.

Critically, the design is documented. Travis's plans survive: the Society holds copies of his original hole drawings, including the reversible plans, and the agency's own 2017 inventory catalogs Travis-era drawings on file at its regional office. CLI 154.[11] Much of the rest of his plan is also in the public record, including annotated routing maps and period aerial photography of the finished course.[12] Whatever else is disputed in this case, the historic design of East Potomac is knowable. The Society acknowledges that the course is not frozen in time. The Park Service's researchers have observed that a golf landscape "is designed to change," and that aspects of Travis's design have already been altered over the decades.[13] But that is precisely why the surviving drawings matter. It is what lets a decisionmaker tell the difference between change that respects the original design and change that erases it.

---

[10] CLI, *supra* note 4, at 5. The Society addresses only the procedural posture the parties have framed and takes no position on matters outside its expertise.
[11] Travis the Architect, *supra* note 3.
[12] Bastable, *supra* note 6.
[13] Golf Course as Classroom, *supra* note 2.

**II.    The Stockpile Now on the Course Was Not, on the Allegations, "Routine" Anything.**

The dumping is the first place to test that difference. Yet the agency never made the comparison. It describes the stockpile as the "temporary storage" of "clean fill on previously disturbed and maintained areas" for "later reuse," and treats it as "routine grounds maintenance." Defs.' Mem. 48 (quoting Nersesian Decl. Ex. B at 1). The Society does not address whether the fill is clean. It does ask the Court to credit, as it must at this stage, what the fill is on the face of the Complaint.

On the allegations, this is not maintenance in any ordinary sense. It is a pile. Roughly 30,000 cubic yards of fill and construction material from the demolition of the East Wing were trucked onto the golf course and placed there, *see* Compl. ¶¶ 12, 68, 70, 72, its only stated use tied to a redevelopment whose design does not yet exist, *see* Compl. ¶ 68. Plaintiffs allege that the pile "included wires, pipes, bricks, and other materials," *id.* ¶ 12, that it sits "within a light breeze's reach of the park's golfers," *id.*, and that it interferes with the use and enjoyment of the course, *id.* ¶¶ 12, 19-20, 73. The Complaint includes photographs of dump trucks and loose rubble on the grounds. *Id.* ¶¶ 72, 74. Whatever the chemistry of the material, a 30,000-cubic-yard heap of demolition fill physically occupying a designed historic landscape is not the "landscaping and landscape maintenance in previously disturbed or developed areas" that the cited categorical exclusion describes. *See* Defs.' Mem. 48-49 (citing 516 DM 12.5(C)(19)).

The agency's own explanation cuts against it. It does not defend the pile as an end, but as a means to the redevelopment: the fill was "planned as part of improvements" reflected in the lease then in effect and could be reused for the course even "without identifying a specific future use." Defs.' Mem. 48 (quoting Nersesian Decl. Ex. B at 1). The lease the agency invokes required "that courses would be redesigned and rebuilt." *Id.* (quoting Bowron Decl. Ex. A). And the agency

6

reviewed the placement under a 2008 programmatic agreement that allows "streamlined review," with "no further consultation" unless a designated party requests it. Defs.' Mem. 51 (citing Nersesian Decl. Ex. D at 9, 15). So, the agency dumped the fill before any design review, and before the public or a group like the Society could be heard.

By the agency's own account, this is not maintenance in use. The fill is "temporarily stored on site," "seeded to prevent erosion" while it waits. Nersesian Decl. ¶ 33. That concession is telling. Routine maintenance material is delivered and promptly worked into the course for a known purpose; it is placed where it is meant to go, not trucked in and left in a mound. This material instead sits in a heap, stored against a future use the agency declines to specify. Its mere presence is the injury the Complaint alleges, a pile occupying and altering a historic landscape, not landscaping performed on it. *See* Compl. ¶¶ 12, 73, 80, 90.

Taken together, and crediting the Complaint, the stockpile is neither routine nor isolated. It is a large, present physical change to a historic course, stored against a redevelopment the agency declines to specify, yet reviewed as though it were a bucket of divot mix (the sand a golfer sprinkles to fill a single footprint-sized gouge). That is the setting against which the agency's "no adverse effect" and categorical-exclusion findings must be measured. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (on a motion to dismiss, the court accepts well-pleaded allegations as true and draws reasonable inferences in the plaintiff's favor).

## III.    The Documentary Record Defeats the Premise of the Agency's "No Adverse Effect" and Categorical-Exclusion Findings.

Two of the agency's findings rest on the same factual premise: that placing the fill will not alter the historic design. Because that design is documented, the Court need not take the premise on faith, and Plaintiffs have plausibly alleged it is wrong. That is all Rule 12 requires.

7

**A.**    **The Agency's Own Records Document the Design, and Prescribe How to Treat It.**

The 2017 Cultural Landscapes Inventory catalogs Travis-era design drawings, including the 1917 "Plan Showing Details of Greens, Golf Course - East Potomac Park," on file at the Park Service's National Capital Region Office, and the 1918 "East Potomac Park: Details of Golf Course." CLI 154. The 2019 Cultural Landscape Report reproduces Travis's course layouts as measured drawings. But in rendering something completely different, the agency's retained architect asked, "Who knows what was original?"[14] The agency's own files answer him.

The agency found the design intact. Applying the National Register criteria, the Cultural Landscape Report concluded that East Potomac "retains integrity of design," "of setting," "of materials," "of feeling," and "of association." CLR 88-90. It identified the course's "three golf courses with a total of thirty-six holes of play" as an essential feature of that design integrity. CLR 88. And it found that the course "retains integrity of setting" because, from its place south of the monumental core, "views to the various monuments and memorials," such as the Washington Monument and the United States Capitol, "are seen throughout the course," "as they were during the period of significance." CLR 88-89.

The agency prescribed the treatment. The Report adopts the Secretary of the Interior's Standards and makes rehabilitation "the recommended treatment for the management of the golf courses." CLR 167. Under those Standards, "[t]he historic character of a property will be retained and preserved," and "removal of distinctive materials or alteration of features, spaces, and spatial relationships that characterize a property will be avoided"; new construction "will not destroy historic materials, features, and spatial relationships that characterize the property" and "will be compatible" in "size, scale and proportion, and massing." CLR 168 (Standards 2, 9).

---

[14] Bastable, *supra* note 6.

The Report's site-specific guidelines direct the agency to "[p]reserve the character of the greens, tees, bunkers, and mounding," and, when restoring greens, to "consult original drawings to restore greens to their original shape and grades" and "[r]estore bunkers and mounds per design documentation or historic record." CLR 175. Even maintenance, the Report says, "should be historically sympathetic, while maintaining the original design intent." CLR 167.

These records reframe both findings the Complaint challenges. The agency cannot find that the fill works "no significant" change to a design its own reports document and find intact, without measuring the fill against that documented design. And it cannot treat as "routine grounds maintenance" a step its own guidelines would test against Travis's drawings.

## B.    Section 106: The Record Belies the Agency's "Will Not Significantly Alter the Design" Finding.

Section 106 of the National Historic Preservation Act directs a federal agency to consider the effect of an undertaking on historic property. 54 U.S.C. § 306108. The agency must ask whether the undertaking may have an "adverse effect," which the regulation defines to include any effect on a property's "design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1). A Section 106 determination is reviewed under the APA's arbitrary-and-capricious standard, and it must be "reasoned and rational." *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 299 (D.C. Cir. 2022) (cited at Defs.' Mem. 50).

The agency found no adverse effect. Its stated reason was factual: its cultural-resource specialist concluded that "the placement of fill will not significantly alter the design of the course." Defs.' Mem. 52 (quoting agency assessment, Nersesian Decl. Ex. C at 3). The agency's finding is a factual claim, not a legal one: that placing the fill will not alter the course's design. A court need not take that claim on faith. The original design is documented in Travis's drawings and routing, so the Court can see for itself whether that is true.

This is where the record matters. The regulation lists, as examples of adverse effect, "[c]hange of the character of the property's use or of physical features within the property's setting that contribute to its historic significance," 36 C.F.R. § 800.5(a)(2)(iv), and "[a]lteration of a property . . . that is not consistent with the Secretary's Standards for the Treatment of Historic Properties (36 CFR part 68)," *id.* § 800.5(a)(2)(ii). The Secretary's Standards, in turn, define the recognized treatments of a historic property by reference to its documented historic design: "restoration" means accurately depicting the property as it appeared at a particular time, and "rehabilitation" means preserving the features that convey its historic character while allowing compatible change. 36 C.F.R. § 68.2(b)-(c). Each treatment depends on knowing the historic design. One cannot say whether a change is "consistent with" the Standards without knowing what the design was.

The agency found that placing the fill would not significantly alter "the design of the course." That design is not a mystery to the agency: as shown above, its own reports document Travis's design and direct that changes be measured against it. CLR 88, 167-168, 175. A no-adverse-effect finding that does not engage that documented design is not, on the allegations, the "reasoned and rational" determination Section 106 requires. At a minimum, where the documented design exists and shows what the course's contributing features are, Plaintiffs have plausibly alleged that a 30,000-cubic-yard placement keyed to a redesign "may" affect those features, which is all Section 106 requires to trigger consultation. 36 C.F.R. § 800.5(a)(1); *see City of Phoenix v. Huerta*, 869 F.3d 963, 971 (D.C. Cir. 2017) (FAA violated Section 106 where its failure to notify the local government of its no-adverse-effect finding and to provide supporting documentation "denied the City its right to participate in the process and object to the FAA's findings.").

The agency invokes its own 2019 Cultural Landscape Report to argue that the course needs major work in any event, pointing to the Report's call to reconstruct "rolling terrain and sand traps, bunkers and 'humps and hollows.'" Defs.' Mem. 36 (quoting CLR 189). But that Report is a preservation document, and it recommends work "consistent with the original design intent." Restoring a course to its design is not the same as redesigning it into something else. The Report says as much: it adopts rehabilitation as the recommended treatment and directs that greens, tees, bunkers, and mounding be preserved or restored to Travis's documented design, consulting his "original drawings." CLR 167-168, 175. The renderings make it obvious: the agency's architect never consulted the original design, producing a course that "bears no resemblance to the original Walter Travis design," the opposite of what the Report prescribes.[15] As explained above, the Secretary's Standards treat faithful restoration as acceptable and departure from the historic design as an adverse effect. Because the original design is documented, whether this plan respects the design or departs from it is a question the Court can answer.

### C.     NEPA: The Same Record Bears on Whether the Categorical Exclusion and 'No Extraordinary Circumstances' Findings Were Reasonable.

The NEPA finding fails for the same reason: it too assumes the design is untouched. The agency invoked a categorical exclusion for "landscaping and landscape maintenance in previously disturbed or developed areas," and found no "extraordinary circumstances" requiring further review. Defs.' Mem. 48-49; 516 DM 12.5(C)(19); 43 C.F.R. § 46.215. Judicial review of that choice is deferential, and the Society does not suggest otherwise. But deference is not a blank check; the determination must still be "reasonable and reasonably explained." *Cf.* Defs.' Mem. 17,

---

[15] The plan unveiled by the Secretary of the Interior on May 14, 2026, is a Tom Fazio design for a par-72, 7,660-yard championship course with new water features, reducing the historic thirty-six holes to twenty-seven. Alan Bastable, *Controversial D.C. muni renovation comes into focus with design plan*, GOLF.com (May 14, 2026), https://golf.com/news/controversial-dc-muni-design-plan/ (reporting that "Fazio's routing bears no resemblance to the original Walter Travis design"); *see also* Bastable, *supra* note 6.

48. NEPA's object is an informed decision. An agency must take a "hard look" at the consequences of its action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 75 (D.C. Cir. 2011) (quoting *Nevada v. Dep't of Energy*, 457 F.3d 78, 92-93 (D.C. Cir. 2006)).

The record, once again, belies two of the agency's premises. First, the agency reasoned that the placement was "maintenance and minor modification of an existing managed landscape, not new construction or a change in land use," and that East Potomac "qualified as a 'disturbed or developed area'" because it "was constructed entirely of fill material and has undergone repeated renovations." Defs.' Mem. 48-49 (quoting Nersesian Decl. Ex. B at 1). The Society does not dispute that the land was made from dredged fill a century ago. But the historic resource is not the dirt; it is the design that Travis placed on the dirt, as documented in the record. That a parkland and golf course was originally built from fill does not make it a place where any quantity of demolition material may be heaped as "maintenance."

Second, the categorical exclusion is unavailable where "extraordinary circumstances" exist, and the regulation lists, among them, significant impacts on "properties listed or eligible for listing on the National Register of Historic Places." 43 C.F.R. § 46.215(f); *see also id.* § 46.215(b). East Potomac is such a property. CLI 5. The agency concluded these circumstances did not apply because the placement "has no significant effects." Defs.' Mem. 49. Once again, the conclusion assumes what it should prove, that the placement leaves the historic design untouched. The extraordinary-circumstances inquiry is reviewed under NEPA's "rule of reason," and the agency must still take the requisite "hard look." *See Theodore Roosevelt*, 661 F.3d at 75. On the

12

allegations, with the design in the record, plaintiffs have plausibly alleged that the agency's no-significant-effects premise is wrong and that this inquiry was not reasonably discharged.

**IV.    The Agency Cannot Treat the Plan as Real Enough to Justify the Stockpile, Yet Too Hypothetical to Review.**

A final point ties the two findings to the plan behind them. The agency cannot have it both ways. It disclaims a plan it has already relied on to alter the course. The Society leaves the doctrines of ripeness and finality to the parties, but the inconsistency is worth the Court's attention. The agency argues that the redevelopment is a mere "concept" that may "die on the vine," and so is unripe and not final. Defs.' Mem. 44 (quoting *Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007)). The Society does not address whether, as a matter of administrative-law, the plan is final agency action; that is the parties' ground to contest. It observes only a factual inconsistency the design record exposes.

The agency justified the stockpile by reference to the redevelopment. It explained that the fill was "planned as part of improvements," would serve as "infill," and was responsive to lease obligations to "redesign[] and rebuil[d]" the course. Defs.' Mem. 48 (quoting Nersesian Decl. Ex. B at 1 and Bowron Decl. Ex. A). A plan real enough to justify 30,000 cubic yards of fill on a historic course is real enough to examine. The Society does not ask the Court to hold the plan final. It asks only that the Court not credit, at the pleading stage, a characterization of the plan as too hypothetical to review when the agency has already relied on it to alter the property. *Cf. Mashack v. Jewell*, 149 F. Supp. 3d 11, 16 (D.D.C. 2016) (claim not ripe where the Park Service committed to the required NEPA/NHPA analysis "before disturbing the physical environment at the marina"). Here, on the allegations, the physical disturbance has already occurred.

13

**CONCLUSION**

East Potomac's design is historic, and it is documented, in the agency's own records, in the public domain, and in the Society's archive. That documentation bears directly on both findings the Complaint challenges: each assumes the fill leaves the design untouched, and the design is available to test that assumption. Taking the Complaint's allegations as true, Plaintiffs have plausibly alleged that the challenged actions affect a historic property. The Society respectfully submits that the motion to dismiss should be denied.

Dated: June 29, 2026                              Respectfully submitted,

<u>/s/ Patricia D. Ryan</u>
Patricia D. Ryan (Bar No. 296053)
Law Office of Patricia D. Ryan
6106 Harvard Avenue, P.O. Box 633
Glen Echo, MD 20812
240-481-6284
patriciaryan@pdrlaw.com
Counsel for *Amicus Curiae* Walter J. Travis Society

14