UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DC PRESERVATION LEAGUE, et al., )
Plaintiffs, )
vs. ) CASE NO. 1:26-cv-00477-ACR
DEPARTMENT OF INTERIOR, et al., )
Defendants. )

TRANSCRIPT OF MOTION HEARING
**BEFORE THE HONORABLE ANA C. REYES, DISTRICT JUDGE**
Thursday - July 2, 2026
2:00 p.m. - 4:47 p.m.
Washington, DC

**FOR THE PLAINTIFFS:**
Democracy Forward Foundation
BY: WILL BARDWELL, MARK SAMBURG and CATHERINE CARROLL
P.O. Box 34553
Washington, DC 20043

Democracy Defenders Action
BY: LINDSAY ZIMLIKI
600 Pennsylvania Avenue Southeast, Suite 15180
Washington, DC 20003

**FOR THE DEFENDANTS:**
DOJ-ENRD
BY: MICHAEL KEITH ROBERTSON
150 M Street, NE
Washington, DC 20002

---

**SONJA L. REEVES**
**Registered Diplomate Reporter**
**Certified Realtime Reporter**
**Federal Official Court Reporter**
Transcript Produced from the Stenographic Record

(Call to Order of the Court at 2:00 p.m.)

DEPUTY CLERK: This is Civil Action 26-477, *DC Preservation League, et al. versus Department of Interior, et al.*

Would the parties please identify yourselves for the record, beginning with plaintiffs' counsel.

MR. BARDWELL: Your Honor, good afternoon. My name is Will Bardwell. I represent the plaintiffs. I'm here today with my co-counsel, Mark Samburg, Catherine Carroll and Lindsay Zimliki. And at the appropriate moment, I would love to introduce some of our summer interns as well.

THE COURT: Oh, please do.

MR. BARDWELL: From Democracy Forward, we have two summer interns with us, Aadhiti VaMatharasu and Gillian Campbell.

THE COURT: Please stand. Where are you guys from, what school?

SPEAKER: I go to Georgetown Law.

SPEAKER: Texas Law.

THE COURT: Oh, I have a Texas Law grad, who is a clerk, and obviously not interested in today's hearing.

Welcome.

MR. BARDWELL: And from Democracy Defenders Fund, Your Honor, Cecilia Katz-Zogby also is with us.

THE COURT: Welcome.

MR. ROBERTSON: Good afternoon, Your Honor. Michael Robertson for defense.

THE COURT: Welcome.

So I want to start with some Declaration of Independence trivia, given that we're about to enter the holiday weekend.

So there is a T-shirt that is sold online and it has a picture of Thomas Jefferson on it and the date July 3rd, 1776, and it says -- he's like frazzled, and it says, "What do you mean this is due tomorrow."

Who can tell me what's wrong with that T-shirt?

MR. SAMBURG: The Declaration of Independence was written well before the 4th. It was only signed on the 4th, Your Honor.

THE COURT: You were all so close. It was signed on the 2nd. The Declaration of Independence was signed on the 2nd. It was only ratified on the 4th. In fact, most people, a lot of people had left by the 4th.

So how many -- raise your hand if you're a lawyer. Okay. So dozens of lawyers and not anybody knew that. All right. For those of you who didn't know that, I suggest that you watch the American Experiment on Netflix. It is a really excellent new documentary on the Revolution and Declaration of Independence.

All right. So what is today? It's July 2nd. So in

the spirit of the actual 250-year anniversary of the signing of the Declaration of Independence, I want to sort of give a short PSA if you will indulge me, which is as follows.

There is a lot of disagreement in our discourse these days, and I think notwithstanding how many of us disagree about so many things and so fervently disagree about them, I think perhaps every American who is paying attention can say that the American men's soccer team last night showed what it meant to be a true American. Amazing teamwork. Amazing skill. Amazing heart. Grit. Everything that you think about when you think about the American ideal they exhibited yesterday.

And I am raising that, A, because it's phenomenal, and best of luck to them. It was a total BS red card. For all of you who think I'm a horrible judge, just know that if I was judging that, I too would have thought that was a horrible red card and I would never have given it.

More than that is that there were literally tens of millions of Americans across the country watching that game in real-time last night, and tens of thousands were together in bars and on the mall and watching parties throughout the country. And what I know not a single person watching that game was wondering about was what the politics of any of the players were or the coaches. No one cared about any of that.

We cared about having our fellow countrymen represent us and succeed in the best way possible in a sports arena and

made us all incredibly proud. I think perhaps we are inundated every single day like literally 24/7 about how much we disagree with each other, and I would hope that as we head into this weekend that we take a moment to think about what last night felt like and what it feels like when we actually all remember that there is far more that unites us than divides us.

With that PSA from the beautiful game to a walk spoiled, a good walk spoiled, we get to get golf.

Obviously, I'm aware that there have been some developments in the last couple of weeks, and so, Mr. Robertson, again, you are on your own. Could I see you first, please.

(Mr. Robertson approaches lectern.)

THE COURT: Can you -- I mean, it was brought to my attention by the plaintiffs and by every social media feed that I look at and by ESPN and the New York Times and everyone else, that the President of the United States, along with the Secretary of Interior, visited Hains Point, I think it was last week or the week before, that they had with them what appears to be final blueprints or certain far-along blueprints of what the new golf course will look like, that they were there with Mr. Fazio, who is a golf course developer, that he has been named as the golf course developer, that they have talked about the new golf course will get rid of the current three-putt or three-hole thingamajig, and maybe even the medium one, and

instead of being something that's purely amateurish or suited for amateurs, may be, while still affordable, a bit complex, that trees are going to be cut down, that the bicycle line is going to be gotten rid of, and that all of this is going to start September 1st.

In light of all that, are we still contending that there is no final agency action?

MR. ROBERTSON: Yes, Your Honor, still no final agency action.

THE COURT: I had a feeling you were going to say that. Let me ask you a series of questions.

First, is there a September 1st start date, as the President announced on social media?

MR. ROBERTSON: The President has announced it on social media, and I think the right way to think about that is he has tried to light a fire under Interior --

THE COURT: No. Look, here is what we're not going to do today. I'm not doing political talk today. Here is what we're not going to do today -- and you know I have an immense amount of respect for you. I think at every single hearing I have said that I think you're doing an excellent job, but here is what I'm not going to do today.

I'm not going to have the President of the United States and the Secretary of Interior say something in the public, say something very concrete in public, and then come in

private -- we're not in private -- and then come in court and say that what they are saying isn't actually what they are saying.

I'm understanding the English language. He's not lighting a fire. He didn't say, "I'm lighting a fire," asking for people to start on September 1st. He said, "This is happening starting September 1st."

So is there a deadline, a date somewhere, on paper, in the ether, wherever, where someone has been instructed to start something on September 1st?

MR. ROBERTSON: Your Honor, I'm not aware of any date other than what the President tweeted. There is no schedule in place at the National Park Service.

THE COURT: So the government is saying that there is no schedule?

MR. ROBERTSON: Correct.

THE COURT: The September 1 date, he just pulled it out of thin air?

MR. ROBERTSON: So --

THE COURT: Because I asked you to come prepared to answer this question, right?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: I said, "I want an answer from the government about what he wrote and I want an answer from the government specifically about the September 1 date."

Now, either the President just pulled the date out of thin air and never heard from anybody about it and never talked to anybody about it, and it's who knows what he was talking about, it's either that, or there is a September 1 date that means something. So which is it?

MR. ROBERTSON: So if he says --

THE COURT: No, no. Here is what we're not doing. No, no, we're not going to do the "if he said." We're not doing that today. This is a year and a half of this and I'm done doing that. Okay. I'm going to --

MR. ROBERTSON: May I try and answer as directly as I can, Your Honor?

THE COURT: You can try. "The course is virtually" -- Oh, wait. "Work on the new course, which will go quickly, will begin on September 1st." There is no "ands, ifs or buts." There is no "I'm lighting a fire under someone." There is no "it may happen, it may not happen, I want it to happen."

"Will begin." So where did that come from?

MR. ROBERTSON: So I don't know exactly where that came from, Your Honor. But what I do know is that NPS and Interior are now trying to meet that schedule. That is accurate.

THE COURT: So now they are trying to meet a schedule?

MR. ROBERTSON: And there is a lot that has to go into that.

THE COURT: Hold on. Hold on. We're going to take this one by one. There is a September 1 date out there that NPS and the Department of Interior are trying to meet?

MR. ROBERTSON: From the President's mouth to their ears, Your Honor.

THE COURT: President speaks, we act?

MR. ROBERTSON: They are attempting to act according to his --

THE COURT: The President speaks, we act is their moving forward view?

MR. ROBERTSON: They are moving forward.

THE COURT: With the September 1 deadline?

MR. ROBERTSON: As best they can, but they need to build out a schedule and they need to hit various targets that have not yet --

THE COURT: What are they trying to accomplish by September 1? What do they plan to start doing on September 1?

MR. ROBERTSON: That is the exact question I wanted you to ask, Your Honor, because I think that is critical.

If you will indulge me just for the smallest amount of time I can walk through what -- since that post, what's now trying to happen at the Department of Interior and at the National Park Service.

THE COURT: The post was, by the way, so we have our chronology set, June 28, 2026.

MR. ROBERTSON: So now what the Park Service and Interior are faced with, and they have to set forth target dates and a schedule to actually try and meet that September 1st, correct.

THE COURT: By the way -- I'm sorry. I told you I would let you go. Go.

MR. ROBERTSON: So there are several things that need to happen and that are statutorily required to happen first. So first, they need enter into an agreement for architectural and design services. I will get to Mr. Fazio in a moment.

But second, they need to submit to the National Capital Planning Commission their plans, detailed plans for this golf course.

THE COURT: Were those blueprints that were photographed, are those detailed prints for the golf course?

MR. ROBERTSON: My understanding, Your Honor, is that those are conceptual renderings. They are not detailed blueprints. I don't want to try and pick them apart like there's a Zapruder film or anything.

THE COURT: That was a good reference. Go ahead.

MR. ROBERTSON: My understanding from the Department of Interior is that they do not have any detailed blueprints. What Mr. Fazio may have we don't know.

THE COURT: The President had them, right?

MR. ROBERTSON: We understand those to be conceptual

renderings similar to what Secretary Burgum posted, which are too low resolution, too high level to actually begin the rest of this process.

THE COURT: So you need to submit detailed drawings?

MR. ROBERTSON: Yes. Those may arrive. I don't know when.

THE COURT: Who are those going to be submitted to?

MR. ROBERTSON: One, National Capital Planning Commission. If I may, Your Honor, briefly 40 U.S.C. 8722(a) and (b), essentially this is now -- Interior is required now to furnish plans once it has them to National Capital Planning Commission.

THE COURT: Is this the same commission that most of the people were appointed by the President?

MR. ROBERTSON: I'm not sure on the details of this.

THE COURT: Is this the same commission that signed off on the reflecting pool and the Kennedy name change and the destruction of the East Wing?

MR. ROBERTSON: My assumption would be yes because it's the national capital and it's all --

THE COURT: If that is the case, then those are people who are mainly appointed by the President. Go ahead.

MR. ROBERTSON: So then second, the Commission on Fine Arts, this 40 U.S.C. 9102(b), Interior has to then request advice under that statute from CFA. At the same time, what can

be happening as those processes play out are NEPA and Section 106. I don't need --

THE COURT: We'll get into NEPA and 106 in a bit.

MR. ROBERTSON: Of course, Your Honor. Then during -- let's say for the NEPA process, take that for example, Interior will conduct an environmental assessment.

Now, assuming they find no significant impact during that environmental assessment, they would also then have a FONSI, finding of no significant impact.

Under their handbook regulations -- sorry, handbook of NEPA implementing procedures, this is 516 DM Section 1.6(b). These are publicly available if you Google "Interior NEPA procedures," they will make them publish those, make them public, once they get to that point.

Then they are not done. Then they will issue a public decision document that says we have made a decision one way or the other to go forward with this project, go forward with something else, abandon this.

THE COURT: Okay. But you keep --

MR. ROBERTSON: They are trying to make that happen by September 1st. I wish them the best. That is a tight turnaround. I'm not sure they are going to be able to make it just realistically, but they know if September 1st rolls around and there is renovation and construction and bulldozers at the course going on, with this not being completed, they are in hot

water. They fully understand that and appreciate. The government completely understands that, that these things need to get done, and they have not been done yet.

THE COURT: Well, let me ask you this. I'm sorry. I told you I would let you finish.

MR. ROBERTSON: So that's the timing that we have now from here until then. Schedules slip. I think the government is hoping they won't, but --

THE COURT: You agree with me that the Secretary of the Interior was with the President when he walked around the golf course at Hains Point and said, "We're changing this whole thing"?

MR. ROBERTSON: My understanding is that, yes. The key word in the President's tweet or post was "will be designed." It has not been -- "will be built, will be designed." So we are still in that kind of far down towards the bottom of that post, Your Honor.

THE COURT: Okay. It says, his quote says, "Most importantly, on today's visit, however, was the Secretary of the Interior and his people." Do you know who the people were who were with him?

MR. ROBERTSON: I don't, Your Honor, off the top of my head. I could find out for you.

THE COURT: Can you add that to the list of things that you're going to have to find out for me. "Together with

me and my staff studying the dilapidated and worn out and very dangerous and outdated golf course known as East Potomac Golf Links." And then he says, "Tom Fazio, the great golf course architect, and his son Gavin, participated on the tour with us whereupon it was determined that on this fantastic site with water and unparalleled views of DC's monuments, we will build one of the greatest golf courses anywhere in the world, which importantly will also be made available to the public."

All right. How is that? What do I tell you about passive voice? Don't use it. Why do I say don't use the passive voice? It is not clear who is acting, right?

"It was determined" is passive voice. Who determined that on the fantastic site with water and unparalleled views of DC's monuments we will build one of the greatest golf courses anywhere? Who determined that?

MR. ROBERTSON: I determine that to be the President, but the President cannot take final agency action.

THE COURT: The Secretary of the Interior was there, right? The Secretary of the Interior has seen this, right?

MR. ROBERTSON: I don't know whether or not he has seen it.

THE COURT: Can you and I both make an educated guess?

MR. ROBERTSON: I would assume that he has.

THE COURT: If I were to ask you to bet a million dollars, you're not going to bet a million dollars that he

hasn't seen it, right?

MR. ROBERTSON: No, Your Honor.

THE COURT: You're not going to bet $10 that he hasn't seen it, right, because you're a government worker, that's a lot for you.

MR. ROBERTSON: I'm not a betting man, Your Honor.

THE COURT: It's a lot for me too for the same reason. You said that everyone is trying to meet the September 1 deadline, right? The Secretary of the Interior has sent something to his people saying we're going to try to do this by September 1?

MR. ROBERTSON: I'm not aware of anything like that, Your Honor.

THE COURT: Well, you just told me everyone is trying to meet this deadline.

MR. ROBERTSON: I'm not aware of any message from the Secretary of Interior to outline that.

THE COURT: Why is everyone acting to try to meet this by September 1?

MR. ROBERTSON: I think, like any directive from the President, like executive orders --

THE COURT: You're telling me that the Secretary of the Interior went on this field trip to the Hains Course, the Hains Golf Course, he walked around with the President of the United States, that's what we do with our time now, we walk

around golf courses, and he was there with one of the world's foremost golf architects, the Secretary of the Interior, and the President posts we're going to do this by September 1, the Secretary of the Interior went back to his desk and did absolutely nothing, did not talk to anyone, did not issue any directive, did not tell anyone, gosh, we got to get this done by the 1st, did not say, "Where are we with this," he just went back to his desk and starting doing whatever it is he does when he's at his desk?

MR. ROBERTSON: Your Honor, I do not know what the Secretary did.

THE COURT: I'm sorry. What part of all these questions that I wanted answered did not say to you I need to know exactly what the Secretary of the Interior did or did not do in response to the President of the United States telling the world that we're going to begin this by September 1st?

MR. ROBERTSON: Sorry. If you could point me to which question, Your Honor.

THE COURT: Oh, my gosh. I probably didn't say like do X exactly. I think probably it was like the spirit of the questions.

You would agree with me that if the Secretary of the Interior sent any directives to his employees to do X, Y or Z, that that would be important for the question of whether or not we have a final agency action?

MR. ROBERTSON: No.

THE COURT: Because here is what I understand from the case law with respect to final agency action, that we're not dealing with -- before, it was very formalistic, right. It was exactly as you're describing it now, do we have a signoff, you will do X, we're doing Y, move forward.

It's now more of like a pragmatic, right, more of like we know it when we see it. And what I'm asking is how do I not know that there has not been a final agency action, given that I have got the President of the United States with the Secretary of the Interior on the golf course saying we're changing this entire thing, we have an architect who is going to help us change the entire thing, it will be done, it will begin by September 1?

How is that not basically at the end of the day a pragmatic we have a final agency action?

MR. ROBERTSON: Two points. One, and just a high level, I think we object to just the framing that the focus of the inquiry is whether there was final agency action in August as plaintiffs allege. They do not get an APA claim in perpetuity.

THE COURT: You know what, if I say to them, hey, do you want to amend your complaint now that the President of the United States has been out on the golf course with the Secretary of Interior with a golf architect of national renown

and says we're going to begin September 1, do you want to amend your complaint to add that as part of the final agency action, my guess is they will say, duh, yes.

Is that what you would say, Counsel?

MR. BARDWELL: Your Honor, probably not in those exact words, but we would accept that invitation, yes, ma'am.

THE COURT: All right.

MR. ROBERTSON: I lost my train of thought, Your Honor, but I guess where I'm trying to answer your question is that, even if they were to do that, our position wouldn't change, still no final agency action based on what we have seen.

THE COURT: When does this become final in your view?

MR. ROBERTSON: When the decision document is published and made available to the public.

THE COURT: That's back to the very formalistic view that you and I just both agreed is no longer how the courts look at this.

MR. ROBERTSON: I guess I don't agree with the premise, Your Honor, in that for final agency action, first, we need agency action, of course, which we don't have. What we have is a goal.

THE COURT: Mr. Robertson, are we still going with like this is just conceptual, because I think we're way past the world of we're in a goal. People are moving forward to

make this happen. They are not moving forward to determine whether to make this happen. You would agree with me on that, right? We're not moving forward with should we do this. They are moving forward with we are doing this.

MR. ROBERTSON: No. We would agree that there have been interim steps in this decision-making process that have been taken, but we will not agree that, yes, this is definitely moving forward until we get to that point.

THE COURT: I just want to make sure it's loud and clear to the White House that the government's position in a U.S. courtroom in front of a federal judge is that there has not been a decision made to pursue this golf course, that it's still maybe we will, maybe we won't.

MR. ROBERTSON: At the agency, yes, Your Honor.

THE COURT: No, no, no, anywhere. You are the government spokesperson today, so when this goes out into the press, they are not going to say, "The government said that the agency's view is that this may or may not happen." They are going to say, "It's the government's view that X."

So recognizing who your audience is, is it the government's position that the President of the United States was wrong and that in fact there has been no final decision to begin a golf course in Hains Point that will start building on September 1? The President was over his skis?

MR. ROBERTSON: Our position is both things can be

true.

THE COURT: No. Both things cannot be true. We are not in a -- no. That's not the world that we live in, Mr. Robertson. We don't live in, you know, Schrodinger's like golf course. All right. The cat is alive or the cat is dead, unless you believe in multiple universes.

Do you believe in multiple universes?

MR. ROBERTSON: Beyond my purview, Your Honor.

THE COURT: Assuming you don't believe in multiple universes, on this earth, we have a decision that's been made about a golf course. Is it the government's position that there has been a final decision made to pursue the golf course, or is it the government's position that that's something the President would like, but maybe it will happen and maybe it won't?

MR. ROBERTSON: The President has made that decision and given his directive, but there is still no final agency action under the APA. That is our position.

THE COURT: Okay. So the President has given his directive, the Secretary of the Interior -- the directive, to be clear, is to build this new golf course?

MR. ROBERTSON: As President Trump described, I think that's how he would describe it, I suppose.

THE COURT: The President has spoken to us, so let's see what the President had to say.

"It was determined that on this fantastic site we will build one of the greatest golf courses anywhere in the world," and he said, "Work on the new course, which will go quickly, will begin on September 1st." So that's the President's directive.

The Secretary of Interior agrees with that directive and is attempting to implement that directive, or the Secretary of Interior doesn't know yet whether or not he's going to implement that directive.

MR. ROBERTSON: Attempting to implement, Your Honor. I think that's right.

THE COURT: No, no. He's either going to implement it, it's been a decision that's been made, we're going forward with this, or the Secretary of the Interior, he calls the President, is going to say, "Mr. President, I haven't really made a final agency action decision as to whether we're going to do this or not under the APA. We may do it. We may not do it."

When he calls the President, what's he going to tell him?

MR. ROBERTSON: So I think the best way that I can frame that, Your Honor -- I'm really trying to address Your Honor without dodging your questions.

THE COURT: I know, but it's hard because you need to say one thing in order to preserve your claim, but what has

actually happened is quite obviously something else. I understand that puts you in a tough spot, and I'm really sorry you're the one taking the bullet. You're not taking bullets. I mean you're taking hard questions.

MR. ROBERTSON: I think from the beginning we have agreed that there was a decision made to pursue this idea way back in August to renovate or redesign a golf course. We have agreed with that. We do not object to that.

Where we object is that that idea is now fleshing itself out in various ways in public-facing reflections of that process.

THE COURT: Is there a universe in which the Secretary of the Interior is going to call the President of the United States and say, "You know what, my agency has thought about it and we decided not to do this. We have decided to keep the Hains Golf Course as it is"?

Is there a universe in which that is a possibility? Yes or no? Because I'm sure this is going to get reported, so let's let everyone know what the Secretary of Interior is going to tell the President.

Is he going to tell the President -- is there any universe in which he calls the President of the United States, who has posted on social media that we are doing this new golf course, that Mr. Fazio is taking it over and doing it, and that work will begin on September 1st and will go quickly, is there

a universe in which the Secretary of Interior calls the President and says, "You know what, I've thought about it, my agency has thought about it. We think we're going to just keep it as it is"?

MR. ROBERTSON: Your Honor, I would be purely speculating on what the Secretary would do. I'm not qualified to do that, Your Honor.

But can I point you to key language in that post?

THE COURT: Sure.

MR. ROBERTSON: We think the key language though is at the bottom where he says, "This will be done through the Department of Interior." We think implicit in that is therefore that all of these steps that I outlined that are statutorily required that are in Department of Interior's handbook, all of those will first get done.

THE COURT: But all of those will first get done in the sense -- in your view in the sense of like to the end of making this golf course. These aren't --

MR. ROBERTSON: Correct, that's the consummation of the decision-making process.

THE COURT: But the agency has decided to move forward with this golf course. Now, might there be things along the way that might trip it up? Might it fail NEPA? Might it fail NHPA? Might the National Parks Commission, which has signed off on the reflecting pool and the Kennedy Center change, and

maybe even the arch by this point, might they say, You know what, no, we don't want to give Mr. Trump his golf course"? Maybe.

But would you agree with me that the decision has been made to move forward to try to get that done?

MR. ROBERTSON: Yes. I thik that's what we've said all along, that that decision to move forward has happened.

THE COURT: On the new golf course? Here is what I want you to let me know by, I don't know, the end of the week at some point. I want to know any directive that the Secretary of the Interior has given to anyone in the agency orally or in writing since this visit to the White House -- since this visit to the golf course or a week before it in order to implement this September 1 deadline.

MR. ROBERTSON: Your Honor -- could Your Honor do me a huge favor and put that in writing in an order?

THE COURT: Yes, we will put that in writing in an order for you.

MR. ROBERTSON: So I don't get things lost in translation.

THE COURT: I hear you. Let me go -- I'm sorry, go ahead.

MR. ROBERTSON: I just wanted to answer directly the questions that you posed yesterday to make sure those don't get lost.

THE COURT: I was about to go through those. Why don't we take them one by one.

MR. ROBERTSON: Let's start at the top. National Garden of American Heroes Foundation.

THE COURT: Has anyone at the National Garden of American Heroes Foundation or the O'Rourke Group communicated with the National Park Service or the Department of the Interior regarding the proposed golf course? And, if so, the nature and substance of those communications.

MR. ROBERTSON: No, full stop.

THE COURT: What commitments, if any, has the Secretary of the Interior or his delegates made concerning President Trump's statements that they, quote, "will build one of the greatest golf courses in the world"?

MR. ROBERTSON: None, Your Honor.

THE COURT: Okay. Well, I guess maybe the word "commitment" was too strong. I will change that and we'll put in an order "what statements or directive, if any, has he made." Fair enough. You answered the question I asked, and so I take that.

MR. ROBERTSON: Question three was my colloquy about the schedule and targets and the Capital Planning Commission and the CFA and NEPA and publishing the FONSI and the EA.

THE COURT: By the way, when this is put out for public comment, how long does the public have to comment?

MR. ROBERTSON: I don't know, Your Honor. I would have to get back to you on the specific --

THE COURT: Can we add that, because obviously -- all right. Mr. Fazio.

MR. ROBERTSON: So Mr. Fazio, he has not been designated or hired by Department of Interior or National Park Service or anyone. Other designers are free to also submit plans and conceptual renderings if they wish, and NPS could consider those at any time. But what needs to happen --

THE COURT: Why was Mr. Fazio with the President of the United States with his son on the golf course?

MR. ROBERTSON: Your Honor, he's a public citizen who designs golf courses and the President was interested in what he had, but --

THE COURT: These renderings that have been done, these like two not detailed enough renderings, who rendered those?

MR. ROBERTSON: I don't know, Your Honor, but I would assume Mr. Fazio has those.

THE COURT: Can you confirm that for us? We'll take a running tab.

MR. ROBERTSON: He's a private third-party who is not a party to this suit, Your Honor. There is no formal relationship yet with Mr. Fazio and the Department of Interior or the Park Service, and they need that formal relationship,

because assuming he develops some kind of detailed blueprint that could actually be put into effect, they need that agreement to be able to have the rights to that intellectual property.

Number five, any agreement or --

THE COURT: Let me just make this absolutely clear. Let's say I have a long-lost sister, and it turns out that she's the one person in the family who was interested in golf and she's a famous golf designer and we just never knew, and she's like, you know what, I really want to design the new golf course and I want the government to consider it. She's absolutely free to put in a request to be considered as one of the golf course architects?

MR. ROBERTSON: Of course, Your Honor. Any public citizen could do that I'm sure.

THE COURT: And if that gets submitted to the Secretary of the Interior, what would be the process by which the Secretary of the Interior would decide which -- let's say 20 people -- because I'm sure lots of people have views as to what the golf course should look like.

MR. ROBERTSON: I assume they would be reviewed and a formal agreement would be reached if they actually wanted to pursue that design.

THE COURT: Would they actually look at every design that came in?

MR. ROBERTSON: I'm sure they would use their professional discretion under *Seven County* to go through designs appropriately.

THE COURT: Okay. Let's go to number five.

MR. ROBERTSON: Number five, any contract or agreement, oral or written. No, again, full stop.

THE COURT: Do we have a lessee yet?

MR. ROBERTSON: Nothing has changed, Your Honor.

THE COURT: We still don't have a lessee for the golf course?

MR. ROBERTSON: No, Your Honor, not since the update that was shared several months ago about the agreement that was reached about NLT.

THE COURT: What about blueprint, plans or conceptual designs?

MR. ROBERTSON: No, all we have right now are conceptual renderings.

THE COURT: Okay. There was a Washington Post picture where I don't know if it was the President or Mr. Fazio -- I thought it was the President -- had something in his hand that looked like blueprints for something. What was that document?

MR. ROBERTSON: I do not know.

THE COURT: We're going to ask you to find that out.

MR. ROBERTSON: Department of Interior and NPS do not have that.

THE COURT: Someone saw it. I'm sure that the Secretary of the Interior or one of his team members that were there saw it. They were with the President, so I'm sure someone can tell us what it was, so that's going to be added to your to-do list.

MR. ROBERTSON: My understanding is that it's conceptual renderings similar to what Mr. Burgum posted on a bigger sheet of paper.

THE COURT: I'll ask you to confirm that. All right. Mr. Robertson, there are some documents somewhere in your agency after this got posted by the President telling people to move and do things. I am positive that that is the case. I have been wrong before. I will be wrong again. I could be wrong on this, but I would be stunned if there is not an email or a document or a something somewhere where the Secretary of the Interior or someone who was with him with the President and Mr. Fazio at the golf course who said, "We need to get moving on this because the President wants this done by September 1st," and I want to know what that was.

Anything else on the final agency action?

MR. ROBERTSON: Your Honor, I would be happy to talk more about final agency action and why we don't have it here.

THE COURT: Go ahead. You understand where I'm coming from, right? I mean, we have been through many, many of these hearings, and every single time I have said to you, "I hear

you. I understand we're not there yet." But you understand why I'm more skeptical today than I was the last time. Because the last time we were talking, I think I said, "I am confident that more has happened than what I know and that what I think you knew at the time," and probably still.

I absolutely believe that everything you're telling me is what you believe to be true. I don't think you're dissembling or hiding anything.

MR. ROBERTSON: Thank you, Your Honor.

THE COURT: I have 1,000 percent faith in you, but I think what I said last time was I am quite confident that more is happening than we're aware of, including you. So I was not surprised to see this social media post. I just said, yeah, makes sense. Given everything we knew, makes total sense that something like this was coming out.

So now I just can no longer suspend disbelief and give you the pure benefit of the doubt that there is not a commitment to move forward in a way that would satisfy final agency action, but go ahead.

MR. ROBERTSON: So two parts there. One, the first part of final agency action, consummation of the decision-making process, right, the steps that I have outlined are the further interim steps that still have to take place before we get to the consummation of that process.

Now, in terms of impact on legal obligations, we don't

have anything yet. There has been no legal consequences to plaintiffs. There is no agreement in place with Mr. Fazio. No legal impacts whatsoever. So we are not quite there on either prong.

THE COURT: So I don't disbelieve you. I mean, I think that there is something that's been written that's out there that you don't know about yet and you are going to find out for me. And if you tell me there has been absolutely nothing, okay, I'll have to live with it.

But here is my concern, and it's a concern I have raised before and it's a concern I'll raise again, and that is that I don't want a situation where the government is like, okay, now we have a final agency action, but, oh, by the way there is bulldozers and they started three weeks ago, or, oh, we have a final agency action and the bulldozers are starting right now, 11:59, final agency action; 12:00, the bulldozers are going. And then a bunch of cherry trees are chopped down and there is nothing we can do about it.

So I'm trying to figure out where we get to a point where we legitimately have what you and I agree is final agency action, and plaintiffs and I agree that there is still time for them to make their case.

And I do want to say one thing while you answer that, there was a lot of press after this post went up and a lot of articles that said something to the effect of President Trump

announces he's going to build golf course notwithstanding judge's order or notwithstanding judge's warning. First of all, that headline is false and misleading. I have not ordered anyone not to build something. All I asked was if more than ten trees are going to be chopped down, please let us know, so if plaintiffs want to move they can. That was false, misleading, not intentionally so, I assume.

But just to be clear, I have not issued any order stopping anyone from doing anything. The only thing I have done, and it wasn't even an order, it was a request, was that if more than ten trees are going to get chopped down that we all know so we can move. I just don't think it's helpful -- I just don't think those kind of headlines are helpful because it gives people a misimpression that your clients aren't following the law. So I just want to make the clarification.

MR. ROBERTSON: Do you want a little segue to that, Your Honor, just briefly?

THE COURT: Sure.

MR. ROBERTSON: So 100 percent we have followed your request. I think plaintiffs can acknowledge that as well. We have given them advanced notice of more than ten trees, any potential closure or heavy equipment coming on site. Now, we still don't think they are legally entitled to any of that.

I do want to note here that there have been discussions -- there is an old fence that's running through

part of the golf course, and Department of Interior and NPS are considering removing that old fence. That's going to require some heavy equipment. I want to just make that known so that gets removed and we don't have another emergency hearing.

There is also going to be some --

THE COURT: Plaintiffs, you understand this, yes?

MR. BARDWELL: Yes, Your Honor.

MR. ROBERTSON: There is going to be some closure associated with the fireworks on July 4th.

THE COURT: We should be closed today. We should be celebrating today, but go forward.

MR. ROBERTSON: The bigger piece here is that we would like this request to be lifted because plaintiffs are not legally entitled to this kind of insight into routine maintenance process that's happening.

THE COURT: Don't let me forget, we'll clarify it before we leave. I just wanted to make clear for the record, because there was misimpression, that no one has violated any of my orders. In fact, Mr. Robertson, you have done every single thing I have asked you to do.

MR. ROBERTSON: Thank you, Your Honor.

So back to the final agency action problem --

THE COURT: I have a sequencing -- my biggest concern is that I not be in a situation where things have happened on the ground because your client is taking the position there is

no final agency action, but they are acting as if there has been. That is where I am coming from.

MR. ROBERTSON: I understand, Your Honor. What I can say is that defendants, of course, are going to follow the statutes and those rules in their handbook that I have outlined. They are going to make those items public that they are going to make public, like the EA and the FONSI and the decision document.

They will provide whatever notice is legally required under the statute and their regulations. Now, if the statute and the regs say, well, if you reach a decision document, you're not required to give any further notice, you can start work the next day, then we're not going to give anything that's not required. I think plaintiffs would have to point that out, point me to something that would say, no, we're required to provide X amount of notice after a decision document is reached.

THE COURT: I think what they are going to say is that the law on final agency action is no longer such formalistic that until we have signed, sealed, delivered final agency action with hugs and kisses, Secretary of the Interior signed on it, that they can then say there is a final agency action.

I mean, I think they are going to tell me that the courts take a far more pragmatic "we know it when we see it" approach to the question, including if you start entering into

legal obligations, if you enter into a legal obligation with Mr. Fazio or someone else to design it, if you enter into a legal obligation with respect to who the contractor is going to be. You know, if the Secretary of the Interior has said to his team, "This is what we're doing, get it done, follow all the rules, but get it done," that can be considered as part of the question.

And then also, can it be reviewed? Is there someone who is going to be able to go back and say, "Yeah. No, I just don't want to do this anymore. No, we thought about it, but we're done." If the Secretary of the Interior has made up his mind and has told his team, "This is what we're doing," that is a final agency action, even if all the I's and T's haven't been crossed yet.

And I think that that's what he is going to tell me is the state of the law after *Bennett*. You have done a terrific job of assessing this on the paper -- your legal arguments on the papers, but I just -- that's where I think I'm coming from, and I think that's where they are going to tell me I should be. Whether you are there or not, I need to find out a little bit more, but I think we're pretty darn close.

MR. ROBERTSON: I don't want to exhaust my time and your patience, Your Honor.

THE COURT: No. You have all the time in the world. My patience is another thing, but you have all the time in the

world.

MR. ROBERTSON: We would submit that the trifecta of cases of *Fun For Animals v. BLM*, *Fun For Animals v. Williams*, and *Mayschak v. Jewel*, those are clear guidance on what should happen here because they involve basically the exact same thing, which is an agency saying, hey, we have this idea, we have this goal; now, let's figure out to implement it, what are our methods for implementing it.

Here, that's redesign the golf course. That process is underway. All three of those courts have said that's not final agency action. It's not agency action under *Fun For Animals v. BLM*. And we think this follows and dovetails exactly like that.

Now, other things have been happening and Your Honor is right to acknowledge that, but we still submit that none of that is remarkable. That is in fact just the reflection of the process that's underway before we get to final agency action.

THE COURT: Okay. I mean, I realize we're in the new social media world, but, to me, if the President of the United States says, "We're doing X," that, to me, is a remarkable thing. It's the President of the United States saying here's what's going to happen. I mean, I hear you that he's not the agency head and it's the agency head's decision.

MR. ROBERTSON: Your Honor, separately from this, before we even get further down that road, there is the

question of standing, which we have not talked about yet today, but is first and foremost where I think this Court has to go before we even get to any of these other questions. I'm happy to discuss that, but I also don't want to test your patience as well.

THE COURT: You have all the time in the world. You really aren't testing my patience. The only people who test my patience are people who are not prepared. You are always uber prepared, and I know that you're uber prepared today, so don't worry about that. But I do want to sort of stick on this first, and then we'll get to some other things and then we'll get to standing.

MR. ROBERTSON: In terms of final agency action, I think we've laid out in our briefs and kind of talked about these cases where an agency makes a decision of whether it's a plan to temporarily close the marina or to manage wild burrows. Agency comes up with this plan, hey, let's figure out how to do this. They start doing it.

Now, here, President Trump, and we don't deny this, he's taken an interest in this particular one for sure, but he is encouraging the agency to act, and we don't think that's really any different from other presidents that have encouraged agencies to, either by executive order or other statements, to get things done by a certain time.

THE COURT: I would say he's telling the agency to act

as opposed to he's encouraging, but I do understand your view.

MR. ROBERTSON: So under that precedent, we do not think there is any agency action or any final agency action here. We have acknowledged all along that there was a decision back in August to pursue this idea, this idea of eventually rehabilitating or renovating or redesigning the golf course.

We acknowledge that 100 percent, but what plaintiffs are doing is they are fishing for more than that. They are fishing for further final agency action. They are fishing for something that looks like, okay, we have reached that decision point. And unfortunately for them, the presumption of regularity and all the statutes that we must comply with prevent them from reaching that point.

THE COURT: I'm not sure that the presumption of regularity applies anymore quite frankly. I mean, I think there has been a lot of discussion in the case law as to whether or not the government remains entitled to that presumption. And I'm not saying they don't, but I'm not saying -- but it is contested for sure, and that's not on you.

MR. ROBERTSON: Your Honor, I think I have covered the grounds of final agency action, and I'm not sure if there is more to go on, but I'm happy to talk further about other aspects or let plaintiffs have their turn.

THE COURT: Yeah, I want to hear from plaintiffs.

MR. ROBERTSON: And then we can reconvene on other

issues if you'd like.

THE COURT: Thank you. So his big problem is final agency action. Your big problem is the merits, which is as follows. It's unclear to me that I can stop them doing everything they are doing, I mean, even if there is a final agency action.

I mean, they haven't violated anything yet, right? I mean, he says that they are going to do NEPA. He says they are going to do 106. Where are we with a violation right now?

MR. BARDWELL: Your Honor, I think where we begin to diverge in opinion with the defendants is our allegation, and by now there is a mountain of evidence supporting it, that the decision was made long ago, long before this past Sunday, to adopt a plan to destroy --

THE COURT: I know all of that. Don't give me the whole spiel. I get the spiel. The trees are going to die. We're sad for the trees. The golf course is going to be gone. I get it.

What my question is -- I'm not sure I can do anything about it. Let me just ask you this way. Let's assume that they go through the entire process. They do the NEPA. They do the NHPA. They do the National Park Commission. They do the Fine Arts Commission. And they get a thumbs-up from everyone. And I can't review that.

MR. BARDWELL: But they haven't.

THE COURT: But he's telling me that they are going to do it.

MR. BARDWELL: But what he's discussing, the selecting a certain plan, is not the final agency action. That is a step in the implementation.

THE COURT: Let's assume for purposes of your and I's discussion that I agree with you that there has been a final agency action. What I'm saying is, even if there has been a final agency action, so what. Against what basis do I have to say to them stop doing whatever it is you're doing?

MR. BARDWELL: Are we talking about whether there has been a violation of NEPA and NHPA, or are we talking about whether there is relief available to the plaintiffs?

THE COURT: Let's just cut to the chase. Let's say I find there has been a massive violation.

MR. BARDWELL: There has been.

THE COURT: Well, great. Let's say that there has been. So what? What can I do? I mean, they don't have bulldozers out there right now. I hear you that if they had bulldozers out there and they were starting to cut down trees, then, yeah, there would be an issue.

But if what he is saying to me is we are going to go through this process, and they are going through the process, I can't say don't go through the process because you haven't been through the process yet.

MR. BARDWELL: But the horse has already left the barn on that. When they adopted the plan, NEPA's triggering event and NHPA's triggering event had already passed them by, because those have to be complied with before the plan is adopted.

THE COURT: But he's telling me that even if I agree there has been a final agency action in the sense that the President of the United States and the Secretary of the Interior went to a golf course and looked around and said, "We think that there could be a better golf course here," and let's say they even hired Mr. Fazio, which he tells me they haven't done yet, and let's say they even have a blueprint, they are still going through the agency actions at the agency to implement this.

Now, if we had all of that and then, you know, the Secretary of Interior was calling his friend the contractor and the bulldozer company to come down that next afternoon and get bulldozing so we can get this thing built by September 1, then, yeah, you would have a good argument. But he's telling me they are going to do all of these things, so even if they haven't done them yet and even if that was a violation, what's the remedy, given that he's telling me that they are going to do them?

MR. BARDWELL: Well, the violation --

THE COURT: No, what's the remedy?

MR. BARDWELL: The remedy, we certainly would be

traveling under the Court's equitable powers. It cannot be the law that a federal agency can dump 37,000 cubic yards of polluted contaminant construction debris.

THE COURT: First of all, you say it's polluted and contaminated, and I have looked at the analysis and it's not ideal, but, first of all, there was no asbestos found. Second of all, yes, there was above baselines as against the sort of residual, I guess, baseline on arsenic and some other things that seemed like not good, but then when they actually did the analysis about impact on human health, it was minimal at best.

And that was a detailed analysis done by an independent group. I think Jacobs was an independent group, right, Mr. Robertson? It's not a government agency?

MR. ROBERTSON: Correct, Your Honor. They were retained by National Park Service.

THE COURT: Now, I have questions for Mr. Robertson about the timing of those tests before the qualification certificates were issued, and he and I can have a discussion on that, but, even so, what's the remedy now?

MR. BARDWELL: I would like to start, if I may, by pushing back a little bit on some of the descriptions of what we know about what's in that dirt. We know from --

THE COURT: Before you tell me why Jacobs is wrong about the dirt -- first of all, I thought I was going to get expert reports from you all on the dirt.

MR. BARDWELL: We have had a consulting expert, Your Honor.

THE COURT: Because the last time you were before me, you were like there is all this stuff in the dirt and you're going to have our expert reports, and I said, "I love expert reports. There is nothing more that I love litigating than deposing an expert."

We talk about that often, right? So I was like "can't wait to get to the expert reports," and then when I was prepping, I didn't see any expert reports. And then I asked for the studies from the government, and I got their studies.

MR. BARDWELL: That is definitely coming. We haven't done it yet. But what we do know --

THE COURT: Are we going to call it the Godot report?

MR. BARDWELL: I beg your pardon?

THE COURT: Are we going to call it the Godot report?

MR. BARDWELL: I'm not sure I got the joke, but some people did.

THE COURT: Mr. Robertson, were you an English major?

MR. ROBERTSON: No, archeology.

THE COURT: Oh. Waiting for Godot is a famous play. Guess what happens at the end of Waiting for Godot?

MR. BARDWELL: Does the judge rule in the plaintiffs' favor?

THE COURT: No. Very well played though. Godot does not appear, but go ahead.

MR. BARDWELL: So what we do know about what's in the dirt, we have a declaration from a White House official in other federal litigation saying unequivocally that the East Wing contained asbestos and other dangerous contaminants.

THE COURT: Yeah, but they actually tested the dirt that's at the golf course, and the golf course doesn't.

MR. BARDWELL: That's the second problem is that testing didn't begin until eight days after the dumping began. The baseline samples weren't taken until eight days after the dumping began.

THE COURT: They are talking about what asbestos is there now.

MR. BARDWELL: I'm sorry. I beg your pardon.

THE COURT: Just because it was eight days later doesn't mean you're not going to find asbestos when asbestos is actually there. I don't know what relevance that has. If asbestos is there, it's there eight days later or it's not there eight days later.

MR. BARDWELL: But they weren't testing for those eight days. And even if there was no asbestos -- and, again, the White House declaration says that it was in the East Wing. There is no reason to believe that it wouldn't have wound up at East Potomac, but even if that were true --

THE COURT: Well, there is lots of reasons.

MR. BARDWELL: There is a load of stuff in that dirt, according to the government's own contractor's test results, lead, arsenic, carcinogenic hydrocarbons. Asbestos is one problem of a multitude. And in fact, the dirt from the first eight days has never been tested. We have asked --

THE COURT: I still don't understand why that matters, the first eight -- look, there is either asbestos there or there's not asbestos there, but I mean, even what you said about the potential concern was a potential concern for an individual who has a full-time worker there for 250 days per year for a duration of 25 years. I mean, we're not talking like this is going to impact the casual golfer.

I think what they are saying is like, yeah, there is some bad stuff in there, but if we're talking about whether that's a potential concern to human health, the answer I think is pretty much no. Again, I haven't seen your expert reports yet, but the same for the ecological risk-based evaluation.

Again, this is by an engineering group that I don't think is associated with the government, and they took like a substantial number of soil samples and it seems like they did a pretty thorough analysis.

MR. BARDWELL: They took samples, background samples from around the circumference of the dirt pile as it existed after eight days of dumping.

THE COURT: Jacobs collected a total of 30 samples of excavated soil from the delivered material between October 28, 2025 and April 2nd, 2026. They didn't say that they were just taking it from around.

I mean, you think like the first eight days of soil was this asbestos hell hole, and then like all the other soil that came after was perfectly asbestos free and they just happened to test all the asbestos-free soil?

MR. BARDWELL: Asbestos is the least of the problems though, Your Honor.

THE COURT: What is the most of the problem?

MR. BARDWELL: Lead, mercury, arsenic, hydrocarbons.

THE COURT: But what this report is telling me is that -- I mean, the major issue that was found that seemed like it was going to be the biggest concern was arsenic. There was definitely -- they detected a maximum concentration of 13 mg/kg, which was in excess of the residential soil screening level of 0.0317 mg/kg.

Now, look, I don't do math, but that seems like a pretty big excessiveness. And the report noted that the potential concerns were arsenic, lead and PAH. But again, that was basically doing a comparison for the exposure of industrial workers to the soil, and that the screening level as a conservative approach for the current land use as a golf course because it assumes a full-time worker at the site 250 days per

year for a duration of 25 years. I mean, you do anything in this world for 250 days a year for 25 years and chances are you have a carcinogen your body.

MR. BARDWELL: A number of thoughts in response to that. First of all, it is not reasonable to conclude that human beings are the only things at risk here. I think it's unreasonable in fact for Jacobs Engineering and for defendants to rely on this conclusion that humans are the most likely receptors.

THE COURT: They had an assessment of ecological concerns.

MR. BARDWELL: We don't know whether there is a barrier underneath the pile. We -- again, I want to have a chance to explain why the background sampling is so problematic.

THE COURT: Before you explain to me why it's problematic, let's just say I assume that it's just this horrible soil out there in the world. And I mean, you have had this case since February. How long have you had access to the materials?

MR. BARDWELL: Zero days.

THE COURT: Okay.

MR. BARDWELL: We have asked for access to that in our motion for expedited discovery and they have flatly --

THE COURT: Your experts are looking at what?

MR. BARDWELL: Our experts are looking at their reports. We're going off their representations, which, candidly, have lacked credibility to this point. We learned today --

THE COURT: You learned today what?

MR. BARDWELL: We learned today that NPS was in possession of the first several weeks of test results by November 17th. They knew that they were dumping contaminants at East Potomac. They kept doing it. They repeatedly represented to this Court that it was clean fill. Their credibility here is not great.

THE COURT: What did you learn today? How did you learn whatever you just said today?

MR. BARDWELL: Mr. Robertson shared that in an email.

THE COURT: I doubt Mr. Robertson said that in an email. Mr. Robertson, what did you say in your -- the email that I saw. Sorry, go ahead.

MR. BARDWELL: I also want to be sure we all are understanding we're talking about more than a NEPA case here. If I may, I'm certainly not conceding any ground on the NEPA case, but let's set that to the side.

The NHPA undoubtedly was violated here.

THE COURT: How is that?

MR. BARDWELL: NHPA's obligations attach prior to the approval of federal funding for an undertaking. We have a

decision here that --

THE COURT: Has there been any approval for funding undertaken, Mr. Robertson?

MR. ROBERTSON: Your Honor, if you're referring to the stockpile, I believe so. That's why we completed the compliance with NHPA.

MR. BARDWELL: Which is a step in the implementation of the plan. East Potomac Golf Course is not just some random patch of ground; it is a historic landscape.

THE COURT: I'm aware of that. I'm not trying to belittle it.

MR. BARDWELL: Right. Now we have virtually resolved the NHPA claim. If we agree that it's a historic landscape and that they disturbed the historic quality of it, didn't just disturb it, they dumped a giant pile of contaminated debris on the top of it, which to say the least altered the landscape, then they have -- the NHPA ship has sailed at that point.

THE COURT: But I don't think there is anything -- like what can I do about it?

MR. BARDWELL: Can I mention one more thing before we return to remedies?

THE COURT: But I really am kind of quite focused on -- because you keep telling me a lot of things in your briefs and you keep saying a lot of stuff, but I'm still not quite sure what I can do about any of that, even if you're right.

MR. BARDWELL: I want to be sure. I have got one chance to mention the Organic Act. And then I promise I'll come back to this.

I understand the Organic Act's text is broad, and that traditionally NPS has been granted a lot of leeway in how it interprets that. I'm not sure that approach applies anymore post *Chevron*, but let's assume it does.

It cannot be that they can pollute national parkland and claim to have protected that national parkland from impairment.

THE COURT: Okay.

MR. BARDWELL: That cannot be, irrespective of what the background levels are.

THE COURT: Let's say I fully agree with everything you just said. So what?

MR. BARDWELL: Remedy. We are looking for equitable relief here. Again -- and I need to be able to finish this statement because this is at the heart of the case.

It cannot be the law that a federal agency can wildly violate these three provisions of law, NEPA, NHPA, the Organic Act, and get away with it as long as they do it quickly enough.

THE COURT: They are not moving like at a hare's pace here. They are kind of being a little turtle-ish about it. I mean, they are like -- you guys filed this in February saying the sky was falling, and we're now at July 2nd, and they still

don't have a contract for a golf designer.

MR. BARDWELL: That's implausible to believe.

THE COURT: I don't think Mr. Robertson is lying to me.

MR. BARDWELL: I don't either. I think Mr. Robertson is finding out about a lot of this stuff the same time as you and I. It is impossible to believe that Mr. Fazio, who works for millions of dollars on each project, would sink the time that is required to design a golf course and show up on site and walk the course, which he's done twice by now, out of the goodness of his heart.

THE COURT: You think if the President of the United States calls you and says, "Hey, I think you're the most amazing golf architect in the world. I would like you to draw me up some plans for this golf course, and I want you to walk it with me," that you would say, "Okay, but only if I get a $100,000 deposit."

No, you would say, "Of course, Mr. President," because, A, I love golf, you love golf; B, I'm going to get a billion dollars worth of free advertising. The President of the United States, who is a golf aficionado, is telling me I'm the best golf architect in the world. That alone is going to be worth however much in terms of free advertising.

I don't think it's that impossible that Mr. Fazio out of the, quote-unquote, goodness of his heart would do that.

MR. BARDWELL: It would be nice to have an administrative record on that.

THE COURT: You have a certified administrative record, and I don't think that that's in the administrative record.

MR. BARDWELL: Not on the Washington National Plan. We have zero administrative record on the Washington National Plan.

THE COURT: I'm going to believe Mr. Robertson until I'm shown otherwise. I have asked Mr. Robertson to confirm, and he'll confirm again.

MR. BARDWELL: I want to throw out there another nugget for thought. I hear the representation that NPS and DOI don't have a contract with Mr. Fazio. Who is his contract with then?

THE COURT: He's told me there is no contract.

MR. BARDWELL: No, ma'am. Excuse me, no, Your Honor. I don't believe that's correct. I believe he said there is no contract between Mr. Fazio and NPS or DOI.

THE COURT: He can't know if he has a personal contract with the President or with, I don't know, whoever. I mean, his client is the Department of Interior. He can ask the Department of Interior, "Do you have a contract with Mr. Fazio." He can't just go to Mr. Fazio and ask him. He can't just ask every other person of the federal government.

MR. BARDWELL: We have asked for permission to do that, of course.

THE COURT: To do what?

MR. BARDWELL: To take written discovery from Mr. Fazio.

THE COURT: I don't know why you have to ask permission. You have subpoena power, subpoena the guy.

MR. BARDWELL: Candidly, we had some trouble running that question to ground about whether we do in fact have that authority.

THE COURT: Well, if you don't, you don't. I mean, I don't know what to tell you.

MR. BARDWELL: I don't want to concede that we don't, but --

THE COURT: Subpoena the guy and let him fight it out. I don't know what you want me to say on that. All I can tell you is that Mr. Robertson's job is to find out what contract he has with the Department of Interior, if any. Mr. Robertson has told me that he's run that down. He told me that they don't. I have every faith in Mr. Robertson.

MR. BARDWELL: As do I. We can get to the bottom of this though through the discovery requests of Mr. Fazio.

THE COURT: What does that even matter? That just goes to final agency action. I tell you I'm assuming final agency action.

MR. BARDWELL: But the contract itself, it doesn't matter that the contract itself, whether it is or isn't final agency action. The point is the contract and the designing it, and the eventual construction of it, these are all implementations of a decision that was made no later than October of last year.

THE COURT: You know what everyone says about generals fighting a new war?

MR. BARDWELL: I'm afraid I don't.

THE COURT: They say that every general fights the last war. For example, one of the reasons that the French had the Maginot Line, and they thought we're going to be totally fine with this line across our border, with this wall across our border, we're fighting a trench war from World War I thinking that the question was you just have people shooting at each other across a half mile. What they weren't taking into account, of course, that we were no longer in World War I, we were in World War II, which meant we now have airplanes that can go over Maginot Lines, and we have tanks that can actually go through forests now.

And so do you know what the Germans did when they had this like big wall in front of them?

MR. BARDWELL: They ran tanks over it.

THE COURT: They had tanks go around the line through the forest and they had planes fly overhead. And the reason

I'm saying this to you is because every time I ask you about what I can do, you keep fighting the final agency action war, and I'm telling you assume final agency action. Fight the war I'm asking you to fight, which is so what. What can I do?

MR. BARDWELL: The dirt did not get there by magic. I would -- again, we're talking about equitable relief here, but it cannot be that they can dump a giant pile of pollution on federal parkland and just get away with it.

THE COURT: You want me to put them in jail? What do you want me to do to them?

MR. BARDWELL: It must be within the equitable power of a court to order them to take it away and perform some degree of remediation.

THE COURT: That's what you want me to do, you want me to order them to take the soil away?

MR. BARDWELL: This is in our prayer for relief in the complaint I believe.

THE COURT: Now, before I do that, you would agree with me that I would need some serious evidence that there were contaminants in there, right?

MR. BARDWELL: We have that.

THE COURT: You agree with me that's not before me right now?

MR. BARDWELL: No, ma'am, I don't agree with that.

THE COURT: Tell me in the record where we have that

right now.

MR. BARDWELL: That is in their test results.

THE COURT: It's not in their test results. I have looked at their test results. These test results do not give me the comfort that I or any other judge would need to say, "I'm ordering you to get rid of all this landfill."

What I have got right now is the Jacobs result and their report. If you have a different analysis from your experts, then I need to hear from your experts, but this is not enough for me to order the federal government to remove however many, 30,000 tons of soil there is on that land.

MR. BARDWELL: Fair enough. Irrespective of the contents of the pile, it certainly is within the authority of the Court to enjoin the implementation of the full plan, of which the dumping was merely one step.

THE COURT: What am I going to enjoin? Right now they are not doing anything other than trying to go through the administrative process.

MR. BARDWELL: The obligation, it is -- maybe I'm just putting a pin in this. I harbor deep concerns that they are actually going to be able to perform a good faith NEPA and NHPA review at this point.

THE COURT: I think a lot of people in this country would share that concern. A lot of people wouldn't. You know what we do in that circumstance? We wait to see if they

actually do it in good faith or not. And if they don't do it in good faith, you'll have my attention as soon as you want it. But I can't just say, "Mr. Robertson, I believe your client is not going to do this in good faith, and, therefore, I'm going to stop your client from even trying to do it." I would get reversed before we walked out of the courthouse.

MR. BARDWELL: One of the problems that they created when they began implementing the Washington National Plan through the dumping of the dirt is that they foreclosed reasonable alternatives that should have been available in a real NEPA review that are foreclosed to whatever is going on at the agency right now.

THE COURT: What has been foreclosed?

MR. BARDWELL: The decision involved the use of this fill, which indisputably has contaminants in it. We can argue about whether it's enough contamination to keep us up at night, but it indisputably has dangerous carcinogenic pollutants in it.

THE COURT: So does Coca-Cola, but, okay, go ahead. Actually, I should take that back. I don't mean to besmudge Coke. I don't know that that's the case. I take it back.

MR. BARDWELL: I'm sorry. I have lost my train of thought a little bit there. What was your question? I was thinking about Coca-Cola.

THE COURT: Now I was too. What did their dumping the

soil actually foreclose?

MR. BARDWELL: It foreclosed the possibility of not doing this at all.

THE COURT: No, it doesn't foreclose that. They can still take the soil away. I mean, am I going to place a bet that they are going to decide not to do this and take the soil away? No. But can they do it? Yes.

MR. BARDWELL: It did foreclose the possibility of not using this fill. If they felt like they were going to build a golf course and would eventually need fill, so be it. We can have a fight about whether that's its own problem. But when they used this fill --

THE COURT: But they haven't used it yet to fill the golf course.

MR. BARDWELL: They certainly have. They have dumped it there and it's sitting there right now.

THE COURT: You are telling me I can make them undump it, right? It's possible that they undump it on their own? They are allowed to undump it. It's physically possible to undump it?

MR. BARDWELL: It certainly is. I wouldn't plan my Christmas around that.

THE COURT: I wouldn't plan my 4th of July around it, but that doesn't mean it can't happen. You're telling me that things are actually foreclosed. Here is where I'm coming from

on this. Where I was coming from when I was giving Mr. Robertson difficult questions is I'm a pragmatist. You're telling me there is not a final agency action. I'm telling you there is a final agency action because I know one when I see it, pure pragmatist.

You have the same problem with me. I'm a pure pragmatist, which means I'm not going to do anything, anything, unless I feel like I have to do it and if there is a pragmatic solution. Otherwise, I'm going to step back, because I think that federal courts should not be involved in telling the Executive or Congress what to do unless we have to because the Constitution or the laws require us to.

Which means I'm not going to step in and make Mr. Robertson tell his client he can't do something before I think there is no turning back, before I think there has been an obvious violation of law, and before I think that they are committed to a course and there is no way to stop them. We're nowhere near that right now.

MR. BARDWELL: The mere possibility that the agency might wake up one morning and decide to reverse course doesn't mean we don't have final agency action. It doesn't mean we don't have an irretrievable commitment of resources for purposes of triggering NEPA.

THE COURT: I have yet to hear from you what the irretrievable commitment of resources are. The only thing you

have told me so far is that there has been a lot of soil dumped on the ground, and I know that that's not irretrievable, because you also told me that I have the power to make them undo it, which means it's physically possible for them to undo it.

So what has been irretrievable to date? I grant you that if we get bulldozers on site and they start mowing down half of the golf course, that that's irretrievable, which is why the one thing I have done is ask them not to do that before giving us all notice. But what else has happened that is irretrievable?

MR. BARDWELL: The fact that a thing could -- well, there's the cost of dumping. Those are not going to be retrieved. That's a financial expenditure that is over and done with.

The fact though that an action could conceivably be somehow undone doesn't mean it's not an irretrievable commitment of resources. The granting of leases --

THE COURT: They haven't granted a lease yet.

MR. BARDWELL: If I may finish.

The granting of a lease can be considered an irretrievable resource, but as NLT's experience shows, a lease can always be terminated. So the fact that they might wake up tomorrow morning and decide to go pick the dirt up doesn't change the fact that for now that dirt is an irretrievable

commitment of a resource. And again, the money certainly is.

THE COURT: Okay. Here is the thing, I am not going to tell them to move that soil unless I have some actual proof that, A, the soils have contaminants in them that are dangerous to the human beings or the ecology. And I'm telling you right now I don't have it.

I have also told you repeatedly, and I've said this for a while now, if you want to get me expert reports, I'm happy to have an evidentiary hearing as soon as you can get them to me and as soon as he has a chance to do his whatever and have a hearing on it. But it's not Mr. Robertson's fault that you haven't gotten me those expert reports yet.

MR. BARDWELL: That is certainly true.

THE COURT: Let's put the soil aside. Now what we're dealing with is the golf course. Look, I have heard from many, many, many people in the DC area about the great concerns about this golf course, and these are not ex parte communications. I have -- my chambers email is online and people just write. And rest assured I do not write them back. And rest assured none of their emails or voicemails are going to impact my decision in any way, shape or form.

But I'm just telling you I am very well aware that people feel very strongly about this golf course, and the fact that there are families who have used the golf course for generations and generations, that it's a golf course that is

wonderful because it allows people who are expert golfers and amateur golfers to play in the same area, to interact with each other, that it is low cost, that it is a beloved part of this community. I fully appreciate all of that. I fully appreciate that there are many people in this community that don't want to see that go away. Okay. I'm incredibly sensitive and sympathetic to that viewpoint.

That does not mean alone that I can stop the Department of Interior from moving forward on changing that golf course right now until you tell me that there has been a violation of law that I can correct in some way by staying their decision-making. But it makes no sense to me to stay their decision-making when, even if we have a technical final agency action, Mr. Robertson is telling me that they are going to go through the NEPA process and all these other processes before they break ground.

MR. BARDWELL: But those review processes had to begin before the implementation of the plan, which included the dumping of the dirt, because the pile --

THE COURT: Let's just say I agree with you on all of that. There is nothing I can do right now. I'm not going to make them get rid of the soil unless I find out that there is actual danger of the soil. I'm just not going to do it.

Right now, there is nothing to stop them. What am I stopping them from doing? You want me to stay their actions.

I looked at your proposed order. You want me to stay a bunch of things, but on what basis am I going to stay something?

I just don't even actually understand what you want me to enjoin at this moment. Put the soil aside, what do you want me to enjoin? What do you want me to have them do?

MR. BARDWELL: Any further implementation of this plan.

THE COURT: So that means that they can't proceed in any way, shape or form? They can't have meetings about it? They can't hire Mr. Fazio? They can't have a lease? They can't go through the NEPA process? They can't go through the 106 process? You want me to stop all of that?

MR. BARDWELL: No, it's certainly -- obviously, they can go through the NEPA and NHPA processes.

THE COURT: Here is what we're going to do, because we have been going for an hour and 20 minutes. I'm going to take a 15-minute break, and then I want an answer to this question when we get back. Before we do that, if you could be seated, please.

When we get back, I'm going to give you time to talk to your team, and I'm going to want you to tell me what exactly it is you want me to stop, how long you want me to stop it, and on what basis I can stop it as a matter of law.

MR. BARDWELL: May I ask a question for clarification?

THE COURT: You can ask as many questions as you would

like.

MR. BARDWELL: Are we talking about the complaint or the motion for preliminary injunction?

THE COURT: I'm sorry. I'll hear him on standing, but I'm not dismissing the complaint. We're talking about preliminary injunction, which I thought we were having a hybrid hearing, so I apologize. I should have made that clear from the get-go.

Ms. Scher, come. Come to the podium, please. Could you please notice your appearance?

MS. SCHER: Not for this case.

THE COURT: Well, just say your name.

MS. SCHER: Hi. My name is Ali Scher.

THE COURT: Who do you work for?

MS. SCHER: Democracy Forward.

THE COURT: Have you and I met?

MS. SCHER: Yes.

THE COURT: How have we met?

MS. SCHER: I clerked for you.

THE COURT: When I offered you a clerkship -- I have a series of really important questions for you.

Don't look at her. She's not going to help you.

When I offered you a clerkship, did you say immediately to me, "Oh, my God, I'm so honored and privileged and this is going to be awesome and I can't wait to start and

thank you so much," or did you say something along the lines of, "I think I'm washing my hair that year, let me get back to you."

MS. SCHER: I said the first, but without a formal commitment.

THE COURT: Okay. What you did, as I recall, is actually not get back to me and ask a bunch of people whether I was worth clerking for, yes?

MS. SCHER: No.

THE COURT: All right. You had a -- Ms. Scher is talented in many, many ways, but you had a specific skill set that was very useful in my chambers, yes?

MS. SCHER: Yes.

THE COURT: What was that?

MS. SCHER: I was very good at Pac-Man.

THE COURT: Ms. Scher was excellent at Mrs. Pac-Man. She was the chambers star at Pac-Man during the regular season, yes.

MS. SCHER: During what?

THE COURT: During the regular season. What happend on the very last -- Ms. Scher, by the way, was the Pac-Man star -- Mrs. Pac-Man star. She beat all of us by like, three, four times the number of points, right, all season long?

MS. SCHER: Yes.

THE COURT: Except what happened on the last day of

your clerkship?

MS. SCHER: You beat me.

THE COURT: Yes, I did, in a come-from-behind victory.

Anyway, did you enjoy the clerkship?

MS. SCHER: Yes.

THE COURT: Did you learn a lot?

MS. SCHER: Yes.

THE COURT: Has she made me proud over on my left side?

MR. BARDWELL: She has, Your Honor.

THE COURT: Ms. Scher is a fabulous young attorney who I have actually seen argue in court, and it was one of my favorite days as a judge was watching you argue in court, because you are fabulous.

MS. SCHER: Thank you.

THE COURT: So thank you for joining us today.

MS. SCHER: Thanks.

THE COURT: Thank you for confirming publicly that I beat you in Pac-Man. You can be seated.

We will be back at 3:40. When I get back, I would like to hear from plaintiffs as to what they want me to do.

(Recessed from 3:23 p.m. to 3:42 p.m.)

THE COURT: What do you want me to do?

MR. BARDWELL: May it please the Court, the relief we're asking for is with relation to the Washington National

Plan as a whole, i.e., whether to do this at all, whether to destroy the golf course at all.

THE COURT: You understand that as a matter of law I can't stop them from changing the golf course? If they follow the NEPA, if they follow the 106, if they do the things, I can't say I just think that's not something you should do.

MR. BARDWELL: We are not going to ask for this within the scope of preliminary relief, but, ultimately, our Organic Act claim will argue that any plan that destroys the golf course does violate the Organic Act.

THE COURT: How so?

MR. BARDWELL: I don't want to forget to give Your Honor what was asked for before.

THE COURT: Don't worry. We'll get to it.

MR. BARDWELL: Okay. Great. And so how does it violate the Organic Act? Well, the Organic Act requires NPS to conserve park resources for the enjoyment of future generations and to protect them from impairment. Destroying a golf course, destroying a contributing site on a national registered district is the exact opposite of conserving against impairment.

THE COURT: If they destroy it and put a shopping mall up there maybe. I don't even know if that would cover it, but they are not destroying it and then walking away. They are going to build another golf course. They are just not going to

build the kind of golf course you want them to build.

MR. BARDWELL: No, ma'am. NPS's documentation of the characteristics of this golf course for decades has been around its consistency and historical origin as a Walter Travis designed course, as part of a 36-hole recreational-style facility. That is the status quo out there. That is -- East Potomac Golf Course, the Walter Travis design, is the contributing site on East Potomac Park spot on the National Register.

So in the same -- what if we weren't talking about East Potomac? What if we were talking about Old Faithful?

THE COURT: The White House?

MR. BARDWELL: I beg your pardon?

THE COURT: Nothing. Go ahead.

MR. BARDWELL: The geyser. Old Faithful and East Potomac Golf Course share the same legal significance insofar as the National Register are concerned. They are both contributing sites to a larger historic district.

No one would suggest that you could bulldoze Old Faithful and put in a big fountain that squirts water up in the air and suggest that you have conserved Old Faithful simply because this is a thing full of water that shoots water in the air just like a geyser.

THE COURT: I mean, I have been to Old Geyser -- what's it called? Old Faithful. I have been to Old Faithful.

I always thought if there were aliens who came down from outer space and visited Old Faithful, they would not know what to make of it, because there is literally hundreds, if not thousands of people sitting around in a big circle just staring at like a blank thing in the middle for a very long time, and then something shoots up in the air, and then they all go away.

I just think you would be really confused if you were an alien. That's what I was thinking when I was there. But that said, maybe. But I don't want to give anyone ideas because I thought it was beautiful. I don't want to diminish it. It was a great experience. I suggest everyone go, just if you see an alien, explain why you are just staring at nothingness with a bunch of other people.

But if the government wanted to go in and put like a rim around it that had sparkles on it or whatnot, are you saying that they couldn't do that?

MR. BARDWELL: I think it's fundamentally different than what we are talking about here.

THE COURT: No, it just looks different than the way that you are saying it should look.

MR. BARDWELL: I think since the Organic Act doesn't really come into play on what we're asking for as far as preliminary relief goes --

THE COURT: Why don't we just take it one step at a time. What do you want me to do today?

MR. BARDWELL: The Washington National Plan is a decision to destroy East Potomac Golf Course and to build something new on top of it.

THE COURT: Agreed.

MR. BARDWELL: The preliminary relief that we are asking for is to stop any irretrievable implementation of that plan.

THE COURT: Nothing irretrievable has happened so far.

MR. BARDWELL: Right, and we want that to continue. Until they have completed NEPA and NHPA compliance, we want an injunction against any meaningful ground disturbance that is inconsistent with East Potomac's historic design.

THE COURT: Okay. Understood.

MR. BARDWELL: NEPA and NHPA are not box-checking exercises. These have got to be real hard looks. It's hard to imagine that happening. I know that we're getting a little bit ahead of ourselves here.

THE COURT: I understand the skepticism. I'm sure many people share it, but I'm not going to assume that the agency is going to act in bad faith before they have acted.

MR. BARDWELL: The fact that it didn't occur before the adoption of the plan is the violation of law that allows the Court to enter this preliminary relief.

THE COURT: Okay. Anything else?

MR. BARDWELL: I was trying to think of something

clever about the Red Sox.

THE COURT: Given the season is as horrific as it is, there is nothing clever to be said about the Red Sox this year. Except that I was at the gym the other day and I have a Boston shirt. And does everyone know that in Fenway in the middle of the eighth inning they play Sweet Caroline every single game. The refrain is like "so good, so good, so good."

And so I have a Boston shirt that I just got, which is like the new green monster, and it has a "B," Boston, and it says, "So good, so good, so good." And I had this last week and I went to the gym and my trainer looked at it, and before he even said hello, he said, "You're below 500, not so good."

So that was ouch, but then we did sweep the Yankees, so that's always fun. But, yeah, there is nothing clever to be said about the Red Sox this year. Sorry.

MR. BARDWELL: In that case, I will sit down.

THE COURT: Thank you.

Mr. Robertson, I have like a couple questions for you. All right. So I always tell my clerks and interns that the most important thing a lawyer can do in any case is build a chronology, and you build a chronology because once you see a chronology, you see things you hadn't seen before. And so I started to build a chronology on this case.

And in particular, I noticed that the assessment of -- I'm sorry, this is Exhibit E to the plaintiffs' complaint, the

categorical exclusion documentation form, the CE form. I think that we talked about that a little bit earlier. And then also Exhibit F is the assessment of actions having an effect on historic properties.

As I understand it, the categorical exclusion documentation was what was the proposed action to involve relocating and reusing approximately 30,000 cubic yards of clean fill generated from the White House Modernization Act.

MR. ROBERTSON: Yes, Your Honor.

THE COURT: And in Exhibit F --

MR. ROBERTSON: Your Honor, may I go to the bench to grab --

THE COURT: Oh, yes, of course.

And then we have Exhibit F to the complaint is the assessment of actions having an effect on historic properties, and that was also October 10, 2025.

And if you look at the third page of that, the 106 comment is also on October 16, 2025. And it says that the grounds are exempt from Section 106 review and that the golf course -- the placement of the fill at the East Potomac Golf Course is eligible for streamlined review since all historic property identification has been previously completed, the activity is generally consistent with routine grounds maintenance, quote, "The placement of fill will not significantly alter the design of the course and will result in

no adverse effect to the historic property." And that's signed off on as determined to be routine ground maintenance.

And then under Section 106 coordinator's review and recommendations, one says, "No adverse effect."

MR. ROBERTSON: Yes, Your Honor. I believe I follow.

THE COURT: And then -- one second.

All right. Now, those are all done on October 16th of 2025, and there were representations made that the soil was, quote-unquote, clean, and that there would be no adverse effects, right?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: In fact, in your briefing, you often mention that the soil is clean, right?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: Maybe I'm missing something, but I understood from your email that the first time we got any test results on the soil was November of 2025.

MR. ROBERTSON: That's correct, Your Honor.

THE COURT: How are people in October saying this is clean fill and there is not going to be any adverse effects when you hadn't had any testing results yet?

MR. ROBERTSON: I understand maybe the dilemma.

THE COURT: It's not a dilemma. It's the forward motion of time.

MR. ROBERTSON: I think with respect to that, Your

Honor, so the definition of clean here I think is subject to some interpretation from the experts over at NPS.

THE COURT: I don't care if it's clean, pristine clean, dirty, whatever. My question is, whatever they said it was, how could they say it if there had been no testing done yet?

MR. ROBERTSON: They did not have any testing done at that time.

THE COURT: Okay. We all agree that they are signing off on this as streamline review because the soil is clean and it's not going to have any adverse effects.

My question is how did they know it was clean and there were going to be no adverse effects if when they issued that assessment or that determination they didn't have any test results yet?

MR. ROBERTSON: I think the expectation at the time, Your Honor, was that --

THE COURT: We can all have expectations, Mr. Robertson, but you're signing a form where the people signing it are saying they have done a 106 review that we can make it a streamlined review because this soil is, quote-unquote, clean, and there are going to be, quote-unquote, no adverse effects.

MR. ROBERTSON: We would say that has now happened.

THE COURT: No, no, no. That's not how this works,

Mr. Robertson. You don't get to say something is clean and not a problem and sign off that it's clean and not a problem and then do the testing later and say, "Whoo, we were right." That's not how it works.

I mean, that is the one strong APA claim that they actually have, which is this whole thing began based on in a not-so-great light false, and a less great -- I mean, in a not as great, but not as bad like negligent assessment that someone put their name to, that I'm not going to put into the record, but rest assured I'm going to give them a deposition on it, and said this is clean and this is not going to have adverse effects.

On what basis were they making that determination, because that I am allowed to review.

MR. ROBERTSON: I understand the expectation was that the fill was coming from the White House, and fill from the White House that's good enough to be at the White House for the Presidents and their children is good enough to be placed at a golf course.

THE COURT: Who said it was good enough for them to do that? Just because it happens doesn't mean that it was good enough. It just means that they did it. Sometimes, Mr. Robertson, we act without actually thinking things through.

I mean, let me ask you this. Before the East Wing was torn down, was there an assessment made that the fill that

would be there after the teardown would be safe?

MR. ROBERTSON: Sorry. Can you run that back? Before the --

THE COURT: Sure. You're telling me that, well, they just assumed it was safe because it was at the White House as a dumped thing, and they wouldn't leave it there, they wouldn't create that if it wouldn't be safe for the President and the kids, right? That's what you just asked me to assume.

MR. ROBERTSON: Yes, Your Honor.

THE COURT: Did someone actually test that hypothesis before the East Wing was destroyed? Did someone go by and say, you know what, if we destroy all this soil it's going to be clean once it's on the ground and it's going to be safe for the President and his children?

MR. ROBERTSON: I will say no.

THE COURT: I think you would be well advised to say no to that. After the soil was put on the ground, they wanted to get rid of it?

MR. ROBERTSON: I don't follow the point.

THE COURT: They destroy the East Wing, there is a bunch of soil sitting by the White House, and the President and his people want it removed, right?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: Okay. Now, one reason they might want it removed is because maybe it had some bad stuff in it that they

don't want around the President and the kids.

MR. ROBERTSON: I would say that is pure speculation.

THE COURT: Bingo, it's pure speculation. Did they have testing results from the soil at the White House before they took it to the yard?

MR. ROBERTSON: Again, no, Your Honor.

THE COURT: No. So no one had tested it.

MR. ROBERTSON: I think our position would be they were not required to and what has shown up is still clean fill.

THE COURT: I'm saying I don't know if they were required to or not. I know that they signed a form that they were required to file before it was moved, and that form said that there would be clean soil, quote-unquote, and, quote-unquote, no adverse effects.

On what basis was it determined that the soil was clean if no one had tested it?

MR. ROBERTSON: My understanding, Your Honor, this is not Jacobs Engineering, this is a different contractor that was hired by the White House, Clark Construction.

THE COURT: Clark Construction wasn't the one who signed it. The person who signed it was someone at the Department of Interior.

MR. ROBERTSON: Correct, Your Honor.

THE COURT: How did that person determine that the proposed action involves relocating and reusing approximately

30,000 cubic yards of, quote-unquote, clean fill generated from the White House East Wing Modernization Project? And how did that person determine that on the next page, if implemented, would the proposal, A, have significant impacts on public health or safety? Answer: No.

Have significant impact on natural resources and unique geographic characteristics as historical or cultural resources, et cetera, et cetera? No.

Have highly uncertain and potentially significant environmental effects on -- no. The project does not have highly uncertain or potential significant environmental effects.

Now, how can you say it's not highly uncertain when we have no idea what it's going to be is beyond mere logic, but let's move on.

Have significant impacts on species listed or proposed to be listed? No, will have no measurable or significant impacts on any listed or proposed species.

How is someone signing off on all of this when no testing has been done?

And then let me get to the next form, which is assessment of actions having an effect on historic properties. When someone has literally done a 106 review and said that this is routine grounds maintenance when we're moving 30,000 cubic feet of soil and we have no idea if it has any contaminants in.

It says, "Assessment of effect. X, no adverse effect."

MR. ROBERTSON: Okay. I think I can address your question, Your Honor. And if I may point Your Honor to 26-1, page 11. This is the declaration of Ms. -- the first declaration of her in our support of our preliminary injunction motion, or opposition to preliminary injunction.

THE COURT: Hold on. Let me pull it up. I have it here somewhere. 26, which one?

MR. ROBERTSON: 26-1, page 11.

THE COURT: I have 26-4 and 5 as the declarations. I'm not sure I have 26-1. Let me see. Hold on a second.

(Pause)

THE COURT: I have it now.

MR. ROBERTSON: Okay.

THE COURT: Which paragraph number?

MR. ROBERTSON: Paragraph 38.

THE COURT: Okay.

MR. ROBERTSON: So my understanding, Your Honor, and so it's clear here, Clark Construction was not retained by Department of Interior, National Park Service. But as they were excavating fill material from the East Wing Modernization Project, they were doing initial testing to make sure that this fill was screened.

Now, it was not tested in the same way that Jacobs Engineering then tested it upon its arrival. That is correct.

But there was some work done at the White House to make sure and ensure that, yes, what's getting pulled out here is being still reviewed and screened so that there is not big chunks --

THE COURT: When was the first time any testing was done on this soil?

MR. ROBERTSON: By Clark Construction, I do not know, Your Honor. I apologize, but I do not know of Clark Construction. Jacobs Engineering, November 17th I believe is the first time we received it. The first day it was actually tested --

THE COURT: I just want to know when the first result -- because even when we get to September, we have unvalidated results. We don't even get validated results until April. Even if -- I mean --

MR. ROBERTSON: I guess my response would be there was simply no indication of any problems with those results.

THE COURT: Yes, but they are unvalidated. I thought I had asked this yesterday.

MR. ROBERTSON: In terms of the timing, Your Honor --

THE COURT: Hold on. I mean, Clark Construction didn't even begin to implement the site for preparation measures until October 18, 2025, which would have been two days after this was signed. So I mean, everything in her declaration involves things that happened after October 10th. Now, I'm going to give you an opportunity to -- I'm going to

add to your to-do list to tell me the first time they got any testing from anyone. I thought maybe that's what I asked, but maybe you read it as just Jacobs, which is totally fine.

MR. ROBERTSON: Sorry, Your Honor, I did. I interpreted that as Jacobs.

THE COURT: That's totally fine. That was on me. I'm going to give you another chance.

MR. ROBERTSON: Related to this to help Your Honor with the timing and the sequence here, in the email to Ms. Aconi (ph) yesterday, we provided the link to the public facing website that has the document list here for all of this. In the Excel files you can see the date of the testing for each sample.

THE COURT: Those are from Jacobs. That's not going to tell me when Clark did it. We already know Jacobs was after October 2025.

MR. ROBERTSON: I understand now, Your Honor, but I did not understand you were asking as to Clark.

THE COURT: That's totally fine. That was on me. I want to know what the first time was that we got any testing back from Clark, and if the first time we got any testing back from Clark was after October 16, 2025, I'm going to give them a deposition of the guy who signed off on the 106 review. And if it wasn't, I still might, but I would want to hear more argument on it.

Do you all have the Clark testing?

MR. BARDWELL: Your Honor, one of the declarations describes Clark's testing. I don't think we have Clark's testing itself the same way we do Jacobs.

THE COURT: Hold on.

MR. BARDWELL: I do believe that is one of the things we have asked for in our discovery motion.

THE COURT: All right. So Mr. Robertson, if you go to Ms. Nersesian's April 30, 2026 declaration, which is 38-1, if you go to paragraph six of that, she talks about all the tests that Clark did, but -- and this is one of the reasons I asked -- and, again, it was my fault, I should've been clear -- she doesn't give a date for any of the tests.

So I want to know the date of the Clark testing that supports paragraph six of her declaration. Okay.

All right. And then I just want to see if you and I can agree on a number of things that I think you've already said in your pleadings. I just want to make sure I understood you correctly. Okay?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: Okay. You would agree with me that any services for the project must go through the NPS or the Interior must procure any relevant services through the federal acquisition regulations?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: And you would agree with me that that would include the solicitation of contracts and you have to evaluate bids?

MR. ROBERTSON: Yes, Your Honor. I think it also includes NPS also has donation receipt authority. I don't have the citation for that off the top of my head.

THE COURT: You would agree with me that we can't just say tap Mr. Fazio to do it without seeking bids and reviewing bids?

MR. ROBERTSON: I don't know about bids, Your Honor. I'm not sure about bid selection process.

THE COURT: So if you could go to Ms. Bowron's declaration from her April 30th declaration.

MR. ROBERTSON: Yes, Your Honor.

THE COURT: And if you go to paragraph ten.

MR. ROBERTSON: Yes, Your Honor.

THE COURT: She is talking about the renovation process for the golf course.

MR. ROBERTSON: Yes.

THE COURT: She says to initiate -- first of all, in paragraph nine, she says you have to go through the federal acquisition regulations, right?

MR. ROBERTSON: Yes, right after talking about the donation acceptance authority, which could be relevant. We don't know yet.

THE COURT: And then she says, "To initiate the procurement process, the NPS would issue a solicitation for a contract. After evaluation, the NPS would select a bid and enter into a contract that includes design services," right?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: You agree with me that that has to happen?

MR. ROBERTSON: I have no basis for not agreeing with you.

THE COURT: I just want to put it on the record so that later when they say, gosh, Mr. Fazio was just given this contract, and there were no other contracts solicited and no bid processing occurred, I don't have a different government attorney coming up here and saying that wasn't required.

MR. ROBERTSON: So if he donates it completely and just says, "Hey, here are some plans that I came up with, they are yours for free," I'm not sure how necessarily that interacts with the FAR regulations, Your Honor.

THE COURT: I think this says, "As an initial step toward such renovation, the NPS would need to procure design services. Unless design services are donated to and accepted by NPS pursuant to its donation acceptance authority, NPS would need to procure such services consistent with the federal acquisition regulations and any other applicable laws and regulations." This was a declaration that you submitted, right?

MR. ROBERTSON: Yes.

THE COURT: Number ten, "To initiate the procurement process, NPS would issue a solicitation for a contract."

So NPS is going to issue a solicitation for design contract, I take it?

MR. ROBERTSON: So what I understand Ms. Bowron to be saying is that there is potentially two pathways. One is the donation pathway. One is procurement pathway.

THE COURT: If Mr. Fazio says, "I'm donating all this for free," you can accept that without getting bids for people to pay for it I guess is what you're saying.

MR. ROBERTSON: That's my understanding.

THE COURT: But if Mr. Fazio says, "You know, I actually want to get paid for this," then you would agree with me, and, in fact, you have submitted a declaration saying that they have to go through the federal agriculture regulations and that that would include soliciting contracts and reviewing bids?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: All right. And then I think you have already said -- let me ask you this. Would you agree with me E that renovating the golf course would constitute a major federal action under NEPA?

MR. ROBERTSON: If there is a full-blown redesign, yes, Your Honor.

THE COURT: So if there is a major federal action, and I think you have already said the government will have to abide by the National Environmental Policy Act, right?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: And that would include that they would need to make an environmental impact statement?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: And make that public?

MR. ROBERTSON: Sorry, no, Your Honor. Environmental assessment will determine whether or not there is reasonably significant environmental effects that require an EIS, or if there are no significant effects. It's kind of like that first-step process.

THE COURT: I just want to make sure I have my wording correct. One second, please.

(Pause)

THE COURT: Let me start again. If the new plan involves a new long-term lease, the lease and the activities would also have to meet the requirements of 36 CFR part 18, right?

MR. ROBERTSON: That's my understanding, Your Honor.

THE COURT: And that's in Ms. Bowron's March 6, 2026 declaration, right? That's what you have told me.

MR. ROBERTSON: That sounds correct.

THE COURT: I'm just going to be asking a lot from her

declaration, so I'm at 26-4.

MR. ROBERTSON: Okay.

THE COURT: I don't know if you have that available.

MR. ROBERTSON: I do, Your Honor.

THE COURT: And then also we have said that if that were to occur, NPS would require full compliance with the National Environmental Policy Act?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: You would have to have full compliance with Section 106 of the National Historic Preservation Act, right?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: You would have to have full compliance with Section 7 of the Endangered Species Act, right?

MR. ROBERTSON: Yes.

THE COURT: And full compliance with the NPS Organic Act of 1916, right?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: This may, depending on the nature and scope of the proposal, you may also need to have review and approval by the National Capital Planning Commission and U.S. Commission of Fine Arts, right?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: Okay. And then I think this is what you were alerting me to, and you were correct, that with compliance

with NEPA will require to analyze environmental consequences of a major federal action, and that the landscaping projects may qualify for categorical exclusion. Any substantial renovation project proposed for one or more of the NPS-administered golf courses in the District would likely constitute a major federal action.

MR. ROBERTSON: Yes, Your Honor.

THE COURT: We can agree if we redo the entire golf course, that would be a major federal action?

MR. ROBERTSON: Yes. To put it another way, redoing the entire golf course is not going to be able to be done through a categorical exclusion.

THE COURT: And that would then require, if we have a major federal action, the preparation of an environmental assessment, which you discussed?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: And if the impacts were found to be significant, an environment impact statment?

MR. ROBERTSON: Yes. And if not, what we call a FONSI.

THE COURT: Okay. And that the NHPA would require consideration of impacts to historic properties prior to commencing the undertaking, right?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: And then you would also, of course, have

to assess the impact on protected species, and we believe that there are indeed protected species in the national capital region that may be in the vicinity of the East Potomac Golf Course, right?

MR. ROBERTSON: ESA compliance would also be required.

THE COURT: And then you would have to have a determination by someone on the NPS that this abided by the Organic Act, and that that would include a finding of no significant impact or record of decision that it will not result in impairment to park resources or values, right?

MR. ROBERTSON: Yes, Your Honor. My understanding with the impairment finding, so there is some discretion of when a decision document is actually issued for a non-impairment finding, but I'm happy to look into that further. But in terms of the EA and the FONSI, those would be published.

THE COURT: Then if we jump down to paragraph 23, you would also need a CFA review and approval, and that's a two-tiered process, right?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: Consisting of concept review and final review?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: And then process begins when an agency submits a project for concept review?

MR. ROBERTSON: Yes, Your Honor.

THE COURT: When that happens, is that made public? Like is it made public that the agency has now submitted a project for the CFA's review?

MR. ROBERTSON: My understanding is yes, that is a public process. I believe there is a posting of a schedule, itinerary or what have you where it says what's going to be discussed, and, therefore, it's made public, this is the proposed final plan that we're looking at here, let's start it through this review process.

THE COURT: Okay.

MR. ROBERTSON: Your Honor, if I could also just point out, the White House visitors screening facility is currently going through this process, if you want an example of what this can look like.

THE COURT: Which one is going through that process?

MR. ROBERTSON: The visitor screening facility. There is going to be a new place where you go as a White House visitor to go through magnetometers and whatnot.

THE COURT: I can look at that. Thank you. That's helpful.

I do not want to file an injunction unless I feel like I'm on all fours that I can file an injunction, and I'm just not there yet. However, I also don't want to be in a situation where things happen and I'm only finding out about them later

and then there is nothing else that we can do.

I understand that you want a reassessment of sort of the agreed deal that we had in place, because it was interfering too much with regular ground crews. What is some language that -- what is something that I can say "please do X before you do Y" where I will have comfort that we're not sending in bulldozers in dark of night to chop down cherry trees?

MR. ROBERTSON: I have been pondering what could possibly work, Your Honor, and I don't have anything at the moment, but I'm happy to confer with my client and see what they can potentially come up with.

THE COURT: I want all you guys to get together in some meeting and figure out some language that your client will agree to that I sign off on, and it's not going to be an injunction. The only reason I'm not making an injunction order is because I don't want to put people through contempt proceedings. I want to trust that people are acting in good faith and have them acting in good faith until proven otherwise, and you have not proven otherwise to me in this litigation.

And frankly, in any litigation I have had, every single order I have issued has been adhered to now. I don't know if everyone can say that. I can say that, which is why I feel confident doing it this way. If that changes, we're going

to be having a different discussion.

But what I want is for you all to come up with some agreement that you tell me about and that you all sign off on that they are going to get and I'm going to get enough notice before some major thing happens. And I understand that you think we're not at a final agency action yet. I get all of that. But even so, I need to have some comfort. And so I'll give you guys two weeks to work something out.

MR. ROBERTSON: I understand, Your Honor. I would be remiss if I did not state formally our position that they are not entitled to anything. We would object on the basis of that.

THE COURT: I understand that you object, but if you're not going to do anything without all of this stuff happening first, then I don't really think it's going to be a problem for you. If at some point it becomes a problem for you, let me know and we'll reassess.

MR. ROBERTSON: Understood, Your Honor.

THE COURT: You want to talk about standing?

MR. ROBERTSON: Happy to. I think your questions to opposing counsel brought up some interesting comments, interesting thoughts. So I think one of the reasons why they had such a hard time telling you the remedy they want is because they have such a hard time identifying injury. Because they have standing, they have no injury.

What they have identified are purely speculative injuries based on some future thing that might happen.

THE COURT: Okay. But we all agree if we have like a brand-new golf course, there is going to be a substantial number of people who are going to be injured, including the organization, the people they represent and the individuals, because there are people who love that golf course. And it is a historic golf course, and it's going to be gone.

MR. ROBERTSON: I would say, Your Honor, back on August 1, the genesis of these allegation, when they filed their complaint, still speculative, not actual or imminent. I think it's kind of played out that way in the interim since then.

THE COURT: I think it's kind of confirmed everything they think is going to happen. It just happened slower than they thought it was going to happen.

MR. ROBERTSON: I think we would submit that's not -- that's one piece is the plan, the idea to redesign this golf course. The other piece is the stockpile. And why this discussion about the stockpile and the contaminants I think is so interesting is because they haven't come close to *Food and Water Watch v. Vilsack's* requirements for actually having increased risk or harm for chemical contaminants.

THE COURT: That's at a motion to dismiss stage, and I now have to accept their allegations as true.

MR. ROBERTSON: They have to sufficiently allege that they --

THE COURT: They allege -- as I recall, they allege in the complaint that there was asbestos in the West Wing [sic] and all of this other contaminants and that that would have made it into the soil and that that would have made it to the golf course.

MR. ROBERTSON: I think what we have heard is that they are speculating that maybe there was asbestos first put there and then other dirt was put on top and they just don't know because there were certain dates where things weren't tested.

THE COURT: That's when it was in the soil. I think their complaint is pretty clear that there was asbestos in the White House before it was -- that's their allegation in the complaint. That's what I have to look at for standing purposes, right?

MR. ROBERTSON: No. Increased risk of harm is much more strict. Those types of claims are just naturally very, very speculative, this thing that might happen that could cause me a risk of future harm. That by its own nature is a very speculative exercise.

The DC Circuit has said, well, okay, you got to do a two-step process here and they have to have allegations that could fit this. One, you have to identify what is the delta

here? What is the difference between the actual risk of harm from the stockpile and the background risk of harm at East Potomac Park?

Now, just because there is a difference is not enough. The difference has to be meaningful and cause a substantial increase in risk.

THE COURT: But you agree with me that there is no asbestos just floating around Hains Point, right?

MR. ROBERTSON: No, Your Honor. I would agree with that.

THE COURT: According to the allegations in their complaint, there was asbestos in the White House that would have gotten into the landfill, and then you are taking the landfill from there to the soil.

MR. ROBERTSON: I guess under *Vilsack*, Your Honor, not to be glib, but so what. Like that is nowhere near --

THE COURT: This is indeed glib, but okay.

MR. ROBERTSON: *Vilsack* requires something much more -- I think "strict" is the word they use in the DC Circuit there.

THE COURT: What's the second step?

MR. ROBERTSON: Once you show that delta is actually meaningful, that it has actual meat to it, then you actually have to show that the probability of harm to these plaintiffs then increases substantially because of that. All we have

really from them in their allegations is that they are concerned there might be asbestos. They are concerned there might be contaminants, but what we don't have is anything that fits that standing test. They don't have any expert reports or statistics or what have you.

THE COURT: They are going to say, well -- they keep telling me they are coming. Maybe I will have them, maybe I won't. I think one of their complaints is also they haven't had a chance to test the soil. If there is no problem with the soil, why not just give them some soil and get them off your back?

MR. ROBERTSON: I would say they have access to FOIA and it was their burden to do this when they filed their complaint and they didn't do it.

THE COURT: That's a great response to the legal question that I didn't ask. I'm asking a practical question. If there is no problem with the soil, who cares, just give them some soil.

MR. ROBERTSON: I think that -- I understand that, but we're not legally obligated to.

THE COURT: I understand, but here is the thing, it's like when the rubber hits the road, right. You can tell me until the day is long that there is no problem and that they don't have any proof there is a problem, and I can say, okay, if you're confident, then what's the skin off your back, give

them access to the soil. Who cares.

MR. ROBERTSON: I think we were forthcoming with the soil results that we said, okay, that won't interfere with our business too much, we can do that.

THE COURT: You think having some people pick up some soil and having them pick up some soil and test it is going to interfere with your ability to do anything?

MR. ROBERTSON: Your Honor, I'll go back to my original statement. They are not legally entitled to that.

THE COURT: The answer is we just don't want to give it to them. I hear what you're saying. I think if there was really no problem there -- and maybe you can go back to your client and ask. I understand you can't speak for your client.

But I think if there was actually no problem, if you actually had full confidence that there was no problem with the soil -- just as a purely logical matter, if I had an issue and I thought I was 100 percent confident that there was no issue here, and someone is like, "No, I think there is an issue," I would be like, "Okay, look at it."

MR. ROBERTSON: I think the problem we have is that with this stockpiling, they are trying to build their standing plain as it flies, and the problem is that if we actually look to what they have alleged, they haven't put anything else really in support -- there is just nothing here.

THE COURT: I hear you, but that's nonresponsive.

MR. ROBERTSON: I think it's critical.

THE COURT: I understand you think it's critical, and it may well indeed be critical from the legal perpspective. I'm just telling you if I was your client, and I'm not your client, and no one has made me the Secretary of Interior and probably never will for lots of good reasons, but if I was the Secretary of Interior, and I had this case and I'm saying the soil is totally fine and everything is fine, and you guys like are just wrong, and someone kept suing me and saying that the soil is not fine, I would be like, "Fine, just take some samples, go to town." I mean, that's what I would do, but go ahead. I'm not the Secretary of the Interior.

MR. ROBERTSON: I think the government's response would be we have tried to find that middle ground in producing the results.

THE COURT: I hear you, and I appreciate that. Thank you.

MR. ROBERTSON: We are sensitive to continued interference by plaintiffs through this litigation into basically the process that's happening at Interior.

THE COURT: I hear you. Thank you.

MR. ROBERTSON: The last thing on *Vilsack* I want to mention too is that I think they have kind of pushed aside asbestos a little bit and they focus on other contaminants.

THE COURT: Seems like there is a whole lot of arsenic

in there, and I don't know, but arsenic seems like a bad thing.

MR. ROBERTSON: Again, "a whole lot" doesn't fit the test.

THE COURT: I hear you.

MR. ROBERTSON: I think what *Vilsack* specifically points to is that -- I think the term they use is "pluck." You can't just pluck some statistic out of a government report and say, gosh, now I'm subject to an increased risk of harm. You have to meet this test, and in *Vilsack*, there was way more that plaintiffs brought to the table than what plaintiffs here have done.

In fact, the DC Circuit rejected the same language that they are concerned about this. They are like that's not enough. We would submit that there is no standing whatsoever for the stockpile issue either on the increased risk of harm or the kind of, gosh, I think this looks ugly-type basis either.

THE COURT: You agree it looks pretty bad? There used to be a historically beautiful golf course. Granted, there seemed to be some maintenance issues with it. I think we can all agree with that. According to some, it's totally dilapidated, but it was a historic golf course, and now there is like a big massive thing of dirt there. It's pretty big. You would agree with me it's an eyesore?

MR. ROBERTSON: I wouldn't necessarily agree with that, Your Honor.

THE COURT: You and I have different design taste, that's fine.

MR. ROBERTSON: It's a grass covered hill amongst a bunch of hills, but neither here nor there what I think, Your Honor, necessarily.

THE COURT: You're the archeology major. You know better than I do about dirt.

MR. ROBERTSON: As long as I'm not ordered to do the actual NHPA work.

THE COURT: Did you actually go out in the field?

MR. ROBERTSON: Yes.

THE COURT: Where did you go?

MR. ROBERTSON: Monticello.

THE COURT: Oh, I was at a conference recently and we actually heard from the woman who heads the Monticello historic trust. She was fascinating. She was a terrific speaker. She gave a wonderful speech on Jefferson and Adams and their sort of relationship when they were just starting out and then when they grew apart and they were fighting and then when they came back together. It was a really, really wonderful discussion of how we can disagree and yet be civil, even after we have not been civil for a while.

MR. ROBERTSON: We'll hope that we can all remain civil.

THE COURT: Did you find anything?

MR. ROBERTSON: Yes, Your Honor. We were tasked with surveying like the back half of the property, basically looking for where -- when Peter Jefferson, Thomas Jefferson's father owned the property, trying to pinpoint where some slave quarters may have been been. We knew from historical documents that they were there, but we were basically doing field survey to try and pinpoint exactly locations.

THE COURT: And were you able to do that?

MR. ROBERTSON: So we found a hearth or remnants of a hearth. It was tough to tell because we thought there were some post holes, but couldn't tell because it had been plowed under. Difficult exercise.

THE COURT: There is some like really fascinating archeology books about things that -- sort of archeological digs in various parts of the world. I really find them interesting.

MR. ROBERTSON: Hopefully, this case is just as interesting.

THE COURT: There was a great book about a really famous female archeologist who was in Egypt when -- hold on. Now I have to get the name of the book or it's going to bug me. It's really, really well done. Empress of the Nile by Lynne Olson, who, by the way, has phenomenal books on Churchill, but it's a really great book about this woman like when there were no women archeologists at all somehow got herself taught in

Paris and went down and saved a bunch of archeological sites.

Go ahead, golf.

MR. ROBERTSON: Golf, yes. Your Honor, I think I have covered the ground on the stockpile, unless there is further questions on the standing issue. We are at a point where essentially, from our perspective, and I think we make this clear in the briefing so I won't dig into it, but there is no standing for any of these claims. That has to get resolved first and foremost. They don't have it. This case can get dismissed right away on those grounds.

THE COURT: You also think they have no standing on the golf course claims?

MR. ROBERTSON: Correct, Your Honor, zero.

THE COURT: Okay.

MR. ROBERTSON: And then piggybacking on that, Your Honor, there was something else you mentioned. You mentioned when you were speaking with opposing counsel that nothing irretrievable has happened here. I think you're exactly right. And I think --

THE COURT: I really love it when counsel tell me that.

MR. ROBERTSON: I think why that matters is the final agency action test, which we covered in the first go-around.

THE COURT: I hear you.

MR. ROBERTSON: And, Your Honor, I'm happy to answer

any further questions. I think you have our position. I guess I did want to reraise I guess this ongoing notification that we have been doing. Is that --

THE COURT: That's what I want you guys to figure out.

MR. ROBERTSON: Is that like a major thing?

THE COURT: I didn't intend for you all to have to tell them every time you want to do any routine maintenance. That's not what I want to have happen. I want you to tell them basically before things start getting chopped down in a massive way that's irretrievable and we're basically like we're moving forward. I want them to have time to come back to me.

MR. ROBERTSON: I understand. Because some routine maintenance does require a big truck, and I think that's where --

THE COURT: You just work it out with them. I mean, I think -- I hope we all understand what I want is I don't want you all to stop and have to ask permission every time you need to tear down a fence or bring in a big truck to do something. I don't want a destroyed East Wing. I don't want a destroyed reflecting pool or whatever before they are able to come back to me and ask for relief, okay. That's all I really don't want. Okay. But I don't want to get in your way. I'm not going to stop you all from doing anything.

MR. ROBERTSON: Thank you, Your Honor. Perhaps we were overly cautious.

THE COURT: That's totally fair, which is also another reason why I thought some of the press was unfair, because you actually have been doing everything I asked, so thank you.

MR. ROBERTSON: If there is nothing further, Your Honor, I guess I'll just close with saying at this moment we think that the Court should grant a motion to dismiss and deny their PI and deny their motion for discovery.

I think we are at a point in this case where I think the government would like to continue to exercise its normal decision-making process free from interference from plaintiffs in this case.

And finally, I know Your Honor said that you would submit in writing additional requests. I want to make sure that whatever those requests are, I need to confer with my client, and we may object to certain of those requests.

THE COURT: There are only two right now that I really actually care about. One is any testing that was done before the October 16, 2025 form was finalized or filled out or signed on October 16th. And two, whether anything has gone from the Secretary of Interior or his delegates to start all of this in motion to get everything done by September 1st. I just do not believe that nothing has been done.

MR. ROBERTSON: Directly understand.

THE COURT: If you object, you object, and we'll deal with it then. I'm not going to hear any objections on the

dating of the Clark testing, because it was referenced in one of your declarations. But if you want to object to the if something went out, then I'll hear you then, but that's what I would like.

Thank you. And don't file a big brief. If you want to object, just tell me you're objecting and we can get together on a Zoom call.

MR. ROBERTSON: Thank you, Your Honor.

THE COURT: Can I hear from you all on standing, particularly with respect to the soil.

MR. BARDWELL: Yes, Your Honor. I think there is a pretty open and shut answer on that. Irrespective of contaminants, the plaintiffs have esthetic and recreational interests in East Potomac that have nothing to do with chemical composition of the debris. So even if it really was clean fill, they still would have interests that supports standing.

THE COURT: Anything else that you want to add at all?

MR. BARDWELL: Only a couple of clarification questions. Is the Court making a ruling today on the discovery motion?

THE COURT: What would you like?

MR. BARDWELL: To grant the motion.

THE COURT: Okay. Do you want to tell me specifically exactly what you want.

MR. BARDWELL: Well, at a minimum, we would love

clarity on whether Your Honor is authorizing third-party discovery.

THE COURT: What third-party discovery do you want?

MR. BARDWELL: The third-party discovery that we mention in our memo from Mr. Fazio's firm, Meredith O'Rourke, the foundation doing this --

THE COURT: He's told me there has been no communications with O'Rourke, and I'm not going to disbelieve him, so no on that. What else?

MR. BARDWELL: We have discovery requests for Clark and Jacobs. There are a lot of unanswered questions even about Jacobs, and we do have a minimal amount from them, still unanswered questions about the baseline sample testing, for instance.

THE COURT: I'm not going to order any more discovery from Clark and Jacobs until I get something from your experts. If your experts say that they need more information and they put that in a report, I'll take that up then.

MR. BARDWELL: One moment, Your Honor. Thank you.

(Pause)

MR. BARDWELL: Just to be clear about the foundation. Our requests there go beyond whether there is an agreement. They go to the basis of their activities.

THE COURT: I asked him to confirm whether or not there had been any communications at all with the agency and

the foundation. He told me no. He was very emphatic about it. Until I find evidence otherwise, I'm not going to have you issue a third-party subpoena to the foundation.

MR. BARDWELL: Lastly, the National Links Trust.

THE COURT: Isn't that part of that foundation?

MR. BARDWELL: The National Links Trust is the group that was leasing the golf course.

THE COURT: What does that have to do with anything?

MR. BARDWELL: We allege that the lease termination was a part of implementing the Washington National Plan.

THE COURT: I thought we discussed this last time. If they think the lease was violated when they broke it, then they can bring a lawsuit, but I'm not going to let you litigate that on their behalf through this.

MR. BARDWELL: No, ma'am. Excuse me. No, Your Honor.

THE COURT: You can call me "ma'am." You keep saying excuse me. I'm totally fine.

MR. BARDWELL: I got some advice last time that I shouldn't call you ma'am.

THE COURT: Not from me you didn't.

MR. BARDWELL: No, ma'am. It's routine in the south to refer to men judges as "sir" and women judges as "ma'am."

THE COURT: I am from the south. You're totally fine calling me "ma'am." If you heard otherwise from somebody who knows me, they were probably just watching out for me. But I'm

okay. Kathryn Janeway on Star Trek Voyager, who I also think is phenomenal, she hated being called ma'am.

MR. BARDWELL: On the show or in real life?

THE COURT: No, on the show. It was like the pilot episode. Harry Kim goes into her ready room and he's like a brand-new ensign, so he's ramrod straight, and he says something ma'am, and she's like, "Call me captain, call me sir in a pinch, but never call me ma'am." Why, I don't know, but it's Kathryn Janeway, and she was pretty smart, so maybe she was onto something. Just don't call me sir.

MR. BARDWELL: Very good. With regard to --

THE COURT: I just like interrupting you now.

MR. BARDWELL: With regard to NLT, we aren't litigating on their behalf either, but our allegations in the complaint are that the termination of the lease was a step in the implementation of the Washington National Plan.

There is one part of this that is particularly -- would shed a lot of light on this question. Mr. Fazio toured the site we believe in November we believe with a handful of officials from the Department of Interior.

If the National Links Trust was not part of that meeting, and we don't know whether they were, but if they weren't part of that site visit, it certainly would tend to show that it had been predetermined that they would not remain with the lease during construction of the golf course.

THE COURT: I don't know about that. I mean, people invite people to meetings or don't invite people to meetings for all kinds of reasons. Even if that was the case, even if it was predetermined they wouldn't be part of the lease, that still goes back to the breach of lease issue and has nothing to do with what we're doing here.

MR. BARDWELL: I'm not going to -- I think the argument there is that the termination of the lease was not done on the grounds that the department said it was, and --

THE COURT: Let's say I accept everything you say to me as true, so what, as Mr. Robertson so famously glibly said, so what.

By the way, every time I say that from now on, I'm going to quote Mr. Robertson, as the great archeologist Mr. Robertson once said to me, so what.

MR. BARDWELL: If the lease termination was pretextual, then that would tend to show that it was in fact a step in implementing the Washington National Plan.

THE COURT: Okay. I'm in whole hearted -- I don't know how I could possibly agree with you more that the plan is being implemented.

MR. BARDWELL: Very good.

THE COURT: With respect to Mr. Fazio, I'm going to hold off on third-party discovery on that for now for lots of very good reasons, not the least of which is I don't want 1,000

lawyers arguing with me about a subpoena to Mr. Fazio, which I'm quite confident would happen in a heartbeat if I allowed that.

Mr. Robertson has told me that there is no contract with Mr. Fazio at the Department of Interior. Mr. Robertson has confirmed the law, which is that if any contracts are to be signed with respect -- they have to follow the federal acquisition regulations, and that presumably as we sit here in the normal course would require solicitation and bids. Any of that starts happening, then you will find out about it when we all find out about it.

If it happens, if he has a contract that's executed with the agency or with the government that doesn't go through that process, then we can litigate it at that point, but a contract is a contract. It doesn't mean that the golf course is being built tomorrow.

I understand this isn't what you want to hear. I get it. I understand that like slow and steady as she goes is not what you want right now.

MR. BARDWELL: Is Your Honor making a ruling on the remainder of the discovery motion, the agency discovery?

THE COURT: No. I'm trying to get through and tell you like just what else do you actually want. Right now no on the National Links Trust. No on Fazio. No on the foundation. Right now, based on what we know here today. All of this can

change.

I have asked Mr. Robertson for a couple of things. With respect to the soil samples, I'm going to have to see something from your experts that tell me that that's necessary before I'm going to agree to do that and that there is some basis to have them do that. And then I'm going to have to decide the motion to dismiss before I do that.

I mean, spoiler alert, Mr. Robertson, I'm not likely to grant your motion to dismiss, but I haven't made that final determination yet because I haven't issued an opinion on that yet and anything could change at any moment.

I'm not proceeding as I'm proceeding without having sort of at least satisfied myself that's it's unlikely I'm going to grant the motion to dismiss, but, again, nothing is final until it's final, which I guess is Mr. Robertson's entire point here today.

MR. BARDWELL: To be clear, I apologize. I was not trying to pester Your Honor.

THE COURT: You're not pestering me.

MR. BARDWELL: I was just trying to get clarity on where we stood with the pending motions.

THE COURT: I think sometimes I have an odd tone and people think I'm annoyed when I'm actually not annoyed. I'm not annoyed. I'm not pestered. You have not exhausted my patience. If any of those things had happened, you would not

have any doubt about it.

MR. BARDWELL: I get that impression from Your Honor.

THE COURT: One last thing before we leave. When we left here, my current clerks, all three of them came out and said we thought you were going to make fun of us for not being able to play Mrs. Pac-Man, we got away with it. And I was like, oh, thanks for reminding me.

My current clerks are horrible at Mrs. Pac-Man. They are like ridiculously bad at it, and it's a massive disappointment in an otherwise stellar clerkship class.

Happy 4th of July, everyone. Happy 2nd of July as well.

(Proceedings concluded at 4:47 p.m.)

CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Columbia, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 8th day of July, 2026.

/s/ Sonja L. Reeves
SONJA L. REEVES, RDR-CRR
FEDERAL OFFICIAL COURT REPORTER

## $

**$10** [1] - 15:3
**$100,000** [1] - 51:17

## /

**/s** [1] - 112:22

## 0

**0.0317** [1] - 46:18

## 1

**1** [17] - 7:17, 7:25, 8:4, 9:2, 9:12, 9:17, 15:8, 15:11, 15:19, 16:3, 17:14, 18:1, 19:24, 24:14, 41:17, 93:10
**1,000** [2] - 30:10, 109:25
**1.6(b)** [1] - 12:11
**10** [1] - 72:16
**100** [3] - 32:19, 38:7, 97:17
**106** [12] - 12:2, 12:3, 39:9, 63:12, 67:5, 72:17, 72:19, 73:3, 74:20, 78:23, 81:23, 87:10
**10th** [1] - 80:24
**11** [2] - 79:4, 79:9
**11:59** [1] - 31:16
**12:00** [1] - 31:16
**13** [1] - 46:16
**15-minute** [1] - 63:17
**150** [1] - 1:20
**15180** [1] - 1:17
**16** [3] - 72:18, 81:22, 104:18
**16th** [2] - 73:7, 104:19
**1776** [1] - 3:8
**17th** [2] - 48:8, 80:8
**18** [2] - 80:22, 86:19
**1916** [1] - 87:17
**1:26-cv-00477-ACR** [1] - 1:5
**1st** [15] - 6:5, 6:12, 7:6, 7:7, 7:10, 8:15, 10:4, 12:21, 12:23, 16:7, 16:16, 21:4, 22:25, 29:19, 104:21

## 2

**2** [1] - 1:11
**20** [2] - 27:19, 63:16
**20002** [1] - 1:21
**20003** [1] - 1:18
**20043** [1] - 1:15
**2025** [9] - 46:3, 72:16, 72:18, 73:8, 73:17, 80:22, 81:16, 81:22, 104:18
**2026** [6] - 1:11, 9:25, 46:3, 82:9, 86:22, 112:20
**23** [1] - 89:17
**24/7** [1] - 5:2
**25** [3] - 45:12, 47:1, 47:2
**250** [3] - 45:11, 46:25, 47:2
**250-year** [1] - 4:1
**26** [1] - 79:8
**26-1** [3] - 79:3, 79:9, 79:11
**26-4** [2] - 79:10, 87:1
**26-477** [1] - 2:2
**28** [2] - 9:25, 46:2
**2:00** [2] - 1:11, 2:1
**2nd** [6] - 3:16, 3:17, 3:25, 46:3, 50:25, 112:11

## 3

**30** [2] - 46:1, 82:9
**30,000** [4] - 56:11, 72:7, 78:1, 78:24
**30th** [1] - 83:13
**34553** [1] - 1:15
**36** [1] - 86:19
**36-hole** [1] - 68:5
**37,000** [1] - 42:2
**38** [1] - 79:16
**38-1** [1] - 82:9
**3:23** [1] - 66:22
**3:40** [1] - 66:20
**3:42** [1] - 66:22
**3rd** [1] - 3:8

## 4

**40** [2] - 11:9, 11:24
**4:47** [2] - 1:11, 112:13
**4th** [7] - 3:13, 3:17, 3:18, 33:9, 58:23, 112:11

## 5

**5** [1] - 79:10
**500** [1] - 71:12
**516** [1] - 12:11

## 6

**6** [1] - 86:22
**600** [1] - 1:17

## 7

**7** [1] - 87:14

## 8

**8722(a** [1] - 11:9
**8th** [1] - 112:20

## 9

**9102(b** [1] - 11:24

## A

**Aadhiti** [1] - 2:14
**abandon** [1] - 12:18
**abide** [1] - 86:2
**abided** [1] - 89:7
**ability** [1] - 97:7
**able** [9] - 12:22, 27:3, 35:9, 50:17, 56:21, 88:11, 101:8, 103:20, 112:6
**above-entitled** [1] - 112:18
**absolutely** [5] - 16:5, 27:6, 27:12, 30:6, 31:8
**accept** [4] - 18:6, 85:10, 93:25, 109:10
**acceptance** [2] - 83:24, 84:21
**accepted** [1] - 84:20
**access** [4] - 47:19, 47:23, 96:12, 97:1
**accomplish** [1] - 9:16
**According** [1] - 99:20
**according** [3] - 9:7, 45:3, 95:11
**account** [1] - 54:17
**accurate** [2] - 8:22, 112:17
**acknowledge** [3] - 32:20, 36:15, 38:7
**acknowledged** [1] - 38:4
**Aconi** [1] - 81:10
**acquisition** [4] - 82:24, 83:22, 84:23, 110:8
**Act** [14] - 50:2, 50:21, 67:9, 67:10, 67:16, 69:21, 72:8, 86:3, 87:7, 87:10, 87:14, 87:17, 89:8
**act** [7] - 9:6, 9:7, 9:9, 37:21, 37:25, 70:20, 75:23
**Act's** [1] - 50:4
**acted** [1] - 70:20
**acting** [5] - 14:11, 15:18, 34:1, 91:18, 91:19
**Action** [2] - 1:16, 2:2
**action** [62] - 6:7, 6:9, 14:17, 16:25, 17:3, 17:9, 17:16, 17:19, 18:2, 18:11, 18:20, 18:21, 20:18, 21:16, 29:20, 29:22, 30:19, 30:21, 31:13, 31:15, 31:16, 31:21, 33:22, 34:1, 34:19, 34:21, 34:22, 35:13, 36:11, 36:17, 37:13, 38:3, 38:9, 38:21, 39:3, 39:6, 40:4, 40:8, 40:9, 41:6, 53:24, 53:25, 54:3, 55:2, 55:3, 59:3, 59:4, 59:21, 60:16, 62:14, 72:6, 77:25, 85:23, 86:1, 88:2, 88:6, 88:9, 88:14, 92:6, 102:23
**actions** [5] - 41:12, 62:25, 72:3, 72:15, 78:22
**activities** [2] - 86:18, 106:23
**activity** [1] - 72:23
**actual** [7] - 4:1, 61:3, 62:23, 93:11, 95:1, 95:23, 100:9
**Adams** [1] - 100:17
**add** [5] - 13:24, 18:2, 26:3, 81:1, 105:17
**added** [1] - 29:4
**additional** [1] - 104:13
**address** [2] - 21:22, 79:2
**adhered** [1] - 91:23
**administered** [1] - 88:4
**administrative** [5] - 52:2, 52:3, 52:4, 52:7, 56:18
**adopt** [1] - 39:14
**adopted** [2] - 41:2, 41:4
**adoption** [1] - 70:22
**advanced** [1] - 32:21
**adverse** [10] - 73:1, 73:4, 73:9, 73:20, 74:11, 74:13, 74:23, 75:11, 77:14, 79:1
**advertising** [2] - 51:20, 51:23
**advice** [2] - 11:25, 107:18
**advised** [1] - 76:16
**affordable** [1] - 6:2
**aficionado** [1] - 51:21
**afraid** [1] - 54:9
**afternoon** [3] - 2:7, 3:1, 41:16
**agencies** [1] - 37:23
**agency** [78] - 6:7, 6:8, 14:17, 16:25, 17:3, 17:9, 17:16, 17:19, 18:2, 18:11, 18:20, 18:21, 19:14, 20:17, 21:16, 22:14, 23:3, 23:21, 24:11, 29:11, 29:20, 29:22, 30:19, 30:21, 31:13, 31:15, 31:16, 31:20, 33:22, 34:1, 34:19, 34:20, 34:22, 35:13, 36:6, 36:11, 36:17, 36:23, 37:13, 37:15, 37:21, 37:25, 38:3, 38:9, 38:21, 39:3, 39:6, 40:4, 40:8, 40:9, 41:6, 41:12, 42:2, 42:13, 50:19, 53:24, 53:25, 54:3, 55:2, 55:3, 57:12, 59:3, 59:4, 59:19, 59:21, 62:14, 70:20, 89:24, 90:3, 92:6, 102:23, 106:25, 110:13, 110:21
**Agency** [1] - 37:17
**agency's** [1] - 19:18
**ago** [3] - 28:12, 31:14, 39:13
**agree** [36] - 13:9, 16:22, 18:19, 19:2, 19:5, 19:7, 24:4, 31:20, 31:21, 40:7, 41:5, 49:13, 50:14, 55:18, 55:22, 55:24, 62:20, 74:9, 82:17, 82:21, 83:1, 83:7, 84:6, 85:14, 85:21, 88:8, 91:15, 93:3, 95:7, 95:9, 99:17, 99:20, 99:23, 99:24, 109:20, 111:5
**agreed** [5] - 18:17,

22:6, 22:8, 70:4, 91:3
**agreeing** [1] - 84:7
**agreement** [9] - 10:9, 27:3, 27:5, 27:22, 28:6, 28:12, 31:2, 92:3, 106:22
**agrees** [1] - 21:6
**agriculture** [1] - 85:16
**ahead** [12] - 10:20, 11:22, 24:22, 29:23, 30:19, 44:2, 48:17, 57:19, 68:14, 70:17, 98:12, 102:2
**air** [5] - 7:18, 8:2, 68:21, 68:23, 69:6
**airplanes** [1] - 54:18
**al** [4] - 1:3, 1:7, 2:3, 2:4
**alert** [1] - 111:8
**alerting** [1] - 87:25
**Ali** [1] - 64:13
**alien** [2] - 69:8, 69:12
**aliens** [1] - 69:1
**alive** [1] - 20:5
**allegation** [3] - 39:11, 93:10, 94:15
**allegations** [5] - 93:25, 94:24, 95:11, 96:1, 108:14
**allege** [5] - 17:20, 94:1, 94:3, 107:9
**alleged** [1] - 97:23
**allowed** [3] - 58:19, 75:14, 110:2
**allows** [2] - 62:1, 70:22
**alone** [2] - 51:22, 62:8
**alter** [1] - 72:25
**altered** [1] - 49:16
**alternatives** [1] - 57:10
**amateur** [1] - 62:2
**amateurish** [1] - 6:1
**amateurs** [1] - 6:2
**amazing** [4] - 4:9, 51:14
**amend** [2] - 17:23, 18:1
**American** [7] - 3:22, 4:7, 4:8, 4:9, 4:11, 25:4, 25:6
**Americans** [1] - 4:18
**amount** [4] - 6:20, 9:20, 34:16, 106:12
**ANA** [1] - 1:10
**analysis** [5] - 42:5, 42:10, 42:11, 45:22, 56:8
**analyze** [1] - 88:1
**ands** [1] - 8:15
**Animals** [3] - 36:3, 36:12
**anniversary** [1] - 4:1
**announced** [2] - 6:13, 6:14
**announces** [1] - 32:1
**annoyed** [3] - 111:23, 111:24
**answer** [13] - 7:21, 7:23, 7:24, 8:11, 18:9, 24:23, 31:23, 45:16, 63:17, 78:5, 97:10, 102:25, 105:12
**answered** [2] - 16:13, 25:19
**anyway** [1] - 66:4
**APA** [4] - 17:20, 20:18, 21:17, 75:5
**apart** [2] - 10:18, 100:19
**apologize** [3] - 64:7, 80:7, 111:17
**appear** [1] - 44:2
**appearance** [1] - 64:10
**applicable** [1] - 84:23
**applies** [2] - 38:15, 50:6
**appointed** [2] - 11:14, 11:22
**appreciate** [4] - 13:1, 62:4, 98:16
**approach** [3] - 34:25, 46:24, 50:6
**approaches** [1] - 5:13
**appropriate** [1] - 2:10
**appropriately** [1] - 28:3
**approval** [4] - 48:25, 49:2, 87:21, 89:18
**April** [4] - 46:3, 80:13, 82:9, 83:13
**arch** [1] - 24:1
**archeological** [2] - 101:14, 102:1
**archeologist** [2] - 101:20, 109:14
**archeologists** [1] - 101:25
**archeology** [3] - 43:21, 100:6, 101:14
**architect** [5] - 14:4, 17:12, 17:25, 51:14, 51:22
**architects** [2] - 16:2, 27:13
**architectural** [1] - 10:9
**area** [2] - 61:16, 62:2
**arena** [1] - 4:25
**argue** [4] - 57:15, 66:12, 66:13, 67:9
**arguing** [1] - 110:1
**argument** [3] - 41:18, 81:25, 109:8
**arguments** [1] - 35:17
**arrival** [1] - 79:25
**arrive** [1] - 11:5
**arsenic** [7] - 42:8, 45:4, 46:12, 46:15, 46:21, 98:25, 99:1
**articles** [1] - 31:25
**Arts** [3] - 11:24, 39:23, 87:22
**asbestos** [21] - 42:6, 44:6, 44:13, 44:17, 44:19, 44:22, 45:4, 45:8, 45:9, 46:6, 46:7, 46:8, 46:9, 94:4, 94:9, 94:14, 95:8, 95:12, 96:2, 98:24
**asbestos-free** [1] - 46:8
**aside** [3] - 61:14, 63:4, 98:23
**aspects** [1] - 38:23
**assess** [1] - 89:1
**assessing** [1] - 35:17
**assessment** [12] - 12:6, 12:8, 47:10, 71:24, 72:3, 72:15, 74:14, 75:8, 75:25, 78:22, 86:10, 88:15
**Assessment** [1] - 79:1
**associated** [2] - 33:9, 45:20
**assume** [11] - 14:23, 26:19, 27:21, 32:7, 39:20, 40:6, 47:17, 50:7, 55:3, 70:19, 76:8
**assumed** [1] - 76:5
**assumes** [1] - 46:25
**assuming** [4] - 12:7, 20:9, 27:1, 53:24
**assumption** [1] - 11:19
**assured** [3] - 61:19, 75:10
**attach** [1] - 48:24
**Attempting** [1] - 21:10
**attempting** [2] - 9:7, 21:7
**attention** [3] - 4:7, 5:15, 57:2
**attorney** [2] - 66:11, 84:13
**audience** [1] - 19:20
**August** [4] - 17:19, 22:7, 38:5, 93:10
**authority** [5] - 53:10, 56:13, 83:5, 83:24, 84:21
**authorizing** [1] - 106:1
**available** [6] - 12:12, 14:8, 18:15, 40:13, 57:10, 87:3
**Avenue** [1] - 1:17
**aware** [7] - 5:9, 7:11, 15:12, 15:16, 30:12, 49:10, 61:22
**awesome** [1] - 64:25


## B


**background** [4] - 45:23, 47:14, 50:13, 95:2
**bad** [7] - 45:15, 70:20, 75:8, 76:25, 99:1, 99:17, 112:9
**Bardwell** [1] - 2:8
**BARDWELL** [124] - 1:14, 2:7, 2:13, 2:23, 18:5, 33:7, 39:10, 39:25, 40:3, 40:11, 40:16, 41:1, 41:23, 41:25, 42:20, 43:1, 43:12, 43:16, 43:18, 43:24, 44:3, 44:9, 44:15, 44:21, 45:2, 45:23, 46:9, 46:12, 47:4, 47:12, 47:21, 47:23, 48:1, 48:6, 48:14, 48:18, 48:24, 49:7, 49:12, 49:20, 50:1, 50:12, 50:16, 51:2, 51:5, 52:1, 52:6, 52:12, 52:17, 53:1, 53:4, 53:8, 53:13, 53:21, 54:1, 54:9, 54:23, 55:5, 55:11, 55:16, 55:21, 55:24, 56:2, 56:12, 56:19, 57:7, 57:14, 57:22, 58:2, 58:8, 58:15, 58:21, 59:19, 60:12, 60:20, 61:13, 62:17, 63:6, 63:13, 63:24, 64:2, 66:10, 66:24, 67:7, 67:12, 67:15, 68:2, 68:13, 68:15, 69:17, 69:21, 70:1, 70:5, 70:9, 70:14, 70:21, 70:25, 71:16, 82:2, 82:6, 105:11, 105:18, 105:22, 105:25, 106:4, 106:10, 106:19, 106:21, 107:4, 107:6, 107:9, 107:15, 107:18, 107:21, 108:3, 108:11, 108:13, 109:7, 109:16, 109:22, 110:20, 111:17, 111:20, 112:2
**barn** [1] - 41:1
**barrier** [1] - 47:13
**bars** [1] - 4:20
**based** [5] - 18:11, 45:18, 75:6, 93:2, 110:25
**baseline** [3] - 42:8, 44:11, 106:13
**baselines** [1] - 42:7
**basis** [10] - 40:9, 63:2, 63:23, 75:13, 77:15, 84:7, 92:11, 99:16, 106:23, 111:6
**beat** [3] - 65:22, 66:2, 66:19
**beautiful** [3] - 5:7, 69:10, 99:18
**become** [1] - 18:13
**becomes** [1] - 92:16
**BEFORE** [1] - 1:10
**beg** [3] - 43:16, 44:15, 68:13
**began** [4] - 44:10, 44:12, 57:8, 75:6
**begin** [13] - 8:15, 8:18, 11:2, 16:16, 17:14, 18:1, 19:23, 21:4, 22:25, 39:10, 44:10, 62:17, 80:21
**beginning** [2] - 2:6, 22:5
**begins** [1] - 89:24
**behalf** [2] - 107:14, 108:14
**behind** [1] - 66:3
**beings** [2] - 47:6, 61:5
**belittle** [1] - 49:11
**beloved** [1] - 62:3
**below** [1] - 71:12
**bench** [1] - 72:11
**benefit** [1] - 30:17
**Bennett** [1] - 35:16

**besmudge** [1] - 57:20
**best** [7] - 4:13, 4:25, 9:13, 12:21, 21:21, 42:10, 51:22
**bet** [4] - 14:24, 14:25, 15:3, 58:5
**better** [2] - 41:9, 100:7
**betting** [1] - 15:6
**between** [3] - 46:2, 52:19, 95:1
**beyond** [3] - 20:8, 78:14, 106:22
**bicycle** [1] - 6:3
**bid** [3] - 83:11, 84:3, 84:12
**bids** [7] - 83:3, 83:8, 83:9, 83:10, 85:10, 85:18, 110:9
**big** [12] - 39:2, 39:3, 46:20, 54:22, 68:20, 69:4, 80:3, 99:22, 103:13, 103:18, 105:5
**bigger** [2] - 29:8, 33:12
**biggest** [2] - 33:23, 46:15
**billion** [1] - 51:20
**bingo** [1] - 77:3
**bit** [8] - 6:2, 12:3, 35:20, 42:21, 57:23, 70:16, 72:2, 98:24
**blank** [1] - 69:5
**BLM** [2] - 36:3, 36:12
**blown** [1] - 85:24
**blueprint** [3] - 27:1, 28:14, 41:11
**blueprints** [6] - 5:20, 10:14, 10:18, 10:22, 28:21
**body** [1] - 47:3
**book** [3] - 101:19, 101:21, 101:24
**books** [2] - 101:14, 101:23
**border** [2] - 54:13, 54:14
**Boston** [3] - 71:4, 71:8, 71:9
**bottom** [3] - 13:17, 23:11, 53:21
**Bowron** [1] - 85:6
**Bowron's** [2] - 83:12, 86:22
**Box** [1] - 1:15
**box** [1] - 70:14
**box-checking** [1] - 70:14
**brand** [2] - 93:4, 108:6
**brand-new** [2] - 93:4, 108:6
**breach** [1] - 109:5
**break** [2] - 62:16, 63:17
**brief** [1] - 105:5
**briefing** [2] - 73:12, 102:7
**briefly** [2] - 11:9, 32:17
**briefs** [2] - 37:14, 49:23
**bring** [2] - 103:18, 107:13
**broad** [1] - 50:4
**broke** [1] - 107:12
**brought** [3] - 5:14, 92:21, 99:10
**BS** [1] - 4:13
**bug** [1] - 101:21
**build** [17] - 9:14, 14:6, 14:14, 20:21, 21:2, 25:13, 32:1, 32:4, 58:9, 67:25, 68:1, 70:2, 71:20, 71:21, 71:23, 97:21
**building** [1] - 19:23
**built** [3] - 13:15, 41:17, 110:16
**bulldoze** [1] - 68:19
**bulldozer** [1] - 41:16
**bulldozers** [8] - 12:24, 31:14, 31:15, 31:16, 40:19, 40:20, 60:7, 91:7
**bulldozing** [1] - 41:17
**bullet** [1] - 22:3
**bullets** [1] - 22:3
**bunch** [7] - 31:17, 63:1, 65:7, 69:13, 76:21, 100:4, 102:1
**burden** [1] - 96:13
**Burgum** [2] - 11:1, 29:7
**burrows** [1] - 37:16
**business** [1] - 97:4
**buts** [1] - 8:15
**BY** [3] - 1:14, 1:17, 1:20

## C

**Campbell** [1] - 2:15
**candidly** [2] - 48:3, 53:8
**cannot** [7] - 14:17, 20:2, 42:1, 50:8, 50:12, 50:19, 55:7
**Capital** [5] - 10:12, 11:8, 11:11, 25:22, 87:21
**capital** [2] - 11:20, 89:2
**captain** [1] - 108:7
**carcinogen** [1] - 47:3
**carcinogenic** [2] - 45:4, 57:17
**card** [2] - 4:13, 4:16
**care** [2] - 74:3, 104:17
**cared** [2] - 4:23, 4:24
**cares** [2] - 96:17, 97:1
**Caroline** [1] - 71:6
**Carroll** [1] - 2:9
**CARROLL** [1] - 1:14
**case** [20] - 11:21, 17:3, 29:12, 31:22, 38:16, 47:19, 48:19, 48:21, 50:18, 57:21, 64:11, 71:16, 71:20, 71:23, 98:7, 101:17, 102:9, 104:8, 104:11, 109:3
**CASE** [1] - 1:5
**cases** [2] - 36:3, 37:15
**casual** [1] - 45:13
**cat** [2] - 20:5
**categorical** [4] - 72:1, 72:5, 88:3, 88:12
**CATHERINE** [1] - 1:14
**Catherine** [1] - 2:9
**cautious** [1] - 103:25
**CE** [1] - 72:1
**Cecilia** [1] - 2:24
**celebrating** [1] - 33:11
**Center** [1] - 23:25
**certain** [5] - 5:20, 37:24, 40:4, 94:11, 104:15
**certainly** [9] - 41:25, 48:20, 56:13, 58:15, 58:21, 61:1, 61:13, 63:13, 108:23
**CERTIFICATE** [1] - 112:15
**certificates** [1] - 42:18
**Certified** [1] - 1:24
**certified** [1] - 52:3
**certify** [1] - 112:17
**cetera** [2] - 78:8
**CFA** [3] - 11:25, 25:23, 89:18
**CFA's** [1] - 90:4
**CFR** [1] - 86:19
**chambers** [3] - 61:18, 65:12, 65:17
**chance** [5] - 47:14, 50:2, 61:10, 81:7, 96:9
**chances** [1] - 47:2
**change** [8] - 11:17, 17:13, 18:11, 23:25, 25:17, 60:25, 111:1, 111:11
**changed** [1] - 28:8
**changes** [1] - 91:25
**changing** [4] - 13:11, 17:12, 62:9, 67:4
**characteristics** [2] - 68:3, 78:7
**chase** [1] - 40:14
**checking** [1] - 70:14
**chemical** [2] - 93:23, 105:14
**cherry** [2] - 31:17, 91:7
**Chevron** [1] - 50:7
**children** [2] - 75:18, 76:14
**chop** [1] - 91:7
**chopped** [4] - 31:17, 32:5, 32:11, 103:9
**Christmas** [1] - 58:22
**chronology** [5] - 9:25, 71:21, 71:22, 71:23
**chunks** [1] - 80:3
**Churchill** [1] - 101:23
**circle** [1] - 69:4
**Circuit** [3] - 94:23, 95:19, 99:12
**circumference** [1] - 45:24
**circumstance** [1] - 56:25
**citation** [1] - 83:6
**citizen** [2] - 26:12, 27:15
**civil** [3] - 100:21, 100:22, 100:24
**Civil** [1] - 2:2
**claim** [6] - 17:20, 21:25, 49:13, 50:9, 67:9, 75:5
**claims** [3] - 94:19, 102:8, 102:12
**clarification** [3] - 32:15, 63:24, 105:18
**clarify** [1] - 33:16
**clarity** [2] - 106:1, 111:20
**Clark** [16] - 77:19, 77:20, 79:19, 80:6, 80:7, 80:20, 81:15, 81:18, 81:21, 81:22, 82:1, 82:11, 82:14, 105:1, 106:10, 106:16
**Clark's** [2] - 82:3
**class** [1] - 112:10
**clean** [20] - 48:10, 72:8, 73:9, 73:13, 73:20, 74:1, 74:3, 74:4, 74:10, 74:12, 74:22, 75:1, 75:2, 75:11, 76:13, 77:9, 77:13, 77:16, 78:1, 105:15
**clear** [14] - 14:11, 19:10, 20:21, 27:6, 32:8, 33:17, 36:4, 64:7, 79:19, 82:12, 94:14, 102:7, 106:21, 111:17
**clerk** [1] - 2:21
**CLERK** [1] - 2:2
**clerked** [1] - 64:19
**clerking** [1] - 65:8
**clerks** [3] - 71:19, 112:4, 112:8
**clerkship** [5] - 64:20, 64:23, 66:1, 66:4, 112:10
**clever** [3] - 71:1, 71:3, 71:14
**client** [12] - 33:25, 52:22, 57:3, 57:5, 59:14, 91:11, 91:14, 97:13, 98:4, 98:5, 104:15
**clients** [1] - 32:14
**close** [5] - 3:15, 35:21, 37:16, 93:21, 104:5
**closed** [1] - 33:10
**closure** [2] - 32:22, 33:8
**co** [1] - 2:9
**co-counsel** [1] - 2:9
**coaches** [1] - 4:23
**Coca** [2] - 57:19, 57:24
**Coca-Cola** [2] - 57:19, 57:24
**Coke** [1] - 57:21
**Cola** [2] - 57:19, 57:24
**collected** [1] - 46:1
**colloquy** [1] - 25:21
**Columbia** [1] - 112:17

**COLUMBIA** [1] - 1:1
**come-from-behind** [1] - 66:3
**comfort** [3] - 56:5, 91:6, 92:7
**coming** [11] - 29:23, 30:15, 32:22, 34:2, 35:18, 43:12, 58:25, 59:1, 75:16, 84:13, 96:7
**commencing** [1] - 88:23
**comment** [3] - 25:25, 72:18
**comments** [1] - 92:21
**Commission** [10] - 10:12, 11:9, 11:12, 11:23, 23:24, 25:22, 39:22, 39:23, 87:21, 87:22
**commission** [2] - 11:13, 11:16
**commitment** [7] - 25:17, 30:18, 59:22, 59:25, 60:18, 61:1, 65:5
**commitments** [1] - 25:11
**committed** [1] - 59:17
**communicated** [1] - 25:6
**communications** [4] - 25:9, 61:17, 106:8, 106:25
**community** [2] - 62:4, 62:5
**company** [1] - 41:16
**comparison** [1] - 46:22
**complaint** [14] - 17:23, 18:2, 55:17, 64:2, 64:5, 71:25, 72:14, 93:11, 94:4, 94:14, 94:16, 95:12, 96:14, 108:15
**complaints** [1] - 96:8
**completed** [4] - 12:25, 49:5, 70:10, 72:22
**completely** [2] - 13:2, 84:14
**complex** [1] - 6:2
**compliance** [8] - 49:6, 70:10, 87:6, 87:9, 87:13, 87:16, 87:25, 89:5
**complied** [1] - 41:4
**comply** [1] - 38:12
**composition** [1] - 105:15
**concede** [1] - 53:13
**conceding** [1] - 48:20
**conceivably** [1] - 60:16
**concentration** [1] - 46:16
**concept** [2] - 89:21, 89:25
**conceptual** [7] - 10:17, 10:25, 18:24, 26:8, 28:14, 28:17, 29:7
**concern** [9] - 31:10, 31:11, 33:23, 45:10, 45:16, 46:15, 56:24
**concerned** [4] - 68:17, 96:2, 99:13
**concerning** [1] - 25:12
**concerns** [4] - 46:21, 47:11, 56:20, 61:16
**conclude** [1] - 47:5
**concluded** [1] - 112:13
**conclusion** [1] - 47:8
**concrete** [1] - 6:25
**conduct** [1] - 12:6
**confer** [2] - 91:11, 104:14
**Conference** [1] - 112:19
**conference** [1] - 100:14
**confidence** [1] - 97:15
**confident** [6] - 30:3, 30:11, 91:25, 96:25, 97:17, 110:2
**confirm** [5] - 26:20, 29:9, 52:10, 52:11, 106:24
**confirmed** [2] - 93:14, 110:6
**confirming** [1] - 66:18
**conformance** [1] - 112:18
**confused** [1] - 69:7
**Congress** [1] - 59:11
**consequences** [2] - 31:1, 88:1
**conservative** [1] - 46:24
**conserve** [1] - 67:17
**conserved** [1] - 68:21
**conserving** [1] - 67:20
**consider** [2] - 26:9, 27:11
**consideration** [1] - 88:22
**considered** [3] - 27:12, 35:6, 60:21
**considering** [1] - 33:2
**consistency** [1] - 68:4
**consistent** [2] - 72:23, 84:22
**consisting** [1] - 89:21
**constitute** [2] - 85:22, 88:5
**Constitution** [1] - 59:12
**construction** [4] - 12:24, 42:3, 54:4, 108:25
**Construction** [6] - 77:19, 77:20, 79:19, 80:6, 80:8, 80:20
**consulting** [1] - 43:1
**consummation** [3] - 23:19, 30:21, 30:24
**contained** [1] - 44:6
**contaminant** [1] - 42:3
**contaminants** [12] - 44:6, 48:8, 55:20, 57:15, 61:4, 78:25, 93:20, 93:23, 94:5, 96:3, 98:24, 105:13
**contaminated** [2] - 42:5, 49:15
**contamination** [1] - 57:16
**contempt** [1] - 91:17
**contending** [1] - 6:6
**contents** [1] - 56:13
**contested** [1] - 38:19
**continue** [2] - 70:9, 104:9
**continued** [1] - 98:18
**contract** [21] - 28:5, 51:1, 52:14, 52:16, 52:19, 52:21, 52:23, 53:17, 54:1, 54:2, 54:3, 84:3, 84:4, 84:11, 85:3, 85:5, 110:4, 110:12, 110:15
**contractor** [3] - 35:3, 41:15, 77:18
**contractor's** [1] - 45:3
**contracts** [4] - 83:2, 84:11, 85:17, 110:6
**contributing** [3] - 67:19, 68:8, 68:18
**coordinator's** [1] - 73:3
**correct** [13] - 7:16, 10:4, 23:19, 42:14, 52:18, 62:11, 73:18, 77:23, 79:25, 86:15, 86:24, 87:25, 102:13
**correctly** [1] - 82:19
**cost** [2] - 60:13, 62:3
**counsel** [5] - 2:6, 2:9, 92:21, 102:17, 102:20
**Counsel** [1] - 18:4
**country** [3] - 4:18, 4:21, 56:23
**countrymen** [1] - 4:24
**County** [1] - 28:2
**couple** [4] - 5:10, 71:18, 105:18, 111:2
**Course** [9] - 15:23, 15:24, 22:16, 49:8, 68:7, 68:16, 70:2, 72:21, 89:4
**course** [95] - 5:21, 5:22, 5:23, 5:24, 8:13, 8:14, 10:13, 10:15, 12:4, 12:25, 13:11, 14:2, 14:3, 17:11, 17:24, 18:21, 19:12, 19:23, 20:5, 20:11, 20:12, 20:21, 21:3, 22:7, 22:24, 23:18, 23:22, 24:2, 24:8, 24:13, 25:8, 26:11, 27:11, 27:13, 27:14, 27:20, 28:10, 29:17, 32:1, 33:1, 34:4, 36:9, 38:6, 39:17, 41:8, 41:9, 44:8, 46:24, 51:9, 51:10, 51:15, 51:18, 53:2, 54:17, 58:10, 58:14, 59:17, 59:20, 60:8, 61:15, 61:17, 61:23, 61:24, 61:25, 62:10, 67:2, 67:4, 67:10, 67:18, 67:25, 68:1, 68:3, 68:5, 72:13, 72:20, 72:25, 75:19, 83:18, 85:22, 88:9, 88:11, 88:25, 93:4, 93:7, 93:8, 93:19, 94:7, 99:18, 99:21, 102:12, 107:7, 108:25, 110:9, 110:15
**courses** [7] - 14:7, 14:14, 16:1, 21:2, 25:14, 26:13, 88:5
**COURT** [362] - 1:1, 2:12, 2:16, 2:20, 2:25, 3:3, 3:15, 5:14, 6:10, 6:17, 7:14, 7:17, 7:20, 7:23, 8:7, 8:13, 8:23, 9:1, 9:6, 9:9, 9:12, 9:16, 9:24, 10:5, 10:14, 10:20, 10:24, 11:4, 11:7, 11:13, 11:16, 11:21, 12:3, 12:19, 13:4, 13:9, 13:18, 13:24, 14:18, 14:22, 14:24, 15:3, 15:7, 15:14, 15:18, 15:22, 16:12, 16:19, 17:2, 17:22, 18:7, 18:13, 18:16, 18:23, 19:9, 19:15, 20:2, 20:9, 20:19, 20:24, 21:12, 21:24, 22:12, 23:9, 23:16, 23:21, 24:8, 24:17, 24:21, 25:1, 25:5, 25:11, 25:16, 25:24, 26:3, 26:10, 26:15, 26:20, 27:6, 27:16, 27:24, 28:4, 28:7, 28:9, 28:14, 28:18, 28:23, 29:1, 29:9, 29:23, 30:10, 31:5, 32:18, 33:6, 33:10, 33:16, 33:23, 34:18, 35:24, 36:18, 37:6, 37:25, 38:14, 38:24, 39:2, 39:15, 40:1, 40:6, 40:14, 40:17, 41:5, 41:24, 42:4, 42:16, 42:23, 43:3, 43:14, 43:17, 43:20, 43:22, 44:1, 44:7, 44:13, 44:16, 45:1, 45:7, 46:1, 46:11, 46:13, 47:10, 47:16, 47:22, 47:25, 48:5, 48:12, 48:15, 48:23, 49:2, 49:10, 49:18, 49:22, 50:11, 50:14, 50:22, 51:3, 51:12, 52:3, 52:9, 52:16, 52:20, 53:3, 53:6, 53:11, 53:15, 53:23, 54:7, 54:10, 54:24, 55:9, 55:14, 55:18, 55:22, 55:25, 56:3, 56:16, 56:23, 57:13, 57:19, 57:25, 58:4, 58:13, 58:17, 58:23, 59:24, 60:19, 61:2, 61:14, 62:20, 63:8, 63:15, 63:25, 64:4, 64:12,

64:14, 64:16, 64:18, 64:20, 65:6, 65:10, 65:14, 65:16, 65:20, 65:25, 66:3, 66:6, 66:8, 66:11, 66:16, 66:18, 66:23, 67:3, 67:11, 67:14, 67:22, 68:12, 68:14, 68:24, 69:19, 69:24, 70:4, 70:8, 70:13, 70:18, 70:24, 71:2, 71:17, 72:10, 72:13, 73:6, 73:12, 73:15, 73:19, 73:23, 74:3, 74:9, 74:18, 74:25, 75:20, 76:4, 76:10, 76:16, 76:20, 76:24, 77:3, 77:7, 77:10, 77:20, 77:24, 79:7, 79:10, 79:13, 79:15, 79:17, 80:4, 80:11, 80:17, 80:20, 81:6, 81:14, 81:19, 82:5, 82:8, 82:21, 83:1, 83:7, 83:12, 83:15, 83:17, 83:20, 84:1, 84:6, 84:9, 84:18, 85:2, 85:9, 85:13, 85:20, 86:1, 86:5, 86:8, 86:14, 86:17, 86:22, 86:25, 87:3, 87:5, 87:9, 87:13, 87:16, 87:19, 87:24, 88:8, 88:13, 88:17, 88:21, 88:25, 89:6, 89:17, 89:21, 89:24, 90:2, 90:11, 90:16, 90:20, 91:13, 92:13, 92:19, 93:3, 93:14, 93:24, 94:3, 94:13, 95:7, 95:11, 95:17, 95:21, 96:6, 96:15, 96:21, 97:5, 97:10, 97:25, 98:2, 98:16, 98:21, 98:25, 99:4, 99:17, 100:1, 100:6, 100:10, 100:12, 100:14, 100:25, 101:8, 101:13, 101:19, 102:11, 102:14, 102:20, 102:24, 103:4, 103:6, 103:15, 104:1, 104:16, 104:24, 105:9, 105:17, 105:21, 105:23, 106:3, 106:7, 106:15, 106:24, 107:5, 107:8, 107:11, 107:16, 107:20, 107:23, 108:4, 108:12, 109:1, 109:10, 109:19, 109:23, 110:22, 111:19, 111:22, 112:3, 112:23

**Court** [11] - 1:24, 2:1, 37:2, 48:10, 56:14, 66:24, 70:23, 104:6, 105:19, 112:16, 112:16
**court** [4] - 7:1, 55:12, 66:12, 66:13
**Court's** [1] - 42:1
**courthouse** [1] - 57:6
**courtroom** [1] - 19:11
**courts** [4] - 18:17, 34:24, 36:10, 59:10
**cover** [1] - 67:23
**covered** [4] - 38:20, 100:3, 102:4, 102:23
**create** [1] - 76:7
**created** [1] - 57:7
**credibility** [2] - 48:3, 48:11
**crews** [1] - 91:4
**critical** [4] - 9:19, 98:1, 98:2, 98:3
**crossed** [1] - 35:14
**CRR** [1] - 112:22
**cubic** [4] - 42:2, 72:7, 78:1, 78:24
**cultural** [1] - 78:7
**current** [4] - 5:24, 46:24, 112:4, 112:8
**cut** [3] - 6:3, 40:14, 40:20

## D

**danger** [1] - 62:23
**dangerous** [4] - 14:2, 44:6, 57:17, 61:4
**dark** [1] - 91:7
**darn** [1] - 35:21
**date** [13] - 3:8, 6:12, 7:8, 7:11, 7:17, 7:25, 8:1, 8:4, 9:2, 60:6, 81:12, 82:13, 82:14
**Dated** [1] - 112:20
**dates** [2] - 10:3, 94:11
**dating** [1] - 105:1
**days** [16] - 4:5, 44:10, 44:11, 44:16, 44:19, 44:20, 44:22, 45:6, 45:11, 45:25, 46:5, 46:25, 47:2, 47:21, 66:13, 80:22
**DC** [10] - 1:3, 1:12, 1:15, 1:18, 1:21, 2:2, 61:16, 94:23, 95:19, 99:12
**DC's** [2] - 14:6, 14:14
**dead** [1] - 20:5
**deadline** [5] - 7:8, 9:12, 15:9, 15:15, 24:14
**deal** [2] - 91:3, 104:24
**dealing** [2] - 17:4, 61:15
**debris** [3] - 42:3, 49:15, 105:15
**decades** [1] - 68:3
**decide** [5] - 27:18, 58:6, 59:20, 60:24, 111:7
**decided** [3] - 22:15, 23:21
**decision** [34] - 12:16, 18:14, 19:6, 19:12, 19:22, 20:10, 20:12, 20:16, 21:13, 21:16, 22:6, 23:20, 24:4, 24:7, 30:22, 34:8, 34:11, 34:16, 36:23, 37:15, 38:4, 38:10, 39:13, 49:1, 54:5, 57:14, 61:20, 62:12, 62:13, 70:2, 89:9, 89:13, 104:10
**decision-making** [6] - 19:6, 23:20, 30:22, 62:12, 62:13, 104:10
**Declaration** [5] - 3:4, 3:12, 3:16, 3:23, 4:2
**declaration** [13] - 44:4, 44:23, 79:4, 79:5, 80:24, 82:9, 82:15, 83:13, 84:24, 85:15, 86:23, 87:1
**declarations** [3] - 79:10, 82:2, 105:2
**deep** [1] - 56:20
**defendants** [3] - 34:4, 39:11, 47:7
**Defendants** [1] - 1:8
**DEFENDANTS** [1] - 1:19
**Defenders** [2] - 1:16, 2:23
**defense** [1] - 3:2
**definitely** [3] - 19:7, 43:12, 46:16
**definition** [1] - 74:1
**degree** [1] - 55:13
**delegates** [2] - 25:12, 104:20
**delivered** [2] - 34:20, 46:2
**delta** [2] - 94:25, 95:22
**democracy** [1] - 64:15
**Democracy** [4] - 1:13, 1:16, 2:13, 2:23
**deny** [3] - 37:19, 104:6, 104:7
**department** [1] - 109:9
**DEPARTMENT** [1] - 1:6
**Department** [19] - 2:3, 9:3, 9:22, 10:21, 23:12, 23:14, 25:7, 26:6, 26:24, 28:24, 33:1, 52:22, 52:23, 53:18, 62:9, 77:22, 79:20, 108:20, 110:5
**deposing** [1] - 43:7
**deposit** [1] - 51:17
**deposition** [2] - 75:10, 81:23
**DEPUTY** [1] - 2:2
**describe** [1] - 20:23
**described** [1] - 20:22
**describes** [1] - 82:3
**describing** [1] - 17:5
**descriptions** [1] - 42:21
**design** [14] - 10:10, 27:10, 27:23, 27:24, 35:2, 51:9, 68:7, 70:12, 72:25, 84:4, 84:19, 84:20, 85:4, 100:1
**designated** [1] - 26:6
**designed** [3] - 13:15, 13:16, 68:5
**designer** [2] - 27:9, 51:1
**designers** [1] - 26:7
**designing** [1] - 54:3
**designs** [3] - 26:13, 28:3, 28:15
**desk** [3] - 16:4, 16:8, 16:9
**destroy** [6] - 39:14, 67:2, 67:22, 70:2, 76:12, 76:20
**destroyed** [3] - 76:11, 103:19
**destroying** [3] - 67:18, 67:19, 67:24
**destroys** [1] - 67:9
**destruction** [1] - 11:18
**detailed** [8] - 10:12, 10:15, 10:17, 10:22, 11:4, 26:16, 27:1, 42:11
**details** [1] - 11:15
**detected** [1] - 46:16
**determination** [4] - 74:14, 75:13, 89:7, 111:10
**determine** [5] - 14:16, 19:1, 77:24, 78:3, 86:10
**determined** [7] - 14:5, 14:12, 14:15, 21:1, 73:2, 77:15
**developer** [2] - 5:22, 5:23
**developments** [1] - 5:10
**develops** [1] - 27:1
**die** [1] - 39:16
**difference** [3] - 95:1, 95:4, 95:5
**different** [8] - 37:22, 56:8, 69:17, 69:19, 77:18, 84:12, 92:1, 100:1
**difficult** [2] - 59:2, 101:12
**dig** [1] - 102:7
**digs** [1] - 101:15
**dilapidated** [2] - 14:1, 99:21
**dilemma** [2] - 73:22, 73:23
**diminish** [1] - 69:10
**Diplomate** [1] - 1:23
**directive** [11] - 15:20, 16:6, 20:17, 20:20, 21:5, 21:6, 21:7, 21:9, 24:10, 25:18
**directives** [1] - 16:23
**directly** [3] - 8:11, 24:23, 104:23
**dirt** [17] - 42:22, 42:24, 42:25, 43:4, 44:4, 44:7, 45:2, 45:5, 45:24, 55:5, 57:9, 60:24, 60:25, 62:19, 94:10, 99:22, 100:7
**dirty** [1] - 74:4
**disagree** [4] - 4:5, 4:6, 5:2, 100:21
**disagreement** [1] - 4:4
**disappointment** [1] - 112:10
**disbelief** [1] - 30:16
**disbelieve** [2] - 31:5, 106:8
**discourse** [1] - 4:4

**discovery** [14] - 47:24, 53:4, 53:22, 82:7, 104:7, 105:19, 106:2, 106:3, 106:4, 106:10, 106:15, 109:24, 110:21
**discretion** [2] - 28:2, 89:12
**discuss** [1] - 37:4
**discussed** [3] - 88:15, 90:8, 107:11
**discussing** [1] - 40:3
**discussion** [6] - 38:16, 40:7, 42:18, 92:1, 93:20, 100:21
**discussions** [1] - 32:25
**dismiss** [5] - 93:24, 104:6, 111:7, 111:9, 111:14
**dismissed** [1] - 102:10
**dismissing** [1] - 64:5
**dissembling** [1] - 30:8
**district** [2] - 67:20, 68:18
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [3] - 88:5, 112:16
**disturb** [1] - 49:15
**disturbance** [1] - 70:11
**disturbed** [1] - 49:14
**diverge** [1] - 39:11
**divides** [1] - 5:6
**DM** [1] - 12:11
**document** [9] - 12:16, 18:14, 28:21, 29:15, 34:8, 34:11, 34:16, 81:11, 89:13
**documentary** [1] - 3:23
**documentation** [3] - 68:2, 72:1, 72:6
**documents** [2] - 29:10, 101:5
**dodging** [1] - 21:23
**DOI** [2] - 52:13, 52:19
**DOJ** [1] - 1:19
**DOJ-ENRD** [1] - 1:19
**dollars** [4] - 14:25, 51:8, 51:20
**donated** [1] - 84:20
**donates** [1] - 84:14
**donating** [1] - 85:9
**donation** [4] - 83:5, 83:24, 84:21, 85:8
**done** [41] - 8:10, 12:15, 13:3, 16:6, 17:13, 23:11, 23:15, 23:16, 24:5, 26:15, 29:18, 32:10, 33:19, 35:5, 35:6, 35:11, 35:16, 37:24, 41:11, 41:20, 42:11, 43:13, 51:10, 60:9, 60:15, 73:7, 74:5, 74:7, 74:20, 78:20, 78:23, 80:1, 80:5, 88:11, 99:11, 101:22, 104:17, 104:21, 104:22, 109:9
**doubt** [3] - 30:17, 48:15, 112:1
**dovetails** [1] - 36:12
**down** [18] - 6:3, 13:16, 31:17, 32:5, 32:11, 36:25, 40:20, 41:16, 53:19, 60:7, 69:1, 71:16, 75:25, 89:17, 91:7, 102:1, 103:9, 103:18
**dozens** [1] - 3:20
**draw** [1] - 51:14
**drawings** [1] - 11:4
**due** [1] - 3:10
**duh** [1] - 18:3
**dump** [2] - 42:2, 55:7
**dumped** [4] - 49:15, 58:15, 60:1, 76:6
**dumping** [9] - 44:10, 44:12, 45:25, 48:8, 56:15, 57:9, 57:25, 60:13, 62:19
**duration** [2] - 45:12, 47:1
**during** [6] - 12:4, 12:7, 65:17, 65:19, 65:20, 108:25

## E

**EA** [3] - 25:23, 34:7, 89:15
**ears** [1] - 9:5
**earth** [1] - 20:10
**East** [23] - 11:18, 14:2, 44:5, 44:23, 44:25, 48:9, 49:8, 68:6, 68:8, 68:11, 68:15, 70:2, 70:12, 72:20, 75:24, 76:11, 76:20, 78:2, 79:21, 89:3, 95:2, 103:19, 105:14
**ecological** [2] - 45:18, 47:10
**ecology** [1] - 61:5
**educated** [1] - 14:22
**effect** [9] - 27:2, 31:25, 72:3, 72:15, 73:1, 73:4, 78:22, 79:1
**effects** [11] - 73:10, 73:20, 74:11, 74:13, 74:23, 75:12, 77:14, 78:10, 78:12, 86:11, 86:12
**Egypt** [1] - 101:20
**eight** [10] - 44:10, 44:11, 44:16, 44:19, 44:20, 44:22, 45:6, 45:8, 45:25, 46:5
**eighth** [1] - 71:6
**EIS** [1] - 86:11
**either** [10] - 8:1, 8:4, 21:12, 31:3, 37:23, 45:8, 51:5, 99:15, 99:16, 108:14
**eligible** [1] - 72:21
**email** [7] - 29:14, 48:14, 48:16, 61:18, 73:16, 81:9
**emails** [1] - 61:20
**emergency** [1] - 33:4
**emphatic** [1] - 107:1
**employees** [1] - 16:23
**Empress** [1] - 101:22
**encouraged** [1] - 37:22
**encouraging** [2] - 37:21, 38:1
**end** [4] - 17:15, 23:17, 24:9, 43:23
**Endangered** [1] - 87:14
**engineering** [1] - 45:19
**Engineering** [4] - 47:7, 77:18, 79:25, 80:8
**English** [2] - 7:4, 43:20
**enjoin** [4] - 56:14, 56:16, 63:4, 63:5
**enjoy** [1] - 66:4
**enjoyment** [1] - 67:17
**ENRD** [1] - 1:19
**ensign** [1] - 108:6
**ensure** [1] - 80:2
**enter** [6] - 3:5, 10:9, 35:1, 35:2, 70:23, 84:4
**entering** [1] - 34:25
**entire** [6] - 17:12, 17:13, 39:21, 88:8, 88:11, 111:15
**entitled** [6] - 32:23, 33:14, 38:17, 92:11, 97:9, 112:18
**environment** [1] - 88:18
**Environmental** [2] - 86:3, 87:7
**environmental** [9] - 12:6, 12:8, 78:10, 78:11, 86:6, 86:9, 86:11, 88:1, 88:14
**episode** [1] - 108:5
**equipment** [2] - 32:22, 33:3
**equitable** [4] - 42:1, 50:16, 55:6, 55:11
**ESA** [1] - 89:5
**ESPN** [1] - 5:16
**essentially** [2] - 11:10, 102:6
**esthetic** [1] - 105:13
**et** [6] - 1:3, 1:6, 2:3, 78:8
**ether** [1] - 7:9
**evaluate** [1] - 83:3
**evaluation** [2] - 45:18, 84:3
**event** [2] - 41:2, 41:3
**eventual** [1] - 54:4
**eventually** [2] - 38:5, 58:10
**evidence** [3] - 39:12, 55:19, 107:2
**evidentiary** [1] - 61:9
**ex** [1] - 61:17
**exact** [4] - 9:18, 18:5, 36:5, 67:20
**exactly** [9] - 8:19, 16:14, 16:20, 17:5, 36:13, 63:21, 101:7, 102:18, 105:24
**example** [3] - 12:5, 54:11, 90:14
**excavated** [1] - 46:2
**excavating** [1] - 79:21
**Excel** [1] - 81:12
**excellent** [3] - 3:23, 6:21, 65:16
**Except** [2] - 65:25, 71:4
**excess** [1] - 46:17
**excessiveness** [1] - 46:20
**exclusion** [4] - 72:1, 72:5, 88:3, 88:12
**Excuse** [2] - 52:17, 107:15
**excuse** [1] - 107:17
**executed** [1] - 110:12
**executive** [2] - 15:21, 37:23
**Executive** [1] - 59:11
**exempt** [1] - 72:19
**exercise** [3] - 94:22, 101:12, 104:9
**exercises** [1] - 70:15
**exhaust** [1] - 35:22
**exhausted** [1] - 111:24
**Exhibit** [4] - 71:25, 72:3, 72:10, 72:14
**exhibited** [1] - 4:11
**existed** [1] - 45:24
**expectation** [2] - 74:16, 75:15
**expectations** [1] - 74:18
**expedited** [1] - 47:24
**expenditure** [1] - 60:14
**experience** [2] - 60:22, 69:11
**Experiment** [1] - 3:22
**expert** [12] - 42:25, 43:1, 43:5, 43:7, 43:9, 43:10, 45:17, 61:8, 61:12, 62:1, 96:4
**experts** [8] - 47:25, 48:1, 56:9, 74:2, 106:16, 106:17, 111:4
**explain** [3] - 47:14, 47:16, 69:12
**exposure** [1] - 46:22
**eyesore** [1] - 99:23

## F

**fabulous** [2] - 66:11, 66:14
**faced** [1] - 10:2
**facility** [3] - 68:6, 90:13, 90:17
**facing** [2] - 22:10, 81:11
**fact** [17] - 3:17, 19:22, 33:19, 36:16, 45:5, 47:7, 53:9, 60:12, 60:16, 60:23, 60:25, 61:23, 70:21, 73:12, 85:15, 99:12, 109:17
**fail** [2] - 23:23
**fair** [3] - 25:19, 56:12, 104:1
**faith** [9] - 30:10,

53:20, 56:21, 57:1, 57:2, 57:4, 70:20, 91:19
**Faithful** [7] - 68:11, 68:15, 68:20, 68:21, 68:25, 69:2
**falling** [1] - 50:25
**false** [3] - 32:3, 32:6, 75:7
**families** [1] - 61:24
**family** [1] - 27:8
**famous** [3] - 27:9, 43:22, 101:20
**famously** [1] - 109:11
**fantastic** [3] - 14:5, 14:13, 21:1
**far** [7] - 5:6, 5:20, 13:16, 34:24, 60:1, 69:22, 70:8
**FAR** [1] - 84:17
**far-along** [1] - 5:20
**fascinating** [2] - 100:16, 101:13
**father** [1] - 101:4
**fault** [2] - 61:11, 82:12
**favor** [2] - 24:16, 43:25
**favorite** [1] - 66:13
**Fazio** [33] - 5:22, 10:10, 10:23, 14:3, 22:24, 26:4, 26:5, 26:10, 26:19, 26:24, 28:19, 29:17, 31:2, 35:2, 41:10, 51:7, 51:24, 52:14, 52:19, 52:24, 53:5, 53:22, 63:10, 83:8, 84:10, 85:9, 85:13, 108:18, 109:23, 110:1, 110:5, 110:24
**Fazio's** [1] - 106:5
**February** [2] - 47:19, 50:24
**Federal** [1] - 112:16
**federal** [21] - 1:24, 19:11, 42:2, 44:5, 48:25, 50:19, 52:25, 55:8, 56:10, 59:10, 82:23, 83:21, 84:22, 85:16, 85:23, 86:1, 88:2, 88:5, 88:9, 88:14, 110:7
**FEDERAL** [1] - 112:23
**feed** [1] - 5:15
**feet** [1] - 78:25
**fellow** [1] - 4:24
**felt** [2] - 5:5, 58:9
**female** [1] - 101:20
**fence** [3] - 32:25, 33:2, 103:18
**Fenway** [1] - 71:5
**fervently** [1] - 4:6
**field** [3] - 15:23, 100:10, 101:6
**fight** [4] - 53:15, 55:3, 55:4, 58:11
**fighting** [4] - 54:8, 54:14, 55:2, 100:19
**fights** [1] - 54:10
**figure** [5] - 31:19, 36:7, 37:17, 91:14, 103:4
**file** [4] - 77:12, 90:22, 90:23, 105:5
**filed** [3] - 50:24, 93:10, 96:13
**files** [1] - 81:12
**fill** [18] - 48:10, 57:15, 58:9, 58:10, 58:12, 58:13, 72:8, 72:20, 72:24, 73:20, 75:16, 75:25, 77:9, 78:1, 79:21, 79:23, 105:16
**filled** [1] - 104:18
**film** [1] - 10:19
**final** [59] - 5:20, 6:7, 6:8, 14:17, 16:25, 17:3, 17:9, 17:16, 17:19, 18:2, 18:11, 18:13, 18:20, 19:22, 20:12, 20:17, 21:16, 29:20, 29:22, 30:18, 30:21, 31:13, 31:15, 31:16, 31:20, 33:22, 34:1, 34:19, 34:20, 34:22, 35:13, 36:11, 36:17, 37:13, 38:3, 38:9, 38:21, 39:2, 39:5, 40:4, 40:7, 40:9, 41:6, 53:24, 54:2, 55:2, 55:3, 59:3, 59:4, 59:21, 62:13, 89:21, 90:9, 92:6, 102:22, 111:9, 111:15
**finalized** [1] - 104:18
**finally** [1] - 104:12
**financial** [1] - 60:14
**fine** [10] - 54:13, 81:3, 81:6, 81:19, 98:8, 98:10, 100:2, 107:17, 107:23
**Fine** [4] - 11:23, 39:23, 87:22, 98:10
**finish** [3] - 13:5, 50:17, 60:20
**fire** [4] - 6:16, 7:5, 8:16
**fireworks** [1] - 33:9
**firm** [1] - 106:5
**first** [35] - 5:12, 6:12, 10:8, 10:9, 18:20, 23:15, 23:16, 30:20, 32:2, 37:2, 37:11, 42:4, 42:6, 42:24, 45:5, 45:8, 46:5, 47:5, 48:7, 65:4, 73:16, 79:4, 80:4, 80:9, 80:11, 81:1, 81:20, 81:21, 83:20, 86:13, 92:15, 94:9, 102:9, 102:23
**first-step** [1] - 86:13
**fishing** [3] - 38:8, 38:9
**fit** [2] - 94:25, 99:2
**fits** [1] - 96:4
**five** [3] - 27:5, 28:4, 28:5
**flatly** [1] - 47:24
**fleshing** [1] - 22:9
**flies** [1] - 97:22
**floating** [1] - 95:8
**fly** [1] - 54:25
**focus** [2] - 17:18, 98:24
**focused** [1] - 49:22
**FOIA** [1] - 96:12
**follow** [7] - 34:4, 35:5, 67:4, 67:5, 73:5, 76:19, 110:7
**followed** [1] - 32:19
**following** [1] - 32:14
**follows** [3] - 4:3, 36:12, 39:4
**FONSI** [5] - 12:9, 25:23, 34:7, 88:20, 89:15
**Food** [1] - 93:21
**FOR** [3] - 1:1, 1:13, 1:19
**foreclose** [3] - 58:1, 58:4, 58:8
**foreclosed** [5] - 57:9, 57:11, 57:13, 58:2, 58:25
**foregoing** [1] - 112:17
**foremost** [3] - 16:2, 37:2, 102:9
**forest** [1] - 54:25
**forests** [1] - 54:20
**forget** [2] - 33:16, 67:12
**form** [9] - 61:21, 63:9, 72:1, 74:19, 77:11, 77:12, 78:21, 104:18
**formal** [4] - 26:23, 26:25, 27:22, 65:4
**formalistic** [3] - 17:4, 18:16, 34:19
**formally** [1] - 92:10
**format** [1] - 112:18
**forth** [1] - 10:2
**forthcoming** [1] - 97:2
**forward** [19] - 9:10, 9:11, 12:17, 17:6, 18:25, 19:1, 19:3, 19:4, 19:8, 21:13, 23:21, 24:5, 24:7, 30:18, 33:11, 62:9, 73:23, 103:11
**Forward** [3] - 1:13, 2:13, 64:15
**foundation** [6] - 106:6, 106:21, 107:1, 107:3, 107:5, 110:24
**Foundation** [3] - 1:13, 25:4, 25:6
**fountain** [1] - 68:20
**four** [1] - 65:23
**fours** [1] - 90:23
**frame** [1] - 21:22
**framing** [1] - 17:18
**frankly** [2] - 38:15, 91:22
**frazzled** [1] - 3:9
**free** [9] - 26:7, 27:12, 46:7, 46:8, 51:20, 51:23, 84:16, 85:10, 104:10
**French** [1] - 54:11
**friend** [1] - 41:15
**front** [2] - 19:11, 54:22
**full** [12] - 25:10, 28:6, 45:11, 46:25, 56:14, 68:22, 85:24, 87:6, 87:9, 87:13, 87:16, 97:15
**full-blown** [1] - 85:24
**full-time** [2] - 45:11, 46:25
**fully** [4] - 13:1, 50:14, 62:4
**Fun** [3] - 36:3, 36:11
**fun** [2] - 71:14, 112:5
**Fund** [1] - 2:23
**fundamentally** [1] - 69:17
**funding** [2] - 48:25, 49:2
**furnish** [1] - 11:11
**future** [3] - 67:17, 93:2, 94:21

## G

**game** [4] - 4:18, 4:22, 5:7, 71:6
**Garden** [2] - 25:4, 25:5
**Gavin** [1] - 14:4
**general** [1] - 54:10
**generally** [1] - 72:23
**generals** [1] - 54:7
**generated** [2] - 72:8, 78:1
**generations** [3] - 61:25, 67:17
**genesis** [1] - 93:10
**geographic** [1] - 78:7
**Georgetown** [1] - 2:18
**Germans** [1] - 54:21
**get-go** [1] - 64:8
**geyser** [2] - 68:15, 68:23
**Geyser** [1] - 68:24
**giant** [2] - 49:15, 55:7
**Gillian** [1] - 2:14
**given** [11] - 3:5, 4:16, 17:9, 20:17, 20:19, 24:11, 30:14, 32:21, 41:21, 71:2, 84:10
**glib** [2] - 95:16, 95:17
**glibly** [1] - 109:11
**go-around** [1] - 102:23
**goal** [3] - 18:22, 18:25, 36:7
**God** [1] - 64:24
**Godot** [5] - 43:15, 43:17, 43:22, 43:23, 44:1
**Golf** [10] - 14:2, 15:24, 22:16, 49:8, 68:7, 68:16, 70:2, 72:20, 89:3, 102:3
**golf** [95] - 5:8, 5:21, 5:22, 5:23, 5:24, 10:13, 10:15, 13:11, 14:2, 14:3, 14:7, 14:14, 16:1, 16:2, 17:11, 17:24, 17:25, 19:12, 19:23, 20:5, 20:11, 20:12, 20:21, 21:2, 22:7, 22:23, 23:18, 23:22, 24:2, 24:8, 24:13, 25:8, 25:14, 26:11, 26:13, 27:8, 27:9, 27:10, 27:13, 27:20, 28:9,

29:17, 32:1, 33:1, 36:9, 38:6, 39:17, 41:8, 41:9, 44:8, 46:24, 51:1, 51:9, 51:14, 51:15, 51:19, 51:21, 51:22, 58:10, 58:14, 60:8, 61:15, 61:17, 61:23, 61:24, 61:25, 62:10, 67:2, 67:4, 67:9, 67:18, 67:25, 68:1, 68:3, 72:19, 75:19, 83:18, 85:22, 88:4, 88:8, 88:11, 93:4, 93:7, 93:8, 93:18, 94:7, 99:18, 99:21, 102:2, 102:12, 107:7, 108:25, 110:15
**golfer** [1] - 45:13
**golfers** [2] - 62:1, 62:2
**goodness** [2] - 51:11, 51:25
**Google** [1] - 12:12
**gosh** [5] - 16:6, 16:19, 84:10, 99:8, 99:16
**government** [22] - 7:14, 7:24, 7:25, 13:2, 13:7, 15:4, 19:16, 19:17, 27:11, 31:12, 38:17, 42:13, 43:11, 45:20, 52:25, 56:10, 69:14, 84:12, 86:2, 99:7, 104:9, 110:13
**government's** [7] - 19:10, 19:19, 19:21, 20:11, 20:13, 45:3, 98:13
**grab** [1] - 72:12
**grad** [1] - 2:20
**grant** [5] - 60:6, 104:6, 105:22, 111:9, 111:14
**granted** [3] - 50:5, 60:19, 99:18
**granting** [2] - 60:18, 60:21
**grass** [1] - 100:3
**great** [13] - 14:3, 40:17, 48:11, 61:16, 67:15, 69:11, 75:7, 75:8, 96:15, 101:19, 101:24, 109:14
**greatest** [4] - 14:7, 14:14, 21:2, 25:14
**green** [1] - 71:9
**grew** [1] - 100:19
**grit** [1] - 4:10
**ground** [13] - 33:25, 48:20, 49:9, 53:9, 60:2, 62:16, 70:11, 73:2, 76:13, 76:17, 91:4, 98:14, 102:4
**grounds** [6] - 38:21, 72:19, 72:23, 78:24, 102:10, 109:9
**group** [4] - 42:12, 45:19, 107:6
**Group** [1] - 25:6
**guess** [14] - 14:22, 18:3, 18:9, 18:19, 25:16, 42:8, 43:23, 80:15, 85:11, 95:15, 103:1, 103:2, 104:5, 111:15
**guidance** [1] - 36:4
**guy** [3] - 53:7, 53:15, 81:23
**guys** [6] - 2:16, 50:24, 91:13, 92:8, 98:8, 103:4
**gym** [2] - 71:4, 71:11

**H**

**Hains** [7] - 5:18, 13:11, 15:23, 15:24, 19:23, 22:16, 95:8
**hair** [1] - 65:2
**half** [4] - 8:9, 54:16, 60:8, 101:2
**hand** [2] - 3:19, 28:20
**handbook** [4] - 12:10, 23:15, 34:5
**handful** [1] - 108:19
**happend** [1] - 65:20
**happy** [10] - 29:21, 37:3, 38:22, 61:9, 89:14, 91:11, 92:20, 102:25, 112:11
**harbor** [1] - 56:20
**hard** [6] - 21:24, 22:4, 70:15, 92:23, 92:24
**hare's** [1] - 50:22
**harm** [8] - 93:23, 94:18, 94:21, 95:1, 95:2, 95:24, 99:8, 99:15
**Harry** [1] - 108:5
**hated** [1] - 108:2
**head** [4] - 5:3, 13:23, 36:23, 83:6
**head's** [1] - 36:23
**headline** [1] - 32:3
**headlines** [1] - 32:13
**heads** [1] - 100:15
**health** [3] - 42:10, 45:16, 78:5
**hear** [21] - 24:21, 29:25, 36:22, 38:24, 40:19, 52:13, 56:9, 59:24, 64:4, 66:21, 81:24, 97:11, 97:25, 98:16, 98:21, 99:4, 102:24, 104:25, 105:3, 105:9, 110:17
**heard** [5] - 8:2, 61:15, 94:8, 100:15, 107:24
**HEARING** [1] - 1:10
**hearing** [6] - 2:21, 6:20, 33:4, 61:9, 61:11, 64:7
**hearings** [1] - 29:25
**heart** [4] - 4:10, 50:18, 51:11, 51:25
**heartbeat** [1] - 110:2
**hearted** [1] - 109:19
**hearth** [2] - 101:9, 101:10
**heavy** [2] - 32:22, 33:3
**hell** [1] - 46:6
**hello** [1] - 71:12
**help** [3] - 17:13, 64:22, 81:8
**helpful** [3] - 32:12, 32:13, 90:21
**hereby** [1] - 112:17
**Heroes** [2] - 25:4, 25:6
**herself** [1] - 101:25
**hi** [1] - 64:13
**hiding** [1] - 30:8
**high** [2] - 11:2, 17:17
**highly** [3] - 78:9, 78:11, 78:13
**hill** [1] - 100:3
**hills** [1] - 100:4
**hire** [1] - 63:10
**hired** [3] - 26:6, 41:10, 77:19
**historic** [14] - 49:9, 49:13, 49:14, 68:18, 70:12, 72:4, 72:15, 72:21, 73:1, 78:22, 88:22, 93:8, 99:21, 100:16
**Historic** [1] - 87:10
**historical** [3] - 68:4, 78:7, 101:5
**historically** [1] - 99:18
**hit** [1] - 9:14
**hits** [1] - 96:22
**hold** [6] - 79:7, 79:11, 80:20, 82:5, 101:20, 109:24
**Hold** [2] - 9:1
**hole** [2] - 5:25, 46:6
**holes** [1] - 101:11
**holiday** [1] - 3:6
**Honor** [133] - 2:7, 2:24, 3:1, 3:14, 6:8, 7:11, 7:22, 8:12, 8:20, 9:5, 9:19, 10:16, 11:9, 12:4, 13:17, 13:22, 15:2, 15:6, 15:13, 16:10, 16:18, 18:5, 18:9, 18:20, 19:14, 20:8, 21:10, 21:22, 21:23, 23:5, 23:7, 24:15, 25:15, 26:1, 26:12, 26:18, 26:23, 27:14, 28:8, 28:11, 29:21, 30:9, 32:17, 33:7, 33:21, 34:3, 35:23, 36:14, 36:24, 38:20, 39:10, 42:14, 43:2, 46:10, 49:4, 52:17, 66:10, 67:13, 72:9, 72:11, 73:5, 73:11, 73:14, 73:18, 74:1, 74:17, 76:9, 76:23, 77:6, 77:17, 77:23, 79:3, 79:18, 80:7, 80:19, 81:4, 81:8, 81:17, 82:2, 82:20, 82:25, 83:4, 83:10, 83:14, 83:16, 84:5, 84:17, 85:19, 85:25, 86:4, 86:7, 86:9, 86:21, 87:4, 87:8, 87:12, 87:18, 87:23, 88:7, 88:16, 88:24, 89:11, 89:20, 89:23, 90:1, 90:12, 91:10, 92:9, 92:18, 93:9, 95:9, 95:15, 97:8, 99:25, 100:5, 101:1, 102:3, 102:13, 102:16, 102:25, 103:24, 104:5, 104:12, 105:8, 105:11, 106:1, 106:19, 107:15, 110:20, 111:18, 112:2
**HONORABLE** [1] - 1:10
**honored** [1] - 64:24
**hope** [3] - 5:3, 100:23, 103:16
**hopefully** [1] - 101:17
**hoping** [1] - 13:8
**horrible** [4] - 4:14, 4:15, 47:18, 112:8
**horrific** [1] - 71:2
**horse** [1] - 41:1
**hot** [1] - 12:25
**hour** [1] - 63:16
**House** [19] - 19:10, 24:12, 44:4, 44:23, 68:12, 72:8, 75:16, 75:17, 76:5, 76:21, 77:4, 77:19, 78:2, 80:1, 90:13, 90:18, 94:15, 95:12
**huge** [1] - 24:16
**hugs** [1] - 34:21
**human** [4] - 42:10, 45:16, 47:6, 61:5
**humans** [1] - 47:8
**hundreds** [1] - 69:3
**hybrid** [1] - 64:6
**hydrocarbons** [2] - 45:4, 46:12
**hypothesis** [1] - 76:10

**I**

**I's** [2] - 35:13, 40:6
**i.e** [1] - 67:1
**idea** [8] - 22:6, 22:9, 36:6, 38:5, 78:14, 78:25, 93:18
**ideal** [2] - 4:11, 42:6
**ideas** [1] - 69:9
**identification** [1] - 72:22
**identified** [1] - 93:1
**identify** [2] - 2:5, 94:25
**identifying** [1] - 92:24
**ifs** [1] - 8:15
**II** [1] - 54:18
**imagine** [1] - 70:16
**immediately** [1] - 64:24
**immense** [1] - 6:19
**imminent** [1] - 93:11
**impact** [11] - 12:7, 12:9, 30:25, 42:10, 45:13, 61:20, 78:6, 86:6, 88:18, 89:1, 89:9
**impacts** [6] - 31:3, 78:4, 78:16, 78:18, 88:17, 88:22
**impairment** [6] - 50:10, 67:18, 67:21, 89:10, 89:12, 89:14
**implausible** [1] - 51:2
**implement** [8] - 21:7,

21:9, 21:10, 21:12, 24:13, 36:7, 41:13, 80:21
**implementation** [7] - 40:5, 49:7, 56:14, 62:18, 63:6, 70:6, 108:16
**implementations** [1] - 54:5
**implemented** [2] - 78:3, 109:21
**implementing** [5] - 12:11, 36:8, 57:8, 107:10, 109:18
**implicit** [1] - 23:12
**important** [3] - 16:24, 64:21, 71:20
**importantly** [2] - 13:19, 14:8
**impossible** [2] - 51:7, 51:24
**impression** [1] - 112:2
**include** [4] - 83:2, 85:17, 86:5, 89:8
**included** [1] - 62:18
**includes** [2] - 83:5, 84:4
**including** [3] - 30:12, 34:25, 93:5
**inconsistent** [1] - 70:12
**increase** [1] - 95:6
**increased** [4] - 93:23, 94:18, 99:8, 99:15
**increases** [1] - 95:25
**incredibly** [2] - 5:1, 62:6
**indeed** [3] - 89:2, 95:17, 98:3
**Independence** [5] - 3:5, 3:12, 3:16, 3:24, 4:2
**independent** [2] - 42:12
**indication** [1] - 80:16
**indisputably** [2] - 57:15, 57:17
**individual** [1] - 45:11
**individuals** [1] - 93:6
**indulge** [2] - 4:3, 9:20
**industrial** [1] - 46:22
**information** [1] - 106:17
**initial** [2] - 79:22, 84:18
**initiate** [3] - 83:20, 84:1, 85:2
**injunction** [9] - 64:3, 64:6, 70:11, 79:5, 79:6, 90:22, 90:23, 91:16
**injured** [1] - 93:5
**injuries** [1] - 93:2
**injury** [2] - 92:24, 92:25
**inning** [1] - 71:6
**inquiry** [1] - 17:19
**insight** [1] - 33:14
**insofar** [1] - 68:16
**instance** [1] - 106:14
**instead** [1] - 6:1
**instructed** [1] - 7:9
**intellectual** [1] - 27:3
**intend** [1] - 103:6
**intentionally** [1] - 32:7
**interact** [1] - 62:2
**interacts** [1] - 84:17
**interest** [1] - 37:20
**interested** [3] - 2:21, 26:13, 27:8
**interesting** [5] - 92:21, 92:22, 93:21, 101:16, 101:18
**interests** [2] - 105:14, 105:16
**interfere** [2] - 97:3, 97:7
**interference** [2] - 98:19, 104:10
**interfering** [1] - 91:4
**interim** [3] - 19:6, 30:23, 93:12
**INTERIOR** [1] - 1:6
**Interior** [64] - 2:3, 5:18, 6:16, 6:24, 8:21, 9:3, 9:22, 10:2, 10:22, 11:10, 11:24, 12:5, 12:12, 13:10, 13:20, 14:18, 14:19, 15:9, 15:17, 15:23, 16:2, 16:4, 16:14, 16:23, 17:11, 17:25, 20:20, 21:6, 21:8, 21:14, 22:13, 22:19, 23:1, 23:12, 24:11, 25:8, 25:12, 26:6, 26:24, 27:17, 27:18, 28:24, 29:2, 29:16, 33:1, 34:21, 35:4, 35:11, 41:8, 41:15, 52:22, 52:23, 53:18, 62:9, 77:22, 79:20, 82:23, 98:5, 98:7, 98:12, 98:20, 104:20, 108:20, 110:5
**Interior's** [1] - 23:14
**interns** [3] - 2:11, 2:14, 71:19
**interpretation** [1] - 74:2
**interpreted** [1] - 81:5
**interprets** [1] - 50:6
**interrupting** [1] - 108:12
**introduce** [1] - 2:11
**inundated** [1] - 5:1
**invitation** [1] - 18:6
**invite** [2] - 109:2
**involve** [2] - 36:5, 72:6
**involved** [2] - 57:14, 59:10
**involves** [3] - 77:25, 80:24, 86:18
**irrespective** [3] - 50:12, 56:12, 105:12
**irretrievable** [13] - 59:22, 59:25, 60:2, 60:6, 60:8, 60:11, 60:17, 60:22, 60:25, 70:6, 70:8, 102:18, 103:10
**ish** [1] - 50:23
**issue** [14] - 12:15, 16:5, 40:21, 46:14, 84:2, 85:3, 85:4, 97:16, 97:17, 97:18, 99:15, 102:5, 107:3, 109:5
**issued** [6] - 32:8, 42:18, 74:13, 89:13, 91:23, 111:10
**issues** [2] - 39:1, 99:19
**items** [1] - 34:6
**itinerary** [1] - 90:7
**itself** [4] - 22:10, 54:1, 54:2, 82:4

## J

**Jacobs** [16] - 42:12, 42:23, 46:1, 47:7, 56:7, 77:18, 79:24, 80:8, 81:3, 81:5, 81:14, 81:15, 82:4, 106:11, 106:12, 106:16
**jail** [1] - 55:9
**Janeway** [2] - 108:1, 108:9
**Jefferson** [3] - 3:8, 100:17, 101:3
**Jefferson's** [1] - 101:3
**Jewel** [1] - 36:4
**job** [3] - 6:21, 35:17, 53:17
**joining** [1] - 66:16
**joke** [1] - 43:18
**JUDGE** [1] - 1:10
**judge** [5] - 4:14, 19:11, 43:24, 56:5, 66:13
**judge's** [2] - 32:2
**judges** [2] - 107:22
**judging** [1] - 4:15
**Judicial** [1] - 112:19
**July** [9] - 1:11, 3:8, 3:25, 33:9, 50:25, 58:23, 112:11, 112:20
**jump** [1] - 89:17
**June** [1] - 9:25

## K

**Kathryn** [2] - 108:1, 108:9
**Katz** [1] - 2:24
**Katz-Zogby** [1] - 2:24
**keep** [9] - 12:19, 22:15, 23:3, 49:23, 49:24, 55:2, 57:16, 96:6, 107:16
**KEITH** [1] - 1:20
**Kennedy** [2] - 11:17, 23:25
**kept** [2] - 48:9, 98:9
**key** [3] - 13:14, 23:8, 23:10
**kids** [2] - 76:8, 77:1
**Kim** [1] - 108:5
**kind** [13] - 13:16, 27:1, 32:13, 33:14, 37:14, 49:22, 50:23, 68:1, 86:12, 93:12, 93:14, 98:23, 99:16
**kinds** [1] - 109:3
**kisses** [1] - 34:21
**known** [2] - 14:2, 33:3
**knows** [2] - 8:3, 107:25

## L

**lacked** [1] - 48:3
**laid** [1] - 37:14
**land** [2] - 46:24, 56:11
**landfill** [3] - 56:6, 95:13, 95:14
**landscape** [3] - 49:9, 49:13, 49:16
**landscaping** [1] - 88:2
**language** [6] - 7:4, 23:8, 23:10, 91:5, 91:14, 99:12
**larger** [1] - 68:18
**last** [18] - 4:8, 4:19, 5:4, 5:10, 5:18, 30:2, 30:3, 30:11, 43:3, 54:6, 54:11, 65:21, 65:25, 71:10, 98:22, 107:11, 107:18, 112:3
**lastly** [1] - 107:4
**law** [14] - 17:3, 32:15, 34:19, 35:16, 38:16, 42:2, 50:19, 50:20, 59:16, 62:11, 63:23, 67:3, 70:22, 110:6
**Law** [3] - 2:18, 2:19, 2:20
**laws** [2] - 59:12, 84:23
**lawsuit** [1] - 107:13
**lawyer** [2] - 3:19, 71:20
**lawyers** [2] - 3:20, 110:1
**lead** [3] - 45:4, 46:12, 46:21
**LEAGUE** [1] - 1:3
**League** [1] - 2:3
**learn** [3] - 48:12, 48:13, 66:6
**learned** [3] - 48:3, 48:5, 48:6
**lease** [14] - 60:19, 60:21, 60:22, 63:10, 86:18, 107:9, 107:12, 108:15, 108:25, 109:4, 109:5, 109:8, 109:16
**leases** [1] - 60:18
**leasing** [1] - 107:7
**least** [4] - 46:9, 49:16, 109:25, 111:13
**leave** [3] - 33:17, 76:6, 112:3
**lectern** [1] - 5:13
**leeway** [1] - 50:5
**left** [4] - 3:18, 41:1, 66:8, 112:4
**legal** [10] - 30:25, 31:1, 31:3, 35:1, 35:3, 35:17, 68:16, 96:15, 98:3
**legally** [5] - 32:23, 33:14, 34:9, 96:20, 97:9
**legitimately** [1] - 31:20

**less** [1] - 75:7
**lessee** [2] - 28:7, 28:9
**level** [4] - 11:2, 17:18, 46:18, 46:23
**levels** [1] - 50:13
**life** [1] - 108:3
**lifted** [1] - 33:13
**light** [4] - 6:6, 6:16, 75:7, 108:18
**lighting** [3] - 7:5, 8:16
**likely** [3] - 47:8, 88:5, 111:8
**Lindsay** [1] - 2:9
**LINDSAY** [1] - 1:17
**line** [3] - 6:3, 54:13, 54:24
**Line** [1] - 54:12
**Lines** [1] - 54:19
**lines** [1] - 65:1
**link** [1] - 81:10
**Links** [5] - 14:3, 107:4, 107:6, 108:21, 110:24
**list** [4] - 13:24, 29:5, 81:1, 81:11
**listed** [3] - 78:16, 78:17, 78:18
**literally** [4] - 4:17, 5:2, 69:3, 78:23
**litigate** [2] - 107:13, 110:14
**litigating** [2] - 43:6, 108:14
**litigation** [4] - 44:5, 91:21, 91:22, 98:19
**live** [3] - 20:3, 20:4, 31:9
**load** [1] - 45:2
**locations** [1] - 101:7
**logic** [1] - 78:14
**logical** [1] - 97:16
**long-lost** [1] - 27:7
**long-term** [1] - 86:18
**Look** [2] - 6:17, 61:15
**look** [16] - 5:16, 5:21, 18:18, 27:20, 27:24, 45:8, 46:19, 64:22, 69:20, 72:17, 89:14, 90:15, 90:20, 94:16, 97:19, 97:22
**looked** [6] - 28:21, 41:8, 42:5, 56:4, 63:1, 71:11
**looking** [5] - 47:25, 48:1, 50:16, 90:9, 101:3
**looks** [5] - 38:10, 69:19, 70:15, 99:16, 99:17
**lost** [5] - 18:8, 24:19, 24:25, 27:7, 57:22
**loud** [1] - 19:9
**love** [8] - 2:10, 43:5, 43:6, 51:19, 93:7, 102:20, 105:25
**low** [2] - 11:2, 62:3
**luck** [1] - 4:13
**lying** [1] - 51:3
**Lynne** [1] - 101:22

## M

**ma'am** [13] - 18:6, 52:17, 55:24, 68:2, 107:15, 107:16, 107:19, 107:21, 107:22, 107:24, 108:2, 108:7, 108:8
**magic** [1] - 55:5
**Maginot** [2] - 54:12, 54:19
**magnetometers** [1] - 90:19
**maintenance** [7] - 33:15, 72:24, 73:2, 78:24, 99:19, 103:7, 103:13
**major** [11] - 43:20, 46:14, 85:22, 86:1, 88:2, 88:5, 88:9, 88:14, 92:5, 100:6, 103:5
**mall** [2] - 4:20, 67:22
**Man** [8] - 65:15, 65:16, 65:17, 65:21, 65:22, 66:19, 112:6, 112:8
**man** [1] - 15:6
**manage** [1] - 37:16
**March** [1] - 86:22
**marina** [1] - 37:16
**MARK** [1] - 1:14
**Mark** [1] - 2:9
**massive** [4] - 40:15, 99:22, 103:9, 112:9
**material** [2] - 46:2, 79:21
**materials** [1] - 47:20
**math** [1] - 46:19
**matter** [6] - 53:23, 54:2, 63:23, 67:3, 97:16, 112:18
**matters** [2] - 45:7, 102:22
**maximum** [1] - 46:16
**Mayschak** [1] - 36:4
**mean** [43] - 3:10, 5:14, 22:4, 29:24, 31:5, 34:23, 36:18, 36:22, 38:15, 39:5, 39:7, 39:8, 40:18, 44:17, 45:9, 45:12, 46:5, 46:14, 47:1, 47:18, 50:24, 52:22, 53:11, 57:20, 58:5, 58:24, 59:21, 60:17, 62:8, 68:24, 75:5, 75:7, 75:21, 75:24, 80:14, 80:20, 80:23, 98:11, 103:15, 109:1, 110:15, 111:8
**meaningful** [3] - 70:11, 95:5, 95:23
**means** [6] - 8:5, 59:7, 59:13, 60:4, 63:8, 75:22
**meant** [2] - 4:8, 54:18
**measurable** [1] - 78:17
**measures** [1] - 80:22
**meat** [1] - 95:23
**media** [6] - 5:15, 6:13, 6:15, 22:23, 30:13, 36:19
**medium** [1] - 5:25
**meet** [9] - 8:21, 8:23, 9:3, 10:3, 15:8, 15:15, 15:18, 86:19, 99:9
**meeting** [2] - 91:14, 108:22
**meetings** [3] - 63:9, 109:2
**members** [1] - 29:2
**memo** [1] - 106:5
**men** [1] - 107:22
**men's** [1] - 4:8
**mention** [5] - 49:20, 50:2, 73:13, 98:23, 106:5
**mentioned** [2] - 102:16
**mercury** [1] - 46:12
**mere** [2] - 59:19, 78:14
**Meredith** [1] - 106:5
**merely** [1] - 56:15
**merits** [1] - 39:3
**message** [1] - 15:16
**met** [2] - 64:16, 64:18
**methods** [1] - 36:8
**mg/kg** [2] - 46:17, 46:18
**Michael** [1] - 3:1
**MICHAEL** [1] - 1:20
**middle** [3] - 69:5, 71:5, 98:14
**might** [12] - 23:22, 23:23, 24:1, 59:20, 60:23, 76:24, 81:24, 93:2, 94:20, 96:2, 96:3
**Might** [2] - 23:23, 23:24
**mile** [1] - 54:16
**million** [2] - 14:24, 14:25
**millions** [2] - 4:18, 51:8
**mind** [1] - 35:12
**minimal** [2] - 42:10, 106:12
**minimum** [1] - 105:25
**minutes** [1] - 63:16
**misimpression** [2] - 32:14, 33:18
**misleading** [2] - 32:3, 32:7
**missing** [1] - 73:15
**Modernization** [3] - 72:8, 78:2, 79:21
**moment** [8] - 2:10, 5:4, 10:10, 63:4, 91:11, 104:5, 106:19, 111:11
**money** [1] - 61:1
**monster** [1] - 71:9
**months** [1] - 28:12
**Monticello** [2] - 100:13, 100:15
**monuments** [2] - 14:6, 14:14
**morning** [2] - 59:20, 60:24
**most** [6] - 3:17, 11:13, 46:11, 47:8, 51:13, 71:20
**Most** [1] - 13:18
**motion** [15] - 47:24, 64:3, 73:24, 79:6, 82:7, 93:24, 104:6, 104:7, 104:21, 105:20, 105:22, 110:21, 111:7, 111:9, 111:14
**MOTION** [1] - 1:10
**motions** [1] - 111:21
**mountain** [1] - 39:12
**mouth** [1] - 9:4
**move** [10] - 17:6, 23:21, 24:5, 24:7, 29:12, 30:18, 32:6, 32:12, 61:3, 78:15
**moved** [1] - 77:12
**moving** [12] - 9:10, 9:11, 18:25, 19:1, 19:3, 19:4, 19:8, 29:17, 50:22, 62:9, 78:24, 103:10
**mowing** [1] - 60:7
**MR** [342] - 2:7, 2:13, 2:23, 3:1, 3:12, 6:8, 6:14, 7:11, 7:16, 7:19, 7:22, 8:6, 8:11, 8:19, 8:24, 9:4, 9:7, 9:11, 9:13, 9:18, 10:1, 10:7, 10:16, 10:21, 10:25, 11:5, 11:8, 11:15, 11:19, 11:23, 12:4, 12:20, 13:6, 13:13, 13:22, 14:16, 14:20, 14:23, 15:2, 15:6, 15:12, 15:16, 15:20, 16:10, 16:17, 17:1, 17:17, 18:5, 18:8, 18:14, 18:19, 19:5, 19:14, 19:25, 20:8, 20:16, 20:22, 21:10, 21:21, 22:5, 23:5, 23:10, 23:19, 24:6, 24:15, 24:19, 24:23, 25:3, 25:10, 25:15, 25:21, 26:1, 26:5, 26:12, 26:18, 26:22, 27:14, 27:21, 28:1, 28:5, 28:8, 28:11, 28:16, 28:22, 28:24, 29:6, 29:21, 30:9, 30:20, 32:16, 32:19, 33:7, 33:8, 33:12, 33:21, 34:3, 35:22, 36:2, 36:24, 37:13, 38:2, 38:20, 38:25, 39:10, 39:25, 40:3, 40:11, 40:16, 41:1, 41:23, 41:25, 42:14, 42:20, 43:1, 43:12, 43:16, 43:18, 43:21, 43:24, 44:3, 44:9, 44:15, 44:21, 45:2, 45:23, 46:9, 46:12, 47:4, 47:12, 47:21, 47:23, 48:1, 48:6, 48:14, 48:18, 48:24, 49:4, 49:7, 49:12, 49:20, 50:1, 50:12, 50:16, 51:2, 51:5, 52:1, 52:6, 52:12, 52:17, 53:1, 53:4, 53:8, 53:13, 53:21, 54:1, 54:9, 54:23, 55:5, 55:11, 55:16, 55:21, 55:24, 56:2, 56:12, 56:19, 57:7, 57:14, 57:22, 58:2, 58:8, 58:15, 58:21,

59:19, 60:12, 60:20, 61:13, 62:17, 63:6, 63:13, 63:24, 64:2, 66:10, 66:24, 67:7, 67:12, 67:15, 68:2, 68:13, 68:15, 69:17, 69:21, 70:1, 70:5, 70:9, 70:14, 70:21, 70:25, 71:16, 72:9, 72:11, 73:5, 73:11, 73:14, 73:18, 73:22, 73:25, 74:7, 74:16, 74:24, 75:15, 76:2, 76:9, 76:15, 76:19, 76:23, 77:2, 77:6, 77:8, 77:17, 77:23, 79:2, 79:9, 79:14, 79:16, 79:18, 80:6, 80:15, 80:19, 81:4, 81:8, 81:17, 82:2, 82:6, 82:20, 82:25, 83:4, 83:10, 83:14, 83:16, 83:19, 83:23, 84:5, 84:7, 84:14, 85:1, 85:6, 85:12, 85:19, 85:24, 86:4, 86:7, 86:9, 86:21, 86:24, 87:2, 87:4, 87:8, 87:12, 87:15, 87:18, 87:23, 88:7, 88:10, 88:16, 88:19, 88:24, 89:5, 89:11, 89:20, 89:23, 90:1, 90:5, 90:12, 90:17, 91:9, 92:9, 92:18, 92:20, 93:9, 93:17, 94:1, 94:8, 94:18, 95:9, 95:15, 95:18, 95:22, 96:12, 96:19, 97:2, 97:8, 97:20, 98:1, 98:13, 98:18, 98:22, 99:2, 99:5, 99:24, 100:3, 100:8, 100:11, 100:13, 100:23, 101:1, 101:9, 101:17, 102:3, 102:13, 102:15, 102:22, 102:25, 103:5, 103:12, 103:24, 104:4, 104:23, 105:8, 105:11, 105:18, 105:22, 105:25, 106:4, 106:10, 106:19, 106:21, 107:4, 107:6, 107:9, 107:15, 107:18, 107:21, 108:3, 108:11, 108:13, 109:7, 109:16, 109:22, 110:20, 111:17, 111:20, 112:2

**MS** [16] - 64:11, 64:13, 64:15, 64:17, 64:19, 65:4, 65:9, 65:13, 65:15, 65:19, 65:24, 66:2, 66:5, 66:7, 66:15, 66:17

**multiple** [3] - 20:6, 20:7, 20:9

**multitude** [1] - 45:5

**must** [4] - 38:12, 55:11, 82:22, 82:23

## N

**name** [6] - 2:7, 11:17, 64:12, 64:13, 75:9, 101:21

**named** [1] - 5:23

**national** [6] - 11:20, 17:25, 50:8, 50:9, 67:19, 89:2

**National** [31] - 7:13, 9:23, 10:11, 11:8, 11:11, 23:24, 25:3, 25:5, 25:7, 26:6, 39:22, 42:15, 52:6, 52:7, 57:8, 66:25, 68:8, 68:17, 70:1, 79:20, 86:3, 87:7, 87:10, 87:21, 107:4, 107:6, 107:10, 108:16, 108:21, 109:18, 110:24

**natural** [1] - 78:6

**naturally** [1] - 94:19

**nature** [3] - 25:9, 87:19, 94:21

**NE** [1] - 1:20

**near** [2] - 59:18, 95:16

**necessarily** [3] - 84:16, 99:24, 100:5

**necessary** [1] - 111:4

**need** [29] - 9:13, 9:14, 10:7, 10:9, 10:11, 11:4, 12:2, 13:2, 16:13, 18:21, 21:24, 26:25, 27:2, 29:17, 35:20, 50:17, 55:19, 56:5, 56:9, 58:10, 84:19, 84:22, 86:6, 87:20, 89:18, 92:7, 103:17, 104:14, 106:17

**needs** [1] - 26:9

**negligent** [1] - 75:8

**NEPA** [24] - 12:1, 12:3, 12:5, 12:11, 12:12, 23:23, 25:23, 39:8, 39:21, 40:12, 48:19, 48:20, 50:20, 56:21, 57:11, 59:23, 62:15, 63:11, 63:14, 67:5, 70:10, 70:14, 85:23, 88:1

**NEPA's** [1] - 41:2

**Nersesian's** [1] - 82:9

**Netflix** [1] - 3:22

**never** [7] - 4:16, 8:2, 27:9, 45:6, 98:6, 108:8

**New** [1] - 5:16

**new** [18] - 3:23, 5:21, 5:24, 8:14, 20:21, 21:3, 22:23, 24:8, 27:10, 36:18, 54:8, 70:3, 71:9, 86:17, 86:18, 90:18, 93:4, 108:6

**next** [4] - 34:13, 41:16, 78:3, 78:21

**NHPA** [14] - 23:24, 39:22, 40:12, 48:22, 49:6, 49:13, 49:17, 50:20, 56:21, 63:14, 70:10, 70:14, 88:21, 100:9

**NHPA's** [2] - 41:3, 48:24

**nice** [1] - 52:1

**night** [5] - 4:8, 4:19, 5:4, 57:16, 91:7

**Nile** [1] - 101:22

**nine** [1] - 83:21

**NLT** [2] - 28:13, 108:13

**NLT's** [1] - 60:22

**NO** [1] - 1:5

**non** [1] - 89:14

**non-impairment** [1] - 89:14

**none** [3] - 25:15, 36:15, 61:19

**nonresponsive** [1] - 97:25

**normal** [2] - 104:9, 110:9

**not-so-great** [1] - 75:7

**note** [1] - 32:24

**noted** [1] - 46:20

**nothing** [19] - 16:5, 28:8, 31:9, 31:18, 43:6, 62:21, 62:24, 68:14, 70:8, 71:3, 71:14, 91:1, 97:24, 102:17, 104:4, 104:22, 105:14, 109:5, 111:14

**nothingness** [1] - 69:13

**notice** [7] - 32:21, 34:9, 34:12, 34:16, 60:10, 64:10, 92:4

**noticed** [1] - 71:24

**notification** [1] - 103:2

**notwithstanding** [3] - 4:5, 32:1, 32:2

**November** [4] - 48:8, 73:17, 80:8, 108:19

**nowhere** [2] - 59:18, 95:16

**NPS** [24] - 8:20, 9:3, 26:8, 28:24, 33:1, 48:6, 50:5, 52:13, 52:19, 67:16, 74:2, 82:22, 83:5, 84:2, 84:3, 84:19, 84:21, 85:3, 85:4, 87:6, 87:16, 88:4, 89:7

**NPS's** [1] - 68:2

**NPS-administered** [1] - 88:4

**nugget** [1] - 52:13

**Number** [1] - 28:5

**number** [9] - 27:5, 28:4, 45:21, 47:4, 65:23, 79:15, 82:17, 85:2, 93:5

## O

**O'Rourke** [3] - 25:6, 106:5, 106:8

**object** [10] - 17:18, 22:8, 22:9, 92:11, 92:13, 104:15, 104:24, 105:2, 105:6

**objecting** [1] - 105:6

**objections** [1] - 104:25

**obligated** [1] - 96:20

**obligation** [3] - 35:1, 35:3, 56:19

**obligations** [3] - 30:25, 35:1, 48:24

**obvious** [1] - 59:16

**obviously** [5] - 2:21, 5:9, 22:1, 26:3, 63:13

**occur** [2] - 70:21, 87:6

**occurred** [1] - 84:12

**October** [12] - 46:2, 54:6, 72:16, 72:18, 73:7, 73:19, 80:22, 80:24, 81:16, 81:22, 104:18, 104:19

**odd** [1] - 111:22

**OF** [3] - 1:1, 1:6, 1:10

**offered** [2] - 64:20, 64:23

**official** [1] - 44:4

**Official** [2] - 1:24, 112:16

**OFFICIAL** [1] - 112:23

**officials** [1] - 108:20

**often** [2] - 43:8, 73:12

**Old** [6] - 68:11, 68:19, 68:21, 68:24, 68:25, 69:2

**old** [4] - 32:25, 33:2, 68:15, 68:25

**Olson** [1] - 101:23

**once** [6] - 11:11, 12:14, 71:21, 76:13, 95:22, 109:15

**One** [2] - 106:19, 112:3

**one** [59] - 4:23, 5:25, 9:2, 11:8, 12:16, 14:7, 14:14, 16:1, 17:17, 21:2, 21:25, 22:3, 25:2, 25:13, 27:8, 27:12, 29:2, 30:20, 31:23, 33:18, 37:20, 45:4, 49:20, 50:1, 54:11, 56:15, 57:7, 59:4, 59:20, 60:9, 66:12, 68:19, 69:24, 73:4, 73:6, 75:5, 76:24, 77:7, 77:16, 77:20, 79:8, 82:2, 82:6, 82:11, 85:7, 85:8, 86:15, 88:4, 90:16, 92:22, 93:18, 94:25, 96:8, 98:5, 104:17, 105:1, 108:17

**ongoing** [1] - 103:2

**online** [2] - 3:7, 61:18

**open** [1] - 105:12

**opinion** [2] - 39:11, 111:10

**opportunity** [1] - 80:25

**opposed** [1] - 38:1

**opposing** [2] - 92:21, 102:17

**opposite** [1] - 67:20

**opposition** [1] - 79:6

**oral** [1] - 28:6

**orally** [1] - 24:11

**order** [16] - 21:25, 24:13, 24:16, 24:18,

25:18, 32:2, 32:8, 32:10, 37:23, 55:12, 55:15, 56:10, 63:1, 91:16, 91:23, 106:15
**Order** [1] - 2:1
**ordered** [2] - 32:3, 100:8
**ordering** [1] - 56:6
**orders** [2] - 15:21, 33:19
**Organic** [10] - 50:2, 50:4, 50:20, 67:8, 67:10, 67:16, 69:21, 87:16, 89:8
**organization** [1] - 93:6
**origin** [1] - 68:4
**original** [2] - 97:9, 112:17
**otherwise** [7] - 52:10, 59:9, 91:20, 107:2, 107:24, 112:10
**ouch** [1] - 71:13
**ourselves** [1] - 70:17
**outdated** [1] - 14:2
**outer** [1] - 69:1
**outline** [1] - 15:17
**outlined** [3] - 23:13, 30:22, 34:6
**overhead** [1] - 54:25
**overly** [1] - 103:25
**own** [5] - 5:11, 45:3, 58:11, 58:18, 94:21
**owned** [1] - 101:4

**P**

**p.m** [6] - 1:11, 2:1, 66:22, 112:13
**P.O** [1] - 1:15
**Pac** [8] - 65:15, 65:16, 65:17, 65:21, 65:22, 66:19, 112:6, 112:8
**Pac-Man** [8] - 65:15, 65:16, 65:17, 65:21, 65:22, 66:19, 112:6, 112:8
**pace** [1] - 50:22
**page** [5] - 72:17, 78:3, 79:4, 79:9, 112:18
**PAH** [1] - 46:21
**paid** [1] - 85:14
**paper** [3] - 7:8, 29:8, 35:17
**papers** [1] - 35:18
**paragraph** [7] - 79:15, 79:16, 82:10, 82:15, 83:15, 83:21, 89:17
**pardon** [3] - 43:16, 44:15, 68:13
**Paris** [1] - 102:1
**park** [2] - 67:17, 89:10
**Park** [11] - 7:13, 9:23, 10:1, 25:7, 26:6, 26:25, 39:22, 42:15, 68:8, 79:20, 95:3
**parkland** [3] - 50:8, 50:9, 55:8
**Parks** [1] - 23:24
**part** [14] - 16:12, 18:2, 30:21, 33:1, 35:6, 62:3, 68:5, 86:19, 107:5, 107:10, 108:17, 108:21, 108:23, 109:4
**parte** [1] - 61:17
**participated** [1] - 14:4
**particular** [2] - 37:20, 71:24
**particularly** [2] - 105:10, 108:17
**parties** [2] - 2:5, 4:20
**parts** [2] - 30:20, 101:15
**party** [7] - 26:22, 26:23, 106:1, 106:3, 106:4, 107:3, 109:24
**passed** [1] - 41:3
**passive** [3] - 14:10, 14:11, 14:12
**past** [2] - 18:24, 39:13
**patch** [1] - 49:9
**pathway** [2] - 85:8
**pathways** [1] - 85:7
**patience** [6] - 35:23, 35:25, 37:4, 37:7, 37:8, 111:25
**Pause** [3] - 79:12, 86:16, 106:20
**pay** [1] - 85:11
**paying** [1] - 4:7
**pending** [1] - 111:21
**Pennsylvania** [1] - 1:17
**people** [42] - 3:17, 3:18, 7:6, 11:14, 11:21, 13:20, 15:10, 18:25, 27:19, 29:11, 32:14, 37:7, 37:8, 43:19, 54:15, 56:23, 56:24, 61:16, 61:18, 61:23, 62:1, 62:5, 65:7, 69:4, 69:13, 70:19, 73:19, 74:19, 76:22, 85:10, 91:17, 91:18, 93:5, 93:6, 93:7, 97:5, 109:1, 109:2, 111:23
**per** [2] - 45:11, 46:25
**percent** [4] - 30:10, 32:19, 38:7, 97:17
**perfectly** [1] - 46:7
**perform** [2] - 55:12, 56:21
**perhaps** [3] - 4:7, 5:1, 103:24
**permission** [3] - 53:1, 53:7, 103:17
**perpetuity** [1] - 17:21
**perpspective** [1] - 98:3
**person** [6] - 4:21, 27:8, 52:25, 77:21, 77:24, 78:3
**personal** [1] - 52:20
**perspective** [1] - 102:6
**pester** [1] - 111:18
**pestered** [1] - 111:24
**pestering** [1] - 111:19
**Peter** [1] - 101:3
**ph** [1] - 81:10
**phenomenal** [3] - 4:12, 101:23, 108:2
**photographed** [1] - 10:15
**physically** [2] - 58:19, 60:4
**Pl** [1] - 104:7
**pick** [4] - 10:18, 60:24, 97:5, 97:6
**picture** [2] - 3:8, 28:18
**piece** [3] - 33:12, 93:18, 93:19
**piggybacking** [1] - 102:15
**pile** [6] - 45:24, 47:13, 49:15, 55:7, 56:13, 62:19
**pilot** [1] - 108:4
**pin** [1] - 56:20
**pinch** [1] - 108:8
**pinpoint** [2] - 101:4, 101:7
**place** [6] - 7:13, 30:23, 31:2, 58:5, 90:18, 91:3
**placed** [1] - 75:18
**placement** [2] - 72:20, 72:24
**plain** [1] - 97:22
**Plaintiffs** [1] - 1:4
**plaintiffs** [21] - 2:8, 5:15, 17:20, 31:2, 31:21, 32:6, 32:20, 33:6, 33:13, 34:14, 38:7, 38:23, 38:24, 40:13, 66:21, 95:24, 98:19, 99:10, 104:10, 105:13
**PLAINTIFFS** [1] - 1:13
**plaintiffs'** [3] - 2:6, 43:24, 71:25
**Plan** [8] - 52:6, 52:8, 57:8, 67:1, 70:1, 107:10, 108:16, 109:18
**plan** [20] - 9:17, 37:16, 37:17, 39:14, 40:4, 41:2, 41:4, 49:8, 56:14, 58:21, 58:23, 62:18, 63:7, 67:9, 70:7, 70:22, 86:17, 90:9, 93:18, 109:20
**planes** [1] - 54:25
**Planning** [5] - 10:12, 11:8, 11:11, 25:22, 87:21
**plans** [7] - 10:12, 11:11, 26:8, 28:14, 51:15, 84:15
**play** [6] - 12:1, 43:22, 62:2, 69:22, 71:6, 112:6
**played** [2] - 44:1, 93:12
**players** [1] - 4:23
**pleadings** [1] - 82:18
**plowed** [1] - 101:11
**pluck** [2] - 99:6, 99:7
**podium** [1] - 64:9
**point** [23] - 12:14, 16:17, 19:8, 23:8, 24:1, 24:10, 31:19, 34:14, 34:15, 38:11, 38:13, 48:3, 49:17, 54:3, 56:22, 76:19, 79:3, 90:12, 92:16, 102:5, 104:8, 110:14, 111:16
**Point** [4] - 5:18, 13:11, 19:23, 95:8
**points** [3] - 17:17, 65:23, 99:6
**Policy** [2] - 86:3, 87:7
**political** [1] - 6:18
**politics** [1] - 4:22
**pollutants** [1] - 57:17
**pollute** [1] - 50:8
**polluted** [2] - 42:3, 42:4
**pollution** [1] - 55:7
**pondering** [1] - 91:9
**pool** [3] - 11:17, 23:25, 103:20
**posed** [1] - 24:24
**position** [11] - 18:10, 19:10, 19:21, 19:25, 20:11, 20:13, 20:18, 33:25, 77:8, 92:10, 103:1
**positive** [1] - 29:12
**possession** [1] - 48:7
**possibility** [4] - 22:17, 58:2, 58:8, 59:19
**possible** [4] - 4:25, 58:18, 58:19, 60:4
**possibly** [2] - 91:10, 109:20
**Post** [1] - 28:18
**post** [9] - 9:21, 9:24, 13:14, 13:17, 23:8, 30:13, 31:24, 50:7, 101:11
**posted** [4] - 11:1, 22:23, 29:7, 29:11
**posting** [1] - 90:6
**posts** [1] - 16:3
**potential** [6] - 32:22, 45:10, 45:16, 46:21, 78:11
**potentially** [3] - 78:9, 85:7, 91:12
**Potomac** [13] - 14:2, 44:25, 48:9, 49:8, 68:7, 68:8, 68:11, 68:16, 70:2, 72:20, 89:3, 95:3, 105:14
**Potomac's** [1] - 70:12
**power** [3] - 53:7, 55:11, 60:3
**powers** [1] - 42:1
**practical** [1] - 96:16
**pragmatic** [4] - 17:7, 17:16, 34:24, 59:8
**pragmatist** [3] - 59:2, 59:5, 59:7
**prayer** [1] - 55:16
**precedent** [1] - 38:2
**predetermined** [2] - 108:24, 109:4
**preliminary** [8] - 64:3, 64:6, 67:8, 69:23, 70:5, 70:23, 79:5, 79:6
**premise** [1] - 18:20

**preparation** [2] - 80:21, 88:14
**prepared** [4] - 7:20, 37:8, 37:9
**prepping** [1] - 43:10
**Preservation** [2] - 2:3, 87:10
**PRESERVATION** [1] - 1:3
**preserve** [1] - 21:25
**President** [56] - 5:17, 6:13, 6:14, 6:23, 7:12, 8:1, 9:9, 10:24, 11:14, 11:22, 13:10, 14:16, 14:17, 15:21, 15:24, 16:3, 16:15, 17:10, 17:23, 19:21, 19:24, 20:14, 20:16, 20:19, 20:22, 20:24, 20:25, 21:15, 21:19, 22:13, 22:20, 22:21, 22:22, 23:2, 25:13, 26:10, 26:13, 28:19, 28:20, 29:3, 29:11, 29:16, 29:18, 31:25, 36:19, 36:21, 37:19, 41:7, 51:12, 51:18, 51:20, 52:21, 76:7, 76:14, 76:21, 77:1
**president** [2] - 9:6, 21:15
**President's** [3] - 9:4, 13:14, 21:4
**presidents** [1] - 37:22
**Presidents** [1] - 75:18
**press** [3] - 19:17, 31:24, 104:2
**presumably** [1] - 110:8
**presumption** [3] - 38:11, 38:14, 38:18
**pretextual** [1] - 109:17
**pretty** [9] - 35:21, 45:17, 45:22, 46:20, 94:14, 99:17, 99:22, 105:12, 108:9
**prevent** [1] - 38:13
**previously** [1] - 72:22
**prints** [1] - 10:15
**pristine** [1] - 74:3
**private** [3] - 7:1, 26:22
**privileged** [1] - 64:24
**probability** [1] - 95:24
**problem** [21] - 33:22, 39:2, 39:3, 44:9, 45:5, 46:11, 58:11, 59:6, 75:2, 92:16, 96:9, 96:17, 96:23, 96:24, 97:12, 97:14, 97:15, 97:20, 97:22
**problematic** [2] - 47:15, 47:17
**problems** [3] - 46:9, 57:7, 80:16
**procedures** [2] - 12:11, 12:13
**proceed** [1] - 63:8
**proceeding** [2] - 111:12
**proceedings** [1] - 91:18
**Proceedings** [1] - 112:13
**process** [35] - 11:3, 12:5, 19:6, 22:11, 23:20, 27:17, 30:22, 30:24, 33:15, 36:9, 36:17, 39:21, 40:23, 40:24, 40:25, 56:18, 62:15, 63:11, 63:12, 83:11, 83:18, 84:2, 85:3, 86:13, 89:19, 89:24, 90:6, 90:10, 90:14, 90:16, 94:24, 98:20, 104:10, 110:14
**processes** [4] - 12:1, 62:15, 62:17, 63:14
**processing** [1] - 84:12
**procure** [3] - 82:23, 84:19, 84:22
**procurement** [3] - 84:2, 85:2, 85:8
**Produced** [1] - 1:25
**producing** [1] - 98:14
**professional** [1] - 28:2
**Project** [2] - 78:2, 79:22
**project** [7] - 12:17, 51:8, 78:10, 82:22, 88:4, 89:25, 90:4
**projects** [1] - 88:2
**promise** [1] - 50:2
**prong** [1] - 31:4
**proof** [2] - 61:3, 96:24
**properties** [4] - 72:4, 72:15, 78:22, 88:22
**property** [5] - 27:4, 72:22, 73:1, 101:2, 101:4
**proposal** [2] - 78:4, 87:20
**proposed** [8] - 25:8, 63:1, 72:6, 77:25, 78:16, 78:18, 88:4, 90:9
**protect** [1] - 67:18
**protected** [3] - 50:9, 89:1, 89:2
**proud** [2] - 5:1, 66:8
**proven** [2] - 91:19, 91:20
**provide** [2] - 34:9, 34:16
**provided** [1] - 81:10
**provisions** [1] - 50:20
**PSA** [2] - 4:3, 5:7
**public** [20] - 6:25, 12:14, 12:15, 14:8, 18:15, 22:10, 25:25, 26:12, 27:14, 34:6, 34:7, 78:4, 81:10, 86:8, 90:2, 90:3, 90:6, 90:8
**public-facing** [1] - 22:10
**publicly** [2] - 12:12, 66:18
**publish** [1] - 12:13
**published** [2] - 18:15, 89:16
**publishing** [1] - 25:23
**pull** [1] - 79:7
**pulled** [3] - 7:17, 8:1, 80:2
**pure** [5] - 30:17, 59:5, 59:6, 77:2, 77:3
**purely** [4] - 6:1, 23:5, 93:1, 97:16
**purposes** [3] - 40:6, 59:23, 94:17
**pursuant** [1] - 84:21
**pursue** [5] - 19:12, 20:12, 22:6, 27:23, 38:5
**purview** [1] - 20:8
**pushed** [1] - 98:23
**pushing** [1] - 42:21
**put** [22] - 24:16, 24:17, 25:17, 25:24, 27:2, 27:12, 55:9, 61:14, 63:4, 67:22, 68:20, 69:14, 75:9, 76:17, 84:9, 88:10, 91:17, 94:9, 94:10, 97:23, 106:18
**puts** [1] - 22:2
**putt** [1] - 5:24
**putting** [1] - 56:20

## Q

**qualification** [1] - 42:17
**qualified** [1] - 23:6
**qualify** [1] - 88:3
**quality** [1] - 49:14
**quarters** [1] - 101:5
**questions** [18] - 6:11, 16:13, 16:21, 21:23, 22:4, 24:24, 37:3, 42:16, 59:2, 63:25, 64:21, 71:18, 92:20, 102:5, 103:1, 105:19, 106:11, 106:13
**quickly** [4] - 8:14, 21:3, 22:25, 50:21
**quite** [7] - 22:1, 30:11, 31:3, 38:15, 49:22, 49:24, 110:2
**quo** [1] - 68:6
**quote** [11] - 13:18, 25:13, 51:25, 72:24, 73:9, 74:22, 77:13, 77:14, 78:1, 109:14
**quote-unquote** [7] - 51:25, 73:9, 74:22, 77:13, 77:14, 78:1

## R

**raise** [2] - 3:19, 31:11
**raised** [1] - 31:11
**raising** [1] - 4:12
**ramrod** [1] - 108:6
**ran** [1] - 54:23
**random** [1] - 49:8
**ratified** [1] - 3:17
**RDR** [1] - 112:22
**RDR-CRR** [1] - 112:22
**reach** [1] - 34:11
**reached** [4] - 27:22, 28:13, 34:17, 38:10
**reaching** [1] - 38:13
**read** [1] - 81:3
**ready** [1] - 108:5
**real** [4] - 4:19, 57:11, 70:15, 108:3
**real-time** [1] - 4:19
**realistically** [1] - 12:23
**realize** [1] - 36:18
**really** [27] - 3:22, 21:15, 21:22, 22:2, 27:10, 37:7, 37:22, 49:22, 64:21, 69:7, 69:22, 92:15, 96:1, 97:12, 97:24, 100:20, 101:13, 101:15, 101:19, 101:22, 101:24, 102:20, 103:21, 104:16, 105:15
**Realtime** [1] - 1:24
**reason** [6] - 15:7, 44:24, 54:25, 76:24, 91:16, 104:2
**reasonable** [2] - 47:5, 57:10
**reasonably** [1] - 86:10
**reasons** [7] - 45:1, 54:11, 82:11, 92:22, 98:6, 109:3, 109:25
**reassess** [1] - 92:17
**reassessment** [1] - 91:2
**receipt** [1] - 83:5
**received** [1] - 80:9
**recently** [1] - 100:14
**receptors** [1] - 47:9
**Recessed** [1] - 66:22
**recognizing** [1] - 19:20
**recommendations** [1] - 73:4
**reconvene** [1] - 38:25
**Record** [1] - 1:25
**record** [11] - 2:6, 33:17, 52:2, 52:4, 52:5, 52:7, 55:25, 75:9, 84:9, 89:9, 112:18
**recreational** [2] - 68:5, 105:13
**recreational-style** [1] - 68:5
**Red** [3] - 71:1, 71:3, 71:15
**red** [2] - 4:13, 4:15
**redesign** [4] - 22:7, 36:9, 85:24, 93:18
**redesigning** [1] - 38:6
**redo** [1] - 88:8
**redoing** [1] - 88:10
**Reeves** [2] - 112:16, 112:22
**REEVES** [2] - 1:23, 112:22
**refer** [1] - 107:22
**reference** [1] - 10:20
**referenced** [1] - 105:1
**referring** [1] - 49:4
**reflecting** [3] - 11:17,

23:25, 103:20
**reflection** [1] - 36:16
**reflections** [1] - 22:10
**refrain** [1] - 71:7
**regard** [2] - 108:11, 108:13
**regarding** [1] - 25:8
**region** [1] - 89:3
**Register** [2] - 68:9, 68:17
**Registered** [1] - 1:23
**registered** [1] - 67:19
**regs** [1] - 34:11
**regular** [3] - 65:17, 65:20, 91:4
**regularity** [2] - 38:12, 38:15
**regulations** [10] - 12:10, 34:10, 82:24, 83:22, 84:17, 84:23, 84:24, 85:16, 110:8, 112:18
**rehabilitating** [1] - 38:6
**rejected** [1] - 99:12
**related** [1] - 81:8
**relation** [1] - 66:25
**relationship** [3] - 26:24, 26:25, 100:18
**relevance** [1] - 44:18
**relevant** [2] - 82:23, 83:24
**relief** [10] - 40:13, 50:17, 55:6, 55:16, 66:24, 67:8, 69:23, 70:5, 70:23, 103:21
**relocating** [2] - 72:7, 77:25
**rely** [1] - 47:8
**remain** [2] - 100:23, 108:24
**remainder** [1] - 110:21
**remains** [1] - 38:17
**remarkable** [2] - 36:16, 36:20
**remediation** [1] - 55:13
**remedies** [1] - 49:21
**remedy** [6] - 41:21, 41:24, 41:25, 42:19, 50:16, 92:23
**remember** [1] - 5:5
**reminding** [1] - 112:7
**remiss** [1] - 92:10
**remnants** [1] - 101:9
**remove** [1] - 56:10
**removed** [3] - 33:4, 76:22, 76:25
**removing** [1] - 33:2
**rendered** [1] - 26:16
**renderings** [7] - 10:17, 11:1, 26:8, 26:15, 26:16, 28:17, 29:7
**renovate** [1] - 22:7
**renovating** [2] - 38:6, 85:22
**renovation** [4] - 12:24, 83:17, 84:19, 88:3
**renown** [1] - 17:25
**repeatedly** [2] - 48:9, 61:7
**report** [7] - 43:15, 43:17, 46:13, 46:20, 56:8, 99:7, 106:18
**reported** [1] - 22:18
**Reporter** [4] - 1:23, 1:24, 1:24, 112:16
**REPORTER** [1] - 112:23
**reports** [10] - 42:25, 43:5, 43:6, 43:9, 43:10, 45:17, 48:2, 61:8, 61:12, 96:4
**represent** [3] - 2:8, 4:24, 93:6
**representation** [1] - 52:13
**representations** [2] - 48:2, 73:8
**represented** [1] - 48:10
**request** [5] - 11:24, 27:12, 32:10, 32:20, 33:13
**requests** [6] - 53:22, 104:13, 104:14, 104:15, 106:10, 106:22
**require** [9] - 33:2, 59:12, 86:11, 87:6, 88:1, 88:13, 88:21, 103:13, 110:9
**required** [13] - 10:8, 11:10, 23:14, 34:9, 34:12, 34:14, 34:15, 51:9, 77:9, 77:11, 77:12, 84:13, 89:5
**requirements** [2] - 86:19, 93:22
**requires** [2] - 67:16, 95:18
**reraise** [1] - 103:2
**residential** [1] - 46:17
**residual** [1] - 42:8
**resolution** [1] - 11:2
**resolved** [2] - 49:12, 102:8
**resource** [2] - 60:22, 61:1
**resources** [7] - 59:22, 59:25, 60:18, 67:17, 78:6, 78:8, 89:10
**respect** [8] - 6:20, 17:3, 35:3, 73:25, 105:10, 109:23, 110:7, 111:3
**response** [5] - 16:15, 47:4, 80:15, 96:15, 98:13
**rest** [4] - 11:2, 61:19, 75:10
**result** [4] - 56:7, 72:25, 80:11, 89:10
**results** [15] - 45:3, 48:7, 56:2, 56:3, 56:4, 73:17, 73:21, 74:15, 77:4, 80:13, 80:16, 97:3, 98:15
**retained** [2] - 42:15, 79:19
**retrieved** [1] - 60:14
**return** [1] - 49:21
**reusing** [2] - 72:7, 77:25
**reverse** [1] - 59:20
**reversed** [1] - 57:6
**review** [20] - 39:24, 56:22, 57:11, 62:17, 72:19, 72:21, 73:3, 74:10, 74:20, 74:21, 75:14, 78:23, 81:23, 87:20, 89:18, 89:21, 89:22, 89:25, 90:4, 90:10
**reviewed** [3] - 27:21, 35:8, 80:3
**reviewing** [2] - 83:8, 85:17
**Revolution** [1] - 3:23
**REYES** [1] - 1:10
**rid** [5] - 5:24, 6:4, 56:6, 62:22, 76:18
**ridiculously** [1] - 112:9
**rights** [1] - 27:3
**rim** [1] - 69:15
**risk** [10] - 45:18, 47:6, 93:23, 94:18, 94:21, 95:1, 95:2, 95:6, 99:8, 99:15
**risk-based** [1] - 45:18
**road** [2] - 36:25, 96:22
**Robertson** [36] - 3:2, 5:11, 5:13, 18:23, 20:4, 29:10, 33:19, 42:13, 42:16, 43:20, 48:14, 48:15, 48:16, 49:3, 51:3, 51:5, 52:9, 52:10, 53:18, 53:20, 57:3, 59:2, 59:14, 62:14, 71:18, 74:19, 75:1, 75:23, 82:8, 109:11, 109:14, 109:15, 110:4, 110:5, 111:2, 111:8
**ROBERTSON** [219] - 1:20, 3:1, 6:8, 6:14, 7:11, 7:16, 7:19, 7:22, 8:6, 8:11, 8:19, 8:24, 9:4, 9:7, 9:11, 9:13, 9:18, 10:1, 10:7, 10:16, 10:21, 10:25, 11:5, 11:8, 11:15, 11:19, 11:23, 12:4, 12:20, 13:6, 13:13, 13:22, 14:16, 14:20, 14:23, 15:2, 15:6, 15:12, 15:16, 15:20, 16:10, 16:17, 17:1, 17:17, 18:8, 18:14, 18:19, 19:5, 19:14, 19:25, 20:8, 20:16, 20:22, 21:10, 21:21, 22:5, 23:5, 23:10, 23:19, 24:6, 24:15, 24:19, 24:23, 25:3, 25:10, 25:15, 25:21, 26:1, 26:5, 26:12, 26:18, 26:22, 27:14, 27:21, 28:1, 28:5, 28:8, 28:11, 28:16, 28:22, 28:24, 29:6, 29:21, 30:9, 30:20, 32:16, 32:19, 33:8, 33:12, 33:21, 34:3, 35:22, 36:2, 36:24, 37:13, 38:2, 38:20, 38:25, 42:14, 43:21, 49:4, 72:9, 72:11, 73:5, 73:11, 73:14, 73:18, 73:22, 73:25, 74:7, 74:16, 74:24, 75:15, 76:2, 76:9, 76:15, 76:19, 76:23, 77:2, 77:6, 77:8, 77:17, 77:23, 79:2, 79:9, 79:14, 79:16, 79:18, 80:6, 80:15, 80:19, 81:4, 81:8, 81:17, 82:20, 82:25, 83:4, 83:10, 83:14, 83:16, 83:19, 83:23, 84:5, 84:7, 84:14, 85:1, 85:6, 85:12, 85:19, 85:24, 86:4, 86:7, 86:9, 86:21, 86:24, 87:2, 87:4, 87:8, 87:12, 87:15, 87:18, 87:23, 88:7, 88:10, 88:16, 88:19, 88:24, 89:5, 89:11, 89:20, 89:23, 90:1, 90:5, 90:12, 90:17, 91:9, 92:9, 92:18, 92:20, 93:9, 93:17, 94:1, 94:8, 94:18, 95:9, 95:15, 95:18, 95:22, 96:12, 96:19, 97:2, 97:8, 97:20, 98:1, 98:13, 98:18, 98:22, 99:2, 99:5, 99:24, 100:3, 100:8, 100:11, 100:13, 100:23, 101:1, 101:9, 101:17, 102:3, 102:13, 102:15, 102:22, 102:25, 103:5, 103:12, 103:24, 104:4, 104:23, 105:8
**Robertson's** [3] - 53:17, 61:11, 111:15
**rolls** [1] - 12:23
**room** [1] - 108:5
**routine** [7] - 33:14, 72:23, 73:2, 78:24, 103:7, 103:12, 107:21
**rubber** [1] - 96:22
**rule** [1] - 43:24
**rules** [2] - 34:5, 35:6
**ruling** [2] - 105:19, 110:20
**run** [2] - 53:19, 76:2
**running** [3] - 26:21, 32:25, 53:8

## S

**sad** [1] - 39:17
**safe** [4] - 76:1, 76:5, 76:7, 76:13
**safety** [1] - 78:5
**sailed** [1] - 49:17
**SAMBURG** [2] - 1:14, 3:12
**Samburg** [1] - 2:9
**sample** [2] - 81:13, 106:13
**samples** [7] - 44:11, 45:21, 45:23, 46:1, 98:11, 111:3

**sampling** [1] - 47:14
**satisfied** [1] - 111:13
**satisfy** [1] - 30:18
**saved** [1] - 102:1
**saw** [3] - 29:1, 29:3, 48:17
**schedule** [8] - 7:12, 7:15, 8:21, 8:23, 9:14, 10:3, 25:22, 90:6
**schedules** [1] - 13:7
**Scher** [6] - 64:9, 64:13, 65:10, 65:16, 65:21, 66:11
**SCHER** [16] - 64:11, 64:13, 64:15, 64:17, 64:19, 65:4, 65:9, 65:13, 65:15, 65:19, 65:24, 66:2, 66:5, 66:7, 66:15, 66:17
**school** [1] - 2:17
**Schrodinger's** [1] - 20:4
**scope** [2] - 67:8, 87:20
**screened** [2] - 79:23, 80:3
**screening** [4] - 46:17, 46:23, 90:13, 90:17
**sealed** [1] - 34:20
**season** [4] - 65:17, 65:20, 65:23, 71:2
**seated** [2] - 63:18, 66:19
**second** [8] - 10:11, 11:23, 42:6, 44:9, 73:6, 79:11, 86:15, 95:21
**Secretary** [40] - 5:18, 6:24, 11:1, 13:9, 13:19, 14:18, 14:19, 15:9, 15:17, 15:22, 16:2, 16:4, 16:11, 16:14, 16:22, 17:11, 17:25, 20:20, 21:6, 21:7, 21:14, 22:12, 22:19, 23:1, 23:6, 24:10, 25:12, 27:17, 27:18, 29:2, 29:15, 34:21, 35:4, 35:11, 41:7, 41:15, 98:5, 98:7, 98:12, 104:20
**Section** [6] - 12:1, 12:11, 72:19, 73:3, 87:10, 87:14
**see** [17] - 5:11, 17:8, 20:25, 30:13, 34:24, 43:10, 56:25, 59:4, 62:6, 69:12, 71:21, 71:22, 79:11, 81:12, 82:16, 91:11, 111:3
**seeking** [1] - 83:8
**segue** [1] - 32:16
**select** [1] - 84:3
**selecting** [1] - 40:3
**selection** [1] - 83:11
**sending** [1] - 91:7
**sense** [6] - 23:17, 30:14, 41:6, 62:12
**sensitive** [2] - 62:6, 98:18
**sent** [2] - 15:9, 16:23
**separately** [1] - 36:24
**September** [31] - 6:5, 6:12, 7:6, 7:7, 7:10, 7:17, 7:25, 8:4, 8:15, 9:2, 9:12, 9:17, 10:4, 12:21, 12:23, 15:8, 15:11, 15:19, 16:3, 16:16, 17:14, 18:1, 19:24, 21:4, 22:25, 24:14, 29:19, 41:17, 80:12, 104:21
**sequence** [1] - 81:9
**sequencing** [1] - 33:23
**series** [2] - 6:11, 64:21
**serious** [1] - 55:19
**Service** [8] - 7:13, 9:23, 10:1, 25:7, 26:7, 26:25, 42:15, 79:20
**services** [7] - 10:10, 82:22, 82:23, 84:4, 84:20, 84:22
**set** [4] - 9:25, 10:2, 48:21, 65:11
**Seven** [1] - 28:2
**several** [3] - 10:7, 28:12, 48:7
**shape** [2] - 61:21, 63:9
**share** [3] - 56:24, 68:16, 70:19
**shared** [2] - 28:12, 48:14
**shed** [1] - 108:18
**sheet** [1] - 29:8
**ship** [1] - 49:17
**shirt** [4] - 3:7, 3:11, 71:5, 71:8
**shooting** [1] - 54:15
**shoots** [2] - 68:22, 69:6
**shopping** [1] - 67:22
**short** [1] - 4:2
**should've** [1] - 82:12
**show** [7] - 51:9, 95:22, 95:24, 108:3, 108:4, 108:24, 109:17
**showed** [1] - 4:8
**shown** [2] - 52:10, 77:9
**shows** [1] - 60:22
**shut** [1] - 105:12
**sic** [1] - 94:4
**side** [2] - 48:21, 66:9
**sign** [3] - 75:2, 91:15, 92:3
**signed** [15] - 3:13, 3:15, 3:16, 11:16, 23:24, 34:20, 34:21, 73:1, 77:11, 77:21, 80:23, 81:23, 104:18, 110:7
**significance** [1] - 68:16
**significant** [12] - 12:7, 12:9, 78:4, 78:6, 78:9, 78:11, 78:16, 78:17, 86:11, 86:12, 88:18, 89:9
**significantly** [1] - 72:25
**signing** [5] - 4:1, 74:9, 74:19, 74:20, 78:19
**signoff** [1] - 17:5
**similar** [2] - 11:1, 29:7
**simply** [2] - 68:21, 80:16
**single** [7] - 4:21, 5:2, 6:20, 29:25, 33:20, 71:6, 91:23
**sink** [1] - 51:8
**sister** [1] - 27:7
**sit** [2] - 71:16, 110:8
**site** [12] - 14:5, 14:13, 21:1, 32:22, 46:25, 51:9, 60:7, 67:19, 68:8, 80:21, 108:19, 108:23
**sites** [2] - 68:18, 102:1
**sitting** [3] - 58:16, 69:4, 76:21
**situation** [3] - 31:12, 33:24, 90:24
**six** [2] - 82:10, 82:15
**skeptical** [1] - 30:2
**skepticism** [1] - 70:18
**skill** [2] - 4:9, 65:11
**skin** [1] - 96:25
**skis** [1] - 19:24
**sky** [1] - 50:25
**slave** [1] - 101:4
**slip** [1] - 13:7
**slow** [1] - 110:18
**slower** [1] - 93:15
**smallest** [1] - 9:20
**smart** [1] - 108:9
**soccer** [1] - 4:8
**social** [6] - 5:15, 6:13, 6:15, 22:23, 30:13, 36:19
**soil** [49] - 45:21, 46:2, 46:5, 46:6, 46:8, 46:17, 46:23, 47:18, 55:15, 56:11, 58:1, 58:5, 58:6, 60:1, 61:3, 61:14, 62:22, 62:23, 63:4, 73:8, 73:13, 73:17, 74:10, 74:21, 76:12, 76:17, 76:21, 77:4, 77:13, 77:15, 78:25, 80:5, 94:6, 94:13, 95:14, 96:9, 96:10, 96:17, 96:18, 97:1, 97:3, 97:6, 97:16, 98:8, 98:10, 105:10, 111:3
**soils** [1] - 61:4
**sold** [1] - 3:7
**solicitation** [5] - 83:2, 84:2, 85:3, 85:4, 110:9
**solicited** [1] - 84:11
**soliciting** [1] - 85:17
**solution** [1] - 59:9
**someone** [16] - 7:9, 8:16, 29:1, 29:4, 29:16, 35:2, 35:8, 75:8, 76:10, 76:11, 77:21, 78:19, 78:23, 89:7, 97:18, 98:9
**sometimes** [2] - 75:22, 111:22
**somewhere** [4] - 7:8, 29:10, 29:15, 79:8
**son** [2] - 14:4, 26:11
**Sonja** [2] - 112:16, 112:22
**SONJA** [2] - 1:23, 112:22
**soon** [3] - 57:2, 61:9, 61:10
**sorry** [13] - 10:5, 12:10, 13:4, 16:12, 22:2, 24:21, 44:15, 57:22, 64:4, 71:15, 71:25, 76:2, 81:4
**Sorry** [3] - 16:17, 48:17, 86:9
**sort** [7] - 4:2, 37:10, 42:7, 91:2, 100:18, 101:14, 111:13
**sounds** [1] - 86:24
**south** [2] - 107:21, 107:23
**Southeast** [1] - 1:17
**Sox** [3] - 71:1, 71:3, 71:15
**space** [1] - 69:2
**sparkles** [1] - 69:15
**speaker** [1] - 100:17
**SPEAKER** [2] - 2:18, 2:19
**speaking** [1] - 102:17
**speaks** [2] - 9:6, 9:9
**species** [4] - 78:16, 78:18, 89:1, 89:2
**Species** [1] - 87:14
**specific** [2] - 26:2, 65:11
**specifically** [3] - 7:25, 99:5, 105:23
**speculating** [2] - 23:6, 94:9
**speculation** [2] - 77:2, 77:3
**speculative** [4] - 93:1, 93:11, 94:20, 94:22
**speech** [1] - 100:17
**spiel** [2] - 39:16
**spirit** [2] - 4:1, 16:20
**spoiled** [2] - 5:8
**spoiler** [1] - 111:8
**spoken** [1] - 20:24
**spokesperson** [1] - 19:16
**sports** [1] - 4:25
**spot** [2] - 22:2, 68:8
**squirts** [1] - 68:20
**staff** [1] - 14:1
**stage** [1] - 93:24
**stand** [1] - 2:16
**standing** [14] - 37:1, 37:12, 64:4, 92:19, 92:25, 94:16, 96:4, 97:21, 99:14, 102:5, 102:8, 102:11, 105:9, 105:16
**Star** [1] - 108:1
**star** [3] - 65:17, 65:22
**staring** [2] - 69:4, 69:12
**start** [18] - 3:4, 6:5, 6:12, 7:6, 7:9, 9:17, 19:23, 25:3, 34:12, 34:25, 37:18, 42:20, 60:7, 64:25, 86:17, 90:9, 103:9, 104:20
**started** [2] - 31:14, 71:23

**starting** [5] - 7:7, 16:8, 31:15, 40:20, 100:18
**starts** [1] - 110:10
**state** [2] - 35:16, 92:10
**statement** [3] - 50:18, 86:6, 97:9
**statements** [3] - 25:13, 25:18, 37:23
**States** [17] - 5:17, 6:24, 15:25, 16:15, 17:10, 17:24, 19:21, 22:14, 22:22, 26:11, 36:20, 36:21, 41:7, 51:13, 51:21, 112:16, 112:19
**STATES** [1] - 1:1
**statistic** [1] - 99:7
**statistics** [1] - 96:5
**statment** [1] - 88:18
**status** [1] - 68:6
**statute** [3] - 11:25, 34:10
**statutes** [2] - 34:5, 38:12
**statutorily** [2] - 10:8, 23:14
**stay** [4] - 62:12, 62:25, 63:1, 63:2
**staying** [1] - 62:11
**steady** [1] - 110:18
**stellar** [1] - 112:10
**Stenographic** [1] - 1:25
**stenographic** [1] - 112:17
**step** [12] - 40:4, 49:7, 56:15, 59:9, 59:13, 69:24, 84:18, 86:13, 94:24, 95:21, 108:15, 109:18
**steps** [4] - 19:6, 23:13, 30:22, 30:23
**stick** [1] - 37:10
**still** [26] - 6:2, 6:6, 6:8, 13:16, 18:11, 18:23, 19:13, 20:17, 28:9, 30:5, 30:23, 31:21, 32:23, 36:15, 41:12, 45:7, 49:24, 50:25, 58:5, 77:9, 80:3, 81:24, 93:11, 105:16, 106:12, 109:5
**stockpile** [6] - 49:5, 93:19, 93:20, 95:2, 99:15, 102:4
**stockpiling** [1] - 97:21
**stood** [1] - 111:21
**stop** [16] - 25:10, 28:6, 39:4, 40:10, 57:5, 59:17, 62:8, 62:24, 63:12, 63:22, 63:23, 67:4, 70:6, 103:17, 103:23
**stopping** [2] - 32:9, 62:25
**straight** [1] - 108:6
**streamline** [1] - 74:10
**streamlined** [2] - 72:21, 74:21
**Street** [1] - 1:20
**strict** [2] - 94:19, 95:19
**strong** [2] - 25:17, 75:5
**strongly** [1] - 61:23
**studies** [2] - 43:11
**studying** [1] - 14:1
**stuff** [7] - 43:4, 45:2, 45:15, 49:24, 51:6, 76:25, 92:14
**stunned** [1] - 29:14
**style** [1] - 68:5
**subject** [2] - 74:1, 99:8
**submit** [8] - 10:11, 11:4, 26:7, 36:2, 36:15, 93:17, 99:14, 104:13
**submits** [1] - 89:25
**submitted** [5] - 11:7, 27:16, 84:24, 85:15, 90:3
**subpoena** [5] - 53:7, 53:15, 107:3, 110:1
**substance** [1] - 25:9
**substantial** [4] - 45:21, 88:3, 93:4, 95:5
**substantially** [1] - 95:25
**succeed** [1] - 4:25
**sufficiently** [1] - 94:1
**suggest** [4] - 3:21, 68:19, 68:21, 69:11
**suing** [1] - 98:9
**suit** [1] - 26:23
**Suite** [1] - 1:17
**suited** [1] - 6:1
**summer** [2] - 2:11, 2:14
**Sunday** [1] - 39:13
**support** [2] - 79:5, 97:24
**supporting** [1] - 39:12
**supports** [2] - 82:15, 105:16
**suppose** [1] - 20:23
**surprised** [1] - 30:13
**survey** [1] - 101:6
**surveying** [1] - 101:2
**suspend** [1] - 30:16
**sweep** [1] - 71:13
**Sweet** [1] - 71:6
**sympathetic** [1] - 62:7

## T

**T's** [1] - 35:13
**T-shirt** [2] - 3:7, 3:11
**tab** [1] - 26:21
**table** [1] - 99:10
**talented** [1] - 65:11
**talks** [1] - 82:10
**tanks** [3] - 54:19, 54:23, 54:24
**tap** [1] - 83:8
**target** [1] - 10:2
**targets** [2] - 9:14, 25:22
**tasked** [1] - 101:1
**taste** [1] - 100:1
**taught** [1] - 101:25
**team** [5] - 4:8, 29:2, 35:5, 35:12, 63:21
**teamwork** [1] - 4:9
**tear** [1] - 103:18
**teardown** [1] - 76:1
**technical** [1] - 62:13
**temporarily** [1] - 37:16
**ten** [5] - 32:5, 32:11, 32:21, 83:15, 85:2
**tend** [2] - 108:23, 109:17
**tens** [2] - 4:17, 4:19
**term** [2] - 86:18, 99:6
**terminated** [1] - 60:23
**termination** [4] - 107:9, 108:15, 109:8, 109:16
**terms** [5] - 30:25, 37:13, 51:23, 80:19, 89:15
**terrific** [2] - 35:16, 100:16
**test** [18] - 37:4, 37:7, 45:3, 46:8, 48:7, 56:2, 56:3, 56:4, 73:16, 74:14, 76:10, 96:4, 96:9, 97:6, 99:3, 99:9, 102:23
**tested** [8] - 44:7, 45:6, 77:7, 77:16, 79:24, 79:25, 80:10, 94:12
**testing** [22] - 37:7, 44:10, 44:21, 73:21, 74:5, 74:7, 75:3, 77:4, 78:20, 79:22, 80:4, 81:2, 81:12, 81:20, 81:21, 82:1, 82:3, 82:4, 82:14, 104:17, 105:1, 106:13
**tests** [3] - 42:17, 82:10, 82:13
**Texas** [2] - 2:19, 2:20
**text** [1] - 50:4
**THE** [364] - 1:1, 1:10, 1:13, 1:19, 2:12, 2:16, 2:20, 2:25, 3:3, 3:15, 5:14, 6:10, 6:17, 7:14, 7:17, 7:20, 7:23, 8:7, 8:13, 8:23, 9:1, 9:6, 9:9, 9:12, 9:16, 9:24, 10:5, 10:14, 10:20, 10:24, 11:4, 11:7, 11:13, 11:16, 11:21, 12:3, 12:19, 13:4, 13:9, 13:18, 13:24, 14:18, 14:22, 14:24, 15:3, 15:7, 15:14, 15:18, 15:22, 16:12, 16:19, 17:2, 17:22, 18:7, 18:13, 18:16, 18:23, 19:9, 19:15, 20:2, 20:9, 20:19, 20:24, 21:12, 21:24, 22:12, 23:9, 23:16, 23:21, 24:8, 24:17, 24:21, 25:1, 25:5, 25:11, 25:16, 25:24, 26:3, 26:10, 26:15, 26:20, 27:6, 27:16, 27:24, 28:4, 28:7, 28:9, 28:14, 28:18, 28:23, 29:1, 29:9, 29:23, 30:10, 31:5, 32:18, 33:6, 33:10, 33:16, 33:23, 34:18, 35:24, 36:18, 37:6, 37:25, 38:14, 38:24, 39:2, 39:15, 40:1, 40:6, 40:14, 40:17, 41:5, 41:24, 42:4, 42:16, 42:23, 43:3, 43:14, 43:17, 43:20, 43:22, 44:1, 44:7, 44:13, 44:16, 45:1, 45:7, 46:1, 46:11, 46:13, 47:10, 47:16, 47:22, 47:25, 48:5, 48:12, 48:15, 48:23, 49:2, 49:10, 49:18, 49:22, 50:11, 50:14, 50:22, 51:3, 51:12, 52:3, 52:9, 52:16, 52:20, 53:3, 53:6, 53:11, 53:15, 53:23, 54:7, 54:10, 54:24, 55:9, 55:14, 55:18, 55:22, 55:25, 56:3, 56:16, 56:23, 57:13, 57:19, 57:25, 58:4, 58:13, 58:17, 58:23, 59:24, 60:19, 61:2, 61:14, 62:20, 63:8, 63:15, 63:25, 64:4, 64:12, 64:14, 64:16, 64:18, 64:20, 65:6, 65:10, 65:14, 65:16, 65:20, 65:25, 66:3, 66:6, 66:8, 66:11, 66:16, 66:18, 66:23, 67:3, 67:11, 67:14, 67:22, 68:12, 68:14, 68:24, 69:19, 69:24, 70:4, 70:8, 70:13, 70:18, 70:24, 71:2, 71:17, 72:10, 72:13, 73:6, 73:12, 73:15, 73:19, 73:23, 74:3, 74:9, 74:18, 74:25, 75:20, 76:4, 76:10, 76:16, 76:20, 76:24, 77:3, 77:7, 77:10, 77:20, 77:24, 79:7, 79:10, 79:13, 79:15, 79:17, 80:4, 80:11, 80:17, 80:20, 81:6, 81:14, 81:19, 82:5, 82:8, 82:21, 83:1, 83:7, 83:12, 83:15, 83:17, 83:20, 84:1, 84:6, 84:9, 84:18, 85:2, 85:9, 85:13, 85:20, 86:1, 86:5, 86:8, 86:14, 86:17, 86:22, 86:25, 87:3, 87:5, 87:9, 87:13, 87:16, 87:19, 87:24, 88:8, 88:13, 88:17, 88:21, 88:25, 89:6, 89:17, 89:21, 89:24, 90:2, 90:11, 90:16, 90:20, 91:13, 92:13, 92:19, 93:3, 93:14, 93:24, 94:3, 94:13, 95:7, 95:11, 95:17, 95:21, 96:6, 96:15, 96:21, 97:5, 97:10, 97:25, 98:2, 98:16, 98:21, 98:25, 99:4, 99:17, 100:1, 100:6, 100:10, 100:12,

100:14, 100:25, 101:8, 101:13, 101:19, 102:11, 102:14, 102:20, 102:24, 103:4, 103:6, 103:15, 104:1, 104:16, 104:24, 105:9, 105:17, 105:21, 105:23, 106:3, 106:7, 106:15, 106:24, 107:5, 107:8, 107:11, 107:16, 107:20, 107:23, 108:4, 108:12, 109:1, 109:10, 109:19, 109:23, 110:22, 111:19, 111:22, 112:3
**therefore** [3] - 23:13, 57:4, 90:8
**thik** [1] - 24:6
**thin** [2] - 7:18, 8:2
**thingamajig** [1] - 5:25
**thinking** [4] - 54:15, 57:24, 69:8, 75:23
**third** [7] - 26:22, 72:17, 106:1, 106:3, 106:4, 107:3, 109:24
**third-party** [6] - 26:22, 106:1, 106:3, 106:4, 107:3, 109:24
**Thomas** [2] - 3:8, 101:3
**thorough** [1] - 45:22
**thoughts** [2] - 47:4, 92:22
**thousands** [2] - 4:19, 69:4
**three** [8] - 5:24, 5:25, 25:21, 31:14, 36:10, 50:20, 65:22, 112:4
**three-hole** [1] - 5:25
**three-putt** [1] - 5:24
**throughout** [1] - 4:20
**throw** [1] - 52:12
**thumbs** [1] - 39:23
**thumbs-up** [1] - 39:23
**Thursday** [1] - 1:11
**tiered** [1] - 89:19
**tight** [1] - 12:21
**timing** [4] - 13:6, 42:17, 80:19, 81:9
**to-do** [2] - 29:5, 81:1
**today** [23] - 2:8, 3:25, 6:18, 6:19, 6:22, 8:9, 19:16, 30:2, 33:10, 33:11, 37:1, 37:9, 48:4, 48:5, 48:6, 48:12, 48:13, 66:16, 69:25, 105:19, 110:25, 111:16
**today's** [2] - 2:21, 13:19
**together** [5] - 4:19, 13:25, 91:13, 100:20, 105:7
**Tom** [1] - 14:3
**tomorrow** [3] - 3:10, 60:24, 110:16
**tone** [1] - 111:22
**tons** [1] - 56:11
**took** [3] - 45:20, 45:23, 77:5
**top** [6] - 13:22, 25:3, 49:16, 70:3, 83:6, 94:10
**torn** [1] - 75:25
**total** [3] - 4:13, 30:14, 46:1
**totally** [9] - 54:12, 81:3, 81:6, 81:19, 98:8, 99:20, 104:1, 107:17, 107:23
**tough** [2] - 22:2, 101:10
**tour** [1] - 14:4
**toured** [1] - 108:18
**toward** [1] - 84:19
**towards** [1] - 13:16
**town** [1] - 98:11
**traditionally** [1] - 50:5
**train** [2] - 18:8, 57:22
**trainer** [1] - 71:11
**transcript** [3] - 112:17, 112:17, 112:18
**Transcript** [1] - 1:25
**TRANSCRIPT** [1] - 1:10
**translation** [1] - 24:20
**traveling** [1] - 42:1
**Travis** [2] - 68:4, 68:7
**trees** [9] - 6:3, 31:17, 32:5, 32:11, 32:21, 39:16, 39:17, 40:20, 91:8
**Trek** [1] - 108:1
**trench** [1] - 54:14
**tried** [2] - 6:16, 98:14
**trifecta** [1] - 36:2
**triggering** [3] - 41:2, 41:3, 59:23
**trip** [2] - 15:23, 23:23
**trivia** [1] - 3:5
**trouble** [1] - 53:8
**truck** [2] - 103:13, 103:18
**true** [9] - 4:9, 20:1, 20:2, 30:7, 44:25, 61:13, 93:25, 109:11, 112:17
**Trump** [4] - 20:22, 24:2, 31:25, 37:19
**Trump's** [1] - 25:13
**Trust** [4] - 107:4, 107:6, 108:21, 110:24
**trust** [2] - 91:18, 100:16
**try** [8] - 8:11, 8:13, 10:3, 10:18, 15:10, 15:18, 24:5, 101:7
**trying** [20] - 8:21, 8:23, 9:3, 9:16, 9:22, 12:20, 15:8, 15:14, 18:9, 21:22, 31:19, 49:10, 56:17, 57:5, 70:25, 97:21, 101:4, 110:22, 111:18, 111:20
**turn** [1] - 38:23
**turnaround** [1] - 12:22
**turning** [1] - 59:15
**turns** [1] - 27:7
**turtle** [1] - 50:23
**turtle-ish** [1] - 50:23
**tweet** [1] - 13:14
**tweeted** [1] - 7:12
**twice** [1] - 51:10
**two** [11] - 2:13, 17:17, 26:16, 30:20, 80:22, 85:7, 89:19, 92:8, 94:24, 104:16, 104:19
**two-step** [1] - 94:24
**two-tiered** [1] - 89:19
**type** [1] - 99:16
**types** [1] - 94:19

## U

**U.S** [2] - 19:11, 87:21
**U.S.C** [2] - 11:9, 11:24
**uber** [2] - 37:8, 37:9
**ugly** [1] - 99:16
**ugly-type** [1] - 99:16
**ultimately** [1] - 67:8
**unanswered** [2] - 106:11, 106:13
**uncertain** [3] - 78:9, 78:11, 78:13
**unclear** [1] - 39:4
**under** [15] - 6:16, 8:16, 11:25, 12:10, 20:18, 21:17, 28:2, 34:10, 36:11, 38:2, 42:1, 73:3, 85:23, 95:15, 101:12
**underneath** [1] - 47:13
**understood** [3] - 70:13, 73:16, 82:18
**Understood** [1] - 92:18
**undertaken** [1] - 49:3
**undertaking** [2] - 48:25, 88:23
**underway** [2] - 36:10, 36:17
**undo** [2] - 60:4
**undone** [1] - 60:17
**undoubtedly** [1] - 48:22
**undump** [4] - 58:17, 58:18, 58:19, 58:20
**unequivocally** [1] - 44:5
**unfair** [1] - 104:2
**unfortunately** [1] - 38:11
**unique** [1] - 78:7
**United** [17] - 5:17, 6:23, 15:25, 16:15, 17:10, 17:24, 19:21, 22:13, 22:22, 26:11, 36:19, 36:21, 41:7, 51:12, 51:21, 112:16, 112:19
**UNITED** [1] - 1:1
**unites** [1] - 5:6
**universe** [4] - 22:12, 22:17, 22:22, 23:1
**universes** [3] - 20:6, 20:7, 20:10
**unless** [8] - 20:6, 59:8, 59:11, 61:3, 62:22, 84:20, 90:22, 102:4
**unlikely** [1] - 111:13
**unparalleled** [2] - 14:6, 14:13
**unquote** [7] - 51:25, 73:9, 74:22, 77:13, 77:14, 78:1
**unreasonable** [1] - 47:7
**unvalidated** [2] - 80:12, 80:17
**up** [25] - 23:23, 31:24, 35:11, 37:17, 39:23, 44:24, 51:9, 51:15, 57:16, 59:20, 60:23, 60:24, 67:23, 68:20, 69:6, 77:9, 79:7, 84:13, 84:15, 91:12, 92:2, 92:21, 97:5, 97:6, 106:18
**update** [1] - 28:11
**useful** [1] - 65:12

## V

**validated** [1] - 80:13
**values** [1] - 89:10
**VaMatharasu** [1] - 2:14
**various** [3] - 9:14, 22:10, 101:15
**versus** [1] - 2:3
**vicinity** [1] - 89:3
**victory** [1] - 66:3
**view** [7] - 9:10, 18:13, 18:16, 19:18, 19:19, 23:17, 38:1
**viewpoint** [1] - 62:7
**views** [3] - 14:6, 14:13, 27:19
**Vilsack** [5] - 95:15, 95:18, 98:22, 99:5, 99:9
**Vilsack's** [1] - 93:22
**violate** [3] - 50:20, 67:10, 67:16
**violated** [4] - 33:18, 39:7, 48:22, 107:12
**violation** [8] - 39:9, 40:12, 40:15, 41:20, 41:23, 59:16, 62:11, 70:22
**virtually** [2] - 8:13, 49:12
**visit** [4] - 13:19, 24:12, 108:23
**visited** [2] - 5:18, 69:2
**visitor** [2] - 90:17, 90:19
**visitors** [1] - 90:13
**voice** [3] - 14:10, 14:11, 14:12
**voicemails** [1] - 61:20
**Voyager** [1] - 108:1
**vs** [1] - 1:5

## W

**wait** [4] - 8:14, 43:9, 56:25, 64:25
**waiting** [1] - 43:22
**Waiting** [1] - 43:23
**wake** [2] - 59:20, 60:23
**walk** [6] - 5:7, 5:8,

9:21, 15:25, 51:10, 51:15
**walked** [3] - 13:10, 15:24, 57:6
**walking** [1] - 67:24
**wall** [2] - 54:13, 54:22
**Walter** [2] - 68:4, 68:7
**wants** [1] - 29:18
**war** [5] - 54:8, 54:11, 54:14, 55:2, 55:3
**War** [3] - 54:14, 54:17, 54:18
**warning** [1] - 32:2
**washing** [1] - 65:2
**Washington** [13] - 1:12, 1:15, 1:18, 1:21, 28:18, 52:6, 52:7, 57:8, 66:25, 70:1, 107:10, 108:16, 109:18
**Watch** [1] - 93:22
**watch** [1] - 3:22
**watching** [5] - 4:18, 4:20, 4:21, 66:13, 107:25
**water** [6] - 13:1, 14:6, 14:13, 68:20, 68:22
**Water** [1] - 93:22
**ways** [2] - 22:10, 65:11
**website** [1] - 81:11
**week** [5] - 5:19, 24:9, 24:13, 71:10
**weekend** [2] - 3:6, 5:4
**weeks** [4] - 5:10, 31:14, 48:7, 92:8
**welcome** [1] - 2:22
**Welcome** [2] - 2:25, 3:3
**West** [1] - 94:4
**whatnot** [2] - 69:15, 90:19
**whatsoever** [2] - 31:3, 99:14
**White** [19] - 19:10, 24:12, 44:4, 44:23, 68:12, 72:8, 75:16, 75:17, 76:5, 76:21, 77:4, 77:19, 78:2, 80:1, 90:13, 90:18, 94:15, 95:12
**whole** [7] - 13:11, 39:16, 67:1, 75:6, 98:25, 99:2, 109:19
**Whoo** [1] - 75:3
**wild** [1] - 37:16
**wildly** [1] - 50:19
**WILL** [1] - 1:14
**Williams** [1] - 36:3
**Wing** [10] - 11:18, 44:6, 44:23, 75:24, 76:11, 76:20, 78:2, 79:21, 94:4, 103:19
**wish** [2] - 12:21, 26:8
**woman** [2] - 100:15, 101:24
**women** [2] - 101:25, 107:22
**wonderful** [3] - 62:1, 100:17, 100:21
**wondering** [1] - 4:22
**word** [3] - 13:14, 25:16, 95:19
**wording** [1] - 86:14
**words** [1] - 18:6
**worker** [3] - 15:4, 45:11, 46:25
**workers** [1] - 46:23
**works** [3] - 51:7, 74:25, 75:4
**world** [15] - 14:7, 16:16, 18:25, 20:3, 21:2, 25:14, 35:24, 36:1, 36:19, 37:6, 47:2, 47:18, 51:14, 51:22, 101:15
**World** [3] - 54:14, 54:17, 54:18
**world's** [1] - 16:1
**worn** [1] - 14:1
**worry** [2] - 37:10, 67:14
**worth** [3] - 51:20, 51:23, 65:8
**wound** [1] - 44:24
**write** [2] - 61:18, 61:19
**writing** [4] - 24:12, 24:16, 24:17, 104:13
**written** [4] - 3:13, 28:6, 31:6, 53:4
**wrote** [1] - 7:24

## Y

**Yankees** [1] - 71:13
**yard** [1] - 77:5
**yards** [3] - 42:2, 72:7, 78:1
**year** [8] - 8:9, 45:12, 47:1, 47:2, 54:6, 65:2, 71:3, 71:15
**years** [3] - 45:12, 47:1, 47:2
**yesterday** [4] - 4:11, 24:24, 80:18, 81:10
**York** [1] - 5:16
**young** [1] - 66:11
**yourselves** [1] - 2:5

## Z

**Zapruder** [1] - 10:19
**zero** [3] - 47:21, 52:7, 102:13
**Zimliki** [1] - 2:10
**ZIMLIKI** [1] - 1:17
**Zogby** [1] - 2:24
**Zoom** [1] - 105:7