**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DC PRESERVATION LEAGUE,

DAVE ROBERTS,

And

and

ALEX DICKSON,

*Plaintiffs*,

vvs.

UNITED STATES DEPARTMENT OF THE INTERIOR;

1849 C Street, N.W.
Washington, DC 20240,

DOUG BURGUM, in his official capacity as Secretary of the Interior;

1849 C Street, N.W.
Washington, DC 20240,

NATIONAL PARK SERVICE;

1849 C Street, N.W.
Washington, DC 20240,

And

and

JESSICA BOWRON, in her official capacity as "Comptroller Exercising the Delegated

Case No. 1:26-cv-477-ACR

Authority of the Director" of the National Park Service,

~~1849 C Street, N.W.
Washington, Dc 20240,~~

*Defendants*.

**PLAINTIFFS' AMENDED AND SUPPLEMENTAL COMPLAINT**

**FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. In 1897, Congress "made and declared a public park" on the publicly owned land now known as East Potomac Park in the District of Columbia, directing that it "be forever held and used as a park for the recreation and pleasure of the people." Act of Mar. 3, 1897, ch. 375, 29 Stat. 624. That vision has endured for nearly ~~129~~130 years—a period that spans 66 Congresses and 23 presidential administrations. This administration's recent and continuing conduct, however, threatens to gut Congress's promise and wrest the Park from the people.

2. For more than a century, East Potomac Park has been home to East Potomac Golf Course, widely renowned as one of the nation's most historically and culturally significant municipal golf courses. Cities throughout America have looked to East Potomac Golf Course as the template for a strong municipal golf system open to all. In 1941, East Potomac played a pivotal role in the push for racial integration when three Black men played at the golf course amidst protests and jeers from white patrons. The next day, the Secretary of the Interior ordered that the park be open to all people, marking an important step toward the integration of public parks and spaces in Washington, D.C.

3. East Potomac Golf Course's 18-hole course was designed by the preeminent golf course architect Walter J. Travis, whose designs (including such jewels of American golf as

Westchester Country Club in New York, Hollywood Golf Club in New Jersey, and Cape Arundel Golf Club in Maine) remain deeply influential on modern course architecture. Patterned after the classic "links" courses of Scotland, which relied heavily on natural land features, Travis's course at East Potomac offered an egalitarian design open to a variety of skill levels. At its opening in 1919, the fee to play was 25 cents.

4. For decades, the Department of the Interior (Interior) and National Park Service (NPS) have maintained East Potomac Park primarily for recreational purposes, broadly accessible to the general public at an affordable fee. That practice has been consistent with Travis's historic design, Congress's intent in establishing the park, and NPS's conservation mandate. 54 U.S.C. § 100101(1). In 1973, East Potomac Park was added to the National Register of Historic Places, in recognition of the significance of its landscape, landscape architecture, and recreation and culture. Ex. A ("East and West Potomac Parks HD").

5. Thousands of D.C.-area residents rely on East Potomac Park for recreation every year. In 2025, East Potomac Golf Course hosted nearly 125,000 rounds of golf—up from about 58,000 in 2019. To this day, East Potomac Golf Course remains one of the most affordable golf courses in the region and one of the easiest ways to play a Walter Travis design in America. In addition, East Potomac Park's athletic facilities include tennis courts, playing fields, and roads and trails for cyclists and runners.

6. East Potomac Park also offers rich opportunities for birdwatching and fishing. It is host to more than 250 species of birds, including bald eagles ~~and~~, migratory species, and endangered species, and the surrounding waters support abundant populations of bass, catfish, and carp.

7. Plaintiffs in this case live and work in this community. Two of the Plaintiffs are D.C.-area residents who play recreational golf at East Potomac Golf Course and enjoy all that East Potomac Park has to offer. For them and the other everyday people who visit or play there, it is a historic, fun, affordable municipal golf course, set in a beautiful public park~~. They are,~~ exactly ~~whom the park and golf course were meant for when~~as Congress ~~protected it.~~intended. The ~~other~~third Plaintiff is a non-profit organization whose purpose is protecting, enhancing, and preserving Washington's historic and built environment; its members, like this case's individual Plaintiffs, rely on and love East Potomac Park and East Potomac Golf Course for its unique historic, recreational, aesthetic, and communal qualities.

8. In 2025, though, Interior and NPS abandoned their longstanding, deliberate approach to maintaining the historic design and public accessibility of East Potomac Park and East Potomac Golf Course.

9. In keeping with President Trump's efforts to remake the public spaces of Washington, D.C., in his image, Interior and NPS decided to destroy East Potomac Golf Course and to build in its place a championship-style golf course suitable for professional tournaments. Such courses tend to be large and sprawling, with exaggerated features, inflated maintenance costs, and difficult elements beyond the skill of most recreational players. The envisioned course would be of a piece with the numerous championship-style golf courses that President Trump, who fancies himself an avid golfer, owns elsewhere.

10. Predictably, the cost of a tee time at such a venue would inflate accordingly. The new golf course, to be built atop East Potomac Golf Course's remains, would reportedly be named "Washington National Golf Course."

11. Defendants have already taken several steps to implement this Washington National plan. Among them, NPS ~~began dumping 30~~dumped 37,000 cubic yards of ~~fill on~~contaminated dirt, debris, and other refuse at East Potomac ~~Golf Course.[1]~~. As NPS explained in a Categorical Exclusion Documentation Form (~~CE~~CatEx Form) and an Assessment of Actions Having an Effect on Historic Properties (Historic Assessment) published on October 16, 2025, the ~~fill would consist~~material consists of dirt, debris, and other refuse from the demolition of the East Wing of the White House and would be "stored and subsequently incorporated" into golf course "improvements~~."~~" as "fill" material.[2]

12. ~~Less than a week later, construction crews began the unannounced demolition of the East Wing of the White House, dumping the resulting dirt, debris, and wreckage onto East Potomac Golf Course. That debris included wires, pipes, bricks, and other materials—apparently untested for pollutants or contaminants, and all within a light breeze's reach of the park's golfers.~~The dumping began on October 20, 2025. Although they asserted in the CatEx Form that the stockpile would consist of "clean fill" that would be tested for contaminants ahead of time, Defendants later admitted they did not begin testing the material in stockpile for contaminants of concern until October 28, 2025—more than a week after dumping began—and did not learn the test results until November 17, 2025. When Defendants did begin testing, they used unreliable methods that could not offer any assurance of safety

~~[1] In landscaping and other terrain modification, "fill" generally means loose material used to modify terrain, whether by leveling it or altering elevations.~~

[2] In landscaping and other terrain modification, "fill" generally means loose material used to modify terrain, whether by leveling it or altering elevations.

for humans, wildlife, or the environment. And even with their flawed methods, Defendants' testing revealed high levels of several contaminants of concern that exceeded risk thresholds for human and environmental health—including carcinogenic arsenic and benzo[a]pyrene—all now stockpiled within a light breeze's reach of the park's golfers and other recreational visitors.

13. Shortly after the dumping began, and to further implement the Washington National plan, Interior and NPS abruptly held in default and terminated the lease held since 2020 by National Links Trust (NLT), a non-profit organization previously entrusted with stewardship of East Potomac Golf Course.

14. ~~Those steps implement the plan Defendants have adopted to transform East Potomac Park in a way that will~~Since then, Defendants have continued implementing the Washington National plan. They have confirmed the selection of Tom Fazio as the architect to design the new course. In May 2026, Defendant Secretary Burgum announced that East Potomac would be renovated and replaced by a championship-style course and unveiled a rendering of the new course design from Fazio Design. And on June 28, 2026, Defendant Secretary Burgum joined Fazio and President Trump to tour the site of the new course, with a design rendering in hand. Later that day, President Trump posted on social media that work on the course would begin on September 1, 2026 – by which date Defendants began clearing scores of trees, performing surveying work, removing a fence, and staging earth-moving equipment. *See also* July 2, 2026 Tr. at 20-21 ("trying" to begin work "by September 1st").

~~14.~~15. Those steps are implementing the plan Defendants adopted to transform East Potomac Park in a way that will (and has already begun to) irrevocably and significantly

harm the quality of the human environment, affect historic property, violate NPS's ~~conservation~~statutory mandate and other statutes, and thwart East Potomac Park's purpose as "a park for the recreation and pleasure of the people," Act of Mar. 3, 1897, ch. 375, 29 Stat. 624.

16. The National Environmental Policy Act (NEPA) required Defendants to consider and mitigate these harmful impacts before they began dumping and storing thousands of cubic yards of ~~potentially~~ contaminated dirt and debris on the East Potomac Golf Course. Defendants failed to meet those obligations. NEPA also required Defendants to consider and mitigate those significant effects *before* they abandoned their longstanding approach to managing East Potomac Park and East Potomac Golf Course in favor of the Washington National plan, including the substantial construction and costs to the human environment that plan will entail. ~~Again, Defendants failed to do so.~~ Again, Defendants failed to do so. Defendants' debris dumping relied on a facially untenable Categorical Exclusion for purported compliance with NEPA, and Defendants have not performed any NEPA review for the Washington National plan as a whole.

17. Furthermore, the National Historic Preservation Act (NHPA) required Defendants to consider the effects of these undertakings on the East Potomac Park Historic District and its historic features, including East Potomac Golf Course. Again, Defendants failed to do so. ~~And~~ Like the CatEx Form, the Historic Assessment they prepared before dumping and storing toxic debris on the East Potomac Golf Course asserted that doing so would have "no adverse effect[s]"—assertions that Defendants had no basis to make, given that they had not yet conducted any testing for contaminants, given that the testing they eventually did undertake confirmed the toxicity of the stockpile, and given that the dirt

pile dramatically distorted a historic landscape and its terrain. As to the Washington National plan as a whole (which necessarily will do the same), Defendants did not even feign compliance before deciding to proceed.

18. Defendants' actions also violate other legal restrictions. NPS's statutory conservation ~~mandate~~and non-impairment mandates and Congress's directive for East Potomac Park~~.~~ forbid Defendants from destroying an NPS cultural landscape, such as East Potomac Golf Course. Federal law affords Defendants no authority to erect buildings or structures on federal parkland without Congress' express permission. And both statute and NPS's own regulations restrict Defendants from storing the East Wing's solid waste in a national park or using it as fill material in their new golf course.

~~15.~~19. The Washington National plan violates all these laws. Defendants' actions should be set aside under the Administrative Procedure Act (APA), and Defendants should be preliminarily and permanently enjoined from further implementing the Washington National plan~~, including but not limited to dumping debris and other refuse, until they comply with their legal obligations~~.

**JURISDICTION AND VENUE**

~~16.~~20. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under federal law, including the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.*, the National Historic Preservation Act, 54 U.S.C. § 300101, *et seq.*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

~~17.~~21. Venue is proper in this district under 28 U.S.C. § 1391(e) because Plaintiff Dave Roberts resides in this District, a substantial part of the events and omissions giving rise

to these claims occurred in this District, and Defendants are agencies, officers, or employees of the United States acting in their official capacity.

## PARTIES

~~18.~~22. Plaintiff DC Preservation League ("DCPL") is a non-profit, tax-exempt § 501(c)(3) membership organization with its principal office in Washington, D.C. DCPL's mission is to preserve, protect, and enhance the built environment of Washington, D.C., through advocacy and education. DCPL's members live, work, and recreate throughout the District, including in and around East Potomac Park. DCPL has at least one member that lives around, works around, and recreates in and around East Potomac Park and the facilities at East Potomac Golf Course. DCPL also has at least one member who regularly uses, views, and enjoys East Potomac Park and East Potomac Golf Course for their recreational values, their historic values, their communal values, and their aesthetic values; who plans to continue using, viewing, and enjoying East Potomac Park and East Potomac Golf Course in enjoyment of those qualities; and who has interests in the same that are injured by the Defendants. DCPL and its members have longstanding interests in the preservation of East Potomac Park, including East Potomac Golf Course. DCPL and its members would, if given the opportunity, participate in NEPA and NHPA processes for the debris dumping and the Washington National plan, including by reviewing environmental documents, submitting comments, and engaging in Section 106 consultation. Defendants' failure to initiate and complete those processes deprives DCPL and its members of procedural rights and information to which they are legally entitled and directly impairs their ability to protect their historical, aesthetic, recreational, communal, professional, economic, and organizational interests in the Park.

~~19.~~23. Plaintiff Dave Roberts has been a resident of Washington, D.C., since 1998. He is a recreational golfer and has been playing golf at East Potomac Golf Course regularly for more than 20 years. He regularly uses the facilities at East Potomac Golf Course, including but not limited to the golf courses, and he plans to continue doing so. His aesthetic, recreational, cultural, environmental, and communal interests in East Potomac Golf Course are being harmed and will continue to be harmed by Defendants' actions.

~~20.~~24. Plaintiff Alex Dickson is a resident of Arlington, Virginia. He is a recreational golfer and has been playing golf at East Potomac Golf Course regularly for more than 10 years. He regularly uses the facilities at East Potomac Golf Course, including but not limited to the White Course and other golf courses, and he plans to continue doing so. His aesthetic, recreational, cultural, environmental, and communal interests in East Potomac Golf Course are being harmed and will continue to be harmed by Defendants' actions.

~~21.~~25. Defendant Department of the Interior is a federal agency headquartered at 1849 C Street, NW, Washington, D.C. 20240. It is led by the Secretary of the Interior, whose responsibilities include "the supervision of public business related to" the National Park Service and all public lands, 43 U.S.C. § 1457(11), (13), including East Potomac Park and East Potomac Golf Course.

~~22.~~26. Defendant Doug Burgum is Secretary of the Interior. He is sued in his official capacity. Defendant Burgum "is charged with the supervision of public business related to" the National Park Service and all public lands. 43 U.S.C. § 1457(11), (13). As such, he is responsible for the supervision of public business related to East Potomac Park, including East Potomac Golf Course.

~~23.~~27. Defendant National Park Service is a bureau of the Department of the Interior, which is a federal agency headquartered at 1849 C Street, NW, Washington, D.C. 20240. NPS is responsible for "promot[ing] and regulat[ing] the use of the National Park System," 54 U.S.C. § 100101(a), which includes East Potomac Park (a subunit of the National Mall and Memorial Parks).

~~24.~~28. Defendant Jessica Bowron assumed the role of Acting Director of the National Park Service on or about January 20, 2025. More recently, she has been referred to as the "Comptroller Exercising the Delegated Authority of the Director." *Compare* 5 U.S.C. § 3345, *et seq.* She is sued in her official capacity. The Director is responsible for "the supervision, management, and control of [National Park] System units." 54 U.S.C. § 100302(a)(3).

**LEGAL BACKGROUND**

~~25.~~29. Congress enacted NEPA to protect the environment by requiring federal agencies to "take a hard look at the environmental consequences *before* taking a major action." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983) (emphasis added). Specifically, where a proposed action "has a reasonably foreseeable significant effect on the quality of the human environment," 42 U.S.C. § 4336(b)(1), NEPA requires the agency to prepare an "environmental impact statement" (EIS) "address[ing] the significant environmental effects of [the] proposed project and identify[ing] feasible alternatives." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 184 (2025); 42 U.S.C. § 4332. A draft EIS must be published for public review and comment on the proposed action's potential environmental impacts and alternatives. 42 U.S.C. § 4336a(c).

~~26.~~30. Where the agency does not know whether a proposed action will have significant effects on the environment, or where the agency concludes the action will not have a reasonably foreseeable significant effect, the agency must prepare an "environmental assessment" (EA) setting forth for public review the basis of the agency's determination that no EIS is necessary. *Id.* § 4336(b)(2).

~~27.~~31. In limited circumstances, an agency may determine that a proposed action falls within a "categorical exclusion" and is thus exempt from the default requirement that the agency prepare an EA or EIS. *Id.* Categorical exclusions are a subset of actions, designated by an agency, ~~which~~that "a bureau has determined normally do not significantly affect the quality of the human environment." 43 C.F.R. § 46.205. If a proposed action does not meet the criteria for any designated categorical exclusion, then the proposed action must be analyzed in an EA or EIS. *Id.* § 46.205(a).

~~28.~~32. Even if the criteria for a categorical exclusion apply to a given action~~, however~~, an agency has an additional obligation to evaluate the action for extraordinary circumstances in which "a normally excluded action may have a significant effect." 43 C.F.R. § 46.205(c)(1). If the Responsible Official determines that an action might meet any of the exceptions delineated by the agency, extraordinary circumstances exist and the agency must prepare an EA or EIS. *Id.* § 46.215.

~~29.~~33. Although NEPA does not impose substantive restrictions on agency action, its procedural requirements "inevitably bring pressure to bear on agencies to respond to the needs of environmental quality" and "ensure[] that important effects will not be overlooked or underestimated only to be discovered after resources have been committed

or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (quotation marks and citation omitted).

~~30.~~34. Like NEPA, the NHPA "is a 'stop, look, and listen' provision" that "requires federal agencies to take into account the effect of their actions" on historic properties, including "structures eligible for inclusion in the National Register of Historic Places." ~~*Illinois Commerce*~~ *Ill. Com. Comm'n v. ICC*, 848 F.2d 1246, 1261 (D.C. Cir. 1988). Specifically, "NHPA's Section 106 requires federal agencies to 'take into account the effect of' their 'undertaking[s] on any historic property.'" *United Keetoowah Band of Cherokee Indians v. FCC*, 933 F.3d 728, 733 (D.C. Cir. 2019) (citing 54 U.S.C. § 306108).

~~31.~~35. Under Section 106, "[t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to approval, of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108.

~~32.~~36. An "undertaking" under ~~section~~Section 106 is any "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . those carried out with Federal financial assistance; and those requiring a Federal permit, license, or approval." 54 U.S.C. § 300320.

~~33.~~37. In fulfilling the Section 106 obligation, agencies must "consult with certain stakeholders in the potentially affected areas." *City of Phoenix~~, Ariz.~~ v. Huerta*, 869 F.3d 963, 971 (D.C. Cir. 2017). The head of the relevant federal agency must "afford the

[Advisory Council on Historic Preservation] a reasonable opportunity to comment with regard to the undertaking." 54 U.S.C. § 306108. The agency also must consult with the public, whose "views . . . are essential to informed Federal decisionmaking in the section 106 process." 36 C.F.R. § 800.2(d)(1). Accordingly, before undertaking a project, an agency must generally "provide the public with information about an undertaking and its effects on historic properties and seek public comment and input." *Id.* § 800.2(d)(2). "If an agency determines that no historic structures will be adversely affected, it still has to 'notify all consulting parties' . . . and give them any relevant documentation." *City of Phoenix*, 869 F.3d at 971 (citing 36 C.F.R. § 800.5(c)).

38. ~~Both NEPA~~Others of Defendants' legal obligations are substantive, and no amount of procedure can obviate them.

39. NPS's Organic Act requires it "to conserve the scenery, natural and historic objects, and wild life" in NPS units like East Potomac Park "and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). Destruction of a historic object like East Potomac Golf Course is a clear violation of that statutory duty.

40. NPS also must adhere to 54 U.S.C. § 100903(a), and its implementing regulations at 36 C.F.R. § 6.1, *et seq.* ("Part 6"), which forbid operating a solid waste disposal site within an NPS unit unless the Regional Director makes a bevy of findings – none of which have been made or even could be made in regard to the Washington National plan and the dumping and storage of toxic fill at East Potomac.

41. Finally, federal law provides that "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106. As NPS acknowledges through its Management Policies (and as evidenced by the fact that building a golf course is necessarily a construction project, no matter its specific design), the championship-style golf course Defendant Burgum confirmed Defendants intend to build is a "structure" subject to this statutory prohibition.

~~34.~~42. NEPA, the NHPA, the Organic Act, Part 6, and Section 8106 are enforceable through the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* Under the APA, a court must set aside final agency action that was taken "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A). *Id.* An agency acts arbitrarily or capriciously if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## FACTUAL BACKGROUND

### I. FOR DECADES, DEFENDANTS MAINTAINED EAST POTOMAC PARK FOR RECREATIONAL PURPOSES, BROADLY ACCESSIBLE TO THE GENERAL PUBLIC AND CONSISTENT WITH WALTER TRAVIS'S ORIGINAL GOLF COURSE DESIGN

#### A. The History of East Potomac Park and East Potomac Golf Course

~~35.~~43. East Potomac Park occupies a publicly owned, man-made island just south of the National Mall that was once part of the underwater Potomac River Flats and was reclaimed by the U.S. Army Corps of Engineers in the late nineteenth century. Congress declared the infilled land a public park in 1897, decreeing that it should be "forever held and used as a park for the recreation and pleasure of the people." Act of Mar. 3, 1897, ch. 375, 29 Stat. 624.

~~36.~~44. Today, the vast majority of the park's 330 acres are used for recreation, including not only East Potomac Golf Course but also tennis courts and a playground. Japanese cherry trees, pines, and other flowering trees frame a road, scenic walkways, and bike trails around the perimeter of the island down to Hains Point, a 15-acre open green space at the southern tip of the park boasting panoramic views of the Anacostia and Potomac Rivers. The park regularly hosts running races, guided bird walks, fishing events, and picnics.

~~37.~~45. At the heart of the park is the 210-acre East Potomac Golf Course. From its opening, its innovative design made it a leading example of an enjoyable, accessible American municipal golf course.

~~38.~~46. Every venue where golf is played is unique. From Augusta National in Georgia to the local pitch-and-putt, no two courses are exactly the same.

~~39.~~47. In golf's earliest days centuries ago, courses presented players with whatever challenges the land itself offered: natural undulations, sandy hazards, and varied ground cover.

~~40.~~48. By the time the game arrived in the United States in the 1890s, however, the nation's first golf courses mostly reflected the prevailing Victorian style of the day: often

symmetrically designed and penal in nature—requiring rigorous execution of specific, demanding shots—and almost always aesthetically out of place in their landscapes.

~~41.~~49. In the early 1900s, a small group of influential golf course architects revolutionized the art of course design by emphasizing more minimalist, natural designs: golf courses truer to the game's heritage, with designs that relied on the natural shape and features of the land. These architects—including Alister MacKenzie, who designed Augusta National, Donald Ross (Pinehurst No. 2 in North Carolina), A.W. Tillinghast (Bethpage Black in New York), and William Flynn (Shinnecock Hills in New York)—ushered in the Golden Age of American golf architecture.

~~42.~~50. Among the titans of this period was Walter J. Travis, a decorated player in his own right who won three United States Amateur titles between 1900 and 1903. Travis popularized a style of design far closer to golf's Scottish origins than America's early Victorian designs. His designs balanced strategic elements and designs forcing precise play with rugged mounding, thoughtfully located hazards, and complex greens.

~~43.~~51. Through this architectural philosophy, Travis captured a design style that characterized the era's greatest courses, including East Potomac: difficult for aggressive elite players, yet playable for unskilled beginners. For example, by designing greens that invite shots played along the ground, Travis's designs accommodate novice golfers' mis-hits and putts from off the green while confounding elite players with the sheer variety of available strategies.

~~44.~~52. Travis's design was ideally suited to the rise of municipal public golf courses. By the 1920s, golf had soared in popularity. But it remained a sport enjoyed mostly by

society's elite. Equipment was expensive, and most high-quality golf courses were owned by private clubs and carried high access fees.

~~45.~~53. The solution lay in municipally owned golf courses that were open to the public at affordable rates—notably, though, on a segregated basis. The number of such courses exploded in the United States in the 1920s.

~~46.~~54. Among them was Travis's course at East Potomac. After years of demand for a public golf course in the nation's capital, the course opened at East Potomac Park in 1919 to great acclaim. Nestled among some of the oldest Japanese cherry trees in the District, the course debuted as a nine-hole design, with a twist: like the Old Course at St. Andrews in Scotland, Travis's layout was reversible, with tees, greens, and hazards carefully arranged to allow playing the course both clockwise and counterclockwise. The course was an instant success. In 1921 alone, East Potomac logged more than 65,000 rounds—a staggering number, even by modern standards. ~~The fee to play was 25 cents.~~

~~47.~~55. To accommodate the demand, in 1921-1922, Travis designed another nine holes, again on a reversible layout. With two reversible nines, East Potomac offered four available nine-hole loops—a feat of both architecture and construction. Today, these 18 holes collectively form East Potomac's "Blue Course."

~~48.~~56. A third nine-hole layout opened at East Potomac in early 1925 (today called the "White Course"), possibly designed by William Flynn, another Golden Age giant. This addition fueled further public interest. In 1927, East Potomac tallied more than 155,000 rounds played.

~~49.~~57. East Potomac's accessible course design contributed to an egalitarian spirit. The Blue and White Courses were soon joined by a third 1920s-era nine-hole course (the

"Red Course") of short par-3 holes particularly well suited for beginners or for more seasoned players looking for a quick round. In 1931, one of the first miniature golf courses in the United States opened at East Potomac, featuring miniature replicas of the White House, Capitol, and Mount Vernon. A version of the course is still operating today and beloved by local families.

~~50.~~58. East Potomac Golf Course was, however, glaringly inegalitarian in one critical respect in its early decades: it was originally a racially segregated course, open only to whites except during limited hours one day a week.

~~51.~~59. In protest, three Black golfers—Asa Williams, George Williams, and Cecil R. Shamwell, members of the Royal Golf Club—demanded the right to play at East Potomac in 1941. After they were initially denied admission, they returned with police protection to play a round amid jeers and insults from white onlookers.[3] The next day, Secretary of the Interior Harold Ickes issued an order opening the course to all players. Black golfers attempting to play at East Potomac continued to face intimidation and harassment, and segregation remained the de jure rule at other public courses until after the Supreme Court's ~~1954~~desegregation decisions ~~in *Bolling v. Sharpe* and *Brown v. Board*~~ of ~~*Education*.~~the 1950s. But the 1941 protest and response at East Potomac marked an inflection point in the struggle for equal access to public spaces and national parks in the United States.

~~52.~~60. In recent years, East Potomac Golf Course has remained an irreplaceable asset for public golf in Washington, D.C. It offers affordable rates and is accessible to players of

[3] *See* NPS, *Golf Course as Classroom: University of Pennsylvania at East Potomac Park*, https://perma.cc/UKF7-XKAG.

all skill levels. A weekend round at East Potomac's Blue Course costs $48. In contrast, a Sunday morning round at Laurel Hill Golf Club—a municipal golf course in Fairfax County, Virginia—costs $~~89~~134.[4] Many semi-private, public-access courses in the D.C. area cost even more, and the cost and other barriers to membership at most private clubs are still more prohibitive.

~~53.~~61. Many golfers from the District and neighboring areas played their first rounds at East Potomac. Many others from across America visit East Potomac Golf Course when in Washington to play at one of Walter Travis's most important designs. And together with the other open spaces, recreational facilities, and natural landscapes of East Potomac Park, East Potomac Golf Course has been central to making the Park an invaluable resource for the whole community as a "park for the recreation and pleasure of the people."

~~54.~~62. East Potomac Park is listed on the National Register of Historic Places, with East Potomac Golf Course as a contributing feature.[5]

**B. Defendants' Longstanding Administration of East Potomac Park**

~~55.~~63. Defendants are charged with the responsibility to "promote and regulate the use of the National Park ~~Syste~~System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as

[4] Fairfax County Golf, ~~*Showing*~~ *Tee Times* ~~*for Feb. 15, 2026,*~~ ~~(Feb. 15, 2026)~~, https://perma.cc/~~26L3-YRAB~~6FZR-LQ6S.
[5] East and West Potomac Parks HD (~~Exhibit~~Ex. A).

will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(1).a). The National Park System includes "any area of land and water administered by the Secretary, acting through the Director, for park, monument, historic, parkway, recreational, or other purposes." *Id.* § 100501. East Potomac Park is one such area administered by Defendants.

56.64. For decades, Interior and NPS have administered East Potomac Park in a manner consistent with the park's historic character and Congress's mandate that it be "forever held and used . . . for the recreation and pleasure of the people." While that status quo has always allowed for necessary upkeep and rehabilitation, including at East Potomac Golf Course, Defendants have consistently and repeatedly—until recently—expressed and maintained a commitment in official records, publications, and practice to that management approach and to preserving Walter Travis's historic design.

57.65. In 1982, for example, Interior and NPS released a Draft Development Concept Plan/Environmental Assessment (ExhibitEx. B) ("1982 Draft DCP"), which addressed the need for adjustments to accommodate the increasing public "demand for close-to-home recreation." Ex. B at 2. The 1982 Draft DCP set out a commitment to retaining the park's "general recreational open space purpose." *Id.* And although some participants in public planning discussions had suggested replacing Travis's layout with a "championship-type 18-hole course," NPS did not include that approach in its proposal. *Id.* at 1. Instead it It proposed only minor restorations such as "rehabilitat[ing] [the] course to improve tee boxes and site drainage,[,] add[ing] new plantings & sand traps; mark[ing], and sign[ing] the three separate nine hole courses," and removal of some

holes while retaining the original Blue and White courses without change. *Id.* at 4 (Alternative B Proposal). Even that limited change was not adopted.

~~58.~~66. In 2017, NPS published a Cultural Landscapes Inventory ("CLI") of the natural and cultural assets at East Potomac Park (~~Exhibit~~Ex. C).

~~59.~~67. The CLI recounts with great specificity the history behind East Potomac's existing golf course designs, Ex. C at 4, positing that "[t]he layouts of all three courses at East Potomac Park have been substantially altered since" 1941, but that East Potomac Golf Course's cultural landscape nonetheless "retains integrity" from that period. *Id.* at 5; *see also id.* at 6 (noting East Potomac Golf Course's "continued integrity of feeling and association"). Indeed, the CLI found the total yardage of Travis's original Blue Course to be 6,599 yards in 2016—nearly the same as its original yardage of 6,244 yards, with the growth reflecting small adjustments to account for advances in golf equipment.[6] The CLI concluded, in accordance with the determination of the superintendent of the National Mall and Memorial Parks ("NAMA"), that East Potomac Golf Course falls within the category of NAMA assets that "[m]ust be [p]reserved and [m]aintained." Ex. C at 12.

~~60.~~68. In June 2019, Interior and NPS released a Cultural Landscape Report ("CLR") for the District's three municipal golf courses (East Potomac Golf Course, Langston Golf Course, and Rock Creek Golf Course) (~~Exhibit~~Ex. D). The CLR again expressed the intent to maintain East Potomac Golf Course's longstanding historic design: "While NPS acknowledges that changes might be necessary to make repairs and/or to accommodate modern playing standards, these treatment guidelines have been developed to support

[6] *East Potomac Golf Links*, playDCgolf (2026), https://perma.cc/2EFT-BQAF.

modernization that is consistent with the original design intent for each [golf] course." Ex. D at 3.

~~61.~~69. The CLR reinforced that NPS's goal for East Potomac Park has turned at all times on maintaining the golf courses' historic quality. The CLR acknowledged that "the individual designs of the [Blue, White, and Red] courses have been modified in order to accommodate changing trends and tastes in the sport of golf." For example, "[h]azards ha[d] shifted location or [been] removed entirely, the routing of courses ha[d] been modified, the placement of fairways and holes ha[d] shifted to accommodate the driving ranges, trees [had been] introduced along the fairway corridors, and cart paths and social trails ha[d] developed and disappeared." Ex. D at 88. But "the overall design and layout of East Potomac Golf Course" still "correspond[ed] to the overall form of the course from the period of significance and recall[ed] the cultural landscape's history as a 20th century public, links-style golf course." *Id.* The CLR concluded that the three courses were "[e]ssential" to "design integrity at East Potomac Golf Course." *Id*~~Ex. D at 88~~.

~~62.~~70. This faithfulness to the historic design of East Potomac Golf Course, the CLR stated, reflects "an egalitarian institution within the city of Washington, D.C., as originally intended." Ex. D at 90. The three original courses were thus "a character-defining feature of the golf course." *Id.* at 97.

~~63.~~71. In 2020, after undertaking a competitive bidding process, NPS entered into a 50-year lease with the National Links Trust ("NLT") to operate the District's three municipal golf courses, including East Potomac. In announcing the award of the lease, NPS underscored that "NLT plan[ned] to restore East Potomac Golf Course to Walter Travis's

design" while making capital improvements and restoring the clubhouse.[7] The lease agreement would thus provide "long-term care to these historic courses and affordable opportunities to golf in our nation's capital," consistent with Defendants' longstanding commitment to maintain East Potomac Park as a recreational space open to the whole community and preserve East Potomac Golf Course's historic design.

64.72. In theFor more than five years since, NLT has worked to improve all three of Washington D.C.'s municipal golf courses, including East Potomac, while navigating the complicated federal bureaucracy associated with making those improvements. NLT has made many important improvements at all three courses, including East Potomac.

65.73. SinceAfter NLT assumed management of East Potomac Golf Course, playing conditions improved dramatically as NLT undertook the work the 2019 CLR acknowledged would be necessary. Fairway turf isgrew healthier. Greens arebecame smoother and more resilient to everyday wear and tear. Daily maintenance isbecame more consistent. Invasive vegetation and dead brush have beenwere removed from throughout and around the golf course, allowing improved air flow to keep the grass healthy and creating unobstructed views beyond the golf course's perimeter. It has become The golf course became again what it was always intended to be: a natural landscape, a social gathering place, and a centerpiece of the community.

## II. DEFENDANTS ABRUPTLY ABANDON THE STATUS QUO AT EAST POTOMAC PARK TO IMPLEMENT THE NEWLY ADOPTED WASHINGTON NATIONAL PLAN

[7] NPS, *National Park Service signs 50-year lease with National Links Trust for historic golf courses*, (Oct. 2, 2020), https://perma.cc/ZA4F-FMTF.

66.74. Since taking office for a second term, President Trump has undertaken or threatened a host of efforts to remake significant monuments, memorials, and public spaces in Washington, D.C. in his image and the image of his various properties—including golf clubs—elsewhere, without regard to laws intended to preserve those spaces for their intended purposes as cultural, historical, or environmental resources for all the people.

67.75. Among those measures, on or about August 1, 2025, Defendant Burgum and Interior Solicitor William Doffermyre met with President Trump to discuss abandoning Walter Travis's historic design at East Potomac Golf Course and replacing it with an exclusive high-end, championship-style golf destination designed to attract major professional tournaments such as the Ryder Cup and the U.S. Open.[8] Interior leadership reportedly proposed naming the new course the "Washington National Golf Course."[9] Defendants thereafter decided to abandon the longstanding status quo at East Potomac Park in favor of the Washington National plan.

## A. Defendants Dump 37,000 Cubic Yards of Contaminated Dirt, Debris, and Solid Waste onto East Potomac Golf Course.

68.76. In furtherance of the Washington National plan, Defendant Burgum proposed dumpingthat the debris and dirt that would result from the East Wing's destruction of the East Wingcould be dumped onto East Potomac Golf Course, so that the debrisit could be used as fill when construction beginsbegan on the new design. According to the Wall Street Journal, President Trump "told Burgum he thought the idea was

[8] Garrett Morrison, *The National Links Trust's Battle with the Trump Administration, Explained*, Fried Egg Golf (Jan. 5, 2026), https://perma.cc/S535-R2B4.
[9] Meridith McGraw, *Trump's Next Renovation Target: D.C.'s Golf Courses,* (Dec. 12, 2025), https://perma.cc/9WPP-5YUK.

brilliant."[10] Tom Fazio, a golf course designer who met with President Trump at the White House in November, tacitly confirmed the debris's purpose: "[Trump] said he needed a place to put the dirt, and the [East Potomac] course could use it anyhow."[11]

69.77. InAbout two months later, in October 2025, President Trump demolished the historically significant East Wing of the White House with little warning—despite having previously promised not to tear it down—to make way for a new ballroom more suited to President Trump's taste.

70.78. In preparation for the debris dumping, on October 16, 2025, Defendants published a Categorical Exclusion Documentation Form (ExhibitEx. E) concluding that the dumping, storage, and use at East Potomac of approximately 30,000 cubic yards of debris from destruction of the White House's East Wing was categorically excluded from NEPA's requirements, and thus did not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS).[12] Defendants asserted that the dumping, storage, and usematerial would consist of the debris—described as "clean fill"—constituted" and that dumping, storing, and using it would constitute "[l]andscaping and landscape maintenance in previously disturbed or developed areas" subject to a NEPA categorical exclusion.[13] *See* DOI Handbook of NEPA Procedures, Appendix 2, National ParksPark Service, Categorical Exclusion 12.5(c)(19) (June 2025) (Ex. F).

71.79. The CECatEx Form further represented that the fill materials "will be tested and verified as clean prior to placement, eliminating the risk of introducing contaminants."

[10] *Id.*

[11] Michael Bamberger, *Pres. Trump Could Talk Golf for Hours. Ask His Go-to Course Designer*, Golf (Dec. 12, 2025) https://perma.cc/E5MS-ZPZF.

[12] NPS, Categorical Exclusion Documentation Form, (CE FormEx. E)

[13] *Id.*

Exhibit E. Photographs show that the debris contained wires, pipes, and other materials that appear to have come from the East Wing itself. There is no indication that this debris, much of which dates to periods with common usage of asbestos, lead paint, and other hazards in construction, was tested for hazards or cleaned, and the speed with which it was moved from the East Wing to East Potomac probably precluded any testing or cleaning. (It also is not clear, nor does the CE Form indicate, what "cleaning" would entail.) Ex. E. The CatEx Form lacked any plan for remediating any contaminants that might nonetheless be present in the debris, and it provided for no mitigation measures such as use of a nonpermeable barrier between the dumped debris and the surrounding environment.




A dump truck enters a makeshift dump site after dropping soil and debris from the East Wing of the White House at the East Potomac Golf Course in Washington, October 23, 2025.
Jessica Koscielniak/Reuters

72.

~~73. Images and videos further show that the chain link and plastic mesh fences are the only structures separating golfers from the heaps of dirt and debris.~~




A golfer tees off as a dump truck exits a makeshift dump site after dropping soil and debris from the East Wing of the White House, where U.S. President Donald Trump's proposed ballroom is being built, at the East Potomac Golf Course in Washington, D.C., U.S., October 23, 2025. REUTERS/Jessica Koscielniak TPX IMAGES OF THE DAY

~~74.~~

~~75.~~80. By its own terms, the October 16, 2025 ~~CE~~CatEx Form applied only to the dumping and did not address the environmental consequences of Defendants' abandonment of East Potomac Park's longstanding status quo and adoption of the Washington National plan. In particular, the October 16, 2025 ~~CE~~CatEx Form did not address Defendants' decision to deviate from that status quo in favor of an exclusive championship-style professional golf course, including the massive changes to the land that would be required to build it, nor the effect on the human environment of replacing the existing natural landscape. To the contrary, the October 16, 2025 ~~CE~~CatEx Form

asserted that the existing golf course operation would be maintained and that there would "not" be "new construction or a change in land use." Exhibit Ex. E.

76.81. On the same day that it issued the October 16, 2025 Environmental Assessment, NPS issued the Historic Assessment, purporting to comply with its obligations under the NHPA. through a streamlined process memorialized in a 2010 Programmatic Agreement. Like the October 16, 2025 CECatEx Form, the Historic Assessment addressed only the dumping of East Wing debris and did not address or acknowledge Defendants' abandonment of the East Potomac Park status quo or the Washington National plan. To the contrary, NPS acknowledged that part of East Potomac Golf Course's historic significance is that it has been "maintained as a designed landscape *retaining its layout*, circulation, grading, and vegetation." Exhibit F Ex. G (Assessment of Actions Having an Effect on Historic Properties) (emphasis added). Nevertheless, the Historic Assessment attested that the dumping would have "No Adverse Effect" on a historic property. *Id.*

82. Shortly thereafter,In fact, none of the representations in furtherance of their decision to adopt and implement the Washington National plan,the CatEx Form or the Historic Assessment was true.

77.83. Although Defendants began dumping the East Wing dirt and debris onat East Potomac Golf Course, to serve as fill in their planned redesign. Tom Fazio, a golf course designer who met with President Trump at the White House in November, tacitly confirmed the debris's purpose: "[Trump] said he needed a

place to put the dirt, and the [East Potomac] course could use it anyhow."[14] on October 20, 2025, they did not begin testing those materials for contaminants until October 28, 2025. To the extent Defendants' tested any of the dirt and debris at the East Wing demolition site before transporting it to East Potomac, they did so only using equipment and methods that were not designed to identify asbestos, metals (like lead), metalloids (like arsenic), and other harmful contaminants. Declaration of Jennifer Nersesian ¶ 6, ECF No. 38-1 ("First, during the excavation, Clark Construction tested the excavated soil at the White House with a Hanby total petroleum hydrocarbon colorimetric field screening kit, a photoionization detector (PID), or both, supplemented by visual and olfactory observations of the soil. These tests are designed to identify the presence of *petroleum-impacted material* (the Hanby TPH field screening kit) or *volatile organic* compounds (the PID) in the excavated soil. According to reports received by NPS from Clark, none of these tests indicated the presence of petroleum or VOCs in the excavated soil leaving the White House grounds.") (emphases added)); Ex. I (Expert Report of Brenda Foos) at 1 n.2 (testing at demolition site "analyzed only the presence of select compounds (detecting only petroleum and/or volatile organic compounds, and not metals, pesticides, etc.)"). To make their representations even less reliable, Defendants did not obtain any test results until November 17, 2025. Defendants thus had no basis on October 16 to state that the debris was "clean" or that it would be tested and confirmed to be clean before Defendants began dumping it at East Potomac. What Defendants did know prior to the East Wing's demolition, however, was that debris from the wreckage of the East Wing was highly likely to contain contaminants of concern because "toxic

[14] Michael Bamberger, *President Trump could talk golf for hours. Ask his go to course designer*, Golf.com (Dec. 12, 2025), https://perma.cc/EV2Z-8G58.

substances" were "spread throughout the structure, including asbestos and lead based paint." Ex. H (Joshua Fisher Decl. ¶ 9).

78. On information and belief, Fazio has already visited East Potomac Golf Course for the purpose of preparing to design the Washington National course to replace East Potomac's current layout.

79. Fazio previously co designed two 18 hole courses at Trump National Golf Club in northern Virginia, among others. Mr. Fazio's style contrasts sharply with the minimalist design philosophy that inspired Walter Travis at East Potomac Golf Course. "I don't believe nature can make great golf all by itself," Mr. Fazio is reported to have said. "I think it's pretty obvious that you need to shape the land forms to create a quality golf setting and to produce acceptable shot values. That's where a golf course designer earns his keep."

80. To date, several thousand cubic yards of dirt, rubble, and debris from the demolition of the White House's East Wing have been hauled to East Potomac and dumped on the White Course. On information and belief, the dumping is ongoing and is expected to continue through the end of February. The CE Form published by NPS indicates that the dumping will total 30,000 cubic yards. Further, the CE Form states that the material is to be "stored and subsequently incorporated" as fill into golf course "improvements." Exhibit E.

81. Experts have raised alarms that the East Wing may have contained asbestos and lead paint.[15] Under regulations promulgated by the Occupational Safety and Health Administration (OSHA), insulation and surfacing material found in buildings constructed prior to 1981 are presumed to contain asbestos. 29 C.F.R. § 1910.1001(b) (2026). The East Wing was constructed in 1902 and renovated in 1942. The White House reportedly did not obtain an asbestos identification and removal permit from the District of Columbia prior to razing the East Wing.[16] Treasury Security Scott Bessent has acknowledged that "maybe parts of the East Wing could have been asbestos."[17] According to reports, the company responsible for East Wing demolition work did not have an asbestos abatement license in the District of Columbia. In a letter to that company, Senator Edward Markey stated that the East Wing's "age and construction era make it overwhelmingly likely that asbestos-containing materials, lead-based paint, and other hazardous substances were present."[18]

84. When Defendants' contractor Jacobs Engineering began testing the refuse on October 28, 2025, their test results confirmed that the East Wing debris and dirt they had dumped at East Potomac were anything but clean: they were contaminated with dangerously high

[15] In January, the Asbestos Disease Awareness Organization—after failing to receive a response to requests under the Freedom of Information Act (FOIA)—brought suit to compel disclosure of documents relating to the release and removal of asbestos during the East Wing demolition. *See* Complaint, *Asbestos Disease Awareness Ass'n. v. NPS*, No. 1:26-cv-00029 (D.D.C. Jan. 7, 2026), ECF No. 1.

[16] Ellie Borst, Heather Richards, *White House dodged East Wing asbestos permits*, E&E News by Politico, (Dec. 01, 2025), https://perma.cc/Y3SR-6C23.

[17] Meet the Press, *'This is moving at warp speed': Scott Bessent defends East Wing demolition*, NBC News (Oct. 26, 2025), https://perma.cc/N4CJ-WGY3.

[18] Edward J. Markey, U.S. Senate Letter (Oct. 30, 2025), https://perma.cc/8ZDW-RKG6.

levels of lead, arsenic, hydrocarbons, and other pollutants that pose significant threats to both wildlife and human health.

85. For example, test results published by Jacobs show that 23 contaminants of concern failed ecological screening because the concentrations detected in Jacobs's stockpile soil samples exceeded NPS's own risk-based ecological screening values ("ESVs")—i.e., the benchmarks NPS itself uses to identify risks of adverse effects to ecological receptors, including plants and wildlife. For some of those contaminants, the maximum detected concentrations were hundreds of times higher than NPS's risk-based ESVs. The maximum soil concentration for lead exceeded the ESV by 425-fold. The maximum soil concentration for mercury exceeded the ESV by 176-fold, and for chromium, 141-fold. Each of these and many other contaminants that Jacobs found in high concentrations in the stockpile present significant hazards to birds and other wildlife found at East Potomac Park, including compromised immune function and reduced reproduction. *See* Foos Report at 11-12.

86. Jacobs's test results also revealed that the stockpile poses threats to human health, with several contaminants found in concentrations that exceed relevant human-health risk-based screening values used by the U.S. Environmental Protection Agency ("EPA") to identify toxins that pose threats to humans through residential soil and groundwater. For example, every soil sample from the stockpile contained levels of arsenic that exceed EPA's residential soil screening value. Arsenic is a potent human carcinogen. Numerous soil samples also contained levels of polycyclic aromatic hydrocarbons ("PAHs") that similarly failed human health screening, including benzo(a)pyrene, which appeared in

dangerously high concentrations in 37% of Jacobs's samples. Benzo(a)pyrene is known to be a potent human carcinogen, particularly to children. *Id.* at 15-16.

87. Aside from grassing over the massive pile of contaminated debris and dirt, Defendants have taken no mitigation or remediation measures. As a result, human exposure to contaminants in the stockpile likely occurred from erosion of the pile via wind, rain, or manipulation (by a bulldozer, for example) and from leaching of contaminants into the soil and groundwater beneath. *See* Ex. J (Expert Report of Jim Connors) at 26-28; Foos Report at 14 ("The contaminants that have failed the human health risk-based screening, as discussed above, present hazards to humans due to their toxicity."), 13-14 ("The contaminated soils may be inhaled or ingest[ed] directly or after the soil has become adhered to hands and skin, as well as after it has become adhered to recreational equipment such as shoes, clothes, golf clubs/bags, water bottles, etc. If the soil contamination leaches into the aquatic environment at EPP, as suggested by the SSL screening discussed in the previous section, then there may also be human exposures via contact with the contaminated water, sediment, and ingestion of fish (fishing is an activity at EPP)."). And if the toxic dirt in the stockpile is spread intentionally over the ground as landscaping fill to areas where adults and children play, golf, jog, picnic, and engage in other recreational activities, exposure to contaminants could result from contact through ingestion of soil, dermal contact, and inhalation. *See* Foos Report at 13 ("Potential human exposures will increase if the stockpile soils are reused as suggested; this is due to the larger contactable surface area of the contaminated soil when spread out.").

88. Even taken at face value, then, Defendants' own test results thus indicate that the stockpile contains numerous contaminants that pose threats to human health, wildlife, and the surrounding environment. But the testing Defendants conducted was also flawed in several respects and likely understates the extent of toxins in the stockpile. First, as noted, Defendants conducted no meaningful testing at all before October 28, 2025. Although Clark Construction, the contractor that demolished the East Wing and prepared the debris for transport to East Potomac, ostensibly "tested" the debris for toxins before transport, they did so using only "sniffer" methods that are typically capable of detecting only gas and chemical vapor emissions and would not have been capable of establishing that the debris constituted "clean fill."

89. Jacobs did not take samples to establish benchmark or background levels at East Potomac until October 28—more than a week after the dumping began. Those benchmark samples thus do not reflect the true conditions that existed on the East Potomac Golf Course *before* the dirt was dumped there. As a result, comparing the contaminant levels Jacobs detected in the stockpile to their unreliable "background" levels of contaminants in the surrounding environment could not support any reliable conclusions about the safety of the stockpile nor its relative contamination to the preexisting conditions at East Potomac. Connors Report at 20-23.

90. Jacobs's failure to take any samples from the stockpile during the first eight days of dumping means that the test results they later reported were not representative of the whole stockpile. Furthermore, the overall downward trajectory of daily contamination levels indicates that if Defendants had tested the debris beginning October 20, 2025, the results likely would have been even higher, which makes sense, because the earliest loads

of refuse would have been soil and debris closest to contact with the East Wing structure. Foos Report at 15. *See also* Connors Report at 25 (trajectory graphs). Jacobs's material data gap therefore might obscure contamination levels that would have been even higher – a reasonable possibility that Defendants never investigated, might have been permanently obscured by continuing to dump for several months, and have refused to allow Plaintiffs to examine.

91. Defendants learned no later than November 17, 2025, when they began receiving Jacobs's concerning test results, that post-dumping tests showed that the debris was not clean. Nevertheless, Defendants took no steps to correct the CatEx Form's misrepresentations, and Defendants continued dumping more contaminants for months.

92. After dumping started, photographs show that the debris contained wires, pipes, and other materials that came from the East Wing itself. And on January 14, 2026, Defendants publicly acknowledged that the East Wing had contained asbestos, yet they made no effort to determine whether that asbestos had made its way into the untested debris that they dumped during the first eight days. Ex. H (Joshua Fisher Decl. ¶ 9). *Accord* Ex. K (Jacobs Report) at Appendix F-11 (two samples from first day of sampling "inadvertently not tested for asbestos").




A dump truck enters a makeshift dump site after dropping soil and debris from the East Wing of the White House at the East Potomac Golf Course in Washington, October 23, 2025.
Jessica Koscielniak/Reuters

93.




A golfer tees off as a dump truck exits a makeshift dump site after dropping soil and debris from the East Wing of the White House, where U.S. President Donald Trump's proposed ballroom is being built, at the East Potomac Golf Course in Washington, D.C., U.S., October 23, 2025. REUTERS/Jessica Koscielniak TPX IMAGES OF THE DAY

94.

95. Today, chain-link and plastic-mesh fences are the only barriers separating golfers and wildlife from the heaps of contaminated dirt and debris.

96. 


**B. Defendants Continue Implementing the Washington National Plan**

~~82.~~97. On October 29, 2025, further implementing the Washington National plan, ~~the National Park Service~~NPS delivered to NLT a notice of default on its lease. Just over two months later, on December 31, 2025, NPS terminated NLT's lease. That termination was a necessary step to implementing the Washington National plan, because NPS had committed in the lease agreement to maintaining East Potomac's historical design. ECF No. 45-1 (NLT Lease) at 36 (directing NLT to "[p]ursue historic preservation via the thorough restoration of the once-celebrated *Walter Travis* design at East Potomac Golf Course (to include reversibility of play)") (emphasis in original).

83. 98. On January 11, 2026, President Trump confirmed that the Washington National plan hashad been adopted and iswas already in motion. During a press gaggle aboard Air Force One, a reporter asked, "What's your plan for East Potomac? Are you going to renovate the golf course?" Trump responded, "Yeah, we're gonna make it a beautiful, world-class, U.S. Open-caliber course. Ideally, we're gonna have major tournaments there and everything else. It's going to bring a lot of business into Washington."[19]

99. On May 8, 2026, Defendant Burgum announced on social media that NPS would partner with Fazio Designs and other private organizations and contributors to "renovate" East Potomac Golf Course and undertake "major infrastructure projects" in East Potomac Park to build an "18-hole championship golf course." On May 14, 2026, Defendant Burgum "unveil[ed]" on social media "the design for the East Potomac Golf Links renovation from Fazio Design." Secretary Doug Burgum (@SecretaryBurgum), X (May 14, 2026, at 10:40 AM), https://perma.cc/QYY6-ZMYB; *see also* Secretary Doug Burgum (@SecretaryBurgum), X (May 8, 2026, at 8:00 PM), https://perma.cc/H235-Z2AF (Fazio Design "will renovate and restore East Potomac Golf Links").

100. On June 28, 2026, President Trump, Defendant Burgum, Fazio, and others toured East Potomac Golf Course with Fazio's renderings in hand. Later that day, President Trump announced on social media that work on the Washington National plan would begin on September 1, 2026.

101. As September 1, 2026, approached, NPS contractors and employees executed a tree-clearing project at East Potomac Park, felling approximately 150 trees, including at least

[19] Forbes Breaking News, *'It's Going To Bring A Lot Of Business': Trump Teases Renovations For East Potomac Golf Course,* YouTube (Jan. 12, 2026), https://perma.cc/LH8E-LGHX.

one of the Park's famed Japanese cherry trees. On September 1, 2026, and the days that followed, workers carried out surveying activities around East Potomac Golf Course and staged heavy equipment, including bobcats and an excavator, adjacent to the course. And in mid-September, it came to light that Defendants had begun advertising for a contract to perform the Washington National plan's "construction" phase,[20] and that they had awarded a contract for "compliance" "support services" in connection with the Washington National plan.[21]

## III. THE DUMPING OF DEBRIS AND ADOPTION OF THE WASHINGTON NATIONAL PLAN CONSTITUTE MAJOR FEDERAL ACTIONS REQUIRING AN ENVIRONMENTAL ANALYSIS UNDER NEPA AND UNDERTAKINGS REQUIRING HISTORIC PRESERVATION ANALYSIS UNDER NHPA

~~84.~~102. ~~Converting~~Demolishing East Potomac Golf Course ~~to~~and replacing it with a "championship-style" course for professional tournaments will necessarily entail far more than mere aesthetic changes and adjusted pin placements. It will require destruction of the Travis-designed course and leave the whole of East Potomac Park unrecognizable.

~~85.~~ Implementing the Washington National plan will require ~~overhaul of~~destroying all or nearly all the footprint currently occupied by East Potomac's 36 holes and miniature golf course—and perhaps all of East Potomac Park. ~~These~~ Regardless of the precise details of the final design, these changes will ~~likely~~ entail, at a minimum, the near-certain removal or relocation of hundreds of trees~~, substantial modification of terrain~~

[20] U.S. Gen. Servs. Admin., Acquisition Gateway, *Construction- East Potomac Park Rehab (Golf Course)*, https://perma.cc/7RXV-JYDQ (last visited Sep. 15, 2026).
[21] SAM.GOV, *A-E Design Support Services for Compliance Rehabilitate East Potomac Park Golf Course*, https://perma.cc/XHT5-PZ8F.

(beyond that which has already occurred), substantially modifying terrain, and replacementcreating unnatural bodies of water, replacing the site's existing clubhouse.

86. Consistent with the nature of championship courses and Tom Fazio designs in particular, execution of Defendants' Washington National plan will most likely also entail the construction of water hazards, including potentially by, destroying existing roadways, modifying terrain and landscaping, and and paths, reclaiming land.

87.103. Defendants have indicated that, in furtherance of their plan, they intend to use the , and spreading the contaminated East Wing dirt and debris that has already been dumped at (as well as other yet unidentified "fill") throughout the entirety of East Potomac Park from the wreckage of the White House's East Wing as fill for a championship-style course. Doing so. This will introduce foreign organic and inorganic materials into the land, potentially causing heavy metals and other toxins to leach into the soil and groundwater, altering the chemistry of the soil and water, harming the ecosystems of both the Park and the Potomac River, and posing risks to human health and wildlife.

88.104. The dumping of debris and implementation of the Washington National plan will each have a reasonably foreseeable significant adverse effecteffects on the quality of the human environment, both on East Potomac Golf Course itself and on the surrounding open spaces and recreational areas of East Potomac Park.

89.105. The reclaimed land occupied by East Potomac Park, which is already eroding, has a high water table susceptible to flooding and fluctuating water levels. Modifying the terrain and tree coverage or introducing new artificial water features, as Defendants

intend to do, will aggravate existing erosion and flooding riskshave decided and begun to do, will aggravate existing erosion and flooding risks. East Potomac Park is home to many species of plants and wildlife, including endangered species. Over 270 bird species have been observed at the park, including bald eagles, herons, egrets, owls, ducks, gulls, swans, the black scoter (near-threatened), the red knot (endangered), the golden-winged warbler (endangered), and others. The park also is home to a variety of mammals, including groundhogs, raccoons, and red foxes. Various reptile species found at the park include five-lined skinks, snapping turtles, Eastern rat snakes, and Eastern copperheads. The area also is habitat for many invertebrates, including insects, worms, and crustaceans that provide a source of food for other wildlife.

90.106. Defendants' actions will also affect historic property, including but not limited to the East Potomac Park Historic District and the historic East Potomac Golf Course, a major contributing resource to the Park's historic character.

91.107. Defendants' adoption and implementation of the Washington National plan constitutesconstitute an "undertaking" under Section 106 of the NHPA. On information and belief, it It is being funded in whole or in part under the direct or indirect jurisdiction of a federal agencyagencies, Interior and NPS.

92.108. Likewise, the dumping of debris from the White House East Wing at East Potomac Golf Course—both as a discrete activity and as a component of Defendants' Washington National plan—is an "undertaking."

93.109. East Potomac Park is listed on the National Register of Historic Places, therefore making it "historic property." 54 U.S.C. § 300308. Eliminating the public accessibility, landscape, terrain, and design elements of East Potomac Golf Course—including the

greens, bunkers, and fairways shaped and carefully designed by the course's architect—will irreparably harm that historic property. Indeed, it will destroy it.

## IV. DEFENDANTS FAILED TO COMPLY WITH NEPA AND NHPA

~~94.~~110. Defendants' decision to abandon their longstanding management of East Potomac Park according to its historic design and egalitarian use and instead adopt the Washington National plan to replace the existing ~~Golf Course~~golf complex with an elite championship-style professional course is a major federal action that has reasonably foreseeable significant effects on the quality of the human environment. The dumping of debris from the East Wing demolition at East Potomac Park for "storage" and use on East Potomac Golf Course is likewise a major federal action that has reasonably foreseeable significant effect on the quality of the human environment.

~~95.~~111. NEPA accordingly required Defendants to prepare and make available for public comment an Environmental Impact Statement before adopting the Washington National plan and before dumping the East Wing debris. Defendants failed to do so.

~~96.~~112. Alternatively, NEPA obligated Defendants to prepare an Environmental Assessment to determine the effects of the Washington National plan and the dumping of debris on the human environment and to set forth for public review the basis of Defendants' conclusion that no EIS was required. Defendants failed to do so.

~~97. Had Defendants conducted the required review and published an EA or EIS in regard to their adoption of the Washington National plan and the dumping of debris, that document would be publicly available. 42 U.S.C. § 4332(2)(C)(v) (EIS "shall be made available . . . to the public"); 42 U.S.C. § 4336(b)(2) (EA must be a "public document"). No such document is available.~~

98.113. The October 16, 2025 CE, CatEx Form does not acknowledge or address the adoption of the Washington National plan and therefore did not satisfy Defendants' NEPA obligations in regard to the Washington National plan. And as to the dumping of debris, the October 16, 2025 CECatEx Form did not satisfy Defendants' NEPA obligations for the independent reasons that it 1) relied on incorrect factualfalse premises in concluding that the action fell within the scope of Categorical Exclusion 12.5(c)(19),)—namely that the debris would constitute "clean fill" and 2)that it would be tested for contaminants of concern before dumping—and failed to account for the extraordinary circumstances present at East Potomac Park, which would have precluded application of the categorical exclusion.

99.114. In fact, by implementing the Washington National plan, Defendants have fundamentally altered the status quo at East Potomac Park, in a manner that will significantly affect the quality of the human environment and rob the community of a priceless resource for open and accessible recreation for all the people.

115. Although they have already firmly committed to adopting the Washington National plan and have already begun to implement that plan—including by dumping toxic debris to use in constructing the new golf course—that implementation was not preceded by any legally sufficient NEPA review.

100.116. Defendants were likewise obligated to "complete the [NHPA] section 106 process 'prior to the approval of the expenditure of any Federal funds on the'" Washington National plan or the dumping of debris, each of which constitutes an "'undertaking'" under the NHPA. 36 C.F.R. § 800.1 (quoting 54 U.S.C. § 306108). They failed to do so.

~~101.~~117. ~~Defendants' only effort to feign~~Defendants feigned compliance with NHPA ~~was~~through the October 16 Historic Assessment, which posited that dumping 30,000 cubic yards of dirt in the middle of the White Course would be "generally consistent with routine grounds maintenance" and would have "no adverse effect" on East Potomac Park. In so concluding, NPS asserted that the dumping of East Wing debris would not "[a]lter or remove features/elements of a historic setting or environment (inc. terrain)" nor "[a]dd non-historic features/elements (inc. visual, audible, or atmospheric) to a historic setting or cultural landscape."

~~102.~~118. The October 16 Historic Assessment does not acknowledge or address the adoption of the Washington National plan and therefore did not satisfy Defendants' obligations under the NHPA in regard to the Washington National plan. And as to the dumping of debris, the October 16, 2025 Historic Assessment did not satisfy Defendants' NHPA obligations because it misrepresented the nature of the actions, rested on the false and baseless assertion that dumping the debris—which Defendants had not yet tested, and did not test for the project's first eight days—would have "no adverse effects," and improperly accounted for the impact of future mitigation efforts.

119. Although Defendants have already committed to adopting the Washington National plan and have already devoted resources and undertaken steps to implement that decision, that implementation was not preceded by any legally sufficient NHPA review, including but not limited to Defendants' failure to allow public comment.

## V. THE WASHINGTON NATIONAL PLAN, INCLUDING THE DUMPING OF TOXIC DEBRIS, VIOLATES DEFENDANTS' SUBSTANTIVE OBLIGATIONS.

120. The lawlessness of Defendants' conduct does not end with their failure to consider the Washington National plan's harms to East Potomac's environment and history. Defendants are also violating substantive limitations on their legal authority.

121. The NPS Organic Act provides that the Secretary of the Interior and NPS "shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). Destroying East Potomac Golf Course and leaving it unavailable to future generations is a plain dereliction of those conservation and non-impairment mandates.

122. Federal law also forbids operating a "solid waste disposal site" "within the boundary of any [National Park] System unit." *Id.* § 100903(a). NPS's implementing regulations likewise "prohibit the operation of any solid waste disposal site . . . within the boundaries of any unit of the National Park System." 36 C.F.R. § 6.1(a). The dirt and debris from the East Wing demolition contain and are solid waste. Accordingly, storing it and disposing of it at East Potomac Golf Course, whether in a stockpile or spread across East Potomac Park, violates these prohibitions.

123. Congress also has instructed that no "building or structure" shall be "erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106. The Washington

National plan violates this statute because constructing a golf course would "erect[ ]" a "structure" without congressional authorization.

## LEGAL CLAIMS

### COUNT 1: Administrative Procedure Act (NEPA, as to the Washington National Plan) 5 U.S.C. § 706(2)(A), (C), (D)

~~103.~~124. Plaintiffs reallege and reincorporate by reference the paragraphs above.

~~104.~~125. The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

~~105.~~126. Defendants' adoption and implementation of the Washington National plan is a final agency action subject to review under the Administrative Procedure Act~~.~~ 5 U.S.C. § 704.

~~106.~~127. Defendants' adoption and implementation of the Washington National plan is a "major Federal action significantly affecting the quality of the human environment" within the meaning of 42 U.S.C. § 4332.

~~107.~~128. Before taking that major federal action, Defendants were required to comply with NEPA by preparing an EIS or EA, or by setting forth for public review the basis of any categorical exclusion determination or finding of no significant impact. By failing to take any of those steps, or taking the requisite "hard look," Defendants violated NEPA.

~~108.~~129. Accordingly, Defendants' actions were not in accordance with NEPA, exceeded statutory authority, and were taken without observance of procedures required by NEPA, all in violation of the APA.

**COUNT 2:**
**Administrative Procedure Act**
**(NHPA, as to the Washington National Plan)**
**5 U.S.C. § 706(2)(A), (C), (D)**

~~109.~~130. Plaintiffs reallege and reincorporate by reference the paragraphs above.

~~110.~~131. The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

~~111.~~132. Defendants' adoption and implementation of the Washington National plan is a final agency action subject to review under the Administrative Procedure Act. 5 U.S.C. § 704.

~~112.~~133. Defendants' adoption and implementation of the Washington National plan is an undertaking having effect on historic property, within the meaning of 54 U.S.C. § 306108.

~~113.~~134. Prior to that undertaking, Defendants were required to comply with NHPA by taking that effect into account, consulting with the public, and affording the Advisory Council on Historic Preservation a reasonable opportunity to comment. By failing to take those steps, Defendants violated the NHPA.

~~114.~~135. Accordingly, Defendants' actions were not in accordance with NHPA, exceeded statutory authority, and were taken without observance of procedure required by NHPA, all in violation of the APA.

**COUNT 3:**
**Administrative Procedure Act**
**(NPS Organic Act and Act of Mar. 3, 1897,**
**as to the Washington National ~~plan~~Plan)**
**5 U.S.C. § 706(2)(A), (C)**

~~115.~~136. Plaintiffs reallege and reincorporate by reference the paragraphs above.

~~116.~~137. The Administrative Procedure Act provides a remedy to “hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law~~.~~”” or “in excess of statutory jurisdiction, authority, or limitations.” 5 U.S.C. § 706(2)(A), (C).

~~117.~~138. Defendants’ adoption and implementation of the Washington National plan is a final agency action subject to review under the Administrative Procedure Act. 5 U.S.C. § 704.

~~118.~~139. Under the NPS organic act, Defendants are obligated to administer East Potomac Park and East Potomac Golf Course so as to “conserve the scenery, natural and historic objects, and wild life in the [National Park] System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.” 54 U.S.C. § 100101(~~1~~a).

~~119.~~140. Defendants’ adoption and implementation of the Washington National plan ~~impairs~~impair the enjoyment of the scenery, natural and historic objects, and wildlife of East Potomac Park and fails to leave them unimpaired for the enjoyment of future generations, in violation of NPS’s organic act.

~~120.~~141. Defendants’ adoption and implementation of the Washington National plan likewise ~~violates~~violate Congress’s mandate that East Potomac Park “be forever held and used as a park for the recreation and pleasure of the people.” Act of Mar. 3, 1897, ch. 367, 29 Stat. 622.

142. Defendants offered no satisfactory explanation, substantial evidence, or reasoned basis for abandoning the longstanding status quo at East Potomac Park and made no attempt to reconcile their actions with their legal obligations under the NPS organic act or the Act of 1897. Defendants failed to take account of reliance interests and other significant aspects of the problem, including the extent to which their actions would impair the enjoyment of the scenery, natural and historic objects, and wildlife of East Potomac Park and impair its use as a park for the recreation and pleasure of the people.

121. acts. Defendants failed to take account of reliance interests and other significant aspects of the problem, including the extent to which their actions would impair the enjoyment of the scenery, natural and historic objects, and wild life of East Potomac Park and impair its use as a park for the recreation and pleasure of the people.

122.143. Accordingly, Defendants' actions were not in accordance with the NPS Organic Act and the Act of Mar. 3, 1897, ch. 367, 29 Stat. 622, exceeded statutory authority, and were arbitrary and capricious, an abuse of discretion, and contrary to law, all in violation of the APA.

**COUNT 4:**
**Administrative Procedure Act**
**(40 U.S.C. § 8106,**
**as to the Washington National Plan)**

**5 U.S.C. § 706(2)(A), (C)**

~~123.~~144. Plaintiffs reallege and reincorporate by reference the paragraphs above.

145. The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary ~~[and]~~, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

146. Defendants' adoption and implementation of the Washington National plan is a final agency action subject to review under the Administrative Procedure Act. 5 U.S.C. § 704.

147. Pursuant to 40 U.S.C. § 8106, "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."

148. A golf course is a "structure" within the meaning of 40 U.S.C. § 8106, and constructing a championship-style golf course constitutes "erect[ing]" a "structure" within the meaning of 40 U.S.C. § 8106.

149. The Washington National plan therefore violates 40 U.S.C. § 8106.

150. Accordingly, Defendants' implementation of the Washington National plan is contrary to 40 U.S.C. § 8106 and exceeds statutory authority, all in violation of the APA.

**COUNT 5:**
~~."~~**Administrative Procedure Act**
**(arbitrary and capricious, as to the Washington National Plan)**
**5 U.S.C. § 706(2)(A)**

151. Plaintiffs reallege and reincorporate by reference the paragraphs above.

~~124.~~152. The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary [and] capricious." 5 U.S.C. § 706(2)(A).

~~125.~~153. Defendants' adoption and implementation of the Washington National plan is final agency action subject to review under the Administrative Procedure Act~~,~~. 5 U.S.C. § 704.

~~126.~~154. Defendants' adoption and implementation of the Washington National plan ~~was~~is unsupported by any satisfactory explanation, substantial evidence, or reasoned basis. In taking that action, Defendants have failed to take account of reliance interests and other significant aspects of the problem, including adverse effects on the environment and historic property and the elimination of East Potomac Golf Course as a shared recreational asset available to the whole community.

~~127.~~155. Accordingly, Defendants acted arbitrarily and capriciously, in violation of the APA.

**COUNT 6:**
**Administrative Procedure Act**
**(54 U.S.C. § 100903 and 36 C.F.R. § 6.1, *et seq.***
**as to the Washington National Plan)**
**5 U.S.C. § 706(2)(A), (C)**
**~~COUNT 5:~~**

156. Plaintiffs reallege and reincorporate by reference the paragraphs above.

157. The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

158. Defendants' adoption and implementation of the Washington National plan is a final agency action under the Administrative Procedure Act. 5 U.S.C. § 704.

159. By statute, "no solid waste disposal site . . . may be operated within the boundary of any [NPS] unit." 54 U.S.C. § 100903(a).

160. National Park Service regulations "prohibit the operation of any solid waste disposal site, except as specifically provided for." 36 C.F.R. § 6.1(a). The Washington National plan violates these regulations because the use of debris and dirt from the East Wing's demolition as "fill" for the new golf course would render East Potomac Park a "solid waste disposal site."

161. Accordingly, Defendants' actions are not in accordance with Title 54, Section 100903 of the United States Code, Title 36, Part 6.1, *et seq.*, of the Code of Federal Regulations, and exceed statutory authority, all in violation of the APA.

**COUNT 7:**
**Administrative Procedure Act**
**(NEPA, as to the Debris Dumping)**
**5 U.S.C. § 706(2)(A), (C), (D)**

~~128.~~162. Plaintiffs reallege and reincorporate by reference the paragraphs above.

~~129.~~163. The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

~~130.~~164. Defendants' dumping of East Wing debris at East Potomac Park is a final agency action under the Administrative Procedure Act. 5 U.S.C. § 704.

~~131.~~165. Defendants' dumping of East Wing debris at East Potomac Park is an agency action that either (1) has a reasonably foreseeable significant effect on the quality of the human environment; or (2) whose significance on the quality of the human environment is unknown. *See* 42 U.S.C. § 4336(b)(1), (2).

~~132.~~166. The dumping is not an action that is excluded from environmental review pursuant to one of DOI's categorical exclusions, another agency's categorical exclusions, or another provision of law. *See* 42 U.S.C. § 4336(b)(2). Consequently, the dumping ~~cannot proceed~~should not have proceeded without an EA or EIS. *See* 43 C.F.R. § 46.205(a).

~~133.~~167. Contrary to Defendants' ~~explanation~~assertion in the CatEx Form, the dumping was not "analogous to ongoing landscaping and landform maintenance performed routinely by the golf course operator."[22] The debris also did not consist of "clean fill" and was not tested for contaminants before Defendants began dumping it on East Potomac Golf Course. Defendants therefore had no basis for their contrary false assertions in the CatEx Form.

[22] ~~CE Form~~Ex. E.

~~134.~~168. Even if the criteria for a categorical exclusion did apply to the dumping, this situation presents extraordinary circumstances, as defined by 43 C.F.R. § 46.205, in which "a normally excluded action may have a significant environmental effect." 43 C.F.R. § 46.205 (c~~), (c)(1).~~). As a result, the dumping ~~cannot~~could not proceed without an EA or EIS. *Id.* ~~§~~ § 46.215.

~~135.~~169. By justifying the dumping through Categorical Exclusion 12.5(c)(19), Defendants' ~~action was~~actions were not in accordance with NEPA, exceeded statutory authority, and ~~was~~were taken without observance of procedure required by NEPA, all in violation of the APA.

**COUNT ~~6~~8:**
**Administrative Procedure Act**
**(NHPA, as to Debris Dumping)**
**5 U.S.C. § 706(2) (A), (C), (D)**

~~136.~~170. Plaintiffs reallege and reincorporate by reference the paragraphs above.

~~137.~~171. The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

~~138.~~172. Defendants' dumping of East Wing debris at East Potomac Park is a final agency action under the Administrative Procedure Act. 5 U.S.C. § 704.

~~139.~~173. Defendants' dumping of East Wing debris at East Potomac Park is an undertaking having effect on historic property, within the meaning of 54 U.S.C. § 306108.

~~140.~~174. Prior to that undertaking, Defendants were required to comply with NHPA by taking that effect into account, consulting with the public, and affording the Advisory Council on Historic Preservation a reasonable opportunity to comment.

175. By failing to take any of those stepsDefendants' assertions in the Historic Assessment Form that the dumping would have "[n]o adverse effect," would not "alter features/elements from a historic structure," would not "add non-historic features/elements to a historic structure," would not "alter or remove features/elements of a historic setting or environment (inc. terrain)," and would not "add non-historic features/elements (inc. visual . . .) to a historic setting or cultural landscape," were all wrong. Ex. G at 2. Reliance on the Historic Assessment Form in lieu of the standard NHPA review process therefore failed to fulfill Defendants' obligations under NHPA and was arbitrary and capricious.

141.176. Accordingly, Defendants' actions were not in accordance with NHPA, exceeded statutory authority, and were taken without observance of procedure required by NHPA, all in violation of the APA.

**COUNT 79:**
**Administrative Procedure Act**
**(NPS Organic Act, as to the Debris Dumping)**
**5 U.S.C. § 706(2)(A), (C)**

142.1. Plaintiffs reallege and reincorporate by reference the paragraphs above.

143. The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

177. Plaintiffs reallege and reincorporate by reference the paragraphs above.

178. The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

~~144.~~179. Defendants' dumping dirt and debris from the East Wing destruction project is a final agency action subject to review under the Administrative Procedure Act. 5 U.S.C. § 704.

~~145.~~180. Under the NPS organic act, Defendants are obligated to administer East Potomac Park and East Potomac Golf Course so as to "conserve the scenery, natural and historic objects, and wild life in the [National Park] System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(~~1~~a).

~~146.~~181. Defendants' dumping of dirt and debris from the East Wing demolition impairs the enjoyment of the scenery, natural and historic objects, and wildlife of East Potomac Park and fails to leave them unimpaired for the enjoyment of future generations, in violation of NPS's organic act.

~~147.~~1. Defendants offered no satisfactory explanation, substantial evidence, or reasoned basis for abandoning the longstanding status quo at East Potomac Park and made no attempt to reconcile their actions with their legal obligations under the NPS organic acts. ~~Defendants failed to take account of reliance interests and other significant aspects of the problem, including the extent to which their actions would impair the enjoyment of the scenery, natural and historic objects, and wildlife of East Potomac Park and impair its use as a park for the recreation and pleasure of the people.~~

182. Defendants failed to take account of reliance interests and other significant aspects of the problem, including the extent to which their actions would impair the enjoyment of the scenery, natural and historic objects, and wildlife of East Potomac Park, fail to conserve the same, and impair its use as a park for the recreation and pleasure of the people.

148.183. Accordingly, Defendants' actions were arbitrary and capricious, an abuse of discretion, and contrary to law.

**COUNT 8: 10:**
**Administrative Procedure Act**
**( (54 U.S.C. § 100903 and 36 C.F.R. § 6.1, *et seq.*, as to the Debris Dumping):**
**5 U.S.C. § 706(2)(A), (C)**

149.184. Plaintiffs reallege and reincorporate by reference the paragraphs above.

150.185. The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary [and], capricious.", an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

186. Defendants' dumping of and storage of dirt and debris from the East Wing debris at East Potomac Parkdestruction project is a final agency action subject to review under the Administrative Procedure Act. 5 U.S.C. § 704.

187. Title 54, Section 100903(a) of the United States Code provides that "no solid waste disposal site . . . may be operated within the boundary of any [NPS] unit."

188. Title 36, Part 6.1, *et seq.*, of the Code of Federal Regulations "prohibit the operation of any solid waste disposal site . . . within the boundaries of any unit of the National Park System."

189. By storing and disposing of dirt and debris from the East Wing's demolition at East Potomac Golf Course, Defendants are operating a "solid waste disposal site . . . within the boundaries of" a National Park within the meanings of Title 54, Section 100903 of the United States Code and Title 36, Part 6.1, *et seq.*, of the Code of Federal Regulations.

190. Accordingly, Defendants' actions are not in accordance with Title 54, Section 100903 of the United States Code, Title 36, Part 6.1, *et seq.*, of the Code of Federal Regulations, and exceed statutory authority, all in violation of the APA.

**COUNT 11:**
**Administrative Procedure Act**
**(arbitrary and capricious, as to the Debris Dumping):**
**5 U.S.C. § 706(2)(A)**

191. Plaintiffs reallege and reincorporate by reference the paragraphs above.

192. The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary [and] capricious." 5 U.S.C. § 706(2)(A).

~~151.~~193. Defendants' dumping of East Wing debris at East Potomac Park is a final agency action subject to review under the Administrative Procedure Act. 5 U.S.C. § 704.

~~152.~~194. Defendants' dumping of East Wing debris at East Potomac Park was unsupported by any satisfactory explanation, substantial evidence, or reasoned basis. In taking that action, Defendants failed to take account of reliance interests and other significant aspects of the problem, including adverse effects on the environment and the historic

character of the East Potomac Historic District and East Potomac Golf Course as a shared historic and cultural asset available to the whole community.

153.195. NPS's conclusions in the CECatEx Form and Historic Assessment, including but not limited to the conclusions that dumping 30,000 cubic yards of debris and foreign material on a golf course is "routine maintenance" and that it would not alter any elements of the historic property, are so implausible that it could not be ascribed to a difference in view or the product of agency expertise. NPS's assertions in the CatEx Form and Historic Assessment that the debris would consist of "clean fill" that would be tested before any dumping began and would have "no adverse effect" on East Potomac Golf Course's environment or historic elements were arbitrary and capricious because Defendants had not yet conducted any testing to determine whether those statements were true, and later testing confirmed they were false.

154.196. Accordingly, Defendants acted arbitrarily and capriciously in violation of the APA.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court grant the following relief:

1. Declare that Defendants' adoption and implementation of the Washington National plan and abandonment of their longstanding management of East Potomac Park and East Potomac Golf Course for recreational purposes consistent with East Potomac Golf Course's historic design violates the Administrative Procedure Act, the National Environmental Policy Act, the National Historic Preservation Act, the Act of Mar. 3, 1897, and the NPS Organic Acts, 54 U.S.C. § 100903, 36 C.F.R. § 6.1, *et seq.*, and 40 U.S.C. § 8106;

~~2.~~1. ~~Set aside and vacate Defendants' decision to adopt and implement the Washington National plan;~~

~~3. Set aside and vacate the CE Form and the Historic Assessment, and any and all authorizations concerning the dumping of East Wing debris at East Potomac Park;~~

~~4.~~2. Preliminarily and permanently enjoin the Defendants from further implementing the Washington National plan ~~until Defendants have complied with the National Environmental Policy Act and the National Historic Preservation Act~~, including but not limited to:

a. Enjoining Defendants from dumping additional dirt, debris, or other refuse from the East Wing construction project at East Potomac Golf Course or elsewhere at East Potomac Park;

b. Enjoining Defendants to remove from East Potomac Park the dirt, debris, rubble, and other refuse from the East Wing destruction project;

c. Enjoining Defendants from further ground disturbance at East Potomac Golf Course or elsewhere at East Potomac Park;

d. Enjoining Defendants from adopting or implementing any new land-use plans, general management plans, development concept plans, materially altered use, or the like concerning East Potomac Golf Course or East Potomac Park;

e. Enjoining Defendants from segmenting the challenged action into discrete components for purposes of avoiding NEPA or NHPA review;

f. Enjoining Defendants from closing East Potomac Golf Course;

g. Enjoining Defendants from further developing, altering, or implementing any projects at East Potomac Golf Course or East Potomac Park that rely on or are facilitated by the dirt, debris, or other refuse from the East Wing construction project;

a. Enjoining Defendants from further reliance on the Enjoining Defendants from further implementing the termination of the National Links Trust's lease;

b. Enjoining Defendants from reassigning the lease for East Potomac Golf Course to any other entity;

c. Enjoining Defendants from ejecting National Links Trust or any of its employees, agents, or assigns from East Potomac Golf Course;

f.a. Enjoining Defendants from closing East Potomac Golf Course;

g.a. Enjoining Defendants from further developing, altering, or implementing any projects at East Potomac Golf Course or East Potomac Park that rely on or are facilitated by the dirt, debris, or other refuse from the East Wing construction project;

h. Enjoining Defendants from further reliance on the CECatEx Form or the Historic Assessment;

i. Enjoining Defendants to preserve the existing physical condition of East Potomac Park and East Potomac Golf Course and all documents, studies, plans, and communications related to land-use planning, fill placement, or golf course redesign; and

j. Enjoining any connected or facilitating actions related to the above relief.

3. Set aside and vacate Defendants' decision to adopt and implement the Washington National plan;

i.a. Enjoining Defendants to preserve the existing physical condition of East Potomac Park and East Potomac Golf Course and all documents, studies, plans, and communications related to land-use planning, fill placement, or golf course redesign; and

j.a. Enjoining any connected or facilitating actions related to the above relief.

4. Set aside and vacate the CatEx Form and the Historic Assessment, and any and all authorizations concerning the dumping of East Wing debris at East Potomac Park;

5. Preliminarily and permanently enjoin the Defendants from further implementing the Washington National plan until Defendants have complied with the National Environmental Policy Act and the National Historic Preservation Act, including but not limited to enjoining the actions delineated in the second prayer for relief; and

5.6. Pursuant to 5 U.S.C. § 705, stay the adoption of the Washington National plan, including Defendants' further implementation of the Washington National plan;, including Defendants' implementation of the Washington National plan;

7. Order Defendants to allow Plaintiffs access to the dirt pile and to the entirety of East Potomac Park for the purpose of collecting samples;

8. Order Defendants to perform remediation;

9. Order Defendants to restore East Potomac Golf Course to the condition and design that existed prior to any non-routine surface modification;

6.10. Award PlaintiffPlaintiffs reasonable attorney's fees pursuant to 28 U.S.C. § 2412(b);

7.11. Award all other relief as the Court may deem just and proper.

RESPECTFULLY SUBMITTED this ThirteenthEighteenth day of FebruarySeptember 2026.

Abbe David Lowell [(Bar No. 358651])
Caleb Hayes-Deats (Bar No. 1653213)
Jack Bolen* (Bar No. 90031046)
Angela Reilly*
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowellandassociates.com
JBolen@lowellandassociates.com
Chayes-Deats@lowellandassociates.com
JBolen@lowellandassociates.com
AReilly@lowellandassociates.com

Norman L. Eisen [(Bar No. 435051]] )
Lindsay Zimliki (Bar No. 475890)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 601-8678
norman@democracydefenders.org

*Application for admission pending or admission *pro hac vice* forthcoming

*/s/ Will Bardwell*
Will Bardwell (Bar No. 90006120)
Mark B. Samburg (Bar No. 1018533)
Catherine M.A. Carroll (Bar No. 497890)
Robin F. Thurston (Bar No. 7268942)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
wbardwell@democracyforward.org
msamburg@democracyforward.org
ccarroll@democracaryforwarddemocracyforward.org
rthurston@democracyforarddemocracyforward.org

*Counsel for Plaintiffs*