# EXHIBIT I

**Review of Ecological and Human Health Risks at East Potomac Park**

Brenda Foos, Principal Consultant, Potomac Perspectives, LLC

September 17, 2026

1. Introduction

This report was prepared for Democracy Forward as an examination of the currently available information on ecological and human health risks associated with the soil, debris, and other materials dumped at the East Potomac Park Golf Course (EPPGC) between October 2025 and April 2026. The review is based on the results of the soil testing that has been conducted by the National Park Service (NPS) as reported in the *Final Sampling Report: East Potomac Soil Sampling Project* prepared for NPS by Jacobs Engineering Group, Inc.[1] (hereafter referred to as the *Jacobs Final Report*), the ecological and human health risk screening also presented in the *Jacobs Final Report,* and related documents addressing the dumping at EPPGC as referenced throughout the report.[2]

2. Qualifications – *also see attachment for CV*

I have over 25 years of experience working on a wide range of risk assessment topics. I was most recently the Director of the Pesticide Data Program at the U.S. Department of Agriculture, which is a chemical residue monitoring program for foods that informs exposure and risk assessments globally. I was also the Director of Regulatory Support and Science Policy at the U.S Environmental Protection Agency's (EPA's) Office of Children's Health Protection, where my staff and I engaged in many risk assessment efforts across all EPA programs. I also worked as a staff toxicologist for the EPA's Office of Children's Health Protection, and I held temporary assignments and worked as a contractor with other EPA programs. These experiences have provided me with a breadth of knowledge in risk assessment approaches and methodologies. I have been recognized for my risk assessment related work with awards from EPA's Administrator's Office, Office of Water, Office of Pollution Prevention and Toxics, Risk Assessment Forum, Region 5, and the former Office of Research and Development.

I have peer reviewed publications on risk assessment topics including the fate of chemical residues in soil.

---

[1] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040*. June 18, 2026. Addressed to Jennifer Phillippe, National Park Service.

[2] NPS has also reported the results of the Clark Construction's testing of soils at the White House excavation site, which began on October 17, 2025 and analyzed only the presence of select compounds (detecting only petroleum and/or volatile organic compounds, and not metals, pesticides, etc.). Based on the more comprehensive and quantitative soil analyses conducted by Jacobs Engineering, the Clark Construction soil testing was not further evaluated in this report. (The description of the limited Clark testing is found in: DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated April 30, 2026. Page 2, ¶ 6)

Note, the October 31, 2025 Clark Construction cover letter states that the soils were tested prior to transport to EPPGC; however, it is not known where the "materials observed to be hauled off site this day" in the 10/17/25 report (PDF Page 4) were dumped because NPS has stated that dumping at EPPGC did not begin until 10/20/25.

I hold a Masters of Environmental Management from Duke University with a specialization in the Environmental Toxicology, Chemistry, and Risk Assessment program, and a Bachelor of Science from Texas A&M University in Bioenvironmental Sciences. I was a graduate fellow with the U.S. Department of Energy and held a practicum assignment with their Formerly Utilized Sites Remedial Action Program where I assessed risks associated with contaminated soils.

3. Background

Beginning on October 20, 2025 Clark Construction, the general contractor for the White House East Wing Modernization Project, began dumping soil, debris, and other material from that project at a prepared stockpile site in the EPPGC.[3] The East Potomac Park (EPP) is administered by the NPS, which published a categorical exclusion from the requirements of the National Environmental Protection Act (NEPA) based on the "temporary storage" of "clean fill" at the EPPGC.[4] NPS has not finalized specific plans for the use of the soil which may include reuse for landscaping, drainage improvement, or similar uses.[5] The EPPGC dumping ended in April 2026 with a total of 37,000 cubic yards having been dumped into a graded stockpile.[6]

4. **Part 1**: The comparison of stockpile contaminant soil testing results to background soil contaminant levels is not appropriate because background samples were not collected at the site prior to the initiation of dumping.

NPS has concluded that contaminant of concern (COC) levels in the dumped soils are very similar to the existing levels in the EPPGC, and therefore the material is clean and suitable for both temporary storage at the park and future use as a part of the park's landscaping.[7] However, as explained below, this conclusion is unfounded because the COCs were not tested in EPPGC soils prior to the initiation of dumping, so the "existing levels in the EPPGC" prior to dumping are unknown.

As a part of the categorical exclusion from NEPA, NPS further documented that the "soil will be tested and verified as clean prior to placement, eliminating the risk of introducing contaminants."[8] NPS has stated:

---

[3] DC Preservation League vs. U.S. Department of the Interior (DOI). No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region.* Dated March 6, 2026. Page 8, ¶ 29, and
Clark Construction. (2025) *Soil Testing Reports*. October 31, 2025. Addressed to William Doffermeyer, Department of the Interior. Field Report 6R observes concrete and demolished waterlines in the tested soils on October 24, 2025, and Field Report 8 observes debris in the tested soils on October 28, 2025.

[4] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 6, ¶ 19-20

[5] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 5, ¶ 17

[6] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated April 30, 2026. Page 3, ¶ 10-11

[7] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 13, ¶ 46

[8] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 7, ¶ 21

> "In order to ensure that all soil transported from the White House grounds for storage at East Potomac Park is clean and suitable for temporary storage at the park, and for the soil's long-term intended use as part of the park's landscaping, the NPS has developed a robust monitoring and evaluation plan. This monitoring and evaluation plan ensures that the arriving soil is tested for the presence of potential contaminants of concern (COCs), and that any results indicating the presence of COCs are evaluated against conservative thresholds to ensure that the soil is clean and suitable for its intended use."
>
> and
>
> "The NPS's monitoring and evaluation plan is generally described in a technical memorandum prepared on the NPS's behalf by NPS contractor Jacobs Engineering Group on October 24, 2025."[9]

The NPS's monitoring and evaluation plan per the memorandum prepared by Jacobs Engineering Group[10] stated:

> "Background sampling within the 2-acre stockpile area should be completed before placement of excavation soils."
> and
> "A total of 10 soil samples will be collected from native material"

<u>The background sampling was not completed as described in the above quotations from NPS's monitoring and evaluation plan</u>. The Jacobs reports do not explain why the background sampling was not completed before the placement of excavated soils as they stated it should be (and is consistent with site assessment practice); however, the dumping had already begun (on October 20, 2025) when the plan that included the recommendation for background sampling was developed (dated October 24, 2025) thereby making it impossible to complete the recommended background sampling at the site before the placement of excavated soils. Thus, the correct methodology for background sampling (as identified in the NPS monitoring and evaluation plan) was not applied to EPGCC soils because the plan was developed after the required timeframe.

Instead of collecting the *background* samples before the placement of excavation soils, the *Jacobs Final Report* states that 11 *baseline* samples were collected at EPP.[11] Based on the sample testing results presented in Table 1 of the *Jacobs Final Report,* the baseline samples were collected on October 28, 2025, which is the same date that the testing of the dumped

---

[9] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 10, ¶ 36-37. "In this context, "conservative" means that the selected thresholds are more stringent than required to ensure that the soil is safe for its intended use as clean fill at an urban recreational site."

[10] Jacobs Engineering Group, Inc. (2025) *<u>Sampling of Excavated Soil from the White House Modernization Project</u>*. October 24, 2025. Page 2, section 4.1

[11] Jacobs Engineering Group, Inc. (2025) *<u>Sampling of Excavated Soil from the White House Modernization Project</u>*. October 24, 2025. Page 1

soils began.[12] The *Jacobs Final Report* does not explain why the baseline sampling replaced the recommended background sampling, but does state that Jacobs considers the baseline samples to be "representative of background conditions" (i.e., not impacted by the stockpiling activities).[13]

By the time the baseline samples and the first soil testing samples were finally collected for testing on October 28, 2025, 8 days of dumping at the site had already occurred and at least an estimated 14,000 cubic yards of soil - or nearly 40% of the total soil - had already been deposited.[14] Thus, the soil that was dumped during the first 8 days was not "tested and verified as clean prior to placement" as it should have been to be consistent with NPS's categorical exclusion document,[15] and it contains unknown levels of contaminants (also see discussion of lead and asbestos in section 5.6, below).

Ten of the baseline soil samples were reported to have been taken "outside the perimeter of the berm" of the stockpile area; however, Jacob's map of the baseline sample locations indicates that the locations of the baseline samples are immediately adjacent to the silt fencing for the stockpile,[16] with all samples appearing to be in contact with the silt fencing and within

---

[12] Jacobs Engineering Group, Inc. (2025) *Sampling of Excavated Soil from the White House Modernization Project*. October 24, 2025. Pages 1-2, Table 1

[13] Jacobs Engineering Group, Inc. (2025) *Sampling of Excavated Soil from the White House Modernization Project*. October 24, 2025. Page 4

[14] Explanation of my method for estimating soil volume:

I calculated the volume of soil deposited before sampling began using the soil sampling protocol in the *Jacobs Final Report*: the report stated the sampling method would be 12 samples for the first 5,000 cubic yards and 1 sample per 1,000 cubic yards for the remaining 32,000 cubic yards to equal a total of 44 samples of the 37,000 cubic feet of soil deposited. However, at the end of the sampling on April 2, 2026, only 30 samples had been collected - following the sampling method this represents 12 samples for the first 5,000 cubic yards plus 1 sample per 1,000 cubic yards for 18,000 cubic yards, and thus implies that if the sampling method was properly applied, it had accounted for only 23,000 cubic yards of soil deposited on or after 10/28/25. Therefore, it can be assumed that the remaining 14,000 cubic yards of soil were deposited in the 8 days prior to 10/28/25 and the initiation of sampling.

There may have been even more that 14,000 cubic yards of soil deposited before the sampling began because the *Jacobs Final Report* described a change in the rate of sampling on December 1, 2025 that was based on "daily import volumes being less than originally anticipated." That is to say, if samples were collected for less than 1,000 cubic yards of fill, then an even smaller volume than the estimated 23,000 cubic yards arrived after testing began on 10/28/25 and more than estimated 14,000 cubic yards arrived prior to the initiation of soil testing. See: Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Page 2 and Table 1.

The plausibility that more than 14,000 cubic yards were deposited in the first 8 days is also supported by the NPS declaration that "the frequency of soil collection has varied over time" and NPS "collects an average of at least one sample for every 1000 cubic yards." See: DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 13, ¶ 44. If "at least one sample" means that more than one sample was collected per every 1000 cubic yards, then fewer than the estimated 23,000 cubic yards were dumped during the period 10/28/26 and 4/2/26 and more than 14,000 cubic yards were deposited in the first 8 days.

[15] NPS (2025) *Categorical Exclusion Documentation Form*. Dated October 13, 2025

[16] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Page 1 and Figure 1

the disturbed area of the stockpile. In my expert opinion, the native soils in these adjacent baseline sample locations are not representative of background conditions because they may have been contaminated due to the proximity of the dumped soil and debris:

- The activities of moving and grading thousands of cubic yards of dumped soil inside the silt fencing likely pushed contaminated soil into these immediately adjacent locations prior to the collection of the baseline samples. Generally the bulldozing of such large quantities of soil (estimated to be at least 14,000 cubic yards) cannot be done with the precision to prevent the movement of soil into immediately adjacent locations. The concern for soil movement as a result of bulldozing is exacerbated by high wind speeds (i.e., soil blowing off of the stockpile), as discussed in the next bullet.
- Soil from the EPP stockpile was subject to movement or erosion by wind, rain, or settling during the first 8 days of the dumping, which had the potential to contaminate the immediately adjacent baseline sampling locations. Local weather reports from 10/20/26 through 10/28/26 indicate rain on the first day and several days of high winds (including multiple days with gusts exceeding 25 miles per hour).[17]

<u>The baseline samples are not background samples because the baseline samples were not collected before dumping began and were collected from locations potentially contaminated by the dumping</u>. Despite this, the *Jacobs Final Report* stated that the baseline samples were collected to "represent" background conditions,[18] that is, conditions not impacted by hauling and stockpiling activities. The *Jacobs Final Report* then used the baseline samples to calculate background threshold values (BTVs).[19] The BTVs and baseline maximum values established in the *Jacobs Final Report*[20] are not appropriate to assess whether the stockpile soils are "clean and suitable for storage" because they are not based on pre-dumping background samples.

<u>The NPS conclusions that COC levels in the dumped soils are very similar to the existing levels in the EPPGC, and therefore the material is clean and suitable for both temporary storage at the park and future use as a part of the park's landscaping,[21] must be rejected because the conclusions are not based on the *background* sampling described in the NPS monitoring and evaluation plan that was not completed. The conclusions are instead based on *baseline* samples collected after dumping had already occurred and in locations potentially contaminated by the dumping</u>. The determination that the soils are "clean" and "suitable" for storage or reuse should instead be based on a risk-based evaluation, as discussed in Part 2.

---

[17] Weatherspark.com (2025). *October 2025 Weather History in Washington DC*. Website accessed 9/12/26. Weatherspark.com data summaries and visualizations are based on weather reported at Ronald Reagan National Airport.

[18] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Page 1

[19] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040. June 18, 2026.* Addressed to Jennifer Phillippe, National Park Service. Page 4

[20] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040. June 18, 2026.* Addressed to Jennifer Phillippe, National Park Service. BTVs and baseline maximum values in Tables 6-8.

[21] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 13, ¶ 46

5. **Part 2**: The risk-based comparison of the EPPGC stockpile soil testing results to both ecological and human health screening values indicated multiple concerns.

As a part of the monitoring and evaluation plan for the dumped soils, NPS has stated that levels of the COCs in the soil imported from the White House grounds were compared "to conservative human health screening values published by the U.S. Environmental Protection Agency for residential soil, and to NPS screening values for ecological receptors."[22] The comparison of the stockpile soil testing results to ecological and human health screening values (sometimes referred to as health benchmarks or thresholds) is appropriate because this approach does not rely on the background soil testing that was not completed (as discussed in Part 1 of this report, above).

The ecological screening value approach used by NPS at EPPGC is consistent with the NPS *Protocol for the Selection and Use of Ecological Screening Values for Non-Radiological Analytes*[23] (hereafter referred to as the NPS *Protocol*), and the human health screening approach is similar to the approach used to identify Superfund sites.[24] For the human health assessment NPS used human health soil screening values used for Superfund sites,[25] and for the ecological assessment the NPS *Protocol* was used.[26] The *Jacobs Final Report* provided the results of the ecological and human health screening in the sections titled "Preliminary Human Health Risk-based Evaluation" and "Preliminary Ecological Risk-based Evaluation,"[27] which I used in the preparation of this report.

For a soil sample to pass (i.e., not fail) the risk-based screening assessment, the soil contaminant concentrations are at or below the health screening values for both human health and ecological receptors. NPS has stated that the "screening values are conservative thresholds used only to identify the need for additional evaluation, and an observed value that exceeds these screening values does not by itself indicate the need for cleanup or another action."[28] However, since the ecological and human health screening is a key aspect of NPS's "robust monitoring and evaluation plan" that ensures "that all soil transported from the White House grounds for storage at East Potomac Park is clean and suitable for temporary storage at the

---

[22] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 11-12, ¶ 41

[23] National Park Service (2025). *Protocol for the Selection and Use of Ecological Screening Values for Non-Radiological Analytes.* Revision 4. Prepared by the Environmental Compliance and Cleanup Division.

[24] It does not appear that NPS has a protocol for the selection and use of human health screening values.

[25] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040. June 18, 2026.* Addressed to Jennifer Phillippe, National Park Service. Page 3 stated that the Environmental Protection Agency's Regional Screening Levels (RSLs) were used in screening human health. Per the (RSLs) website, these values are used to screen Superfund sites.

[26] National Park Service (2025). *Protocol for the Selection and Use of Ecological Screening Values for Non-Radiological Analytes.* Revision 4. Prepared by the Environmental Compliance and Cleanup Division.

[27] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Pages 5-7

[28] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 12, ¶ 41

park, and for the soil's long-term intended use as part of the park's landscaping,"[29] I believe one cannot reasonably conclude that the dumped soil is "clean fill"[30] due to the large number of samples and COCs that have failed the screening for the ecological and/or human health, as discussed in more detail in the following sections.

### *5.1 Ecological Risk-Based Screening Results*

In the *Jacobs Final Report* the ecological screening included a comparison of the tested COC soil concentrations to "risk-based ecological screening values available from NPS."[31] Twenty-three COCs failed the ecological screening because the concentration of the contaminant found in the stockpile soils exceeded the chemical-specific ecological screening value in one or more samples. (See contaminant list in Table 1, below.)

Utilizing the results presented in the *Jacobs Final Report,*[32] I conducted a more detailed review of the reported ecological effects screening results[33] that focused on the 30 stockpile samples taken during the EPPGC dumping (10/21/25 through 4/2/26). I chose to review the stockpile samples (duplicates excluded) because they are the best available measure of the contamination of soils throughout the stockpile,[34] whereas the stockpile surface samples (14 samples collected on 4/23/26 after grading was complete[35]) provide contaminant concentrations only on the outer surface. The comparison of the stockpile soil contamination testing results to the NPS's ecological effects-based ecological benchmarks, known as ecological screening values (ESVs),[36] provides the best screening level estimate of the risk of effects to

---

[29] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 10, ¶ 36-37
[30] NPS (2025) *Categorical Exclusion Documentation Form*. Dated October 13, 2025
[31] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Table 8
[32] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Pages 6-7
[33] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Table 4. Note, I inferred that values labeled "U" and not bolded in Table 4 were detection limits, but this is not explicitly stated in the report.
[34] Note, the sampling of the stockpile soils is the best available information on the contamination throughout the stockpile, but the information is not complete. The *Jacobs Final Report* stated 44 soil samples were to be collected based on the Maryland Voluntary recommendation of 12 samples for the first 5,000 cubic yards plus 1 sample for each additional 1,000 cubic yards of material. However, only 30 of those 44 samples were taken during the period of dumping, and the remainder were taken on the surface of the stockpile after the dumping ended (and therefore were not collected as each additional 1,000 cubic yards of material was dumped during the construction of the stockpile).
[35] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated April 30, 2026. Page 3, ¶ 11
[36] National Park Service (2025). *Protocol for the Selection and Use of Ecological Screening Values for Non-Radiological Analytes.* Revision 4. Prepared by the Environmental Compliance and Cleanup Division. The lowest available ESV was selected by Jacobs Engineering for each contaminant.

**Table 1**: COCs Failing the Risk-Based Screening in the *Jacobs Final Report* (stockpile and stockpile surface samples combined)

**23 COCs Failing Ecological Screening**

| | |
|---|---|
| Alpha-chlordane | PAH: Acenaphthene |
| Antimony | PAH: Benzo(a)anthracene |
| Arsenic | PAH: Benzo(a)pyrene |
| Cadmium | PAH: Benzo(b)fluoranthene |
| Chromium | PAH: Chrysene |
| Copper | PAH: Fluoranthene |
| DDE: 4,4'-dichlorodiphenyltrichloroethylene | PAH: Pyrene |
| DDT: 4,4'-dichlorodiphenyltrichloroethane | PAH: Sum High Molecular Weight PAHs |
| Heptachlor | Selenium |
| Lead | Thallium |
| Mercury | Zinc |
| Nickel | |

**6 COCs Failing Human Health Screening**

| | |
|---|---|
| Arsenic | PAH: Benzo(a)pyrene |
| Lead | PAH: Benzo(b)fluoranthene |
| PAH: Benzo(a)anthracene | PAH: Dibenzo(a,h)anthracene |

ecological receptors, including plants and wildlife, should the stockpiled soil be used for landscaping in EPP as intended by NPS.[37] Note, my review of the ecological screening assessment was based on the *Jacobs Final Report* Tables[38] because the ecological spreadsheets posted to the NPS EPP Temporary Fill Storage website[39] contain incorrect ESVs per the NPS *Protocol*.[40]

All 30 stockpile samples failed the ecological screening for four COCs: arsenic, chromium, lead, and zinc; that is to say, the soil testing result exceeded the ESV in every sample. For two additional COCs, thallium and mercury, every sample that had a detection of the compound exceeded the ecological benchmark, and the detection limit was too poor to detect concentrations at the ecological benchmark in all remaining samples, such that the samples where thallium and mercury were not detected are likely to fail the ecological screening if an adequate analytical chemistry method were used to analyze the samples. In summary, these six COCs (arsenic, chromium, lead, zinc, thallium, and mercury) failed the ecological screening in

---

[37] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 5, ¶ 17

[38] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Table 4.

[39] National Park Service (2026). *Soil Testing Data – Jacobs Engineering*. Website accessed August 20, 2026

[40] National Park Service (2025). *Protocol for the Selection and Use of Ecological Screening Values for Non-Radiological Analytes.* Revision 4. Prepared by the Environmental Compliance and Cleanup Division.

every soil sample that was tested with adequate methods (i.e., 100% failure) and therefore clearly have not passed the screening for "clean fill."

For other COCs a majority of the samples failed the ecological screening: nickel (87% failure) and copper (57% failure). Fewer samples failed the screening for the legacy pesticide contaminant DDT (13% failure), and its environmental degradation product DDE (23% failure); however, these failure rates may be artificially low because many of the samples for DDT and DDE had the problem of a detection limit too poor to detect the ecological benchmark (see next paragraph for further explanation). If it is assumed that the samples with the poor detection limits also failed the screening, then the failure rates increase to 47% failure for DDT and 53% failure for DDE. Additionally, one third of all stockpile samples for the summed total of high molecular weight polycyclic aromatic hydrocarbons (HMW PAHs) failed the ecological screening (33% failure). Ten more COCs had 1 to 5 samples failing the ecological screening (3-17% failure). Selenium did not fail the ecological screening for the stockpile samples, but did fail in the stockpile surface samples.

The EPPGC soil testing results had a pervasive problem of soil testing detection limits so poor that they could not detect the ESV. When this occurs it is impossible know if the contaminant concentration in the soil is of concern because the detection limit, or the lowest amount that the analytical chemistry method can find, is not sufficiently sensitive. For a hypothetical example of contaminant "xx": the detection limit for the soil is 10 parts per million (ppm) and the ESV is 1 ppm. In this scenario, it is not possible to confirm that the concentration of "xx" in sample is lower than the ESV of 1 ppm because the analytical method is inadequate to detect 1 ppm (that is because it cannot detect anything less than 10 ppm). It can be assumed that all samples with the result that "xx" was not detected may at the same time be failing the ecological screening; this assumption is likely to be correct if there are samples from the site known to be failing the ecological screening for the contaminant (i.e., with levels above the detection limit = soil detections greater than 10 ppm) and/or there is a larger margin of undetectable concentrations between the detection limit and the ESV.

As previously discussed, it is reasonably likely that all soil samples would have failed ecological screening for the COCs mercury and thallium if all the samples had been tested using a method sufficiently sensitive to detect the ESV. If you don't look, then you definitely won't find. For example, for one COC, arochlor 1248, the detection limit for every soil sample exceeded the ESV. Not surprisingly, no soils failed the ecological screening for arochlor 1248 because the method could not detect concentrations as low as the ecological benchmark. The problem of high detection limits occurred in the analysis of a portion of samples for eleven COCs in addition to mercury, thallium, and arochlor 1248 (i.e., 14 COCs total). Per the NPS *Protocol* "the achieved method detection limits should be lower than the ESV to ensure that the chemical will be reliably detected if present at concentrations near the ESVs," thus these 14 COCs (15% of all COCs that have ESVs) are not compliant with the *Protocol's* guidance.

*5.2 Potential Exposures to Ecological Receptors at EPP*

EPP is home to many species of plants and wildlife. Over 270 bird species have been observed at the park,[41] which is a birding hotspot for Washington, DC.[42] The birds include bald eagles, herons, egrets, owls, ducks, gulls, and swans among many others.[43] The park is also home to a variety of mammals, including groundhogs, raccoons, and red foxes.[44] Various reptile species are found at the park including five-lined skinks, snapping turtles, Eastern rat snakes, and Eastern copperheads. A variety of trees, shrubs, and herbaceous plant species provide food and habitat for the wildlife. The area is also habitat for many invertebrates, including insects, worms, and crustaceans[45] that provide a source of food for other wildlife.

The plants and wildlife of EPP are currently exposed to contaminants from the EPPGC stockpile[46] and will be more widely exposed to the contaminants as a result of the potential future reuse of the stockpile soil for landscaping, drainage improvement, or similar uses[47] due to the larger contactable surface area of the contaminated soil when spread out. Plants and wildlife can be exposed to soil contaminants through direct contact with soil or via contact with soil that has been eroded by wind or rain.[48] Wildlife may be exposed via ingestion of the soil (including burrowing in the soil and ingestion of soil via grooming feathers or coats), ingestion of food items that have been in contact with the soil and absorbed contaminant(s) (e.g., plants, earthworms), dermal contact with the soil (e.g., during burrowing or nesting), and/or inhalation of volatile contaminants and airborne particles (i.e., dust).

If the soil contamination leaches into the groundwater and aquatic environment at EPP, as suggested by the SSL screening discussed in the human health section below, then there also may be contaminant exposures to aquatic organisms that make their home in the water and/or sediment. There is subsequently the potential for exposure to other organisms that consume the plants and animals that were in contact with the contaminated water and sediment, for example wildlife may eat fish and invertebrates that have absorbed the contaminants from the aquatic environment.

### *5.3 Ecological Hazards to Plants and Wildlife*

The contaminants that have failed the ecological risk-based screening, as discussed above, present significant hazards to wildlife due to the toxicity of the contaminants.

---

[41] ebird.org (2026) *East Potomac Park- Hains Point Overview*. Website accessed August 19, 2026.
[42] Maryland Ornithological Society (2026). *East Potomac Park (Hains Point), West Potomac Park, and the Tidal Basin*. (2026) Part of: Birder's Guide to Maryland and DC. Website accessed August 19, 2026.
[43] ebird.org (2026). *East Potomac Park- Hains Point Iconic Birds*. Website accessed August 19, 2026.
[44] NPS (2023). *Wildlife at Hains Point*. Website accessed August 19, 2026.
[45] Washington DC Department of Energy and Environment (2015). *District of Columbia Wildlife Action Plan – Update*. Website accessed August 24, 2026.
[46] Note, it does not appear that there is any sort of cap covering the stockpile to prevent plants and wildlife from contacting the soil or to prevent wind and rain from eroding the pile.
[47] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 5, ¶ 17
[48] U.S. Environmental Protection Agency (1997). *Ecological Risk Assessment Guidance for Superfund: Process for Designing and Conducting Ecological Risk Assessments*. Interim Final. Environmental Response Team, Edison, NJ

The *Jacobs Final Report* utilized the NPS *Protocol* to identify ESVs for assessing ecological effects, including the adverse effects of each contaminant on plants, birds, mammals, and/or invertebrate animals.[49] The *Protocol* defines ESVs as "concentrations of chemicals in soils that are protective of ecological receptors exposed to soil by direct contact (plants and invertebrates), incidental ingestion of soil, or ingestion of biota that live in or on soil (birds and mammals)."[50]

As discussed above, the soil concentrations found at the EPPGC stockpile exceeded the ESV for 23 contaminants. For some of the contaminants, the maximum soil concentrations greatly exceeded the ESV,[51] such that the concentrations are more likely to be associated with the adverse ecological effects that the ESVs are intended to protect against. That is to say, the more the soil concentrations exceed the ESV, the more likely there are to be adverse effects to the environment with respect to ecological receptors. For example, at the EPPGC:

- The maximum soil concentration for <u>lead</u> exceeded the ESV by 425-fold (that is 425 times the NPS *Protocol's* protective value). Lead has been associated with ecological effects including reduced reproduction in birds.[52]
- The maximum soil concentration for <u>mercury</u> exceeded the ESV by 176-fold. Mercury is a concern for bioaccumulation and has been associated with ecological effects including reduced reproductive output and compromised immune function in birds.[53]
- The maximum soil concentration for <u>chromium</u> exceeded the ESV by 141-fold. Chromium has been associated with adverse effects on both invertebrate and plant species.[54]
- The maximum soil concentration for <u>DDE</u> exceed the ESV by 120-fold. DDE is known has been associated with ecological effects including adverse reproductive effects in birds.[55]

*5.4 Human Health Risk-Based Screening Results*

For the human health screening, the detected soil concentrations at EPPGC were compared to the EPA's residential soil RSLs.[56] <u>Six COCs failed the human health screening because the concentration of the contaminant found in the stockpile soils exceeded the human health</u>

---

[49] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Page 6 and Table 4

[50] National Park Service (2025). *Protocol for the Selection and Use of Ecological Screening Values for Non-Radiological Analytes.* Revision 4. Prepared by the Environmental Compliance and Cleanup Division. Page 30

[51] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Table 8

[52] Sample, BE, DM Opresko, and GW Suter II. 1996. *Toxicological Benchmarks for Wildlife: 1996 Revision*. Oak Ridge National Laboratory. Document ES/ER/TM-86/R3.

[53] Whitney, M.C., Cristol, D.A. (2017). *Impacts of Sublethal Mercury Exposure on Birds: A Detailed Review*. In: de Voogt, P. (eds) Reviews of Environmental Contamination and Toxicology Volume 244. Viewed as an abstract

[54] National Park Service (2025). *Protocol for the Selection and Use of Ecological Screening Values for Non-Radiological Analytes.* Revision 4. Prepared by the Environmental Compliance and Cleanup Division. Table 5

[55] Sample, BE, DM Opresko, and GW Suter II. 1996. *Toxicological Benchmarks for Wildlife: 1996 Revision*. Oak Ridge National Laboratory. Document ES/ER/TM-86/

[56] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Pages 5-6 and Table 7

screening value in one or more samples (see Table 1, above). For these six COCs, Jacobs conducted an additional human health screening that compared the mean (average) soil concentrations (described in the *Jacob Final Report* as exposure point concentrations) to a less conservative (i.e., less health protective) screening value for industrial workers. Arsenic is the only COC that also failed this less conservative screening. However, I do not find this to be a reasonable exposure scenario because industrial workers are not the only people to use EPP.

Utilizing the results presented in the *Jacobs Final Report,*[57] I conducted a more detailed review of the reported human health screening[58] that focused on the 30 stockpile samples taken during the EPPGC dumping (10/21/25 through 4/2/26). As discussed above, I chose to review the stockpile samples (duplicates excluded) because they are the best available measure of the contamination of soils throughout stockpile, whereas the stockpile surface samples (14 sample collected on 4/23/26 after grading was complete[59]) provide contamination concentrations only on the outer surface of the pile.

In the detailed review of the comparison of the EPPGC soil testing results to EPA's human health RSLs,[60] arsenic was the primary concern, as every soil sample failed the screening (100% failure). Several polycyclic aromatic hydrocarbons (PAHs) also failed the human health screening: 37% of soil samples failed the screening for benzo(a)pyrene, 17% failed for dibenzo(a,h)anthracene, 7% failed for benzo(b)fluoranthene, and 3% failed for benzo(a)anthracene. Lead failed the human health screening in the field duplicate and stockpile surface samples, but not stockpile samples.

The *Jacobs Final Report* also compares the EPPGC soil testing results to EPA's soil-to-groundwater Soil Screening Levels (SSLs) in Table 5, but these results are not discussed in the body of the report. Soil-to-groundwater SSLs are used to identify concentrations in soil that have the potential to contaminate groundwater.[61] In the EPPGC human health screening, 104 COCs had a soil-to-groundwater SSL available for comparison, and 31 of those compounds failed the screening (30% failure) because the contaminant concentration in one or more EPPGC stockpile soil samples exceed the SSL.[62] An additional 35 COCs (34%) were plagued with the problem of the detection limit exceeding the SSL, such that some or all samples may have been contaminated but the method could not detect the problem.[63]

---

[57] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Pages 5-6
[58] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Table 5. Note, I inferred that values labeled "U" and not bolded in Table 4 were detection limits, but this is not explicitly stated in the report.
[59] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated April 30, 2026. Page 3, ¶ 11
[60] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Table 5.
[61] U.S. Environmental Protection Agency. (2026) *Regional Screening Levels (RSLs – User's Guide)*. Website Accessed August 24, 2026.
[62] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Table 5.
[63] See explanation of the poor detection limits in the preceding ecological section.

It is unclear why the "Preliminary Human Health Risk-Based Evaluation" section of *Jacobs Final Report*[64] does not include a discussion of the 31 COCs that failed the soil-to-groundwater SSL screening or the 35 COCs where the soil testing results are inadequate to complete the screening. Given the results of the SSL screening, it seems likely that the EPPGC stockpile soil contamination will migrate into the groundwater, and this may happen relatively quickly because there is no restrictive barrier beneath the stockpile and this area has a generally high water table (i.e., a short distance between the stockpile and the groundwater).

Even though there may not be current human exposure to the EPPGC groundwater as a drinking water source, there may be the need to rely on groundwater as a drinking water source in the future, which makes the protection of groundwater a concern. Moreover, given the generally high water table and regular flooding at EPP, it is likely that the groundwater freely exchanges with nearby aquatic sediments and the Potomac River, and it could spread stockpile contamination to these areas. The river water and aquatic sediments are habitats for wildlife that warrant protection from sources of contamination; such risks to wildlife were not evaluated in the *Jacobs Final Report*.

### *5.5 Potential Exposures to Humans at EPP*

The assessment of exposures to humans involved in recreational activities is a standard practice in human health risk assessment, particularly as it relates to contaminated sites addressed under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), commonly known as Superfund.[65] Recreators may be exposed to contaminated soils via incidental ingestion of soil, dermal contact with soil, inhalation of volatile contaminants and airborne particles (i.e., dust), and ingestion of foods raised on contaminated land (e.g., community gardens, fish, wildlife). In the case of EPP, these exposures may include soil that is mobilized (i.e., made available for human contact) by recreational or maintenance activities, or natural factors such as wind, rain, and freeze/thaw cycles; the soils may be mobilized from either the stockpile itself[66] or during the potential future reuse of the soil for landscaping, drainage improvement, or similar uses.[67] Potential human exposures will increase if the stockpile soils are reused as suggested; this is due to the larger contactable surface area of the contaminated soil when spread out.

The contaminated soils may be inhaled or ingestion directly or after the soil has become adhered to hands and skin, as well after it has become adhered to recreational equipment such as shoes, clothes, golf clubs/bags, water bottles, etc. If the soil contamination leaches into the aquatic environment at EPP, as suggested by the SSL screening discussed in the previous section,

---

[64] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Pages 5-6

[65] U.S. Environmental Protection Agency. (2026) *Regional Screening Levels (RSLs – User's Guide)*. Website Accessed August 24, 2026. Section 4.6

[66] Note, it does not appear that there is any sort of cap covering the stockpile to prevent wind and rain from eroding the pile, thereby making exposure to current park users a possibility.

[67] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 5, ¶ 17

then there may also be human exposures via contact with the contaminated water, sediment, and ingestion of fish (fishing is an activity at EPP[68]).

Ingestion of contaminated soil by children is of particular concern because children generally play outdoors more and lack the judgment required to limit their contact with soil, for example they may mouth their hands, toys, etc. and may deliberately ingest non-food items,[69] which increases their exposures to soil contaminants. Children's soil ingestion rates may be 100-fold greater than adults,[70] thereby leading to a 100-fold greater risk resulting from exposure to the same soil.

The *Jacobs Final Report* states "the use of residential soil screening level is a conservative approach given the current land use is as a golf course." However, this approach is not as conservative, or health protective, as the Jacobs report states as it relates to children. For the contaminant lead, which is found at the EPPGC stockpile, the U.S. Environmental Protection Agency applies the soil screening value (the RSL) used by Jacobs not only for residential soils, but also as the screening value applied to contaminated soils in all areas where children live, learn, and play, including playgrounds, parks, and other recreational areas.[71] In my expert opinion it is reasonable to extend this approach of applying the residential soil RSL to all contaminated soils where children live, learn, and play, including National Park land, thereby making the Jacob's approach a standard screening approach rather than a conservative screening approach.

Children's recreational exposures are relevant at EPP. The park currently has a children's playground, and children also engaging other activities at the park including golf, miniature golf, footgolf (soccer golf), playing, walking, biking, and picnicking.[72]

### *5.6 Human Health Hazards*

The contaminants that have failed the human health risk-based screening, as discussed above, present hazards to humans due to their toxicity.

Similar to the findings of the ecological assessment, every stockpile soil that was tested for arsenic failed the human health screening, and the highest arsenic detection in soil was 19 times the RSL.[73] Arsenic is a potent human carcinogen, and the 2024 EPA arsenic residential soil RSL that was used in the Jacobs risk-based screening has not been updated to reflect the new

---

[68] Recreation.gov (2026) *Hains Point Picnic Area (East Potomac Park).* Website accessed September 13, 2026

[69] U.S. Environmental Protection Agency. (2005) *Guidance on Selecting Age Groups for Monitoring and Assessing Childhood Exposures to Environmental Contaminants*. Risk Assessment Forum, Washington, DC

[70] U.S. Environmental Protection Agency. (2017) *Update for Chapter 5 of the Exposure Factors Handbook: Soil and Dust Ingestion*. National Center for Environmental Assessment, Washington, DC

[71] U.S. EPA (2025) *Residential Lead Directive for CERCLA sites and RCRA Hazardous Waste Cleanup Program Facilities*. Signed by John W. Busterud, Assistant Administrator, dated October 16, 2025.

[72] PlayDCGolf.com (2026) *East Potomac Golf Links*. Website accessed September 13, 2026. And Recreation.gov (2026) *Hains Point Picnic Area (East Potomac Park).* Website accessed September 13, 2026

[73] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Table 5.

EPA human health toxicity assessment[74] for arsenic that found a 21-fold increase in cancer potency based on new data analyses (i.e., 21-times more risk due to arsenic exposures).

Four PAHs also failed the human health screening, and PAH benzo[a]pyrene was found to exceed the human health screening values in the most samples (37%).[75] Benzo[a]pyrene is known to be carcinogenic to humans based on strong and consistent evidence in laboratory animals and humans.[76] Moreover, it has been determined that benzo[a]pyrene exhibits greater toxicity[77] as a result of childhood exposures making the prevention of exposures to children a significant concern. The cancer-causing effects of PAHs, including the four PAHs that failed the EPPGC human health screening, are considered to have relative potency in causing cancer,[78] and exposures can be considered cumulative (i.e., the cancer risk can be summed across the PAHs using the relative potency factors). The *Jacobs Final Report* mentions the cumulative risk of PAHs and identifies all 7 PAHs as COCs based on the cumulative risk,[79] but does not discuss the increased risks associated with this concern.

Lead and asbestos were documented as toxic substances of concern for the White House East Wing Modernization Project.[80] Lead was detected in all stockpile soil samples, with two samples exceeding the human health benchmark for soil and all samples exceeding the ecological benchmark for soil.[81] Asbestos was not detected in any soil samples. More lead and asbestos risk-based screening concerns may have been expected given that they were noted as issues prior to the demolition of the East Wing. However, any contaminants present in the structure of the East Wing were most likely deposited on the surface of the soil surrounding the structure as a result of the demolition activities. It is not stated in the available documentation whether these surface soils were dumped at EPPGC, and if they were, then the dumping likely occurred in the first 8 days when no soil testing was conducted (because the surface is the first to be excavated). If the surface soils from the demolition area were dumped at EPPGC, then it can be concluded that there may be an untested area at the bottom of the stockpile that has high concentrations of lead and asbestos contamination resulting from the dumping during the first 8 days.[82] If the stockpile soil is reused for the soil for landscaping, drainage improvement,

---

[74] U.S. EPA. (2025) *Arsenic IRIS File*

[75] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Table 5.

[76] U.S. EPA. (2017) *Benzo[a]pyrene IRIS File*

[77] Early life susceptibility is discussed in U.S. EPA 2017 as the "mutagenic mode of action," and "age dependent adjustment factors" are applied to address the early life susceptibility to benzo[a]pyrene.

[78] U.S. EPA. (2026) *Relative Potency Factors for Carcinogenic Polycyclic Aromatic Hydrocarbons (PAHs).*

[79] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Page 5

[80] National Trust for Historic Preservation in the United States vs. National Park Service, et al. No.1:25-cv-04316-RJL. Declaration of Joshua Fisher, Director for White House Management and Administration. Dated 1/15/26. Page 6, ¶ 9

[81] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Tables 4 and 5.

[82] Generally there was a trend in decreasing stockpile soil contaminant concentrations as the timeline of the dumping progressed, which suggests the highest concentrations of soil contaminants were in the first days of dumping; however, these the soils dumped prior to October 28, 2025 were untested, thus this is unconfirmed.

or similar uses as has been suggested,[83] then these untested soils will be spread throughout the park.

6. Summary, Conclusions, and Potential Next Steps

In summary, as discussed in Part 1 of this report, no background soil samples were obtained from EPPGC prior to dumping, and the baseline samples collected after dumping had already begun were taken from locations potentially contaminated by the dumping. Therefore, no conclusions regarding the contamination of EPPGC should be based on the comparison of dumped soils to the baseline testing results. As discussed in Part 2, a risk-based screening approach is an appropriate basis for evaluating contamination at EPPGC. In the risk-based screening of stockpile soils, 23 contaminants failed the ecological screening, and 6 failed the human health screening (See Table 1), while many contaminants were not fully detectable with the methods used (and thus may been present at levels which would have failed screenings) and/or raised concerns for groundwater contamination. The contaminants that have failed the risk-based screening have exposure pathways for humans and ecological receptors (plants and/or wildlife); these contaminants are toxic and present hazards to humans and other organisms.

NPS has stated that "this soil is suitable for beneficial reuse at a recreational site like East Potomac Park,"[84] but this conclusion was based on preliminary data.[85] It has been further stated that "NPS has confirmed the fill material is indeed being tested and that levels of contaminants in the incoming fill material is very similar to background levels in the existing soil at East Potomac Park;"[86] however, background samples were not collected making this conclusion unfounded. NPS has stated that "If the soil's COC levels exceed the baseline samples and the screening values, the NPS may conduct further analyses of the soils from the stockpile. Then, if the NPS determines based on this holistic evaluation that the soil would pose an unacceptable risk to human health or the environment, it would take further action."[87]

The conclusions of the *Jacobs Final Report* indicate that NPS should conduct further analyses of the stockpile soils because the screening results are of potential concern; the *Jacobs Final Report* stated "additional ecological risk assessment is warranted to refine[88] risks to receptors

---

[83] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 5, ¶ 17
[84] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 14, ¶ 49, and
DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated April 30, 2026. Page 4, ¶ 14
[85] The Declarations of Jennifer T. Nersessian are dated March 6 and April 30, 2026, but the *Jones Final Report* that contains the full data is dated June 18, 2026.
[86] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. Defendants' Response in Opposition to Plaintiffs' Motion for Stay or in the Alternative, Preliminary Injunction. Page 23.
[87] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 12, ¶ 41
[88] A refined risk assessment is conducted when screening assessments show that risks are potentially of concern. A refined risk assessment uses more detailed data, models, etc. Source: U.S. Environmental Protection Agency

potentially exposed to site soils" and "completion of a more detailed human health risk assessment will provide a more refined evaluation of the constituents of potential concern."[89] Given that the conclusion of the Jacobs report is that additional study is required due to potential concerns, I believe it is reasonable to conclude that the stockpile soils are not "clean fill" as stated in the NEPA categorical exclusion.[90] That is to say, if the soils were "clean fill" there would not be potential concerns following the risk-based screening assessment, and the soil concentrations would have been below the ecological and human health benchmarks for all soil samples and contaminants.

Per the NPS *Protocol*, for some sites it may be preferable to clean up the site based on conservative screening estimates rather than to spend additional time and resources to refine risk estimates.[91] Thus another option for action that is consistent with the NPS *Protocol* would be to simply clean up the EPPGC stockpile based on the findings of the current risk-based screening presented in the *Jacobs Final Report* and return the course to its original state before the contamination in the stockpile spreads further due to leaching, erosion, and/or reuse.

In my expert opinion, the NPS conclusion that that "this soil is suitable for beneficial reuse at a recreational site like East Potomac Park,"[92] is not substantiated by the assessments conducted to date, as background soil samples were not collected and many soil samples and many contaminants that have failed the risk-based screening for ecological and/or human health effects. When the "further analyses of the soils from the stockpile"[93] that NPS committed to completing is carried out, those analyses should include a study of wildlife risks to ensure that there is not an immediate and ongoing risk to the resident wildlife of EPP, and NPS should take action if there is risk. I make this recommendation because the stockpile soil concentrations greatly exceeded the ecological screening values for contaminants that impact bird reproduction (see discussion in previous sections) and already one breeding season has passed with the stockpile soils potentially exposing wildlife to the contamination.

If NPS continues to assert that the baseline EPPGC soil samples represent background soil concentrations at EPP (i.e., soils not impacted by the stockpiling activities), then the next phase of risk-based assessment should evaluate all EPP soils - not just the stockpile. This more comprehensive soil testing is needed to ensure the safety of the soils as it has been stated that "levels of contaminants in the incoming fill material is very similar to background levels in the

---

(2004). *An Examination of EPA Risk Assessment Principles and Practices*. Office of the Science Advisor, Washington, DC.

[89] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Pages 6-7

[90] NPS (2025) *Categorical Exclusion Documentation Form*. Dated October 13, 2025.

[91] National Park Service (2025). *Protocol for the Selection and Use of Ecological Screening Values for Non-Radiological Analytes.* Revision 4. Prepared by the Environmental Compliance and Cleanup Division. Page 2

[92] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 14, ¶ 49, and DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated April 30, 2026. Page 4, ¶ 14

[93] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. *Declaration of Jennifer T. Nersesian Regional Director for the National Park Service National Capital Region*. Dated March 6, 2026. Page 12, ¶ 41

existing soil at East Potomac Park"[94] yet many of the baseline and stockpile soil samples have failed the ecological and human health risk-based screenings.[95] For example, as a part of the Superfund site assessment process, federal facilities undergo a preliminary assessment that typically includes soil testing across the site.[96]

Acknowledging that refined risk-based assessments require time and money, I believe it may be a reasonable alternative option for to NPS decide that it is preferable to clean up the stockpile based on the conservative screening estimates (i.e., ending the "temporary storage" of the stockpile), as is identified as an option in the NPS *Protocol*.[97] This would involve removing the stockpile from the EPPGC, disposing of the soils in an appropriate location, and returning EPPGC to its condition prior to the dumping.

[94] DC Preservation League vs. U.S. DOI. No. 1:26-cv-00477. Defendants' Response in Opposition to Plaintiffs' Motion for Stay or in the Alternative, Preliminary Injunction. Page 23.

[95] Jacobs Engineering Group, Inc. (2026) *Final Sampling Report: East Potomac Soil Sampling Project #140P2126Q0040.* June 18, 2026. Addressed to Jennifer Phillippe, National Park Service. Tables 4-5 and 7-8

[96] U.S. Environmental Protection Agency (2025). *Superfund Site Assessment Process.* Website accessed August 25, 2026. And
U.S. Environmental Protection Agency (2026). *About the Superfund Cleanup Process*. Website accessed September 14, 2026.

[97] National Park Service (2025). *Protocol for the Selection and Use of Ecological Screening Values for Non-Radiological Analytes.* Revision 4. Prepared by the Environmental Compliance and Cleanup Division. Page 2

**Attachment: Curriculum Vitae**

# Brenda Foos

## Professional Summary

Environmental risk assessment expert with 25+ years interdisciplinary experience in toxicology, monitoring data, science policy, and federal regulatory development. Exceptional track record managing projects/products, producing quality results, and communicating complex scientific and technical topics with diverse audiences including senior government officials and advisory committees, industry representatives, and consulting clients.

## Professional Experience

**Founder and Principal Consultant**
Potomac Perspectives, LLC, Alexandria, VA. October 2025 – Present

- Advise on risk assessment, environmental, science policy, and regulatory issues, including specialized expertise in chemical pollutants and children's health. Recent projects have addressed:
    - Systematic review of per- and polyfluoroalkyl substances (the "forever chemicals"),
    - Multi-pathway human health and ecological exposure and risk assessment for metals in solid waste, and
    - Toxicity of the medical sterilizer ethylene oxide.
- Apply extensive research, review, and data analysis experience to deliver documentation, recommendations, reports, and oral/written communications on schedule.
- Provide inside the federal government perspective based on leadership positions at the U.S. Environmental Protection Agency and U.S. Department of Agriculture.

**Monitoring Programs Division Director - Director, Pesticide Data Program**
United States Department of Agriculture (USDA), Agricultural Marketing Service, Science & Technology Program, Washington, DC. April 2019 – September 2025

- Led the USDA Pesticide Data Program (PDP), one of the world's largest food pesticide residue monitoring efforts.
    - The results database of more than 50 million pesticide-commodity paired residues informs pesticide-related risk assessments and regulatory decision making globally.
    - Recognized for pesticide residue monitoring and data, exposure assessment, and food systems/safety expertise.

- Ensured the timely development of the PDP Annual Summary report highlighting the key findings and quality of the results; served as primary editor.
- Represented the program through oral and written communications including conferences, presentations, technical reports, website content, and social media with an emphasis on data analysis and storytelling based on scientific findings.
- Engaged key stakeholders in industry, nonprofits, academia, and other international, federal, and state government organizations to advance program goals.
- Developed annual program work plans, performance metrics, and accomplishments reports.
    - Goals were routinely exceeded or completed ahead of deadlines.
- Identified, prioritized, and led new projects for program innovation, efficiency, adaptation, and continuous improvement.
    - Received 2024 Administrator's Award for the innovative and collaborative effort modernizing the cross-platform application that increased efficiency in collecting and reporting data for approximately 10,000 food samples annually.
    - Negotiated the first corporate-level private sector volunteer partnership for PDP sampling operations in 2025 by engaging America's largest food retailer.
- Coordinated state-based interdisciplinary teams with 200+ members on the successful performance of program operations including: training, meetings, compliance with workplans and standard operating procedures, sampling and laboratory activities, standardized reporting, and quality assurance.

**Regulatory Support and Science Policy Division Director**
United States Environmental Protection Agency (EPA), Office of Children's Health Protection, Washington, DC. October 2010 – March 2019

- Planned and managed a diverse portfolio of multi-media environmental health policy, regulatory, and research projects on complex scientific/technical issues.
    - Maintained extensive knowledge of toxicology and human health risk assessment with expertise in chemical safety and pediatric health.
- Collaborated with internal and external interdisciplinary colleagues to apply expertise in researching, analyzing, writing, reviewing, and/or editing priority children's environmental health environmental policies, regulations, and reports across diverse sectors including pesticide registration, chemical safety, clean air, remediation, safe drinking water, ambient water quality, and public health.
- Prepared briefings, made recommendations, and translated complex environmental issues for senior executives, government leaders, and other internal and external stakeholders.
- Oversaw the development of key Agency resources on children's environmental health, including the reaffirmation of EPA's Policy on Evaluating Health Risks to Children, the development of the introductory Children's Environmental Health online training, and the Children's Health and the ADP the webinar training.
- Developed and implemented division strategic plans and contributed to organization-wide strategic measures for children's environmental health.

- Recruited and developed a team of approximately ten technical employees with varying experience, abilities, and performance. Prioritized, assigned, and supervised work; reviewed staff performance; and advocated for bonuses and promotions.
- Received 2017 Team Excellence Award from the EPA Office of the Administrator.
- Chaired of the cross-federal group that developed the report "Key Federal Programs to Reduce Childhood Lead Exposures and Eliminate Associated Health Impacts."
- Co-authored Human Health Risk Assessment Paper of the Year – Journal of Human and Ecological Risk Assessment - "Assessing Children's Exposures and Risks to Drinking Water Contaminants: A Manganese Case Study." Awarded 2010.

**Human Health Risk Assessment Expert Advisor**
United State Environmental Protection Agency, Office of Pollution Prevention and Toxics, Washington, DC. October 2016 – February 2017 *Temporary Assignment*

- Supported implementation of the 2016 Frank R. Lautenberg Chemical Safety for the 21st Century Act amendments to the Toxic Substances Control Act (TSCA).
- Provided expertise for the implementation of changes in chemical safety statute, particularly provisions addressing potentially exposed or susceptible subpopulations.
- Led a team of staff scientists in identifying existing resources, supporting the development of external guidance, and drafting an internal framework.

**Toxicologist**
United States Environmental Protection Agency, Office of Children's Health Protection, Washington, DC. September, 2000 - October 2010

- Developed expertise in children's health including physiological and behavioral development, developmental toxicology, and exposure and risk assessment, as well as hazardous and toxic chemicals and the federal regulatory process.
- Advised senior officials on significant technical, scientific, and policy issues pertinent to children's environmental health.
- Reviewed and analyzed scientific information on for incorporation of children's environmental health in Agency programs, documents and assessment tools.
- Served as internal reviewer for EPA's Integrated Risk Information System (IRIS) and on Risk Assessment Forum workgroups.
- Led Office efforts on regulatory and other actions related to TSCA.
- Participated in regulatory workgroups, such as the National Ambient Air Quality Standards for Ozone and the Candidate Contaminant List evaluation of drinking water contaminants.
- Led cross-agency efforts including co-chairing the Science & Technology Policy Council's Minimal Data Values Workgroup and organizing the Workshop on Children's Inhalation Dosimetry and Health Effects in Risk Assessment.
- Served as a staff liaison with the federal Children's Health Protection Advisory Committee for scientific, health, and community interests.
- Provided technical reviews of outreach materials and program web site.

- Managed government contracts including scope of work, budgets, deliverables, and deadlines.
- Oversaw federal assistance agreements, including administrative requirements and budgets.
- Mentored public health fellows.

**Toxicologist**
United States Environmental Protection Agency, Office of Water, Office Science and Technology, Washington, DC. May - August 2005 *Temporary Assignment*

- Reviewed and revised selected support documents for Regulatory Determination under the Safe Drinking Water Act.
- Prepared sections of scientific documents and associated analyses for review by the EPA's Science Advisory Board.
- Participated in the workgroup developing methods for the evaluation of drinking water pollutants under consideration for the Safe Drinking Water Act - Candidate Contaminant List.
- Attended EPA Water Academy.

**Scientist**
Syracuse Research Corporation, Arlington, VA July, 1999 – September 2000

- Worked under contract to EPA Office of Pesticide Programs and Office of Pollution Prevention and Toxics.
- Supported human health and ecological toxicity projects and summarized data submitted to EPA in Pre-Manufacture Notices.
- Supported pesticide registration through the preparation of Data Evaluation Records for the fate of pesticides in the environment.
- Reviewed laboratory methods and analytical results data, prepared technical reports, and edited the technical reports of colleagues.
- Managed tasks of large contract work assignments and supported the Project Managers in contract administration.
- Led and assisted in technical proposal writing.

**Environmental Scientist**
Environmental Consulting and Research, Inc., Durham, NC June 1997 – May 1999

- Supported the planning and development of EPA policies, standards, and technical documents on air toxics.
- Worked on the development of maximum achievable control technology standards for hazardous air pollutants under section 112 of the Clean Air Act (CAA), the National Emission Standards for Hazardous Air Pollutants (NESHAP).
- Prepared the dioxin risk assessment for the Study of Hazardous Air Pollutant Emissions from Electric Utility Steam Generating Units, Final Report to Congress (EPA publication: EPA-453/R-98-004a).

- Performed methodology development and analyses for the CAA section 112(f) residual risk assessments of NESHAP industry source categories, including human health and ecological risks.
- Gained familiarity with the government contracts process, and managed or assisted in the management of work assignments and task orders.

## Education

Master of Environmental Management
Duke University, Durham, NC
*Program in Environmental Toxicology, Chemistry, and Risk Assessment*
*United States Department of Energy Graduate Fellow*

Bachelor of Science, Bioenvironmental Science
Texas A&M University, College Station, TX

## Honors and Awards

Administrator's Award, USDA Agricultural Marketing service, 2024. Modernization the cross-platform electronic sample information form for food sample collection data reporting.

Excellence Award, EPA Office of the Administrator, 2017. Office of Children's Health Protection Regulatory Support and Science Policy Team.

Scientific and Technical Achievement Award, Honorable Mention, 2011, for Methods and a Case Study that Help the EPA to Protect Children from Drinking-Water Contaminants.

Exceptional Support to U.S. EPA Office of Research and Development Award, August 2010. Integrated Risk Information System (IRIS) Agency Review

Human Health Risk Assessment Best Paper of the Year for 2009 from the journal Human and Ecological Risk Assessment for the article: Brown, MT and B Foos. "Assessing Children's Exposures and Risks to Drinking Water Contaminants: A Manganese Case Study" Human and Ecological Risk Assessment, 2009 15(5):923-47"

Bronze Medal for Commendable Service, U.S. EPA Administrator's Office, December, 2017 (for efforts in documenting 20 years of EPA's success in protecting children's health)

Bronze Medal for Commendable Service, U.S. EPA Administrator's Office, December, 2016 (for contributions to the Key Federal Lead Programs report of the Interagency Task Force on Children's Environmental Health)

Bronze Medal for Commendable Service, U.S. EPA Administrator's Office, December, 2015 (for developing Agency-wide plan to track children's health progress)

Bronze Medal for Commendable Service, U.S. EPA Office of Chemical Safety and Pollution Prevention, November, 2014 (for actions related to a siloxane).

Bronze Medal for Commendable Service, U.S. EPA Administrator's Office, March, 2013 (for Children's Health Policy Reaffirmation).

Bronze Medal for Commendable Service, U.S. EPA Office of Research and Development, October, 2013 (for Reference Concentration Methods).

Bronze Medal for Commendable Service, U.S. EPA Administrator's Office, March, 2012 (for children's health regulatory tracking).Bronze Medal for Commendable Service, U.S. EPA Office of Water, January, 2012 (for second Six Year Review of National Primary Drinking Water Regulations).

Bronze Medal for Commendable Service, U.S. EPA Office of Research and Development, September, 2009 (for Harmonization in Interspecies Extrapolation Use of BW3/4 as Default Method in the Derivation of the Oral Reference Dose)

Bronze Medal for Commendable Service, U.S. EPA Office of Water, June, 2009 (for exceptional work to finalize the Agency's Regulatory Determinations for the second drinking water Candidate Contaminants List)

Bronze Medal for Commendable Service, U.S. EPA Administrator's Office, November 2006 (for Leadership Toward Improving the Scientific Basis for Assessing Children's Inhalation Risks)

Bronze Medal for Commendable Service, U.S. EPA Region 5, May 2005 (for Toxicity and Exposure Assessment for Children's Health Website Development)

Bronze Medal for Commendable Service, U.S. EPA Office of Research and Development, August 2004 (for the Integrated Risk Information System Reforms Implementation Steering Committee) Team

"S"uperior Awards, EPA Office of the Administrator, August 2002, April 2003, August 2003, June 2007, July 2009, June 2010, August 2016, June 2018

## Journal Publications

---

Pappas, C and B Foos. "Pesticide Data Program: 30 years of food residue data and trends" Journal of Exposure Science and Environmental Epidemiology, 2022 (Open Access).

Dzubow, R, C Fields, G Ginsberg, M Sandy, M Mabson and B Foos. "Comparison of carcinogenic potency across life stages: implications for the assessment of transplacental cancer risk" Journal of Toxicology and Environmental Health, Part A, 2019, 82(13) 769-787

*Preliminary presentation of this work was recognized as Society of Toxicology, Risk Assessment Specialty Section “Top 10 abstract of the year"

Ginsberg, G, SV Vulimiri, Y Lin, J Kancherla, B Foos and B Sonawane. “A framework and case studies for evaluation of enzyme ontogeny in children’s health risk evaluation” Journal of Toxicology and Environmental Health, Part A, 2017, 80(10-12):569-593

Firestone, M, M Berger, B Foos, and R Etzel. “Two Decades of Enhancing Children’s Environmental Health Protection at the U.S. Environmental Protection Agency” Environmental Health Perspectives, 2016, 124(12) A214-18

Ginsberg, G, J Ginsberg, and B Foos. “Approaches to Children’s Exposure Assessment: Case Study with Diethylhexylphthalate (DEHP)” International Journal of Environmental Research and Public Health, 2016, 13(7):670-691

Rehr, R, G Miller, and B Foos. “Children’s environmental health indicators as tools to measure progress toward sustainability” Sustainability: Science, Practice, and Policy, 2015, 11(1):44-52

Ginsberg, G, B Foos, RB Dzubow, and M Firestone. "Options for Incorporating Children's inhaled dose into human health risk assessment" Inhalation Toxicology, 2010, 22(8):627-47

Brown, MT and B Foos. "Assessing Children's Exposures and Risks to Drinking Water Contaminants: A Manganese Case Study" Human and Ecological Risk Assessment, 2009 15(5):923-47

*Human Health Risk Assessment Paper of the Year - Journal of Human and Ecological Risk Assessment

Foos, B and B Sonawane. "Overview: Workshop on Children's Inhalation Dosimetry and Health Effects for Risk Assessment" J Toxicology Environ Health, Part A, 2008, 71(3):147-8.

*Guest editor for this volume of the Journal of Toxicology and Environmental Health

Foos, B, M Marty, J Schwartz, W Bennett, J Moya, A Jarabek, and AG Salmon. "Focusing on Children's Inhalation Dosimetry and Health Effects for Risk Assessment: An Introduction." J Toxicology Environ Health, Part A, 2008, 71(3):149-65.

Selgrade, MK, CG Plopper, MI Gilmour, RB Connolly, and BSP Foos. "Assessing the Health Effects and Risks Associated with Children's Inhalation Exposures – Asthma and Allergy." J Toxicology Environ Health, Part A, 2008, 71(3):196-207.

Berlin, CM, JS LaKind, SE Fenton, RY Wang, MN Bates, RL Brent, M Condon, BL Crase, ML

Dourson, AS Ettinger, B Foos, et al. "Conclusions and Recommendations of the Expert Panel: technical workshop on human milk surveillance and biomonitoring for environmental chemicals in the United States" J Toxicology Environ Health, 2005, 68(20):1825-31.

Ginsberg, G, BSP Foos, and MP Firestone "Review and Analysis of Inhalation Dosimetry Methods for Application to Children's Risk Assessment" J Toxicology Environ Health, 2005, 68(8):573-615.

EL Arthur, BS Perkovich, TA Anderson, and JR Coats. "Degradation of an Atrazine and Metolachlor Herbicide Mixture in Pesticide-Contaminated Soils from Two Agrochemical Dealerships in Iowa." Water Air Soil Pollution, 2000, 119:75-90.

BS Perkovich, TA Anderson, EL Kruger, and JR Coats. "Enhanced Mineralization of [14C]Atrazine in Kochia scoparia Rhizospheric Soil from a Pesticide-Contaminated Site." Pesticide Science, 1996, 46:391-396.