**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DC PRESERVATION LEAGUE, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>Defendants. | Civil Action No. 1:26-cv-477-ACR |

# DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS


INTRODUCTION ........................................ 1

BACKGROUND ........................................ 2

I. Factual Background ........................................ 2

A. East Potomac Park and East Potomac Golf Course ........................................ 2

B. The NPS Decides to Stockpile Fill Material from the East Wing Modernization Project at East Potomac Park ........................................ 3

C. The NPS Implements Its Decision to Stockpile Fill Material ........................................ 5

D. Department Consider Renovate or Rehabilitate East Potomac Golf Course ........................................ 8

1. Department Officials Engage in Early Discussions ........................................ 8

2. Department Officials Continue to Deliberate Plans for East Potomac Golf Course ........................................ 9

II. Procedural Background ........................................ 10

III. Legal Background ........................................ 12

LEGAL STANDARD ........................................ 12

ARGUMENT ........................................ 14

I. Plaintiffs Lack Standing ........................................ 14

A. Plaintiffs Lack an Article III Injury ........................................ 15

1. Plaintiffs Have Not Shown an Injury Necessary to Maintain Their Proposal Claims ........................................ 16

2. Plaintiffs Have Not Shown an Injury Necessary to Maintain Their Stockpiling Claims ........................................ 21

B. Plaintiffs Fail to Show that Their Alleged Injuries are Traceable to Defendants' Conduct ........................................ 27

II. Plaintiffs' Claims Fail on the Merits ........................................ 28

A. Plaintiffs' Proposal Claims Fail to Establish a Final Agency Action ........................................ 28

B. Plaintiffs' Proposal Claims are Unripe ........................................ 32

C. 40 U.S.C. § 8106 Is Inapplicable ..... 35

D. Defendants' Decision to Stockpile Soil Complied with Applicable Laws ..... 37

1. Defendants' Stockpiling Decision Complied with NEPA ..... 38

2. Defendants' Stockpiling Decision Complied with NHPA Section 106 ..... 39

3. Defendants' Stockpiling Decision Complied with the NPS's Organic Act ..... 41

4. Defendants' Stockpiling Decision Did Not Violate 54 U.S.C. § 100903 ..... 42

III. Recourse & Remedy ..... 43

CONCLUSION ..... 44

# TABLE OF AUTHORITIES

Page(s)

**Other Authorities**

*Abbott Labs v. Gardner*,
387 U.S. 136 (1967)........................................................................................................ 33

*Akinseye v. District of Columbia*,
339 F.3d 970 (D.C. Cir. 2003) ........................................................................................ 13

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ........................................................................................ 43

*Am. Petroleum Inst. v. EPA*,
683 F.3d 382 (D.C. Cir. 2012) ........................................................................................ 33

*Am. Wildlands v. Kempthorne*,
530 F.3d 991 (D.C. Cir. 2008) ........................................................................................ 13

*Atl. States Legal Found. v. EPA*,
325 F.3d 281 (D.C. Cir. 2003) ........................................................................................ 33

*Bark v. U.S. Forest Serv.*,
37 F. Supp. 3d 41 (D.D.C. 2014) ............................................................................... 30, 32

*Bennett v. Spear*,
520 U.S. 154 (1997)................................................................................................ 28, 30, 32

*Biden v. Texas*,
597 U.S. 785 (2022)........................................................................................................ 29

*Biodiversity Assocs. v. U.S. Forest Serv. Dep't of Agriculture*,
226 F. Supp. 2d 1270 (D. Wyo. 2002) ............................................................................ 30

*Brady Campaign to Prevent Gun Violence v. Salazar*,
612 F. Supp. 2d 1 (D.D.C. 2009) ............................................................................... 21, 26

*Bulova Watch Co. v. United States*,
365 U.S. 753 (1961)........................................................................................................ 35

*California v. Texas*,
593 U.S. 659 (2021)........................................................................................................ 27

*Camp v. Pitts*,
411 U.S. 138 (1973)........................................................................................................ 14

*Canaza v. Platek*,
No. CV 25-303-BAH, 2026 WL 811234 (D. Md. March 24, 2026)........................................ 30

*Carney v. Adams*,
592 U.S. 53 (2020).......................................................................................................... 15

*Cent. Delta Water Agency v. U.S. Fish & Wildlife Serv.*,
653 F. Supp. 2d 1066 (E.D. Cal. 2009) .......... 30

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... passim

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) .......... 32

*Consumers for Auto Reliability & Safety v. Fed. Trade Comm'n*,
No. 17-cv-0540, 2021 WL 4050876 (D.D.C. Sept. 6, 2021) .......... 27

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
144 F.4th 296 (D.C. Cir. 2025) .......... 20

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
563 F.3d 466 (D.C. Cir. 2009) .......... 20

*Ctr. for Democracy & Tech. v. Trump*,
507 F. Supp. 3d 213 (D.D.C. 2020) .......... 19

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .......... 13

*Davis v. Latschar*,
202 F.3d 359 (D.C. Cir. 2000) .......... 41

*Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*,
85 F. Supp. 3d 250 (D.D.C. 2015) .......... 34

*Devia v. Nuclear Regul. Comm'n*,
492 F.3d 421 (D.C. Cir. 2007) .......... 33

*Doe v. Doe Agency*,
608 F. Supp. 2d 68 (D.D.C. 2009) .......... 32

*Env't Def. Fund v. FERC*,
2 F.4th 953 (D.C. Cir. 2021) .......... 22

*Food & Drug Admin. v. All. for Hippocra*tic *M*ed.,
602 U.S. 367 (2024) .......... 16

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) .......... 19, 23, 24

*Fund for Animals v. Williams*,
391 F. Supp. 2d 132 (D.D.C. 2005) .......... 31, 32

*Fund for Animals, Inc. v. U.S. Bureau of Land Management*,
460 F.3d 13 (D.C. Cir. 2006) .......... 29

*Garcia v. Acosta*,
393 F. Supp. 3d 93 (D.D.C. 2019) .......... 33

*Gen. Motors Corp. v. Env't Prot. Agency*,
363 F.3d 442 (D.C. Cir. 2004) ........................................................................................ 13

*Hormel Foods Corp. v. U.S. Dep't of Agric.*,
808 F. Supp. 2d 234 (D.D.C. 2011) ............................................................................ 29, 32

*Humane Soc. of U.S. v. Babbitt*,
46 F.3d 93 (D.C. Cir. 1995) .......................................................................................... 23

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)...................................................................................................... 16

*In re Navy Chaplaincy*,
534 F.3d 756 (D.C. Cir. 2008) ........................................................................................ 22

*Indep. Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004) ........................................................................................ 29

*Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*,
456 U.S. 694 (1982)...................................................................................................... 13

*Int'l Acad. of Oral Med. & Toxicology v. U.S. Food & Drug Admin.*,
195 F. Supp. 3d 243 (D.D.C. 2016) .................................................................................. 27

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994)...................................................................................................... 13

*Lance v. Coffman*,
549 U.S. 437 (2007)...................................................................................................... 21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)...................................................................................................... 36

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).......................................................................................... 13, 15, 26

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990).............................................................................................. 28, 31

*Mashack v. Jewell*,
149 F. Supp. 3d 11 (D.D.C. 2016) ............................................................................ 34, 35

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983)........................................................................................................ 14

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior*,
538 U.S. 803 (2003)...................................................................................................... 33

*Nat'l Parks Conservation Ass'n v. Jewell*,
965 F. Supp. 2d 67 (D.D.C. 2013) .................................................................................... 41

*Nat'l Treasury Emps. Union v. United States*,
101 F.3d 1423 (D.C. Cir. 1996) ...................................................................................... 34

*National Park Service v. National Trust for Historic Preservation in the United States*,
No. 26A203, 2026 WL 2564318, 609 U.S __ (August 31, 2026) ........................................ 1, 22

*NO Gas Pipeline v. Fed. Energy Regul. Comm'n*,
756 F.3d 764 (D.C. Cir. 2014) ........................................................................................ 24

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004).......................................................................................... 28, 29, 35

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
45 F.4th 291 (D.C. Cir. 2022) ........................................................................................ 40

*Pub. Citizen v. Off. of U.S. Trade Representative*,
970 F.2d 916 (D.C. Cir. 1992) ........................................................................................ 32

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
489 F.3d 1279 (D.C. Cir. 2007) ............................................................................... 23, 24

*Scenic Am., Inc. v. U.S. Dep't of Transp.*,
836 F.3d 42 (D.C. Cir. 2016) .......................................................................................... 13

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025)........................................................................................ 14, 32, 38, 39

*Sierra Club v. FERC*,
867 F.3d 1357 (D.C. Cir. 2017) ...................................................................................... 13

*Soundboard Ass'n v. FTC*,
888 F.3d 1261 (D.C. Cir. 2018) ...................................................................................... 28

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)........................................................................................ 14, 15, 21, 22

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998)............................................................................................................ 13

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009).......................................................................................................... 20

*Texas v. United States*,
523 U.S. 296 (1998).......................................................................................................... 32

*Toilet Goods Ass'n v. Gardner*,
387 U.S. 158 (1967).......................................................................................................... 33

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021).......................................................................................................... 15

*Trump v. California*,
Nos. 26A124, 26A139, 2026 WL 2473573, 609 U.S. __ (Aug. 24, 2026)........................ passim

*Trump v. New York*,
592 U.S. 125 (2020).................................................................................................... 15, 16

*United States v. Chem. Found., Inc.*,
272 U.S. 1 (1926) .......... 31

*United States v. Texas*,
599 U.S. 670 (2023) .......... 43

*United Transp. Union v. I.C.C.*,
891 F.2d 908 (D.C. Cir. 1989) .......... 18

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) .......... 14, 22

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) .......... 38

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) .......... 17

*WildEarth Guardians v. Provencio*,
272 F. Supp. 3d 1136 (D. Ariz. 2017) .......... 21

*Wildlife v. Jewell*,
815 F.3d 1 (D.C. Cir. 2016) .......... 13

*Williams v. Lew*,
77 F. Supp. 3d 129 (D.D.C. 2015) .......... 17

**Statutes**

5 U.S.C. § 551(13) .......... 28

5 U.S.C. § 702 .......... 13

5 U.S.C. § 704 .......... 28

5 U.S.C. § 706(2)(A) .......... 13

16 U.S.C. § 451 .......... 35

40 U.S.C. § 8106 .......... 12, 35, 36, 37

40 U.S.C. § 8711 .......... 35

40 U.S.C. § 8711(a) .......... 35

40 U.S.C. § 8722 .......... 36

42 U.S.C. § 4336(a) .......... 38

42 U.S.C. § 4336(a)(2) .......... 38

42 U.S.C. § 4336(b) .......... 38

42 U.S.C. § 4336e(1) .......... 38

54 U.S.C. § 100101(a) .......... 37, 41

54 U.S.C. § 100903 .......... 12, 37, 42

54 U.S.C. § 100903(a) .......... 42

54 U.S.C. § 306108 .......... 20, 39

**Rules**

Fed. R. Civ. P. 56(a) .......... 12

**Regulations**

36 C.F.R. § 6.3 .......... 42

36 C.F.R. § 800.14 .......... 40

36 C.F.R. §§ 800.1-.6 .......... 39

43 C.F.R. § 46.215(a)-(i) .......... 39

**Other Authorities**

516 DM 12.5(C)(19) .......... 38

54 H.R. Rept. No. 2708 (1897) .......... 37

54 S. Rept. No. 1327 (1897) .......... 37

Act of Mar. 3, 1897, ch. 375, 29 Stat. 624 .......... 37

Omnibus Parks and Public Lands Management Act of 1996,
Pub. L. No. 104-333 § 801, 110 Stat. 4093 .......... 35

S. Rep. 104-50 (1995) .......... 35

**EXHIBIT INDEX**

| | |
|---|---|
| Ex. 1 | Second Supplemental Declaration of Jessica Bowron ("Third Bowron Decl.") |
| Ex. 1-A | July 17, 2026 Letter from the National Park Service to the District of Columbia State Historic Preservation Office |
| Ex. 1-B | August 19, 2026 Letter from the District of Columbia State Historic Preservation Office to the National Park Service |
| Ex. 2 | Jacobs Engineering Group Final Sampling Report & Preliminary Risk Evaluation (excluding Tables) |
| Ex. 3 | Jacobs Engineering Group Data Validation Summary |
| Ex. 4 | Proposed Order |

## INTRODUCTION

Plaintiffs dislike that the federal government is considering rehabilitating East Potomac Golf Course. But the proposed project remains at an early and conceptual stage. Defendants have initiated a planning process for a potential rehabilitation of the Golf Course, but this process is still nascent. No final decision has been made, and any such decision will be informed by the planning and decisionmaking processes. And should Defendants ultimately make a final decision to proceed with a rehabilitation of the Golf Course, Defendants have consistently explained that they will undertake the very compliance processes that Plaintiffs seek in this lawsuit, prior to making such decision.

In their rush to challenge a potential rehabilitation that, *if* ever designed, approved, and implemented, *might* differ from their preferences, Plaintiffs have disregarded foundational and basic principles of Article III standing and administrative law. They ask the Court to intervene in an ongoing planning and decisionmaking process—a process only in its initial stages that has inflicted no concrete injury and has produced no final agency action.

Separately, Plaintiffs challenge an October 2025 decision by the National Park Service to temporarily stockpile fill material in a void between three holes of the Golf Course. The stockpiled soil is intended for future landscaping purposes, although the National Park Service has not made any determination about its ultimate placement. Meanwhile, the Golf Course remains open for play. Plaintiffs suffer no cognizable Article III injury from the stockpile; they simply object to its appearance, and the Supreme Court has made clear that such aesthetic injury does not count. *National Park Service v. National Trust for Historic Preservation in the United States*, No. 2026 WL 2564318, 609 U.S __ (August 31, 2006) (*NTHP*). Plaintiffs also attempt to manufacture a theory that the stockpile poses an increased risk of harm. But despite filing this suit eight months

ago and despite Defendants voluntarily releasing testing data, Plaintiffs have not come close to demonstrating that the stockpile poses any such risk.

Even if Plaintiffs could overcome these hurdles, the record is clear that the National Park Service has complied with all applicable laws. The Court should therefore grant judgment for Defendants on all claims. If Defendants approve a new design for the Golf Course after completing their planning and decisionmaking processes, and assuming Plaintiffs can show standing, satisfy other justiciability concerns, and find legal error in Defendants' processes, they may bring a claim at that time. But Defendants are entitled to judgment as a matter of law on the premature and flawed claims they have brought now.

## BACKGROUND

### I. Factual Background

The facts underlying this case have been presented in detail by Defendants. *See* Defs.' Resp. in Opp'n to Pls' Mot. for Stay rr, in the Alt. Prelim. Inj. ("Defs.' Resp. in Opp'n"), Dkt. No. 26; Defs.' Mem. in Supp. of Mot. to Dismiss, Dkt. No. 34-1. Not much has changed. Defendants therefore incorporate by reference the information provided therein and include here only a concise recitation of the most pertinent facts.

#### A. East Potomac Park and East Potomac Golf Course

Created from the dredges of the Potomac River, the East Potomac Golf Course has undergone repeated change over the decades. NAMA 0387.[1] Features, including individual courses and structures within the Golf Course, have been built, demolished, and altered. NAMA 0408-16. Today, East Potomac Park and East Potomac Golf Course are in a state of deterioration

[1] Citations are to the Administrative Record submitted on April 30, 2026. Dkt. Nos. 39-46.

and in need of significant maintenance, rehabilitation, and reconstruction. NAMA 0547; NAMA 1006-25; *see also* Dr. Kevin Griess Decl., May 4, 2026, Dkt. No. 48-1.

In 2020, the National Park Service ("NPS") leased East Potomac Golf Course to the National Links Trust ("NLT"). NAMA 1098-143. Among NLT's obligations under the lease were significant construction and improvement projects at East Potomac Golf Course, including the redesigning and rebuilding of several individual courses. NAMA 1133-34. After executing the 2020 NLT lease, the NPS and NLT began considering options for renovating the East Potomac Park and Golf Course, and potentially securing 400,000 to 1,000,000 cubic yards of fill material. Jennifer Nersesian Decl., March 6, 2026 ("First Nersesian Decl. ¶¶ 13-14), Dkt. No. 26-1.

### B. The NPS Decides to Stockpile Fill Material from the East Wing Modernization Project at East Potomac Park

In October 2025, in anticipation of these improvements, the NPS decided to stockpile an anticipated 30,000 cubic yards of clean fill material from the East Wing Modernization Project in East Potomac Park. *See* NAMA 1672-74. Collaborating with NLT, the NPS identified and selected a suitable stockpile location at East Potomac Golf Course that would avoid interfering with site infrastructure and recreational use of the Golf Course. First Nersesian Decl. ¶ 18; NAMA 1631-45.

In reaching that decision, the NPS completed the appropriate analyses and compliance measures. Under the National Environmental Policy Act ("NEPA"), the NPS determined it was not required to prepare an environmental impact statement, an environmental assessment, or a finding of no significant impact because the proposed soil storage project is excluded pursuant to a categorical exclusion ("CE"). On October 16, 2025, the NPS completed a categorical exclusion documentation form for the proposed soil storage project. NAMA 1672-74. The proposed action

included "temporary storage" of "clean fill on previously disturbed and maintained areas of the East Potomac Golf Course" for later reuse. *Id.*

The NPS concluded that the proposed soil storage project was "consistent with CE 12.5(C)(19), which covers 'landscaping and landscape maintenance in previously disturbed or developed areas,'" because the soil was expected to be used for "contour correction, drainage improvement, and turf establishment," which "represent[] maintenance and minor modification of an existing managed landscape, not new construction or a change in land use." *Id.* The NPS further documented that "[t]he soil will be tested and verified as clean prior to placement, eliminating the risk of introducing contaminants." *Id.* The NPS also concluded that no extraordinary circumstances existed to warrant further analysis. *Id.*

The NPS also completed an Assessment of Actions Having an Effect on Historic Properties ("Assessment") in satisfaction of its obligations under Section 106 of the National Historic Preservation Act ("NHPA"). NAMA 1646-50. The Assessment documented the NPS's consideration of the effects of the proposed project on historic properties and the NPS's finding that the project would have "No Adverse Effect." NAMA 1648. The NPS found that the project was eligible for streamlined review under the NPS's 2008 Nationwide Programmatic Agreement with the Advisory Council on Historic Preservation ("ACHP") and the National Conference of State Historic Preservation Officers. *Id.*; *see also* NAMA 0187-214. The NPS explained that because "all historic property identification has been previously completed, the activity is generally consistent with routine grounds maintenance, the placement of fill will not significantly

alter the design of the course (cultural landscape) and will result in No Adverse Effect to the historic property." *Id.*[2]

**C. The NPS Implements Its Decision to Stockpile Fill Material**

On October 17, 2025, personnel from Clark Construction Group, LLC ("Clark") began field testing excavated soil on the White House grounds.[3] Because a diesel spill was suspected to have occurred on the White House grounds in the past, NAMA 0001, Clark tested the excavated soil at the White House for the presence of petroleum-impacted material or volatile organic compounds. Jennifer Nersesian Decl., Apr. 30, 2026 ("Second Nersesian Decl."), ¶ 6, Dkt. No. 38-1. Clark used a Hanby total petroleum hydrocarbon colorimetric field screening kit, a photoionization detector, or both, supplemented by visual and olfactory observations. *Id.*

On October 18, 2025, personnel from Clark began implementing site preparation measures at East Potomac Park, as specified in a conceptual stockpile plan, sediment control plan, and NPS security requirements, including laying temporary material for the haul road and silt protection of adjacent stormwater grates. First Nersesian Decl. ¶ 27-33, Dkt. No. 26-1. Two days later, on October 20, the first loads of soil from the East Wing Modernization Project were delivered to the prepared stockpile site. *Id.* ¶ 29.

From October 17, 2025, to March 31, 2026, Clark continued field testing of the material at the White House. None of these tests revealed the presence of any contamination from petroleum or volatile organic compounds in the excavated soil leaving the White House grounds.

---

[2] The NPS also completed other compliance measures, none of which are challenged here and which have been well-documented in earlier filings. *See* Defs.' Resp. in Opp'n 7 n. 5-6, Dkt. No. 26.

[3] At the Court's request, the NPS made testing data and analyses publicly available online on the NPS's Planning, Environmental and Public Comment (PEPC) webpage for this project: https://parkplanning.nps.gov/documentsList.cfm?parkID=463&projectID=133318. For the Court's convenience, Defendants are attaching the most pertinent materials as Exhibits 2-3.

Upon the excavated soil's arrival at the stockpile site in East Potomac Park, Clark sorted through the soil to remove any construction debris or similar materials that may have been inadvertently transported with the soil from the White House grounds. First Nersesian Decl. ¶ 42. Clark segregated any such materials and transported them out of the park for disposal. *Id.*

At the stockpile site, the NPS's contractor Jacobs Engineering Group ("Jacobs") conducted further testing consistent with the NPS's robust monitoring and evaluation plan so that the NPS could ensure that the soil was suitable for temporary storage and later use.[4] Beginning on October 28, 2025, Jacobs collected baseline samples near the temporary haul road and around the temporary stockpile site and began collecting representative samples of the commercially sourced haul road material and excavated soil delivered to the site. Ex. 2. Between October 28 and the conclusion of soil deliveries around April 2, 2026, Jacobs collected thirty samples of soil delivered to the site. *Id.* at 2. On April 23, 2026, after final grading of the stockpile, Jacobs collected an additional fourteen samples from the stockpile surface. *Id.* In total, approximately 30,000 cubic yards of soil were excavated from the White House and, because soil is compressed in situ and expands when excavated and transported, approximately 37,000 cubic yards of soil were delivered to the site. *Id.* Jacobs sent the samples to an independent laboratory, where they were analyzed for over 100 potential constituents of concern, including asbestos. Ex. 3. Other constituents included volatile organic compounds, semivolatile organic compounds, polychlorinated biphenyls, pesticides, petroleum hydrocarbons, pollutant metals, and herbicides. *Id.* at 2-3.

On June 18, 2026, Jacobs published a final sampling report and preliminary risk evaluation. The report sought to characterize preexisting soil conditions and the excavated soil and to provide

[4] The NPS's monitoring and evaluation plan is generally described in a technical memorandum prepared on the NPS's behalf by Jacobs. First Nersesian Decl. ¶ 37, Ex. K, Dkt. No. 26-3.

a preliminary evaluation of the potential for risk to human and ecological receptors from the stockpile. Ex. 2, at 1, 5-7. Asbestos was not detected. *Id.* at 3. As for other potential constituents, they were compared against three benchmark values: (1) background threshold values calculated using the baseline samples; (2) EPA human health screening levels; and (3) NPS ecological screening values. *Id.*; First Nersesian Decl. ¶ 41. Screening values are conservative thresholds used only to identify the need for additional evaluation; an observed value that exceeds a screening value does not by itself indicate the need for cleanup or another action. First Nersesian Decl. ¶ 41.

In conducting its preliminary human health risk-based evaluation, Jacobs compared the maximum detected concentrations of constituents for the stockpile and stockpile surface with conservative EPA residential soil screening levels (despite the non-residential nature of the site). Ex. 2, at 5. Jacobs identified several constituents with maximum detected concentrations greater than residential soil screening levels. *Id.* Jacobs then conducted a secondary evaluation by comparing the exposure point concentrations ("EPCs")[5] for the stockpile and stockpile surface to screening levels for exposure of industrial workers to soil. *Id.* Unlike even the most avid golfer, industrial screening levels assume an individual is in proximity to a site—here, the stockpile—for 250 days per year for twenty-five years. *Id.* Jacobs identified only one constituent (arsenic) in both the stockpile and stockpile surface where the EPC—that is, the conservative estimate of the mean concentration—exceeded the industrial worker soil screening level. *Id.* 6. But the calculated background threshold value for arsenic, representing the *existing* surface soil at the golf course, *also* exceeded the industrial worker soil screening level and was higher than the values for *both* the stockpile and the stockpile surface. *Id.* Accordingly, Jacobs concluded that "there is limited

[5] EPCs "are a conservative estimate of the mean concentration of a constituent in a given exposure area and are used to represent the concentrations of the constituent that a receptor may be exposed to across a site." Ex. 2, at 4.

risk to human receptors associated with the constituents of potential concern in the stockpile and the stockpile surface soil based on the current and likely future use of the site." *Id.*

As for ecological screening values, Jacobs conservatively used maximum detected concentrations of potential constituents and compared those to the lowest available ecological screening value for each constituent. *Id.* Based on that preliminary analysis, Jacobs identified several constituents of potential ecological concern. This list was likely over-inclusive based on the above conservative metrics and because constituents within background concentrations were not eliminated; that comparison is done in later stages of ecological risk assessment. *Id.* Thus, Jacobs recommended that the NPS conduct an additional ecological risk assessment. *Id.* at 7.

Consistent with the NPS's plans from the start and with Jacobs' recommendation in its report, the NPS did not stop here; it continues working to ensure that the soil in the stockpile is in fact clean. The NPS is now conducting further risk assessments and analyses to quantify potential risks to human health and the environment, based on more realistic exposure assumptions.[6] As of filing this Memorandum, those assessments and analyses are unfinished. Should the NPS determine that the soil would pose an unacceptable risk to human health or the environment, it would then take further action, but all indications are that the soil is suitable for beneficial use at the Golf Course. First Nersesian Decl. ¶ 41; Second Nersesian Decl. ¶¶ 12, 14.

### D. Department Consider Renovate or Rehabilitate East Potomac Golf Course

#### 1. Department Officials Engage in Early Discussions

Around the same time that the NPS was considering whether to stockpile soil from the East Wing at East Potomac Park, President Trump and agency officials began discussing whether East

[6] Indeed, Jacobs concluded that "[t]he data can be used in the project decision-making process." Ex. 3, at 11.

Potomac Golf Course and other NPS golf courses within Washington, D.C. could be improved. By September 2025, NPS was informed of a conceptual proposal under consideration called the "Washington National Golf Project" and/or the "America 250 Golf Project." Jessica Bowron Decl., March 6, 2026 ("First Bowron Decl."), Dkt. No.26-4. The idea was that the President and the Secretary of the Interior, using charitable contributions, would work in collaboration with NLT and NPS to renovate Washington, D.C.'s three NPS golf courses while keeping them affordable and accessible, consistent with the terms set forth in NLT's lease. *Id.*

Although the Department of Interior and NPS originally intended to work in collaboration with NLT, the Department subsequently discovered that NLT was in default because it had failed to make required initial improvements. *Id.* ¶¶ 8, 10, & Ex. B, Dkt. No. 26-5. Department officials made extensive efforts to meet and confer with NLT, and during that time learned that NLT had failed to pay millions in rent. *Id*. Accordingly, on December 30, 2025, the Department terminated NLT's Lease. *Id.* ¶ 12, Ex. & C, Dkt. No. 26-5.

### 2. Department Officials Continue to Deliberate Plans for East Potomac Golf Course

After the filing of Plaintiffs' Complaint on February 13, 2026, Department officials continued to deliberate whether and how East Potomac Golf Course should be rehabilitated, renovated, or redesigned. Jessica Bowron Decl. April 30, 2026 ("Second Bowron Decl.") ¶ 5, Dkt. No. 38-2. The Department determined that NPS should pursue managing and executing a rehabilitation of the Golf Course under its own authority. *Id.* ¶¶ 7-8.

Before it could reach a final decision to rehabilitate the Golf Course and bring this conceptual proposal to fruition, the NPS would have to take a number of interim steps throughout the decisionmaking process. For example, the NPS would need to procure or otherwise have donated design and construction services. *Id.* ¶¶ 9-10. The NPS would also need to initiate the

requisite compliance processes including full compliance with NEPA, Section 106 of the NHPA, Section 7 of the Endangered Species Act, the NPS Organic Act of 1916 ("Organic Act"), and any other applicable laws and regulations. *Id.* ¶ 11; First Bowron Decl. ¶¶ 16-21.

Depending on the scope and nature of the project ultimately proposed, a rehabilitation of the Golf Course could also require review and approval from the Commission on Fine Arts ("CFA") and the National Capital Planning Commission ("NCPC"). First Bowron Decl. ¶¶ 16, 22-23.

Most recently, NPS began developing possible target dates and proposed compliance schedules for the potential redesign of East Potomac Golf Course. *See* Def.'s Resp. to the Court's July 6, 2026 Min. Order 2, Dkt. No. 63. The NPS initiated consultation under Section 106 of the NHPA with the District of Columbia State Historic Preservation Office via letter dated July 17, 2026. Ex. 1, Decl. of Jessica Bowron, Oct. 6, 2026 ("Third Bowron Decl."), ¶ 6, Ex. 1-A. NPS scheduled but ultimately postponed initial consulting parties' meetings pending further internal coordination. Ex. 1-B. In postponing these meetings, the NPS has explained that it "has no intent to commence significant rehabilitation work until all applicable compliance requirements have been satisfied." Third Bowron Dec. ¶ 6.

To date, the NPS has received guidance on the pathway to pursue any future rehabilitation of East Potomac Golf Course, but no formal decision has been made regarding the nature and scope of any rehabilitation, and the NPS's decisionmaking process including all necessary compliance measures remains ongoing. *Id.* ¶ 7.

## II. Procedural Background

On February 13, 2026, Plaintiffs the D.C. Preservation League ("League"), Dave Roberts, and Alex Dickson (collectively, "Plaintiffs") filed an eight-count Complaint challenging

Defendants' nascent proposal to improve East Potomac Golf Course and Defendants' decision to stockpile soil at the Golf Course. Compl. Dkt. No. 5-1 (corrected and refiled). The Parties fully briefed Plaintiffs' Motion for Stay or, in the Alternative, Preliminary Injunction; Defendants' Motion to Dismiss; and Plaintiffs' Motion for Expedited Discovery. Dkt. Nos. 8, 34, and 51.

On April 30, 2026, at the Court's request, Defendants made all testing data collected to date publicly available and filed the Administrative Record for the NPS's decision to stockpile soil at East Potomac Golf Course. Notice of Publ'n & Admin. Rec. 1, Dkt. No. 38. Defendants also explained that the decisionmaking process regarding a potential rehabilitation of the Golf Course remained ongoing, no decision regarding the nature or scope of any rehabilitation had been made, several interim steps remained before a decision could be reached, and therefore, no administrative record could be provided for the potential rehabilitation of the Golf Course. *Id.* at 2.

In the ensuing months, Plaintiffs filed an Emergency Motion for Status Conference and four "Notice[s] of Factual Development." Dkt. Nos. 47, 49, 50, 58, 69. Plaintiffs' filings included matters concerning ordinary deferred maintenance of the Golf Course like the removal of dead, dying, hazardous or invasive trees; and photographs, social media posts, and other information indicating that the NPS and government officials were still in the midst of the planning and decisionmaking process. In hearings and court filings, Defendants explained that no decision to rehabilitate the Golf Course had been made, the decisionmaking and planning process remained ongoing, and multiple public-facing steps during those processes must first occur. *E.g.* Tr. 18:15-23 (Sept. 3, 2026); Tr. 87:5-90-11 (July 2, 2026); Proposed Briefing Schedules 6, Dkt. No. 66; Second Bowron Decl. ¶¶ 11-13; First Bowron Decl. ¶¶ 16-24.

Following additional proceedings, *see* Min. Orders Aug. 13, 2026 and Sept. 4, 2026; Dkt. Nos. 64, 71, on September 18, 2026, Plaintiffs filed a Motion for Leave to file a new complaint

and attached their Amended and Supplemental Complaint. Dkt. No. 72. Like their original complaint, Plaintiffs' new complaint presents two categories of claims. First, Plaintiffs reallege that Defendants' conceptual proposal to potentially rehabilitate East Potomac Golf Course violated the Administrative Procedure Act ("APA"), NEPA, the NHPA, and the NPS's Organic Act (Counts 1-3, 5). Plaintiffs also allege that Defendants' proposal violates 40 U.S.C. § 8106 (Count 4) and 54 U.S.C. § 100903 (Count 6) (collectively, "Proposal Claims"). Plaintiffs also reallege that Defendants' decision to temporarily stockpile soil violated the APA, NEPA, the NHPA, the NPS's Organic Act, and also 54 U.S.C. § 100903 (Counts 7-11) (collectively, "Stockpiling Claims").

## III. Legal Background

Defendants incorporate by reference their summary of the relevant provisions of NEPA, the NHPA, the NPS's Organic Act, and the APA provided in their Response in Opposition to Plaintiffs' preliminary injunction motion. Resp. in Opp'n 11-14, Dkt. 26.

Title 40, Subtitle II, Part D of the U.S. Code prescribes rules governing public buildings and grounds in the District of Columbia. Section 8106 states that "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106.

Subtitle I of Title 54 governs the NPS. Section 100903 directs that "no solid waste disposal site (including any site for the disposal of domestic or industrial solid waste) may be operated within the boundary of any System unit" other than limited exceptions. 54 U.S.C. § 100903.

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure directs that a court must grant summary judgment to a moving party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Before a court can reach the merits, it must determine whether the plaintiff has properly invoked the court's jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. Env't Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004). "[B]ecause subject-matter jurisdiction is an 'Art. III as well as a statutory requirement, . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)).

This jurisdictional inquiry necessarily includes determining whether the plaintiff has established standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). And because federal courts are presumed to lack jurisdiction, once a party's standing is challenged, it has the burden of proving it. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006). At the summary judgment stage, the plaintiff "must set forth by affidavit or other evidence specific facts" establishing the Court's jurisdiction. *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 48 (D.C. Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

As for the merits, alleged agency violations of NEPA, the NHPA, and other statutes are reviewed under the APA and its "deferential standard of review." *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) (citation omitted). Under this standard, a court may set aside agency action if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 702, 706(2)(A). "Such review is 'highly deferential' and 'presumes agency action to be valid.'" *Defs. of Wildlife v. Jewell*, 815 F.3d 1, 9 (D.C. Cir. 2016) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997 (D.C. Cir. 2008)). Thus, review of agency action is

"narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). The reviewing court "asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180 (2025). In reaching this decision, the court's review is confined to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).[7]

## ARGUMENT

Defendants are entitled to judgment as a matter of law on all claims. As a threshold matter, Plaintiffs continue to lack standing. Even if Plaintiffs could establish standing, their claims are barred or otherwise fail on the merits.

### I. Plaintiffs Lack Standing

Article III confines federal courts to deciding "Cases" and "Controversies," so that legal questions are resolved "in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). To invoke that power, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). A plaintiff cannot file its complaint and then

[7] Accordingly, Defendants cite the Administrative Record in support of their arguments on the merits of Plaintiffs' Stockpiling Claims. Defendants cite matters outside the Administrative Record and post-decisional materials (like Defendants' declarations and testing data and analysis) in support of their justiciability arguments that the Court lacks subject-matter jurisdiction because Plaintiffs have not established standing and Plaintiffs failed to allege a final agency action ripe for adjudication. Review of Plaintiffs' Proposal Claims cannot be confined to the Administrative Record because there has been no decision, and thus, there is no record.

wait-and-see if standing materializes; the requirements of Article III must be satisfied at the time the complaint is filed and be sustained throughout the litigation. *Carney v. Adams*, 592 U.S. 53, 59-60 (2020). And because "standing is not dispensed in gross," a plaintiff must make that showing separately for each claim and each form of relief it seeks. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citation omitted).

Plaintiffs fail this test for both sets of claims they press. Plaintiffs' Proposal Claims rest on allegations of preliminary agency decisionmaking that do not give rise to a concrete, nonconjectural injury. Plaintiffs' Stockpiling Claims rest on little more than alleged "eyesore" injuries and an unsupported increased-risk-of-harm theory, both of which lack merit.

### A. Plaintiffs Lack an Article III Injury

To establish injury in fact, a plaintiff must show "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). If a plaintiff's alleged injuries are forward-looking, the plaintiff must show "a material risk of future harm" that is "sufficiently imminent and substantial." *TransUnion LLC*, 594 U.S. at 435. The injury must be "*certainly* impending," and allegations of "*possible* future injury" fail to establish standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation modified).

Mere internal directives from the President to a subordinate do not cause "concrete harm." *Trump v. California*, Nos. 26A124, 26A139, 2026 WL 2473573, at *2, 609 U.S. __ (Aug. 24, 2026) (per curiam) (citation omitted). They simply "initiate the process" that could ultimately implement that directive, and even then, perhaps only possibly cause injury. *Id.* at *4. In such instances, "[t]he true 'source of any injury'" to a potential plaintiff "would be the downstream action that the Secretary '*might* take in the future.'" *Id.* at *2 (citing *Trump v. New York*, 592 U.S. 125, 133-34

(2020) (per curiam)). But early predictions as to whether and how the agency will implement a directive while balancing the feasibility of the directive and the agency's legal compliance obligations are pure "conjecture." *Id.* (quoting *Trump v. New York*, 592 U.S. at 131).

### 1. Plaintiffs Have Not Shown an Injury Necessary to Maintain Their Proposal Claims

Plaintiffs allege that they have suffered injuries simply from Defendants conceiving of an idea to rehabilitate East Potomac Golf Course and making related announcements or taking public-facing steps that reflect their ongoing consideration of that conceptual proposal. But none of these supposed injuries is concrete and not conjectural.

The League claims to have suffered both organizational and associational injuries. *See Food & Drug Admin. v. All. for Hippocratic Med.* ("*AHM*"), 602 U.S. 367, 395 (2024) (organizational standing requires a showing that the defendant's conduct "directly affected and interfered with [the organization's] core business activities"); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (associational standing requires, among other things, that the organization's "members would otherwise have standing to sue in their own right").

The League alleges that it and its members recreate in, use, and otherwise have interests in East Potomac Golf Course. Am. & Supp. Compl. ¶ 22. The League has claimed that *if* the Golf Course is redesigned, it would have to "update [its] app and website." Miller Decl. ¶ 8, 18, Dkt. No. 8-5. It has also claimed that Defendants' deliberations "would preclude [it] from holding our September event at East Potomac Golf Course." *Id.* ¶ 11, 18. And it suggests that it has suffered a procedural injury by being excluded from the NEPA and Section 106 processes for any potential redesign of the Golf Course. *Id.* ¶¶ 14-18; Am. & Suppl. Compl. ¶ 22. As for its members, it has claimed that they enjoy playing golf at East Potomac Golf Course, riding bikes around East Potomac Park, and "looking at the Japanese cherry trees." Miller Decl. ¶¶ 21-22.

Similarly, Plaintiffs Roberts and Dickson allege that they use the Golf Course and have various aesthetic, recreational, and other interests in the Golf Course. Am. & Suppl. Compl. ¶ 23-24. Plaintiff Roberts has claimed his "interest in East Potomac's recreational value and aesthetic value" would be harmed, but only "*if* the golf course is turned into something different." Roberts Decl. ¶ 25, Dkt. No. 8-6 (emphasis added). Similarly, Plaintiff Dickson has claimed his appreciation for the Course's "beauty, fun, history, accessibility, and . . . sense of community" will be harmed "*[i]f* East Potomac is converted into what the President has described." Dickson Decl. ¶ 19, Dkt. No. 8-4 (emphasis added).

None of these purported injuries constitute a concrete and nonconjectural injury.

*First*, the majority of Plaintiffs' alleged injuries—claimed harm to their aesthetic, recreational, and other interests and their "app and website"—are premised on a *potential* redesign of the Golf Course. These are quintessential "allegations of *possible* future injury." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). But future, "threatened injury must be *certainly impending* to constitute injury in fact," *id.* at 409 (citation modified), and Plaintiffs have not made this showing.

At most, Plaintiffs have alleged that Defendants conceived of an idea to rehabilitate East Potomac Golf Course and received a rough conceptual design of what that rehabilitation *could* look like. But "several speculative contingences must occur before plaintiff is harmed by" a rehabilitation of East Potomac Golf Course. *Williams v. Lew*, 77 F. Supp. 3d 129, 133 (D.D.C. 2015). At minimum, Plaintiffs speculate (1) what the ultimate design will look like, (2) that Defendants will not follow proper legal compliance measures during their decisionmaking, (3) that Defendants will in fact decide to rehabilitate the Golf Course, and (4) assuming a final, detailed design is developed and a final decision to implement that design is made, that it will harm

Plaintiffs' interests. "Article III prohibits federal courts from stacking hypothetical on hypothetical to speculate that harm will eventually materialize." *Trump v. California*, 2026 WL 2473573, at *2 (*citing Clapper*, 568 U.S. at 414-15, n.5). "Adjudicating this claim requires a prediction not only about *whether*" the NPS will rehabilitate the Golf Course, "but also about the shape that any such action might ultimately take." *Id.* As the Supreme Court has made clear, "Article III demands more certainty." *Id.*

Plaintiffs claim a decision *has* been made but identify no such decision. *United Transp. Union v. I.C.C.*, 891 F.2d 908, 912 (D.C. Cir. 1989) (Courts must distinguish "allegations of facts . . . from allegations that are really predictions."). Instead, they point to "factual developments" that only illustrate the agency's ongoing decisionmaking process or that are independent of any potential rehabilitation, based on separate compliance processes, and separate decisions rooted in different considerations and utility. For example, they highlight the termination of NLT's lease, Am. & Supp. Compl. ¶ 97; the stockpiling of soil, *id.* ¶ 76; ordinary deferred maintenance like the removal of trees, removal of a fence, and survey activity, *id.* ¶ 14, 101; a listing identifying a potential future construction contract, *id.* ¶ 101;[8] and public statements, social media posts, and visits to the Golf Course by the President and high-ranking officials, *id.* ¶ 14. They also rely on the awarding of a contract for the very compliance services they insist must be performed. *Id.* ¶ 101.

[8] Plaintiffs allege that "Defendants had begun advertising for a contract to perform the Washington National plan's 'construction phase.'" Am. & Supp. Compl. ¶ 101. Not true. The government website they cite in support explains that it is a nationwide list of "upcoming federal contracting opportunities," that "[a]ll projected procurements are subject to revision or cancellation," and that "[t]his forecast data is for planning only and is not a commitment to purchase." Forecast Tool, Acquisition Gateway, U.S. Gen. Servs. Admin., https://acquisitiongateway.gov/forecast; *see also* Third Bowron Decl. ¶ 8.

In effect, Plaintiffs challenge agency statements and discussions that "only set[] a course of government processes into motion," *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 222 (D.D.C. 2020), and subsequent activities that are, at most, simply public reflections of those processes. Their future injury from one possible outcome of those processes cannot support an injury in fact. *See id.* at 223.

Plaintiffs' expansive theory of standing, *see infra* § II.A., would grind future government functioning to a halt. Once parties got wind that an agency was considering a proposed action they may not like, studying potential outcomes, and facilitating the decisionmaking process, they could claim injury from a "decision" that had occurred without adequate justification or compliance, and seek to enjoin the decisionmaking process. As just one of countless examples, renovation projects like the transformation of Franklin Park in Washington, D.C., completed a decade ago, would never advance beyond the initial proposal before being mired in litigation and plaintiff-driven oversight of agency deliberations.[9]

*Second*, "[P]laintiffs 'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *Clapper*, 568 U.S. at 416). And yet, that is what the League attempts here, by claiming its ability to host a fundraiser has been harmed. The League never alleges that it requested to host this fundraiser or that its request was denied after agency officials began deliberations. And the League concedes that this

[9] *See e.g.,* Franklin Park Vision and Transformation Plan, National Park Service, https://parkplanning.nps.gov/projectHome.cfm?projectID=48509. Like East Potomac Golf Course, and so many other federal projects, the transformation of Franklin Park began with a conceptual "Proposed Action" in which "[t]he NPS and partners are beginning to develop a . . . conceptual design for transforming Franklin Park into a premier active, flexible, and sustainable historic urban park connected to its community." *Id.* Franklin Park Public Meeting Presentation 11/17/13 at 16.

fundraiser could be hosted elsewhere. Miller Decl. ¶ 9. If the League has changed its plans (or its app and website), and fears an impact to its fundraising revenue, such speculative financial impacts cannot support an injury for standing. *See Clapper*, 568 U.S. at 416 (plaintiffs lack an Article III injury where their alleged harms are "based on costs they incurred in response to a speculative threat"). The "hypothetical future harm" that Plaintiffs fear "is far from 'certainly impending.'" *Trump v. California*, 20256 WL 2473573, at *3 (quoting *Clapper*, 568 U.S. at 416).

*Third,* without any basis for its speculative or self-inflicted injuries, Plaintiffs are left only with the League's allegation that it has suffered a procedural injury to rights provided by Section 106 of the NHPA. Am. & Supp. Compl. ¶ 22; Miller Decl. ¶ 18. But even assuming Plaintiffs had a procedural right to participate in the Section 106 process, "a procedural right *in vacuo* . . . is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see also Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 304 (D.C. Cir. 2025) ("[A] plaintiff claiming procedural injury must show how the agency's error could affect her 'concrete interests.'" (citation omitted)).

Plus, the League has no right to be involved in any review that has not yet begun. Plaintiffs have argued that they should have had a chance to participate in the NEPA and Section 106 processes for the conceptual "Washington National Plan." But what they claim is a legal violation is instead indicative of the fact that no such processes have yet occurred and no decision is imminent. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009) ("[A]n agency's NEPA obligations mature only once it reaches a 'critical stage of a decision which will result in "'irreversible and irretrievable commitments of resources' to an action that will affect the environment.'" (citation omitted)); 54 U.S.C. § 306108 (requiring consideration of effects on historic property only "prior to the approval of the expenditure of any Federal funds on

the undertaking or prior to the issuance of any license"). The planning process is only in its initial stage; Defendants have only just initiated the Section 106 process. *See* Ex. 1-A. They have not completed the compliance process, or reached a decision on any potential redesign, nor have they sought to implement such undeveloped plans.[10]

Plaintiffs' premature allegations of injury from a rehabilitation of East Potomac Golf Course that *might* occur and that they *might* not like cannot establish a concrete and nonconjectural injury. They are instead, "generalized grievance[s] about the conduct of government" incapable of sustaining standing. *Lance v. Coffman*, 549 U.S. 437, 442 (2007).

**2. Plaintiffs Have Not Shown an Injury Necessary to Maintain Their Stockpiling Claims**

In challenging the NPS's decision to stockpile soil at East Potomac Park, Plaintiffs must again establish an injury that is concrete, particularized, and actual or imminent. *Spokeo*, 578 U.S. at 339. They have not done so. Instead, they present two flawed and incomplete theories based on purported "eyesore" injuries to their aesthetic, recreational, and other interests and a purported increased-risk-of-harm from the stockpile. Neither theory has merit.

*First*, the Supreme Court's recent decision in *National Trust for Historic Preservation* forecloses Plaintiffs' aesthetic injury theory. Like Plaintiffs here, the plaintiff in *NTHP* complained that government construction "would cause her to suffer 'injuries' to her 'aesthetic, cultural, and historical interests'" because she found aspects "of the government's design distasteful." *Id.* at *2;

[10] By law, the League cannot demonstrate a right to participate in decisionmaking processes for agency actions that are subject to a CE or that do not require further Section 106 review because they are taken pursuant to a programmatic agreement. *See, e.g.*, *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 23 n.15 (D.D.C. 2009) ("[N]o such requirement exists in NEPA . . . ."); *WildEarth Guardians v. Provencio*, 272 F. Supp. 3d 1136, 1165-66 (D. Ariz. 2017) (explaining that a programmatic agreement satisfies the agency's Section 106 consultation responsibilities).

*compare id. with* Am. & Suppl. Compl. ¶¶ 22-24 (claiming aesthetic, recreational, cultural, historical, and related interests in East Potomac Golf Course) *and* Roberts Decl. ¶ 22 (claiming the stockpile harms "how the golf course looks and feels to [him]," and that it is "a big, ugly pile of dirt" that "looks terrible."). But "mere offense, disagreement, or distaste does not qualify as a concrete and particularized injury under Article III." *NTHP*, 2026 WL 2564318 at *2.

Consistent with *NTHP*, the D.C. Circuit has held that mere "eyesore" injuries cannot confer standing. *Env't Def. Fund v. FERC*, 2 F.4th 953, 970 (D.C. Cir. 2021) (*EDF*). To have standing based on alleged aesthetic injuries, plaintiffs must show that "[their] specific aesthetic interests" are harmed, by describing their particular "use[] and enjoy[ment] [of] the land" beyond "mere incidental viewership," and they must further identify how they will have to "alter [their] behavior." *Id.* at 969–70. An offense to "someone's sensibilities" is not sufficient. *NTHP*, 2026 WL 2564318, at *2; *see also In re Navy Chaplaincy*, 534 F.3d 756, 763 (D.C. Cir. 2008) ("[M]ere personal offense to government action does not give rise to standing to sue.").

Here, Plaintiffs claim their interests are harmed from having to view the stockpile while engaging in their preferred activities. *E.g.*, Roberts Decl. ¶ 22. Of course, they are free to not like the looks of it. But like the plaintiff in *EDF*, "a person who incidentally views something unpleasant" or "must look at an 'eyesore' several times per [golf round] when driving [or playing] past" has not suffered an injury-in-fact for standing purposes. 2 F.4th at 968-70. Plaintiffs "must identify some concrete and particularized injury 'other than the psychological consequence presumably produced by observation of conduct with which one disagrees.'" *NTHP*, 2026 WL 2564318, at *2 (quoting *Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc.*, 454 U.S. 464, 485 (1982)). They have not done so. The Golf Course remains open. Holes 4, 5, and 9 of the White Course, between which the stockpile is located, remain open.

Plaintiffs never allege any particularized interest in the temporarily fenced-in site where the stockpile is located. They simply do not like the way the stockpile looks. But if this were enough to confer standing, any one of the 300 million annual visitors to the National Park System would have standing simply by being disappointed in having to view maintenance activities during their visit. Such displeasure is not a concrete and particularized injury.[11]

*Second*, in their search for an injury, Plaintiffs devote much of their Amended and Supplemental Complaint to a theory of injury based on a purported increased risk of harm from the stockpile. Am. & Suppl. Compl. ¶¶ 83-95; *see also* Dickson Decl. ¶ 22. Plaintiffs continue to fall far short of establishing a legally cognizable injury from an increased risk of harm.

Alleged harms are too speculative to support standing when they rely on a "highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410. Increased-risk-of-harm theories of injury naturally implicate these concerns. *Food & Water Watch, Inc.*, 808 F.3d at 914. The D.C. Circuit therefore requires a plaintiff relying on an increased-risk-of-harm theory of injury to "show '*both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account.'" *Id.* at 914.

To satisfy this *substantial* standard, a plaintiff cannot rely on cursory assumptions or trivial increases in risk. This is because, "the constitutional requirement of imminence . . . necessarily compels a very strict understanding of what increases in risk and overall risk levels can count as 'substantial.'" *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1296 (D.C. Cir. 2007)). Thus, "the proper way to analyze an increased-risk-of-harm claim is to consider

[11] To the extent that Plaintiff Roberts claims emotional harms because he "felt violated," Roberts Decl. ¶ 24, by the stockpile, such feelings do not rise to the level of a constitutional injury for standing purposes. *Humane Soc. of U.S. v. Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995) (general emotional harm "cannot suffice for injury-in-fact for standing purposes").

the ultimate alleged harm—such as death, physical injury, or property damage . . . —as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently 'imminent' for standing purposes." *Id.* at 1298.

Applying this framework here, Plaintiffs must first show that the presence of the stockpile poses a *substantially* increased risk of harm. That inherently requires demonstrating that the stockpile presents *any* increased risk of harm relative to the background risk of harm; then, they must show that this increased risk is *substantial* and not merely trivial or immaterial. *See NO Gas Pipeline v. Fed. Energy Regul. Comm'n*, 756 F.3d 764, 768 (D.C. Cir. 2014). Then, through site-specific factors—such as how likely a contaminant is to be dispersed, in what concentrations it would be dispersed, and how likely Plaintiffs would be exposed—they must show that there is a *substantial* probability of harm. Without this "strict understanding," "all hypothesized, nonimminent injuries could be dressed up as increased risk of future injury." *Food & Water Watch, Inc.*, 808 F.3d at 914.

Take arsenic—the only constituent of potential concern that had an exposure point concentration exceeding *industrial worker* soil screening levels. To have standing based on an increased risk of harm from arsenic exposure, Plaintiffs must, at minimum, show that (1) the levels of arsenic in the stockpile pose a risk; (2) that risk is greater than the risk from background arsenic levels in the soil at the Golf Course; (3) this increase in risk is not slight or insignificant but substantial; (4) given the state of the stockpile, arsenic is likely to leach from, blow off, or otherwise be transmitted from the stockpile to human receptors; (5) this transmission is likely to occur in sufficient concentrations or quantities to result in harm; (6) that harm is likely to occur to *these Plaintiffs* given their activities and the regularity, duration, and proximity of their exposure

to the stockpile; and finally, (7) in light of all these considerations, the probability of Plaintiffs suffering that harm is substantial.

Plaintiffs do not come close to alleging, let alone establishing, *any* of this. They do not provide evidence establishing the background risk of harm. They do not provide evidence of the current risk of harm with the stockpile present, or that the difference between the background and current risks of harm is *substantial*. They do not provide any evidence that dispersal from the stockpile would be likely, and in such concentrations or quantities as to present any risk. And they do not provide any evidence that given the nature of Plaintiffs' limited activities—walking past the stockpile while periodically playing golf—that those activities will result in a level of exposure that could constitute a substantial probability of harm.

For example, Plaintiffs do not allege that they play golf or recreate near the stockpile 250 days a year and intend to do so for the next 25 years, so as to render the conservative industrial screening levels indicative of their likely exposure. Instead, they resort to conclusory allegations and "expert" reports that have no bearing on whether Plaintiffs have suffered an actual or imminent injury in the form of an increased risk of harm from chemical exposure. They rely on their own conclusory allegations that the stockpile is "contaminated with dangerously high levels" of chemicals "that pose significant threats to both wildlife and human health." Am. & Suppl. Compl. ¶ 84. But they provide no evidence identifying what is a "dangerous level" of any constituent, that such level poses a substantially higher risk than background levels, or how the threat of harm from that constituent is "significant."

Plaintiffs' expert reports do not come close to satisfying the increased-risk-of-harm standard either. Those reports offer only a critique of Defendants' data collection and testing methodology and their own vague concerns based on comparisons to screening values. They do

not provide *any* evidence that the stockpile poses a substantially increased risk of harm or that it is substantially probable that Plaintiffs will suffer harm from that increased risk. It is Plaintiffs' burden to show standing and establish the Court's subject-matter jurisdiction. *Lujan*, 504 U.S. at 561. They have not done so.

For example, the Foos Report, Dkt. No. 72-12, presents two opinions. First, it takes issue with how Defendants conducted background sampling, without providing its own evidence of the background levels of constituents at East Potomac Park or that the levels observed at the stockpile present a substantially higher risk. *Id.* at 2-5. Second, it opines that comparing the testing results to ecological and human health screening values indicates "concerns." *Id.* at 6-16. But "concern" is not the relevant legal standard.

Plaintiffs' Connors Report fares no better. Dkt. No. 72-13. The Connors Report presents five opinions, but again, the first four merely critique the NPS's baseline sampling methodology and early sampling efforts. Like the Foos Report, it offers nothing in the way of demonstrating the background levels of risk at East Potomac Park, that the levels observed at the stockpile present a substantially higher risk, or that those risks pose any harm to Plaintiffs based on their site-specific use of the site. *Id.* The fifth opinion offered in the Connors Report suggests that during the brief window in which the stockpile was being assembled but before it was seeded, "contaminant transport and exposure" may have occurred, again, without ever opining on the legally relevant questions.[12]

---

[12] Aside from the lack of relevant substantive opinions, Plaintiffs' experts' reports rest on speculation and a "highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410; *see, e.g.*, Foos Report 8, 13-15 (speculating whether the NPS will use the material for landscaping, whether "there may be the need to rely on [East Potomac Golf Course] groundwater as a drinking water source in the future," and whether "there may be an untested area at the bottom of the stockpile"); Connors Report 23, 26-27 (speculating whether "post-placement concentrations were above or below actual background concentrations," relying on a "hypothesis, not a fact backed up by actual

Plaintiffs' claims of increased-risk-of-harm remain speculative and unsubstantiated. Courts in this Circuit demand far more to establish standing on such a theory. *See, e.g.*, *Int'l Acad. of Oral Med. & Toxicology v. U.S. Food & Drug Admin.*, 195 F. Supp. 3d 243, 266 (D.D.C. 2016) (granting motion to dismiss where plaintiff's expert "offer[ed] neither support . . . nor explanation" for "bald assertion" that plaintiff would be exposed to dangerous levels of chemicals); *Consumers for Auto Reliability & Safety v. Fed. Trade Comm'n*, No. 17-cv-0540, 2021 WL 4050876, at *11 (D.D.C. Sept. 6, 2021) (granting motion to dismiss where plaintiffs' statistics and reports failed to plausibly allege increased risk of harm from unrepaired used cars).

### B. Plaintiffs Fail to Show that Their Alleged Injuries are Traceable to Defendants' Conduct

Plaintiffs' theories of standing as to both their Proposal Claims and Stockpiling Claims fail on injury alone. But even if the Court could find an Article III injury that is concrete and not conjectural, they also fail on causation grounds.

Plaintiffs must show that their injury is "fairly traceable" to the defendants' "allegedly unlawful conduct." *California v. Texas*, 593 U.S. 659, 669 (2021). For many of the same reasons Plaintiffs cannot show an Article III injury, they cannot demonstrate causation. There are too many speculative links in the causal chain to support either category of their claims. As for the Proposal Claims, Defendants still would need to adopt a sufficiently detailed design, conduct necessary compliance, approve that design, and implement construction activities. And that assumes Plaintiffs could in fact find any final design injurious. Defendants have not yet done any of these things. *See* Third Nersesian Decl. ¶ 7. As for their Stockpiling Claims, Plaintiffs would need to

---

sampling results," and speculating that potential future flooding "could remobilize and transport the contamination").

show, at a minimum, that Defendants' decision to stockpile soil has caused them injury in some cognizable way. They have not done that either.

## II. Plaintiffs' Claims Fail on the Merits

Standing aside, Defendants are entitled to judgment as a matter of law on each of Plaintiffs' claims for several reasons. Defendants' initial decision to pursue a potential rehabilitation of East Potomac Golf Course and engage in that decisionmaking process is not a final agency action reviewable under the APA. Plaintiffs' Proposal Claims are otherwise unripe and do not identify any violation of a relevant statute. Similarly, Defendants' decision to stockpile soil at East Potomac Park complies with all applicable laws.

### A. Plaintiffs' Proposal Claims Fail to Establish a Final Agency Action

Absent specific statutory authorization, the APA limits judicial review to "final agency action." 5 U.S.C. § 704. "Agency action," as used in the APA, is a term of art, referring to an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). It requires "circumscribed, discrete agency action[]" on the part of agency defendants. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

"Final agency action" is action that (1) "mark[s] the 'consummation' of the agency's decisionmaking process," and (2) creates legal "rights or obligations," with "direct and appreciable legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). The action "must not be of a merely tentative or interlocutory nature." *Id.* Whether an agency has taken final agency action is a threshold *legal* determination—it is not a question appropriate for judicial fact-finding drawn from public statements. *See, e.g.*, *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267-

68 (D.C. Cir. 2018); *see also Hormel Foods Corp. v. U.S. Dep't of Agric.*, 808 F. Supp. 2d 234, 242-43 (D.D.C. 2011).

In support of their Proposal Claims, Plaintiffs identify no agency action, let alone *final* agency action. Instead, the allegations in their Amended and Supplemental Complaint demonstrate only that Defendants conceived of an idea to potentially renovate or redesign East Potomac Golf Course, Am. & Supp. Compl. ¶¶ 75-76, and have continued down the agency decisionmaking path, at times with input or encouragement from the President, i*d.* ¶¶ 98-100. The remainder of Plaintiffs' allegations rest on pure speculation. *Id.* ¶ 97, 101.

APA claims must be directed at discrete agency action. "[A]n abstract decision apart from specific agency action" is not reviewable. *Biden v. Texas*, 597 U.S. 785, 809 (2022). Plaintiffs' theory of agency action is foreclosed by the D.C. Circuit's opinion in *Fund for Animals, Inc. v. U.S. Bureau of Land Management*, 460 F.3d 13 (D.C. Cir. 2006). There, the D.C. Circuit recognized that "agency action" as used in the APA "is not so all-encompassing as to authorize . . . judicial review over everything done by an administrative agency." *Id.* at 83 (quoting *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004)). "Much of what an agency does is in anticipation of agency action." *Id.* at 83-84.

Like the circumstances alleged here, agencies do not engage in agency action where they simply "prepare proposals, . . . meet with . . . interested groups, and engage in a wide variety of activities that comprise the common business of managing government programs." *Id.* at 84. And like the budget proposal and land use plans analyzed in *Fund for Animals, Inc. v. U.S. Bureau of Land Management*, a proposal to renovate East Potomac Golf Course is "generally unreviewable; it is only specific actions implementing the [proposal] that are subject to judicial scrutiny." *Id.*

at 85. Other courts faced with similar allegations of purported agency plans and proposals have reached the same conclusion.[13]

Even if the Court were to conclude that Plaintiffs have alleged an agency action, they have not alleged a *final* agency action reviewable under the APA. The decision to develop a future proposal to renovate a golf course and then engage in the necessary decisionmaking process by definition does not reflect the consummation of that process, nor does it create any legal rights or obligations. *See Bennett*, 520 U.S. at 177-78. Defendants have presented sworn declarations—now three times—establishing that no decision on any Golf Course redesign proposal has been made and that Defendants will continue to pursue all necessary legal and compliance measures before making an ultimate decision. First Bowron Decl. ¶¶ 16-24; Second Bowron Decl. ¶¶ 11-13; Third Bowron Decl. ¶ 7. And Plaintiffs themselves allege that Defendants hired a third party to help conduct compliance—the very compliance Plaintiffs insist Defendants must perform before reaching a decision on whether and how to rehabilitate the Golf Course. Am. & Supp. Compl. ¶ 101. This confirms Defendants have not reached the consummation of the decisionmaking process. It is now undisputed that process remains underway.

Indeed, Plaintiffs' allegations reflect that process in action—discussions and statements by and among agency officials and the President exploring how best to improve East Potomac Golf Course. Plaintiffs cannot convert nonbinding expressions of agency intent into final agency action simply by mislabeling them as plans for or promises of future agency action. *See, e.g.*, *Bark v.*

[13] *See, e.g.*, *Canaza v. Platek*, No. CV 25-303-BAH, 2026 WL 811234, *8 (D. Md. March 24, 2026) (concluding plaintiffs challenge to alleged "scheme" to refuse visas under statutory provision did not qualify as discrete, final agency action); *Cent. Delta Water Agency v. U.S. Fish & Wildlife Serv.*, 653 F. Supp. 2d 1066, 1089-93 (E.D. Cal. 2009) (concluding that conservation plan and related preliminary activities were not final agency action); *Biodiversity Assocs. v. U.S. Forest Serv. Dep't of Agriculture*, 226 F. Supp. 2d 1270, 1314 (D. Wyo. 2002) (concluding that agency plans for future timber sales were neither agency action nor final agency action).

*U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) (plaintiffs cannot "attach[] a . . . label to their own amorphous description of the [agency's] practices. . . . [A] final agency action requires more").

Plaintiffs' Proposal Claims are on all fours with *Fund for Animals v. Williams*, 391 F. Supp. 2d 132 (D.D.C. 2005). In *Fund for Animals v. Williams*, plaintiffs sought to challenge various long-term "goals" announced by the U.S. Fish & Wildlife Service in its five-year Strategic Plan. This Court concluded that the agency simply declaring these objectives "does not constitute a final agency action because implementation of the goals announced . . . entails 'subsequent discretionary actions requiring separate and independent decisionmaking that are divorced from the prior decision.'" 391 F. Supp. 2d at 137 (quoting *Lujan*, 497 U.S. at 892 n.2).

The same is true here. Before any abstract proposal to rehabilitate East Potomac Golf Course could transform into final agency action, NPS would first need to pursue a host of preliminary activities within its management discretion. *See* First Bowron Decl. ¶¶ 16-24. No party disputes that these steps, like NEPA or Section 106 compliance, would need to occur, and Plaintiffs now concede that the NPS has retained a contractor to help conduct that compliance. Am. & Supp. Compl. ¶ 101. Should Defendants continue to advance this proposal further, Defendants should be granted leeway to take those implementation steps and take specific action here. *See United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." (citation

omitted)).[14] But for now, mere "announcement of the goal[]"—or in this case a concept for a golf course—"is not a final agency action." *Fund for Animals*, 391 F. Supp. 2d at 138.

Finally, Plaintiffs cannot identify how Defendants' decision to develop a proposal for renovating East Potomac Park in any way creates binding legal obligations. Finality turns on legal consequences—whether the agency has bound itself or altered rights or obligations of another. *Bennett*, 520 U.S. at 178. But Plaintiffs point to no agency determination that imposes any obligations on them or denies them any right. *Cf. Hormel Foods Corp.*, 808 F. Supp. 2d at 245-46 (concluding agency letter was not final agency action where letter stated agency was still "considering how best to proceed").

Taken together, Plaintiffs' allegations amount to little more than "generalized complaints about agency behavior." *Bark*, 37 F. Supp. 3d at 50 (quoting *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006)). These complaints are not reviewable under the APA.

**B. Plaintiffs' Proposal Claims are Unripe**

Without final agency action, Plaintiffs' challenge to an inchoate proposal to redesign the Golf Course is not ripe. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Doe v. Doe Agency*, 608 F. Supp. 2d 68, 72 (D.D.C. 2009) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision

[14] Moreover, the failure to prepare a NEPA or NHPA document cannot alone be the final agency action subject to review under the APA—a separate final agency action must be challenged. *See Seven Cnty.*, 605 U.S. at 180; *Pub. Citizen v. Off. of U.S. Trade Representative*, 970 F.2d 916, 918 (D.C. Cir. 1992) ("[R]efusal to prepare an EIS is not itself a final agency action for [APA] purposes.").

has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003) (citation omitted).

Ripeness involves consideration of both Article III standing and "prudential reasons for refusing to exercise jurisdiction." *Garcia v. Acosta*, 393 F. Supp. 3d 93, 103 (D.D.C. 2019) (citation modified). "[T]he doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to, and then, only once." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012). Courts look to "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs v. Gardner*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Under the fitness prong of this test, courts must consider "[1] whether [the claim] is 'purely legal, [2] whether consideration of the issue would benefit from a more concrete setting, and [3] whether the agency's action is sufficiently final.'" *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (citation omitted). Under the hardship prong, courts must ask whether the challenged administrative action is likely to have a direct and immediate effect on the "primary conduct" of the plaintiff. *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967).

Plaintiffs' Proposal Claims are constitutionally unripe for the standing reasons noted above. But Plaintiffs' Proposal Claims also fail both prudential ripeness prongs. *First*, Plaintiffs' Proposal Claims are not purely legal. Rather, they require a series of future interim steps that have yet to occur. These steps would include compliance with NEPA, Section 106, and other applicable laws, and depending on the nature of the ultimate proposal, consultation with the CFA and NCPC. At any one of these stages, this idea may die on the vine. *See Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007) ("[W]hen an agency decision may never have 'its effects felt in a concrete way by the challenging parties,' the prospect of entangling ourselves in a challenge to

such a decision is an element of the fitness determination as well." (citation modified)). The Court cannot decide now whether a future decision will survive APA scrutiny, and "[it] may never need to." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996). *Second*, Plaintiffs suffer no hardship from deferred judicial review. If Defendants undertake a final agency action based on the President's proposal, Plaintiffs can bring claims challenging that action at that time—assuming other jurisprudential requirements are met. But delayed review is, by definition, no hardship itself. *See Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*, 85 F. Supp. 3d 250, 272-73 (D.D.C. 2015).

This Court's decision in *Mashack v. Jewell*, 149 F. Supp. 3d 11 (D.D.C. 2016), is directly on point. In *Mashack*, plaintiffs alleged the NPS violated the APA by allowing a concessioner's contract to expire, temporarily closing a marina, and purportedly planning to permanently remove marina infrastructure. *Id.* at 18-19. The Court correctly rejected plaintiffs' attempt to merge discrete past and future agency actions into "part of [a] larger decision-making process." *Id.* at 30. The Court concluded that even when agency officials had informed the public of their intentions, because there was no formal decision and the agency represented that any future decision would include the requisite NEPA and NHPA compliance, the agency had "not yet bound itself . . . in a way that would warrant review of those actions at this stage." *Id.* at 33. Like the potential permanent closure of the marina in *Mashack*, any claim concerning potential permanent renovation of East Potomac Golf Course "is not ripe." *Id.*

Defendants should be permitted to deliberate any conceptual golf course proposal, develop potential paths forward, conduct the appropriate analyses, and make a decision that would turn that concept into a reality without Plaintiffs and the Court inserting themselves into those processes. "The prospect of pervasive oversight by federal courts over the manner and pace of agency

compliance with . . . [broad] congressional directives is not contemplated by the APA." *Norton*, 542 U.S. at 67.

### C. 40 U.S.C. § 8106 Is Inapplicable

In their new complaint, Plaintiffs also allege that by proposing to renovate the Golf Course and temporarily stockpiling soil, Defendants have violated 40 U.S.C. § 8106. Enacted in a 1912 appropriations bill, § 8106 states that "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." Justiciability concerns aside, Defendants are entitled to judgment on Plaintiffs' claims for several reasons.

*First*, § 8106 does not apply to the NPS. Section 8106 was included in the section of the 1912 appropriations law providing for appropriations to the Engineer Department. *See* Act of Aug. 24, 1912, ch. 355, 37 Stat. 417, 442-44. A complementary provision, prohibiting certain construction expenditures "made in any national park except under express authority of Congress," applied to the Department of the Interior. *Id.* at 37 Stat. 460. But this statute, what would be codified at 16 U.S.C. § 451, was *repealed* in 1996. *See* Omnibus Parks and Public Lands Management Act of 1996, Pub. L. No. 104-333 § 801, 110 Stat. 4093 (Aug. 22, 1996); S. Rep. 104-50 at 12 (1995).

*Second*, it is questionable whether § 8106 remains operative *at all* after Congress's passing of the National Capital Planning Act ("NCPA"). *See Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961) ("[A] specific statute controls over a general one[.]"). The NCPA provides a detailed scheme for authorizing buildings on federal land in the District of Columbia. 40 U.S.C. § 8711. The NCPA created the NCPC, "the central federal planning agency for the Federal Government in the National Capital." 40 U.S.C. § 8711(a). The NCPA mandates that "[a]gencies

of the Federal Government responsible for public developments and projects shall cooperate and correlate their efforts by using the [NCPC] as the central planning agency for federal activities in the National Capital region." 40 U.S.C. § 8722. Plaintiffs identify no finalized plan that could be submitted to the NCPC. They identify only preliminary conceptual designs that are being deliberated within the NPS. And the NPS acknowledges, should these conceptual designs ever advance to a sufficiently detailed design, the NPS would likely be required to present its proposal to the NCPC for review. Second Bowron Decl. ¶ 12.[15]

*Third*, Plaintiffs fall outside § 8106's zone of interests. The zone-of-interests requirement is a fundamental limit on causes of action. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-30 (2014). Here, § 8106 protects Congress's institutional interests, not private citizens' visual tastes. The mismatch between Plaintiffs' purported injuries—aesthetic and other harms—and the legal wrong of construction without express congressional sign-off demonstrate they are simply outside § 8106's intended zone.

*Fourth*, § 8106 is definitionally inapplicable. Plaintiffs identify no "building or structure" that the NPS has built or has approved to be built. They identify only preliminary conceptual designs that are not even sufficiently detailed to begin the compliance process, let alone designs that have gone through the compliance process, contain a "building or structure," and that have been approved. And any suggestion that the temporary soil stockpile is a "building or structure" is absurd.

[15] In light of this history, and the subsequently enacted NPCA, it makes sense that few of the myriad of NPS buildings and other structures constructed on federal lands were specifically authorized by Congress in the manner Plaintiffs suggest is necessary. Put plainly, Plaintiffs reading of § 8106 doesn't square with the history of NPS land management in DC.

*Finally*, the NPS has congressional authorization for construction in East Potomac Park. In the NPS Organic Act, which post-dates § 8106, Congress specifically empowered the Secretary of the Interior, through the NPS, to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units" which includes "the enjoyment of the scenery, natural and historic objects, and wildlife in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). Congress appropriates millions of dollars in construction funding to the NPS under this authority each year. And East Potomac Park has its own enabling legislation, in which Congress declared that the land be "made and declared a public park . . . to be forever held and used as a park for the recreation and pleasure of the people." Act of Mar. 3, 1897, ch. 375, 29 Stat. 624; 54 S. Rept. No. 1327 (1897); 54 H.R. Rept. No. 2708 (1897). The NPS now manages East Potomac Park and inherent in that management authority is the power to make necessary improvements like design and structural changes that satisfy NPS's mission under its Organic Act and Congress's intent that East Potomac Park be a public place of recreation.

To the extent § 8106 has any operative effect as to the NPS, the better reading of the statute is that it requires express congressional authorization for a non-NPS entity to construct a building or structure on NPS lands. No such circumstances exist here.

**D. Defendants' Decision to Stockpile Soil Complied with Applicable Laws**

Independent of Plaintiffs' lack of standing, Defendants are also entitled to judgment as a matter of law on Plaintiffs' Stockpiling Claims because NPS's decision to stockpile fill material at East Potomac Park complied with NEPA, Section 106 of the NHPA, the NPS's Organic Act, and 54 U.S.C. § 100903.

### 1. Defendants' Stockpiling Decision Complied with NEPA

Generally, NEPA requires agencies to prepare either an Environmental Impact Statement ("EIS") or an Environmental Assessment ("EA") with respect to a proposed action. 42 U.S.C. § 4336(b). But the agency remains in compliance with NEPA where the agency determines "the proposed agency action is excluded pursuant to one of the agency's categorical exclusions." 42 U.S.C. § 4336(a)(2). Judicial review of the agency's determination "is a limited one." *Seven Cnty.*, 605 U.S. at 185 (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978)).

Section 12.5 of the Department of the Interior Departmental Manual identifies proposed actions that "normally do[] not significantly affect the quality of the human environment," and are thus excluded from NEPA's environmental document requirement. 42 U.S.C. §§ 4336(a), 4336e(1). They include actions related to routine land management, such as "[l]andscaping and landscape maintenance in previously disturbed or developed areas." 516 DM 12.5(C)(19).

Here, the NPS reasonably concluded that soil from the East Wing Modernization Project could be temporarily stockpiled at East Potomac Park for later reuse and reasonably explained its decision. The proposed action consisted of the "temporary storage" of soil "on previously disturbed and maintained areas of the East Potomac Golf Course," for later reuse. NAMA 1672. Since infill was "planned as part of improvements" reflected in NLT's lease then in effect, the NPS reasonably concluded the soil could be used for landscaping purposes, even without identifying a specific future use. *Id.*; *see* NAMA 1133-34. And given that East Potomac Park was artificially constructed entirely of dredged fill material and has undergone repeated renovations, the NPS reasonably concluded that it was suitable as a "disturbed or developed area." NAMA 1672.

The NPS also reasonably concluded that no extraordinary circumstances required additional NEPA analysis. NAMA 1673. The NPS explained that this limited action did not have the potential for significant adverse impacts, did not introduce new environmental effects, and aligned with prior uses and maintenance. *Id.*; *see* 43 C.F.R. § 46.215(a)-(i).

In making this decision, the NPS was aware of a potential diesel spill on the White House grounds near where soil would be extracted, NAMA 0001, and aware that East Potomac Park was constructed from dredged material from the Potomac and its associated contaminants, NAMA 0828, 0717. *Seven Cnty.*, 605 U.S. at 181 ("The agency is better equipped to assess what facts are relevant to the agency's own decision than a court is."). Accordingly, the NPS implemented reasonable and appropriate protective measures, pursuant to its monitoring and evaluation plan.[16]

In short, the NPS's decision to stockpile fill material, combined with its intent to conduct reasonable testing and evaluation efforts, was reasonable and reasonably explained. NEPA requires nothing more. *Seven Cnty.*, 605 U.S. at 185.

**2. Defendants' Stockpiling Decision Complied with NHPA Section 106**

Broadly speaking, Section 106 of the NHPA requires that agencies "take into account" the effects of their undertakings on historic properties, and its implementing regulations provide a process for agencies to take those effects into account. *See* 54 U.S.C. § 306108; 36 C.F.R. §§ 800.1-.6. Consistent with the implementing regulations, an agency's Section 106 obligations

[16] This included testing the soil for contaminants upon removal from the White House and upon delivery to East Potomac Park at reasonable intervals. *See* Exs. 2-4; First Nersesian Decl. Ex. K, Dkt. No. 26-3. This also included an interim and final sampling report and preliminary risk assessment based on the data collected from the NPS's contractor Jacobs and forthcoming site-specific risk assessment. *See* Ex. 2. The NPS is not stopping there. The NPS is conducting site-specific human health and ecological risk assessments to again confirm that the soil is sufficiently "clean," that is, suitable for temporary storage and eventual long-term use at the Golf Course, and to determine whether further steps are warranted. *See* Ex. 2; Second Nersesian Decl. ¶ 12.

can be satisfied through reliance on program alternatives. 36 C.F.R. § 800.14. For example, an agency official may negotiate a programmatic agreement. *Id.* § 800.14(b). The regulations authorize the use of a programmatic agreement in some cases, including "[w]here routine management activities are undertaken . . . ." *Id.* § 800.14(b)(1)(iv). Under the APA's deferential arbitrary-and-capricious standard, an agency's determination under Section 106 will be upheld "so long as the agency's decision is 'reasoned and rational.'" *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 299 (D.C. Cir. 2022) (citation omitted).

The NPS entered into a nationwide programmatic agreement to govern its compliance with Section 106. NAMA 0187-0214. That 2008 Programmatic Agreement provides for a streamlined review process, whereby, if a proposed action satisfies certain criteria, no further consultation is required unless specifically requested by certain parties. NAMA 0197-98.[17]

Here, the NPS issued an Assessment of Actions Having an Effect on Historic Properties and reasonably concluded that the proposed stockpiling was eligible for streamlined review and reasonably explained its decision. NAMA 1646-50. *First*, the NPS's cultural resource specialist explained that the proposed action was "consistent with routine grounds maintenance [because] the placement of fill will not significantly alter the design of the course." NAMA 1648. *Second*, the NPS determined that the area of potential effects in and around East Potomac Golf Course had previously been surveyed to identify historic properties. NAMA 1646; NAMA 0385. *Third*, the NPS concluded that this routine storage of fill material for future landscaping uses would have no

[17] To be eligible for streamlined review, a proposed undertaking must generally satisfy three requirements. First, it must be an activity eligible for streamlined review. NAMA 0197-98. Eligible activities include routine grounds maintenance. *Id.* Ex. D at 15. Second, all historic properties within the undertaking's area of potential effects must have been previously identified and evaluated. *Id.* Ex. D at 9-10. And third, the agency Section 106 Coordinator must have reviewed the undertaking and certified that its effects on historic properties or properties eligible for the National Register will not be adverse. *Id.* Ex. D at 10.

adverse effect on historic properties. NAMA 1647-48. Therefore, the NPS complied with Section 106 and the NPS's consultation obligations by reasonably concluding and reasonably explaining that stockpiling soil was eligible for streamlined review under its programmatic agreement.

#### 3. Defendants' Stockpiling Decision Complied with the NPS's Organic Act

The Organic Act directs the NPS to "conserve the scenery, natural and historic objects, and wild life" within the parks in a manner that "will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). But "[b]ecause the Organic Act is silent as to the specifics of park management, the Secretary has especially broad discretion on how to implement his statutory mandate." *Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000). The NPS has thus developed policies and guidance to interpret the Organic Act and its non-impairment standard. NAMA 0026-28; NAMA 1153-57.

Under those policies, the NPS has defined "impairment" as "an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values." NAMA 0027; *see also Nat'l Parks Conservation Ass'n v. Jewell*, 965 F. Supp. 2d 67, 84 (D.D.C. 2013). Impairment is a high standard and not every impact is an impairment. "Whether an impact meets this definition depends on the particular resources and values that would be affected; the severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question and other impacts." NAMA 0027.

NPS guidance requires the preparation of a separate written non-impairment determination only for proposed actions requiring an EA or EIS. NAMA 1153. That is because proposed actions

that are reviewed using a categorical exclusion have no potential for significant impacts, much less for impacts that rise to the level of impairment.

Here, the NPS complied with its Organic Act when, pursuant to a categorical exclusion, it concluded that the soil storage project has "No Potential for Significant Impacts to Sensitive Resources." NAMA 1673. Other than their own conclusory statements, Plaintiffs identify no impact from the soil stockpile that would rise to the level of impairment by harming the integrity of park resources or values, including opportunities that would otherwise be available for enjoyment. The Golf Course remains open and available for play. *See* Third Bowron Decl. ¶ 4.

**4. Defendants' Stockpiling Decision Did Not Violate 54 U.S.C. § 100903**

The National Park Service is generally prohibited from operating a "solid waste disposal site . . . within the boundary of any [National Park] System unit." 54 U.S.C. § 100903(a). The NPS regulations define a "solid waste disposal site" as "land or water where *deliberately discarded* solid waste . . . is discharged, deposited, injected, dumped, spilled, leaked, or placed." 36 C.F.R. § 6.3 (emphasis added). And "solid waste" is further defined as "garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other *discarded* material, including solid, liquid, semisolid, and contained gaseous material resulting from industrial, commercial, mining, and agricultural operations or from community activities." *Id.* (emphasis added).

On its face, § 100903 does not apply to the soil stockpile at East Potomac Park. The stockpiled soil is not "discarded" by any definition.[18] It is temporarily stored and intended for beneficial reuse as infill for future improvements to the Golf Course. NAMA 1672. Accordingly,

[18] *Oxford English Dictionary*, "discard (*v.*), sense 1.a," June 2026, https://doi.org/10.1093/OED/5793457186 (defining "discard" as "to reject as being no longer wanted or needed; to cast aside, get rid of; to abandon).

the NPS's decision to stockpile fill material did not violate Congress's prohibition against the operation of most solid waste disposal sites on NPS lands.

## III. Recourse & Remedy

Defendants are entitled to judgment as a matter of law on Plaintiffs' present claims. And if Defendants continue to deliberate improving East Potomac Golf Course and ultimately decide to rehabilitate the Golf Course, a decision in Defendants' favor here does not leave Plaintiffs without potential recourse. That is because, assuming Plaintiffs can identify a legal error in a future decision, and assuming they can satisfy standing and other justiciability concerns, "they may challenge that [decision]." *Trump v. California*, 2026 WL 2473573, at *4. They simply cannot do what they have done here, which is bring a premature challenge to an agency's proposed idea and the agency's ongoing deliberation of that idea.

With respect to Plaintiffs' Stockpiling Claims, if the Court concludes that Defendants' decision was made in error, the appropriate remedy would be remand without vacatur. At least three Justices of the Supreme Court have expressed skepticism that vacatur is available as a remedy at all under the APA. *United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring). Against this cautious backdrop, courts in this Circuit determine whether to vacate an agency decision depending on "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal quotation marks omitted).

Assuming the Court finds error, both *Allied-Signal* factors would weigh in favor of remand without vacatur here. With respect to the first *Allied-Signal* factor, "the seriousness of the order's deficiencies," the NPS took substantial steps to ensure that the stockpiled soil was clean before

deciding to store it, such as ensuring that the soil would be tested before its arrival at East Potomac Park. NAMA 1672. Even if the Court were to decide that the NPS should have taken additional steps to ensure that the soil is clean before making the decision to stockpile the soil, the record before the Court clearly demonstrates that the NPS has been diligent in continuing to monitor the contents and condition of the stockpile and conduct appropriate analyses. Accordingly, any error is, at worst, an error of timing, which the NPS can remedy by continuing its efforts to ensure the cleanliness of the stockpiled soil before making any decision about where to ultimately place the soil.

As for the *second Allied Signal* factor, "the disruptive consequences of an interim change that may itself be changed," any order from the Court that would require the NPS to remove soil from the present stockpile would interrupt the ongoing efforts described above. Moreover, such removal could increase the dispersal of soil from the stockpile, and therefore, increase any risk of dispersal of contaminants that plaintiffs allege—incorrectly—are present and pose a risk. Therefore, such an order would not only be "disruptive," but would be counterproductive to plaintiffs' own alleged interests.

## **CONCLUSION**

For these reasons, Defendants' Motion for Summary Judgment should be granted and judgment entered in Defendants' favor.

Respectfully submitted this 9th day of October 2026.

**ADAM R. F. GUSTAFSON**
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Energy & Natural Resources Division

BENJAMIN HAYES
Deputy Assistant Attorney General
U.S. Department of Justice

Energy & Natural Resources Division

<u>*/s/ Marissa A. Piropato*</u>

MARISSA A. PIROPATO
Deputy Chief (MA Bar No. 651630)
MICHAEL K. ROBERTSON
Trial Attorney (DC Bar No. 1017183)
U.S. Department of Justice
Energy & Natural Resources Division
Natural Resources Section
4 Constitution Square
150 M Street NE
Washington, DC 20002
Tel: (202)-532-3182
Email: Marissa.piropato@usdoj.gov

*Attorneys for Federal Defendants*