**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DC PRESERVATION LEAGUE,

DAVE ROBERTS,

and

ALEX DICKSON,

*Plaintiffs*,

*vs*.

UNITED STATES DEPARTMENT OF THE INTERIOR;

DOUG BURGUM, in his official capacity as Secretary of the Interior;

NATIONAL PARK SERVICE;

and

JESSICA BOWRON, in her official capacity as "Comptroller Exercising the Delegated Authority of the Director" of the National Park Service,

*Defendants*.

Case No. 1:26-cv-477-ACR

**MEMORANDUM IN SUPPORT OF**
**EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER OR, ALTERNATIVELY, FOR A 14-DAY STAY UNDER SECTION 705 OF THE ADMINISTRATIVE PROCEDURE ACT**

## TABLE OF CONTENTS

BACKGROUND ..... 5

LEGAL ANALYSIS ..... 6

I. Plaintiffs are Likely to Succeed on the Merits. ..... 7

A. Plaintiffs Are Likely To Establish Standing. ..... 7

1. Plaintiffs Have Suffered and Will Continue Suffering Concrete, Particularized Injuries. ..... 9

a. *DC Preservation League* ..... 10

b. *Individual Plaintiffs* ..... 12

2. Plaintiffs' Injuries are Directly Traceable to Defendants' Failure to Comply with NEPA. ..... 14

3. A Favorable Decision Will Redress Plaintiffs' Injuries. ..... 15

B. Plaintiffs Are Likely To Establish Final Agency Action and That Defendants Are Violating NEPA, Including By "Segmenting" Connected Elements of the Washington National Plan in an Effort to Avoid NEPA Review of the Full Plan. ..... 15

1. Defendants Have Reached Final Agency Action. ..... 15

2. Plaintiffs Are Likely to Succeed on the Merits of Their NEPA Claim. ..... 17

a. *No Logical Termini: Defendants Feign Adherence to a Cultural Landscape Report That Calls for Rehabilitating the Travis Design, Not Replacing It.* ..... 19

b. *No or Little Independent Utility Outside Major Golf Course Renovation.* ..... 20

c. *Moving Forward Will Thwart the No-Action Alternative.* ..... 21

d. *Defendants Admit That the Tree-Clearing Project Irretrievably Commits Federal Resources to a Project Closely Related to the Washington National Plan.* ..... 22

II. Plaintiffs Will Suffer Irreparable Harm Without Preliminary Relief. ..... 23

III. Balancing the Equities and Serving the Public Interest Both Favor Temporarily Restraining Defendants' Segmentation. ..... 24

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*,
317 F.3d 334 (D.C. Cir. 2003) ....9

*Amoco Prod. Co. v. Village of Gambell, Alaska*,
480 U.S. 531 (1987) ....24

*Attias v. CareFirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017) ....8

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*,
462 U.S. 87 (1983) ....17

*Bennett v. Spear*,
520 U.S. 154 (1997) ....16

*Brady Campaign to Prevent Gun Violence v. Salazar*,
612 F. Supp. 2d 1 (D.D.C. 2009) ....23

*C.G.B. v. Wolf*,
464 F. Supp. 3d 174 (D.D.C. 2020) ....24

*Cal. Cmtys. Against Toxics v. EPA*,
928 F.3d 1041 (D.C. Cir. 2019) ....8, 13

*Citizens Action Coalition of Indiana, Inc. v. FERC*,
125 F.4th 229 (D.C. Cir. 2025) ....21

*Coalition on Sensible Transp., Inc. v. Dole*,
826 F.2d 60 (D.C. Cir. 1987) ....18, 22

*Comm. for Auto. Resp. v. Solomon*,
603 F.2d 992 (D.C. Cir. 1979) ....17

*Ctr. for Biological Diversity v. DOI*,
144 F.4th 296 (D.C. Cir. 2025) ....8

*Delaware Riverkeeper Network v. F.E.R.C.*,
753 F.3d 1304 (D.C. Cir. 2014) ....3, 18, 19

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ....2

*District of Columbia v. Trump*,
810 F. Supp. 3d 19 (D.D.C. 2025) ....7

*Dole v. Williams Enterprises, Inc.*,
876 F.2d 186 (D.C. Cir. 1989) ....17

*Earthworks v. Dep't of the Interior*,
105 F.4th 449 (D.C. Cir. 2024)....................17

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996)....................9, 14, 15

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
528 U.S. 167 (2000)....................8

*Fund for Animals v. Clark*,
27 F. Supp. 2d 8 (D.D.C. 1998)....................23

*Global Health Couns. v. Trump*,
153 F.4th 1 (D.C. Cir. 2025)....................7

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)....................10

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)....................24

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................8, 14

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990)....................11, 15

*Minisink Residents for Env. Pres. and Safety v. FERC*,
762 F.3d 97 (D.C. Cir. 2014)....................17

*Nat. Res. Def. Council, Inc. v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988)....................18

*National Park Service v. National Trust for Historic Preservation in the U.S.*,
609 U.S. ___, No. 26A203, 2026 WL 2564318 (Aug. 31, 2026)....................13, 14

*NRDC v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020)....................16

*Open Cmtys. All. v. Carson*,
286 F. Supp. 3d 148 (D.D.C. 2017)....................24

*R.I.L-R v. Johnson*,
80 F. Supp. 3d 164 (D.D.C. 2015)....................16

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)....................23

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025)....................17

*Sierra Club v. Jewell*,
764 F.3d 1 (D.C. Cir. 2014)....................9

*Simon v. Eastern Ky. Welfare Rights Org.*,
426 U.S. 26 (1976)....................14

*Spann v. Colonial Village, Inc.*,
899 F.2d 24 (D.C. Cir. 1990)....................11

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)....................8, 11

*Sw. Airlines Co. v. Dep't of Transp.*,
832 F.3d 270 (D.C. Cir. 2016)....................16

*Taxpayers Watchdog, Inc. v. Stanley*,
819 F.2d 294 (D.C. Cir. 1987)....................18, 19

*Thomas v. Peterson*,
753 F.2d 754 (9th Cir. 1985)....................18

*United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*,
517 U.S. 544 (1996)....................10, 11

*Valley Forge Christian College v. Am. Un. for Separation of Church and State*,
454 U.S. 464 (1982)....................13

*WildEarth Guardians v. Jewell*,
738 F.3d 298 (D.C. Cir. 2013)....................9, 15

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008)....................7

**Statutes**

42 U.S.C. § 4332....................17

42 U.S.C. § 4336....................18

42 U.S.C. § 4336a....................17

**Other Authorities**

Categorical Exclusion Documentation Form (CE Form) of Kevin Griess, Nat'l Park Serv., U.S. Dep't of the Interior (Oct. 9, 2026), https://perma.cc/ERL7-UHYV....................3, 21

Cultural Landscape Report: National Park Service Golf Courses in the District of Columbia East Potomac Park, Langston, and Rock Creek: Treatment Guidelines, Nat'l Park Serv., U.S. Dep't of the Interior (June 2019), https://perma.cc/X92Z-W8FC....................3, 19, 20, 24

Environmental Assessment, Rock Creek Park Golf Course Rehabilitation, Nat'l Park Serv., U.S. Dep't of the Interior (Sep. 2023), https://perma.cc/N5XG-UAER....................21

Findings of No Significant Impact, Rock Creek Park Golf Course Rehabilitation, Nat'l Park Serv., U.S. Dep't of the Interior (Mar. 28, 2024), https://perma.cc/B9X7-3LDV ..........21

This Court has repeatedly instructed Defendants to provide "enough notice before some major thing happens" in the implementation of the Washington National plan at East Potomac Golf Course to allow Plaintiffs and the Court a meaningful opportunity to review and, if necessary, to act. Mot. Hr'g Tr. ("July 2 Tr.") at 92:2-5, July 2, 2026; *see also* Status Conf. Tr. ("Apr. 13 Tr.") at 18:15-19:10, Apr. 13, 2026 ("[H]ere's what I don't want to have happen . . . I don't want to get to a point where someone is telling me, from the government, that it's too late, too many things have happened and now we are, like, moving forward and we can't, you know, stop the trains. All right? So please make clear to your client that I am not going to entertain—and I am going to be quite emphatically not entertaining any argument that, oh, things are too far along, it's going to be too expensive to undo things or undo plans or any more of those kinds of things because if I get that, I'm going to refer to this and I'm going to say I told you I wasn't going to deal with that."). Defendants have told this Court time and time again that they would not take irreversible action to implement the Washington National plan without completing various legal review processes and providing public notice thereof. July 2 Tr. at 12:23-13:1 ("[T]hey know if September 1st rolls around and there is renovation and construction and bulldozers at the course going on, with this not being completed, they are in hot water. They fully understand that and appreciate.").

But the die has now been cast. Despite the Court's admonitions, at 4:55 p.m. on Friday preceding the holiday weekend, Defendants announced their intent to begin—barely 12 hours later—a massive operation to clear 529 trees at East Potomac Golf Course. Decl. of Dr. Kevin Griess, Superintendent of National Mall and Memorial Parks, National Park Service ("Griess Decl.") ¶ 20, ECF 74-1. Plaintiffs received no more notice than the Court did and immediately requested a conference to meet and confer. By 8 a.m. on Saturday, Defendants' workers had arrived in full force to begin felling hundreds of trees, including healthy, mature oaks and maples.

Defendants' counsel made themselves available to meet and confer in the afternoon of Sunday, October 11. Shortly before that conference, Defendants notified Plaintiffs that their tree-razing operation was proceeding "faster than anticipated" and that a total of 529 trees had already been destroyed on Saturday alone and that—contrary to their Friday declaration—hundreds of additional trees would be felled imminently. As Defendants' counsel explained during the meet-and-confer, only the rain on Sunday delayed further tree removal. Defendants' counsel confirmed that the tree-razing will resume as soon as the weather permits.[1]

Defendants would have this Court believe that this unprecedented operation is merely the sudden and purely coincidental fulfillment of recommendations posited in a Cultural Landscape Report seven years ago and is totally unrelated to the ongoing implementation of the Washington National plan. But the Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). Even if Defendants were entitled to the benefit of the doubt, they are not entitled to a suspension of disbelief. As Plaintiffs have asserted since this case's inception, implementing the Washington National plan will require massive tree-clearing. Compl. ¶ 85, ECF 1 (Washington National plan "will likely entail, at a minimum, removal or relocation of hundreds of trees"); *see also* Proposed Am. and Suppl. Compl. ¶ 103, ECF 72-1 (Washington National plan "will entail, at a minimum, the near-certain removal or relocation of hundreds of trees"). And Defendants have already undertaken significant tree removal, characterizing it each time as mere "routine maintenance." These excuses can no longer be swallowed. The unprecedented scale of the clear-cutting that is happening now—following in the wake of President Trump's declaration that "[w]ork on the new course, which will go quickly, will begin on September 1st," Pls.' Notice of Factual Developments, ECF 58 at 1, and Defendants'

[1] Defendants' counsel represent that they oppose this motion.

admission that they are "trying to meet that schedule," July 2 Tr. at 8:20-21—cannot be understood as anything other than a major, irretrievable further step toward implementation of the Washington National plan. Viewed in light of Defendants' acknowledgment that they are working quickly to fulfill President Trump's direction to fundamentally overhaul the courses at East Potomac, it strains plausibility that the ongoing tree-clearing is principally motivated by the CLR's recommendations to "preserv[e] [the courses'] historic character . . . consistent with the original design intent for each course." Cultural Landscape Report: National Park Service Golf Courses in the District of Columbia East Potomac Park, Langston, and Rock Creek: Treatment Guidelines ("CLR") at xiii, Nat'l Park Serv., U.S. Dep't of the Interior (June 2019), https://perma.cc/X92Z-W8FC. Working toward an end goal of maintaining the courses' original character would be at odds with everything Defendants have acknowledged they are doing.

Instead, Defendants are engaging in textbook "NEPA segmentation"—avoiding their obligations under the National Environmental Policy Act by "divid[ing] connected, cumulative, or similar federal actions into separate projects and thereby fail[ing] to address the true scope and impact of the activities that should be under consideration." *Delaware Riverkeeper Network v. F.E.R.C.*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). Defendants thus prepared a conclusory Categorical Exclusion, published on Friday, October 9, 2026, declaring that the "tree management" project—described then as the razing of 529 trees—would simply be yet another instance of "routine maintenance" exempt from NEPA's requirements. Categorical Exclusion Documentation Form (CE Form) of Kevin Griess, Nat'l Park Serv., U.S. Dep't of the Interior (Oct. 9, 2026), https://perma.cc/ERL7-UHYV. (On Sunday, October 11, 2026, after the total of 529 was reached on the first day of the project alone, Defendants hastily prepared and provided to Plaintiffs a supplement explaining that NPS had undercounted the targeted number of trees and that hundreds

more would be removed. Ex. 1 (Determination of NEPA Adequacy, PEPC Project Number 139091 (Oct. 11, 2026))). Neither of these documents evaluated the environmental effects of the Washington National plan as a whole or considered the tree-clearing as part of that project, despite Defendants' acknowledgments that they are working toward bringing that project to fruition.

Given these developments, Plaintiffs intend to seek a preliminary injunction and in the meantime respectfully move for a temporary restraining order (TRO) to preserve the status quo. Plaintiffs request that the Court enter a 14-day injunction against any further tree felling at East Potomac Park. Further, given Defendants' failure to provide any meaningful advance notice of this weekend's activities, Plaintiffs additionally request that the Court order Defendants to provide written advance notice to Plaintiffs and the Court no less than three business days before undertaking any irreparable modification to any permanent forms or features of East Potomac Park. Such relief is well warranted to address the Complaint's claim that Defendants' implementation of the Washington National plan violates NEPA. Compl. ¶¶ 103-08, ECF 1; *see also* Proposed Am. and Suppl. Compl. ¶¶ 124-29, ECF 72-1.[2] As explained, Defendants' surprise tree-razing operation constitutes classic NEPA segmentation: undertaking elements of a larger project piecemeal and insisting that they are independent and therefore need not be evaluated in a single NEPA review of the entire project. Defendants cannot circumvent their NEPA obligations in this manner.

Without a temporary restraining order, Plaintiffs will suffer irreparable injuries to their legal interests, and the public stands to lose a treasured jewel of the National Park system and the Washington, D.C. community. Defendants took down 529 trees in one day. They have

---

[2] The other claims alleged in the Complaint, ECF 1, and in Plaintiffs' Proposed Amended and Supplemental Complaint, ECF 72-1, are not at issue in this motion.

acknowledged they intend to take hundreds more. Left unchecked, Defendants are moving rapidly toward precisely the *fait accompli* this Court has repeatedly admonished against. A TRO will allow Plaintiffs to present full briefing on a motion for preliminary relief and ensure Defendants do not permanently raze hundreds more trees at East Potomac before the Court can even hear Plaintiffs' claims.

## **BACKGROUND**

Due to the emergency nature of this request, the recitation of this case's history is succinct.

Plaintiffs filed suit in February 2026, alleging that Defendants had adopted and begun implementing a plan to destroy East Potomac Golf Course in Washington, D.C., and to replace it with an ahistorical, championship-style venue designed to host professional golf tournaments. Compl. ¶¶ 9, 67, ECF 1; Proposed Am. and Suppl. Compl. ¶¶ 9, 75, ECF 72-1. Plaintiffs alleged, among other things, that Defendants were violating NEPA because they had not prepared an Environmental Impact Statement or Environmental Assessment before adopting and implementing the plan.

In various filings, Defendants have opposed those claims on their merits, *see, e.g.,* Defs.' Resp. in Opp'n to Pls.' Mot. for Stay or, in the Alternative, Prelim. Inj. at 43-49, ECF 26; Defs.' Reply Mem. in Support of Defs.' Mot. to Dismiss at 26-28, ECF 57, but most of their defense has rested on their view that Defendants have not completed a final agency action or otherwise triggered their NEPA obligations and that Plaintiffs' suit is therefore premature. *See, e.g.,* ECF 26 at 26-43; ECF 57 at 14-25. In a March 2026 declaration, Defendant Jessica Bowron of NPS attested that several steps remained to be taken before work would begin on what Defendants claim is still a mere concept, including "full compliance" with NEPA "*prior to* undertaking the project."

Decl. of Jessica Bowron, Comptroller of the National Park Service ("Bowron Decl.") ¶ 16, ECF 26-4 (emphasis added).

In the months that followed, Plaintiffs resisted opportunities to call Defendants on behavior appearing to creep toward full-scale construction. When Defendants cut down more than 60 trees (including a cherry tree), openly performed surveying work, and staged heavy earth-moving equipment, Plaintiffs notified the Court but did not seek relief. Pls.' Notice of Factual Development, ECF 69. But what Defendants are doing now goes beyond routine maintenance, or maintenance of any kind. Defendants have begun an operation that is unprecedented in East Potomac Park's 130-year history: felling more than 500 trees in a single day, with plans to cut down hundreds more as soon as the weather permits. As initially described in their October 9 notice and declaration, Defendants intended to fell a "total" of 529 trees, with work intended to proceed in tranches over time. Griess Decl. ¶¶ 19-20. Without warning, Defendants abandoned that staged approach and took 529 trees on the first day.

In their telling, this is not an opening step toward the golf course's destruction but is instead happening because, remarkably, they have suddenly found "available funding" and "temporary workforce support" to carry out recommendations from a 2019 Cultural Landscape Report, which Defendants have (again, coincidentally) "directed staff to accelerate." Griess Decl. ¶ 6. True to their word, *see id.* ¶ 18, Defendants began the tree-clearing operation on Saturday, October 10, 2026, a little more than 12 hours after announcing the plan.

## <u>LEGAL ANALYSIS</u>

A party seeking either a temporary restraining order or a Section 705 stay faces virtually identical requirements. A plaintiff must make the same four familiar showings to obtain either a stay under 5 U.S.C. § 705 or a TRO: "that he is likely to succeed on the merits, that he is likely to

suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Global Health Couns. v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). Where the government opposes preliminary relief, the third and fourth factors merge. *Id.* "The same factors governing the issuance of a preliminary injunction [and TRO] govern the issuance of relief under section 705." *District of Columbia v. Trump*, 810 F. Supp. 3d 19, 35 (D.D.C. 2025).

**I. Plaintiffs are Likely to Succeed on the Merits.**

**A. Plaintiffs Are Likely To Establish Standing.**

The parties have extensively briefed Plaintiffs' standing in prior filings on Defendants' motion to dismiss, which the Court denied without prejudice. Minute Order (Sept. 4, 2026). On Friday, October 9, in response to Plaintiffs' Rule 15 motion to file an amended and supplemental complaint, Defendants renewed these arguments in a motion for summary judgment that, like their previous motion to dismiss, rests on several disputed issues of fact. Defs.' Combined Resp. in Opp'n to Pls.' Rule 15 Mot. and Mot. for Summ. J., ECF 75. Plaintiffs will respond to that motion in due course. For present purposes, Defendants' ongoing clear-cutting operations only bring into sharper relief the injuries Plaintiffs suffer from Defendants' conduct and the resulting need for a TRO.

Plaintiffs are two individual golfers and a historic preservation membership nonprofit organization. Plaintiffs Dave Roberts and Alex Dickson have recreational, aesthetic, historical, and communal interests in East Potomac Park and East Potomac Golf Course that are injured by both Defendants' adoption and implementation of the Washington National plan and by Defendants' dumping of contaminated debris from the demolition of the East Wing on the golf course. Decl. of Alex Dickson ("Dickson Decl.") ¶¶ 6, 7, 12, 14, 15, 17, 19-22, ECF 8-4; Decl. of

Dave Roberts ("Roberts Decl.") ¶¶ 15, 16, 20-27, ECF 8-6. Plaintiff DC Preservation League ("DCPL") has associational standing to sue on behalf of its members, who likewise have particularized recreational, aesthetic, historic, and communal interests in East Potomac Park and East Potomac Golf Course that are injured by Defendants' actions. Ex. 2 (Second Declaration of Rebecca Miller ("Miller Decl.") ¶¶ 19-22). Furthermore, DCPL has organizational standing because Defendants' actions impede opportunities to solicit donations and memberships and require diversion of its resources. *Id.* ¶¶ 5, 8-13, 18. All Plaintiffs have been denied their procedural rights to protect concrete interests through the procedural rights afforded them by NEPA.

To establish standing, a plaintiff must show an injury in fact that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical;" a "causal connection between the injury and the conduct complained of;" and that the injury likely will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up). Future injury can establish standing "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks and citation omitted); *see also, e.g.*, *Attias v. CareFirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017) ("Since [*Susan B. Anthony List*], we have frequently upheld claims of standing based on allegations of a 'substantial risk' of future injury."). "[E]nvironmental plaintiffs adequately allege standing 'when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.'" *Ctr. for Biological Diversity v. DOI*, 144 F.4th 296, 305 (D.C. Cir. 2025) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 183 (2000)); *see also Cal. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1049 (D.C. Cir. 2019) (finding standing because

reasonable fear of harm from hazardous waste pollution caused petitioners reduced enjoyment of the outdoors). A plaintiff also adequately alleges standing for a procedural-rights claim by showing that the defendant's actions omitted a procedural requirement and that it is substantially probable that the procedural breach will cause the injury to the plaintiff's interest. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664-65 (D.C. Cir. 1996). Those standards are met here.

1. <u>Plaintiffs Have Suffered and Will Continue Suffering Concrete, Particularized Injuries.</u>

The implementation of the Washington National plan has already injured, or will imminently injure, every Plaintiff in concrete and particularized ways. This weekend's tree cutting has both injured Plaintiffs in its own right and unlawfully advanced Defendants' implementation of the Washington National plan, which will further injure Plaintiffs. Where a plaintiff asserts a procedural violation such as an agency's failure to comply with NEPA, they must show "the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *Fla. Audubon Soc'y*, 94 F.3d at 664 (regarding NEPA). "Aesthetic and recreational injuries" are actionable injuries in suits alleging NEPA violations. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013). Interfering with visitors' "appreciati[on]" of a site's "history" also supports standing. *Sierra Club v. Jewell*, 764 F.3d 1, 5 (D.C. Cir. 2014) (plaintiffs "who observe it for purposes of . . . appreciating its history[ ] would suffer a concrete and particularized injury"). So does interference with a person's emotional attachment to a social interaction, so long as the plaintiff intends to engage in such actions. *See Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 337 (D.C. Cir. 2003) ("emotional attachment" to an elephant that plaintiff "would like to 'visit' [] again" "takes his claim out of the category of a generalized interest in ensuring the enforcement of the law"). All three Plaintiffs have such interests.

a. *DC Preservation League*

DCPL's membership includes individuals who have suffered and will continue to suffer particularized injuries, and DCPL has associational standing to assert claims on their behalf. An organization has associational standing if (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

First, DCPL includes members with particularized interests that are harmed by Defendants' actions, *infra* at Sec. I.A.1.b; its mission of "preserving the historic and cultural resources of the District of Columbia" and "advocat[ing] for the protection, enhancement, and celebration of Washington's built environment" is germane to its members' interests, Miller Decl. ¶¶ 4-5; and its members' individual participation is not necessary. *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) ("'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members" (quoting *Hunt*, 432 U.S. at 343)). As described in greater detail in the attached supplemental declaration of DCPL's executive director, Rebecca Miller, "[s]everal" of its members "often visit East Potomac Park to go walking. They enjoy walking there, and they have plan[s] to continue doing so." Miller Decl. ¶ 20. Because of East Potomac Park's flat land, "East Potomac's landscape [is] particularly important to our members." *Id.* Furthermore, "[s]everal" DCPL members "regularly play golf at East Potomac Golf Course and plan to continue doing so." *Id.* ¶ 21. Crucially, "[a] number of those members specifically enjoy East Potomac Golf Course's history, architecture, landscape, and recreational opportunit[ies] while playing golf at East Potomac Golf Course." *Id.* Executive Director Miller—who herself is a DCPL member—"plan[s] to take" her son bicycling at East Potomac Park. *Id.* ¶ 22. She enjoys taking him there "because it is flat and easy to teach a kid

how to ride a bike." *Id.* She also "enjoy[s] looking at the Japanese cherry trees and the landscape as a whole," and she "plan[s] to continue visiting East Potomac Park." *Id.* Second, the League's mission of "preserving the historic and cultural resources of the District of Columbia" and "advocat[ing] for the protection, enhancement, and celebration of Washington's built environment" is germane to its members' interests. *Id.* ¶¶ 4-5. Third, its members' individual participation is not necessary because the League seeks injunctive relief. *United Food*, 517 U.S. at 546.

DCPL also has suffered and will continue suffering particularized injuries as an organization. *See Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (plaintiff seeking organizational standing "must show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision"). For instance, the League hosts a historic sites app with 60 different self-guided tours, including thematic tours such as a recreation-themed tour. Miller Decl. ¶ 6. East Potomac Golf Course is part of that tour. *Id.* If East Potomac were altered ahistorically, the League "would have to change [its] app and website to remove the listings." *Id.* ¶ 8. By advancing Defendants' implementation of the Washington National plan, this weekend's razing of 500+ trees makes even clearer that such an injury is "certainly impending." *Susan B. Anthony List*, 573 U.S. at 158.

Furthermore, DCPL has suffered procedural injuries. NEPA affords Plaintiffs the right to receive information about proposed projects and to provide comments on them in order to protect their interests in continued recreational use and aesthetic enjoyment of East Potomac Park. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990) (recognizing such interests as among the sorts of interests NEPA protects).

b. *Individual Plaintiffs*

Plaintiff Dave Roberts plays golf at East Potomac "frequently." Roberts Decl. ¶ 2. He enjoys recreational and aesthetic benefits from East Potomac Golf Course. *See, e.g.*, *id.* ¶ 13 ("For the past five years, the greens at East Potomac have been in impeccable shape. For public golfers like me, that's the biggest thing that you want: an opportunity to have putts that roll true."); *id.* ¶ 14 ("I didn't realize it until NLT took over the course, but before they came along at East Potomac, there was almost no connection between the golf course and the surrounding area. . . . [E]ven though the Potomac River is right there, you couldn't see it. Now, it's omnipresent. . . . It's all added up to make East Potomac a great golf experience."). He enjoys a sense of community. *Id.* ¶ 15 ("You don't just play and go home. East Potomac is more communal than that."). Roberts plans to continue going to East Potomac Golf Course, unless Defendants finish implementing the Washington National plan. *Id.* ¶ 21 ("If it happens, then I don't think I'd ever go back. It wouldn't be the same. It will have cost me a golf course that I think is a lot of fun to play. It wouldn't look the same to me. It wouldn't feel historically important to me anymore."). The debris dumped on the course as part of the Washington National plan has already harmed Roberts's enjoyment and aesthetic interests. *Id.* ¶ 24.

Plaintiff Alex Dickson considers East Potomac his "home course," Dickson Decl. ¶ 5; visits East Potomac "at least a few times a month," *id.* ¶ 6; and "plan[s] to keep playing East Potomac as often as [he] currently do[es]", *id.* ¶ 21. Dickson also plans to take his youngest son to East Potomac to start playing golf, "because the Red Course as it exists now is perfect for teaching beginners." *Id.* ¶ 14. Dickson is worried about the effects of inhaling particles from the potentially hazardous debris dumped on the White Course as part of the implementation of the Washington National plan, though. "I am also concerned about the large mounds of debris I have seen sitting on the course. I worry about what I, my family, and my friends are being exposed to while we

play. Being near this debris for hours raises real questions about whether it is safe to be that close to that material." *Id.* ¶ 22; *Cal. Cmtys. Against Toxics*, 928 F.3d at 1049 (standing where reasonable fear of harm from pollution caused petitioners reduced enjoyment). Dickson wants East Potomac's historic designs to stay in place, so that he can continue enjoying them consistent with their historical value. Dickson Decl. ¶¶ 14, 19, 21.

Dickson appreciates East Potomac Golf Course's "historical importance." Dickson Decl. ¶¶ 11-13, 21. "To me," he says, "East Potomac is one of the most beautiful places in Washington, due to the inherent appearance of the park and golf courses . . . . Turning [it] into a championship-style course built to attract a major professional tournament would ruin that beauty." *Id.* ¶ 18. Likewise, "[i]f East Potomac is converted into what the President has described, the beauty, fun, history, accessibility, and the sense of community that bring [him] and others to the course will be lost." *Id.* ¶ 19; *see also id.* ¶ 14 ("[T]urning this into a single championship course means losing two public courses that I and other people can actually play.").

Implementing the Washington National plan would injure all these interests by irreversibly displacing the source of all three Plaintiffs' interests. The Supreme Court's recent emergency-docket opinion granting a stay in *National Park Service v. National Trust for Historic Preservation in the U.S.*, 609 U.S. ___, No. 26A203, 2026 WL 2564318 (Aug. 31, 2026), underscores that these injuries establish Plaintiffs' standing. In that case, the Court reaffirmed that "mere offense, disagreement, or distaste does not qualify as a concrete and particularized injury under Article III." *Id.* at *2. In other words, "a plaintiff must identify something 'other than the psychological consequence presumably produced by observation of conduct with which one disagrees.'" *Id.* (quoting *Valley Forge Christian College v. Am. Un. for Separation of Church and State*, 454 U.S. 464, 485 (1982)). But the Court was clear that a plaintiff has standing "where the plaintiff's

injuries involve[ ] *more* than mere offense," *id.* (emphasis in original), such as when "harmful pollutants" were discharged into a river that an outdoorsman frequented, or whether a plaintiff has "recreational interests" in a place. *Id.* These are the injuries that Plaintiffs assert and have asserted since before the Supreme Court issued its opinion in *National Trust*. Dickson Decl. ¶¶ 14-15, 17-22; Roberts Decl. ¶¶ 15-16, 20, 22-26; Miller Decl. ¶¶ 19-22. Implementing the Washington National plan would not merely offend Plaintiffs; it would interfere with their longstanding use of a place that exists for that use.

2. <u>Plaintiffs' Injuries are Directly Traceable to Defendants' Failure to Comply with NEPA.</u>

For a plaintiff to show a "causal connection" between their injury and a defendant's conduct, the injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Defs. of Wildlife*, 504 U.S. at 560 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)); *Fla. Audubon Soc'y*, 94 F.3d at 665. Where, as here, a plaintiff's procedural rights are at stake, "an adequate causal chain must contain at least two links: one connecting the omitted [procedural obligation] to some substantive government decision that may have been wrongly decided because of the lack of [procedural compliance] and one connecting that substantive decision to the plaintiff's particularized injury." *Id.* at 668 (failure to generate EIS in a NEPA case). In this case, the causal chain is easily established. Despite not complying with NEPA, Defendants adopted and have begun to implement the Washington National plan as evidenced by their dumping of debris from the East Wing demolition, their termination of NLT's lease, their numerous public statements confirming the plan to destroy East Potomac and construct a new championship-style golf course, their previous tree-clearing projects, and their forecasting and awarding of contracts relating to the plan. They are now significantly and irretrievably advancing that plan further by the

unprecedented clearing of more than 500 trees so far and hundreds more to follow—an irreparable loss that helps clear the way for the overhaul of East Potomac and inflicts direct injuries in its own right. Without performing the rigorous review that NEPA requires—including consideration of reasonable alternatives and consideration of public input about the harms the Plan will cause—Defendants wrongly decided to move forward with the plan despite the significant harms their actions will inflict on the human environment.

3. A Favorable Decision Will Redress Plaintiffs' Injuries.

A temporary restraining order on Plaintiffs' claim that Defendants have violated NEPA by adopting and implementing the Washington National plan without performing the advance review that NEPA requires, and by segmenting the ongoing clear-cutting project for separate NEPA review, would require Defendants to stop the present tree clearing and any further implementation of the Washington National plan until they have evaluated the full plan's environmental impacts and considered reasonable alternatives—including the alternative of not moving forward at all. *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013) ("if [agency] is required to adequately consider each environmental concern, it could change its mind about" its decision).

**B. Plaintiffs Are Likely To Establish Final Agency Action and That Defendants Are Violating NEPA, Including By "Segmenting" Connected Elements of the Washington National Plan in an Effort to Avoid NEPA Review of the Full Plan.**

1. Defendants Have Reached Final Agency Action.

APA review is available when plaintiffs have been "adversely affected or aggrieved . . . by some final agency action." *Fla. Audubon Soc'y*, 94 F.3d at 665 (quoting *Nat'l Wildlife Fed'n*, 497 U.S. at 882-83). For agency action to be "final," the action must (1) "mark the 'consummation' of the agency's decisionmaking process," and (2) "be one by which 'rights or obligations have

been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted).

Here, Defendants consummated their decisionmaking process by deciding to adopt the plan and have been implementing the plan since late 2025. The best proof is their own conduct. "Agency action . . . need not be in writing to be final and judicially reviewable," *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015), and may be inferred from a consistent pattern of conduct, even when the government denies that the action exists. *Id.* at 176. "In assessing whether a particular agency action qualifies as final for purposes of judicial review, [courts] look[ ] to the way in which the agency subsequently treats the challenged action." *Sw. Airlines Co. v. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016). An agency action is final when it "is not itself subject to further consideration by the agency." *NRDC v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020).

Defendant Secretary Burgum has publicly admitted that the decision has been made. Proposed Am. and Suppl. Compl. ¶ 99. President Trump has confirmed this at least twice. *Id.* ¶¶ 98, 100; Compl. ¶ 83. Additionally, among other things, Defendants dumped 37,000 cubic yards of contaminated debris to use as fill in the Washington National construction phase; they kicked out East Potomac's leaseholder; they toured the site with their chosen golf course architect with renderings in hand; they hired a consultant for (belated) legal compliance; and they advertised a contract for the Washington National plan's construction phase. Proposed Am. and Suppl. Compl. ¶¶ 11, 13-14, 91, 97, 100-101. Now, they have begun executing a plan to clear several hundred more trees in addition to dozens they have previously razed. Defendants' consistent

pattern of behavior shows that the Washington National plan has been adopted and is moving forward.[3]

2. Plaintiffs Are Likely to Succeed on the Merits of Their NEPA Claim.

NEPA has a "dual mission . . . to generate federal attention to environmental concerns and to reveal that federal consideration for public scrutiny." *Minisink Residents for Env. Pres. and Safety v. FERC*, 762 F.3d 97, 112 (D.C. Cir. 2014) (internal quotation marks and citation omitted). Congress enacted NEPA to protect the environment by requiring federal agencies to "take a hard look at the environmental consequences *before* taking a major action." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983) (emphasis added) (internal quotations and citations omitted). NEPA requires agencies to prepare a "detailed" environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." *Earthworks v. Dep't of the Interior*, 105 F.4th 449, 458 (D.C. Cir. 2024) (quoting 42 U.S.C. § 4332(2)(C)). *See Comm. for Auto. Resp. v. Solomon*, 603 F.2d 992, 1002-03 (D.C. Cir. 1979) (NEPA review "normally is triggered when there is a proposal to change the status quo"). An EIS "must identify significant environmental impacts and feasible alternatives." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 181 (2025). A draft EIS must be published for public review and comment on the proposed action's potential environmental impacts and alternatives. 42 U.S.C. § 4336a(c).

If the agency does not know whether a proposed action will significantly affect the environment, or if the agency concludes the action will not have a reasonably foreseeable

[3] "WHEREAS it looks like a duck, and WHEREAS it walks like a duck, and WHEREAS it quacks like a duck, WE THEREFORE HOLD that it is a duck." *Dole v. Williams Enterprises, Inc.*, 876 F.2d 186, 188 n.2 (D.C. Cir. 1989) (all-caps in original).

significant effect, the agency must prepare an "environmental assessment" (EA) setting forth for public review the basis of the agency's determination that no EIS is necessary. *Id.* § 4336(b)(2).

Agencies may not evade these obligations by engaging in "segmentation." "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Delaware Riverkeeper Network v. F.E.R.C.*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). Forbidding segmentation "prevent[s] agencies from dividing one project into multiple individual actions 'each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'" *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988) (quoting *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985)). Otherwise, an agency could "avoid the NEPA requirement that an EIS be prepared for all major federal actions with significant environmental impacts by dividing an overall plan into component parts, each involving action with less significant environmental effects." *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987).

The D.C. Circuit applies a four-factor test to identify segmentation: "whether the proposed segment (1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives[;] and (4) does not irretrievably commit federal funds for closely related projects." *Id.* These factors are designed to ferret out truly independent projects from projects that have no independent justification, outside the larger plan. These factors do not always receive equal weight—that is, one factor can outweigh another. *See Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987). As applied here, these factors confirm that Defendants' tree-cutting operation is not separate from the Washington National plan but is a

major step toward implementing that Plan and therefore had to be preceded by an EIS or EA that considered the effects of the Washington National plan as a whole.

a. *No Logical Termini: Defendants Feign Adherence to a Cultural Landscape Report That Calls for Rehabilitating the Travis Design, Not Replacing It.*

First, Defendants' plan to cut down 529 trees does not have logical termini—its "endpoints" are not "logical." *Taxpayers Watchdog*, 819 F.2d at 299. To put it another way, Defendants have no "viable reason" why they would perform a massive tree-clearing operation ostensibly to rehabilitate the Blue Course's historic design in accordance with the CLR while simultaneously taking other steps to destroy that design by implementing the Washington National plan. *See Delaware Riverkeeper*, 753 F.3d at 1315 ("FERC has not articulated any viable reason why it completed its NEPA review of [one stretch of a pipeline project] without regard to the other three projects on the [same pipeline]."). Defendants have admitted they are working toward bringing President Trump's vision for East Potomac to fruition, July 2 Tr. at 8:20-21; 9:1-11, and to that end they have solicited and publicly unveiled a design for the new course that is fundamentally at odds with the Travis design and the objectives of the CLR, which included recommendations calculated to preserve the original Travis design, not to modify or replace it. *See, e.g.,* CLR at xiii, ("This CLR contains treatment guidelines to provide responsible management direction for on-going maintenance and future modifications to the courses while preserving their historic character. . . . [T]hese treatment guidelines have been developed to support modernization that is consistent with the original design intent for each course."); *id.* at 163 ("While it is understood that . . . changes may be appropriate to accommodate modern developments, they *must* be accomplished in a historically sympathetic way for these significant cultural resources.") (emphasis added); *id.* at 184 (East Potomac's three golf courses "will be rehabilitated to preserve fundamental historic landscape characteristics"); *id.* at 189 (NPS should

"[r]estore the Walter Travis 1923 links-style Blue Course"). Given that tension, the Court could credit Defendants' representations that the newly ongoing work is consistent with the CLR's recommendations, but nevertheless determine that the ongoing clear-cutting must *also* be part of the Washington National plan. Clearing East Potomac's mature trees is a necessary step to constructing a new golf course and thus cannot logically be viewed as separate from that plan.

b. *No or Little Independent Utility Outside Major Golf Course Renovation.*

Similarly, and perhaps most tellingly, the tree-clearing has little independent utility from a major golf course restoration—namely, the one Defendants are implementing through the Washington National plan. (Indeed, a tree-clearing campaign of this scale can be fairly described as a renovation in and of itself.) Defendants are correct that the 2019 Cultural Landscape Report called for "[r]estor[ing] the links style and historic vegetation (rough grasslands, thin trees between fairways, and sentinel deciduous trees)." Griess Decl. ¶ 12. But Defendants (almost literally) miss the forest for the trees: the CLR did not establish this guideline in a vacuum, but in the greater service of restoring and maintaining the intent of Travis's design. Absent any actual commitment to carrying out the CLR's broader intention—which the Washington National plan expressly contradicts—the ongoing tree-clearing project has no independent utility beyond preparing for further construction work on the Washington National plan.

Defendants' own declaration casts doubt on the independence of this project. Dr. Griess states that, after seven years, he has suddenly received "temporary workforce support"—"20 to 50 trained personnel"—and "additional budgetary resources." Griess Decl. ¶ 6. Implementation of the Washington National plan is an obvious explanation for that sudden and drastic increase in resources for the project. Defendants do not provide any other explanation for that influx of

resources. That silence is powerful evidence of the tree-clearing's connection to the implementation of the Washington National plan.

c. *Moving Forward Will Thwart the No-Action Alternative.*

Third, felling 529 trees plus hundreds more that are slated to follow forecloses the opportunity to consider alternatives. One of NEPA's chief purposes is to require agencies to consider reasonable alternatives to their plan, "including a no-action alternative." *Citizens Action Coalition of Indiana, Inc. v. FERC*, 125 F.4th 229, 239 (D.C. Cir. 2025). If Defendants complete their tree-felling campaign without including it within a NEPA review of the full Washington National plan, then the no-action alternative would be no alternative at all. The damage already will have been done.

Defendants assert that they "documented . . . compliance" with NEPA before undertaking the tree clearing. Griess Decl. ¶ 15. But they provide no explanation or documentation of how they did so. If this assertion refers to the Categorical Exclusion form completed and published on the NPS website on October 9,[4] the day before the tree clearing began, Defendants are mistaken. Like the Categorical Exclusion Defendants relied on to justify dumping 37,000 cubic yards of toxic debris at East Potomac, the October 9 Categorical Exclusion characterizes the razing of more than 500 mature trees as "routine maintenance" that will have no significant impacts. But ahead of a similar tree-clearing project at Rock Creek Golf Course in 2023, NPS published an Environmental Assessment spanning more than 250 pages[5] and needed six months of analysis to issue a Finding of No Significant Impact that ran more than 300 pages.[6] Defendants provide no

[4] Categorical Exclusion Documentation Form (CE Form) of Kevin Griess, Nat'l Park Serv., U.S. Dep't of the Interior (Oct. 9, 2026), https://perma.cc/ERL7-UHYV.
[5] Environmental Assessment, Rock Creek Park Golf Course Rehabilitation, Nat'l Park Serv., U.S. Dep't of the Interior (Sep. 2023), https://perma.cc/N5XG-UAER.
[6] Findings of No Significant Impact, Rock Creek Park Golf Course Rehabilitation, Nat'l Park Serv., U.S. Dep't of the Interior (Mar. 28, 2024), https://perma.cc/B9X7-3LDV.

explanation for their failure to conduct a similar analysis here. Indeed, merely two days after publishing the October 9 Categorical Exclusion, Defendants had to supplement it on October 11 to assert authority for an even more destructive clear-cutting project after their sights shifted from 529 trees to hundreds more. That Defendants are approaching East Potomac's tree-clearing so haphazardly less than three years after conducting painstaking review for a similar project at Rock Creek is telling and suggests that the outcome of the analysis was predetermined, likely because of its importance to the Washington National plan.

What is undebatable about the Categorical Exclusion, however, is that it nowhere considers the tree-razing operation in the context of the broader Washington National plan or even acknowledges the existence of that plan, despite Defendants' having admitted before this Court that they are working toward fulfilling President Trump's marching orders with regard to the overhaul of East Potomac. July 2 Tr. at 8:20-21; 9:1-11. The October 9 Categorical Exclusion thus comes nowhere close to fulfilling Defendants' NEPA obligations, and by relying on it to justify destruction of more than 500 trees, Defendants have foreclosed reasonable alternatives.

d. *Defendants Admit That the Tree-Clearing Project Irretrievably Commits Federal Resources to a Project Closely Related to the Washington National Plan.*

Finally, the newly announced tree-clearing campaign has "irretrievabl[y] commit[ted]" federal funds for a project closely related to the Washington National plan. *Coalition on Sensible Transp.,* 826 F.2d at 66. Dr. Griess's declaration acknowledges that the tree-clearing is made possible by "temporary workforce support" and "additional budgetary resources." Griess Decl. ¶ 6. And for the reasons discussed, clearing hundreds of trees is "closely related" (to put it lightly) to the Washington National plan. The irretrievable use of those federal resources to irreparably destroy hundreds of trees is precisely what NEPA is supposed to forestall until the agency has conducted a proper analysis of the harmful effects of the whole project on the human environment.

## II. Plaintiffs Will Suffer Irreparable Harm Without Preliminary Relief.

Defendants have adopted and begun to implement a plan that will degrade the human environment by permanently altering the land, the golf courses' historic layouts, and these recognized resources' setting, in both visible and unseeable ways. Once the Washington National plan has been completed, the three golf courses will be gone; the ground, landscape, and vistas will be irrevocably altered; and significant disturbance and ground contamination will occur on an island adjoining a major waterway and supporting a wide variety of wildlife. And in the coming days, hundreds of additional trees that contribute to East Potomac's current layout, setting, and qualities will be forever lost as a major step toward bringing that Plan to fruition.

Once those changes occur, they will be irreversible—not only because East Potomac cannot be restored to its historic form and destroyed trees cannot be replaced, but because NEPA requires informed review *before* "resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). "Demolish first, assess the environmental and historic consequences later (or never)" renders this law toothless. Temporary relief is therefore necessary to preserve East Potomac's human environment and Plaintiffs' right to meaningful review before harm occurs.

"When a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009); *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (procedural injury plus injury to aesthetic interest showed irreparable harm). This is true even when a plaintiff shows only that the major Federal action "will have *some* environmental impacts, even if the extent of those impacts are not fully known." *Brady Campaign to Prevent Gun Violence*, 612 F. Supp. 2d at 25. "Environmental

injury, by its [very] nature, . . . is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 545 (1987). Plaintiffs have made such a showing. *See* Dickson Decl. ¶¶ 14-15, 17-22; Roberts Decl. ¶¶ 15-16, 20, 22-26; Miller Decl. ¶¶ 19-22. Displacement and alteration of East Potomac Park's landscape and contributing resources will injure the recreational, environmental, and other interests that Plaintiffs have asserted. These changes will be "permanent," *Amoco*, 480 U.S. at 545, and without any remedy at law.

### III. Balancing the Equities and Serving the Public Interest Both Favor Temporarily Restraining Defendants' Segmentation.

"[T]he Government cannot suffer harm from an injunction that merely ends an unlawful practice," *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (cleaned up), and "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (citing *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws . . . that govern their existence and operations." *Id.* (cleaned up).

But even if this Court were to balance Defendants' interests as if they were private parties, Defendants would suffer only modest delay from a temporary restraining order that preserves the status quo pending this Court's consideration of an application for a preliminary injunction. Any such "delay" would have been a natural result of NEPA compliance if Defendants had abided by the statute. And the inconvenience of a two-week delay is far outweighed by the irreparable injury that would be inflicted on Plaintiffs and the public by the current tree removal proceeding unabated. Even if the clear-cutting is, as Defendants represent, simply delayed implementation of the 2019 CLR, there is no meaningful impact to extending the seven-year delay by another two

weeks.

The further Defendants proceed with implementing the Washington National plan, the more irreversible Plaintiffs' injuries will become. Permitting the clear-cutting of hundreds more trees on top of the 529 that were razed on Saturday would leave the Court without the opportunity for meaningful consideration of Plaintiffs' claims and would leave Plaintiffs without recourse to remedy their harms. Temporary restraining orders exist to avoid precisely that outcome.

## CONCLUSION

The Court should issue an order—or, alternatively, a 14-day stay under 5 U.S.C. § 705—temporarily restraining Defendants from any further tree removal at East Potomac Park, and requiring Defendants to provide three business days' written notice in advance of any irreparable modification to any permanent features or landforms of East Potomac Park. Contemporaneously, the Court should enter a scheduling order concerning Plaintiffs' forthcoming motion for a preliminary injunction.

Dated: October 11, 2026

RESPECTFULLY SUBMITTED,

Abbe David Lowell (Bar No. 358651)
Caleb Hayes-Deats (Bar No. 1653213)
Jack Bolen (Bar No. 90031046)
Angela Reilly (*pro hac vice*)
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowelland associates.com
Chayes-Deats@lowellandassociates.com
JBolen@lowellandassociates.com
AReilly@lowellandassociates.com

*/s/Will Bardwell*
Will Bardwell (Bar No. 90006120)
Mark B. Samburg (Bar No. 1018533)
Catherine M.A. Carroll (Bar No. 497890)
Robin F. Thurston (Bar No. 7268942)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
T: (202) 448-9090
wbardwell@democracyforward.org
msamburg@democracyforward.org
ccarroll@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*

Norman L. Eisen (Bar No. 435051)
Lindsay Zimliki (Bar No. 475890)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
T: (202) 601-8678
norman@democracydefenders.org