**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DC PRESERVATION LEAGUE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DEPARTMENT OF INTERIOR, et al.,<br><br>*Defendants*. | Case No. 1:26-cv-477-ACR |

**MEMORANDUM OPINION**

In five days—from Monday, October 5, 2026, to Friday, October 9, 2026—the Department of the Interior ordered, considered, and approved a plan to remove hundreds of trees from the East Potomac Golf Course.[1] Early the next morning, the National Park Service had bulldozers on site. By day's end, it had removed about 430 healthy, non-invasive trees.[2] From contracting through completion, the effort required coordination among officials and employees

[1] October 12, 2026, Rough Tr. 21:19–25, 22:1–3, 100:20–25, 101:1–5.

[2] *Id.* at 9:6–7, 39:16–21. It would have removed hundreds more but for a rain delay. Dkt. 76-1 at 8.

from across DOI.[3] The officials included the Deputy Chief of Staff for the Secretary of the Department of the Interior, Greg Wischer; the Acting Director of the NPS, Jessica Bowron; the Deputy Director of Operations for the NPS, Frank Lands; and the Superintendent of the National Mall and Memorial Parks, Kevin Griess.[4]

Breakneck speed to clear trees that posed no harm. The reason? Disputed. The budget? Unclear.[5] The environmental impact? Unstudied.[6] The urgency? None.[7] Next steps: bulldoze hundreds more.[8]

Plaintiffs ask the Court to temporarily restrain the Government from removing these additional trees.[9] They claim that the Tree Management Plan (TMP) is but one step in the Government's Washington National Plan, which, as Plaintiffs put it, seeks to "destroy East Potomac Golf Course."[10] They link the tree removal to President Donald J. Trump's pronouncement that the Department of the Interior would begin work on September 1, 2026, to "quickly" replace the East Potomac Golf Course with "one of the Greatest Golf Courses anywhere in the World."[11]

---

[3] Oct. 12 Rough Tr. at 16:13–18:11.

[4] *Id.* at 73:4–17, 75:4–10, 101:16–21, 104:9–23.

[5] *Id.* at 48:8–13.

[6] *See* Dkt. 76-1 at 9 (citing Kevin Griess, Categorical Exclusion Documentation Form (Oct. 9, 2026), https://perma.cc/ERL7-UHYV (CatEx Form 1)); Dkt. 76-2, Kevin Griess, Determination of NEPA Adequacy When Taking a New Proposed Action and Making a New Decision (Oct. 11, 2026) (CatEx Form 2).

[7] Oct. 12 Rough Tr. at 50:4–10, 78:17–21.

[8] Dkt. 76-1 at 8.

[9] *See generally id.*

[10] *Id.* at 7–8, 11.

[11] Dkt. 58 at 1 (citing Donald J. Trump, Truth Social (June 28, 2026, at 2:42 PM), https://perma.cc/E3HB-7AUL) (June 28 Post).

The Government claims that the TMP implements a 2019 Cultural Landscape Report and has nothing to do with the Washington National Plan.[12] It is a coincidence, the Government seems to suggest, that DOI cut down hundreds of trees at the Course weeks after the President asked DOI to cut down trees at the Course,[13] and not, say, any other time in the last seven years.

That asks rather a lot of coincidence. For now, Plaintiffs have satisfied the factors necessary for the Court to enter a temporary restraining order prohibiting further implementation of the TMP. They have shown a likelihood of success on jurisdiction: the individual plaintiffs regularly golf at East Potomac Golf Course, and the TMP is final agency action. They have also shown a likelihood of success on their National Environmental Policy Act (NEPA) claim as NPS likely failed to comply with that statute's procedural and "hard look" requirements. They have shown irreparable injury given that the imminent felling of hundreds of healthy, non-invasive trees has no adequate remedy at law.

And the balance of the equities favors Plaintiffs given the professed lack of any governmental interest in proceeding urgently to remove the remaining trees. At an October 12, 2026, emergency hearing, the Court heard from Griess, the individual who submitted the TMP for approval and oversees its implementation. The following exchange occurred:

> **The Court:** Is there any urgency of continuing with the tree removal?
>
> **Griess:** Not that I'm aware of, Your Honor.
>
> **The Court:** So the trees could be cut down tomorrow, or they could be cut down a month from now, and from the government's perspective, it's basically the same?
>
> **Griess:** From what I understand, Your Honor, yes.[14]

---

[12] Dkts. 41–44 (CLR); Dkt. 74-1 ¶ 7.

[13] *See* June 28 Post.

[14] Oct. 12 Rough Tr. at 50:4–10.

For the reasons explained below, the Court **GRANTS** Plaintiffs' Emergency Motion for Temporary Restraining Order.[15]

## BACKGROUND

This suit began in February 2026. Two frequent golfers at East Potomac Golf Course and a non-profit dedicated to preserving the Park sued NPS and DOI. They allege that the Government's decision to "replace the existing Golf Course with an elite championship-style course" violates several provisions of the Administrative Procedure Act. Dkt. 1 ¶ 94. Concerned that the Government would begin unlawful renovations, Plaintiffs also sought injunctive relief. *Id.* ¶¶ 1–7; Dkt. 8. The Government moved to dismiss for lack of jurisdiction and failure to state a claim and opposed any injunctive relief. Dkt. 34.

Since that initial stage, the Court has held multiple hearings to address the parties' competing motions and Plaintiffs' requests for injunctive relief.[16] Core to the Government's defense was its claim that no final agency action had occurred. There was, the Government repeatedly contended, "no final agency action" because it had not yet implemented the Washington National Plan. July 2, 2026, Tr. 18:11, 20:9–18; *see also* Dkt. 48 at 4. There was only "a goal," July 2 Tr. at 18:11, 22, and a "conceptual proposal," Dkt. 26 at 32, 40. Instead of entering injunctive relief, the Court agreed to accept the Government's repeated assurances that it would notify Plaintiffs and the Court of any major developments at the Course outside of ordinary maintenance. July 2 Tr. at 32:19–22, 34:9–17; September 3, 2026, Tr. 5:23–25.

---

[15] Dkt. 76.

[16] The procedural history in this case is complicated. The Court commends to the interested reader the case docket. The Court does not address this history in detail on this emergency posture.

On June 28, 2026, President Trump posted to Truth Social that—having just toured East Potomac Golf Course with "Tom Fazio, the Great Golf Course Architect," the DOI Secretary, and others from that department—"it was determined that . . . we will build one of the Greatest Golf Courses anywhere in the World." June 28 Post. "Work on the new Course, which will go quickly, will begin on September 1st," and "[i]t will be built through the Department of the Interior." *Id.*

Suffice it to say, Plaintiffs had questions. At a hearing on July 2, 2026, the Government maintained that no final agency action had occurred, even though it acknowledged that "NPS and Interior are now trying to meet that schedule." July 2 Tr. at 8:19–9:11. "From the President's mouth to their ears, Your Honor." *Id.* at 9:4–5.

Plaintiffs asked again that the Court enter an injunction, or at least a formal order requiring notice before the Government took any action on the Course. *See id.* at 70:5–23. But the Court had not yet seen a basis to act. It stated, "if we get bulldozers on site and they start mowing down half the golf course, . . . that's irretrievable, which is why the one thing I have done is ask them not to do that before giving us all notice." *Id.* at 60:6–10. The Court opted instead to trust the Government to provide appropriate notice:

> **The Court:** I want all you guys to get together in some meeting and figure out some language that your client will agree to that I sign off on, and it's not going to be an injunction. The only reason I'm not making an injunction order is because I don't want to put people through contempt proceedings. I want to trust that people are acting in good faith and have them acting in good faith until proven otherwise, and you have not proven otherwise to me in this litigation.

*Id.* at 91:13–21.

In August, NPS removed dozens of trees from East Potomac Golf Course. Plaintiffs again had questions. The Government explained that those trees met "one of four criteria":

"hazardous, dead, dying, or invasive." Sept. 3 Tr. at 7:1–2. "[O]ut of the approximately 3,800 trees in the park, there were 77 invasives that were removed, and 73 dead, dying or hazardous that were removed." *Id.* at 7:5–7. "Now there's also some additional trees that the government has identified that will be subject to removal based on these criteria, no other criteria." *Id.* at 8:17–19. "But there is no implementation of a new design. We're talking less than 4 percent of the total trees at the golf course that are being removed right now underneath these four criteria." *Id.* at 9:7–10.

Plaintiffs yet again requested that the Court order the Government to provide notice before additional removals commenced. *See id.* at 24:18–20, 25:1–4. But the Court took the Government at its word that "no other criteria" or plan existed for removing trees, *id.* at 8:19, since removing "live, healthy trees" was something altogether different, *id.* at 13:10–16. And in declining to enter a formal notification order, the Court had the following exchange with Government counsel:

> **The Court:** You know, my concern has always been from a place of—and I think that, you know, someone just showed me a New York Times article about this recently, something about how, you know, the administration's sort of improvement plans are just plans or—until they're not, until they're sort of already done. And what I've said from the get-go is that what I do not want is to be here with a fait accompli. And I have made that very, very clear. I've made that clear to [Counsel]. I think [Counsel] fully understands that. And I am quite confident that the last thing [Counsel] wants to do is come up here and tell me that something has happened that's irrevocable, and that is an implementation of a plan that no one had notice of. Right, [Counsel]?
>
> **Counsel:** Yes, Your Honor.
>
> **The Court:** Okay. So I'm not—so if—I mean, I have no reason to disbelieve what he's telling me. And if you don't have any reason to disbelieve what he's telling me, then I don't think anything wrong has happened here. Because they have just been doing what I said they could do, which was continue to get rid of the invasive trees or to deal with the dying trees.

*Id.* at 11:1–22.

Through it all, the Court has repeatedly declined to play "parks and rec" with the parties. May 4, 2026, Tr. 12:11. The Court has given the Government "the benefit of the doubt" that it would not "act first and ask forgiveness later." *Id.* at 12:22, 23:7.

The Government then did precisely what Plaintiffs feared. Sometime between the September 3 hearing and October 2, plans moved from removing only hazardous, dead, dying, or invasive trees to removing hundreds of healthy, non-invasive trees. And then it removed them without providing meaningful notice to Plaintiffs or the Court.

Specifically, sometime in September, Griess asked his staff to provide him with a tree management plan. Oct. 12 Rough Tr. at 44:9–11. On October 2, he received the TMP from one of his architects. *Id.* at 45:2–46:7. The TMP purports to implement "certain vegetation treatment recommendations included in" a June 2019 Cultural Landscape Report, titled "National Park Service Golf Courses in the District of Columbia: East Potomac Park, Langston, and Rock Creek: Treatment Guidelines."[17] Dkt. 74-1 ¶ 7. Griess submitted the TMP and funding request to NPS on October 5; Bowron authorized execution of the TMP the next day. Oct. 12 Rough Tr. at 21:17–22:23.

At some point on October 5, Wischer directed Lands to implement the CLR (as it related to the East Potomac Golf Course) "as soon as practical." *See id.* at 95:6–97:4. Agency counsel attended this meeting. *Id.* at 77:13–17. Wischer did not explain the urgency, *id.* at 96:1–9, and both Griess and Lands testified there was (and remains) none, *id.* at 50:4–6, 78:17–19, 111:9–12.

---

[17] The CLR recommended treatment guidelines for three golf courses in Washington, D.C. *See* Dkts. 41–44. The Government here pursued the CLR's recommendations only with respect to East Potomac Golf Course.

For his part, Griess initially stated in a written declaration that the work began in October 2026 because he had "now received temporary workforce support" and "additional budgetary resources." Dkt. 74-1 ¶ 6. The workforce issue remains unclear. But Griess later testified that he had not received any additional budgetary resources. Oct. 12 Rough Tr. at 31:13–33:15. He could have submitted the TMP, from a budgetary perspective, at any point. *Id.* at 32:23–33:2.

Despite the lack of any urgency, people acted urgently. During the week of October 5, a spate of officials worked on developing and implementing the TMP. *See id.* at 106:3–23. This included coordinating various entities and individuals at "headquarters, region, and park level." *Id.* at 105:23–25. Griess announced the culmination of these efforts in a Categorical Exclusion Documentation Form dated October 9. He deemed the plan "routine maintenance" that, since it "is consistent with established preservation objectives for the historic cultural landscape," is categorically exempt from further NEPA analysis. *See* CatEx Form 1 at 5.

The Government acted urgently—internally, that is. There was no comparable rush when it came to providing Plaintiffs or the Court notice of the TMP. The Government did not provide any notice until 4:55 p.m. on Friday, October 9. Dkt. 74. That is, a week from when Griess received the draft plan and four days from when agency counsel first became aware something was afoot. Oct. 12 Rough Tr. at 45:2–46:7, 96:23–97:9. The notice, when it came, announced that NPS planned to remove "up to 529 trees" from the Course to "restor[e] and maintain[] the Golf Course's historic links-style character." Dkt. 74-1 ¶¶ 13, 20. The Government planned to begin removal the next day in Zone A, which it estimated contained 169 trees. *Id.* ¶ 19.

And, indeed, beginning around 8:00 a.m. on Saturday, October 10, the Government razed nearly 430 trees, none of which were hazardous or posed safety concerns. *See* Dkt. 76-1 at 7; Oct. 12 Rough Tr. at 39:16–21. The next day, Griess signed off on "additional removals" of

"immature" trees in a second Categorical Exclusion form. CatEx Form 2 at 2. Today, about 300 additional trees are on the literal chopping block. Oct. 12 Rough Tr. at 12:18–20.

Plaintiffs, caught off guard by Defendants' late-breaking October 9 notice, asked to meet and confer. The parties met on Sunday, October 11. Dkt. 76-1 at 7–8. Plaintiffs then learned three things. First, the "operation was proceeding 'faster than anticipated.'" *Id*. at 8. Second, "contrary to [Griess's] Friday declaration[,] hundreds of additional trees would be felled imminently." *Id.* Third, "the tree-razing w[ould] resume as soon as the weather permits." *Id*.

Late that evening, Plaintiffs moved for a TRO. Dkt. 76. They claim that NPS and DOI violated NEPA by failing to comply adequately with the statute's procedural and substantive requirements before cutting down hundreds of trees on the East Potomac Golf Course. *See* Dkt. 76-1 at 9–10.

The Court ordered Defendants not to remove any more trees until 7:00 a.m. on October 13, 2026. Min. Order (Oct. 12, 2026). The Court held an emergency hearing on October 12, at which Griess and Lands testified, and the Court extended the stay until 2:00 p.m. This opinion follows.

**STANDARD**

To obtain a temporary restraining order, a plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Where, as here, a movant seeks to enjoin the government, the final two factors merge "because the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## DISCUSSION

### I. Likelihood of Success

#### A. Standing

##### 1. Recreational and Aesthetic Injuries

Plaintiffs must show a likelihood of success that they have standing. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). To do so, "plaintiffs must state a plausible claim that they have suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Id.* (cleaned up). The injury must be "concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

"If at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). And so, for now, the Court will address only the individual plaintiffs' standing. Plaintiffs Alex Dickson and Dave Roberts frequent the East Potomac Golf Course. Dkt. 8-4 ¶¶ 5–6; Dkt. 8-6 ¶ 2. Dickson visits the Course "at least a few times a month, often more," Dkt. 8-4 ¶ 6, and Roberts visits "at least once per month," Dkt. 8-6 ¶ 2. At the Course, the men often play golf alone, with friends, or with their children. Dkt. 8-4 ¶¶ 6–8, 10; Dkt. 8-6 ¶¶ 9–11, 17. Both men appreciate the Course's "deep sense of history" and "beauty." Dkt. 8-4 ¶¶ 12, 17–18; *see* Dkt. 8-6 ¶¶ 12, 20, 22. And both men benefit from the Course's public status, which makes it accessible to "average . . . working-class golfers" who may not be able to afford private courses. Dkt. 8-4 ¶¶ 14–15, 20; *see* Dkt. 8-6 ¶ 20. Plaintiffs also credit the Course's welcoming, communal environment to its public status. Dkt. 8-4 ¶ 15; Dkt. 8-6 ¶ 15.

Plaintiffs allege that the Government's implementation of the Washington National Plan, in part through the TMP, would harm their "recreational, aesthetic, historical, and communal

interests in East Potomac Park and East Potomac Golf Course." Dkt. 76-1 at 13. Dickson and Roberts have both stated that they would not—and could not—continue playing with the same frequency if renovations proceed. Dkt. 8-4 ¶ 21; Dkt. 8-6 ¶¶ 21, 25.

At this juncture, the individual plaintiffs have met their burden to establish standing.

***Concrete Injury.*** Plaintiffs present concrete injuries: the infringement of their recreational and aesthetic interests. Dkt. 8-4 ¶ 19; Dkt. 8-6 ¶ 25. "It is well established that environmental plaintiffs adequately allege standing when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Ctr. for Bio. Diversity v. DOI*, 144 F.4th 296, 305–06 (D.C. Cir. 2025) (collecting cases) (cleaned up). And so it is here. Plaintiffs use East Potomac Golf Course; enjoy its recreational and aesthetic benefits; and would decrease their use if the Washington National Plan proceeds. Dkt. 8-4 ¶¶ 6–8, 12, 17–18, 21; Dkt. 8-6 ¶¶ 2, 9–12, 17, 20–22, 25.

True, the Supreme Court recently reaffirmed in a per curiam order that "mere offense, disagreement, or distaste does not qualify as a concrete and particularized injury under Article III." *NPS v. Nat'l Tr. for Historic Pres. in the U.S.*, No. 26A203, 2026 WL 2564318, at *2 (Aug. 31, 2026) (per curiam). But, in the same order, the Court also reaffirmed that it has "found standing in certain environmental cases where the plaintiff's injuries involved *more* than mere offense," such as an interference with the plaintiff's "recreational interests." *Id.* Plaintiffs do not allege mere offense at the activities at East Potomac Golf Course: Plaintiffs' declarations detail specific recreational and aesthetic interests, including Plaintiffs' intent to continue playing golf on the Course. Dkt. 8-4 ¶ 19; Dkt. 8-6 ¶ 25.

***Imminence.*** Plaintiffs' threatened injuries are imminent. The Government has already cleared hundreds of trees and has stated its intent to clear "hundreds of additional trees." Dkt. 76-1 at 8. Only the vagaries of Mother Nature—and then this Court's equitable powers—halted the Government's tree-clearing operations. *See id.*

***Traceability and Redressability.*** Plaintiffs' injuries are fairly traceable to the Government's conduct and likely to be redressed by a favorable decision. The Government's rapid implementation of the TMP caused Plaintiffs' recreational and aesthetic injuries by "interfer[ing] with their longstanding use of a place that exists for that use." *Id.* at 20. And an injunction enjoining further tree-clearing would redress Plaintiffs' injuries by halting operations until the Government completes sufficient NEPA review. *Id.* at 21.

**2. Procedural Injury**

Plaintiffs also claim that they will suffer a procedural injury if the Government clears additional trees without first complying with NEPA's requirements. *See id.* at 29–30. The D.C. Circuit has recognized that a plaintiff's "injury may result from an agency action that failed to follow some statutorily required procedure, such as completing NEPA environmental review . . . prior to undertaking a specific action." *Ctr. for Bio. Diversity*, 144 F.4th at 304 (cleaned up). If Plaintiffs establish a procedural injury under NEPA, the imminence and redressability requirements "are somewhat relaxed." *Id.*

***Concrete Injury.*** Plaintiffs must show a violation of a procedural right and connect it to a substantive interest. *See Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). At this early stage, Plaintiffs adequately tie the Government's failure to comply with NEPA's procedural requirements to their concrete recreational and aesthetic interests: Plaintiffs assert that the Government's failure to adequately consider the environmental impacts of the TMP has

materially affected Plaintiffs' aesthetic and recreational interests in the Course. *See* Dkt. 76-1 at 20–21.

***Traceability.*** Plaintiffs have also shown that their procedural injury is traceable to the Government's implementation of the TMP. "[I]n a case alleging a procedural deficiency, an adequate causal chain must contain at least two links: one connecting the omitted [procedural requirement] to some substantive government decision that may have been wrongly decided because of the lack of [the procedural requirement] and one connecting that substantive decision to the plaintiff's particularized injury." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013) (cleaned up).

As to the first link, Plaintiffs need only "show that the procedural step was connected to the substantive result." *Id.* (cleaned up) Here, Plaintiffs have likely shown that the Government's expedited Categorical Exclusion procedures resulted in the premature implementation of the TMP. *See* Dkt. 76-1 at 15–17, 23–25. As to the second link, Plaintiffs have plausibly connected the Government's implementation of the TMP to the Washington National Plan, and therefore with their recreational and aesthetic injuries. *See id.* at 8.

***Imminence and Redressability.*** Plaintiffs easily satisfy the relaxed imminence and redressability requirements. "If the [Government] is required to adequately consider each environmental concern, it could change its mind about" proceeding with the TMP. *WildEarth Guardians*, 738 F.3d at 306. Here, that is enough.

**B. Final Agency Action**

Final agency action presents the closest call in the Court's analysis—an analysis made more difficult by this case's unique procedural posture.

Plaintiffs may sue under the Administrative Procedure Act for failure to comply with statutory requirements so long as the agency has undertaken a final agency action. *See* 5 U.S.C. §§ 704; 706(2)(C)–(D). A final action "mark[s] the consummation of the agency's decisionmaking process" and is the mechanism "by which rights or obligations have been determined" or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). An agency action does not escape review merely because the agency undertakes it to advance a broader policy; the action need only "reflect a discrete decision." *Hennepin Cnty. v. HHS*, No. 26-cv-2460, 2026 WL 2426300, at *7 (D.D.C. Aug. 19, 2026). Such an action is final when it is "not itself subject to further consideration by the agency." *NRDC v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020).

Plaintiffs have identified the TMP as a relevant final agency action. Dkt. 76-1 at 8–9. The TMP identifies, by zone and description, each tree to axe. *See id.* at 9–10 (citing CatEx Form 1). Griess finalized the TMP on October 5; Bowron approved it on October 6; NPS acted on it by removing approximately 430 trees on October 10; and, but for the weather, NPS would have removed hundreds more on October 11. *See id.* at 8; Oct. 12 Rough Tr. at 9:5–7, 11:12–16, 21:17–22:23, 47:9–12.

The Government insists that the Washington National Plan "remain[s] in the conceptual stage" and is therefore not final. Dkt. 75-3 ¶ 6. But the situation has changed materially on this point since Plaintiffs filed suit in February, including, for example, President Trump in June directing the Washington National Plan to commence on September 1, and the implementation of the TMP on October 10. June 28 Post; CatEx Form 1.

The Court need not determine the finality of the Washington National Plan. On this sparse record, the Court credits Plaintiffs' assertion that the TMP is a "distinct, if interrelated,

strateg[y] for implementing" the Washington National Plan. *Hennepin Cnty.*, 2026 WL 2426300, at *8. "An interim agency resolution counts as final agency action despite the potential for a different permanent decision," so long as the interim decision is the "final word from the agency on what will happen up to the time of any different permanent decision." *NRDC*, 955 F.3d at 78. The TMP is indisputably final, and so the Court may review it.

The Government contends that the TMP has nothing to do with President Trump's decision, much less this litigation. Dkt. 74-1 ¶ 16. It claims that the TMP merely implements the 2019 CLR. *Id.* ¶ 7. The Court is skeptical. Having not yet heard from Bowron or Wischer, the Court is left with the following facts. The President announced that work on the Washington National Plan would begin on September 1. *See* Dkt. 58 at 1. On October 5, Wischer instructed Lands to implement the CLR "as soon as practical" but provided no explanation for the urgency. *See* Oct. 12 Rough Tr. at 95:20–96:19. Griess testified there is none. *Id.* at 50:4–11. And Griess, at the emergency hearing, walked back his written claim that work began in October because budgetary resources had become available. *Id.* at 32:23–33:15. Even though the CLR covers numerous types of improvements (such as structure and boundary, along with vegetation) at each of D.C.'s three public golf courses, Dkts. 41–44, the TMP covers only tree removal at the East Potomac Golf Course, CatEx Form 1; CatEx Form 2. Coincidentally, then, NPS's only implementation of the 2019 CLR is consistent with the President's express desire to redesign the East Potomac Golf Course. *See* Oct. 12 Rough Tr. at 90:23–92:1; June 28 Post.

The Court concludes, on this limited record, that government officials raced to undertake the TMP because President Trump demands haste on his redesign, and not because of some newfound zeal to implement a small part of a seven-year-old CLR.

**C. NEPA Claim**

Plaintiffs are likely to succeed on the merits of their claim that the development of the TMP failed to comply with NEPA's procedural and substantive requirements.

NEPA ensures that agencies "take a hard look at the environmental consequences before taking a major action." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (cleaned up). It "requires agencies to prepare an environmental impact statement when they approve a major Federal action significantly affecting the quality of the human environment." *Sierra Club v. FERC*, 153 F.4th 1295, 1303 (D.C. Cir. 2025) (cleaned up). Alternatively, the agency must prepare an "environmental assessment" if it concludes that the action will not have a reasonably foreseeable significant environmental impact. 42 U.S.C. § 4336(b)(2).

NPS prepared neither an environmental impact statement nor an environmental assessment before implementing the TMP. Instead, NPS claims it documented compliance with NEPA through its publication of two Categorical Exclusion forms. Dkt. 74-1 ¶ 15; Oct. 12 Rough Tr. at 80:19–20. NPS published the first on October 9, the day before tree clearing began. *See* CatEx Form 1 at 10. It published the second on October 11, after it had razed 430 trees, 200 more than initially estimated. *See* CatEx Form 2 at 2, 6.

The NEPA Handbook requires that "before applying a categorical exclusion, each proposed action must undergo a review to determine that it applies and that no extraordinary circumstances exist (*see* 43 CFR 46.215)." 91 Fed. Reg. 8738, 8755 (Feb. 24, 2026). Extraordinary circumstances exist where, for example, the agency's proposed action would "[h]ave significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; [or] park, recreation or refuge lands." 43 C.F.R. § 46.215 (2026).

Griess certified that extraordinary circumstances did not apply, writing that "[t]he proposed action would not have significant impacts on [the] natural resources or unique geographic characteristics" of the historic East Potomac Golf Course. CatEx Form 1 at 5. The TMP, recall, was initially to remove hundreds of trees, including nearly every tree in the Course's interior. *See* CatEx Form 1 at 5–6, 10–11. Griess signed this certification on October 9, within one week of receiving the draft TMP and four days after sharing the TMP with Bowron. *See* Oct. 12 Rough Tr. at 34:5–8, 21:17–22:23, 45:20–23, 46:4–5.

On October 10, NPS knowingly destroyed two hundred additional trees "identified and removed beyond" what the first Categorical Exclusion form contemplated. *See* CatEx Form 2 at 2. "The initial assessment," Griess noted, "estimated approximately 169 trees within this area; however, the dense vegetation made it difficult to accurately identify and inventory individual trees. During removal activities, an additional 200 trees were identified and removed beyond the original estimate." *Id.* Griess attributed NPS's severe underestimate in the first Categorical Exclusion form to the size of the trees, which "generally rang[ed] from 3 to 5 inches in diameter at breast height." *Id.*

Perhaps. Or perhaps the oversight occurred because the agency's NEPA compliance efforts lasted mere days. Plaintiffs highlight that ahead of a similar tree-removal project at Rock Creek Golf Course in 2023, "NPS published an Environmental Assessment spanning more than 250 pages and needed six months of analysis to issue a Finding of No Significant Impact," which itself "ran more than 300 pages." Dkt. 76-1 at 27 & nn.5–6. Presumably that assessment of the forest did not miss half its trees.

Even at this preliminary stage, Plaintiffs have shown that it is unlikely that NPS and DOI complied with NEPA's "hard look" requirement before beginning tree removals. *See Balt. Gas*

*& Elec. Co.*, 462 U.S. at 97. At a minimum, Plaintiffs are likely to succeed on their claim that NPS ran afoul of NEPA by destroying the trees outside of those identified in the first Categorical Exclusion form. For obvious reasons, NEPA requires review before "resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

There is more. In the second Categorical Exclusion form, Griess highlights:

> Additional review is necessary to document the discrepancy between the estimated and actual number of trees removed, evaluate whether the additional removals resulted in effects beyond those previously assessed, and determine whether further analysis or consultation is warranted under the National Environmental Policy Act (NEPA), Section 106 of the National Historic Preservation Act (NHPA), or other applicable environmental compliance requirements.

CatEx Form 2 at 2. The record does not reflect whether NPS has undertaken this additional review, lending further support for a TRO preventing the Government from taking additional harmful action without proper analysis.

Plaintiffs also make a NEPA segmentation claim. *See* Dkt. 76-1 at 24. "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1326 (D.C. Cir. 2015) (cleaned up). The Court need not assess this claim now to grant Plaintiffs' motion. And it needs further briefing from the parties before it can assess it fully.

## II. Irreparable Harm

Plaintiffs must demonstrate that the harm they will suffer is "both certain and great" and "actual and not theoretical" to demonstrate irreparable harm meriting injunctive relief. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). They have met that burden.

This Court has previously held that "an *established* NEPA violation might rise to the level of irreparable harm when coupled with sufficient evidence of environmental injury." *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013). Here, the Court can measure the evidence of environmental injury by looking at the tree trunks littering Zone A of the East Potomac Golf Course and counting those trees left standing (for now) in Zones B and C. And, while by no means automatically, healthy tree removal can "clear the bar of irreparable harm." *Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 204–05 (D.D.C. 2015) (collecting cases).

When a plaintiff has demonstrated a "procedural violation of NEPA" as well as "a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009). The Court does not hesitate here. Plaintiffs note that if no injunctive relief is awarded, "the ground, landscape and vistas will be irrevocably altered" because "destroyed trees cannot be replaced."[18] Dkt. 76-1 at 29. And Rebecca Miller, the Executive Director of the DC Preservation League, has noted that implementation of the TMP at the Course will cause East

---

[18] Just ask the Lorax. As an aside, the Court has just learned that Dr. Seuss "work[ed] late into the night," toiling over how to depict "the smallish gopher-like creature called the Lorax" for "a full year." Cynthia Gorney, *Dr. Seuss*, Wash. Post (May 20, 1979), https://perma.cc/FL6F-NKTE. But then, while on vacation in Africa, Dr. Seuss—inspired by the sight of a herd of elephants—"'picked up a laundry pad and wrote the whole book that afternoon.'" *Id.* The Court has seen no elephants. And it has certainly had less than a year to write. But it very much appreciates that her clerks know something of late-night work and industrious afternoons.

Potomac Park to lose its designation criteria as a contributing site for East and West Potomac Park District's listing on the National Register of Historic Places. Dkt. 76-3 at 3. There is no adequate remedy at law for such harm.

### III. Balance of the Equities and the Public Interest

The balance of the equities tips sharply in favor of Plaintiffs. Lands, in his sworn testimony, could provide no reason that NPS needed to implement the TMP urgently. *See* Oct. 12 Rough Tr. at 78:17–21, 95:18–96:10. Griess further testified that no urgency exists in removing the remaining trees:

> **The Court:** Is there any urgency of continuing with the tree removal?
>
> **Griess:** Not that I'm aware of, Your Honor.
>
> **The Court:** So the trees could be cut down tomorrow, or they could be cut down a month from now, and from the government's perspective, it's basically the same?
>
> **Griess:** From what I understand, Your Honor, yes.

*Id.* at 50:4–10. And given that the Court has found that Plaintiffs are likely to succeed on the merits of their NEPA claim, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

On the other hand, Plaintiffs will suffer further irreparable harm if the trees in Zones B and C are axed in line with the Government's proposed TMP implementation, and would be left with no recourse at law, despite diligently pursuing these claims over several months.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiffs' Emergency Motion for Temporary Restraining Order, Dkt. 76. The Court **ORDERS** that the Temporary Restraining Order shall be in effect through Monday, October 26, 2026. Plaintiffs shall post a $1.00 bond in accordance with Federal Rule of Civil Procedure 65(c) by October 19, 2026.

A separate Order consistent with this Memorandum Opinion issues this day.

Date: October 13, 2026

ANA C. REYES
United States District Judge