**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DC PRESERVATION LEAGUE,

DAVE ROBERTS,

and

ALEX DICKSON,

*Plaintiffs*,

*vs.*

UNITED STATES DEPARTMENT OF THE INTERIOR;

DOUG BURGUM, in his official capacity as Secretary of the Interior;

NATIONAL PARK SERVICE;

and

JESSICA BOWRON, in her official capacity as "Comptroller Exercising the Delegated Authority of the Director" of the National Park Service,

*Defendants*.

Case No. 1:26-cv-477-ACR

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR A PRELIMINARY INJUNCTION OR, ALTERNATIVELY,**
**FOR A STAY UNDER SECTION 705 OF THE ADMINISTRATIVE PROCEDURE ACT**

## TABLE OF CONTENTS

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 6

LEGAL ANALYSIS ........ 9

I. Plaintiffs are Likely to Succeed on the Merits. ........ 10

A. Plaintiffs Are Likely To Establish Standing. ........ 10

1. Plaintiffs are likely to establish injury in fact. ........ 12

a. *DC Preservation League* ........ 12

b. *Individual Plaintiffs* ........ 15

2. Plaintiffs' Injuries are Directly Traceable to Defendants' Failure to Comply with NEPA. ........ 17

3. A Favorable Decision Will Redress Plaintiffs' Injuries. ........ 18

B. Plaintiffs Are Likely To Establish Final Agency Action and That Defendants Are Violating NEPA, Including By "Segmenting" Connected Elements of the Washington National Plan in an Effort to Avoid NEPA Review of the Full Plan. ........ 18

4. Defendants Have Reached Final Agency Action. ........ 18

5. Plaintiffs Are Likely to Succeed on the Merits of Their NEPA Claim. ........ 20

a. *No Logical Termini: Defendants Feign Adherence to a Cultural Landscape Report That Calls for Rehabilitating the Travis Design, Not Replacing It.* ........ 22

b. *No or Little Independent Utility Outside Major Golf Course Renovation.* ........ 24

c. *Moving Forward Will Thwart the No-Action Alternative.* ........ 25

d. *Defendants Admit That the Tree-Clearing Project Irretrievably Commits Federal Resources to a Project Closely Related to the Washington National Plan.* ........ 27

II. Plaintiffs Will Suffer Irreparable Harm Without Preliminary Relief. ........ 28

III. Balancing the Equities and Serving the Public Interest Both Favor Preliminarily Enjoining Defendants' Segmentation. ........ 30

CONCLUSION ........ 31

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*,
317 F.3d 334 (D.C. Cir. 2003) ........ 12

*Amoco Prod. Co. v. Village of Gambell, Alaska*,
480 U.S. 531 (1987) ........ 27

*Attias v. CareFirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017) ........ 10

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
462 U.S. 87 (1983) ........ 19

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 18

*Brady Campaign to Prevent Gun Violence v. Salazar*,
612 F. Supp. 2d 1 (D.D.C. 2009) ........ 27

*C.G.B. v. Wolf*,
464 F. Supp. 3d 174 (D.D.C. 2020) ........ 27

*Cal. Cmtys. Against Toxics v. EPA*,
928 F.3d 1041 (D.C. Cir. 2019) ........ 11, 15

*Citizens Action Coalition of Indiana, Inc. v. FERC*,
125 F.4th 229 (D.C. Cir. 2025) ........ 24

*Coal. on Sensible Transp., Inc. v. Dole*,
826 F.2d 60 (D.C. Cir. 1987) ........ 21, 25

*Comm. for Auto. Resp. v. Solomon*,
603 F.2d 992 (D.C. Cir. 1979) ........ 20

*Ctr. for Biological Diversity v. DOI*,
144 F.4th 296 (D.C. Cir. 2025) ........ 11

*Del. Riverkeeper Network v. F.E.R.C.*,
753 F.3d 1304 (D.C. Cir. 2014) ........ 3, 7, 20, 21

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........ 5

*District of Columbia v. Trump*,
810 F. Supp. 3d 19 (D.D.C. 2025) ........ 9

*Dole v. Williams Enters., Inc.*,
876 F.2d 186 (D.C. Cir. 1989) ........ 19

*Earthworks v. Dep't of the Interior*,
105 F.4th 449 (D.C. Cir. 2024)....................20

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996)....................11, 16, 17, 18

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
528 U.S. 167 (2000)....................11

*Fund for Animals v. Clark*,
27 F. Supp. 2d 8 (D.D.C. 1998)....................27

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025)....................9

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)....................12

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)....................27

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................10, 16

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990)....................14, 18

*Minisink Residents for Env. Pres. and Safety v. FERC*,
762 F.3d 97 (D.C. Cir. 2014)....................19

*Nat. Res. Def. Council, Inc. v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988)....................20

*Nat'l Automatic Laundry & Cleaning Council v. Shultz*,
443 F.2d 689, 702 (D.C. Cir. 1971) ....................19

*National Park Service v. National Trust for Historic Preservation in the U.S.*,
609 U.S. ___, No. 26A203, 2026 WL 2564318 (Aug. 31, 2026)....................16

*NRDC v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020)....................18

*Open Cmtys. All. v. Carson*,
286 F. Supp. 3d 148 (D.D.C. 2017)....................27

*R.I.L-R v. Johnson*,
80 F. Supp. 3d 164 (D.D.C. 2015)....................18

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)....................26

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025)....................20

*Sierra Club v. Jewell*,
764 F.3d 1 (D.C. Cir. 2014) .......... 11

*Simon v. E. Ky. Welfare Rts. Org.*,
426 U.S. 26 (1976) .......... 16

*Spann v. Colonial Vill., Inc.*,
899 F.2d 24 (D.C. Cir. 1990) .......... 13

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... 10, 14

*Sw. Airlines Co. v. Dep't of Transp.*,
832 F.3d 270 (D.C. Cir. 2016) .......... 18

*Talbott v. United States*,
775 F. Supp. 3d 445 (D.D.C. 2025) .......... 3

*Taxpayers Watchdog, Inc. v. Stanley*,
819 F.2d 294 (D.C. Cir. 1987) .......... 20, 21

*Thomas v. Peterson*,
753 F.2d 754 (9th Cir. 1985) .......... 20

*United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*,
517 U.S. 544 (1996) .......... 12, 13

*WildEarth Guardians v. Jewell*,
738 F.3d 298 (D.C. Cir. 2013) .......... 11, 17

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) .......... 9

**Statutes**

5 U.S.C. § 705 .......... 2, 5, 9, 28

42 U.S.C. § 4332 .......... 20
§ 4336 .......... 20
§ 4336a .......... 20

**Rules**

Fed. R. Civ. P. 15 .......... 6

**Other Authorities**

Categorical Exclusion Documentation Form of Kevin Griess, Nat'l Park Serv., U.S. Dep't of the Interior (Oct. 9, 2026), https://perma.cc/ERL7-UHYV .......... 9

Donald J. Trump, Truth Social (June 28, 2026, 2:42 PM), https://perma.cc/E3HB-7AUL ........................................................................................2, 5

Environmental Assessment, Rock Creek Park Golf Course Rehabilitation, Nat'l Park Serv., U.S. Dep't of the Interior (Sep. 2023), https://perma.cc/N5XG-UAER........................26

Findings of No Significant Impact, Rock Creek Park Golf Course Rehabilitation, Nat'l Park Serv., U.S. Dep't of the Interior (Mar. 28, 2024), https://perma.cc/B9X7-3LDV ..........26

Forbes Breaking News, '*It's Going To Bring A Lot Of Business': Trump Teases Renovations for East Potomac Golf Course*, YouTube (Jan. 12, 2026), https://perma.cc/4BUC-F9RY.........................................................................................1

Garrett Morrisson, *The National Links Trust's Battle with the Trump Administration, Explained*, Fried Egg Golf (Jan. 5, 2026), https://perma.cc/WG5B-KFH5..............................1

SAM.GOV, *A-E Design Support Services for Compliance Rehabilitate East Potomac Park Golf Course*, https://perma.cc/XHT5-PZ8F.......................................................................2

U.S. Gen. Servs. Admin., *Acquisition Gateway, Construction- East Potomac Park Rehab (Golf Course)*, https://perma.cc/7RXV-JYDQ (last visited Sep. 15, 2026) ............................................2

## INTRODUCTION

From the moment Plaintiffs filed this suit in February, Defendants have been saying one thing and doing another: insisting that there is no plan to destroy East Potomac Golf Course, but all the while implementing that plan piecemeal.

In October 2025, Defendants began dumping more than 37,000 cubic yards of dirt and debris on the golf course, contaminated with lead, arsenic, mercury, and various hydrocarbons. *See* Report of Brenda Foos at 9-10, ECF 72-12. On December 30, 2025, Defendants wrested control of East Potomac from the golf course's lessee. Garrett Morrisson, *The National Links Trust's Battle with the Trump Administration, Explained*, Fried Egg Golf (Jan. 5, 2026), https://perma.cc/WG5B-KFH5. In January 2026, President Trump confirmed a plan to convert East Potomac Golf Course into "a beautiful, world-class, U.S. Open-caliber course. Ideally, we're gonna have major tournaments there and everything else. It's going to bring a lot of business into Washington."[1] In May, evidence emerged of a fundraising campaign by President Trump's chief fundraiser to solicit "binding commitment[s]" of funding that "will be used" for construction of the new golf course. Pledge Agreement at 9, ECF 47-2. A few days later, Secretary of the Interior Doug Burgum posted a statement on social media announcing that "[t]he National Park Service will renovate East Potomac Golf Links. . . . Following this renovation, . . . East Potomac Golf Links will offer a top-tier 18-hole championship course capable of hosting pre-eminent tournament golf." Statement at 2, ECF 49-1. Later in the month, Defendant Burgum posted an illustration "unveil[ing] the design for the East Potomac Golf Links renovation from Fazio Design," and

[1] Forbes Breaking News, '*It's Going To Bring A Lot Of Business': Trump Teases Renovations for East Potomac Golf Course*, YouTube (Jan. 12, 2026), https://perma.cc/4BUC-F9RY.

reaffirmed that the renovated course "will offer . . . championship-quality golf." Statement at 2, ECF 50-1.

On June 28, 2026, Defendant Burgum, President Trump, and golf course architect Tom Fazio—who had been tapped to design the new course—made a site visit to East Potomac, along with someone holding an autographed copy of a golf course renovation rendering. Notice at 1, ECF 58. That same day, President Trump confirmed on social media that "it was determined that, on this site, . . . we will build one of the Greatest Golf Courses anywhere in the World," and that it "will have the ability to host Major Golf Tournaments, including The U.S. Open, The Ryder Cup, The PGA Championship, and other top PGA Tour events." *Id*; Donald J. Trump, Truth Social (June 28, 2026, 2:42 PM), https://perma.cc/E3HB-7AUL. Trump said that "[w]ork on the new Course, which will go quickly, will begin on September 1st." *Id.* Government counsel subsequently confirmed in Court that Defendants were "trying to meet that schedule." July 2 Tr. at 8:21. *See also id.* at 9:4-5 ("From the President's mouth to their ears, Your Honor.").

Sure enough, by September, NPS had begun conspicuous work throughout East Potomac Park, especially on and around East Potomac Golf Course: cutting down trees, pulling up fencing, and performing surveying work. Notice of Fact Dev., ECF 69. In mid-September, it came to light that Defendants had begun advertising for a contract to perform the plan's "construction" phase,[2] and that they had awarded a contract for "compliance" "support services" in connection with the plan.[3] And if any doubt remained about the plan's implementation, four days ago, on Saturday, October 10, Defendants—with barely 12 hours' notice to the Court and Plaintiffs—cut down

---

[2] U.S. Gen. Servs. Admin., *Acquisition Gateway, Construction- East Potomac Park Rehab (Golf Course)*, https://perma.cc/7RXV-JYDQ (last visited Sep. 15, 2026).
[3] SAM.GOV, *A-E Design Support Services for Compliance Rehabilitate East Potomac Park Golf Course*, https://perma.cc/XHT5-PZ8F.

hundreds of trees at East Potomac Golf Course on a single Saturday; if not for heavy rain, more trees were due to meet the same fate on Sunday. Mem. Op. ("TRO Op.") at 1 n1, ECF 79.

That clear-cutting operation prompted Plaintiffs to seek a temporary restraining order and now this motion for preliminary injunction, or in the alternative, a stay under 5 U.S.C. § 705. Defendants' execution of that operation—planned in haste on the orders of senior leadership in the Department of the Interior and purportedly justified as mere "routine maintenance" in a last-minute Categorical Exclusion analysis—constituted textbook "NEPA segmentation." Defendants sought to avoid their obligations under the National Environmental Policy Act to conduct a thorough review of the effects of their golf course plan by "divid[ing] connected, cumulative, or similar federal actions into separate projects and thereby fail[ing] to address the true scope and impact of the activities that should be under consideration." *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014).

Both in filings and in Court the next day, Defendants maintained that their unprecedented operation had nothing to do with the plan they'd spent the past year implementing but was instead motivated by their sudden interest in fulfilling the recommendations of a 2019 Cultural Landscape Report that had lain dormant for seven years. *See generally* Testimony of Dr. Kevin Griess (Oct. 12, 2026). But even accepting that the tree-razing operation might have been consistent with 2019 recommendations Defendants had long ignored, that does not mean the operation was not also a significant and irretrievable step toward further implementation of their plan to overhaul East Potomac Golf Course. And that is exactly what the record shows. In testimony at the October 12 TRO hearing, Dr. Kevin Griess, Superintendent of NPS's National Mall and Memorial Parks unit, and Frank Lands, Deputy Director for Operations at Interior, testified that orders to execute the clear-cutting operation came from the Secretary's Deputy Chief of Staff. They explained that

numerous NPS staff members were ordered to stop what they were doing to focus on developing and executing the operation. They testified that plans were underway days before Defendants provided notice. They acknowledged that Defendants have devoted no comparable resources or attention to any other recommendation in the 2019 CLR other than the tree-"management" recommendations that happen to align with the President's pet golf course project. And Mr. Lands testified that his orders were to execute the operation "as soon as practical," notwithstanding that both Dr. Griess and Mr. Lands acknowledged under oath that they knew of absolutely no urgency necessitating that timeline.

There are only two possible explanations, so "let's Occam's razor this. What is the more straightforward explanation?" *Talbott v. United States*, 775 F. Supp. 3d 445, 449 (D.D.C. 2025) (Reyes, J.).

First (and as Defendants would have Plaintiffs and the Court believe), every single bit of this is coincidence. In their telling, it is only coincidence that they suddenly took interest in tree-clearing to restore East Potomac's historical appearance when, as Plaintiffs have long alleged, tree-clearing also would be the first major step in the full-scale construction of a new golf course. It is coincidence, Dr. Griess said, that a "surge" in manpower and funding (in an amount neither Dr. Griess nor Mr. Lands even knew) suddenly became available to pursue this project. Oct. 12 Tr. at 18:5-14. *See also* Declaration of Dr. Kevin Griess (Griess Decl.) ¶ 6, ECF 48-1. It is coincidence, they say, that President Trump's top fundraiser led a campaign to solicit unrefundable donations for a new golf course plan when (in Defendants' telling) they have merely been spitballing a possible renovation. It is coincidence, they say, that Defendants dumped a "25 to 30 ft tall" hill of fill material on the golf course shortly before Mr. Fazio told a golf magazine that the material would be used not in day-to-day maintenance work but in his new course design. Expert Report

of James Connors at 19, ECF 72-13. *Compare to* Oct. 2025 Categorical Exclusion at 2, ECF 1-7 (fill material to be used in "ongoing golf course improvements"). It is coincidence that Defendant Burgum has publicly stated *twice* that East Potomac "will be" converted from a generally accessible, recreational-style facility to a championship-style venue and has "unveil[ed]" what he unequivocally called "*the* design for the East Potomac Golf Links renovation from Fazio Design" (emphasis added). Notice of Fact Dev. Ex. A, ECF 50-1. It is coincidence that Mr. Fazio, whom Defendant Burgum publicly linked to the project in May, toured East Potomac with Defendant Burgum and President Trump in June, mere hours before President Trump said, "Tom Fazio will be the Course Architect." Donald J. Trump, Truth Social (June 28, 2026, 2:42 PM), https://perma.cc/E3HB-7AUL. *Compare to* July 2 Tr. at 26:12-14 ("Your Honor, he's a public citizen who designs golf courses and the President was interested in what he had . . ."). It is coincidence, they say, that Mr. Lands has had multiple discussions about the East Potomac Golf Course with White House staff and with Mr. Fazio himself. Oct. 12 Tr. at 124:12-22. And it is coincidence that Defendants and their counsel chose not to alert the Court, Plaintiffs, or the public—despite the Court's repeated statements regarding its expectations to the contrary—to their tree-clearing operation until five minutes before close of business on a holiday weekend, barely 12 hours before the operation began, despite knowing days earlier that the operation would move forward and despite lacking any explanation for the sudden urgency.

That's Defendants' explanation. Plaintiffs' explanation, as it has been since the beginning, is that Defendants have adopted a plan to overhaul East Potomac—the Washington National Plan. And Defendants developed and carried out the razing of hundreds of trees on Saturday, on the basis of a flimsy Categorical Exclusion without any NEPA consideration of the plan as a whole, to further advance that plan under the guise of the 2019 CLR and to evade their NEPA obligations.

Courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). Defendants are implementing the Washington National plan. The tree-clearing operation was yet another step in that plan—one that Defendants segmented from the rest of the plan to circumvent NEPA and to ensure it would become a *fait accompli* before this Court had an opportunity to intervene. The Court should enter a preliminary injunction, or a stay under 5 U.S.C. § 705, to preserve the status quo pending the Court's resolution of Plaintiffs' claim that Defendants' adoption and implementation of the Washington National plan without any environmental review violated NEPA.

## FACTUAL BACKGROUND

On February 26, 2026, Plaintiffs instituted this action with a Complaint that asserted, among other things, that Defendants had adopted and begun implementing the Washington National plan without having performed a NEPA review first. Compl. ¶¶ 9, 67, ECF 1; Proposed Amended & Suppl. Compl. ¶¶ 9, 75, ECF 72-1.[4] This Motion for Preliminary Injunction relies only on that claim.[5] This recitation accordingly focuses on facts relevant to that claim, particularly Defendants' efforts to "segment" the Washington National plan into distinct parts in an effort to avoid their NEPA obligations to conduct an appropriate environmental review of the entire Washington National plan as a whole.

---

[4] On September 18, 2026, Plaintiffs filed a motion under Federal Rule of Civil Procedure 15 for leave to file an amended and supplemental complaint, with the proposed pleading attached as an exhibit. ECF 72. The parties agreed to a schedule for briefing the Rule 15 motion, which had not been completed when the tree-razing operation necessitated Plaintiffs' motion for a temporary restraining order. Contemporaneously with this motion, Plaintiffs are filing their Reply in support of the Rule 15 motion to enable a ruling on the Rule 15 motion forthwith, ahead of the Court's consideration of the motion for preliminary injunction.

[5] Compl. ¶¶ 103-08, ECF 1; *see also* Proposed Amended & Suppl. Compl. ¶¶ 124-29, ECF 72-1. Defendants have filed a motion for summary judgment to which Plaintiffs will respond in due course. Plaintiffs reserve all rights in regard to the claims that are not at issue in this motion.

Despite repeatedly instructing Defendants to provide “enough notice before some major thing happens” in the implementation of the Washington National plan at East Potomac Golf Course to allow Plaintiffs and the Court a meaningful opportunity to review and, if necessary, to act, Mot. Hr’g Tr. (“July 2 Tr.”) at 92:2-5, July 2, 2026, at 4:55 p.m. on Friday preceding the holiday weekend, Defendants announced their intent to begin—barely 12 hours later—a massive operation to clear 529 trees at East Potomac Golf Course. Griess Decl. ¶ 20, ECF 74-1. Plaintiffs received no more notice than the Court did and promptly contacted Defendants to request a conference to meet and confer.[6] By early morning on Saturday, Defendants’ workers had arrived in full force to begin felling hundreds of trees, including healthy, mature oaks and maples. Defendants’ counsel made themselves available to meet and confer in the afternoon of Sunday, October 11. Shortly before that conference, Defendants notified Plaintiffs that their tree-razing operation was proceeding “faster than anticipated” and that a total of 529 trees had already been destroyed on Saturday alone and that—contrary to their Friday declaration—hundreds of additional trees would be felled imminently.[7] As Defendants’ counsel explained during the meet-and-confer, only the rain on Sunday delayed further tree removal. Defendants’ counsel said that the tree-razing would resume as soon the weather permitted.[8]

[6] *See* Ex. A (Declaration of Will Bardwell).

[7] Shortly before, and again during, the parties’ meeting to confer regarding Plaintiffs’ motion for a TRO, Defendants’ counsel confirmed that 529 trees were cut on Saturday, October 10, comprising all the trees identified in Zone A in Defendants’ tree-cutting proposal, approximately 200 additional trees Defendants had discovered and removed in Zone A while conducting the operation, and the 90 trees removed in Zone B. *See* Bardwell Declaration. Defendants thus appear to have stopped cutting on Saturday because they reached the limit of the number of trees approved for removal in their original plan. At the TRO hearing on October 12, counsel indicated that “approximately 430” trees had been removed on Saturday. Oct. 12 Tr. 10. Based on the discussion during the meet-and-confer, Plaintiffs understand that figure to refer to the number of trees removed from Zone A alone.

[8] Defendants’ counsel represent that they oppose this motion.

On Sunday evening, Plaintiffs moved for a temporary restraining order to halt further tree-cutting on the golf course. Plaintiffs sought that relief on their NEPA claim based on the Defendants' evident evasion of their NEPA obligations. As Plaintiffs have asserted since this case's inception, implementing the Washington National plan will require massive tree-clearing. Compl. ¶ 85, ECF 1 (Washington National plan "will likely entail, at a minimum, removal or relocation of hundreds of trees"); *see also* Proposed Amended. & Suppl. Compl. ¶ 103, ECF 72-1 (Washington National plan "will entail, at a minimum, the near-certain removal or relocation of hundreds of trees"). And before the weekend's operation, Defendants had already undertaken significant tree removal, characterizing it each time as mere "routine maintenance." Given the unprecedented scale of the weekend's clear-cutting, in the context of Defendants' numerous other actions to implement the Washington National plan, Plaintiffs contended in their TRO motion that Defendants' tree-razing operation constituted classic "NEPA segmentation"—avoiding their obligations under the National Environmental Policy Act by "divid[ing] connected, cumulative, or similar federal actions into separate projects and thereby fail[ing] to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. F.E.R.C.*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). Defendants had prepared a conclusory Categorical Exclusion, published on Friday, October 9, 2026, declaring that the "tree management" project—described then as the razing of 529 trees—would simply be yet another instance of "routine maintenance" exempt from NEPA's requirements. Categorical Exclusion Documentation Form (CE Form) of Kevin Griess, Nat'l Park Serv., U.S. Dep't of the Interior (Oct. 9, 2026), https://perma.cc/ERL7-UHYV. On Sunday, October 11, 2026, after the total of 529 was reached on the first day of the project alone, Defendants hastily prepared and provided to Plaintiffs a supplement to the Categorical Exclusion explaining that NPS had undercounted the targeted

number of trees, that hundreds more would be removed, but that the project nevertheless still qualified for exclusion from any NEPA review under NPS's categorical exclusion for "routine maintenance." Mem. in Supp. of Emergency Mot. for TRO, ECF 76-2. But neither of these documents evaluated the environmental effects of the Washington National plan as a whole or considered the tree-clearing as part of that project, despite the tree-clearing's close relationship to that plan and despite Defendants' having acknowledged that they are working toward bringing that project to fruition.

In the face of this overwhelming evidence and flagrant disregard for NEPA, the Court entered an order pausing the tree-cutting operation pending an emergency hearing and then entered a Temporary Restraining Order on Tuesday, October 13, 2026, to last through Monday, October 26, 2026. The TRO enjoined Defendants from "fell[ing] any further trees at East Potomac Golf Course." Oct. 12 Minute Order. Given Defendants' failure (despite counsel's promises) to provide any meaningful notice in advance of the tree-cutting operation, the Court further ordered Defendants to "provide the Court and Plaintiffs three business days' written advance notice prior to making any irreparable modification to any permanent form or feature of the East Potomac Golf Course." The Court entered a schedule for briefing Plaintiffs' motion for preliminary injunction and set a hearing for October 19. Oct. 12 Minute Order.

## **<u>LEGAL ANALYSIS</u>**

A plaintiff must make the same four familiar showings to obtain either a stay under 5 U.S.C. § 705 or a preliminary injunction: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). Where

the government opposes preliminary relief, the third and fourth factors merge. *Id.* "The same factors governing the issuance of a preliminary injunction govern the issuance of relief under section 705." *District of Columbia v. Trump*, 810 F. Supp. 3d 19, 35 (D.D.C. 2025).

## I. Plaintiffs are Likely to Succeed on the Merits.

### A. Plaintiffs Are Likely To Establish Standing.

The parties have extensively briefed Plaintiffs' standing in prior filings on Defendants' motion to dismiss, which the Court denied without prejudice. Minute Order (Sept. 4, 2026). On Friday, October 9, in response to Plaintiffs' Rule 15 motion to file an amended and supplemental complaint, Defendants renewed these arguments in a motion for summary judgment that, like their previous motion to dismiss, rests on several disputed issues of fact. Defs.' Combined Resp. in Opp'n to Pls.' Rule 15 Mot. and Mot. for Summ. J., ECF 75. Plaintiffs will respond to that motion in due course. For present purposes, Defendants' ongoing clear-cutting operations only bring into sharper relief the injuries Plaintiffs suffer from Defendants' conduct and the resulting need for a preliminary injunction.

Plaintiffs are two individual golfers and a historic preservation membership nonprofit organization. Plaintiffs Dave Roberts and Alex Dickson have recreational, aesthetic, historical, and communal interests in East Potomac Park and East Potomac Golf Course that are injured by both Defendants' adoption and implementation of the Washington National plan and by Defendants' dumping of contaminated debris from the demolition of the East Wing on the golf course. Decl. of Alex Dickson ("Dickson Decl.") ¶¶ 6, 7, 12, 14, 15, 17, 19-22, ECF 8-4; Decl. of Dave Roberts ("Roberts Decl.") ¶¶ 15, 16, 20-27, ECF 8-6. Plaintiff DC Preservation League ("DCPL") has associational standing to sue on behalf of its members, who likewise have particularized recreational, aesthetic, historic, and communal interests in East Potomac Park and

East Potomac Golf Course that are injured by Defendants' actions. Second Declaration of Rebecca Miller, ¶¶ 19-22, ECF 76-3. Furthermore, DCPL has organizational standing because Defendants' actions impede opportunities to solicit donations and memberships and require diversion of its resources. *Id.* ¶¶ 5, 8-13, 18. All Plaintiffs have been denied their procedural rights to protect concrete interests through the procedural rights afforded them by NEPA.

To establish standing, a plaintiff must show an injury in fact that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical;" a "causal connection between the injury and the conduct complained of;" and that the injury likely will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up). Future injury can establish standing "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks and citation omitted); *see also, e.g.*, *Attias v. CareFirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017) ("Since [*Susan B. Anthony List*], we have frequently upheld claims of standing based on allegations of a 'substantial risk' of future injury."). "[E]nvironmental plaintiffs adequately allege standing 'when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.'" *Ctr. for Biological Diversity v. DOI*, 144 F.4th 296, 305 (D.C. Cir. 2025) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 183 (2000)); *see also Cal. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1049 (D.C. Cir. 2019) (finding standing because reasonable fear of harm from hazardous waste pollution caused petitioners reduced enjoyment of the outdoors). A plaintiff also adequately alleges standing for a procedural-rights claim by showing that the defendant's actions omitted a procedural requirement and that it is substantially probable that the procedural breach will cause the injury to the plaintiff's interest. *Fla. Audubon*

*Soc'y v. Bentsen*, 94 F.3d 658, 664-65 (D.C. Cir. 1996). Those standards are met here. *See* TRO Op. ("At this juncture, the individual plaintiffs have met their burden to establish standing.").

1. Plaintiffs are likely to establish injury in fact.

Plaintiffs face concrete and particularized injury from Defendants' adoption and implementation of the Washington National plan. Defendants' tree-clearing operation inflicted injuries in its own right, but it also confirms the imminence of the harms Plaintiffs face from the Washington National plan as a whole.

With regard to NEPA in particular, where a plaintiff asserts a procedural violation such as an agency's failure to conduct required NEPA review, they must show "the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *Fla. Audubon Soc'y*, 94 F.3d at 664 (regarding NEPA). "Aesthetic and recreational injuries" are actionable injuries in suits alleging NEPA violations. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013). Interfering with visitors' "appreciati[on]" of a site's "history" also supports standing. *Sierra Club v. Jewell*, 764 F.3d 1, 5 (D.C. Cir. 2014) (plaintiffs "who observe it for purposes of . . . appreciating its history[ ] would suffer a concrete and particularized injury"). So does interference with a person's emotional attachment to a social interaction, so long as the plaintiff intends to engage in such actions. *See Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 337 (D.C. Cir. 2003) ("emotional attachment" to an elephant that plaintiff "would like to 'visit' . . . again" "takes his claim out of the category of a generalized interest in ensuring the enforcement of the law"). All three Plaintiffs have such interests.

a. *DC Preservation League*

DCPL's membership includes individuals who have suffered and will continue to suffer particularized injuries, and DCPL has associational standing to assert claims on their behalf. An

organization has associational standing if (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

First, DCPL includes members with particularized interests that are harmed by Defendants' actions, *infra*; its mission of "preserving the historic and cultural resources of the District of Columbia" and "advocat[ing] for the protection, enhancement, and celebration of Washington's built environment" is germane to its members' interests, Miller Decl. ¶¶ 4-5; and its members' individual participation is not necessary. *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) ("'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members" (quoting *Hunt*, 432 U.S. at 343)). As described in greater detail in the supplemental declaration of DCPL's executive director, Rebecca Miller, "[s]everal" of its members "often visit East Potomac Park to go walking. They enjoy walking there, and they have plan[s] to continue doing so." ECF 76-3 (Miller Decl. ¶ 20). Because of East Potomac Park's flat land, "East Potomac's landscape [is] particularly important to our members." *Id.* Furthermore, "[s]everal" DCPL members "regularly play golf at East Potomac Golf Course and plan to continue doing so." *Id.* ¶ 21. Crucially, "[a] number of those members specifically enjoy East Potomac Golf Course's history, architecture, landscape, and recreational opportunit[ies] while playing golf at East Potomac Golf Course." *Id.* Executive Director Miller—who herself is a DCPL member—"plan[s] to take" her son bicycling at East Potomac Park. *Id.* ¶ 22. She enjoys taking him there "because it is flat and easy to teach a kid how to ride a bike." *Id.* She also "enjoy[s] looking at the Japanese cherry trees and the landscape as a whole," and she "plan[s] to continue visiting East Potomac Park." *Id.* Second, the League's

mission of "preserving the historic and cultural resources of the District of Columbia" and "advocat[ing] for the protection, enhancement, and celebration of Washington's built environment" is germane to its members' interests. *Id.* ¶¶ 4-5. Third, its members' individual participation is not necessary because the League seeks injunctive relief. *United Food*, 517 U.S. at 546.

DCPL also has suffered and will continue suffering particularized injuries as an organization. *See Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (plaintiff seeking organizational standing "must show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision"). For instance, the League hosts a historic sites app with 60 different self-guided tours, including thematic tours such as a recreation-themed tour. Miller Decl. ¶ 6. East Potomac Golf Course is part of that tour. *Id.* The Washington National plan will alter East Potomac ahistorically and permanently, and if that happens, DCPL "would have to change [its] app and website to remove the listings." *Id.* ¶ 8. By advancing Defendants' implementation of the Washington National plan, Defendants' razing of more than 500 trees makes even clearer that such an injury is "certainly impending." *Susan B. Anthony List*, 573 U.S. at 158.

Furthermore, DCPL has suffered procedural injuries. NEPA affords Plaintiffs the right to receive information about proposed projects and to provide comments on them in order to protect their interests in continued recreational use and aesthetic enjoyment of East Potomac Park. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990) (recognizing such interests as among the sorts of interests NEPA protects). By proceeding with further implementation of the Washington National plan without conducting the thorough review NEPA requires, Defendants have deprived

DCPL of the opportunity to participate in those processes and, through them, to influence Defendants' decisions.

b. *Individual Plaintiffs*

Plaintiff Dave Roberts plays golf at East Potomac "frequently." Roberts Decl. ¶ 2. He enjoys recreational and aesthetic benefits from East Potomac Golf Course. *See, e.g.*, *id.* ¶ 13 ("For the past five years, the greens at East Potomac have been in impeccable shape. For public golfers like me, that's the biggest thing that you want: an opportunity to have putts that roll true."); *id.* ¶ 14 ("I didn't realize it until NLT took over the course, but before they came along at East Potomac, there was almost no connection between the golf course and the surrounding area. . . . [E]ven though the Potomac River is right there, you couldn't see it. Now, it's omnipresent. . . . It's all added up to make East Potomac a great golf experience."). He enjoys a sense of community. *Id.* ¶ 15 ("You don't just play and go home. East Potomac is more communal than that."). Roberts plans to continue golfing at East Potomac Golf Course, unless and until Defendants finish implementing the Washington National plan. *Id.* ¶ 21 ("If it happens, then I don't think I'd ever go back. It wouldn't be the same. It will have cost me a golf course that I think is a lot of fun to play. It wouldn't look the same to me. It wouldn't feel historically important to me anymore."). The debris dumped on the course as part of the Washington National plan has already harmed Roberts's enjoyment and aesthetic interests. *Id.* ¶ 24.

Plaintiff Alex Dickson considers East Potomac his "home course." ECF ___ (Dickson Decl. ¶ 5). He visits East Potomac "at least a few times a month," *id.* ¶ 6, and "plan[s] to keep playing East Potomac as often as [he] currently do[es]," *id.* ¶ 21, as long as possible. Dickson also plans to take his youngest son to East Potomac to start playing golf, "because the Red Course as it exists now is perfect for teaching beginners." *Id.* ¶ 14. Dickson is worried, though, about the effects of inhaling particles from the potentially hazardous debris dumped on the White Course as

part of the implementation of the Washington National plan. "I am also concerned about the large mounds of debris I have seen sitting on the course. I worry about what I, my family, and my friends are being exposed to while we play. Being near this debris for hours raises real questions about whether it is safe to be that close to that material." *Id.* ¶ 22; *Cal. Cmtys. Against Toxics*, 928 F.3d at 1049 (finding standing where reasonable fear of harm from pollution caused petitioners reduced enjoyment). Dickson wants East Potomac's historic designs to stay in place, so that he can continue enjoying them consistent with their historical value. Dickson Decl. ¶¶ 14, 19, 21.

Dickson appreciates East Potomac Golf Course's "historical importance." Dickson Decl. ¶¶ 11-13, 21. "To me," he says, "East Potomac is one of the most beautiful places in Washington, due to the inherent appearance of the park and golf courses . . . . Turning [it] into a championship-style course built to attract a major professional tournament would ruin that beauty." *Id.* ¶ 18. Likewise, "[i]f East Potomac is converted into what the President has described, the beauty, fun, history, accessibility, and the sense of community that bring [him] and others to the course will be lost." *Id.* ¶ 19; *see also id.* ¶ 14 ("[T]urning this into a single championship course means losing two public courses that I and other people can actually play.").

The Washington National plan injures all these interests by irreversibly displacing the source of all three Plaintiffs' interests. The Supreme Court's recent emergency-docket opinion granting a stay in *National Park Service v. National Trust for Historic Preservation in the U.S.*, 609 U.S. ___, No. 26A203, 2026 WL 2564318 (Aug. 31, 2026), underscores that these injuries establish Plaintiffs' standing. In that case, the Court reaffirmed that although "mere offense, disagreement, or distaste does not qualify as a concrete and particularized injury under Article III." *Id.* at *2, a plaintiff has standing "where the plaintiff's injuries involve[ ] *more* than mere offense," *id.* (emphasis in original), such as when "harmful pollutants" were discharged into a river

that an outdoorsman frequented, or whether a plaintiff has "recreational interests" in a place. *Id.* These are the injuries that Plaintiffs assert and have asserted since before the Supreme Court issued its opinion in *National Trust*. Dickson Decl. ¶¶ 14-15, 17-22; Roberts Decl. ¶¶ 15-16, 20, 22-26; Miller Decl. ¶¶ 19-22. As this Court concluded, "Plaintiffs do not allege mere offense at the activities at East Potomac Golf Course: Plaintiffs' declarations detail specific recreational and aesthetic interests, including Plaintiffs' intent to continue playing golf on the Course." TRO Op. at 11.

2. Plaintiffs' Injuries are Directly Traceable to Defendants' Failure to Comply with NEPA.

For a plaintiff to show a "causal connection" between their injury and a defendant's conduct, the injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Defs. of Wildlife*, 504 U.S. at 560 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)); *Fla. Audubon Soc'y*, 94 F.3d at 665. Where, as here, a plaintiff's procedural rights are at stake, "an adequate causal chain must contain at least two links: one connecting the omitted [procedural obligation] to some substantive government decision that may have been wrongly decided because of the lack of [procedural compliance] and one connecting that substantive decision to the plaintiff's particularized injury." *Fla. Audubon Soc'y*, 94 F.3d at 668 (failure to generate EIS in a NEPA case). In this case, the causal chain is easily established. Despite not complying with NEPA, Defendants adopted and have begun to implement the Washington National plan as evidenced by their dumping of debris from the East Wing demolition, their termination of NLT's lease, their numerous public statements confirming the plan to destroy East Potomac and construct a new championship-style golf course, their previous tree-clearing projects, and their forecasting and awarding of contracts relating to the plan. The tree-clearing operation on October 10

significantly and irretrievably advanced that plan further by the unprecedented clearing of more than 500 trees so far, with hundreds more to follow absent relief—an irreparable loss that helps clear the way for the destruction of East Potomac Golf Course and inflicts direct injuries in its own right. Without performing the rigorous review that NEPA requires—including consideration of reasonable alternatives and consideration of public input about the harms the Plan will cause—Defendants wrongly decided to move forward with the plan despite the significant harms their actions will inflict on the human environment and without affording Plaintiffs an opportunity to participate in NEPA's required review procedures.

3. A Favorable Decision Will Redress Plaintiffs' Injuries.

A preliminary injunction on Plaintiffs' claim that Defendants have violated NEPA by adopting and implementing the Washington National plan without performing the advance review that NEPA requires, and by segmenting the ongoing clear-cutting project for separate NEPA review, would require Defendants to stop the tree-clearing during this litigation (unless and until they have evaluated the full plan's environmental impacts and considered reasonable alternatives—including the alternative of not moving forward at all, *see WildEarth Guardians*, 738 F.3d at 306 ("if [agency] is required to adequately consider each environmental concern, it could change its mind about" its decision)).

**B. Plaintiffs Are Likely To Establish Final Agency Action and That Defendants Are Violating NEPA, Including By "Segmenting" Connected Elements of the Washington National Plan in an Effort to Avoid NEPA Review of the Full Plan.**

4. Defendants Have Reached Final Agency Action.

APA review is available when plaintiffs have been "adversely affected or aggrieved . . . by some final agency action." *Fla. Audubon Soc'y*, 94 F.3d at 665 (quoting *Nat'l Wildlife Fed'n*, 497 U.S. at 882-83). For agency action to be "final," the action must (1) "mark the 'consummation'

of the agency's decisionmaking process," and (2) "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted).

Here, Defendants consummated their decisionmaking process by deciding to adopt the Washington National plan and have been implementing the plan since late 2025. The best proof is their own conduct. "Agency action . . . need not be in writing to be final and judicially reviewable," *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015), and may be inferred from a consistent pattern of conduct, even when the government denies that the action exists. *Id.* at 176. "In assessing whether a particular agency action qualifies as final for purposes of judicial review, [courts] look[ ] to the way in which the agency subsequently treats the challenged action." *Sw. Airlines Co. v. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016). An agency action is final when it "is not itself subject to further consideration by the agency." *NRDC v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020).

Defendant Secretary Burgum has publicly admitted that the decision has been made. Proposed Am. and Suppl. Compl. ¶ 99. President Trump has confirmed this at least twice. *Id.* ¶¶ 98, 100. Additionally, among other things, Defendants dumped 37,000 cubic yards of contaminated debris to use as fill in the Washington National construction phase; they kicked out East Potomac's leaseholder; they toured the site with their chosen golf course architect with renderings in hand; they hired a consultant for (belated) legal compliance; and they advertised a contract for the Washington National plan's construction phase. Proposed Am. and Suppl. Compl. ¶¶ 11, 13-14, 91, 97, 100-101. Defendants executed this weekend's tree-clearing operation on orders from the Deputy Chief of Staff of the Department of Interior, whose job duties presumably do not ordinarily include tree management except when it implicates the interests of the Secretary

and the President. *See Nat'l Automatic Laundry and Cleaning Council v. Shultz*, 443 F.2d 689, 702 (D.C. Cir. 1971) (agency head approval is a "signpost[] of authoritative determination, finality[,] and ripeness"). And shortly after he gave that instruction, Defendants carried out the destruction of over 500 trees—a necessary and irretrievable step toward further implementation of the plan. Defendants' repeated pattern of behavior shows that the Washington National plan has been adopted and is moving forward.[9]

As the Court concluded in granting the TRO, Defendants' tree-cutting operation itself is also a final agency action. TRO Op. 14-15. That operation reflected a "'discrete decision'" Defendants undertook "to advance a broader policy." *Id.* at 14 (quoting *Hennepin Cnty. v. HHS*, No. 26-cv-2460, 2026 WL 2426300, at *7 (D.D.C. Aug. 19, 2026). Defendants finalized, approved, and acted on their plan to raze hundreds of trees on East Potomac Golf Course as a step toward implementing the Washington National plan, marking the consummation of the agency's decisionmaking process. *Id.* And in approving the tree-clearing operation and purporting to justify it through a Categorical Exclusion, Defendants determined legal rights and obligations—including by determining that the tree clearing could proceed with no further environmental review of either the tree-clearing plan or of the "interrelated" Washington National plan. *Id.*

5. Plaintiffs Are Likely to Succeed on the Merits of Their NEPA Claim.

NEPA has a "dual mission . . . to generate federal attention to environmental concerns and to reveal that federal consideration for public scrutiny." *Minisink Residents for Env. Pres. and Safety v. FERC*, 762 F.3d 97, 112 (D.C. Cir. 2014) (internal quotation marks and citation omitted). Congress enacted NEPA to protect the environment by requiring federal agencies to "take a hard

[9] "WHEREAS it looks like a duck, and WHEREAS it walks like a duck, and WHEREAS it quacks like a duck, WE THEREFORE HOLD that it is a duck." *Dole v. Williams Enters., Inc.*, 876 F.2d 186, 188 n.2 (D.C. Cir. 1989) (all-caps in original).

look at the environmental consequences *before* taking a major action." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983) (emphasis added) (internal quotations and citations omitted). NEPA requires agencies to prepare a "detailed" environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." *Earthworks v. Dep't of the Interior*, 105 F.4th 449, 458 (D.C. Cir. 2024) (quoting 42 U.S.C. § 4332(2)(C)). *See Comm. for Auto. Resp. v. Solomon*, 603 F.2d 992, 1002-03 (D.C. Cir. 1979) (NEPA review "normally is triggered when there is a proposal to change the status quo"). An EIS "must identify significant environmental impacts and feasible alternatives." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 181 (2025). A draft EIS must be published for public review and comment on the proposed action's potential environmental impacts and alternatives. 42 U.S.C. § 4336a(c).

If the agency does not know whether a proposed action will significantly affect the environment, or if the agency concludes the action will not have a reasonably foreseeable significant effect, the agency must prepare an "environmental assessment" (EA) setting forth for public review the basis of the agency's determination that no EIS is necessary. *Id.* § 4336(b)(2).

Agencies may not evade these obligations by engaging in "segmentation." "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Delaware Riverkeeper Network v. F.E.R.C.*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). Forbidding segmentation "prevent[s] agencies from dividing one project into multiple individual actions 'each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'" *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988) (quoting *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir.

1985)). Otherwise, an agency could "avoid the NEPA requirement that an EIS be prepared for all major federal actions with significant environmental impacts by dividing an overall plan into component parts, each involving action with less significant environmental effects." *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987).

The D.C. Circuit applies a four-factor test to identify segmentation: "whether the proposed segment (1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives[;] and (4) does not irretrievably commit federal funds for closely related projects." *Id.* These factors are designed to ferret out truly independent projects from projects that have no independent justification, outside the larger plan. These factors do not always receive equal weight—that is, one factor can outweigh another. *See Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987). As applied here, these factors confirm that Defendants' tree-cutting operation is not separate from the Washington National plan but is a major step toward implementing that Plan and therefore had to be preceded by an EIS or EA that considered the effects of the Washington National plan as a whole.

a. *No Logical Termini: Defendants Feign Adherence to a Cultural Landscape Report That Calls for Rehabilitating the Travis Design, Not Replacing It.*

First, Defendants' plan to cut down 529 trees does not have logical termini—its "endpoints" are not "logical." *Taxpayers Watchdog*, 819 F.2d at 299. To put it another way, Defendants have no "viable reason" why they would perform a massive tree-clearing operation ostensibly to rehabilitate the Blue Course's historic design in accordance with the CLR while simultaneously taking other steps to destroy that design by implementing the Washington National plan. *See Delaware Riverkeeper*, 753 F.3d at 1315 ("FERC has not articulated any viable reason why it completed its NEPA review of [one stretch of a pipeline project] without regard to the other three projects on the [same pipeline]."). Defendants have admitted they are working toward

bringing President Trump's vision for East Potomac to fruition, July 2 Tr. at 8:20-21; 9:1-11, and to that end they have solicited and publicly unveiled a design for the new course that is fundamentally at odds with the historical design first laid out by architect Walter Travis and with the objectives of the CLR, which included recommendations calculated to preserve the original Travis design, not to modify or replace it. *See, e.g.,* CLR at xiii, ("This CLR contains treatment guidelines to provide responsible management direction for on-going maintenance and future modifications to the courses while preserving their historic character. . . . [T]hese treatment guidelines have been developed to support modernization that is consistent with the original design intent for each course."); *id.* at 163 ("While it is understood that . . . changes may be appropriate to accommodate modern developments, they *must* be accomplished in a historically sympathetic way for these significant cultural resources.") (emphasis added); *id.* at 184 (East Potomac's three golf courses "will be rehabilitated to preserve fundamental historic landscape characteristics"); *id.* at 189 (NPS should "[r]estore the Walter Travis 1923 links-style Blue Course"). Given that tension, the Court could credit Defendants' representations that the newly ongoing work is consistent with the CLR's recommendations but nevertheless determine that the ongoing clear-cutting must *also* be part of the Washington National plan. Clearing East Potomac's mature trees is a necessary step to constructing a new golf course and thus cannot logically be viewed as separate from that plan.

Testimony adduced during the October 12 hearing further refuted any logical separation between the tree-clearing and the Washington National plan—especially the tree-clearing's genesis. The 2019 CLR under which Defendants (ostensibly) justified the operation had sat dormant for seven years. Both Dr. Griess and Mr. Lands testified that knew of no urgency to the tree-clearing operation from the government's perspective except that the Deputy Chief of Staff

of the Department of Interior had instructed that it should be done "as soon as practical." Oct. 12 Tr. at 53:20-54:1 (Griess not aware of any reason for urgency); 117:14-17 (Lands "not aware of any reason" for urgency); 81:21-81:24 (Deputy Chief of Staff Wischer gave instruction to "implement the" CLR); 101:6-7 (Lands told to clear trees "as soon as practical"). Likewise, their testimony acknowledged that the tree-clearing had taken priority over other recommendations set forth in the CLR—many of which do not concern East Potomac Golf Course and thus have received no attention by Defendants—and had even taken priority over safety-related rehabilitation measures Superintendent Griess had identified as necessary in May. The record further indicates that Defendants poured substantial resources into conducting the tree-cutting operation, reassigning numerous staff, *id.* at 111:22-112:22, to work on it and spending an unknown amount of funds of unknown provenance—apparently without concern for the size of the bill. On that record, it is self-evident that the tree-cutting operation, while consistent in some respects with some recommendations in the 2019 CLR, was undertaken because of its utility in advancing the President's and Secretary's Washington National plan. The tree-cutting cannot be understood as logically or practically separate from that plan as a whole.

b. *No or Little Independent Utility Outside Major Golf Course Renovation.*

Similarly, the tree-clearing has little independent utility apart from a major golf course restoration—namely, the one Defendants are implementing through the Washington National plan. (Indeed, a tree-clearing campaign of this scale can be fairly described as a renovation in and of itself.) Defendants are correct that the CLR called for "[r]estor[ing] the links style and historic vegetation (rough grasslands, thin trees between fairways, and sentinel deciduous trees)." Griess Decl. ¶ 12. But Defendants (almost literally) miss the forest for the trees: the CLR did not establish this guideline in a vacuum, but in the greater service of restoring and maintaining the intent of

Travis's original course design. Absent any actual commitment to carrying out the CLR's broader intention of retaining the historical layout—which the Washington National plan expressly contradicts—the ongoing tree-clearing project has no independent utility beyond preparing for further construction work on the Washington National plan.

Defendants' own declaration casts doubt on the independence of this project. Dr. Griess states that, after seven years, he suddenly received "temporary workforce support"—"20 to 50 trained personnel"—and "additional budgetary resources." Griess Decl. ¶ 6. Implementation of the Washington National plan is an obvious explanation for that sudden and drastic increase in resources for the project. Dr. Griess claimed that the money became available from an America 250 source following the completion of a local automobile race, but more than nine months into the nation's 250-year anniversary, the timing between this "surge" and President Trump's September 1 deadline (and thus, its connection to the Washington National plan) is difficult to overlook.

c. *Moving Forward Will Thwart the No-Action Alternative.*

Third, felling 529 trees plus hundreds more that will follow absent a preliminary injunction forecloses the opportunity to consider alternatives. One of NEPA's chief purposes is to require agencies to consider reasonable alternatives to their plan, "including a no-action alternative." *Citizens Action Coalition of Indiana, Inc. v. FERC*, 125 F.4th 229, 239 (D.C. Cir. 2025). If Defendants complete their tree-felling campaign without conducting a proper NEPA review and considering it within a NEPA review of the full Washington National plan, then the no-action alternative would be no alternative at all. Much of the damage already has been done; without a preliminary injunction, the rest of it soon will be.

Defendants assert that they "documented . . . compliance" with NEPA before undertaking the tree clearing. Griess Decl. ¶ 15. But they are mistaken. Like the Categorical Exclusion

Defendants relied on to justify dumping 37,000 cubic yards of toxic debris at East Potomac, the October 9 Categorical Exclusion characterizes the razing of more than 500 mature trees as "routine maintenance" that will have no significant impacts. But ahead of a similar tree-clearing project at Rock Creek Golf Course in 2023, NPS published an Environmental Assessment spanning more than 250 pages[10] and needed six months of analysis to issue a Finding of No Significant Impact that ran more than 300 pages.[11] Defendants provide no explanation for their failure to conduct a similar analysis here. Indeed, merely two days after publishing the October 9 Categorical Exclusion, Defendants had to supplement it on October 11 to assert authority for an even more destructive clear-cutting project after their sights shifted from 529 trees to hundreds more. That Defendants are approaching East Potomac's tree-clearing so haphazardly less than three years after conducting painstaking review for a similar project at Rock Creek is telling and suggests that the outcome of the analysis was predetermined, likely because of its importance to the Washington National plan.

What is undebatable about the Categorical Exclusion is that it nowhere considers the tree-razing operation in the context of the broader Washington National plan or even acknowledges the existence of that plan, despite Defendants' having admitted before this Court that they are working toward fulfilling President Trump's marching orders with regard to the overhaul of East Potomac. July 2 Tr. at 8:20-21; 9:1-11. The October 9 Categorical Exclusion thus comes nowhere close to fulfilling Defendants' NEPA obligations, and by relying on it to justify destruction of more than

[10] Environmental Assessment, Rock Creek Park Golf Course Rehabilitation, Nat'l Park Serv., U.S. Dep't of the Interior (Sep. 2023), https://perma.cc/N5XG-UAER.

[11] Findings of No Significant Impact, Rock Creek Park Golf Course Rehabilitation, Nat'l Park Serv., U.S. Dep't of the Interior (Mar. 28, 2024), https://perma.cc/B9X7-3LDV.

500 trees, Defendants have foreclosed reasonable alternatives, including the alternative of doing nothing.

d. *Defendants Admit That the Tree-Clearing Project Irretrievably Commits Federal Resources to a Project Closely Related to the Washington National Plan.*

Finally, Defendants' tree-clearing campaign has "irretrievabl[y] commit[ted]" federal funds for a project closely related to the Washington National plan. *Coalition on Sensible Transp.*, 826 F.2d at 66. Dr. Griess's declaration acknowledges that the tree-clearing is made possible by "temporary workforce support" and "additional budgetary resources." Griess Decl. ¶ 6. His and Mr. Lands's testimony further confirmed that NPS staff were deployed and funds of unknown amount were expended to carry out the tree-cutting operation. Oct. 12 Tr. at 18:1-17, 19:14-21, 34:4-35:13, 51:22-52:21, 114:11-116:15, 118:8-199:12. And for the reasons discussed, clearing hundreds of trees is "closely related" (to put it lightly) to the Washington National plan. The irretrievable use of those federal resources to irreparably destroy hundreds of trees is precisely what NEPA is supposed to forestall until the agency has conducted a proper analysis of the harmful effects of the whole project on the human environment. Plaintiffs are thus likely to succeed on the merits of their NEPA claim based on the Defendants' segmentation of the tree-clearing operation.

Independently of NEPA segmentation, Plaintiffs are likely to succeed in establishing that Defendants violated NEPA by carrying out the tree-razing operation based on two Categorical Exclusions for "routine maintenance." TRO Op. at 16-18. In limited circumstances, an agency may determine that a proposed action falls within a "categorical exclusion[]" and is thus exempt preparing an EA or EIS. 42 U.S.C. § 4336(b)(2). Categorical exclusions are a subset of actions, designated by an agency, which "a bureau has determined normally do not significantly affect the quality of the human environment." 43 C.F.R. § 46.205. If a proposed action does not meet the criteria for any designated categorical exclusion, then the proposed action must be analyzed in an

EA or EIS. *Id.* § 46.205(a). Moreover, even if the criteria for a categorical exclusion apply to a given action, an agency still must evaluate the action for extraordinary circumstances in which "a normally excluded action may have a significant [] effect." 43 C.F.R. § 46.205(c)(1). If the responsible official determines that an action might meet any of the exceptions delineated by the agency, extraordinary circumstances exist, and the agency must prepare an EA or EIS. *Id.* § 46.215.

Here, a project to clear-cut several hundred healthy, noninvasive trees is anything but "routine maintenance," and Defendants could not reasonably conclude otherwise. Indeed, as noted, when NPS undertook a comparable project just three years earlier, it conducted an extensive environmental assessment, TRO Op. at 17, indicating that NPS itself does not consider a project of this scope to constitute "routine maintenance." Moreover, destruction of hundreds of trees undeniably had "significant impacts" on East Potomac Golf Course's "natural resources and unique geographic characteristics." 43 C.F.R. § 46.215(b). Those "extraordinary circumstances" foreclosed Defendants' reliance on the Categorical Exclusion. *Id.* And as the Court noted in granting the TRO, Defendants reached the contrary conclusion only through a hasty analysis that failed even to accurately identify the number of trees that would be destroyed. TRO Op. at 17. Defendants thus failed entirely to take the "hard look" NEPA requires before executing the tree-clearing operation. *Id.* at 17. Similar shortcomings plague the hasty supplemental Categorical Exclusion as well, *id.* at 18, and there is not yet any indication that Defendants have undertaken the analyses that their own supplement conceded to be necessary for reliance on that Categorical Exclusion. Mem. in Supp. of Emergency Mot. for TRO at 2, ECF 76-2.

## II. Plaintiffs Will Suffer Irreparable Harm Without Preliminary Relief.

Defendants have adopted and begun to implement a plan that will degrade the human

environment by permanently altering the land, the golf courses' historic layouts, and these recognized resources' setting, in both visible and unseeable ways. Once the Washington National plan has been completed, the three golf courses will be gone; the ground, landscape, and vistas will be irrevocably altered; and significant disturbance and ground contamination will occur on an island adjoining a major waterway and supporting a wide variety of wildlife. And absent a preliminary injunction, hundreds more trees that contribute to East Potomac's current landscape, setting, and qualities will be forever lost as a major step toward bringing that Plan to fruition. *See* TRO Op. at 19 ("while by no means automatically, healthy tree removal can 'clear the bar of irreparable harm' (citing *Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 204–05 (D.D.C. 2015)).

Once those changes occur, they will be irreversible—not only because East Potomac cannot be restored to its historic form and destroyed trees cannot be replaced, but because NEPA requires informed review *before* "resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). "Demolish first, assess the environmental and historic consequences later (or never)" renders this law toothless. Preliminary relief is therefore necessary to preserve East Potomac's human environment and Plaintiffs' right to meaningful review before harm occurs.

"When a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009); *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (procedural injury plus injury to aesthetic interest showed irreparable harm). This is true even when a plaintiff shows only that the major Federal action "will have *some* environmental impacts, even if the extent of those impacts are not

fully known." *Brady Campaign to Prevent Gun Violence*, 612 F. Supp. 2d at 25. "Environmental injury, by its [very] nature, . . . is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 545 (1987). Plaintiffs have made such a showing. *See* Dickson Decl. ¶¶ 14-15, 17-22; Roberts Decl. ¶¶ 15-16, 20, 22-26; Miller Decl. ¶¶ 19-22. Displacement and alteration of East Potomac Park's landscape and contributing resources will injure the recreational, environmental, and other interests that Plaintiffs have asserted. These changes will be "permanent," *Amoco*, 480 U.S. at 545, and without any remedy at law.

## III. Balancing the Equities and Serving the Public Interest Both Favor Preliminarily Enjoining Defendants' Segmentation.

"[T]he Government cannot suffer harm from an injunction that merely ends an unlawful practice," *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (cleaned up), and "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (citing *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws . . . that govern their existence and operations." *Id.* (cleaned up).

But even if this Court were to balance Defendants' interests as if they were private parties, Defendants would suffer only modest delay from a preliminary injunction that preserves the status quo. *See* TRO Op. at 20 ("The balance of the equities tips sharply in favor of Plaintiffs."). Mr. Lands and Dr. Griess each testified that they knew of no urgency and no government interest in clear-cutting the trees expeditiously. Oct. 12 Tr. at 53:23-54:1 ("The Court: 'So the trees could be cut down tomorrow, or they could be cut down a month from now, and from the government's perspective, it's basically the same?' [Griess]: 'From what I understand, Your Honor, yes."),

117:14-17 (Lands "not aware of any reason" for urgency). Moreover, any such "delay" would have been the natural result of NEPA compliance if Defendants had abided by the statute. And such an inconvenience is far outweighed by the irreparable injury that would be inflicted on Plaintiffs and the public by allowing the tree-clearing to proceed unabated. Even if the clear-cutting simply implements the 2019 CLR, as Defendants represent, there is no meaningful harm in delaying that implementation for the time necessary to resolve Plaintiffs' NEPA claim on the merits when Defendants themselves already delayed that implementation by seven years.

The further Defendants proceed with implementing the Washington National plan, the more irreversible Plaintiffs' injuries will become. Permitting the clear-cutting of hundreds more trees on top of the 529 that were razed on October 10 would leave the Court without the opportunity for meaningful consideration of Plaintiffs' claims and would leave Plaintiffs without recourse to remedy their harms. Preliminary injunctions exist to avoid precisely that outcome.

## CONCLUSION

The Court should issue an order—or, alternatively, a stay under 5 U.S.C. § 705—preliminarily enjoining Defendants from any further tree removal at East Potomac Park. Further, given Defendants' and counsel's failure to provide any meaningful advance notice before they destroyed 529 trees on Saturday, despite having denied any such plans were imminent and despite counsel's promise to provide notice of significant activity, the Court should enter an order requiring Defendants to provide three business days' written notice in advance of any irreparable modification to any permanent features or landforms of East Potomac Park.

Dated: October 14, 2026

RESPECTFULLY SUBMITTED,

_/s/Will Bardwell_
Will Bardwell (Bar No. 90006120)
Mark B. Samburg (Bar No. 1018533)
Catherine M.A. Carroll (Bar No. 497890)
Robin F. Thurston (Bar No. 7268942)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
T: (202) 448-9090
wbardwell@democracyforward.org
msamburg@democracyforward.org
ccarroll@democracyforward.org
rthurston@democracyforward.org

Abbe David Lowell (Bar No. 358651)
Caleb Hayes-Deats (Bar No. 1653213)
Jack Bolen (Bar No. 90031046)
Angela Reilly (*pro hac vice*)
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowelland
associates.com
Chayes-Deats@lowellandassociates.com
JBolen@lowellandassociates.com
AReilly@lowellandassociates.com

Norman L. Eisen (Bar No. 435051)
Lindsay Zimliki (Bar No. 475890)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
T: (202) 601-8678
norman@democracydefenders.org

*Counsel for Plaintiffs*