**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DC PRESERVATION LEAGUE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>Defendants. | Case No. 1:26-cv-477-ACR |

**DEFENDANTS' MEMORANDUM IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 3

I. Procedural Background ..... 3

II. Factual Background Relevant to Tree Removal ..... 4

A. East Potomac Golf Course ..... 4

B. The Cultural Landscape Inventory and Cultural Landscape Report Treatment Guidance ..... 5

1. Tree Removal ..... 7

a. Environmental Compliance ..... 8

b. Implementation of the Tree Management Plan ..... 9

LEGAL STANDARD ..... 10

ARGUMENT ..... 11

I. The Improperly Compelled Testimony of High-Ranking Government Officials Cannot Be Used to Establish Plaintiffs' Standing or Their Entitlement to Preliminary Relief ..... 12

II. Plaintiffs Lack Article III Standing ..... 14

A. Plaintiffs' Disapproval of NPS's Proposed Renovations is Not an Injury in Fact ..... 14

1. Individual Plaintiffs ..... 15

2. DC Preservation League ..... 18

3. Post-Complaint Factual Developments, Such as the Tree Removal, Cannot Be Used to Bolster the Speculative Allegations in the Complaint ..... 21

B. Plaintiffs Fail to Show that Their Alleged Injuries are Traceable to Defendants' Conduct ..... 22

II. Plaintiffs Are Not Entitled to a Preliminary Injunction ..... 24

A. There is no final agency action ..... 24

B. Plaintiffs Are Not Likely to Succeed on the Merits of their Segmentation Claim ........ 27

C. Plaintiffs Have Not Established That They or Their Members Will Suffer Irreparable Injury ........ 33

D. The Balance of Equities and Public Interest Do Not Favor Preliminary Relief ........ 33

IV. If an Injunction is Granted, Plaintiff Should be Required to Post a Bond ........ 34

CONCLUSION ........ 35

# TABLE OF AUTHORITIES

**Other Authorities**

*Aid for Women v. Foulston*,
441 F.3d 1101 (10th Cir. 2006) ... 34

*Apotex, Inc. v. FDA*,
449 F.3d 1249 (D.C. Cir. 2006) ... 11

*Ark. Dairy Coop. Ass'n, Inc. v. U.S. Dep't of Agric.*,
573 F.3d 815 (D.C. Cir. 2009) ... 11

*Bennett v. Spear*,
520 U.S. 154 (1997) ... 24, 26

*Biden v. Texas*,
597 U.S. 785 (2022) ... 25, 26

*Bogan v. City of Boston*,
489 F.3d 417 (1st Cir. 2007) ... 13

*Brady Campaign to Prevent Gun Violence v. Salazar*,
612 F. Supp. 2d 1 (D.D.C. 2009) ... 21

*California v. Texas*,
593 U.S. 659 (2021) ... 22

*Camp v. Pitts*,
411 U.S. 138 (1973) ... 12

*Carney v. Adams*,
592 U.S. 53 (2020) ... 12

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ... 11, 33

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971) ... 12

*City of Port Isabel v. FERC*,
111 F.4th 1198 (D.C. Cir. 2024) ... 31

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ... passim

*Climate United Fund v. Citibank, N.A.*,
154 F.4th 809 (D.C. Cir. 2025) ... 3

*Colbert v. Dist. of Columbia*,
78 F. Supp. 3d 1 (D.D.C. 2015) ... 21

*Colbert v. Dist. of Columbia*,
78 F. Supp. 3d 1, 13 (D.D.C. 2015) ........................................................................ 21

*Consumers for Auto Reliability & Safety v. Fed. Trade Comm'n*,
No. 17-cv-0540, 2021 WL 4050876 (D.D.C. Sept. 6, 2021) ................................................ 18

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
563 F.3d 466 (D.C. Cir. 2009) ............................................................................ 20

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
144 F.4th 296 (D.C. Cir. 2025) ........................................................................... 20

*Delaware Riverkeeper Network v. FERC*,
753 F.3d 1304 (D.C. Cir. 2014) .................................................................. 2, 27, 29, 30

*Dynalantic Corp. v. Dept. of Defense*,
115 F.3d 1012 (D.C. Cir. 1997)............................................................................ 24

*FDA v. All. For Hippocratic Med.*,
602 U.S. 367 (2024)................................................................................... 15, 18

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985)........................................................................................ 12

*Food & Water Watch, Inc.*,
808 F.3d 905 (D.C. Cir. 2015) ...................................................................... 17, 19

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
528 U.S. 167 (2000)........................................................................................ 16

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
460 F.3d 13 (D.C. Cir. 2026) .............................................................................. 26

*Harris Cnty. v. Kennedy*,
786 F. Supp. 3d 194 (D.D.C. 2025) ........................................................................ 10

*Hudson v. Am. Fed'n of Gov't Emps.*,
No. 17-cv-2543 (KBJ), 2018 WL 1143172 (D.D.C. Mar. 2, 20218)....................................... 21

*Hudson v. American Federation of Government Employees*,
No. 17-cv-2543-KBJ, 2018 WL 114317, at *2 (D.D.C. Mar. 2, 2018) .................................. 21

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)........................................................................................ 18

*In re FDIC*,
58 F.3d 1055 (5th Cir. 1995).............................................................................. 13

*In re United States (Holder)*,
197 F.3d 310 (8th Cir. 1999).............................................................................. 13

*In re United States (Kessler)*,
985 F.2d 510 (11th Cir. 1993) ............................................................................ 13

*In re United States, (Jackson)*,
624 F.3d 1368 (11th Cir. 2010) ........ 12, 13

*Independent Equip. Dealer v. EPA*,
372 F.3d 420 (D.C. Cir. 2004) ........ 26

*Int'l Acad. of Oral Med. & Toxicology v. U.S. Food & Drug Admin.*,
195 F. Supp. 3d 243 (D.D.C. 2016) ........ 17

*K.G. ex rel. Garrido v. Dudek*,
839 F. Supp. 2d 1254 (S.D. Fla. 2011)........ 34

*Lance v. Coffman*,
549 U.S. 437 (2007)........ 21

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)........ 14

*Make the Road N.Y. v. Mullin*,
149 F.4th 16 (D.C. Cir. 2026) ........ 11

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
783 F. Supp. 3d 290 (D.D.C. 2025) ........ 34

*Nat'l Min. Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014) ........ 26

*Nat'l Park Serv. v. Nat'l Tr. For Historic Preservation in the U.S.*,
609 U.S. ____, 2026 WL 2564318 (U.S. Aug. 31, 2026)........ 1, 15, 16, 19

*Nat'l Wildlife Fed'n v. Lujan*,
497 U.S. 871 (1991)........ 25, 27

*Nken v. Holder*,
556 U.S. 418 (2009)........ 11

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)........ 25, 27

*Pennsylvania v. DeVos*,
480 F. Supp. 3d 47 (D.D.C. 2020) ........ 11

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016) ........ 34

*Reliable Automatic Sprinkler Co. v. Consumer Product Safety Comm'n*,
324 F.3d 726 (D.C. Cir. 2003) ........ 25

*Safari Club Int'l v. Jewell*,
47 F. Supp. 3d 29 (D.D.C. 2014) ........ 10

*Save the Sound, Inc. v. FAA*,
183 F.4th 763 (D.C. Cir. 2026) ........ 28, 29

*Schindler Elevator Corp. v. Washington Metro. Transit Auth.*,
514 F. Supp. 3d 197 (D.D.C. 2020) ........ 11

*Seven County Infrastructure Coal. v. Eagle Cnty., Colorado*,
605 U.S. 168 (2025) ........ 11, 28, 29

*Simplex Time Recorder Co. v. Sec'y of Labor*,
766 F.2d 575 (D.C. Cir. 1985) ........ 13

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ........ 14

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ........ 20

*Taxpayers Watchdog v. Stanley*,
819 F.2d 294 (D.C. Cir. 1987) ........ 29, 32

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 15

*Trump v. California*,
2026 WL 2473573 ........ 18, 20

*Trump v. CASA*, Inc.,
606 U.S. 831 (2025) ........ 34

*Trump v. United States*,
603 U.S. 593 (2024) ........ 12

*United States v. Morgan*,
313 U.S. 409 (1941) ........ 12, 13, 25

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) ........ 26

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) ........ 14

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ........ 12

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
714 F.3d 186 (4th Cir. 2013) ........ 27

*WildEarth Guardians v. Provencio*,
272 F. Supp. 3d 1136 (D. Ariz. 2017) ........ 21

*Winter v. NRDC*,
555 U.S. 7 (2008) ........ 2, 10, 33, 34

*Wisc. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ........ 33

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
165 F.3d 43 (D.C. Cir. 1999) ........................................ 25

**Statutes**

5 U.S.C. § 551(13) ........................................ 26

5 U.S.C. § 704 ........................................ 24

5 U.S.C. § 706(2) ........................................ 12

54 U.S.C. § 306108 ........................................ 20

**Rules**

Fed. R. Civ. P. 15 ........................................ 22

Fed. R. Civ. P. 65(c) ........................................ 34

# TABLE OF EXHIBITS

| |
|---|
| Decl. of Dr. Kevin Griess (Oct. 16, 2026) |

## INTRODUCTION

Plaintiffs' theory of standing is foreclosed by the Supreme Court's decision in *National Trust for Historic Preservation*, 609 U.S. ___, No. 2026 WL 2564318 (U.S. Aug. 31, 2026). And they cannot gin up a final agency action from amorphous events that have not yet materialized into a concrete, final decision. Despite lacking jurisdiction, this Court has now violated bedrock separation of powers principles by demanding that high-ranking Department of the Interior officials be subject to wide-ranging cross-examination without any showing of exceptional circumstances. This error is compounded given that Plaintiffs have had their bite at the apple: they previously cross-examined two Interior officials on matters of little to no relevance to the TRO proceedings before the Court.

On October 13, 2026, the Court entered a TRO based on a claim that Plaintiffs did not make, against an agency action they did not challenge, on a theory of harm and causation they did not present. *See* Mem. Op. ("TRO Opinion"), Dkt. No. 79. The order prohibits the National Park Service ("NPS") from "fell[ing] any further trees on the East Potomac Golf Course," an NPS-managed facility within East Potomac Park ("Park"). *See* Minute Order of Oct. 13, 2026 ("TRO").

Plaintiffs have now moved for a preliminary injunction, or in the alternative, a stay under 5 U.S.C. § 705. *See* Dkt. No. 80 ("Motion"). Plaintiffs chart a course different from the one taken by the Court in its TRO Opinion, but still one that veers outside the bounds of the Court's jurisdiction. Plaintiffs seek to enjoin further felling of trees at the Park based on a "NEPA segmentation claim" that the Court chose not to reach, finding that "additional briefing" was needed, TRO Op. at 18. Plaintiffs' NEPA segmentation claim, unlike the Court's TRO Opinion, identifies the relevant agency action as what they have called the "Washington National Plan," a yet-to-be-finalized proposal to redesign and renovate the East Potomac Golf Course (hereafter,

"Proposal"). *See* Mem. in Supp. of Motion ("Mem.") at 18, Dkt. No. No. 80-1. But Plaintiffs fail to demonstrate a concrete injury that is or will be fairly traceable to the Proposal. Their complaint, even as amended, still relies upon speculation about what the Proposal will specifically propose, how it will be implemented and what it will consist of in final form, and how, if at all, the Proposal or its final implementation might cause them injury in the future. *See* Amended & Suppl. Compl., Dkt. No. 72-1. And Plaintiffs' complaint nowhere alleges that the tree removal that occurred on October 10th, and would have continued but for this Court's intervention, is even part of the Proposal to begin with. The record demonstrates that it is not.

Plaintiffs' Motion should be denied because the Court lacks jurisdiction to entertain it, and because Plaintiffs have not satisfied the four *Winter* factors that govern preliminary relief. *See Winter v. NRDC*, 555 U.S. 7, 20 (2008). As Defendants have repeatedly demonstrated, Plaintiffs cannot demonstrate Article III standing to challenge the Proposal, on an individual or on an associational basis. *See, e.g.*, Dkt. No. 34; Dkt. No. 67; Dkt. No. 75-1. Nothing in their Motion papers or the Court's TRO Opinion makes up for the defects that existed in this suit at the time it was brought.

Even if the Court had jurisdiction (when it does not), and even if Plaintiffs had pleaded a segmentation claim (when they did not), Plaintiffs' Motion should still be denied under the *Winter* factors. Plaintiffs are not likely to succeed on a NEPA segmentation claim for two independent reasons: (1) because there has been no final agency action on the proposal for renovating East Potomac Park (hereafter, "Proposal"), and (2) the tree removal project has "substantial independent utility" without regard to whether or when the Proposal is finalized and implemented, *see Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014); *see generally* Decl. of Dr. Kevin Griess (Oct. 16, 2026) ("Greiss Decl.) (attached).

As for the other factors, Plaintiffs barely stir themselves to show an irreparable injury, alleging nothing more than that they have "made such a showing." Mot. at 30. They have not demonstrated that they or their members have been or will be irreparably injured by the removal of the trees that did not contribute to the Park's historic character, much less the specific noncontributing trees at issue, or that any such injury is traceable to the Proposal. Further, while the Court has found that the government lacks "urgency" justifying the removal of the trees, TRO Op. at 20, there is a public interest in ensuring that federal courts intervene only where their jurisdiction to award relief has been established. *See Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 830 (D.C. Cir. 2025).

For all these reasons and those discussed further below, Plaintiffs' Motion should be denied and the TRO vacated.

## BACKGROUND

### I. Procedural Background

On February 13, 2026, Plaintiffs filed a complaint challenging a nascent proposal to improve East Potomac Golf Course. Compl., Dkt. No. 5-1 (as corrected and refiled). The Parties have since fully briefed Plaintiffs' Motion for Stay or, in the Alternative, Preliminary Injunction; Defendants' Motion to Dismiss; and Plaintiffs' Motion for Expedited Discovery. Dkts. 8, 34, and 51.[1] In the ensuing months, Plaintiffs filed an Emergency Motion for Status Conference and four "Notice[s] of Factual Development." Dkts. 47, 49, 50, 58, 69. In hearings and court filings,

[1] Defendants argued that Plaintiffs lacked standing when briefing these motions. *See* Dkt. 26; Dkt. 34-1; Dkt. 54. On September 4, 2026, the Court denied each of these motions as moot considering Plaintiffs planned to file a forthcoming amended complaint. Minute Order (Sept. 4, 2026); *see also* Minute Order (Aug. 13, 2026) (requiring Plaintiffs to inform the Court on whether they intended to file an amended complaint).

Defendants explained that no decision to rehabilitate the Golf Course had been made, the decisionmaking and planning process remained ongoing, and multiple public-facing steps during those processes must first occur. *E.g.*, Tr. 18:15–23 (Sept. 3, 2026); Tr. 87:5–90:11 (July 2, 2026); Proposed Briefing Schedules 6, Dkt. No. 66; Second Bowron Decl. ¶¶ 11–13; First Bowron Decl. ¶¶ 16–24. The parties began briefing motions for summary judgment on October 9, 2026. On October 15, 2026, the Court granted Plaintiffs' motion for leave to file an amended and supplemental complaint. Minute Order (Oct. 15, 2026).

## II. Factual Background Relevant to Tree Removal

The facts underlying this case have been recited in detail in Defendants' prior submissions.[2] Defendants therefore incorporate by reference the information provided therein and include here only a concise recitation of the facts pertinent to Defendants' opposition to Plaintiffs' Motion.

### A. East Potomac Golf Course

Constructed on East Potomac Park in 1920, East Potomac Golf Course ("Golf Course") helped transform what had been marshy mud flats into an extraordinary place of public recreation. The original design of the Golf Course was "generally treeless—a characteristic feature of links-style courses—with cleared fairways and grassy turf," NAMA 0433, and that "[w]ide open vistas of grass and views toward the water, were the desired effect at East Potomac," NAMA 0524–25. Over time, the Golf Course underwent a series of alterations and renovations to expand the course and to respond to various environmental and public safety concerns such as flooding. *See* Nat. Park Serv. Cultural Landscapes Inventory, East Potomac Golf Course, 3 (2017) ("CLI"),[3] at 25–

---

2 *See* Defs.' Resp. in Opp'n to Pls' Mot. for Stay for, in the Alt. Prelim. Inj., Dkt. 26; Defs.' Mem. in Supp. of Mot. to Dismiss, Dkt. 34-1, Defs.' Mem. In Supp. Mot. for Summ. J., Dkt. 75-1.

3 The CLI is publicly available on NPS's website at https://irma.nps.gov/DataStore/DownloadFile/583046.

31 (explaining that various courses and other features have been added, redesigned, reconstructed, or removed since the Park's inception).

### B. The Cultural Landscape Inventory and Cultural Landscape Report Treatment Guidance

In 2017, the NPS prepared a cultural landscape inventory ("CLI") for the East Potomac Golf Course. The CLI concluded that, in addition to being a contributing feature to the East and West Potomac Parks Historic District, listed in the National Register of Historic Places (National Register), the Golf Course was eligible for individual listing in the National Register. NAMA 0403 The CLI recommended a period of significance of 1917 to 1947. *Id.* However, over the years, "[m]aturation of vegetation and additional planting since the period of significance, [] resulted in the loss of view sheds and changed the feeling of playing the course, designed in the relatively treeless links style." NAMA 0527. Whether through deliberate decisions, or lack of maintenance, due to the addition of these trees, the Golf Course deviated from the links-style character that defined its period of historic significance. Greiss Decl. ¶ 8. However, the CLI concluded that "these developments are reversible." NAMA 0527.

In 2019, NPS prepared a Cultural Landscape Report ("CLR") for the three NPS-managed golf courses in the District of Columbia, including the Golf Course. *See generally* CLR.[4] The Report builds upon other documents that address these historic golf courses, including the 2017 CLIs for each golf course. *Id.* The CLR provides ongoing maintenance and treatment guidelines for the long-term stewardship of the golf courses under NPS management control.[5] *Id.*

---

[4] Cultural Landscape Report, National Park Service Golf Courses in the District of Columbia, East Potomac Park, Langston, and Rock Creek: Treatment Guidelines, June 2019, https://npshistory.com/publications/nace/clr-golf-courses-2019.pdf.

[5] Generally Cultural Landscape Reports are the primary guide for the treatment and use of historic landscapes. A CLR documents and evaluates the landscape characteristics, materials, and qualities that make a landscape eligible for the National Register. It analyzes the development and

While a CLR typically includes treatment alternatives, this CLR included treatment guidelines instead. *Id.* The treatment guidelines were included to provide NPS with responsible management direction for ongoing maintenance and future modifications necessary to accommodate modern playing standards while still preserving their historic character. *Id.*

The CLR explained that the Golf Course was designed as a traditional links style course "that favored 'a rough, grassy area of land along the coastline that includes sand dunes and few, if any, trees.'" Greiss Decl., Ex. E (CE Form) at 1. However, due to decades of limited maintenance, ad-hoc plantings, and the development of dumping areas, the appearance of the Golf Course shifted from its historic design to a parkland-style course. *Id.* To restore the Golf Course to its original character, the CLR recommended various treatments, including managing and reducing trees and understory vegetation, reestablishing rough grasslands, and retaining strategically placed trees between fairways. *Id.*

In October 2020, the NPS executed a lease with National Links Trust ("NLT"). The lease incorporated the CLR recommendations into the long-term work plan, and NLT assumed responsibility for completing these actions. Greiss Decl. ¶ 14. Given that NLT had assumed maintenance responsibilities, NPS did not develop its own restoration plan or independently pursue the funding and staffing necessary to fulfill the goals of the CLR. *Id.* NLT did not make implement the CLR's maintenance recommendations while it held the lease. *Id.* In December 2025, NPS terminated the lease with NLT and resumed responsibility over the CLR maintenance recommendations. *Id.* ¶ 15. NPS now seeks to restore the Golf Course to its intended historic character.

---

evolution of the landscape, including modifications, materials, geographical context, and use in all periods.

Since issuance of Executive Order 14252, *Making the District of Columbia Safe and Beautiful*, in March 2025, and issuance of Secretary's Order 3428, National Capital Region has received funding for, and completed,[6] a series of long-deferred maintenance projects on NPS administered lands within the Washington, D.C. region. The Tree Management Plan for the Golf Course is a continuation of NPS's focus on addressing long-deferred maintenance and restoration needs.

**1. Tree Removal**

Consistent with NPS's goal to maintain the historic character of the designed landscape NPS proposed a Tree Management Plan for the Golf Course. *Id.* ¶ 20. The objectives of the Plan include: (1) restoring and maintaining the Golf Course's historic links-style character of open fairways, broad sightlines, rough grasslands, limited interior tree cover, and strategically retained specimen trees; (2) preserving the character-defining and historic vegetation; and (3) removing or thinning non-contributing and invasive woody vegetation that encloses fairways and greens, among other goals that are consistent with the CLR recommendation. Greiss Decl., Ex. E at 2–3. These treatments are intended to improve the condition and historical integrity of the cultural landscape while still supporting its continued use as a public golf course. *Id.* NPS's implementation of the Plan focuses on maintenance; it is not intended to renovate or redesign the Golf Course. Greiss Decl. ¶ 44.

Under the Plan, NPS will selectively remove trees and woody vegetation that it determines obscure historically open fairways, greens, significant views and vistas, or impede the function of

---

[6] Funding has been used for numerous projects, including (a) the repair of 22 fountains and water features; (b) rehabilitating or installing 1700 benches; (c) repairing nearly 2400 light fixtures; and (d) removing approximately 10 tons of litter, debris, and downed vegetation from public spaces. Greiss Decl. ¶ 17.

the golf course. Greiss Decl., Ex. E at 3; *id.*, Ex. F at 3. Before work began, NPS identified approximately 529 trees of varying sizes[7] to be removed using methods designed to minimize soil disturbance. Greiss Decl., Ex. E at 3. NPS determined that mature specimen trees that are "compatible isolated landscape features and do not compromise historic views or golf-course function would be retained." Greiss Decl., Ex. F at 3. After the vegetative removal, NPS intends to replant or stabilize the area with turf or low-growing vegetation, consistent with the historic landscape. Greiss Decl. ¶ 39.

*a. Environmental Compliance*

Under the National Environmental Policy Act ("NEPA"), NPS determined it was not required to prepare an environmental impact statement, an environmental assessment, or a finding of no significant impact because the work is excluded pursuant to a categorical exclusion ("CE"). On October 9, 2026, to document its compliance with NEPA, NPS completed a categorical exclusion documentation form for the Tree Management Plan. Greiss Decl., Ex. E. The CE form explains that the application of the categorical exclusion was consistent with CE 12.5 (C)(4) "because the action constitutes routine maintenance and treatment of cultural resource grounds and is consistent with established preservation objectives for the historic cultural landscape." *Id.* at 5. NPS concluded that no extraordinary circumstances existed to warrant further analysis. *Id*. at 10.

NPS also completed an Assessment of Actions Having an Effect on Historic Properties ("Assessment") in satisfaction of its obligations under Section 106 of the National Historic Preservation Act. Greiss Decl., Ex. F. The Assessment documented NPS's consideration of the effects of the Project on historic properties and NPS's finding that the work would have "No

---

[7] Of the 529 trees identified, approximately 382 trees were larger than 10 inches in diameter at breast height. The remaining 147 trees had an average DBH of 6.1 inches. Greiss Decl., Ex. E at 3.

Adverse Effect" on any historic properties. Greiss Decl., Ex. F. NPS found that the work was eligible for streamlined review under NPS's 2008 Nationwide Programmatic Agreement with the Advisory Council on Historic Preservation and the National Conference of State Historic Preservation Officers. *Id.* NPS clarified that "the project constitutes vegetation and landscape management within an existing developed recreational and historic cultural landscape." *Id.* at 4. The Assessment explained that the Project is intended solely "to improve the condition and integrity of the historic landscape by restoring the open links-style character, protecting character-defining vegetation, reopening historically significant views and controlling incompatible and invasive vegetation." *Id.* NPS concluded the Project work will have no adverse effect on historic property. *Id.* at 6.

*b. Implementation of the Tree Management Plan*

The Court orally requested that Defendants provide Plaintiffs and the Court with notice should Defendants intend to conduct any imminent, significant construction or destructive activities of an irretrievable character at the Golf Course. Dkt. No. 74 at 1. In general, the work – a maintenance action intended to restore the historic character of the golf course – would not be considered by NPS to be significant construction or destructive activities, as reflected in the use of a CE. However, consistent with the Court's request, Defendants provided notice of the planned restoration activities aimed at implementing the recommendations in the CLR. *Id.* Defendants explained that the restoration activities are a separate agency decision, conducted pursuant to separate NEPA and NHPA compliance, than either any nascent rehabilitation or redesign of Golf Course or the soil stockpiling decision that are at issue here.

Defendants initiated the Project's work on October 10, and the Golf Course remained open throughout that time. Greiss Decl. ¶¶ 34, 38. Initial work focused on a heavily overgrown area,

commonly referred to as "Trash Island" by NPS personnel, and depicted in Zone A.[8] *Id.* ¶ 33. While implementing the removal activities, NPS realized that the number of trees and woody vegetation in Zone A were underestimated due to the dense, unmanaged vegetative conditions. *Id.* The initial assessment had estimated 169 trees within Zone A. *Id.* ¶ 34. Only after work began did NPS realize that approximately 200 small-diameter, immature trees, ranging from 3 to 5 inches in DBH also needed to be removed. *Id.*; *see also id.*, Ex. G.

NPS also began work in the area identified as Zone B. *Id.* ¶ 34. Approximately 300 trees identified under the Plan for removal remain on the Golf Course. *Id.* ¶ 39. In total, NPS estimates that approximately 729 trees that do not contribute to the historic landscape would ultimately be removed as part of this Project, with a relatively high percentage of those trees consisting of immature, small- diameter trees from Zone A. *Id.* ¶ 43.

## LEGAL STANDARD

A preliminary injunction" is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 32 (D.D.C. 2014) (citing *Winter*, 555 U.S. 7, 22 (2008)). An injunction must be denied unless the moving party demonstrates (1) that it is likely to succeed on the merits of its claims; (2) it is likely to suffer an irreparable injury in the absence of injunctive relief; (3) the balance of equities tips in its favor; and (4) the proposed injunction is in the public interest. *Winter*, 555 U.S. at 20. "The last two factors merge when the government is a party." *Harris Cnty. v. Kennedy*, 786

---

[8] NPS documented its consideration of the additional number of trees that were removed in Zone A and evaluation of those effects in a Determination of NEPA Adequacy ("DNA"), which was signed October 11, 2026. Greiss Decl., Ex. G. The DNA concluded that the CE applied for NEPA compliance remained appropriate because the additional removed small-diameter trees (1) did not change the purpose or nature of the action, (2) were located within the same densely vegetated area, and (3) was consistent with the activities considered in the CE. *Id.* at 3.

F. Supp. 3d 194, 203 (D.D.C. 2025) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The factors governing the issuance of a preliminary injunction "also govern the issuance of a stay under Section 705 of the APA." *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 58 (D.D.C. 2020) (citation omitted).

Failure to show a likelihood of success on the merits is sufficient to defeat a motion for a preliminary injunction, *Ark. Dairy Coop. Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009); *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253–54 (D.C. Cir. 2006), as is failure to demonstrate irreparable injury, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see also Make the Road N.Y. v. Mullin*, 149 F.4th 16, 25 (D.C. Cir. 2026).

When considering a motion for a preliminary injunction, if it becomes apparent to the court that it lacks jurisdiction, the court may dismiss the claims. *See, e.g.*, *Schindler Elevator Corp. v. Washington Metro. Transit Auth.*, 514 F. Supp. 3d 197, 212 (D.D.C. 2020) (denying plaintiff's motion for preliminary injunction and dismissing plaintiff's claims sua sponte).

## ARGUMENT

Plaintiffs lack standing to challenge a renovation and reconstruction of the Golf Course. And that project, still in the planning phase, is not final agency action. Rather than dismiss the case for lack of jurisdiction, as the Court should, it chose to string the government along with a supposed "agreement"—under threat of an immediate TRO—to provide the Court with notice if the National Park Service ever decides to clear some trees from its golf course. The Court should end the drama now and dismiss for lack of standing and lack of final agency action. As for the merits, this case has generated far too much fire and brimstone given what is actually at stake: a pointless, procedural NEPA claim that could never legitimately justify injunctive relief. *Seven County Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 190 (2025).

## I. The Improperly Compelled Testimony of High-Ranking Government Officials Cannot Be Used to Establish Plaintiffs' Standing or Their Entitlement to Preliminary Relief.

Plaintiffs seek to invoke this Court's Article III jurisdiction to resolve their claims for relief under the APA, 5 U.S.C. § 706(2). It is axiomatic that Plaintiffs have the burden to establish this Court's jurisdiction, including by demonstrating their standing to sue. *Carney v. Adams*, 592 U.S. 53, 59–60 (2020). It is equally well established that, in an APA case, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). *See also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) ("The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry."). It is also well established that cross-examination of high-ranking government officials violates fundamental separation of powers principles. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977) ("[J]udicial inquiries into legislative or executive motivation represents a substantial intrusion into the working of other branches of government. Placing a decision-maker on the stand is therefore 'usually to be avoided.'") (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)); *see also Trump v. United States*, 603 U.S. 593, 613 (2024) (recognizing that a "presumptive privilege" protecting Presidential communication "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution"). Indeed, "[j]ust as a judge cannot be subjected to such a scrutiny [*i.e.*, oral examination], so the integrity of the administrative process must be equally respected." *United States v. Morgan*, 313 U.S. 409, 422 (1941) (citation omitted); *see In re United States (Jackson)*, 624 F.3d at 1373–74 (finding that "compelling the personal appearance of the higher-ranking Administrator in a distant judicial district for interrogation by the court for an indefinite period" is an "encroachment on the separation of powers"). The October

12th hearing violated these well-established principles, many times over. The evidence compiled at the hearing, if it is not stricken, should be disregarded in its entirety.

The Court's summons to appear at a hearing on October 12 was not merely irregular but also an encroachment on the separation of powers. Courts have long recognized the general rule that a litigant may not depose a high-level government official in the absence of "extraordinary circumstances." *See Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985) (holding that a litigant may not depose a high-level Government official in the absence of "extraordinary circumstances"); *In re United States (Jackson)*, 624 F.3d 1368, 1372 (11th Cir. 2010) (recognizing need for "extraordinary circumstances" for "compelling the appearance of a high-ranking officer in a judicial proceeding"); *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007) (citing *Morgan* for the proposition that "top executive department officials should not, absent extraordinary circumstances, be called to testify"); *In re FDIC*, 58 F.3d 1055, 1060 (5th Cir. 1995) (recognizing that "exceptional circumstances must exist before the involuntary depositions of high agency officials are permitted.") (citation omitted). These "extraordinary circumstances" exist only when the party seeking testimony from a high-level government official establishes that the information sought from that official is both "essential to his case . . . [and] not obtainable from another source[,]" which means that "the discovery sought is relevant and necessary and that it cannot otherwise be obtained." *In re United States (Holder)*, 197 F.3d 310, 314 (8th Cir. 1999) (citing *In re United States (Kessler)*, 985 F.2d 510, 512-13 (11th Cir. 1993)). Here, the Court ordered high-level government officials to appear virtually or telephonically on a federal holiday, on less than 24 hours' notice (indeed, less than 2 hours' notice for Deputy Director Lands), and to submit to hours of forensic examination by the Court and opposing counsel (with one witness testifying from his telephone from his car). The Court made no finding that extraordinary

circumstances justified this intrusion into a coordinate branch of government, and no such circumstances existed.

No interest cited by the Court justified its command to appear. The Court acknowledged that no violation of a written court order had occurred. Tr. 134:6–9, 135:5–11 (Oct. 12, 2026). And the relief sought by the plaintiffs—and injunction preventing trees from being cut down—did not present any imminent risk.

The Court then compounded the violation by using the officials' compelled testimony to justify the entry of a TRO, when such real-time testimony is plainly impermissible for purposes of demonstrating standing or an entitlement to preliminary relief. The record for deciding Plaintiffs' Motion should be limited to the parties' written submissions and the evidentiary hearing noticed for October 19th should be cancelled.

## II. Plaintiffs Lack Article III Standing.

Article III confines federal courts to deciding "Cases" and "Controversies," so that legal questions are resolved "in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). To invoke that power, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016).

### A. Plaintiffs' Disapproval of NPS's Proposed Renovations is Not an Injury in Fact.

To establish injury in fact, a plaintiff must show "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). If a

plaintiff's alleged injuries are forward-looking, the plaintiff must show "a material risk of future harm" that is "sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021). The injury must be "*certainly* impending," and allegations of "*possible* future injury" fail to establish standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation modified).

Plaintiffs dislike the proposed changes to the Golf Course. They enjoy the golf course as it is, and do not wish for it to change. Presumably, "nearly any government action or project offends someone's sensibilities." *Nat'l Park Serv. v. Nat'l Tr. For Historic Preservation in the U.S.*, 609 U.S. ____, 2026 WL 2564318, at *2 (U.S. Aug. 31, 2026). But mere "distress at or disagreement with the activities of [the Government] is not a basis under Article III for a plaintiff to bring a federal lawsuit." *Id.* at *2 (quoting *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 390 n.3 (2024)). As the Supreme Court just reiterated, adopting such an "'unprecedented and limitless' view that offense alone suffices to establish a concrete and particularized injury would seemingly usher in a world where 'virtually every citizen had standing to challenge virtually every government action that they do not like.'" *Id.* (quoting *All. For Hippocratic Med.*, 602 U.S. at 391–92). And that is an "approach to standing that [the] Court has consistently rejected as flatly inconsistent with Article III." *Id.*

**1. Individual Plaintiffs**

*Alleged recreational & aesthetic harms*. Individual Plaintiffs Dave Roberts and Alex Dickson are apparently both regular golfers at the Park. Roberts expresses an emotional attachment to the Course. He reports that the clean fill material that the NPS stockpiled in the Park "is already affecting how the golf course looks and feels to [him]" and made him "fe[el] violated." *See* Dkt. No. 8-6 ¶ 22. "It looks terrible," according to Roberts, and "diminishes the beauty that [he] appreciate[s] about East Potomac." *Id.* If NPS renovates the Course, Roberts fears that it "wouldn't

be the same," and that it "wouldn't feel historically important to [him] anymore." *Id.* ¶ 21. He doubts that he would "ever go back." *Id.* "[E]ven if there were just a modest renovation," Roberts says he "couldn't support that." *Id.* He also speculates that "green fees would go through the roof." *Id.* Similarly, Dickson appreciates East Potomac's history, community, and "how much fun the existing golf courses are." Dkt. No. 8-4 ¶ 22. He fears that, if NPS renovates the Course, its "beauty, fun, history, accessibility, and sense of community . . . will be lost." *Id.* ¶ 17. Dickson speculates that the renovated course would be less affordable and says that he would not play there as often. *Id.* ¶¶ 17–21. He apparently also has "questions about whether it is safe to be that close to" the stockpiled fill material. *Id.* ¶ 22.

Roberts and Dickson simply dislike the possibility of an East Potomac renovation and redesign. Their complaints—including their appeals to the Golf Course's history—are precisely the sort of aesthetic injuries that the Supreme Court just rejected in *National Park Service*: "Article III standing is unavailable where, as here, the only injury a plaintiff asserts stems from offense, disagreement, or distaste." *Nat'l Park Serv.*, 2026 WL 2564318, at *2. That Plaintiffs also claim recreational (rather than purely aesthetic) injuries is of no consequence. Their voluntary decisions to change their recreational habits in response to their subjective dislike of the proposed renovations still "stems from offense, disagreement, or distaste." *See id.*; *cf. Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 184–85 (2000) (finding a sufficient recreational injury where the plaintiffs ceased recreational activity at a river after the defendant pollutants in excess of legal limits into the rivers). Plaintiffs' desire for NPS to cater to their aesthetic and recreational preferences does not create a legally protected interest.

*Increased risk of harm.* Plaintiffs continue to fall far short of establishing a legally cognizable injury from an increased risk of harm. Alleged harms are too speculative to support

standing when they rely on a "highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410. Increased-risk-of-harm theories of injury naturally implicate these concerns. *Food & Water Watch, Inc.*, 808 F.3d at 914. The D.C. Circuit therefore requires a plaintiff relying on an increased-risk-of-harm theory of injury to "show '*both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account.'" *Id.* at 914.

Plaintiffs' allegations and declarations come nowhere close to satisfying this two-part inquiry. *See* Dkt. 75-1. They do not provide evidence establishing the background risk of harm. They do not provide evidence of the current risk of harm with the stockpile present, or that the difference between the background and current risks of harm is *substantial*. They do not provide any evidence that dispersal of chemicals from the stockpile would be likely, and in such concentrations or quantities as to present any risk. And they do not provide any evidence that given the nature of Plaintiffs' limited activities—walking past the stockpile while periodically playing golf—that those activities will result in a level of exposure that could constitute a substantial probability of harm. They rely on their own conclusory allegations that the stockpile is "contaminated with dangerously high levels" of chemicals "that pose significant threats to both wildlife and human health." Pls.' Am. & Suppl. Compl. ¶ 84. But they provide no evidence identifying what is a "dangerous level" of any constituent, that such level poses a substantially higher risk than background levels, or how the threat of harm from that constituent is "significant." *See also* Dkt. 75-1 (discussing deficiencies in Plaintiffs' expert reports).

Plaintiffs' claims of increased-risk-of-harm remain speculative and unsubstantiated. Courts in this Circuit demand far more to establish standing on such a theory. *See, e.g.*, *Int'l Acad. of Oral Med. & Toxicology v. U.S. Food & Drug Admin.*, 195 F. Supp. 3d 243, 266 (D.D.C. 2016) (granting motion to dismiss where plaintiff's expert "offer[ed] neither support . . . nor explanation" for "bald

assertion" that plaintiff would be exposed to dangerous levels of chemicals); *Consumers for Auto Reliability & Safety v. Fed. Trade Comm'n*, No. 17-cv-0540, 2021 WL 4050876, at *11 (D.D.C. Sept. 6, 2021) (granting motion to dismiss where plaintiffs' statistics and reports failed to plausibly allege increased risk of harm from unrepaired used cars). Plaintiffs' unsubstantiated increased risk of harm claim is simply an attempt to circumvent limits on aesthetic and recreational standing.

*Miscellaneous injuries*. Plaintiffs' other purported injuries fair no better. Article III prohibits federal courts from stacking hypothetical on hypothetical to speculate that harm will eventually materialize." *Trump v. California*, No. 26-124, 2026 WL 2473573, at *2 (Aug. 24, 2026) (*citing Clapper*, 568 U.S. at 414–15, n.5). But Plaintiffs do just that by speculating that the NPS's proposed renovations of the *public* golf course would limit their access to East Potomac and materially increase green fees. "Article III demands more certainty." *Id.*

Moreover, the Golf Course will remain a public facility open to Plaintiffs after any renovation. Plaintiffs in essence argue that making the Golf Course better will harm them by making the course more desirable for other members of the public. There is no cognizable theory of standing allowing one member of the public to sue the government to prevent improving a public facility because it would then attract more members of the public.

**2. DC Preservation League**

The DC Preservation League ("the League") claims both organizational and associational injuries. *See Food & Drug Admin. v. All. for Hippocratic Med.* ("*AHM*"), 602 U.S. 367, 395 (2024) (stating organizational standing requires a showing that the defendant's conduct "directly affected and interfered with [the organization's] core business activities"); *Hunt v. Wash. State Apple*

*Advert. Comm'n*, 432 U.S. 333, 343 (1977) (stating associational standing requires, among other things, that the organization's "members would otherwise have standing to sue in their own right").

The League alleges that it and its members recreate in, use, and otherwise have interests in East Potomac. Pls.' Am. & Supp. Compl. ¶ 22. League members enjoy playing golf at East Potomac, riding bikes around East Potomac Park, and "looking at the Japanese cherry trees." Miller Decl. ¶¶ 21–22. They are concerned that "[i]f East Potomac is *destroyed*," they will no longer be able to engage in these activities. *Id.* (emphasis added). As for its own injuries, the League claims that if the Golf Course is redesigned, it will have to "update [its] app and website." Miller Decl. ¶¶ 8, 18, Dkt. No. 8-5. It has also claimed that Defendants' deliberations "would preclude [it] from holding our September event at Golf Course." *Id.* ¶¶ 11, 18. And it suggests that it has suffered a procedural injury by being excluded from the NEPA and Section 106 processes for any potential redesign of the Golf Course. *Id.* ¶¶ 14–18; Pls.' Am. & Suppl. Compl. ¶ 22.

*First*, the majority of the League's alleged injuries—claimed harm to their aesthetic, recreational, and other interests and their "app and website"—fail for the same reason as the individual Plaintiffs: they are mere disagreements with NPS's proposed renovations. *See Nat'l Park Serv.*, 2026 WL 2564318, at *2.

*Second*, "[P]laintiffs 'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *Clapper*, 568 U.S. at 416). League members' alleged injuries that are premised on NPS *destroying* the Golf Course are not only wholly speculative—they exceed Plaintiffs' allegations in this case. Miller Decl. ¶¶ 21–22. The League likewise seeks to manufacture standing by claiming its ability to host a fundraiser has been harmed. The League never alleges that it requested to host this fundraiser or that its

request was denied after agency officials began deliberations. And the League concedes that this fundraiser could be hosted elsewhere. Miller Decl. ¶ 9. If the League has changed its plans (or its app and website), and fears an impact to its fundraising revenue, such speculative financial impacts cannot support an injury for standing. *See Clapper*, 568 U.S. at 416 (finding plaintiffs lack an Article III injury where their alleged harms are "based on costs they incurred in response to a speculative threat"). The "hypothetical future harm" that Plaintiffs fear "is far from 'certainly impending.'" *Trump v. California*, 20256 WL 2473573, at *3 (quoting *Clapper*, 568 U.S. at 416).

*Third,* without any basis for its speculative or self-inflicted injuries, Plaintiffs are left only with the League's allegation that it has suffered a procedural injury to rights provided by Section 106 of the NHPA. Pls.' Am. & Supp. Compl. ¶ 22; Miller Decl. ¶ 18. But even assuming Plaintiffs had a procedural right to participate in the Section 106 process, "a procedural right *in vacuo* . . . is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see also Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 304 (D.C. Cir. 2025) ("[A] plaintiff claiming procedural injury must show how the agency's error could affect her 'concrete interests.'" (citation omitted)).

Plus, the League has no right to be involved in any review that has not yet begun. Plaintiffs have argued that they should have had a chance to participate in the NEPA and Section 106 processes for the conceptual "Washington National Plan." But what they claim is a legal violation is instead indicative of the fact that no such processes have yet occurred. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009) ("[A]n agency's NEPA obligations mature only once it reaches a 'critical stage of a decision which will result in "'irreversible and irretrievable commitments of resources' to an action that will affect the environment.'" (citation omitted)); 54 U.S.C. § 306108 (requiring consideration of effects on

historic property only "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license"). Defendants will comply with all legal required processes and the League will have a chance to participate in those processes.[9]

In sum, Plaintiffs raise only "generalized grievance[s] about the conduct of government" incapable of sustaining standing. *Lance v. Coffman*, 549 U.S. 437, 442 (2007).

**3. Post-Complaint Factual Developments, Such as the Tree Removal, Cannot Be Used to Bolster the Speculative Allegations in the Complaint.**

The recent developments relating to the October 10th tree removal cannot be cited retroactively to rehabilitate Plaintiffs' complaint. It is "clear beyond cavil that a complaint's claims cannot be amended *implicitly*, through subsequent briefing or otherwise." *Hudson v. American Federation of Government Employees*, No. 17-cv-2543-KBJ, 2018 WL 114317, at *2 (D.D.C. Mar. 2, 2018) (citing *Colbert v. Dist. of Columbia*, 78 F. Supp. 3d 1, 13 (D.D.C. 2015)). To accept such a proposition would afford Article III courts ongoing and temporally unlimited supervisory powers. The Court has emphasized that it does not want to play "parks and rec" and supervise the daily goings-on at East Potomac Park. *See, e.g.*, Tr. at 132:11–13 (Oct. 12, 2026). Entertaining Plaintiffs' newly minted segmentation claim would put the Court in just that position. It would invite endless rounds of emergency requests every time Defendants took action at the Park, even if Plaintiffs have never alleged, and could not possibly have alleged, an injury in fact causally related to that action at the time they filed their complaint. *See Hudson v. Am. Fed'n of Gov't*

---

9 By law, the League cannot demonstrate a right to participate in decisionmaking processes for agency actions that are subject to a CE or that do not require further Section 106 review because they are taken pursuant to a programmatic agreement. *See, e.g.*, *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 23 n.15 (D.D.C. 2009) ("[N]o such requirement exists in NEPA . . . ."); *WildEarth Guardians v. Provencio*, 272 F. Supp. 3d 1136, 1165–66 (D. Ariz. 2017) (explaining that a programmatic agreement satisfies the agency's Section 106 consultation responsibilities).

*Emps.*, No. 17-cv-2543 (KBJ), 2018 WL 1143172, at *2 (D.D.C. Mar. 2, 2018) (declining to "act as referee and counselor with respect to the parties' perpetual renegotiations of their respective positions on various issues based on real-time developments in the factual landscape as this case proceeds").

The Federal Rules provide the mechanism for seeking amendment and supplementation of a pleading, *see* Fed. R. Civ. P. 15, and Plaintiffs have shown they know how to use that mechanism. *See* Dkt. No. 72. Rather than strain to conform Plaintiffs' existing pleadings to match the case at hand, the Court should hold Plaintiffs to their burden to allege their standing to pursue the relief that they seek. Their complaint does not allege a concrete injury based on NEPA segmentation.

Even if it did, the tree cutting activity could not sustain standing for Plaintiffs. Plaintiffs' recreational and aesthetic interests as expressed in this case are not implicated by the thinning and removal of trees to restore the Golf Course to its historic state. There is no serious allegation that they cannot golf just as they always have or that the course will remain closed to the public after renovation. At most, what they seek is the offended observer theory that the Supreme Court just found to be insufficient in *National Trust*.

### B. Plaintiffs Fail to Show that Their Alleged Injuries are Traceable to Defendants' Conduct

Plaintiffs' theories of standing fail on injury alone. But even if the Court could find an Article III injury that is concrete and not conjectural, they also fail on causation grounds.

Plaintiffs must show that their injury is "fairly traceable" to the defendants' "allegedly unlawful conduct." *California v. Texas*, 593 U.S. 659, 669 (2021). For many of the same reasons Plaintiffs cannot show an Article III injury, they cannot demonstrate causation. There are too many speculative links in the causal chain to support either category of their claims. As for the claims challenging the Proposal, Defendants still would need to adopt a sufficiently detailed design,

conduct necessary compliance, approve that design, and implement construction activities. And that assumes Plaintiffs could in fact find any final design injurious. Defendants have not yet done any of these things. As for their Stockpiling Claims, Plaintiffs would need to show, at a minimum, that Defendants' decision to stockpile soil has caused them injury in some cognizable way. They have not done that either.

Plaintiffs' allegations about the tree-removal project do not change the analysis. As noted, Plaintiffs' briefing on the project, and the testimony the Court heard about it, do not reach back in time to amend the complaint. Moreover, Plaintiffs cannot show that any purported injuries to their aesthetic, recreational, or other interests resulting from the tree removal are traceable to the Proposal. NPS made the decision to proceed with the tree removal because the trees were overgrown in some areas and blocking historic viewsheds. Greiss Decl. ¶¶ 22–23. These findings were not novel. They are rooted in the 2017 CLI and the 2019 CLR, both of which are cited with approval in the Plaintiffs' Amended Complaint. Pls.' Am. & Supp. Compl. ¶¶ 66–70; *see also* Greiss Decl. ¶¶ 11–13. Plaintiffs have not shown that the tree removal project, intended to restore the Golf Course's historic character, is part of the Proposal, nor demonstrate any cognizable injury stemming from it.

Beginning with the October 12th hearing, Plaintiffs and the Court have pursued a hypothesis that Defendants funded the tree-removal project because they believe it to be the first step of implementing the Proposal. Plaintiffs and the Court, in its TRO Opinion, appear to be working out the hypothesis with real-time fact-finding, gathering testimony and building a case to demonstrate a connection. Setting aside Defendants' concerns about the basis and propriety of that questioning, the fact remains that Plaintiffs' complaint does not allege the causal links that are required.

Redressability provides an alternative framework for evaluating allegations of causation. *Dynalantic Corp. v. Dept. of Defense*, 115 F.3d 1012, 1017 (D.C. Cir. 1997) ("Causation and redressability typically "overlap as two sides of a causation coin."). Here, Plaintiffs cannot show that an order declaring the Proposal to be invalid would have any effect on the tree-removal project. The project implements recommendations that were established in 2019 and is proceeding based on environmental and compliance documentation unrelated to the Proposal. Invalidating the Proposal would not invalidate the recommendations, or the decision. Therefore, it would not remedy any injury stemming from the removal of trees on October 10 or the removal of additional trees that Plaintiffs seek to enjoin. *See* Proposed Order, Dkt. No. 80-4.

## III. Plaintiffs Are Not Entitled to a Preliminary Injunction.

Because Plaintiffs are not likely to succeed on the merits of their segmentation claim, and the balance of equities and harms is neutral at this preliminary stage, they are not entitled to a preliminary injunction.

### A. There is no final agency action.

Plaintiffs are not likely to succeed on the merits of any claim that would entitle them to relief against the tree removal project pursuant to the 2019 CLR. The APA limits review of "agency action" to "final agency action." 5 U.S.C. § 704. Agency action is "final" if it (1) "mark[s] the 'consummation' of the agency's decisionmaking process," and (2) creates legal "rights or obligations," with "direct and appreciable legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted).

Here, there is no final agency action. Plaintiffs' theory is that the Washington National Plan has been finalized and is final agency action, and that the tree removal is an implementation of that final action. To support this theory that the Washington National Plan is final and underway, they proffer only conjecture based on a handful of tweets. Even if justiciable under the APA (which it

is not), the President's mention of a possible project, in a handful of tweets, demonstrates at most that the President has given preliminary thought to it. Mere consideration of a hypothetical action (indeed, even a proposed action) does not represent the consummation of a decision-making process or the required commitment of resources. *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999). Nor does it determine rights or obligations or cause legal consequences. *See Nat'l Wildlife Fed'n*, 497 U.S. at 894 (noting that such preparatory actions do not have "an actual or immediately threatened effect"). Such preparatory activities, without more, are not final agency action under the APA. *See, e.g.*, *Reliable Automatic Sprinkler Co. v. Consumer Product Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) (finding "a statement of the agency's intention to make a preliminary determination" was not final agency action). Plaintiffs cannot point to a final decision document, yet at the same time apparently concede that Defendants are actively working on legal compliance documents that would support a final decision. In reviewing agency action, "it [is] not the function of the court to probe the mental processes" of relevant decisionmakers. *United States v. Morgan*, 313 U.S. 409, 422 (1941). Under the APA, it is "error" for a court to "review[ ] an abstract decision apart from a specific agency action." *Biden v. Texas*, 597 U.S. 785, 809 (2022); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ("Where no other statute provides a private right of action, the agency action complained of must be *final* agency action.") (citation modified). This alone shows that there has not been final agency action. Indeed, it is doubtful the Plan will be agency action at all, given that it concerns NPS's maintenance and upkeep of its own property. *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 194 (4th Cir. 2013).

For its part, this Court came up with its own theory in its TRO ruling that the tree removal itself was a separate final agency action. TRO Op. 14–15. But that is not Plaintiffs' theory. They

have not pleaded it and they did not present it in their motion. *See generally* Pls.' Am. & Supp. Compl., Pls.' Mot. The Court should thus abandon it and adhere to ordinary principles of party presentation as a "neutral arbiter," rather than commandeering the proceedings by staking out its own legal theories in parallel with its own demands for witnesses and testimony. *United States v. Sineneng-Smith*, 590 U.S. 371, 379 (2020).

The Court's theory of final agency action also fails on the merits because the Park Service's clearing vegetation in its own golf course is not "agency action" at all because it is not the sort of legal action the APA is concerned with. *See* 5 U.S.C. § 551(13) (defining "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof"); *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2026) ("[W]e have long recognized that the term agency action is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency.") (citation omitted, cleaned up). The APA does not authorize "judicial review over everything done by an administrative agency." *Independent Equip. Dealers v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (brackets and citation omitted). Agency action requires more: "actual legal effect" on the rights or obligations of "regulated parties." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251-252 (D.C. Cir. 2014) (Kavanaugh, J.); *see also Bennett v. Spear*, 520 U.S. 154, 170 (1997) (finding the biological opinion authorizing take of an endangered species to be final agency action); *Biden v. Texas*, 597 U.S. 785, 806-807 (2022) (finding final agency action where a memo required aliens to return to Mexico). Removing vegetation is instead simply the management of the Service's landscaping, not a "rule, order, license, sanction, relief, or the equivalent or denial thereof." 5 U.S.C. § 551(13). If landscaping were agency action, the public would soon challenge lawn mowing, hedge trimming, rose clipping, rearranging paintings in the art gallery, and all manner of horticultural

and other activities that the Executive Branch undertakes every day. This would inappropriately inject courts "into day-to-day agency management" of federal landscaping decisions, *SUWA*, 542 U.S. at 62, 67, which is the type of "general judicial review" forbidden by the APA, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990); *see also Vill. of Bald Head Island*, 714 F.3d at 194 (4th Cir. 2013).

**B. Plaintiffs Are Not Likely to Succeed on the Merits of their Segmentation Claim.**

Plaintiffs' NEPA claim fails because their segmentation theory is no longer good law and because they lose even under the obsolete test they invoke.

**1.** To begin, Plaintiffs' key precedent is no longer good law. PI Mot. at 3, 7, 20, 21 (quoting *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014)). This is true for two reasons that Plaintiffs glaringly omit from their brief.

First, *Delaware Riverkeeper* rests on regulations that have been rescinded. *See Delaware Riverkeeper Network*, 753 F.3d at 1313 (quoting and relying on 1978 regulations, which were repealed in January 2026, 91 Fed. Reg. 618).[10] Those regulations required agencies to assess environmental effects of "connected actions," "cumulative actions," and "similar actions with similarities that provide a basis for evaluating their environmental consequences together." *Delaware Riverkeepe Network*, 753 F.3d at 1314 (quoting 40 C.F.R. § 1508.25). Those now-rescinded requirements are the backbone of Plaintiff's obsolete segmentation claim.

Second, on top of that, the Supreme Court eliminated the old segmentation claims as a statutory matter in *Seven County*. The Court held that NEPA does not require agencies to "address environmental effects from projects that are separate in time or place from the … project at hand."

[10] DOI published a NEPA handbook in February 2026. *See* https://www.doi.gov/media/document/doi-handbook-nepa-procedures.

605 U.S. at 186. That's because "the textually mandated focus of NEPA is the 'proposed action'—that is, the project at hand—not other future or geographically separate projects." *Id.* at 186-87. The Court squarely held, contrary to the obsolete regulations, that NEPA does not require agencies to assess the combined effects of connected actions, cumulative actions, or similar actions. *Id.* at 186–91.

After *Seven County*, the relevant question is not segmentation, but is simply a matter of identifying the "project at hand." *Save the Sound, Inc. v. FAA*, 183 F.4th 763, 771 (D.C. Cir. 2026) (quoting *Seven County*, 605 U.S. at 190). And on that question, NEPA "gives agencies wide latitude to define the relevant project: Even 'interrelated' projects that are 'close in time and place to the project at hand' are not necessarily a single project." *Id.* As the Supreme Court emphasized, the court's "review 'must remain deferential,' particularly as to the 'gray area in defining the project at hand.'" *Id.* (quoting *Seven County*, 605 U.S at 190–91).

The deference point warrants emphasis: *Seven County* repeatedly admonished lower courts that "the central principle of judicial review in NEPA cases is deference." 605 U.S. at 179. Thus, all NEPA requires is whether the agency has "drawn a reasonable and manageable line," not whether "NEPA would support drawing a different line," and not whether this Court or the plaintiffs would like the agency to draw a different line. *Id.* So long as the agency has defined the project in a rational way, Courts must defer. *Seven County* certainly does not allow courts to interrogate agency witnesses regarding their subjective motives in defining the "project at hand." Quite to the contrary. "The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id.* at 185.

That is the end of Plaintiffs' segmentation claim. The agency defined the "project at hand" as tree removal to implement the treatment recommendations in the 2019 CLR to restore the

historic character of the Golf Course. That is a rational way to define the project. Plaintiffs do not contest that it is a still-governing agency planning document, or that tree-removal would be historically appropriate at the Park. This Court must defer to that judgment. *Seven County*, 605 U.S. at 185, 190.

**2**. Even under the obsolete regulations, Plaintiffs' segmentation claim fails. As the D.C. Circuit recently held, those regulations "police" the line for defining the "project at hand" "by considering whether possibly different projects overlap temporally and have substantial independent utility." *Save the Sound*, 183 F.4th at 771. An earlier version of the test has four prongs: if the allegedly segmented project "(1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives; and (4) does not irretrievably commit federal funds for closely related projects." *Delaware Riverkeeper*, 753 F.3d at 1315 (quoting *Taxpayers Watchdog v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987)).[11] Applying either test here makes clear that NPS has not engaged in impermissible segmentation, and instead, is simply conducting a project in East Potomac Park. Plaintiffs' position, if adopted by the Court, would essentially ban NPS from doing *anything* to manage a National Park if there are also future hypothetical plans in that same park under consideration. This is not a workable result. NPS drew a manageable line in separating this maintenance activity, reviewed under a CE, and future work, which would have its own compliance documents (as Plaintiffs begrudgingly acknowledge, *see* PI Mot. at 19).

*Logical Termini*. The project to implement the vegetation management components of the CLR has a logical termini: completion of the vegetation management recommendations to restore

---

[11] It is not clear whether the *Delaware Riverkeeper* four-pronged analysis survives the D.C. Circuit's decision in *Save the Sound*, which described a two-pronged analysis. However, regardless of which test applies, segmentation has not occurred.

the course to its historic state. As the CLR explains, the Golf Course is a links style of course, which "is patterned on landscapes of ancient Scotland and refers to a rough, grassy area of land along the coastline that includes sand dunes *and few, if any, trees*." CLR at 11 (emphasis added). The course architect's "drawings contained no trees adjacent to the fairways[.]" *Id.* at 12. "Trees throughout the landscape have continued to mature; in some cases, this has changed the character of the course's original treeless, links–style design." *Id.* at 37. The treatment guidelines for vegetation management describe that:

> Successive decades of unchecked plantings by the NPS and concessionaire, changed the character of the links–style courses closer to that of a parkland–style course. The encroaching vegetation has altered strategy, impacted turf health, and obscured intended views within the course. The interior of the course has also accumulated storage areas for brush, logs, dirt, rocks, and other natural debris. This has promoted undesired vegetation, topographic changes, and loss of views.

*Id.* at 196. Accordingly, it recommends that NPS should restore the links style course by "minimizing trees growing between the fairways" while preserving large sentinel trees. *Id.* In comparison, in *Delaware Riverkeeper*, the court found segmentation after an agency split the analyses for "a single pipeline" which "is linear and physically interdependent, and it contains no physical offshoots." *Delaware Riverkeeper Network*, 753 F.3d at 1316. Plaintiffs' assertion that the only logical termini of work that has uncontestably been part of an NPS planning document for seven years is completion of an entirely different project is based on supposition on supposition. But speculation does not suffice. NPS's quick implementation of the treatment guidelines—which including selective vegetation management—when resources became available does not mean there is no logical termini. The speed at which the agency acted cannot plausibly inform whether the project has a logical endpoint. Plaintiffs' attempt to connect the two reveals that they have no argument to make. Further, NPS is entitled by law to deference in drawing the lines between projects, the Court should not take Plaintiffs' slippery-slope theory at face value.

*Substantial Independent Utility*. The tree removal project has substantial independent utility. Plaintiffs posit that tree management at East Potomac Park "has little independent utility apart from a major golf course restoration." PI Mot. at 24. Yet in the same breath, Plaintiffs concede that the CLR "called for "[r]estor[ing] the links style and historic vegetation (rough grasslands, thin trees between fairways, and sentinel deciduous trees)." *Id.* Plaintiffs cannot have it both ways: they cannot agree that tree maintenance has been long-recommended for the historic integrity of the course, but at the same time, presume without evidence that tree maintenance is not for that stated purpose. As the D.C. Circuit has explained, the bar for substantial independent utility is low: it is satisfied where "each project could proceed without the other(s)." *City of Port Isabel v. FERC*, 111 F.4th 1198, 1212 (D.C. Cir. 2024), *on reh'g in part*, 130 F.4th 1034 (D.C. Cir. 2025). There is no serious contest that the tree-cutting could go forward without requiring any broader changes to the Park, and that doing only that would bring the course closer to its historic status. The reverse is also true: without this tree management project, NPS *could* proceed with a broader plan to renovate the Park. Neither is reliant on the other, and accordingly, the tree management project has substantial independent utility.

*Does not foreclose alternatives*. The tree-management project does not foreclose any alternatives, except for alternatives that leave East Potomac overgrown and out-of-touch with its historic design. Plaintiffs argue that tree-cutting "thwarts" a no-action alternative to the purported Washington National Plan. *Id.* at 21. But this assumes that Plaintiffs are entitled to a no-action alternative as to a specific date. East Potomac Park was not frozen in amber when Plaintiffs filed their lawsuit. Regular management continues. If the posited Washington National project moved forward, the CLP would remain an active governing plan for this Park. The no-action alternative in a NEPA analysis would simply consider a world where the Washington National project does

not proceed. NPS is not required to structure a no-action alternative that takes the Park back to a certain date. It certainly does not "foreordain a particular choice" for future changes to East Potomac Park. *Taxpayers Watchdog, Inc.*, 819 F.2d at 299.

*Irretrievable Commitment of funds.* The tree management project does not irretrievably commit any future funds. Plaintiffs suggest that the standard for irretrievable commitment of funds is simply whether Defendants spent any money on the tree management project. *See* PI Mot. at 27 (arguing that "Defendants' tree-clearing campaign has 'irretrievabl[y] commit[ted]' federal funds for a project closely related to the Washington National plan"). But this misstates the law. The question is whether approving this project would "irretrievably commit federal funds for the construction of any proposed" future project. *Id.* It does not, and Plaintiffs do not even argue that it does. *See id.* Nothing in the funding for the tree management project "can compel [NPS] to underwrite any future construction without complying with NEPA." *Id.* Plaintiffs cannot show that the funding provided for this project also locks in future, broader work. Accordingly, the tree management project does not meet the irretrievable commitment of funds prong either.

In sum, NPS engaged in reasonable and manageable line-drawing in conducting a separate NEPA review for the tree management project. Because that is all that NEPA requires, NPS did not violate the general rule against segmenting larger projects into multiple smaller ones. The tree management project has both a logical termini and independent utility—the restoration of the course closer to its historic state. It does not foreclose any future alternatives, and does not commit any funds to any future work. In sum, it is totally separate from any future projects at East Potomac Park.

### C. Plaintiffs Have Not Established That They or Their Members Will Suffer Irreparable Injury.

The "high standard for irreparable injury" in this Circuit requires a two-fold showing by Plaintiffs: First, because an irreparable injury "must be both certain and great," Plaintiffs "must show 'the injury complained of is of such imminence that there is a "clear and present" need for equitable relief to prevent irreparable harm."' *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). And second, "the injury must be beyond remediation." *Id.* Plaintiffs cannot meet these burden by pointing to the irreparable injury to the trees. A plaintiff seeking a preliminary injunction "must establish . . . that *he* is likely to suffer ham in the absence of preliminary relief," *Winter*, 555 U.S. at 20 (emphasis added).

Plaintiffs submitted nothing to establish they or their members are likely to suffer immediate, irreparable harm as a result of to the tree removal project. The Dickson and Roberts declarations were signed and submitted nearly eight months ago, in connection with Plaintiffs' unsuccessful Motion to Stay. *See* Dkt. No. 8-4; Dkt. No. 8-6. Moreover, the only injury those declarations is recreational, and there is absolutely no recreational harm incurred from tree removal. The Second Miller Declaration mentions "trees" only once, in reference to the Japanese cherry trees, without alleging any injury from the tree removal project. Dkt. No. 76-3. Thus, Plaintiffs have failed to allege they will suffer *any* injury, much less irreparable injury, caused by the tree removal project. This is fatal to Plaintiffs' Motion.

### D. The Balance of Equities and Public Interest Do Not Favor Preliminary Relief.

Because Plaintiffs have not shown a likelihood of success on the merits, the Court need not consider the balance of harms and the public interest in issuance of an injunction. However, because Plaintiffs failed to show they are irreparably injured by tree management activities, and there is no Washington National Plan to enjoin, the balance of equities does not tip in their favor.

In assessing the balance of equities and public interest factors, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Where a "movant seeks to enjoin the government, the final two factors merge 'because the government's interest is the public interest.'" *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 314 (D.D.C. 2025) (quoting *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)). Here, Plaintiffs have alleged no irreparable injury from the tree removal project. Thus, there is no harm to balance. By contrast, Defendants and the public have an interest in ensuring that courts abide their jurisdictional limits, including by enforcing the doctrines of standing and ripeness, and that they uphold the separation of powers under the Constitution, which precludes improper infringement on presidential authority. *See Trump v. CASA*, Inc., 606 U.S. 831, 860 (2025). Further, as one court has explained, "governmental action pursuant to a statutory scheme is 'taken in the public interest.'" *Aid for Women v. Foulston*, 441 F.3d 1101, 1115 n.15 (10th Cir. 2006); *see also K.G. ex rel. Garrido v. Dudek*, 839 F. Supp. 2d 1254, 1279 (S.D. Fla. 2011). The governmental action—to thin trees, pursuant to NEPA and the CLR—is taken in the public interest.

For these reasons, the balance of the harms and the public interest also weigh against preliminary injunctive relief.

## IV. If an Injunction is Granted, Plaintiff Should be Required to Post a Bond

Before a court may award preliminary injunctive relief, a plaintiff must post a compensatory security bond. Fed. R. Civ. P. 65(c). If the Court concludes that injunctive relief is

warranted, the Court should require Plaintiffs to post a security in an amount that the Court considers proper to reflect potential litigation and agency compliance costs.

## CONCLUSION

For these reasons, Plaintiffs cannot establish any of the factors necessary to obtain preliminary injunctive relief. Defendants respectfully request that the Court deny Plaintiffs' Motion. Because Plaintiffs lack standing and the Court thus lacks subject matter jurisdiction, the Court could dismiss this case even before Defendants' responsive pleading deadline.

Respectfully submitted this 16th day of October 2026.

**ADAM R. F. GUSTAFSON**
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Energy & Natural Resources Division

**ROBERT STANDER**
Deputy Assistant Attorney General

**BENJAMIN HAYES**
Deputy Assistant Attorney General

*/s/ Marissa A. Piropato*

**MARISSA A. PIROPATO**
Deputy Chief (MA Bar No. 651630)
U.S. Department of Justice
Energy & Natural Resources Division
Natural Resources Section
4 Constitution Square
150 M Street NE
Washington, DC 20002
Tel: (202) 532-3182
Email: Marissa.Piropato@usdoj.gov

*Attorneys for Federal Defendants*