# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DC Preservation League, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. Department of the Interior, *et al.*,<br><br>Defendants. | No. 1:26-cv-00477 |

## DECLARATION OF DR. KEVIN GRIESS, SUPERINTENDENT OF NATIONAL MALL AND MEMORIAL PARKS, NATIONAL PARK SERVICE

**I, Kevin Griess, Ph.D., declare as follows:**

1. I am the Superintendent of National Mall and Memorial Parks (NAMA), a unit of the National Park System, and have been in that position since December 2024. Prior to that time, I was employed by the U.S. Army as the Deputy Garrison Commander at Fort Bragg in North Carolina. In that role, I was a military City Manager, responsible for all municipal operations for a military city of 135,000.
2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I would testify competently thereto.
3. In my current position I manage and oversee the management, preservation, and protection of over 1,000 acres of federal parkland in Washington, D.C., including the National Mall's iconic monuments and memorials and East Potomac Park. The East Potomac Golf Course (Golf Course) is within East Potomac Park.
4. I report to the Regional Director of the National Capital Region ("NCR"), Jennifer Nersesian. My declaration supplements Jennifer Nersesian's March 3, 2026, and April 30,

2026, declarations, the declarations by the Comptroller, Exercising the Authority of the Director of the National Park Service ("NPS"), Jessica Bowron, signed on March 3, 2026, and April 30, 2026, and my declaration signed October 9, 2026.

5. East and West Potomac Parks Historic District was listed in the National Register of Historic Places ("National Register") in 1973, and this listing was updated in 2001. A copy of the 1973 National Register Nomination Form is attached as Exhibit A. The East Potomac Golf Couse is identified as a contributing site to the listed historic district. *Id.* at Section 7, p. 50.

6. The East Potomac Golf Course is a maintained cultural landscape. In furtherance of the NPS's management responsibilities for cultural landscapes and historic properties in general, the NPS prepared a Cultural Landscape Inventory for the Golf Course in July 2017 (2017 CLI).. NAMA 0382-0703.

7. The purpose of a CLI "is to identify cultural landscapes in the national park system and provide information on their location, historical development, character-defining features, and management." NPS-28, Cultural Resource Management (Chapter 7) at 4. A CLI is intended to assist "park managers in planning, programming, and recording treatment and management decisions." *Id.* A copy of NPS-28, Cultural Resource Management (Chapter 7) is attached as Exhibit B.

8. The 2017 CLI identified that the East Potomac Park Golf Course cultural landscape was individually eligible for listing in the National Register and recommended a period of significance of 1917 to 1941. 2017 CLI at 19. The 2017 CLI described the current vegetation at the Golf Course as a deviation from the Golf Course's historic character during its period of significance of 1917-1941. NAMA 0382-0703. The 2017 CLI explains

that "[t]he vegetation pattern of [Golf Course designer Walter] Travis' design was generally treeless—a characteristic feature of links-style courses—with cleared fairways and grassy turf," NAMA 0433, and that "[w]ide open vistas of grass and views toward the water, were the desired effect at East Potomac," NAMA 0524-0525. Consistent with that design intent, the 2017 CLI identifies "a wide open, treeless landscape" as "[c]haracter-defining vegetation" at East Potomac Golf Course. NAMA 0527. The 2017 CLI also concludes that "[m]aturation of vegetation and additional planting since the period of significance, has resulted in the loss of view sheds and changed the feeling of playing the course, designed in the relatively treeless links style," and that "[t]hese developments are reversible." NAMA 0527.

9. The following image, included in the 2017 CLI, illustrates the difference between the Golf Course's original, links-style design, and its more recent, heavily vegetated condition:



NAMA 0590.

10. The NPS documented its consultation with the D.C. State Historic Preservation Office ("DC SHPO") under Section 110 of the National Historic Preservation Act regarding the 2017 CLI, via letter dated May 22, 2017, and specifically sought the DC SHPO's concurrence with respect to the resources within the Golf Court that contribute to its historic character. In particular, the NPS identified the "[o]pen links-style landscape, with few trees between fairways or lining greens" as a contributing feature of the landscape and identified trees in various locations as noncontributing vegetation. On July 18, 2017 the DC SHPO concurred with the NPS's findings. A copy of the NPS's May 22, 2017 letter and the DC SHPO's July 18, 2017 response is attached as Exhibit C.

11. Following the 2017 CLI, the NPS prepared a Cultural Landscape Report in June 2019 titled "National Park Service Golf Courses in the District of Columbia: East Potomac Park, Langston, and Rock Creek: Treatment Guidelines" (2019 CLR). *See* NAMA 0798-1097. The purpose of the 2019 CLR was to "provide treatment guidelines" for the three golf courses in Washington, D.C. NAMA 0822.

12. As explained in the 2019 CLR, Golf Course designer Walter J. Travis "opted to design a traditional links-style course rather than a parkland-style course," showcasing a style that favored "a rough, grassy area of land along the coastline that includes sand dunes and few, if any, trees." NAMA 0830. The 2019 CLR notes, however, that "after Travis's initial planning effort, successive decades have led to the introduction of additional trees to the course, which have altered the feeling of the course, moving the character of the links-style courses closer to parkland-style courses," and that the "encroachment of vegetation has altered strategy and obscured intended views within the course." NAMA 0912.

13. Accordingly, the 2019 CLR recommends that the NPS "[r]estore the links style and historic vegetation (rough grasslands, thin trees between fairways, and sentinel deciduous trees)," and "minimiz[e] trees growing between the fairways." NAMA 1015. The 2019 CLR also recommends that the NPS "[d]evelop a Vegetation Management Plan for the [Golf Course] to establish removals, thinning, replacement and new plantings based on the management objective to preserve the links–style landscape." *Id.*

14. The 2019 CLR identified areas of the Golf Course that should be rehabilitated or restored to reflect the period of historical significance, but it did not include timelines, or an implementation strategy. When NPS executed a new 50-year lease with National Links Trust (NLT) in October 2020, the lease incorporated the 2019 CLR recommendations into NLT's long-term work plan. Because NLT assumed responsibility for completing these actions, the NPS, specifically NAMA, did not develop its own restoration plan or pursue funding, staffing, or contracting strategies to carry out the work independently. I am not aware that NLT did any of the work contemplated in the lease to implement the 2019 CLR's recommendations with respect to vegetation maintenance.

15. The NPS's lease with NLT was terminated in December 2025. A "holdover" arrangement allowed NLT to continue daily golf operations, but all other requirements of the lease — including maintenance and fulfilling the recommendations in the 2019 CLR — reverted back to the NPS, specifically to NAMA.

16. Since its issuance, implementing the actions required under Executive Order 14252 *Making the District of Columbia Safe and Beautiful* (March 28, 2025) and preparing for America's Semiquincentennial events, many of which were held in and around the National Mall, have been an NPS priority.

17. NPS has renovated, restored, or rehabilitated, or is in the progress of restoring, many NPS sites within the National Capital Region. Among other projects, NAMA has focused on rehabilitating turf and open park areas on the National Mall and West Potomac Park to address wear and damage from intensive event activity and high visitation. Funding has also been used for (a) the repair of 22 fountains and water features; (b) rehabilitating or installing 1700 benches; (c) repairing nearly 2400 light fixtures; and (d) removing approximately 10 tons of litter, debris, and downed vegetation from public spaces.

18. The long neglected East Potomac Park, with its high visibility and close proximity to the National Mall, was logically prioritized as well. For example, NPS is currently evaluating options to repair the seawall surrounding East Potomac Park, which was recommended in a 2011 Initial Rehabilitation Plan for the seawall. NAMA 0366. My staff used the 2019 CLR as the foundation for evaluating the Golf Course, which was the CLR's intended use. Consistent with the 2019 CLR's recommendation, NAMA staff, in coordination with National Capital Region personnel with functional expertise, created a proposed tree and vegetation management plan for the Golf Course.

19. Below is an aerial photograph taken by the Bureau of Land Management, on NPS's behalf, on August 31, 2026. It accurately depicts the trees on East Potomac Park as of October 5, 2026, except to the extent that dead, dying or invasive trees were removed after August 31, 2026 and the extent to which immature trees may not be visible due to their small size.



20. Consistent with the 2019 CLR, the NPS prepared a tree management plan for the Golf Course on October 5, 2026 (“Tree Management Plan). The objectives of the Plan included restoring and maintaining the Golf Course’s historic links-style character of open fairways, broad sightlines, rough grasslands, limited interior tree cover, and strategically retained specimen trees; preserving character-defining and historic vegetation; and removing or thinning non-contributing and invasive woody vegetation that encloses fairways and greens. A copy of the Tree Management Plan is attached as Exhibit D.

21. The NPS then proposed a tree management and cultural landscape rehabilitation project (“the Project”) designed to implement the recommendations in the 2019 CLR and the tree

management plan through selective tree and woody vegetation removal; preservation and management of historic and character-defining vegetation and compatible specimen trees; restoration and maintenance of significant views and the historically open spatial character of the Golf Course; and control of invasive and volunteer vegetation. The Project was also intended to include associated stump and root removal, and stabilization of disturbed areas. These treatments were intended to improve the condition and historic integrity of the cultural landscape while supporting its continued use as a public golf course.

22. The NPS documented its compliance with the National Environmental Policy Act in a Categorical Exclusion Documentation Form ("CE Form"), signed October 9, 2026. The CE Form documents that the NPS applied the categorical exclusion found at DOI NEPA Handbook, Appendix 2, 12.5, C(4), (Feb. 2026) for the proposed action. CE Form at 5. This categorical exclusion applies to "Routine maintenance and repairs to cultural resource sites, structures, utilities and grounds under an approved Historic Structures Preservation Guide or Cyclic Maintenance Guide; or if the action would not adversely affect the cultural resource." *Id.* A copy of the CE Form is attached as Exhibit E and is available online at https://parkplanning.nps.gov/showFile.cfm?sfid=868637&projectID=139091.

23. As explained in the CE Form, the NPS found that application of the categorical exclusion was "appropriate because the action constitutes routine maintenance and treatment of cultural resource grounds and is consistent with established preservation objectives for the historic cultural landscape" and the proposed action would not have an adverse effect on the cultural resource, the East Potomac Golf Course cultural landscape, as it was consistent with the recommendations in the 2019 CLR. CE Form at 5. The NPS also documented its consideration of extraordinary circumstances that would preclude application of the

categorical exclusion and determined that none applied. CE Form at 5-10. The CE Form did not divide the trees into zones, identify priority zones for removal, or limit the number of trees that would be cut in specific zones. *See generally id*.

24. The NPS documented its compliance with Section 106 of the National Historic Preservation Act for the Project in an Assessment of Effects ("Assessment"), signed October 9, 2026. A copy of the Assessment is attached as Exhibit F and available online at https://parkplanning.nps.gov/document.cfm?parkID=427&projectID=139091&documentID=153937.

25. The Assessment documented the NPS's consideration of the effects of the proposed Project on historic properties and the NPS's finding that the Project would have "No Adverse Effect" on any historic properties. Assessment at 6. The NPS found that the Project was eligible for streamlined review under the NPS's 2008 Nationwide Programmatic Agreement with the Advisory Council on Historic Preservation and the National Conference of State Historic Preservation Officers because it would "involve vegetation management and landscape maintenance intended to preserve the historic character and condition of an existing cultural landscape. *Id.* The work implements recommendations in the NPS's 2019 Cultural Landscape Report, including selective removal of non-contributing vegetation that has altered the historically open links-style character of the golf course and obscured significant historic views." Assessment at 7. It further explained that the proposed Project was "intended to maintain and recover existing character-defining landscape features" and that "[h]istoric trees, significant specimen trees, and character-defining planting patterns would be retained and protected." *Id.*

26. As described in the CE Form, and based on the NPS's then-current tree inventory, the Project would involve removing "approximately 382 trees measuring greater than 10 inches diameter at breast height (DBH), plus an additional 147 trees of a smaller size" for a total of 529 trees. CE Form at 3.

27. The NPS's methodology for selecting trees to be removed or retained began with the 2019 CLR descriptions of links-style design and focused on the interior of the golf course. My staff applied a conservative retention methodology, beginning with an evaluation of interior trees greater than 30 inches DBH. This threshold was selected as a practical starting point because it generally identifies mature trees that may predate significant landscape changes, while recognizing that DBH is an imperfect proxy for age and can vary considerably by species and site conditions. Tree size was therefore used by my staff as a screening tool rather than a sole determinant of significance.

28. The trees were then evaluated by park staff to determine: (1) whether they existed during the historic period based on historic photographs, plans, and the 1927 aerial imagery; (2) whether they occupied a location associated with documented historic tree groupings or landscape features (such as original green sites, bunkers, and playing corridors) identified in the historic record; and (3) if they were not present during the historic period, whether they functioned as a isolated specimens compatible with the character and design intent of a links-style golf course. A complete and total tree-by-tree tabulation was not possible in the area referred to by NPS staff as "Trash Island" due to the intensely overgrown and dense vegetative conditions.

29. Recommended removals focused on non-contributing trees that were absent during the historic period, substantially obstructed documented historic views and vistas, were

inconsistent with links-style golf course design principles (including linear tree plantings along fairways characteristic of parkland-style courses), or interfered with golf course function and playability, as well as invasive nonnatives that had not yet been removed in previous actions. In areas where historic tree locations were documented in the aerial imagery, trees were often identified to be retained even when they did not date to the period of significance, serving as foundation plantings for the long-term re-establishment of historically appropriate vegetation patterns.

30. Consistent with cultural landscape management practices, retention decisions were not based solely on tree health. Trees that contribute to the historic landscape may warrant substantial preservation efforts, including enhanced maintenance, hazard mitigation, and operational adjustments. The removal program was developed by NPS as a balanced approach that considers cultural landscape integrity, historic viewsheds, golf course operations, agronomic conditions, and long-term vegetation management.

31. The process described above is how the NPS arrived at the total of 529 trees identified in the CE Form, which I signed.

32. After the trees to be removed were identified, the work effort was sub-divided into Zones according to priority of effort where Zone A (the area referred to as "Trash Island") was the first priority, followed by Zone B, etc… Below is a map that was developed to aid communication of work plan with the NPS's contractor. It depicts the trees identified for removal, as well as zones identified containing a higher volumes of trees.




33. Consistent with my October 9 declaration, work on the Project began on Saturday, October 10. Initial work focused on a heavily overgrown area (referred to as Trash Island by NPS staff) and depicted as Zone A on the map above. Work on October 10 progressed to Zone B.

34. During implementation of tree removal activities on October 10, the NPS identified that trees and woody vegetation in Zone A were under-estimated in the previous count of the total number of non-contributing trees to be removed due to the dense, unmanaged vegetative conditions in Zone A. The initial assessment had estimated 169 trees, but because the dense and overgrown vegetation made it difficult to accurately identify and inventory trees, approximately 200 small-diameter, immature trees, generally ranging from 3 to 5 inches in DBH were also removed. In Zone B, which had 90 trees identified for removal, 63 trees were felled on October 10, leaving 27 trees in Zone B identified for

removal. Zone B did not have the same dense vegetation present in Zone A and there was no discrepancy between the number of trees identified for removal and the number of trees removed on October 10.

35. The numbers above are based on the NPS's contractor's reporting. It is likely the contractor over-counted the number of individual trees removed as it counted multi-leader trees (single trees that have multiple main trunks rather than a single main trunk) as multiple trees in addition to small DBH trees. The NPS plans to verify the number of trees cut by counting the stumps once the debris is cleared from Zone A and the area is accessible.

36. The NPS documented its consideration of the unanticipated trees that were removed in Zone A and evaluation of those effects in a Determination of NEPA Adequacy (DNA), signed October 11, 2026. A copy of the DNA is attached as Exhibit G. and available online at https://parkplanning.nps.gov/showFile.cfm?sfid=868658&projectID=139091. The DNA began by finding that additional review was "necessary to document the discrepancy between the estimated and actual number of trees removed, evaluate whether the additional removals resulted in effects beyond those previously assessed, and determine whether further analysis or consultation is warranted under the National Environmental Policy Act (NEPA), Section 106 of the National Historic Preservation Act (NHPA), or other applicable environmental compliance requirements." DNA at 1.

37. NPS performed that additional review and concluded that the CE applied for NEPA compliance remained appropriate because the additional removals of small-diameter trees did not change the purpose or nature of the action, the additional trees were all located within the same densely vegetated area, and their removal was consistent with the activities considered in the CE Form. *Id.* at 3.

38. No areas of the Golf Course were closed during the tree removal activities on October 10. Most of the felled trees remain *in situ* on the Golf Course, pending future removal by the contractor.

39. The map in Paragraph 32 also identifies Zone C and an area around the driving range. There are 39 trees identified for removal in Zone C and 35 trees identified for removal in the zone around the driving range. Additionally, there are 196 trees identified for removal that are not within any of the four delineated zones. In total, approximately 300 trees identified for removal remain on the Golf Course. After the vegetative removal, NPS intends to replant or stabilize the area with turf or low-growing vegetation, consistent with the historic landscape.

40. Due to heavy rain and wet conditions on the ground, work was unable to proceed on October 11. Due to these same conditions, the NPS did not plan to proceed with tree felling on October 12. I am aware that the Court has now issued an order preventing additional tree felling through October 26. Further tree felling will not proceed unless and until the Court order expires or is lifted.

41. If the Project is allowed to move forward as planned, including felling of the remaining approximately 300 trees, any temporary closures of portions of the Golf Course will be limited to that which is necessary to ensure public safety in the immediate area of work being performed. At present, the NPS will need to assess conditions on the ground to identify the safe perimeter of work-zones.

42. The NPS anticipates that the project would take approximately 2-3 weeks from initiation to completion, though it could take longer. Of this time, the NPS estimates an additional

1-2 days of tree felling. The remainder of the work will consist of site cleanup and debris removal.

43. The NPS estimates that approximately 729 trees that do not contribute to the historic landscape would ultimately be removed as part of this tree management and cultural landscape rehabilitation project, with a high percentage of those trees consisting of immature, small-diameter trees from Zone A. No healthy trees that are contributing features of the historic golf course (such as healthy historic cherry trees) have been or will be removed as part of the Project.

44. I am aware that the NPS is evaluating proposals to redesign or renovate the Golf Course and has initiated consultation under Section 106 of the National Historic Preservation Act in connection with that potential project. The planned tree management and cultural landscape rehabilitation project is not a renovation or redesign of the Golf Course, is not a part of any potential project to redesign or renovate the Golf Course, and would be carried out irrespective of any future renovation or redesign. It is intended to further the NPS's resource management objectives for the Golf Course consistent with its historic character and its existing links-style design, to utilize available resources to complete long-deferred maintenance needs, and to implement the recommendations in the 2019 CLR. It does not include any modifications to individual golf holes or routing; grading or landform modifications such as mounding or berms; rehabilitation or modification of bunkers or greens; or other significant renovation work.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 16, 2026.

Kevin J. Griess 2026.10.16 10:36:34 -04'00'

Kevin Griess, Ph.D.

# EXHIBIT A

Griess Decl.

PH0021911

Form 10-306
(Oct. 1972)

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

# NATIONAL REGISTER OF HISTORIC PLACES INVENTORY – NOMINATION FORM FOR FEDERAL PROPERTIES

*(Type all entries - complete applicable sections)*

STATE:

COUNTY:

FOR NPS USE ONLY

ENTRY DATE: NOV 30 1973

SEE INSTRUCTIONS

## 1. NAME

COMMON:
East and West Potomac Parks

AND/OR HISTORIC:
Potomac Flats

## 2. LOCATION

STREET AND NUMBER: area bounded by Constitution Avenue, 17th Street, Independence Avenue, Washington Channel, Potomac River and Rock Creek Park

CITY OR TOWN: Washington

CONGRESSIONAL DISTRICT: Congressman Walter E. Fauntroy, D.C.

STATE: District of Columbia — CODE: 11

COUNTY: District of Columbia — CODE: 001

## 3. CLASSIFICATION

| CATEGORY (Check One) | OWNERSHIP | | STATUS | ACCESSIBLE TO THE PUBLIC |
|---|---|---|---|---|
| [X] District | [X] Public | Public Acquisition: | [ ] Occupied | Yes: |
| [ ] Building | [ ] Private | [ ] In Process | [ ] Unoccupied | [ ] Restricted |
| [ ] Site | [ ] Both | [ ] Being Considered | [ ] Preservation work in progress | [X] Unrestricted |
| [ ] Structure | | | | [ ] No |
| [ ] Object | | | | |

PRESENT USE *(Check One or More as Appropriate)*

| | | | | |
|---|---|---|---|---|
| [ ] Agricultural | [X] Government | [X] Park | [X] Transportation | [ ] Comments |
| [ ] Commercial | [ ] Industrial | [ ] Private Residence | [ ] Other *(Specify)* | |
| [ ] Educational | [ ] Military | [ ] Religious | | |
| [ ] Entertainment | [ ] Museum | [ ] Scientific | | |

## 4. AGENCY

National Park Service, Department of the Interior

REGIONAL HEADQUARTERS: *(If applicable)* National Capital Parks

STREET AND NUMBER: 1100 Ohio Drive, S.W.

CITY OR TOWN: Washington

STATE: District of Columbia — CODE: 11

STATE:

## 5. LOCATION OF LEGAL DESCRIPTION

COURTHOUSE, REGISTRY OF DEEDS, ETC.: None exists--parks are reclaimed land

STREET AND NUMBER:

CITY OR TOWN:

STATE:

CODE

COUNTY:

RECEIVED SEP 12 1973 NATIONAL REGISTER

## 6. REPRESENTATION IN EXISTING SURVEYS

TITLE OF SURVEY: National Park Service survey in compliance with Executive Order 11593

DATE OF SURVEY: [X] Federal [ ] State [ ] County [ ] Local

DEPOSITORY FOR SURVEY RECORDS: National Capital Parks

STREET AND NUMBER: 1100 Ohio Drive, S.W.

CITY OR TOWN: Washington

STATE: District of Columbia — CODE: 11

FOR NPS USE ONLY — ENTRY NUMBER — DATE: NOV 30 1973

## 7. DESCRIPTION

| CONDITION | (Check One) |
|---|---|
| | [X] Excellent [ ] Good [ ] Fair [ ] Deteriorated [ ] Ruins [ ] Unexposed |
| | (Check One): [X] Altered [ ] Unaltered — (Check One): [ ] Moved [ ] Original Site |

DESCRIBE THE PRESENT AND ORIGINAL *(if known)* PHYSICAL APPEARANCE

Most of the land known as Potomac Park was originally underwater, unnavigable shoals, or useless swamp land. That the area was reclaimed, beginning in 1834, was merely as an incident in the construction of the "Long Bridge" (currently the railroad bridge site), and later as a vital sanitary measure. In order to construct the "Long Bridge," it was necessary in 1834 to build an approach on a solid earth causeway. This was done on top of the shoals on the District side of the Potomac, and the fill used was mud from the dredging of the river channels and from excavations under Dupont Circle. After most of the present area had been filled, the Potomac River which had once flowed very near the base of the Washington Monument, was now some distance westward from the Monument. The Washington Channel, which lies between Hains Point and the Naval Air Station, was kept open and separate from the river to provide a quiet harbour. Unlike the river, however, the Channel was inclined to fill with mud. To remedy this, it became necessary to regulate the tidal pools in the western part of Potomac Park used for washing out the Channel daily. This necessitated the creation of the Tidal Basin, an artificial body of water, which at high tide fills up with water flowing through the inlet bridge and at low tide, expels the surplus water under the 14th Street Bridge at the lower end of the Basin. Thus, it sweeps through the Washington Channel taking away mud and sand and keeping the ship lanes of the Channel open.

The reclamation of the Potomac Flats and the excavation of the Tidal Basin had been authorized by Congress by an Act of August 2, 1882, which appropriated $400,000 for the project. It was not, however, until March 3, 1897, by another Act of Congress that:

> "the entire area formerly known as the Potomac Flats, and now being reclaimed, together with the tidal reservoirs, be, and the same are hereby, made and declared a public park, under the name of the Potomac Park, and to be forever held and used as a park for the recreation and pleasure of the people."

This Act began the refinement and landscaping of the land for recreational purposes. The Office of Public Buildings and Grounds had received the land from the Corps of Engineers and set out to develop a new park area which "preserved the features of its natural beauty or enhanced the natural landscape." This was done primarily through the clearing of the land for playing fields and picnic grounds and by the erection of several memorials.

The West Potomac Park area was the first to be developed. West Potomac Park is the land west of the railroad bridge, including the Tidal Basin, to Constitution Avenue on the north and to 17th Street on the East. Most of the early work done on the area consisted of grading and paving a roadway, and in 1904 of lining the parkway west of 17th Street with portrait statues from St. Louis. In 1907, a boat dock was built near the bathing beach on the Tidal Basin, and, in 1908, the polo fields west of the Tidal Basin was graded and a wooden bandstand erected. Meanwhile, macadam

SEE INSTRUCTIONS

Form 10-300a
(July 1969)

RECEIVED
SEP 12 1973
NATIONAL REGISTER

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

**NATIONAL REGISTER OF HISTORIC PLACES**
**INVENTORY - NOMINATION FORM**

*(Continuation Sheet)*

| STATE | |
|---|---|
| COUNTY | |
| FOR NPS USE ONLY | |
| ENTRY NUMBER | DATE |
| | NOV 30 1973 |

*(Number all entries)*

Potomac Park

7. Description (2)

roadways, the inlet bridge, bridle paths and walkways were being completed throughout the park. On March 25, 1912, 3,000 Japanese cherry trees were received as a gift from the City of Tokyo and ceremonially planted by the Japanese Ambassador's wife and by Mrs. William H. Taft around the Tidal Basin. To these were added 55 flowering peach trees making the area a prime visitor site in the spring. A statue of Captain John Paul Jones, sculpted by Charles H. Niehaus, was unveiled at the foot of 17th Street near the Tidal Basin, in1912. This was the first permanent monument completed in the park. Work on the Lincoln Memorial, to be built in West Potomac Park, was begun in 1913 with Henry Bacon as the commissioned architect and Daniel Chester French as the Lincoln statue sculptor. The Memorial was dedicated on May 20, 1922, and its construction had done much to improve Potomac Park, notably, the improvement of roadways and the construction of permanent approaches to the Memorial, as well as necessary reinforcement of the land itself as some settling was beginning to occur. During this time, progress was continually being made throughout West Potomac Park with seeding, planting and taming a few more acres into park-like appearance every year.

In 1918 a public beach was completed on the present site of the Jefferson Memorial, and a liquid chlorine plant was installed under the Tidal Basin inlet bridge. Elsewhere in West Potomac Park, the Wilson Administration had authorized the construction of two concrete office buildings along Constitution Avenue, west of 17th Street, to be occupied by the War and Navy Departments during World War I. They were completed in 1918 as "temporary" but were not demolished until 1970. With the completion of the Reflection Pool and the smaller transverse pool at its east end in 1922, the basic present design of West Potomac Park was completed. Although there were to be later constructions in the park, all land was now reclaimed and in use for recreational purposes.

The first improvements in East Potomac Park consisted of the construction of a macadam roadway around the fringes of the park. During this time, several low places behind the sea wall surrounding East Potomac Park were reinforced and filled. Other improvements included clearing the land, planting more cherry trees and laying out a bridle path. During the war years, several acres of the park were used by the Boy Scouts as "war gardens" to produce corn. The first nine of the present golf greens were constructed in 1917 and the last nine completed in 1922. During this era, 15 acres of East Potomac Park were occupied by 41 wooden buildings housing regular army troops on guard duty in Washington. A ferry was launched at this time and for 3 years carried visitors from 7th Street across the Washington Channel to Hains Point.

Form 10-300a
(July 1969)

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

RECEIVED
SEP 12 1973
NATIONAL REGISTER

NATIONAL REGISTER OF HISTORIC PLACES
INVENTORY - NOMINATION FORM

*(Continuation Sheet)*

| STATE | |
|---|---|
| COUNTY | |
| FOR NPS USE ONLY | |
| ENTRY NUMBER | DATE |
| NOV 30 1973 | |

*(Number all entries)*

Potomac Park

7. Description (3)

An automobile tourist camp was set up in 1921 near the railroad bridge on the site of the buildings which had housed the troops during the war. Since 1920, the Girl Scouts had operated a refreshment concession at Hains Point. In 1924 a new concession, the Teahouse, had been erected for them and the Girl Scouts continued to run the concession until 1925.

Up until this time - 1925 - the supervision of Potomac Park had been under the Office of Public Buildings and Grounds. In this year, however, that office ceased to exist and was replaced by the Office of Public Buildings and Public Parks of the Nation's Capital. One of the first jobs accomplished by this new department was the elimination of the Tidal Basin bathing beach in 1925, thus restoring the lawn area around the Tidal Basin.

In 1926, a memorial statue to John Ericsson, a Swedish immigrant and designer of the U.S.S. Monitor was completed. Charles Fraser was commissioned as the sculptor and the statue is located on Ohio Drive south of the Lincoln Memorial. In 1928, the 100th anniversary of the opening of the C & O Canal, a memorial plaque was dedicated on the old lock house at 17th Street and Constitution Avenue. Also in 1928, a large ornamental marble urn donated by the President of Cuba to President Coolidge was placed in the rose garden in West Potomac Park. This urn was a fragment of one of the columns that had supported the monument to the U.S.S. Maine in Havana.

In November, 1931, a marble memorial bandstand was dedicated by President Herbert Hoover to District of Columbia residents who had served in the armed forces in World War I. The memorial was designed by Frederick Brooke, Horace Peaslee, and Nathan Wyeth and constructed in West Potomac Park, south of the reflecting pool and west of 17th Street. After the completion of the D.C. War Memorial, the wooden bandstand near the polo field was demolished.

The Arlington Memorial Bridge had been under construction since 1925, and its construction necessitated more reinforcement of parkway approaches. In 1932, the Bridge was first opened to traffic.

On June 10, 1933, the Office of Public Buildings and Public Parks of the Nation's Capital was reorganized under the Department of the Interior and on March 2, 1934 was further reorganized as a part of the National Park Service. The administration of the Potomac Parks was thus shifted to its present status.

Rudulf Evans was commissioned in 1941 to design the memorial to Thomas Jefferson. Frederick Law Olmstead was commissioned to do the landscape architecture for the memorial. However, World War II delayed work on the memorial and it was not dedicated until 1947.

Form 10-300a
(July 1969)

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

RECEIVED SEP 12 1973 NATIONAL REGISTER

**NATIONAL REGISTER OF HISTORIC PLACES**
**INVENTORY - NOMINATION FORM**

*(Continuation Sheet)*

| STATE | |
|---|---|
| COUNTY | |
| FOR NPS USE ONLY | |
| ENTRY NUMBER | DATE |
| NOV 30 1973 | |

*(Number all entries)*

Potomac Park

7. Description (4)

World War II also brought a reversal in the use of parts of Potomac Park as park land. As during World War I, many temporary war-time measures affecting Potomac Park were enacted. Notably, the covering of the polo field with six inches of asphalt as a parking lot. More temporary measures were the construction of dormitories providing housing for girls working in Washington during the war. In 1949, these buildings were converted into offices for the War Assets Administration and were finally demolished in 1965.

The construction of the Rochambeau Bridge (completed in 1958), the Case Memorial Bridge (completed in 1966), and the George Mason Bridge (completed in 1967) have also somewhat changed the face of Potomac Park due to the necessary approaches, plazas, and overpasses that cut through park land.

In 1954, a 300 year old granite Japanese lantern was presented by the Governor of Tokyo to commemorate Commander Perry's visit to Japan. The lantern is in West Potomac Park and its ceremonial lighting begins the Cherry Blossom Festival each year. In 1958, the Mayor of Yokohama presented a stone pagoda, also placed in West Potomac Park in commemoration of the Treaty of Yokohama. That same year, a plaque memorializing the first air mail flight from Washington, D.C. was dedicated near the river in West Potomac Park. At one time several acres of the park had been used for an air field and the first air mail flight to New York, via Philadelphia had taken three hours, in 1918. Other changes in recent years have been the necessary and recurrent dumping of dredged mud onto Hains Point because of constant settling. The bicycle center, horse stables and Girl Scout Teahouse have all been closed. The Teahouse has become the Ecological Services Lab of the National Park Service and the bicycle center has become offices for a mobile tourist concession. In the Johnson Administration, Potomac Park was the recipient of other additions as a part of Mrs. Johnson's Beautification Program. In 1967, an anonymous gift of $160,00 made possible the 150 foot jet fountain off Hains Point. In that same year, a set of playground equipment donated by the President of Mexico, was presented to the citizens of Washington in commemoration of the Johnson's visit to Mexico.

Today, the landscaping of Potomac Park and the Tidal Basin is a part of a well-integrated plan which includes not only recreational areas, but serves as a background for several memorials and acts as a buffer between the Potomac River, in an area where the river serves as a backdrop to the Federal City , and the parks, drives, and monumental buildings of the Nation's Capital.

Presently, Potomac Park consists of 723.86 acres, most of it open park land ringed by parkways, and divided by concrete walks along the river. Beginning in West Potomac Park, standing menorials and buildings are; the Watergate amphitheater, the Lincoln Memorial and Reflecting Pools, the statue of

Form 10-300a
(July 1969)

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

**NATIONAL REGISTER OF HISTORIC PLACES**
**INVENTORY - NOMINATION FORM**

*(Continuation Sheet)*

| STATE | |
|---|---|
| COUNTY | |
| FOR NPS USE ONLY | |
| ENTRY NUMBER | DATE |
| NOV 30 1973 | |

*(Number all entries)*

Potomac Park

7. Description (5)

John Paul Jones, the D.C. War Memorial, the John Ericsson statue, the Flowering Japanese cherry trees, the Stone Pagoda, the Japanese Lantern, the Kutz Memorial Bridge, the Jefferson Memorial, the Pansy Gardens and Fountain, the Tulip Gardens, the National Park Service, National Capital Parks Headquarters, the U.S. Park Police Headquarters, tennis courts, golf links, swimming pool, children's playground, and the Lady Bird Johnson Fountain.

RECEIVED
SEP 12 1973
NATIONAL REGISTER

## 8. SIGNIFICANCE

PERIOD (*Check One or More as Appropriate*)

- [ ] Pre-Columbian
- [ ] 15th Century
- [ ] 16th Century
- [ ] 17th Century
- [ ] 18th Century
- [x] 19th Century
- [ ] 20th Century

SPECIFIC DATE(S) (*If Applicable and Known*) 1897-present

AREAS OF SIGNIFICANCE (*Check One or More as Appropriate*)

- Aboriginal
  - [ ] Prehistoric
  - [ ] Historic
- [ ] Agriculture
- [x] Architecture
- [ ] Art
- [ ] Commerce
- [ ] Communications
- [ ] Conservation
- [ ] Education
- [ ] Engineering
- [ ] Industry
- [ ] Invention
- [x] Landscape Architecture
- [ ] Literature
- [ ] Military
- [ ] Music
- [ ] Political
- [ ] Religion/Philosophy
- [ ] Science
- [x] Sculpture
- [ ] Social/Humanitarian
- [ ] Theater
- [x] Transportation
- [ ] Urban Planning
- [ ] Other (*Specify*)

SEE INSTRUCTIONS

STATEMENT OF SIGNIFICANCE

The uses of Potomac Park as a recreational facility and its many visitor attractions constitute its significance and uniqueness as an urban park area. Its size, 723.86 acres, allows for a wide variety of activities and special events in a city that not only has a large population but also attracts millions of tourists yearly. With the exception of war-time infringements on some areas of the park, Potomac Park has fulfilled its designers intent "to be...used as a park for the recreation and pleasure of the people." Some of the recreational facilities are large open playing fields which are used for everything from baseball and rugby to kite flying, a children's playground, and a system of walkways and roadways which are used as bicycling and jogging trails as well as a means for visitors to sightsee at a leisurely pace. There are also several operating concessions including boat rides on the Tidal Basin, tennis courts, golf links, and a swimming pool.

Potomac Park also lends itself to many special event activities, the most famous being the annual Cherry Blossom Festival. This festival has been held every year since 1935 and began as a commemoration of the planting of the first Cherry Trees. The festival is focused in West Potomac Park around the Tidal Basin and is held early in the Spring. The Park has also been the scene of activities such as civil-rights and anti-war demonstrations and has even hosted several weddings. The annual President's Cup Regatta is held on the Potomac and viewed yearly from East Potomac Park.

Another equally important aspect of Potomac Park is providing a setting for the memorials and monuments within it. And, in addition to complementing the memorials within its boundaries, Potomac Park provides a backdrop for many other federal buildings and monuments within Washington. Across 17th Street, Potomac Park becomes part of the Monument grounds and the Mall, and to the Northwest, it becomes part of Rock Creek Park and Parkway.

That the design of Potomac Park was evolutionary and utilized the talents of many architects, artists, and landscape architects is even more important when one realizes that over 100 years of designing were involved, yet each new addition enhances others before it and none can be said to

## 9. MAJOR BIBLIOGRAPHICAL REFERENCES


A History of the Reclamation and Development of Potomac Park, Gordon Chappell, National Park Service, NCP-C Washington, D.C. 1971

Washington, City and Capital, 1879-1950, Constance Green, Princeton University Press, Princeton, New Jersey, 1963

Washington Cavalcade, Charles Hurd, E.P. Dutton & Co., New York, 1948.

The Potomac--A Report of the Potomac Planning Task Force, American Institute of Architects, U.S.G.P.O., Washington, D.C. 1967


## 10. GEOGRAPHICAL DATA

LATITUDE AND LONGITUDE COORDINATES DEFINING A RECTANGLE LOCATING THE PROPERTY

| CORNER | LATITUDE (Degrees Minutes Seconds) | LONGITUDE (Degrees Minutes Seconds) |
|---|---|---|
| NW | 38° 53' 36" | 77° 03' 38" |
| NE | 38° 53' 58" | 77° 02' 51" |
| SE | 38° 51' 47" | 77° 00' 43" |
| SW | 38° 51' 25" | 77° 01' 21" |

OR

LATITUDE AND LONGITUDE COORDINATES DEFINING THE CENTER POINT OF A PROPERTY OF LESS THAN TEN ACRES

| LATITUDE (Degrees Minutes Seconds) | LONGITUDE (Degrees Minutes Seconds) |
|---|---|
| ° ' " | ° ' " |

APPROXIMATE ACREAGE OF NOMINATED PROPERTY: 723.86 acres

LIST ALL STATES AND COUNTIES FOR PROPERTIES OVERLAPPING STATE OR COUNTY BOUNDARIES

| STATE: | CODE | COUNTY: | CODE |
|---|---|---|---|
| STATE: | CODE | COUNTY: | CODE |
| STATE: | CODE | COUNTY: | CODE |
| STATE: | CODE | COUNTY: | CODE |

RECEIVED SEP 12 1973 NATIONAL REGISTER

## 11. FORM PREPARED BY

NAME AND TITLE: Helen Dillon, Historian

DATE: July 15, 1972

BUSINESS ADDRESS: National Capital Parks

STREET AND NUMBER: 1100 Ohio Drive, S.W.

PHONE: 426-6957

CITY OR TOWN: Washington

STATE: District of Columbia

CODE: 11

## 12. CERTIFICATION OF NOMINATION

State Liaison Officer recommendation:

- [x] Yes
- [ ] No
- [ ] None

[signature]
State Liaison Officer Signature

In compliance with Executive Order 11593, I hereby nominate this property to the National Register, certifying that the State Liaison Officer has been allowed 90 days in which to present the nomination to the State Review Board and to evaluate its significance. The recommended level of significance is ☐ National ☐ State ☐ Local

Russ Dickenson — 6-21-73
Federal Representative Signature — Date

Dir, Natl Cap Parks
Title

## NATIONAL REGISTER VERIFICATION

I hereby certify that this property is included in the National Register.

Robert M. Utley
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
(Acting) Associate Director, Professional Services

Date 11/30/73

ATTEST:

Charles A. Herrington
Acting Keeper of The National Register

Date 11-29-73

SEE INSTRUCTIONS

(A) 18/322440/4307460

(B) 18/325360/4303250

(C) 18/324500/4302580

(D) 18/321500/4306760

UTM REF 12-14-73 sm

Form 10-300a
(July 1969)

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

**NATIONAL REGISTER OF HISTORIC PLACES**

**INVENTORY - NOMINATION FORM**

*(Continuation Sheet)*

| STATE | |
|---|---|
| COUNTY | |
| FOR NPS USE ONLY | |
| ENTRY NUMBER | DATE |
| NOV 30 1973 | |

*(Number all entries)*

Potomac Park

8. Significance (2)

be most prominent. The people who worked on, directed, and designed for the creation of Potomac Park are numerous. During the years from 1867 to 1913, the reclamation project was under the direction of the Army Corps of Engineers. Major Peter C. Hains, for whom Hains Point was named, was the officer in charge during the years 1882-1891. The designer of the Tidal Basin, Major W.C. Twining, was another member of the Corps of Engineers and at one time the Tidal Basin was popularly known as "Twining Lake". Potomac Park also contains many memorial to Washingtonians, one of the few areas of Washington to do so. The Kutz Memorial Bridge across the Tidal Basin was dedicated in honor of Charles W. Kutz who was Commissioner of Engineering for the District from 1914-15, 1918-20, and 1941-44. Another prominent Washingtonian, Charles Carroll Glovier, financier and philanthropist, was instrumental in getting President Cleveland to sign the Act of August 2,1882. The D. C. War Memorial honors 435 of the District residents who served in the armed forces during World War I.

Architects who designed or helped plan various memorials in the park were: Henry Bacon, Lincoln Memorial; John L. Nagle, Arlington Memorial Bridge; Frederick D. Own, Frederick H. Brooke, Horace W. Peaslee, and Nathan Wyeth, D.C. War Memorial; John Russell Pope, Jefferson Memorial; Paul P. Cret, Rochambeau and George Mason Memorial Bridges; and Archie Alexander, Kutz Memorial Bridge.

Sculptors included Charles H. Niehaus, John Paul Jones Statue; Daniel Chester French, Lincoln Memorial Status; James E. Fraser, John Ericsson Statue; and Rudulf Evans, Thomas Jefferson Statue.

Among the many landscape architects involved were those from the Corps of Engineers, the Office of Buildings and Public Grounds of the National Capital, the Office of Public Buildings and Public Parks of the National Capital, and the National Park Service. Frederick Law Olmstead, who designed the landscaping for New York's Central Park, was commissioned to work on the Potomac Park development and is responsible for the grounds around the Jefferson Memorial.

RECEIVED
SEP 12 1973
NATIONAL REGISTER

Form 10-300a
(July 1969)

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

**NATIONAL REGISTER OF HISTORIC PLACES**
**INVENTORY - NOMINATION FORM**

*(Continuation Sheet)*

| STATE | |
|---|---|
| COUNTY | |
| FOR NPS USE ONLY | |
| ENTRY NUMBER | DATE |
| NOV 30 1973 | |

*(Number all entries)*

Potomac Park

9. Bibliography


The Development of Washington, Glenn Brown, Chamber of Commerce, Washington, D.C., 1910.

National Capital Parks, a pamphlet by the National Park Service, Washington, D.C., 1934.

Annual Report - The Commission of Fine Arts, 1911 (1st Annual Report). Washington, D.C., 1911.

A History of National Capital Parks, Cornelius W. Heine, Washington, D.C.


RECEIVED SEP 12 1973 NATIONAL REGISTER







Form 10-301
(July 1968)

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

# NATIONAL REGISTER OF HISTORIC PLACES
## PROPERTY MAP FORM

*(Type all entries - attach to or enclose with map)*

**1. NAME**

| COMMON | AND/OR HISTORIC | NUMERIC CODE *(Assigned by NPS)* |
|---|---|---|
| East and West Potomac Parks | Potomac Flats | |

**2. LOCATION**

| STATE | COUNTY | TOWN |
|---|---|---|
| District of Columbia | District of Columbia | Washington |

STREET AND NUMBER
area bounded by Constitution Avenue, 17th Street, Independence Avenue, Washington Channel, Potomac River and Rock Creek Park

**3. MAP REFERENCE**

| SOURCE | DATE | SCALE |
|---|---|---|
| District of Columbia Department of Highways & Traffic | 1965 | 1" = 1500' |

REQUIREMENTS: PROPERTY BOUNDARIES, WHERE REQUIRED, AND NORTH ARROW.



## 9. MAJOR BIBLIOGRAPHICAL REFERENCES


A History of the Reclamation and Development of Potomac Park, Gordon Chappell, National Park Service, NCP-C Washington, D.C. 1971

Washington, City and Capital, 1879-1950, Constance Green, Princeton University Press, Princeton, New Jersey, 1963

Washington Cavalcade, Charles Hurd, E.P. Dutton & Co., New York, 1948.

The Potomac--A Report of the Potomac Planning Task Force, American Institute of Architects, U.S.G.P.O., Washington, D.C. 1967


## 10. GEOGRAPHICAL DATA

LATITUDE AND LONGITUDE COORDINATES DEFINING A RECTANGLE LOCATING THE PROPERTY — OR — LATITUDE AND LONGITUDE COORDINATES DEFINING THE CENTER POINT OF A PROPERTY OF LESS THAN TEN ACRES

| CORNER | LATITUDE (Degrees Minutes Seconds) | LONGITUDE (Degrees Minutes Seconds) |
|---|---|---|
| NW | 38° 53' 36" | 77° 03' 38" |
| NE | 38° 53' 58" | 77° 02' 51" |
| SE | 38° 51' 47" | 77° 00' 43" |
| SW | 38° 51' 25" | 77° 01' 21" |

| LATITUDE (Degrees Minutes Seconds) | LONGITUDE (Degrees Minutes Seconds) |
|---|---|
| ° ' " | ° ' " |

APPROXIMATE ACREAGE OF NOMINATED PROPERTY: 723.86 acres

LIST ALL STATES AND COUNTIES FOR PROPERTIES OVERLAPPING STATE OR COUNTY BOUNDARIES

| STATE | CODE | COUNTY: | CODE |
|---|---|---|---|
| STATE | CODE | COUNTY: | CODE |
| STATE | CODE | COUNTY: | CODE |
| STATE: | CODE | COUNTY: | CODE |

## 11. FORM PREPARED BY

NAME AND TITLE: Helen Dillon, Historian

DATE: July 15, 1972

BUSINESS ADDRESS: National Capital Parks

STREET AND NUMBER: 1100 Ohio Drive, S.W.

PHONE: 426-6957

CITY OR TOWN: Washington

STATE: District of Columbia

CODE: 11

## 12. CERTIFICATION OF NOMINATION

State Liaison Officer recommendation:

☐ Yes
☐ No
☐ None

*State Liaison Officer Signature*

In compliance with Executive Order 11593, I hereby nominate this property to the National Register, certifying that the State Liaison Officer has been allowed 90 days in which to present the nomination to the State Review Board and to evaluate its significance. The recommended level of significance is ☐ National ☐ State ☐ Local

*Federal Representative Signature* *Date*

*Title*

## NATIONAL REGISTER VERIFICATION

I hereby certify that this property is included in the National Register.

*Director, Office of Archeology and Historic Preservation*

Date

ATTEST:

*Keeper of The National Register*

Date

SEE INSTRUCTIONS

(Rev. 10-90)

AD

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
REGISTRATION FORM

This form is for use in nominating or requesting determinations for individual properties and districts. See instructions in How to Complete the National Register of Historic Places Registration Form (National Register Bulletin 16A). Complete each item by marking "x" in the appropriate box or by entering the information requested. If any item does not apply to the property being documented, enter "N/A" for "not applicable." For functions, architectural classification, materials, and areas of significance, enter only categories and subcategories from the instructions. Place additional entries and narrative items on continuation sheets (NPS Form 10-900a). Use a typewriter, word processor, or computer, to complete all items.

===============================================================

1. Name of Property

===============================================================

historic name **East and West Potomac Parks Historic District**

other names/site number **Potomac Flats (historically, refers to the general area of both parks prior to their reclamation by the Corps of Engineers)**

**Franklin Delano Roosevelt Memorial Park (refers to the portion of West Potomac Park that is bordered by Independence Avenue on the north, by the Tidal Basin on the east, by the Inlet Bridge on the south, and by the Potomac River on the west)**

===============================================================

2. Location

===============================================================

street & number **Area roughly bounded by Constitution Avenue, NW, the Potomac River, the Washington Channel, and Seventeenth Street**

not for publication ___

city or town **Washington** vicinity X

state **District of Columbia** code **DC** county **District of Columbia**

code **001**

zip code __________

(Rev. 10-90)

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
REGISTRATION FORM

This form is for use in nominating or requesting determinations for individual properties and districts. See instructions in How to Complete the National Register of Historic Places Registration Form (National Register Bulletin 16A). Complete each item by marking "x" in the appropriate box or by entering the information requested. If any item does not apply to the property being documented, enter "N/A" for "not applicable." For functions, architectural classification, materials, and areas of significance, enter only categories and subcategories from the instructions. Place additional entries and narrative items on continuation sheets (NPS Form 10-900a). Use a typewriter, word processor, or computer, to complete all items.

===============================================================

1. Name of Property

===============================================================

historic name **East and West Potomac Parks Historic District**

other names/site number **Potomac Flats (historically, refers to the general area of both parks prior to their reclamation by the Corps of Engineers)**

**Franklin Delano Roosevelt Memorial Park (refers to the portion of West Potomac Park that is bordered by Independence Avenue on the north, by the Tidal Basin on the east, by the Inlet Bridge on the south, and by the Potomac River on the west)**

===============================================================

2. Location

===============================================================

street & number **Area roughly bounded by Constitution Avenue, NW, the Potomac River, the Washington Channel, and Seventeenth Street**
not for publication ___
city or town **Washington** vicinity X
state **District of Columbia** code **DC** county **District of Columbia**
code **001**
zip code __________

3. State/Federal Agency Certification

As the designated authority under the National Historic Preservation Act of 1986, as amended, I hereby certify that this _X_ nomination ____ request for determination of eligibility meets the documentation standards for registering properties in the National Register of Historic Places and meets the procedural and professional requirements set forth in 36 CFR Part 60. In my opinion, the property _X_ meets ____ does not meet the National Register Criteria. I recommend that this property be considered significant _X_ nationally ___ statewide ___ locally.
( ___ See continuation sheet for additional comments.)

[signature] May 22, 2000
Signature of certifying official Date

State or Federal agency and bureau

In my opinion, the property _X_ meets ____ does not meet the National Register criteria. ( ___ See continuation sheet for additional comments.)

[signature] 9-18-01
Signature of commenting or other official Date

National Park Service
State or Federal agency and bureau

4. National Park Service Certification

I, hereby certify that this property is:

____ entered in the National Register ______________
___ See continuation sheet.
____ determined eligible for the National Register ______________
___ See continuation sheet.
____ determined not eligible for the National Register ______________
____ removed from the National Register ______________
____ other (explain): ______________

Signature of Keeper Date of Action

## 5. Classification

Ownership of Property (Check as many boxes as apply)

___ private
___ public-local
___ public-State
_X_ public-Federal

Category of Property (Check only one box)

___ building(s)
_X_ district
___ site
___ structure
___ object

Number of Resources within Property

| Contributing | Noncontributing | |
|---|---|---|
| 4 | 7 | buildings |
| 12 | 4 | sites |
| 11 | 0 | structures |
| 10 | 3 | objects |
| 37 | 14 | Total |

Number of contributing resources previously listed in the National Register **20**

Name of related multiple property listing (Enter "N/A" if property is not part of a multiple property listing.) **N/A**

## 6. Function or Use

Historic Functions (Enter categories from instructions)

| Cat: | Sub: |
|---|---|
| **RECREATION & CULTURE** | **Outdoor Recreation** |
| **RECREATION & CULTURE** | **Monument/Marker** |
| **RECREATION & CULTURE** | **Sports Facility** |
| **GOVERNMENT** | **Government Offices** |
| **LANDSCAPE** | **Park** |
| **LANDSCAPE** | **Landscape Feature** |

Current Functions (Enter categories from instructions)

| Cat: | | Sub: |
| --- | --- | --- |
| | **RECREATION & CULTURE** | **Outdoor Recreation** |
| | **RECREATION & CULTURE** | **Monument/Marker** |
| | **RECREATION & CULTURE** | **Sports Facility** |
| | **GOVERNMENT** | **Government Offices** |
| | **LANDSCAPE** | **Park** |
| | **LANDSCAPE** | **Landscape Feature** |

===========================================================================

7. Description

===========================================================================

Architectural Classification (Enter categories from instructions)

**LATE 19th AND EARLY 20th CENTURY REVIVALS**

Materials (Enter categories from instructions)

| | |
| --- | --- |
| foundation | **STONE** |
| | **CONCRETE** |
| roof | **ASPHALT** |
| | **WOOD** |
| | **CERAMIC TILE** |
| walls | **STONE** |
| | **CONCRETE** |
| | **WOOD** |
| | **STUCCO** |
| other: | **STONE** |
| | **CONCRETE** |
| | **METAL** |
| | **WOOD** |
| | **ASPHALT** |
| | **VEGETATION** |
| | **OPEN SPACE** |
| | **VIEWS AND VISTAS** |

Narrative Description (Describe the historic and current condition of the property on one or more continuation sheets.)

**SEE CONTINUATION SHEETS 7.1 THROUGH 7.54**

## 8. Statement of Significance

Applicable National Register Criteria (Mark "x" in one or more boxes for the criteria qualifying the property for National Register listing)

**X** A Property is associated with events that have made a significant contribution to the broad patterns of our history.

____ B Property is associated with the lives of persons significant in our past.

**X** C Property embodies the distinctive characteristics of a type, period, or method of construction or represents the work of a master, or possesses high artistic values, or represents a significant and distinguishable entity whose components lack individual distinction.

____ D Property has yielded, or is likely to yield information important in prehistory or history.

Criteria Considerations (Mark "X" in all the boxes that apply.)

____ A owned by a religious institution or used for religious purposes.

**X** B removed from its original location.

____ C a birthplace or a grave.

____ D a cemetery.

____ E a reconstructed building, object, or structure.

**X** F a commemorative property.

**X** G less than 50 years of age or achieved significance within the past 50 years.

Areas of Significance (Enter categories from instructions)

**Architecture**
**Art**
**Engineering**
**Entertainment/Recreation**
**Other - City Planning**
**Landscape Architecture**
**Politics/Government**
**Social History**
**Transportation**
**Other - Commemoration**

Period of Significance **1882 - 1997**

Significant Dates
Significant Person (Complete if Criterion B is marked above)___________

Cultural Affiliation ________________________________

Architect/Builder/Sculptor

**Henry Bacon**
**Leonard Baskin**
**John Benson**
**Cooper-Lecky Partnership**
**Paul Philippe Cret**
**EDAW, Inc.**
**John Joseph Earley**
**Neil Estern**
**Rudulph Evans**
**Daniel Chester French**
**Frank Gaylord**
**Glenna Goodacre**
**Robert Graham**
**Lawrence Halprin**
**Tom Hardy**
**Frederick Hart**
**Thomas Hastings**
**Maya Ying Lin**
**McKim, Mead and White**
**Frederick Law Olmsted, Jr.**
**Horace Whittier Peaslee**
**John Russell Pope**
**George Segal**
**Skidmore, Owings and Merrill**
**Wood, Donn and Deming**
**Nathan C. Wyeth**

Narrative Statement of Significance (Explain the significance of the property on one or more continuation sheets.)

**SEE CONTINUATION SHEETS 8.55 THROUGH 8.92**

==============================================================

9. Major Bibliographical References

==============================================================

(Cite the books, articles, and other sources used in preparing this form on one or more continuation sheets.)

**SEE CONTINUATION SHEETS 9.93 THROUGH 9.103**

Previous documentation on file (NPS)

___ preliminary determination of individual listing (36 CFR 67) has been requested.
_X_ previously listed in the National Register
___ previously determined eligible by the National Register
___ designated a National Historic Landmark
_X_ recorded by Historic American Buildings Survey # **DC-692, DC-693**
___ recorded by Historic American Engineering Record # __________

Primary Location of Additional Data
___ State Historic Preservation Office
___ Other State agency
_X_ Federal agency
___ Local government
___ University
_X_ Other - Name of repository: **Records of the National Park Service at the Suitland Federal Records Center; and at National Capital Region Headquarters, 1100 Ohio Drive, SW, Washington, DC, 20242**.

==================================================================

10. Geographical Data

==================================================================

Acreage of Property **approximately 730 acres**

UTM References (Place additional UTM references on a continuation sheet)

**Washington West, DC, MD, VA Quad**

| Zone Easting Northing | Zone Easting Northing |
|---|---|
| **1 18.321680.4306760** | **4 18.323600.4305580** |
| **2 18.323050.4306700** | **5 18.324300.4304850** |
| **3 18.323050.4306340** | **6 18.323500.4304850** |

**Alexandria, VA, DC, MD Quad**

| Zone Easting Northing | Zone Easting Northing |
|---|---|
| **1 18.323540.4304820** | **3 18.324580.4302540** |
| **2 18.324300.4304820** | **4 18.324000.4303750** |

Verbal Boundary Description (Describe the boundaries of the property on a continuation sheet.)

**SEE CONTINUATION SHEET 10.104**

Boundary Justification (Explain why the boundaries were selected on a continuation sheet.)

**SEE CONTINUATION SHEET 10.104**

==================================================================

11. Form Prepared By

==================================================================

name/title **Laura L. Bobeczko, Judith H. Robinson, Architectural Historians**
organization **Robinson & Associates, Inc.** date **July 31, 1998**
street & number **1909 Que Street, NW** telephone **(202) 234-2333**
city or town **Washington** state **District of Columbia** zip code **20009**

## Additional Documentation

Submit the following items with the completed form:

Continuation Sheets
Maps
A USGS map (7.5 or 15 minute series) indicating the property's location.
A sketch map for historic districts and properties having large acreage or numerous resources.
Photographs
Representative black and white photographs of the property.
Additional items (Check with the SHPO or FPO for any additional items)

## Property Owner

(Complete this item at the request of the SHPO or FPO.)
name **National Park Service, National Capital Region**
street & number **1100 Ohio Drive, SW** telephone **(202) 619-7279**
city or town **Washington** state **DC** zip code **20242**

Paperwork Reduction Act Statement: This information is being collected for applications to the National Register of Historic Places to nominate properties for listing or determine eligibility for listing, to list properties, and to amend existing listings. Response to this request is required to obtain a benefit in accordance with the National Historic Preservation Act, as amended (16 U.S.C. 470 et seq.). Estimated Burden Statement: Public reporting burden for this form is estimated to average 18.1 hours per response including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the form. Direct comments regarding this burden estimate or any aspect of this form to the Chief, Administrative Services Division, National Park Service, P.0. Box 37127, Washington, DC 20013-7127; and the Office of Management and Budget, Paperwork Reductions Project (1024-0018), Washington, DC 20503.

## INTRODUCTION

This revised nomination has been prepared to supplement the original nomination for the East and West Potomac Parks Historic District, which was prepared in 1972, and was accepted into the National Register of Historic Places on November 30, 1973. The revised nomination was commissioned by the National Capital Region Office of the National Park Service in 1996, and was necessitated by changes in overall documentation standards, by the need to evaluate major national monuments and memorials less than 50 years of age, and by the evolving requirement to include historic landscapes in National Register documentation. Recent monuments such as the Franklin Delano Roosevelt Memorial, the Vietnam Veterans Memorial, the Vietnam Women's Memorial, the Korean War Veterans Memorial, and the 56 Signers Memorial have been included for the first time in this revised National Register documentation, as have important landscape features such as the Japanese Cherry Trees, Constitution Gardens, and the Dutch elm trees flanking the Reflecting Pool.

The boundaries for the revised nomination remain the same as in the original nomination, and include all 730 acres of parkland. Four historic features in West Potomac Park, which were documented in both the original and the revised nominations, have also been listed individually in the National Register: the Lockkeeper's House, the Arlington Memorial Bridge, the Lincoln Memorial, and the Jefferson Memorial. Both parks are considered contributing features in the L'Enfant Plan of the City of Washington, DC, National Register nomination, prepared in 1994.

The original nomination documented a total of 22 features, including 3 contributing buildings, 5 contributing sites, 3 contributing structures, 9 contributing objects, and 2 noncontributing buildings. The scope of this revised nomination was expanded to document a total of 51 features, including 4 contributing buildings, 12 contributing sites, 11 contributing structures, 10 contributing objects, 7 noncontributing buildings, 4 noncontributing sites, and 3 noncontributing objects. Each of these features is described in detail below, and a comprehensive list of features and their contributing/noncontributing status can be found on pages 7.55 - 7.56. One feature in East Potomac Park, a portable sculpture entitled "The Awakening," has not been formally evaluated, since it is not owned by the federal government, but is on long-term loan at the site. Significant views and vistas were also identified in this nomination; however, they have not been included in the resource count.

## DESCRIPTION SUMMARY

East and West Potomac Parks are part of the collection of national parklands around Washington, DC, and nearby Maryland and Virginia that are collectively referred to as the National Capital Region of the National Park Service.[1] The two parks comprise a large portion of the monumental core of the city of Washington, at the same time providing recreational space for residents and tourists alike. Situated roughly between the Potomac River and the grounds of the Washington Monument, East and West Potomac Parks are characterized by broad expanses of open space framed by mature landscape plantings, and by views of major memorials that have become part of the American collective memory. Within their spacious boundaries, these remarkable urban parks provide the setting for such nationally recognized memorials and landscape features as the Lincoln Memorial and Reflecting Pool, the Jefferson Memorial, the Franklin Delano Roosevelt Memorial, the Vietnam Veterans and Women's Memorials, the Korean War Veterans Memorial, Constitution Gardens, the 56 Signers Memorial, and the Tidal Basin. They are also home to many lesser-known memorials of various types.

East and West Potomac Parks have a combined area of approximately 730 acres. West Potomac Park contains nearly 400 acres, and East Potomac Park contains nearly 330 acres. West Potomac Park is generally bounded by Constitution Avenue, NW to the north, the Potomac River to the west, Seventeenth Street to the northeast, and by the elevated railroad bridge to the south that forms a shared boundary between the two parks. East Potomac Park, to the south and east of West Potomac Park, occupies most of a peninsula of land located between the Washington Channel and the Potomac River. The central

[1]Currently, the National Park Service is divided into seven regions for administrative and management purposes. The parks in Washington, DC, Maryland, and Virginia fall under the jurisdiction of the National Capital Region, which is the smallest region geographically and contains the greatest concentration of historic resources of the seven regions. Within this region, the National Capital Parks-Central Office (headquartered at 900 Ohio Drive, SW) is primarily responsible for two discrete historic resources, the Old Post Office Pavilion and Ford's Theater, as well as all the lands and constructed features of the National Mall, the Washington Monument Grounds, and East and West Potomac Parks. (While the term "The Mall" is sometimes used informally to describe the axial landscape between the Lincoln Memorial and the Capitol, the Mall is officially defined by the National Capital Planning Commission as the land bounded by Constitution Avenue on the north, Independence Avenue on the South, the Capitol on the east, and 14th Street, NW, on the west. The Washington Monument grounds lie immediately west of the Mall, between Constitution and Independence avenues, and from 17th Street, NW, to 14th Street, NW.) Within this area, often termed the "Monumental Core," are a number of individual units, including the Washington Monument, the Lincoln Memorial, the Jefferson Memorial, the Vietnam Veterans Memorial, and the Franklin Delano Roosevelt Memorial. National Capital Parks-Central is also responsible for the operation, care, and maintenance of the federally owned parks, circles, and squares located in the central and southwestern portions of the District of Columbia.

portion of West Potomac Park was originally reserved for passive recreation purposes, with areas for active recreation, like the Polo Grounds, placed around the park's edges. The park has since evolved into a designed landscape occupied by prominent monuments and memorials. East Potomac Park has been primarily developed for active recreation uses; currently, the park contains a 36-hole golf course, a swimming pool, and a tennis facility.

The large land masses that today are East and West Potomac Parks were sculpted from tidal flats by the U.S. Army Corps of Engineers in an ambitious reclamation project lasting over 30 years. The character of the site was established in 1897 by Senate Bill 3307, which provided that the entire reclaimed area, including the tidal reservoir, was to become a public park for the "recreation and pleasure" of the people. The resulting parkland has been shaped by a number of successive development plans, most notably the Senate Park Commission (McMillan) Plan of 1901-02, the country's first major manifestation of the City Beautiful movement. According to the McMillan Plan, the reclaimed land west of the Washington Monument extended the grand axis of the Mall as a formal greensward within West Potomac Park, which terminated at the Neoclassical memorial to Abraham Lincoln. A long canal, or reflecting pool, was constructed to provide a formal element connecting the Lincoln Memorial and the Washington Monument. The vista from the White House was extended south across reclaimed land to the site for another notable monument (now the Jefferson Memorial).

East and West Potomac Parks are the cumulative product of a century of work of noted architects, landscape architects, planners, engineers, and artists, and thus consist of many distinctive elements. To order the district's numerous features, this section of the nomination has been divided into two parts, one for each park. Because of the inherent diversity in the distribution, location, and types of resources found in the two parks, the descriptive text for the contributing and noncontributing features has been arranged slightly differently for the two parks. Related resources in West Potomac Park have been loosely clustered by geographical location, running generally from west to east, while related resources in East Potomac Park have been grouped by their function and use. The final pages of this section, 7.48 and 7.49, list of all the contributing and noncontributing features in the two parks documented in this nomination. These features have been divided by their Property and Resource Type, as set forth in *National Register Bulletin 16, How to Complete the National Register Registration Form.* These classifications include Building, Site, Structure, and Object. Contributing primary historic views and vistas have also been defined and described, but they have not been included in the resource count.

## WEST POTOMAC PARK

West Potomac Park is a large, complex site that encompasses numerous elements of historical, landscape, and architectural significance. In the northern portion of West Potomac Park, the axis created on the National Mall, the long east/west greensward stretching from the Washington Monument grounds to the Capitol, is extended west to the Lincoln Memorial. This portion of the park is part of one of the single best-known and most important landscapes in the country -- what has been called "the most beautiful place man has made in America."[2] In addition to many other monuments, the park is the site of the Lincoln and the Jefferson Memorials, two of the three major commemorative monuments that define Washington, DC's monumental core and that also define the nation's capital.

Because it is an integral feature of the ceremonial heart of Washington, the landscaping, placement of built features, and physical shape of West Potomac Park have been molded by successive city planning efforts. The two parks are, in fact, a central feature of these plans, the most prominent of which were the L'Enfant Plan of 1791 and the McMillan Plan of 1901-02 (see Section 8). Although the L'Enfant Plan established the overall concept that was to be later applied to West Potomac Park, because most of the land was not created until nearly a century later, most aspects of the park's overall design -- its traditionally baroque plan, long vistas, axial relationships, and expansive open spaces -- are associated with the McMillan Plan.

Covering approximately 400 acres in the northwest and southwest quadrants of Washington, the boundaries of West Potomac Park are generally defined by Constitution Avenue, NW, to the north, Seventeenth Street and the banks of the Tidal Basin to the east, the Potomac Railroad Bridge to the south, and the Potomac River to the west.[3] Nearly a quarter of the total acreage of the park is occupied by the Tidal Basin, a large body of water with an asymmetrical quatrefoil-like (four-lobed) shape.

---

[2]Elbert Peets, "Original Plan of Washington," *House & Garden* (July 1940): Section 1, p. 63. As one of the many areas reserved for public uses in Washington, West Potomac Park is referred to as Reservation 332 in Washington's system of legal property description.

[3]Also included is a small piece of land located south of Theodore Roosevelt Bridge. This roughly U-shaped parcel, associated with the construction of Arlington Memorial Bridge, is to the north of the hypothetical line of Constitution Avenue, NW, if it were extended to the Potomac River (see Arlington Memorial Bridge).

Prior to the 1890s, the area that today is West Potomac Park was a shallow area or "flat" in the Potomac River. The 1882 to 1913 program of channel clearing produced sufficient fill to create both West and East Potomac Parks (see Section 8). This reclamation project created a largely flat topography that today dips slightly at the Reflecting Pool, rises slightly around the Lincoln Memorial, and declines to the banks of the Potomac and the Tidal Basin. Most of the site is between 10 and 15 feet above sea level. Because the land that comprises West Potomac Park is manmade, it has no natural features with the exception of the Potomac River, which is an important visual component of the park, and which constitutes much of its western boundary.

West Potomac Park is a designed landscape that contains numerous naturalistic areas, such as grassy areas, areas occupied by shrubs, trees, or other vegetation, and bodies of water, which vary in size from the 110-acre Tidal Basin to the relatively diminutive (less than one acre) Rainbow Pool. The four major water bodies in the park include the Tidal Basin, the Reflecting Pool, the Rainbow Pool, and the lake in Constitution Gardens. Each is an important component of the park and is described individually below.

Spatial relationships, most of which are a direct legacy of the McMillan Plan, are a key component of the design of the park. These relationships differ decidedly north and south of Independence Avenue, SW. Most of the land area of the park, which is located to the north of Independence Avenue, SW, has a distinct, linear, east-west orientation representing the continuation of axis established on the National Mall running westward from the Capitol. The strong axial relationship between the Lincoln Memorial and the Capitol, one of the touchstones of the McMillan Plan, is the defining feature of this section of the park.

South of Independence Avenue, SW, West Potomac Park has an irregular, asymmetric shape, influenced by the equally irregular shape of the Tidal Basin. To the west of the Tidal Basin, the park consists mostly of a peninsula of land defined by the curvilinear shape of the Tidal Basin on the north and east and by the generally linear Potomac River bank on the southwest. This spit of land ends at the inlet to the Tidal Basin. The small portion of the park on the west side of the Tidal Basin is also irregular in shape. It is defined by the curved outline of the Tidal Basin from the northeast to the southwest and by the straight northeast/southwest line of the Potomac Railroad Bridge (the farthest south of the grouping of roads and bridges clustered at Fourteenth Street). This piece of land, which is actually the westernmost part of the land mass on which East Potomac Park is located, is the site of the Jefferson Memorial.

Although physically separated from the Mall by the Tidal Basin, the location of the Jefferson Memorial was also an integral feature of the plans that molded the design of Washington's monumental core. The site is the "open end point" of the axis, a continuation of Sixteenth Street, which runs south from the White House. This cross axis, one of the integral features of the L'Enfant Plan of 1791, was affected by the off-axis placement of the Washington Monument. The restoration of this important feature of the L'Enfant Plan was one of the major goals of the McMillan Plan, as was the location of a major monument at its southern end (the current site of the Jefferson Memorial).

Like spatial relationships, vistas comprise one of the other defining features of West Potomac Park. Of these, the view along the axis between the Capitol and the Lincoln Memorial is such a well-known American image that it has become a symbol of Washington as the nation's capital. The most important vistas follow the axial relationships in the park. The two most significant of these are the vista between the Lincoln Memorial and the Washington Monument and the vista between the Jefferson Memorial and the White House. Both of these vistas were integral features of the McMillan Plan, and the vista from the current site of the Jefferson Memorial was also called for in the L'Enfant Plan. Other important vistas include those along Twenty-third Street from Washington Circle to the Lincoln Memorial, from the Lincoln Memorial across the Arlington Memorial Bridge to Arlington House, and along Seventeenth Street from Constitution Avenue, NW, to the Commodore John Paul Jones Statue. In addition to these major vistas, because of the large open spaces, there are a multitude of other views that are essential features of the park. These include (but are not limited to) views in all directions to and from the Jefferson Memorial, views in all directions to and from the Lincoln Memorial, and views beneath the canopy of the elms that line the axial section of the park near the Reflecting Pool.

Circulation in the northern section of the park is dominated by the continuation of patterns established on the National Mall. Major east-west vehicular circulation in the park is defined by Constitution Avenue, NW (to the north) and Independence Avenue, SW (to the south). At their western ends, these roads connect to Rock Creek and Potomac Parkway and provide access to two Potomac River bridges, Arlington Memorial Bridge (1926-1932) and Theodore Roosevelt Bridge (1964). North and south circulation in the park is via Seventeenth Street (the eastern boundary of the park), and Twenty-third Street (to the west). Keyed to more localized traffic is Ohio Drive, SW, which runs parallel to the Potomac River from the Lincoln Memorial southeast to East Potomac Park. (North of the Lincoln Memorial, this road becomes the south end of Rock Creek and Potomac Parkway.) Also smaller and more park-oriented, West Basin Drive follows the Tidal Basin northward from the Tidal Reservoir Inlet Bridge. At the Kutz Bridge, the road becomes East Basin Drive as it continues around the Tidal Basin to the Jefferson Memorial. To the south and east of the Tidal Basin, a collection of roads, including

Fourteenth Street and Fifteenth Street, act as access routes to Potomac River bridges. Parallel and to the south of these, the elevated Potomac Railroad Bridge constitutes the dividing line between East and West Potomac Parks. Bridges that cross the Potomac here include (from north to south) the George Mason Memorial Bridge (1962), the Rochambeau Memorial Bridge (1950), the Arland D. Williams, Jr. Memorial Bridge (1971), the Metro [Subway] Bridge (1980), and the Potomac Railroad Bridge (1906). A score of minor paved roads, mostly short access roads to the various memorials, are also located within the park.

There are approximately 20 miles of pedestrian paths in West Potomac Park.[4] Paved sidewalks parallel most of the roads described above and are located along the perimeter of the Tidal Basin, along the Potomac waterfront, and throughout Constitution Gardens. Although most of the paths (with the exception of those around the Tidal Basin) follow straight lines between points, the paths through Constitution Gardens are distinctly curvilinear. All of these paths are of concrete construction, some with a smooth finish and others with an exposed aggregate finish. Major wide gravel walks, a continuation of the circulation system of the Mall, run on either side of the Reflecting Pool, between the rows of Dutch elm trees. While historically the paths under the elms were concrete, similar to those currently in place around the Rainbow Pool, they were changed to asphalt prior to the Bicentennial celebration, when there were insufficient funds to repave both walks in their original material.

Several major plantings span large areas of the park, which act to organize and to provide links between different areas. (See the individual descriptions of these resources that follow.) The most significant of these are the broad formal greensward and accompanying parallel rows of Dutch elm trees that run parallel to the Reflecting Pool (an important, stated feature of the McMillan Plan) and the notable collection of Japanese Cherry Trees that follow the periphery of the Tidal Basin. In addition to these features, the trees planted as part of the Memorial Tree Program are another element that spans the park (and are located in both East and West Potomac Parks). Located at various places throughout the park, including along Twenty-third Street, French Drive, Bacon Drive, and Constitution Avenue, NW, the first memorial trees were planted in the 1920s, as part of an organized program that flourished until the 1940s.[5] Other significant vegetative features include grassy areas, some of which are used for

---

[4]Historic American Buildings Survey, West Potomac Park, HABS No. DC-693, p. 12.

[5]Most of the recently planted memorial trees date from the National Park Service's "Blossoms in Our Future" program, which was launched in 1987. Under this program, private citizens can purchase memorial trees and, although plaques are no longer placed on the trees, pertinent information, such as the date of the dedication, the name of the person being memorialized, and the planting location, is recorded by the National Capital Parks Central

---

recreational purposes, along Twenty-third Street and south of Independence Avenue, SW; the meadow in Constitution Gardens; and an area sometimes referred to as Ash Woods, a grove of trees located between Independence Avenue, SW, and the gravel path south of the Reflecting Pool. Most vegetation in the park is of a smaller scale and is linked to individual sites or areas within the park that are discussed at length below. (See, in particular, the discussion of Lincoln and Jefferson Memorials.)

Although most walls, fences, and hedges in the park are relatively discrete elements, major elements in this category that span a significant portion of the park are the Stone Seawalls that surround the Tidal Basin and were constructed as retaining walls for the newly reclaimed land. The walls date largely from the 1880s and 1890s. However, major sections of the walls were replaced when the Kutz Bridge was constructed in the 1940s, and when the Jefferson Memorial was constructed in the late 1930s and early 1940s. An eight-feet-wide concrete walk caps the seawalls around the perimeter of the Tidal Basin. An iron-pipe railing is present only along the section of the walk between the Kutz Bridge and the Tidal Reservoir Outlet Bridge. Most walls, fences, and hedges in the park are associated with individual features and are discussed below.

A variety of types of light fixtures are used throughout the park, some with historical antecedents and some of a more modern, utilitarian nature. Constitution Avenue, NW, part of Independence Avenue, SW, and certain other roads (such as Ohio Drive, SW) are lined with "Twin Twentys" light standards. These light standards have twin globes on either side of a decorative metal connecting bracket. Their octagonal poles are approximately 15 feet high, bringing the total height of the fixture to roughly 21 feet. Other streets such as East Basin Drive use the lower (15-foot) Washington Globe light standards, which are single globes atop a round, decorative pole. The light standards on the Kutz Bridge are Olmsted light standards which have a single, cylindrical globe with a decorative cap and supports and an octagonal pole. Although all three of these light standards are based on historic designs, many of the current standards are recent replacements. There are also a number of modern highway lights (tall fixtures with long brackets that overhang the street) that are used throughout the park.

With the exception of landscape areas specifically associated with individual monuments, most site furnishings, including benches, trash receptacles, tree grates, fencing, and drinking fountains in the park

---

Office of the National Park Service. Telephone interview with Steve Lorenzetti, National Capital Parks Central, National Park Service, Washington, DC, July 15, 1997.

are National Park Service standard designs. These include benches that have a metal frame and wood slats, "tulip" trash receptacles that have an exterior wood slat covering and a metal pedestal, metal tree grates with a concentric circular pattern of openings, and metal, pedestal-type drinking fountains that are handicapped accessible. In general, signage throughout the park also follows National Park Service standards. The design of smaller-scale signage around individual resources is most often linked to that of the specific resource.

Today, West Potomac Park, because of its significant location and its wealth of open space, continues to be one of the country's preeminent civic spaces. It is the primary location for national political demonstrations, rallies, and parades, and is also the site of a variety of more festive gatherings such as Washington's annual Fourth of July celebration, which is centered around the Washington Monument. The park is operated as a national park and is predominantly recreational in use. As the site of the Lincoln, Jefferson, and Vietnam, and Franklin Delano Roosevelt Memorials, as well as a number of smaller or less-well-known memorials, the park is one of the foremost tourist destinations in Washington. Visitors, arriving by foot, car, Tourmobile, and bus, visit the monuments, stroll the paths, and use the paddle boats in the Tidal Basin. To accommodate these visitors, there is a range of recent public and private facilities varying from National Park Service information kiosks to comfort stations. The park is also used extensively for a variety of recreational/sporting uses by local residents, including polo matches at the Polo Grounds and jogging and bicycling throughout the park.

## RESOURCES CLUSTERED AROUND THE LINCOLN MEMORIAL

A number of notable historic resources in West Potomac Park are clustered around the Lincoln Memorial and its associated landscape, including the Reflecting and Rainbow Pools, the Dutch elm trees lining the Reflecting Pool, Arlington Memorial Bridge, and the Flood Control Levee. This grassy area is dominated by the memorial itself, and by a number of associated hardscape and landscape features. The **Lincoln Memorial (Contributing Structure)** is located at the focal point of the western end of the east-west axis that starts at the Capitol. Constructed between 1913 and 1922, both the memorial and the statue inside are principally oriented to the east, facing the Washington Monument and the Capitol along that axis. The massive masonry structure is set upon a rectangular platform with a 14-foot-tall raised terrace wall constructed of pink Milford granite, and is surrounded by a circular lawn that provides a

verdant setting for the structure.[6] The memorial has a concrete foundation, exterior walls of Colorado-Yule marble, interior walls of Indiana limestone, and floors and interior wall base of pink Tennessee marble. Designed by architect Henry Bacon, the memorial is in the form of a peripteral Greek temple surrounded by a peristyle of 38 fluted Doric columns, which tilt slightly inward to give an increased illusion of height. The names of the 36 states that belonged to the Union at the time of Lincoln's death in 1865, as well as the dates on which they joined, are inscribed on the frieze above the colonnade; the names are separated by double-wreath medallions in bas-relief. The cornice is comprised of carved scrolls alternating with projecting lions' heads, which are ornamented with palmetto cresting along the upper edge. The names of the 48 states belonging to the Union at the time of the memorial's dedication are inscribed on the attic frieze. All frieze and cornice ornamentation was completed by carver Ernest C. Bairstow.[7]

The principal access to the Lincoln Memorial is via a monumental flight of steps, known as the approachway, located on the memorial's east side, facing the Mall's axis. The approachway steps begin at the level of the circular roadway that surrounds the memorial, and continue up to the memorial's main entrance. A regular series of landings is interspersed with the steps. Access to the memorial from the level of the Reflecting Pool is via steps up to the level of the circular roadway. This roadway encircles an area of green, landscaped lawn, which serves as an intermediate setting for the memorial. Flanking the approachway at the entrance to the memorial are two buttresses crowned with tripods of carved pink Tennessee marble. The memorial's interior is partitioned by two rows of Ionic columns into three chambers. The north and south chambers are inscribed with Lincoln's Second Inaugural Address and his Gettysburg Address; the inscriptions are bordered with pilasters decorated with wreaths, eagles, and faces. The inscriptions and ornamentation were carved by Evelyn Beatrice Longman. Above each inscription is a mural by Jules Guerin that portrays governing principles present in Lincoln's life. The south wall mural, entitled "Emancipation," illustrates the principles of Freedom, Liberty, Immortality, Justice, and the Law, and the north wall mural, entitled "Reunion," pictures Unity, Fraternity, and

---

[6]For the purposes of this nomination, the Lincoln Memorial has been classified a structure, rather than an object. This classification is based on the fact that it is a major memorial, which can be entered into, much like a structure. This distinction separates the Lincoln Memorial from the parks' other minor memorials, such as statues and plaques. The Lincoln Memorial has been counted as a single contributing structure, while the memorial's surrounding landscape has been counted as a single contributing site.

[7]Donald C. Pfanz, National Register of Historic Places Inventory-Nomination Form, "Lincoln Memorial," United States Department of the Interior, National Park Service, Washington, DC, January 12, 1981, p. 7.1.

Charity.[8] The central hall, located between the north and south chambers, features a seated statue of Lincoln that faces east, looking down the axial vista toward the Capitol. The statue, carved by the Piccirilli brothers under the direction of sculptor Daniel Chester French, is 19 feet wide, 19 feet high, and took over four years to complete. Made of Georgia white marble, the statue weighs 175 tons, and was shipped to the site in 28 separate pieces. The statue is placed upon an oblong pedestal of Tennessee marble, which in turn rests upon a platform of the same material. An engraved epitaph, located above the statue's head, is bordered by two pilasters. The memorial's 60-foot ceiling is made of bronze girders decorated with oak and laurel leaves, alternating with panels of Alabama marble.

Only a few repairs have been made to the Lincoln Memorial since its construction. The exterior of the memorial was cleaned with a high-pressure water treatment and repointed in 1973. As part of preparations for the Bicentennial, in 1975-1976, an elevator was installed in the memorial, as well as handicapped ramps and toilet facilities, and modifications were made to sidewalks and entrances.[9] A bronze plaque with information on the states of Alaska and Hawaii was added to the memorial at the foot of the approachway in 1985.[10] In the early 1990s, the National Park Service completed the first comprehensive repair effort at the memorial, and the handicapped ramps were renovated to a five percent grade. In 1994, a museum, which was the result of a nationwide fund-raising and lobbying effort by schoolchildren from Scottsdale, Arizona, opened in the memorial's basement.

The broader **Lincoln Memorial Grounds (Contributing Site)** are comprised of several component landscapes, including the Lincoln Memorial Circle, and the Watergate Steps Area. Additional adjacent related features are the Reflecting Pool (see also) and Rainbow Pool (see also).[11] In its entirety, this designed landscape is the product of numerous landscape architects and government agencies. The site in West Potomac Park on which the Lincoln Memorial was constructed was reserved as the location of a major monument in the McMillan Plan of 1901-02. The site was drained and graded from 1911-12, and

---

[8]National Register Inventory-Nomination Form, "Lincoln Memorial," pp. 7.1-7.2.

[9]Merrill J. Mattes, "Landmarks of Liberty: A Report on the American Revolution Bicentennial Development Program of the National Park Service," United States Department of the Interior, National Park Service, Washington, DC, 1989, pp. 118-119.

[10]Pamela Scott and Antoinette J. Lee, *Buildings of the District of Columbia* (New York, New York: Oxford University Press, 1993), p. 104.

[11]For the purposes of this nomination, the entire landscape of the Lincoln Memorial has been classified as a single contributing site, while the Reflecting Pool and the Rainbow Pool have each been classified as a contributing site.

by 1914 the area had been informally landscaped with trees and shrubs. The first formal landscape design for this area was a collaboration between the Lincoln Memorial's architect Henry Bacon and Frederick Law Olmsted, Jr. As the landscape architect member of the Commission of Fine Arts and the only surviving member of the McMillan Commission, Olmsted was tremendously influential in the evolution of the design for the memorial's landscape. In 1915, landscape architect Clarence Howard was hired to design the park area between the Lincoln Memorial and the Washington Monument; and in 1919 Office of Public Buildings and Grounds staff landscape architect Irving Payne designed the plan for the circular terrace around the memorial. Payne's planting plans were then revised by James Greenleaf, Olmsted's successor on the Commission of Fine Arts. Since 1933, this landscape has been maintained by the National Park Service.[12]

The landscape design for the area within the Lincoln Memorial Circle was generally implemented between 1920 and 1932. The memorial's primary east (front) and west (back) elevations were treated individually, and their designs wrapped the plantings around the corners into the north and south elevations. The views of the memorial were to be framed with low plantings, and were to be softened by vegetation placed at the structure's corners. The palette for the memorial's foundation plantings included a variety of broadleaf evergreen trees and shrubs. The area in front of the principal east elevation was the first to be designed and planted. The plant palette for this elevation consisted primarily of mature boxwood and yew trees, which were planted in groupings along the memorial's facade. Located on the east side of the circle, two walled, rectangular planting beds with granite benches were constructed to frame the memorial's approachway. These planting beds originally contained two mature dwarf boxwoods, with a short dwarf boxwood hedge planted to serve as a backdrop. Hedges of dwarf boxwood first lined both outer edges of the pavement along the entire length of the approachway. In 1944, the boxwood hedge flanking the approachway was replaced with a low, yew hedge, which was in turn replaced with a more compact yew hedge in 1976. The dwarf boxwood hedge was replaced with a Japanese holly hedge sometime in the 1960s, and in 1976 was again replaced with the original species, dwarf boxwood. The front planting beds have also been replanted several times; by 1994, these beds were planted with Japanese holly edged with liriope. During the 1995-96 restoration of the approachway, the Japanese hollies were removed, and were later replaced in kind in 1996.[13]

---

[12] "Cultural Landscape Inventory, West Potomac Park, Lincoln Memorial Grounds," U.S. Department of the Interior, National Park Service, National Capital Parks-Central, Washington, DC, Draft, November 1996, pp. 3.5-3.14. This draft Cultural Landscape Inventory has since been revised into a Cultural Landscape Report.

[13] "Cultural Landscape Inventory, West Potomac Park, Lincoln Memorial Grounds," p. 4.24.

The design for the area in front of the west elevation was not fully implemented until the early 1930s, as the Arlington Memorial Bridge (see also) was being completed, and featured a more varied palette than did the east elevation. Here, southern magnolias were strategically placed and then intermixed with American hollies, with common and dwarf boxwoods grouped in front. The north and south sides of the memorial were first planted with American holly, common boxwood, and English yew, and clusters of mugo pine were planted at the center of these two elevations to act as a transition between the first and later plantings. These mugo pines were later replaced with a more horizontal-growing yew species. The outer edge of the circular drive and the roads radiating from this drive, Twenty-third Street, Bacon Drive, and French Drive, were first planted with American elms in 1923. The pattern of the original trees planted along the radial roads remains today. However, the planting pattern of trees along the circular drive has been mostly obliterated by the recent insertion of Constitution Gardens (see also) and the Korean War Veterans Memorial (see also), where newer plantings of understory trees are clustered beneath a canopy of oaks, maples, and zelkovas. Hardy vines, planted at the base and the top of the raised terrace wall in 1924, as a quick, temporary way to create a green background for the less densely planted areas around the structure, were removed soon after.[14]

Over the years, several construction projects in the immediate vicinity have altered the landscape of the Lincoln Memorial. In 1927, two "public comfort stations" were installed under the raised terrace on the memorial's eastern front, in response to increased visitation. Two entrances were cut through the raised terrace wall on both sides of the steps leading to the memorial, space for restrooms was created behind the wall, and a pair of bronze doors was hung at each entrance.[15] A significant alteration to the original landscape plan occurred in 1953, when a change was made to the outer edge of the circular roadway near the sidewalk above the Reflecting Pool. A rectangular curb cut was removed, making the circle continuous, and two planting beds were installed on the north and south sides of the sidewalk, in the areas formerly shaped by the original squared-off curb. These beds have been successively planted with dwarf boxwood, little leaf holly, and Japanese hollies, which are present in the beds today.[16] In addition, numerous minor vegetation management changes have been made, including the removal and replacement of dying shrubs, the addition of specimen trees (for example, two hollies along the memorial's east elevation), and the introduction of new plants (like the liriope in the front planting beds)

[14]"Cultural Landscape Inventory, West Potomac Park, Lincoln Memorial Grounds," pp. 3.11-3.24, 4.21-4.22.

[15]"Cultural Landscape Inventory, West Potomac Park, Lincoln Memorial Grounds," p. 3.18.

[16]"Cultural Landscape Inventory, West Potomac Park, Lincoln Memorial Grounds," p. 4.22.

to the palette. Today, however, the site's overall spatial organization, patterns of circulation, and longstanding placement of vegetation around the Lincoln Memorial remains mostly consistent with the original design intent.

The Watergate Steps Area, located adjacent to the Lincoln Memorial and the Arlington Memorial Bridge, was designed in 1929 by William Mitchell Kendall of the architectural firm of McKim, Mead and White as part of the plan for Arlington Memorial Bridge (see also). Completed in 1932, this structure functions as a watergate (a gate giving access to a body of water) with steps leading from the city to the river, and a bridge that carries the Rock Creek and Potomac Parkway to the western end of the monumental axis. The watergate is a curved area consisting of 40 granite steps, which are 230 feet wide at the level of the Potomac River and 206 feet wide at the top. The watergate, seawall, and bridge are all constructed of reinforced concrete faced with dimensioned, granite masonry, used to make the complex compatible with Arlington Memorial Bridge. The Watergate Steps were originally intended as a ceremonial entrance where foreign dignitaries arriving by boat could be welcomed to the city, and as a recreational space where boats could be docked.[17] Instead, outdoor musical performances were held in the amphitheater created by the Watergate Steps from 1935 until 1973. During this time, a series of barges with orchestral shells, which served as stages for the performers, was anchored in the River near the base of the steps. Audiences were seated on these steps, although some concert-goers came by boat and listened while anchored nearby.[18] These concerts were abandoned due to noise from National Airport resulting from the advent of jet planes.

The character of the landscape of the Watergate Steps area was first determined in the 1930s by James Greenleaf, consulting landscape architect for the Arlington Memorial Bridge Commission, and Irving Payne, landscape architect for the Office of Public Buildings and Public Parks. Payne's final planting plan for this area utilized some of the same species of trees as were planted inside the Lincoln Memorial Circle. American holly, yew, and boxwood were planted in informal arrangements within the beds formed by the north and south plaza walls on both sides of the Watergate Steps and the bridge and parkway abutments. White pines, bald cypress, deodar cedar, swiss stone pine, and mugo pines were planted on the slopes adjacent to the north and south wing walls, for additional height and mass, to frame the view to the Potomac, and to supplement the broadleaf evergreens and coniferous shrubs already

---

[17] Historic American Engineering Record, Arlington Memorial Bridge: Watergate and Bridge Plaza, HAER No. DC-7-A, pp. 1-2.

[18] "Cultural Landscape Inventory, West Potomac Park, Lincoln Memorial Grounds," pp. 3.25-3.26.

selected. Pink and white dogwoods were added to provide year-round interest. The recreational area west and northwest of the Lincoln Memorial received a more informal treatment, where a grove of native, deciduous, memorial trees was planted in the 1930s and 1940s. Subsequent plantings from the 1970s through the 1990s have enhanced the naturalistic quality of this area, including a yew hedge that screens the volleyball courts, Kousa dogwoods planted underneath a row of elms along the approach road to the Rock Creek and Potomac Parkway, and a large grove of Yoshino cherry trees planted to mark both sides of Ohio Drive, SW, near the northwestern corner of West Potomac Park. A double row of American elm trees lines Constitution Avenue, and a circular planting bed dating to the early 1930s is located at the avenue's terminus. The placement of these elms indicates the original alignment of the avenue west to the Potomac River; this alignment was altered in the 1960s. Despite minor changes over the years, such as replacing American dogwoods with Kousa dogwoods, the landscape in this area retains a high degree of integrity.[19]

The Lincoln Memorial was individually listed in the National Register of Historic Places in 1981. The Lincoln Memorial and the Lincoln Memorial Grounds contribute to the East and West Potomac Parks Historic District, based on National Register Criteria A and C in the areas of Architecture, Art, Landscape Architecture, and Commemoration. Despite the fact that the memorial and its associated landscape are primarily commemorative in intent (thus in the category of properties not usually qualifying for the National Register), its design, age, tradition, and symbolic value has invested it with its own historical significance, thus it falls within the exception to National Register Criteria Consideration F. The Lincoln Memorial has become one of the nation's best-known and well-loved monuments.[20]

The **Reflecting Pool (Contributing Site) and Rainbow Pool (Contributing Site),** located along the major east-west axis of the northern portion of West Potomac Park, are integral components of the designed historic landscape of the Lincoln Memorial. The McMillan Plan of 1901-02 called for a long reflecting pool, or canal, to provide a formal water element connecting the Washington Monument and Lincoln Memorial. This element, as implemented by the Reflecting and Rainbow Pools, is one of the singularly important features of the extended vista that the McMillan Plan created on this grand axis.

---

[19]"Cultural Landscape Inventory, West Potomac Park, Lincoln Memorial Grounds," pp. 4.44-4.45.

[20]For additional information on the Lincoln Memorial, refer to its individual National Register of Historic Places Inventory-Nomination Form, U.S. Department of the Interior, National Park Service, January 12, 1981. For additional information on the landscape of the Lincoln Memorial, refer to the Draft Cultural Landscape Inventory for West Potomac Park and the Lincoln Memorial Grounds, U.S. Department of the Interior, National Park Service, November 1996.

Together, the Reflecting Pool and the smaller Rainbow Pool form a panel of water more than 2,000 feet long, and their geometry provides a striking feature of the ground plane as viewed from the air. The two pools, set along the monumental axis that extends from the Lincoln Memorial to the Capitol, are framed by narrow walks flanked by lawn. A double row of Dutch elm trees with broad, unpaved walks between them, parallels the pools. These landscape features were constructed contemporaneously in 1919-22, as the Lincoln Memorial was being completed. The product of the collaboration of several men, the conceptual design for the two pools (as well as the memorial) was prepared by McMillan Commission member Charles F. McKim. The interpretation of McKim's conceptual design can be credited to Lincoln Memorial architect Henry Bacon working directly with Commission of Fine Arts member Frederick Law Olmsted, Jr. The edges of the two shallow basins are defined by granite copings.

The rectangular Reflecting Pool, which originally appeared on the McMillan Plan drawings as a cruciform body of water, was built without its planned cross-shaped lagoon, as the temporary Navy and Munitions Buildings constructed during World War I along Constitution Avenue, NW, stood in the way. The Reflecting Pool measures 2,029 feet long, 163 feet wide, and approximately 30 inches deep at its center; it is named for the fact that striking images of the Washington Monument are reflected on its surface. The Rainbow Pool, a smaller, transverse basin located at the eastern end of the Reflecting Pool, is named for its water display, created by 142 jets which create upward and inward sprays of water that refract the sunlight in a rainbow effect. The Rainbow Pool, an oval basin with gracefully curved corners, is 300 feet long, 160 feet wide, and three feet deep.[21] The Reflecting Pool and Rainbow Pool contribute to the East and West Potomac Parks Historic District based on National Register Criterion A in the areas of City Planning and Landscape Architecture. The two pools are integral aspects of the McMillan Plan, the landmark City Beautiful plan for the city of Washington.

The double rows of **Dutch Elm Trees (Contributing Site)** that line and shade the gravel walkways along the north and south sides of the Reflecting Pool are also a defining feature within the McMillan Plan landscape. "English elms" were recommended in 1915 by Frederick Law Olmsted, Jr., while he was serving as the landscape architect member of the Commission of Fine Arts. The trees specified were what Olmsted, and others, considered to be an "English elm;" in fact, the elms that were planted along the pool over the years are all cultivars of what we might commonly call today a Dutch elm. Olmsted selected "English elms" because he liked their upright form that provided shade when mature,

---

[21]Leonard J. Furbee, "The Reflecting and Rainbow Pools," 1955, Revised 1964, U.S. Department of the Interior, National Park Service, National Capital Region, Office of Land Use, Washington, DC, Reservation File 332, pp. 3-4, 6-7.

which made them an appropriate selection for park use. The original 502 "English elms" were ordered and imported from a nursery in Chester, England; they were planted in 1915-16, prior to the construction of both the Reflecting Pool and the Rainbow Pool. Of these trees, 398 were planted in four parallel rows that flanked (two rows on each side) the site of the Reflecting Pool. The remaining 104 trees were planted to the south of the parallel rows. As early as 1929, some of the original elms had to be replaced, as they had developed poor root systems, and frequently fell in high winds. Improved drainage and the lowering of the ground water level has since allowed the replacement elm trees to survive.[22]

These elms have been continuously replanted over the years to retain their assertive green edge. Today, the rows contain a combination of trees from the original planting and later replacements. The majority of the trees are Dutch elms, with a few smoothleaf, American, English, and Scottish elms planted in between.[23] Current National Park Service policy is to replace dead or dying trees in kind on a cyclical basis to ensure that the original design intent is perpetuated. The Park Service no longer advocates planting entire areas with a single type of tree, as this makes them less resistant to disease. The Dutch elm trees contribute to the East and West Potomac Parks Historic District based on National Register Criterion A in the areas of City Planning and Landscape Architecture, as a critical landscape feature of the McMillan Plan that can be directly attributed to Frederick Law Olmsted, Jr.

The **Arlington Memorial Bridge (Contributing Structure),** designed by William Mitchell Kendall of the New York City architectural firm of McKim, Mead and White, was constructed between 1926 and 1932. James Greenleaf served as consulting landscape architect for the bridge. Spanning the Potomac River from the Lincoln Memorial in Washington, DC, to Arlington Cemetery in Arlington, Virginia, the 2,163-foot-long Neoclassical bridge has a 60-foot-wide roadway flanked by 15-foot-wide sidewalks. The bridge is composed of nine broad arches; all but the central bascule draw span are constructed of reinforced concrete faced with North Carolina granite in an ashlar pattern. The double-leaf, underneath counterweight, central bascule draw span is faced with pressed ornamental steel. These arches are crowned with six-foot bison keystones that were carved by Alexander Phimister Proctor.[24]

The piers supporting the bridge's arches are between 32 and 41 feet wide, and sit on bedrock 35 feet into the Potomac River. The two piers that rest on the riverbanks feature simple square panels, while the

---

[22]"Cultural Landscape Inventory, West Potomac Parks, Lincoln Memorial Grounds," pp. 3.10, 3.20.
[23]"Cultural Landscape Inventory, West Potomac Parks, Lincoln Memorial Grounds," p. 4.9.
[24]Barry Mackintosh, "Arlington Memorial Bridge," National Register of Historic Places Inventory-Nomination Form, U.S. Department of the Interior, National Park Service, Washington, DC, December 7, 1979, p. 7.1.

remaining piers are ornamented with bas relief eagles in disks that are 12 feet in diameter. These disks are flanked by fasces with axe blades projecting from the top. This ornamental detailing was carved by sculptor Carl Paul Jennewein. The bridge's upper edge is delineated by granite balustrades with recessed benches atop each pier. These benches are set between granite blocks featuring Greek key banding. Two pairs of monumental Neoclassical statues on matching pedestals flank the eastern end of the Arlington Memorial Bridge and the Rock Creek and Potomac Parkway. "The Arts of War," standing at the end of the bridge, were sculpted by Leo Friedlander. "Valor" is represented by a male equestrian figure accompanied by a female holding a shield, and "Sacrifice" is depicted by a standing female representing the Earth looking to the equestrian figure of Mars. "The Arts of Peace," standing at the end of the parkway, were sculpted by James Earle Fraser. The statue entitled "Music and Harvest" features the winged horse Pegasus between a male figure holding a sickle and a bundle of wheat, and a female holding a harp. "Aspiration and Literature" also features Pegasus, this time flanked by figures holding a bow and a book. These 17-foot tall bronze statues rest on granite pedestals with 36 bronze stars, which represent the States that belonged to the Union at the end of the Civil War. The two sculptures were commissioned in 1925 and their designs were approved in 1933; however, the statues were not actually erected until 1951, after they were cast and gilded as a gift to the United States by Italy. All four statues were regilded in 1971.

The bridge's surroundings include a granite-faced, balustraded river wall that extends northwesterward along the riverbank, flanking the southern terminus of the Rock Creek and Potomac Parkway, and terminating in an exedra at the original western end of Constitution Avenue (now cut off from Constitution Avenue by the Theodore Roosevelt Bridge approaches). According to the National Register nomination for the Arlington Memorial Bridge and its related features, this architectural treatment of the Parkway terminus was designed and constructed in conjunction with the bridge.

The Arlington Memorial Bridge, along with its related features, was individually listed in the National Register of Historic Places in 1980, and it contributes to the East and West Potomac Parks Historic District based on National Register Criterion C in the areas of Architecture, Engineering, and Art. It is an exceptional Neoclassical bridge designed by the nationally known architectural firm of McKim, Mead and White.[25]

---

[25]For additional information on Arlington Memorial Bridge, refer to its individual National Register of Historic Places Inventory-Nomination Form, U.S. Department of the Interior, National Park Service, December 7, 1979.

Running parallel to the Reflecting Pool, north of the double row of Dutch elm trees, on an east-west alignment from the Lincoln Memorial to Seventeenth Street, is the **Flood Control Levee (Contributing Site).** This embankment was constructed by the U.S. Army Corps of Engineers in 1938 to protect the Smithsonian museums and downtown Washington from Potomac River flooding. The present levee, which replaced a temporary levee constructed in 1936, is essentially an eight-foot high, linear, grassed berm. There is a gap in the levee at Twenty-third Street that allows automobile traffic to pass through the area at grade. In times of emergency, sandbags can be used to close the gap between Twenty-third Street and the Lincoln Memorial and Seventeenth Street at Constitution Avenue. On the east side of Seventeenth Street, there is no levee per se, but the Washington Monument Grounds are graded to provide the elevation needed for flood protection.

## RESOURCES CLUSTERED AROUND CONSTITUTION GARDENS

A second group of historic features is clustered around **Constitution Gardens (Contributing Site)**, a 52-acre designed landscape located within West Potomac Park. The long, rectangular park is bounded on the east by Seventeenth Street; on the west by Twenty-third Street; by the Reflecting Pool on the south; and by Constitution Avenue, NW, on the north. Completed as a Bicentennial project in 1976, Constitution Gardens was designed by the Washington, DC, office of the national architectural firm Skidmore, Owings, and Merrill, and the landscape architectural firm of Arnold Associates in the early 1970s. Designed in a romantic, naturalistic style, one of the major features of Constitution Gardens is a six-acre, curvilinear, constructed lake with a kidney-shaped island (see also "56 Signers Memorial"), which is connected by a footbridge to the lake's northern shore. The lake has a circumference of 2,625 feet, and is approximately two feet deep. The gardens contain masses of forest trees placed around open lawn areas, and a network of winding paths for pedestrians and bicyclists runs throughout. Constitution Gardens is the site of the Vietnam War Veterans Memorial (see also) and Vietnam Women's Memorial(see also). At the easternmost edge of the site, on the cross-axis of the Rainbow Pool, is a flat, raised platform, which was intended to hold a food pavilion that was never built; it is accessed by four diagonal paths. Three fieldstone, walled terraces leading down from the platform to the lake were meant for tables. The plan for Constitution Gardens features bold, curvilinear forms. The only exception to this is the angular Vietnam Veterans Memorial set within its boundaries. The view from the gardens to the east is dominated by the Washington Monument, and the views of Constitution Avenue to the north are filtered through maple, beech, oak, and gum trees planted in masses throughout the site.[26]

---

[26]Allen Freeman, "Romantic Garden on the Classical Mall," *The AIA Journal (*June 1983): pp. 51-52.

Constitution Gardens contributes to the East and West Potomac Parks Historic District based on National Register Criterion A in the areas of Landscape Architecture and Commemoration. The garden falls within the exception to National Register Criteria Consideration G. Though less than fifty years old, the garden has achieved exceptional significance, first as a highly visible project celebrating the American Bicentennial in the nation's capital, and later as the landscaped setting for a number of national memorials.

The **Vietnam Veterans Memorial (Contributing Object)** is set within a two-acre site on the grounds of the Constitution Gardens meadow near the Lincoln Memorial. The memorial is composed of three distinct elements: the Wall, designed by Maya Ying Lin and architect of record Cooper-Lecky Partnership (dedicated in 1982), the bronze figurative sculpture designed by Frederick Hart, and the nearby flagstaff. (Both the sculpture and the flagstaff were dedicated in 1984). The Wall, Frederick Hart sculpture, and flagstaff were all authorized by Public Law 96-297 in 1980.

Maya Lin won the design competition for the Vietnam Veterans Memorial as an undergraduate architecture student at Yale University; she then worked with the Cooper-Lecky Partnership so that her design could be constructed. The Wall, a striking, contemporary design, consists of two, 200-foot-long, polished black granite walls, which are built into the earth and meet to form a "V." It was designed by Lin to "emerge and recede into the earth." In deference to the existing landscape, this strong symbol retains the openness of the landscape through carefully engineered vistas to both the Lincoln Memorial and the Washington Monument. The Wall was inscribed with the names of the 57,692 Americans that were killed or missing in action in Vietnam between 1963 and 1973. These names are listed in the chronological order in which they died or disappeared. Additional names have been added to the Wall since its completion, and the symbols behind certain names which indicate their status have been revised, usually from "missing in action" to "killed in action." Also, a number of people listed on the Wall have since been discovered to be alive; as it is difficult to remove or erase names from the granite wall, their names remain.

After great debate, a flagstaff and a figurative sculpture were added to the memorial's original design, as a concession to those who were opposed to the Wall's modern design and symbolism. These features are located in a granite-paved plaza, which was added a certain distance from the Wall, but near an entrance walk to it, and were dedicated on Veterans Day, November 11, 1984. Frederick Hart's bronze sculpture, entitled "Three Servicemen," features a Hispanic soldier, an African-American soldier, and a Caucasian

soldier. It was cast at the Joel Meisner & Co., Inc., foundry in Plainview, New York.[27] The base of the 60-foot flagstaff features the emblems of the five armed services: the Army, Navy, Air Force, Marines, and Coast Guard.[28] Alterations have since been made to the memorial, including night lighting for the Wall, widening walkways, and adding post and chain barriers to accommodate intense visitation levels while protecting the site.

The Vietnam Veterans Memorial contributes to the East and West Potomac Parks Historic District, based on National Register Criteria A and C in the areas of Architecture, Art, and Commemoration. Despite the fact that it is primarily commemorative in intent (thus in the category of properties not usually qualifying for the National Register), its design, tradition, and symbolic value has invested it with its own historical significance, thus it falls within the exception to National Register Criteria Consideration F. The Vietnam Veterans Memorial also falls within the exception to National Register Criteria Consideration G. Though it is less than 50 years old, the memorial possesses exceptional significance due to the Congressional authorization of its site and design, and its immediate symbolic importance in the Monumental Core.

The **Vietnam Women's Memorial (Contributing Object)**, a memorial honoring the women who served in Vietnam, was first conceived by Diane Carlson Evans, a housewife from Minnesota who had served as an Army nurse in Vietnam. Evans organized the Vietnam Women's Memorial Project, Inc., to recognize the efforts of women in the Vietnam War, and then to raise money for a suitable memorial to be placed in Washington, DC, near the existing memorial.[29] The resulting Vietnam Women's Memorial was authorized by Public Law 96-297 in 1980, and was dedicated on Veterans Day, November 11, 1993. The memorial features a bronze sculpture of three nurses, the first caring for a wounded soldier, the second kneeling and clutching an empty helmet, and the third looking skyward for a rescue helicopter. This sculpture, by Glenna Goodacre of Santa Fe, New Mexico, is located on a terrace of granite pavers approximately 300 feet southeast of the Frederick Hart sculpture and facing across the lawn towards the Wall. The architect who designed the memorial plaza was George Dickie, AIA, ASLA, of State College, Pennsylvania.

---

[27] Jannelle Warren-Findley, "A Guide to Selected Statues, Monuments and Memorials," U.S. Department of the Interior, National Park Service, National Capital Parks-Central, August 1, 1985, pp. 124-126.

[28] "Vietnam Veterans Memorial Official Park Guide," U.S. Department of the Interior, National Park Service, National Capital Parks-Central, Washington, DC.

[29] Peter Perl, "A Matter of Honor," *The Washington Post Magazine*, October 25, 1992, pp. 16-31.

The Vietnam Women's Memorial contributes to the East and West Potomac Parks Historic District, based on National Register Criteria A and C in the areas of Art and Commemoration. Despite the fact that it is primarily commemorative in intent (thus in the category of properties not usually qualifying for the National Register), its design, tradition, and symbolic value has invested it with its own historical significance, thus it falls within the exception to National Register Criteria Consideration F. The Vietnam Women's Memorial also falls within the exception to National Register Criteria Consideration G. Though it is less than 50 years old, the memorial possess exceptional significance due to the Congressional authorization of its site and design, and its immediate symbolic importance in the Monumental Core.

The **56 Signers Memorial (Contributing Object)**, located on the small island in Constitution Gardens, was designed in 1981 by the landscape architectural firm EDAW, Inc., with Joseph Brown as principal-in-charge, and Kurt Pronske, civil engineer. The memorial was designed to honor the 56 Signers of the Declaration of Independence. It consists of an arc of granite blocks, each bearing an enlarged, incised, gold-leaf signature of one of the Declaration's signers, along a granite plaza that opens out to the lake and to views of nearby memorials. Sedums planted between the blocks soften their edges. A curving, low fieldstone wall, which bisects the island, extends in two directions from the memorial.[30] The last sentence of the Declaration of Independence is engraved at the entrance to the memorial, and a wooden bridge provides access to the island.

The 56 Signers Memorial contributes to the East and West Potomac Parks Historic District, based on National Register Criteria A and C, in the areas of Landscape Architecture and Commemoration. Despite the fact that it is primarily commemorative in intent (thus in the category of properties not usually qualifying for the National Register), its design, tradition, and symbolic value has invested it with its own historical significance, thus it falls within the exception to National Register Criteria Consideration F. The 56 Signers Memorial also falls within the exception to National Register Criteria Consideration G. Though it is less than 50 years old, the memorial possesses exceptional significance due to the Congressional authorization of its site and design, and its immediate symbolic importance in the Monumental Core.

[30]Freeman, "Romantic Garden on the Classical Mall," *The AIA Journal,* p. 52.

RESOURCES CLUSTERED AROUND THE TIDAL BASIN

A significant number of historic resources are arranged around the **Tidal Basin (Contributing Site)**, an irregularly shaped, constructed body of water with four lobes, covering 110 acres and averaging six feet deep. Located between the Potomac River and the Washington Channel, the Tidal Basin is an integral component of the landscape of West Potomac Park. Designed in 1882 by U.S. Army Major Peter C. Hains as part of his plan for the reclamation of the Potomac Flats and the creation of Potomac Park, the Tidal Basin was dredged in 1885, and redredged in 1907.[31] The water that it holds is used for recreation, as well as to flush out the Washington Channel. The basin is formed by structural stone seawalls (see also). Hundreds of Japanese Cherry Trees (see also) line the banks of the Tidal Basin, and are reflected in the water's surface (see also "Views Around Tidal Basin"). The Tidal Basin contributes to the East and West Potomac Parks Historic District based on National Register Criteria A and C in the area of Engineering. The basin is a significant feature of the reclamation and subsequent improvement of the Potomac Flats, one of the most important projects undertaken by the U.S. Army Corps of Engineers in the late nineteenth century.

The Tidal Basin is rimmed with **Stone Seawalls (Contributing Structure)** -- retaining walls that prevent the massive earth fill from eroding back into the Potomac River.[32] The seawalls were constructed from 1882 into the 1890s by the U.S. Army Corps of Engineers, as the reclamation of the parks progressed. Since the reclamation proceeded generally from west to east, it is likely that the seawalls in West Potomac Park were constructed before those in East Potomac Park. The seawall surrounding the Tidal Basin was completed by 1896.[33] Portions of the seawall rimming the Tidal Basin have been periodically repaired or rebuilt as needed. One example of this is when the northern lobe of the Tidal Basin was reshaped in the early 1940s as part of the construction of Kutz Bridge; another is when the Jefferson Memorial was constructed along the Tidal Basin in the 1940s. Many sections of the seawall are in need of repair, although their alignment is intact.

The seawalls are capped by an eight-foot-wide concrete walk, which was constructed by the U.S. Army Corps of Engineers to provide safe access to the riverfront for such passive recreation uses as strolling and fishing. An iron-pipe railing runs along the top of the seawall only between the Tidal Reservoir Outlet

---

[31]Historic American Engineering Record, Tidal Reservoir, HAER No. DC-9, pp. 1-3.

[32]Although the seawalls are present in both parks, for the purposes of this nomination they have been considered a single contributing structure, and have been counted only once.

[33]Historic American Buildings Survey, West Potomac Park, HABS No. DC-693, p. 5.

Bridge and the Kutz Bridge. The concrete walk and railing likely date to the late 1920s or early 1930s. Each component of the three-tier pipe railing is approximately four inches in diameter; overall, the railing stands forty inches high, and has been painted gray. The Stone Seawalls contribute to the East and West Potomac Parks Historic District, based on National Register Criteria A and C in the area of Engineering; they are an important feature of the U.S. Army Corps of Engineers' efforts to reclaim the Potomac Flats.

After construction of the Tidal Basin had begun, the **Tidal Reservoir Outlet Bridge (Contributing Structure)** was built in 1888-89 by the U.S. Army Corps of Engineers as the primary tidal gate for the Tidal Basin. Located where East Basin Drive crosses the Washington Channel, between the base of Fifteenth Street and the Fourteenth Street Bridge, the bridge was one of the earliest completed features of the basin. The need for a tidal gate at the Tidal Basin's outlet became apparent as the basin was dredged, when tremendous amounts of water flowed from the basin into the channel. The Tidal Reservoir Outlet Bridge was designed to regulate the flow of water from the Washington Channel through the Tidal Basin into the Potomac River. As originally conceived, the tidal gate at the outlet was to operate on its own without an accompanying gate at the inlet. An additional tidal gate, the Tidal Reservoir Inlet Bridge (see also), was constructed two decades later at the inlet to control the silt building up in the Tidal Basin.

The Tidal Reservoir Outlet Bridge is constructed of granite with two concrete wing walls on each side of the outlet on the Channel side, and has a reinforced concrete deck. This low-level bridge has six arched spans, each of which is six feet wide and 12 feet high, and contains a pair of wooden gates that open and close to control the flow of water out into the channel.[34] The setting of the Tidal Reservoir Outlet

Bridge has been changed dramatically since its completion by the construction of numerous bridges in its immediate vicinity. Today, the Outlet Bridge is hemmed in between the Fourteenth Street bridge that crosses the outlet, and the Fifteenth Street bridge that connects with the exit ramp leading to Hains Point.

While originally used to control water flow, today it functions primarily as a pedestrian crossing.[35] Regardless of this changing use, the Tidal Reservoir Outlet Bridge contributes to the East and West Potomac Parks Historic District based on National Register Criteria A and C in the area of Engineering. The bridge is an integral feature of the Tidal Basin as devised and constructed by the U.S. Army Corps of Engineers in the late nineteenth century.

[34]Historic American Engineering Record, Tidal Reservoir Outlet Bridge, HAER No. DC-9-B, pp. 1-3.
[35]Historic American Engineering Record, Tidal Reservoir Outlet Bridge, HAER No. DC-9-B, pp. 2-3.

Once it was determined that the primary tidal gate was insufficient for regulating the basin's flow, the **Tidal Reservoir Inlet Bridge (Contributing Structure)** was constructed in 1908-09. Located on Ohio Drive, SW, spanning the inlet to the Tidal Basin, the bridge was designed to act as a tidal gate for the Tidal Basin, controlling and regulating the water entering from the Potomac River. The construction of these two bridges also allowed for complete circulation around the Tidal Basin by 1910. Today, the Tidal Basin Inlet Bridge carries vehicular and pedestrian traffic along Ohio Drive. Designed by noted Washington, DC, architect Nathan C. Wyeth, and constructed by the U.S. Army Corps of Engineers, the Inlet Bridge is 184 feet in length, and has a 25-foot roadway flanked by 7-foot sidewalks. The bridge consists of a single central span with one fixed span on each side, all constructed of reinforced concrete. The ornamental details of the Inlet Bridge, such as gargoyles that vent water from integral bronze fountains, are constructed of cast concrete with exposed aggregate facing.[36]

The Inlet Bridge has been altered several times since its completion. In 1926, the bridge was widened to 32 feet; one sidewalk was converted to a bridle path; lighting standards on the bridge were removed; and steel I-beams were placed underneath the roadbed for reinforcement. Between 1969 and 1971, the tidal gate spans were removed and replaced. A major repair of the Inlet Bridge was undertaken in 1985-86, at which time an original removable lock span was permanently removed and replaced with a fixed, reinforced concrete span. Also, deteriorating sections of the bridge were replaced, and the entire structure was cleaned.[37] Despite these alterations, the Tidal Reservoir Inlet Bridge contributes to the East and West Potomac Parks Historic District based on National Register Criteria A and C in the area of Engineering. The bridge is an integral component of the Tidal Basin, and was constructed by the U.S. Corps of Engineers in the early twentieth century.

Traffic circulation in this portion of West Potomac Park was altered with the construction of the **Independence Avenue Extension (Contributing Structure).** This road project was initiated in the early 1940s primarily to allow better access from the city of Washington to the Pentagon. Philadelphia architect Paul Philippe Cret designed a narrow dual-highway system with a bridge (see "Kutz Bridge" below) across the Tidal Basin, which was an amenable solution to several different constituencies. The War Department liked the fact that Cret's road system connected to both the Fourteenth Street Bridges

[36]Historic American Engineering Record, Tidal Reservoir Inlet Bridge, HAER No. DC-9-A, pp. 1-3.
[37]Historic American Engineering Record, Tidal Reservoir Inlet Bridge, HAER No. DC-9-A, pp. 1, 3, 5.

and to Arlington Memorial Bridge, which allowed access to the Pentagon even if one bridge was destroyed during the war. At the insistence of the National Park Service and the Commission of Fine Arts, the new roads were narrow, and existing park roads were incorporated into the new system; this helped to preserve both existing vegetation and scenic vistas.[38] This road system remains in place today.

The **Kutz Bridge (Contributing Structure)** was designed by Paul Philippe Cret in 1941 as an integral part of the Independence Avenue Extension project. The bridge was constructed in 1943 to carry eastbound Independence Avenue, SW, over the north bay of the Tidal Basin; and a separate roadway immediately north of this bay was planned to carry westbound traffic. Just south of the Washington Monument Grounds an overpass was built where the westbound lanes passed over the eastbound lanes, and a connection was constructed to Maine Avenue, SW, south of the Bureau of Engraving and Printing. Cret's design necessitated a change in the shape of the basin's Northern Neck, the area of shoreline between the Kutz Bridge and the John Paul Jones Memorial. The original rounded shape of the shoreline was flattened, and new revetment walls were built.[39] The 833-foot bridge is constructed of concrete and steel on pilings. It has granite facings and contains 15 40-foot-long spans. The bridge's roadway is 34 feet wide, and is flanked by 6-foot-wide sidewalks. Known simply as the Independence Avenue Bridge, it was dedicated in 1954 by Mrs. Charles W. Kutz in memory of her late husband, a Brigadier General who had served three times as Engineer Commissioner for the District of Columbia.[40]

Several components of the landscape surrounding the Kutz Bridge can be attributed to Frederick Law Olmsted, Jr. In accordance with Olmsted's original design for the landscape of West Potomac Park, elm trees were planted in this area as early as 1907, and a cluster of sycamore trees located on the north side of Independence Avenue, SW, near Seventeenth Street, was likely planted under his direction.[41] The Independence Avenue Extension and the Kutz Bridge contribute to the East and West Potomac Parks Historic District based on National Register Criterion C in the areas of Transportation, Architecture and Engineering, as the skillful work of nationally recognized architect Paul Philippe Cret.

---

[38]Scott G. Shultz, "The Development of the Historic Landscape of the Washington Monument Grounds and West Potomac Park," U.S. Department of the Interior, National Park Service, Cultural Resources, Washington, DC, 1995, p. 21.

[39]Shultz, "The Development of the Historic Landscape of the Washington Monument Grounds and West Potomac Park," p. 20.

[40]Gordon Chappell, "East and West Potomac Parks: A History," U.S. Department of the Interior, National Park Service, Denver Service Center, June 1973, pp. 151-152.

[41]Shultz, "The Development of the Historic Landscape of the Washington Monument Grounds and West Potomac Park," pp. 27, 30.

Since its completion, a number of memorials have been sited near the Tidal Basin, the earliest of which was the **Commodore John Paul Jones Statue (Contributing Object).** It was constructed at Seventeenth Street and Independence Avenue, SW, to honor the Revolutionary War hero, who was born in Scotland in 1747, and died in poverty in Paris in 1792. Jones joined the United States Navy in 1775, and after an extraordinary naval career here, he joined the Russian Navy as a Rear Admiral. His grave had been discovered in an obscure cemetery in Paris in 1905, and his remains, which had been preserved in a barrel of rum, were returned to the United States for reinterment at the United States Naval Academy, in Annapolis, Maryland. Immediately thereafter, in 1906, Congress appropriated $50,000 for a memorial to Jones,[42] and the resulting statue was built from 1911-12, and dedicated on April 17, 1912. The memorial's bronze statue and marble pedestal were designed by sculptor Charles Henry Niehaus. Thomas Hastings, of the New York City architectural firm of Carrere and Hastings, served as project architect. Carver John Grignolai was responsible for the ornamentation on the statue's base, and the statue was cast by the Gorham Company.[43]

The memorial's bronze statue of Jones is mounted against a large, marble pylon. The statue and pylon are both placed on a pedestal containing spouts shaped like dolphins, through which water flows into the basin below. Jones is depicted in the statue in period naval officer dress, with his left hand on the pommel of his sword, and his right hand clenched in a fist. The marble pylon features a series of military symbols, and the rear of the pylon has a relief that depicts Jones raising the American flag on a United States man-of-war ship. This relief illustrates the long-held belief that he was the first man to raise the new American flag on a war ship. Over this relief, the words "Surrender? I have not yet begun to fight!" are carved.[44] A plaque, presented by the Navy Department, was placed on the statue on October 30, 1920, the 145th anniversary of the founding of the United States Navy. This plaque was inscribed with a quote from a speech Jones delivered on September 14, 1775, in which he outlined the desired attributes of a good naval officer.[45] In 1949, the Department of the Navy requested that this plaque be removed and

---

[42]James M. Goode, *The Outdoor Sculpture of Washington, DC* (Washington, DC: Smithsonian Institution Press, 1974), p. 397.

[43]Warren-Findley, "A Guide to Selected Statues, Monuments and Memorials," pp. 68-71.

[44]Goode, *The Outdoor Sculpture of Washington, DC*, p. 397.

[45]"Nation's Tribute Paid Paul Jones," Clipping dated October 31, 1920, Found at National Archives and Records Administration, Washington, DC, Record Group 66, Records of the Commission of Fine Arts, Entry 17, Box 86; "John Paul Jones Tablet Unveiled," The Evening Star, October 31, 1920.

replaced with one with an authentic recounting of the facts of Jones' life, as the quote by Jones on the original plaque was not correctly attributed.[46] A 1997 site visit revealed no plaque present on the statue.

The Commodore John Paul Jones Statue contributes to the East and West Potomac Parks Historic District based on National Register Criterion A in the areas of Art and Commemoration. Despite the fact that it is primarily commemorative in intent (thus in the category of properties not usually qualifying for the National Register), its design, age, tradition, and symbolic value has invested it with its own historical significance, thus it falls within the exception to National Register Criteria Consideration F. The statue was also the first memorial to be placed in either of the two parks.

The **Japanese Cherry Trees (Contributing Site)**, a major character-defining component of the landscape of East and West Potomac Parks, were also sited around the Tidal Basin.[47] Approximately 3,000 cherry trees, given to the city of Washington as a gift from Japan, were planted in the two parks in 1912. The first shipment of trees from Japan was infested with several types of insects, so they were destroyed, and a second shipment of trees was made. Twelve species of cherry trees were sent by Japan, the majority of which were planted on the banks of the Tidal Basin. An estimated 150 to 200 of the original trees survive today; and the former diverse collection of trees has dwindled to only two species, the white Yoshino and the pink, double-blossomed Kwanzan. As replacement records have only been kept since the 1970s, the exact location of most of the original trees is not known. The first two Yoshino trees that were planted in 1912 by Mrs. Taft and the wife of the then Japanese ambassador are marked with a bronze plaque (see also).[48] The Japanese Cherry Trees contribute to the East and West Potomac Parks Historic District, based on Criterion A in the areas of Landscape Architecture and Social History. The cherry trees remain a major tourist attraction in the spring today.

The **First Japanese Cherry Trees Planting Plaque (Noncontributing Object),** located along the northwestern lobe of the Tidal Basin, on a boulder between the first two cherry trees that were planted by Mrs. Taft and the Viscountess of Chinda, wife of the then Japanese ambassador, in 1912. The rectangular plaque was placed on this site in 1950 by the National Capital Sesquicentennial Commission to commemorate and to mark the exact location of the first two Japanese cherry trees that were planted. The First Japanese Cherry Trees Planting Plaque does not contribute to the East and West Potomac Parks

---

[46]Warren-Findley, "A Guide to Selected Statues, Monuments and Memorials," p. 71.

[47]Although the cherry trees are present in both parks, for the purposes of this nomination, they have been considered a single contributing site, and have been counted only once.

[48]Linda Wheeler, "Tidal Basin's Blossoming Controversy," *The Washington Post*, March 23, 1997.

Historic District, as it is commemorative in nature, less than 50 years old, and does not exhibit exceptional importance. This feature should be re-evaluated once it is 50 years old.

Two gifts from the nation of Japan were placed on the banks of the Tidal Basin in the 1950s. The first gift, the **Japanese Lantern (Contributing Object)**, located along the Tidal Basin near the intersection of Independence Avenue, SW, and West Basin Drive, SW, was one of three antique stone lanterns given to the citizens of the United States by the Governor of Tokyo in 1954. The other two lanterns were given to the cities of Providence and Newport, Rhode Island. A symbol of Japanese-American understanding, the lantern was dedicated on March 30, 1954, the 100th anniversary of Commodore Matthew Perry's opening of American trade with Japan. The lantern was placed on the northwest bank of the Tidal Basin, between two of the original cherry trees that were planted by Mrs. William Howard Taft and the wife of the then Japanese ambassador, the Viscountess Chinda, in 1912.[49]

This Japanese Lantern was carved in Tokyo in 1651 to honor dead warlord Tokugawa Iemitsu; its twin still stands on the grounds of a temple in Ueno Park in Tokyo. The granite lantern, hexagonal in shape and ten feet in height, consists of small base, a circular pillar, and a lantern with six small openings, which is crowned by six scrolled ornaments and a finial. This lantern is lighted yearly to officially begin the city's Cherry Blossom Festival.[50] The Japanese Lantern contributes to the East and West Potomac Parks Historic District based on National Register Criterion A in the areas of Art and Social History. Despite the fact that it is primarily commemorative in intent (thus in the category of properties not usually qualifying for the National Register), its design, age, tradition, and symbolic value has invested it with its own historical significance, thus it falls within the exception to National Register Criteria Consideration F. The lantern has achieved additional significance as a gift to the nation from the country of Japan.

The second gift, the **Japanese Pagoda (Contributing Object)**, located near the intersection of Ohio Drive, SW, and West Basin Drive, SW, was given by Ryozo Kiranuma, the Mayor of Yokohama, to the people of Washington. The 3,800-pound, stone pagoda arrived in the District of Columbia on June 19, 1957, in pieces that were packed in five wooden crates with no assembly instructions. With assistance

---

[49] "Tokyo Governor Sends DC A 300-Year-Old Lantern," *Washington Times Herald*, November 19, 1953; Goode, *The Outdoor Sculpture of Washington, DC*, pp. 398-399.

[50] Goode, *The Outdoor Sculpture of Washington, DC*, pp. 398-399; Warren-Findley, "A Guide to Selected Statues, Monuments and Memorials," pp. 63-64.

from an expert in Japanese culture from the Library of Congress, the pagoda was reassembled, and was installed on the bank of the Tidal Basin. It was dedicated on April 21, 1958.[51]

The Japanese Pagoda is a nine-tiered structure, with four seated Buddhas carved into its base.[52] A brass plaque, located on the pagoda's base, reads "May this pagoda symbolize the spirit of friendship between the United States of America and Japan manifested in the treaty of peace, amity and commerce signed at Yokohama on March 31, 1854, by the plenipotentiaries of the two countries."[53] The Japanese Pagoda contributes to the East and West Potomac Parks Historic District based on National Register Criterion A in the areas of Art and Social History. Despite the fact that it is primarily commemorative in intent (thus in the category of properties not usually qualifying for the National Register), its design, age, tradition, and symbolic value has invested it with its own historical significance, thus it falls within the exception to National Register Criteria Consideration F. The pagoda has also achieved additional significance as a gift to the nation from the country of Japan.

Stretching 800 feet along the southwest bank of the Tidal Basin and supported by 900 steel pilings set into the marshy soil, the **Franklin Delano Roosevelt Memorial (Contributing Site)** is the newest monument in the two parks. The idea for a memorial to honor the nation's 32nd president was formally recognized in 1955 when Congress created the Franklin Delano Roosevelt Memorial Commission to guide the design and construction of the memorial. In 1959, Congress passed Public Law 86-241, which set aside a 27-acre site in West Potomac Park for the memorial, authorized the commission to hold a design competition, and appropriated $150,000 to organize it. The memorial's construction was delayed for over 30 years, as its evolving design underwent agency review, and private moneys were raised and Congressional authorizations were made to fund its fabrication. Designed by San Francisco landscape architect Lawrence Halprin, FASLA, the memorial was built in thirty months between 1994 and 1997 at a cost of $48.5 million, and was dedicated by President Clinton on May 2, 1997. The memorial landscape, which covers approximately seven-and-a-half acres, features four outdoor rooms, one for each of Roosevelt's four terms. These rooms are defined by walls constructed by hand-carved blocks of Carnelian red granite from South Dakota and Minnesota. Each room has a fountain, sculptural elements, and inscriptions from Roosevelt's speeches that reflect the events of the times. Water is a

---

[51]Goode, *The Outdoor Sculpture of Washington, DC*, p. 399; Warren-Findley, "A Guide to Selected Statues, Monuments and Memorials," p. 65; "City Seeks Blueprint for a Pagoda; Japanese Gift Arrives in 5 Crates," *The Washington Star*, June 19, 1957; "Company for Blossoms," *The Washington Daily News*, April 22, 1958.

[52]Goode, *The Outdoor Sculpture of Washington, DC*, p. 399.

[53]"City Seeks Blueprint for a Pagoda; Japanese Gift Arrives in 5 Crates," *The Washington Star*, June 19, 1957.

leitmotif in the memorial, as Roosevelt was born and raised near the Hudson River, was an avid sailor, and also served as assistant secretary of the navy early in his political career. The memorial's inscriptions were carved by master stone carver John Benson.

Located in West Potomac Park, the Franklin Delano Roosevelt Memorial occupies the last of four ceremonial spaces reserved by the McMillan Plan.[54] The east side of the memorial's forecourt contains a small stone building that houses offices for park rangers, a small bookstore, and an interpretive area. The entrance to the memorial features a 12-foot-high granite wall, on which is inscribed "Franklin Delano Roosevelt, President of the United States, 1933-1945." Inside the memorial's entrance is a bronze sculpture of the presidential seal Roosevelt used during his 12 years in office, created by sculptor Tom Hardy of Portland, Oregon. On the wall to the left of this seal is a line from one of Roosevelt's best-known speeches during his first term, "This generation of Americans has a rendezvous with destiny." In the first room, which represents Roosevelt's first term (1933-1937), the images and sculpture focus on the first 100 days of Roosevelt's presidency. A bronze bas-relief sculpture by sculptor Robert Graham depicts his first inauguration; the inspiration for this artwork was a segment from a contemporary newsreel covering this inauguration. The quote "The only thing we have to fear is fear itself" is carved into the wall above the bas-relief. Other short quotes from several of his speeches and fireside chats have been carved into the granite walls, and longer quotations have been sandblasted onto thermal-finished granite panels. The large waterfall in the first room symbolizes Roosevelt's life-long ties to the water, and also helps to filter the sound of airplanes taking off from and landing at National Airport.[55]

The transition between the first and second rooms is a landscaped passageway with a small stone fountain at its end. The second room, which represents his second term (1937-1941), focuses on the Great Depression and the tremendous problem of unemployment during this time. Three sculptures by New Jersey sculptor George Segal, of an urban breadline, a rural couple, and a man listening to a fireside chat represent specific American responses to the country's depression. A thirty-foot bronze, bas-relief mural by Robert Graham illustrates 54 of the New Deal social and economic programs instigated by Roosevelt, and five free-standing, bronze cylinders in front of the wall contain the negative images from the mural. The large fountain in this room, patterned after a Tennessee Valley Authority dam, represents the large-scale New Deal regional electrification projects of this period.[56]

---

[54]As described elsewhere in this report, the other three ceremonial spaces are occupied by the Lincoln Memorial, Washington Monument, and Jefferson Memorial.

[55]Lawrence Halprin, *The Franklin Delano Roosevelt Memorial* (San Francisco, California: Chronicle Books, 1997), pp. 26, 42, 44, 46-47, 52-53, 56.

[56]Halprin, *The Franklin Delano Roosevelt Memorial*, pp. 26, 58, 66-73, 80, 85.

A grassy berm between the second and third rooms marks the point at which the President and the nation entered into World War II. The third room, representing his third term (1941-1945), focuses on World War II. A granite wall, known as the War Wall, is inscribed with the following Roosevelt quotation: "I have seen war. I have seen war on land and sea. I have seen blood running from the wounded . . . I have seen the dead in the mud. I have seen cities destroyed . . . I have seen children starving. I have seen the agony of mothers and wives. I hate war." Huge granite blocks with the refrain "I hate war" carved into them are strewn across the paved path, and a fountain with broken granite blocks and skewed water jets simulate the destructive nature of the war in Europe. The room also contains bronze sculptures of a seated President Roosevelt and his beloved dog Fala, both the work of sculptor Neil Estern.[57]

The transition between the third and fourth rooms is actually a viewing platform. The fourth room, symbolizing the final year Roosevelt served before he died in office in 1945, focuses on the peace after the close of World War II and the creation of the United Nations. A sunken alcove within the room contains a 30-foot bronze bas-relief of Roosevelt's funeral procession, created by sculptor Leonard Baskin. A sculpture of First Lady Eleanor Roosevelt, shown as the nation's first delegate to the United Nations, is located in a niche at the end of a ramp. The risers of the seats of an amphitheater, formed by the placement of massive granite stones bearing more of Roosevelt's quotations, are carved with a timeline of dates and major events in the President's life. The seats of this amphitheater face a large fountain that empties into a pool with stepping stones. Roosevelt's Four Freedoms for the American people, Freedom of Speech, Freedom of Worship, Freedom from Want, and Freedom from Fear, are inscribed on the final wall of the memorial.[58]

The landscape plantings at the Franklin Delano Roosevelt Memorial include a complex palette of deciduous and evergreen trees, shrubs, and groundcovers. The major existing landscape features on the site prior to the memorial's construction were a number of mature trees, including 100-foot-high Dutch elm trees along the road bordering the Tidal Basin, flowering Japanese Cherry Trees on the bank of the Tidal Basin, several hemlocks, and a pawlonia. To complement these existing trees that were incorporated into the site's new landscape design, Halprin chose a variety of large deciduous trees, such as maples, zelkovas, locusts, and pin oaks, to be planted on the slope of the berm and throughout the memorial, as he wanted trees that provided both copious amounts of shade and fall color. He also selected pines and hollies for their evergreen quality in winter. He specified that small flowering trees, such as

---

[57]Halprin, *The Franklin Delano Roosevelt Memorial*, pp. 26, 92, 94, 103, 105-107.
[58]Halprin, *The Franklin Delano Roosevelt Memorial*, pp. 26, 114, 119-123, 128-131.

hawthornes, dogwoods, crabapples, cherries, and mountain ash trees, be planted on the slope and at each of the sitting areas in the garden passageways between each room. The memorial also contains shrubs like azaleas, rhododendrons, viburnums, and pyracantha, and ivy and pachysandra for groundcovers.[59]

Two additional site features located near the Tidal Basin deserve mention. The **Number 4 Fountain (Contributing Object)** is a 58-foot-diameter, circular, concrete fountain basin, which is located just southeast of the Tidal Reservoir Inlet Bridge. Constructed in 1905-06, it is the last of four fountain basins built in a 50-acre evergreen nursery and rose garden, which was established in 1905 by the Office of Public Buildings and Grounds. The other three fountains were removed sometime in the late 1940s due to the construction of the Fourteenth Street Bridge. Public Law 541, passed on July 16, 1946, called for the removal of the three fountains and a portion of the nursery. The fountain is flanked by curvilinear beds known locally as the Pansy Beds, which are planted with pansies and tulips in the fall, then replaced by annuals in the summer. The beds are encircled by an informal hedge of forsythia backed by a ring of mature saucer magnolias. The proposed memorial to George Mason is to be placed here. The Number 4 Fountain contributes to the East and West Potomac Parks Historic District based on National Register Criterion A in the area of Landscape Architecture. The fountain is one of the oldest remaining features in West Potomac Park, and is a remnant of the parks' early management and history.

The **Floral Library (Noncontributing Site),** which was designed in 1968 by Darwina L. Neal, FASLA, a landscape architect with the National Park Service, first bloomed in the spring of 1969. It is located in a quarter-acre plot of land south of Independence Avenue, SW, and East Basin Drive, SW, near the Tidal Basin. The Floral Library is curvilinear in shape, runs east to west, and contains 95 different planting beds separated by grass paths. The design concept for the library was inspired by a similar planting at Sterling Forest Gardens in Tuxedo Park, New York. Originally conceived as a Tulip Library, it was intended to provide people with the opportunity to view and compare a number of different tulip varieties in close proximity, and also to serve as a demonstration garden for National Park Service employees who were responsible for selecting floral displays for the parks. It is now considered a Floral Library, as the tulips are replaced in the summer by annuals, and some fading annuals are replaced in the fall by chrysanthemums. The Floral Library does not contribute to the East and West Potomac Parks Historic

[59]Halprin, *The Franklin Delano Roosevelt Memorial*, pp. 36-37, 39, 58.

District as it is less than 50 years old, and does not exhibit exceptional importance. This feature should be re-evaluated once it is 50 years old.

The **Jefferson Memorial (Contributing Structure)**, located on the southeast shore of the Tidal Basin, at the southern terminus of the Sixteenth Street cross-axis of the Washington Monument Grounds, on axis with the White House, was originally designed by John Russell Pope in 1937.[60] Pope's design was later modified by his successor firm Eggers and Higgins (Otto R. Eggers and Daniel P. Higgins, principals). The memorial, modeled after the Roman Pantheon, was constructed between 1939 and 1943, and was dedicated in 1947. A circular open-air structure, the Jefferson Memorial features a shallow dome, a circular peripteral colonnade composed of 26 unfluted Ionic columns, a 12-column-wide north portico, and 4 columns supporting each of the memorial's four monumental openings. The memorial is constructed of white Imperial Danby marble from Vermont, and it rests upon a series of granite-stepped terraces. A flight of granite steps and landings, flanked by granite buttresses, leads from the Tidal Basin. The stairs rise to an octastyle portico with a triangular pediment. This pediment features a sculpture by Adolph A. Weinman, depicting the five members of the drafting committee of the Declaration of Independence submitting their report to Congress. A dentiled cornice with egg-and-dart molding surrounds the pediment, below which is a plain frieze.[61]

The interior of the Jefferson Memorial is constructed of white Georgia marble with an axed finish, and the floor is made of pink Tennessee marble. Rudulph Evans' bronze statue of Jefferson stands centered in the chamber on a black Minnesota granite pedestal, which is inscribed with Jefferson's birth and death dates (1743 and 1826). The statue, which faces north towards the White House along the Mall's cross-axis, depicts Jefferson in mid-life holding the Declaration of Independence in his left hand. Four quotations from Jefferson's writings are carved into the walls of the memorial. An excerpt from the Declaration of Independence, the document for which Jefferson is best known, is located on the southwest wall. The southeast wall features a statement on the evolution of law and the Constitution,
which was taken from a letter written to Samuel Kercheval in 1816. The northwest wall is inscribed with a combination of six quotations taken primarily from Jefferson's "1786 Notes on Virginia" and "Summary

---

[60]For the purposes of this nomination, the Jefferson Memorial has been classified a structure, rather than an object. This classification is based on the fact that it is a major memorial, which can be entered into, much like a structure. This distinction separates the Jefferson Memorial from the parks' other minor memorials, such as statues and plaques. The Jefferson Memorial has been counted as a single contributing structure, while the memorial's surrounding landscape has been counted as a single contributing site.

[61]Donald C. Pfanz, National Register of Historic Places Inventory-Nomination Form, "Thomas Jefferson Memorial," U.S. Department of the Interior, National Park Service, Washington, DC, January 12, 1981, p. 7.1.

Views," which illustrate his beliefs on the evils of slavery and the need to educate the masses. On the northwest wall is a quote from the "Act of Religious Freedom," which was adopted in 1779 and eliminated the state church in Virginia; this quote expresses Jefferson's views on freedom of religion. A fifth quote, "I have sworn upon the altar of God eternal hostility against every form of tyranny over the mind of man," taken from an 1800 letter from Jefferson to Benjamin Rush, is engraved on the frieze encircling the memorial's interior. The frieze is topped by a dentiled cornice and a massive Indiana limestone dome. The dome's interior is divided into two parts; the lower section has a coffered surface containing lights that illuminate the statue, and the upper section has a smooth, uninterrupted surface.[62]

A few alterations have been made to the Jefferson Memorial since its dedication in 1947. In 1970, a pedestrian plaza was installed on the north side of the memorial adjacent to the Tidal Basin, to prevent cars from driving around the memorial. The construction of this plaza has changed the character of the original, single, continuous, circular roadway. The plaza is not linked to the memorial's historic landscape, nor does it relate to the memorial's shape and form. In addition, the plaza does not delineate the edge of the Tidal Basin as the roadway's sidewalk originally did. Several years after the plaza's construction, two phases of work were performed in preparation for the nation's Bicentennial. In 1974-75, work was performed to repair minor structural defects in the memorial. In 1975-76, repairs were made to benefit visitors, particularly the elderly and the handicapped. These included heating and ventilating work, air conditioning repairs in enclosed portions of the memorial, new toilet facilities, installing an elevator and a handicapped-access ramp, and plumbing and electrical repairs. In addition, a small gift shop was installed in the northwest section of the memorial in what had been a storage room.[63] In 1987, the freestanding information booth located inside the memorial was replaced with a more sympathetic, integral one. In the early 1990s, a team led by Einhorn Yaffee Prescott and Hartman-Cox Architects worked with the National Park Service on the first comprehensive repair effort at the memorial.

The design of the **Jefferson Memorial Grounds (Contributing Site)** can be attributed to Frederick Law Olmsted, Jr., who was appointed project landscape architect in October 1938. Much of Olmsted's work on the memorial was actually prepared by Henry V. Hubbard, a landscape architect employed by the firm. The base of the Jefferson Memorial is surrounded by a "stylobate mall," or a grassy, elevated terrace, and a roadway that was originally intended for automobiles, and was given over solely to pedestrian use in

---

[62]National Register Inventory-Nomination Form, "Thomas Jefferson Memorial," pp. 7.1-7.2.
[63]Mattes, "Landmarks of Liberty," p. 119.

1970. Two parallel access roads, separated by a central grass panel, are located on the south grounds of the memorial. The Olmsted firm's original planting plans for the grounds of the memorial were divided into two specific areas, the land inside the circular roadway, and the land outside the circular roadway. The plan for the area surrounding the Jefferson Memorial within the circular roadway, which was approved by the Commission of Fine Arts in October 1941, specified 13 species of plants, most of which were evergreen. Once this area was planted in 1942, it was considered to be "too thin," so 12 additional white pines were added, several holly trees were replaced and added, and some of the shrubs were rearranged. The scheme for the Jefferson Memorial Grounds outside the circular roadway was limited to a few different trees, shrubs, and ground covers; the original plant palette for this area included cotoneasters, yews, thorn trees, Japanese hollies, dogwoods, crabapples, maples, hollies, lindens, oaks, American elms, cherry trees, and periwinkle.[64]

Much of what is planted on the grounds of the Jefferson Memorial today is not what was originally specified or first planted. In general, the plantings are now more "architectural" in style than what was originally intended. The major change in the landscape in the immediate vicinity of the memorial occurred in the 1970s, when a mass of yews was planted on the stylobate mall. At this same time, a ring of Zelkova trees was planted inside the circular roadway, where none existed originally. Other more minor changes have also been made to the landscape over the years. In 1986, three mature, original white pine trees were removed, and were replaced with six-foot-high specimens. This same year, the holly hedge on the stylobate mall, comprised of 3,806 individual plants, was removed and replaced with a different species of holly. The newer yews were removed in 1993, and several original yews, a holly, and a white pine were removed and replaced. A number of original species of flowering trees and shrubs, including dogwoods, cotoneasters, and glossy Abelia, have been lost entirely; Olmsted preferred a more diverse plant palette than exists today. The original periwinkle ground cover was replaced with grass soon after the memorial's completion.[65]

The Jefferson Memorial was individually listed in the National Register of Historic Places in 1981. The Jefferson Memorial and the Jefferson Memorial Grounds contribute to the East and West Potomac Parks Historic District, based on National Register Criteria A and C in the areas of Architecture, Art, Landscape Architecture, and Commemoration. Despite the fact that the memorial and its associated

---

[64] Sally Prothero, "Jefferson Memorial Landscape Overview," U.S. Department of the Interior, National Park Service, Denver Service Center, Final Draft, September 14, 1995, pp. 20, 38-40, 42, 72-74.

[65] Prothero, "Jefferson Memorial Landscape Overview," pp. 69, 103-104, 142-143.

landscape are primarily commemorative in intent (thus in the category of properties not usually qualifying for the National Register), its design, age, tradition, and symbolic value has invested it with its own historical significance, thus it falls within the exception to National Register Criteria Consideration F. The Jefferson Memorial has become one of the nation's best-known and well-loved monuments.[66]

## RESOURCES CLUSTERED SOUTH OF THE REFLECTING POOL

The area south of the Reflecting Pool in West Potomac Park is the setting for several memorials.[67] The oldest of these is the **John Ericsson Monument (Contributing Object)**, located in a traffic circle at the southern terminus of Twenty-third Street at Independence Avenue, SW, and Ohio Drive, SW. The memorial honors Ericsson as the designer of the *Monitor*, the Union Army's ironclad ship, which was used in the most famous naval encounter of the Civil War. Ericsson is also credited with perfecting the design of the screw propeller. Designed by sculptor James Earle Fraser and architect Albert Randolph Ross, the monument was financed mainly by Americans of Scandinavian descent. The monument features a figure of Ericsson seated in front of three allegorical figures: a woman representing "Vision," a Viking representing "Adventure," and an iron molder representing "Labor." The figures stand against the Norse Tree of Life, and the granite pavement that surrounds the sculpture bears the inlaid form of a mariner's compass. The inscription "John Ericsson A.D. 1803-A.D. 1889; Inventor and Builder Of The Monitor; He Revolutionized Navigation By His Invention of the Screw Propeller" wraps around the four sides of the pedestal.[68]

Construction of the John Ericsson Monument began in 1924. The sculpture had not yet been carved at the time of the monument's dedication on May 29, 1926, so Fraser placed his full-size plaster casts, which had been painted to resemble pink granite, at the location of the monument. The sculpture, completed in April 1927, was carved on site from pink Milford granite from Massachusetts. The monument's

---

[66]For additional information on the Jefferson Memorial, refer to its individual National Register of Historic Places Inventory-Nomination Form, U.S. Department of the Interior, National Park Service, January 12, 1981. For additional information on the landscape of the Jefferson Memorial, refer to the Jefferson Memorial Landscape Overview Report, U.S. Department of the Interior, National Park Service, September, 1995.

[67]A wooded area south of the Reflecting Pool is sometimes informally referred to as "Ash Woods," and may be connected with the construction of the District of Columbia World War I Memorial (see below). However, neither the origin of this term nor its possible connection with the memorial has been found.

[68]Goode, *The Outdoor Sculpture of Washington, DC*, p. 400.

landscape, for which Frederick Law Olmsted, Jr. was the consultant, was completed by 1932;[69] it retains little integrity today. The monument's granite platform and the four sets of steps from its base were originally surrounded by plantings of three types of junipers, each having different growth habits. These junipers were replaced at some point with Japanese holly. The four walks that radiate from the granite platform were also planted with junipers; these shrubs have been removed entirely.[70]

The John Ericsson Monument contributes to the East and West Potomac Parks Historic District based on National Register Criterion A in the areas of Art and Commemoration, as an early monument placed in West Potomac Park. Despite the fact that it is primarily commemorative in intent (thus in the category of properties not usually qualifying for the National Register), its design, age, tradition, and symbolic value has invested it with its own historical significance, thus it falls within the exception to National Register Criteria Consideration F.

The **District of Columbia World War I Memorial (Contributing Object)** is located along Independence Avenue, SW, on axis with Nineteenth Street, south of the Reflecting Pool. The memorial was authorized by Congress in 1924, constructed in 1931, and dedicated on November 11, 1931. Intended to honor District residents who served in the first World War, the white marble Doric tempietto was also designed to be used as a bandstand. A list containing the names of the 26,000 District residents who served in World War I was placed in the memorial's cornerstone, and the names of the 499 residents who died as a result of this war were inscribed in the memorial's base. Funding for this memorial was raised entirely through public subscription. The architect for the memorial was Frederick H. Brooke, who worked with associate architects Nathan C. Wyeth and Horace W. Peaslee.[71]

At the time of its construction, an eight-foot-wide circular sidewalk was built around the memorial, and eight-foot-wide parallel walks with 35 feet of grass in between were also built. These walks led to the service road on the north and to Independence Avenue on the south.[72] In 1937, the Office of National Capital Parks announced plans to surround the memorial with 50 white dogwood trees, which were planted soon after.[73] The District of Columbia World War I Memorial contributes to the East and West

---

[69]Warren-Findley, "A Guide to Selected Statues, Monuments and Memorials," pp. 36-37.

[70]"Cultural Landscape Inventory, West Potomac Park, Lincoln Memorial Grounds," pp. 4.21-4.22.

[71]Warren-Findley, "A Guide to Selected Statues, Monuments and Memorials," pp. 20-22; Marilyn Feldman, "The Mall's Forgotten Monument," *The Washington Post*, September 28, 1995.

[72]"Keystone of DC Memorial Temple Laid, Completion of Structure Rushed for Dedication on Armistice Day," *The Washington Star*, September 30, 1931.

[73]"War Memorial to be Beautified," *The Washington Star*, May 30, 1937.

Potomac Parks Historic District based on National Register Criterion A in the areas of Art and Commemoration, as an early monument erected in West Potomac Park. Despite the fact that it is primarily commemorative in intent (thus in the category of properties not usually qualifying for the National Register), its design, age, tradition, and symbolic value has invested it with its own historical significance, thus it falls within the exception to National Register Criteria Consideration F.

The **Korean War Veterans Memorial (Contributing Object)** is also located south of the Reflecting Pool, on a direct axis with the Vietnam Veterans Memorial. It was dedicated on July 27, 1995, the 42nd anniversary of the armistice that ended the Korean War. Also the product of a competition, the original winning design by a team of four architects and landscape architects from Pennsylvania State University, John Paul Lucas, Veronica Burns Lucas, Don Alvaro Leon, and Eliza Pennypacker, was selected in the spring of 1989. However, due to negative feedback during the approval process, the original designers removed themselves, and the design was greatly revised by the Cooper-Lecky Partnership, a Washington, DC, architectural firm.[74]

The Korean War Veterans Memorial features 19 realistic, slightly larger than life, gray, stainless-steel soldiers sculpted by Frank Gaylord of Barre, Vermont. The patrolling soldiers, arranged in combat formation climbing up the hill, are set on parallel strips of polished black granite within a triangular "field of service" planted with juniper. At the top of the hill is a circular plaza with a black, stone, circular "pool of remembrance" at its center, which is framed by a double row containing 40 pleached linden trees, and an American flag. A 164-foot-long memorial wall, made of large, black, polished, granite slabs, serves as a backdrop for the sculpted figures. This bas-relief wall features etchings of support personnel, such as nurses, chaplains, and clerks, and where it juts into the pool, is the inscription "Freedom is not free." [75]

The Korean War Veterans Memorial contributes to the East and West Potomac Parks Historic District, based on National Register Criteria A and C in the areas of Architecture, Art and Commemoration. Despite the fact that it is primarily commemorative in intent (thus in the category of properties not usually qualifying for the National Register), its design, tradition, and symbolic value has invested it with its own historical significance, thus it falls within the exception to National Register Criteria Consideration F. The Korean War Veterans Memorial also falls within the exception to National Register Criteria Consideration G. Though it is less than 50 years old, the memorial possesses exceptional significance due

---

[74]Benjamin Forgey, "A March to Remember, Moving Monument to Korea Veterans Surpasses the Tortured History of its Design," *The Washington Post*, July 22, 1995, pp. D1, D6.

[75]Forgey, "A March to Remember," *The Washington Post*, July 22, 1995, pp. D1, D6.

to the Congressional authorization of its site and design, and its immediate symbolic importance in the Monumental Core.

Located to the south of the Reflecting Pool near the Korean War Memorial are the **U.S. Park Police Stables (Noncontributing Building)**, which were constructed in 1975 by Morris Wood of Lapiz, Kentucky, for the Bicentennial Folk Festival Committee. The five stables were meant to temporarily house the Park Police horses during the Bicentennial and until more suitable quarters could be found. The stables have wood foundations, exposed frame walls, corrugated metal roofs, and dirt floors. Although they have been upgraded and repaired over the years, their construction remains temporary in nature. The U.S. Park Police Stables do not contribute to the East and West Potomac Parks Historic District, as they are less than 50 years old and do not exhibit exceptional importance.

## MISCELLANEOUS RESOURCES IN WEST POTOMAC PARK

A number of resources are found throughout West Potomac Park that do not form a cohesive grouping. The oldest standing structure in both parks, the **Lockkeeper's House (Contributing Building)**, located at the southwest corner of Constitution Avenue, NW, and Seventeenth Street, remains somewhat isolated from the other historic resources in West Potomac Park. The home of the keeper of the Chesapeake and Ohio Canal extension, it was built in 1832-33 when the C & O Canal was extended from Georgetown to connect with the Washington City Canal. From this building, the lockkeeper collected tolls and kept records on trade conducted on the canal. The identities of the architect and builder of the Lockkeeper's House are not known. This one-and-one-half-story, Federal-style, fieldstone building has a concrete foundation, a stone chimney, a gable roof covered with wooden shingles, and two front-facing dormers. Originally two-and-a-half stories high, the building was reduced to its present height when the nearby canal was filled in the 1870s.

The U.S. Army Corps of Engineers renovated the building in 1903 for use as a toolhouse and lodge for the Potomac Park watchmen. Originally located 49 feet west and 10 feet north of its present location, the building was moved in 1915 to accommodate Seventeenth Street as it was extended across West Potomac Park. In the early twentieth century, the building served as a headquarters for the Park Police, and as a temporary holding cell for prisoners arrested in Potomac Park. From 1940 to 1970, the first floor of the building was used as a comfort station, and the attic was used as storage space for park maintenance equipment and supplies, and as a lodge for the Park Police. Today, the building is once again used by the National Park Service as a toolhouse.

A plaque commemorating the one-hundredth anniversary of the Canal's opening was placed on the building's north facade in 1928 by the Office of Public Buildings and Public Parks. The Lockkeeper's House was individually listed in the National Register of Historic Places in 1973, and it contributes to the East and West Potomac Parks Historic District based on National Register Criterion A in the areas of Architecture and Transportation. It also falls within Criteria Consideration B, as a building removed from its original location that is significant primarily for its architectural value, as well as being a surviving structure most importantly associated with a historic event. The Lockkeeper's House is the oldest building in East and West Potomac Parks, and it survives as the sole remnant in the two parks of the city's canal system, which provided a means for transportation and trade in the nineteenth century.

A number of noncontributing features are located in the area of West Potomac Park that is south of the Reflecting Pool and west of the Tidal Basin. The **West Potomac Park Polo Grounds (Noncontributing Site),** located between Independence Avenue, SW and Ohio Drive, SW, were laid out in 1908, and a frame bandstand was built there in 1909. The Polo Grounds were used regularly during the summer months by the Fort Myer Polo Team for Saturday afternoon matches. In 1942, the Polo Grounds were paved over to provide parking for employees of the War and Navy Departments. This parking lot was never filled to even half capacity, so, beginning in August 1942, Capital Transit used the lot to store buses between rush hours. In 1943, the southern portion of the lot, which was used by the War Department, was returfed for softball diamonds and tennis courts. In 1944, a complex containing three dormitories to house 2,500 WAVES (Women Appointed to Voluntary Emergency Services), a mess hall, an infirmary, and a recreation building, was constructed on the former Polo Grounds. These buildings were demolished in 1965,[76] and the grounds were resodded and returned to parkland used for polo. Today, the area is a large, grass-covered tract of open land, which is enclosed by temporary snow fencing. Although this portion of West Potomac Park has been used for polo for nearly 75 years, the Polo Grounds do not contribute to the East and West Potomac Parks Historic District, as they consist of open fields with no associated, recognizable structures. The grounds were not planned or planted according to any known plan, and they have been significantly altered over time.

The **First Air Mail Flight Marker (Noncontributing Object),** a bronze plaque on a memorial boulder, is located across from the Polo Grounds and south of Ohio Drive, SW. The plaque and boulder, which were placed there by the Aero Club of Washington to honor the Washington departure site of the first

---

[76]Martin Luther King, Jr., Public Library, Washington, DC, Washingtoniana Collection, Vertical Files, Parks, Potomac, 1940-1949; Federal Records Center, Suitland, Maryland, Record Group 79, File 64-A-42, Box 49.

scheduled domestic air mail service, were dedicated on May 15, 1958. The original marker was stolen c. 1969, and was replaced in 1971.[77] The First Air Mail Flight Marker does not contribute to the East and West Potomac Parks Historic District, as it is commemorative in nature, less than 50 years old, and does not exhibit exceptional importance. This feature should be re-evaluated once it is 50 years old.

The **Guardhouse (Contributing Building)**, located at the northeast corner of Twenty-third Street and Independence Avenue, SW, was constructed in 1950. This diminutive one-story, frame building sits on a 5' square concrete slab. Its wooden walls, articulated with chamfered rustiction, incorporate a square window opening on each side; the plywood door has a matching window. The Buildin'gs frieze and cornice support a pyramidal metal roof. Like many modest structures in East and West Potomac Parks, it was built by National Park Service maintenance personnel. The Guardhouse was constructed to provide shelter during inclement weather for a traffic officer, who controls the traffic light and places barricades at this busy intersection to regulate rush-hour, one-way traffic on the Rock Creek and Potomac Parkway.

There are a number of **Recreational Facilities (Noncontributing Site)** located in West Potomac Park, including baseball diamonds in the elliptical area between Ohio and West Basin Drives, SW, and on both sides of Twenty-third Street north of the Lincoln Memorial, and volleyball courts and nets located in the grove of trees west of the Rock Creek and Potomac Parkway west of Lincoln Memorial.[78] These features are not considered specific contributing elements due to their temporary nature and recent construction.

## CONTRIBUTING VIEWS AND VISTAS IN WEST POTOMAC PARK

Among the defining elements of West Potomac Park are the vast unimpeded vistas. Vistas connect the broad greensward, the distant monuments, the Potomac River, and the low skyline of the city. The strongly prevalent axial views and vistas are the essence of the McMillan Plan for the parks. Orientation and cross axis are provided by certain central axial relationships and vistas, as delineated below; however, though not specifically described below, other views and vistas that preserve this sense of open space should not be precluded from consideration as significant aspects of the parks. For the purposes of this nomination, the term "vista" defines views of primary importance that were specifically planned, designed, and implemented, while the term "view" describes those unplanned views that resulted from the construction of other park features. The following primary views and vistas in West Potomac Park are

---

[77]Warren-Findley, "A Guide to Selected Statues, Monuments and Memorials," pp. 43-44.

[78]Although there are recreational facilities in both parks, for the purposes of this nomination, they have been considered a single noncontributing site, and have been counted only once.

recognized by the National Register.significant, and add to the qualities of the historic district. These primary views and vistas are not included in the resource count, since views and vistas are not among the five Property and Resource Types.

**Seventeenth Street Vista from Constitution Avenue, NW, to its Southern Terminus**

The **Seventeenth Street Vista from Constitution Avenue, NW, to its Southern Terminus** is a distinctive feature of the landscape of West Potomac Park. Seventeenth Street forms the eastern boundary of West Potomac Park, separating the park from the grounds of the Washington Monument; this road carries four lanes of traffic, two north-bound and two south-bound. This vista extends south along Seventeenth Street from its intersection with Constitution Avenue, NW, to its terminus, which is marked by the Commodore John Paul Jones Statue (see also). Framed on both sides by mature trees, Seventeenth Street is an important north-south axis, and is an integral element of the McMillan Plan of 1901-02.

**Twenty-third Street Vista from Constitution Avenue, NW, to its Southern Terminus**

The **Twenty-third Street Vista from Constitution Avenue, NW, to its Southern Terminus** is another notable feature of the landscape of West Potomac Park. Twenty-third Street is an important north-south axis, and an integral part of the McMillan Plan of 1901-02. This vista extends south along Twenty-third Street from its intersection with Constitution Avenue, NW; is interrupted by the Lincoln Memorial; and ends at the terminus of Twenty-third Street, where it intersects with Independence Avenue, SW. Twenty-third Street is framed on both sides by mature trees, and carries four lanes of traffic, two north-bound and two south-bound. The southern terminus of Twenty-third Street is marked by the John Ericsson Monument, the location of which was a key feature of the McMillan Plan.

**Vista from the Lincoln Memorial to the Washington Monument**

The **Vista from the Lincoln Memorial to the Washington Monument** was one of the most important elements of the McMillan Plan of 1901-02, as it extended the formal vista to the east (between the Capitol and the Washington Monument) a major distance to the west to connect the Washington Monument and the Lincoln Memorial. This vista is most impressive viewed from the steps of the Lincoln Memorial across the length of the Reflecting Pool and the Rainbow Pool, to the Washington Monument. Important features of this vista are the double rows of Dutch elm trees on each side of the Reflecting Pool and reflections in the clear water of the pool.

**Views around the Tidal Basin**

The Jefferson Memorial is visible from numerous vantage points along the walk surrounding the Tidal Basin. These continuous, informal, panoramic views are framed by the cherry trees that are clustered around the circumference of the basin. (See also "Jefferson Memorial Grounds," "Tidal Basin," and "Japanese Cherry Trees.")

Covering approximately 330 acres in Washington's southwest quadrant, East Potomac Park is a peninsula between the Potomac River (to the west and south) and Washington Channel (to the east).[79] Approximately one-third of a mile wide, and 1.9 miles long, the park adjoins West Potomac Park at its northern boundary (the Potomac Railroad Bridge). The far end of the peninsula is referred to as Hains Point.

Prior to the 1890s, the area that today is East Potomac Park was a shallow area or "flat" in the Potomac River. The 1882 to 1911 program of channel clearing produced sufficient fill to create both West and East Potomac Parks (see Section 8). This reclamation project created a largely flat topography that is approximately 14 feet above mean low tide in the center and 11 feet above low tide at the periphery.[80] Because the land that comprises West Potomac Park is manmade, it has no natural features with the exception of the Potomac River, an important visual component of the park that also constitutes much of its boundary. The Washington Channel, a deep-water navigational channel, was created as part of the same reclamation program that created the land in the parks.

The park is generally crescent-shaped. Its south end terminates in a point at the confluence of the Potomac River and the Washington Channel. Its north end, rather than coming to a point, is cut off by the linear Potomac Railroad Bridge that separates East and West Potomac Parks. Unlike most of West Potomac Park, the organization and overall design of East Potomac Park is distinctly non-linear. It has few strictly geometric relationships or vistas and, overall, the plan of the park follows the shape of the land. The park's main organizing feature is Ohio Drive, SW, which directs traffic in a one-way loop around the perimeter of

---

[79]As one of the many areas reserved for public uses in Washington, East Potomac Park is referred to as Reservation 333 in Washington's system of legal property description.

[80]Chappell, "East and West Potomac Parks: A History," p. 93.

the park near the waterfront. Buckeye Drive, SW, crosses the width of the park towards its north end. There are a variety of short access roads and/or driveways off Ohio Drive, SW, to the various features in the park. Pedestrian circulation is provided for by a concrete walkway that runs between Ohio Drive, SW, and the water and via a variety of paths that provide access to various park features.

Because of its river location and low topography, there are outstanding views throughout the park, especially along the peninsula's periphery. On the east side there are views of Washington, the monumental core, and Fort McNair. At Hains Point, there are views down river of both the Washington and Virginia sides of the Potomac. On the west side there are views across the river to Washington National Airport and Columbia Island.

Although East Potomac Park has a number of built features, most of the land area consists of open grassy areas. Roughly two-thirds of the land in the park (210 acres) is occupied by the 36-hole golf course. There are a variety of trees and shrubs located throughout the park that are associated with specific built features. Perhaps the single most significant vegetative element in the park is the row of Japanese Cherry Trees that are planted between Ohio Drive, SW, and the waterfront. These trees, planted in the late 1960s, provide a visual link between East and West Potomac Park. Memorial trees are also located throughout the park.

Most major walls, fences, and hedges in the park are associated with individual features that are discussed specifically below. In addition to these, major elements in this category that span a significant portion of the park are the Stone Seawalls located along the waterfront. These walls, constructed to act as retaining walls, date largely from the 1880s and 1890s with later repairs. A concrete walk capped by an iron-pipe railing is located above the seawalls. The ten-foot-wide, four-mile-long walk was completed in 1931. Light fixtures, site furnishings, and signage in East Potomac Park are similar to those used in West Potomac Park. In terms of lighting, Ohio Drive, SW, is lined with Olmsted light standards. Most site furnishings, including benches, trash receptacles, tree grates, fencing, and drinking fountains in the park are National Park Service standard designs. These include benches that have a metal frame and wood slats; "tulip" trash receptacles that have an exterior wood slat covering and a metal pedestal; metal tree grates with a concentric circular pattern of openings; and metal, pedestal-type drinking fountains that are handicapped-accessible. In general, signage throughout the park also follows National Park Service standards. Although there are no significant bodies of water in the park, a simple rectangular water garden lined with slate is located in front of the National Park Service National Capital Region Headquarters Building.

Today, East Potomac Park is operated as a national park and is used primarily for recreational purposes. The park is the site of a golf course, driving range, miniature golf course, swimming pool, tennis courts, a playground area, and various picnic facilities (see descriptions of each that follow). The park is

extensively used, particularly on weekends and in warm weather, for these activities as well as for fishing and other informal uses. East Potomac Park is also the site of a number of National Park Service and Tourmobile facilities, most of which are clustered in the center of the park. These facilities include an office building (the National Park Service National Capital Region Headquarters and U.S. Park Police Headquarters Building), the National Capital Parks-Central Maintenance Yard, and the Tourmobile Headquarters. Two other National Park Service facilities, a U.S. Park Police Building and the National Capital Parks Central office, are in other locations in the park.

**LINKAGE RESOURCES**

Several constructed and landscape features in East Potomac Park that are related to its reclamation, subsequent improvement, and access to the new park have been grouped together. The **Potomac Railroad Bridge (Contributing Structure)** serves as the boundary between East and West Potomac Parks, and is the southernmost of all the Fourteenth Street crossings. This federally chartered bridge, which carries railroad traffic over the Potomac River, was constructed by the U.S. Army Corps of Engineers in 1901. The steel truss bridge with stone embankments was originally built with full truss construction; a series of steel plate girders later replaced the trusses in all but the central swing span.[81] The Potomac Railroad Bridge contributes to the East and West Potomac Parks Historic District, based on National Register Criterion C in the area of Engineering. It is an engineering feature of long standing in East Potomac Park, and it is still used for its original purpose, to carry rail travel across the Potomac River.

The **Stone Seawalls (Contributing Structure)** in East Potomac Park were constructed from 1882 into the 1890s, by the U.S. Army Corps of Engineers, as the reclamation of the parks progressed.[82] The seawalls are retaining walls that prevent the massive earth fill from eroding back into the Potomac River. Since the reclamation proceeded generally from west to east, it is likely that the seawalls in East Potomac Park were constructed after those in West Potomac Park. Portions of the seawall have been periodically repaired or rebuilt as needed. Many sections of the seawall are in need of repair, although their alignment is intact. The seawalls are capped by concrete walks and an iron-pipe railing, which was constructed by the U.S. Army Corps of Engineers so that the land could safely be enjoyed for recreational use. The ten-foot-wide, four-mile-long walk rimming the perimeter of East Potomac Park was begun in 1919 and completed in 1931.[83] Each component of the three-tier pipe railing is approximately four inches in diameter; overall, the

[81] Myer, *Bridges and the City of Washington*, p. 34.

[82] Although the seawalls are present in both parks, for the purposes of this nomination, they have been considered a single contributing structure, and have been counted only once.

[83] Historic American Buildings Survey, East Potomac Park, HABS No. DC-692, p. 6.

railing stands forty inches high, and has been painted gray. The Stone Seawalls contribute to the East and West Potomac Parks Historic District, based on National Register Criterion A in the area of Engineering; the seawalls are an important feature of the U.S. Army Corps of Engineers' efforts to reclaim the Potomac Flats.

**Ohio Drive, SW, (Contributing Structure),** the road leading around the perimeter of East Potomac Park, was constructed in increments between 1912 and 1916. The bituminous-bound macadam road was originally one lane wide, and served to carry traffic from the entrance at the railroad embankment on the Washington Channel side of the park around the tip of Hains Point, and back around the peninsula on the Potomac River side. At some unknown date, the road was increased to two lanes between the railroad embankment and the entrance to the East Potomac Park Golf Course, each lane carrying traffic in the opposite direction. This modification was likely designed to alleviate traffic congestion caused by the use of the two golf courses.

For many years, Ohio Drive, SW, was known as "the Speedway." This name appears to have been taken from a mile-long, circular, dirt, horse-racing track which, at the turn of the twentieth century, was located on the grounds of the Washington Monument on Fifteenth and Sixteenth Streets. On Saturdays the racing track was reserved for fast driving. After the reclamation of East Potomac Park, the original use of the Speedway was abolished, and the track was connected with the new road around Hains Point. This connection led to assigning the moniker "the Speedway" to the new road.[84] The road's informal name proved to be particularly appropriate, as in the early years of the park, people used Ohio Drive, SW, to race their automobiles. This road has also been informally known as "the Breezeway," as many families would come to the park in the summer to catch the breezes coming in from the Potomac River. Ohio Drive, SW, contributes to the East and West Potomac Parks Historic District, based on National Register Criteria C in the areas of Transportation and Entertainment/Recreation. Once the reclamation of East Potomac Park was completed, this road was planned and constructed so that the land could be accessed for recreational purposes.

The **Japanese Cherry Trees (Contributing Site)** are a major character-defining component of the landscape of East Potomac Park.[85] During 1966-68, approximately 1,800 American-grown cherry (and other flowering) trees were planted on both sides of Ohio Drive, SW, around the perimeter of Hains Point. These trees were planted by friends of President and Mrs. Lyndon B. Johnson to honor their role in the nationwide Beautification Program. The Japanese Cherry Trees contribute to the East and West Potomac

---

[84]"Speedway? It's Just a Name Inherited From Track of Old," *The Washington Post*, September 7, 1933.

[85]Although the cherry trees are present in both parks, for the purposes of this nomination they have been considered a single contributing site, and have been counted only once.

Parks Historic District, based on Criterion A in the areas of Landscape Architecture and Social History. The cherry trees are a major landscape feature of the parks today.

A **Plaque Honoring the Placement of Cherry Trees on Hains Point in 1966-68 (Noncontributing Object)** has been placed on a stone and wood bench along Ohio Drive, SW, on the western side of Hains Point. The text of the plaque reads "These 1,800 flowering cherries and other trees were planted on Hains Point in 1966-68 in honor of President and Mrs. Lyndon B. Johnson by friends in gratitude for their inspiring leadership and efforts to enhance the beauty of America." The Plaque Honoring the Placement of the Cherry Trees on Hains Point in 1966-68 does not contribute to the East and West Potomac Parks Historic District, as it is commemorative in nature, less than 50 years old, and does not exhibit exceptional importance. This feature should be re-evaluated once it is 50 years old.

**ADMINISTRATIVE FACILITIES**

A number of buildings in East Potomac Park have been grouped by their use by the National Park Service and the U.S. Park Police for park administration. The **U.S. Engineers' Storehouse (Contributing Building)**, located at 900 Ohio Drive, SW, is just east of the Potomac River bridge embankment. This building was designed in 1912 by the noted Washington, DC, architectural firm of Wood, Donn and Deming, in a simplified version of Mediterranean Renaissance Revival style. Constructed in 1913, the two-story, six-bay, rectangular building is composed of a concrete foundation, wood framing, brick walls covered by pebble-dash stucco painted yellow, and a low, hipped roof covered with red terra-cotta tile. All the six-over-six double-hung sashes are framed by three-panel wooden shutters that are painted green. The door on the west elevation has an arched opening and a brick and concrete entrance stoop with a metal railing. The principal (south) elevation features a door with a small, frame, entrance enclosure, and a frame, shed-roofed porch, which runs nearly the entire length of the elevation. The porch has five frame supports that feature a lattice pattern. Two large concrete bays, original doorways for construction materials and equipment, are visible on the first story of both the south and north elevations. On the south elevation, one of the concrete bays has been filled in with a door, and the other with a window; on the north elevation, both bays have been filled in with a window.

The building's interior, originally open in plan, has been divided into numerous small offices for the staff of the National Capital Parks-Central office of the National Park Service; little if any original fabric remains on the interior of this building. However, the U.S. Engineers' Storehouse contributes to the East and West Potomac Parks Historic District, based on National Register Criterion A in the area of Engineering and Criterion C in the area of Architecture. The building served as the base from which much

of the reclamation of the two parks was directed, and it survives as possibly the final commission of the noted Washington, DC architectural firm of Wood, Donn and Deming.

The National Park Service operates a cluster of administrative buildings and maintenance facilities of more recent vintage on the Potomac River side of East Potomac Park. The **National Park Service National Capital Region Headquarters Building (Noncontributing Building)** and the **U.S. Park Police Headquarters Building (Noncontributing Building),** both located at 1100 Ohio Drive, SW, were constructed from 1962 to 1963 on the former site of the East Potomac Park Tourist Camp (see Section 8). These two Modernist buildings and related site improvements were designed by National Park Service professional staff, and were built contemporaneously by Victor R. Beauchamp Associates, Inc. The two buildings, connected by a covered walkway, have concrete foundations; blond brick walls; regular, fixed fenestration; and flat, metal roofs. The National Capital Region Headquarters Building is three stories with a two-story wing, while the U.S. Park Police Headquarters Building is two stories. In 1969, a training and cafeteria wing was built onto the Park Service Building by L. J. Robinson, Inc. The main entrance lobby of this complex of buildings features a slate patio and a pool with aquatic plants. Parking constructed in conjunction with the original building effort has been expanded several times to accommodate increased numbers of employees working in the two buildings and the adjacent Park Service maintenance yard. The National Park Service National Capital Region Building and the U.S. Park Police Headquarters Building do not contribute to the East and West Potomac Parks Historic District, as they are less than 50 years old and do not exhibit exceptional importance. Their significance should be reexamined when the buildings become 50 years old.

The **Tourmobile Headquarters (Noncontributing Building)**, located at 1000 Ohio Drive, SW, was built in 1979 by the Jack Bays Construction Company. The headquarters facility includes offices, a bus garage, and a maintenance shop. The one-story building has a concrete foundation, and steel panel walls and roof. The adjacent **National Capital Parks-Central Maintenance Yard (Noncontributing Building)** is of similar construction, and likely dates to the same period. Neither of these buildings contribute to the East and West Potomac Parks Historic District, as they are less than 50 years old, meant to be temporary in nature, and do not exhibit exceptional importance.

## RECREATIONAL FEATURES

East Potomac Park contains many twentieth-century recreational facilities, since it has been used primarily for public recreation since its completion. The **East Potomac Park Golf Course (Contributing Site),** covering approximately 210 of the island's 330 acres, officially opened in July 1920, and has been in continuous operation ever since. The course has had several different configurations since the first nine holes were completed in 1917 and the second nine holes were completed by 1923. The first practice putting course was installed at the East Potomac Park Golf Course in 1925, and the first practice driving range was constructed in 1934. It appears that the design of the course is the cumulative product of several different golf course designers over the years. Dr. Walter S. Harban is credited with designing certain features of the first nine holes,[86] which were likely laid out by Walter J. Travis.[87] Robert White may have designed the second nine holes,[88] and William S. Flynn later remodeled the course in the mid-1920s.[89] Nine holes were removed and then reinstalled in the early 1980s.

Currently, the course contains 36 holes and two putting greens. The White Course, also known as the F Course, has nine holes. The Blue Course has 18 holes; the front nine are called the B Course, while the back nine are called the D Course. The Red Course, also known as the G Course, has nine holes. The East Potomac Park Golf Course contributes to the East and West Potomac Parks Historic District, based on National Register Criterion A in the area of Entertainment/Recreation. The golf course is one of a very few recreational features found on the 1916 development plan for East Potomac Park that was actually implemented. It is the oldest extant recreational feature in the two parks and most fully represents the intended use of East Potomac Park for public recreation. In addition, the presence of the course retains the open space characteristic of East Potomac Park since its creation.

The structure most closely associated with the golf course is the **East Potomac Park Field House (Contributing Building)**, two identical wings of what was planned as a three-part structure. Designed by skilled architect Horace Whittier Peaslee in 1917, the wings were constructed as men's and women's locker and changing rooms for the municipal golf course. The center portion of the field house, although planned, was never constructed. The wings are one-story, L-shaped, concrete buildings with flat, metal roofs, and full basements. Their most striking features are long porticos supported by columns crowned

[86]"Long Drive Today Opens Public Golf Course in the District," *The Evening Star*, July 8, 1920.
[87]Minutes of the Commission of Fine Arts, May 18, 1917, Commission of Fine Arts, Washington, DC.
[88]Geoffrey S. Cornish and Ronald E. Whitten, *The Architects of Golf* (New York, New York: Harper Collins Publishers, 1993), p. 432.
[89]Cornish and Whitten, *The Architects of Golf*, p. 262.

with elaborate capitals. The Field House wings were constructed using the "Earley Process," a method of creating decorative exposed-aggregate concrete patented by noted concrete sculptor John Joseph Earley in 1921. The buildings are constructed of a combination of precast and field-applied concrete which matches seamlessly in both color and application. The portico's cornice, columns, capitals, and balustrade, all precast concrete, were cast in the Earley Studio; the capitals were cast in a single piece with all details complete. The remainder of the buildings' elevations are stucco applied to terra-cotta tile. The concrete and stucco both have exposed aggregates of a fairly large size. Since both wings are painted, they have the same color and texture. The stucco was shaped at the corners of the buildings to form quoins. The foundations of the buildings are monolithic concrete that was poured in place.[90]

Currently, the east wing of the Field House contains the golf professional shop, offices for the golf course concessionaire, and a food-service concession, and the west wing is the District One Sub-station for the U.S. Park Police. Little if any original fabric remains on the interior of the two buildings, and several important features on the exterior of the buildings have been altered, most notably the fenestration. Regardless of these alterations, the East Potomac Park Field House contributes to the East and West Potomac Parks Historic District, based on National Register Criterion A in the area of Entertainment/Recreation and Criterion C in the area of Architecture. The Field House was the first feature of the 1916 plan for the recreational development of East Potomac Park to be implemented, and it is a recreational feature of long-standing, continuous use. In addition, the Field House represents the collaboration of architect Horace W. Peaslee and concrete artist John Joseph Earley.

A fairly early addition to the golf course is the **East Potomac Park Miniature Golf Course (Contributing Site)**, now known as Circus Mini Golf, which is located to the east of the Field House wings. This course was the first miniature golf course to be constructed by the National Park Service on federally owned land, and it is also the sole remaining miniature golf course in the District of Columbia. In addition, the East Potomac Park Miniature Golf Course is considered by many to be the longest continuously operating miniature golf course in the country.[91] The course was constructed in early 1931, officially opened for its first season on May 9, 1931, and has been in continuous seasonal operation since that time. Surrounded by a chain-link fence, the course has 18 holes of varying shape and complexity. The holes are edged in concrete having a fairly large aggregate. It is not known if any of the holes were

---

[90]American Concrete Institute, *Proceedings of the Sixteenth Annual Convention* (Detroit, Michigan: American Concrete Institute, 1920), pp. 77-82.

[91]Karen and Ernie Brain, "Circus Miniature Golf," *National Mini Golf and Range Association* 1, 3 (July 1990): p. 11.

originally designed with obstacles, although physical evidence such as posts and brackets reveals that some holes did have obstacles at some point in the course's history. The miniature golf course was renovated in the 1960s, and it is likely that the holes' concrete borders were constructed at this time.[92] Since the new concessionaire, Golf Course Specialists, Inc., took over the management and operation of both the full-size and miniature courses in 1983, a number of improvements have been made to the miniature course. These improvements include the removal of a lighting system strung on overhead wires across the course, new carpeting on the holes, and landscaping.

Also part of the miniature golf course complex, the ball house serves as both ticket booth and snack bar. Constructed by the National Park Service's labor force in 1949 at a cost of $2,310, the building replaced an earlier structure on the same site. The modest, rectangular, single-story, frame building has a concrete foundation, and is capped by a hipped roof covered with green asphalt shingles. A wide, striped, metal awning extends from the roof line on all four elevations of the ball house. The East Potomac Park Miniature Golf Course contributes to the East and West Potomac Parks Historic District, based on National Register Criterion A in the area of Entertainment/Recreation. The course is a recreational feature of long standing in the two parks that represents the immense popularity of miniature golf in the United States in the early 1930s. It survives today as the only miniature golf course in the District of Columbia.

A more recent addition to the grouping of structures associated with the golf course is the **East Potomac Park Driving Range Building (Noncontributing Building),** designed by the Washington, DC, architectural firm of Oehrlein & Associates Architects. Completed in 1995, the two-story, frame building has practice stalls for 100 golfers. Several of the stalls are a bit wider than the others, and are used for instruction by the on-site golf school. The surface of the driving range is covered with artificial turf. The East Potomac Park Driving Range Building does not contribute to the East and West Potomac Parks Historic District, as it is less than 50 years old and does not exhibit exceptional importance.

The **East Potomac Park Swimming Pool (Contributing Structure)**, constructed in 1936 with Projects Works Administration (PWA) funds, was one of six public "bathing pools" authorized by Congress in 1929. The largest of the six pools, the East Potomac Park Swimming Pool was considered "the show pool of the city," and was intended for white swimmers.[93] The rectangular pool measures 163' by 66', has a

---

[92]Several people, including a former manager of the miniature golf course, have suggested that the holes' borders may have originally been constructed of wood. At this time, no early photographs have been located that verify this assertion.

[93]*Swimming Pool Report 1940, Annual Report of the Swimming Pools Operated by Welfare and Recreational Association*, Federal Records Center, Suitland, Maryland, Record Group 79, Records of the National Park Service, File 64-A-42, Box 24.

capacity of 2,500 swimmers, and is surrounded by a concrete deck. The pool was constructed with a lighted bottom, and a flat parcel of land between the two Field House wings was originally used as a grassy sunning area for swimmers. Entrance was gained to the pool through a small, frame ticket booth, which was centered on the grassy expanse facing the traffic circle.

The construction of the East Potomac Park Bathhouse (see also) on this site in 1978 required that this grassy expanse be built up and regraded, so that swimmers could exit the new bathhouse directly onto the pool deck. A renovation of the pool in the 1970s modified the pool deck and replaced the lighted pool bottom with a solid base. Regardless of these modifications, the East Potomac Park Swimming Pool retains integrity and contributes to the East and West Potomac Parks Historic District, based on National Register Criterion A in the area of Entertainment/Recreation. The pool is one of a very few recreational features found on the 1916 development plan for East Potomac Park that was actually implemented; it is also a feature of long-standing, continuous use.

The **East Potomac Park Bathhouse (Noncontributing Structure)** was constructed by the DC Department of Recreation in 1978. The building has a concrete foundation, brick walls, and a roof covered with cedar shingles. It features a one-and-one-half-story, asymmetrical crossed gable, which extends out over a one-story rear gable, forming an elongated dormer. The ends of the single-story rear gable extend past the dormer on both sides. The East Potomac Park Bathhouse does not contribute to the East and West Potomac Parks Historic District, as it is less than 50 years old and does not exhibit exceptional importance.

The **East Potomac Park Tennis Facility (Noncontributing Site)** consists of a covered tennis bubble, an administrative building, and outdoor tennis courts. Constructed in 1974, the tennis bubble originally had a turquoise-colored cover. In 1982, the tennis bubble was replaced with an off-white translucent material cover. In 1995, an administrative building was constructed on the site. The Tennis Facility does not contribute to the East and West Potomac Parks Historic District, as it is less than 50 years old and does not exhibit exceptional importance.

There are a number of minor **Recreational Facilities (Noncontributing Site)** located not far from the tip of Hains Point, including a small picnic shelter, a playground area, and circular restrooms known by

National Park Service personnel as "Benjis."[94] These features are not considered specific contributing elements due to their temporary nature and recent construction.[95]

Finally, "The Awakening," a cast-aluminum sculpture by J. Seward Johnson, Jr., which was created for the 1980 International Sculpture Conference Exhibition, was installed near the tip of Hains Point the same year. The five-part sculpture, composed of a giant head, knee, foot, hand, and arm, depicts a man emerging from the ground. "The Awakening" has not been evaluated as to its contributing or noncontributing status at this time, since it is not owned by the federal government, but is on long-term loan at the site.

## CONTRIBUTING VIEWS IN EAST POTOMAC PARK

The amount and quality of open space is the most significant character-defining element of East Potomac Park, as it is what allows the unimpeded views to and from distant monuments, the Potomac River and adjacent waterfront, and the low skyline of the city. The strongly prevalent axial views and open, spatially continuous set of views are the essence of the McMillan Plan for the parks. A strong sense of orientation is provided by certain axial relationships and views, as delineated below. Also, though not specifically described below, other views that preserve this sense of open space should not be precluded from consideration as contributing elements. For the purposes of this nomination, the term "view" describes those unplanned views that resulted from the construction of other park features. These primary views are not included in the resource count, since they are not recognized by the National Register as an individual Property and Resource Type.

### Views from the Walk Around Hains Point into Washington, DC, and Virginia

The walk around Hains Point was constructed from 1919-31, and was planned for recreational use. This walk affords uninterrupted views from the periphery of East Potomac Park and Hains Point, towards such local landmarks as the National Defense University at Ft. McNair and St. Elizabeth's Hospital, as well as across the Potomac River to the city and waterfront, memorials, parkways, and Ronald Reagan Washington National Airport.

---

[94]The term "Benjis," an informal term used by National Park Service personnel, was derived from the name of the Chief of the Denver-based design office when the structures were designed in the 1970s, Benjamin Biederman.

[95]Although there are recreational facilities in both parks, for the purposes of this nomination, they have been considered a single noncontributing site, and have been counted only once.

## LIST OF RESOURCES INCLUDED IN THIS NOMINATION

WEST POTOMAC PARK (listed in approximate chronological order)

| NAME | DATE | STATUS |
|---|---|---|
| Lockkeeper's House | 1832-33 | Contributing Building |
| Stone Seawalls | 1882-90s | Contributing Structure |
| Tidal Basin | 1885 | Contributing Site |
| Tidal Reservoir Outlet Bridge | 1888-89 | Contributing Structure |
| Number 4 Fountain | 1905-06 | Contributing Object |
| Tidal Reservoir Inlet Bridge | 1908-09 | Contributing Structure |
| West Potomac Park Polo Grounds | 1908 | Noncontributing Site |
| Commodore John Paul Jones Statue | 1911-12 | Contributing Object |
| Japanese Cherry Trees | 1912 | Contributing Site |
| Lincoln Memorial | 1913-22 | Contributing Structure |
| Dutch Elm Trees | 1915-16 | Contributing Site |
| Reflecting Pool | 1919-22 | Contributing Site |
| Rainbow Pool | 1919-22 | Contributing Site |
| Lincoln Memorial Grounds | 1920-32 | Contributing Site |
| John Ericsson Monument | 1924-32 | Contributing Object |
| Arlington Memorial Bridge | 1926-32 | Contributing Structure |
| District of Columbia World War I Memorial | 1931 | Contributing Object |
| Flood Control Levee | 1938 | Contributing Site |
| Jefferson Memorial | 1939-43 | Contributing Structure |
| Independence Avenue Extension | 1940s | Contributing Structure |
| Jefferson Memorial Grounds | 1942 | Contributing Site |
| Kutz Bridge | 1943 | Contributing Structure |
| Guard House | 1950 | Contributing Building |
| First Japanese Cherry Tree Planting Plaque | 1950 | Noncontributing Object |
| Japanese Lantern | 1954 | Contributing Object |
| Japanese Pagoda | 1958 | Contributing Object |
| First Air Mail Flight Marker | 1958/1971 | Noncontributing Object |
| Floral Library | 1968 | Noncontributing Site |
| Constitution Gardens | 1970s | Contributing Site |
| U.S. Park Police Stables | 1975 | Noncontributing Building |
| 56 Signers Memorial | 1981 | Contributing Object |
| Vietnam Veterans Memorial | 1982 | Contributing Object |

| | | |
|---|---|---|
| Vietnam Women's Memorial | 1993 | Contributing Object |
| Franklin Delano Roosevelt Memorial | 1994-97 | Contributing Site |
| Korean War Veterans Memorial | 1995 | Contributing Site |
| Recreational Facilities | Not Available | Noncontributing Site |

LIST OF RESOURCES INCLUDED IN THIS NOMINATION

EAST POTOMAC PARK (listed in approximate chronological order)

| NAME | DATE | STATUS |
|---|---|---|
| Stone Seawalls | 1882-90s | Contributing Structure |
| Potomac Railroad Bridge | 1901 | Contributing Structure |
| Ohio Drive, SW | 1912-16 | Contributing Structure |
| U.S. Engineers' Storehouse | 1913 | Contributing Building |
| East Potomac Park Field House | 1917 | Contributing Building |
| East Potomac Park Golf Course | 1917 | Contributing Site |
| East Potomac Park Miniature Golf Course | 1931 | Contributing Site |
| East Potomac Park Swimming Pool | 1936 | Contributing Structure |
| National Park Service National Capital Region Building | 1962-63 | Noncontributing Building |
| U.S. Park Police Headquarters Building | 1962-63 | Noncontributing Building |
| Japanese Cherry Trees | 1966-68 | Contributing Site |
| Plaque Honoring the Placement of Cherry Trees on Hains Point in 1966-68 | 1968 | Noncontributing Object |
| National Capital Parks-Central Maintenance Yard | 1970s | Noncontributing Building |
| East Potomac Park Tennis Facility | 1974/1995 | Noncontributing Site |
| East Potomac Park Bathhouse | 1978 | Noncontributing Building |
| Tourmobile Headquarters | 1979 | Noncontributing Building |
| East Potomac Park Driving Range Building | 1995 | Noncontributing Building |
| Recreational Facilities | Not Available | Noncontributing Site |

**INTRODUCTION/SUMMARY**

The lands included in the East and West Potomac Parks Historic District constitute all the historic developed areas within the boundaries of the two parks. These are remarkable urban spaces, with a singular history and a singular national significance as part of the monumental core of the nation's capital. The parks' significance falls under both National Register **Criterion A** (properties that are associated with events that have made a significant contribution to the broad patterns of our history) and **Criterion C** (properties that embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master). Certain features within the two parks fall within the exception to **Criteria Consideration B** (properties removed from their original locations but that are significant primarily for their architectural value, or that are the surviving structures associated with a historic person or event)**,** **Criteria Consideration F** (properties primarily commemorative in intent, whose design, age, tradition, or symbolic value have invested them with their own historical significance), and/or **Criteria Consideration G** (properties achieving significance within the past 50 years due to their exceptional importance).

East and West Potomac Parks are significant in the areas of Architecture, Art, City Planning, Commemoration, Engineering, Entertainment/Recreation, Landscape Architecture, Politics/Government, Social History, and Transportation for the period of 1882-1997. This period of significance begins with the first year of reclamation in West Potomac Park and ends with the completion of the construction of the Franklin Delano Roosevelt Memorial in West Potomac Park. The significance of individual features within the two parks has been documented in Section 7 of this nomination. A brief description of each area of significance follows.

**Architecture** - East and West Potomac Parks are the cumulative product of a century of work by noted American architects. Several historic features in West Potomac Park have become the architects' best-known work, such as Henry Bacon's Lincoln Memorial and John Russell Pope's Jefferson Memorial. A number of nationally renowned architects have designed structures in the two parks, including the firm of McKim, Mead and White; Paul Philippe Cret; and Thomas Hastings. In addition, the work of noted local architects, such as Horace Whittier Peaslee, Nathan C. Wyeth, and the firm of Wood, Donn and Deming, is represented, along with the designs of other important modern architects.

**Art** - In the twentieth century, the landscape of West Potomac Park has been enriched with what have since become nationally recognized works of art, most notably Daniel Chester French's seated marble statue of Abraham Lincoln and Rudulph Evans' standing bronze statue of Thomas Jefferson, located in

each president's memorial. Recent memorials in West Potomac Park with a significant sculptural component include the Vietnam Veterans Memorial, the Vietnam Women's Memorial, the Korean War Veterans Memorial, and the Franklin Delano Roosevelt Memorial. Other important representative sculptures include James Earle Fraser's "Arts of Peace" and Leo Friedlander's "Arts of War."

**City Planning** - The treatment and use of West Potomac Park was directly addressed as part of the McMillan Plan of 1901-02, the country's first major manifestation of the City Beautiful movement's ideals of order, hierarchy, and formality in grand, civic spaces. This landmark plan, intended to restore L'Enfant's vision to the city of Washington, still has resonance within the city today. Besides the L'Enfant and McMillan Plans, the parkland has been shaped by a succession of later plans, most notably the Skidmore, Owings, and Merrill 1965 master plan for the National Mall.

**Commemoration** - West Potomac Park contains the country's foremost collection of commemorative structures, which together represent the definitive history of twentieth-century American memorialization. These monuments, created and dedicated first to honor famous people and later to remember those who served and died in the nation's wars, range in age from the Commodore John Paul Jones Statue (completed in 1912) to the Franklin Delano Roosevelt Memorial (completed in 1997).

**Engineering** - East and West Potomac Parks were created by the U.S. Army Corps of Engineers in one of the city's most ambitious reclamation projects. Intended to improve both river navigation and the sanitation of the Potomac Flats, the reclamation project lasted over 30 years, and created over 730 acres of new parkland. Noteworthy extant features of the Corps' 1882 reclamation plan include the Tidal Basin, the Tidal Reservoir Inlet and Outlet Bridges, and Stone Seawalls. Another related structure in East Potomac Park is the U.S. Engineers' Storehouse, which served as the base of operations for much of the reclamation of the two parks.

**Entertainment/Recreation** - An 1897 Act of Congress set aside the two parks for recreational use by residents and tourists alike. The McMillan Plan of 1901-02 reserved the interior of West Potomac Park for passive recreation, and spaces for active recreation were later sited on the park's fringes. The completion of Ohio Drive, SW, in 1916 allowed access to East Potomac Park, and a development plan dating to the same year set the framework for the construction of later, primarily active, recreational amenities. Both parks have served as major recreational facilities for the city in the ensuing years. East Potomac Park still contains many early twentieth-century recreational features, including a field house, golf course, miniature golf course, and swimming pool, and the two parks also contain more modern ball fields and tennis courts.

---

**Landscape Architecture** - West Potomac Park has become one of the nation's most important designed landscapes. Several of the park's defining landscape features can be directly attributed to Frederick Law Olmsted, Jr., one of the most famous American landscape architects of all time. As a member of the

McMillan Commission, the Commission of Fine Arts, and the National Capital Planning Commission, Olmsted, Jr., was intimately involved in shaping the landscape of West Potomac Park. East and West Potomac Parks are also the product of a number of landscape architects employed by the federal government including James G. Langdon, James Greenleaf, and Irving Payne, and more recent private landscape architects such as the firm EDAW and Lawrence Halprin. A number of the resulting landscape features, such as the Japanese Cherry Trees surrounding the Tidal Basin and the Dutch elms flanking the Reflecting Pool, have become symbols of the city of Washington, DC, as have the landscapes associated with such significant monuments as the Lincoln and Jefferson Memorials.

**Politics/Government** - East and West Potomac Parks are the result of several large-scale federal initiatives. The parkland's reclamation, conducted by the U.S. Army Corps of Engineers, was funded by annual Congressional appropriations. The resulting land was reserved for recreational use by an 1897 Act of Congress. The parks have since been managed by a number of successive government agencies, beginning with the Office of Public Buildings and Grounds, and currently by the National Park Service; as a result, the land has been shaped by numerous federal employees. During both World Wars, land in the two parks was used for the construction of office and dormitory buildings to support the war effort. Throughout the twentieth century, Congressional authorization of the sites, designs, and much of the construction funding for numerous memorials has altered the landscape of West Potomac Park considerably.

**Social History** - West Potomac Park has become a continued venue for significant national social gatherings and demonstrations. In particular, the Lincoln Memorial has become an icon in the civil rights movement. It is best known as the location of such defining moments as Marian Anderson's 1939 Easter Sunday concert, and Martin Luther King, Jr.'s "I Have A Dream" speech in 1963. Also, the nation's annual Fourth of July celebration centers on West Potomac Park and the National Mall. Numerous other events add to the national impact that gatherings in this space have made.

**Transportation** - Historic circulation patterns and features relating to evolving modes of transportation, the majority of which date to the first half of the twentieth century, are still extant in the two parks. Related features in West Potomac Park include the Arlington Memorial Bridge, and the system of walks and bridges around the perimeter of the Tidal Basin, as well as Ohio Drive, SW, in East Potomac Park. A

number of these features can be attributed to important architects, for example, the Arlington Memorial Bridge (McKim, Mead and White) and the Kutz Bridge (Paul Philippe Cret). Another related feature is the Lockkeeper's House, the oldest constructed feature of the two parks and a remnant of the city's nineteenth-century canal system.

**SIGNIFICANCE DESCRIPTION**[96]

The Reclamation of the Potomac Flats and Early Park Development

By the second half of the nineteenth century a marshland, referred to as the Potomac Flats, had been formed along the Potomac River by deposits of silt. The reclamation of the area was necessary both to improve navigation on the Potomac River, which frequently silted up and was often unnavigable, and to improve public health. The flats, which filled with sewage from the city of Washington, had become a breeding ground for diseases like malaria.[97]

The first funding for the reclamation was appropriated by Congress in 1882, in the amount of $400,000, and Army Major Peter C. Hains was assigned to direct the reclamation.[98] The reclamation work, performed by the U.S. Army Corps of Engineers, was divided into three sections: 135 acres in what is now West Potomac Park, 277 acres consisting of the Tidal Basin and its immediate surroundings, and 327 acres in East Potomac Park.[99] The reclamation of the Potomac Flats was carried out in phases from 1882

---

[96]For a better understanding of the two parks' history and development, please refer to the current and historic photos, maps, and site plans that have been submitted with this nomination.

[97]Historic American Engineering Record, Tidal Reservoir, HAER No. DC-9, p. 1.

[98]U.S. Congress, House of Representatives, Executive Documents, *Appendix I to "Report of the Chief of Engineers," comprising Report of Major Peter C. Hains, July 31, 1883*, Document Number 1, Part 2, Volume 3, 48th Congress, 1st Session, 1883, p. 780; as referenced in Gordon Chappell, East and West Potomac Parks: A History, United States Department of the Interior, National Park Service, Denver Service Center, June 1973, p. 32.

[99]*Development of East Potomac Park, House Document Number 1038, 64th Congress, First Session* (Washington, DC: Government Printing Office, 1916), p. 11. During the reclamation of what is now West Potomac Park, the park was known simply as "Potomac Park." In the early twentieth century, once reclamation east of the Potomac Railroad Bridge had begun, the resulting new land was called "East Potomac Park." East Potomac Park first appears in the annual Report of the Chief of Engineers as a separate park in 1907.

until 1913, and, in general, was conducted from west to east. While the land was being reclaimed, mainly by hydraulic dredging, the Tidal Basin (Contributing Site) was dredged and the Tidal Reservoir Inlet Bridge (Contributing Structure) and the Tidal Reservoir Outlet Bridge (Contributing Structure) were constructed. The Stone Seawalls (Contributing Structure) that line the Tidal Basin in West Potomac Park and rim the perimeter of the peninsula that is East Potomac Park were constructed to retain the earthen fill as the reclamation progressed. Although portions of the seawalls have been rebuilt during several construction projects since, the overall configuration of the Tidal Basin and the shape of the peninsula remain intact to this day.

The idea of creating a park on the reclaimed land, with lakes holding a reserve of water that would be both a recreational element and a means to flush out the Washington Channel, was originally conceived by U.S. Army Major William Twining in 1879. Twining's plan was modified by Hains in 1882, who substituted the 110-acre Tidal Basin with two gates for the flushing lakes.[100] In Hains' revised plan, water from the Potomac River, which entered into the Tidal Basin through the tidal gates in the Inlet Bridge, was expelled via the Outlet Bridge's tidal gates into the Washington Channel, creating a natural flushing action that kept the channel clear and free of debris.

As the land was reclaimed from the Potomac River, plans could then be made for the improvement of the parks, including grading, sodding, planting, and road and seawall construction. In West Potomac Park, as sections of the reclamation work were completed, the resulting land was transferred to the Office of Public Buildings and Grounds for further improvement; the first land in this park was transferred in 1901. East Potomac Park was transferred in its entirety to the Office of Public Buildings and Grounds in 1912. The transferred land could hardly be called parkland, however, as the fertile, reclaimed soil was covered in a thick growth of wild grasses, bushes, and trees. This dense growth had to be removed so that the land could be sodded.

[100]Historic American Engineering Record, Tidal Reservoir, HAER No. DC-9, p. 1. In 1917, at the suggestion of Army Corp of Engineers Colonel William W. Harts, the tip of East Potomac Park was renamed "Hains Point," in honor of Hains' role in creating the parkland. Although only the tip of the island was renamed, most people today think that Hains Point refers to the entire island. At this same time, Harts also suggested renaming the Tidal Basin "Twining's Lake," after the man who originally conceived the idea of a flushing body of water; this name never caught on as did Hains Point.

Congress annually appropriated money for the improvement of the two parks, beginning with a sum of $70,000 in 1902. This initial appropriation was designated for a 33-acre tract of land in West Potomac Park between the Tidal Basin and the Washington Monument Grounds, extending from Seventeenth Street and Virginia Avenue to Fourteenth Street and Maryland Avenue. The Corps of Engineers used this money to construct a new road along the north side of the Tidal Basin, which connected Fifteenth and Seventeenth Streets, and passed around to the south and west of the Washington Monument Grounds. This road was officially opened on October 16, 1903, and was reserved for "speeding purposes" from 4:00 to 6:00 p.m. on Saturdays.[101]

The only structure in either park that predated the parks' creation was the Lockkeeper's House (Contributing Building), which was constructed in 1832-33 as the home of the Keeper of the Chesapeake and Ohio Canal extension. The building was likely abandoned by the canal company in the early 1870s, when the canal was filled in as part of Alexander "Boss" Shepherd's ambitious campaign to improve the physical condition of the District of Columbia. In August 1902, a family of squatters was evicted from the building, and in 1903 the building was renovated by the U.S. Army Corps of Engineers so it could be used as a toolhouse and lodge for the Potomac Park watchmen.[102] The building was moved a short distance to its present site in 1915 in order to accommodate Seventeenth Street as it was extended through West Potomac Park. In the early twentieth century, the building served as a headquarters for the Park Police, and as a temporary holding cell for prisoners arrested in Potomac Park. It is now used by the National Park Service as a toolhouse.

In 1909, during the construction of the two parks, the U.S. Army Corps of Engineers moved their wharf and storage facility from Easby's Point in West Potomac Park to a two-acre site in East Potomac Park located just east of the railroad embankment. At one point, as many as a dozen buildings were clustered around this new site, from which the U.S. Army Corps of Engineers directed other reclamation and navigation-improvement projects. Today, the only extant historic building at the former Engineers' wharf is the U.S. Engineers' Storehouse (Contributing Building), which was designed in 1912 for office and storage space. Designed to be fireproof, and intended to replace several earlier frame structures on the site, the building was constructed by the U.S. Army Corps of Engineers' labor force at a cost of approximately $10,000. Originally, the building had two concrete bays on the first story of both the north and south elevations, and each bay contained a pair of large metal, sliding doors. These sliding doors,

[101]Chappell, "East and West Potomac Parks: A History," pp. 96-97.
[102]Chappell, "East and West Potomac Parks: A History," p. 98.

designed to allow large pieces of machinery and construction materials to be stored inside, were removed circa 1940; three of the openings were filled in with a window, and one with a door. The building was mostly open in plan, except for a freight elevator, a stair, and a single, small office on each floor.

The building was designed by the prominent local architectural firm of Wood, Donn and Deming, who practiced together from 1902 until 1912, and it appears to be one of their final commissions. These men were comfortable using the vocabulary of the Mediterranean Renaissance Revival style; in 1906 they designed the Carnegie Institution of Washington Geophysical Laboratory at 2801 Upton Street, NW, in a similar style. Although the latter is a more elaborate building than the Engineers' Storehouse, both buildings share features such as pebble-dash stucco walls, low, hipped roofs covered with terra-cotta tile, and symmetrical fenestration. This style has an almost residential appearance, and worked equally well for high-style as well as more mundane buildings.

Like other buildings in East and West Potomac Parks, the U.S. Engineers' Storehouse has accommodated numerous functions since its construction. The U.S. Army Corps of Engineers used the building for an undetermined number of years, and its interior was first remodeled in 1932 for an unspecified use. In 1936, the building was renovated to serve as the base for the Girl Mariners and the Sea Scouts, branches of the Girl Scouts and Boy Scouts respectively. These programs, which began in the early 1920s, were intended for advanced Scouts of high-school age. Since these programs focused on maritime activities, it is logical that they would want a base for their meetings near the water, and a building near the U.S. Engineers' Wharf would have been an ideal location for such a purpose. The elevator was removed at this time, and other minor repairs were undertaken. By 1940, the decision had been made to renovate the building for use as a bicycle-rental facility. This concession had earlier been operated from a site along the Tidal Basin, but increasing automobile traffic, coupled with concerns about appropriate uses of the land surrounding the basin, necessitated its removal. It is likely that the sliding steel doors were removed, the shutters added to the windows, and the front and rear porches constructed for the building's new use. The bicycle rental concession, which peaked during the gasoline rationing of World War II, ceased operation in 1955. The building was then used by the National Park Service as a studio for workmen who built museum displays. In 1965, it was remodeled to serve as the headquarters for the National Capital Parks-Central office of the National Park Service. The first floor housed the Chief of Interpretation and his staff, and the second floor housed the Superintendent and his staff. In 1976, the building was leased as offices for the Tourmobile concession. In 1977, the building once again became the headquarters for the National Capital Parks-Central office, in which capacity it still serves to this day.

Early Twentieth-Century Planning Efforts for the Parks

In the first quarter of the twentieth century, three important plans were drafted for the development of East and West Potomac Parks. The first planning effort began in March of 1901, when the U.S. Senate passed a resolution directing that the Committee on the District of Columbia, chaired by Michigan Senator James McMillan, consider plans for the improvement of Washington's park system. Since this resolution mandated the committee to seek the advice of experts, a commission was formed, consisting of architects Daniel H. Burnham and Charles F. McKim, landscape architect Frederick Law Olmsted, Jr., and sculptor Augustus St. Gaudens. This group of experts became known as the Senate Park Commission, subsequently the McMillan Commission. The four members of the commission began by studying Pierre Charles L'Enfant's 1791 plan for the city of Washington, by familiarizing themselves with the city's topography, and by visiting important Georgian houses in Maryland and Virginia such as Wye, Shirley, Westover, and Carter's Grove, as well as the colonial capital of Williamsburg. They traveled throughout Europe in June and July of 1901, along with Senator McMillan's aide Charles Moore, in order to study both the formal gardens of French landscape designer Andre LeNotre, and the continent's grand capital cities, including Paris, Rome, Venice, Vienna, and Budapest.[103] Their travels strongly affected the form that the plan would take, embracing as it did both Le Notre's baroque planning and characteristics of classical Rome, in particular the simplicity and directness of Rome's planning and its "subordination of ornament to structural usage."[104]

The Senate Park Commission issued their resulting report and plan in early 1902. Although the report addressed and proposed an extensive citywide and regional park system, the heart of the McMillan Plan -- a kite-shaped geographic area of Washington encompassing the Capitol (to the east), the White House (to the north), the future location of the Lincoln Memorial (to the west) and what became the future site of the Jefferson Memorial (to the south) -- was West Potomac Park.

The plan had a number of goals, but at its most fundamental, it sought to restore L'Enfant's vision of the capital city. Pierre L'Enfant's seminal 1791 plan of Washington featured a regular grid overlaid with a

---

[103]Cynthia R. Field, "The McMillan Commission's Trip to Europe," pp. 19-24; in Antoinette Lee, editor, "Conference Proceedings, Historical Perspectives on Urban Design: Washington, DC 1890-1910," Washington, DC: George Washington University, Center for Washington Area Studies, 1983.

[104]Charles Moore, quoted in David C. Streatfield, "The Olmsteds and the Landscape of the Mall," p. 123, in Richard Longstreth, ed., *The Mall in Washington, 1791-1991* (Washington, DC: National Gallery of Art, 1991).

system of diagonal avenues that intersected at grand circles or squares. A traditionally baroque plan, it emphasized long vistas, axial relationships, and open spaces. By the twentieth century, a number of aspects of L'Enfant's plan had been seriously compromised. The ambitious McMillan Plan sought to re-establish elements of the L'Enfant Plan and to expand what was interpreted as the spirit of the L'Enfant plan. Major elements of the plan included the restoration of the east end of the Mall, the correction of the off-axis placement of the Washington Monument, and the inclusion of the new "Potomac Park" (i.e., East and West Potomac Parks) in the L'Enfant scheme.

The plan addressed the treatment and use of East and West Potomac Parks with some specificity, stating that:

> The mall of the original city will be connected with the new Potomac Park and form an integral and important part of an extensive park area. The blemishes upon the appearance of the mall through disfiguring railroad tracks will not, however, be permitted by the public to be duplicated in the case of the new reservation. The latter will, in pursuance of the declaration of the law, be forever held and used as a public park, for the recreation and pleasure of the people . . . If a fraction of the proposed uses of this area is realized the public welfare will be wonderfully promoted. The park will be transformed into a thing of beauty by the landscape gardener's art; an improved and enlarged bathing beach and bathing pool will contribute to the public health; for the recreation of the people there will be provided baseball diamonds, play grounds, tennis courts, golf links, and special areas, including piles of sand for the little ones; upon water basins will be rowboats and naptha launches; here will be laid out in elliptical shape a sidewalk, a carriage drive, a bridle path, a bicycle path and a speedway, and enclosed within the ellipse will be an area suitable for races and field sports. Tree-lined roads and bridle paths will afford attractive vistas of land and water.[105]

As part of its revised treatment of the Sixteenth Street cross-axis, the plan also called for building additional land to the south along the axis (between Fifteenth and Seventeenth Streets) thereby greatly reducing the size of the Tidal Basin. Under this scheme, the memorial that terminated this vista (the approximate site of what was to be the Jefferson Memorial), was located at the very end of the new land. This new land, "the Washington Common and Public Playgrounds" was to be devoted to recreational uses

[105]Senate Committee on the District of Columbia, *Park Improvement Papers, No. 1, Action of the Washington Board of Trade in Relation to the Park System of the District of Columbia*, March 28, 1901, pp. 1-2.

including boating, wading, swimming, and skating.[106] In addition to the proposed memorial, a bathhouse, theater, boathouse, and gymnasium were all elements of the scheme.

For the area immediately to the west of the Washington Monument, the plan attempted to correct the off-axis placement of the Washington Monument by redrawing the east-west axis to bisect the monument. This new axis, which was terminated to the west by a site designated for a monument to Lincoln, formed the spine of the new landscaped Mall. Under the plan, the axial parkland west of the Washington Monument was to feature a long, narrow, water feature or "canal" (what was to be the Reflecting Pool) running along most of this area with a smaller, more oblong pool (what was to become the Rainbow Pool) to its east. The plan also called for the canal to be bisected with a cross-arm at Twenty-third Street -- a feature that was never implemented.

The extension westward of the grand tree-lined axis begun on the Mall, the construction of the Reflecting Pool, the Rainbow Pool, and the Lincoln Monument and related features,[107] the extension of the Sixteenth Street cross-axis south of the Washington Monument, and the informal landscaping approach of East Potomac Park are some of the elements of the McMillan Plan as it related to East and West Potomac Parks that were executed in the years to come.[108] Although implementation of many of the changes called for in the McMillan Plan took quite a long time, the construction of one particular element in West Potomac Park, the Lincoln Memorial (1913-22), was key to insuring that the plan was carried out.[109]

The McMillan Plan was clearly responsible for establishing (or in some cases, re-establishing) the remarkable monumental civic spaces that are defining characteristics of Washington today. However, even in its unimplemented state, this plan had broad influence beyond Washington. It is recognized today as the first comprehensive plan of the American City Beautiful movement, the Beaux-Arts tradition as applied to city planning.[110] Its creation of grand, civic spaces within the city and its harmonizing of such

---

[106] Streatfield, “The Olmsteds and the Landscape of the Mall,” p. 127, in Longstreth, *The Mall in Washington, 1791-1991.*

[107] Not only was the location and purpose for the Lincoln Memorial set out in the plan, but McKim’s drawings for the memorial as they appeared in the plan were strikingly similar to what was actually built.

[108] These features are discussed below in the appropriate chronological section.

[109] Richard Guy Wilson, “High Noon on the Mall: Modernism versus Traditionalism, 1910-1970,” p. 151, in Longstreth, *The Mall in Washington, 1791-1991.*

[110] Named for the Ecole des Beaux-Arts in Paris, the Beaux-Arts tradition emphasized order, hierarchy, and formality in the design of monumental civic spaces. Beaux-Arts public buildings, including train stations, libraries, and museums, were built in major cities across the United States in the first quarter of the twentieth century.

spaces with more naturalistic landscapes was particularly influential. Its effect can be seen throughout the country, particularly in the improvement of state capitals and larger cities such as Cleveland, San Francisco, and Chicago. The plan, in fact, helped initiate the movement throughout the country for city planning and was important as utilizing a new method of recreating the spirit of a historic plan.[111]

The McMillan Plan has been called a permanent version of the 1893 Chicago World's Columbian Exposition's "ideal of America as a new democratic Rome," and much in the plan can be linked to the architecture and planning of the planning of this world's fair.[112] The fair was the product of some of the period's most important designers: Daniel H. Burnham and John Wellborn Root were selected as chief architects for the buildings, Frederick Law Olmsted was hired as the site's landscape architect, and Augustus St. Gaudens was chosen as advisor for the sculptural program. Prestigious architects were awarded commissions for individual buildings at the exposition, including McKim, Mead and White; George B. Post; Richard Morris Hunt; Peabody and Stearns; Charles B. Atwood; and Van Brunt and Howe.[113] Through personal visits to the fair's "White City" and through subsequent publications, Americans across the country were exposed to the ideals of the Beaux-Arts aesthetic. In addition, the later work of the fair's designers was influenced by their experiences at the Columbian Exposition. A prime example of this occurred when Burnham, St. Gaudens, and McKim reunited in 1901 as three of the four members of the McMillan Commission.[114] Despite its debt to the Columbian Exposition, it is clear that after 1902, the influence of the McMillan Plan eclipsed the influence of the fair.[115]

---

[111]For information on the significance of the McMillan Plan, see generally Richard Longstreth, ed., *The Mall in Washington, 1791-1991.* Within this publication, see specifically David C. Streatfield, "The Olmsteds and the Landscape of the Mall," p. 129, Thomas S. Hines, "The Imperial Mall: The City Beautiful Movement and the Washington Plan of 1901-1902," p. 96, Jon A. Peterson, "The Mall, the McMillan Plan, and the Origins of American City Planning," p. 103, Richard Guy Wilson, "High Noon on the Mall: Modernism versus Traditionalism, 1910-1970," p. 151.

[112]Robert A. M. Stern, "A Temenos for Democracy: The Mall in Washington and Its Influence,"p. 265, in Longstreth, ed., *The Mall in Washington, 1791-1991.*

[113]Stanley Applebaum, *The Chicago World's Fair of 1893: A Photographic Record* (New York, New York: Dover Publications, Inc., 1980), pp. 2-3.

[114]After this work in Washington was completed, Burnham continued his city planning work, and went on to draft influential plans for major cities such as Chicago, San Francisco, and Manila, Phillippines.

[115]Stern, "A Temenos for Democracy: The Mall in Washington and Its Influence," p. 265, in Longstreth, ed. *The Mall in Washington, 1791-1991.*

Two additional important twentieth-century plans for the two parks differed from the McMillan Plan in that each plan addressed a specific park in its entirety, rather than focusing solely on the city's monumental core. As West Potomac Park was the first of the two parks in which the reclamation was completed, it was also the first park for which specific development plans were drawn. In late 1906, Frederick Law Olmsted, Jr., was hired by the Office of Public Buildings and Grounds to draft a plan for a portion of West Potomac Park located west of the Tidal Basin. Olmsted, Jr., was a logical choice for this project as he had been a member of the McMillan Commission and, as a result, knew the city of Washington quite well. In early 1907, Olmsted, Jr., presented his preliminary design concept. He proposed large, open, lawns, planted sparsely with deciduous trees, and carriage and riverside drives lined with tall, deciduous trees. The existing willows, which had been planted along the banks of the Potomac River in the early years of the twentieth century, were to be supplemented with 17 different water-tolerant species of trees, including birch, willow, oak, American elm, and sweet gum. Based on this general scheme, Olmsted, Jr., completed a planting plan for West Potomac Park by late 1907; it was implemented by the Office of Public Buildings and Grounds over the next ten or so years.[116]

The reclamation of East Potomac Park was completed by 1911, and in 1912, the resulting parkland was transferred to the Office of Public Buildings and Grounds, which supervised the park's further development. The first "comprehensive plan for the development of East Potomac Park as a public recreation ground"[117] was prepared by city planner James G. Langdon, under the direction of Colonel William W. Harts, Chief of the Army Corps of Engineers, and Frederick Law Olmsted, Jr. This work came under Olmsted's purview as the landscape architect member of the Commission of Fine Arts. The initial version of the plan was presented by Colonel Harts to the Commission of Fine Arts in October 1915, at which time it was approved in concept by the Commission for presentation to Congress.[118] This plan, published as *Development of East Potomac Park,* was presented to Congress in April 1916.

From its earliest origins, East Potomac Park was meant to be a model "public playground," and this first development plan was an ambitious and comprehensive one. The plan called for a U-shaped stadium to seat 14,000 people, two "sand beach bathing pools" with "locker houses," a wading pool, a 60-acre parade

[116]Kress-Cox Associates, P.C. "Historic Structure Report, Tidal Basin Inlet Bridge," Washington, DC, May 2, 1986, pp. 41-42; Planting Plan for Portion of Potomac Park, October 15, 1907, Plan # 2828-25, Frederick Law Olmsted National Historic Site.

[117]*Development of East Potomac Park* (Washington, DC: Government Printing Office, 1916), p. 3.

[118]Minutes of the Commission of Fine Arts, October 2, 1915, Commission of Fine Arts, Washington, DC.

ground, a boat harbor, and four boat houses. Provisions for recreation included 2 football fields, 13 baseball fields, a 27-hole golf course and field house, 10 croquet and 8 roque courts, 4 basketball courts, 31 tennis courts, a cricket field, and picnic grounds. Visitors could reach and traverse the park via a number of transportation options, including automobile, horse, trolley, and ferry. Foreseeing the popularity of the personal auto, the 1916 plan reserved land for 500 parking spaces. It also demarcated separate thoroughfares for cars and equestrians, including a 1.2 mile soft "driving road," 3.5 miles of "border and cross drives," and a "saddle path" of an undetermined length. Also, a "cross-park canal" was planned to connect the Washington Channel with the Potomac River, to keep the water in the Boat Harbor fresh and to "separate the quiet from the noisy sports."[119] The total cost to fully implement this plan was estimated to be $1.5 million dollars.[120] As the project funding was to come from Congressional appropriations, a plan of this scope and breadth was doomed from the outset. Also, as the country mobilized for World War I, the implementation of recreational plans was not given a higher priority. Fortunately, a number of the features of this ambitious plan were to be realized in the coming years, including the golf course, the field house, and the swimming pool.

Park Development from the 1900s through the 1920s

The implementation of these three plans proved to be a long and uneven process, as various features were built in the two parks sporadically as funding and labor were made available. Nevertheless, a great deal of construction activity took place in both parks in the first three decades of the twentieth century. In 1901, the Potomac Railroad Bridge (Contributing Structure) was constructed by the U.S. Army Corps of Engineers to carry rail travel over the Potomac. The southernmost of all the Fourteenth Street crossings, the bridge still functions in its original capacity, and has become the dividing boundary between the two parks. In 1906 in West Potomac Park, an evergreen nursery and rose garden (no longer extant) was established between the railroad bridge, the Tidal Basin, and the Potomac River. This nursery featured four fountains of different shapes, only one of which, the Number 4 Fountain (Contributing Object), remains today. In 1907, a boat dock (no longer extant) was built on the northeast lobe of the Tidal Basin, and the existing boathouse was transferred to the Office of Public Buildings and Grounds, to be run by the same concessionaire. This boathouse was replaced by a new structure (no longer extant) in 1928. Located at the foot of Seventeenth Street, this new facility included a lunchroom, a storage area for model boats, and a covered porch. A variety of boats have been employed at the Tidal Basin, including swan

[119] *Development of East Potomac Park,* Information taken from map that accompanied the report.
[120] *Development of East Potomac Park*, p. 16.

boats, speed boats, replicas of Venetian gondolas, and paddle boats. In 1908, the West Potomac Park Polo Grounds (Noncontributing Site) west of the Tidal Basin were graded, and in 1909, a frame bandstand was constructed nearby.[121] Concerts were held in this bandstand until it was demolished in 1931.

The landscape of West Potomac Park was greatly improved during this period. In 1912, approximately 3,000 Japanese Cherry Trees (Contributing Site) were planted in both parks. Given as a gift to the city of Washington by Japan, the first shipment of trees was infested with several types of insects, and had to be destroyed. A second shipment was then arranged, and the first two of these trees were planted along the Tidal Basin by Mrs. Taft and the Viscountess Chinda, the wife of the then Japanese ambassador. In 1923, a rose garden was planted at the foot of Fourteenth Street, which remained at this location until it was destroyed in 1949, during the construction of the first Fourteenth Street Bridge.

The first two memorials in the two parks were also constructed during this era. The first permanent memorial in West Potomac Park, the Commodore John Paul Jones Statue (Contributing Object), was constructed at the foot of Seventeenth Street in 1911-12. Jones' remains had been discovered in an obscure cemetery in Paris in 1905; and after reinterment at the United States Naval Academy, Congress appropriated $50,000 for a suitable memorial for the Revolutionary War hero. The memorial's bronze statue and marble pedestal were designed by Charles Henry Niehaus; Thomas Hastings served as project architect. It was dedicated on April 17, 1912. The second memorial, the John Ericsson Monument (Contributing Object), located at the intersection of Independence Avenue, SW, and Ohio Drive, SW, was also constructed in West Potomac Park during this time period. The memorial honors Ericsson as the designer of the Union Army's ironclad ship, the *Monitor,* which was used in the most famous naval encounter of the Civil War. Ericsson is also credited with perfecting the design of the screw propeller. Constructed from 1924-26, the monument was designed by sculptor James Earle Fraser and architect Albert Randolph Ross, and was financed mainly by Americans of Scandinavian descent. Frederick Law Olmsted, Jr., served as landscape consultant for the memorial.

The most significant project in West Potomac Park during this time period was construction of the Lincoln Memorial (Contributing Structure). Located at the foot of Twenty-third Street, the nation's foremost memorial to the sixteenth American president is a strong example of Neoclassical architecture. It serves as the formal terminus to the axis extending from the Capitol, as was recommended in the McMillan Plan of 1901-02 for the city's monumental core. A memorial to Abraham Lincoln was first

[121]Chappell, "East and West Potomac Parks: A History," pp. 99-100, 169-170.

proposed in 1867, when Congress passed a bill creating a formal commission tasked with erecting a fitting memorial. Clarke Mills designed a colossal edifice to be adorned with 6 equestrian and 31 pedestrian statues; however, sufficient funds could not be raised to erect this structure, and these plans were abandoned. In 1911, Congress established a new commission -- the Lincoln Memorial Commission, chaired by former president William H. Taft, to guide the progress of the memorial. The planned memorial was viewed by many as a symbol of the Union, North and South united. By 1913, both the design and location of the memorial had been approved, though these decisions were far from unanimous. The Greek temple design, loosely based on the Parthenon, as interpreted by Henry Bacon, was thought by many to be overly ostentatious for a man of Lincoln's humble origins and character. An alternate design proposed a simple log cabin form for the memorial. Others had serious reservations about the site, thinking the reclaimed land in West Potomac Park swampy, remote, inaccessible, or not grand enough for such a memorial. The Lincoln Memorial Commission held to their decision, and they were bolstered by the fact that the site in Potomac Park had been designated in the McMillan Plan as appropriate for a major memorial, as well as the fact that the site was on axis with both the Washington Monument and the U.S. Capitol.[122]

A month after a dedication ceremony on February 12, 1914, the construction of the Lincoln Memorial began,[123] and the memorial's cornerstone was laid on February 12, 1915.[124] (This date was selected for both events as it was the anniversary of Lincoln's birth.) The memorial was constructed by the George A. Fuller Company under the direction of the Director of the Office of Public Buildings and Grounds of the National Capital. Building upon reclaimed land proved to be quite challenging. A subfoundation of 100 concrete piles reinforced with twisted steel rods was first built, on top of which a structure of concrete piers was constructed to support the memorial. The outbreak of World War I brought a halt to the construction; however, a great deal of the memorial had already been completed. The columns had been raised, the roof was completed, and the interior was under construction.[125] Work resumed after the war's end, and was

[122]National Register Inventory-Nomination Form, "Lincoln Memorial," p. 8.1.

[123]National Register Inventory-Nomination Form, "Lincoln Memorial," p. 8.2.

[124]Federal Writers' Project, Works Project Administration, Washington City and Capital (Washington, DC: Government Printing Office, 1937), p. 332.

[125]Albert E. Cowdrey, A City for the Nation: The Army Engineers and the Building of Washington, DC, 1790-1967 (Washington, DC: Government Printing Office, 1978), pp. 45-46.

completed by the dedication ceremony on May 30, 1922. At the ceremony Lincoln Memorial Committee chairman Taft presented the memorial to President Warren Harding, who accepted it on behalf of the American people.[126]

A number of events significant in the history of the civil rights movement have taken place at the Lincoln Memorial. On April 9, 1939, contralto Marian Anderson gave an Easter Sunday concert on the steps of the Lincoln Memorial, before an integrated crowd of 75,000 people. This concert was arranged after Anderson was barred from performing at Constitution Hall by the Daughters of the American Revolution because of their "white artists only" policy. This concert is viewed by many scholars as the birth of the modern civil rights movement.[127] On August 28, 1963, Martin Luther King, Jr., delivered his "I Have A Dream" speech before a crowd of 400,000 people. The speech was part of the March on Washington for Jobs and Freedom, designed to demonstrate racial cooperation in support of civil rights. This speech has been since credited with both coalescing the nation's conscience against segregation and leading to the passage of the 1964 Civil Rights Act.[128] The Lincoln Memorial has also been the location of numerous protests and demonstrations for a variety of causes. On December 28, 1971, 87 members of Vietnam Veterans Against the War were arrested for their attempt to seize and seal off the memorial.[129] In the past twenty years, protestors have demonstrated at the Lincoln Memorial on a wide variety of issues, such as abortion rights, fetal rights, gay rights, housing discrimination, world hunger, the plight of soldiers missing in Vietnam, embassy hostages in Iran, victims of drunk drivers, AIDS, and for the freedom of the people of numerous countries.[130] These events have provided an additional layer of significance to an already important national memorial.

As the construction of the Lincoln Memorial progressed, the shaping of the surrounding landscape began. At the suggestion of Frederick Law Olmsted, Jr., 502 Dutch elm trees (Contributing Site) were planted in West Potomac Park in 1915-16. These "English elms," though purchased and imported from a nursery in Chester, England, were likely of Dutch parentage. Of these trees, 398 were planted in double rows on

---

[126]National Register Inventory-Nomination Form, "Lincoln Memorial," p. 8.2.

[127]Scott A. Sandage, "A Marble House Divided: The Lincoln Memorial, the Civil Rights Movement, and the Politics of History," *The Journal of American History* 80, 1 (June 1993): pp. 135-136, 143.

[128]Sandage, "A Marble House Divided," pp. 155-156; Lois Craig and the staff of the Federal Architecture Project, *The Federal Presence: Architecture, Politics, and Symbols in United States Government Building* (Cambridge, Massachusetts: MIT Press, 1978), p. 530.

[129]Sandage, "A Marble House Divided," p. 164.

[130]Sandage, "A Marble House Divided," p. 166.

===========================================================================

either side of the site of the Reflecting Pool in 1915-16, prior to the basin's actual construction, and the remaining 104 were planted south of the parallel rows. The poor drainage of the marshy soil did not allow the trees' roots to fully develop, and they became quite top heavy. By 1929, many of the original trees were toppling over in high winds, and had to be replaced. Today, the rows of elms contain a mixture of original and replacement trees, and consist primarily of Dutch elms, with a few smoothleaf, American, English, and Scottish elms planted between. The National Park Service replaces dead or dying trees in kind to ensure that the original design intent is perpetuated.

The Reflecting Pool (Contributing Site) and Rainbow Pool (Contributing Site), conceptually designed by Charles F. McKim, and further refined by Henry Bacon and Frederick Law Olmsted, Jr., were both prominent features of the McMillan Plan of 1901-02. The broad expanse of water in the Reflecting Pool was planned to reflect the Washington Monument. The two pools were constructed contemporaneously in 1919-22 along the east-west axis leading from the Lincoln Memorial to the Washington Monument. The Reflecting Pool had originally been designed as a cruciform body of water, but the presence of the World War I-era temporary buildings necessitated that it be built without its planned cross-arms. The Rainbow Pool, built at the eastern end of the Reflecting Pool, was equipped with jets that created a rainbow effect in natural sunlight when water was forced through them. Over the years, these two basins have been used for recreational purposes such as wading, ice skating, model boat racing, and fly-casting contests.

During the city's mobilization for World War I, numerous temporary buildings were constructed in West Potomac Park. Beginning in 1916, the area between the Reflecting and Rainbow Pools and Constitution Avenue was cleared of all trees and shrubs, as well as 23 tennis courts, to make way for temporary government office buildings. By March of 1918, two three-story, concrete buildings had been constructed for the War Department. Additional buildings were added in the same area soon after; this complex became known collectively as the Navy and Munitions Buildings. A parking lot for these structures was built between the complex and the Dutch elm trees along the northern side of the Reflecting Pool.[131] Though intended to be temporary in nature, these buildings were not demolished until 1970-71.

The most popular early recreational use of the Tidal Basin was for swimming. In the early years of the twentieth century, a private bathing beach was established in a gap in the seawall, on the shore of the Tidal Basin, northeast of the inlet. In 1902, the Office of Public Buildings and Public Parks ordered the private bathing beach closed, and the seawall rebuilt, so that they could begin their own municipal

[131] "Cultural Landscape Inventory, West Potomac Park, Lincoln Memorial Grounds," p. 3-11.

operation. In 1918, the municipal bathing beach opened on the south shore of the Tidal Basin, between the Inlet and Outlet Bridges, even prior to the completion of a public bathhouse, designed by architect Horace Whittier Peaslee. This same year, a 400-foot-long by 100-foot-wide sand beach was constructed on the site, and a liquid chlorine plant was installed under the Tidal Reservoir Inlet Bridge, which purified the water in the basin for swimming.[132] Since this facility was for white swimmers only, it soon became a matter of great discussion in Congress as to whether or not they should fund a similar, separate facility for black bathers. Funds were appropriated in 1922 for a bathing beach for blacks. By 1925, another site along the Tidal Basin had been selected, and the foundation of the second bathhouse had been completed. This same year, Congress decided that swimming in the Tidal Basin was not an appropriate recreational use, and both bathing concessions, including the beach and both bathhouses, were demolished.

Golf was another sport in which the races were segregated. In 1925, a golf course and clubhouse for black players were constructed in West Potomac Park. This course was poorly maintained, however, and the grass was often so long that golf balls were lost. It was remodeled during the construction of Arlington Memorial Bridge, and was abandoned entirely in the late 1930s when a new, segregated course, Langston, was constructed in Anacostia Park. During this time, there was also a nine-hole course in West Potomac Park for white players.

East Potomac Park was also greatly improved and developed during the first three decades of the twentieth century. Ohio Drive, SW, (Contributing Structure) was constructed around the perimeter of the park between 1912 and 1916. During this period of time, the invasive vegetation was cleared off the fertile fill, trees and shrubs were planted, and grass was seeded by the U.S. Army Corps of Engineers. Once these general improvements were completed, the 1916 development plan for East Potomac Park could then be implemented.

The golf course and two associated structures were the first features of the 1916 development plan to be constructed. The two wings of the East Potomac Park Field House (Contributing Building), were designed by Horace Whittier Peaslee (1884-1959) in 1917. A native of Malden Bridge, New York, Peaslee received a Bachelor of Architecture in 1910 from Cornell University, where he also minored in landscape architecture. In 1911 he traveled to Europe on a fellowship, and in 1912 he came to Washington to work as a landscape designer for the Office of Public Buildings and Grounds. He journeyed to Europe again in 1914, this time at his own expense, expressly to study parks in Italy, France,

[132] Chappell, "East and West Potomac Parks: A History," p. 109.

and Switzerland. Peaslee held the position of landscape designer for the Office of Public Buildings and Grounds until 1917, when he was promoted to architect of this same office. Peaslee started his own practice in 1918, and performed both positions simultaneously until he left the Office of Public Buildings and Grounds in 1922. He remained in private practice until his death, and during his lifetime he designed structures as diverse as park lodges, schools, town halls, embassies, apartment buildings, gas stations, and private residences.[133] Peaslee is best known today as the primary designer of Meridian Hill Park, a National Historic Landmark in Washington, DC.

Peaslee designed the East Potomac Park Field House during his tenure as Architect for the Office of Public Buildings and Grounds. The two L-shaped wings were part of the design for a larger U-shaped structure that was never fully executed. The square, center portion of the Field House, which was never built, was designed to contain a large assembly room, a refectory with counter and table service, a kitchen, and a pantry. A loggia was planned to enclose both the north and south elevations of the center section. The design for the Field House's unimplemented center portion illustrates Peaslee's attention to the landscape, as it featured an open courtyard in its center, with gravel walks, a round reflecting pool in its center, and formal landscaping.

The decorative exposed-aggregate concrete Field House wings were also the product of Washington, DC, concrete artist John Joseph Earley (1881-1945). Earley viewed the creation of concrete as a combination of science and art, and his process created a concrete product resembling more costly mosaic work. Earley's process had several sequential steps. First, forms were filled with a concrete mixture that was studded with colorful pebbles. Once the forms were removed, the surface of the concrete was then scrubbed with acid to highlight the colored aggregates. This process was used to create a wide range of products, including murals, walls, and entire buildings. Earley patented his "Earley Process" in 1921. The best known example of Earley's work is the system of retaining walls, steps, and paving at Meridian Hill Park, in Washington, DC, which was completed in 1936.[134]

The Field House wings have served numerous functions since their construction. Originally, the east wing was built to serve as the men's changing facility, and the west wing to serve as the women's

[133]Obituaries for Horace W. Peaslee, The Washington Star, May 18, 1959, and May 20, 1959; The Washington Post, May 20, 1959. Vertical File, "Horace W. Peaslee," Robinson & Associates, Inc., Washington, DC.

[134]"John Joseph Earley," Vertical File, Robinson & Associates, Inc., Washington, DC.

changing facility, both for the municipal golf course. The east wing had a dining room, lunch room, locker rooms, and a golf professional shop on the main floor, and a kitchen, pantry, and cold storage area in the basement. The west wing had locker rooms, offices, and storage rooms on the main floor, and laundry facilities and additional storage in the basement. Both wings were remodeled in 1936, as part of a larger, Public Works Administration (PWA) project that included the construction of the East Potomac Park Swimming Pool. After the pool was built, the two wings were shared by the Leoffler Company, the concessionaire that operated the golf course, and the Welfare and Recreational Association of Public Buildings and Grounds, the concessionaire that operated the swimming pool. At this point, the wings were remodeled to include basement dressing rooms for the swimming pool. This sharing of space continued until 1978, when the DC Recreation Department constructed a bathhouse on the open land between the two wings. An early porch that enclosed the colonnade on the east wing was removed in 1977. The east wing currently houses the golf professional shop, offices for the golf course concessionaire, and a food-service concession. Since 1979, the west wing has functioned as the District One Sub-station for the U.S. Park Police.[135]

The East Potomac Park Golf Course (Contributing Site), the city's first municipal golf course, began to take shape during this same period. A number of different golf course architects helped to shape the course over the years. In May 1917, noted golf course designer Walter Travis presented a design for this municipal golf course to the Commission of Fine Arts. It appears that Dr. Walter S. Harban assisted Travis with certain features of the course. The first nine holes of the course were constructed in 1917, seeded in 1918, and officially opened for business on July 8, 1920. Golfers paid a fee of 25 cents, which included use of the locker and shower rooms. The course has been constantly reconfigured since the 1920s. The course's second nine holes, likely designed by Andrew White, were completed by 1923. The first putting green was installed at the course in 1925, and the first driving range was added in 1934. Also, William S. Flynn later remodeled the course in the mid-1920s.

After one season of operating the course at a loss, the Office of Public Buildings and Grounds put a contract out to bid for its management. In 1921, Severine G. Leoffler was selected to do so, and his company, known first as the Park Amusement Company, and later as the S.G. Leoffler Operating Company, managed the East Potomac Park Golf Course until 1983. At this point, it was taken over by Golf Course Specialists, Inc., who continue in this capacity today. Leoffler created a municipal golf

[135]Real Property Files, United States Department of the Interior, National Park Service, National Capital Region, Washington, DC.

empire in the District of Columbia; by the 1960s, his company also operated 18-hole courses at Anacostia, Rock Creek, and Fort Dupont Parks. He did a great deal to promote the sport of golf locally, offering free clinics for children, as well as low-cost clinics for adults. During Leoffler's tenure, the East Potomac Park Miniature Golf Course (Contributing Site) was constructed in early 1931, when the miniature golf craze was sweeping the nation. This 18-hole miniature golf course officially opened for business on May 9, 1931, and quickly became one of the park's most popular recreational features. It was operated seasonally during the warm-weather months. Miniature golf was popular in large part because it was such an inexpensive activity; for example, in 1948, an 18-hole round of miniature golf cost 35 cents. The miniature course is still in operation today, and is likely the longest continuously operating course in the nation.[136] (The National Park Service later allowed Leoffler to construct a miniature course at Anacostia Park in 1948; unfortunately, this course is no longer extant.)

Land in East Potomac Park was used a number of different ways during World War I. The Boy Scouts were granted permission in 1917 to tend a garden in the park, and employees of the Office of Public Buildings and Public Parks were allowed in 1921 to have their own vegetable garden in the park. This use was later determined inappropriate for park land, and the gardens were discontinued.

Temporary buildings were also constructed in East Potomac Park as part of the war effort. In 1918, 41 frame buildings were constructed on the Potomac River side of the park near the railroad embankment. These barracks were built by the Construction Division of the War Department to house detachments of Regular Army Troops, who were assigned to guard duty in Washington. An additional 57 barracks were constructed on the Washington Channel side of the park to house enlisted clerks serving in the War Department.[137] The barracks on the Potomac River side of the park were demolished in 1921-22, at which time those on the Washington Channel side were being used for storage by the War and Treasury Departments.[138]

In 1921, a six-acre, tourist camp for tent camping was established in East Potomac Park, just east of the railroad embankment, to accommodate the growing number of tourists visiting the nation's capital by automobile. One of the old World War I barracks was turned over to the tourist camp; it was renovated to

---

[136]Brain, "Circus Miniature Golf," *National Mini Golf and Range Association* 1, 3 (July 1990): p. 11.
[137]Chappell, "East and West Potomac Parks: A History," p. 116.
[138]Chappell, "East and West Potomac Parks: A History," p. 118.

include toilet and bath facilities.[139] By 1926, the size of the tourist camp had grown to 60 acres. This same year, a community building was erected at the tourist camp, in spite of the Commission of Fine Arts' strenuous objections. Because the tourist camp was only to be temporarily located in East Potomac Park, the construction of a brick building was considered by the commission to be too permanent. Given its prominent site that could be seen by visitors approaching Washington from the south, the commissioners also felt that the tourist camp was unsightly, and that the growth of the camp would likely prevent the recreational plan for the park from being fully implemented. However, since the $50,000 Congressional appropriation specified the building's construction at the camp's East Potomac Park location, it had to be built there. The commission continued to recommend that the tourist camp be relocated to a more appropriate location.[140]

Tourists used the camp for free until 1923, when usage fees were first charged. By 1927, the camp included 20 cabins and cottages, numerous tents and camping sites, a laundry, bathhouses, a playground, and the community building. The tourist camp was extremely popular. A 1927 *Sunday Star* article reported:

> Washington's tent city is popular because of its facilities, police protection, sanitation and attractive surroundings. Tourists from everywhere in this country who pass through the National Capital follow the "tips" of more experienced motorists and stop by as long as possible in the Government camp. Swept by cooling breezes from the Potomac, set down amidst a wealth of verdure, with excellent facilities for golf, baseball, tennis, fishing, bathing, boating and sightseeing close at hand, the East Potomac Park camp is a mecca of cross-country travel.[141]

As transportation and recreation evolved, so too did the tourist camp; by 1954, a 56-unit trailer court had been added to the camp.[142] After years of debate about the appropriate uses of federally owned parkland, the tourist camp was finally relocated in 1963 to Prince William Forest Park near Quantico, Virginia, 25 miles south of Washington, and the camp in East Potomac Park was demolished to make way for the National Park Service National Capital Region and U.S. Park Police Headquarters Buildings.

---

[139] Chappell, "East and West Potomac Parks: A History," p. 118.

[140] "Tourists' Camp House Bids to be Asked Soon," *The Washington Post*, January 14, 1926; "Urges Removal of Tourist Camp", *The Washington Star*, February 20, 1926.

[141] "Tent City Here Quarters Tourists From Forty-Eight States," *The Sunday Star*, July 10, 1927.

[142] "Potomac Park Trailer Court," *Planning and Civic Comment*, March 1954.

Beginning in 1920, the Girl Scouts operated a lunch and refreshment room in a small temporary building on Hains Point. In 1923-34, an elaborate new park pavilion was constructed near the tip of Hains Point, which contained a restaurant, snack bar, and public restrooms. The Girl Scouts continued to serve refreshments from this new building, known as the "Teahouse," until the end of 1925, when the food concession was awarded to the newly organized Welfare and Recreation Association of Public Buildings and Grounds. This organization was the predecessor of Government Services Incorporated, now Guest Services Incorporated, which now has the concession to provide all food and other sales services within all the public parks in the nation's capital. It operated the Teahouse on a seasonal basis until 1962 (there was only limited service during World War II, due to decreased park visitation because of gasoline rationing). From 1962 until 1967, the Teahouse was used as a visitors center, and it was closed entirely during 1968. From 1969 through 1985, the building served as the Ecological Services Laboratory for the National Capital Region. Since it violated current health and safety codes, and could not be adapted successfully to other uses, the Teahouse was demolished in 1987.[143]

Park Development in the 1930s and 1940s

This era in the history of the East and West Potomac Parks was characterized by the construction of major memorials, and also by the encroachment of World War II-related development onto federal lands. The most important development in the two parks during this period was the construction of the Jefferson Memorial (Contributing Structure). Located in West Potomac Park on the southeast shore of the Tidal Basin, at the southern terminus of the Sixteenth Street cross-axis of the Washington Monument Grounds, approximately 3,000 feet south of the Washington Monument, the nation's memorial to third American president Thomas Jefferson is a significant example of Neoclassical architecture. The Jefferson Memorial serves as a key landmark in the city, as constructed on the site reserved in the McMillan Plan for a major national monument.

The Thomas Jefferson Memorial Commission was created by Congress in 1934 to guide the memorial's design and construction. Its location on the Tidal Basin had previously been suggested in the 1920s as the site for a memorial to Theodore Roosevelt. Although the Theodore Roosevelt Memorial Committee actually held a design competition, the project was halted.[144] John Russell Pope of New York City was selected as the Jefferson Memorial's architect by the commission in 1937. Pope's design inspiration for

---

[143]Historic American Buildings Survey, Girl Scout Teahouse, HABS No. DC-549, pp. 6-9.
[144]National Register Inventory-Nomination Form, "Thomas Jefferson Memorial," p. 8.1.

the memorial was the Pantheon in Rome, which had influenced the designs of Jefferson's Monticello and the Rotunda at the University of Virginia more than a century earlier.[145] He designed a large monolithic pantheon that faced north towards the White House. His design would have transformed the Tidal Basin into a series of reflecting pools, which were to be flanked with rectangular terraces, and outlined with formal rows of trees. The Commission of Fine Arts and the National Capital Planning Commission were united in vigorous opposition to this scheme. They argued that the overly grand design would dominate the vista and upset the balance of the city's monumental core, and that restructuring the Tidal Basin would render it incapable of performing its flushing mechanism. They also objected to the fact that the flow of traffic to Virginia would be disrupted by changes in street design necessitated by implementing the elaborate landscape treatment, and that the 1,200 cherry trees surrounding the Tidal Basin and 80 elm trees would be destroyed by the new landscape plan.[146]

After his untimely death in 1937, at the request of the Commission of Fine Arts and the National Capital Planning Commission, Pope's design was modified by the principals of his successor firm, Otto R. Eggers and David P. Higgins. Their revisions included moving the structure 600 feet south, reducing its size to make it more compatible with other memorials, and eliminating the extensive landscape treatment -- leaving the Tidal Basin, street, and most of the cherry trees intact.[147] This plan pleased most of the people opposed to Pope's original design; however, many members of the Commission of Fine Arts still preferred an open peristyle design to that of the Pantheon. The Thomas Jefferson Memorial Commission found this proposed change unacceptable, so they went directly to President Roosevelt and asked him to intervene. Roosevelt overrode the authority of the Commission of Fine Arts, and ordered construction to begin on the enclosed Pantheon-inspired design. To no avail, the Commission of Fine Arts appealed this decision to Congress.[148]

Ground breaking for the Jefferson Memorial took place on December 15, 1938, and construction began in early 1939. John McShain, Inc., of Philadelphia was selected as the contractor for the memorial, and

---

[145]National Register Inventory-Nomination Form, "Thomas Jefferson Memorial," p. 7.1.

[146]National Register Inventory-Nomination Form, "Thomas Jefferson Memorial," p. 8.1.

[147]In fact, 171 of 2,700 cherry trees were removed to allow construction of the Jefferson Memorial on the south shore of the Tidal Basin. Jannelle Warren-Findley, "Historic Documentation: Thomas Jefferson Memorial," United States Department of the Interior, National Park Service, National Capital Parks Central, Washington, DC, September 15, 1985, p. I.

[148]National Register Inventory-Nomination Form, "Thomas Jefferson Memorial," p. 8.2.

Frederick Law Olmsted, Jr., was selected as consulting landscape architect. The memorial's cornerstone was laid on November 15, 1939. As the superstructure began to take shape, artist Adolph A. Weinman was hired to carve the north portico pediment, and sculptor Rudulph Evans began to sculpt the statue of Jefferson which dominates the memorials's central chamber.[149]

Evans' design had been selected from 101 entries in a national competition held by the Thomas Jefferson Memorial Commission in 1938. A full-scale plaster model of the sculpture was placed in the memorial from 1943 until World War II ended , when restrictions on the use of metal were lifted and the bronze sculpture could be cast. The memorial was dedicated on April 13, 1943, the bicentennial of Jefferson's birth.[150]

A number of other projects were undertaken in the two parks during the 1930s and 1940s. The District of Columbia World War I Memorial (Contributing Object) was constructed in 1931 on the south side of the Reflecting Pool. This memorial, designed by architects Frederick H. Brooke, Nathan C. Wyeth, and Horace W. Peaslee, was intended to honor the District residents who served and died in the first World War. The white marble Doric temple was also designed to be used as a bandstand for concerts, replacing the frame bandstand that had been constructed nearby in 1908. In 1931, a ten-foot-wide concrete walk with an iron-pipe railing was completed around the perimeter of East Potomac Park. The construction of Arlington Memorial Bridge (Contributing Structure), designed by the architectural firm of McKim, Mead and White, was completed by 1932. The East Potomac Park Swimming Pool (Contributing Structure) was built in 1936 with Projects Works Administration funds; it was one of six pools authorized by Congress in 1929.

The Flood Control Levee (Contributing Site) running along the north side of the reflecting pool was erected in 1938, as a result of the 100 year flood that occurred in 1936. Like the masonry seawalls, this berm was designed by the Army Corps of Engineers. The site contributes to the significance of the park because it reflects the Federal government's role in developing and managing the parks; including its attempts to protect government buildings located to the north of Constitution Avenue.

Despite the governmental and engineering significance, it should be recognized that the levee compromises the integrity of the formal landscape design intent of the Lincoln Memorial Grounds (defined by 17th Street, the Potomac River, and Constitution and Independence avenues). McKim's design of this area, as revised by Bacon and Olmsted, called for a level symmetrical field that would reinforce the Mall, in terms of its form and directional axis. Specifically, the central axis was articulated by a canal (Reflecting Pool) flanked by parterres. Accordingly, the approximately 8' high levee topographically separates spaces that were intended as one.

---

[149] National Register Inventory-Nomination Form, "Thomas Jefferson Memorial," p. 8.2.
[150] National Register Inventory-Nomination Form, "Thomas Jefferson Memorial," pp. 7.1, 8.2.

The entrance of the United States into World War II brought even more defense-related development into the two parks, as war-time planners cast envious glances at the vast, open parkland of the nation's capital. In 1942, the West Potomac Park Polo Grounds (Noncontributing Site) were paved over for a parking lot for the War and Navy Departments (this was later reversed), and numerous dormitories to house war workers and office buildings were also constructed south of the Reflecting Pool. Two enclosed walkways were constructed across the Reflecting Pool in 1942, one near the Nineteenth Street alignment, and another over the small plaza between the Reflecting and Rainbow Pools. These World War II temporaries were demolished in 1965, and the World War I office buildings along Constitution Avenue and the two enclosed walkways were demolished in 1970-1971.

The Kutz Bridge (Contributing Structure) and the Independence Avenue Extension (Contributing Structure), both designed by Philadelphia architect Paul Philippe Cret, were constructed in 1943 to provide improved access from Washington to the Pentagon. The bridge was constructed to carry eastbound Independence Avenue, SW, over the north bay of the Tidal Basin, and a separate roadway was constructed immediately north of the bridge to carry westbound traffic.

There are several small buildings and structures in the parks, including: information and ticket booths; concession buildings; a guard house; map and historical markers; and Vietnam Veteran booths. Of these buildings, the Guard House (Contributing Building), located at the northwest corner of 23rd Street and Independence Avenue, has the most architectural character. The Guard House was built in 1950 to serve as a station for a traffic officer whose duties included regulating the one-way rush hour traffic pattern established in 1937 on Ohio Drive and the Rock Creek and Potomac Parkway. The classically derived details reinforce the sense of order found on the Lincoln Memorial and Washington Monument grounds, the Mall and President's Park. Its architectural form recalls the Bulfinch Gatehouses and fence piers located at the intersections of Constitution Avenue and 17th, 15th and 7th streets; these ca. 1828 sandstone structures with channeled rustication and Neoclassical mouldings were removed from the U.S. Capitol grounds in 1874 and relocated by the NPS along Constitution Avenue in 1938. Accordingly, the Guard House contributes to the significance of the park in terms of transportation and architectural history.

Park Development from the 1950s through the 1970s

This era of the parks' history was characterized by incremental additions to the parks' landscape, such as the examples given below, and by preparations for the nation's Bicentennial celebration. The historic ties between the United States and Japan were further commemorated in the 1950s, when two gifts to the nation from Japan were placed in West Potomac Park. The first of these gifts, the Japanese Lantern (Contributing Object) was crafted in Tokyo in 1651 to honor a dead warlord, and its twin still stands on the grounds of a temple in Tokyo. The Japanese Lantern was placed on the northwest bank of the Tidal Basin in 1954, between two of the original cherry trees planted in 1912. It is lighted each spring to officially begin the

Cherry Blossom Festival. It is one of three lanterns that were given to the United States as symbols of Japanese-American understanding; the other two are located in Providence and Newport, Rhode Island.

In 1958, the second gift, the Japanese Pagoda (Contributing Object) was placed on the bank of the Tidal Basin, near the intersection of Independence Avenue, SW, and West Basin Drive. The 3,800-pound pagoda arrived in pieces in five crates without any instructions for assembly; with the help of an expert in Japanese culture from the Library of Congress, it was reassembled. The pagoda was a gift from the Mayor of Yokohama to the people of Washington, as a gesture to improve American-Japanese relations. Also in 1958, a boulder with the First Air Mail Flight Marker (Noncontributing Object) was placed across from the Polo Grounds by the Aero Club of Washington, to honor the departure site of the first scheduled air mail service.

In 1963, after the relocation of the tourist camp from East Potomac Park to Prince William Forest Park, and the demolition of the existing buildings, the National Park Service National Capital Region Headquarters Building (Noncontributing Building) and the U.S. Park Police Headquarters Building (Noncontributing Building) were constructed on the same site. The Park Service and the Park Police continue to occupy these buildings, from which they administrate and police the region's parks.

During her husband's administration (1964-68), Lady Bird Johnson undertook a number of projects in the two parks as part of her formidable Beautification Program. In East Potomac Park, a 150-foot water jet was placed in the Potomac River off Hains Point in 1967, funded by a $160,000 gift to her beautification committee. (This water jet has since been removed.) Between 1966 and 1968, friends of the President and Mrs. Johnson funded the purchase of 1,800 flowering cherry and other trees, which were planted around the perimeter of Hains Point in 1966-68. A Plaque Honoring the Placement of the Cherry Trees on Hains Point in 1966-68 (Noncontributing Object) was placed on a stone and wood bench along Ohio Drive, SW, on Hains Point in 1968. In West Potomac Park, a Floral Library (Noncontributing Site) was designed and installed near the Tidal Basin in 1968, on a quarter-acre plot of land south of Independence Avenue, SW, and East Basin Drive. The library was originally planned to provide people with the opportunity to view and compare a number of different tulip varieties in close proximity, and also to serve as a demonstration garden for National Park Service employees who were responsible for selecting floral displays for the parks. It is now known as a Floral Library, as the tulips are replaced in the summer by annuals, and some fading annuals are replaced by chrysanthemums in the fall.

The landscape of West Potomac Park was reevaluated in 1964, when the architectural firm Skidmore, Owings, and Merrill, with landscape architect Dan Kiley serving as landscape consultant, was retained to draft a new master plan for the National Mall. According to historian David C. Streatfield, "Up to this time, the execution of the McMillan Plan had been one of progressive simplification that was a pragmatic response to low budgets and more detailed ecological information. In this process the picturesque nature of the Capitol grounds had been married to a simple formal treatment on the Mall. New plans, proposed in 1964 and 1965,

represented more a return to the formality of the McMillan Plan than an evolving interpretation of that plan's principles and those of L'Enfant's design, which Olmsted had sought to practice."[151]

The 1965 Skidmore, Owings, and Merrill master plan proposed to redesign the axial portion of West Potomac Park, by lengthening the Reflecting Pool, which was to terminate at an "island lookout platform" at Seventeenth Street. This cross axis was to continue to a viewing platform at the rim of the Tidal Basin. The traffic circle around the Lincoln Memorial was to be removed, to allow direct pedestrian access to the Lincoln Memorial from the east. The area to the north of the Reflecting Pool, where the World War I temporaries still stood, was redesigned with a "varied series of formal bosks evoking the character of a baroque woodlands."[152] The majority of these features were never implemented. The eastern third of the circular roadway surrounding the Lincoln Memorial, between Henry Bacon and Daniel French Drives, was closed to automobile traffic, and the area north of the Reflecting Pool was, nearly a decade later, to become the site of Constitution Gardens.

The 1965 plan "also called for planting additional trees to reduce the Mall's greensward from the proportions established by the McMillan Plan at the start of the century. Since there was no hope of matching the existing elms, the idea was to place a row of trees along the inner border."[153] This facet of the plan was never implemented, as members of the Commission of Fine Arts felt that the existing proportions of green space were appropriate. One important aspect of this plan was the replacement of the inner drives of the Mall and West Potomac Park with gravel walks, which were solely designated for pedestrians, and not for parked cars. This alteration, which was implemented, has greatly improved the visual impact of the monumental axis.[154] Hardscape handicapped lanes are currently being added to these walks.

The World War I temporary buildings north of the Reflecting Pool were finally demolished in 1970-71, at the insistence of President Richard M. Nixon. During a helicopter ride over the site, he remarked to John

---

[151]David C. Streatfield, "The Olmsteds and the Landscape of the Mall," p. 137, in *The Mall in Washington, 1791-1991.*

[152]Streatfield, "The Olmsteds and the Landscapes of the Mall," p. 138, in *The Mall in Washington, 1791-1991.*

[153]J. Carter Brown, "The Mall and the Commission of Fine Arts," p. 249, in *The Mall in Washington, 1791-1991.*

[154]Brown, "The Mall and the Commission of Fine Arts," pp. 249-250, in *The Mall In Washington, 1791-1991.*

Ehrlichman "My God! There are those old buildings I was stationed in during World War II. Look at them--they're a disgrace! Get rid of them. Let's clean them off the Mall." Nixon was prompted every time he flew over the Navy and Munitions buildings to write memos asking why they were still standing.[155] However, the Department of the Navy, who occupied the buildings at this time, had been reluctant to lose its prime location just three blocks from the White House.[156]

The Constitution Gardens (Contributing Site) project was then proposed to fill in the newly opened parkland in West Potomac Park. Washington, DC, was to be the focus of the nation's Bicentennial celebration in 1976, and preparations were made to accommodate visitors from across the country. Designed in the early 1970s by the architectural firm Skidmore, Owings, and Merrill, in association with the landscape architectural firm Arnold Associates, Constitution Gardens was completed and presented to the nation as a Bicentennial gift in 1976. As first proposed by President Nixon, the design for the new park was to be selected through a student competition orchestrated by architect David Childs. This plan was abandoned when students denounced the design competition as a way for the Nixon administration to divert attention from their policies on the Vietnam War. Later, Nathaniel Owings of Skidmore, Owings and Merrill secured for his firm the commission to design Constitution Gardens, and he hired David Childs to work in the firm's small Washington office, and to design the park.[157] The project team studied urban parks around the world searching for appropriate models, including Hyde Park in London, the Tuilleries in Paris, Central Park in New York, Golden Gate Park in San Francisco, and Tivoli Gardens in Copenhagen.[158] Nixon thought the park should be an amusement park filled with restaurants and activities, combining the best aspects of both Williamsburg and Walt Disney, and referred to the project as "Tivoli Gardens." The Commission of Fine Arts, however, did not like the Tivoli Gardens concept, suggesting instead a heavily wooded area containing a simple program and modest structures.[159]

Constitution Gardens is one of the largest, most visible, and one of the few surviving Bicentennial projects in the Washington, DC, area. (Another large Bicentennial project, turning Union Station into a visitors' center, was not nearly as successful, and was reversed in the 1980s.) Designed in the romantic,

---

[155]Freeman, "Romantic Garden on the Classical Mall," *The AIA Journal*, p. 48.

[156]The buildings were only razed to ground level; the foundations remain below ground and have caused problems with plant growth, due to soil contamination.

[157]Freeman, "Romantic Garden on the Classical Mall," *The AIA Journal*, pp. 48-50.

[158]Mattes, "Landmarks of Liberty," p. 116.

[159]Freeman, "Romantic Garden on the Classical Mall," *The AIA Journal*, pp. 48-50.

naturalistic style that contrasts with the symmetrical, more formal aspects of the Mall, Constitution Gardens is dominated by a six-acre, curvilinear, constructed lake with a kidney-shaped island, which is connected by a footbridge to the lake's northern shore. At the easternmost edge of the site, on the cross-axis of the Rainbow Pool, is a flat, raised platform, which was intended to hold a food pavilion that was never built; it is accessed by four diagonal paths. Three fieldstone, walled terraces leading down from the platform to the lake were meant for tables. Trees planted in masses throughout the site, including maple, beech, oak, and gum, form a dense tree canopy. In the 1980s and 1990s, Constitution Gardens has become a landscaped setting for three new memorials, one dedicated to the 56 Signers of the Declaration of Independence, and two honoring those who served in the Vietnam War (see also).

The five U.S. Park Police Stables (Noncontributing Building) are another tangible reminder of the preparations for the Bicentennial celebration. Constructed in 1975 for the Bicentennial Folk Festival Committee to the south of the Reflecting Pool near the site of the Korean War Memorial, the stables were intended to temporarily house the Park Police horses during the Bicentennial and until more suitable quarters could be found. Like other extant temporary structures in the two parks, they are still used for their original purpose.

During the mid- to late 1970s, a number of administrative and recreational facilities were constructed in East Potomac Park. The bubble at the East Potomac Park Tennis Facility (Noncontributing Site) was constructed in 1974. In 1978, the DC Department of Recreation built the East Potomac Park Bathhouse (Noncontributing Structure) between the two wings of the Field House. The Tourmobile Headquarters (Noncontributing Building) was constructed in 1979 near the Park Service National Capital Region Headquarters, and the adjacent National Capital Parks-Central Maintenance Yard (Noncontributing Building) likely dates to the same period. Both of these buildings are meant to be temporary in nature.

The 56 Signers Memorial (Contributing Object) is also a product of the Bicentennial celebration. The $500,000 appropriation with which it was funded came from the American Revolution Bicentennial Administration, from whom the memorial was intended as a gift. It was authorized by Congress and approved by the President on April 17, 1978. The Alexandria, Virginia, office of the landscape architectural firm EDAW was hired in 1979 to design the memorial, along with Kurt Pronske, civil engineer. It was completed in 1983, and was dedicated on July 2, 1984. In 1984, the memorial won an Honor Award in the Professional Awards Program of the American Society of Landscape Architects.[160]

---

[160]Warren-Findley, "A Guide to Selected Statues, Monuments and Memorials," p. 41.

The idea for the Vietnam Veterans Memorial (Contributing Object) was conceived by young Vietnam veteran Jan Scruggs. The memorial's design was the result of a national competition, held in 1980-81, that was sponsored by the Vietnam Veterans Memorial Fund, a group formed by Scruggs to lobby for the memorial. The competition was advised by architect Paul D. Spreiregen, FAIA, and the jury included sculptors Richard H. Hunt, Constantino Nivola, and James Rosati; architects Harry Weese and Pietro Belluschi; landscape architects Hideo Sasaki and Garrett Eckbo; and Grady Clay, editor of *Landscape Architecture* magazine.[161] The design competition was funded by wealthy Texas businessman H. Ross Perot.[162] The competition literature stated a number of basic goals for the memorial. "The memorial was to acknowledge and recognize the sacrifice of all those who had served and died in the war; it was not to make a statement as to whether the involvement of the United States in the conflict had been right or wrong; it was to be harmonious with its site and with the other memorials on the Mall; and it was to be reflective and contemplative in character."[163]

A total of 1,421 individuals and teams entered the competition; and the winning design, selected unanimously by the jury, was drafted by Maya Ying Lin, a 21-year-old undergraduate architecture student at Yale University. Lin designed two, 200-foot-long, polished black granite walls, which met to form a "V," and were built into the sloping earth. The walls were to be inscribed with the names of the 57,692 Americans killed or missing in action in Vietnam between 1963 and 1973, listed in the chronological order in which they died or disappeared.[164] Maya Lin presented a statement on her design approach at a July 1981 meeting of the Commission of Fine Arts. "Describing the composition as 'a rift in the earth -- a long, polished black stone wall, emerging and receding into the earth,' she hoped it would be a peaceful, park-like place, a place for 'personal reflection and private reckoning,' where the collective and individual loss could be remembered."[165]

---

[161]Paul Richard, "Design Competition for Vietnam Memorial," *The Washington Post,* November 1, 1980.

[162]John Bodnar, *Remaking America: Public Memory, Commemoration, and Patriotism in the Twentieth Century* (Princeton, New Jersey: Princeton University Press, 1992), p. 5.

[163]Sue A. Kohler, *The Commission of Fine Arts: A Brief History, 1910-1990* (Washington, DC: Government Printing Office, 1991), pp. 125-126.

[164]Henry Allen, "Epitaph for Vietnam, Memorial Design is Selected," *The Washington Post*, April 30, 1981, pp. F1, F3.

[165]Kohler, *The Commission of Fine Arts: A Brief History, 1910-1990*, p. 126.

This simple design proved to be extremely controversial, and was derided by some veterans as an inappropriate memorial for those who had perished in Vietnam. One decorated Vietnam veteran, Tom Carhart, called the Wall both a "shameful degrading ditch," and "a black gash of sorrow."[166] The Commission of Fine Arts approved the design concept, regardless of the controversy, and the Wall was built as planned in 1982. The Cooper-Lecky Partnership, a Washington, DC, architectural firm, served as architect of record, and the Gilbane Building Company constructed the Wall. It was dedicated onVeterans Day, November 11, 1982. The Frederick Hart sculpture and flagstaff were added to the memorial in 1984. The Vietnam Veterans Memorial has subsequently received tremendous design professional and popular support, and visitors often leave personal mementos, such as letters and medals, at the Wall in honor of the dead soldiers.

The idea for the Vietnam Women's Memorial (Contributing Object) was conceived by Minnesota housewife Diane Carlson Evans, who had served as an Army nurse in Vietnam. Evans initially organized the Vietnam Women's Memorial Project to recognize the efforts of women in Vietnam, and then to raise money for a suitable memorial to be placed in Washington, DC. An open competition was held for the memorial's design in 1990, and nearly 350 submissions were judged at the National Building Museum in Washington. The winner, announced on Veterans Day 1990, was, in fact, a combination of two separate designs, that of a figure of a woman in uniform, standing at a slab of marble and granite which would emit a perpetual mist of water. The National Park Service informed the Board of the Vietnam Women's Memorial that this was an impractical solution, as the mist machine would be difficult to install on the marshy fill, and that it would have to be turned off six months of the year during cold weather. The Board then took a second look at the honorable mention designs, and selected a sculpture by New Mexico artist Glenna Goodacre, which featured three nurses, one tending to a wounded soldier, a second looking skyward for a rescue helicopter, and a third holding a sick baby. This design was later revised by Goodacre; in the completed sculpture, the third nurse holds an empty helmet, rather than a baby.[167] George L. Dickie, AIA, was the architect who designed the memorial plaza. The Vietnam Women's Memorial was dedicated on Veterans Day, November 11, 1993.

The Korean War Veterans Memorial (Contributing Object) was dedicated on July 27, 1995, the 42nd anniversary of the armistice that ended the Korean War. This design for this memorial was also the

---

[166] Jack Eisen, "Commission Rejects Veteran's Protest, Reapproves Vietnam Memorial Design," *The Washington Post*, October 14, 1981.

[167] Perl, "A Matter of Honor," *The Washington Post Magazine*, October 25, 1992, pp. 16-31.

product of a design competition. The concept statement that was distributed to all entrants stated that "the Korean War had been waged in the cause of freedom, and unlike the Vietnam War, there had been a victory in geo-political terms. Although the memorial would be American, it would pay homage to all those who had participated, including those from the United Nations forces."[168]

Selected in the spring of 1989, the winning design was drafted by four architects and landscape architects from Pennsylvania State University, John Paul Lucas, Veronica Burns Lucas, Don Alvaro Leon, and Eliza Pennypacker. Their complex design concept included a line of 38 statues of seven-foot-tall foot soldiers, placed along a ramp, paralleling the Reflecting Pool, in rushing water, marching through a "landscape symbolic of war." This imaginative landscape was to be created by flanking the statues with barberry bushes, and placing plane trees pruned in hideous shapes on the north side of the proposed memorial. Visitors would enter the memorial, walk up a ramp, and actually walk through the field of advancing soldiers. Pools of water, symbolizing the end of war, located at the top of the ramp, would then lead to another ramp descending into a paved plaza with an American flag. Looking back from the plaza, visitors would see a wall with inscriptions and images highlighting the various combat activities, the country and people of Korea, and a message that a total of 21 nations participated in the war. An alcove at the end of this wall was planned to commemorate the dead, the missing, and the prisoners of war. This section of the memorial was meant to illustrate "the end of the struggle and the prospect for peace." Here, the nature of the landscape would change, to dogwood trees lining the northern boundary, and a stone bench and arborvitae edging the arched walk at the southern end of the memorial.[169]

When this design failed to win approval from the Commission of Fine Arts, it was later revised by the Washington, DC, architectural firm the Cooper-Lecky Partnership, who was hired as architect of record, to draft the construction documents and to supervise the construction of the memorial. Cooper-Lecky's revised design represented a great departure from the original winning design, although it retained many key elements of the original plan, including the column of soldiers moving forward, the paved plaza, the flag, and the water feature. Rather than marching in a straight line, the statues were placed on a diagonal, aligned between the Lincoln and Jefferson Memorials. This line ended in a plaza with a flag, where a curved wall, with inscriptions and pictures of support troops, angled towards the Reflecting Pool. Visitors then entered into a grove that commemorated the dead and missing, before leaving the memorial on the existing system of paths. The landscape treatment was softer than in the first design, and was more

---

[168]Kohler, *The Commission of Fine Arts: A Brief History, 1910-1990*, p. 166.
[169]Kohler, *The Commission of Fine Arts: A Brief History, 1910-1990*, p. 166.

consistent with that of Constitution Gardens. The use of the barberry bushes, plane trees, and arborvitae had been eliminated, and both berming and trees were added to screen the line of soldiers from Independence Avenue.[170]

After the winning Pennsylvania State University team withdrew their design in response to these revisions, the Korean War Veterans Memorial was built using Cooper-Lecky's design, which was also further refined. As built, the Korean War Veterans Memorial features 19 realistic, gray, stainless-steel soldiers sculpted by Frank Gaylord of Barre, Vermont. The patrolling soldiers, arranged in combat formation climbing up the hill, are set on parallel strips of polished black granite within a triangular "field of service." At the top of the hill is a circular plaza with a black, stone, circular "pool of remembrance" at its center, which is framed by a double row containing 40 braided linden trees, and an American flag. A 164-foot memorial wall, made of large, black, polished, granite slabs, serves as a backdrop for the sculpted figures. The wall features etched images of support troops, such as nurses, chaplains, and clerks, and where the wall juts into the pool is the inscription "Freedom is not free."

The design and construction history of the Franklin Delano Roosevelt Memorial (Contributing Site) is even more complex. In 1941, Roosevelt called Supreme Court Judge Felix Frankfurter to share his thoughts with his friend about the type of memorial he would like. He wanted a simple block of stone about the size of his desk to be placed in front of the National Archives building. On April 12, 1965, the twentieth anniversary of Roosevelt's death, a small group of the President's associates provided and dedicated a modest memorial to him. In accordance with Roosevelt's wishes, the white marble block bears the inscription "In Memory of Franklin Delano Roosevelt 1882-1945," and is located on Pennsylvania Avenue at the southeast corner of its intersection with 9th Street, NW, in front of the National Archives building.

Despite the presence of this memorial, champions of Roosevelt continued to rally for a larger memorial to the nation's 32nd President. In 1955, Congress authorized the creation of the Franklin Delano Roosevelt Memorial Commission to guide the design and construction of the memorial. Then in 1959, Congress passed Public Law 86-241, which set aside a 27-acre site in West Potomac Park for the memorial, mandated that the commission hold a design competition, and appropriated $150,000 to organize it. This competition was held in 1960, and nearly 600 designs for the new memorial were submitted. The winning entry, designed by the New York architectural firm of Pedersen and Tilney in association with Norman

---

[170]Kohler, *The Commission of Fine Arts: A Brief History, 1910-1990*, p. 168.

Hoberman and Joseph Wasserman, consisted of eight large concrete stele set into the landscape at various angles to each other. Subsequent presentation to the Commission of Fine Arts in 1962 engendered a wide variety of responses that ranged from wholehearted support to complete rejection. The commission did not approve the selected design, as they thought that the stele were too large in scale, and that the memorial did not fit well into the site or with the city's other three major memorials. They also questioned whether or not the concrete would be a lasting and durable material.[171]

The Commission of Fine Arts then asked Pedersen and Tilney to revise their design. In late 1963, when Pedersen appeared before the commission, all but one of the members were new; only landscape architect Hideo Sasaki had seen the original design. After viewing both the original and revised designs, Pedersen was again asked to revise the design. The commission did accept this revised design in 1964; however, it was never built, as the Roosevelt family did not approve of this design in any version. After sharing the President's family's comments with Congress, the Pedersen and Tilney design was abandoned entirely.

In 1967, the Franklin Delano Roosevelt Memorial Commission presented a new design for the memorial by architects Marcel Breuer and Herbert Beckhard. Planned for the same site in West Potomac Park, the large-scale, open-air memorial consisted of a paved area with a large, dark, granite cube placed at its center. A photographic likeness of President Roosevelt was to be etched onto the granite cube, and seven large granite slabs were to placed around the cube at 45-degree angles. Roosevelt's recorded speeches were to be played in the central space surrounding the granite cube. The commission rejected this design as well.[172]

In 1971, the Commission of Fine Arts approved a House Resolution that authorized the Secretary of the Interior to participate in the planning and design of this memorial. In 1975, San Francisco landscape architect Lawrence Halprin, FASLA, submitted a design for the proposed memorial, which was thought to be too large and too architectural for its naturalistic site between the Potomac River and the Tidal Basin. Halprin's original design was reduced in both size and scale over the years, and was finally approved by the commission in 1979, although its construction was delayed for years due to a lack of funding. Halprin's design was again presented to the commission in 1990. The membership of the commission had changed greatly since the design was first granted approval, and Halprin was asked to make revisions. These final revisions included halving the size of the visitors' center and moving it to an

---

[171]Kohler, *The Commission of Fine Arts: A Brief History, 1910-1990*, pp. 86-87.
[172]Kohler, *The Commission of Fine Arts: A Brief History, 1910-1990*, pp. 89-90.

unobtrusive location near the memorial's entrance, greatly reducing the amount of paving within the memorial, softening the berm that protected the wall of the memorial by using more natural grading and more plant material, and adding a grilled opening in one of the rooms to allow a view to the Potomac River.[173] The commission also reviewed and approved the memorial's sculptural program, as well as the text, typeface, and location of the quotations throughout the four outdoor rooms.[174]

The Franklin Delano Roosevelt Memorial was finally constructed in 30 months between 1994 and 1997 at a cost of $48.5 million; it was dedicated by President Clinton on May 2, 1997. It occupies the last of four ceremonial spaces reserved by the McMillan Plan. The memorial landscape stretches 800 feet along the southwest bank of the Tidal Basin and is supported by 900 steel pilings set into the marshy soil. The memorial, which covers approximately seven-and-a-half acres, features four outdoor rooms, one for each of Roosevelt's four terms. These rooms are defined by walls constructed by hand-carved blocks of Carnelian red granite from South Dakota and Minnesota. Since its completion, the memorial has become one of the city's most popular tourist destinations.

There has been some concern expressed by advocates of the disabled that the Franklin Delano Roosevelt Memorial does not contain a likeness of President Roosevelt in the wheelchair he used for 24 years. (There is, however, mention in the timeline of his life of his being stricken with polio.) A compromise was announced by Vice President Albert Gore in July 1998, in which a fifth outdoor room will be added to the memorial that will contain a life-sized statue of Roosevelt sitting in a wheelchair. California artist Robert Graham, who completed several other sculptures already on display in the memorial landscape, will cast the bronze sculpture that is estimated to cost $1.5 million. This sculpture will be paid for entirely by private funds raised over the course of the next two years.[175] In addition, the entire memorial has been designed to be wheelchair accessible.

In recent years, improvements have been made to several of the recreational facilities in East Potomac Park, including the golf course and the tennis facility. Completed in 1995, the East Potomac Park Driving Range Building (Noncontributing Building) provides practice stalls for 100 golfers on two levels. This

---

[173]Kohler, *The Commission of Fine Arts: A Brief History, 1910-1990*, pp. 91, 120-121, 160-162.

[174]Sue A. Kohler, *The Commission of Fine Arts: A Brief History, 1910-1995* (Washington, DC: Government Printing Office, 1996), pp. 209-211.

[175]Jennifer Lee, "Expansion Planned For FDR Memorial, Wheelchair Statue to Occupy New Room," *The Washington Post*, July 3, 1998.

same year, an administrative building was constructed at the East Potomac Park Tennis Facility (Noncontributing Site).

A number of special events have been held in the two parks over the years, including the President's Cup Regatta and the Cherry Blossom Festival. The reviewing stand and flagpole associated with President's Cup Regatta stood on the river side of East Potomac Park for a number of years; they are no longer extant. The Cherry Blossom Festival has been held in West Potomac Park since 1935, except for the duration of World War II. Also, "The Awakening," a cast-aluminum sculpture by J. Seward Johnson, Jr., which was created for the 1980 International Sculpture Conference Exhibition, was installed near the tip of Hains Point the same year. The five-part sculpture, composed of a giant head, knee, foot, hand, and arm, depicts a man emerging from the ground. "The Awakening" is not owned by the federal government, but is on long-term loan at the site. It is a regular stop for tour buses.

## INDEX

"The Awakening"................................................7.1, 7.54, 8.93
Arlington Memorial Bridge..................................7.13-7.14, 7.17-7.18, 8.74, 8.81
Bacon, Henry.......................................................7.10-7.13, 7.16-7.17, 8.71-8.73
Baskin, Leonard...................................................7.32
Bicentennial Projects...........................................8.85
Commission of Fine Arts.....................................7.12, 7.16, 8.76, 8.78-8.80, 8.84-8.86, 8.88-8.91
Commodore John Paul Jones Statue.....................7.26-7.8, 8.70
Constitution Gardens...........................................7.19-7.20, 8.84-8.86
Cooper-Lecky Partnership...................................7.20-7.21, 7.39, 8.87-8.90
Cret, Paul Philippe...............................................7.25-7.26, 8.82
Development Plan for East Potomac Park...........7.50-7.52, 8.68, 8.74
District of Columbia World War I Memorial.......7.38-7.39, 8.81
Dutch Elm Trees..................................................7.7, 7.16-7.17, 8.72-8.73
EDAW, Inc..........................................................7.22,8.86
Earley, John Joseph.............................................7.51,8.75-76
East Potomac Park Bathhouse.............................7.53, 8.86
East Potomac Park Driving Range Building.........7.52, 8.92
East Potomac Park Field House...........................7.50-7.51, 8.76-8.77
East Potomac Park Golf Course...........................7.49-7.50, 8.76-8.77
East Potomac Park Miniature Golf Course...........7.51-7.53, 8.77
East Potomac Park Swimming Pool......................7.52-7.53, 8.81
East Potomac Park Tennis Facility.......................7.53, 8.86
East Potomac Park Tourist Camp.........................8.77-8.77-8.79
Estern, Neil.........................................................7.32
Evans, Rudulph....................................................7.34
First Air Mail Flight Marker................................7.41-7.42, 8.82-8.83
First Japanese Cherry Trees Planting Plaque........7.28
Flood Control Levee............................................7.19, 8.81
Floral Library.......................................................7.33-7.34, 8.83
Franklin Delano Roosevelt Memorial...................7.30-7.33, 8.90-8.92
Fraser, James Earle...............................................7.18, 7.37-7.38, 8.70
French, Daniel Chester.........................................7.11
Gaylord, Frank.....................................................7.39, 8.90

**INDEX** (continued)

Goodacre, Glenna.......7.21, 8.88
Graham, Robert.......7.31, 8.92
Guardhouse.......7.42, 8.82
Halprin, Lawrence.......7.30- 7.33, 8.91-8.93
Hart, Frederick.......7.20-7.21, 8.88
Hastings, Thomas.......7.27-7.28
Independence Avenue.......7.25-7.26, 8.82
Japanese Cherry Trees.......7.7, 7.28-7.29, 7.44, 8.70, 8.83
Japanese Lantern.......7.29-7.30, 8.82
Japanese Pagoda.......7.29, 8.82
Jefferson Memorial.......7.5, 7.34-7.37, 8.79-8.81
Jefferson Memorial Grounds.......7.34-7.35
John Ericsson Memorial.......7.37-7.38, 8.70
Korean War Veterans Memorial.......7.39-7.40, 8.88-8.90
Kutz Bridge.......7.26-7.27, 8.82
L'Enfant Plan.......7.4-7.5, 8.64-8.65, 8.88-8.90
Light Fixtures.......7.8, 7.45
Lin, Maya Ying.......7.20-7.21, 8.87
Lincoln Memorial.......7.9-7.14, 8.70-8.73
Lincoln Memorial Grounds.......7.11-7.15
Lockkeeper's House.......7.40-7.41, 8.62
McKim, Mead and White.......7.14, 7.17-7.18, 8.81
McMillan Plan.......7.3-7.6, 7.16-7.17, 7.31, 7.42, 8.64-8.69, 8.71,8.79, 8.83-8.84
Memorial Trees.......7.7, 7.44
National Park Service National Capital Region Headquarters Building.......7.45, 7.47, 8.78, 8.83, 8.86
National Capital Parks-Central Maintenance Yard.......7.46, 7.49, 8.86
Number 4 Fountain.......7.33, 8.69
Ohio Drive, SW.......7.44-7.47-7.49,8.74
Olmsted, Frederick Law, Jr.......7.12, 7.16-7.17, 7.26,7.35-7.37, 8.64-8.69, 8.81

==========================================================================

**INDEX** (continued)

Peaslee, Horace Whittier......................................7.38, 7.50-7.51, 8.74-8.75, 8.81
Plaque Honoring the Placement of the Cherry
Trees on Hains Point in 1966-1968.........7.48, 8.83
Pope, John Russell...............................................7.34, 8.79
Potomac Railroad Bridge.....................................7.46, 8.69
Rainbow Pool.......................................................7.15-7.16, 8.73
Recreational Facilities.........................................7.42, 7.53
Reflecting Pool....................................................7.15-7.16, 8.73-8.74, 8.81-8.82
Segal, George.......................................................7.31-7.32
Signage................................................................7.8, 7.45
Site Furnishings...................................................7.8, 7.45
Skidmore, Owings and Merrill............................7.19, 8.83-8.84
Stone Seawalls.....................................................7.8, 7.23-7.24, 7.46-7.47, 8.58, 8.61
"The Teahouse"...................................................8.79
Tidal Basin..........................................................7.7, 7.21, 8.60-8.61, 8.65, 8.73-8.74
Tidal Basin Bathing Beach..................................8.73-8.74
Tidal Reservoir Inlet Bridge................................7.25, 8.58, 8.74
Tidal Reservoir Outlet Bridge.............................7.24, 8.58
Tourmobile Headquarters....................................7.46, 7.49, 8.86
U.S. Army Corps of Engineers............................7.3, 7.19, 7.23-7.25, 7.40, 7.46, 8.58-8.63, 8.69, 8.78
U.S. Engineers' Storehouse.................................7.48, 8.63-8.64
U.S. Park Police Headquarters Building..............7.46, 7.49, 8.78, 8.83
U.S. Park Police Stables......................................7.40, 8.86
Vietnam Veteran's Memorial..............................7.19-7.21, 8.87-8.88
Vietnam Women's Memorial..............................7.21-7.22, 8.87-8.88
Views and Vistas.................................................7.42-7.46, 7.54
West Potomac Park Polo Grounds........................7.41, 8.70, 8.82-8.83
Wood, Donn and Deming.....................................7.48-7.49, 8.63
World War I Temporary Buildings.......................8.73, 8.77-8.78, 8.81, 8.84-8.85
World War II Temporary Buildings......................8.81
Wyeth, Nathan C..................................................7.38, 8.81
56 Signers Memorial.............................................7.19, 7.21-7.22, 8.86
1965 Mall Master Plan..........................................8.58, 8.83-8.84

---

## BIBLIOGRAPHY

Published Sources

*American Concrete Institute, Proceedings of the 16th Annual Convention*. Detroit, Michigan: American Concrete Institute, 1920.

Applebaum, Stanley. *The Chicago World's Fair of 1893: A Photographic Record.* New York, New York: Dover Publications, Inc., 1980.

Bodnar, John. *Remaking America: Public Memory, Commemoration, and Patriotism in the Twentieth Century*. Princeton, New Jersey: Princeton University Press, 1992.

Brain, Karen and Ernie. "Circus Mini Golf." *National Mini Golf and Range Association* 1, 3 (July 1990): p. 11.

Brown, David A. *The Mall in Washington: 1791-1991.* Washington, DC: Trustees of the National Gallery of Art, 1991.

Brauer, Carl M. *The Man Who Built Washington, A Life of John McShain*. Wilmington, Delaware: Hagley Museum and Library, 1996.

Bushong, William, Judith Helm Robinson, and Julie Mueller. *A Centennial History of the Washington Chapter, The American Institute of Architects, 1887-1987.* Washington, DC: Washington Architectural Foundation, 1987.

Cameron, Robert. *Above Washington.* San Francisco, California: Cameron and Company, 1980.

Commission of Fine Arts. *The Plan of the National Capital.* From the Ninth Report of the Commission of Fine Arts. Washington, DC: Government Printing Office, 1923.

_____. *The Plan of the National Capital.* From the Eleventh Report of the Commission of Fine Arts. Washington, DC: Government Printing Office, 1930.

**BIBLIOGRAPHY** (continued)

Cornish, Geoffrey S. And Ronald E. Whitten. *The Architects of Golf.* New York, New York: Harper Collins Publishers, 1993.

Cowdrey, Albert E. *A City for the Nation: The Army Corps of Engineers and the Building of Washington, DC 1790-1967*. Washington, DC: Government Printing Office, 1979.

Craig, Lois, and the staff of the Federal Architecture Project. *The Federal Presence: Architecture, Politics, and Symbols in United States Government Building*. Cambridge, Massachusetts: MIT Press, 1978.

Creighton, Lynne. "Long-Awaited Memorial to FDR is Under Way." *Progressive Architecture* (September 1995): p. 21.

Cron, Frederick W. *The Man Who Made Concrete Beautiful: A Biography of John Joseph Earley*. Fort Collins, Colorado: Centennial Publications, 1977.

*Development of East Potomac Park, House Document Number 1038, 64th Congress, First Session.* Washington, DC: Government Printing Office, 1916.

Federal Writers' Project, Works Project Administration. *Washington City and Capital*. Washington, DC: Government Printing Office, 1937.

Freeman, Allen. "Romantic Garden on the Classical Mall." *The AIA Journal* (June 1983): pp. 48-53.

Goode, James M. *The Outdoor Sculpture of Washington, DC.* Washington, DC: Smithsonian Institution Press, 1974.

Green, Constance McLaughlin. *Washington, A History of the Capital, 1800-1950.* Princeton, New Jersey: Princeton University Press, 1962.

Grosvenor, Gilbert. "Washington Through the Years." *National Geographic* 55 (November 1931): pp. 517-619.

**BIBLIOGRAPHY** (continued)

Halprin, Lawrence. *The Franklin Delano Roosevelt Memorial.* San Francisco, California: Chronicle Books, 1997.

Jackson, Donald C. *Great American Bridges and Dams.* Washington, DC: The Preservation Press, 1988.

Jefferson, Roland M. And Alan E. Fusonie. *The Japanese Flowering Cherry Trees of Washington, DC.* Washington, DC: U.S. Department of Agriculture, Agricultural Research Service, December 1977.

The Junior League of the City of Washington, DC. *The City of Washington: An Illustrated History.* New York, New York: Alfred A. Knopf, 1977.

Kohler, Sue. *The Commission of Fine Arts: A Brief History, 1910-1990.* Washington, DC: Government Printing Office, 1991.

_____. *The Commission of Fine Arts: A Brief History, 1910-1995.* Washington, DC: Government Printing Office, 1996.

Longstreth, Richard, ed. *The Mall in Washington.* Washington, DC: National Gallery of Art, 1991.

Mackintosh, Barry. *The National Parks: Shaping the System.* Washington, DC: Government Printing Office, 1991.

Margolies, John. *John Margolies' Miniature Golf.* New York, New York: Abbeville Press, 1987.

Miller, Fredric M. and Howard Gillette, Jr. *Washington Seen, A Photographic History 1875-1965.* Baltimore, Maryland: The John Hopkins Press, 1995.

Myer, Donald Beekman. *Bridges and the City of Washington.* Washington, DC: Government Printing Office, 1983.

National Capital Planning Commission and Frederick Gutheim. *The Federal City: Plan & Realities.* Washington, DC: Smithsonian Institution Press, 1976.

**BIBLIOGRAPHY** (continued)

_____. *Worthy of the Nation: The History of Planning for the National Capital.* Washington, DC: Smithsonian Institution Press, 1977.

Peets, Elbert. "Original Plan of Washington." *House & Garden* (July 1940): Section 1, p. 63.

*Pioneers in Preservation: Biographical Sketches of Architects Prominent in the Field Before World War Two*. Washington, DC: American Institute of Architects, 1990.

"Potomac Park Trailer Court." *Planning and Civic Comment* (March 1954).

*Report of the Thomas Jefferson Memorial Commission to the Senate and the House of Representatives, 76th Congress, 1st Session.* Washington, DC: Government Printing Office, 1939.

Reps, John W. *Washington on View, The Nation's Capital Since 1970.* Chapel Hill, North Carolina: The University North Carolina Press, 1991.

Sandage, Scott A. "A Marble House Divided: The Lincoln Memorial, the Civil Rights Movement, and the Politics of History." *The Journal of American History* 80, 1 (June 1993): pp. 135-167.

Savage, Kirk. "The Politics of Memory: Black Emancipation and the Civil War Monument." in *Commemorations: The Politics of National Identity*. Princeton, New Jersey: Princeton University Press, 1994, pp. 127-149.

Scott, Pamela and Antoinette J. Lee. *Buildings of the District of Columbia*. New York, New York: Oxford University Press, 1993.

Senate Committee on the District of Columbia. *Park Improvement Papers, No. 1, Action of the Washington Board of Trade in Relation to the Park System of the District of Columbia*. March 28, 1901.

Thompson, J. William. "Notes from the Underground." *Landscape Architecture* (September 1997): pp. 40-45.

**BIBLIOGRAPHY** (continued)

_____. "The Power of Place." *Landscape Architecture* (July 1997): pp. 63-70, 90-94.

Weeks, Christopher. *AIA Guide to the Architecture of Washington, DC.* Baltimore, Maryland: The Johns Hopkins University Press, 1994.

U.S. Congress. Senate. Committee on Public Buildings and Grounds. *Communication of N. Michler, Major of Engineers relative to a suitable site for a public park and presidential mansion.* Report prepared by Nathaniel Michler, Document Number 21, 39th Congress, 2nd session, 1867.

U.S. Congress. Senate. Committee on the District of Columbia. *The Improvement of the Park System of the District of Columbia.* ed. by Charles Moore. Washington, DC: Government Printing Office, 1902.

U.S. Congress. House of Representatives. Executive Documents. *Appendix I to "Report of the Chief of Engineers," comprising Report of Major Peter C. Hains, July 31, 1883.* Document Number 1, Part 2, Volume 3, 48th Congress, 1st Session, 1883.

Unpublished Sources

Chappell, Gordon. "East and West Potomac Parks: A History." U.S. Department of the Interior, National Park Service, Denver Service Center, June 1973.

"Cultural Landscape Inventory, West Potomac Parks, Lincoln Memorial Grounds." U.S. Department of the Interior, National Park Service, National Capital Parks Central, Washington, DC, Draft, November 1996.

"Franklin Delano Roosevelt Memorial Official Park Guide." U.S. Department of the Interior, National Park Service, National Capital Parks-Central, Washington, DC.

Furbee, Leonard J. "The Reflecting and Rainbow Pools." U.S. Department of the Interior, National Park Service, National Capital Region, Office of Land Use, Washington, DC, Reservation File 332, 1955, Revised 1964.

KressCox Associates, P.C. "Historic Structure Report, Arlington Memorial Bridge." Washington, DC, May 2, 1986.

**BIBLIOGRAPHY** (continued)

_____. "Historic Structure Report, Tidal Basin Inlet Bridge." Washington, DC, May 2, 1986.

Land Files. U.S. Department of the Interior, National Park Service, National Capital Region, Office of Stewardship and Partnerships, Washington, DC.

Lee, Antoinette, editor. "Conference Proceedings, Historical Perspectives on Urban Design: Washington, DC 1890-1910." Washington, DC: George Washington University, Center for Washington Area Studies, 1983.

List of Classified Structures. U.S. Department of the Interior, National Park Service, National Capital Region, Office of Stewardship and Partnerships, Washington, DC.

Mattes, Merrill J. "Landmarks of Liberty: A Report on the American Revolution Bicentennial Development Program of the National Park Service." U.S. Department of the Interior, National Park Service, History Division, Washington, DC, 1989.

McClure, Stanley W. "The Thomas Jefferson Memorial." U.S. Department of the Interior, National Park Service, National Capital Region, Washington, DC, Written 1942, Revised 1955.

Minutes of the Commission of Fine Arts. Commission of Fine Arts, Washington, DC.

National Archives and Records Administration. Record Group 66, Records of the Commission of Fine Arts.

Olszewski, George J. "History of the Mall, Washington, DC" U.S. Department of the Interior, National Park Service, Eastern Service Center, Office of History and Historic Architecture, Washington, DC, March 1970.

Prothero, Sally. "Jefferson Memorial Landscape Overview." U.S. Department of the Interior, National Park Service, Denver Service Center, Final Draft September 14, 1995.

Real Property Files. U.S. Department of the Interior, National Park Service, National Capital Region, Office of Property Management, Washington, DC.

Reservations Collection. Historical Society of Washington, Washington, DC.

Reservation Files. U.S. Department of the Interior, National Park Service, National Capital Region, Office of Stewardship and Partnerships, Washington, DC.

Robinson & Associates, Inc. Vertical Files on Multiple Historic Properties, Architects, Etc., Washington, DC.

Shultz, Scott G. "The Development of the Historic Landscape of the Washington Monument Grounds and West Potomac Park." U.S. Department of the Interior, National Park Service, Cultural Resources, Washington, DC, 1995.

Snell, Charles W. "A History of East Potomac Park, Washington, DC, 1882-1978." U.S. Department of the Interior, National Park Service, Denver Service Center, 1978.

Suitland Federal Records Center, Suitland, Maryland. Record Group 79, Records of the National Park Service.

Vertical Files. Historical Society of Washington, Washingtoniana Collection, Washington, DC.

Vertical Files. Martin Luther King, Jr., Public Library, Washington, DC.

"Vietnam Veterans Memorial Official Park Guide." U.S. Department of the Interior, National Park Service, National Capital Parks-Central, Washington, DC.

Warren-Findley, Jannelle. "A Guide to Selected Statues, Monuments and Memorials." U.S. Department of the Interior, National Park Service, National Capital Parks-Central, Washington, DC, August 1, 1985.

______. "Historic Documentation: Thomas Jefferson Memorial." U.S. Department of the Interior, National Park Service, National Capital Parks-Central, Washington, DC, September 15, 1985.

Washington, DC, Board of Examiners and Registrars Application. "Horace W. Peaslee." Washington, DC Archives, Washington, DC.

"Washington's First 'Tulip Library' to Begin Blooming." U.S. Department of the Interior, News Release, March 12, 1969, from the files of Darwina L. Neal, FASLA, Chief Landscape Architect, National Park Service, National Capital Region, 1100 Ohio Drive, SW, Washington, DC.

Newspaper Articles

Allen, Henry. "Epitaph for Vietnam Memorial Design is Selected." *The Washington Post*, April 30, 1981.

"City Seeks Blueprint for a Pagoda; Japanese Gift Arrives in 5 Crates." *The Washington Star*, June 19, 1957.

"Company for Blossoms." *The Washington Daily News*, April 22, 1958.

Eisen, Jack. "Commission Rejects Veteran's Protest, Reapproves Vietnam Memorial Design." *The Washington Post*, October 14, 1981.

Feldman, Marilyn. "The Mall's Forgotten Monument." *The Washington Post*, September 28, 1995.

Forgey, Benjamin. "A March to Remember, Moving Monument to Korea Veterans Surpasses the Tortured History of its Design." *The Washington Post*, July 22, 1995.

_____. "Like the Man, The Memorial Breaks With Tradition." *The Washington Post*, April 27, 1997.

"John Paul Jones Tablet Unveiled." *The Evening Star*, October 31, 1920.

"Keystone of DC Memorial Laid, Completion of Structure Rushed for Dedication on Armistice Day." *The Washington Star*, September 30, 1931.

"Long Drive Today Opens Public Golf Course in the District." *The Evening Star*, July 8, 1920.

"Memorial Grove Will Be Planted at Doric Temple." *The Washington Star*, October 14, 1931.

Perl, Peter. "A Matter of Honor." *The Washington Post Magazine*, October 25, 1992.

---

Richard, Paul. “Design Competition for Vietnam Memorial.” *The Washington Post*, November 1, 1980.

“Speedway? It’s Just a Name Inherited from Track of Old.” *The Washington Post*, September 7, 1933.

“Tent City Here Quarters Tourists From Forty-Eight States.” *The Sunday Star*, July 10, 1927.

“Tokyo Governor Sends A 300-Year-Old Lantern.” *Washington Times Herald*, November 19, 1953.

“Tourists’ Camp House Bids to be Asked Soon.” *The Washington Post*, January 14, 1926.

“Urges Removal of Tourist Camp.” *The Washington Star*, February 20, 1926.

“War Memorial to be Beautified.” *The Washington Star*, May 30, 1937.

Wheeler, Linda. “Tidal Basin’s Blossoming Controversy.” *The Washington Post*, March 23, 1997.

National Register of Historic Places Nominations

Dillon, Helen. National Register of Historic Places Nomination-Inventory Form. "East and West Potomac Parks." U.S. States Department of the Interior, National Park Service, Washington, DC, July 15, 1972.

____. National Register of Historic Places Nomination-Inventory Form. "Lockkeeper's House, C & O Canal Extension." U.S. Department of the Interior, National Park Service, Washington, DC, November 27, 1972.

Leach, Sara Amy and Elizabeth Barthold. National Register of Historic Places Registration Form. “L’Enfant Plan of the City of Washington, District of Columbia.” U.S. Department of the Interior, National Park Service, Washington, DC, July 20, 1994.

Mackintosh, Barry. National Register of Historic Places Inventory-Nomination Form. "Arlington Memorial Bridge." U.S. Department of the Interior, National Park Service, Washington, DC, December 7, 1979.

===========================================================================

McClelland, Linda Flint. National Register of Historic Places Multiple Property Documentation Form. "Historic Park Landscapes in National and State Parks." U.S. Department of the Interior, National Park Service, Washington, DC, August 1995.

Pfanz, Donald C. National Register of Historic Places Inventory-Nomination Form. "Thomas Jefferson Memorial." U.S. Department of the Interior, National Park Service, Washington, DC, January 12, 1981.

____. National Register of Historic Places Inventory-Nomination Form. "Lincoln Memorial." U.S. Department of the Interior, National Park Service, Washington, DC, January 12, 1981.

## Historic American Buildings Survey Documentation

Historic American Buildings Survey, East Potomac Park, HABS No. DC-692.

Historic American Buildings Survey, Girl Scout Tea House, HABS No. DC-549.

Historic American Buildings Survey, Jefferson Memorial, HABS No. DC-4.

Historic American Buildings Survey, Lincoln Memorial, HABS No. DC-3.

Historic American Buildings Survey, Lock Keepers House, HABS No. DC-36.

Historic American Buildings Survey, West Potomac Park, HABS No. DC-693.

## Historic American Engineering Record Documentation

Historic American Engineering Record, Arlington Memorial Bridge, HAER No. DC-7.

Historic American Engineering Record, Arlington Memorial Bridge: Boundary Channel Extension, HAER No. DC-7-B.

Historic American Engineering Record, Arlington Memorial Bridge: Watergate and Bridge Plaza, HAER No. DC-7-A.

**BIBLIOGRAPHY** (continued)

Historic American Engineering Record, Tidal Reservoir, HAER No. DC-9.

Historic American Engineering Record, Tidal Reservoir Inlet Bridge, HAER No. DC-9-A.

Historic American Engineering Record, Tidal Reservoir Outlet Bridge, HAER No. DC-9-B.

Maps

General Plan, Independence Avenue Extension West of 14th Street, February 3, 1942, National Park Service, National Capital Region Building, 1100 Ohio Drive SW.

Plan Showing Progress of Planting, West Potomac Park, Plan #2828-29, Frederick Law Olmsted National Historic Site.

Planting Plan for Portion of Potomac Park, October 15, 1907, Plan #2828-25, Frederick Law Olmsted National Historic Site.

Preliminary Plan, Public Recreation Grounds, East Potomac Park, Washington, DC, March 1916, *Development of East Potomac Park*, 1916.

Plan of Proposed Development, The Mall and Vicinity, January 1931, Plan #2843-M400-Part 7, Frederick Law Olmsted National Historic Site.

Senate Park Commission Plans for the Monumental Core of the City of Washington, DC, 1901-02.

Skidmore, Owings, and Merrill Mall Master Plan, 1965.

Interviews

Oral interview with Kenny Green, Detective, United States Park Police, Washington, DC, conducted by Laura L. Bobeczko of Robinson & Associates, Inc., January 28, 1997.

**BIBLIOGRAPHY** (continued)

Oral interview with Darwina Neal, FASLA, Chief Landscape Architect, National Capital Region, National Park Service, Washington, DC, conducted by Judith H. Robinson and Laura L. Bobeczko of Robinson & Associates, Inc. June 26, 1997.

Oral interview with Kevin Ortyl, Park Architect, Maintenance Division, National Capital Parks-Central, National Park Service, Washington, DC, conducted by Laura L. Bobeczko of Robinson & Associates, Inc., January 28, 1997.

Oral interview with Frank Stevens, President, Golf Course Specialists, Inc., concessionaire for East Potomac Park Golf Course, Washington, DC, conducted by Laura L. Bobeczko of Robinson & Associates, Inc., January 23, 1997.

Telephone interview with Henry Agusiewicz, United States Park Police, Washington, DC, conducted by Laura L. Bobeczko of Robinson & Associates, Inc., January 28, 1997.

Telephone interview with Ernie Brain, manager of East Potomac Park Circus Mini-Golf, Washington, DC, conducted by Laura L. Bobeczko of Robinson & Associates, Inc., January 27, 1997.

Telephone interview with Steve Lorenzetti, National Capital Parks-Central, National Park Service, Washington, DC, conducted by Laura L. Bobeczko of Robinson & Associates, Inc., July 15, 1997.

Telephone interview with James Olmsted, distant cousin of Frederick Law Olmsted, McLean, Virginia, conducted by Laura L. Bobeczko of Robinson & Associates, Inc., January 31, 1997.

Telephone interview with Scott G. Shultz, Park Ranger, Division of Interpretation, National Capital Parks-Central, National Park Service, Washington, DC, conducted by Laura L. Bobeczko of Robinson & Associates, Inc., January 31, 1997.

**Verbal Boundary Description**

The East and West Potomac Parks Historic District, Washington, DC, is a 730-acre property located primarily in the southwest quadrant of the District of Columbia. The property is legally defined as Reservation 332 (East Potomac Park) and Reservation 333 (West Potomac Park), and its boundaries are roughly defined as Constitution Avenue, NW on the north; Seventeenth Street and the Washington Channel on the east; and the Potomac River on the west.

**Boundary Justification**

The boundaries of the East and West Potomac Park Historic District were determined by both legal and historical considerations. The boundaries include all of the land contained in the two national parks, which were set aside as Reservations 332 and 333. This land was created by the Army Corps of Engineers in a massive reclamation project lasting over 30 years. Also, these boundaries correspond with those delineated in the first National Register Nomination for the site, submitted on July 15, 1972. East and West Potomac Parks were listed in their entirety in the National Register of Historic Places on November 30, 1973.

All photographs are of :

EAST AND WEST POTOMAC PARKS HISTORIC DISTRICT
Washington, DC
Stephanie S. Foell, photographer

All negatives are stored with the National Register of Historic Places, Washington, DC.

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Constitution Gardens, facing east
PHOTO 1 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Lincoln Memorial, facing west
PHOTO 2 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Vista to Washington Monument from Lincoln Memorial, facing east
PHOTO 3 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Arts of Peace Statues at approach to Rock Creek and Potomac Parkway, facing southwest
PHOTO 4 of 40

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Vietnam Veterans Memorial, "The Wall," facing northeast
PHOTO 5 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Korean War Veterans Memorial, facing southwest
PHOTO 6 of 40

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Vietnam Veterans Memorial, Frederick Hart Statue, facing southwest
PHOTO 7 of 40

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Vietnam Women's Memorial, Glenna Goodacre Statue, facing southeast
PHOTO 8 of 40

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Arlington Memorial Bridge, facing southwest
PHOTO 9 of 40

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Lockkeeper's House, facing southeast
PHOTO 10 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Watergate Steps, facing southeast
PHOTO 11 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: District of Columbia World War I Memorial, facing south
PHOTO 12 of 40

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Commodore John Paul Jones Statue, facing southeast
PHOTO 13 of 40

NPS Form 10-900-a
(8-86)

OMB No. 1024-0018

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET



LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: John Ericsson Monument, facing northwest
PHOTO 14 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Franklin Delano Roosevelt Memorial, facing south
PHOTO 15 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Franklin Delano Roosevelt Memorial, facing south
PHOTO 16 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Franklin Delano Roosevelt Memorial, facing south
PHOTO 17 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Franklin Delano Roosevelt Memorial, facing east
PHOTO 18 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Franklin Delano Roosevelt Memorial, facing south
PHOTO 19 of 40

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Japanese Pagoda, facing northeast
PHOTO 20 of 40

---

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Japanese Lantern, facing south
PHOTO 21 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Constitution Gardens, facing west
PHOTO 22 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: 56 Signers Memorial, facing east
PHOTO 23 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Jefferson Memorial across Tidal Basin, facing southeast
PHOTO 24 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Tidal Reservoir Inlet Bridge, facing southeast
PHOTO 25 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Two original Japanese Cherry Trees and boulder with commemorative plaque, facing north
PHOTO 26 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: First Japanese Cherry Trees Planting Plaque, facing north
PHOTO 27 of 40

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Walk along Tidal Basin, facing northeast
PHOTO 28 of 40

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Double row of Dutch Elm Trees on south side of the Reflecting Pool, facing west
PHOTO 29 of 40

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Number 4 Fountain, facing southeast
PHOTO 30 of 40

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: East Potomac Golf Course, facing northwest
PHOTO 31 of 40

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: East Potomac Park Bathhouse, facing west
PHOTO 32 of 40

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: East Potomac Park Miniature Golf Course, facing east
PHOTO 33 of 40

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: East Potomac Park Miniature Golf Course ball house, facing northeast
PHOTO 34 of 40

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: East Wing of East Potomac Park Field House, facing northwest
PHOTO 35 of 40

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: National Park Service National Capital Region Building and United States Park Police Headquarters Building, facing west
PHOTO 36 of 40

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: Plaque Honoring the Placement of Cherry Trees on Hains Point in 1966-68, facing west
PHOTO 37 of 40

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: Walk around Hains Point, facing north
PHOTO 38 of 40

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: United States Engineers' Storehouse, facing southeast
PHOTO 39 of 40

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: Potomac Railroad Bridge and embankments, facing northwest
PHOTO 40 of 40

NPS Form 10-900-a
(8-86)

OMB No. 1024-0018

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET



All slides are of:

EAST AND WEST POTOMAC PARKS HISTORIC DISTRICT
Washington, DC
Laura L. Bobeczko, photographer

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Lake in Constitution Gardens, facing southwest
SLIDE 1 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Island in Lake in Constitution Gardens, facing southwest
SLIDE 2 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Constitution Gardens, facing southeast
SLIDE 3 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Constitution Gardens, facing southeast
SLIDE 4 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: 56 Signers Memorial, facing south
SLIDE 5 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: 56 Signers Memorial, facing east
SLIDE 6 of 60

---

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Vista along Twenty-third Street from Constitution Avenue, NW, facing south
SLIDE 7 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Lincoln Memorial, facing west
SLIDE 8 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Vista to Washington Monument from interior of Lincoln Memorial, facing east
SLIDE 9 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Vista to Washington Monument from Lincoln Memorial, facing east
SLIDE 10 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Reflecting Pool and Lincoln Memorial, facing west
SLIDE 11 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Arts of Peace Statues at approach to Rock Creek and Potomac Parkway, facing west
SLIDE 12 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Watergate Steps, facing southeast
SLIDE 13 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Arlington Memorial Bridge, facing southwest
SLIDE 14 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Arlington Memorial Bridge, facing northwest
SLIDE 15 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Vietnam Veterans Memorial, “The Wall,” facing northeast
SLIDE 16 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Vietnam Veterans Memorial, “The Wall,” facing northeast
SLIDE 17 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Vietnam Veterans Memorial, “The Wall,” facing southwest
SLIDE 18 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Vietnam Veterans Memorial, Frederick Hart Statue, facing southwest
SLIDE 19 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Vietnam Women’s Memorial, Glenna Goodacre Statue, facing southeast
SLIDE 20 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Korean War Veterans Memorial, facing northwest
SLIDE 21 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Korean War Veterans Memorial, "Pool of Remembrance," facing south
SLIDE 22 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Flood Control Levee, facing north
SLIDE 23 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Double row of Dutch Elm Trees on south side of Reflecting Pool, facing west
SLIDE 24 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: District of Columbia World War I Memorial, facing south
SLIDE 25 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: John Ericsson Monument, facing northwest
SLIDE 26 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Commodore John Paul Statue, facing southeast
SLIDE 27 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Lockkeeper's House, facing southeast
SLIDE 28 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: First Japanese Cherry Trees Planting Plaque, facing north
SLIDE 29 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Two original cherry trees and boulder with commemorative plaque, facing north
SLIDE 30 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Walk along Tidal Basin, facing northeast
SLIDE 31 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Japanese Pagoda, facing northeast
SLIDE 32 of 60

LOCATION: West Potomac Park
DATE: August 1, 1997
VIEW OF: Japanese Lantern, facing south
SLIDE 33 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Tidal Reservoir Inlet Bridge, facing southeast
SLIDE 34 of 60

---

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Franklin Delano Roosevelt Memorial, facing south
SLIDE 35 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Franklin Delano Roosevelt Memorial, facing south
SLIDE 36 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Franklin Delano Roosevelt Memorial, facing east
SLIDE 37 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Franklin Delano Roosevelt Memorial, facing east
SLIDE 38 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Franklin Delano Roosevelt Memorial, facing south
SLIDE 39 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Jefferson Memorial across Tidal Basin, facing southeast
SLIDE 40 of 60

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Kutz Bridge and Jefferson Memorial, facing southeast
SLIDE 41 of 60

---

LOCATION: West Potomac Park
DATE: July 17, 1997
VIEW OF: Number 4 Fountain, facing southeast
SLIDE 42 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: Potomac Railroad Bridge and embankments, facing northwest
SLIDE 43 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: U.S. Engineers' Storehouse, facing northwest
SLIDE 44 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: U.S. Engineers' Storehouse, facing southeast
SLIDE 45 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: Walk around Hains Point, facing south
SLIDE 46 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: Walk around Hains Point, facing north
SLIDE 47 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: Ohio Drive, SW, facing north
SLIDE 48 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: Plaque Honoring the Placement of Cherry Trees on Hains Point in 1966-68, facing west
SLIDE 49 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: East Wing of East Potomac Park Field House, facing northwest
SLIDE 50 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: West Wing of East Potomac Park Field House, facing northwest
SLIDE 51 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: East Potomac Park Bathhouse, facing northwest
SLIDE 52 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: East Potomac Park Driving Range Building, facing northwest
SLIDE 53 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: East Potomac Park Golf Course, facing northwest
SLIDE 54 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: East Potomac Park Golf Course, facing northwest
SLIDE 55 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: East Potomac Park Golf Course, facing southeast
SLIDE 56 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: East Potomac Park Miniature Golf Course ball house, facing northeast
SLIDE 57 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: East Potomac Park Miniature Golf Course, facing northeast
SLIDE 58 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: East Potomac Park Miniature Golf Course, facing east
SLIDE 59 of 60

LOCATION: East Potomac Park
DATE: August 1, 1997
VIEW OF: National Park Service National Capital Region Building and U.S. Park Police Headquarters Building, facing west
SLIDE 60 of 60

===================================================================

Please note: These laser copies of historic photographs are provided for additional information only. They are not meant to replace the current photographs required by the National Register.

All historic photographs are of :

EAST AND WEST POTOMAC PARKS HISTORIC DISTRICT
Washington, DC

LOCATION: West Potomac Park
DATE: Early 1920s
VIEW OF: Lincoln Memorial and Reflecting Pool, facing west from Washington Monument
SOURCE OF PHOTO: Commission of Fine Arts Photograph Files
PHOTO 1 of 31

LOCATION: West Potomac Park
DATE: Early 1920s
VIEW OF: Aerial view of the Mall, facing east
SOURCE OF PHOTO: *The Mall in Washington*
PHOTO 2 of 31

LOCATION: West Potomac Park
DATE: 1943
VIEW OF: Aerial view of the Mall, facing west
SOURCE OF PHOTO: *The Mall in Washington*
PHOTO 3 of 31

LOCATION: West Potomac Park
DATE: 1931
VIEW OF: Lincoln Memorial, facing southwest
SOURCE OF PHOTO: "Washington Through the Years," *National Geographic*
PHOTO 4 of 31

LOCATION: West Potomac Park
DATE: 1931
VIEW OF: Reflecting Pool, facing northeast
SOURCE OF PHOTO: "Washington Through the Years," *National Geographic*
PHOTO 5 of 31

LOCATION: West Potomac Park
DATE: 1931
VIEW OF: Rainbow Pool, facing east
SOURCE OF PHOTO: "Washington Through the Years," *National Geographic*
PHOTO 6 of 31

LOCATION: West Potomac Park
DATE: 1931
VIEW OF: Recreational uses of West Potomac Park
SOURCE OF PHOTO: "Washington Through the Years," *National Geographic*
PHOTO 7 of 31

LOCATION: West Potomac Park
DATE: 1931
VIEW OF: John Ericsson Monument, facing east
SOURCE OF PHOTO: "Washington Through the Years," *National Geographic*
PHOTO 8 of 31

LOCATION: West Potomac Park
DATE: 1931
VIEW OF: Japanese Cherry Trees and the Tidal Reservoir Inlet Bridge, facing southwest
SOURCE OF PHOTO: "Washington Through the Years," *National Geographic*
PHOTO 9 of 31

LOCATION: West Potomac Park
DATE: Late 1920s
VIEW OF: Cherry trees along the Tidal Basin, facing east
SOURCE OF PHOTO: NPS Reservation File 332 - West Potomac Park
PHOTO 10 of 31

LOCATION: West Potomac Park
DATE: Mid-1920s
VIEW OF: Bathhouse at Bathing Beach, facing south
SOURCE OF PHOTO: Commission of Fine Arts Photograph File
PHOTO 11 of 31

LOCATION: West Potomac Park
DATE: 1941
VIEW OF: Jefferson Memorial under construction
SOURCE OF PHOTO: *The Man Who Built Washington: A Life of John McShain*
PHOTO 12 of 31

LOCATION: West Potomac Park
DATE: Circa 1920s
VIEW OF: Ohio Drive, SW, near Lincoln Memorial, facing northwest
SOURCE OF PHOTO: Commission of Fine Arts Photograph File
PHOTO 13 of 31

LOCATION: West Potomac Park
DATE: Early 1980s
VIEW OF: Aerial view of Constitution Gardens and the Lincoln Memorial, facing west
SOURCE OF PHOTO: Commission of Fine Arts Photograph File
PHOTO 14 of 31

LOCATION: West Potomac Park
DATE: Early 1990s
VIEW OF: Bird's-eye view of Franklin Delano Roosevelt Memorial, facing southeast
SOURCE OF PHOTO: *Progressive Architecture*, September 1995
PHOTO 15 of 31

LOCATION: East Potomac Park
DATE: Late 1910s
VIEW OF: Aerial view of East Potomac Park, facing south from the Washington Monument
SOURCE OF PHOTO: Commission of Fine Arts Photograph File
PHOTO 16 of 31

LOCATION: East Potomac Park
DATE: Early 1920s
VIEW OF: Aerial view of East Potomac Park, facing south from the Washington Monument
SOURCE OF PHOTO: Commission of Fine Arts Photograph File
PHOTO 17 of 31

LOCATION: East Potomac Park
DATE: Mid-1920s
VIEW OF: Aerial view of East Potomac Park, facing southwest
SOURCE OF PHOTO: Commission of Fine Arts Photograph File
PHOTO 18 of 31

LOCATION: East Potomac Park
DATE: Late 1920s
VIEW OF: Aerial view of East Potomac Park, facing south
SOURCE OF PHOTO: Commission of Fine Arts Photograph File
PHOTO 19 of 31

LOCATION: East Potomac Park
DATE: 1922
VIEW OF: Aerial view of East Potomac Park, facing northeast
SOURCE OF PHOTO: NPS Reservation File 333 - East Potomac Park
PHOTO 20 of 31

LOCATION: East Potomac Park
DATE: Circa 1920s
VIEW OF: Aerial view of East Potomac Park, facing east
SOURCE OF PHOTO: Commission of Fine Arts Photograph File
PHOTO 21 of 31

LOCATION: East Potomac Park
DATE: Early 1910s
VIEW OF: Ohio Drive, SW, and U.S. Army Corps of Engineers' Wharf, facing southeast
SOURCE OF PHOTO: Commission of Fine Arts Photograph File
PHOTO 22 of 31

LOCATION: East Potomac Park
DATE: Mid-1910s
VIEW OF: Ohio Drive, SW, under construction, Hains Point, facing north
SOURCE OF PHOTO: Commission of Fine Arts Photograph File
PHOTO 23 of 31

LOCATION: East Potomac Park
DATE: Circa 1920s
VIEW OF: Landscape of East Potomac Park, facing northeast
SOURCE OF PHOTO: Commission of Fine Arts Photograph File
PHOTO 24 of 31

LOCATION: East Potomac Park
DATE: Early 1920s
VIEW OF: Tourist Camp, facing northeast
SOURCE OF PHOTO: Commission of Fine Arts Photograph File
PHOTO 25 of 31

LOCATION: East Potomac Park
DATE: 1927
VIEW OF: Tourist Camp showing Field House and new bungalows
SOURCE OF PHOTO: NPS Reservation File 333 - East Potomac Park
PHOTO 26 of 31

LOCATION: East Potomac Park
DATE: 1931
VIEW OF: Tourist Camp, facing north
SOURCE OF PHOTO: "Washington Through the Years," *National Geographic*
PHOTO 27 of 31

LOCATION: East Potomac Park
DATE: Circa 1930s
VIEW OF: Teahouse, facing northwest
SOURCE OF PHOTO: Commission of Fine Arts Photograph File
PHOTO 28 of 31

LOCATION: East Potomac Park
DATE: 1940
VIEW OF: U.S. Engineers' Storehouse, facing northeast
SOURCE OF PHOTO: Commission of Fine Arts Photograph File
PHOTO 29 of 31

LOCATION: East Potomac Park
DATE: Circa 1950s
VIEW OF: East wing of East Potomac Park Field House, facing southeast
SOURCE OF PHOTO: NPS Real Property Files, Office of Property Management
PHOTO 30 of 31

LOCATION: East Potomac Park
DATE: 1954
VIEW OF: Miniature golf course and ballhouse, facing northeast
SOURCE OF PHOTO: NPS Real Property Files, Office of Property Management
PHOTO 31 of 31

**WEST POTOMAC PARK**

1 Lincoln Memorial (Contributing Structure)
2 Lincoln Memorial Grounds (Contributing Site)
3 Reflecting Pool (Contributing Site)
4 Rainbow Pool (Contributing Site)
5 Elm Trees (Contributing Site)
6 Arlington Memorial Bridge (Contributing Structure)
7 Flood Control Levee ( contributing Site)
8 Constitution Gardens (Contributing Site)
9 Vietnam Veterans Memorial (Contributing Object)
10 Vietnam Women's Memorial (Contributing Object)
11 56 Signers Memorial (Contributing Object)
12 Tidal Basin (Contributing Site)
13 Stone Seawalls (Contributing Structure)
14 Tidal Reservoir Outlet Bridge (Contributing Structure)
15 Tidal Reservoir Inlet Bridge (Contributing Structure)
16 Independence Avenue Extension (Contributing Structure)
17 Kutz Bridge (Contributing Structure)
18 Commodore John Paul Jones Statue (Contributing Object)
19 Japanese Cherry Trees (Contributing Site)
20 First Japanese Cherry Trees Planting Plaque (Noncontributing Object)
21 Japanese Lantern (Contributing Object)
22 Japanese Pagoda (Contributing Object)
23 Franklin Delano Roosevelt Memorial (Contributing Site)
24 Number 4 Fountain (Contributing Object)
25 Floral Library (Noncontributing Site)
26 Jefferson Memorial (Contributing Structure)
27 Jefferson Memorial Grounds (Contributing Site)
28 John Ericsson Monument (Contributing Object)
29 District of Columbia World War I Memorial (Contributing Object)
30 Korean War Veterans Memorial (Contributing Object)
31 U.S. Park Police Stables (Noncontributing Building)
32 Lockkeeper's House (Contributing Building)
33 West Potomac Park Polo Grounds (Noncontributing Site)
34 First Air Mail Flight Marker (Noncontributing Object)
35 Guardhouse ( contributing Building)
36 Recreational Facilities (Noncontributing Site)

**EAST POTOMAC PARK**

37 Potomac Railroad Bridge (Contributing Structure)
38 U.S. Engineer's Storehouse (Contributing Building)
13 Stone Seawalls (Contributing Structure)
39 Ohio Drive, SW (Contributing Structure)
40 East Potomac Park Golf Course (Contributing Site)
41 East Potomac Park Field House (Contributing Building)
42 East Potomac Park Miniature Golf Course (Contributing Site)
43 East Potomac Park Driving Range Building (Noncontributing Building)
44 East Potomac Park Swimming Pool (Contributing Structure)
45 East Potomac Park Bathhouse (Noncontributing Structure)
46 East Potomac Park Tennis Facility (Noncontributing Site)
36 Recreational Facilities (Noncontributing Site)
47 National Park Service National Capital Region Headquarters Building (Noncontributing Building)
48 U.S. Park Police Headquarters Building (Noncontributing Building)
49 Tourmobile Headquarters (Noncontributing Building)
50 National Capital Parks-Central Maintenance Yard (Noncontributing Building)
19 Japanese Cherry Trees (Contributing Site)
51 Plaque Honoring the Placement of Cherry Trees on Hains Point in 1966-68 (Noncontributing Object)
52 "The Awakening" (Status Not Evaluated)




**Site Documentation Map**
**East and West Potomac Parks Historic District**
**Washington, DC**

Notes:
-All features have been approximately located.

-Numbers that are circled indicate features that have been determined to contribute to the East and West Potomac Parks Historic District.

-In the interest of simplicity, three repeating features that are located in both East and West Potomac Parks have been plotted twice, once in each park. The **Stone Seawalls** (Feature 13) rim the Tidal Basin and the water's edge of both parks. The **Japanese Cherry Trees** (Feature 19) are found along the banks of the Tidal Basin and around the perimeter of East Potomac Park. Numerous **Recreational Facilities** (Feature 36), including picnic shelters and playground areas, are found in the two parks.

The base for this map was taken from the map showing the Park Service of the Nations Capital and Environs under Jurisdiction of the National Capital Area, National Park Service, United States Department of the Interior, prepared in August 1995.

The scale for this map is 1"=1,500' or 1:18,000.

East and West Potomac Parks
Historic District
Washington, DC
Site Documentation Map

**East and West Potomac Parks Historic District**
**Washington, DC**
**Resource Location Map**

WEST POTOMAC PARK

1 Lincoln Memorial (Contributing Structure)
2 Lincoln Memorial Grounds (Contributing Site)
3 Reflecting Pool (Contributing Site)
4 Rainbow Pool (Contributing Site)
5 Elm Trees (Contributing Site)
6 Arlington Memorial Bridge (Contributing Structure)
7 Flood Control Levee ( . contributing Site)
8 Constitution Gardens (Contributing Site)
9 Vietnam Veterans Memorial (Contributing Object)
10 Vietnam Women's Memorial (Contributing Object)
11 56 Signers Memorial (Contributing Object)
12 Tidal Basin (Contributing Site)
13 Stone Seawalls (Contributing Structure)
14 Tidal Reservoir Outlet Bridge (Contributing Structure)
15 Tidal Reservoir Inlet Bridge (Contributing Structure)
16 Independence Avenue Extension (Contributing Structure)
17 Kutz Bridge (Contributing Structure)
18 Commodore John Paul Jones Statue (Contributing Object)
19 Japanese Cherry Trees (Contributing Site)
20 First Japanese Cherry Trees Planting Plaque (Noncontributing Object)
21 Japanese Lantern (Contributing Object)
22 Japanese Pagoda (Contributing Object)
23 Franklin Delano Roosevelt Memorial (Contributing Site)
24 Number 4 Fountain (Contributing Object)
25 Floral Library (Noncontributing Site)
26 Jefferson Memorial (Contributing Structure)
27 Jefferson Memorial Grounds (Contributing Site)
28 John Ericsson Monument (Contributing Object)
29 District of Columbia World War I Memorial (Contributing Object)
30 Korean War Veterans Memorial (Contributing Object)
31 U.S. Park Police Stables (Noncontributing Building)
32 Lockkeeper's House (Contributing Building)
33 West Potomac Park Polo Grounds (Noncontributing Site)
34 First Air Mail Flight Marker (Noncontributing Object)
35 Guardhouse ( contributing Building)
36 Recreational Facilities (Noncontributing Site)

EAST POTOMAC PARK

37 Potomac Railroad Bridge (Contributing Structure)
38 U.S. Engineer's Storehouse (Contributing Building)
13 Stone Seawalls (Contributing Structure)
39 Ohio Drive, SW (Contributing Structure)
40 East Potomac Park Golf Course (Contributing Site)
41 East Potomac Park Field House (Contributing Building)
42 East Potomac Park Miniature Golf Course (Contributing Site)
43 East Potomac Park Driving Range Building (Noncontributing Building)
44 East Potomac Park Swimming Pool (Contributing Structure)
45 East Potomac Park Bathhouse (Noncontributing Structure)
46 East Potomac Park Tennis Facility (Noncontributing Site)
36 Recreational Facilities (Noncontributing Site)
47 National Park Service National Capital Region Headquarters Building (Noncontributing Building)
48 U.S. Park Police Headquarters Building (Noncontributing Building)
49 Tourmobile Headquarters (Noncontributing Building)
50 National Capital Parks-Central Maintenance Yard (Noncontributing Building)
19 Japanese Cherry Trees (Contributing Site)
51 Plaque Honoring the Placement of Cherry Trees on Hains Point in 1966-68 (Noncontributing Object)
52 "The Awakening" (Status Not Evaluated)




**Notes:**

- All features have been approximately located.
- ◯ Indicates a feature determined to contribute to the East and West Potomac Parks Historic District.
- ⬡ Indicates a feature determined to be a noncontributing element, or not evaluated.
- In the interest of simplicity, three repeating features that are located in both East and West Potomac Parks have been plotted twice, once in each park. The **Stone Seawalls** (Feature 13) rim the Tidal Basin and the water's edge in both parks. The **Japanese Cherry Trees** (Feature 19) are found along the banks of the Tidal Basin and around the perimeter of East Potomac Park. Numerous **Recreational Facilities** (Feature 36), including picnic shelters and playground areas, are found in the two parks.
- The base for this map was taken from the map showing the Park Service of the Nation's Capital and Environs under Jurisdiction of the National Capital Area, National Park Service, United States Department of the Interior, prepared in August 1995.
- The scale for this map is 1" = 1,500' or 1:18,000.

East and West Potomac Parks
Historic District
Washington, DC
Resources Location Map


THE MALL

East and West Potomac Parks
Historic District
Washington, DC
Historic Map 1 of 14

- Image of McMillan Plan as originally published in _Century Magazine_, February 1902; and reprinted in Reps, _Washington on View_, p. 257.


THE MALL.
WASHINGTON D.C.
PLANTING PLAN FOR PORTION OF POTOMAC PARK.
Scale 60=1"
2928-
#25
Notes on ground by F.L.O. Jr
Copy of plan loaned from Col Bromwell
May 5/08
PLANTING LIST.
Red Oak.
Sweet Gum.
River Birch.
from path

East and West Potomac Parks
Historic District
Washington, DC

Historic Map 2 of 14

- Planting plan for Portion of Potomac Park, Plan # 2828-25, October 15, 1907; Frederick Law Olmsted National Historic Site.


CORPS OF ENGINEERS
U.S. ARMY.
Office of Public Buildings and Grounds
WASHINGTON
MAP OF
WEST POTOMAC PARK
SHOWING
NORTH B STREET EXTENDED
AND THE INLET BRIDGE
WASHINGTON.
Colonel Spencer Cosby.
In Charge 1908.
Scale in Feet.
MONUMENT
GROUNDS
TIDAL
RESERVOIR
POTOMAC
RIVER
CHANNEL
OUTLET
FILLING COMPLETED
1908
UNGRADED
MARINE
HOSPITAL
GROUNDS
VA. AVE.
N.Y. AVE
N.H. AVE
SWIMMING
BASIN
YARDS
LOW AND
UNDEVELOPED
PORTION
NURSERY
BAND
STAND

16-248



# THE MALL

## WASHINGTON, D. C.

East and West Potomac Parks
Historic District
Washington, DC
Historic Map 4 of 14

- Development of the National Mall to 1915, as originally published in National Geographic Magazine, March 1915; and reprinted in Reps, Washington on View, p. 260.


PLAN SHOWING PROGRESS OF PLANTING
WEST POTOMAC PARK.
Prepared in the Office of Public Buildings and Grounds
Under the Direction of Col. Wm. W. Harts, in Charge.
by George Burnap, Landscape Architect
Date: Jan. 4 1915
Scale: 1in - 100 ft
Submitted to the "Commission of Fine Arts", January 8, 1915.
Planting Completed
New Planting
TIDAL BASIN
LANDING BASIN
B STREET
17TH ST
18TH ST
19TH ST
20TH ST
21ST ST
23RD ST

East and West Potomac Parks
Historic District
Washington, DC
Historic Map 5 of 14

- Plan Showing Progress of Planting, West Potomac Park, Plan # 2828-25, January 4, 1915; Frederick Law Olmsted National Historic Site.

REPRODUCED AT THE NATIONAL ARCHIVES

WAR DEPARTMENT
CORPS OF ENGINEERS

PRELIMINARY PLAN

# PUBLIC RECREATION GROUNDS

EAST POTOMAC PARK
WASHINGTON, D.C.

MADE UNDER THE DIRECTION OF
COL. W^m. W. HARTS, U.S.A.
OFFICER IN CHARGE OF PUBLIC BUILDINGS AND GROUNDS.

SCALE
0 200 400 600 800 1000 1200 1400 1600 FT

PREPARED BY
JAMES G. LANGDON
CONSULTING LANDSCAPE ARCHITECT
MARCH 1916




There is proposed a Commercial Water Front 6 miles long on the Anacostia River below the P. B. & W. R. R. bridge.

The proposed civic group west of the Playground represents a preliminary adaptation of the plans of the Park Commission of 1901 and is subject to future detail study.

## Description.

Transportation – Extension of the city car lines into the grounds, with loops at the Stadium and the Boat Harbor near the Field House. Stadium loop would be used on large occasions only. Ferries at Boat Harbor and at Stadium communicate with South Washington.

Stadium – – – The centre portion has concrete seats for 6,000 people, the two wings temporary wooden seats for 8,000 more. On large occasions circus seats can be placed around the open end of the Stadium to further increase the seating capacity. The back slopes of the Stadium are covered with trees which furnish shade to the seats when the sun is low. A one-third mile running track with a 220 yard lap is partly enclosed by the Stadium.

Bathing Pools – Two sand beach bathing pools of 1 3/4 acres each with Locker Houses accommodating 500 bathers at one time.

Wading Pool – – Between the Bathing Pools and near a two acre Grove having swings etc., accommodation is thus provided for a large number of children.

Foot Ball – – – Two fields adjoin the Stadium, they can be used for minor sports also.

Base Ball – – – 13 fields are so arranged that most of them are provided with shade for the spectators; the back stops are made removable.

Parade Ground – 60 acres in extent and overlooked by the Stadium.

Boat Harbor – – For the safe accommodation of canoes and other small craft, most of which would be kept in the 4 Boat Houses upon it's banks; the one on the left would be a renting Boat House. A channel connects with the Potomac River, it keeps the Boat Harbor fresh and separates the quiet from the noisy sports.

Field House – – Opposite the Boat Harbor and overlooking the Golf Course, it is provided with baths, lockers and toilets, it has luncheon facilities and has ample porches.

Croquet and Roque – – 10 Croquet and 3 Roque Courts, located between the Field House and the Boat Channel; spectators seats are located between the courts.

Basket Ball – – 4 courts between the Field House and the Tennis Courts.

Tennis Courts – 31 courts, located at the southerly side of the Field House and Boat Harbor, they are provided with seats for spectators and are enclosed by wire cages.

Cricket – – – There is a permanent field located near the river end of the Boating Channel.

Golf – – – 100 acres – an 18 hole and a 9 hole course.

Straightaway for Horses – 1/2 miles long and located on the Potomac side of the Golf Course.

Soft Driving Road – 1 1/2 miles, between the Boat Channel and Lookout Point.

Saddle Path – – 3 miles from the Potomac River Entrance to Lookout Point and return by way of the Boat Harbor.

Park Drives – – 3 1/2 miles of Border and Cross Drives.

Automobile Parking — Parking spaces for 500 automobiles located as follows – between the Railroad and the Stadium; adjoining the Foot Ball field, Wading Pool, Boat Houses, Tennis Courts, Straightaway for Horses and at Lookout Point.

Horse Shelter – Near the Automobile Park at Lookout Point.

Lookout Point – The southernmost point of the Recreation Grounds – provided with boat landings and shaded seats.

Picnic Grounds – In the many Groves about the grounds.

Approved March 1, 1916
[signature] Harts
Colonel U.S. Army

East and West Potomac Parks
Historic District
Washington, DC
Historic Map 6 of 14

- Preliminary Plan, Public Recreation Grounds, East Potomac Park, March 1916; Development of East Potomac Park.

| TOTAL AREA OF VARIOUS FEATURES | 2,773,823.70 SQ.FT. |
|---|---|

Field Work By: W.B.M.-L.W.R.-1924-1927

| BRIDGES | KIND | NO. | SQ. FT. |
|---|---|---|---|
| HIGHWAY | Concrete | 1 | 1950.0 |
| FOOT | | | |
| CULVERTS | | | |

WALKS AROUND RESERVATION

| KIND | LIN. FT. | WIDTH | SQ. FT. |
|---|---|---|---|
| | | | |
| | | | |

| REFLECTING POOL | LIN. FT. | WIDTH | SQ. FT. |
|---|---|---|---|
| | 2300.8 | ✓ | 365,500.0 |

| RETAINING WALL | LIN. FT. | WIDTH | SQ. FT. |
|---|---|---|---|
| | 14,614.0 | 3.0 | 43,842.0 |

| COPING | LIN. FT. | WIDTH | SQ. FT. |
|---|---|---|---|
| Granite | 5,237.0 | | 15,711.0 |
| Concrete | 1,524.76 | | 1,394.0 |

| CURB | LIN. FT. | WIDTH | SQ. FT. |
|---|---|---|---|
| Stone | | | |
| Concrete | 18,893.0 | | 12,858.44 |

| GUTTERS | LIN. FT. | WIDTH | SQ. FT. |
|---|---|---|---|
| Cobble Stone | | | |
| Brick | 2,041.5 | | 6,124.5 |
| Concrete | 1,296.3 | | 2,592.6 |




| | KIND | LIN. FT. | SQ. FT. |
|---|---|---|---|
| Platform — | Concrete | 537.28 | 4146.31 |
| Steps — | Concrete | 651.12 | 5911.73 |

| SPORTS | NO. | SQ. FT. |
|---|---|---|
| Tennis Courts | 10 | 55,271.92 |
| Roque Courts | | ✓ |
| Baseball Fields | 3 | Nonskinned |
| Hockey Fields | | ✓ |
| Soccer Fields | | ✓ |
| Cricket Fields | 1 | |
| Horse Hurdle | 1 | |
| Band Stands | 1 | |
| Bathing Beaches | ✓ | ✓ |
| Childrens Playgr'ds | ✓ | ✓ |
| Athletic Fields | ✓ | ✓ |
| Volley ball Courts | ✓ | ✓ |
| Croquet Courts | 1 | |
| Football Fields | 1 | |
| Polo Fields | 2 | |
| Lacrosse Fields | 1 | |
| Picnic Grounds | ✓ | ✓ |
| Golf Courses | 2 | White - 18.27 Ac. Colored - 14.636 |
| Bowling Greens | ✓ | |
| Quoits Courts | ✓ | |
| Sand Boxes | ✓ | ✓ |

| | NO. |
|---|---|
| Benches | 155 |
| Display Fountains | 4 |
| Drinking Fountains | 6 |
| Posts - Ornamental Iron | 108 |
| Muellers | 5 |
| Elec. Lamp Posts | 111 |
| Fire Plugs | 5 |
| Water-Stand Pipes | 242 |
| Drainage Traps | 206 |
| Trash Baskets | 33 |
| Boat Life Preservers | 21 |

| FENCES | LIN. FT. |
|---|---|
| Post & Chain | 3 |
| Pipe Rail | 3369.70 |
| Strand Wire | 576.0 |
| Back Stop | 2222.3 |
| Ornamental Iron | ✓ |
| Mesh Wire | [illegible] |
| Trespass Irons | 691.4 |

| | SQ. FT. | SQ. YDS. |
|---|---|---|
| Shrub Beds | 147,497.00 | 16399.66 |
| Flower Beds | 35,763.70 | 3973.73 |
| Lawn | | |
| Forest Area | 550,140.0 | 61,127.00 |
| Unimproved A. | ✓ | ✓ |

HEDGE : (Kind) Cal. Privet

| LENGTH (ft.) | WIDTH | HEIGHT | SQ. FT. |
|---|---|---|---|
| 7924.00 | | | 20,594.80 |

STATUES: Names

John Paul Jones - 771.16 "
Ericsson Memorial - 196.0 "
Lincoln Memorial - 26,532.0

| TREES : (Kind) | No. |
|---|---|
| Various | 4109 |
| Cherry | 371 |

| BUILDINGS | No. | SQ. FT. COVERED |
|---|---|---|
| TOILET & LODGES | 2 | 1292.78 |
| REFRESHMENT BUILDINGS | 2 | 1246.29 |
| NAVY-MUNITIONS BUILDINGS | | 610,144.0 |
| BAND STAND | 1 | 1,528.0 |
| WATCH HOUSE | 2 | 174.89 |
| LINCOLN MEM. | | 26,532.0 |

| | KIND | LENGTH | AREA (SQ. FT.) |
|---|---|---|---|
| PATHS (ROAD) | Cinder | 5419.1 | 35,139.45 |
| | Macadam | 9361.5 | 64,228.7 |
| | Broken Stone & Gravel | 6864.0 | 34,196.0 |
| | Dirt | 161.0 | 1,685.0 |
| | ~~Cinder~~ | [illegible] | [illegible] |
| ROADS | Asphalt | 28600.8 | 815,165.47 |
| | Concrete | 7792.3 | 148,830.30 |
| | Cinder | 4725.4 | 106,007.60 |
| WALKS | Flagstone | 294.2 | 1,227.62 |
| | Broken Stone | 310.5 | 1,752.5 |
| | Concrete | 19,391.65 | 177,777.06 |
| | Cinder | 559.52 | 5,723.90 |
| | Scrubbed Concrete | 1,696.0 | 24,252.80 |

LOCATION: B St.-17th St.-Pot. River & Tidal Basin

| RES. AREA (SQ. FT.) | (ACRES) |
|---|---|
| 17,200,964.78 | |

RES. No. 332 West Potomac Park (including Tidal Basin)

ACQUIRED: Reclaimed Area by U.S. Engrs.
TRANSF. FROM PB&P.P.
TRANSF. TO P.B.&P.P.

East and West Potomac Parks
Historic District
Washington, DC
Historic Map 7 of 14

- Map of West Potomac Park, Reservation 332, 1927; Reservation Files, National Park Service, National Capital Region Building.

| TOTAL AREA OF VARIOUS FEATURES | 1,323,346.34 SQ.FT. |
|---|---|

| BRIDGES | KIND | NO. | SQ. FT. |
|---|---|---|---|
| HIGHWAY | – | | – |
| FOOT | – | – | – |
| CULVERTS | | | |

| WALKS AROUND RESERVATION | | | |
|---|---|---|---|
| KIND | LIN. FT. | WIDTH | SQ. FT. |
| – | – | – | – |
| – | – | – | – |

| WATER WAYS | LIN. FT. | WIDTH | SQ. FT. |
|---|---|---|---|
| | – | – | – |

| RETAINING WALL | LIN. FT. | WIDTH | SQ. FT. |
|---|---|---|---|
| | – | – | |

| COPING | LIN. FT. | WIDTH | SQ. FT. |
|---|---|---|---|
| Stone | – | – | – |
| Concrete | – | – | – |

| CURB | LIN. FT. | WIDTH | SQ. FT. |
|---|---|---|---|
| Stone | | | |
| Concrete | 394.7 | .72 | 284.20 |

| GUTTERS | LIN. FT. | WIDTH | SQ. FT. |
|---|---|---|---|
| Stone | | | |
| Brick | 56,222.0 | | 122,993.0 |
| Concrete | | | |

Field Work By: W.B.M. - L.W.R. 1923 1924




Note:
Area of Display Fountains = 6206.28 "

SCALE: 1" = 1600'

ACQUIRED
Reclaimed Area by U.S. Engrs.

TRANSF. FROM PB&P.P.

TRANSF. TO P.B.&P.P.

| SPORTS | NO | SQ. FT. |
|---|---|---|
| Tennis Courts | 10 | 54,990.0 |
| Roque Courts | – | – |
| Baseball Fields | – | – |
| Hockey Fields | – | – |
| Soccer Fields | – | – |
| Cricket Fields | – | – |
| Riding Grounds | – | – |
| Band Stands | – | – |
| Bathing Beaches | – | – |
| Childrens Playgr'ds | – | – |
| Athletic Fields | – | – |
| Volley ball Courts | – | – |
| Croquet Courts | – | – |
| Football Fields | – | – |
| Polo Fields | – | – |
| Lacrosse Fields | – | – |
| Picnic Grounds | 1 | |
| Golf Courses | 3 | 9 Hole - Reversible 82.0 Acres |
| Bowling Greens | – | |
| Quoits Courts | – | |
| Sand Boxes | | |

| | NO. |
|---|---|
| Benches | 46 |
| Display Fountains | 4 |
| Drinking Fountains | 3 |
| Tables | 175 |
| Gas Lamp Posts | |
| Elec. Lamp Posts | 239 |
| Fire Plugs | 10 |
| Water-Stand Pipes | 186 |
| Drainage Traps | 270 |
| Trash Baskets | 13 |
| Flush Hydrants | 20 |
| Valves | 73 |

| FENCES | LIN. FT. |
|---|---|
| Post & Chain | 490.0 |
| Pipe Rail | 1495.0 |
| Strand Wire | 987.0 |
| Back Stop | 1174.0 |
| Ornamental Iron | 64 (Posts) |
| Mesh Wire | 2360.0 |
| Trespass Irons | – |

| | SQ. FT. | SQ. YDS. |
|---|---|---|
| Shrub Beds | | |
| Flower Beds | 241,901.0 | 26,766.0 |
| Lawn | 12,920,773.0 | 1435,641.4 |
| Forest Area | – | – |
| Unimproved A. | | – |

HEDGE : (Kind)

| LENGTH (ft.) | WIDTH | HEIGHT | SQ. FT. |
|---|---|---|---|
| 1675.0 | | | 13,368.0 |

STATUES: Names

| TREES : (Kind) | No. |
|---|---|
| Various | 1012 |
| Cherry | 916 |

| BUILDINGS | NO. | SQ. FT. COVERED |
|---|---|---|
| Eng. Wharves | | 99,339.0 |
| Field House | 1 | 6,175.6 |
| Small Tourist Bld. | 2 | 6125.34 |
| Main " " | 1 | 4,277.5+ |
| Tea House | 1 | 3,193.0 |

| | KIND | LENGTH | AREA (SQ. FT.) |
|---|---|---|---|
| PATHS | Cinder (F) | 5,460.0 | 34,911.0 |
| PATHS | Cinder (B) | 26,564.0 | 214,939.0 |
| PATHS | Macadam (?) | 403.4 | 2,925.0 |
| ROADS | Macadam | 26,923.0 | 748,834.0 |
| ROADS | Asphalt | 1773.0 | 47,179.53 |
| ROADS | Concrete | 2545.0 | 44,919.25 |
| ROADS | Cobble Stone | 772.0 | 20,844.0 |
| ROADS | Cinder | 425.0 | 152,472.0 |
| WALKS | Macadam | – | – |
| WALKS | Dirt | 250.0 | 1000.0 |
| WALKS | Concrete | ~~[illegible]~~ | ~~[illegible]~~ |
| WALKS | Brick | – | – |
| WALKS | Cinders | 2600.0 | 19,611.0 |

LOCATION: Bet. West Pot. Park; Pot. River & Wash. Channel

| RES. AREA (SQ. FT.) | (ACRES) |
|---|---|
| 14,244,120.0 | 327.00 |

RES. NO. 333
East Potomac Pk.

East and West Potomac Parks
Historic District
Washington, DC
Historic Map 8 of 14

- Map of East Potomac Park, reservation 333, 1927; Reservation Files, National Park Service, National Capital Region Building.



CONSTITUTION AVENUE
POTOMAC
LINCOLN MEMORIAL
REFLECTING POOL
MONUMENT GARDENS
PLAN OF 1901
WEST POTOMAC PARK
D.C. WORLD WAR MEMORIAL
ARLINGTON MEMORIAL BRIDGE
CHANNEL BRIDGE
RIVER
TIDAL BASIN
TO MT. VERNON
MT. VERNON MEMORIAL HIGHWAY
EAST POTOMAC PARK
WASHINGTON CHANNEL
WATER STREET
PUBLIC BUILDINGS COMMISSION
THE MALL AND VICINITY
WASHINGTON
PROPOSED DEVELOPMENT
SCALE
PREPARED UNDER THE DIRECTION OF LT. COL. U. S. GRANT 3RD
EXECUTIVE OFFICER – PUBLIC BUILDINGS COMMISSION
REVISION AS OF JANUARY 1931
GOVERNMENT BUILDINGS
PROPOSED BUILDINGS
GOVERNMENT LAND
AREA TO BE PURCHASED

East and West Potomac Parks
Historic District
Washington, DC

Historic Map 9 of 14

- The Mall and Vicinity,
Proposed Development, 1931;
Frederick Law Olmsted
National Historic Site


CONSTITUTION
LINCOLN
MEMORIAL
WASHINGTON
MONUMENT
D.C. WAR
MEMORIAL
ARLINGTON MEMORIAL BRIDGE
ROCK CREEK AND POTOMAC PARKWAY
TIDAL BASIN
POTOMAC
RIVER
N
INDEPENDENCE
AVENUE
DEPT
OF
AGRICULTURE
BUREAU
OF
ENGRAVING
AND
PRINTING
WASHINGTON
CHANNEL
JEFFERSON
MEMORIAL
NATIONAL CAPITAL
PARK AND PLANNING COMMISSION
GENERAL PLAN
INDEPENDENCE AVENUE
EXTENSION WEST OF 14TH ST.
SCALE 1" = 200'
APPROVED
RECOMMENDED
SUBMITTED
DATE
FEB 3, 1942
REVISED
FILE NUMBER
1.15-61
JEFFER'S SIMPLIFIED PLAN

East and West Potomac Parks
Historic District
Washington, DC

Historic Map 10 of 14

- General Plan, Independence Avenue, West of Fourteenth Street, February 3, 1942; Frederick Law Olmsted National Historic Site.






A Memorial to the 56 SIGNERS of the Declaration of Independence

CONSTITUTION GARDENS, WEST POTOMAC PARK, NATIONAL CAPITAL REGION, WASHINGTON, DC

EDAW inc.
Environmental Planning, Urban Design, Landscape Architecture
Alexandria, Virginia

prepared for
UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE
DENVER SERVICE CENTER

REVISIONS

DRAWING TITLE
PLANTING PLAN

DESIGNED
DRAWN
CHECKED
SCALE
DATE 3-16-81

DRAWING NUMBER
801
41,012
PKG. NO.
SHEET NUMBER
5
of 13

East and West Potomac Parks
Historic District
Washington, DC

Historic Map 12 of 14

- Planting Plan for 56 Signers Memorial, March 16, 1981; National Park Service, National Capital Region Building.




FILE COPY
RETURN PROMPTLY TO
NATIONAL CAPITAL PARKS
MAP FILES

# VIETNAM VETERANS MEMORIAL

CONSTITUTION GARDENS - WASHINGTON, D. C.

ESTABLISHED BY THE VIETNAM VETERANS MEMORIAL FUND - WASHINGTON, D. C.

MAYA YING LIN
DESIGNER
WASHINGTON, D. C.

COOPER-LECKY PARTNERSHIP
PROJECT ARCHITECTS
3203 GRACE STREET, NW
WASHINGTON, D. C.

JAMES MADISON CUTTS
STRUCTURAL ENGINEERS
1147 TWENTIETH STREET, NW
WASHINGTON, D. C. 822-3222

BERNARD F. LOCRAFT
CIVIL ENGINEERS
1056 THOMAS JEFFERSON STREET, NW
WASHINGTON, D. C. 337-4940

HENRY F. ARNOLD ASSOCIATES
LANDSCAPE ARCHITECTS
40 WITHERSPOON STREET
PRINCETON, N. J. 609 924-4047

GILBANE BUILDING COMPANY
CONSTRUCTION MANAGER
LANDOVER, MARYLAND 301 459-1550

DATE: 29 JAN 82 DRAWN BY: MPH
REVISIONS:

PLANTING PLAN
SCALE: 1" = 20'-0"

L-3

East and West Potomac Parks
Historic District
Washington, DC
Historic Map 13 of 14

- Planting Plan for Vietnam Veterans Memorial, January 29, 1982; National Park Service, National Capital Region Building.




THIS SHOP DRAWING REPRESENTS OUR INTERPRETATION OF THE ARCHITECTURAL PLANS AND CONTRACT REQUIREMENTS OF THE COLD SPRING GRANITE COMPANY AND / OR SUBSIDIARIES OF COLD SPRING FOR THIS PROJECT, AND SHOWS STANDARD COLD SPRING DETAILS.

PRIOR TO THE MANUFACTURE OF ANY GRANITE FOR THIS JOB, ALL DIMENSIONS, METHODS OF CONSTRUCTION, AND EXISTING CONDITIONS MUST BE CHECKED AND APPROVED OR CORRECTED ON THE GRANITE SHOP DRAWINGS BY THE [illegible]

GRANITE TO ACCOMMODATE [illegible] AND WILL NOT BE RESPONSIBLE FOR ANY ENGINEERING OF THE WORK SHOWN ON THESE DRAWINGS. ANY ANCHORING DETAILS ARE TO BE CONSIDERED AS PROPOSALS ONLY, SUBJECT TO INDEPENDENT ENGINEERING REVIEW TAKING INTO ACCOUNT ALL ASPECTS OF THE GRANITE INSTALLATION AND BACKUP SYSTEMS. SUCH INDEPENDENT ENGINEERING WILL NOT BE THE RESPONSIBILITY OF COLD SPRING, UNLESS OTHERWISE QUALIFIED.

| QTY | DISTRIBUTION | DATE |
|---|---|---|
| 1/5 | 1ST APPROVAL | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| 1/1 | FINAL RECORD | 8/7 |
| | SETTING & DIS.R | |

COLD SPRING GRANITE
202 S. 3rd AVENUE
COLD SPRING, MN 56320-[illegible]
PHONE: 612-685-3621

PROJECT: KOREAN WAR MEMORIAL

LOCATION: WASHINGTON D.C.

PURCHASER: CONTRACTING DIVISION

ARCHITECT: COOPER-LECKY ARCHITECTS

DRAWN BY: SCOTT BARTHEL

| GRANITE | FINISH |
|---|---|
| ACADEMY BLACK-POLISH | |
| ACADEMY BLACK-DIAMOND 8 | |
| ACADEMY BLACK-THERMAL | |
| C.S. BLACK-HONED | |
| C.S.BLACK-POLISH | |

STONE MARK:

DESCRIPTION: KEY PLAN-SITE

JOB NUMBER: 93-3750

801
80963
(76-96

| FILE | SHEET |
|---|---|
| H-10 | K1 |

East and West Potomac Parks
Historic District
Washington, DC
Historic Map 14 of 14

- Site Plan for Korean War Veterans Memorial, August 7, 1995; National Park Service, National Capital Region Building
























THE WORLD WAR


PAUL JONES




FRANKLIN DELANO ROOSEVELT
PRESIDENT OF THE UNITED STATES
1933 – 1945


EE ONE-THIRD OF A NATION ILL-HOUSED, ILL-CLAD, ILL-NOUR
HED
THE TEST OF OUR PROGRESS
IS NOT WHETHER WE ADD MORE
TO THE ABUNDANCE OF THOSE
WHO HAVE MUCH, IT IS WHETHER
WE PROVIDE ENOUGH FOR
THOSE WHO HAVE TOO LITTLE


HOUSED ILL-CLAD ILL-NOURISHED
ROGRESS
ADD MORE
OF THOSE
S WHETHER
GH FOR
OO LITTLE.


I HAVE SEEN WAR
I HAVE SEEN WAR ON LAND AND SEA. I HAVE SEEN BLOOD RUNNING FROM THE WOUNDED... I HAVE SEEN THE DEAD IN THE MUD. I HAVE SEEN CITIES DESTROYED... I HAVE SEEN CHILDREN STARVING. I HAVE SEEN THE AGONY OF MOTHERS AND WIVES.
I HATE WAR


THEY (WHO) SEEK TO ESTABLISH
SYSTEMS OF GOVERNMENT BASED ON
THE REGIMENTATION OF ALL HUMAN
BEINGS BY A HANDFUL OF INDIVIDUAL
RULERS... CALL THIS A NEW ORDER.
IT IS NOT NEW AND IT IS NOT ORDER.
















THE FIRST
JAPANESE CHERRY TREES
PRESENTED TO
THE CITY OF WASHINGTON
AS A GESTURE OF FRIENDSHIP
AND GOOD WILL BY THE CITY OF
TOKYO, WERE PLANTED ON THIS SITE,
MARCH 27, 1912.
NATIONAL CAPITAL SESQUICENTENNIAL COMMISSION
1950










EAST POTOMAC PARK
BATHHOUSE




PEDESTRIANS
DO NOT
DO NOT
ENTER
ICE
ONLY
BEYOND THIS






THESE 1,800 FLOWERING CHERRIES
AND OTHER TREES WERE PLANTED
ON HAINS POINT IN 1966-1968
IN HONOR OF
RESIDENT AND MRS. LYNDON B. JOHNSON
BY FRIENDS IN GRATITUDE FOR
THEIR INSPIRING LEADERSHIP
AND EFFORTS TO ENHANCE
THE BEAUTY OF AMERICA.






12'-10"



ast and West Potomac Parks
Historic District
Washington, DC
oric Photo 1 of 31



East and West Potomac Parks
Historic District
Washington, DC
storic Photo 2 of 31



East and West Potomac Parks
Historic District
Washington, DC
Historic Photo 3 of 31



Photograph by Capt. Albert W. Stevens

EVEN AS THE MOODS OF NATURE VARY, SO THE LINCOLN MEMORIAL REFLECTS NEW BEAUTY IN CHANGING LIGHTS AND SHADOWS

The soothing harmony of its line and form, with its colossal approaches, is fully appreciated when seen from the air. What infinite melody it suggests to those who feel that "architecture is frozen music"! The Arlington Memorial Bridge in the background (see, also, opposite page, and Color Plate XVI).

East and West Potomac Parks
Historic District
Washington, DC
Historic Photo 4 of 31



© National Geographic Society

Finlay Direct Color Photograph by Clifton Adams

STROLLERS ON THE GRASSY BANKS OF THE LINCOLN MEMORIAL POOL

Its placid waters reflect both the impressive temple to Lincoln and Washington's towering shaft. Although more than 2000 feet long and 160 feet wide, the pool nowhere attains a depth greater than three feet and affords a safe and popular place for the activities of juvenile yachtsmen and for skaters in winter. At the left are the wartime emergency Munitions Buildings, and topping the trees the old Post Office tower. Domes of the National Museum and Capitol flank the Monument.

East and West Potomac Parks
Historic District
Washington, DC
Historic Photo 5 of 31



© National Geographic Society

Finlay Photograph by Clifton Adams

THE NEW WORLD'S NOBLEST OBELISK

Washington Monument towers to a height of $555\frac{7}{16}$ feet. It was begun in 1848 but not completed until 1885. The line visible in the masonry just above the tree tops marks the place where construction was suspended for 23 years. At night from the chamber at the top of the Monument airplane signal lights warn night flyers of the towering shaft's whereabouts.

ast and West Potomac Parks
istoric District
ashington, DC
Historic Photo 6 of 31



THE WITCHERY OF ARCHERY

On summer afternoons devotees of the ancient sport practice for their annual tournament.



© National Geographic Society

Finlay Direct Color Photographs by Clifton Adams

WASHINGTON PARKS AFFORD A PEERLESS PLAYGROUND

Golf, tennis, polo, horseback riding, croquet, miniature golf, motoring, picnicking, and to a limited extent bathing and boating are among the

East and West Potomac Parks
Historic District
Washington, DC
Historic Photo 7 of 31




© National Geographic Society

Natural Color Photograph by Maynard Owen Williams

IN COMMEMORATION OF THE INVENTOR OF THE "MONITOR"

John Ericsson's craft was instrumental in revolutionizing naval warfare. His memorial, erected jointly by the United States Government and private contributions from Americans of Scandinavian descent, was dedicated May 29, 1926. For sentimental and historical reasons it was placed near the Lincoln Memorial, which is visible through the trees at the right.

East and West Potomac Parks
Historic District
Washington, DC
Historic Photo 8 of 31



© Theodor Horydczak

JAPANESE CHERRY BLOSSOMS IN BLOOM AROUND THE TIDAL BASIN

A gift from the Municipal Council of Tokyo, many hundreds of these trees line the banks of the Tidal Basin and the Potomac Park Driveway, made largely of land reclaimed from the Potomac River by dredging and filling (see, also, text, page 590, and Color Plate V).

East and West Potomac Parks
Historic District
Washington, DC
Historic Photo 9 of 31



and West Potomac Parks
Historic District

Washington, DC

Historic Photo 10 of 31


1000A.S

East and West Potomac Parks
Historic District
Washington, DC
Historic Photo 11 of 31




Jefferson Memorial, Washington, D.C., 1941.

East and West Potomac Parks
Historic District
Washington, DC
Historic Photo 12 of 31



East and West Potomac Parks
Historic District
Washington, DC
Historic Photo 13 of 31



East and West Potomac Parks
Historic District
Washington, DC
Historic Photo 14 of 31



ast and West Potomac Parks
Historic District
ashington, DC
Historic Photo 15 of 31



East and West Potomac Parks
Historic District
Washington, DC
Photo 16 of 31



East and West Potomac Parks
Historic District
Washington, DC
Photo 17 of 31



East and West Potomac Parks
Historic District
Washington, DC
Historic Photo 18 of 31



East and West Potomac Parks
Historic District
Washington, DC
Historic Photo 19 of 31



AIR PICTURE OF EAST POTOMAC PARK
1922

[illegible] and [illegible] Potomac Parks
Historic District
Washington, DC
Historic Photo 20 of 31


POTOMAC PARK; WASH. D.C

East and West Potomac Parks
Historic District
Washington, DC
Historic Photo 21 of 31



East and West Potomac Parks
Historic District
Washington, DC
Historic Photo 22 of 31



ast and West Potomac Parks
Historic District

Washington DC

Historic Photo 23 of 31



East and West Potomac Parks
Historic District
Washington, DC
Historic Photo 24 of 31



ast and West Potomac Parks
Historic District
Washington, DC
storic Photo 25 of 31



EAST POTOMAC PARK~ TOURIST CAMP
SHOWING FIELD HOUSE & NEW BUNGALOWS
June 26, 1927

ast and West Potomac Parks
Historic District
Washington, DC
Historic Photo 26 of 31



Photograph by Capt. Albert W. Stevens

WASHINGTON'S TOURIST CAMP FOR THOSE WHO TAKE THE OPEN ROAD

Since 1921 thousands of travelers have made good use of the model tourist camp in East Potomac Park. Here are permanent tents for rent, with hot and cold water, shower baths, a gasoline filling station, a laundry, and a commissariat where provisions may be obtained at cost. Equipped with playgrounds for children, well-laid-out streets, sanitary sewerage, the camp is a city in miniature. It is screened by trees from Potomac Park Driveway, which surrounds it.

East and West Potomac Parks
Historic District
Washington, DC
Historic Photo 27 of 31



East and West Potomac Parks
Historic District
Washington, DC
Historic Photo 28 of 31





Top, the present bicycle "base" at the Tidal Basin. Below, its future home near the Railroad Bridge.

and West Potomac Parks
Historic District
Washington, DC
Historic Photo 29 of 31


LADIES

ast and West Potomac Parks
Historic District
Washington, DC
Historic Photo 30 of 31



Island and West Potomac Parks
Historic District
Washington, DC
Historic Photo 31 of 31



FORM 10-301 A
(6/72)

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

# NATIONAL REGISTER OF HISTORIC PLACES
## PROPERTY PHOTOGRAPH FORM

*(Type all entries - attach to or enclose with photograph)*

RECEIVED SEP 12 1973 NATIONAL REGISTER

**1. NAME**

| COMMON | AND/OR HISTORIC | NUMERIC CODE (Assigned by NPS) |
|---|---|---|
| East and West Potomac Parks | Potomac Flats | 11/30/73 |

**2. LOCATION**

| STATE | COUNTY | TOWN |
|---|---|---|
| District of Columbia | District of Columbia | Washington |

STREET AND NUMBER area bounded by Constitution Avenue, 17th Street, Independence Avenue, Washington Channel, Potomac River, and Rock Creek Park

**3. PHOTO REFERENCE**

| PHOTO CREDIT | DATE | NEGATIVE FILED AT |
|---|---|---|
| National Park Service, National Capital Parks | April 7, 1957 | National Capital Parks 1100 Ohio Drive, S.W. |

**4. IDENTIFICATION**

DESCRIBE VIEW, DIRECTION, ETC.

West Potomac Park area around the Tidal Basin, Jefferson Memorial on the left, inlet bridge in the background on the right. Boat ride concession around the Tidal Basin in the foreground.

PROPERTY OF THE NATIONAL REGISTER



FORM 10-301 A
(6/72)

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

# NATIONAL REGISTER OF HISTORIC PLACES
## PROPERTY PHOTOGRAPH FORM

*(Type all entries - attach to or enclose with photograph)*

RECEIVED SEP 12 1973 NATIONAL REGISTER

### 1. NAME

| COMMON | AND/OR HISTORIC | NUMERIC CODE *(Assigned by NPS)* |
|---|---|---|
| East and West Potomac Parks | Potomac Flats | NOV 30 1973 |

### 2. LOCATION

| STATE | COUNTY | TOWN |
|---|---|---|
| District of Columbia | District of Columbia | Washington |

STREET AND NUMBER
area bounded by Constitution Avenue, 17th Street, Independence Avenue, Washington Channel, Potomac River and Rock Creek Park

### 3. PHOTO REFERENCE

| PHOTO CREDIT | DATE | NEGATIVE FILED AT |
|---|---|---|
| National Park Service National Capital Parks | April 7, 1957 | National Capital Parks National Park Service |

### 4. IDENTIFICATION

DESCRIBE VIEW, DIRECTION, ETC.

Tidal Basin with Japanese Cherry Trees bordering it, Kutz Memorial Bridge to the right. Washington Monument in the background.

# EXHIBIT B

Griess Decl.

National Park Service

# NPS-28: CULTURAL RESOURCE MANAGEMENT GUIDELINE

## CHAPTER 7: MANAGEMENT OF CULTURAL LANDSCAPES

### A. Introduction and Objectives

1. Introduction

Cultural landscapes are complex resources that range from large rural tracts covering several thousand acres to formal gardens of less than an acre. Natural features such as landforms, soils, and vegetation are not only part of the cultural landscape, they provide the framework within which it evolves. In the broadest sense, a cultural landscape is a reflection of human adaptation and use of natural resources and is often expressed in the way land is organized and divided, patterns of settlement, land use, systems of circulation, and the types of structures that are built. The character of a cultural landscape is defined both by physical materials, such as roads, buildings, walls, and vegetation, and by use reflecting cultural values and traditions.

Identifying the significant characteristics and features in a landscape and understanding them in relation to each other and to significant historic events, trends, and persons allows us to read the landscape as a cultural resource. In many cases, these features are dynamic and change over time. In many cases, too, historical significance may be ascribed to more than one period in a landscape's physical and cultural evolution.

Cultural landscape management involves identifying the type and degree of change that can occur while maintaining the historic character of the landscape. The identification and management of an appropriate level of change in a cultural landscape is closely related to its significance. In a landscape significant for its association with a specific style, individual, trend, or event, change may diminish its integrity and needs to be carefully monitored and controlled. In a landscape significant for the pattern of use that has evolved, physical change may be essential to the continuation of the use. In the latter case, the focus should be on perpetuating the use while maintaining the general character and feeling of the historic period(s), rather than on preserving a specific appearance.

2. Program Objectives

According to federal law and the NPS *Management Policies*, all cultural landscapes are to be managed as cultural resources, regardless of the type or level of significance. Cultural landscape management focuses on preserving a landscape's physical attributes, biotic systems, and use when that use contributes to its historical significance. Research, planning, and stewardship are the framework for the program. Research defines the features, values, and associations that make a landscape historically significant; planning outlines the issues and alternatives for long-term preservation; and stewardship involves such activities as condition assessment, maintenance, and training.

3. Cultural Landscape Categories

A cultural landscape is a geographic area, including both natural and cultural resources, associated

with a historic event, activity, or person. The National Park Service recognizes four cultural landscape categories: *historic designed landscapes*, *historic vernacular landscapes*, *historic sites*, and *ethnographic landscapes*. These categories are helpful in distinguishing the values that make landscapes cultural resources and in determining how they should be treated, managed, and interpreted.

*Historic designed landscapes* are deliberate artistic creations reflecting recognized styles, such as the twelve-acre Meridian Hill Park in Washington, D.C., with its French and Italian Renaissance garden features. Designed landscapes also include those associated with important persons, trends, or events in the history of landscape architecture, such as Frederick Law Olmsted National Historic Site and the Blue Ridge Parkway.

*Historic vernacular landscapes* illustrate peoples' values and attitudes toward the land and reflect patterns of settlement, use, and development over time. Vernacular landscapes are found in large rural areas and small suburban and urban districts. Agricultural areas, fishing villages, mining districts, and homesteads are examples. The 17,400-acre rural landscape of Ebey's Landing National Historical Reserve represents a continuum of land use spanning more than a century. It has been continually reshaped by its inhabitants, yet the historic mix of farm, forest, village, and shoreline remains.

*Historic sites* are significant for their associations with important events, activities, and persons. Battlefields and presidential homes are prominent examples. At these areas, existing features and conditions are defined and interpreted primarily in terms of what happened there at particular times in the past.

*Ethnographic landscapes* are associated with contemporary groups and typically are used or valued in traditional ways. In the expansive Alaska parks, Native Alaskans hunt, fish, trap, and gather and imbue features with spiritual meanings. Jean Lafitte National Historical Park and Preserve illustrates the strong interrelationship between the dynamic natural system of the Delta region and several cultural groups through many generations. Numerous cultural centers maintain ties to distinctive, long-established groups with ethnic identities.

The four cultural landscape categories are not mutually exclusive. A landscape may be associated with a significant event, include designed or vernacular characteristics, and be significant to a specific cultural group. For example, Gettysburg National Military Park is a historic site primarily significant as the scene of the 1863 Civil War battle. The park also includes historic vernacular farm complexes that existed at the time of the battle and a number of designed components added later to commemorate the event, including a national cemetery, roads, and numerous monuments.

The cultural landscape program focuses on landscapes listed in or eligible for the National Register of Historic Places. Landscapes primarily significant for their ethnographic value are under the purview of the ethnography program; however, professionals from both programs may be involved in their documentation and treatment. (See Chapter 10 for guidance in managing ethnographic landscapes.)

## B. Research

The primary purpose of research on cultural landscapes is to define the values and associations that make them historically significant. Research findings provide information for management decisions and actions extending from the development of long-term plans to compliance with preservation law and maintenance, assist in determining appropriate treatment, and support interpretive programs. The following standards apply:

- Research on a cultural landscape involving other resource types (archeological resources, structures, museum objects, ethnographic resources, natural resources) is conducted in consultation with specialists in their related disciplines, whose expertise is reflected in the reported findings and recommendations.

- Deficiencies in research on, and evaluation and registration of, a cultural landscape are identified in the park resources management plan and corrected as soon as possible.

1. Identification

Section 110 of the National Historic Preservation Act requires the NPS to identify and nominate to the National Register all resources under its jurisdiction that appear eligible, including cultural landscapes. Historical areas of the national park system are automatically listed in the National Register upon their establishment by law or executive order, but landscape resources within them that contribute to their historical significance still must be documented for the Register.

Research and preliminary field surveys are conducted to determine the existence of cultural landscapes. Identifying the significant characteristics and features of a landscape involves understanding its physical modifications and use, along with any ethnographic values and affiliations.

Except for ethnographic landscapes, the initial identification of cultural landscapes occurs in historic resource studies. An HRS must contain enough information about the developmental history, evolution, and existing conditions of a cultural landscape to evaluate its integrity and define appropriate National Register boundaries. Based on the research and field investigations conducted, a historical base map clearly depicting all cultural landscape resources and a National Register nomination are prepared. Addenda to existing HRSs are appropriate to address cultural landscapes that were not addressed initially.

2. Documentation, Evaluation, and Registration

a. Documentation

Documentation of cultural landscapes requires the use of primary and secondary sources; review and assessment of archeological records; and intensive field investigations to determine the extent and condition of historic and contemporary landscape features. Maps, plans, drawings, and photographs should be prepared as part of the baseline documentation.

b. Significance

Significance is determined by relating a landscape's history and existing characteristics and features to its historic context. The features, materials, patterns, and relationships that contribute to its historical significance must be present and have integrity. There may be more than a single area or period of historical significance for the landscape as a whole or for individual parts of it.

c. Integrity

The integrity of a cultural landscape is judged by the degree to which the characteristics that define its historical significance are present. Because important aspects such as vegetation and use change over time, integrity also depends on how evident the general character of the historic period is and the degree to which incompatible elements are reversible. With some vernacular and ethnographic landscapes, change itself is a significant factor and must be considered in assessing their integrity. In a designed landscape, a specific feature or area may survive in better condition than other equally important features or areas. In this case, an assessment of integrity should focus on the role of the individual feature in the overall historic design and the degree to which it contributes to the integrity of the design. In a similar way, as vegetation matures, the change in tree canopy, scale, and massing may affect the overall character of the landscape. It is important to consider how such changes affect the landscape as a whole and the degree to which they impact or obscure it.

d. National Register Nominations

Cultural landscapes are listed in the National Register when their significant cultural values have been documented and evaluated within appropriate thematic contexts and physical investigation determines that they retain integrity. Cultural landscapes are classified in the National Register as sites or districts or may be included as contributing elements of larger districts.

e. Cultural Landscapes Inventory

The Cultural Landscapes Inventory (CLI) is a computerized, evaluated inventory of all cultural landscapes in which the NPS has or plans to acquire any legal interest. Its purpose is to identify cultural landscapes in the national park system and provide information on their location, historical development, character-defining features, and management. The CLI assists park managers in planning, programming, and recording treatment and management decisions. CLI forms, including maps, drawings, and photographs, are maintained in the support offices and parks.

For more information on documentation, evaluation, and registration see National Register Bulletins 18, 30, 38, 40, 41, and 42 and the *Cultural Landscapes Inventory Professional Procedures Guide*.

3. Cultural Landscape Report

A cultural landscape report (CLR) is the primary guide to treatment and use of a cultural landscape. Based on the historic context provided in a historic resource study, a CLR documents the characteristics, features, materials, and qualities that make a landscape eligible for the National Register. It analyzes the landscape's development and evolution, modifications, materials, construction techniques, geographical context, and use in all periods, including those deemed not significant. Based on the analysis, it evaluates the significance of individual landscape characteristics and features in the context of the landscape as a whole. Typically interdisciplinary in character, it includes documentation, analysis, and evaluation of historical, architectural, archeological, ethnographic, horticultural, landscape architectural, engineering, and ecological data as appropriate. It makes recommendations for treatment consistent with the landscape's significance, condition, and planned use.

A CLR's scope and level of investigation will vary depending on management objectives. It may focus on an entire landscape or on individual features within it. Before any decision regarding treatment of a landscape, *Part 1: Site History, Existing Conditions, Analysis, and Evaluation* must be completed.

A CLR includes the following:

*Introduction* contains the management summary, historical overview and context, study boundaries, methodology and scope of the project, and a summary of findings.

*Part 1: Site History, Existing Conditions, Analysis, and Evaluation* contains three primary sections:

> *Site History* includes a narrative history of the landscape describing, as appropriate, the historic context, design intent, primary design principles, key developments, physical relationships, patterns, features, and important individuals or events; and a historical base map/period plan for each significant historic period.
>
> *Existing Conditions* includes a definition of site boundaries, an accurate site map, and a brief description of current resources, primary features, access, and site use.
>
> *Analysis and Evaluation* includes an inventory and documentation of significant characteristics and features based on National Register criteria, a condition assessment of those features, and related site information.

*Part 2: Treatment* contains recommendations for treatment of the landscape based on the site history,

existing conditions, and analysis; enabling legislation; applicable standards; and the proposed use as defined in planning documents. Recommendations are presented in a treatment plan and/or narrative guidelines. Cost estimates may be included.

*Part 3: Record of Treatment* documents the actual treatment with photographs, sketches, accounting data, and narratives outlining the course of work, conditions encountered, and materials used.

*Appendices, Bibliography, and Index* contain supplemental drawings, illustrations, maps, photographs, technical information, or other support documentation; a list of sources used in preparing the document; and references to material in the document, respectively.

The following standards apply:

- A CLR is prepared to minimize loss of significant characteristics, features, and materials when existing information about the physical history and condition of a cultural landscape is inadequate to address anticipated management objectives, when impending development alternatives could have adverse effects, or to record actual treatment.
- The CLR is prepared by qualified professionals based on appropriate methodologies and techniques for cultural landscape research, documentation, and evaluation.
- Archeological records, base maps, and techniques such as soil analysis are used for data on past features and conditions.
- Landscape, architectural, and archeological investigations supporting a CLR employ nondestructive methods to the maximum extent possible; they are prescribed and justified in a task directive that includes a research design and impact analysis.

## MODEL CLR CONTENTS

*Cover Page*
*Table of Contents*
*Introduction.* The introduction includes five sub-sections: (a) a management summary describing the purpose of the project; (b) a historical overview that provides a brief historical context for the landscape; (c) a description of the scope of the project and methodology for completing it; (d) a description of study boundaries; and (e) a summary of findings.

## PART 1. SITE HISTORY, EXISTING CONDITIONS, ANALYSIS, AND EVALUATION

*Site History.* This section provides a historical description of the landscape and all significant characteristics. The text is based on research and historical documentation, with enough support material to illustrate the physical character, attributes, features, and materials that contribute to the significance of the landscape. This section identifies the historical context within which the landscape developed, and the period or periods of significance if this has not been done in the HRS or National Register nomination. *Existing Conditions.* This section contains a description of the landscape as it exists today including the documentation of landscape characteristics such as land use, vegetation, circulation, and structures. It is based on both research and site survey, including on-the-ground observation and recordation of significant features. A condition assessment is completed to determine the age, material, composition, and integrity of significant components.

*Analysis and Evaluation.* This section compares findings from the site history and existing conditions to identify the significance of individual features in the context of the landscape as a whole. Historical integrity is evaluated to determine if the characteristics and features that defined the

landscape during the historic period are present. A statement of significance for the landscape is included, and the analysis and evaluation are summarized in the identification of character areas or the development of management zones.

## PART 2. TREATMENT

This section describes the preservation strategy for long-term management of the cultural landscape based on its significance, existing condition, and use. It also includes a discussion of overall management objectives for the site as documented in planning studies or other management documents. The treatment section may address the entire landscape, or a portion, or a specific feature within it. Treatment is described in a narrative text, treatment plan, or design alternatives.

## PART 3. RECORD OF TREATMENT

This section summarizes (a) the intent of the work, (b) the way in which the work was approached and accomplished, (c) the time required to do the work, and (d) the cost of the work. This section also contains copies of the field reports, condition assessments, and contract summaries. It is usually included as an appendix or addendum to the CLR.

## APPENDIX, BIBLIOGRAPHY, AND INDEX

This section contains supplemental drawings, illustrations, maps, photographs, technical information, or other support documentation; a list of sources used in preparing the document; and references to material in the document, respectively.

- Confidential information on the location, nature, character, or ownership of archeological and ethnographic resources is identified and not made available to the public.
- National Register documentation is prepared or amended to address cultural landscape resources identified in a CLR after its preparation, if appropriate.
- All field notes, primary documents, original maps, drawings, photographs, and plant materials gathered or associated with the research for CLRs or special landscape projects are organized and preserved as archival material or museum objects in consultation with the park or support office curator.
- All information regarding the condition and assessment of character-defining landscape features is incorporated in the Inventory and Condition Assessment Program (ICAP).

## C. Planning

1. Relationship to Park Plans

Cultural landscapes should be considered in all special resource studies for establishing new park areas. In existing parks, cultural landscapes often influence proposals in a park's statement for management, general management plan, development concept plan(s), resources management plan, and interpretive prospectus. Cultural landscape issues, such as historic land uses and the location and character of significant resources, should be considered in the development of all planning documents to avoid adverse effects on landscapes. Information in the Cultural Landscapes Inventory is generally adequate for a general management plan. A development concept plan should be coordinated with the preparation of a CLR and/or involve a historical landscape architect to ensure that development maintains the significant character and features of the landscape. The resources management plan should provide a format for documenting research and treatment requirements related to cultural landscapes as part of a comprehensive park cultural resource program. Appropriate

siting of wayside exhibits and signs and techniques for cultural landscape interpretation should be addressed in the interpretive prospectus. In all park plans, the planning process itself is a fundamental tool for integrating information about and determining relationships among cultural landscapes and other resource types.

2. Decisions About Treatment

Information about the significance and integrity of cultural landscapes is required before making planning decisions about treatment and in many activities associated with park operations. For general management planning purposes, the historic resource study is the

primary document for determining significance and integrity. Before treatment of a landscape or its individual features, additional information regarding its significance, integrity, and condition is necessary. The CLR is the primary supporting document in this regard.

The following standards apply:

- The Cultural Landscapes Inventory or Part I of a CLR, as appropriate, is completed before any major park planning effort affecting a cultural landscape.
- Proposals for actions affecting a cultural landscape are consistent throughout all park planning documents.
- Development plans affecting a cultural landscape involve consultation among historical landscape architects and other resource specialists to assure appropriate protection of all resources.

3. Compliance

Because many parks were evaluated and documented for the National Register before cultural landscapes were recognized as significant resources, the National Register is an incomplete indicator of the presence of landscape resources. In Section 106 compliance, therefore, particular attention must be given to identifying and evaluating landscapes and their significant characteristics, features, and uses so that the effects of proposed undertakings on them can be adequately considered.

Actions affecting cultural landscapes, and thus requiring Section 106 compliance, fall into two categories:

*Actions undertaken specifically for the management of a cultural landscape*: The most common activity in this category that may affect the character or use of a cultural landscape is routine grounds maintenance, such as pruning and replacing vegetation, mowing grass, repairing fences, resetting and replacing paving materials in kind, and maintaining roads, paths, and trails. Although the work required to maintain a cultural landscape may not differ significantly from other park maintenance practices, many landscapes require special attention and treatment of various features. This especially is true in designed landscapes where the treatment, use, and maintenance of single features may profoundly affect the integrity of the whole.

*Actions undertaken for other management purposes*: Actions in this category can have significant adverse effects on a cultural landscape if not planned and carried out with consideration of its values. Examples include the construction of buildings and general work associated with site development; the addition or resurfacing of trails to meet accessibility standards; the addition of contemporary patios, fences, walkways, walls, utilities, and site furniture; and changes in use from open space to parking lot, visitor center, or maintenance yard. Although the impact of a single such action may be minor, the cumulative effect of successive actions may be adverse.

The following standards apply to actions affecting landscape resources:

- A landscape that has not been evaluated for National Register eligibility is given such evaluation before or during Section 106 consideration of an undertaking affecting it.
- Proposed actions are evaluated for their effects on individual landscape features and landscapes as a whole.
- Any ground disturbance in a cultural landscape requiring archeological clearance is reviewed in advance by a historical landscape architect in consultation with an archeologist.

4. Use

Use is an integral characteristic of a cultural landscape and impacts the landscape both materially and spatially. In vernacular and ethnographic landscapes, significant patterns of land use may have varied over several generations, while in a historic designed landscape land use activities may be fixed. Contemporary use of a cultural landscape is appropriate (1) if it does not adversely affect significant landscape features, and (2) if it either follows the historic use or does not impede public appreciation of it.

5. Funding and Staffing

Because the NPS has only recently recognized cultural landscapes as a major resource type, funding and staffing for landscape research, planning, and stewardship are relatively limited. Parks should systematically evaluate their funding and staffing needs for landscapes and identify them in park resources management plans.

## D. Stewardship

1. General Treatment

This section contains management standards that provide a broad philosophical base for the treatment of cultural landscapes. Treatment is traditionally divided into four categories: preservation, rehabilitation, restoration, and reconstruction. The standards should be used in evaluating proposed projects and in planning and executing all work.

The following standards apply to all treatments:

- Land use activities, whether historic or introduced, do not impair archeological resources.
- Uses addressing programmatic needs or park facilities within a cultural landscape, such as visitor centers, parking, interpretive structures, housing, administrative facilities, maintenance yards, and storage areas, are carefully considered in the context of the significance of the landscape.
- Use is monitored and regulated to minimize both immediate and long-term damage.
- Contemporary facilities do not adversely impact the landscape's physical and visual character. New facilities are compatible with the historic character and material of the landscape.
- Contemporary structures to facilitate access, such as ramps, railings, signs, and curb cuts, are designed and located to minimize adverse impacts on the character and features of a cultural landscape.
- Access to a cultural landscape that is vulnerable to damage from human use is limited, monitored, or controlled.

- All treatment and use decisions reflect consideration of effects on both the natural and built features of a cultural landscape and the dynamics inherent in natural processes and continued use.

- Use of destructive techniques, such as archeological excavation, is limited to providing sufficient information for research, interpretation, and management needs.

- All work that may affect cultural landscapes is evaluated by a historical landscape architect and other professionals, as appropriate.

- All modification, repair, or replacement of materials and features is preceded by sufficient study and recording to protect research and interpretive values.

- New work, materials, and replacement features are identified, documented, or permanently marked in an unobtrusive manner to distinguish them from original work, materials, and features. The manner and location of identification is recorded using the Inventory and Condition Assessment Program (ICAP).

- A proposed treatment project is initiated by the appropriate programming document, including a scope of work and cost estimate from a CLR or ICAP. Such projects include preservation maintenance as well as major treatment. No treatment is undertaken without an approved CLR or work procedure specifying the work, and Section 106 compliance.

- A treatment project is directed by a historical landscape architect and performed by qualified technicians.

- Representative features salvaged from a cultural landscape are accessioned and cataloged, provided that they fall within the park's scope of collection statement.

- All changes made during treatment are graphically documented with drawings and photographs. Records of treatment are managed as archival materials by a curator or archivist within the park's museum collection.

- Work on historic structures, including modifications to improve drainage and access, does not harm the character-defining features of a cultural landscape.

a. Preservation

Preservation maintains the existing integrity and character of a cultural landscape by arresting or retarding deterioration caused by natural forces and normal use. It includes both maintenance and stabilization. Maintenance is a systematic activity mitigating wear and deterioration of a cultural landscape by protecting its condition. In light of the dynamic qualities of a landscape, maintenance is essential for the long-term preservation of individual features and the integrity of the entire landscape. Stabilization involves reestablishing the stability of an unsafe, damaged, or deteriorated cultural landscape while maintaining its existing character. The following standards based on the *Secretary of the Interior's Standards for the Treatment of Historic Properties* apply:

- A cultural landscape is used as it was historically, or is given a new or adaptive use that maximizes the retention of historic materials, features, spaces, and spatial relationships. Where a treatment and use have not been identified, a landscape is protected and, if necessary, stabilized until additional work may be undertaken.

- The historic character of a cultural landscape is retained and preserved. The replacement or removal of intact or repairable historic materials or alteration of features, spaces, and spatial

relationships that characterize a landscape is avoided.

- Each cultural landscape is recognized as a physical record of its time, place, and use. Work needed to stabilize, consolidate, and conserve historic materials and features is physically and visually compatible, identifiable upon close inspection, and properly documented for future research.

- Changes to a cultural landscape that have acquired historical significance in their own right are retained and preserved.

- Historic materials, features, finishes, and construction techniques or examples of craftsmanship that characterize a cultural landscape are preserved.

- The existing condition of historic features is evaluated to determine the appropriate level of intervention needed. Where the severity of deterioration requires repair or limited replacement of a historic feature, the new work matches the old in design, color, texture, and where possible, materials. Repair or replacement of features is substantiated by archeological, documentary, or physical evidence.

- Chemical or physical treatments that cause damage to historic materials are not used.

- Archeological and structural resources are protected and preserved in place. If such resources must be disturbed, mitigation measures are undertaken including recovery, curation, and documentation.

The following additional standards apply:

- Stabilization detracts as little as possible from a cultural landscape's appearance and significance. Reinforcement is concealed wherever possible so as not to intrude upon or detract from the aesthetic, historical, or archeological quality of the landscape, except where concealment would result in the alteration or destruction of historically or archeologically significant features, materials, or physical or visual relationships. Accurate documentation of stabilization procedures is kept and made available for future needs.

- Maintenance is executed by qualified technicians in accordance with approved work procedures. Where such procedures are nonexistent or incomplete, a historical landscape architect or appropriate cultural resource specialist provides technical guidance.

- All features of the cultural landscape are inspected on a scheduled basis and information about their condition is entered into ICAP.

b. Rehabilitation

Rehabilitation improves the utility or function of a cultural landscape, through repair or alteration, to make possible an efficient compatible use while preserving those portions or features that are important in defining its significance. The following standards based on the *Secretary of the Interior's Standards for the Treatment of Historic Properties* apply:

- A cultural landscape is used as it was historically or is given a new or adaptive use that maximizes the retention of historic materials, features, spaces, and spatial relationships.

- The historic character of a cultural landscape is retained and preserved. The replacement or removal of intact or repairable historic materials or alteration of features, spaces, and spatial relationships that characterize a landscape is avoided.

Each cultural landscape is recognized as a physical record of its time, place, and use. Changes that create a false sense of historical development, such as adding conjectural features from other landscapes, are not undertaken. Work needed to stabilize, consolidate, and conserve historic materials and features is physically and visually compatible, identifiable upon close inspection, and properly documented for future research.

- Changes to a cultural landscape that have acquired historical significance in their own right are retained and preserved.

- Historic materials, features, finishes, and construction techniques or examples of craftsmanship that characterize a cultural landscape are preserved.

- Deteriorated historic features are repaired rather than replaced. Where the severity of deterioration requires repair or replacement of a historic feature, the new feature matches the old in design, color, texture, and, where possible, materials. Repair or replacement of missing features is substantiated by archeological, documentary, or physical evidence.

- Chemical or physical treatments that cause damage to historic materials are not used.

- Archeological and structural resources are protected and preserved in place. If such resources must be disturbed, mitigation measures are undertaken including recovery, curation, and documentation.

- Additions, alterations, or related new construction do not destroy historic materials, features, and spatial relationships that characterize the cultural landscape. New work is differentiated from the old and is compatible with the historic materials, features, size, scale and proportion, and massing of the landscape.

- Additions and adjacent or related new construction are undertaken in such a manner that if removed in the future, the essential form and integrity of the cultural landscape would be unimpaired.

c. Restoration

Restoration accurately depicts the form, features, and character of a cultural landscape as it appeared at a specific period or as intended by its original constructed design. It may involve the reconstruction of missing historic features and selective removal of later features, some having cultural value in themselves. The following standards based on the *Secretary of the Interior's Standards for the Treatment of Historic Properties* apply:

- A cultural landscape is used as it was historically or given a new or adaptive use that interprets the landscape and its restoration period.

- Materials and features from the restoration period are retained and preserved. The removal of materials or alteration of features, spaces, and spatial relationships that characterize the period is not undertaken.

- Each cultural landscape is recognized as a physical record of its time, place, and use. Changes that create a false sense of historical development, such as adding conjectural features from other landscapes, are not undertaken. Work needed to stabilize, consolidate, and conserve materials and features from the restoration period is physically and visually compatible, identifiable upon close inspection, and properly documented for future research.

- Materials, features, finishes, spaces, and spatial relationships that characterize other historic periods are documented prior to their alteration or removal.

- Historic materials, features, finishes, and construction techniques or examples of craftsmanship that characterize the restoration period are preserved.

- Deteriorated features from the restoration period are repaired rather than replaced. Where the severity of deterioration requires replacement of a historic feature, the new feature matches the old in design, color, texture and, where possible, materials.

- Replacement of missing features from the restoration period is substantiated by archeological, documentary, or physical evidence. A false sense of history is not created by adding conjectural features or features from other landscapes, or by combining features that never existed together historically.

- Chemical or physical treatments that cause damage to historic materials are not used.

- Archeological and structural resources are protected and preserved in place. If such resources must be disturbed, mitigation measures are undertaken including recovery, curation, and documentation.

- Designs that were never executed historically are not constructed.

The following additional standards apply:

- Archeological, documentary, or physical evidence is sufficient to permit accurate restoration with minimal conjecture.

- Restoration is essential to public understanding of the cultural associations of a park.

- Reinforcements required for stability of existing support systems and protective or code-required features (electrical, security, fire protection, handicapped accessibility, etc.) are concealed whenever possible so as not to intrude upon or detract from a cultural landscape's aesthetic and historical qualities, except where concealment would result in the alteration or destruction of historically significant features, materials, or physical or visual relationships.

d. Reconstruction

Reconstruction entails depicting the form, features, and details of a non-surviving cultural landscape, or any part thereof, as it appeared at a specific period or as intended by its original constructed design. Reconstruction of an entire landscape is always a last-resort measure for addressing a management objective and will be undertaken only upon specific written approval of the director after policy review in the Washington office. The following standards based on the *Secretary of the Interior's Standards for the Treatment of Historic Properties* apply:

- Archeological, documentary, or physical evidence is available to permit accurate reconstruction with minimal conjecture, and such reconstruction is essential to public understanding of the cultural associations of a park established for that purpose.

- Reconstruction of a cultural landscape in its historic location is preceded by a thorough archeological investigation to identify and evaluate those features and artifacts which are essential to an accurate reconstruction. Mitigation measures are undertaken including recovery, curation, and documentation.

- Reconstruction includes measures to preserve any remaining historic material, features, and spatial relationships.

- Reconstruction is based on the accurate duplication of historic features substantiated by

archeological, documentary, or physical evidence, rather than on conjectural designs or the availability of different features from other landscapes. A reconstructed cultural landscape re-creates the appearance of the non-surviving landscape in design, color, texture, and, where possible, materials.

- A reconstruction is clearly identified as a contemporary re-creation.

- Designs that were never executed historically are not constructed.

The following additional standards apply:

- The reconstructed cultural landscape is full-scale and on the original site.

- The reconstruction does not simulate a damaged or ruined cultural landscape or constitute a general representation of a "typical" landscape, e.g., kitchen garden, period garden, orchard, that never existed historically.

2. Biotic Systems Treatment

This section contains standards addressing the special issues related to the treatment of biotic systems. Virtually all cultural landscapes evolve from and are dependent on natural resources. In many ways, the dynamic qualities inherent in natural systems are what differentiate cultural landscapes from other cultural resources. Plant and animal communities associated with human settlement and use are considered *biotic cultural resources* and can reflect social, functional, economic, ornamental, or traditional uses of the land. Within a cultural landscape, biotic cultural resources are recognized either as a system or as individual specimen features that contribute to the landscape's significance. For example, the preservation of a single tree in a historic designed landscape may be critical to the integrity of the overall design. A herd of a historic variety of livestock may have similar significance in a historic vernacular landscape. In contrast, an entire woodland may have significance, so that preserving the ecological processes of the system rather than individual trees or animals becomes paramount. In all cases, consultation with natural resource professionals is necessary to determine appropriate protection and management strategies for biotic cultural resources.

General standards for managing vegetation in a cultural landscape are followed by specific standards and guidance for managing specimen plants, vegetation systems, pests, and endangered species. (Additional guidance for management of biotic resources is found in the *Natural Resources Management Guideline* [NPS-77].)

- Existing vegetation, both native and introduced (exotic), that contributes to the historic character of a cultural landscape or is important to a traditional user group is identified, maintained, and perpetuated, as appropriate. Special consideration is given to introduced species because they may be important clues to the history of the landscape, they may include plant varieties that are rare or endangered, or they may be mistaken as "pests" and removed.

- Maintenance methods are used that promote the health and vigor of the vegetation and respect either the natural habit of growth or the trained form of the plant material related to the historic character of a cultural landscape.

- Treatment of vegetation is based on an understanding of the functional, design, and associative values of the plant material in a cultural landscape.

a. Specimen Plant Management

Specimens include both individual plants and aggregations of plants that have distinct, unique, or

noteworthy characteristics in a landscape such as individual trees and shrubs, ornamental plantings, perennial borders, gardens, and orchards. In some cultural landscapes, it is important that specific types of plant materials and the location, shape, and form of these materials be retained and perpetuated based on their historic character and significant values. The primary considerations in managing specimen plants are to ensure their health and vigor and, if appropriate, provide for propagation of the next generation. Perpetuation of historic genetic material is especially important when cultivars are rare or unavailable. The following standards apply:

- Extant historic vegetation considered significant as a specimen in a cultural landscape is identified and maintained.
- Perpetuation of historic genetic material, through propagation or other means, is undertaken when plants are rare or have important historical associations or when replacements are unavailable.
- Significant vegetation that causes damage to or threatens other resources is controlled rather than removed whenever feasible.
- Replacement of plant material matches the original in type, location, form, and shape.
- Substitution of plant material is considered in response to changes in growing conditions, susceptibility to disease and pests, or the unavailability of original material. Substitute material matches the historic material in visual, functional, and horticultural characteristics. Varieties resistant to disease, pests, and pollution are used where they meet these standards. Accurate records of substitutions are kept.
- Removal of vegetation that threatens health and safety is preceded by adequate documentation and followed by replacement if appropriate.

b. Vegetation Systems Management

In managing vegetation systems, the overall pattern of vegetation is the primary concern. Elements of pattern include height and general scale and the size and juxtaposition of areas with different vegetation. Exact configurations and plant species can vary as long as the overall pattern is retained. Forests, woodlands, woodlots, and most agricultural lands are examples of vegetation systems. The following standards apply:

- The need for succession through several stages to retain healthy communities is considered in managing forests, woodlands, and woodlots. On agricultural lands, the value of crop rotation, fallow periods, and succession into woodland is considered.
- Consideration is given to the effects of vegetation on the nutrient regime of water bodies and the stability of banks. Erosion is minimized using vegetation or other materials compatible with the historic character of the cultural landscape.
- Vegetation management activities associated with ground disturbance are monitored to ensure the protection of archeological and other cultural resources, such as the remains of roads and traces, fence lines, hedgerows, earthworks, subsurface features, and other structures.
- Areas that meet the definition of wetland generally are excluded from agricultural use. If agricultural use is allowed in wetland areas, appropriate measures are taken to monitor impacts.
- Historic exotic species are monitored and controlled to avoid spreading and disrupting desirable adjacent natural plant communities and associations. Historically inappropriate exotic species

are not introduced.

c. Pest Management

A pest is defined as a population of organisms that interferes with the accomplishment of management objectives. Integrated pest management (IPM) involves taking steps to prevent pest problems, monitoring to detect when a pest population reaches a predetermined threshold level considered unacceptable, and using a combination of approaches to control pests in a manner that will be most effective, safest to people, and most environmentally sound. (For additional information on IPM see the *Natural Resource Management Guideline*.) The following standards apply:

- Landscape management practices that contribute to pest problems are identified and alternate practices that maintain the historic character of a cultural landscape are considered.
- When appropriate, pest-resistant varieties are used to minimize pest-caused damage to features of a cultural landscape and the need for pesticides.
- All use of biocides complies with the standards and procedures in the *Natural Resources Management Guideline*.

d. Endangered Species

Federally or state-listed threatened or endangered species must receive utmost protection. They may be considered "specimens" within the cultural landscape system. (For additional information on endangered species, see the *Natural Resources Management Guideline*.)

3. Inventory and Condition Assessment Program (ICAP)

ICAP, a module of the Maintenance Management (MM) program, assists in planning for the maintenance and major treatment of cultural landscapes through an inventory and condition assessment of their features. ICAP generates annual inspection forms and other reports, develops a preventive maintenance program, and uploads data into the park MM program.

The Historic Property Preservation Database (HPPD) is a computerized database containing technical information on the treatment of cultural landscapes and historic and prehistoric structures. It is used to develop work procedures for ICAP and MM, including skill requirements, work consideration, material and equipment selection, and work instructions. The HPPD also provides information for more intensive treatments such as rehabilitation and restoration.

(For additional information see the ICAP *Reference Manual* and *Computer User Manual*.)

4. Partnerships

NPS fee ownership and occupancy of a cultural landscape provides park managers the greatest flexibility. However, when the integrity of a landscape can be maintained and long-term management objectives realized with the property held or occupied by others, acquisition of less-than-fee interests or special use agreements should be considered. (For further information see Director's Order 27, "Historic Property Leases and Exchanges," the *Special Park Uses Guideline* [NPS-53], and the *Park Planning Guideline* [NPS-2].) The following standards apply to the acquisition and control of lands containing or contributing to a cultural landscape:

a. Acquisition of Lands and Interests

- The fee-simple acquisition of lands is undertaken where necessary to ensure the protection of significant features and uses associated with a cultural landscape.

- The use of easements to protect a cultural landscape takes into account the economic viability of continuing their historic uses and the ability and desire of owners to continue those uses.

- Easements on agricultural lands address the protection of significant small-scale features within a cultural landscape, such as historic roads and paths, hedgerows, fences, and specimen trees. The ability of owners to preserve and maintain such features over time is evaluated to ensure compliance.

b. Leases and Agreements

- Agricultural leases and agreements are managed to protect significant features of a cultural landscape, such as topography, field size, fences, walls, ditches, vegetation, wetlands, earthworks, structures, and vistas.

- Archeological surveys are undertaken as necessary to ensure that modern farming techniques will not destroy subsurface resources.

- Modifications prompted by modern farm machinery and practices, including the alteration of historic buildings, lanes, roads, fences, and gates and the introduction of nonhistoric crops, field patterns, and pruning techniques, are minimized to protect significant landscape features and patterns.

- Landscape support facilities resulting from leases and agreements, such as parking areas and signs, are not allowed to diminish the integrity of a cultural landscape.

c. Adjacent Lands

- Adjacent lands significant to the physical, functional, or symbolic cultural landscape context of the park are identified.

- Direct impacts of adjacent land development on a park cultural landscape are identified, such as removal of woodlands; development and/or reforestation of traditionally "open" lands; alteration of historically significant field patterns; alteration of topography, streams, and watercourses impacting existing natural systems; and alteration of historic vistas.

- Indirect impacts of adjacent land development on a park cultural landscape are identified, such as increased commuter traffic on park roads, storm water runoff or restricted overland flow impacting park vegetation or generating erosion and pollution, increased pressure for the park to serve local recreational needs, higher taxes or land values rendering local agriculture unprofitable, and use of pesticides and herbicides that may negatively impact natural resources.

- Potential impacts of adjacent land development on the cultural landscape context of parks are addressed through park involvement in the planning processes of local jurisdictions.

5. Destruction or Neglect of Cultural Landscapes

No cultural landscape listed in or potentially eligible for the National Register or listed in the Cultural Landscapes Inventory will be destroyed or deliberately neglected without review by cultural resource specialists and approval by the regional director. If a potentially eligible landscape has not been evaluated for the National Register, the state historic preservation officer will be consulted. If it is determined, in consultation with the SHPO, that the landscape does not meet the National Register criteria, destruction or deliberate neglect may occur. In some cases, neglect is the appropriate action to protect archeological resources and the natural resources and processes that may have cultural or ethnographic value.

Case 1:26-cv-00477-ACR Document 84-1 Filed 10/16/26 Page 323 of 361

Before a landscape eligible for the National Register is destroyed or allowed to deteriorate, it must be documented in accordance with Section 110(b) of the National Historic Preservation Act, and the documentation must be accepted by the Chief, HABS/HAER Program.

6. Special Issues

a. Cemeteries

Cemeteries in parks may have significance as repositories of the remains of individuals having local, state, or national importance; as places associated with historic events or figures not interred therein (e.g., Gettysburg National Cemetery for its association with Abraham Lincoln); or because of individual structures of high artistic or architectural merit. In addition, some cemeteries are significant cultural landscapes because they represent a type of burial ground (family), because they typify a broad social movement or pattern (the slave burial ground), or because in plan and execution they were seminal designs (early examples of the "rural" cemetery movement) or works of important designers. The following standards address treatment of park cemeteries, including those in private ownership.

- The cemetery is managed in a manner that recognizes its significance and preserves and interprets the cultural landscape as a whole. The character-defining features of the cemetery, such as general organization and layout, plant materials, roads and pathways, fences, and the placement of statuary and grave markers, are documented and incorporated in a maintenance program.

- Maintenance activities do not impair the significant character and individual features of the cultural landscape. Mowing, weed whipping, and use of commercial herbicides immediately next to grave markers are avoided.

- The repair, cleaning, consolidation, and resetting of grave markers is supervised by a historical architect and other professionals, as appropriate.

- New landscape features are compatible with the original design and character of the cemetery and do not negatively impact the significant built or natural features (e.g., new trees are planted so that roots will not later damage or disrupt grave markers and curbing).

(For further information see the *National Cemeteries Guideline* [NPS-61].)

b. Circulation Systems

In many parks, the roads, parkways, and trails are significant historic circulation systems. A circulation system may constitute a cultural landscape in and of itself, such as Going-to-the-Sun Road in Glacier National Park, or it may be an integral feature of a cultural landscape. Key features of circulation systems, such as topography, bridges, headwalls, retaining walls, culverts, and views, are important to defining the overall character of the landscape. The following standards apply:

- Historically significant circulation systems and their associated features are not adversely impacted to accommodate recreational vehicles, buses, commuter traffic, or other contemporary uses.

- Plans for the treatment of structural features that are parts of historically significant circulation systems are developed in consultation with a historical architect.

- Historic circulation systems are rehabilitated to accommodate health and safety codes in ways that minimize impact on character-defining features.

c. Earthworks

Earthworks are linear or geometric landscape structures built for military, industrial, agricultural, ceremonial, or aesthetic purposes. They include fortifications, water impoundment and control structures, early field boundary ditches and berms, burial mounds, grass garden ramps, and raised beds. Because of their composition, earthworks are constantly being impacted by a variety of natural forces. The long-term preservation of earthworks commonly requires an appropriate vegetative cover that may differ from the historic material. The following standards apply:

- Earthworks are maintained with a healthy, vigorous vegetation cover to minimize erosion and loss of integrity.
- Circulation and visitor use facilities are located and controlled to avoid impacting earthworks.

(For more information see the *Earthworks Landscape Management Manual* and *Earthworks Landscape Management Field Handbook* [full citations in Appendix K].)

d. Monuments, Memorials, and Landscape Remnants

Monuments and memorials are defined as structures and included in the List of Classified Structures. They are often significant components of cultural landscapes and may be cultural landscapes in their own right. The siting, orientation, plantings, paving materials, roads, and pathways designed as an integral part of a monument or memorial should be considered part of the feature and managed as a whole. In addition, remnant objects may have cultural value as landscape features. Their treatment should be developed in collaboration with a historical architect or curator.

At battlefields and other military sites, artillery pieces need to be evaluated in terms of their relationship to the historic landscape. A piece of ordnance may be part of a planned memorial design and significant as a structural feature of the landscape or it may be strictly an interpretive device without site-specific significance. If the ordnance is fixed in position it is defined as a structure; if it is not fixed it is defined as a museum object and may be part of the museum collection. In both cases, the relocation of artillery pieces should be evaluated based on their significance in the context of the overall design of the historic landscape.

## CHECKLIST FOR MANAGEMENT OF CULTURAL LANDSCAPES

### RESEARCH:

- The historic contexts and significant characteristics and features of cultural landscapes are identified and documented in historic resource studies.
- All landscapes eligible for the National Register of Historic Places have been identified and nominated.
- All cultural landscapes are listed in the Cultural Landscapes Inventory.
- Documentary research and physical investigation are sufficient to support treatment.
- Cultural landscape reports are prepared for all cultural landscapes.
- Work procedures and major assessments are complete in an ICAP format.
- All records associated with cultural landscape studies, including maps, field notes,

photographs, soil or pollen analyses, and construction files, are properly organized and placed in the park museum collection.

- All professional reports and publications are entered in the Cultural Resources Management Bibliography.

## PLANNING:

- All cultural landscapes are appropriately addressed in the park's general management plan, development concept plan(s), resources management plan, and interpretive prospectus.
- Plans and specifications for all preservation, rehabilitation, restoration, and reconstruction work are prepared by a historical landscape architect.
- Required consultation and legal compliance is carried out before any work is initiated, and the concerns of consultants are taken into account in decision-making.

## STEWARDSHIP:

- Actions identified in a cultural landscape report are implemented and a record of treatment is added to the report.
- All work is performed by qualified people in conformance with approved plans and specifications or work procedures.
- All maintenance personnel who work with cultural landscapes are given appropriate preservation training.
- All cultural landscapes are inspected at least annually in an ICAP format.
- All ground disturbance in cultural landscapes is cleared or monitored by an archeologist.
- The entire park staff is made aware of the significance of cultural landscapes and the major threats to them.

<<< **Previous** <<< **Contents** >>> **Next** >>>

# EXHIBIT C

Griess Decl.

**Statement of Concurrence**
**East Potomac Park Golf Course Cultural Landscape Inventory**

The preparation of this CLI for East Potomac Park is part of the National Park Service's efforts to update cultural resource inventories, as required by Section 110 of the National Historic Preservation Act.

- The D.C. State Historic Preservation Officer (DC SHPO) concurs with the overall findings of the East Potomac Park Golf Course Cultural Landscape, including its proposed Period of Significance of 1917-1941 which reflects the Golf Course's growth from an initial nine-hole course, to its expansion and desegregation in 1941.
- However, the DC SHPO notes that East Potomac Park Golf Course is a contributing resource of the East and West Potomac Parks Historic District whose Period of Significance extends from 1882-1997. Therefore, the DC SHPO may consider both Periods of Significance when evaluating the effects of future undertakings on the Golf Course and the larger historic district.

[signature]
David Maloney
DC State Historic Preservation Officer

7/18/2017
Date

**Statement of Concurrence**
**Langston Golf Course Cultural Landscape Inventory**

The preparation of this CLI for Langston Golf Course is part of the National Park Service's efforts to update cultural resource inventories, as required by Section 110 of the National Historic Preservation Act.

- The D.C. State Historic Preservation Officer (DC SHPO) concurs with the overall findings of the Langston Golf Course Cultural Landscape, including its proposed Period of Significance (POS) of 1939-1955, which reflects the Golf Course's growth from initial construction through expansion in the 1950s.
- However, the DC SHPO notes that the Langston Golf Course National Register nomination, prepared in 1991, establishes a POS that ends in 1941 (based on the National Register 50-year rule). The NR nomination identifies the Langston Golf Course Clubhouse as non-contributing because it was built in 1955 and falls outside of the POS. Conversely, the CLI identifies the clubhouse as contributing because it was built within the expanded POS. The DC SHPO concurs with the CLI recommendations while recognizing that it implies the need to update the National Register nomination to reflect the change in POS and Contributing/Non-Contributing status of its associated resources.

David Maloney
DC State Historic Preservation Officer

7/18/2017
Date

# EXHIBIT D

Griess Decl.

# EAST POTOMAC PARK GOLF COURSE
# TREE MANAGEMENT PLAN

***GOAL***

**Restore the open links-style golf landscape while concentrating dense vegetation along perimeter of course and administrative and contemporary use areas.** The course interior should read as open, wind-exposed, and visually connected; dense woody vegetation should be used selectively where it screens incompatible administrative, parking, maintenance, and headquarters uses. Specimen trees and small groupings of trees should remain where it aesthetically or strategically makes sense in numbers that do not impact the open links feeling.

## 1. Purpose

This Tree Management Plan translates the 2019 Cultural Landscape Report (CLR) treatment recommendations for East Potomac Park Golf Course into an implementable framework for tree preservation, removal, thinning, relocation, replacement, and new planting. The CLR calls for restoration of links-style golf course through the retention of select specimen trees that are compatible with the historic character, screening of contemporary uses, removal of invasive and non-contributing vegetation, and reopening of important views.

Since completion of the CLR, a new project requirement has been established to provide dense vegetative screening along Buckeye Drive, particularly to screen the USPP/NCR Headquarters complex, parking, administrative, and operational areas. This requirement supplements the perimeter tree management guidelines of the CLR and should be implemented in a manner that protects the historic Ohio buckeye allée and does not unnecessarily compromise significant long-distance views.

## 2. Objectives

- Restore and maintain the historic links-style character: open fairways, broad sightlines, rough grasslands, limited interior tree cover, and strategically retained specimen trees.
- Preserve character-defining and historic vegetation, including the 1910 White Course cherry planting, Ohio Drive cherry plantings, the Buckeye Drive Ohio buckeye allée, and compatible mature specimen trees.
- Remove or thin non-contributing and invasive woody vegetation that encloses fairways or greens, alters golf strategy, reduces turf health, or obscures significant views.
- Concentrate new woody vegetation at appropriate perimeter and modern-use areas rather than distributing it throughout the playable course.
- Create a dense, durable, multi-layer vegetative screen along Buckeye Drive while retaining the historic allée as a visible and managed landscape feature.
- Use vegetation to reduce the visual effect of parking, maintenance, administrative, service, and other non-historic facilities.

### 3. Landscape Management Zones

| ZONE | DESIRED CHARACTER | PRIMARY ACTION | PLANTING DENSITY |
|---|---|---|---|
| A – Golf Course Interior | Open links landscape; long sightlines; isolated specimens. | Remove/thin non-contributing woody vegetation; preserve selected specimen trees; favor turf and rough grasslands. | LOW |
| B - Historic and Specimen Trees | Historic cherries, Buckeye allée, contributing specimens, specimen trees that can be retained for transplanting in other locations. | Preserve, replacement where historically appropriate or compatible with a links-style golf course; transplant desirable specimen trees for use in screening; remove competing invasive growth. | TARGETED |
| C - River/Ohio Drive Perimeter | Seamless edge with outward views; cherries remain prominent. | Control invasives and unmanaged screen growth; selectively open views to river/channel; protect cherries. | LOW-MODERATE |
| D - Fieldhouse / Entry / Parking/Miniature Golf Course | Welcoming landscape; shade and visual softening without enclosing course. | Retain compatible shade trees; add parking shade/perimeter trees; coordinate planting with entry redesign. | MODERATE |
| E - Maintenance / Administrative / Service | Operational uses visually subordinate to historic course. | Layered screening; relocate support functions outside key views where feasible; use vegetation as visual buffer. | HIGH |
| F - Buckeye Drive Screening Corridor | Dense vegetative buffer screening USPP/NCR HQ and modern uses while preserving Buckeye allée. | Preserve allée; add continuous multi-layer screen with canopy, understory and shrubs; close visual gaps over time. | VERY HIGH |

### 4. Course Interior - Links-Style Rehabilitation

The course interior is the highest priority area for restoring openness. The CLR describes East Potomac as historically consisting of open, mostly treeless fairways, with most trees relegated to course edges. Later plantings moved the landscape toward a parkland character, altered strategy, affected turf, and obscured intended views.

- Remove or substantially thin continuous tree rows and woody masses that visually define fairway edges where those plantings are non-contributing.

- Remove invasive vines, volunteer trees, brush, and unmanaged understory along fairways, greens, fence lines, and former debris/storage areas.
- Evaluate non-contributing evergreens and paired cedars within fairway corridors for removal where they conflict with the restored links character.
- Evaluate later flowering trees behind greens for removal or thinning where they enclose greens or obstruct significant views.
- Preserve mature specimen trees where they function as isolated landscape features and do not compromise historic views or play.
- Use rough grasslands and compatible low herbaceous vegetation, rather than woody screens, to define non-play areas within the course.
- Do not introduce continuous new canopy or understory planting between playable holes except where specifically justified by historic documentation, safety, or a documented screening need.

### 5. Historic and Character-Defining Trees

- White Course 1910 cherry grove: preserve and maintain as a priority historic resource; treatment should be consistent and follow the maintenance and care schedule of other cherry trees within the Park portfolio.
- Ohio Drive cherry plantings: preserve and keep visually prominent; remove competing invasive and unmanaged woody growth. Strategically maintain or introduce gaps in flowering cherry plantings adjacent to greens and tee boxes to preserve and recapture historic visual connections to the Potomac River, Washington Channel, and nearby urban landmarks. Manage views through the trees and in between cherry tree groves.
- Buckeye Drive Ohio buckeye allée: preserve, maintain, and replace missing/failed trees in a manner that sustains the allée's continuity and identity. Add irrigation required by the buckeye species (Yellow Buckeye and Red Horsechestnut) in the allee. Supplement with Ohio Buckeye.
- Specimen mature trees: preserve healthy specimens that enhance the setting, provide appropriate shade, and remain compatible with open links character. Install lighting protection.
- Fieldhouse/miniature golf shade trees: incorporate compatible existing shade trees into a cohesive planting and entry plan.

### 6. Views and Vistas

Tree work shall be coordinated with a viewshed inventory. The CLR identifies views to important monuments and memorials, city, waterways, and fieldhouse as part of the course's historic character.

- Prioritize reopening and maintaining views toward the Washington Monument, Jefferson Memorial, U.S. Capitol, National War College, Potomac River, Washington Channel, Virginia shoreline, and historic fieldhouse wings.
- Use selective removal, crown raising, thinning, and understory clearing before retaining dense vegetation in a historic view corridor.
- Do not permit new interior planting to close reopened views.
- Where the Buckeye Drive screening requirement intersects a potentially significant view, shape the screen to maintain the most important long-distance visual connection while still providing effective screening of modern facilities.

### 7. Buckeye Drive Dense Screening Corridor

The Buckeye Drive corridor shall receive a dense and continuous vegetative treatment because screening of USPP/NCR Headquarters, parking, administrative, and maintenance areas is now a project requirement. From the golf-course side, modern facilities across and along Buckeye Drive should be substantially filtered or screened by vegetation through the growing season, with meaningful year-round screening where feasible. The historic Ohio buckeye allée should remain the primary recognizable roadside landscape feature.

- Retain and manage the existing Ohio buckeye allée on both sides of Buckeye Drive.
- Establish a broad, layered planting zone wherever available behind, between, or beyond the allée, using canopy trees, understory trees, shrubs, and low ground-layer planting.
- Plant in staggered, overlapping groups rather than single rows so that gaps do not align and screening remains effective as individual plants decline or are removed.
- Use a high proportion of evergreen, or persistent-screening material in the secondary/background layer where compatible with site conditions, while avoiding a formal evergreen wall immediately adjacent to the historic allée.
- Use deciduous canopy trees to build long-term height and mass; understory trees to close middle-level views; and shrubs to screen vehicles, parking, fencing, service areas, and ground-level operations.
- Increase planting density opposite the USPP/NCR Headquarters, parking lots, service yards, and other visually intrusive facilities.
- Maintain clear zones necessary for roadway safety, utilities, security, access, drainage, and tree health.
- Where space is constrained, prioritize layered screening at the most visually exposed locations and use planting masses that widen where land is available.
- Evaluate healthy trees removed from the course interior for relocation to the Buckeye screening corridor when species, size, condition, transplantability, and historic compatibility make relocation practical.
- Monitor the corridor annually and infill gaps promptly so that screening density increases rather than erodes over time.

### 8. Parking, Administrative, Maintenance and Service Areas

- Use dense perimeter planting where these uses are visible from playable areas or primary circulation.
- Add canopy trees within and around parking areas for shade and visual softening, consistent with the CLR's parking recommendations.
- Screen maintenance yards, storage, dumpsters, equipment, fencing, trailers, and service functions with layered vegetation where relocation outside critical views is not feasible.
- Keep screening concentrated around the modern use; do not extend dense woody vegetation unnecessarily into the historic playing landscape.

## 9. Tree Inventory and Treatment Classification

Before final design, prepare a georeferenced inventory of significant trees and vegetation masses. Assign each inventoried feature one primary treatment:

| CLASSIFICATION | CRITERIA / ACTION |
|---|---|
| **PRESERVE** | Historic/contributing tree or compatible mature specimen; protect root zone and canopy during construction. Lightning protection where appropriate. |
| **PRESERVE + MANAGE** | Retain with pruning, crown raising/thinning, critical rootzone management, and tree health practices. |
| **REMOVE** | Non-contributing, invasive, hazardous, declining, view-obstructing, turf-damaging, or incompatible with links character. |
| **RELOCATE** | Healthy and transplantable but incompatible in current location; evaluate for Buckeye/parking/admin screening areas. |
| **REPLACE IN KIND / HISTORIC PATTERN** | Loss or missing historic tree where replacement supports continuity of a documented planting. |
| **NEW SCREEN PLANTING** | New canopy/understory/shrub vegetation serving Buckeye Drive or modern-use screening. |
| **NO WOODY PLANTING** | Areas intentionally maintained as open links landscape, viewshed, fairway, rough grassland, or historic open space. |

## 10. Maintenance and Monitoring Standards

- Inspect newly planted trees and shrubs at least annually during establishment and replace failed material promptly.
- Maintain invasive-plant control as an ongoing program, especially along fence lines, river edges, naturalized areas, and screening zones.
- Prune to preserve tree health, historic form, visibility beneath selected canopies, and roadway/golf safety.
- Add irrigation to the golf course system to support tree plantings and encourage faster growth/establishment.
- Prevent accumulation of brush, logs, soil, rock, or natural debris in the course interior; dispose of or compost material in designated locations using best management practices.
- Review significant removals and new planting against the viewshed plan and historic landscape objectives before implementation.
- Track canopy and understory change with repeat photography from established viewpoints, including key views toward monuments, waterways, fieldhouse, and Buckeye Drive.
- Evaluate Buckeye Drive screening annually for gaps, mortality, visibility of headquarters/parking, and conflicts with the historic allée; infill or adjust as needed.

# EXHIBIT E

Griess Decl.

National Park Service
U.S. Department of the Interior

National Mall and Memorial Parks

# Categorical Exclusion Documentation Form (CE Form)

**Project:** East Potomac Park Golf Course - Tree Management and Cultural Landscape Rehabilitation

**PEPC Project Number:** 139091

**Description of Action (Project Description):**

The National Park Service (NPS) proposes to implement a tree management and cultural landscape rehabilitation project at the East Potomac Park Golf Course in Washington, DC. The project would implement vegetation treatment recommendations contained in the 2019 'Cultural Landscape Report: National Park Service Golf Courses in the District of Columbia - East Potomac Park, Langston, and Rock Creek: Treatment Guidelines' (CLR) through selective tree and woody vegetation removal; preservation and management of historic and character-defining vegetation and compatible specimen trees; restoration and maintenance of significant views and the historically open spatial character of the golf course; control of invasive and volunteer vegetation; and targeted replacement and new planting where necessary to perpetuate historic vegetation patterns or screen contemporary administrative and operational uses. The project is limited to restoration activities at the East Potomac Park Golf Course.

As explained in the CLR, East Potomac Golf Course designer Walter J. Travis 'opted to design a traditional links-style course rather than a parkland-style course,' showcasing a style that favored 'a rough, grassy area of land along the coastline that includes sand dunes and few, if any, trees.' CLR at 11. The CLR notes, however, that 'after Traviss initial planning effort, successive decades have led to the introduction of additional trees to the course, which have altered the feeling of the course, moving the character of the links-style courses closer to parkland-style courses,' and that the 'encroachment of vegetation has altered strategy and obscured intended views within the course.' CLR at 93. The CLR further observes that '[l]inks-style courses typically have very few trees and shrubs,' because '[t]oo many trees would interfere with the characteristic views and ever-present wind,' and that at East Potomac 'there were some trees originally, but overwhelmingly the property was treeless allowing for views across the golf course and to the surrounding water.' CLR at 94. The CLR attributes the change in this character to the fact that '[m]any trees have grown up within the course due to lack of maintenance, creation of dumping areas, and aggressive planting without regard to the history or function of the golf course,' and it concludes that '[t]rees and understory will have to be managed in order for [East Potomac Park Golf Course] to return to its links character.' CLR at 94. Accordingly, the CLR recommends that the NPS '[r]estore the links style and historic vegetation (rough grasslands, thin trees between fairways, and sentinel deciduous trees),' and 'minimiz[e] trees growing between the fairways.' CLR at 196.

The Treatment chapter of the CLR is explicit that restoring this character requires removing trees. In its site-specific guidelines for East Potomac, the CLR explains that '[t]he East Potomac Park Golf Course originally consisted of open, mostly treeless, fairways with the majority of trees relegated to the edges of the various courses,' but that '[s]uccessive decades of unchecked plantings by the NPS and concessionaire, changed the character of the links-style courses closer to that of a parkland-style course.' CLR at 196. The CLR therefore directs the NPS to '[r]emove invasive vegetation growing unchecked along the fence line and the planted non-contributing vegetation that occurred piecemeal without a cohesive design around the fieldhouse and along the property's fairways.' CLR at 196. With respect to the championship Blue Course, which the CLR found 'includes more trees than were originally intended,' the CLR states that '[n]on-contributing vegetation planted along the fairways should be removed to open views and reinforce the links-style character.' CLR at 189. The CLR similarly

recommends that views from the White Course 'be enhanced by removing non-contributing vegetation planted along the fairways to open up these views and reinforce the links-style character.' CLR at 190. The CLR's general recommendations, which apply to all three NPS golf courses in the District of Columbia, including East Potomac, likewise direct the NPS to '[r]emove encroaching vegetation that adversely affects design intent,' CLR at 173, and to '[r]emove non-contributing, non-native, and invasive vegetation where it compromises the historic character of the golf course, where it may affect the playability of the golf course, change the historic spatial qualities, impact important views, or introduce varieties of vegetation that change the historic planting character.' CLR at 177. The CLR further provides that '[e]ncroaching vegetation that compromises the design intent of the views and playability of the golf course should be removed.' CLR at 179.

NPS's other cultural landscape documentation reaches the same conclusions. The 2017 'Cultural Landscapes Inventory: East Potomac Golf Course' (Golf Course CLI) explains that '[t]he vegetation pattern of Travis' design was generally treeless—a characteristic feature of links-style courses—with cleared fairways and grassy turf.' Golf Course CLI at 48. It further states that '[w]ide open vistas of grass and views toward the water, were the desired effect at East Potomac.' Golf Course CLI at 132-133. Consistent with that design intent, the Golf Course CLI identifies 'a wide open, treeless landscape' as character-defining vegetation at East Potomac. Golf Course CLI at 135. The Golf Course CLI also documents how that character was lost, explaining that images of Augusta National 'resulted in the planting of thousands of trees and flowering shrubs, on courses throughout the country including on links-style courses such as East Potomac, where they were never intended.' Golf Course CLI at 133. It concludes that '[m]aturation of vegetation and additional planting since the period of significance, has resulted in the loss of view sheds and changed the feeling of playing the course, designed in the relatively treeless links style,' and that '[t]hese developments are reversible.' Golf Course CLI at 75. Similarly, the 2023 'Cultural Landscapes Inventory: East Potomac Park' (Park CLI) explains that Travis's design, 'inspired by links-style courses in Scotland, preferred a mostly treeless landscape, which permitted open views to the Potomac River and Washington Channel beyond.' Park CLI at 141.

As an intermediate step, the CLR recommends that the NPS '[d]evelop a Vegetation Management Plan for the [East Potomac Golf Course] to establish removals, thinning, replacement and new plantings based on the management objective to preserve the links-style landscape.' CLR at 196. The NPS developed a Tree Management Plan that provides an implementation framework for this work. The plan expressly translates the CLR treatment recommendations into criteria and actions for tree preservation and removal. Consistent with the CLR, the plan is intended to restore the open links-style golf landscape while concentrating denser vegetation along the perimeter of the course and around contemporary administrative and operational uses while restoring significant views.

Specifically, the plan seeks to restore open fairways, maintain significant views and vistas, protect historic vegetation, and address invasive, hazardous, unmanaged, and non-contributing trees and woody growth. Accordingly, this effort consists of selective vegetation removal, associated stump and root removal, and stabilization of disturbed areas. These treatments are intended to improve the condition of the cultural landscape while supporting its continued use as a public golf course.

**Site Description**

The East Potomac Park Golf Course is an established, developed recreational landscape located between the Potomac River and Washington Channel. The golf course is a contributing site within the National Register-listed East and West Potomac Parks Historic District. Its significant landscape characteristics include land use, topography, spatial organization, circulation, vegetation patterns, buildings and structures, and views and vistas. The course was originally conceived as a links-style landscape characterized by predominantly open fairways, long sightlines, rough grasslands, and relatively limited interior tree cover. The Tree Management Plan notes that subsequent tree planting and unmanaged woody growth have contributed to a more enclosed, parkland character in portions of the course, affecting historic views, golf strategy, turf conditions, and the historic spatial character of the landscape. The CLR likewise found that, at East Potomac, '[t]he encroaching vegetation has altered strategy, impacted turf health, and obscured intended views within the course.' CLR at 196. It notes, for example, that cedars defining a green are 'not in keeping with the original intention of Travis.' CLR at 197. The CLR also attributes turf problems on the course in part to 'tree root competition' and 'shade from trees.' CLR at 198.

The proposed project would selectively remove trees and woody vegetation that have been determined to be non-contributing to the historic landscape or incompatible with the historic links-style character. Removal would focus on trees and vegetation that enclose historically open fairways and greens, obscure significant views and vistas, adversely affect turf or golf-course function, or otherwise conflict with the historic landscape treatment objectives. Invasive vines, volunteer trees, brush, and unmanaged understory vegetation would also be removed where appropriate. Mature specimen trees that function as compatible isolated landscape features and do not compromise historic views or golf-course function would be retained.

Based on the current tree inventory, the proposed action includes removal of approximately 382 trees measuring greater than 10 inches diameter at breast height (DBH), plus an additional 147 trees of a smaller size. Of these, approximately 247 trees have DBHs between 10.1 and 20 inches, with an average DBH of 14.38 inches; 93 trees have DBHs between 20.1 and 30 inches, with an average DBH of 24.72 inches; and 42 trees have DBHs greater than 30 inches, with an average DBH of 46.32 inches. Approximately 147 trees are less than 10 inches and an average DBH of 6.71 inches. Total number of trees to be removed is 529. These trees would be evaluated and treated consistently with the Tree Management Plan and the historic landscape objectives established by the CLR. The project includes excavation or pulling stumps or root balls or stump grinding along with substantial root removal.

Tree-removal activities covered by this compliance review would generally consist of cutting identified trees at or near existing grade using conventional arboricultural equipment and methods. Equipment access would use existing roads, golf-course circulation routes, turf areas, and previously disturbed portions of the developed landscape to the extent practicable. Ground protection matting along equipment access routes and within work areas will be used where needed to minimize soil disturbance and damage to existing turf. Work would be performed in a manner that avoids unnecessary soil disturbance and protects historic landscape features.
The project would specifically protect vegetation identified as historic or character-defining. This includes the historic cherry plantings associated with the White Course, the Ohio Drive cherry plantings, the Ohio buckeye allée along Buckeye Drive, and compatible mature specimen trees.

Tree removal would also be used to restore and maintain significant historic views and vistas. Vegetation management would prioritize views toward the Washington Monument, Jefferson Memorial, U.S. Capitol, National War College, Potomac River, Washington Channel, Virginia shoreline, and historic fieldhouse wings. Selective removal would be used to reopen or maintain these visual relationships. The CLR's site-specific guidelines for East Potomac explain that '[t]ree plantings around the greens in the 1960s and 1970s hemmed in the views and restricted the vistas along the fairways,' and they direct the NPS to '[r]einforce the visual connections to the city and river by selectively removing vegetation to open views to the iconic buildings of Washington, D.C., and to the Potomac River and Washington Channel.' CLR at 205. The CLR adds that 'Travis capitalized on the geography, relatively flat topography, and generally treeless areas to offer general views and vistas to the Washington Monument, the Jefferson Memorial, the U.S. Capitol building, National War College, and other landmarks of the city as well as the surrounding Potomac River and Washington Channel.' CLR at 205-206. Along the course perimeter, the CLR found that 'screen plantings and encroaching invasive vegetation filled in along the edge blocking the views to the surrounding East Potomac Park, Potomac River, and Washington Channel on three sides of the golf course.' CLR at 187. These open views are integral to the historic design of the golf course. According to the Park CLI, '[t]he earliest plans for the East Potomac Park Golf Course offered exceptional views of surrounding landmarks, including the Washington Monument, the US Capitol Building, and the waterfront opposite the Washington Channel,' and '[t]hese views were enhanced through a combination of selective siting of vegetation and through the controlled design of topographic features, which were kept low to avoid impeding views.' Park CLI at 220. The Golf Course CLI notes, however, that '[i]n some areas of the cultural landscape, the maturation of trees throughout and outside the course have partially or fully obstructed these views.' Golf Course CLI at 140.

Following tree removal, affected areas would be stabilized and maintained as turf, rough grassland, or other compatible low-growing vegetation where appropriate to reinforce the historically open character of the links-style golf course. In locations identified for historic replacement planting or screening, trees and other vegetation would be installed in accordance with the Tree Management Plan. The plan establishes treatment classifications

of Preserve, Preserve + Manage, Remove, Relocate, Replace in Kind/Historic Pattern, New Screen Planting, and No Woody Planting to ensure that vegetation treatment is responsive to the historic character and function of individual portions of the landscape.

The project would not change the existing use of East Potomac Park Golf Course, alter the fundamental configuration or function of the golf course, construct new buildings, expand the developed footprint of the golf course, or authorize substantial new ground disturbance. Rather, the project constitutes vegetation and landscape management within an existing developed recreational and historic cultural landscape. The work is intended to improve the condition and integrity of the historic landscape by restoring the open links-style character, protecting character-defining vegetation, reopening historically significant views and controlling incompatible and invasive vegetation.

The NPS completed an inventory and evaluation of existing trees and vegetation to establish baseline conditions and identify invasive vegetation, hazardous or declining trees, historic and character-defining vegetation, compatible specimen trees, and non-contributing vegetation potentially inconsistent with the historic links-style landscape. This work provides the information necessary to prioritize subsequent vegetation-management treatments and to distinguish vegetation appropriate for preservation from vegetation that may be considered for removal, thinning, relocation, or replacement.

Maps of trees to be removed and specimen trees attached to compliance, along with photos of specimen trees.

**Project Location:**

**County, State:** District of Columbia, DC

**Mitigation(s):**

- Park staff & contractors must comply with protection of bats and bat habitat as required by law. Any trees larger than 3" DBH are subject to surveys the night before removal or pruning to ensure no bats are roosting in the tree.
- Construction equipment will be in satisfactory condition; i.e., it will be equipped with required safety components and not be leaking hazardous liquids or emitting hazardous or undesirable fumes above allowable legal limits.' (9.1.3.1, NPS Management Policies 2006). Equipment must be free of any fluid leaks (fuel, oil, hydraulic fluid, etc.) upon arrival to the work site and will be inspected at the beginning of each shift for leaks. Leaking equipment will be removed off site for necessary repairs before the commencement of work.
- All refueling of equipment shall have spill containment pads in position prior to refueling activities. Spill kits shall be onsite and readily accessible anytime hazardous materials including fuel and/or oil are brought into the park. Secondary containment of these materials is required at all times.
- Erosion control methods shall be used to prevent erosion and sedimentation during and post construction. Use the DC Department of Energy & Environment Erosion and Sediment control Manual (aug 2017) and guidance. https://doee.dc.gov/sites/default/files/dc/sites/ddoe/release_content/attachments/2017%20DC%20ESC%20Specifications%20Manual_08_2017.pdf
- Tree and Turf Protection: All motorized equipment used shall be conveyed and staged on ground mats (e.g. Alturna mats; Trak-mats; etc.) designed for the purpose when operating off of paved surfaces. At no time shall motor vehicles or heavy equipment be in direct contact with turf or critical root zones.
- Soil disturbance shall be minimized to the greatest extent possible to reduce disturbance to native plants and reduce the potential for the introduction or spread of invasive non-native plant species.
- Spill containment kits and fire extinguishers shall be available on site at all times.
- Any safety violations shall be corrected immediately. If the violation is not corrected immediately, the project shall be postponed until such corrections are made.
- Minimize or avoid impacts to breeding birds.

- All project zones will be kept trash free at all times.
- Work shall follow the recommendation of an approved treatment plan
- Brush removal in cultural/historic areas shall take place outside of peak visitor use, and shall be conducted in stages to lessen changes to visual impacts.

**CE Citation:** DOI NEPA Handbook, Appendix 2, 12.5, C(4), (Feb. 2026). Routine maintenance and repairs to cultural resource sites, structures, utilities and grounds under an approved Historic Structures Preservation Guide or Cyclic Maintenance Guide; or if the action would not adversely affect the cultural resource.

**CE Justification:** Use of NPS CE 12.5 C(4) is appropriate because the action constitutes routine maintenance and treatment of cultural resource grounds and is consistent with established preservation objectives for the historic cultural landscape. The work is intended to maintain and rehabilitate character-defining landscape conditions and would be undertaken in accordance with applicable cultural resource treatment guidance. The action would not adversely affect the cultural resource and would not result in a change in the property's historic use or introduce incompatible alterations to its character-defining features. The CLR identifies rehabilitation as the recommended treatment for the golf courses and explains that, while 'a well-managed landscape keeps its intended character,' where a landscape 'is not well-maintained, vegetation can grow unchecked and block views, affect the playability of a course, and impact the health of the turf.' CLR at 167. The CLR also incorporates the NPS Management Policies direction that, '[w]here necessary to preserve and protect the desired condition of specific cultural resources and landscapes, plants and plant communities generally will be managed to reflect the character of the landscape that prevailed during the historic period.' CLR at 165.

**Extraordinary Circumstances:**

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| **A.** Have significant impacts on public health or safety? | No | The proposed action would not have significant impacts on public health or safety. Vegetation management activities would be conducted using standard NPS and industry safety practices, with appropriate controls for work areas, equipment operation, and visitor access. The action would not introduce new public health or safety hazards or substantially increase existing risks. |
| **B.** Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands; floodplains; national monuments; migratory birds; and other ecologically significant or critical areas? | No | The proposed action would not have significant impacts on natural resources or unique geographic characteristics. The work would occur within the existing, developed East Potomac Park Golf Course and is intended to implement vegetation-management recommendations of the 2019 Cultural Landscape Report and restore characteristics of the historic cultural landscape. The Tree Management Plan specifically provides for preservation of historic and character-defining vegetation, including the White Course cherry planting, Ohio Drive cherry plantings, the Buckeye Drive Ohio buckeye allée, and compatible mature specimen trees.<br><br>Although the project is located within park and recreation lands and a historic cultural landscape, the proposed treatments will maintain and rehabilitate those resources. Tree removal and thinning would focus on non-contributing and would support restoration of the historically open links-style character and significant views and vistas. |

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| | | Tree removal would include removal of associated stumps and root systems and would therefore result in localized ground disturbance within existing tree root zones. Ground disturbance would be limited to the area necessary to remove individual stumps and roots and would not involve widespread excavation or substantial alteration of the golf course's existing topography. Appropriate erosion and sediment controls, soil stabilization, protection of retained vegetation, and other applicable best management practices would be implemented during the work. Areas disturbed by stump and root removal would be stabilized and restored consistent with the historic landscape treatment objectives. East Potomac Park Golf Course is located on Hains Point, an area of artificially created land formed through the dredging and reclamation of the Potomac River tidal flats during the late nineteenth and early twentieth centuries. The U.S. Army Corps of Engineers deposited dredged sediments and fill materials to create the landmass that became East Potomac Park. The golf course was subsequently developed on this reclaimed land beginning in 1917. As a result, the golf course is situated primarily on historically placed fill rather than an undisturbed natural land surface, although the presence of fill does not preclude the potential for archaeological resources. |
| **C.** Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks? | No | The proposed action would not have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks. The types of activities proposed including selective tree and vegetation removal, stump and root removal, invasive vegetation control, and subsequent stabilization of disturbed areas are established vegetation-management practices with generally understood environmental effects.<br><br>The location and nature of the work are also well understood. The Tree Management Plan establishes specific treatment criteria for determining which vegetation should be preserved, managed, removed, relocated, or replaced and identifies preservation of historic and character-defining vegetation as a fundamental treatment objective. The proposed removals implement the CLR-based objective of restoring the historically open links-style character of the golf course and reopening significant views rather than introducing a new or experimental landscape treatment.<br><br>Stump and root removal would result in localized |

| If implemented, would the proposal… | Yes/No | Explanation |
|---|---|---|
| | | subsurface disturbance; however, the nature of that disturbance is reasonably foreseeable and can be addressed through established resource-protection measures, including limits on the extent of excavation, protection of retained vegetation, erosion and sediment controls, stabilization of disturbed soils, and procedures for addressing any previously unidentified cultural resources encountered during ground-disturbing work. The work does not involve unusual construction methods, hazardous materials, novel technologies, or environmental conditions for which the potential effects cannot reasonably be anticipated. |
| **D.** Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects? | No | The proposed action would not establish a precedent for future actions or represent a decision in principle about future actions with potentially significant environmental effects. The current action is limited to recommendations including in the 2019 CLR and consists of priority vegetation management based on the completed tree and vegetation inventory. The treatments are intended to address non-contributing vegetation that conflicts with the historic links-style character, significant views, or other cultural landscape objectives. The Tree Management Plan establishes treatment criteria for individual trees and vegetation masses rather than establishing a general policy or authorization for future vegetation removal.<br><br>Implementation of the current project therefore does not predetermine the design, location, scope, or approval of subsequent projects and does not foreclose reasonable alternatives that may be considered during future planning and environmental review. Accordingly, the action would neither establish a precedent for future actions with potentially significant environmental effects nor constitute a decision in principle regarding such actions. |
| **E.** Have a direct relationship to other actions that implicate potentially significant environmental effects? | No | The proposed action would not have a direct relationship to other actions that implicate potentially significant environmental effects. The current action is limited to recommendations included in the 2019 CLR focuses on priority vegetation management, including removal of non-contributing vegetation; associated stump and root removal; and stabilization of disturbed areas. These treatments have an independent cultural landscape management purpose and can be implemented without requiring implementation of subsequent projects. This project has independent utility because it would achieve meaningful cultural landscape preservation and resource management objectives regardless of whether future projects to renovate or rehabilitate the |

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| | | golf course occur. The selective removal of non-contributing vegetation, including associated stump and root removal, would help restore the historically open links-style character of East Potomac Park Golf Course, reopen significant historic views, and improve long-term landscape maintenance consistent with the 2019 Cultural Landscape Report. These benefits would be realized without requiring subsequent golf-course redesign, grading, or other improvements. The project can be completed independently and does not commit NPS to implementing future projects. |
| **F.** Have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by the bureau? | No | The proposed action is not anticipated to have significant impacts on properties listed in or eligible for listing in the National Register of Historic Places. Although the work would occur within the historic East Potomac Park Golf Course cultural landscape, it will implement the preservation and rehabilitation recommendations established in the 2019 Cultural Landscape Report.<br><br>The CLR identifies the historically open links-style character, vegetation patterns, spatial organization, and significant views and vistas as important aspects of the historic landscape. The proposed vegetation treatments would support restoration of these characteristics through selective removal of invasive, unmanaged, and non-contributing vegetation while preserving historic and character-defining trees and compatible specimen vegetation.<br><br>The current project would include stump and root removal, resulting in localized ground disturbance. The NPS completed Section 106 review through the applicable Streamlined Review process, provided the undertaking satisfies its eligibility requirements and is determined not to adversely affect historic properties.<br><br>The NPS has determined that implementation of the East Potomac Park Golf Course Tree Management Plan would result in No Adverse Effect to historic properties under Section 106 of the National Historic Preservation Act (36 CFR § 800.5(b)). The proposed vegetation management activities are consistent with the treatment recommendations outlined in the 2019 Cultural Landscape Report and are intended to rehabilitate the historic links-style character of the golf course, a contributing resource to the East and West Potomac Parks Historic District. Selective removal of non-contributing vegetation would restore historic openness, improve significant views and vistas, and reinforce character-defining spatial |

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| | | relationships. Historic and contributing trees and planting patterns would be preserved and protected, and ground disturbance associated with stump and root removal would be limited and subject to appropriate resource protection measures. The undertaking would not diminish the characteristics that qualify the historic property for listing in the National Register of Historic Places. Accordingly, the NPS has determined that the proposed action would have no adverse effect on historic properties.<br>Based on the CLR treatment recommendations, the limited scope of the current project, and implementation of appropriate cultural-resource protection measures, the undertaking is not anticipated to diminish the characteristics that qualify the historic property for National Register listing or result in significant impacts to historic properties. |
| **G.** Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species? | No | The proposed action is not anticipated to have significant impacts on federally listed or proposed threatened or endangered species or designated critical habitat. The work would occur within the existing, actively managed East Potomac Park Golf Course and would consist of selective removal of non-contributing vegetation, including associated stump and root removal and stabilization of disturbed areas.<br><br>The project incorporates measures specifically designed to avoid adverse impacts to federally listed species and migratory birds. To the extent practicable, tree removal activities will occur outside the seasonal restriction period of March 15 through August 15. If work must occur during that period, qualified biologists will conduct pre construction nesting and bat roost surveys no more than five calendar days before treatment. Trees containing active nests or occupied roosts will be avoided until no longer occupied. Work is limited to previously disturbed and actively managed landscapes and does not involve permanent habitat conversion or alteration of designated critical habitat. These avoidance measures eliminate pathways for significant adverse effects to federally protected species. Herbicides, biological controls, prescribed fire, and other treatment methods evaluated in the NCR-IPMP-EA are not proposed under this project. |
| **H.** Significantly limit access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites? | No | The proposed action is not anticipated to significantly limit access to or ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sites. There are no known sites within the project area. |

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| **I.** Contribute to potentially significant effects resulting from the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or from other actions that promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act)? | No | The proposed action would not contribute to potentially significant environmental effects resulting from the introduction, continued existence, or spread of noxious weeds or non-native invasive species.<br><br>Although vegetation removal and associated soil disturbance could temporarily create conditions favorable to the establishment or spread of invasive species, these risks would be minimized through established best management practices. Such measures would include cleaning equipment to prevent the introduction or transfer of invasive plant material, properly handling and disposing of removed vegetation and root material, minimizing the extent and duration of exposed soils, promptly stabilizing disturbed areas with appropriate turf or other compatible vegetation, and monitoring treated areas for invasive species regrowth. |

**Decision: I find that the action fits within the categorical exclusion(s) above. Therefore, I am categorically excluding the described project from further NEPA analysis. No extraordinary circumstances apply.**

**Superintendent Signature:** Kevin J. Griess 2026.10.09 09:15:45 -04'00' **Date:** ____________

Kevin Griess

# EXHIBIT F

Griess Decl.

National Park Service
U.S. Department of the Interior

National Mall and Memorial Parks
Date: 10/09/2026

# ASSESSMENT OF ACTIONS HAVING AN EFFECT ON HISTORIC PROPERTIES

## A. DESCRIPTION OF UNDERTAKING

**1. Park:** National Mall and Memorial Parks

**2. Project Description:**

**Project Name:** East Potomac Park Golf Course - Tree Management and Cultural Landscape Rehabilitation
**Prepared by:** Tammy Stidham **Date Prepared:** **Telephone:** 202-619-7474
**PEPC Project Number:** 139091
**Locations:**
**County, State:** District of Columbia, DC
**Describe project:**

The National Park Service (NPS) proposes to implement a tree management and cultural landscape rehabilitation project at the East Potomac Park Golf Course in Washington, DC. The project would implement vegetation treatment recommendations contained in the 2019 'Cultural Landscape Report: National Park Service Golf Courses in the District of Columbia - East Potomac Park, Langston, and Rock Creek: Treatment Guidelines' (CLR) through selective tree and woody vegetation removal; preservation and management of historic and character-defining vegetation and compatible specimen trees; restoration and maintenance of significant views and the historically open spatial character of the golf course; control of invasive and volunteer vegetation; and targeted replacement and new planting where necessary to perpetuate historic vegetation patterns or screen contemporary administrative and operational uses. The project is limited to restoration activities at the East Potomac Park Golf Course.

As explained in the CLR, East Potomac Golf Course designer Walter J. Travis 'opted to design a traditional links-style course rather than a parkland-style course,' showcasing a style that favored 'a rough, grassy area of land along the coastline that includes sand dunes and few, if any, trees.' CLR at 11. The CLR notes, however, that 'after Traviss initial planning effort, successive decades have led to the introduction of additional trees to the course, which have altered the feeling of the course, moving the character of the links-style courses closer to parkland-style courses,' and that the 'encroachment of vegetation has altered strategy and obscured intended views within the course.' CLR at 93. The CLR further observes that '[l]inks-style courses typically have very few trees and shrubs,' because '[t]oo many trees would interfere with the characteristic views and ever-present wind,' and that at East Potomac 'there were some trees originally, but overwhelmingly the property was treeless allowing for views across the golf course and to the surrounding water.' CLR at 94. The CLR attributes the change in this character to the fact that '[m]any trees have grown up within the course due to lack of maintenance, creation of dumping areas, and aggressive planting without regard to the history or function of the golf course,' and it concludes that '[t]rees and understory will have to be managed in order for [East Potomac Park Golf Course] to return to its links character.' CLR at 94. Accordingly, the CLR recommends that the NPS '[r]estore the links style and historic vegetation (rough grasslands, thin trees between fairways, and sentinel deciduous trees),' and 'minimiz[e] trees growing between the fairways.' CLR at 196.

The Treatment chapter of the CLR is explicit that restoring this character requires removing trees. In its site-specific guidelines for East Potomac, the CLR explains that '[t]he East Potomac Park Golf Course originally consisted of open, mostly treeless, fairways with the majority of trees relegated to the edges of the various

courses,' but that '[s]uccessive decades of unchecked plantings by the NPS and concessionaire, changed the character of the links-style courses closer to that of a parkland-style course.' CLR at 196. The CLR therefore directs the NPS to '[r]emove invasive vegetation growing unchecked along the fence line and the planted non-contributing vegetation that occurred piecemeal without a cohesive design around the fieldhouse and along the property's fairways.' CLR at 196. With respect to the championship Blue Course, which the CLR found 'includes more trees than were originally intended,' the CLR states that '[n]on-contributing vegetation planted along the fairways should be removed to open views and reinforce the links-style character.' CLR at 189. The CLR similarly recommends that views from the White Course 'be enhanced by removing non-contributing vegetation planted along the fairways to open up these views and reinforce the links-style character.' CLR at 190. The CLR's general recommendations, which apply to all three NPS golf courses in the District of Columbia, including East Potomac, likewise direct the NPS to '[r]emove encroaching vegetation that adversely affects design intent,' CLR at 173, and to '[r]emove non-contributing, non-native, and invasive vegetation where it compromises the historic character of the golf course, where it may affect the playability of the golf course, change the historic spatial qualities, impact important views, or introduce varieties of vegetation that change the historic planting character.' CLR at 177. The CLR further provides that '[e]ncroaching vegetation that compromises the design intent of the views and playability of the golf course should be removed.' CLR at 179.

NPS's other cultural landscape documentation reaches the same conclusions. The 2017 'Cultural Landscapes Inventory: East Potomac Golf Course' (Golf Course CLI) explains that '[t]he vegetation pattern of Travis' design was generally treeless—a characteristic feature of links-style courses—with cleared fairways and grassy turf.' Golf Course CLI at 48. It further states that '[w]ide open vistas of grass and views toward the water, were the desired effect at East Potomac.' Golf Course CLI at 132-133. Consistent with that design intent, the Golf Course CLI identifies 'a wide open, treeless landscape' as character-defining vegetation at East Potomac. Golf Course CLI at 135. The Golf Course CLI also documents how that character was lost, explaining that images of Augusta National 'resulted in the planting of thousands of trees and flowering shrubs, on courses throughout the country including on links-style courses such as East Potomac, where they were never intended.' Golf Course CLI at 133. It concludes that '[m]aturation of vegetation and additional planting since the period of significance, has resulted in the loss of view sheds and changed the feeling of playing the course, designed in the relatively treeless links style,' and that '[t]hese developments are reversible.' Golf Course CLI at 75. Similarly, the 2023 'Cultural Landscapes Inventory: East Potomac Park' (Park CLI) explains that Travis's design, 'inspired by links-style courses in Scotland, preferred a mostly treeless landscape, which permitted open views to the Potomac River and Washington Channel beyond.' Park CLI at 141.

As an intermediate step, the CLR recommends that the NPS '[d]evelop a Vegetation Management Plan for the [East Potomac Golf Course] to establish removals, thinning, replacement and new plantings based on the management objective to preserve the links-style landscape.' CLR at 196. The NPS developed a Tree Management Plan that provides an implementation framework for this work. The plan expressly translates the CLR treatment recommendations into criteria and actions for tree preservation and removal. Consistent with the CLR, the plan is intended to restore the open links-style golf landscape while concentrating denser vegetation along the perimeter of the course and around contemporary administrative and operational uses while restoring significant views.

Specifically, the plan seeks to restore open fairways, maintain significant views and vistas, protect historic vegetation, and address invasive, hazardous, unmanaged, and non-contributing trees and woody growth. Accordingly, this effort consists of selective vegetation removal, associated stump and root removal, and stabilization of disturbed areas. These treatments are intended to improve the condition of the cultural landscape while supporting its continued use as a public golf course.

**Site Description**

The East Potomac Park Golf Course is an established, developed recreational landscape located between the Potomac River and Washington Channel. The golf course is a contributing site within the National Register-listed East and West Potomac Parks Historic District. Its significant landscape characteristics include land use, topography, spatial organization, circulation, vegetation patterns, buildings and structures, and views and vistas. The course was originally conceived as a links-style landscape characterized by predominantly open fairways,

long sightlines, rough grasslands, and relatively limited interior tree cover. The Tree Management Plan notes that subsequent tree planting and unmanaged woody growth have contributed to a more enclosed, parkland character in portions of the course, affecting historic views, golf strategy, turf conditions, and the historic spatial character of the landscape. The CLR likewise found that, at East Potomac, '[t]he encroaching vegetation has altered strategy, impacted turf health, and obscured intended views within the course.' CLR at 196. It notes, for example, that cedars defining a green are 'not in keeping with the original intention of Travis.' CLR at 197. The CLR also attributes turf problems on the course in part to 'tree root competition' and 'shade from trees.' CLR at 198.

The proposed project would selectively remove trees and woody vegetation that have been determined to be non-contributing to the historic landscape or incompatible with the historic links-style character. Removal would focus on trees and vegetation that enclose historically open fairways and greens, obscure significant views and vistas, adversely affect turf or golf-course function, or otherwise conflict with the historic landscape treatment objectives. Invasive vines, volunteer trees, brush, and unmanaged understory vegetation would also be removed where appropriate. Mature specimen trees that function as compatible isolated landscape features and do not compromise historic views or golf-course function would be retained.

Based on the current tree inventory, the proposed action includes removal of approximately 382 trees measuring greater than 10 inches diameter at breast height (DBH), plus an additional 147 trees of a smaller size. Of these, approximately 247 trees have DBHs between 10.1 and 20 inches, with an average DBH of 14.38 inches; 93 trees have DBHs between 20.1 and 30 inches, with an average DBH of 24.72 inches; and 42 trees have DBHs greater than 30 inches, with an average DBH of 46.32 inches. Approximately 147 trees are less than 10 inches and an average DBH of 6.71 inches. Total number of trees to be removed is 529. These trees would be evaluated and treated consistently with the Tree Management Plan and the historic landscape objectives established by the CLR. The project includes excavation or pulling stumps or root balls or stump grinding along with substantial root removal.

Tree-removal activities covered by this compliance review would generally consist of cutting identified trees at or near existing grade using conventional arboricultural equipment and methods. Equipment access would use existing roads, golf-course circulation routes, turf areas, and previously disturbed portions of the developed landscape to the extent practicable. Ground protection matting along equipment access routes and within work areas will be used where needed to minimize soil disturbance and damage to existing turf. Work would be performed in a manner that avoids unnecessary soil disturbance and protects historic landscape features. The project would specifically protect vegetation identified as historic or character-defining. This includes the historic cherry plantings associated with the White Course, the Ohio Drive cherry plantings, the Ohio buckeye allée along Buckeye Drive, and compatible mature specimen trees.

Tree removal would also be used to restore and maintain significant historic views and vistas. Vegetation management would prioritize views toward the Washington Monument, Jefferson Memorial, U.S. Capitol, National War College, Potomac River, Washington Channel, Virginia shoreline, and historic fieldhouse wings. Selective removal would be used to reopen or maintain these visual relationships. The CLR's site-specific guidelines for East Potomac explain that '[t]ree plantings around the greens in the 1960s and 1970s hemmed in the views and restricted the vistas along the fairways,' and they direct the NPS to '[r]einforce the visual connections to the city and river by selectively removing vegetation to open views to the iconic buildings of Washington, D.C., and to the Potomac River and Washington Channel.' CLR at 205. The CLR adds that 'Travis capitalized on the geography, relatively flat topography, and generally treeless areas to offer general views and vistas to the Washington Monument, the Jefferson Memorial, the U.S. Capitol building, National War College, and other landmarks of the city as well as the surrounding Potomac River and Washington Channel.' CLR at 205-206. Along the course perimeter, the CLR found that 'screen plantings and encroaching invasive vegetation filled in along the edge blocking the views to the surrounding East Potomac Park, Potomac River, and Washington Channel on three sides of the golf course.' CLR at 187. These open views are integral to the historic design of the golf course. According to the Park CLI, '[t]he earliest plans for the East Potomac Park Golf Course offered exceptional views of surrounding landmarks, including the Washington Monument, the US Capitol Building, and the waterfront opposite the Washington Channel,' and '[t]hese views were enhanced through a combination of selective siting of vegetation and through the controlled design of topographic features, which were kept low to avoid impeding

views.' Park CLI at 220. The Golf Course CLI notes, however, that '[i]n some areas of the cultural landscape, the maturation of trees throughout and outside the course have partially or fully obstructed these views.' Golf Course CLI at 140.

Following tree removal, affected areas would be stabilized and maintained as turf, rough grassland, or other compatible low-growing vegetation where appropriate to reinforce the historically open character of the links-style golf course. In locations identified for historic replacement planting or screening, trees and other vegetation would be installed in accordance with the Tree Management Plan. The plan establishes treatment classifications of Preserve, Preserve + Manage, Remove, Relocate, Replace in Kind/Historic Pattern, New Screen Planting, and No Woody Planting to ensure that vegetation treatment is responsive to the historic character and function of individual portions of the landscape.

The project would not change the existing use of East Potomac Park Golf Course, alter the fundamental configuration or function of the golf course, construct new buildings, expand the developed footprint of the golf course, or authorize substantial new ground disturbance. Rather, the project constitutes vegetation and landscape management within an existing developed recreational and historic cultural landscape. The work is intended to improve the condition and integrity of the historic landscape by restoring the open links-style character, protecting character-defining vegetation, reopening historically significant views and controlling incompatible and invasive vegetation.

The NPS completed an inventory and evaluation of existing trees and vegetation to establish baseline conditions and identify invasive vegetation, hazardous or declining trees, historic and character-defining vegetation, compatible specimen trees, and non-contributing vegetation potentially inconsistent with the historic links-style landscape. This work provides the information necessary to prioritize subsequent vegetation-management treatments and to distinguish vegetation appropriate for preservation from vegetation that may be considered for removal, thinning, relocation, or replacement.

Maps of trees to be removed and specimen trees attached to compliance, along with photos of specimen trees.

**Area of potential effects (as defined in 36 CFR 800.16[d])**
The Area of Potential Effects (APE) for the proposed undertaking encompasses the portions of East Potomac Park Golf Course within Washington, D.C.

**3. Has the area of potential effects been surveyed to identify historic properties?**

____ **No**
__X__ **Yes**

**Source or reference:** East Potomac Golf Course Cultural Landscape Inventory (2017, 2023)
East Potomac Park Cultural Landscape Inventory (2017, 2023)
East Potomac Park Golf Course and Fieldhouse HALS (2022)
East and West Potomac Parks NR Nomination 01000271 (1973, updated 2001)
CLR for NCR DC Golf Courses: East Potomac, Langston and Rock Creek Park (2019)

**4. Potentially Affected Resource(s):**

**Archeological Resources Present:** No

**Historical Structures/Resources Present:** Yes

**Property Name:** East Potomac Golf Course - Clubhouse - Res. 333 **LCS:** 46854 **Asset:** 333
**Location:** Reservation 333, Hains Point, Ohio Drive SW

**Property Name:** East Potomac Park Miniature Golf Course **LCS:** 626927 **Asset:** x1

**Property Name:** East Potomac Park Miniature Golf Course - Building **LCS:** 627026 **Asset:** x2
**Location:** Reservation 333, Hains Point, Ohio Drive SW

**Property Name:** East Potomac Park - Police Substation- Res. 333 **LCS:** 46860 **Asset:** 333
**Location:** Reservation 333, Hains Point, Ohio Drive SW

**Cultural Landscapes Present:** Yes

**Property Name:** East Potomac Park, Reservation 333 **LCS:**
**Location:** Reservation 333, East Potomac Park, Hains Point, Ohio Drive SW

**Property Name:** East Potomac Golf Course **LCS:**
**Location:** Reservation 333, Hains Point, Ohio Drive SW

**Ethnographic Resources Present:** No

**5. The proposed action will: (check as many as apply)**

No Destroy, remove, or alter features/elements from a historic structure
No Replace historic features/elements in kind
No Add non-historic features/elements to a historic structure
No Alter or remove features/elements of a historic setting or environment (inc. terrain)
No Add non-historic features/elements (inc. visual, audible, or atmospheric) to a historic setting or cultural landscape
No Disturb, destroy, or make archeological resources inaccessible
No Disturb, destroy, or make ethnographic resources inaccessible>
No Potentially affect presently unidentified cultural resources
No Begin or contribute to deterioration of historic features, terrain, setting, landscape elements, or archeological or ethnographic resources
No Involve a real property transaction (exchange, sale, or lease of land or structures)
___ Other (please specify): ____________________

**6. Supporting Study Data:**
**(Attach if feasible; if action is in a plan, EA or EIS, give name and project or page number.)**

**B. REVIEWS BY CULTURAL RESOURCE SPECIALISTS**

The park 106 coordinator requested review by the park's cultural resource specialist/advisors as indicated by check-off boxes or as follows:

---

**No Reviews From**: Curator, Archeologist, Historical Architect, Historian, 106 Advisor, Other Advisor, Anthropologist, Historical Landscape Architect

---

**C. PARK SECTION 106 COORDINATOR'S REVIEW AND RECOMMENDATIONS**

**1. Assessment of Effect:**

________ No Potential to Cause Effects
________ No Historic Properties Affected
___X___ No Adverse Effect
________ Adverse Effect

**2. Documentation Method:**

**[ ] Standard 36 CFR Part 800 Consultation**
Further consultation under 36 CFR Part 800 is needed.

**[ X ] Streamlined Review Under the 2008 Servicewide Programmatic Agreement (PA)**
The above action meets all conditions for a streamlined review under section III of the 2008 Servicewide PA for Section 106 compliance.

**Applicable Activities:**

5. Routine Grounds Maintenance.

**[ ] Program Comment on Stewardship and Management of National Park Service Mission 66-Era Facilities (1945-1972)**
The above action meets all of the requirements of this Program Comment for Section 106 compliance and required documents have been uploaded.

**[ ] Undertaking Related to Park Specific or Another Agreement**
The proposed undertaking is covered for Section 106 purposes under another document such as a park, region or statewide agreement established in accord with 36 CFR 800.7 or 36 CFR 800.14.

**3. Consultation Information**

**SHPO Required:**
**SHPO Sent:**
**SHPO Received:**

**THPO Required:** No
**THPO Sent:**
**THPO Received:**

**SHPO/THPO Notes:**

**Advisory Council Participating:** No
**Advisory Council Notes:**
**Additional Consulting Parties:** No

**4. Stipulations and Conditions:** Following are listed any stipulations or conditions necessary to ensure that the assessment of effect above is consistent with 36 CFR Part 800 criteria of effect or to avoid or reduce potential adverse effects.

**5. Mitigations/Treatment Measures:** Measures to prevent or minimize loss or impairment of historic/prehistoric properties: (Remember that setting, location, and use may be relevant.)

**Required Mitigations** - For the proposed project actions to be within compliance requirements during construction and/or project implementation, the following mitigations must be adhered to:

- Park staff & contractors must comply with protection of bats and bat habitat as required by law. Any trees larger than 3" DBH are subject to surveys the night before removal or pruning to ensure no bats are roosting in the tree.
- Construction equipment will be in satisfactory condition; i.e., it will be equipped with required safety components and not be leaking hazardous liquids or emitting hazardous or undesirable fumes above allowable legal limits.' (9.1.3.1, NPS Management Policies 2006). Equipment must be free of any fluid leaks (fuel, oil, hydraulic fluid, etc.) upon arrival to the work site and will be inspected at the beginning of each shift for leaks. Leaking equipment will be removed off site for necessary repairs before the commencement of work.
- All refueling of equipment shall have spill containment pads in position prior to refueling activities. Spill kits shall be onsite and readily accessible anytime hazardous materials including fuel and/or oil are brought into the park. Secondary containment of these materials is required at all times.
- Erosion control methods shall be used to prevent erosion and sedimentation during and post construction. Use the DC Department of Energy & Environment Erosion and Sediment control Manual (aug 2017) and guidance. https://doee.dc.gov/sites/default/files/dc/sites/ddoe/release_content/attachments/2017%20DC%20ESC%20Specifications%20Manual_08_2017.pdf
- Tree and Turf Protection: All motorized equipment used shall be conveyed and staged on ground mats (e.g. Alturna mats; Trak-mats; etc.) designed for the purpose when operating off of paved surfaces. At no time shall motor vehicles or heavy equipment be in direct contact with turf or critical root zones.
- Soil disturbance shall be minimized to the greatest extent possible to reduce disturbance to native plants and reduce the potential for the introduction or spread of invasive non-native plant species.
- Spill containment kits and fire extinguishers shall be available on site at all times.
- Any safety violations shall be corrected immediately. If the violation is not corrected immediately, the project shall be postponed until such corrections are made.
- Minimize or avoid impacts to breeding birds.
- All project zones will be kept trash free at all times.
- Work shall follow the recommendation of an approved treatment plan
- Brush removal in cultural/historic areas shall take place outside of peak visitor use, and shall be conducted in stages to lessen changes to visual impacts.

**6. Assessment of Effect Notes:**

All work follows treatment recommendations identified in the 2019 Cultural Landscape Report. Tree removal to restore historic character will not adversely effect historic properties, including East and West Potomac Park Historic District, and is recommended eligible for Streamlined Review. The proposed East Potomac Park Golf Course Tree Management activities qualify for consideration under Activity #5, Routine Maintenance, of the 2008 NPS Programmatic Agreement because they involve vegetation management and landscape maintenance intended to preserve the historic character and condition of an existing cultural landscape. The work implements recommendations in the NPS's 2019 Cultural Landscape Report, including selective removal of non-contributing vegetation that has altered the historically open links-style character of the golf course and obscured significant historic views.
The proposed activities are intended to maintain and recover existing character-defining landscape features rather than introduce new uses, alter the historic golf-course configuration, or remove contributing landscape elements. Historic trees, significant specimen trees, and character-defining planting patterns would be retained and protected. Associated stump and root removal would be limited to areas necessary to complete the vegetation treatments, with appropriate measures to protect archaeological resources and surrounding historic landscape

features.

The undertaking is consistent with the preservation objectives of the Cultural Landscape Report and is not anticipated to diminish the characteristics that qualify East Potomac Park Golf Course as a contributing resource to the East and West Potomac Parks Historic District.

**D. RECOMMENDED BY PARK SECTION 106 COORDINATOR:**

**Compliance Specialist:**

**NHPA Specialist**
Jason Theuer

JASON THEUER Digitally signed by JASON THEUER Date: 2026.10.09 08:50:21 -04'00'

**Date:** ____________________

**E. SUPERINTENDENT'S APPROVAL**

The proposed work conforms to the NPS *Management Policies* and *Cultural Resource Management Guideline*, and I have reviewed and approve the recommendations, stipulations, or conditions noted in Section C of this form.

**Superintendent:** Kevin T. Griess **Signature** 2026.10.09 09:14:46 -04'00'

Kevin Griess

**Date:** ____________________

# EXHIBIT G

Griess Decl.

**National Park Service**
**U.S. Department of the Interior**

**National Park Service – National Mall and Memorial Parks**

## Determination of NEPA Adequacy when taking a new proposed action and making a new decision

### A. Project Information

**Park Name:** National Mall and Memorial Parks
**PEPC Project Number: 139091**
**Original project PEPC ID (if NPS): 139091**
**Project Title:** East Potomac Park Golf Course - Tree Management and Cultural Landscape Rehabilitation
**Project Location:** National Mall and Memorial Parks
**County, State:** Washington, DC
**Project Leader:** Tammy Stidham

### B. Description of the Proposed Action and any applicable mitigation measures

During implementation of the tree removal activities on October 10, 2026, the NPS identified that trees and vegetation within the area identified on the map below as Zone A (often referred to as Trash Island) were underrepresented in the original environmental and cultural resource compliance documentation. The area contains refuse from the prior lessee and had not been properly maintained. The lack of maintenance resulted in unmanaged, dense vegetation in the area. The initial assessment estimated approximately 169 trees within this area; however, the dense vegetation made it difficult to accurately identify and inventory individual trees. During removal activities, an additional 200 trees were identified and removed beyond the original estimate. Although classified by the NPS as trees, they are more accurately characterized as small-diameter, immature trees, generally ranging from 3 to 5 inches in diameter at breast height (DBH).

As a result, the original compliance documentation did not fully account for the extent of vegetation removal within Zone A. Unlike Zone A, Zone B did not experience a discrepancy between the number of trees identified in the original inventory and those removed during implementation. Accordingly, the inventory limitations identified in Zone A were isolated to that area and did not affect the accuracy of compliance review for the other zones. Additional review is necessary to document the discrepancy between the estimated and actual number of trees removed, evaluate whether the additional removals resulted in effects beyond those previously assessed, and determine whether further analysis or consultation is warranted under the National Environmental Policy Act (NEPA), Section 106 of the National Historic Preservation Act (NHPA), or other applicable environmental compliance requirements. See map in Appendix A – Contractor Work Zones.

### C. Identify applicable National Environmental Policy Act (NEPA) documents and other related documents that cover the proposed action.

1. East Potomac Park Golf Course - Tree Management and Cultural Landscape Rehabilitation Categorical Exclusion October 10, 2026

## D. NEPA Adequacy Criteria

1. Is the proposed action a feature of, or essentially like an alternative analyzed in the existing NEPA document(s)?

   *Yes, the additional tree removal within Zone A is consistent with the type of vegetation management activities evaluated in the existing NEPA Categorical Exclusion (CE) for the East Potomac Park Golf Course Tree Management and Cultural Landscape Rehabilitation project. The original CE addressed selective removal of non-contributing trees and woody vegetation to restore the historically open links-style character of the golf course, improve significant views and vistas, and implement the treatment recommendations of the 2019 Cultural Landscape Report.*

   *Although the original assessment underestimated the number of individual trees within Zone A due to the density of vegetation, the additional 200 small-diameter trees removed represent the same general type of vegetation management activity considered in the original review. The additional removals do not constitute a new category of action or change the overall purpose of the project.*

   *However, because the actual number of individual trees removed exceeded the original inventory, additional review is necessary to document the discrepancy and confirm that the increased extent of vegetation removal does not introduce environmental effects materially different from those considered in the existing CE. This includes verifying that the additional removals were consistent with the approved treatment objectives and applicable resource-protection measures.*

2. Is the project within the same analysis area, or if the project location is different, are the geographic and resource conditions sufficiently similar to those analyzed in the existing NEPA document(s)?

   *Yes, the additional tree removal occurred within Zone A, an area located entirely within the East Potomac Park Golf Course and the geographic boundaries evaluated in the existing NEPA CE. The original environmental review included Zone A as part of the proposed vegetation management activities and estimated approximately 169 trees for removal within this area. However, due to the density of vegetation, the original inventory did not fully account for all individual trees present, and undercounted immature, small diameter trees.*

   *The additional removals did not expand the geographic boundaries of the project or introduce activities into previously unevaluated locations. The affected vegetation was part of the same densely vegetated area identified for treatment under the Tree Management Plan and the 2019 Cultural Landscape Report. Accordingly, the geographic and resource conditions remain consistent with those considered in the original environmental analysis. The increased number of trees represents a discrepancy in the original inventory which undercounted small, immature trees due to the dense and overgrown vegetation in Zone A rather than a change in project location or the general nature of the affected resources. However, the additional review should confirm that the greater extent of removal did not materially alter the anticipated*

*environmental effects.*

3. Is the range of alternatives analyzed in the existing NEPA document(s) appropriate with respect to the new proposed action, given current environmental concerns, interests, and resource values?

   Yes, *the existing NEPA CE remains appropriate for evaluating the additional tree removal within Zone A. The original compliance review considered vegetation management activities intended to implement the recommendations of the 2019 Cultural Landscape Report and the Tree Management Plan, including removal of non-contributing vegetation to restore the historically open links-style character of East Potomac Park Golf Course.*

   *Although the original inventory underestimated the number of immature, small diameter trees within Zone A, the additional removal of approximately 200 small-diameter trees did not change the purpose or nature of the action. The additional trees were located within the same densely vegetated area identified for treatment, and their removal was consistent with the vegetation management activities described in the original CE.*

   *Because the original NEPA review was completed through a categorical exclusion, a formal range of alternatives was not developed or analyzed. Nevertheless, the additional removals do not represent a substantially different approach to achieving the established cultural landscape rehabilitation objectives. No new environmental concerns, resource values, or substantially different alternatives have been identified that would warrant reconsideration of the original approach, based on the information currently available.*

   *Accordingly, the existing CE remains an appropriate basis for evaluating the action. The additional removals do not result in materially different environmental effects or extraordinary circumstances that would preclude continued reliance on the categorical exclusion.*

4. Is the existing analysis valid in light of any new information or circumstances relevant to the proposed action?

   Yes, *the existing NEPA analysis remains valid in light of the additional information identified during implementation of the East Potomac Park Golf Course Tree Management and Cultural Landscape Rehabilitation project. Although the original tree inventory underestimated the number of individual trees within Zone A, the additional removal of approximately 200 small-diameter trees does not appear to substantially change the nature, location, or anticipated environmental effects of the action.*

   *The additional trees were located within the same densely vegetated area previously identified for treatment and were consistent with the types of non-contributing and unmanaged vegetation addressed in the original CE. The increased number of removals reflects limitations in the original inventory resulting from the density of vegetation rather than a change in the project's purpose, scope, or treatment objectives.*

   *The additional removals remain consistent with the recommendations of the 2019 Cultural Landscape Report and the Tree Management Plan, which emphasize restoring the historically*

*open links-style character of the golf course through selective vegetation management. The additional removals did not introduce a new type of activity or expand the project into previously unevaluated areas.*

*Based on the information currently available, the additional removals are not expected to substantially change the environmental effects considered in the original CE. The additional removals did not result in previously unidentified impacts to historic landscape features, wildlife habitat, soils, or other protected resources. The existing NEPA analysis remains applicable, and preparation of additional NEPA documentation is not anticipated to be necessary.*

5. Are the reasonably foreseeable effects that would result from implementation of the proposed action similar (both quantitatively and qualitatively) to those analyzed in the existing NEPA document?

   *Yes, the reasonably foreseeable environmental effects associated with the additional tree removal within Zone A are generally consistent in nature with those evaluated in the existing NEPA CE. The original analysis considered the removal of non-contributing, woody vegetation, including associated ground disturbance, changes in vegetation cover, potential impacts to wildlife habitat, and alterations to the historic cultural landscape.*

   *Although this represents a substantial numerical increase within that portion of the project area, the additional vegetation consisted primarily of smaller trees within the same densely vegetated area previously identified for treatment. The types of environmental effects associated with these removals are therefore qualitatively similar to those considered in the original analysis.*

   *Quantitatively, the additional removals increased the extent of vegetation loss beyond the original estimate. However, the relatively small diameter of the additional trees, their concentration within an area already identified for vegetation management, and the absence of an expansion into previously unevaluated areas did not alter the overall environmental effects of the project.*

   *This additional review documents the increased extent of vegetation removal and verifies that associated effects on wildlife habitat, soils, erosion potential, and historic landscape characteristics remain within the scope of the original analysis. The existing CE remains an appropriate basis for NEPA compliance.*

**E. Are the public involvement and interagency review or other compliance requirements associated with actions approved under existing NEPA document(s) adequate for the current proposed action?**

Yes, *the public involvement, interagency review, and other compliance requirements associated with the existing NEPA CE and Section 106 Streamlined Review remain appropriate for the additional tree removal within Zone A. The original action was evaluated under DOI NEPA Handbook, Appendix 2,*

*Section 12.5 C(4), and Section 106 Activity #5, Routine Grounds Maintenance, of the 2008 NPS Servicewide Programmatic Agreement. Neither compliance pathway required public involvement for the original undertaking, and no public involvement was conducted.*

*The additional removal of approximately 200 small-diameter trees occurred within the same geographic area and involved the same types of vegetation management activities evaluated in the original compliance documentation. Although the number of trees removed exceeded the original estimate, the additional removals did not change the purpose of the undertaking or introduce a new category of activity that would independently require public involvement.*

*The original Section 106 review resulted in a No Adverse Effect determination through the streamlined review process, which did not require separate consultation with the State Historic Preservation Officer (SHPO) or consulting parties. The additional removals are consistent with the general vegetation management objectives evaluated under that review. The increased removal did not affect contributing vegetation or character-defining features of the historic cultural landscape, and the undertaking continues to qualify for streamlined review under the 2008 Programmatic Agreement. In addition, the associated Endangered Species Act (Section 7) , Migratory Bird Act, and other protected resources, remain satisfied and do not require update. Based on the information currently available, the additional small diameter tree removals do not warrant new public involvement or interagency consultation.*

**F. Persons /Agencies / NPS Staff Consulted** (if applicable). *Include name, title, and resource agency represented.*

Tammy Stidham, Associate Regional Director – Lands and Planning
Mike Commisso, Deputy Superintendent, National Mall and Memorial Parks

## Conclusion

I have reviewed the proposed action described in the NEPA and other documentation prepared for this project. All required compliance (e.g., National Historic Preservation Act, Endangered Species Act, Tribal consultation, as applicable) is complete and documented in the project file. Based on this review, I have decided to approve and authorize the proposed action, including all design features, mitigation measures, and stipulations identified in the project file. This decision authorizes implementation of the action as described.

Kevin T. Griess
SUPERINTENDENT
National Mall and Memorial Parks
National Park Service

2026.10.11
13:43:31 -04'00'

Kevin Griess Date
Superintendent
National Mall and Memorial Parks

## Appendix A – Contractor Work Zones

