**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DC PRESERVATION LEAGUE,

DAVE ROBERTS,

and

ALEX DICKSON,

*Plaintiffs*,

*vs.*

UNITED STATES DEPARTMENT OF THE INTERIOR;

DOUG BURGUM, in his official capacity as Secretary of the Interior;

NATIONAL PARK SERVICE;

and

JESSICA BOWRON, in her official capacity as "Comptroller Exercising the Delegated Authority of the Director" of the National Park Service,

*Defendants*.

Case No. 1:26-cv-477-ACR

**REPLY IN SUPPORT OF**
**MOTION FOR A PRELIMINARY INJUNCTION OR, ALTERNATIVELY,**
**FOR A STAY UNDER SECTION 705 OF THE ADMINISTRATIVE PROCEDURE ACT**

# TABLE OF CONTENTS


I. Plaintiffs Have Standing. ....................2

A. The Washington National Plan Likely Injures Plaintiffs' Concrete Interests. ....................2

1. Plaintiffs Assert Cognizable Injuries. ....................2

a. Recreational, Historical, Aesthetic, and Communal Interests....................2

b. Environmental Harm....................4

c. DC Preservation League Faces Organizational Injury. ....................6

2. The Tree Removal is Precisely the Sort of Injury that Plaintiffs' NEPA Claim Seeks to Prevent. ....................7

B. Injuries Inflicted by Defendants are Traceable to Defendants And Redressable By The Relief Requested. ....................8

II. Plaintiffs Are Likely To Establish Final Agency Action....................9

A. Defendants' Adoption of the Washington National Plan is Final Agency Action....................9

B. Defendants' Issuance of an Inadequate CatEx and Subsequent Razing of 529 Trees is Final Agency Action in Its Own Right ....................12

III. Plaintiffs Are Likely To Succeed on the Merits of Their Claims....................13

A. Plaintiffs Are Likely To Demonstrate that Defendants' Deforestation Efforts are Impermissible NEPA Segmentation....................13

B. Plaintiffs are Likely to Demonstrate that Defendants' Tree-Removal Operation Violated NEPA in its Own Right....................18

IV. Plaintiffs Will Suffer Irreparable Harm Without Interim Relief....................20

V. The Balance Of Equities And Public Interest Favor Preliminary Relief ....................22

VI. The Court May Order Testimony from Wischer, Bowron, Lands, and Griess ....................22

# TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. Dep't of Labor*,
836 F. Supp. 3d 137 (D.D.C. 2026) .......... 23

*Baltimore Gas & Elec. Co. v. NRDC*,
462 U.S. 87 (1983) .......... 18

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 11

*Blue Mountains Biodiversity Project v. Jeffries*,
99 F.4th 438 (9th Cir. 2024) .......... 23

*Brady Campaign to Prevent Gun Violence v. Salazar*,
612 F. Supp. 2d 1 (D.D.C. 2009) .......... 21

*Camp v. Pitts*,
411 U.S. 138 (1973) .......... 23

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .......... 20

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .......... 23

*City of Dania Beach, Fla. v. FAA*,
485 F.3d 1181 (D.C. Cir. 2007) .......... 7

*Ctr. for Taxpayer Rights v. IRS*,
__ F.4th __, 2026 WL 2635380 (D.C. Cir. Sept. 8, 2026) .......... 20

*Defs. of Wildlife v. Salazar*,
877 F. Supp. 2d 1271 (M.D. Fla. 2012) .......... 11

*Delaware Riverkeeper Network v. F.E.R.C.*,
753 F.3d 1304 (D.C. Cir. 2014) .......... 8, 16, 18

*Env't Def. Fund v. FERC*,
2 F.4th 953 (D.C. Cir. 2021) .......... 3

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) .......... 6

*Friends of the Earth, Inc. v. Laidlaw Env't Services*,
528 U.S. 167 (2000) ........ 2, 3

*Ihebereme v. Capital One, N.A.*,
730 F. Supp. 2d 40 (D.D.C. 2010) ........ 8

*In re Cheney*,
544 F.3d 311 (D.C. Cir. 2008) ........ 24, 25

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........ 15

*Low v. Whitman*,
207 F.R.D. 9 (D.D.C. 2002) ........ 25

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 4

*Lujan v. Nat'l Wildife Fed'n*,
497 U.S. 871 (1990) ........ 13

*Marbury v. Madison*,
1 Cranch 137 (1803) ........ 15

*Motor Vehicle Manufacturers Ass'n of the U.S. v. State Farm Mut. Ins. Co.*,
463 U.S. 29 (1983) ........ 19

*National Min. Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014) ........ 12

*Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the U.S.*,
609 U.S. ___, 2026 WL 2564318 (Aug. 31, 2026) ........ 2, 3

*NLRB v. Noel Canning*,
573 U.S. 513 (2014) ........ 15

*Norton v. SUWA*,
542 U.S. 55 (2004) ........ 13

*NRDC v. Callaway*,
524 F.2d 79 (2d Cir. 1975) ........ 14

*Parsi v. Daioleslam*,
778 F.3d 116 (D.C. Cir. 2015) ........ 24

*PETA v. U.S. Dep't of Agric.*,
797 F.3d 1087 (D.C. Cir. 2015) ........ 6

*R.I.L-R v. Johnson*,
80 F. Supp. 3d 164 (D.D.C. 2015) .................................................................. 10

*Ramirez v. ICE*,
310 F. Supp. 3d 7 (D.D.C. 2018) .................................................................. 10

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)......................................................................................... 21

*San Francisco Herring Ass'n v. Dep't of Interior*,
946 F.3d 564 (9th Cir. 2019) ..........................................................................11

*Save the Sound, Inc. v. F.A.A.*,
183 F.4th 763 (D.C. Cir. 2026) ...................................................................... 18

*Schiff v. OPM*,
784 F. Supp. 3d 380 (D.Mass. 2025) ............................................................. 10

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943)........................................................................................... 22

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025)...................................................................................... 1, 14

*Shepherd v. ABC, Inc.*,
62 F.3d 1469 (D.C. Cir. 1995)........................................................................ 23

*Sherrod v. Breitbart*,
304 F.R.D. 73 (D.D.C. 2014) ......................................................................... 25

*Sierra Club v. FERC*,
827 F.3d 59 (D.C. Cir. 2016)............................................................................ 3

*Sierra Club v. Morton*,
405 U.S. 727 (1972)........................................................................................... 3

*Sierra Club v. United States Dep't of Transp.*,
125 F.4th 1170 (D.C. Cir. 2025)....................................................................... 4

*Sugar Cane Growers Coop. of Florida v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002)............................................................................ 7

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)........................................................................................... 7

*Taxpayers Watchdog, Inc. v. Stanley*,
819 F.2d 294 (D.C. Cir. 1987)........................................................................ 17

*United States Ass'n of Reptile Keepers, Inc. v. Jewell*,
106 F. Supp. 3d 125 (D.D.C. 2015) ........ 21

*United States v. Newman*,
531 F. Supp. 3d 181 (D.D.C. 2021) ........ 25

*Washington Area Bicyclists Ass'n v. Burgum*,
___ F. Supp. 3d ___, 2026 WL 1078218 (D.D.C. Apr. 21, 2026)........ 11, 18

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001)........ 10

*Wisc. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985)........ 20

**Statutes**

5 U.S.C.

§ 705........ 2, 8, 25

Act of Mar. 3, 1897, ch. 375, 29 Stat. 624 ........ 3

**Rules**

Fed. R. Civ. P. 1........ 8

**Regulations**

36 C.F.R.

§ 2.1........ 6

§ 2.5........ 6

43 C.F.R.

§ 46.215........ 19

43 Fed. Reg. 55,978 (Nov. 29, 1978)........ 15

**Other Authorities**

Council on Environmental Quality, Implementation of the National
Environmental Policy Act (Feb. 19, 2025) ........ 15

The dispute before the Court comes down to this: Either Defendants have adopted and begun to implement the Washington National plan ("WNP"), and the razing of hundreds of trees was part of that plan just as Plaintiffs alleged that it would be—or Defendants just happen to have suddenly decided after seven years to carry out a single recommendation from a 300-page document written in 2019 that just happens to align perfectly with the WNP.

Plaintiffs' opening brief recites at length the substantial evidence that Defendants are committed to overhauling East Potomac Golf Course and have already traveled far down the road in executing that decision. Pls.' Mem. at 1-5, ECF 80-1. Defendants make no attempt to engage with that evidence other than to mischaracterize it as "conjecture based on a handful of tweets." Defs.' Opp. at 24, ECF 84. But the record is damning, and it forecloses Defendants' recycled threshold arguments. As to the merits, although Defendants denigrate Plaintiffs' NEPA claim as "pointless," *id.* at 11, they do not and cannot deny that *if* the razing of hundreds of trees was another step toward implementing the WNP, then it violated NEPA because Defendants conducted it without an environmental review that considered the WNP as a whole. That remains true after the Supreme Court's decision in *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 190 (2025), which confirms that agencies cannot skirt their legal obligations by pretending that interrelated projects are separate when in fact they are not. In contending otherwise, Defendants effectively ask the Court to hold that an agency could build a warehouse in the Everglades with no environmental review whatsoever so long as it proceeds brick by brick. On that view, NEPA would indeed become "pointless."

Lacking any plausible defense to these points, Defendants resort to attacking the Court and the analysis it relied on in issuing a temporary restraining order. But the Court was fully justified in entering that order. Razing hundreds of trees was final agency action, as was the issuance of

the categorical exclusion purporting to allow that operation. And even if destroying hundreds of healthy trees on national park land could reasonably be characterized as "routine maintenance" (a dubious proposition), "extraordinary circumstances" plainly foreclosed reliance on a categorical exclusion here, and no amount of deference could sustain Defendants' conclusory assertion to the contrary. While Defendants claim this analysis is disconnected from Plaintiffs' complaint and injuries, that again ignores the fundamental inseparability of the tree-cutting operation from the WNP. And it ignores that the Court is obligated to tailor relief to the specific harm at hand. That is exactly what the Court did in crafting the TRO, and Defendants cite no concrete harm stemming from that limited order. Absent further preliminary relief, Plaintiffs and the public face the imminent loss of a treasured and unique recreational and cultural resource. The Court should enter a preliminary injunction or stay under 5 U.S.C. § 705.

## I. Plaintiffs Have Standing.

### A. The Washington National Plan Likely Injures Plaintiffs' Concrete Interests.

#### 1. Plaintiffs Assert Cognizable Injuries.

##### a. Recreational, Historical, Aesthetic, and Communal Interests.

In their efforts to shoehorn Plaintiffs' asserted injuries into *Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the U.S.*, 609 U.S. ___, 2026 WL 2564318 (Aug. 31, 2026), Defendants misread or mischaracterize both the injuries and the opinion. In that case, the Court noted it has "found standing in certain environmental cases where the plaintiff's injuries involved *more* than mere offense," *id.* at *2 (emphasis in original), citing as an example *Friends of the Earth, Inc. v. Laidlaw Env't. Services*, 528 U.S. 167 (2000). In *Friends of the Earth*, the Court explained "that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity.'" *Id.* at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

That is the difference between this case and *National Trust*. In *National Trust*, the declarant asserted injuries to her "aesthetic, cultural, and historic interests" in "having to view" the ballroom being built in place of the White House's East Wing. 2026 WL 2564318 at *2. The declarant simply did not like the way it would look. Here, though, the WNP's injuries to Plaintiffs' recreational, historical, aesthetic, and communal interests support standing because the uncontroverted record shows that Plaintiffs regularly *use* East Potomac Golf Course to further those interests. *See* Am. & Supp. Compl. ¶¶ 22-24, ECF 72-1; Decl. of Alex Dickson ¶¶ 6-11, 13-15, 19, 21, ECF 8-4; Decl. of Dave Roberts ¶¶ 2, 8-9, 11, 22-23, 25-26, ECF 8-6; Second Decl. of Rebecca Miller ¶¶ 9, 20-22, ECF 76-3. *See Friends of the Earth*, 528 U.S. at 183 ("they use the affected area"). That is exactly what East Potomac Golf Course exists for. Act of Mar. 3, 1897, ch. 375, 29 Stat. 624 (East Potomac Park "to be forever held and used as a park for the recreation and pleasure of the people"). The WNP seeks to take that away. Indeed, the 2019 Cultural Landscape Report on which Defendants have placed so much weight acknowledges that the historical three-course layout is essential to East Potomac's cultural, historical, and recreational value as a "public recreational amenity" "available to all levels of society" and "open to all players and skillsets for a nominal fee," 2019 Cultural Landscape Report ("CLR") at 78, 91, ECF 1-5, the WNP will eliminate that resource. Plaintiffs (or in the case of DC Preservation League, its members) use that resource routinely; under the WNP, that will not be possible. That is cognizable injury. *See Sierra Club v. FERC*, 827 F.3d 59, 66 (D.C. Cir. 2016) (increased tanker ship traffic supported standing because it injured declarant's "aesthetic and recreational" interests in waterways that he "frequently" "use[d] and enjoy[ed]"); *cf. Env't Def. Fund v. FERC*, 2 F.4th 953, 969 (D.C. Cir. 2021) (no standing where plaintiff asserted only an objection to an "eyesore" and failed to allege that she "used and enjoyed the land"; a "plaintiff claiming injury from

environmental damage *must use the area affected* by the challenged activity") (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 565-66 (1992)).

Contrary to Defendants' mischaracterization, Plaintiffs do not "simply dislike" what Defendants' new golf course might look like. Defs.' Opp. at 16, ECF 84. If Plaintiffs merely feared driving by Defendants' new golf course someday and finding the renovation distasteful, then *National Trust* would spell trouble. But as noted, that is not the substance of Plaintiffs' injuries. Defendants barely wrestle with Plaintiffs' actual interests, arguing only that Plaintiffs' "voluntary decisions to change their recreational habits in response to their subjective dislike of the proposed renovations still 'stems from offense, disagreement, or distaste.'" Defs'. Opp. at 16, ECF 84 (quoting *Nat'l Trust*, 2026 WL 2454318 at *2). Defendants miss the point. Plaintiffs do not claim injury from the possibility Defendants will build something they don't like; they claim injury from Defendants' plan to destroy the existing golf course that Plaintiffs routinely have used and seek to continue to use for recreational, communal, aesthetic, and other purposes. *See Sierra Club v. United States Dep't of Transp.*, 125 F.4th 1170, 1180 (D.C. Cir. 2025) (environmental organization had standing where its members' ability to "recreate" along rail routes would be "disrupt[ed]" by increased train traffic).

**b. Environmental Harm.**

Plaintiffs further allege and have demonstrated in their declarations and expert reports that they face exposure to harmful contaminants due to Defendants' stockpiling at the golf course of dirt and debris from the East Wing—a risk that will increase when that dirt and debris are spread and incorporated around East Potomac Park as Defendants have said will occur. Am. & Supp. Compl. ¶¶ 11, 76, ECF 72-1. Defendants claim that concern is unsubstantiated, Defs.' Opp. 17, ECF 84, but it is based on Defendants' own test results. As explained in the expert reports of Dr.

James Connors and Brenda Foos ("Foos Report"), ECF 72-12, 72-13, Defendants' assurances that contamination levels in the East Wing debris were "very similar to levels in the existing soil at East Potomac Park," ECF 26 at 9, are baseless and unreliable. Defendants did not take valid background samples at all but instead took *baseline* samples after the debris pile was already in place–samples that "may have been contaminated due to the proximity of the dumped soil and debris" and therefore are not representative of East Potomac's true pre-dumping contamination levels. Foos Report at 5. When compared against objective screening values instead of Defendants' unreliable background samples, Defendants' own testing showed levels of six contaminants that exceeded human health screening thresholds. *Id.* at 8. In recreational settings, Plaintiffs have shown, humans can be exposed to these contaminants in several ways: through "incidental ingestion of soil, dermal contact with soil, inhalation of volatile contaminants and airborne particles (i.e., dust)." *Id.* at 13. "In the case of [East Potomac], these exposures may include soil that is mobilized (i.e., made available for human contact) by recreational or maintenance activities, or natural factors such as wind, rain, and freeze/thaw cycles," including "during the potential future reuse of the soil for landscaping, drainage improvements, or similar uses." *Id.* "Potential human exposures *will* increase if the stockpile soils are reused as suggested[.]" *Id.* (emphasis added).

Defendants offer no expert or other evidence to refute this. They simply assert that there is no "background risk of harm," Defs.' Opp. at 17, and fault Plaintiffs for failing to provide their own evidence establishing a substantial difference between background and current risks of harm. But that evidence is solely within Defendants' control: absent permission from Defendants or an order from this Court, Plaintiffs are not free to enter onto national park land to retrieve core samples from the stockpile. *See, e.g.*, 36 C.F.R. 2.1(a)(1)(ii); 2.5(a). Plaintiffs have requested discovery to

develop that evidence further and will renew that request in due course in light of Defendants' reliance on this argument in their motion for summary judgment. On the present motion, however, the question is whether Plaintiffs have shown they are likely to establish standing, and given Defendants' outright failure to conduct any testing on the dirt for the first eight days of dumping, their failure to collect valid background samples, and their own test results showing elevated levels of multiple contaminants of concern, Plaintiffs have more than satisfied that burden.

**c. DC Preservation League Faces Organizational Injury.**

Apart from injuries to its members' recreational, aesthetic, communal, and environmental interests, DC Preservation League also has standing based on harm the WNP will cause to its organizational interests. Defendants dismiss these harms, suggesting DCPL could simply hold East Potomac-centric events elsewhere and that destroying East Potomac would not force DCPL to change its app and website. This ignores DCPL's mission: "to preserve, protect, and enhance the built environment of Washington, D.C., through advocacy and education." Am. & Supp. Compl. ¶ 22, ECF 72-1. Even if DCPL theoretically could hold an East Potomac celebration somewhere else, destroying East Potomac would interfere with DCPL's ability to host such events. *See PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1095 (D.C. Cir. 2015) (cognizable injury where agency "plainly impairs [organization]'s activities in a non-speculative manner"). Likewise, once East Potomac Golf Course has been irrevocably lost, DCPL will be required "to divert and redirect" its resources and staff time by changing its app and website. *Id.* That is not an injury DCPL "manufacture[d]" for itself, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015), but the direct result of Defendants' actions. And Defendants completely overlook that all this is the result of the procedural injury they are visiting on DCPL. "The procedural requirements of NEPA were designed to protect persons . . . who might be injured by hasty federal actions taken without regard for possible environmental consequences," *City of Dania Beach, Fla.*

*v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007), and a plaintiff "never has to prove that if he had receive the procedure the substantive result would have been altered. All that is necessary is to show that the procedural step was connected to the substantive result." *Sugar Cane Growers Co-op. of Florida v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002).

**2. The Tree Removal is Precisely the Sort of Injury that Plaintiffs' NEPA Claim Seeks to Prevent.**

Defendants argue their tree-clearing project "cannot bolster" Plaintiffs' standing because they carried it out after Plaintiffs filed the operative complaint and got away with it before Plaintiffs could amend again. That argument fundamentally misunderstands Plaintiffs' injuries and the relevance of the tree-cutting operation.

Plaintiffs have demonstrated injuries stemming from the WNP (and its incremental implementation). The tree-razing operation constitutes yet another significant step forward in the implementation of that plan. As such, the operation makes clear that Plaintiffs' injuries from the WNP are "certainly impending." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Defendants accordingly err in suggesting the tree-clearing is somehow disconnected from the operative pleading. Defs.' Opp. at 21-22, ECF 84. Plaintiffs alleged that implementing the WNP would inevitably entail "removal . . . of hundreds of trees." Am. & Suppl. Compl. ¶ 103, ECF 72-1; Compl. ¶ 85, ECF 1. Plaintiffs are not required to amend their complaint to obtain relief against a discrete step Defendants take unlawfully to carry out the agency action that is challenged in the complaint—any more than a NEPA plaintiff must file an amended complaint every time an agency lays down a new brick in a construction project for which it never performed a NEPA analysis. The tree-cutting operation was an exercise in segmentation—a theory that is necessarily bound up in Plaintiffs' claim that Defendants began implementing the WNP without performing a NEPA review. (Indeed, this is what segmentation is: peeling off a portion of a larger plan to avoid

accounting for it in the plan's NEPA review.) "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Delaware Riverkeeper Network v. F.E.R.C.*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). And the Court has authority to issue appropriate relief "to preserve status and rights" when Defendants seek to irrevocably alter the status quo. 5 U.S.C. § 705.

The logical implication of Defendants' argument is that a defendant can escape legal accountability by continuing to act illegally after being sued. "It would invite endless rounds of emergency requests every time Defendants took action," Defendants complain. Defs.' Opp. at 21, ECF 84. Perhaps Defendants should stop doing that, then. At any rate, a NEPA claim necessarily seeks prospective relief, *i.e.* relief preventing a future major federal action unless and until the agency conducts a proper NEPA analysis. A plaintiff need not amend the complaint to stop the defendant from taking a major step toward completing the challenged major federal action that initiated the litigation. Defendants cite the Federal Rules, but those rules require only notice pleading. *See Ihebereme v. Capital One, N.A.*, 730 F. Supp. 2d 40, 47 (D.D.C. 2010) (complaint must "give fair notice to the defendants of the claim being asserted"); Fed. R. Civ. P. 1 (rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding"). The pleadings in this case make amply clear that Plaintiffs challenge the adoption and implementation of the WNP, of which the tree-cutting operation is undeniably a part.

**B. Injuries Inflicted by Defendants are Traceable to Defendants And Redressable By The Relief Requested.**

Defendants adopted the WNP. Defendants are implementing the WNP. As part of that implementation, Defendants skirted NEPA by conducting the tree-clearing operation without

adequate NEPA review and without considering the operation as part of the WNP as a whole. Plaintiffs' injuries are traceable to Defendants and their implementation of the plan, including the tree-clearing, because implementing the plan will necessarily take away East Potomac's historical design and function as a three-course layout accessible to all skill levels for a nominal fee. And a ruling in Plaintiffs' favor would stop Defendants from further implementing the WNP, absent a NEPA review, thereby redressing Plaintiffs' injuries.

Defendants' response again mischaracterizes Plaintiffs' injuries and implausibly disavows the WNP. Plaintiffs' injuries do not stem from any particular design choice Defendants might make in deciding, for example, where to place the fourth hole's tee box. *Cf.* Defs.' Opp. at 22-23, ECF 84. The injuries stem from Defendants' elimination of East Potomac Golf Course as it currently exists for Plaintiffs and others to use and enjoy. Defendants' implausible denials notwithstanding, *id.* at 23, their tree-razing spree irretrievably advanced that outcome, and entering preliminary relief carefully tailored to that specific harm will redress Plaintiffs' injuries.

## II. Plaintiffs Are Likely To Establish Final Agency Action

### A. Defendants' Adoption of the Washington National Plan is Final Agency Action

Defendants have, thus far, stopped short of placing a large sign at the corner of Ohio Drive and Buckeye Drive reading "Future Home of the Washington National Golf Course," but only just. Defendants essentially ignore Plaintiffs' recitation of the steps Defendants have taken towards the implementation of the WNP and the attendant destruction of East Potomac Golf Course: Defendants have dumped 37,000 cubic yards of debris at East Potomac for use as "fill;" Defendants have terminated the lease for the course (while allowing the former leaseholder to continue to operate it); Defendant Burgum has toured the course with President Trump and the exact course architect Plaintiffs alleged would be hired to design the course, blueprints in hand; Defendants

have advertised a contract for the WNP's construction phase; and even before this weekend, Defendants had already cleared numerous trees from the East Potomac site. *See* Pls.' Mem. at 19-20, ECF 80-1. And both President Trump and Secretary Burgum have twice publicly confirmed the plan to convert East Potomac to a championship course. Defendants have now chopped down, on orders from the Deputy Chief of Staff of the Department of Interior, 529 trees from the course in one day after the President announced renovations would begin weeks before. *Id.*

Defendants can do no better than to mischaracterize the scope and scale of that evidence as "a handful of tweets," Defs.' Opp. at 24, ECF 84, but that is simply too much smoke to conclude that there's no fire. Defendants remark that Plaintiffs do not "point to a final decision document," *id*. at 25, but it is well established that agency action is reviewable under the APA even if it falls outside the bounds of traditional rulemaking. "Action" within the APA meaning of final agency action "is meant to cover comprehensively ever manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). *See, e.g.*, *Schiff v. OPM*, 784 F. Supp. 3d 380 (D.Mass. 2025) (removal of articles from government websites was likely reviewable final agency action); *Ramirez v. ICE*, 310 F. Supp. 3d 7, 20 (D.D.C. 2018) ("decisions of where to place" detained individuals were final agency action). "Agency action . . . need not be in writing to be final and judicially reviewable." *R.I.L-R v. Johnson,* 80 F. Supp. 3d 164, 184 (D.D.C. 2015).

A plaintiff can establish the existence—and, if necessary, the details—of a final agency action by inference from how an agency implements it. *Id.* at 176. And that is all the Court need find here—the available evidence makes crystal clear that Defendants have committed to the overhaul of East Potomac and are working towards it. And Defendants do not seriously question that the adoption and implementation of the WNP, if it has occurred as Plaintiffs have described it,

would constitute final agency action. They could not do so: it reflects the consummation of agency decisionmaking at both NPS and Interior and indisputably gives rise to legal obligations (including legal compliance obligations and obligations of and to contractors, designers, and architects), rights (including the rights of Plaintiffs and other interested parties to participate in advisory processes under NHPA and NEPA); and legal consequences (including authorization to undertake the wholesale destruction of protected parkland and the contributing features of a National Register historic district). *See Bennett v. Spear*, 520 U.S. 154 (1997) (defining final agency action).

Defendants do make the single isolated assertion that "it is doubtful the Plan will be agency action at all, given that it concerns NPS's maintenance and upkeep of its own property." Defs.' Opp. at 25, ECF 84. This argument lays bare Defendants' apparent belief that they are entitled to do whatever they want at East Potomac, free from the bounds of NEPA, other laws, and any form of judicial review. To repeat this argument is to refute it: there can be no serious question that Defendants' intended overhaul of East Potomac is final agency action, nor can Defendants wish away the volume of cases holding NPS activities on national parkland to be reviewable final agency action. *See, e.g., San Francisco Herring Ass'n v. Dep't of Interior*, 946 F.3d 564 (9th Cir. 2019) (banning herring fishing in NPS waters was final agency action); *Washington Area Bicyclists Ass'n v. Burgum*, -- F. Supp. 3d __, 2026 WL 1078218 (D.D.C., Apr. 21, 2026) (decision to eliminate bike lanes on NPS-managed property was final agency action); *Defs. of Wildlife v. Salazar*, 877 F. Supp. 2d 1271, 1302 (M.D. Fla. 2012) (decision to reopen a trail in a National Park was final agency action) But Defendants' bold claim nevertheless makes clear that so long as they continue to hold open the promise that NEPA review will be forthcoming, they will never acknowledge that they have undertaken a final agency action even when they are cutting the ribbon on opening day of the new Washington National course.

### B. Defendants' Issuance of an Inadequate CatEx and Subsequent Razing of 529 Trees is Final Agency Action in Its Own Right

The Court was also fully justified in determining that the tree-cutting operation and the categorical exclusion that authorized it were themselves final agency actions under *Bennett*. Mem. Op. at 14, ECF 79; *see also* Pls.' Mem. at 20, ECF 80-1; Mot. for TRO at 2-3, ECF 76-1. In claiming the operative pleading does not reach the tree-cutting operation, Defendants again disregard the tree clearing's inextricable link to the WNP—indeed, the complaint alleges that tree-clearing is a major and necessary step in implementing that plan. Am. & Supp. Compl. at ¶ 103, ECF 72-1; Compl. at ¶ 85, ECF 1. Defendants suggest *Bennett* is satisfied only by an action's impacts on "regulated parties," but no such requirement exists. *National Min. Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014), which Defendants selectively quote, stated only that in distinguishing between a legislative rule or a statement of policy, courts look to "actual legal effect" on "regulated parties." *Id.* at 251-252; *see* Defs.' Opp. at 26, ECF 84. It is neither surprising nor relevant to Plaintiffs' claims that, in classifying an agency action—between two options which bear directly on regulated parties, in a challenge by a regulated party—a court would consider the effect on those parties.

Nor do Defendants have any answer to Plaintiffs' argument that Defendants' execution of a (woefully inadequate) Categorical Exclusion constituted final agency action under *Bennett*. *See* Pls.' Mem. at 20, ECF 80-1. The Categorical Exclusion represented the consummation of Defendants' thinking (or lack thereof) as to the environmental consequences of the tree-clearing operation, and it directly determined legal rights and obligations by providing authority for Defendants to carry out that operation, terminating Defendants' review without any analysis of the operation's significant impacts on the human environment, and precluding any public participation in such a review process.

Defendants separately argue that "[r]emoving vegetation"—Defendants' euphemism for the removal of hundreds of mature trees from protected parkland—is simply the wrong type of government activity to constitute final agency action. But Defendants provide no basis for this assertion. The one-time removal of hundreds of trees (with several hundred more to come), including mature growth trees, is a far cry from "day-to-day agency management;" *contra* Defs.' Opp. at 27, ECF 84; it is exactly the sort of "*discrete* agency action" that Defendants' own authority recognizes as subject to APA review. *Norton v. SUWA*, 542 U.S. 55, 66-67 (2004). *Lujan v. Nat'l Wildife Fed'n*, 497 U.S. 871, 899 (1990) is not to the contrary, having only treated as unreviewable under the APA a challenge to a "program" without any reference to any "identifiable" action or decision. Defendants understand as much, having previously conceded that, though not challenged in this motion, Defendants' dumping 37,000 cubic feet of debris in East Potomac Park constitutes final agency action. Mar. 11 Tr. at 42:19-42:24. The placement of a pile of dirt, which can at least be theoretically relocated in a matter of days, gives rise to fewer legal consequences than the irreversible destruction of hundreds of mature trees.

## III. Plaintiffs Are Likely To Succeed on the Merits of Their Claims

### A. Plaintiffs Are Likely To Demonstrate that Defendants' Deforestation Efforts are Impermissible NEPA Segmentation

As to the merits, apart from rehashing their ever-more implausible denials that they have adopted and begun to implement the WNP and that the tree-cutting operation was undertaken to advance that plan, *see* Defs.' Opp. at 24-27, Defendants mainly contend that segmentation is no longer a valid basis for a NEPA claim. This would both defeat NEPA's effectiveness and contradict Defendants' own authorities.

NEPA prohibits segmentation to advance Congress's efforts to "instill in the environmental decisionmaking process a more comprehensive approach so that long term and cumulative effects

of small and unrelated decisions could be recognized, evaluated and either avoided, mitigated, or accepted as the price to be paid for the major federal action under consideration." *NRDC v. Callaway*, 524 F.2d 79, 88 (2d Cir. 1975). Defendants' theory would allow the government to separate and sweep those effects under so many small rugs, thus avoiding adequate prospective NEPA compliance.

In light of the important role of segmentation claims, it is unsurprising that, far from "eliminat[ing]" segmentation claims, *contra* Defs' Opp. at 27, ECF 84, *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 168, expressly confirms the continued availability of NEPA segmentation claims in circumstances like these. In *Seven County*, the Supreme Court held that NEPA analysis for a railroad line that would facilitate the transportation of crude oil need not consider the environmental impact of that oil's extraction and refinement. Crucially, the U.S. Surface Transportation Board, the agency responsible for the railway's construction, had no "authority over those separate projects," and there was "no proximate causation" between the railway and the environmental impact of those projects. *Id.* at 187-88. On the other hand, the Court stressed that where projects are "interrelated and close in time and place to the project at hand . . . [t]he question then is whether that is a single project within the authority of the agency in question." *Id.* at 190. While Defendants are correct that agencies are entitled to deference in how they compartmentalize projects for NEPA assessments, an agency must draw a "reasonable and manageable line" between the projects. *Id.* at 190. No such line can be drawn here. Cutting down hundreds of trees is a necessary step in overhauling East Potomac and implementing the WNP. The remainder of the plan is not a result to which the tree-cutting "may someday lead" but is the whole "relevant project" of which tree removal is a part. *Id.* at 189. To say that a necessary component step of a broader plan can be excised from the plan itself and subjected to a lower level of NEPA review would

render NEPA wholly toothless. If a CatEx would not suffice for an entire project, the agency cannot CatEx its way brick-by-brick to the same result.

The rescission of the 1978 Council on Environmental Quality ("CEQ") regulations does not eliminate the availability of NEPA segmentation claims, *contra* Defs.' Opp. at 27, ECF 84. Despite that rescission, neither the CEQ nor any court has taken the position that the regulations did not fairly and correctly interpret NEPA. To the contrary, on February 19, 2025, shortly before rescission, CEQ circulated a memorandum to federal agencies advising that "although CEQ is rescinding its NEPA implementing regulations at 40 C.F.R. parts 1500-1508, agencies should consider voluntarily relying on those regulations in completing ongoing NEPA reviews or defending against challenges to reviews completed while those regulations were in effect." Council on Environmental Quality, *Implementation of the National Environmental Policy Act*, Feb. 19, 2025. In the absence of those regulations, and in the wake of the Supreme Court's decision in *Loper Bright Enters. v. Raimondo*, it falls to the Court to "say what the law is." 603 U.S. 369, 385 (2024) (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)). Nevertheless, the rescinded regulations, which first took effect in 1979, *see* 43 Fed. Reg. 55,978 (Nov. 29, 1978), are instructive as to a reasonable interpretation of NEPA, as "the longstanding practice of the government—like any other interpretive aid—can inform [a court's] determination of what the law is." *Id.* at 386 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014)) (internal quotation marks and citations omitted). And *Seven County*'s express approval of segmentation claims postdated the repeal of the CEQ regulations.

Applying the test for NEPA segmentation confirms Defendants are impermissibly piecemealing the implementation of the WNP.[1]

*Logical Termini*: Defendants characterize the logical terminus of their tree clearing as "completion of the vegetation management recommendations to restore the course to its historic state." Defs.' Opp. at 29-30, ECF 84. But this pretext is belied by the acknowledged fact that Defendants are working to destroy the course's historic state and replace it with an ahistoric championship design that by definition will eliminate key features that the 2019 CLR itself identifies as "essential" to the course's integrity. July 2 Tr. at 8:20-21; 9:1-11; CLR at 88, ECF 1-5. Contrary to Defendants' view, Defs.' Opp. at 30, ECF 84., there is no supposition at work here—Defendants' own stated explanation for their actions is diametrically opposed to their own stated descriptions of the goal towards which they are working. To work at such cross purposes is not logical.

*Substantial Independent Utility*: Defendants' argument again relies entirely on the idea that the substantial utility of the tree-clearing is the restoration of East Potomac to its "historic status." Defs.' Opp. at 31, ECF 84. But again, Defendants do not grapple with Plaintiffs' position that, while the tree-cutting may be *consistent* with the CLR, it is actually in service of the WNP. Defendants offer only that they "*could* proceed with a broader plan to renovate the Park" without cutting down 529 trees. *Id.* Maybe so as a general matter, but in the absence of any urgency to suddenly implement the seven-year-old tree-cutting recommendations of the CLR, *see* Pls.' Mem. at 24, ECF 80-1, it is nevertheless apparent that the removal of these trees is a prerequisite to the

[1] There is no requirement that a plaintiff satisfy all four factors to sustain a NEPA segmentation claim. *See, e.g., Delaware Riverkeeper*, 753 F.3d at 1315 (finding segmentation where only "first two factors . . . are relevant").

specific renovation which will result from implementation of the WNP and which Defendants have acknowledged they are pursuing. July 2 Hrg. Tr. at 8:21.

*Foreclosure of Alternatives*: Defendants argue that clearing 529 trees has not foreclosed any alternatives, but this once again fails to take account of that tree-clearing as a step in the WNP. By cutting those trees, Defendants have foreclosed the possibility that the NEPA analysis they conduct for the WNP as a whole (if they conduct it before bulldozing the course), could evaluate alternative renovations or designs that would not entail destroying hundreds of trees. Plaintiffs do not seek to freeze East Potomac "in amber," *contra* Defs.' Opp. at 31, ECF 84, but rather to prevent Defendants from continuing down the path of the WNP until the point where it is, essentially a *fait accompli* because each of its component steps has been completed without any analysis of the plan as a whole.

*Irretrievable Commitment of Funds*: Defendants characterize this inquiry as whether "approving this project would 'irretrievably commit federal funds for the construction of any proposed' future project." Defs.' Opp. at 32, ECF 84 (quoting *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 299 (D.C. Cir. 1987)). But Defendants overstate *Taxpayers Watchdog*, which does not treat "construction" as a required element but discusses follow-on construction simply because that was the most likely form of activity in that case. *See* 819 F.2d at 298 (correctly reciting fourth factor as ensuring that action "does not irretrievably commit federal funds for closely related projects."). Even if the Court takes Defendants at their word that the tree-clearing was in the service of the CLR's program of restoring the historic course, that work is now inchoate: to complete it, Defendants will need to expend resources on other CLR recommendation. And if Plaintiffs are correct that the tree clearing is part of the WNP, each step that moves Defendants

closer to the completion of the plan will be followed by more expenditures to implement the plan. Either way, further expenditures are assured.

*Save the Sound, Inc. v. F.A.A.*, 183 F.4th 763 (D.C. Cir. 2026) counsels the same conclusion. The two-pronged test for NEPA segmentation emerging from that case considers whether "projects overlap temporally and have substantial independent utility." *Id.* at 771. But two projects need not literally take place at the same time for their separation to be impermissible segmentation: at most, *Save the Sound* stands for the self-evident proposition that an action not taking place for at least another five years need not be factored into the NEPA analysis of a project underway now. *Id.* at 772; *cf* July 2 Tr. at 8:21 (Defendants trying to meet September 1 deadline to begin work). And here, the tree-cutting lacks "substantial independent utility" for the reasons discussed *supra*.

This is no different than the segmentation approach the D.C. Circuit held to violate NEPA in *Delaware Riverkeeper Network*, 753 F.3d at 1304. There, the D.C. Circuit concluded that an agency could not segment NEPA analysis for the construction of a single piece of pipeline that would be connected to three other new pieces of pipeline; rather the four segments had to be treated as a single project. The tree clearing is, similarly, an inseparable part of the WNP, and must be considered as a piece of that whole.

### B. Plaintiffs are Likely to Demonstrate that Defendants' Tree-Removal Operation Violated NEPA in its Own Right

NEPA's most fundamental purpose is to require that agencies "take a 'hard look' at the environmental consequences before taking a major action." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983). There are innumerable ways in which agencies can fail this obligation. One is by improperly relying on a categorical exclusion. *See, e.g., Washington Area Bicyclist Ass'n, Inc. v. Burgum*, ___ F. Supp. 3d ___, 2026 WL 1078218 (D.D.C. Apr. 21, 2026). The

ultimate inquiry is whether the agency's decision was "the product of reasoned decisionmaking." *Motor Vehicle Manufacturers Ass'n of the U.S. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 52 (1983).

Here, Defendants failed to engage in reasoned decisionmaking in relying on the Categorical Exclusion. Department of the Interior regulations make categorical exclusions unavailable when "extraordinary circumstances" are present. 43 C.F.R. § 46.215. The tree-clearing implicated at least two extraordinary circumstances: it had "significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources [or] park, recreation or refuge lands," *id.* § 46.215(b); and it had "significant impacts on properties listed . . . on the National Register of Historic Places." *Id.* § 46.215(f). Even if it were reasonable for Defendants to treat the razing of hundreds of health trees in a national park as "routine maintenance"—and it was not—that alone renders Defendants' reliance on a categorical exclusion arbitrary and capricious.[2]

Furthermore, the timeline of Defendants' development of the project confirms they could not have engaged in "reasoned decisionmaking." Mr. Lands testified that he was directed on Monday, October 5, to implement the tree-clearing operation "as soon as practical." Oct. 12 Tr. at 79:17-18, 101:7; that he first met with Dr. Griess about it on "the 6th or 7th," *Id*. at 103:11-12; and that he saw "the NEPA documents" "probably Wednesday [the 7th] or Thursday [the 8th] maybe." *Id*. at 89:14-23. "By Friday," Mr. Lands said, "we had essentially a plan to implement, to begin executing the plan on the ground." *Id*. at 106:24-25. By Mr. Lands' own admission, developing and finalizing a plan of such magnitude in one work week "is fast." *Id*. at 114:5. Little wonder, then, that the plan undercounted the number of targeted trees by 200. Oct. 11 CatEx, ECF 76-2. Underestimating an environmental impact so dramatically is precisely the sort of result that

[2] Defendants' very different approach to a comparable tree-clearing project in 2023 confirms NPS itself does not usually regard clear-cutting of healthy trees as "routine maintenance." Pls. Mem. at 26, ECF 80-1.

NEPA's "hard look" is designed to avoid. The Categorical Exclusion was contrived in haste, without reasoned decisionmaking, to provide cover for Defendants' execution of the next step in the WNP. Indeed, Defendants failed entirely to consider the fundamental conflict between the CLR's treatment guidelines and the WNP: feigning a step toward restoring East Potomac's historical feel while also implementing a plan to destroy all traces of it.

## IV. Plaintiffs Will Suffer Irreparable Harm Without Interim Relief

"A threatened injury is irreparable if it is certain and great, actual and not theoretical, and beyond remediation at a later date." *Ctr. for Taxpayer Rights v. IRS*, __ F.4th __, 2026 WL 2635380, *13 (D.C. Cir. Sept. 8, 2026) (internal quotation marks and citation omitted). "The key word in this consideration is *irreparable*." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (*per curiam*)). Plaintiffs have demonstrated that standard is easily met here.

Clear-cutting hundreds of trees was merely the latest—and, thus far, the most destructive—step in implementing the WNP. Once the plan is complete, the three golf courses and the unique recreational opportunities they offer will be gone. Defendants' own 2019 Cultural Landscape Report itself makes clear what stands to be lost: East Potomac is "significant as a continuously public-owned golf course, signifying the municipal investment in green space and recreational infrastructure in Washington, D.C." and has "continually served as a public recreational amenity" that has been "available to all levels of society." CLR at 78, ECF 1-5. The CLR acknowledges that the historical three-course layout, anchored by Walter Travis's original design, is essential to the integrity of East Potomac as a cultural resource and as a recreational amenity "open to all players and skillsets for a nominal fee." *Id.* at 91. Under the WNP, that one-

of-a-kind cultural resource and historic district will be lost forever. That loss will be beyond remediation, and as discussed above, overwhelming evidence shows that the harm is imminent

Defendants' opposition to the motion for preliminary injunction does not dispute that overhauling East Potomac Golf Course will irreparably harm Plaintiffs. Defs.' Opp. at 33, ECF 84. They contend only that Plaintiffs face no irreparable harm "as a result of [] the tree removal project." *Id.* Like the rest of their opposition, though, this argument asks the Court to turn a blind eye to what the record makes clear. The "tree removal project," like Defendants' newfound devotion to the 2019 Cultural Landscape Report, is part and parcel of Defendants' implementation of the WNP. To the extent Defendants fault Plaintiffs for seeking relief that is tailored to the irremediable felling of trees as a step toward implementation of that plan, that ignores that a preliminary injunction should be "narrowly tailored to remedy the specific harm shown," so as to "preserve the parties' respective rights and interests while the case is pending" without going further than necessary to preserve the status quo. *United States Ass'n of Reptile Keepers, Inc. v. Jewell*, 106 F. Supp. 3d 125, 126 (D.D.C. 2015).

Defendants also fail to dispute the Plaintiffs' procedural harms. *See* Defs.' Opp. at 33, ECF 84 (characterizing Plaintiffs' asserted injuries as "only . . . recreational"). NEPA requires informed review *before* "resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). If the WNP's implementation continues unchecked, the statutory safeguards that Congress imposed to constrain Defendants' lawless behavior will have been thwarted by the very behavior they were meant to constrain. *See Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009) ("When a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury.").

## V. The Balance Of Equities And Public Interest Favor Preliminary Relief

Defendants do not and cannot dispute that the government faces absolutely no harm from a tailored injunction against further tree felling in East Potomac Park. Defs.' Opp. at 33-34, ECF 84. Superintendent Griess and Deputy Director Lands each testified under oath that they knew of no reason for any urgency in completing the tree-cutting operation. Pls.' Mem. at 30-31, ECF 80-1 (citing testimony). Defendants likewise do not dispute that there can be no meaningful harm to the government from postponing implementation of the 2019 recommendations that Defendants have ignored for seven years. Pls.' Mem. at 31, ECF 80-1.

Defendants instead rely solely on their jurisdictional and merits defenses. Defs.' Opp. 34, ECF 84. But as demonstrated above, those arguments are unavailing. This Court has jurisdiction, and Defendants have violated NEPA by failing to conduct the required environmental review of either the tree-cutting operation or the WNP as a whole. Defendants' argument, if accepted, would effectively eliminate the balance-of-equities and public-interest factors from the traditional four-factor test for equitable relief.[3]

## VI. The Court May Order Testimony from Wischer, Bowron, Lands, and Griess

Rather than confront their witnesses' problematic testimony, Defendants seek to have it ignored. Despite not objecting before or during the October 9 hearing, they now cast Dr. Griess and Mr. Lands as "top executive department officials" whose testimony should be "stricken . . . [or] disregarded in its entirety." *Id.* at 13.

Judicial review of agency action requires that the "grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *SEC v. Chenery Corp.*, 318 U.S. 80,

[3] Defendants ask that, if the Court enters a preliminary injunction, Plaintiffs be required to post a bond. The Court has already ordered Plaintiffs to post a bond in connection with the Temporary Restraining Order, Mem. Op. at 21, ECF 79, and Defendants have not argued that that bond is insufficient.

94 (1943). If an agency fails to "explain administrative action," and thus "frustrate[s] judicial review," courts may "obtain from the agency . . . such additional explanation of the reasons for the agency decision as may prove necessary." *Camp v. Pitts*, 411 U.S. 138, 143 (1973); *AFL-CIO v. Dep't of Labor*, 836 F. Supp. 3d 137, 154 (D.D.C. 2026). "The court may require the administrative officials who participated in the decision to give testimony explaining their action." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *see Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 454 (9th Cir. 2024) ("inadequacy of the existing record" may require "fact development").

The factual record Defendants submitted failed to adequately explain the reasons for their abrupt decision to raze hundreds of trees at East Potomac Golf Course, much less their eleventh-hour notification. Dr. Griess's declaration raised the question of why Defendants "cut down hundreds of trees at the Course weeks after the President asked DOI to cut down trees at the Course, and not, say, any other time in the last seven years." Mem. Op. at 3, ECF 79.

Faced with an inadequate explanation, the Court required "the administrative officials who participated in the decision to give testimony explaining their action," *Overton Park*, 401 U.S. at 420, first calling Dr. Griess because he was the official Defendants have repeatedly put forth as a knowledgeable witness and then calling Mr. Lands only after Dr. Griess made clear the orders had come from him. Mr. Lands also could give no explanation for Defendants' sudden interest in swiftly executing a seven-year-old plan before Plaintiffs or the Court could act but identified Mr. Wischer as the apparent decisionmaker. The Court thus had every reason to order Mr. Wischer to explain the decision. *Id.*; *see also Camp*, 411 U.S. at 143.

Courts also have "inherent power" to "protect their integrity and prevent abuses of the judicial process." *Shepherd v. ABC, Inc.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995); *see also Parsi v.*

*Daioleslam*, 778 F.3d 116, 130 (D.C. Cir. 2015). On October 6, 2026, at 5:15 PM, Acting Director Jessica Bowron executed a declaration stating:

- "The management of the East Potomac Golf Course is unchanged from the situation described in my previous declarations."
- "Plans for renovating the East Potomac Golf Course remain in the conceptual stage."
- "The NPS has taken and continues to take some maintenance actions in or around the Golf Course since April 30, 2026, subject to available funding, including tree pruning; removal of dead, dying, hazardous or invasive trees; and removal of the fence surrounding the golf course, which was in poor condition."

ECF 75-3 ¶¶ 4, 6, 9. But Dr. Griess testified that, 24 minutes after Acting Director Bowron executed her declaration, she approved his plan to "cut[] down hundreds of trees"—a plan she omitted to mention in her declaration. Oct. 12 Tr. at 24:1-24. Defendants did not file that declaration until October 9, giving her three days to amend it to discuss the tree management plan. Second Suppl. Decl. of Jessica Bowron, ECF 75-3. She did not. The Court had authority to order her to explain why she submitted a sworn statement that plans for East Potomac Golf Course were "unchanged," "conceptual," and included removal of only "dead, dying, hazardous or invasive trees" at the same time that she authorized a new and concrete plan to remove hundreds of healthy trees. Oct. 12 Tr. at 137:11-15.

The qualified prohibition against requiring testimony by "high-ranking executive officers" does not protect Acting Director Bowron, Mr. Wischer, Dr. Griess, or Deputy Director Lands from appearing to testify. *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008). Typically, the doctrine applies to "cabinet-level officials," although it can also include other "high administrative heads" upon a showing that testifying would constitute an unwarranted impairment of their offices'

functions. *United States v. Newman*, 531 F. Supp. 3d 181, 188-89 (D.D.C. 2021); *see Cheney*, 544 F.3d at 314 (permitting deposition of Vice President's Deputy Chief of Staff); *Low v. Whitman*, 207 F.R.D. 9, 12 (D.D.C. 2002) (extending doctrine to Deputy Chief of Staff at EPA who had "day-to-day administrative oversight of the Office of the Administrator"). Even where an official qualifies as "high-ranking," the Court can require their testimony if necessary information cannot "be obtained elsewhere." *Cheney*, 544 F.3d at 314; *Newman*, 531 F. Supp. 3d at 188.

Those principles permit the Court to require testimony from the officials at issue several times over. Dr. Griess is not a high-ranking executive officer, *Newman*, 531 F. Supp. 3d at 188, and his declarations (which put his testimony at issue) attested to "personal knowledge that is directly relevant" to the issues before the Court, *Sherrod v. Breitbart*, 304 F.R.D. 73, 76 (D.D.C. 2014). The Court required testimony from Mr. Wischer and Deputy Director Lands, who are also unlikely to qualify as high-ranking executive officers, only after determining that required information could not "be obtained elsewhere," specifically, from the official who had held himself out as the decisionmaker. *Cheney*, 544 F.3d at 314; *Newman*, 531 F. Supp. 3d at 188. Finally, although Director Bowron is an agency head, she has submitted multiple declarations inviting the Court to rely on her sworn statements. *E.g.*, ECF 75-3. She "alone has precise knowledge" of her basis for declaring the truth of those statements. *Breitbart*, 304 F.R.D. at 76 (permitting deposition of Secretary of Agriculture); *see also Cheney*, 544 F.3d at 312 (permitting testimony to "follow up on factual questions that [agency] had put at issue in its declarations"). She cannot submit sworn statements to the Court and then urge that the Court lacks authority to demand that she appear and explain what she meant.

***

The Court should enter a preliminary injunction and/or stay under 5 U.S.C. § 705.

Dated: October 17, 2026

RESPECTFULLY SUBMITTED,

_/s/Will Bardwell_
Will Bardwell (Bar No. 90006120)
Mark B. Samburg (Bar No. 1018533)
Catherine M.A. Carroll (Bar No. 497890)
Robin F. Thurston (Bar No. 7268942)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
T: (202) 448-9090
wbardwell@democracyforward.org
msamburg@democracyforward.org
ccarroll@democracyforward.org
rthurston@democracyforward.org

Abbe David Lowell (Bar No. 358651)
Caleb Hayes-Deats (Bar No. 1653213)
Jack Bolen (Bar No. 90031046)
Angela Reilly (*pro hac vice*)
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowellandassociates.com
Chayes-Deats@lowellandassociates.com
JBolen@lowellandassociates.com
AReilly@lowellandassociates.com

Norman L. Eisen (Bar No. 435051)
Lindsay Zimliki (Bar No. 475890)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
T: (202) 601-8678
norman@democracydefenders.org

*Counsel for Plaintiffs*