**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DC PRESERVATION LEAGUE,

DAVE ROBERTS,

and

ALEX DICKSON,

*Plaintiffs*,

*vs*.

UNITED STATES DEPARTMENT OF THE INTERIOR;

DOUG BURGUM, in his official capacity as Secretary of the Interior;

NATIONAL PARK SERVICE;

and

JESSICA BOWRON, in her official capacity as "Comptroller Exercising the Delegated Authority of the Director" of the National Park Service,

*Defendants*.

Case No. 1:26-cv-477-ACR

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISQUALIFY JUDGE ANA C. REYES AND TO AUTHORIZE RELEASE OF HEARING AUDIO**

## TABLE OF CONTENTS

**INTRODUCTION** 1

**ARGUMENT** 3

I. The Government's Request for Disqualification Should be Denied 3

A. A Judge's Views Based on Judicial Proceedings Warrant Recusal Only When They Reveal Such a High Degree of Favoritism or Antagonism That Fair Judgment is Impossible 4

B. The Comments and Conduct Identified in the Government's Motion Fall Far Short of that Demanding Standard 5

i. Sharp criticism of a party or its counsel does not establish disqualifying partiality. 5

ii. The Court's criticism responded to the government's conduct and the evidence before it. 8

iii. The record affirmatively demonstrates the Court's impartiality 11

iv. The testimony orders provide no basis for recusal and were justified by the record 14

v. The cited proceedings in *Talbott* do not establish disqualifying animus 17

II. Plaintiffs Defer to the Court on Defendants' Request to Authorize the Release of the Audio for the October 12 Hearing 18

**CONCLUSION** 19

# TABLE OF AUTHORITIES

## Cases

*Belue v. Leventhal*, 640 F.3d 567 (4th Cir. 2011) ........ 7

*Berger v. United States*, 255 U.S. 22 (1921) ........ 6

*District of Columbia v. Doe*, 611 F.3d 888 (D.C. Cir. 2010) ........ 7

*In re Beard*, 811 F.2d 818 (4th Cir. 1987) ........ 8

*In re Cheney*, 544 F.3d 311 (D.C. Cir. 2008) ........ 15, 16

*In re Cooper*, 821 F.2d 833 (1st Cir. 1987) ........ 7

*In re Musk*, 169 F.4th 445 (4th Cir. 2026) ........ 15, 16

*In re United States*, 985 F.2d 510 (11th Cir. 1993) ........ 15

*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988) ........ 3

*Liteky v. United States*, 510 U.S. 540 (1994) ........ passim

*SEC v. Loving Spirit Found. Inc.*, 392 F.3d 486 (D.C. Cir. 2004) ........ 4, 7, 14

*Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575 (D.C. Cir. 1985) ........ 15

*Talbott v. Trump*, No. 25-cv-240 (ACR) (D.D.C. filed Jan. 28, 2025) ........ 18

*United States v. Carson*, 455 F.3d 336 (D.C. Cir. 2006) ........ 7

*United States v. McTiernan*, 695 F.3d 882 (9th Cir. 2012) ........ 8

*United States v. Riley*, 115 F.4th 604 (D.C. Cir. 2024) ........ 7

*United States v. Roach*, 108 F.3d 1477 (D.C. Cir. 1997), *vacated in part on other grounds*, 136 F.3d 794 (D.C. Cir. 1998) ........ 7

## Statutes

28 U.S.C. § 455(a) ........ 6

**Rules**

Fed. R. Civ. P. 30(b)(6) ........ 16

LCvR 83.1 ........ 18

**INTRODUCTION**

Defendants have not met their high burden to justify the extraordinary relief of disqualification of the Article III judge presiding over this case. ECF No. 86, Defendants' Motion ("Defs' Mot."). That extraordinary relief requires an extraordinary showing: to justify disqualification, judicial remarks must reveal "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* Defendants' allegations fall far short of that demanding standard.

The motion rests on criticism of the Court's litigation conduct, objections to the Court's management of an emergency hearing, and disagreement with orders requiring testimony from officials involved in the challenged actions. Even viewed in isolation, those allegations do not warrant recusal. Viewed in context, however, the inadequacy of the motion's allegations becomes even more stark. In their motion, Defendants fail to acknowledge their own egregious conduct that led to the Court's alleged "animosity." Throughout this litigation, the Court could not have made its expectations clearer. To allow sufficient time for review before any significant activity at East Potomac Golf Course, the Court repeatedly requested Defendants to provide notice, and Defendants through counsel repeatedly promised to provide it. Defendants' conduct on October 9 and 10 flouted those promises. As the Court explained at the hearing, "I had said at the May hearing that I didn't want 10 trees chopped down without someone having notice, and at the September hearing, the plaintiffs asked me to give a specific number [of trees] and put it in an order, and I said no, I don't have to do that, because the government knows what is expected, and

the government is not going to lie to me and say that they're going to do something and then do the exact opposite, which appears is precisely what has happened." Oct. 12 Tr. 10:7–14.

For months in this litigation, Defendants represented to the Court that they would not take irreversible action at East Potomac Golf Course without providing Plaintiffs notice and an opportunity to be heard and to inform the Court of their plans ahead of time. But, on October 10, Defendants did exactly what they said they would not do: they razed hundreds of trees on the golf course before Plaintiffs had an opportunity to challenge Defendants' actions. And as to the promised notice for any such undertaking, Defendants did not write or call Plaintiffs' counsel. Instead, they made a filing at 4:55 pm on a Friday of a holiday weekend and began the razing early the next morning, scarcely 12 hours later. Over the next few hours hundreds of healthy trees were gone. Defendants offered no justification for their failure to provide notice or for failing to honor the commitment they had made to the Court. Their explanation for felling this small forest of trees raised serious questions about whether Defendants were implementing a plan they have long denied is in place. They took action in a manner and at a time where Plaintiffs could not seek relief from the Court to try to stop it before it occurred. Confronted with these facts and after many months of denying Plaintiffs' motions for emergency relief based on the government's assertions, the Court appropriately admonished Defendants for breaching their repeated representations and properly investigated their apparent lack of candor. Defendants cannot now seek to avoid accountability for their actions.

Defendants' motion also omits the broader context of this case's litigation history, which clearly demonstrates that the Court remains open to Defendants' positions and thus lacks the bias that the legal standard requires. For months since this litigation's inception, the Court has shown significant deference to, and faith in the candor and credibility of, Defendants' counsel. When

Plaintiffs repeatedly sought orders requiring notice or restraining activity on East Potomac, the Court repeatedly denied those requests, opting instead to rely on Defendants' good faith. Even at the October 12 hearing, while expressing its frustration, the Court also acknowledged that Defendants could prevail on the merits. Oct. 12 Tr. 9:15–21. It considered replacing the TRO with a notice requirement, declined to enter a preliminary injunction without further briefing, and expressly invited an opposition before deciding whether to extend or lift the TRO. *Id.* at 132:9–133:11, 136:13–16, 138:10–14. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 850 (1988) (recusal must be evaluated from perspective of "a reasonable person, knowing the relevant facts"). And that openness was also repeatedly reflected in the prior hearings in this case, as detailed below.

Accordingly, Plaintiffs oppose Defendants' motion to disqualify Judge Reyes for the reasons discussed herein.

## ARGUMENT

### I. The Government's Request for Disqualification Should be Denied.

Defendants' account omits the full record that led to the October 12 hearing. For months, the Court declined Plaintiffs' requests for injunctive relief and formal notice requirements before actions of the kind that occurred two weekends ago occurred. Instead, the Court accepted Defendants' repeated assurances that they would provide advance notice of significant developments at East Potomac Golf Course. The Court specifically warned against irreversible changes occurring before Plaintiffs and the Court could respond. Defendants then did precisely what the Court had cautioned them not to do, waiting until 4:55 p.m. on a Friday of a holiday weekend to announce work beginning the next morning, then removed hundreds of healthy, non-invasive trees before Plaintiffs could be heard or the Court could consider Plaintiffs' objections.

The resulting hearing revealed discrepancies in Defendants' explanations, and the two government witnesses whose testimony Defendants now suggest striking, confirmed that there was no urgent governmental need to remove the trees. ECF 79 at 4–9, 15, 20. A judge's adverse assessment of that egregious litigation conduct does not establish disqualifying bias; indeed, if the Court had *not* responded with alarm, that would have been more unexpected.

Beyond the inadequacy of the motion's allegations, the record affirmatively demonstrates that the Court remains open to Defendants' positions and thus lacked the bias that the legal standard requires. Even while expressing its frustration at the October 12 hearing, the Court acknowledged that Defendants might prevail on the merits. Oct. 12 Tr. 9:15–21. It considered replacing the TRO with a notice requirement, declined to enter a preliminary injunction without further briefing, and expressly invited an opposition before deciding whether to extend or lift the TRO. *Id.* at 132:9–133:11, 136:13–16, 138:10–14. Defendants cannot establish an appearance of prejudgment by omitting those statements and isolating expressions of displeasure from their context. Accordingly, its request for disqualification should be denied.

### A. A Judge's Views Based on Judicial Proceedings Warrant Recusal Only When They Reveal Such a High Degree of Favoritism or Antagonism That Fair Judgment is Impossible

Section 455(a) requires disqualification when a judge's impartiality might reasonably be questioned. The inquiry is objective: it asks whether a reasonable and informed observer would question the judge's impartiality. *SEC v. Loving Spirit Foundation Inc.*, 392 F.3d 486, 493 (D.C. Cir. 2004). In *Liteky*, the Supreme Court recognized the critical distinction between disqualifying partiality and opinions properly formed in judicial proceedings. 510 U.S. at 548, 553–55. Under *Liteky*, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* at 555. Opinions formed from facts or events in current or prior proceedings

warrant recusal only when those remarks "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id*. Because the government's motion rests on judicial comments and actions arising in litigation, it must establish the exceptional antagonism that *Liteky* requires in that setting.

### B. The Comments and Conduct Identified in the Government's Motion Fall Far Short of that Demanding Standard

#### i. Sharp criticism of a party or its counsel does not establish disqualifying partiality.

Section 455(a) requires the government to demonstrate why the particular statements and actions they identify, considered in context, cross the line from judicial criticism—even forceful criticism—to antagonism so profound that fair judgment is impossible. The motion fails to establish judicial conduct even approaching that degree of antagonism.

The government emphasizes the Court's tone, expressions of frustration, skepticism toward witnesses, and criticism of counsel. Defs' Mot. 3–6. But a recusal motion requires more than a catalog of sharp exchanges and disputed procedural decisions. *Liteky* recognizes that judicial displeasure, including anger, can arise during proceedings without establishing an inability to judge fairly. 510 U.S. at 555–56. Assessing whether a witness's account is credible, whether a declaration is accurate, and whether a party has honored its representations are ordinary judicial responsibilities. An unfavorable assessment on such questions does not become disqualifying simply because it is expressed forcefully.

The Supreme Court's decision in *Liteky* demonstrates that recusal is not warranted. The Court there rejected a recusal request grounded in the same kinds of judicial conduct the government invokes here. The defendants alleged that the judge had displayed "impatience, disregard for the defense and animosity" during an earlier trial involving one of them, including by questioning witnesses, limiting examination, and admonishing counsel and witnesses. 510 U.S.

at 542–43. They also challenged his questioning of witnesses in the subsequent trial, his alleged "anti-defendant tone," and his restrictions on testimony. *Id.* at 556. The Supreme Court held those allegations insufficient: they concerned judicial rulings, trial administration, and "ordinary admonishments (whether or not legally supportable)" arising within judicial proceedings, without the exceptional antagonism necessary to require disqualification. *Id.* The Court thus rejected the contention that allegations of hostile treatment, intrusive questioning, and purportedly improper restrictions on the presentation of a case warrant recusal under § 455(a).

That comparison answers both the government's emphasis on the Court's tone and the government's effort to aggregate conduct from separate cases. As in *Liteky*, the challenged conduct arose from judicial proceedings and involved questions to witnesses, assessments of the parties' positions, and management of the litigation. The government's reliance on *Berger v. United States*, 255 U.S. 22, 28 (1921), further establishes the insufficiency of the allegations here. Defs' Mot. at 10. In *Berger*, a World War I espionage prosecution against German American defendants, the judge allegedly stated during trial that "[o]ne must have a very judicial mind, indeed, not to be prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id*. at 28; *Liteky*, 510 U.S. 540, 555. A judicial statement of a self-professed "prejudice" that all Americans of a criminal defendant's ethnic or national origin are "reeking with disloyalty" is precisely the sort of extreme animosity that establishes the level of partiality and bias that undermines the fairness of the proceeding and thus warrants recusal. Here, the Court's criticism responded to specific representations made by Defendants, subsequent conduct that contradicted those statements, and evidence from pleadings and testimony in litigation that demonstrated both disregard for the Court and apparent discrepancies or lapses in candor in Defendants' submissions. Despite those bases for the Court's actions, the record nevertheless

affirmatively shows the Court's continued openness to the government's merits position. There is thus no basis for Defendants' effort to equate severity of criticism with categorical prejudice.

D.C. Circuit decisions and those of the other circuits confirm the conclusion that the Court's criticisms do not warrant recusal. In *United States v. Roach*, the D.C. Circuit rejected the attempt to turn strongly expressed, record-based views into judicial bias even in a criminal-contempt proceeding. 108 F.3d 1477, 1483–84 (D.C. Cir. 1997), *vacated in part on other grounds*, 136 F.3d 794 (D.C. Cir. 1998); *see also District of Columbia v. Doe*, 611 F.3d 888, 899 (D.C. Cir. 2010) (holding that Liteky foreclosed recusal based on allegedly flawed rulings and "excessive statements," including accusations that a party acted deceptively and engaged in unethical ex parte communications); *Loving Spirit*, 392 F.3d at 493‑94 (affirming denial of recusal because record-based rulings "almost never" establish partiality and do so only in "the rarest circumstances"); *United States v. Carson*, 455 F.3d 336, 355‑59 (D.C. Cir. 2006) (per curiam) (rejecting judicial-bias challenge although the judge allegedly demeaned and threatened counsel, characterized objections as frivolous, accused counsel of delay and attempting to cause a mistrial, warned counsel about contempt, and twice held counsel in contempt; concluding that comments reflecting efforts to control the proceedings did not establish bias merely because they were "critical or even harsh"); *United States v. Riley*, 115 F.4th 604, 618‑19 (D.C. Cir. 2024) (rejecting appearance-of-partiality challenge based on allegedly harsh and dismissive criticism because the remarks reflected legitimate efforts to keep counsel focused and probe the parties' arguments). *Accord In re Cooper*, 821 F.2d 833, 843–44 (1st Cir. 1987) (declining to require recusal despite statements that defense counsel lacked credibility and might warrant a perjury indictment, and a threat to revoke his pro hac vice admission); *Belue v. Leventhal*, 640 F.3d 567, 574–75 (4th Cir. 2011) (rejecting recusal based on suggestions that a settlement was collusive, encouragement of an

expedited class-certification motion, and a shortened response period); *In re Beard*, 811 F.2d 818, 830 (4th Cir. 1987) (denying mandamus for recusal despite allegations that the judge used personal epithets toward counsel, absent a showing of resulting bias against the parties); *United States v. McTiernan*, 695 F.3d 882, 892–93 (9th Cir. 2012) (affirming denial of recusal despite repeated findings that the defendant had lied, because the judge's disapproval arose from his known conduct).[1]

**ii. The Court's criticism responded to the government's conduct and the evidence before it.**

The Court's frustration had an identifiable basis in this case. Defendants repeatedly maintained that no final agency action had occurred, that there were no plans to renovate the public golf course at East Potomac Park and that the proposed renovation remained conceptual. Rather than enjoin Defendants, the Court accepted assurances that it would notify Plaintiffs and the Court of major developments outside ordinary maintenance. ECF 79 at 4. In July, the Court specifically warned about bulldozers arriving and making irreversible changes before notice could be given. July 2 Tr. 60:6–10; ECF 79 at 5. ("if we get bulldozers on site and they start mowing down half the golf course, . . . that's irretrievable, which is why the one thing I have done is ask them not to do that before giving us all notice."). In September, government counsel represented that tree removal was confined to hazardous, dead, dying, or invasive trees, with no other criteria. The Court again declined a formal notification order after counsel acknowledged its concern about an irreversible fait accompli. ECF 79 at 5–7; Sept 3 Tr. 13:10–15 ("Well -- look, I'm not going to

[1] The government's invocation of the local civility provisions does not supply the showing the motion fails to make. Defs' Mot. 5–6. The issue in a recusal motion is not the Court's phrases or inflections but whether the challenged conduct, viewed in context, demonstrates the kind of partiality that requires disqualification. *See Liteky*, 510 U.S. at 556. Nor do news reports describing the Court's volume, or public statements criticizing its demeanor, establish what the underlying record does not.

discuss the trees ad nauseam, all right, not the Lorax. Sounds like we have a solid response from the government. I have no reason to disbelieve it. If you have reason to believe that they're cutting down live, healthy trees, then by all means let me know and we can get on it then, okay?").

The October operation departed dramatically from that account. Evidence adduced at the October 12 hearing indicated that National Park Service Superintendent Dr. Kevin Griess received the Tree Management Plan ("TMP"), the basis for the October 10 operation, on October 2; he submitted it to others in his agency for approval on October 5; and he obtained acting NPS agency head Jessica Bowron's authorization on October 6. DOI Chief of Staff Gregory Wischer directed NPS Deputy Director Frank Lands on October 5 to implement the 2019 Cultural Landscape Report "as soon as practical"; agency counsel attended that meeting. Yet on October 9, Defendants submitted a declaration, signed by Bowron on October 6, which made no mention of the TMP and instead stated, "No final decision has been made regarding the nature and scope of any renovations" and only that "the NPS has taken and continues to take *some* maintenance actions if or around the Golf Course, . . . including tree pruning; removal of dead or dying or intrusive trees." ECF 75-3 ¶¶ 7, 9. The testimony Defendants suggest striking states that Ms. Bowron signed off on the TMP on October 6 and yet made no mention of it in her declaration that day or in the days after leading to the October 10 action. Indeed, Defendants did not notify Plaintiffs or the Court until 4:55 p.m. on October 9 of what had been approved days before. Removal began early the next morning, and hundreds of healthy, mature, non-invasive trees were removed. ECF 79 at 7–8. By Sunday, Plaintiffs learned that hundreds of additional trees remained to be felled and that work would resume as soon as the weather permitted. *Id.* at 9.

Defendants' complaints about the Court's questioning of counsel's access to email and telephones must be read against that chronology. Defs' Mot. at 3. Counsel acknowledged learning

on October 7 that work might begin Saturday and learning later that such work was certain to begin. Oct. 12 Tr. 6:13–15, 7:8–17. The Court asked why that information had not prompted counsel to convey an immediate warning to Plaintiffs or the Court, even if Defendants were still assembling the details for a declaration. *Id.* at 7:18–8:24. Its point was straightforward: the absence of a completed filing did not prevent counsel from communicating that irreversible work was imminent. Likewise, the criticism of counsel's asserted best efforts was immediately followed by an explanation that a call, email, or text could have alerted Plaintiffs. *Id.* at 10:19–11:1. The motion extracts the criticism while omitting the conduct it addressed and the context in which the questions were asked.

The hearing also exposed other concrete discrepancies requiring inquiry. Dr. Griess's declaration attributed the timing of the work partly to newly available budgetary resources. His testimony instead acknowledged that he could have sought those resources earlier, prompting the Court to identify a needed correction to the declaration. Oct. 12 Tr. 35:14–25 ("So we need to make that correction to paragraph 6 of your declaration; would that be fair?"). ECF 79 at 8, 15. Defendants removed substantially more trees from the initial targeted zone of operation than its October 9 notice said would be removed, and it documented additional removals in a second NEPA categorical exclusion form after the first tranche of work occurred. ECF 79 at 8, 16–18. The Court had ample reason to investigate the accuracy and completeness of Defendants' explanations without assuming that every discrepancy necessarily established intentional deception.

These circumstances also answer the assertion that there was no urgency justifying the holiday hearing. Defs' Mot. at 6. To state the obvious, the urgency of the hearing was a crisis of Defendants' own creation. Defendants' witnesses unequivocally confirmed that there was no urgent need to remove trees, but Defendants had already removed hundreds and intended to

remove hundreds more as soon as the weather permitted. ECF 79 at 9, 20. The lack of urgency for Defendants' project did not eliminate the urgency of preventing irreversible harm pending review. It made the rush to act before meaningful notice that much more difficult to explain.

Finally, the statement that "the government can't be trusted" was not some sweeping judgment against the executive branch. It concerned whether repeated assurances that tDefendants' counsel and officials had made on the record, over several months, remained sufficient to protect against further removals. Oct. 12 Tr. 132:9–21. Immediately before that statement, the Court explained that it had repeatedly avoided injunctive relief but, in light of Defendants' conduct over the weeks before the TMP, no longer had confidence that the remaining trees would be preserved without an order. Immediately afterward, it proposed replacing the TRO with a requirement of 72 hours' notice and expedited briefing. *Id.* at 132:22–133:11. In context, the statement expressed a record-based judgment about reliance on assurances in this litigation. It did not announce that Defendants could never prevail or receive a fair hearing.

**iii. The record affirmatively demonstrates the Court's impartiality**

The Defendants' motion puts forward selective statements by the Court to support their view of bias, but the full record in this litigation is incompatible with Defendants' portrait of predetermined hostility. In July, Plaintiffs questioned whether Defendants could conduct environmental review in good faith. The Court refused to assume that it would not: "We wait to see if they actually do it in good faith or not." July 2 Tr. 56:23–57:6; *see also* 17:18-20 ("I'm not going to assume that the agency is going to act in bad faith before they have acted."). The Court later explained that it wanted to trust the parties' good faith unless proven otherwise and that Defendants had not proven otherwise in this litigation. *Id.* at 91:13–25. It also rejected Plaintiffs'

requests for additional third-party discovery based on Defendants' representations and the absence of contrary evidence. *Id.* at 106:3–107:14.

Nor did the Court's frustration on October 12 foreclose consideration of the merits. Even at the height of its exasperation, the Court stated: "I'm not sure you don't have a fine claim; I'm not sure you might not win on the merits." Oct. 12 Tr. 9:19–20. That contemporaneous statement directly refutes the suggestion that the Court equated dissatisfaction with Defendants' conduct with a predetermined result. It is incompatible with the lack of impartiality that Section 455(a) requires to justify recusal.

As much as the Court called out the actions of Defendants and counsel at the October 12 hearing, it previously continued to distinguish counsel and issues rather than treating Defendants as a disfavored monolith. The Court has consistently expressed praise for DOJ attorney Michael Robertson. *See* March 11 Tr. 3:8–16 ("This was one of the more exceptional government briefs I have seen in three years on the bench. … is sort of the model government work."); May 4 Tr. 31:22–32:1("Mr. Robertson has had a great deal of credibility with me from day one. And he continues to maintain that credibility with me."); July 2 Tr. 29:23–30:10 ("I absolutely believe that everything you're telling me is what you believe to be true. I don't think you're dissembling or hiding anything. … I have 1,000 percent faith in you."); *Id.* at 37:6–10 ("The only people who test my patience are people who are not prepared. You are always uber prepared"); *Id.* at 51:3–4, 52:9-1, 53:15–20 ("I don't think Mr. Robertson is lying to me." … "I'm going to believe Mr. Robertson until I'm shown otherwise." … "I have every faith in Mr. Robertson."); Sept. 3 Tr. 6:13–18 ("I think you've been a terrific advocate for the Government. And I have -- you've given me no reason to doubt what you've said."); Oct. 12 Tr. 134:1–2 ("And again, I have nothing but praise for Mr. Robertson."). At the October 12 hearing itself, the Court reiterated its faith in the government. *Id.*

at 11:22–12:10 ("I always say I trust the government lawyers. I say I have had nothing but good experiences with the government lawyers, and I say that not a single government lawyer has violated one of my orders."). It thanked DOJ attorney Marissa Piropato for stepping in and credited Defendants' efforts to locate Mr. Wischer. *Id.* at 134:1–5, 134:16–21. It accommodated counsel's travel plans and invited an opposition to the pending TRO motion, expressly stating that the next day's decision could either extend the restraint or lift it. *Id.* at 138:1–14. When Defendants' counsel proposed entry of a preliminary injunction, the Court declined to decide that relief after only a day of addressing the new issues and required further briefing. *Id.* at 136:8–16. The ensuing opinion likewise reserved any consideration of Plaintiffs' NEPA segmentation claim for further briefing. ECF 79 at 18.

Defendants' reliance on the Court's use of the pronoun "we" fares no better. Defs' Mot. at 4. In the passage at issue, the Court referred collectively to questions asked at the hearing and then expressly distinguished its own questions from those asked by Plaintiffs' counsel. Oct. 12 Tr. 137:5–9. It immediately explained that the questions concerned the accuracy of declarations, the timing of the plan, and the notice the Court would receive. *Id.* at 137:11–15. That passage does not establish an alliance with Plaintiffs, especially when read alongside the Court's repeated rejection—over many months—of their requests for injunctive relief and other procedural rulings. *See* May 4 Tr. 31:22–32:1 (Court rejecting Plaintiffs' request for a TRO on the dumping of dirt: "[Y]ou know, Mr. Robertson has had a great deal of credibility with me from day one. And he continues to maintain that credibility with me. And until he gives me a reason to believe otherwise, I'm going to continue along the path I've been"); *Id.* at 31:16-17 ("I'm not going to enter a TRO or PI before your experts have even looked at the materials."); July 2 Tr. 91:18–25 ("I want to trust that people are acting in good faith and have them acting in good faith until proven otherwise, and

you have not proven otherwise to me in this litigation. And frankly, in any litigation I have had, every single order I have issued has been adhered to now. … which is why I feel confident doing it this way."); Sept. 3 Tr. 20:4–7 ("But I'm not going to ask the government or force the government to sort of provide notifications as they're following the law. I mean, I just -- I don't have any basis to do that."). In fact, at the October 12 hearing Judge Reyes stated "You know what I have not wanted to do this entire time? I have not wanted to enter a TRO. I have not wanted to enter a PI. I have time and time again avoided doing that, because I actually don't think courts should be playing parks and rec." Oct. 12 Tr. 132:9–13. There could not be better record evidence refuting Defendants' claim of disqualifying bias.

The claim that Plaintiffs received a veto over ordinary maintenance similarly confuses notice with a prohibition. Defs' Mot. at 1. The Court repeatedly allowed ordinary maintenance to proceed and declined to impose the formal protections Plaintiffs requested. ECF 79 at 4–7. Requiring meaningful notice before irreversible changes preserves an opportunity for judicial review; it does not give Plaintiffs authority to decide the legality of those changes. And the motion's allegation of prejudging motions not yet filed, Defs' Mot. 2, cannot be reconciled with the Court's express reservation of the merits, invitation for further briefing, and consideration of lifting the temporary restraint.

**iv. The testimony orders provide no basis for recusal and were justified by the record.**

Defendants' objections to testimony from senior officials raise questions about the scope and necessity of particular orders. Those questions are subject to reconsideration and appellate review, including mandamus when its requirements are met. They do not, however, establish, nor even indicate, disqualifying partiality. *Liteky*, 510 U.S. at 555; *Loving Spirit*, 392 F.3d at 493–94. Defendants' cited decisions concerning high-ranking officials address limits on compelled

testimony, not a rule that a testimony order Defendants contend to be erroneous requires disqualification. See *In re Cheney*, 544 F.3d 311, 313–14 (D.C. Cir. 2008); *Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985); *In re Musk*, 169 F.4th 445, 448–49 (4th Cir. 2026); *In re United States*, 985 F.2d 510, 512–13 (11th Cir. 1993).

In any event, the record supplies a particularized justification for testimony here. The Court did not begin by summoning agency leadership simply because of official rank. Defendants themselves had put the officials' knowledge at issue by submitting declarations from Dr. Griess, who testified at the October 12 hearing, and Ms. Bowron, who is called to testify at the October 19 hearing. When Dr. Griess could not identify precisely when the workforce was notified and identified Mr. Lands as the responsible official, the Court directed that Mr. Lands appear. Oct. 12 Tr. 20:1–19. Mr. Lands then identified Mr. Wischer as the official who convened the October 5 meeting and directed expeditious implementation of the TMP but could not explain what prompted the timing. *Id.* at 79:12–81:24. That is when the Court stated the need for Mr. Wischer to answer what Mr. Lands could not. The Court's inquiry followed the witnesses' own identification of who possessed the missing information.

The need for Mr. Wischer's testimony was explained expressly. The Court stated that he could illuminate, as the prior witnesses and other available evidence could not, the basis for the urgency and when the idea was first identified. *Id.* at 135:5–8. It connected those questions to Defendants' representations and to whether temporary relief was necessary. *Id.* at 135:17–136:2. Ms. Bowron, meanwhile, authorized execution of the plan and had supplied a declaration, as it turns out a very incomplete declaration, asserting that plans for renovating the course remained conceptual. ECF 79 at 7, 14–15; Oct. 12 Tr. 129:1–7. Her role therefore concerned both the

challenged action, the factual account advanced in this litigation, and how the TMP was omitted from her declaration filed the very day before the TMP began.

Under *Cheney*, the appropriateness of requiring testimony by high-ranking officials depends on the totality of the circumstances rather than solely on the officials' status as an absolute bar. There, the D.C. Circuit allowed the court to require limited testimony by the Vice President on factual assertions the government had put in evidence, while requiring substitution for the Vice President's Chief of Staff because another witness appeared able to supply the information. 544 F.3d at 313–14. Here, the witnesses already heard identified material gaps in their knowledge and pointed to the officials whose testimony the Court sought. Together with the discrepancies in the government's account, the impending irreversible harm, and the need to decide emergency relief, that record supports the need for their testimony.

Defendants invoke *Musk* for the proposition that firsthand knowledge alone is insufficient. Mot. 8. Neither the Court nor Plaintiffs contend otherwise. Defendants ignore the stark difference in surrounding circumstances between *Musk* and the testimony the Court required here. In *Musk*, the court identified unpursued alternatives, including other lower-ranking witnesses and a Rule 30(b)(6) deposition. 169 F.4th at 449. Here, the Court faced an emergency application arising from irreversible work undertaken after last-minute notice, had already questioned witnesses (some of whom Defendants had inserted in the litigation with their own declarations) about the disputed events, and had identified specific questions they could not answer. The need to resolve those questions promptly, including the reliability of the declarations offered to the Court, justified targeted testimony from the officials those witnesses identified. To the extent Defendants believe a substitute, a narrower inquiry, or another procedure could adequately answer them in the time

available, that is an argument about tailoring the testimony order. It does not show that the Court sought testimony out of hostility to Defendants.

So too regarding the objections about preparation time, the holiday, or the manner of appearance. The Court was responding to an emergency created by Defendants themselves: by irreversible work undertaken after last-minute notice, and the relevant witnesses emerged through the testimony. It also limited questions when privilege concerns arose, directing that Dr, Griess provide dates and times without disclosing the substance of attorney communications. Oct. 12 Tr. 59:10–60:16. Whatever procedural adjustments the government might request, its objections do not demonstrate an inability to obtain a fair adjudication from this Court.

**v. The cited proceedings in *Talbott* do not establish disqualifying animus**

The motion devotes a separate section to *Talbott v. Trump*, No. 25-cv-240 (D.D.C. 2025), asserting that the Court's statements there establish hostility to the Administration across cases. Defs.' Mot. at 9–10. But *Liteky* expressly covers opinions formed in prior judicial proceedings. 510 U.S. at 555. Moving a disputed exchange from this case to another does not convert it into an extrajudicial source of bias or relieve the government of showing the requisite degree of antagonism.

Even as described in the motion, the cited episodes concern the Court's examination of the policy challenged in *Talbott*, hypotheticals testing the government's position, and the availability of an official to testify. Defs.' Mot.at 9–10. The UVA hypothetical, for example, posited an exclusion based on a sweeping assertion about a class of people; the motion itself describes it as a hypothetical, not an actual finding that government counsel or UVA graduates lack integrity. The Jesus exchange likewise addressed the treatment of a group under the policies being discussed. And the Hegseth comment concerned the asserted burden on his time from testimony. The government may object to the form or substance of those exchanges, but it does not explain how

they demonstrate that the Court cannot fairly decide the distinct claims and evidence in this entirely separate case. Again, this is especially the case with the Court's clear statements acknowledging the government's position on the merits of the claim in this case.

Considering these allegations together does not change the result. The asserted pattern must be evaluated alongside the Court's actual treatment of Defendants in this case, including its repeated reliance on counsel's assurances, refusals of Plaintiffs' requested relief and discovery, and express acknowledgment that Defendants might prevail. That record defeats the inference that the Court approached this litigation with an unalterable hostility to the Administration.

## II. Plaintiffs Defer to the Court on Defendants' Request to Authorize the Release of the Audio for the October 12 Hearing

As clarified in Plaintiffs' Notice of Corrections Regarding Plaintiffs' Position on Defendants' Motion, ECF 87, Plaintiffs take no position on Defendants' requests concerning the release of the audio of the October 12 hearing. Standing Order 24-31 and Local Rule 83.1 govern this Court's handling of audio of proceedings, and Plaintiffs do not believe that the parties' positions are material to the resolution of that portion of the motion. Plaintiffs nevertheless note that Defendants are seeking *both* that the audio recording of the October 12 hearing be posted to the Court's website, *and* that all restrictions on dissemination of the recording be lifted. *See* ECF 86-1 (Proposed order seeking "that any existing prohibition on the publication, distribution, or transmittal of audio recordings of judicial proceedings shall not apply to the audio recording of the October 12, 2026 hearing on Plaintiffs' Motion for a Temporary Restraining Order."). The former relief, if granted, would fully address Defendants' asserted interest in facilitating public access to the audio. The latter relief would have independent value only for individuals who impermissibly recorded the October 12 proceedings or who wish to transmit selected snippets for purposes of creating a distracting side show that would detract from the substantive issues of the case.

**CONCLUSION**

For these reasons, the Court should deny Defendants' motion to disqualify Judge Reyes and Plaintiffs defer to the Court on Defendants' request to release the hearing audio.

Dated: October 18, 2026

RESPECTFULLY SUBMITTED,

*/s/ Abbe David Lowell*
Abbe David Lowell (Bar No. 358651)
Caleb Hayes-Deats (Bar No. 1653213)
Jack Bolen (Bar No. 90031046)
Angela Reilly (*pro hac vice*)
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowellandassociates.com
Chayes-Deats@lowellandassociates.com
JBolen@lowellandassociates.com
AReilly@lowellandassociates.com

*/s/ Norman L. Eisen*
Norman L. Eisen (Bar No. 435051)
Lindsay Zimliki (Bar No. 475890)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
T: (202) 601-8678
norman@democracydefenders.org
lindsay@democracydefenders.org

*/s/Will Bardwell*
Will Bardwell (Bar No. 90006120)
Mark B. Samburg (Bar No. 1018533)
Catherine M.A. Carroll (Bar No. 497890)
Robin F. Thurston (Bar No. 7268942)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
T: (202) 448-9090
wbardwell@democracyforward.org
msamburg@democracyforward.org
ccarroll@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*