**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DC PRESERVATION LEAGUE, *et al.*,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,**<br><br>Defendants. | Civil Action No. 1:26-cv-00477 (ACR)<br><br>The Hon. Ana C. Reyes |

**BRIEF OF *AMICI CURIAE* HAINS POINT RUNNERS AND CHERRY BLOSSOM, INC. IN SUPPORT OF PLAINTIFFS**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. P. 7.1, Cherry Blossom, Inc., doing business as Cherry Blossom 10 Mile and 5K, states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... iii

INTEREST OF *AMICI CURIAE* .......... 1

INTRODUCTION .......... 4

STATEMENT OF FACTS .......... 6

I. The Hains Point Perimeter Roadway Is Unusually Valuable to the Running Community. .......... 6

II. Organized Running Races Have Long Relied on the Hains Point Roadway, and NPS Has Long Supported Such Events. .......... 7

III. NPS Has Affirmatively Recognized and Accommodated Recreational Use of the Hains Point Corridor. .......... 9

ARGUMENT .......... 10

I. NPS's Plan Defies Congress's Mandate and Reverses Decades of Agency Practice Without Reasoned Explanation. .......... 10

A. NPS's Plans Contravene Congress's Intent to Preserve East Potomac Park as a Longstanding Public Recreational Resource. .......... 10

B. NPS Has Long Protected the Roadway's Recreational Uses and Cannot Reverse Course Without Explanation or Support. .......... 15

II. NPS Could Not Lawfully Eliminate or Substantially Impair the Roadway Without Complying With Multiple Independent Procedural Requirements of Federal Law. .......... 17

III. Public Participation and Consultation Must Occur Before the Project's Defining Features Are Fixed. .......... 22

IV. The Proposed Construction Lacks the Required Express Congressional Authorization. .......... 23

CONCLUSION .......... 25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

INDEX OF APPENDICES

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bicycle Trails Council of Marin v. Babbitt*,
82 F.3d 1445 (9th Cir. 1996) ....................11

*Daingerfield Island Protective Soc'y v. Babbitt*,
40 F.3d 442 (D.C. Cir. 1994) ....................11

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020) ....................16

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ....................16

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ....................21

*Greater Yellowstone Coal. v. Kempthorne*,
577 F. Supp. 2d 183 (D.D.C. 2008) ....................11

*Grunewald v. Jarvis*,
776 F.3d 893 (D.C. Cir. 2015) ....................11

*Judulang v. Holder*,
565 U.S. 42 (2011) ....................11

*Jin v. Ministry of State Sec.*,
557 F. Supp. 2d 131 (D.D.C. 2008) ....................1

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ....................21

*Marin Audubon Soc'y v. FAA*,
121 F.4th 902 (D.C. Cir. 2024) ....................19

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....................11, 16

*Nat'l Park Serv. v. Nat'l Tr. for Historic Pres*,
609 U.S. —, 2026 WL 2564318 (Aug. 31, 2026) ....................21, 23

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ....................22

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) ....................12

*Wash. Area Bicyclist Ass'n, Inc. v. Burgum*,
— F. Supp. 3d —, 2026 WL 1078218 (D.D.C. Apr. 21, 2026)........................................11, 17

**Statutes**

40 U.S.C. § 8106..........................................................................................................23, 24

42 U.S.C. § 4332..........................................................................................................19

54 U.S.C. § 100101......................................................................................................10, 11

54 U.S.C. § 306108......................................................................................................19

Act of Aug. 25, 1916, ch. 408, 39 Stat. 535 ..............................................................10, 13

Act of Mar. 3, 1897, ch. 375, 29 Stat. 624.................................................4, 10, 11, 12, 15, 21, 23

**Legislative Materials**

29 Cong. Rec. 2214 (1897)..........................................................................................12

H.R. Doc. No. 55-7 (1898) ..........................................................................................13

H.R. Doc. No. 64-1038 (1916) .....................................................................................13

S. Rep. No. 54-1327 (1897)..........................................................................................12

S. Rep. No. 57-166 (1902)............................................................................................13

**Regulations**

36 C.F.R. § 1.5..............................................................................................................18

36 C.F.R. § 1.7..............................................................................................................18

36 C.F.R. § 800.1 ...........................................................................................20, 22, 23

36 C.F.R. § 800.2..........................................................................................................23

36 C.F.R. § 800.5......................................................................................................20, 21

36 C.F.R. § 800.6..........................................................................................................21

40 C.F.R. § 1501.9........................................................................................................22

**Other Authorities**

Acquisition Gateway listing, *Construction-East Potomac Park Rehab (Golf Course) (NAMA)* ............................................................................................5

Credit Union Cherry Blossom, *2026 Credit Union Cherry Blossom Race Yearbook* (2026)....8

Cuneyt Dil, *New Group Fights Trump's Upscale Plans for East Potomac Golf Course*, Axios (May 11, 2026) ....18

David A. Fahrenthold et al., *Who Approves Trump's Washington Makeover Projects?*, N.Y. Times (Sep. 2, 2026)....4

Elizabeth Barthold, Historic Am. Bldgs. Survey, NPS, *East Potomac Park (Hains Point), HABS No. DC-692* (1993)....13, 14

Gary Scott, Historic Am. Bldgs. Survey, NPS, *Girl Scout Teahouse*, *(Hains Point Teahouse) (Hains Point Inn), HABS No. DC-549* (1987)....14

Jessica Albert, *Cyclists Protest Trump Plan to Renovate East Potomac Park into Championship Golf Course*, NBC4 Wash. (July 18, 2026) ....18

Jimmy Alexander, *'America's National Parks Are Not For Sale': Cyclists Rally at Hains Point over Proposed Golf Course Changes*, WTOP News (Aug. 29, 2026) ....18

Josephine Demos, *Hains Point Hoopla and Picnic Potluck Attendees Voice Concerns about East Potomac Park Development*, The Southwester (Aug. 1, 2026) ....18

Marine Corps Marathon, *Spectator and Landmarks Map (50th Marine Corps Marathon)* ....8

Matthew Daly, *Park Service Quietly Awards Contracts to Work on Trump's Takeover of East Potomac Golf Course*, NBC Wash. (Sep. 17, 2026)....5

NPS, *East Potomac Park Traffic Safety Improvements Presentation* (Apr. 19, 2022) ....9, 15

NPS, Nat'l Register of Historic Places, *East and West Potomac Parks*, Ref. No. 73000217 (updated June 4, 2026)....20

Press Release, *Raskin, Beyer, Norton, Ivey Oppose Trump Administration's Rushed "Redevelopment" of Historic East Potomac Park* (July 30, 2026) ....18

Rick Maese, *Democrats Demand Records From Trump's 'Methodical' D.C. Golf Takeover*, Wash. Post (Sep. 16, 2026) ....22

Rick Maese, *Park Service Works to Fortify Sea Wall Key to East Potomac Golf Project*, Wash. Post (Sep. 12, 2026) ....5

Rick Maese, *Trump's Upscale Golf Plan Could Destroy a D.C. Haven for Cyclists, Runners*, Wash. Post (Sep. 30, 2026) ........................................................................5, 18

Robert Billard, *50th Marine Corps Marathon: New Record Set, Marine Major Claims Third Win*, Military.com (Oct. 27, 2025) .........................................................................8

## INTEREST OF *AMICI CURIAE*

Cherry Blossom, Inc. (doing business as "Cherry Blossom 10 Mile and 5K"), is a District of Columbia nonprofit corporation that organizes and stages the annual Credit Union Cherry Blossom Ten Mile Run, one of the nation's premier road races and among the largest annual athletic events conducted on National Park Service ("NPS") lands in the Washington, D.C., metropolitan area. The race attracts more than 20,000 participants from across the United States and around the world.

Since 1973, the race has utilized the East Potomac Park roadway system as a central component of its course, except during limited periods when construction activities required temporary adjustments. For more than five decades, the race's final miles have been run beneath the canopy of the nearly 500 Kwanzan cherry trees that line the Hains Point perimeter roadway, making that segment one of the most iconic and distinctive features of the race experience. *See* App. A (2026 Cherry Blossom Course Map); *see also* App. B (Evolution of the 10 Mile Course).[1] Through decades of race operations, Cherry Blossom, Inc. has worked closely with NPS on permits, course design, participant safety, and stewardship of park resources, and has long relied on continued public access to the Hains Point roadway in planning and conducting the race. The organization views continued public access to that roadway as important to the continued success of the race and has a substantial interest in ensuring that the effects of the proposed project on organized running events are fully considered. *See* App. C (July 29, 2026 Email to Prospective Cherry Blossom Race Participants) (explaining impact of loss of roadway on 2027 10 Mile race).

[1] "App." refers to the appendices to the brief, which are provided for the Court's convenience. *See Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131, 137 (D.D.C. 2008) (participation of *amici* permitted "when the *amicus* has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide" (citation omitted)).

Individual *amici* are residents of the District of Columbia, Maryland, and Virginia who have collectively accumulated well over one hundred years of experience using East Potomac Park for running, walking, cycling, race organizing, race volunteering, athletic rehabilitation, and other forms of outdoor recreation.

Individual *amici* include the following:

- Jeffrey Redfern is a resident of Bethesda, Maryland. He has been training for distance running events and racing around Hains Point since moving to the area in 2012. He also served as race director for a marathon conducted at East Potomac Park in December 2020, with a permit issued by NPS.
- Evan Fallor is a resident of Vienna, Virginia, and a longstanding user of East Potomac Park. He has regularly used the perimeter roadway for distance-running training and organized races for approximately ten years.
- Barry Hauptman has resided in Bethesda, Maryland, since 2003 and has regularly used East Potomac Park for running, cycling, and walking. He has competed in multiple Marine Corps Marathons that included the Hains Point loop and has volunteered for several Credit Union Cherry Blossom Ten Mile Runs, including serving as a water-stop captain on the Hains Point perimeter roadway.
- Lydia Pelliccia has resided in Washington, D.C., for more than three decades. She has relied upon the Hains Point roadway for marathon training, endurance running, and organized races throughout that period.
- Camille Doom is a resident of Washington, D.C., and has regularly used the Hains Point roadway in East Potomac Park for uninterrupted running during the past eight

years. She also uses the Park for cycling and recreation and frequently shares its scenic resources with visiting family and friends, especially during cherry blossom time.

- Matthew Sarge is a resident of Washington, D.C., has regularly used the Hains Point perimeter roadway for running and cycling training for approximately fifteen years, and has participated in numerous organized races utilizing the roadway.
- Luke Cancilla is a resident of Arlington, Virginia, and regularly uses Hains Point for running and race preparation. A physical therapist specializing in treating endurance athletes, he frequently recommends East Potomac Park as a safe environment in which injured athletes may resume training.
- Katherine Engel is a resident of Washington, D.C., who has regularly used Hains Point for competitive running, training, and recreational cycling for the past six years. She has participated in the Credit Union Cherry Blossom Ten Mile Run, the DC Half, and other races using the Hains Point roadway.
- Xavier Salvador is a resident of Washington, D.C., who regularly uses Hains Point for marathon training, recreational running, and cycling. He has participated in the Credit Union Cherry Blossom Ten Mile Run and other races using the Hains Point roadway.

Each individual *amicus* anticipates continuing to rely on Hains Point for these purposes as conditions permit.

*Amici* represent only a small portion of the much larger community that relies on the Hains Point roadway. They submit this brief to inform the Court of the unique recreational role that the roadway has long served for runners and other recreational users of East Potomac Park, and of the substantial effects that the proposed elimination or impairment of the roadway would have on a longstanding public recreational resource. *Amici* also seek to assist the Court in evaluating whether

NPS adequately considered the recreational uses that Congress directed it to preserve in managing these public parklands.[2]

## INTRODUCTION

In 1897, Congress directed that East Potomac Park be "forever held and used as a park for the recreation and pleasure of the people." Act of Mar. 3, 1897, ch. 375, 29 Stat. 624, 624. The Administration's recent plan to replace substantial portions of East Potomac Park with a championship golf course defies that mandate.

This brief offers the perspective of longtime runners who have logged thousands of miles in East Potomac Park—specifically, the Hains Point perimeter roadway—for training, recreation, and organized local and national races over many decades, together with Cherry Blossom, Inc., the nonprofit corporation that administers the Credit Union Cherry Blossom Ten Mile Run and related running events. The interests of these *amici* largely align with those of the many other recreational users who rely on the Hains Point corridor. Collectively, *amici* offer firsthand insight into the special value of the Hains Point corridor as one of the region's few suitable venues for sustained distance running.

Although Defendants have not disclosed the project's final design, concrete implementation steps indicate that it is likely to eliminate the Ohio Drive perimeter roadway around the golf course (known by runners and other users as "Hains Point") or foreclose public access to it.[3] Recent news reports and photographs of the President holding an architect's drawing

---

[2] No party or party's counsel authored this brief in whole or in part. Moreover, no party or party's counsel made a monetary contribution intended to fund the preparation or submission of this brief, and no person other than *amici* or undersigned counsel made such a monetary contribution.

[3] *See* David A. Fahrenthold et al., *Who Approves Trump's Washington Makeover Projects?*, N.Y. Times (Sep. 2, 2026), https://www.nytimes.com/2026/09/02/us/politics/trump-washington-renovation-projects-approval.html?unlocked_article_code=1 [https://perma.cc/4PAW-6XKS] (captured Oct. 14, 2026).

of the redesigned golf course further reinforce that the roadway would be demolished if the redesign were implemented.[4] In September of this year, the Administration awarded a nearly $400,000 contract for "compliance" work in connection with the project and posted a notice of intent to issue a solicitation in January 2027 for a construction contract for the "East Potomac Park Rehab (Golf Course)" with an estimated value of between 20 and 49 million dollars.[5] It is because of these new developments—and to offer the perspective of the running community, one of several recreational communities that rely on the space—that *amici* now file this brief.

This brief addresses these threatened developments as they affect runners and others who use the perimeter roadway for recreation. The project drastically affects a recreational resource that is readily understood by those who use it, but may be less apparent to those who do not. The perimeter roadway is not merely a means of vehicular access to other destinations within East Potomac Park. It is itself one of the District's most important public recreational corridors. Few locations in the District provide comparable opportunities for extended running, walking, cycling, and other forms of outdoor recreation with minimal interruption from traffic signals, cross streets,

---

[4] *See* Rick Maese, *Trump's Upscale Golf Plan Could Destroy a D.C. Haven for Cyclists, Runners*, Wash. Post (Sep. 30, 2026), https://www.washingtonpost.com/politics/2026/09/30/trumps-upscale-golf-plan-would-destroy-dc-haven-cyclists-runners/ [https://perma.cc/QDW4-69Q9] (captured Oct. 14, 2026) (reporting that in discussions of the renovation, President Trump was "fixated" on Ohio Drive and "wanted to eliminate the public road that loops around the peninsula, allowing the golf course to stretch to the water's edge"); Rick Maese, *Park Service Works to Fortify Sea Wall Key to East Potomac Golf Project*, Wash. Post (Sep. 12, 2026), https://www.washingtonpost.com/sports/2026/09/12/park-service-works-fortify-sea-wall-key-east-potomac-golf-project/ [https://perma.cc/3LJG-9LW3] (captured Oct. 14, 2026).

[5] Matthew Daly, *Park Service Quietly Awards Contracts to Work on Trump's Takeover of East Potomac Golf Course*, NBC Wash. (Sep. 17, 2026), https://www.nbcwashington.com/news/local/park-service-awards-contracts-work-trumps-takeover-east-potomac-golf-links/4155481 [https://perma.cc/JLU5-TX4Q] (captured Oct. 14, 2026); Acquisition Gateway listing, *Construction–East Potomac Park Rehab (Golf Course) (NAMA)*, https://acquisitiongateway.gov/forecast/resources/50379?nid=50379 [perma.cc/7RXV-JYDQ] (captured Sep. 17, 2026) (Acquisition Gateway notice of construction contract solicitation).

and conflicting vehicular movements. For that reason, generations of runners have incorporated Hains Point into their daily training, long runs, competitive preparation, and organized races. The corridor is an important venue for athletic events ranging from local community races to two of the nation's largest and best-known distance-running competitions. As explained below, NPS itself has repeatedly recognized and accommodated all these uses.

*Amici* do not contend that golf is an improper use of East Potomac Park, nor do they ask the Court to prefer one recreational activity over another. Their point is narrower. Before approving a project that would substantially impair or eliminate a longstanding recreational corridor, federal law requires NPS to identify, evaluate, and meaningfully consider the longstanding recreational uses of the Hains Point corridor, as well as alternatives and measures that would mitigate adverse impacts on those uses. From the perspective of the running community, that did not occur here.

Accordingly, *amici* submit this brief to explain the significance of Hains Point as a recreational resource, the history of its use by runners and organized races, NPS's longstanding recognition and protection of such use, and the extent to which the administrative record fails to grapple with the consequences of the project for those longstanding uses.

## STATEMENT OF FACTS

### I. The Hains Point Perimeter Roadway Is Unusually Valuable to the Running Community.

The Hains Point roadway is especially valued by distance runners because it provides one of the few opportunities in central Washington to run continuously for multiple miles without traffic signals, significant cross-traffic, frequent turns, or roadway crossings. Marathon and half-marathon training programs commonly incorporate long aerobic runs, marathon-pace runs, and tempo or threshold workouts, all of which require runners to maintain a consistent effort for

extended distances. Traffic signals, street crossings, and frequent interruptions can significantly interfere with such training.

Hains Point's unique combination of relatively flat terrain, scenic setting, and extended linear and uninterrupted roadway has made it a preferred venue for such workouts for decades. As a practical matter, running tracks are either not typically accessible to the general public, overcrowded, or subject to advance reservation. Hains Point is one of the few locations in the District where runners can complete a long-distance training run while remaining almost entirely within an NPS landscape and without repeatedly encountering traffic lights, commercial corridors, major roadway crossings, or sharp turns. The circuit layout of the roadway and its extended linear straightaways make Hains Point particularly well suited for uninterrupted lap running—an important component of race training for long-distance events. The roadway is similarly valuable to walkers and cyclists who seek a safe and scenic environment for recreation. Its combination of river views, hundreds of flowering cherry trees in spring, historic landscape features, relative separation from urban congestion, and continuous loop configuration makes it unlike any other recreational venue in the District.

## II. Organized Running Races Have Long Relied on the Hains Point Roadway, and NPS Has Long Supported Such Events.

The characteristics that make the Hains Point roadway especially attractive for everyday recreational use also make it particularly well suited for organized running events. As a result, the roadway has become a central component of NPS's permitting program for road races in the District's national parks. Organized running events require NPS permits, and NPS has identified only a limited number of "pre-approved" race routes for use by event organizers seeking permits. *See* App. D (NPS Pre-approved Race-Course Maps). NPS's approved East Potomac Park race-course maps all incorporate substantial portions of the Hains Point perimeter roadway. Using these

pre-approved courses, NPS permits numerous local 5-kilometer and 10-kilometer races throughout the year. *See, e.g.*, App. E (Illustrative List of Other Recent Running Races Using the Hains Point Perimeter Roadway). If such races were forced to seek other courses, on NPS parkland or otherwise, the predictable result would be a need for increased closure of more heavily used traffic corridors.

The Hains Point roadway is also a long-established part of the area's two largest and most famous road races. First, the Marine Corps Marathon, one of the nation's largest marathons, attracts more than 30,000 participants and includes the Hains Point perimeter roadway as part of the course.[6] On the Potomac River side of the peninsula, the roadway has been the location of the Marathon's "Blue Mile," where runners pass photographs and tributes honoring fallen service members.[7] Second, the Credit Union Cherry Blossom Ten Mile Run, with 20,536 finishers in 2026,[8] has utilized Hains Point since the race's inaugural run in 1973, save only for years when construction of road improvements necessitated temporary rerouting. *See* App. B (Evolution of the 10 Mile Course).

---

[6] *See* Robert Billard, *50th Marine Corps Marathon: New Record Set, Marine Major Claims Third Win*, Military.com (Oct. 27, 2025), https://www.military.com/feature/2025/10/26/50th-marine-corps-marathon-wraps-barrett-shatters-course-record-marine-major-king-wins-third.html [https://perma.cc/7RPT-5AWS] (captured Oct. 14, 2026) (reporting the race drew "over 40,000 registered runners" and that organizers reported "nearly 30,000 finishers").

[7] *See, e.g.*, Marine Corps Marathon, *Spectator and Landmarks Map (50th Marine Corps Marathon)*, https://experience.arcgis.com/experience/fc6a1c86ca494ffaad19a22abe76741c/page/Spectator-and-Landmarks-Map [https://perma.cc/3WGY-ZVPN] (captured Oct. 14, 2026). The official map identifies the "Blue Mile" as a distinct feature along the marathon route.

[8] Credit Union Cherry Blossom, *2026 Credit Union Cherry Blossom Race Yearbook* 19 (2026), https://cherryblossom.org/wp-content/uploads/2026/06/CB26_Yearbook_June16Update-Corrected.pdf [https://perma.cc/9LN2-ZJDY] (captured Oct. 14, 2026).

*Amicus* Cherry Blossom, Inc., which administers the race, has publicly expressed concern regarding the proposed elimination of the Hains Point roadway. In communications to prospective 2027 race participants, the organization warned that the proposed redevelopment could cause the permanent elimination of "the perimeter road around Hains Point and a three-mile cherry tree laden section of the course that runners have enjoyed for decades." App. C (July 29, 2026 Email to Prospective Cherry Blossom Race Participants).

The Credit Union Cherry Blossom Ten Mile Run has been the site of six American or world 10-mile records for men and sixteen American or world records for women. App. F (Elite 10-Mile Records). The flat and linear final miles at Hains Point have contributed significantly to the race's reputation as one of the premier ten-mile races in the world. Cherry Blossom, Inc. has concluded that elimination of the roadway would substantially diminish both a defining feature of the race experience for recreational participants, who run beneath the corridor's iconic cherry-tree canopy, *see* App. A (2026 Cherry Blossom Course Map), and a course characteristic that has contributed to the race's longstanding reputation among elite runners as a fast and record-producing event.

## III. NPS Has Affirmatively Recognized and Accommodated Recreational Use of the Hains Point Corridor.

NPS has long recognized and accommodated use of the Hains Point perimeter roadway for recreational purposes. In 2022, NPS conducted a formal planning process addressing traffic-safety conditions on Ohio Drive in East Potomac Park. As part of that process, NPS expressly recognized that the Hains Point roadway serves a wide variety of users, including motorists, cyclists, runners, walkers, birdwatchers, anglers, picnickers, and organized race participants.[9]

---

[9] NPS, *East Potomac Park Traffic Safety Improvements Presentation* 4–5 (Apr. 19, 2022), https://parkplanning.nps.gov/showFile.cfm?sfid=577393&projectID=108550 [https://perma.cc/H48U-V4HL] (captured Oct. 14, 2026); App. G at 4–5 (NPS, *East Potomac Park Traffic Safety Improvements: Final Concept Presentation* (Nov. 2022)).

NPS identified potential conflicts among motor vehicles, cyclists, and pedestrians as a safety concern, and evaluated alternatives designed to accommodate the roadway's diverse recreational uses. *See* App. G at 4–6 (NPS, *East Potomac Park Traffic Safety Improvements Final Concept Presentation* (Nov. 2022)). Following public comment and further study, NPS adopted traffic-safety improvements that maintain vehicular access to Hains Point while dedicating a substantial portion of the roadway to non-motorized recreational use. The adopted design converted one of the roadway's travel lanes into a buffer zone and lanes reserved for pedestrians and cyclists around the Hains Point loop. *See id.* at 8, 11–14.

The significance of this planning process is not the particular traffic configuration selected. Rather, it demonstrates that NPS recently and expressly recognized the Hains Point roadway as a recreational resource in its own right and concluded that a substantial portion of the roadway should be dedicated to non-motorized recreational use.

## ARGUMENT

### I. NPS's Plan Defies Congress's Mandate and Reverses Decades of Agency Practice Without Reasoned Explanation.

#### A. NPS's Plans Contravene Congress's Intent to Preserve East Potomac Park as a Longstanding Public Recreational Resource.

East Potomac Park's park-specific statute and the NPS Organic Act, through which Congress created the NPS, define the purposes against which the agency's decision must be judged. *See* Act of Mar. 3, 1897, ch. 375, 29 Stat. 624; Organic Act, 54 U.S.C. § 100101(a); Act of Aug. 25, 1916, ch. 408, 39 Stat. 535.

Congress dedicated Potomac Park to the public's recreation and enjoyment and consistently understood that purpose in broad, inclusive terms. The Potomac Park Statute directed that the Park be "forever held and used as a park for the recreation and pleasure of the people." 29 Stat. at 624. The Organic Act likewise requires NPS to conserve park resources while providing

for their enjoyment by the public, with NPS's discretion bounded by the purposes for which Congress prescribed the parklands it administers. 54 U.S.C. § 100101(a), (b)(2).[10] Those Organic Act duties must be understood in light of Congress's express decision to dedicate East Potomac Park to the "recreation and pleasure of the people" and to preserve it for public benefit. 29 Stat. at 624; *see also Grunewald v. Jarvis*, 776 F.3d 893, 896–98 (D.C. Cir. 2015) (evaluating NPS management decisions under both the Organic Act and the park-specific statute establishing and defining the purposes of the particular park).

These statutes make any potential effect on public recreation a mandatory consideration. Agency action must account for the factors made relevant by the governing statute, *Wash. Area Bicyclist Ass'n, Inc. v. Burgum*, — F. Supp. 3d —, 2026 WL 1078218, at *23 (D.D.C. Apr. 21, 2026); remain reasonably connected to the statute's "purposes and concerns," *Judulang v. Holder*, 565 U.S. 42, 55, 64 (2011); and address every "important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Although NPS may balance competing uses, it may not disregard the loss of longstanding recreational use that lies at the heart of Congress's intent.

The Hains Point perimeter roadway is one of the principal places where East Potomac Park fulfills that recreational purpose. For decades, the Hains Point roadway has served runners, walkers, cyclists, inline skaters, birdwatchers, cherry-blossom watchers, fitness groups, race participants, volunteers, and other visitors, including participants in the Marine Corps Marathon

---

[10] *See also Daingerfield Island Protective Soc'y v. Babbitt*, 40 F.3d 442, 446 (D.C. Cir. 1994) (Organic Act's "broad" language does not confer on NPS "unlimited discretion in determining what actions are best calculated to protect Park resources" (citation omitted)); *Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 193 (D.D.C. 2008) (NPS's "discretion is bounded by the . . . Organic Act"); *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1461 (9th Cir. 1996) (stating the Organic Act "includes as an overarching concern the goal of resource protection" (citation omitted)), *as amended* (June 17, 1996).

and the Credit Union Cherry Blossom Ten Mile Run. The roadway is not simply infrastructure serving the golf course; it is itself a recreational resource. Eliminating or substantially impairing it would not merely redesign one recreational facility—it would expand one use by displacing another use that directly advances Congress's prescribed purpose.

Moreover, the Potomac Park statute and the Organic Act were intended to protect the recreation and enjoyment of Potomac Park by "the people"—not merely any activity that can be characterized as recreational. 29 Stat. at 624. Eliminating a free or low-cost recreational resource available to virtually all visitors and replacing it with a substantially more exclusive facility serving a much smaller user population raises a serious question whether the park would continue to be managed for "the recreation and pleasure of *the people*." *Id.* (emphasis added).[11]

The legislative history of the 1897 Potomac Park statute and the Organic Act affirm Congress's purpose in establishing East Potomac Park as a site for recreation of various kinds, for enjoyment by "the people." *Id.* The Senate Committee considering the Potomac Park bill explained that the area "should be declared a public park in order to prevent any encroachments thereon," S. Rep. No. 54-1327, at 1 (1897), and the bill's House sponsor stated that Congress could "see no better purpose for which th[e] land can be used than for the benefit of the whole people," 29 Cong. Rec. 2214, 2214 (1897) (statement of Rep. Joseph Weeks Babcock). By enacting the Potomac Park Statute, Congress rejected proposals to sell the land on which Potomac Park sits for private development (as was done in Boston's Back Bay neighborhood), establishing it instead as

[11] *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (quotation marks and citations omitted)).

a public park.[12] Likewise, Congress established NPS to make park resources accessible and useful to the public, providing, for example, that the Secretary of Interior's authority to grant leases, permits, or other "privileges" for use of the land could not, as to "natural curiosities, wonders, or objects of interest," be exercised on terms that would "interfere with free access . . . by the public." 39 Stat. at 535, § 3.

Consistent with this mandate, in 1898, District of Columbia Commissioners identified the Park as uniquely suited for "adapt[ation] . . . for the purposes of a public playground," including for "youthful sports and other forms of diversion in the open air" that were "becoming fewer and more restricted" elsewhere.[13] In 1902, the McMillan Senate Park Commission, charged with reporting to the Senate on plans for the "development and improvement" of the District of Columbia park system, recognized the area as "land . . . set apart as a park," for which "first importance [was] [to] be given to its perfection as a beautiful place of recreation." S. Rep. No. 57-166, at 117–19 (1902). And in 1916, Secretary of War *ad interim* transmitted a letter from the U.S. Army Chief of Engineers to the House, outlining plans for development of the Park as "a public recreation ground" "embod[ying] facilities for every anticipated modern recreation," including swimming pools; boathouses; a playground; tennis, basketball, croquet, and roque courts; an 18-hole golf course; and a "skating pond," among others.[14]

Subsequent development of the Park reinforced the Congressional mandate and intent to develop the Park for recreation of varied kinds. In 1912, Congress appropriated $25,000 to

---

[12] Elizabeth Barthold, Historic Am. Bldgs. Survey, NPS, *East Potomac Park (Hains Point), HABS No. DC-692*, at 5 (1993), https://tile.loc.gov/storage-services/master/pnp/habshaer/dc/dc0800/dc0801/data/dc0801data.pdf [https://perma.cc/62GZ-ZT4L] (captured Oct. 14, 2026).

[13] H.R. Doc. No. 55-7, at 443 (1898).

[14] H.R. Doc. No. 64-1038, at 5, 12–16 (1916).

construct the "Speedway," a roadway encircling East Potomac Park that was completed by 1916. Around this time, Japanese Cherry trees were planted along the roadway,[15] and by 1917, the first nine holes of the golf course opened, together with authorization for a field house, with the remaining nine holes completed thereafter.[16] Other improvements broadened public use of the Park. In 1920, for example, construction began on a concrete walk along the perimeter of the Park, with the four-mile promenade completed in 1931, and in 1921, the site of military barracks was converted into a tourist camp that would serve "thousands of visitors" each year.[17] East Potomac Park thus developed as an integrated recreational landscape, with picnic grounds near Hains Point, an eighteen-hole golf course within the Speedway, a road encircling the island, and baseball fields and a tourist camp at the Park's northern end.[18]

The government itself has memorialized this recreational character in its historic-preservation findings. East and West Potomac Parks are listed on the National Register of Historic Places, and in evaluating the basis for that designation, NPS prepared a revised National Register nomination describing the historic characteristics that make the district significant. *See* App. H. The nomination does not define the district by golf or any single activity. Rather, it recognizes a diverse recreational landscape that included 36 holes of golf, a swimming pool, tennis facility, "small picnic shelter," and "playground area." *Id.* at 3, 50–54. Consistent with that understanding,

---

[15] Gary Scott, Historic Am. Bldgs. Survey, NPS, *Girl Scout Teahouse*, *(Hains Point Teahouse) (Hains Point Inn), HABS No. DC-549*, at 4–5 (1987), https://tile.loc.gov/storage-services/master/pnp/habshaer/dc/dc0500/dc0598/data/dc0598data.pdf [https://perma.cc/V3QK-QBRC] (captured Oct. 14, 2026); *East Potomac Park*, *HABS No. DC-692*, *supra*, at 6.

[16] *Girl Scout Teahouse*, *(Hains Point Teahouse) (Hains Point Inn), HABS No. DC-549*, *supra*, at 5.

[17] *East Potomac Park*, *HABS No. DC-692*, *supra*, at 6; *see also Girl Scout Teahouse*, *(Hains Point Teahouse) (Hains Point Inn), HABS No. DC-549*, *supra*, at 5.

[18] *Girl Scout Teahouse*, *(Hains Point Teahouse) (Hains Point Inn), HABS No. DC-549*, *supra*, at 5.

the nomination specifically identifies the roadway and pathway system as an important recreational feature of the historic district. *See id.* at 47 (stating the perimeter roadway was "constructed so that the land could be accessed for recreational purposes"); *id.* at 54 (explaining the "walk around Hains Point . . . was planned for recreational use").

The historic significance of Potomac Park therefore lies not in any single facility, but in the relationship of its open spaces, circulation network, views, memorial landscapes, and diverse recreational opportunities. NPS cannot properly treat the elimination of the perimeter roadway's longstanding recreational function as a minor modification to a golf project, because the roadway itself is among the features that help define the historic district's significance and help it maintain adherence to the statutory mandate to maintain the Park for the "recreation and pleasure of the people." 29 Stat. at 624.

### B. NPS Has Long Protected the Roadway's Recreational Uses and Cannot Reverse Course Without Explanation or Support.

Indeed, NPS has long recognized the Hains Point roadway as a recreational resource and affirmatively preserved it for non-motorized public use. Its apparent decision to eliminate or substantially impair that same resource marks a reversal of agency practice that NPS must acknowledge and justify with a reasoned, evidence-based explanation.

For decades, NPS has permitted organized races that depend on the Hains Point roadway, including nationally significant events such as the Marine Corps Marathon and the Credit Union Cherry Blossom Ten Mile Run. More recently, during its 2022 traffic-safety planning process, NPS expressly identified runners, walkers, cyclists, birdwatchers, and organized races as users of the roadway. *See* NPS, *East Potomac Park Traffic Safety Improvements Presentation*, *supra*, at 4–5; App. G at 4. Following public comment, NPS converted one lane of the Hains Point loop from motor-vehicle use to dedicated pedestrian-and-bicycle lanes, explaining that the final design

would provide a safer experience while "continuing to provide for the fullest range of uses of East Potomac Park."[19]

Those actions reflected a clear agency determination that the Hains Point roadway is itself an important recreational resource, not merely incidental infrastructure serving the golf course. NPS recognized the corridor's diverse recreational uses, reserved substantial roadway space for them, and structured its permitting and planning decisions around their continuation.

NPS may change that practice, but it cannot silently abandon it. An agency departing from a prior policy or factual assessment must acknowledge the change and provide a reasoned explanation. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). Where the prior policy has engendered serious reliance interests, the agency must consider those interests before changing course. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 30–33 (2020).

Yet NPS has not explained why the recreational uses it recently deemed important enough to protect may now be eliminated or substantially impaired. Nor has it identified new evidence, changed circumstances, or competing considerations sufficient to support that reversal. It cannot extensively evaluate golf course design, operations, and access while relegating the roadway's established recreational function to an unexamined background condition.

That unexplained reversal is especially significant because the Administrative Procedure Act requires NPS to examine the relevant evidence and articulate a rational connection between that evidence and its chosen action. *State Farm*, 463 U.S. at 43. NPS therefore had to address evidence concerning the roadway's existing users, the frequency and nature of the roadway's uses, its role in organized races and community recreation, the effects of eliminating or narrowing the

[19] App. I (NPS, *National Park Service To Implement Traffic Safety Improvements in East Potomac Park* (Nov. 29, 2022)).

Hains Point corridor, and alternatives that would preserve some or all of its recreational function. The agency could disagree with evidence submitted by recreational users, but it could not ignore that evidence or proceed without confronting the consequences it identified.

NPS also must confront the reliance interests that its longstanding policy created. For more than fifty years, Cherry Blossom, Inc., has organized one of the nation's largest road races using NPS-approved routes that incorporate the Hains Point corridor. *See* App. B (Evolution of the 10 Mile Course). During that period, the organization has worked with NPS on permits, course design, participant safety, and stewardship of park resources. Race organizers, volunteers, participants, and everyday recreational users have likewise relied on continued public access to the roadway. Those interests do not compel NPS to preserve the corridor unchanged, but they do require consideration and a reasoned explanation before the agency reverses course.

The same defect proved decisive in *Washington Area Bicyclist Ass'n, Inc. v. Burgum*, where the court vacated NPS's removal of an established cycle track in the District because the record did not show that the agency had "examined the relevant data and articulated a rational connection between the facts found and the choice made." 2026 WL 1078218, at *32. The court explained that "the fact that the agencies' thoughts about [key considerations]—or whether they even considered them at all—cannot be found in the record means that the record cannot support a conclusion that the decision to implement the Removal Project was the product of reasoned decisionmaking." *Id.* at *17.

## II. NPS Could Not Lawfully Eliminate or Substantially Impair the Roadway Without Complying With Multiple Independent Procedural Requirements of Federal Law.

The requirement on NPS to evaluate existing recreational uses is not merely an abstract management principle. Independent provisions of federal law impose concrete obligations on NPS before it can eliminate or substantially impair a longstanding public recreational resource.

*First*, because Defendants' threatened elimination of access to the perimeter roadway would close an area or substantially restrict an existing recreational activity, NPS must comply with its closure regulations. 36 C.F.R. § 1.5. At minimum, the responsible superintendent must issue a written determination explaining the restriction and its justification. *Id.* § 1.5(c). But the regulations require more: NPS must proceed through notice-and-comment rulemaking if, as is the case here, the restriction's "nature, magnitude and duration" would significantly alter the Park's public-use pattern; adversely affect its "natural, aesthetic, scenic or cultural values"; require a long-term or significant change in resource-management objectives; or prove highly controversial. *Id.* § 1.5(b); *see also id.* § 1.7 (requiring public notice). The threatened action would trigger all those criteria. Eliminating or restricting access to the perimeter roadway would dramatically alter longstanding public-use patterns, affect the scenic and cultural experience of the Park, and require a significant departure from NPS's 2022 management objectives for the corridor. And for those reasons, the proposed elimination of the Hains Point perimeter roadway has already generated substantial public opposition and controversy.[20] NPS therefore cannot rely solely on the

[20] *See* Maese, *Trump's Upscale Golf Plan Could Destroy a D.C. Haven*, *supra* note 4; Jimmy Alexander, *'America's National Parks Are Not For Sale': Cyclists Rally at Hains Point over Proposed Golf Course Changes*, WTOP News (Aug. 29, 2026), https://wtop.com/dc/2026/08/americas-national-parks-are-not-for-sale-cyclists-rally-at-hains-point-over-proposed-golf-course-changes/ [https://perma.cc/79JA-2L4P] (captured Oct. 14, 2026); Jessica Albert, *Cyclists Protest Trump Plan to Renovate East Potomac Park into Championship Golf Course*, NBC4 Wash. (July 18, 2026), https://www.nbcwashington.com/news/local/dc-cycling-community-protests-plans-to-renovate-east-potomac-park/4131785/ [https://perma.cc/RQ9J-WMD5] (captured Oct. 14, 2026); Josephine Demos, *Hains Point Hoopla and Picnic Potluck Attendees Voice Concerns about East Potomac Park Development*, The Southwester (Aug. 1, 2026), https://thesouthwester.com/2026/08/01/hains-point-hoopla-and-picnic-potluck-attendees-voice-concerns-about-east-potomac-park-development/ [https://perma.cc/9MHS-X869] (captured Oct. 14, 2026); Cuneyt Dil, *New Group Fights Trump's Upscale Plans for East Potomac Golf Course*, Axios (May 11, 2026), https://www.axios.com/local/washington-dc/2026/05/11/east-potomac-golf-course-activist-group-save-east-po [https://perma.cc/W7MU-KAHL] (captured Oct. 14, 2026); Press Release, *Raskin, Beyer, Norton, Ivey Oppose Trump Administration's Rushed "Redevelopment" of Historic East Potomac Park* (July 30, 2026), (continued…)

superintendent's ordinary closure authority under § 1.5(a), but instead must proceed through notice-and-comment rulemaking under § 1.5(b).

*Second*, the National Environmental Policy Act ("NEPA") requires NPS to meaningfully assess the proposed action's effects on visitor use and recreation and genuinely evaluate reasonable alternatives. 42 U.S.C. § 4332(2)(C)(i)–(iii). NPS may not define the affected environment or project baseline in such a way that disregards the roadway's existing recreational function. *See Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 916–18 (D.C. Cir. 2024) (agency acted arbitrarily when it avoided confronting adverse environmental effects by redefining the status quo to exclude the activities potentially causing such adverse effects). If NPS characterizes the Hains Point perimeter roadway in a way that disregards the roadway's established recreational use by the broader public, it commits the same error identified in *Marin Audubon*—using a distorted baseline that masks rather than reveals the project's effects. *See id.* Because the existing roadway functions as a significant recreational resource within the Park, the loss or displacement of the walking, running, cycling, sightseeing, and organized-race uses that it currently supports constitutes an environmental effect of the proposed action that, under NEPA, NPS must analyze. NPS may not evade that obligation by characterizing the roadway merely as infrastructure associated with the golf course.

*Third*, review under the National Historic Preservation Act ("NHPA")'s Section 106 requires NPS to "take into account" the undertaking's effects on historic properties and afford the Advisory Council on Historic Preservation a reasonable opportunity to comment. *See* 54 U.S.C.

---

https://raskin.house.gov/2026/7/raskin-beyer-norton-ivey-oppose-trump-administration-s-rushed-redevelopment-of-historic-east-potomac-park [https://perma.cc/QZ8N-A7F5] (captured Oct. 14, 2026) (reporting objections by Members of Congress and demands for information regarding impacts on existing recreational uses and public access).

§ 306108; 36 C.F.R. §§ 800.1(a), 800.5. As noted *supra*, East and West Potomac Parks are listed on the National Register of Historic Places, and NPS's revised National Register nomination describes the Parks as reflecting "the cumulative product of a century of work," with East Potomac Park "used primarily for public recreation since its completion."[21] The governing NHPA regulations define adverse effects as including: "[p]hysical destruction of or damage to all or part of" a historic property; certain "[a]lteration[s] of a property"; and a "[c]hange of the character of the property's use or of physical features within the property's setting that contribute to its historic significance." 36 C.F.R. § 800.5(a)(2)(i), (ii), (iv). The proposed project threatens not merely a strip of pavement, but the continuous perimeter route that connects the Park's river views, cherry-tree canopy, open spaces, and memorial landscapes, and that has long enabled the running, walking, cycling, sightseeing, and organized races described throughout this brief. NPS itself has repeatedly treated that route as a recreational resource—by approving race courses that depend on it, by permitting nationally significant events that use it, and, as recently as 2022, by dedicating roadway space to pedestrians and cyclists.

Under the NHPA, NPS therefore must consider whether eliminating the existing Hains Point perimeter roadway would alter the public's experience of the historic landscape and/or impair longstanding uses associated with organized races and civic events. It cannot dismiss the roadway as incidental infrastructure subordinate to the golf course, because both the National Register nomination and NPS's own management history recognize the perimeter roadway and the public uses it supports as part of the historic resource itself. Given the NHPA regulations' examples of "adverse effects," it is difficult to see how permanently eliminating the established

---

[21] App. H, at 3, 50; *see also* NPS, Nat'l Register of Historic Places, *East and West Potomac Parks*, Ref. No. 73000217 (updated June 4, 2026), https://www.nps.gov/subjects/nationalregister/database-research.htm#table.

circulation roadway could be deemed to have no adverse effect on the historic property. A contrary conclusion would be exceedingly difficult to reconcile with the governing regulations, the National Register nomination, and NPS's own recognition of the roadway network as a contributing feature to the historic landscape. NPS therefore cannot lawfully bypass NHPA review of that impact; it must evaluate the loss of the existing perimeter route as part of its adverse-effects analysis and—if it reaches the only conclusion the present record plausibly supports—consult regarding alternatives or modifications that could "avoid, minimize or mitigate" the resulting harm. 36 C.F.R. §§ 800.5, 800.6(a).[22]

Taken together, these requirements do not compel NPS to preserve every feature of East Potomac Park unchanged. But they foreclose approval of a project that would eliminate or substantially impair the Hains Point roadway without a reasoned, evidence-based, and legally compliant evaluation of the recreational resource that would be lost, and the alternatives for preserving it. Federal law does not permit the destruction of established recreational uses to be treated as a secondary or incidental concern. Congress established the Park for the "recreation and pleasure of the people," 29 Stat. at 624, and impacts on those longstanding uses must accordingly be at the heart of the analysis.

[22] This is not a matter of "distress at or disagreement" with the Administration's plan to replace substantial portions of East Potomac Park with a golf course, *Nat'l Park Serv. v. Nat'l Tr. for Historic Pres*, 609 U.S. —, 2026 WL 2564318, at *2–3 (Aug. 31, 2026) (citation omitted); *cf.* Mem. Op. Granting Pls.' Mot. for TRO 11, Dkt. No. 79. *Amici*, who have collectively accumulated more than one-hundred years of use of the Park for all manner of outdoor recreation, and continue to rely on Hains Point, would suffer concrete and particularized injury by the elimination or substantial impairment of East Potomac Park. *Cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992) ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." (citation omitted)); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–83 (2000) (plaintiff-petitioners stated concrete injury from degradation of river regularly used by group members due to alleged mercury discharges).

## III. Public Participation and Consultation Must Occur Before the Project's Defining Features Are Fixed.

According to the *Washington Post*, NPS has retained a contractor to conduct NEPA and NHPA review activities even though the underlying redevelopment proposal has not been publicly released.[23] If environmental review is already underway while the public still does not know the details of the project itself, serious questions arise as to whether public participation can occur early enough to shape the scope of analysis, alternatives, and mitigation measures. NEPA is designed to ensure not merely that the public may comment on an agency's conclusions, but that public participation will help inform the agency's analysis before critical decisions are made. *See* 40 C.F.R. § 1501.9; *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (NEPA's procedure "ensures that the agency. . . will carefully consider[] detailed information concerning significant environmental impacts" and "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision").

Those concerns extend to the NHPA process as well. NHPA's Section 106 process is designed to occur through consultation among interested parties "commencing at the early stages of project planning," with the goal of identifying historic properties potentially impacted, assessing effects, and considering ways to "avoid, minimize or mitigate" adverse effects. 36 C.F.R. § 800.1(a). The regulations require agencies to initiate consultation early enough that "a broad range of alternatives may be considered" and recognize that "[t]he views of the public are essential to

---

[23] Rick Maese, *Democrats Demand Records From Trump's 'Methodical' D.C. Golf Takeover*, Wash. Post (Sep. 16, 2026), https://www.washingtonpost.com/sports/2026/09/16/trump-started-golf-course-project-without-proper-oversight-democrats-say/ [https://perma.cc/6VSM-NP8W] (captured Oct. 14, 2026).

informed Federal decision making in the Section 106 process." *Id.* §§ 800.1(c), 800.2(d). These principles parallel NEPA's emphasis on informed public participation.

Existing users of East Potomac Park, including golfers, runners, walkers, cyclists, race organizers, and other recreational users, cannot meaningfully participate in the NEPA or NHPA process unless they are given timely access to the redevelopment proposal itself. NEPA and NHPA are designed to inform agency decision making while alternatives remain genuinely available—not after the project has been substantially defined. If consultant-led environmental and historic-preservation review is already underway before the public can evaluate the proposal itself, there is a substantial risk that participation will become an exercise in commenting on decisions already made, rather than helping shape decisions still under consideration. The Court should therefore ensure that any review process genuinely considers alternatives that preserve public access to the Hains Point roadway and the diverse recreational uses for which Congress directed Potomac Park to be "forever held and used . . . for the recreation and pleasure of the people." 29 Stat. at 624.

## IV. The Proposed Construction Lacks the Required Express Congressional Authorization.

Separate from the procedural requirements discussed above, the proposed redevelopment faces a more fundamental obstacle. Congress has provided that "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106. Justice Roberts recently identified that requirement as an independent limitation on federal construction projects in the District. *See Nat'l Park Serv.*, 2026 WL 2564318, at *4–7 (Roberts, J., dissenting on other grounds). The renovation will almost certainly require the erection of buildings and structures, including a new clubhouse, dining facilities, a pro shop, a driving range, and related facilities, together with extensive grading, excavation, installation of new irrigation systems, construction of

new tee boxes, and other physical alterations to the landscape. Section 8106 plainly requires express congressional authorization before construction of "building[s]" or "structure[s]" may proceed within a federal park within the District, such as East Potomac Park. Significantly, NPS's own advance procurement notice classifies the project as "Commercial and Institutional Building Construction" under the North American Industry Classification System. *See supra* note 5. As far as *amici* are aware, Congress has granted no express authorization for such construction, and Defendants have not sought it.[24]

Section 8106 forbids Defendants from undertaking unauthorized construction. The Court should therefore resolve *now* whether Defendants possess the requisite authority, while compliance reviews are already underway, procurement planning has begun, and site work—undertaken with last-minute notice and unexplained urgency—has already irreparably altered conditions on the ground. *Cf.* Mem. Op. 18, Dkt. No. 79. Review should occur before further irreversible changes are made to the site, not after construction has progressed beyond meaningful judicial remedy.

---

[24] Defendants' treatment of 40 U.S.C. § 8106 is telling. *See* Defs.' Mem. Supp. Mot. Summ. J. 35–37, Dkt. No. 75-1. Although they insist the statute is inapplicable, they devote nearly three pages to a meritless succession of alternative theories: that § 8106 does not apply to NPS and reaches only non-NPS entities (although the statute contains no such exception or limitation); that the statute may have been superseded by the National Capital Planning Act (although Congress never repealed § 8106, and National Capital Planning Commission review is not "express authority of Congress," *id.* § 8106); that Plaintiffs fall outside the statute's "zone of interests" (although Plaintiffs challenge precisely the construction activity that § 8106 regulates); that no "building or structure" is involved (although NPS's procurement notice classifies the to-be-advertised renovation contract as "Commercial and Institutional *Building* Construction"); and that the Organic Act and other statutes provide the requisite authorization (although a general grant of management authority is not the sort of express congressional authorization that § 8106 demands). *Id*. The multitude of theories underscores a simple point: Section 8106 remains operative law, says what it says, and presents a substantial obstacle to the construction activities contemplated here.

## CONCLUSION

For the foregoing reasons, *amici* respectfully submit that this Court should grant Plaintiffs' motion for preliminary injunction and Plaintiffs' requested relief.

Respectfully submitted,

*/s/ Alan Pemberton*

Alan Pemberton (D.C. Bar No. 367108)
Rachel Bercovitz (D.C. Bar No. 1780904)
Basundhara Mukherjee (D.C. Bar No. 90025431)*
*Application for admission to the Bar of this Court pending
Covington & Burling LLP
850 Tenth St. NW
Washington, D.C. 20001
Phone: (202) 662-6000
apemberton@cov.com
rbercovitz@cov.com
bmukherjee@cov.com

*Counsel for* Amici Curiae *Hains Point Runners and Cherry Blossom, Inc.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Local Civil Rule 7(o)(4) because it does not exceed 25 pages. I further certify that this brief complies with the Court's typeface and type style requirements for motions because it has been prepared in a proportionally spaced typeface using 12-point, Times New Roman font, two spaces between sentences, double spacing, and with page numbers and margins of no less than 1 inch.

Respectfully submitted,

*/s/ Alan Pemberton*
Alan Pemberton (D.C. Bar No. 367108)
Covington & Burling LLP
850 Tenth St. NW
Washington, D.C. 20001
Phone: (202) 662-6000
apemberton@cov.com

*Counsel for* Amici Curiae *Hains Point Runners and Cherry Blossom, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 15, 2026, an electronic copy of the foregoing was filed with the Clerk of Court for the United States District Court for the District of Columbia using the Court's CM/ECF system and was served electronically by the Notice of Docket Activity upon registered CM/ECF participants.

Respectfully submitted,

*/s/ Alan Pemberton*

Alan Pemberton (D.C. Bar No. 367108)
Covington & Burling LLP
850 Tenth St. NW
Washington, D.C. 20001
Phone: (202) 662-6000
apemberton@cov.com

*Counsel for* Amici Curiae *Hains Point Runners and Cherry Blossom, Inc.*

## INDEX OF APPENDICES

**Appendix A**: 2026 Course Map, Cherry Blossom Ten Mile Run - Excerpt from *2026 Credit Union Cherry Blossom Official Media Guide* (2026 ed.), p. 14, https://cherryblossom.org/wp-content/uploads/2026/04/CB26_MediaGuide_comp.pdf [https://perma.cc/FJ2S-VRT4] (captured Oct. 15, 2026).

**Appendix B**: Evolution of the 10 Mile Course, Cherry Blossom Ten Mile Run - Excerpt from *2026 Credit Union Cherry Blossom Official Media Guide* (2026 ed.), p. 76.

**Appendix C**: July 29, 2026 Email to Prospective Cherry Blossom Race Participants.

**Appendix D**: NPS Pre-approved Race-Course Maps.

**Appendix E**: Illustrative List of Other Recent Running Races Using the Hains Point Perimeter Roadway.

**Appendix F**: Elite Records, Cherry Blossom 10 Mile Run - Excerpt from *2026 Credit Union Cherry Blossom Official Media Guide* (2026 ed.), pp. 36–37.

**Appendix G**: NPS, *East Potomac Park Traffic Safety Improvements Final Concept Presentation* (Nov. 2022), https://parkplanning.nps.gov/document.cfm?documentID=125016.

**Appendix H**: July 16, 1999 revised National Register of Historic Places Nomination for East and West Potomac Parks.

**Appendix I**: NPS, *National Park Service to Implement Traffic Safety Improvements in East Potomac Park* (News Release, Nov. 29, 2022), https://www.nps.gov/nama/learn/news/eppsafety.htm.