**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DC PRESERVATION LEAGUE, et al.,<br>*Plaintiffs*,<br>v.<br>DEPARTMENT OF INTERIOR, et al.,<br>*Defendants*. | Case No. 1:26-cv-477-ACR |

# MEMORANDUM OPINION

Rarely, if ever, has the United States Department of Justice urged a federal court *not* to believe the sitting President. Not to believe him that a cabinet secretary has "developed" a federal land project. Not to believe him that the secretary's agency will destroy a historic golf course already on the land. Not to believe him that "Restoration work" will begin "IMMEDIATELY!" Not to believe him that the course "will be closed" for over a year. Not to believe what the President has repeatedly told the American public.

And yet, here we are.

This started as a case about golf. That good walk spoiled. But it has become much more. It now forces the Court to reconcile assertions by President Donald J. Trump with the sworn testimony of multiple government employees and the argument of senior Department of Justice attorneys. This morass of different accounts concerns the future of the East Potomac Golf Course, a historic landmark. Plaintiffs[1] claim a final agency plan, the so-called Washington National Plan, exists "to destroy East Potomac Golf Course and to replace it with a

[1] Dave Roberts, Alex Dickson, and the D.C. Preservation League. *See* Dkt. 72-1 ¶¶ 22–24.

championship-style golf course suitable for professional tournaments."[2] They seek a preliminary injunction to stop it.[3] Defendants[4] claim no final plan exists.[5] To resolve the dispute, the Court must decide who is likely right.

Let's back up. The Court had set an evidentiary hearing on Plaintiffs' motion for Monday, October 19, 2026. Sunday morning, President Trump posted to Truth Social:[6]

> **Donald J. Trump**
> @realDonaldTrump
>
> I am pleased to announce that the Department of the Interior, under the auspices of Secretary Doug Burgum, and in conjunction with famed Golf Course Architect, Tom Fazio, has developed a plan to build a World Class Championship Golf Course on the site of the current East Potomac Golf Links, located in Washington, D.C. When completed, it will be open to the Public
>
> …
>
> dysfunctional, and unsafe. Restoration work will begin on the Fazio Design on November 15th, when the old Course will be closed to play. The new Course will be opened in approximately 15 months. The United States Golf Association, PGA of America, and the PGA Tour have already been notified that they will soon have one of the Best and Most Spectacular Golf Courses anywhere in the World to put on their list of great places to play, and hold Major Events. Thank you for your attention to this matter! President DONALD J. TRUMP

At 6:08 a.m. the next morning, just hours before the hearing, President Trump posted about the golf course again. This time the work would begin not on November 15, but instead "IMMEDIATELY!"[7] Employees at the Department of the Interior testified under oath, however,

---

[2] *Id.* ¶¶ 9, 11.

[3] *See* Dkt. 80.

[4] The Department of the Interior, Interior Secretary Doug Burgum, the National Park Service, and Comptroller and Acting NPS Director Jessica Bowron. Dkt. 72-1 ¶¶ 25–28.

[5] *See* Dkt. 84 at 10.

[6] Dkt. 91-1 at 2–4 (citing Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 18, 2026, at 10:09 a.m.), https://perma.cc/FKK4-4CEW).

[7] Dkt. 96-1 at 2 (citing Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 19, 2026, at 6:08 a.m.), https://perma.cc/K4PH-FJ7X).

that they did not know the Secretary's position.[8] They did not know about the November 15th start date, any immediate work, or the 15-month closure.[9]

Consider the testimony of the Deputy Chief of Staff to the Secretary of the Interior and the Acting Director of the National Park Service.

**October 19, 2026, Hearing**

> **Plaintiffs' Counsel:** [D]o you have any information as to whether or not the golf course is going to be closed on November 15th for a period of 15 months?
>
> **DOI Deputy Chief:** The Truth Social post is the only place where I see that.[10]
>
> […]
>
> **THE COURT:** Do you have an understanding, any understanding as to whether any work is set to begin on the East Potomac Golf Course on November 15th, on or about that date?
>
> **DOI Deputy Chief:** I'm not aware of any at this time.[11]
>
> […]
>
> **Plaintiffs' Counsel:** Do you have any plans that you know about in your agency to provide notice and if so how much notice about the plan to close the golf course on November 15th?
>
> **Acting NPS Director:** I don't have any information on the referenced plan.
>
> **THE COURT:** Are there any plans . . . to close the park on November 15th?
>
> **Acting NPS Director:** None that I've been made aware of.[12]

The Court's difficult task of weighing these conflicting accounts is made more so by DOJ attorneys who serve the Executive but also have obligations as officers of the court. Consider this from a Deputy Assistant Attorney General:

---

[8] *See* Oct. 19, 2026, Rough Tr. I at 95:1–16.

[9] *See id.* at 93:1–16, 102:20–103:8; *see also* Oct. 19, 2026, Rough Tr. II at 37:17–24.

[10] Oct. 19 Rough Tr. I at 93:12–16.

[11] *Id.* at 93:1–5.

[12] Oct. 19 Rough Tr. II at 37:17–24.

> **THE COURT:** But then this morning President Trump said [work] was going to start immediately, all caps. He wanted us to know it was going to start immediately. So if there's no plan, if it's still in development, how is it going to start immediately?
>
> **Deputy Asst. AG:** So Your Honor the answer to all this is the President is not an agency.[13]
>
> […]
>
> **THE COURT:** I'm being told by the President of the United States that the golf course is going to close on November 15th. And you're telling me that there is no plan to close the golf course. So who do I believe? Do I believe the President of the United States, or do I believe you?
>
> **Deputy Asst. AG:** . . . I think the agency that's in charge of closing the golf course is the National Park Service. So I think it's the National Park Service that needs to answer a question about whether the course will close on the 15th.
>
> **THE COURT:** So I don't believe the President, I believe the National Park Service?
>
> **Deputy Asst. AG**: That is not what I said.[14]

But that's what he meant. And so the Associate Attorney General, DOJ's third highest-ranking official, jumped in. He did not clarify matters.

> **Associate AG:** With regard to the November 15th date . . . there is no plan to close the course.
>
> **THE COURT:** Okay.
>
> **Associate AG:** As those words have their literal meaning.
>
> **THE COURT:** How about if we use the nonliteral meaning of the words.
>
> **Associate AG:** It's difficult to put my colleague [the Deputy Asst. AG], a non-Senate confirmed DOJ employee, in a position of contradicting the President. I want to be clear, just because today the testimony from also career employees of the National Park Service is there is no plan to close the golf course on November 15th, that is a very different thing than the President putting out to the American public he would like the golf course closed . . . .
>
> **THE COURT:** He didn't say he would like it closed, [he said] it will close.
>
> **Associate AG:** You understand the point that I'm making.
>
> **THE COURT:** Counsel, I understand the point you're making, do you understand

---

[13] *Id.* at 99:2–8.

[14] *Id.* at 100:1–13.

the point that I'm making? . . .

**Associate AG:** Yes.[15]

The Court would much prefer not to have to resolve *Lorax v. Once-ler* redux. Indeed, for months, the Court declined to intervene. Before early October, Plaintiffs had asked for some form of relief about a dozen times. The Court denied each one. The Court acts now only because the Government did what it assured all it would not do. Without meaningful notice to Plaintiffs or the Court, on October 10, it bulldozed hundreds of trees on the Course.[16] It did so even though, as two NPS officials have testified, there was no urgency.[17]

At this preliminary posture, the Court finds that the Plan is final. If, as DOJ insists, President Trump is wrong, Secretary Burgum can just say so. He has not. That said, at this juncture Plaintiffs carry the burden of showing a final plan likely exists. They have done so. This is confirmed not just by the President's and Secretary's many posts, but also by the Government's actions, not the least of which is the removal of hundreds of healthy, non-invasive trees on no real notice. The best way to reconcile everyone's accounts is as follows. Secretary Burgum has communicated to President Trump that the Plan is final. The Secretary has not yet read the testifying witnesses[18] in on the details. There is a plan to close the Course soon even if the implementation date remains in some flux. And DOJ cannot acknowledge the President's account without dropping a key defense to Plaintiffs' suit, so it has not.

Plaintiffs have met the rest of their burden as well. They have shown a likelihood of standing. As to the remaining injunction factors, Plaintiffs are likely to succeed on their claim

---

[15] *Id.* at 139:4–140:2.

[16] *See* Dkt. 76-1 at 7.

[17] Oct. 12, 2026, Tr. 53:20–54:1, 83:17–21.

[18] Save perhaps his Deputy Chief of Staff, as discussed later.

that the Plan violates the National Environmental Policy Act. DOI likely violated NEPA by impermissibly segmenting its review of the Plan's environmental effects. Plaintiffs will be imminently and irreparably harmed if the Court does not act. And there is no equitable reason to permit the Government to continue removing trees pending litigation given its conceded lack of any urgency to do so.

The events surrounding this case have become extraordinary. The legal result is not. A lower federal court enjoining an administrative agency from proceeding as the President wants. A ruling subject, as all such opinions should be, to appellate review.

The Court **GRANTS** Plaintiffs' Motion for a Preliminary Injunction. A separate Order consistent with this Memorandum Opinion issues this day. In it the Court **ENJOINS** Defendants from removing or damaging additional trees on East Potomac Golf Course and **ORDERS** them to provide ten business days' written advance notice before making any irreparable modification to any forms or features of East Potomac Park, pending the outcome of this litigation.

* * *

The Government felled hundreds of trees from East Potomac Golf Course without real notice even though it knew of the scheduled removal at least a week prior. And even though the Court literally warned against bulldozers bulldozing on no real notice. "If we get bulldozers on site and they start mowing down half of the golf course, . . . that's irretrievable, which is why the one thing I have done is ask them not to do that before giving us all notice."[19] And even though the Court was equally clear that it did not want an act-first-ask-forgiveness-later situation.

[19] July 2, 2026, Tr. 60:7–10.

"[W]hat I've said from the get-go is that what I do not want is to be here with a fait accompli. And I have made that very, very clear."[20]

All this is concerning. The Government appears to have set the timing of the tree removal and late notice to impede Plaintiffs' ability to seek Court intervention. And its recent actions call into question other representations it has made to the Court over these many months.

The Court cannot turn a blind eye. But neither will it rush to judgment. To start, the Court **ORDERS** the Government to show cause by 10:00 a.m., October 28, 2026, as to why the Court should not order it—including relevant DOJ attorneys and staff—to preserve information relevant to the existence of the Washington National Plan, the timing of the tree removal, and the notification of tree removal to Plaintiffs and the Court.

## BACKGROUND

### I. The East Potomac Golf Course

#### A. The Original Design

The Board of Trade proposed the municipal East Potomac Golf Course in February 1911, during the "Golden Age of Golf."[21] It was a "golden age" for multiple reasons. The sport had boomed in popularity among amateurs as well as professionals. As tournaments and media coverage increased, "amateur" golf stars such as Bobby Jones grew in popularity.[22] And as officials built more public links in urban areas, golf gained attention as a mode of exercise for middle-class city dwellers.[23]

---

[20] Sept. 3, 2026, Tr. 11:6–8.

[21] Patricia Kuhn Babin, NPS, *Links to the Past: A Historic Resource Study of National Park Service Golf Courses in the District of Columbia* 26 (2017).

[22] *See id.* at 48.

[23] *See* NPS, *Golf Course as Classroom: University of Pennsylvania at East Potomac Park*, https://perma.cc/4APG-NZ2K (last updated May 4, 2022).

The East Potomac Golf Course drew inspiration from Scotland, where civic authorities routinely established municipal golf links at the public's expense.[24] Its creators advertised East Potomac as a course for both professionals and amateurs. "Such a course is for the use of those who have no means of reaching inaccessible locations, and the site chosen will be within easy reach of all."[25]

That mission is evident in the Course's design. Walter J. Travis, the course architect, drew inspiration from the reversible Old Course at St. Andrews, in Scotland, which could be played both clockwise and counterclockwise.[26] He designed the Course to be playable by amateurs while still challenging for seasoned pros. It was a quick success: by 1921, golfers of all skill levels logged over 65,000 rounds, a significant increase from the 16,000 rounds logged the prior year.[27] By 1927, golfers logged over 155,000 rounds annually.[28] With this popularity, East Potomac Golf Course expanded from nine holes to thirty-six with the creation of the separate Red, White, and Blue courses. Dkt. 41-2 at 3–4.

The Course was open to players of all skill levels and classes—it was designed to "adapt the sport to the pocketbook of the poor as well as the rich man."[29] And it did just that. When it

---

[24] *See Public Golf Is Urged: Board of Trade Will Interest Other Organizations*, Wash. Post, Feb. 18, 1911, at 5.

[25] *Assures Golf Course: Col. Cosby Promises Public Links for Potomac Park*, Wash. Post, Apr. 15, 1913, at 9.

[26] *See* Babin, *supra* note 21, at 164.

[27] Maureen D. Joseph et al., NPS, *Cultural Landscape Report: Golf Courses in the District of Columbia, East Potomac Park, Langston, and Rock Creek Treatment Guidelines* Dkt. 41-2 at 16 (2019), cited at Dkts. 41–44.

[28] Cultural Landscape Found., *Washington, D.C.'s Historic East Potomac Park Is in the Crosshairs* (Mar. 3, 2026), https://perma.cc/HGP5-64XL.

[29] *Col. Harts Plans to Help Golfers: Public Courses Opened in Thirty-Four Cities in Country*, Wash Post, Mar. 25, 1917, at S2.

opened in 1920, players paid a small fee of twenty-five cents to play a round (approximately $4 today).[30] That mission remains, with fees as low as $17 to play nine holes.[31]

**B. Cultural Significance**

On June 29, 1941, three members—Asa Williams, George Williams, and Cecil R. Shamwell—of the Royal Golf Club, a Black men's golf club, walked onto East Potomac Golf Course to a chorus of boos and jeers.[32] At the time, the Course operated under the prevailing Jim Crow customs; Black people were allowed on the course for only a few hours one day a week and could not play at the same time as white people. *See* Dkt. 42-1 at 1. And the Black-only golf course nearby, Langston Golf Course, was not to the same standard as East Potomac. *See id.*

The three golfers, having had one of their "fair skinned" peers purchase tickets for them, were turned away.[33] They returned with reinforcements: Paris Brown, Dolores Brown, Emmet Sullivan, and Dr. Edgar Brown, the director of the National Negro Council, president of the United States Government Employees union, and a member of FDR's "Black Cabinet." Again, the club rejected the group.[34] When the park police came, however, the lieutenant ordered that they be allowed to play since they had tickets. Six police officers escorted them through the course while they successfully played an 18-hole round.[35] As onlookers booed and shouted

---

[30] *See* Cultural Landscape Found., *supra* note 28.

[31] *See* East Potomac Golf Links, *Regular Greens Fees*, https://perma.cc/N4K4-JUH7.

[32] *See* Babin, *supra* note 21, at 125–27.

[33] Babin, *supra* note 21, at 125.

[34] *Id.* at 126–27.

[35] *Id.* at 127.

insults, they played calmly and exceptionally well. George Williams scored a 76, Asa Williams scored a 74, and Shamwell scored a 71.[36]

The next day, on June 30, Secretary of the Interior Harold Ickes issued an order that East Potomac Golf Course was open to everyone, regardless of race.[37] This effectively desegregated the golf course, making East Potomac one of the first public golf courses to integrate.[38] Within eight years, DOI ordered all its recreational facilities to desegregate.[39] Six years later, in *Holmes v. City of Atlanta*, 350 U.S. 879, 879 (1955) (per curiam), the Supreme Court held segregation in publicly funded recreational facilities unconstitutional.

**C. Proposed Changes: 2017 and 2019 Reports**

Public parks require public upkeep. And so NPS periodically inventories historically significant landscapes to ensure that a property's future reflects its past. East Potomac Park, which joined the National Register of Historic Places in 1973, is one such property. *See* Dkt. 84-1 ¶ 5 (Griess Decl.).[40] In anticipation of "on-going maintenance and future modifications" to East Potomac, NPS has made recommendations to upkeep the park while preserving its historic character. Dkt. 41-1 at 15; *see also* Dkt. 40-3. Those recommendations pertain to the Red, White, and Blue courses that comprise East Potomac Golf Course. *See generally* Dkts. 41–44.

In 2017, NPS published a Cultural Landscapes Inventory (CLI) evaluating East Potomac Golf Course. *See* Dkt. 40-3. The CLI concluded that "the overall landscape" of the Course

---

[36] *See id.*

[37] *See id.* at 127–28.

[38] *See id.* at 127–29; *see also* Dkt. 1-3 at 22, 24–25.

[39] *See* Babin, *supra* note 21, at 69.

[40] Government counsel reviewed and, governed by Federal Rule of Civil Procedure 11(b), filed with the Court every declaration executed by a Government official cited in this opinion.

"retains integrity." *Id.* at 8. That said, "[m]aturation of vegetation"—including trees—has "changed the feeling of playing the course, designed in the relatively treeless links style." *Id.* at 83. But worry not: "These developments are reversible and the course retains a sense of openness." *Id.*

Most recently, NPS published a Cultural Landscape Report (CLR) in 2019. *See* Dkts. 41–44. The CLR assessed the three public golf courses in Washington, D.C.: East Potomac, Langston, and Rock Creek. *See* Dkt. 41-1 at 6. And its assessment was comprehensive. It covered everything from buildings and structures to site furnishings to vegetation. *See id.*

As to East Potomac, the CLR concluded that the Course's overall design aligned with "the cultural landscape's history as a 20th century public, links-style" facility. Dkt. 42-1 at 10. Still, NPS intended to "rehabilitat[e]" East Potomac while "accommodat[ing] changes necessary to ensure that access to golf remains affordable, accessible, and an attractive and high quality recreational experience." Dkt. 43-1 at 6.

The CLR outlined extensive recommendations for East Potomac. To name a few: changing fencing, defining the perimeter boundaries of the course, repairing historic buildings, improving grass quality on greens and fairways, and updating the golf-course path system. *See id.* at 9–25; *see also* Dkt. 43-2 at 1–3. The CLR also recommended targeted tree cutting to restore the links-style open fairways. *See* Dkt. 43-2 at 18; *see also* Dkt. 44-1 at 13. Specifically, it recommended removing "non-contributing and invasive vegetation" around the "perimeter of the golf course and along fairways." Dkt. 43-1 at 18.

But the CLR also emphasized that some things at East Potomac should stay the same. It recommended retaining East Potomac's historic "three separate golf courses" to accommodate

players of all skill levels. *Id.* at 10–13. And it recommended retaining historic trees, including cherry and Ohio buckeye trees. *See id.* at 20–22.

But bureaucracy, like tree growth, is slow. The CLR sat dormant for years.

Meanwhile, in 2020, NPS leased East Potomac to the National Links Trust (NLT). *See* Griess Decl. ¶ 14; *see also* Dkt. 26-5. "[T]he lease incorporated the . . . CLR recommendations into NLT's long-term work plan." Griess Decl. ¶ 14. NLT assumed responsibility for running the Course, making initial improvements, and keeping the Course affordable. *See* Dkt. 48-1 ¶¶ 8–11; Dkt. 26-5 at 15–16, 19, 37–38, 43.

Then came some movement on the CLR—but not at East Potomac. Between 2023 and 2024, NPS prepared an over-250-page assessment of potential tree removal at Rock Creek Golf Course and an over-300-page finding that tree removal would not significantly impact the environment. *See* Dkt. 76-1 at 27 & nn.5–6.[41]

## II. The Washington National Plan

Fast forward to 2025. In October, the Government dumped over 30,000 cubic yards of soil from the destruction of the White House East Wing onto the Course to use "as part of improvements to be made by" NLT. Dkt. 72-8 at 2 (Oct. 16, 2025, CE). Two months later, NPS terminated NLT's lease because NLT had not made "initial improvements" required by its lease. Dkt. 26-5 at 51–53. But NLT kept running daily operations while NPS assumed oversight and maintenance responsibilities for the Course. *See* Griess Decl. ¶ 15.

---

[41] Dkt. 76-1 at 27 & nn.5–6 (first citing NPS, DOI & NLT, *Environmental Assessment, Rock Creek Park Golf Course Rehabilitation* (Sept. 2023), https://perma.cc/N5XG-UAER; and then citing NPS, DOI & NLT, *Finding of No Significant Impact, Rock Creek Park Golf Course Rehabilitation* (Mar. 28, 2024), https://perma.cc/B9X7-3LDV).

In 2026, President Trump announced his intention to renovate East Potomac. On January 11, in response to the question, "What's your plan for East Potomac? Are you going to renovate the golf course?," the President stated, "Yeah, we're gonna make it a beautiful, world-class, U.S. Open-caliber course." (Singular.) "Ideally, we're gonna have major tournaments there and everything else. It's going to bring a lot of business into Washington." Dkt. 72-1 ¶ 98.[42]

On February 23, the D.C. Preservation League and two golfers at East Potomac asked this Court to enjoin the implementation of the "Washington National Plan," a plan to "destroy East Potomac Golf Course and to build in its place a championship-style golf course suitable for professional tournaments." Dkt. 1 ¶¶ 9, 11.[43]

The Government opposed. It stated that DOI was merely "entertaining . . . proposal[s] to further improve East Potomac Golf Course." Dkt. 26 at 12. It pointed to a declaration from defendant Jessica Bowron, NPS's Comptroller and Acting Director, who said that proposals were "still in the conceptual phase" and "no proposed plans ha[d] been finalized." Dkt. 26-4 ¶ 14. It also asserted that the "soil storage project" was "consistent with applicable law." Dkt. 26 at 16, 26.

Bowron further assured Plaintiffs and the Court that "NPS would undertake a variety of legal and compliance steps before authorizing a major renovation," including steps to comply with NEPA. Dkt. 26-4 ¶¶ 14, 16. That statute requires agencies to create a detailed environmental impact statement (EIS) in all proposals for "major Federal actions significantly affecting the quality of the human environment." *Earthworks v. DOI*, 105 F.4th 449, 458 (D.C.

---

[42] Dkt. 72-1 ¶ 98 (citing Forbes Breaking News, *"It's Going To Bring a Lot of Business": Trump Teases Renovations For East Potomac Golf Course*, YouTube (Jan. 12, 2026), https://perma.cc/LH8E-LGHX).

[43] The operative complaint contains the same allegation. *See* Dkt. 72-1 ¶¶ 9, 11.

Cir. 2024) (cleaned up). If it is unclear whether the proposal will significantly affect the environment, the agency may prepare a shorter environmental assessment (EA). *See id.* According to Bowron, "any substantial renovation project" at East Potomac "would likely constitute a 'major Federal action,' requiring the NPS to prepare an [EA] or, if impacts were found to be significant, an [EIS]." Dkt. 26-4 ¶ 18.

The Court declined to intervene. At that point, "the agency [wa]s still kind of deciding what it want[ed] to do." March 11, 2026, Tr. 11:6–7. And so Plaintiffs' concerns, the Court noted, were "ephemeral" because the agency did not "actually have a plan." *Id.* at 12:19–20.

And, then, the legal equivalent of *Groundhog Day* began:[44] Plaintiffs asking for relief, the Government denying any plan, and the Court refusing to intervene.

That same month, Plaintiffs again asked the Court to step in. This time, they claimed to "have learned that officials from the Executive Office of the President met with Department of the Interior officials on or about March 23, 2026, to instruct [DOI] to continue moving forward with the Washington National Plan." Dkt. 33 at 2.

The Government repeated the same refrain: no final plan to overhaul the Golf Course existed. *See* Dkt. 34-1 at 11. There was "still no decision" or "final authorization here of approval of any plan," only "ongoing active consideration of any kind of proposed renovation plan to the golf course." April 9, 2026, Tr. 5:7–9, 7:13–15.

The Court again declined to intervene. But it stressed that it did not "want to get to a point where someone is telling me, from the government, that it's too late, too many things have happened and now we are . . . moving forward and we can't . . . stop the trains." *Id.* at 18:20–23.

[44] *Groundhog Day* (Columbia Pictures 1993).

In May, the Government started removing dead, dying, hazardous, and invasive trees using a "surge workforce" brought to "help beautify D.C." in preparation for the summer's "America's 250" events. Oct. 12 Tr. at 18:5–8. At East Potomac, the workforce performed exclusively tree-related work. *Id.* at 38:16–42:15. It left untouched the "significantly concerning" and "critical safety" "issues with the conditions of the facilities." *See id.*; *see also* Dkt. 48-1 ¶ 1. Kevin Griess, Superintendent of the National Mall and Memorial Parks, explained that the workforce was a "tree-cutting, ground-digging, ground maintenance" crew ill equipped to fix dilapidated buildings. Oct. 12 Tr. at 40:11–41:19. At any rate, Griess understood that the buildings were NLT's responsibility, and he "wasn't asked to address structures." *Id.* at 41:18–19.

In response to the tree cutting, Plaintiffs again urged the Court to step in. *See* Dkt. 47. But at a May 4 hearing, Griess testified that it was "business as usual" at East Potomac. May 4, 2026, Tr. 11:6. Still, the Court asked Government counsel to notify Plaintiffs if the Government planned to remove "more than ten trees," to do "[a]nything other than just getting rid of some dying trees," or to begin "major construction activity." *Id.* at 15:15, 16:7–8, 36:3–4. Government counsel agreed to do so. *See id.* at 15:14–17, 16:6–17:21, 35:24–36:12. And Griess agreed "not to cut down anything until . . . g[etting] the okay from" Government counsel. *Id.* at 15:23–25.

Days later, DOI Secretary Doug Burgum made two public announcements about the Golf Course. On May 8, he announced that NPS would renovate East Potomac to "offer a top-tier 18-hole championship golf course." Dkt. 49-1 at 2.[45] And on May 14, he "unveil[ed] the design for

[45] Dkt. 49-1 at 2 (citing Secretary Doug Burgum (@SecretaryBurgum), X (May 8, 2026, at 8:00 p.m.), https://perma.cc/H235-Z2AF).

the East Potomac Golf Links renovation from Fazio Design." Dkt. 50-1 at 2.[46] That design proposed a single 18-hole course, instead of the three existing courses at East Potomac. *See id.*

On June 28, President Trump toured East Potomac Golf Course. *See* Dkt. 58 at 1.[47] Joining him were, among others: DOI Deputy Chief of Staff, Gregory Wischer; NPS Deputy Director of Operations, Frank Lands; and golf-course architect Tom Fazio (the same Fazio referenced in Burgum's May 14 announcement). *See* Oct. 19 Rough Tr. I at 72:4–73:20. The media reported on the tour, including a photograph taken of the group. *See id.* In that photograph, Wischer is carrying a large document. When asked about the photograph, Wischer stated that he was carrying "[v]arious conceptual proposals" for "[t]he golf course." *Id.* at 75:1–7. And he received those "various concepts" from Fazio. *See id.* at 75:12–15.

Trump posted about the June 28 meeting on Truth Social. He stated,

> [O]n today's visit . . . the Secretary of the Interior, and his people, together with me and my staff, stud[ied] the dilapidated, worn out, and very dangerous and outdated Golf Course known as East Potomac Golf Links. *Tom Fazio, the Great Golf Course Architect, and his son, Gavin, participated on the tour with us, whereupon it was determined that, on this fantastic site, with water and unparalleled views of D.C.'s Monuments, we will build one of the Greatest Golf Courses anywhere in the World* which, importantly, will also be made available to the Public. When completed, this Course will have the ability to host Major Golf Tournaments, including The U.S. Open, The Ryder Cup, The PGA Championship, and other top PGA Tour events. . . . *Work on the new Course, which will go quickly, will begin on September 1st*. Tom Fazio will be the Course Architect. It will be built through the Department of the Interior, and designed to the Highest Standards of Golf, but also in such a way that the General Public will love it.

Dkt. 58 at 1 (emphasis added).

---

[46] Dkt. 50-1 at 2 (citing Secretary Doug Burgum (@SecretaryBurgum), X (May 14, 2026, at 10:40 a.m.), https://perma.cc/QYY6-ZMYB).

[47] Dkt. 58 at 1 (citing Donald J. Trump (@realDonaldTrump), Truth Social (June 28, 2026, at 2:42 p.m.), https://perma.cc/E3HB-7AUL).

At a July 2 hearing, Government counsel stated that NPS and DOI were working to meet the President's September 1 start date. *See* July 2 Tr. at 9:2–13, 24:4–7. But there was "still no final agency action." *Id.* at 6:8–9. The Court asked the Government how those positions could be consistent:

> **THE COURT:** [I]s it the government's position that the President of the United States was wrong and that in fact there has been no final decision to begin [building] a golf course . . . on September 1? The President was over his skis?
>
> **Gov't Counsel:** Our position is both things can be true.
>
> **THE COURT:** No. Both things cannot be true. . . . We don't live in Schrödinger's golf course.

*Id.* at 19:20–20:5 (cleaned up). The Court again pressed:

> **THE COURT:** Is it the government's position that there has been a final decision made to pursue the golf course, or is it the government's position that that's something the President would like, but maybe it will happen and maybe it won't?
>
> [...]
>
> **Gov't Counsel:** We think implicit in [the President's post] is therefore that all of these steps that I outlined that are statutorily required that are in Department of Interior's handbook, all of those will first get done.

*Id.* at 20:11–15, 23:12–15. Only after DOI took those steps, the Government reassured everyone, would its decision become final. *See id.* at 18:13–15, 34:3–8.

At the end of the July 2 hearing, the Court again declined to enjoin the implementation of the Washington National Plan. *See id.* at 90:22–24. The Court "want[ed] to trust that people [we]re acting in good faith . . . until proven otherwise." *Id.* at 91:18–20. And at that point, the Government "h[ad] not proven otherwise." *Id.* at 91:20–21.

On September 3, Plaintiffs notified the Court that the Government "ha[d] significantly accelerated construction-related activities in recent days on and adjacent to East Potomac Golf Course." Dkt. 69 at 1.

And so the Court held yet another hearing. At the hearing, the Government explained that NPS was removing only dead, dying, hazardous, or invasive trees. *See* Sept. 3 Tr. at 6:25–7:17. It stated that it removed invasive trees pursuant to the CLR and an "Invasive Plant Management Plan," which had led NLT and NPS to conduct, in 2024, a "tree assessment looking for dead, dying, hazardous, [and] invasive trees." *Id.* at 7:21–8:10. During the 2024 assessment, NPS had identified 132 trees for removal. *See id.* at 8:11–12. But because of the "resources [NPS] ha[d] at th[at] moment," it could "be a little bit more aggressive in identifying dead, dying, or hazard[ous] trees." *Id.* at 8:12–15. So, as of September 3, NPS had identified 150 trees for removal. *See id.* at 8:15–16.

The Government reiterated that it "would notify [the Court] and [P]laintiffs if there was going to be imminent destruction [or] implementation of a new plan" at East Potomac. *Id.* at 9:22–24. But as of September 3, "that ha[d] not happened." *Id.* at 9:24. The Court again declined to intervene because, at that point, the Government "ha[d] just been doing what I said they could do, which was continue to get rid of the invasive trees or to deal with the dying trees." *Id.* at 11:20–22.

That all changed later in September. On September 25, NPS's Regional Headquarters contacted Griess with a "question of what would a tree plan look like . . . according to the CLR." Oct. 19 Rough Tr. II at 55:24–56:20. Griess then asked his staff to prepare a Tree Management Plan (TMP). *See* Oct. 12 Tr. at 23:17–19, 88:11–89:8. Unlike the Government's prior tree removal efforts, the TMP was not limited to dead, dying, hazardous, or invasive trees. *See* Dkt. 84-1 at 330–34; Oct. 19 Rough Tr. II at 50:25–51:2. Griess stated that the TMP was designed, per the CLR's recommendation, to reflect the "stated intent of the original course," which had "very, very, very few trees." Oct. 12 Tr. at 31:2–8. So he instructed his staff to "mark every

single tree that would be—could be cut to return it back to its historic nature and which ones would not—would not ever be cut and should be protected." *Id.* at 26:23–25. He did not instruct his staff to implement any other CLR recommendations. *See id.* at 95:17–96:25; Oct. 19 Rough Tr. II at 47:11–48:18. And he does not know whether the Government plans to act on any of those recommendations. *See* Oct. 19 Rough Tr. II at 54:19–55:7.

On September 29, Deputy Chief of Staff Gregory Wischer called Bowron and agency counsel to his office to discuss "what the compliance pathway would look like to implement vegetation management related to the CLR." *Id.* at 4:6–5:4. Again, like Griess, they discussed the CLR only as it pertained to East Potomac (not Rock Creek or Langston) and only its recommendations about "vegetation management." *Id.* at 4:11–13.

On October 5, Wischer called a meeting with Lands and two other DOI employees, again including agency counsel. *See* Oct. 12 Tr. at 79:15–82:24. According to Lands, Wischer instructed him to implement the CLR "as soon as practical." *Id.* at 101:4–7; *see also id.* at 80:3–9, 83:5–8. Lands also understood that NPS had to "file a plan" on vegetation management at East Potomac "by Friday." *Id.* at 106:25–107:1; *see also id.* at 112:5–12. Lands was unsure what prompted the meeting or accounted for the rushed timeline. *See id.* at 81:19–22. He did not "know that there was a specific urgency. It was just a normal course of business." *Id.* at 83:18–19.

Also on October 5, Griess sent a draft of the TMP to Bowron. *See id.* at 23:17–24:12, 48:23–49:8. She shared the draft with Lands that afternoon and with Wischer that evening. *See* Oct. 19 Rough Tr. II at 17:13–21, 22:4–9. She did not know about the meeting in Wischer's office earlier that day. *See id.* at 16:21–23.

When and how the TMP received approval is complicated. According to Griess, Bowron approved it on October 6. *See* Oct. 12 Tr. at 24:4–12. But according to Bowron, her approval was not necessary for the TMP to proceed: DOI could have "[gone] and hire[d] contractors" to begin clearing trees even if the TMP "had never gone to [her]." Oct. 19 Rough Tr. II at 19:11–21:1. Instead, Bowron testified that, after receiving Wischer's edits on the TMP, she performed only a "fatal flaw" review to ensure that the TMP reflected the "language and intent of the agency." *Id.* at 18:10–15. At 5:39 p.m., she emailed an edited version of the TMP "to the park and region[al]" staff. *Id.* at 17:24–25, 32:9–11.

The Government moved with unusual haste to implement the TMP. After the October 5 meeting, Lands assembled park, regional, and headquarters staff to complete contracting and compliance work. *See* Oct. 12 Tr. at 105:6–10, 111:15–112:24, 118:12–19. And he first saw the TMP and "NEPA documents" on October 6 or 7. *Id.* at 86:4–87:9, 89:13–19.

On October 7, Government counsel learned that "there was a possibility" tree cutting could begin on October 10. *Id.* at 6:10–15. Either late October 8 or early October 9, counsel knew it was "definitely" going to happen. *Id.* at 7:8–12.

A few things happened on October 9. First, at 9:15 a.m., Griess executed a Categorical Exclusion (CE) Form for the TMP. *See* Dkt. 84-1 at 336–45 (Oct. 9 CE). The Form stated that the TMP was meant to "implement vegetation treatment recommendations contained in the" CLR. *Id.* at 336. And it settled on the total number of healthy trees to be removed: 529. *See id.* at 338. The Government estimated that it would remove 169 trees in "Zone A" alone. Dkt. 74-1 ¶ 19. Griess concluded that the TMP amounted to "routine maintenance and treatment of cultural resource grounds and [wa]s consistent with established preservation objectives for the historic cultural landscape." Oct. 9 CE at 340.

Second, at 4:55 p.m., Government counsel notified Plaintiffs and the Court of the TMP. *See* Dkt. 74. The Government notified the Court the afternoon of the Friday before a holiday weekend despite its earlier knowledge of the plan, its repeated assurances that it would provide advance notification, and the fact that NPS would begin cutting trees early the next morning.

The Government attached to the notice another declaration from Griess. *See* Dkt. 74-1. He declared that the TMP "[wa]s not a renovation or redesign of the Golf Course, [wa]s not a part of any potential project to redesign or renovate the Golf Course, and would be carried out irrespective of any future renovation or redesign." *Id.* ¶ 16. Instead, the TMP's "purpose" was to "implement certain vegetation treatment recommendations included in" the CLR. *Id.* ¶ 7.

And third, at 5:55 p.m., the Government moved for summary judgment. *See* Dkt. 75. Attached: a declaration signed by Bowron three days prior—twenty-four minutes before she emailed her TMP edits on October 6. *See* Dkt. 75-3; Oct. 19 Rough Tr. II at 32:9–23. In the declaration, Bowron attested that NPS was "actively considering ideas to renovate" East Potomac Golf Course, but plans "remain in the conceptual stage" and "several interim steps have yet to occur before a final decision can be made to go forward with any specific renovation." Dkt. 75-3 ¶¶ 5–6. She stated that "NPS ha[d] taken and continue[d] to take some maintenance actions in or around the Golf Course . . . including tree pruning [and] removal of dead, dying, hazardous or invasive trees." *Id.* ¶ 9. "The NPS documented its compliance with all applicable laws and regulations for those actions." *Id.* Missing: any mention of the TMP.

Less than eighteen hours after its notification, the Government began clearing hundreds of healthy, nonhazardous trees from East Potomac. *See* Dkt. 76-1 at 7. At day's end, NPS had razed nearly 430 trees—an operation that agency employees later called "cleaning up the course"

and a "small project to address deteriorating conditions." *See* Oct. 19 Rough Tr. I at 22:5–7; Oct. 19 Rough Tr. II at 28:4–17.

During the October 10 tree removal, the Government identified and removed 200 additional trees which it had not identified in the first CE. So, on October 11 at 1:43 p.m., Griess executed a "Determination of NEPA Adequacy" to account for the 200 trees. *See* Dkt. 84-1 at 356–61 (Det. NEPA Adequacy). Griess concluded—within hours of the removal—that the removal of 200 extra trees "did not change the purpose or nature of the [TMP]": to implement the CLR's tree-specific recommendations. *Id.* at 358.

NPS had planned to pick up where it left off by clearing additional trees on October 11. *See* Dkt. 76 at 3–4. A rain delay prevented it from doing so. *See id.* Later on October 11, Plaintiffs met with the Government. *See id.* at 3. Plaintiffs learned that tree clearing was moving "faster than anticipated," that hundreds more trees would be felled imminently, and that clearing would resume as soon as weather permits. Dkt. 76-1 at 8.

That evening, Plaintiffs moved for a temporary restraining order. *See* Dkt. 76. This Court granted it. *See* Dkt. 79; Third Min. Order (Oct. 12, 2026). The Government then moved to disqualify the Court for bias. *See* Dkt. 86. The Court denied the motion. *See* Dkt. 95.

Which brings the Court to the present motion. Before the temporary restraining order expired, Plaintiffs moved for a preliminary injunction. *See* Dkt. 80. They argue that the Government has segmented connected components of the Washington National Plan into discrete projects to circumvent NEPA. *See id.* at 2. The Court scheduled a hearing on the motion for October 19. *See* Second Min. Order (Oct. 15, 2026).

Before the hearing, President Trump weighed in. On October 18, he posted:

> I am pleased to announce that the Department of the Interior, under the auspices of Secretary Doug Burgum, and in conjunction with famed Golf Course Architect,

> Tom Fazio, has developed a plan to build a World Class Championship Golf Course on the site of the current East Potomac Golf Links. . . . Restoration work will begin on the Fazio Design on November 15th, when the old Course will be closed to play. The new Course will be opened in approximately 15 months.

Dkt. 91-1 at 3–4. And again:

> Doug Burgum, and the United States Department of the Interior, is very excited about the new Development of a Great Golf Course at the site of the old East Potomac Golf links.

Dkt. 91-2 at 2.[48] And again, on the morning of the hearing:

> The experts at 'Interior' are allowed to do this First Class renovation 'as of right.' They do not need approval. Work is scheduled to begin IMMEDIATELY!

Dkt. 96-1 at 2.

## PRELIMINARY FINDINGS OF FACT

Courts grant preliminary injunctions "based on less formal procedures and on less extensive evidence than in a trial on the merits." *N. Am.'s Bldg. Trades Unions v. DOD*, 783 F. Supp. 3d 290, 301 (D.D.C. 2025) (quoting *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004)). Here, the Court has also concluded that the "strong showing of bad faith" and "bare" administrative record in this case required extra-record discovery. Oct. 19 Rough Tr. I at 4:25–10:23; *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010). The Court then heard sworn testimony from four individuals: Griess, Lands, Bowron, and Wischer.

"It is beyond dispute that the Court can decline to give weight to evidence it finds incredible." *Beck v. Test Masters Educ. Servs., Inc.*, 289 F.R.D. 374, 379 (D.D.C. 2013).

---

[48] Dkt. 91-2 at 2 (citing Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 18, 2026, at 10:09 a.m.), https://perma.cc/4P6G-PLVV).

Accordingly, the Court assesses the credibility of each witness before it relies on a witness's testimony to inform its preliminary findings of fact.

**Griess.** The Court finds Griess credible. Relevant here, Griess directed the implementation of the Tree Management Plan: he told his staff to prepare it; reviewed a draft of it on October 2, 2026; and prepared all NEPA compliance forms. *See* Oct. 12 Tr. at 27:20–24, 47:25–48:18. And he testified that the October 10 operation felled mostly healthy, non-invasive trees, *see* Oct. 19 Rough Tr. II at 49:24–50, 51:3–52:2, not the purportedly "dangerous" and "disease infested trees" that the President described on October 18, Dkt. 91-1 at 3.

Despite that level of involvement, and despite his stated goal that the TMP should implement the CLR, Griess seemed credibly unaware of what prompted its sudden implementation. He could not identify a reason to justify the urgency, but—the Court believes pursuant to some directive to move quickly—he nonetheless edited and implemented the TMP within a week. *See* Oct. 12 Tr. at 23:17–25, 53:20–54:1. And he was out of the loop on other parts of the TMP. He testified that he was not privy to certain project logistics, including its cost. *See id.* at 35:7–18, 50:23–52:21.

Given Griess's lack of knowledge of these critical details, the Court concludes that he was likely unaware of the Washington National Plan. He instead implemented directives given to him.

**Lands.** The Court also finds Lands credible. Lands testified that Wischer asked him to execute the TMP "as soon as practical." *Id.* at 101:7. Lands also testified that he was unaware of any particular urgency for carrying out the plan, other than a general desire to comply with the President's D.C. Beautification executive order. *See id.* at 83:17–21. Like Griess, Lands was forthcoming about his limited involvement in the creation and implementation of the TMP.

**Bowron.** The Court finds Bowron's oral testimony credible. However, it concludes that her October declaration was misleading.

In a declaration signed on October 6 but filed with the Court on October 9, Bowron wrote that, "subject to available funding," NPS "continues to take some maintenance actions in or around the Golf Course" as it had been since April. Dkt. 75-3 ¶ 9. She emphasized that "NPS has explained that it has no intent to commence significant rehabilitation work until all applicable compliance requirements have been satisfied." *Id.* ¶ 6. And she reaffirmed that NPS "documented its compliance with all applicable laws and regulations for those actions and will continue to do so for any future maintenance actions," including the removal of dead, dying, hazardous, or invasive trees. *Id.* ¶ 9. She did not mention the TMP.

Bowron signed her October 6 declaration at 5:15 p.m. Twenty-four minutes later, she emailed her edits to the TMP to park and regional staff. *See* Oct. 19 Rough Tr. II at 17:24–18:1. Given that timeline, the omission of the TMP is not just conspicuous—it is misleading.

The only way to square Bowron's declaration with the TMP is to characterize the chopping down of hundreds of healthy and non-invasive trees as "routine maintenance"—a "small" undertaking to address deteriorating conditions. And indeed, that is what Bowron testified. *See id.* at 28:4–17. The Court rejects that characterization and questions (but does not find) that Bowron truly believes it. Whatever "routine maintenance" means, it does not cover the events of October 10.

The Court does not fault Bowron. At the October 19 hearing, Bowron testified that she relied on Government counsel's advice when asked why she did not discuss the TMP in her declaration. *See id.* at 26:15–27:10. Counsel must have known that the TMP was a material

development that should have been included in any declaration attesting to NPS's plans on the course.[49]

**Wischer.** The Court does not find Wischer credible. Wischer toured the East Potomac Golf Course with the President, Secretary Burgum, and Tom and Gavin Fazio while carrying various Fazio-designed "concepts" for its redesign. *See* Oct. 19 Rough Tr. I at 71:8–75:13. A tour after which President Trump posted that redesign work would begin on September 1. See Dkt. 58 at 1. Yet Wischer maintains that he—as Deputy Chief of Staff to the Secretary of the Interior—just spontaneously became interested in tree and vegetation management. In mid-September. At the East Potomac Golf Course. Because of one recommendation in a seven-year-old CLR. That contained dozens of recommendations as to three golf courses. And that he had not previously heard about. *See id.* at 23:20–24:9, 25:2–32:2.

At the October 19 hearing, Wischer testified that the CLR was the basis for the tree removal on October 10—not any plan to replace East Potomac Golf Course with a Fazio-designed course. *See id.* at 23:14–19, 41:16–23. But Wischer ignored the vast majority of the CLR. He testified that he was only aware of the CLR's recommendations for East Potomac Golf Course, not the other two courses mentioned. *See id.* at 28:2–11. And he stated that he was only aware of its recommendations for "vegetation management"—not the many other suggested improvements to the Course. *Id.* at 25:12–26:8. Wischer's selective knowledge of the CLR undermines the purported justification for the TMP.

---

[49] This is a key reason the Court is concerned about Government counsel's actions in this case. *See Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 & n.3 (2016) (discussing the common-law "rule that half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations").

Wischer also testified that he looked up the CLR on the internet in September. *See id.* at 23:20–24:5. He did not credibly explain why he looked up the CLR, saying only that he thought it would help the agency "figure out what we could do to clean up the course." *Id.* at 24:2–3. Never mind that the timing coincides with President Trump's stated start date. Nor did he explain the sudden urgency to implement the CLR. *See id.* at 68:17–22. Or why he focused on only one of its countless recommendations for each of D.C.'s three public golf courses. *See id.* at 26:18–27:12.

Finally, Wischer's characterization of the TMP's implementation as "cleaning up" the Course is borderline farcical. True, there had been routine maintenance—removal of dead, dying, hazardous, or invasive trees—since at least May. *See* Dkt. 48-1 ¶ 22. But as things stood before October 10, it is unclear whether there were any "dangerous" and "disease infected" trees left to remove. *See* Oct. 19 Rough Tr. II at 51:3–13. And NPS in fact removed hundreds of healthy, non-invasive trees. *See* Oct. 19 Rough Tr. I at 22:16–23:11.

Given those credibility determinations, the Court turns to its preliminary findings of fact:

**1. The Washington National Plan exists.**

Plaintiffs argue that the agency has developed and been implementing the Plan, undisclosed, for months. The Government argues that any plan, if it exists, is still in early development. *See, e.g.*, Dkt. 84 at 20, 33–34.

The Court concludes that the Washington National Plan—which the Court defines as a plan to destroy the current East Potomac Golf Course and to replace it with a modern, championship-style course designed by Tom Fazio—exists. The existence of the Plan is evidenced by:

- President Trump stating so on January 11, June 28, twice on October 18, and once on October 19;

- Secretary Burgum stating so on May 8 and May 14;
- Secretary Burgum not contradicting the President's statement that DOI, under his auspices, has developed the plan;[50]
- final designs announced by President Trump, prepared by the same individual—Tom Fazio—who Secretary Burgum (in May) and the President (in June) said would design the Course;
- the dumping of soil on the Course, in preparation for future construction;
- the termination of the National Links Trust's lease, which allowed NPS directly to oversee Course design and maintenance;
- the June tour of the Course, where President Trump, Secretary Burgum, Fazio, Wischer, and others discussed a full Course renovation pursuant to a Fazio design; and
- the removal of hundreds of trees, a necessary step for the construction of the championship-style course.

*See* Dkt. 49-1; Dkt. 58 at 1; Dkt. 72-1 ¶¶ 98–99; Dkt 91-1; Dkt. 91-2; Dkt. 96-1; Oct 11 Det. NEPA Adequacy at 356; Griess Decl. ¶¶ 15, 33–34; Oct. 16, 2025, CE at 2.

The Government has made no compelling factual rebuttal. It asks the Court to disbelieve repeated public comments made by the President, who has stated in no uncertain terms that DOI and Secretary Burgum have a plan to redesign the Course. To disbelieve the President's announcement that "the Department of the Interior, under the auspices of Secretary Doug Burgum, and in conjunction with famed Golf Course Architect, Tom Fazio, has developed"—past tense—"a plan to build a World Class Championship Golf Course on the site of the current East Potomac Golf Links." Dkt. 91-1 at 2. To disbelieve the President's announcement that the work will start "IMMEDIATELY!" Dkt. 96-1 at 2. To disbelieve many other statements in his posts about the Course.

---

[50] The Court would reach the same conclusion even if it did not consider the Secretary's silence. But his silence speaks—in the Court's mind—volumes.

Government counsel argues that President Trump, who discussed the Plan to redesign the Course no fewer than five times, has "at most . . . has given preliminary thought to" the Washington National Plan. Dkt. 84 at 34. That claim does not square with the record.

The Court cannot disbelieve the President's clear, repeated statements of fact when those statements find support in the record and the Government has presented no credible evidence to contradict him. The Court therefore concludes that the Washington National Plan exists.[51]

**2. The TMP is part of the Washington National Plan and the Government's justification for the TMP—compliance with the CLR—is pretextual.**

The Government argues that it crafted and implemented the TMP to return the Course to its historic Travis design, pursuant to the CLR. *See* Dkt. 84 at 16, 37–38; Griess Decl. ¶¶ 20–21.

But that justification contradicts the President's announcement that the Department of the Interior, "under the auspices of Secretary Doug Burgum," "has developed a plan to build a World Class Championship Golf Course on the site of the current East Potomac Golf Links," with construction slated to begin in November. Dkt. 91-1 at 2–3. And recall that the Fazio design, if implemented, would supplant the Travis design. *See supra*. Not to mention that it would flout the CLR's direction to maintain all three historic courses to accommodate players of all skill levels. *See id.* It makes zero sense for the agency to have cut down hundreds of healthy, mature, and non-invasive trees to return East Potomac Golf Course to the Travis design—only for that same agency, behind the scenes, simultaneously to develop and implement a Plan to abandon that same historical design.

The CLR is a sprawling document that provides numerous recommendations for agency actions at each of the three publicly owned golf courses in Washington, D.C. *See* Dkts. 41–44.

---

[51] Of course, not all agency plans are subject to judicial review. The Court discusses whether the Plan is cognizable under the APA below.

But, of important note, DOI and NPS executed only its recommendations concerning tree-clearing at East Potomac Golf Course. *See generally* Oct. 9 CE. DOI and NPS staff testified that they have not discussed implementing any CLR-recommended changes to the other two golf courses. *See* Oct. 12 Tr. at 95:17–96:25. Nor did they rush to implement any of the CLR's non-tree-clearing recommendations for East Potomac Golf Course. *See* Oct. 19 Rough Tr. I at 25:13–30:14; Oct. 19 Rough Tr. II at 47:11–48:18.

The agency also acted on the TMP with unusual speed—just one week from initial drafting to implementation—despite two witnesses, including the individual who oversees the park directly, testifying that no urgency existed. *See* Oct. 12 Tr. at 53:20–54:1, 83:17–21, 117:14–17. And CLR compliance had not been a longtime priority of the agency's—the first conversations about implementing the CLR at East Potomac occurred in September. *See id.* at 25:16–28:22; Oct. 19 Rough Tr. II at 4:6–5:3, 14:10–15:7. And no testifying witness has even read the full CLR.

To implement the wholesale Course renovation called for by the Washington National Plan, NPS needed to remove existing trees. It asks too much of coincidence to accept that NPS created the TMP to effectuate one part of a seven-year-old CLR when the same tree clearing was necessary to carry out the Washington National Plan.

Even if lower-level staff members, such as Lands and Griess, believed in good faith that the TMP was meant to implement the CLR, and not to prepare the Course for total renovation, the Court need not—and does not—ignore the President's and Secretary's repeated affirmations, over months, that the Course would be renovated under a Fazio design. That every member of the agency might not have been privy to the development and implementation of the Washington

National Plan does not mean that the Plan did not exist, or that DOI did not undertake the TMP to effectuate it.

The Court finds as a factual matter that the TMP was undertaken in furtherance of the Washington National Plan and that the Government's proffered justification for the TMP—compliance with the CLR—is pretextual.

**LEGAL STANDARD**

To obtain a preliminary injunction, a plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Where, as here, a movant seeks to enjoin the government, the final two factors merge "because the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

**LIKELIHOOD OF SUCCESS**[52]

Before addressing the merits of Plaintiffs' NEPA claim, the Court addresses two preliminary matters. Plaintiffs may only sue under the Administrative Procedure Act if the agency has taken final agency action. *See* 5 U.S.C. § 704; *Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006). And, of course, Plaintiffs must show that they have Article III standing. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

The Court takes each in turn.

[52] Here, the Court relies only upon the parties' written submissions, the record developed in those submissions, and legal argumentation. The Government concedes that the Court can rely on the record the parties developed in their written submissions. *See* Dkt. 84 at 23.

## I. Final Agency Action

The Administrative Procedure Act's "limited cause of action" provision limits challenges to final agency action. *Trudeau*, 456 F.3d at 185. It does so to preserve "the process of agency refinement, including give-and-take with the regulated interests, that is an important part of the life of the agency process." *Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 703 (D.C. Cir. 1971). It does not, however, provide shelter for an agency seeking to evade judicial review by shielding its final decisions from public view.

The Government argues that even if the Washington National Plan exists, it is not final agency action within the meaning of *Bennett v. Spear*, 520 U.S. 154 (1997). *See* Dkt. 84 at 33–34. The Court disagrees. Plaintiffs' "characterization" that the Plan is final agency action "finds ample support in the record." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 174 (D.D.C. 2015). And so they are likely to succeed on this part of the analysis.

### A. Finality

For Plaintiffs to prevail, the Court must conclude that the Washington National Plan was final as of October 15, 2026—the date that the Court granted Plaintiffs' Motion for Leave to File their Amended and Supplemental Complaint pursuant to Federal Rule of Civil Procedure 15(a) and (d). *See Scahill v. District of Columbia*, 909 F.3d 1177, 1184 (D.C. Cir. 2018).[53] And while its "review is deferential," the Court is "not required to exhibit a naiveté from which ordinary citizens are free. . . . Accepting contrived reasons would defeat the purpose" of the reasoned

[53] *See also* First Min. Order (Oct. 15, 2026); D.D.C. LCvR 7(i).

explanation requirement of administrative law. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

Agency action is final when it "mark[s] the consummation of the agency's decisionmaking process." *Bennett*, 520 U.S. at 178 (cleaned up). That is, when it is "not itself subject to further consideration by the agency." *NRDC v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020). To qualify, it must "not [be] of a merely tentative or interlocutory nature," and it must also be the mechanism "by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (cleaned up); *see also Sw. Airlines Co. v. DOT*, 832 F.3d 270, 275 (D.C. Cir. 2016).

Of course, agencies do not always paper the record. If no written policy exists, the Court may infer the existence of a final action from a consistent pattern of conduct. *See R.I.L-R*, 80 F. Supp. 3d at 174–76. A decision coming from an agency head, such as Secretary Burgum (DOI) or Acting Director Bowron (NPS), serves as a "signpost[] of authoritative determination, finality[,] and ripeness." *Nat'l Automatic Laundry & Cleaning Council*, 443 F.2d at 702.

Here, Plaintiffs do not ask the Court to review an "abstract decision apart from [a] specific agency action." *Biden v. Texas*, 597 U.S. 785, 809 (2022). Rather, DOI's "discernible course of agency conduct . . . reflects a discrete decision" by the agency that is subject to APA review. *Hennepin Cnty. v. HHS*, No. 26-cv-2460, 2026 WL 2426300, at *7 (D.D.C. Aug. 19, 2026).

The Government belittles the evidence, chiding that Plaintiffs "proffer only conjecture based on a handful of tweets." Dkt. 84 at 33. Not so. The "handful of tweets" are not complaints about the Red Sox's latest blown lead in the ninth.[54] They are statements from the

[54] Sigh.

President of the United States, and from the Secretary of the Interior, about actions within their purview. *See* Dkt. 49-1; Dkt. 50-1; Dkt. 58; Dkt. 91-1; Dkt. 91-2. And the posts say, in no uncertain terms, that a plan exists and that construction will start imminently—one even contains a final schematic of the Course's redesign. *See* Dkt. 91-1 at 4.

The Court notes that the Secretary of the Interior, who publicly affirmed the Plan in May, *see* Dkt. 49-1; Dkt. 50-1, has not disavowed the President's statement that a Plan was developed under his "auspices," and further notes that the Department of the Interior's logo is prominently featured on the posted Fazio redesign, Dkt. 91-1 at 2, 4. And it highlights that the Government has previously stated that the President's social media posts spark agency action on the Course. "From the President's mouth to their ears, Your Honor. . . . They are moving forward." July 2 Tr. at 9:4–11.

Nor is the evidence limited to tweets and Truth Social posts. Plaintiffs trace a series of the agency's "irreversible and irretrievable commitment[s] of resources." *Wyo. Outdoor Council v. USFS*, 165 F.3d 43, 50 (D.C. Cir. 1999). These actions, beginning in October 2025, are not preliminary in nature. Consider just two. The agency dumped over 30,000 cubic yards of fill on the Course, and it cut down hundreds of healthy and mature trees. *See* Oct. 16, 2025, CE at 2; Griess Decl. ¶¶ 33–34. The agency cannot return to a time when the debris had never been dumped. It cannot un-chop a single tree, much less hundreds of them. And East Potomac Park will never be the same: the agency's implementations of the Plan thus far have "an actual or immediately threatened effect" on the Course. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990).

And obligations have been determined or legal consequences have flowed from the agency's decision to implement the Plan. *See Bennett*, 520 U.S. at 178. These include the

cancellation of the NLT lease, the preparation of NEPA compliance documents in connection with the TMP and dumping projects, and the creation of contracts with third parties. It also has led to the announcement of the imminent closure of the Course, for a period of approximately 15 months. *See* Dkt. 91-1 at 3.

To be sure, the Court cannot pinpoint the exact date at which the Plan became final. But it determines without hesitation that it occurred at some point well before October 15, 2026. Without evidence from the White House, which the Court understands to assert executive privilege, and without a fully developed record, the Court cannot on this posture say more. But that too does not render action non-final. Yes, "the details of the [Washington National Plan] are still unclear." *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008). But "the record leaves no doubt" that DOIhad, before October 15, decided to destroy East Potomac Golf Course and replace it with a Fazio-designed championship-style course. *Id.*

The Government mainly responds to all this by picking and choosing what of President Trump's posts it claims the Court should believe. It stresses President Trump's statement that the Plan may be subject to "variance or changes . . . depending on site conditions." Dkt. 91-2 at 2. But that disclaimer does not get the Government far. Even "[a]n interim agency resolution counts as final agency action despite the potential for a different permanent decision," so long as it is the "final word from the agency on what will happen up to the time of any different permanent decision." *NRDC*, 955 F.3d at 78. The agency need not have publicly settled on a final design for the Fazio course, so long as it has made the final decision to replace the current Course. Any other result would permit the agency to destroy a century-old Course with no possibility of pre-destruction judicial review.

### B. Agency Action

The Government also argues that "any redesign of the golf course is not 'agency action'" at all "because it is not the kind of regulation that constitutes a 'rule, order, license, sanction, [or] relief' under the APA." Dkt. 94 at 1 (citing 5 U.S.C. § 551(13)); *see also* Dkt. 84 at 35.

In prior argument before the Court, the Government, with good reason, stressed time and again that alterations of the magnitude of the Washington National Plan would be subject to strict NEPA requirements:

> **THE COURT:** Would you agree with me that renovating the golf course would constitute a major federal action under NEPA?
>
> **Gov't Counsel:** If there is a full-blown redesign, yes, Your Honor.
>
> **THE COURT:** So if there is a major federal action, and I think you have already said the government will have to abide by the National Environmental Policy Act, right?
>
> **Gov't Counsel:** Yes, Your Honor.
>
> **THE COURT:** And that would include that they would need to make an environmental impact statement?
>
> **Gov't Counsel:** Yes, Your Honor.

July 2 Tr. at 85:21–86:7. And:

> **THE COURT:** We can agree if we redo the entire golf course, that would be a major federal action?
>
> **Gov't Counsel:** Yes. To put it another way, redoing the entire golf course is not going to be able to be done through a categorical exclusion.
>
> **THE COURT:** And that would then require, if we have a major federal action, the preparation of an environmental assessment, which you discussed?
>
> **Gov't Counsel:** Yes, Your Honor.
>
> **THE COURT:** And if the impacts were found to be significant, an environment impact statement?
>
> **Gov't Counsel:** Yes. And if not, what we call a FONSI.

*Id.* at 88:8–20. And because the site is a "contributing feature to the East and West Potomac Parks Historic District, listed in the National Register of Historic Places," Dkt.

84 at 14, the Government also acknowledged that major renovations will trigger fulsome National Historic Preservation Act compliance requirements as well. *See* Sept. 3 Tr. at 18:5–23. All this, the point being, will take a lot of time. No need for the Court to slow down what is already traveling at a snail's pace.

Faced with the emerging record, the Government asks that the Court ignore its prior representations and accept its "alternative argument" that a Course redesign is categorically unreviewable under the APA. Oct. 19 Rough Tr. II at 67:13. It says, Emily Litella-style: "Never mind."[55] This about-face is troubling. The Government took its previous position to persuade the Court not to issue Plaintiffs interim relief. The Court accepted and credited that argument when it repeatedly declined to grant Plaintiffs' requests for interim relief. *See* May 4 Tr. at 12:10–25, 16:22–17:3; July 2 Tr. at 55:5–57:6, 59:6–18, 61:2–63:5, 91:13–92:1; Sept. 3 Tr. at 10:21–13:16; *see also* Dkt. 8; Dkt. 47; Apr. 9 Tr. at 18:15–19:17. The so-called alternative argument cuts in the opposite direction. Course work can begin immediately.

But parties cannot change course whenever and however the evidence suits them. As the Supreme Court has held, "[W]here a party assumes a certain position . . . and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (cleaned up). And so the Court does not credit this new argument.

---

[55] For those born after 1980: After delivering an impassioned commentary based on a misunderstanding that the weekend anchor then corrected, Litella would respond "Never mind." Once, she confused "violence on television" with "violins on television." *Saturday Night Live: Weekend Update with Chevy Chase* (NBC television broadcast May 8, 1976) (Gilda Radner as Emily Litella). The Court commends this clip to any reader seeking a good laugh.

In any event, it fails on its own terms. The APA defines "agency action" as "includ[ing] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). It is not a high bar. Indeed, the Supreme Court has explained that "[t]he bite in the phrase 'final action' . . . is not in the word 'action,' which is meant to cover comprehensively every manner in which an agency may exercise its power. It is rather in the word 'final.'" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (cleaned up). And the D.C. Circuit has emphasized that "the term 'agency action' undoubtedly has a broad sweep." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004).

The Government reasons by analogy. "Just as a decision to redesign all the art exhibits in a Smithsonian Museum would not be agency action," the Government analogizes, "neither would a decision to redesign a golf course." Dkt. 94 at 1. Maybe. But if an agency tore down the Smithsonian Museum, redesigned its entire layout, rebuilt it from the ground up, changed its mission statement, and closed it down for over a year, that would unequivocally be agency action. So too here.

But the Government persists. And provides two cases in support of its far-reaching claim. Neither helps it. In the first, *Independent Equipment Dealers*, then-Judge Roberts held that the EPA had not engaged in reviewable action when it published a letter that reaffirmed a policy that was "hardly new," "reflect[ed] no change in the position announced" previously by the agency, and had no "concrete impact" on the plaintiff. 372 F.3d at 425–26. By contrast, the Plan constitutes a dramatic departure from the agency's purported commitment to restore the Course to the Travis design.

The second, *National Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014), is equally unpersuasive. There, then-Judge Kavanaugh held that certain agency guidance

documents relating to procedures for Clean Water Act permit processing, which "disclaim[ed] any intent to require anyone to do anything or to prohibit anyone from doing anything," were not agency actions "subject to pre-enforcement review." *Id.* at 252–53. As the court concluded, any challenge to the action was premature: "To be sure, the Final Guidance may signal likely future permit denials by EPA; if so, those permit denials can be challenged at that time." *Id.* at 252.

This case works differently. Plaintiffs do not challenge a guidance document indicating that something may or may not happen in the future. They challenge the Plan that the President and the Secretary have endorsed, and that DOI has partially implemented through soil dumping, lease termination, and tree-clearing. Importantly, the Government here does not argue that there is some future agency action that Plaintiffs will be able to challenge to prevent further implementation of the Plan; the Government seeks to place the Plan entirely beyond APA review.

The Court takes the Government at its word that renovations of the scale of the Plan are "major federal actions" and are thus reviewable "agency actions" under the APA.

## II. Article III Standing

Standing asks plaintiffs: "What's it to you?" *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 110 (2025) (cleaned up). To answer, plaintiffs must show (1) a concrete, particularized, and imminent injury; (2) caused by the challenged conduct; (3) that is likely to be redressed by a favorable decision. *See id.* at 111.

At the preliminary injunction stage, plaintiffs must establish "a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (cleaned up). Plaintiffs "cannot rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts that, if taken to be true, demonstrate a substantial likelihood of standing." *Id.* (cleaned up).

### A. Scope of Standing Analysis

Ordinarily, courts assess standing on the date a plaintiff filed his complaint. *See Davis v. FEC*, 554 U.S. 724, 732 (2008). But when a plaintiff amends his complaint, courts "look to the amended complaint to determine jurisdiction." *Scahill*, 909 F.3d at 1183. An amended complaint is deemed filed on the date the Court grants leave to amend. *See* D.D.C. LCvR 7(i). Here, Plaintiffs moved for leave to file an amended and supplemental complaint, which the Court granted on October 15, 2026. *See* Dkt. 72; First Min. Order (Oct. 15, 2026). So the Court considers whether Plaintiffs had standing as of October 15.

The Government makes two arguments on the scope of the Court's standing inquiry. First, it argues that the Court must look solely to Plaintiffs' "tree cutting claim" because Plaintiffs' preliminary injunction motion focuses on the Tree Management Plan. Oct. 19 Rough Tr. II at 126:7–20. Second, it argues that the Court cannot consider the clearing of hundreds of trees from the Course on October 10. *See* Dkt. 84 at 30.

Both misconstrue Plaintiffs' claim. Start with the first. Plaintiffs do not raise a separate "tree cutting claim." They raise a NEPA segmentation claim in which tree cutting is one smaller project impermissibly segmented from the Washington National Plan. *See* Dkt. 80-1 at 25–28; Dkt. 72-1 at 55 ¶ 2(e). So, although the Government is correct that Plaintiffs must demonstrate standing "for each claim [they] seek[] to press and for each form of relief that is sought," *Davis*, 554 U.S. at 734 (cleaned up), the Court must consider Plaintiffs' standing to challenge the Washington National Plan.[56]

---

[56] Even if the Court assessed standing for a "tree cutting claim," Plaintiffs would have standing for the same reasons discussed later in this opinion. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009); *Sierra Club v. Jewell*, 764 F.3d 1, 5–6 (D.C. Cir. 2014).

As to the second argument, Plaintiffs need not amend their complaint each time the Government takes some new action to implement the Washington National Plan. Plaintiffs have, from the jump, challenged the Government's plan to replace East Potomac Golf Course with a championship-style course. *See* Dkt. 1 ¶¶ 9, 11. And they have repeatedly asserted that the Plan was already underway. *See id.* ¶ 11; Dkt. 72-1 ¶ 11. They highlighted the Government's dumping of dirt and debris on the Course. *See* Dkt. 72-1 ¶ 11. Its staging of construction equipment. *See id.* ¶ 101. Its earlier removal of trees. *See id.* At each step, Plaintiffs have asked the Court to stop the Government "from segmenting the [Plan] into discrete components for purposes of avoiding NEPA . . . review." *Id.* at 55 ¶ 2(e). And although plaintiffs must amend to raise new legal theories, *see Colbert v. District of Columbia*, 78 F. Supp. 3d 1, 13 (D.D.C. 2015), nothing requires them to play a game of legal whack-a-mole through an endless cycle of amendments following each step toward the completion of the Plan.

With these threshold arguments out of the way, the Court turns to Plaintiffs. Plaintiffs are two frequent golfers at the Course and a nonprofit dedicated to preserving historical and cultural resources in the District of Columbia. The Court addresses the individual plaintiffs' standing before the nonprofit's.

**B. Individual Plaintiffs**

The individual plaintiffs, Dave Roberts and Alex Dickson, frequently golf at East Potomac Golf Course. Dkt. 72-1 ¶¶ 23–24. They contend that the Government failed to comply with NEPA before implementing the Washington National Plan. *See* Dkt. 72-1 ¶¶ 110–19; *see also id.* at 55 ¶ 2(e).

In claiming that the Government failed to follow a statutorily required procedure (adequate NEPA review), Plaintiffs allege an "archetypal procedural injury." *WildEarth*

*Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013). But a procedural injury alone does not create standing: Plaintiffs must also show that their procedural injury is "tethered to some concrete interest adversely affected by the procedural deprivation." *Id.*

Procedural injury claims are subject to unique standing rules. To start, courts relax the imminence and redressability requirements. *See id.* As to redressability, a plaintiff "need not show that court-ordered compliance with the procedure would alter the final agency decision," but only that the agency "*could* reach a different conclusion if ordered to revisit its procedural error." *Growth Energy v. EPA*, 5 F.4th 1, 27–28 (D.C. Cir. 2021) (per curiam) (cleaned up). As to causation, a plaintiff "must show two links: one connecting the omitted procedural step to some substantive government decision that may have been wrongly decided because of the lack of [compliance with] that procedural requirement and one connecting that substantive decision to the plaintiff's particularized injury." *Id.* (cleaned up).

The individual plaintiffs have standing to challenge the Government's implementation of the Washington National Plan. Their procedural injury is tied to their recreational, aesthetic, and historic interests in East Potomac Golf Course. The Government's rapid implementation of the Plan without adequate NEPA review has caused this injury, and a favorable decision by this Court would redress it.

**1. Injury-in-Fact**

**a. Recreational, Aesthetic, and Historic Injuries**

Plaintiffs allege that the implementation of the Washington National Plan harms their recreational, aesthetic, and historic interests in East Potomac Golf Course. *See* Dkt. 80-1 at 16.

And they draw from a long line of Supreme Court and D.C. Circuit decisions holding that these interests are sufficiently concrete under Article III. *See id.* at 17. So far, so good for Plaintiffs.

Enter *NPS v. National Trust for Historic Preservation in the United States*, No. 26A203, 2026 WL 2564318 (U.S. Aug. 31, 2026) (per curiam). According to the Government, that decision from the Supreme Court's non-merits docket forecloses Plaintiffs' theory of standing. *See* Dkt. 84 at 10. The Government's assertion warrants some discussion.

In *National Trust*, the Trust challenged NPS's construction of a ballroom in place of the East Wing of the White House. *See* 2026 WL 2564318, at *1. To establish its own standing, the Trust relied on a declaration from one of its members, Alison Hoagland. *See id.* at *2. Hoagland expected "to visit the neighborhood around the White House about once a month." *Id.* (cleaned up). And according to the Court, Hoagland asserted that "having to view the finished ballroom . . . would cause her to suffer injuries to her aesthetic, cultural, and historical interests because she f[ound] the scale, height, and massing of the government's design distasteful." *Id.* (cleaned up).

The Court rejected that theory of injury. The Court "ha[d] not found standing in [similar] circumstances." *Id.* Instead, it "ha[d] repeatedly held that mere offense, disagreement, or distaste does not qualify as a concrete and particularized injury under Article III." *Id.* It is easy to see why: holding "that offense alone suffices to establish a concrete and particularized injury would seemingly usher in a world where virtually every citizen had standing to challenge virtually every government action that they do not like," a result that would be "flatly inconsistent with Article III." *Id.* (cleaned up).

But that is not all the Court said. It also distinguished the Trust's alleged injury from environmental precedents where "the plaintiff's injuries involved *more* than mere offense," such

as harm to a plaintiff's "recreational interests." *Id.* (cleaned up). So, for example, a plaintiff who "occasionally" drives over a polluted river and wishes to "fish, camp, swim, and picnic in and near the river . . . but w[ill] not do so because he [i]s concerned that the water [i]s polluted" suffers a concrete injury. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181, 183 (2000). As does a plaintiff who repeatedly visits an area, plans to do so again, and whose "interests in viewing the flora and fauna" there will be harmed absent judicial review. *Summers*, 555 U.S. at 494.

And in recognizing recreational injuries as something more than mere offense, the Court did not hold that aesthetic or historic interests alone are necessarily insufficient under Article III. *See Nat'l Trust*, 2026 WL 2564318, at *3. As the Court acknowledged, even "the desire to view a 'particular crocodile'" can constitute a cognizable interest for purposes of standing. *Id.* The problem for the Trust, however, was that its alleged injury, while cognizable, was not concrete and particularized because it was based on its disagreement with the ballroom's construction. *See id.*

An observant reader (or intrepid law student) may still ask: how can "I want to look at a crocodile" suffice for standing but "I want to look at the White House" cannot? *See id.* at *6 (Roberts, C.J., dissenting). Fair question. In response, the Court directs the reader to the facts of *National Trust*. By the time the Trust filed suit, the Government had demolished the historic East Wing. *See id.* at *1; Dkt. 19 ¶ 1, *Nat'l Trust for Historic Preservation v. NPS*, No. 25-cv-4316 (D.D.C. Dec. 29, 2025). As the Court stated, it "ha[d] not found standing in [similar] circumstances." *Nat'l Trust*, 2026 WL 2564318, at *2. That may be true because in the environmental precedents the Court cited, the plaintiffs' aesthetic interests were tied to *existing*

wildlife and landscapes—not an ongoing redesign following the completed demolition of a historic building. *See, e.g.*, *id.* at *2 (collecting cases).

To be clear, distinguishing between mere offense and a concrete injury may prove difficult in certain cases. Thankfully, this is not one of them. In addition to their aesthetic and historic injuries, Plaintiffs allege significant recreational injuries based on the Government's implementation of the Washington National Plan—injuries the Court approved of in *National Trust*. And these recreational injuries distinguish Plaintiffs from "virtually every citizen" who may dislike the Washington National Plan. *Id.* at *2. To put a finer point on it, many people may want East Potomac Golf Course to remain unchanged. Fewer regularly play golf there.

Consider Plaintiffs' declarations. Roberts plays golf at East Potomac Golf Course "at least once per month." Dkt. 8-6 ¶ 2. Though Roberts knows that "a lot of better players prefer the White Course's greens," he prefers the Blue Course. *Id.* ¶ 11. He appreciates East Potomac's variety of courses tailored to different skill levels: "No matter what kind of golf course you like or how good a player you are, East Potomac has something for you." *Id.* Though the Blue Course is his favorite, he also plays the beginner-friendly Red Course with his son and daughter. *See id.* ¶¶ 11, 17. If NPS destroys East Potomac's three courses to create a single championship-style course, however, Roberts "d[oesn't] think [he']d ever go back." *Id.* ¶ 21; *see also id.* ¶ 26.

Dickson plays golf at East Potomac "frequently, usually with [his] 10-year-old son or a few of [his] regular golf buddies." Dkt. 8-4 ¶ 6. He plays all three courses but prefers the White Course for its scale, "nice balance of par-3 and par-4 holes," and views of D.C. monuments set behind the course's existing landscape. *Id.* ¶¶ 7–10.

According to Dickson, replacing East Potomac's three courses with a single championship-style course would present several issues, including (1) eliminating the Red

Course, a "perfect [course] for teaching beginners, especially kids," and (2) removing "two public courses that [he] and other people can actually play." *Id.* ¶ 14. Dickson "ha[s] fun playing the golf courses as they are currently designed, and . . . plan[s] to continue to enjoy them" unless the courses are converted into a single course. *Id.* ¶ 19. If that happens, Dickson claims East Potomac's "fun" and "accessibility" would be "lost." *Id.*

The Washington National Plan would significantly harm these recreational interests. Championship-style courses typically have "difficult elements beyond the skill of most recreational players." Dkt. 72-1 ¶ 9. And as Roberts stated, part of East Potomac's appeal is that it has something for everyone—no matter "what kind of golf course you like or how good a player you are." Dkt. 8-6 ¶ 11. Further, converting East Potomac's three courses into a single championship-style course deprives Plaintiffs of a beginner-friendly course where they can play with their children. *See* Dkt. 8-6 ¶¶ 11, 17; Dkt. 8-4 ¶ 14. And so the individual plaintiffs adequately establish injury-in-fact because "they aver that they use the affected area and are persons for whom the . . . recreational value[] of the area will be lessened by the challenged activity." *Ctr. for Bio. Diversity v. DOI*, 144 F.4th 296, 305 (D.C. Cir. 2025) (cleaned up).

Separately, Roberts appreciates the "beauty" and "aesthetic value" of East Potomac, including the layout of its courses. Dkt. 8-6 ¶¶ 14, 16, 22, 25. Additionally, he "feel[s] connected with the history of the golf courses," appreciates their "historic designs," and notes that "converting East Potomac into a big championship-style golf course" would destroy that history. *Id.* ¶¶ 12, 27. Likewise, Dickson notes that East Potomac "is one of the most beautiful places in Washington due to [its] inherent appearance," including its sightlines of other D.C. landmarks. Dkt. 8-4 ¶¶ 17–18. He also appreciates the "deep sense of history at East Potomac," which extends to its "historic layout." *Id.* ¶¶ 12, 14. Like Roberts, Dickson states that if East

Potomac is converted into a championship-style golf course, the "beauty . . . [and] history . . . that bring [him] and others to the course will be lost." *Id.* ¶ 19.

The Court has no trouble concluding that Plaintiffs' aesthetic and historic interests are more than mere offense. Unlike the Trust's alleged injuries in *National Trust*, the injuries described by Roberts and Dickson are analogous to those previously recognized by the Supreme Court and the D.C. Circuit. *See, e.g.*, *Summers*, 555 U.S. at 494; *Sierra Club v. Jewell*, 764 F.3d at 5–6. And so the individual plaintiffs also adequately establish injury-in-fact based on the harm to their aesthetic and historic interests in East Potomac.

The individual plaintiffs establish injury-in-fact. Their recreational, aesthetic, and historic interests are concrete interests adversely affected by the Government's failure to comply with NEPA procedures.

**b. Other Injuries**

In their reply and at argument, Plaintiffs seemingly offered two additional injuries. First, they claim to face a risk of harm due to their exposure to contaminants from the dirt and debris dumped on the Course in October 2025.[57] *See* Dkt. 88 at 10. Second, Roberts's and Dickson's declarations suggest that the Washington National Plan will make it more expensive to golf at the Course. *See* Dkt. 8-6 ¶¶ 20–21; Dkt. 8-4 ¶¶ 20–21.

Assuming Plaintiffs properly raised these injuries, both fail for the same reason: at this stage, they are too speculative. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Start with Plaintiffs' increased risk of harm from the contaminated dirt and debris. A plaintiff claiming an injury from an increased risk of harm must show "*both* (i) a *substantially*

[57] Ironically, the contaminated dirt and debris came from the Government's demolition of the East Wing, the same project at issue in *National Trust*. *See* Oct. 16, 2025, CE at 2.

increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Food & Water Watch*, 808 F.3d at 914 (cleaned up).

Plaintiffs fail at step one. They have not (so far) shown a substantial increase in the risk of harm because the level of contaminants in the Course's soil before October 2025 is, according to Plaintiffs' own expert, "unknown." Dkt. 72-12 at 3. The Court therefore lacks sufficient evidence to determine whether the contaminated soil substantially increased Plaintiffs' risk of harm. *See Food & Water Watch*, 808 F.3d at 915–16.

Moreover, although the individual plaintiffs express concern that the Plan will increase the cost of playing golf at the Course, they have provided no evidence substantiating that concern. *See Elec. Priv. Info. Ctr.*, 878 F.3d at 377. And it may well be that the American taxpayer, who will foot the bill for any redesign, will also foot the bill for the increased cost of playing on a championship-style course.

**2. Causation**

Having concluded that Plaintiffs sufficiently tie their procedural injury to their concrete recreational, aesthetic, and historic interests, the Court easily concludes they establish causation. *See Growth Energy*, 5 F.4th at 27. DOI's "failure to comply with its [NEPA] obligations is plainly connected" to its fast-tracked implementation of the Washington National Plan, and DOI "might have [reconsidered the Plan] if [it] had complied" with those obligations. *Id.* at 29. And as discussed above, DOI's implementation of the Plan will harm Plaintiffs' recreational, aesthetic, and historic interests. *See id.*

**3. Redressability**

Finally, Plaintiffs have met the relaxed redressability requirement for procedural injuries. *See Am. Fuel & Petrochemical Mfrs. v. EPA* (*AFPM*), 937 F.3d 559, 595 (D.C. Cir. 2019) (per

curiam). There is "at least the possibility" that the Government could change its decision to implement the Washington National Plan after conducting proper NEPA review. *Id.* (cleaned up). As Plaintiffs point out, the Government could decide "not [to] mov[e] forward at all." Dkt. 80-1 at 24. To be sure, that appears highly unlikely given the President's social media posts. But because NEPA review could change the current trajectory of the Plan, an injunction requiring such review would redress Plaintiffs' injuries.

### C. D.C. Preservation League

The remaining plaintiff is a nonprofit, the D.C. Preservation League. DCPL advances two standing theories: it sues on behalf of itself (organizational standing) and on behalf of its members (associational standing). *See* Dkt. 80-1 at 18–20. Although DCPL lacks organizational standing, it has associational standing on behalf of its member and Executive Director, Rebecca Miller.

#### 1. Organizational Standing

As an organization, DCPL claims three injuries from the Washington National Plan. First, it notes that the Plan would require it to change its app and website to remove information about the Course. *See* Dkt. 80-1 at 20. Second, it alleges that it would lose the ability to host programs on the Course. *See* Dkt. 88 at 12. And third, it asserts a procedural injury based on its exclusion from NEPA processes. *See* Dkt. 80-1 at 20.

"Like an individual, an organization can establish standing by showing an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Ctr. for Bio. Diversity*, 144 F.4th at 314 (cleaned up). An organization's injury must be "concrete, meaning that it must be real" and not a

"mere setback to the organization's abstract social interests." *Indep. Mkt. Monitor for PJM v. FERC*, 162 F.4th 1167, 1172 (D.C. Cir. 2025) (cleaned up).

The D.C. Circuit has established a two-step inquiry to determine whether an organization has suffered an injury-in-fact. *Id.* At step one, the organization must show "an injury to its organizational interests." *Id.* Injuries to an organization's ability to engage in "issue advocacy," such as "urg[ing] the government to [act]," are generally insufficient. *Ctr. for Bio. Diversity*, 144 F.4th at 315. But an organization may suffer a concrete injury where "the challenged action directly affect[s] and interfere[s] with [an organization's] core business activities." *Id.* (cleaned up). At step two, the organization must show that it "has used its resources to counteract that harm." *PJM*, 162 F.4th at 1172 (cleaned up). In other words, the organization must "identify programmatic expenditures it must make" because of the challenged action. *Id.* at 1174 (cleaned up).

In support of its organizational standing, DCPL relies on a declaration from its Executive Director, Rebecca Miller. *See* Dkt. 80-1 at 20. Miller states that DCPL's mission is to "advocate for the protection, enhancement, and celebration of Washington's built environment and to educate the public about the District's architectural and cultural heritage." Dkt. 8-5 ¶ 5. As part of that mission, DCPL provides "a free historic sites app and [a] website, which provide education about Washington's historic sites." *Id.* ¶ 6. The app offers self-guided tours of historic landmarks, including a "recreation-themed tour" featuring East Potomac Golf Course. *Id.* The website lists sites registered in the National Register of Historic Places, including East Potomac Golf Course. *See id.* ¶¶ 7, 18. Miller states that the Washington National Plan would make DCPL's work "more difficult" because it "would have to change [its] app and website to remove the listings" referencing the Course. *Id.* ¶ 8.

Additionally, Miller states that DCPL hosts themed events at historic sites each month. *See id.* ¶ 9. These events are open to DCPL members and the public. *See id.* ¶ 11. Non-members attending these programs "commonly" sign up for membership. *Id.* ¶ 13. DCPL accepts donations at each event and makes "between $100 and $1,000 per event." *Id.* ¶ 11. DCPL had planned to host a golf-themed program at East Potomac Golf Course in September, which would have included a "presentation about the historical importance" of the Course, invited attendees to play golf, and solicited memberships and donations. *Id.* ¶¶ 9, 11. DCPL has not indicated whether it held the September event or whether it has any plan for a program at the Course.

These are not the kinds of injuries that give rise to organizational standing. Start with DCPL's app-and-website injury. Even if changing these resources would injure DCPL's organizational interests, DCPL has not explained how the change would be a "programmatic expenditure[]." *PJM*, 162 F.4th at 1174. Miller's conclusory statement that changing the app and website would make DCPL's work "more difficult" falls short of the evidence this Circuit requires to establish organizational standing—which the Supreme Court has recognized only in the "unusual case." *Ctr. for Bio. Diversity*, 144 F.4th at 315 (cleaned up); *see also PJM*, 162 F.4th at 1174.

As to DCPL's ability to host events, that injury is too speculative—at least on this record. DCPL has not alleged that the Washington National Plan interfered with its planned September event at the Course. And it has not identified any plan to host an event at the Course in the future. Because DCPL has not identified a harm that has occurred or that is likely to occur soon, its alleged inability to host events fails to establish an injury-in-fact. *See Clapper*, 568 U.S. at 409.

The Court easily disposes of DCPL's remaining procedural injury. "Because [DCPL] ha[s] failed to establish that [it] will likely suffer a substantive injury, [its] claimed procedural injury . . . necessarily fails." *Food & Water Watch*, 808 F.3d at 921 (cleaned up).

**2. Associational Standing**

To have associational standing, DCPL must show that "(1) at least one of its members has standing to sue in her or his own right, (2) the interests it seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 764 (D.C. Cir. 2025) (cleaned up).

The parties do not dispute that DCPL satisfies the latter two requirements. And for good reason. As an organization "dedicated to preserving the historic and cultural resources of the District of Columbia," DCPL has an obvious interest in challenging DOI's failure to comply with NEPA before irrevocably altering the historic character of the Golf Course. Dkt. 8-5 ¶ 4; *see also AFPM*, 937 F.3d at 592. And neither the claim nor the relief sought requires participation of an individual DCPL member. *See AFPM*, 937 F.3d at 592.

So the only question is whether a DCPL member would have standing to sue in her own right. DCPL again relies on the declaration from Rebecca Miller, its Executive Director, and relevant here, a DCPL member. *See* Dkt. 8-5 ¶¶ 3, 22. Miller states that she "enjoy[s] going to East Potomac Park with [her] son." *Id.* ¶ 22. She admires the Japanese cherry trees and the landscape of the Golf Course. *See id.* She also appreciates the "uninterrupted view of historic Fort McNair across the Washington Channel." *Id.*

For largely the same reasons the individual plaintiffs have standing, Miller—and therefore DCPL—also has standing. Like the individual plaintiffs, Miller claims a procedural

injury from DOI's failure to comply with NEPA before implementing the Washington National Plan. *See* Dkt. 80-1 at 18–19. And like the individual plaintiffs, Miller's procedural injury is tied to her concrete aesthetic and historic interests: she avers that she admires the Course's layout, trees, and view of historic landmarks. *See, e.g.*, *Sierra Club v. Jewell*, 764 F.3d at 5–6. The Government's implementation of the Washington National Plan without NEPA compliance has caused this injury, and a preliminary injunction by this Court would redress it.

## III. NEPA Claim

Which brings us—finally[58]—to the core of this opinion. NEPA "imposes upon federal agencies a statutory duty to include in all proposals for major Federal actions significantly affecting the quality of the human environment, a detailed environmental impact statement by the responsible official." *Earthworks*, 105 F.4th at 458 (cleaned up). "If it is unclear whether an action will significantly affect the quality of the human environment, agencies may prepare an environmental assessment" that may result in a "finding of no significant impact." *Theodore Roosevelt*, 616 F.3d at 503 (cleaned up). Finally, an agency may "identify categories of actions that have no significant environmental effects. If a proposed action fits into one of those categories, the agency can invoke the categorical exclusion and avoid preparing an environmental assessment or an environmental impact statement." *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 911 (D.C. Cir. 2024) (cleaned up).

Plaintiffs claim that DOI and NPS have violated NEPA by "segmenting" its procedural compliance requirements. Rather than evaluate the cumulative environmental effects of the Washington National Plan in a single EIS or EA, they argue, the agency has impermissibly

[58] Blaise Pascal wrote in *Lettres Provinciale*, "I have made this one longer only because I did not have the leisure to make it shorter." Blaise Pascal, *The Provincial Letters*, Letter XVI (Dec. 4, 1656) (roughly translated). Same.

broken down the Plan into small constituent projects, each requiring a less rigorous form of NEPA compliance.

The Court concludes that Plaintiffs are likely to succeed on the merits of their NEPA segmentation claim.

**A. The Government's NEPA Documentation**

To date, the Government has proceeded only by categorical exclusion. It prepared a Categorical Exclusion Documentation Form on October 16, 2025, before dumping more than 30,000 cubic yards of East Wing debris into East Potomac Park, concluding that dumping, storing, and using the fill would comprise "landscaping and landscape maintenance in previously disturbed or developed areas." Oct. 16, 2025, CE at 2. It then prepared a second Categorical Exclusion Documentation Form on October 9, 2026, in connection with the TMP, claiming that the destruction hundreds of healthy and non-invasive trees "constitute[d] routine maintenance and treatment of cultural resource grounds and [wa]s consistent with established preservation objectives for the historic cultural landscape." Oct. 9 CE at 340.

And finally, after it emerged that on October 10, 2026, NPS removed "an additional 200 trees . . . beyond the initial estimate," NPS concluded—immediately—no problem. Det. NEPA Adequacy at 356. It stated in a post-hoc Determination of NEPA Adequacy form that "[a]lthough the original assessment underestimated the number of individual trees" destroyed, "the additional 200 small-diameter trees . . . represent the same general type of vegetation and management activity," and so their removal "do[es] not constitute a new category of action or change the overall purpose of the project." *Id.* at 357. It was forced to concede, however, that "additional review [wa]s necessary to document the discrepancy and confirm that the increased

extent of vegetation removal does not introduce environmental effects materially different from those considered in the existing CE." *Id.*

Plaintiffs argue that those determinations fall short of NEPA's procedural requirements. "If a [categorical exclusion] would not suffice for an entire project, the agency cannot [categorical exclusion] its way brick-by-brick to the same result." Dkt. 88 at 21. The Court agrees.

**B. Availability of NEPA Segmentation Claims**

The Government tries to head Plaintiffs off at the pass. First, it argues that segmentation claims are no longer cognizable after the Supreme Court's decision in *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168 (2025). *See* Dkt. 84 at 36–37. And second, regardless, the claims must fail because certain implementing regulations were repealed in January 2026. *See id.* at 36. Each argument fails, as the Court explains in turn.

As to the first, the Government posits that "the Supreme Court eliminated the old segmentation claims as a statutory matter in *Seven County*." *Id.* That would be news to the D.C. Circuit, however. In *Save the Sound, Inc. v. FAA*, 183 F.4th 763, 771–72 (D.C. Cir. 2026), decided more than a year after *Seven County*, the court acknowledged that *Seven County* guided its segmentation analysis but nowhere held that such a claim was foreclosed.

At issue in *Seven County* was a proposed 88-mile railroad line in Utah. 605 U.S. at 173. Before approving construction and operation of the line, the agency "prepared an extraordinarily lengthy EIS, spanning more than 3,600 pages of environmental analysis" that "addressed the environmental effects of the railroad line." *Id.* But the lower court had "nonetheless faulted the EIS for not sufficiently considering the environmental effects of projects separate from the railroad line itself—primarily, the environmental effects that could ensue from (i) increased oil

drilling upstream . . . and (ii) increased oil refining downstream." *Id.* at 173–74. To prevent NEPA's transformation "from a modest procedural requirement into a blunt and haphazard tool employed by project opponents . . . to try to stop or at least slow down new infrastructure and construction projects," the Supreme Court stressed that "[t]he bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id.* at 183, 185.

Key here, the Court emphasized that the "textually mandated focus of NEPA is the 'proposed action'—that is, the project at hand—not other future or geographically separate projects that may be built (or expanded) as a result of or in the wake of the immediate project under consideration." *Id.* at 186–87. "[I]f the project at issue might lead to the construction or increased use *of a separate project*—for example, a housing development that might someday be built near a highway—the agency need not consider the environmental effects *of that separate project*." *Id.* at 187 (cleaned up).

And so when assessing whether an agency properly defined the contours of the project, a reviewing court should consider whether related projects are "separate in time or place from the project at hand," as well as whether the agency that prepared the EIS "possesses . . . regulatory authority over those separate projects." *Id.* at 188. But because "[t]here may be a gray area in defining the project at hand," "a court should defer to an agency so long as the agency drew a reasonable and manageable line." *Id.* at 190 (cleaned up); *accord Save the Sound*, 183 F.4th at 771–72.

The best reading of *Seven County*, as it pertains to segmentation claims, is then not that those claims are "eliminated . . . as a statutory matter." Dkt. 84 at 36. It is instead that courts should ordinarily defer to the agency's definition of the "proposed action" when the agency undertakes NEPA compliance. Of course, because the merit of a NEPA segmentation claim turns

on whether the agency has too-restrictively defined the scope of the proposed action, *Seven County* affects this Court's review. But it does not foreclose review altogether.

And even if *Seven County* did foreclose review of agency action involving environmental impact statements, that holding likely does not extend to NEPA cases—such as this one—involving categorical exclusions. The D.C. Circuit has applied *Seven County* to agency action requiring an EA, *see, e.g.*, *Save the Sound*, 183 F.4th at 771, but never to any case involving a categorical exclusion. Categorical exclusion forms, by their own terms, indicate the *absence* of review, unlike the "reasoned and detailed" analysis warranting deference in *Seven County*, 605 U.S. at 181. And so in *Washington Area Bicyclist Ass'n v. Burgum*, No. 26-cv-0998, 2026 WL 1078218, at *24–25 (D.D.C. Apr. 21, 2026), this Court rejected the application of *Seven County* deference in categorical exclusion cases, concluding that "[a]n in-depth analysis of environmental impacts conducted by agency experts can hardly be compared to the NPS's short statement announcing an absence of safety concerns" in a categorical exclusion form "that cites no data whatsoever."

Finally, the Government argues that NEPA segmentation claims are unavailable because *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304 (D.C. Cir. 2014), a leading NEPA segmentation case, relied on regulations repealed in January 2026. *See* Dkt. 84 at 36 (citing Removal of National Environmental Policy Act Implementing Regulations, 91 Fed. Reg. 618 (Jan. 8, 2026)). But timing matters.

The D.C. Circuit has consistently applied the regulations "in effect at the time of [the agency's] decision." *Sierra Club v. FERC*, 153 F.4th 1295, 1308 n.7 (D.C. Cir. 2025); *see also Save the Sound*, 183 F.4th at 772 n.1; *Healthy Gulf v. FERC*, 132 F.4th 544, 549 n.1 (D.C. Cir. 2025). Plaintiffs allege a course of conduct going back to October 2025, when the applicable

regulations remained in effect. *See* Dkt. 80-1 at 7, 10–11. Here, the agency has kept hidden the precise timing of its decision to implement the Washington National Plan. Thus, the Court cannot determine whether the regulations were in effect when the Plan became final; as discussed, the Court concludes only that the Plan became final sometime before October 15, 2026.

No matter. Even accepting the Government's argument, it does not follow that NEPA segmentation claims are now foreclosed. *Delaware Riverkeeper* cited to NEPA's implementing regulations for the proposition that an agency must include "'connected actions,' 'cumulative actions,' and 'similar actions' in a project EA." 753 F.3d at 1308 (quoting 40 C.F.R. § 1508.25(a)). And NEPA carries that requirement as a statutory matter, separate from that imposed by the implementing regulations. *See* 42 U.S.C. § 4332(2)(C).

Indeed, in a decision predating the issuance of the 1978 implementing regulations, the Supreme Court clarified the scope of NEPA section 102(2)(C): "[W]hen several proposals for . . . related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together. Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976). Therefore, the repealed implementing regulations are best understood as a restatement of NEPA's statutory requirements. Their repeal is not the death knell of NEPA segmentation claims.

In sum, even if *Seven County* applies to categorical-exclusion cases, that case is best understood as reaffirming that a reviewing court must give the agency a healthy dose of deference when assessing the merits of a NEPA segmentation claim. And segmentation claims

are cognizable under NEPA's statutory text, notwithstanding the repeal of implementing regulations this past January.

**C. The Likely Merits of Plaintiffs' NEPA Segmentation Claim**

So now that we are at the pass, let's move forward. The Court's review of Plaintiffs' NEPA segmentation claim is, as it must be, deferential to the agency "so long as the agency drew a reasonable and manageable line." *Seven Cnty.*, 605 U.S. at 190 (cleaned up). Even so, Plaintiffs are likely to succeed on this claim.

The Court has already concluded that the Washington National Plan, in toto, constitutes one final agency action. The Plan calls for the wholesale destruction of the historic East Potomac Golf Course and its replacement with a modern championship-style course designed by Tom Fazio. *See* Dkt. 91-1 at 2–4. Pursuant to the design shared by President Trump, DOI's Plan requires, at least, the creation of new water features, the construction of new buildings, the closure of public roads,[59] and the destruction of existing trees. *Compare* Griess Decl. at 7, *with* Dkt. 91-1 at 4. And yet DOI has prepared no environmental impact statement or environmental assessment in connection with the Plan. Instead, since October 2025, DOI has proceeded under the aegis of separate categorical exclusion forms. This is textbook segmentation.

*Seven County* provides several factors that reviewing courts should consider when determining whether a line separating potential projects is "reasonable" or "manageable": whether the agency has "regulatory authority over th[e] separate projects"; whether the projects are temporally remote; and whether the projects are geographically distinct. *See* 605 U.S. at 187–88. All cut the same way here.

---

[59] One amicus notes that the proposed design appears to eliminate the Ohio Drive perimeter roadway around the Course—a roadway frequented by runners. *See* Dkt. 97 at 11–12. The Court thanks amicus for its terrific brief and argument.

DOI has direct oversight over NPS, which felled the trees pursuant to the Tree Management Plan. And DOI "developed a plan," "under the auspices of Secretary Doug Burgum," to replace East Potomac Golf Course with a championship-style, Fazio-designed course. Dkt. 91-1 at 2. The same agency has regulatory authority over all parts of the Washington National Plan. And the Plan has taken and will continue to take place in a constrained geographic space—Hains Point—and in a compressed time frame. *See, e.g.*, Dkt. 91-1 at 3. The Court declines to find that the agency's decision to refrain from evaluating the Washington National Plan in its entirety was reasonable or manageable within the meaning of *Seven County*, and so does not defer to the agency's scoping of the proposed action requiring NEPA compliance.

The Court turns next to the D.C. Circuit's four-factor test to identify impermissible segmentation: whether the proposed segment "(1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives[;] and (4) does not irretrievably commit federal funds for closely related projects." *Del. Riverkeeper*, 753 F.3d at 1315 (cleaned up).[60] Not every factor is relevant in each case. *See id.* Considered together, these factors also point to segmentation.

**Logical Termini.** On this, the Government's argument makes no sense. It is beyond illogical to embark on a sprawling operation to remove more than 500 healthy and mature trees, ostensibly to return the Course to its historic design, while simultaneously preparing to tear up that design and replace the Course with a modern, championship-style course. Because the action is illogical, its termini are similarly illogical: the agency "has not articulated any viable

[60] In *Save the Sound*, the D.C. Circuit articulated the segmentation factors as "whether possibly different projects overlap temporally and have substantial independent utility." 183 F.4th at 771.

reason why it completed its NEPA review of the [TMP] without regard to the" Washington National Plan. *Id.* at 1315. This factor favors finding segmentation.

**Substantial Independent Utility.** The TMP targeted healthy and non-invasive trees. *See* Dkt. 84-1 at 330–34. The Court had already permitted, and so the NPS had already felled, dead, dying, hazardous, and invasive trees months earlier. *See* Sept. 3 Tr. at 4:14–7:7. So there is no independent utility from removing further trees, other than as part of a more robust renovation to the Course. And because DOI does not intend to move forward with implementation of the Travis design, no independent utility exists for the TMP serving as a partial implementation of the 2019 CLR. This factor favors finding segmentation.

**Does Not Foreclose Alternatives.** NEPA requires agencies to consider alternatives to their actions, "including a no-action alternative." *Citizens Action Coal. of Ind., Inc. v. FERC*, 125 F.4th 229, 239 (D.C. Cir. 2025). The chop-first, review-later approach DOI employed here foreclosed the no-action alternative. Under that alternative, the Course would remain in status quo until DOI fully assessed the environmental implications of wholesale renovation. This factor favors finding segmentation.

**Does Not Irretrievably Commit Federal Funds to Closely Related Projects.** On this preliminary posture, the Court is unable to assess this factor. The evidence so far does not address how federal funds were used to implement the TMP and how they will be used to implement the Washington National Plan. Future renovations to the Course may be funded in part by private donations. *See* Dkt. 80-1 at 7. Or taxpayers may foot the bill. The Court cannot yet assess this factor.

Three of the four *Delaware Riverkeeper* factors favor Plaintiffs. That is sufficient to find that DOI and NPS likely violated NEPA by impermissibly segmenting their compliance efforts.

*See Del. Riverkeeper*, 753 F.3d at 1315–17. The TMP is one part of the Washington National Plan, and DOI should have treated it as such. It still can and must: for the Washington National Plan to progress further, DOI will likely need to study its cumulative environmental effects.

Plaintiffs have shown a likelihood of success on the merits of their NEPA segmentation claim.

**IRREPARABLE HARM**

Irreparable harm is a "high standard." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The harm "must be both certain and great," "actual and not theoretical," and "of such *imminence* that there is a clear and present need for equitable relief." *Id.* (cleaned up). The harm must also be "beyond remediation," meaning "the possibility [of] adequate compensatory or other corrective relief . . . at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297–98. As then-Judge Jackson stated, "[A]n established NEPA violation might rise to the level of irreparable harm when coupled with sufficient evidence of environmental injury." *Sierra Club v. U.S. Army Corps of Eng'rs* (*USACE*), 990 F. Supp. 2d 9, 41 (D.D.C. 2013) (emphasis omitted).

Plaintiffs clear this bar. Roberts and Dickson frequently play golf on East Potomac's historic three courses. *See* Dkt. 8-6 ¶¶ 2, 11, 17; Dkt. 8-4 ¶¶ 6–10. Both men enjoy East Potomac as it is now—from its historic three-course design, to the Red Course's "perfect" setup for teaching beginners and kids, to their respective "favorite stretch of holes" on the Course. Dkt. 8-6 ¶¶ 11, 16–17, 27; Dkt. 8-4 ¶¶ 6, 9–10, 14. And each intends to continue playing golf at East Potomac, including with their children. Dkt. 8-6 ¶¶ 17, 26; Dkt. 8-4 ¶¶ 6, 14, 19. They also appreciate East Potomac's "beauty," "historic layout," and "historic designs." Dkt. 8-6 ¶¶ 14, 20, 27; Dkt. 8-4 ¶¶ 6, 12, 14, 17–19. As does DCPL's Executive Director, Rebecca Miller. *See* Dkt. 8-5 ¶¶ 3, 22.

This would all be lost if the Washington National Plan proceeds. The Plan would destroy two of the three courses at East Potomac, including the beginner-friendly Red Course where Plaintiffs play with their children. *See* Dkt. 8-6 ¶¶ 11, 26–27; Dkt. 8-4 ¶¶ 10, 14. And for "everyday recreational" golfers like Plaintiffs, Dkt. 8-4 ¶ 15, building a single championship-style course would materially diminish their golfing experiences because championship-style courses often have "difficult elements beyond the skill of most recreational players," Dkt. 72-1 ¶ 9. That result is incompatible with Walter Travis's original intent: to create courses "open to *all* players and skillsets." Dkt. 42-1 at 13 (emphasis added). Plus, it would harm Plaintiffs' aesthetic and historic interests in the century-old Course. *See* Dkt. 8-6 ¶¶ 12, 14, 16, 22, 25; Dkt. 8-4 ¶¶ 12, 14, 17–19.

These harms have no adequate remedy at law. *See, e.g.*, *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009); *USACE*, 990 F. Supp. 2d at 41. And they are no doubt imminent. NPS has started work on the Plan—most recently, by clearing hundreds of trees on October 10. *See* Dkt. 80-1 at 13. Further work, according to the President, is scheduled to begin "IMMEDIATELY!" Dkt. 96-1 at 2.

In response, the Government offers a now-familiar shell game: even if Plaintiffs may suffer irreparable harm from the Washington National Plan, they will not suffer any such harm from further tree removal. Dkt. 84 at 42. The Court rejects this framing. Tree removal is but one aspect of the Plan. And the Plan irreparably harms Plaintiffs absent injunctive relief.

But even so, Plaintiffs establish a likelihood of irreparable harm from further tree cutting. An established NEPA violation may constitute irreparable harm "when coupled with sufficient evidence of environmental injury." *USACE*, 990 F. Supp. 2d at 41. The clearing of "healthy and mature" trees is one such injury. *Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 204–05

(D.D.C. 2015) (collecting cases). The Government's continued razing of trees on the Course would harm Plaintiffs' aesthetic interests there. *See* Dkt. 8-6 ¶¶ 14, 16, 22, 25; Dkt. 8-4 ¶¶ 17–18; Dkt. 8-5 ¶ 22. And given the Government's statement that it intends to remove 300 additional trees if the TMP "is allowed to move forward as planned," this harm is imminent. *See* Dkt. 84 at 19; Griess Decl. ¶¶ 40–41, 43.

**BALANCE OF THE EQUITIES**

The final two factors—the balance of the equities and the public interest—sharply favor Plaintiffs. Those factors "merge" when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). To assess them, the Court "balance[s] the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

**Assessing Injury and the Public Interest.** As discussed, Plaintiffs are likely to suffer irreparable harm should the Plan continue without NEPA review. The Court must weigh that injury against any injury asserted by the Government.

The Government asserts that "[t]he governmental action—to thin trees, pursuant to NEPA and the CLR—is taken in the public interest." Dkt. 84 at 43. But the Court has already found that Plaintiffs are likely to succeed on their claim that the TMP violated NEPA. And because the Court has determined that the CLR-compliance justification is pretextual, that assertion of harm too does not factor into the Court's analysis.

The Government also argues that "Defendants and the public have an interest that courts abide their jurisdictional limits, including by enforcing the doctrines of standing and ripeness, and that they uphold the separation of powers under the Constitution, which precludes improper infringement on presidential authority." *Id.* But here, the Court has jurisdiction, Plaintiffs have standing, and the Government has made no case that entering an injunction with Plaintiffs'

proposed relief infringes the President's authority. Quite the opposite: the Government has repeatedly tried to *distance* itself from the President's comments. In any event, the scope of the proposed preliminary injunction would be to enjoin government agencies—DOI and NPS—and not the President from proceeding with the Washington National Plan.

The Court concludes that the Government has made no plausible showing of injury to balance against Plaintiffs' irreparable harm.

**No Urgency.** Lands, in his sworn testimony, could provide no reason that NPS needed to cut down hundreds of trees urgently. *See* Oct. 12 Tr. at 83:17–21. Griess further testified that no urgency exists in removing the remaining trees:

> **THE COURT:** Is there any urgency of continuing with the tree removal?
>
> **Griess:** Not that I'm aware of, Your Honor.
>
> **THE COURT:** So the trees could be cut down tomorrow, or they could be cut down a month from now, and from the government's perspective, it's basically the same?
>
> **Griess:** From what I understand, Your Honor, yes.

*Id.* at 53:20–54:1.

On this posture, the Court is not preventing all implementations of the Washington National Plan, forever—it is only pausing implementation of the Plan until the courts conclusively determine the case. The Government has provided no compelling reason that it must destroy the remaining trees on the Course before then.

**No Interest in Unlawful Action.** The Court's conclusion that Plaintiffs are likely to succeed on the merits of their NEPA claim is a "strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "There is generally no public interest in the perpetuation of unlawful agency action."

*Id.* So the Government cannot rest its equities injury on its merits argument. *See* Oct. 19 Rough Tr. II at 131:18–25.

**Separation of Powers.** The Government claims that there is a "strong separation of powers equity in the executive branch managing its own affairs." *Id.* at 135:10–12. True.

But "separation of powers" is not a talismanic incantation that permits the Executive to run amok, unchecked. The Founders carefully crafted our system of government so that "the constant aim is to divide and arrange the several offices in such a manner as that each may be a check on the other—that the private interest of every individual may be a sentinel over the public rights." *The Federalist* No. 51, at 322 (James Madison) (Clinton Rossiter ed., 1961).[61]

Yes, this is a case about a golf course. And, yes, those words are nowhere in Article III. But neither are they in Articles I or II. When plaintiffs challenge executive action, courts step in. Justice Scalia, as usual, put it best:

> I am sure that the Framers of the Constitution, aware of the 1457 edict of King James II of Scotland prohibiting golf because it interfered with the practice of archery, fully expected that sooner or later the paths of golf and government, the law and the links, would once again cross, and that the judges of this august Court would some day have to wrestle with that . . . .

*PGA Tour, Inc. v. Martin*, 532 U.S. 661, 700 (2001) (Scalia, J., dissenting). Here, golf and government have again clashed. By issuing this preliminary injunction, the Court does not end the round: it simply marks the ball until the parties can fully and fairly litigate this case.

[61] The Court does not pretend that this discussion is a comprehensive review. It could fill a library with scholarship about the Founders' views on the structure of government and the judiciary within that structure. Those interested to learn more, but without time to scour such a library, might consider: Richard Beeman, *Plain, Honest Men: The Making of the American Constitution* (2010) and Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (1997).

The Government ignores this. Just as it ignores two of the Founders' key insights: that separation of powers is the flip side of checks and balances. And that an independent judiciary is a linchpin of those checks and balances. "The notion of an independent 'judicial power,' . . . goes back beyond the seventeenth century."[62] But the Court does not have the time to get us from there to the Founding. So it jumps ahead.

The Founders were well concerned with King George III's repeated infringements upon the independence of the colonial courts. In 1768, for example, the North Carolina legislature empowered local courts to attach British merchants' in-colony property to pay off debts.[63] But British merchants were not keen on the practice. And so in 1772, King George III's Privy Council ordered the royal governor of North Carolina to veto the reauthorization of that statute.[64] But the legislature "refused to renew the court system without renewing" the attachment power.[65] In the ensuing chaos, "the governor dissolved the legislature, leaving [North Carolina] without superior courts for three years."[66]

King George III also broke from the English law tradition of protecting judges from royal interference by making colonial judges' commissions and salaries subject to his whim.[67] And after the Boston Tea Party, Parliament took the power to pay judges away from the legislature

---

[62] M.J.C. Vile, *Constitutionalism and the Separation of Powers* 34 (2d ed. 1998).

[63] *See* Ryan C. Williams, *Personal Jurisdiction and the Declaration of Independence*, 75 Duke L.J. 247, 258 (2025).

[64] *See id.* at 260.

[65] Akhil Reed Amar & Samarth Desai, *The Annotated Declaration of Independence*, Nat'l Const. Ctr., https://perma.cc/889W-44JP.

[66] *Id.*

[67] *See* Adam J. White, *Here the People Rule, and So Does the Law*, Am. Enter. Inst. (July 25, 2025), https://perma.cc/XZ65-XS7U.

and gave it to the royal governor.[68] This naturally gave the King's representative significant control over Massachusetts's judiciary.

The Founders took notice. They accused the King in the Declaration of Independence of "ha[ving] obstructed the Administration of Justice, by refusing his Assent to Laws for establishing Judiciary powers," and of "ma[king] Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries." *The Declaration of Independence* paras. 10–11 (U.S. 1776). "As the Declaration attests, our Founders fought a war for judicial independence."[69]

The Founders rejected domination by the Executive. They gave federal courts their independent station within the three coordinate branches, enabling judges to decide cases and controversies according to law, not political favor. As Alexander Hamilton explained, "[t]he complete independence of the courts of justice is peculiarly essential in a limited Constitution." *The Federalist* No. 78, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Judicial independence guarantees that judges may continue to uphold their oaths to act without fear or favor, even if doing so requires checking the powers of the executive branch.

Take the following. The Founders contemplated permitting the President to remove judges "on the application" of the Senate and House of Representatives.[70] But in a direct rebuke of British pre-revolutionary practice, the delegates rejected the proposal.[71] Why? It would

---

[68] *See* Alison L. LaCroix, *The Ideological Origins of American Federalism* 92 (2010). *See generally* Barbara Aronstein Black, *Massachusetts and the Judges: Judicial Independence in Perspective*, 3 Law & Hist. Rev. 101, 101–62 (1985).

[69] Trevor N. McFadden, *The Declaration of Independence and Our Legal Tradition*, Harv. J.L. & Pub. Pol'y Per Curiam, Summer 2026, at 7.

[70] 2 *The Records of the Federal Convention of 1787*, at 428–29 (Max Farrand ed., rev. ed. 1966) [hereinafter, *RFC*].

[71] *Id.* at 429.

weaken judicial independence and subject judges to the arbitrary whims of the other two branches of government.[72] Instead, Article III guarantees that "[t]he Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." U.S. Const. art. III, § 1.

The Founders balanced the independence of the judiciary against certain checks. They did not, for example, grant the judiciary policymaking authority.[73] And in the early years of the nation, the Supreme Court declined to issue advisory opinions to the executive: when asked by President Washington to weigh in on a legal foreign affairs question, then-Chief Justice John Jay refused, cautioning "against the propriety of our extra-judicially deciding" questions posed by the executive, lest the branches not be able to exert "checks upon each other."[74] Put differently, the judiciary cannot threaten public liberty as long as it "remains truly distinct from both the legislature and the Executive." *The Federalist* No. 78, at 466 (Alexander Hamilton).

The judiciary may, however, check the legislature and executive only through its power to "expound" the laws.[75] Soon after the Founding, the Supreme Court confirmed the federal courts' ability to hold the executive branch to account for its legal violations. *See Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804). When President John Adams instructed an American ship commander to seize a vessel without statutory authorization, the Court held the commander liable for the damages his illegal seizure caused. *See id.* at 179–80. The President's instructions

---

[72] *Id.*

[73] *Id.* at 73–80.

[74] Letter from Chief Justice John Jay to President George Washington (Aug. 8, 1793), *reprinted in* 3 *The Correspondence and Public Papers of John Jay* 410 (Henry P. Johnston ed., 1891).

[75] 1 RFC 97–98.

could not "legalize an act which without those instructions would have been a plain trespass." *Id.* at 179. As the Founders intended and as early Supreme Court precedent confirms, the executive branch may not act free from any judicial oversight.

That in mind, the Court returns to 2026. It reiterates what it has said elsewhere: "judicial overreach is no less pernicious than executive overreach." *Talbott v. United States*, 775 F. Supp. 3d 283, 293 (D.D.C. 2025). But the Court does not overreach here. Our government—as the Founders intended—is one of checks and balances between three coordinate and coequal branches. One branch may not shield itself from accountability merely by invoking separation of powers principles without any reasoning. But that is all the Government has done. And that invocation alone does not shift the balance of the equities in its favor.

## CONCLUSION

The Court earlier stated, "I am not the Lorax. I do not speak for the trees." The Court still does not speak for the trees. It speaks only for the rule of law.

The Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction, Dkt. 80.

Date: October 26, 2026

ANA C. REYES
United States District Judge