# EXHIBIT B

National Park Service
U.S. Department of the Interior

NATIONAL CAPITAL REGION
DESIGN AND CONSTRUCTION
BRANCH
WASHINGTON, D.C.

# Phased Rehabilitation Plan
# Historic Washington Sea

## Task Five - Initial Rehabilitation Plan

**East Potomac Park, West Potomac Park & Tidal Basin**

**National Mall and Memorial Parks (NAMA), Washington, DC**

**Task Five FINAL SUBMISSION**
**August 2011**



**Prepared by**
**Dewberry & Davis LLC**
**Fairfax, VA**

**PMIS No. 98463**
**Contract No. C3000050004**
**Task Order No. 08**

Dewberry

# TABLE OF CONTENTS


| | |
|---|---|
| List of Figures and Tables | ii |
| A. EXECUTIVE SUMMARY | 1 |
| B. INTRODUCTION | 4 |
| C. BACKGROUND | 5 |
| D. TOP OF WALL SURVEY | 8 |
| E. CONDITION SURVEY RESULTS | 11 |
| F. SEAWALL REPAIR OPTIONS | 16 |
| G. SEAWALL ELEVATION OPTIONS & RECOMMENDATIONS | 40 |
| H. SEAWALL REPAIR RECOMMENDATION | 44 |
| I. DEMONSTRATION AREA RECOMMENDATIONS | 49 |
| J. REHABILITATION PHASING PLAN | 56 |

APPENDIX 1 – SEAWALL HEIGHT COMPARISON (1988 TO 2009) (11 X 17)
APPENDIX 2 – PRESENTATION PLAN SHEETS (11 X 17)
APPENDIX 3 – SEAWALL CONDITION PHOTO DOCUMENTATION (11X17)
APPENDIX 4A – TOPSIDE DAMAGE MATRIX
APPENDIX 4B – WATER-SIDE DAMAGE MATRIX
APPENDIX 4C – COMPOSITE DAMAGE MATRIX
APPENDIX 5 – SEAWALL REPAIR OPTIONS DRAWINGS AND COST ESTIMATES
APPENDIX 6 – INUNDATION MODEL OUTPUT (11 X 17)
APPENDIX 7 – SEAWALL ELEVATION TABLE AND GRAPHIC (11 X 17)
APPENDIX 8 – DRAWINGS OF CANDIDATE DEMONSTRATION PROJECT LOCATIONS (11 X 17)
APPENDIX 9 – SEAWALL REPAIR PHASE TABLE AND GRAPHIC (11 X 17)
APPENDIX 10 – GEOWEB APPLICATION DATA
APPENDIX 11 – LIVING SHORELINE DESIGN – CONFERENCE PROCEEDINGS

# LIST OF FIGURES AND TABLES

## Figures


| Figures | | Page |
|---|---|---|
| 1. | Assumed section of existing wall from historical documents | 5 |
| 2. | Existing wall at area repaired with pre-cast concrete cap doweled into the sidewalk | 6 |
| 3. | Option 1 gravity wall with cast face block and micropile foundation | 17 |
| 4. | Cast face block wall similar to that proposed for option 1 | 18 |
| 5. | Option 1A Gravity wall with stone face and micropile foundation | 20 |
| 6. | Option 2A Soldier Pile Wall Outboard of Existing Wall | 21 |
| 7. | Option 2B Soldier Pile Wall Inboard of Existing Wall | 24 |
| 8. | Option 2C Soldier Pile Wall on Centerline of Existing Wall | 26 |
| 9. | Option 3 Gravity wall with spread footing | 28 |
| 10. | Option 4 Tie-back wall with spread footing | 30 |
| 11. | Option 5 Rip-rap revetment | 32 |
| 12. | Option 6 Geo-Web planted face with micropile foundation | 34 |
| 13. | Living Shoreline Profile | 36 |
| 14. | Option 7A Living Shoreline Plan for Continuous Option | 37 |
| 15. | Option 7B Living Shoreline Plan for Segmented Option | 38 |
| 16. | Cast face block wall possible in several options | 47 |
| 17. | 500 foot stations with sheet number key plan | 50 |
| 18. | Typical damage in candidate demonstration area 1 | 51 |
| 19. | Typical damage in candidate demonstration area 2 | 52 |
| 20. | Typical damage in candidate demonstration area 3 | 53 |
| 21. | Typical damage in candidate demonstration area 4 | 54 |


## Tables


| | | |
|---|---|---|
| 1. | Affected park features at incremental levels of flooding | 41 |
| 2. | Preferred phasing plan | 56 |
| 3. | Extended phasing plan | 57 |

# A. EXECUTIVE SUMMARY

The report contains a condition assessment and repair recommendations for the stone seawall that surrounds East Potomac Park in Southwest, Washington, DC. The seawall, and its associated resources that will be impacted by repairs, are listed in the National Register of Historic Places under the nomination entitled "East and West Potomac Parks Historic District."[1]

The prior reports provided under this task included the existing condition assessment of the seawall including photographs of seawall and sidewalk damage, assessments of loss of fill and what was believed to be on-going settlement of the East Potomac Park. The prior report also highlighted inundation impacts on buildings, roadways, trees and the golf course to consider in the selection of a recommended wall height which is part of this Task.

This report is a stand-alone document which includes both a condition assessment of the seawall and topside features at the seawall and provides an analysis of the options available to the National Park Service for rehabilitation. Preliminary geotechnical exploration was performed at East Potomac Park as part of this Task Order as reported in the Geotechnical Report dated July 22, 2011. Due to the very wide spacing of the boring sites, the geotechnical exploration is preliminary. As segments of the wall are approved for renovation more closely spaced borings and additional sampling and testing will be required to finalize pile selection and detailed design. However, the geotechnical report does provide a great deal of useful information and the earlier Task FIVE SUBMISSION dated February 2010 has been edited to incorporate this information.

Section D discusses the top of wall survey that was conducted and the comparison of that data to the previous survey done in 1988. Section E provides a condition assessment of the seawall based on photographs and both landward and waterside inspections conducted in the Fall of 2009. The scope of work does not allow an additional detailed inspection and photo documentation of the seawall. Because inundation and erosion are now the major causes of damage the relative condition of the 2009 assessments should still be reasonable though additional damage has occurred.

Section F provides discussion on the 7 conceptual options we have created and a summary of the pros and cons of each potential solution. Section G discusses the options for the height of the seawall and recommends the height to be used in the rehabilitation. Section H provides our recommendations for the type of wall and supporting arguments for the recommendation.

Our recommendation for wall type depends on the height of the wall in the section being rehabilitated. If the height of the new wall is over one foot higher than the height of the existing seawall we recommend that Option 1, a deep foundation option, be used to prevent settlement. Where the new wall height is one foot or less higher than the existing seawall we recommend that option 3, a spread footing option, be used because it is the same wall as option 1 just with a different foundation; therefore, the entire seawall will have a consistent appearance. Both options recommended propose using cast face blocks to simulate the appearance of the historic seawall. We believe the photos we include of cast face block on another project (See figure 4,

[1] "East and West Potomac Park," National Register of Historic Places Nomination Form [Entered in the National Register of Historic Places: 30 November 1973].

page 18) demonstrate this approach is appropriate for this project. If the cast face block is not acceptable to the NCPC or the SHPO, then our recommendation for a permanent solution would be the same structural options using a stone façade made from the stone salvaged from the existing historical seawall.

Although we present three “non wall” options, including two “soft” or bio-engineering solutions as requested by the NPS, we do not recommend any of these options (Options 5, 6 and 7). Our reluctance to recommend one of these solutions is primarily due to safety and security concerns from this type of sloped construction, but also from our understanding that such a significant deviation from the character of the listed historic seawall could trigger an environmental impact statement with some stakeholders potentially holding up the entire project while that issue is resolved.

We believe that the Potomac River side of the park is particularly vulnerable to various problems using a “non-wall” solution. There is considerably more current, scour and wave run up on the river side. These conditions would potentially damage the structure, would tend to “snag” debris and generally have a high maintenance requirement. The regime for a “non-wall” solution, if used at all, would have to be on the Washington Channel side from approximately station 10155+00 to 10170+00 (with no loss of parking) or between 10155+00 and station 178+50 if the parking area between station 10170 and 10173 can be sacrificed.

The determination of the optimum seawall elevation is constrained by the existing infrastructure, tree plantings and differential settlement which has already taken place. The original statement of work directed us to provide a top-of-wall height that would provide protection from a 50-year event. To provide 50-year protection to the entire park would require a wall elevation of between 9 and 10 feet above mean sea level (MSL). This height of a seawall would not be feasible in terms of benefit-cost considerations, as discussed in Section G. We have looked at the inundation data, the existing infrastructure and trees behind the wall and have recommended wall heights to prevent frequent overtopping, but when overtopped, provide a drainage path when flood waters recede.

If a guarantee of 50- or 100-year protection for specific buildings or clusters of buildings is required, we recommend rather than attempting to protect the entire park from flooding that the individual buildings or clusters of buildings be protected by individual seawalls or earth berms. These can be low height walls or berms adjusted based on the current elevation of the buildings; they can be aesthetically pleasing and could perform dual functions as a force protection barrier, if desired. Looking at the inundation data for buildings, such distributed walls or berms may be as low as 2 to 3 feet to provide up to 100-year flood level protection. Such distributed walls or berms would be more cost effective than trying to protect the entire peninsula from flooding. Because Ohio Drive would be under water at this flood stage it may be possible to enter and exit from the Interstate ramp if acceptable to District of Columbia Department of Transportation for emergency situations and official vehicles only.

Our recommendations for the elevation of the seawall on the perimeter of the peninsula is based on integrating goals of limiting inundation, limiting construction cost, reducing impact on roadways, trees and other infrastructure behind the wall as well as drainage of Hains Point.

We discuss our recommendations in section H and list the recommended wall heights in both tabular and graphical form in Appendix 7 of this report.

The key plan and recommended phasing of the rehabilitation of the entire seawall is laid out in Section J. Because many areas along the seawall are already failing due to the combination of past settlement and washout of fill, and loss of wall integrity our preferred rehabilitation phasing plan to is complete construction as quickly as possible. This is the preferred plan. Due to the high cost of construction for the rehabilitation of the seawall it may not be possible to complete construction in as few phases as the preferred plan recommends. Alternatively we have presented an extended phasing plan in Section J of 19 roughly equal phases. By creating smaller phases the project could use an acquisition strategy of one or more phases in any particular fiscal year, depending on availability of funds. These two phasing plans are detailed in Appendix 9. Note that the costs shown on the tables in Appendix 9 are in 2009 dollars and are only Rough Order of Magnitude (ROM) estimates. When detailed design is completed for the first phase of the rehabilitation project a detailed budget estimate using solicited market pricing will refine the estimate.

## B. INTRODUCTION

The NPS seeks to develop a comprehensive, phased repair strategy for the historic seawall bounded by the Potomac River and Washington Channel. The intended use of the park at Hains Point protected by the seawall includes recreation and pleasure, which is supported by walkways, a golf course, fishing areas, park benches, and viewing areas. Much of the walkways are surrounded by various trees and an inland roadway that parallels the walkway and adjacent seawall.

Progressive deterioration of the seawall from erosion and repeated inundation (from high tides and wave run-up) has caused numerous problems including river bank erosion, loss of vegetation, inundation of trees, failure at storm drain outfalls and other utility crossings as well as damage to concrete walkways, and railing instability. This has caused the stone and concrete walls, walks and interior sections of the park to be undermined. The long-term effect has created uneven walking surfaces and sidewalk voids resulting in tripping hazards for the many visitors to the park. Many areas of the seawall, caps, sidewalks and railings have been structurally compromised. With daily tidal flooding of portions of the riverfront walkways, visitors who are unfamiliar with high water events find themselves having to walk in the street and compete with vehicular traffic when they are unexpectedly unable to use the sidewalk. Moreover, drainage piping and swales have become distorted and ineffective by gradual, but consistent ground movement or erosion.

Current remedial activities consist of short-term treatments, such as re-grading swales, filling holes, shoreline debris clean-up, railing repairs, patching walks and roads, cutting and replanting drowned trees, and, in several cases, substituting tree species that tolerate greater amounts of groundwater. Current actions have not been sufficient to preclude repeated damage and threats to the integrity of the park's historic landscape.

The National Capital Planning Commission's 2009 Monumental Core Framework Plan (Framework Plan) incorporates recommended developments and improvements for East Potomac Park. The proposals in the plan that most impact the seawall repair study are the construction near the north end of the island of a canal between the Washington Channel and the Potomac River and development of "a waterfront esplanade and reclaim wetland habitat along portions of the park shoreline." The plan specifically recommends that the seawall and walkways along the Potomac River edge be reconstructed and improved "to reduce the impact of periodic flooding and to create a pleasant and welcoming esplanade." The Framework Plan calls for reinforcing the Washington Channel-side seawall with "a sustainable solution" that would incorporate native vegetation, wetlands, infill earth removed from the canal construction, and rock as a "bioengineered shoreline." [2]

*LINK TO MORE FRAMEWORK PLAN INFO:*
*http://ncpc.gov/April2009/Main(T2)/Publications(Tr2)/iframpages/monumental_core_framework_plan_a.aspx*

---

[2] National Capital Planning Commission and Commission of Fine Arts, *Monumental Core Framework Plan*, 2009, pp. 46 – 57.

## C. BACKGROUND

East Potomac Park was originally a tidal flat of alluvial silt located southeast of the existing railroad bridge. In 1897, Congress created a public park there; named Potomac Park, it occupied an area "formerly known as the Potomac Flats" which had been reclaimed with fill dredged from the bottom of the Potomac River starting in 1870. [3]

Erected in stages between 1884 and 1913, the seawall enclosing the park was originally a dry-laid, cut-stone masonry wall built on top of a stone rip rap foundation. The rip rap foundation was reportedly constructed by excavating a 6-foot-deep-by-20-foot-wide trench in the existing bottom, laying a "mattress" of woven vegetation in the bottom then covering the "mattress" with stone rip rap. A slightly angled stone masonry wall was built approximately 6 feet high upon the stone rip rap foundation. The wall was subsequently mortared as a repair, but the mortar has since dissolved.[4] The base of the wall was approximately 4 feet wide while the top was approximately 2'-6" wide. Our estimate of the construction from station 10048+50 to station 10134+14.8 and from station 10184+28.8 to 10247+45.7 is shown in the section below. See Appendix A for the key plan and stations on East Potomac Park and drawing sheet numbers from 1988 survey.




**Figure 1: Assumed section of existing wall from historical documents**

The rip rap foundation was indicated to have been completed between 1884 and 1891. The masonry wall was completed by 1913 to an approximate elevation of 7 feet above mean low water[5]. On August 30, 1911 the grade in East Potomac Park was indicated as reaching 14 feet above mean low tide in the center and 11 feet on the sides[6]. In 1950, National Park Service engineers calculated that the land had settled 3.5 feet since it was first filled. They also calculated that it was settling at a rate of 1/2 inch per year, with no sign that the settlement

[3] Gordon Chapell, "Historic Resource Study – East and West Potomac Parks: A History", June 1973, page 66
[4] Gordon Chapell, "Historic Resource Study – East and West Potomac Parks: A History", June 1973, pages 35-36
[5] Annotated Guide For The Washington Seawall Drawing by Robert J. Hughes, 1985
[6] Chapell, Page 93

would ever end[7]; however, as will be discussed in more detail in the next section consolidation and settlement no longer appear to be a factor in the continuing deterioration of the seawall.

Sometime in the past during one of the repairs to the seawall a precast concrete cap was placed and mortared to the top of the wall. We were not able to find the original design drawings for this repair. The sidewalks were replaced and doweled into the cap. This repair took place from station 10134+14.8 to station 10184+28.8 (5,014 L.F.). Our estimate of the construction is shown below.




**Figure 2: Existing wall at area repaired with pre-cast concrete cap doweled into sidewalk**

This repair raised the height of the wall and attached the sidewalk to the concrete cap with dowels. The seawall on the Washington Channel side of the Park has the largest exposed height and our calculations indicate that without the anchoring associated with the sidewalk/cap dowels, the wall may overturn. The original joint between the cap and side walk was filled with expansion joint material. This expansion joint material has since disappeared leaving the joint open. There is no indication that any geotechnical or filter fabric was installed as part of the work; therefore, when the joint deteriorated it allowed water to erode the fill below the side walk which is then lost through the open seawall masonry joints.

Given the existing condition of the seawall there appears to be 3 mechanisms affecting the seawall at East Potomac Park.

[7] Chappell, Page 165

1. Settlement caused by primary and secondary consolidation of the alluvial soils below the dredge material and of the dredge material itself. The preliminary geotechnical report of July 2011 indicates there is a very thick zone of "weak soils," typically to a depth of 82 to 92 feet.
2. Loss of fill through the deteriorated or missing masonry wall joints due to hydraulic pressure.
3. Loss of fill through open storm water pipe joints and through unsealed pipe or cable penetrations through the seawall.

In summary, we believe the main cause of the settlement is due to primary consolidation of the very thick underlying soil layers of weak soils, possibly as much as 3 to 5 feet since the wall was constructed. Records indicate that this settlement slowed progressively from the ½ inch per year seen in the first forty years the wall was in place to where there was essentially no difference in wall height between 1988 and 2009. This is consistent with the geotechnical report determination of the duration of primary consolidation. Primary consolidation is still a major concern for any wall repair if the new wall is higher than the current top of wall elevation in that area. Building up the wall height will increase the surcharge on the soil and lead to primary consolidation of the new load. The original settlement damaged the seawall construction which was already susceptible to erosion and washout, Settlement or mechanical damage such as floating debris increased erosion exacerbating the settlement and accelerating the failure of the wall and the sidewalk.

## D. TOP OF WALL SURVEY

If the settlement calculations in 1950 described by Chappell were correct then by the time of the 1988 survey an additional 1.58 feet of elevation would have been lost by that time. Assuming the original wall was built to an elevation of between 7 and 11 feet above mean low water based on the historical information, and settlement continued at ½ inch per year the top of wall elevation in 1988 should be at an elevation between 1.9 and 5.9 feet above mean low water. Based on the 1988 topographic survey, the top of wall elevation varies between 1.9 feet and 5.66 feet above mean low water which agrees quite closely with the anticipated settlement of ½ inch per year predicted by NPS in Chappell.

As part of this task Dewberry sent a field survey team to the field on two separate occasions. These surveys were of a limited area in February, 2008 and the entire length of the seawall in February, 2009.

During the week of February 12, 2008, Dewberry performed a Topography survey and obtained spot elevations along the Top of Seawall on a portion of land within East Potomac Park. The limits of survey was a strip of topography 1000 feet in length bounded by Ohio Drive and the seawall along the Potomac River. The survey resulted in cross sections at approximately 50 foot intervals between the southerly curb along Ohio Drive and included ground elevations, sidewalk and top of seawall. This survey was from station 10124+50 to 10134+50.

Dewberry recovered, verified and used existing NPS monuments for both horizontal and vertical data in performing the survey. Dewberry occupied NPS monuments 805HV86013, 805HV86014 and 805HV86016 using a Topcon Total Station instrument. The maximum vertical difference of field observations versus published monuments was 0.10 foot between the three monuments.

The week of February 5, 2009 thru February 20, 2009, Dewberry conducted a field survey to obtain horizontal and vertical locations along the top of seawall beginning near the Tidal basin approximately 650' North of the George Mason Memorial Bridge, thence southerly along the Potomac River to Hains Point, encompassing East Potomac Park and returning along the Washington Channel to the inlet/outlet near U.S. Route 1 and the NCP Central Headquarters.

During the course of this survey, Dewberry collected top of wall data using a Trimble R8 GNSS GPS receiver (Global Positioning Survey) and a Topcon Total Station instrument in the performance of our work.

Again, Dewberry recovered, verified and used existing NPS control monuments during the course of the survey. A network of G.P.S. points were tied to the NPS monuments using V.R.S. (Virtual Reference System) control checks and a site calibration determined to verify horizontal and vertical data used within the site limits.

When performing the site calibration we recovered forty-one (41) existing NPS monuments. Monuments 805HVSEBASERM3, 805HVLEN9, 805HV86010, 805HV88002 and 805HV89027 were held for the horizontal alignment and monument 805HV89027 was held for

the vertical elevation. The maximum horizontal difference observed between the (5) monuments was 0.03' and the maximum vertical difference was 0.01'. Additionally, the total station instrument was used to establish temporary control points adjacent to the working area for profiling the top of wall locations.

NPS monuments used for the Conventional Total Station locations were:
805HVLEN6, 801HV86009, 808HV86001, 805HV86003, 805HV86004, 805HV86005, 805HV88002, 805HV86010, 805HV86011, 805HV86012, 805HV86014, 805HV86015, 805HV86017, 805HV86006, 805HV86007, 805HV86009, 805HV86019, 805HVLEN9, 805HV89027, 805HV86036. The maximum vertical differences between these monuments was less than 0.10 foot. The spot elevations and description of each point located was placed on the AutoCAD file.

With nearly 20 years between top-of-wall surveys if the 1950 NPS prediction were still valid one would have expected nearly 10 inches of additional settlement. Appendix 1 shows a graphical comparison of the 1988 and 2009 wall height. The field notes and specifics of the controls for the 1988 survey were not available. What this data shows is that there is essentially no difference between the two surveys with the exception of areas with severe deterioration where there is a pronounced change between the two data sets. In all other areas the difference is only one or two tenths of a foot and is often higher in the new survey compared to the old. We are confident that there is no heave or uplift mechanism going on along the seawall. We believe the differences in elevation are more in the controls and details of the surveys and not the consolidation (or heave) of the soil.

If the historical record of the initial elevation of the seawall being from 7 to 11 feet above sea level there has been significant settlement in the past, but that is no longer the case. This is not inconsistent with the behavior of dredge fill materials. When a significant surcharge is placed on the expansive soil it will consolidate; however, if the surcharge load remains the same consolidation will asymptotically approach its maximum consolidation for that surcharge. The comparison of the survey data in Appendix 1 would indicate that the seawall is now on the "flat part of the curve" where consolidation, though not theoretically zero has stopped from a practical standpoint.

The geotechnical report of July 2011 calculates that the duration of primary consolidation of the soils at the park would be expected to be in the asymptotic stage by 1988 which supports the finding of little or no difference in wall height between the 1988 and 2009 surveys. Secondary consolidation continues for a much longer period, but is normally not a major factor unless the soil has a high percentage of organic material. The geotechnical data generally found very little organic material other than a peat layer at one boring location. Such pockets of organic material could contribute to significant differential settlement over an extended period of time. This is true in that all areas will undergo similar primary consolidation in reaction ot the load. The non-organic soils will see little secondary consolidation while the "pocket" of organic material undergoes potentially significant secondary consolidation leading to a differential settlement between the two areas.

The substantial difference shown between the two surveys in areas like station 10117+90 or 10129+00 to 10129+70 are local failures due to erosion or other deterioration. Section G will

discuss the recommended final seawall elevation. If the replacement wall is essentially the height of the present wall then further consolidation may not be a major concern and a less expensive shallow foundation should be effective, as long as more extensive geotechnical investigation does not indicate large pockets of organic material. For sections of the wall at the west end of the park the wall heights following rehabilitation will need to be higher than the existing to provide needed protection from inundation. Adding height to the wall will add new surcharge to the underlying soils. Based on the geotechnical report of July 2011 raising the wall could lead to significant new primary consolidation. Deep foundations that bear on the "competent material" below the soft soil are indicated at any location where the new wall height is one foot or more higher than the current wall elevation (based on 2009 survey).

## E. SEAWALL CONDITION SURVEY RESULTS

Dewberry employees conducted a visual condition survey along the top portion of the seawall in East Potomac Park. The perimeter drawings from the 1988 topographic survey performed by Dewberry & Davis and Greenhorne & O'Mara, Inc. were used to note the conditions along the seawall. The findings of the survey are annotated on the drawings in Appendix 2. There are notes to indicate the location and embedded pictures to show particularly egregious situations. A more systematic presentation of photo documentation is provided in Appendix 3 with top side damage on the top of the page and water-side damage on the bottom of the page.

A Damage Matrix was created to try to systematically portray the condition of the top side, water side and the composite condition. The Damage Matrix is included at Appendix 4. The damage assessment was done without subsurface investigation or geotechnical study, but was conducted by experienced field engineers and should be a useful tool for a "snap shot" in time of the relative condition of the Seawall broken down into 50 foot segments. The rating system used is as follows (a copy is also at the beginning of Appendix 4).

- 1 Significant damage to concrete walkway, Block wall. Major washout of soil, foundation
- 2 Damage to concrete walkway. Missing Blocks. Erosion, washout of soil and foundation
- 3 Some damage to concrete walkway and block wall. Small sinkholes or voids
- 4 Fair condition. Minor wear to concrete walkway or block wall
- 5 Good condition

Individual ratings of 1 or 2 are of serious concern

A composite damage rating of 1 to 2.5 is considered **RED** in imminent need of rehabilitation

A composite damage rating of 2.6 and less than or equal to 4.0 is YELLOW and should be in the planning cycle for rehabilitation

A composite damage rating of 4.5 or less will likely require some interim maintenance and should be in the long range plan for major rehabilitation

The drawings in Appendix 2, the photo documentation in Appendix 3 and the Damage Condition Matrix in Appendix 4 all reflect the stationing identified in exhibit 2 of a document titled "Report on the Condition of and Recommended Repair of the Seawall" prepared by the Baltimore District Corps of Engineers. We added 10,000 to the stationing in accordance with NPS instructions so that the Inlet Bridge abutment became 10048+50 versus 48+50 identified by the Corps report. This is to avoid negative stationing for the seawall along the Tidal Basin. The stationing is taken from the top water side edge of the seawall. Traditionally the boundary between the East and West Potomac Parks is at the Railroad Bridge which starts on the Potomac River at approximately station 10065+00 and finishes on the Washington Cannel at approximately station 10253+07.5. The total linear feet of seawall from the eastern edge of the Railroad Bridge on the Potomac River and the Railroad Bridge abutment on the Washington Channel is approximately 18,807 feet. The length of the seawall from the Inlet Bridge to the Railroad Bridge abutment is approximately 20,458 feet.

Using the rating scheme outlined above only 5.1% of the 50 foot segments evaluated in Appendix 4 had a composite rating of **RED** and all but one of these **RED** areas is contained within one of the four possible demonstration project areas. These four areas are discussed in Section I and are highlighted in Composite Damage Matrix, Appendix 4C. All of the damage matrices have been color coded to make the **RED** and YELLOW areas stand out from the rest. The Composite Damage Matrix (4C) is interesting because it clearly shows that although in the worst areas there tends to be significant damage in both the topside and water-side, there is a number of locations where there are significant problems topside (YELLOW rating between 2.6 and 4.0) while the waterside rating is better than a 4.0. This is most likely due to washout of fines through the joints in the stone wall. With structural damage to the wall itself the washout is more immediate and dramatic, but with no measures to prevent washout of fines (like geotechnical fabric) topside damage in sections where the waterside is in good visual condition will occur over time and create the topside damage that is most prevalent. Burrowing animals also contribute to this, but washout of fines is seen as the major mechanism in these areas. There are some of the inverse situation as well (waterside in YELLOW and topside has a rating better than 4.0). Most of these sections are between Buckeye and Park Headquarters. We did not see records of marjor maintenance work on the topside in this area, but that is a possible reason that the topside currently rates in better condition than the corresponding waterside. There are 88 fifty foot segments where either topside or water-side is YELLOW, but the other has a better rating than 4.0. In all there are 412 segments evaluated in the Damage Matrices. Some observations:

- There is a total of 19 **RED** topside segments (4.61%)
- There is a total of 26 **RED** water-side segments (6.31%)
- There is a total of 21 **RED** segments for composite rating (5.1%), but only 7 of those segments are rated **RED** for both topside and water-side in the same segments, at the tip of the point (4 segments) and from 10129+50 to 130+50 (3 segments)
- There is a total of 169 YELLOW topside segments (41.02%) of which 87 are in segments where the water-side rating is better than 4.0.
- There is a total of 99 YELLOW water-side segments (24.03%) of which 22 are in segments where the topside rating is better than 4.0.

An 8 foot wide concrete sidewalk, next to or cast on top of the seawall begins approximately at station 10049+17 until station 10051+09 where it becomes a 10 foot wide concrete sidewalk. The 10 foot wide concrete sidewalk continues to follow the perimeter of East Potomac Park until it ends at station 10247+45.7 on the Washington Channel side near the fence surrounding the Headquarters buildings. Steel pipe railing with steel posts at 10 feet on center are set one 1 foot back from the edge of the seawall. As the pictures below (and many more in Appendices 2 and 3) indicate the railing is in poor condition. The railing is heavily rusted and as Task 2 documented is contaminated with peeling lead based paint.





It is our opinion that the sidewalk was originally constructed either level or slightly sloped toward the river. The edge of the sidewalk was originally cast on top of the seawall stone from station 10048+50 to station 10134+14.8 and from station 10184+28.8 to 10247+45.7 to match the face of the seawall. A repair which installed a pre-cast concrete cap from station 10134+14.8 to station 10184+28.8 changed the sidewalk width to 7.5 feet but matched the land side edge of the 10 foot walk because of the 2.5 foot wide cap. The sidewalk appears to be reinforced by ½" diameter bars at 12" on center each way which is currently helping the concrete bridge voids. Based on our observations we believe that most of the sidewalk has voids which have formed from loss of fill and bedding. The void areas we were able to measure varied from 6 to 27 inches deep at the back of the seawall.






At the present time the sidewalk generally has a negative slope away from the seawall up to 10 degrees in some locations from loss of fill through the seawall. There are numerous areas with asphalt patches where maintenance personnel have filled in holes in the sidewalk to prevent injuries to pedestrians. Many of these patches have in turn sunken below the side walk from soil loss. Many of the pipe railing posts have broken out of the concrete sidewalk and are either free hanging or have been field modified and secured by maintenance personnel to prevent their loss. These areas are delineated on the drawings in Appendix 2 with additional photos in Appendix 3.





We also observed what appeared to be burrowing animal holes next to the back of the side walk and extending under the walk which is also contributing to the loss of fill.





In areas where utilities such as storm water outfalls, electrical conduits, telephone conduits and force main sewers either penetrated the masonry stone wall or were bored under or through the rip

rap foundation, the sidewalk evidences settlement or loss of fill. In the case of the storm water piping, the loss of fill may also be caused by open pipe joints which should be investigated further, since this is a separate causative factor from washout at the penetration through the seawall and/or foundation. A camera sled could be used inside the storm drains to investigate the pipe joints. During the design of the first phase to be rehabilitated the designer must inspect each storm pipe penetration by boat in that section to see if we can observe any source for loss of fill through the joints in that section of wall.

The seawall itself was originally built of dry stone masonry and later repaired by the addition of mortar in the joints. This mortar has dissolved over the years and allowed the hydrostatic pressure of floods and the river to dislodge the stone in certain areas. This is especially evident at areas which were disturbed by boring of under ground electrical, telephone and force sewer main piping such as those shown below. All of the utility crossings are delineated on the drawings in Appendix 2.






Electrical Crossing

Sanitary Force Main Crossing





Several sections of the seawall have settled significantly allowing frequent flooding of the sidewalk, this is especially true between approximately station 10126+50 and 10134+14.8 at the ramp on the Potomac River. The seawall also is flooded between approximately station 10236+00 and station 10249+80 on the Washington Channel side near the Headquarters Building. This flooding cannot be easily fixed due to the elevations of the fixed infrastructure behind the seawall such as roads, manholes and trees. Adding additional height to the wall was recommended during its original construction but was not performed due to lack of funds.

Attachment 2 is a plan summary of the condition survey we performed and updated on the plan sheets from the 1988 topographic survey. Attachment 3 is seawall condition photo documentation of our observations as well as previous NPS personnel observations.

## F. SEAWALL REPAIR OPTIONS

Dewberry marine engineers have conceptualized seven (7) options for the National Park Service to consider. Four (4) are "hard" wall options in which the seawall is replaced to appear similar to its original historical construction even though the details of the structure vary considerably from the current wall. Two (2) are "softer," non wall options which remove the seawall entirely yet provide some protection from flooding and embankment erosion. The last option is a "living wall" design which can be done either continuously or as a segmented design. This final option (option 7 discussed below) may be the type of solution that the National Capital Planning Commission's 2009 Monumental Core Framework Plan had in mind for at least portions of the Washington Channel side of the park in calling for a "sustainable solut8ion." The recommended elevations of the walls/embankments will be discussed in section "G". SEAWALL ELEVATION OPTIONS and RECOMMENDATIONS". The selection of the wall elevation is essentially independent from the structural options discussed below.

All of the options shown are based on the height of wall at the deepest portion of the existing wall (where the water depth is the greatest) for which that option would be recommended, which is the worst case height condition for the wall due to several factors. The actual height of the wall from the foundation varies from section to section. Each option shows an estimated cost per lineal foot to install this option. These estimates are Rough Order of Magnitude (ROM) estimates. The estimated costs are to make assessments between options and are not intended to be programming or budgeting cost estimates. Cost estimates are currently based on experience and Means but during detailed design when more detailed (more closely spaced borings) geotechnical information is available pricing for the candidate deep foundation types can be solicited on major components to improve the accuracy of the estimate.

The "hard" options provide the same safety and security as the existing wall construction. The "soft" options provide a significantly different appearance from the historical seawall. The soft solutions will require considerations of different safety, security and maintenance concerns from a traditional wall solution, and may trigger an Environmental Assessment (EA) or and Environmental Impact Statement (EIS) due to being an Fundamental change to the historic fabric of the listed seawall. Small scale sketches of each option are included in the text below and a ROM cost per linear foot, but a larger version of each option and an accompanying cost estimate are provided in Appendix 5. Each option shows the top of wall and sidewalk elevation the same as the soil behind the wall, but the actual grade varies considerably as well as the surrounding infrastructure and trees. The grade coming off of the sidewalk could be sloped to allow the wall to be higher than roadways or other infrastructure, though there may be some adverse impacts, particularly on trees. Final grades and storm drainage will be major factors for the detailed design phase for each section. The following options are provided for consideration:

## Option 1

Option 1 is a permanent "hard" solution to the seawall which will eliminate future settlement and provides additional features to prevent loss of fill, voids and when raised to elevations discussed in the next section, will minimize flooding and embankment erosion.

**Figure 3 – Option 1 Gravity Wall with Cast Face Block & Micropile Foundation**
Estimated cost per linear foot = $4,226



OPTION 1

This option includes a micro pile foundation with a pile cap for support of the new wall with two pile "bents" on approximately eight foot spacing. The estimated cost is based on piles of 120 feet to be conservative due to limited borings and a very thick soft soil layer. Piles wil get all bearing capacity from the underlying competent soils. The minimum pile diameter will be part of detailed design by should not be less than 12 inches due to the lack of lateral support in the very thick soft layer. A steel jacket through the existing rip-rap will prevent significant down drag on the micro piles after the wall is completed. The wall is called a gravity wall because the sheer weight of the wall resting on the pile cap is what resists the overturning moment of the soil being restrained by the wall. The micro piles minimize or eliminate the settlement problem which is not currently a problem (based on the top of wall survey data); however, settlement will again be an issue where the wall is raised to reduce the incidence of flooding.

This option will require excavation approximately 20 feet back from the existing wall and a cofferdam to demolish the esisting wall and install the pile cap and lower portion of the wall. To minimize damage to landscaping and impact on traffic in the park it is assumed that the piles will be driven from a barge. If pile driving is done from the land side extensive protection and restoration of landscaping would be required. This will be an issue for the excavation and construction equipment on the landside and the actual construction technique should be left to the construction contractor as a "means and methods," but the cost of the barge in the estimate would be offset by higher costs for protection of sod areas and trees, traffic control and landscaping restoration. Based on this, the current estimate is a good tool to compare options.

The wall shown is a gravity wall with a filter fabric to prevent loss of soil thereby preventing voids behind the wall and below the sidewalk. If there are storm drains or other utility penetrations of the wall, it is particularly important that filter fabric be carefully placed around the penetration

and the pipe where it runs through the backfill material. Utility penetrations are a significant factor in some of the most severely damaged areas of the seawall. The construction of the penetration and proper use of filter fabric to prevent migration of soil fines through the wall or through leaky joints in storm drains will be particularly critical to the long term integrity of the wall. The face of the wall is concrete cast-face blocks with a similar appearance to the historic existing wall. The appearance of this type of wall is shown in the photos below from another project. The horizontal location of the face of the new wall is in the same location as the existing which will minimize permitting requirements with the Corps of Engineers.



**Figure 4 - Cast face block wall similar to that proposed for Option 1**

Positives:

1. Simulated stone, cast concrete facing approximates the visual appearance of the existing wall.
2. Permanent wall settlement solution regardless of wall height relative to the current wall
3. Low maintenance requirements
4. Existing stone may be salvaged for reuse in park or foundation enhancement
5. Permitting requirements minimized
6. Fewer trees are lost than most other options since the excavation behind the current wall is limited
7. Difficult access by water to park or park to water

Negatives:

1. Highest construction cost of the "hard" solutions (using cast face block)
2. Requires full removal and replacement of the existing historic seawall and its associated features.
3. State Historic Preservation Office and National Capital Planning Commission may prefer reuse of historic stone to simulated stone face.
4. Requires a cofferdam for foundation construction

**5.** The pile foundation will keep the wall itself from settling, but if the wall height is increased significantly, the surcharge (weight of soil) behind the wall could lead to settlement behind the wall causing damage to the sidewalk or other infrastructure.

## Option 1A

Option 1A as the number suggests is a variation of option 1. This is the same gravity wall with micro pile foundation, the only difference is that the stone from the existing wall is salvaged and reused as a façade face for the wall. This will likely require that some of the stone be cut to be used as a façade. Case face block can be used (option 1) below mean low water since this portion of the wall will rarely if ever be seen.

**Figure 5 – Gravity Wall with Stone Face and Micropile Foundation**

Estimated cost per linear foot = $4,536




OPTION 1A

Since this is structurally the same solution as option 1 the discussion in the first three paragraphs for option 1. This option also shares most of the same positives and negatives as option 1. The differences in this regard are:

Positives:

1. Historic existing stone is reused as the facade
2. Closest visual match to the existing historic wall. Reuse of historic stone to face the wall will have the least impact on the historic resource.
3. Likely more attractive to SHPO and NCPC by reuse of historic seawall stones, particularly on the Potomac side of the park.

Negatives:

1. Highest construction cost of the "hard" solutions (reusing the historic stone)
2. Requires full removal and replacement of the existing historic seawall and its associated features.
3. Requires a cofferdam for foundation construction
4. The pile foundation will keep the wall itself from settling, but if the wall height is increased significantly, the surcharge (weight of soil) behind the wall could lead to settlement behind the wall causing damage to the sidewalk or other infrastructure. State Historic Preservation Office or National Capital Planning Commission may prefer reuse of historic stone to simulated stone face.

## Option 2

Option 2 is a "hard" wall solution that also uses a deep foundation; however, in this case the solution uses driven soldier piles with precast concrete sheet pile or lagging between the soldier piles to create the wall. Since the piles are driven and the spacing of the piles has a relatively low tolerance so that the precast sheet pile will interlock with the soldier piles, we do not believe it is feasible to drive the piles through the existing rip-rap foundation rubble under the current wall. Therefore the wall would have to move either 10 to 12 feet outboard of its current location (if the piles are driven outboard of the rip-rap foundation) or 10 to 12 feet inboard of its current location, or the rip rap would have to be removed to the level of the native soil along the alignment of the piles. We will discuss these options more below.

## Option 2A

Option 2A is placing the soldier piles outboard of the rip-rap foundation, approximately 10-12feet outboard of the current wall.

**Figure 6 – Soldier Pile wall outboard of existing seawall**

Estimated cost per linear foot = $4,053 with cast face and $4,363 with reused stone




OPTION 2A

As mentioned previously the spacing of the precast concrete piles is sensitive so that the precast sheet pile will interlock with the soldier piles to form a wall. Due to the thickness of the soft soil the piles will require splicing. Due to the depth the splices must also transmit moment since the soft soil will provide little or no lateral support for the piles. Detailed geotechnical work with much more closely spaced borings is required to get accurate pile lengths before ordering the piles. The length and placement accuracy of the piles is also critical for the precast beams that form the “masonry ledge.” This beam will allow the salvaged stone from the existing wall to be placed as a façade supported by the precast beam. Alternatively, a cast face “faux stone” like that proposed on option 1 could be used at a substantial savings over salvaging, cutting and placing the reused stone from the current wall. For estimating purposes the cost of salvaging and reusing the existing stone as a façade is the difference in cost between options 1 and 1A or about $310 per lineal foot.

Moving the wall 10 to 12 feet outboard of the current wall would encroach into the Potomac River or the Washington Channel. It would create a significant amount of additional land in the park, but would definitely require a Environmental Impact Statement. Getting the required permits from the Corps of Engineers is not assured and even if successful would be extremely time consuming.

Moving the wall outboard will require substantial fill material for the “new land.” As shown in figure 6 there would be stone placed from the top of the existing rip-rap foundation stone to mean low water and select fill material from mean low water to below the top of the new wall (under the new sidewalk). For a 1,000 lineal foot section of this type of wall, this would add 1,500 to 2,000 cubic yards of stone and 5,000 to 6,000 cubic yards of select fill.

The soldier piles would be driven into the competent deeper soils and provide the same long term protection against settlement of the wall provided by option 1. Because the wall is outboard of the existing wall this option would have by far the smallest impact on existing infrastructure and trees behind the seawall.

Positives:

1. Permanent wall settlement solution regardless of wall height relative to the current wall
2. Low maintenance requirements
3. Since this option is not going through rip-rap do not need added cost of jacketing the piles through this zone.
4. Existing stone may be salvaged for reuse in park or for a façade on the wall
5. No cofferdam is required but must “muck out” before placing stone behind new wall
6. The lowest impact on existing trees and infrastructure.
7. Difficult access by water to park or park to water
8. Creates additional park land

Negatives:

1. Second highest construction cost of the three variations soldier piles Requires full removal and replacement of the existing historic seawall and its associated features.
2. Requires significant fill of rock and select fill.
3. Encroaching into Potomac River or Washington Channel so permit may not be obtained

4. Will definitely require an environmental impact statement (EIS)
5. The pile foundation will keep the wall itself from settling, but being outboard most of the soil has not seen the primary consolidation that the soil under or inboard of the wall has so it may have substantial settlement, causing damage to the sidewalk or other infrastructure transiting the area such as storm drains.

**Option 2B**

This option is the same structural solution but moves the soldier piles driven inboard of the existing rip-rap foundation, or approximately 10 to 12 feet inboard of the existing wall. Figure 7 shows this option graphically. Since the piles are well behind the existing wall they can be driven without significant excavation; however, excavation will be required to place the precast sheet pile and the precast beams to hold the cast face block or the reused stone façade. Soil currently behind the existing wall but now outboard of the new soldier pile wall will need to be excavated to at least mean low water or the bottom of the precast beam, whichever is lowest.

Since locations where this option might be used will have higher wall height than the existing wall, there will be a requirement for fill behind the new, higher wall as it ties back to the prevailing grade. Although there will be substantial material removed between the existing wall and the new wall, it is not likely that this will meet the gradation and moisture content required for select fill; therefore, it is assumed that this will have to be removed from the site and select fill brought in as required to meet grading requirements.

**Figure 7 – Soldier Pile wall inboard of existing seawall**

Estimated cost per linear foot = $3,798 with cast face and $4,108` with reused stone




OPTION 2B

Positives:

1. Permanent wall settlement solution regardless of wall height relative to the current wall
2. Low maintenance requirements
3. Existing stone may be salvaged for reuse in park or for a façade on the wall
4. Soldier piles can be driven without excavation but must excavate to place precast beams and interlocking sheet pile.
5. Since the piles are driven inland no cofferdam is required, though dewatering will be required during construction.
6. Difficult access by water to park or park to water

Negatives:

1. Lowest cost of construction of the deep foundation solutions Not encroaching, but still significantly changing the shoreline of the Potomac River or Washington Channel so permit still may not be obtained
2. Requires full removal and replacement of the existing historic seawall and its associated features to below mean low water (or further if required by permit).
3. Will definitely require an environmental impact statement (EIS)
4. Since the new wall is so far inboard there is a high impact on trees and infrastructure, particularly where the new wall height is significantly higher than the existing seawall and/or the infrastructure behind the wall is not significantly higher then the seawall.
5. The pile foundation will keep the wall itself from settling, but if the wall height is increased significantly, the surcharge (weight of soil) behind the wall could lead to additional primary consolication behind the wall causing damage to the sidewalk or other infrastructure. This is less than option 2A but similar to Option 1, 1A and 2C.

## Option 2C

This is structurally the same as A and B, but because the soldier piles cannot be driven through the existing stone rip-rap foundation all of that stone directly under the wall must be removed down to the underlying soil. This keeps the new seawall on the same alignment as the current wall which will make permitting much more likely, but the cost of excavating all the rock under the wall will make this option cost as much as option 2A and also may have more execution risk because even though all stone is thought to be excavated, an unforeseen condition could be encountered where a large stone that had sunk into the sub-bottom is hit during the pile driving operation.

**Figure 8 – Soldier Pile wall on centerline of existing seawall**
Estimated cost per linear foot = $4,082 with cast face and $4,392 with reused stone




OPTION 2C

Positives:
1. Permanent wall settlement solution regardless of wall height relative to the current wall
2. Low maintenance requirements
3. Existing stone may be salvaged for reuse in park or for a façade on the wall
4. Difficult access by water to park or park to water
5. On existing alignment so should obtain permit with no more than EA – by far the easiest to permit of the soldier pile options

6. Fewer trees are lost than most other options (except 2B) since the excavation behind the current wall is limited

Negatives:

1. Highest construction cost of the soldier pile solutions due to the cost of removing the rip rap foundation so that the soldier piles can be accurately placed and driven.
2. Requires full removal and replacement of the existing historic seawall and its associated features.
3. The pile foundation will keep the wall itself from settling, but if the wall height is increased significantly the surcharge (weight of soil) behind the wall could lead to settlement behind the wall causing damage to the sidewalk or other infrastructure.
4. The piles will keep the wall from settling but if the wall height is increased significantly, the surcharge (weight of soil) behind the wall could lead to additional primary consolication behind the wall causing damage to the sidewalk or other infrastructure. This is less than option 2A but similar to Option 1, 1A and 2B.

**Option 3**

Option 3 is a "hard" solution that can be considered in areas where the recommended wall height for the new wall is approximately equal to the existing seawall, and detailed geotechnical investigation does not indicate significant pockets of organic material beneath the wall. This stipulation is because the foundation on this wall would be subject to settlement if the new wall is significantly higher than the existing seawall (new primary consolidation) or if there are thick pockets of organic material (on-going secondary consolidation concern). Section D shows that historically the seawall has settled significantly since it was built, but there has been little or no settlement between the surveys in 1988 and 2009. If the height recommended for the new wall is approximately the same as the existing seawall the surcharge (weight) on the underlying soils will be essentially the same as it is now and settlement should not be a major factor. Similar to the other options discussed so far, this will also require geotechnical fabric and other features to prevent loss of fill or voids.

**Figure 9 – Gravity Wall w/ Spread Footing**
Estimated cost per linear foot = $2,027 with cast face
$2,337 with reused stone facade




Like option 1, this is a gravity wall so the weight of the wall sitting on the concrete footing is what is resisting the overturning moment of the soil behind the wall. This option includes a concrete spread footing foundation cast on a lean concrete "mud mat" which is directly on the existing stone rubble foundation. The mud mat allows accurate placement of reinforcing steel which is required in the foundation to support the new wall. With reinforcement in the concrete footing, the foundation will be much more effective at distributing the wall loads to minimize the differential settlement problem which affected the existing wall in the past when settlement was more prevalent.

This option will also require excavation approximately 20 feet back from the existing wall. The wall shown is a gravity wall with a filter fabric to prevent loss of soil thereby preventing voids behind the wall and below the sidewalk. The face of the wall is the same as proposed in option 1, concrete cast-face blocks made to look as close as possible to the original historic appearance of the existing wall. The face of the new wall is in the same location as the existing seawall which will minimize permitting requirements with the Corps of Engineers. An option "3A" could be developed by using the existing stone as a façade for this option. Similar to the difference between option 1A and option 1B, this would increase the cost of construction by approximately $310 per lineal foot.

Positives:

1. Lowest construction cost of the “hard” wall solutions
2. Permanent solution if settlement is not an issue (i.e., if the height of the new wall is approximately the same as the existing seawall)
3. Lower maintenance requirements than existing seawall
4. Existing stone may be salvaged for reuse in park or foundation enhancement or the stone may be used as a façade on the new wall
5. Permitting requirements minimized
6. Tree loss lowest except for option 2A which moves the wall outboard
7. Difficult access by water to park or park to water

Negatives:

1. Not a solution where new wall height is higher than existing seawall. Settlement will be progressively worse the higher the new wall is relative to the existing (higher increase in surcharge on underlying soils).
2. Requires full removal and replacement of the existing historic seawall and its associated features.
3. Even with reinforcement in the footing, differential settlement along the wall is much more likely than with a pile foundation.
4. Requires a cofferdam for foundation construction
5. Does not provide a solution for soil settlement due to consolidation behind wall

**Option 4**

Option 4 is a "hard" solution which like option 3 is a solution that can be considered in areas where the recommended wall height for the new wall is approximately equal to the existing seawall. This is not a solution to seawall settlement which will be experienced if this option is used and the seawall is significantly higher than the existing seawall, or if detailed geotechnical evaluation shows significant pockets of organic material. This option also requires geotechnical fabric and other features to prevent loss of fill and voids.

**Figure 10 – Tie-Back Wall with Spread Footing Foundation**
Estimated cost per linear foot = $3,058 with cast face and $3,368 with reused stone




This option includes a concrete spread footing foundation cast on a lean concrete "mud mat" which is directly on the existing stone rubble foundation. The mud mat allows accurate placement of reinforcing steel which is required in the foundation to support the new wall. With reinforcment in the concrete footing, the foundation will distribute the wall loads to minimize the differential settlement problem which may have contributed to damage to the wall when the wall was experiencing significant settlement (from construction until the 1960s to perhaps as late as the 1980s.

The wall section is thinner in this case because it is a tied-back wall while options 1-3 are gravity walls. There is geogrid reinforcing fabric attached to the wall. The weight of the soil on the geogrid fabric prevents the wall from overturning rather than the weight of the wall itself. This option will require excavation approximately 30 feet back from the existing wall to construct the geogrid reinforcing fabric. The wall shown also uses filter fabric between the wall and the backfill and between the backfill and the native soil to prevent loss of soil thereby preventing voids behind the wall and below the sidewalk. The face of the wall can be either the cast face block (faux stone) or a façade that reuses the stone in the existing historical wall. As previously noted the concrete cast-face blocks made to look as close as possible the original historic appearance of the existing wall are approximately $310 per lineal foot less expensive than salvaging, cleaning, cutting and fitting the stone from the existing wall. The face of the new wall is in the same location as the existing wall which will minimize permitting requirements with the Corps of Engineers.

Positives:

1. Less costly than deep foundations
2. Permanent solution if settlement is not an issue (i.e., if the height of the new wall is approximately the same as the existing seawall and no pockets of organic materials)

3. If historic stone is reused in facing the new wall will provide a close visual match to the existing historic wall.
4. Lower maintenance requirements than existing
5. Existing stone may be salvaged for reuse in park or foundation enhancement or the stone may be used as a façade on the new wall
6. Permitting requirements minimized
7. Difficult access by water to park or park to water

Negatives:

1. Not a solution where new wall height is higher than existing seawall. Settlement will be progressively worse the higher the new wall is relative to the existing (new primary consolidation due to increase in surcharge on underlying soils).
2. Even with reinforcement in the footing, differential settlement along the wall is much more likely than with a pile foundation.
3. Requires full removal and replacement of the existing historic seawall and its associated features.
4. Requires a cofferdam for foundation construction
5. Does not provide a solution for soil settlement due to consolidation behind wall
6. Moderate to high tree loss depending on required excavation – excavation required is directly related to wall height from footing to top of wall – typically 3 to 4 times the height of the wall. May impact roadways and utilities.

## Option 5

Option 5 is a commonly used revetment, "non-wall" solution but it provides additional features to prevent loss of fill, voids, and when raised to elevations discussed in the next section, will minimize flooding and embankment erosion; however, if placed at a height significantly higher than the existing seawall the increased surcharge on the underlying soils could make settlement a problem. The slope and the edges of the rock in the rip rap will tend to collect debris in flood stage and could be labor intensive to clean as debris becomes wedged into the stones.

**Figure 11 – Rip-Rap Revetment on Existing Foundation**
Estimated cost per linear foot = $770 as shown, $825 with sidewalk and railing




This option includes a riprap slope, which will lower the concentrated load from the wall on the foundation. This option will require excavation approximately 20 feet back from the existing wall. Several layers of filter fabric are used between the native soil and the base for the rip-rap and between the base and the rip-rap to prevent loss of soil thereby preventing voids behind the slope. A sidewalk is not shown but may be included at the top of the slope with a railing for approximately an additional $55 per lineal foot. If the sidewalk is in the vicinity of the top of the "wall," a railing would be required to be placed to keep people from inadvertently wandering onto the slope. In this option, the existing historic wall is completely removed and the stones reused as riprap or elsewhere in the park for other uses such as benches or walls. The riprap slope is an environmentally sound solution commonly used in the watershed which should not be difficult to permit.

Positives:

1. Lowest construction cost of all of the solutions
2. Provides habitat for marine/mammal organisms
3. Existing stone may be salvaged for reuse in park or slope construction
4. Permitting requirements minimized
5. Settlement will not be noticeable in a rip rap configuration and the filter fabric should keep voids from forming even if there is some movement
6. Does not require cofferdam for construction
7. Other areas on the Potomac and Anacostia use a similar approach to shore stabilization

Negatives:

1. Frequent maintenance for cleaning (river debris) and slope adjustment will be required.
2. Requires full removal and replacement of the existing historic seawall and its associated feature; the wall will not be replaced.
3. This and other non-wall solutions will have the greatest impact on the historic park setting which will draw criticism from SHPO and NCPC, since it differs from the historic and is not sustainable per the NCPC Framework Plan.
4. Reduces land available for pedestrian use.
5. Animal use of the slope (i.e. muskrats) will increase and may undermine slope, including damage to geotechnical fabric.
6. Easy access by water to park or park to water by scrambling up/down the slope.
7. Park Patrons tempted to launch boats or other water craft from land over the face of the revetment.

**Option 6**

Option 6 is a "semi-soft" solution which is really a hybrid with a pile foundation toe to support the structure to prevent slope settlement and provide additional features to prevent loss of fill, voids and when raised to elevations discussed in the next section will minimize flooding and embankment erosion.

**Figure 12 – Geoweb Planted Face with Concrete Toe and Micropile Foundation**
Estimated cost per linear foot = $4,048
$4,103 with sidewalk and railing




This option includes a micro pile foundation with a pile cap similar to option 1 and slope retaining wall for support of the mechanically stabilized slope. This toe will prevent movement or undermining of the foundation. The micro piles eliminate settlement as a problem if this option is chosen where the new wall height is greater than the existing seawall height. This option includes a geo-textile erosion control fabric with planting cells such as the GEOWEB cellular confinement system shown in Appendix 10.

This option will require excavation approximately 20 feet back from the existing wall. Several layers of filter fabric are used to prevent loss of soil thereby preventing voids behind the slope. The planting cells, when fully established with appropriate species, will also stabilize the face. A sidewalk is not shown but may be included at the top of the slope. If the sidewalk is placed in the vicinity of the top of the slope a railing will be required for safety. The cost of sidewalk and railing is approximately $55 per lineal foot. In this option, the existing historic wall is completely removed and the stones reused as riprap or elsewhere in the park for other type uses such as benches or walls. The planting slope option is an environmentally sound solution used in many similar applications.

Since the existing seawall is a listed historic structure the State Historic Preservation Office (SHPO) and/or the National Capitol Planning Commission (NCPC) may object, particularly on the Washington Channel side of the park where the seawall is part of the view shed from the other side of the channel.

Positives
1. Permanent slope settlement solution
2. Lower maintenance requirements than Option 5, but significantly higher than the wall options
3. Existing stone may be salvaged for reuse in the park or slope construction
4. Minimizes tree loss

5. Provides habitat for marine/mammal organisms
6. Slope will be planted with vegetation to prevent erosion. Once plantings are established will have the appearance of a more natural shoreline
7. Depending on final design might meet the sustainability requirement of the NCPC Framework Plan for sections on the Washington Channel side of the park, though the plan seems to favor something more like option 7.

Negatives:
1. Pile foundation stabilizes the toe, but settlement can restart in areas where the wall height has been increased due to increase in surcharge on underlying soils.
2. Frequent maintenance for cleaning (river debris) and slope adjustment may be required.
3. Requires full removal and replacement of the existing historic seawall and its associated feature; the wall will not be replaced.
4. This and other non-wall solutions will have the greatest impact on the historic park setting which will draw criticism from SHPO.
5. Reduces land available for pedestrian use if sidewalk and railing are not installed
6. Animal use of the slope (i.e. muskrats) will increase and may undermine slope, including damage to geotechnical fabric.
7. Easy access by water to park or park to water/up/down the slope
8. Park Patrons tempted to launch small watercraft like canoes from land side over the face of the slope.

**<u>Option 7</u>**

Option 7 is a Living Shoreline design. Although this would be classified as a "soft" or sustainable solution since it appears to be most like a natural shoreline, it is actually a hybrid. It is a hybrid because it requires a hard "toe" to protect the shoreline from erosion and scour. To ease permitting with the Corps of Engineers the toe of the structure is assumed to be at the same point as the existing seawall location. The living shoreline could be used on the Potomac River side of the park, but this is a much higher energy environment than the Washington Channel and would likely be harder to get the shoreline established and be much higher maintenance cost for debris removal and other maintenance. The top of the slope would define the "top of wall" and should still follow the recommended heights of G. Replacing the historic seawall with the living shoreline could present an issue in getting approval from SHPO, though it seems in keeping with the NCPC Framework Plan that calls for a sustainable approach on the Washington Channel side of the park. Selection of one of the living shoreline options for any portion of the rehabilitation of the seawall will likely trigger an EIS since it is a fundamental change from the existing historic seawall.

As indicated on figure 13 below the success of the living shoreline requires the correct species be planted and that the slope of this area be approximately 10 to 1. That means that if this solution were used where the new "wall height" being proposed is over six feet the slope behind the wall would be sixty to seventy feet. In most areas there is not this much room from the existing seawall

to the curb of roadway. The existing street lights are outboard of the curb so those would also be impacted by this design.

**Figure 13 – Living Shoreline Profile for either Continuous or Segmented Option**




## Option 7A

Option 7A uses the profile above and is a continuous application of the living seawall as shown in the plan view in figure 14 below. The height of the weirs is set between normal mean high water and mean low water so that there is a regular tidal flush of the shoreline. In flood events the entire toe structure will be overtopped.

If the this option is placed on the Potomac River side of the park high flows following significant rainfall in the Potomac River catchment area will subject the shoreline to flow and erosion. This could damage the plants on the slope, particularly in the first several years when the plantings would be maturing. Since the weir is set between normal high water and low water as floods recede this large sloped area would likely be inundated with debris that comes down river and hang up on the planting and ultimately is trapped by the toe as the flood water recedes.

**Figure 14 – Living Shoreline Plan for either Continuous Option**
Estimated cost per linear foot = $2,052 cost for infrastructure changes **not** included




Positives
1. The foundation makes the weir elevation essentially fixed since the load of the toe is equal to or less than the existing wall.
2. Existing stone may be salvaged for reuse in the park
3. Provides habitat for marine/mammal organisms
4. Slope will be planted with vegetation to prevent erosion. Once plantings are established will have the appearance of a more natural shoreline and appears what NCPC had in mind for portions of the Washington Channel side in the Framework Plan.

Negatives:
1. Frequent maintenance for cleaning (river debris) and slope adjustment or replacing damaged vegetation may be required, particularly in first few years after construction
2. Requires full removal and replacement of the existing historic seawall and its associated feature; the wall will not be replaced.
3. This and other non-wall solutions will have the greatest impact on the historic park setting which will draw criticism from SHPO and NCPC.
4. 10 to 1 slope will impact roadway and lighting if used in many areas
5. Leaves no area for pedestrian walkway unless it moves to other side of roadway in these areas.
6. Animal use of the slope (i.e. muskrats) will increase and may undermine slope, including damage to geotechnical fabric.
7. Easy access by water to park or park to water/up/down the slope
8. Park Patrons tempted to launch small watercraft like canoes from land side over the face of the slope.

**<u>Option 7B</u>**

Option 7B uses the same profile as Option 7A shown in figure 13 above, although the profile would essentially be a hemisphere . This option is a Segmented Living Shoreline. As the name implies and as is shown in figure 15 below, there are "pockets" of living shoreline behind each weir. Between segments one of the "hard" wall options would be used. This option would also require an EIS since it is a fundamental change to the existing historical seawall.

The toe that holds the weir will actually place less load on the underlying soils than the existing wall does since even in some of the areas where the existing seawall has settled significantly it is still above mean high tide. That is why this solution is placed on a spread footing foundation; however, with the segmented living wall a traditional wall is used between segments, and must transition from the toe height to the height of the seawall in that area. To prevent settlement due to increased surcharge, if the segmented wall is used where the new wall height is higher than the existing by more than a foot, a pile foundation should be used (like that used in option 1). This would require pile foundation for approximately 50% of the segment. A spread footing can be used on the other 50% of the segment since the toe and transitioning wall height will not increase the surcharge on the underlying soils. As can be seen in looking at the difference in cost between option 1 and 3 the cost of a deep foundation adds $1,090 per lineal foot for that portion which requires it.

**Figure 15 – Living Shoreline Plan for either Continuous Option**
Estimated cost per linear foot = $2,084 cost for infrastructure changes **not** included
Estimated cost in deeper areas with partial pile foundation =$3,174




SEGEMENTED LIVING SHORELINE – PLAN
SCALE: NOT TO SCALE




B SEGEMENTED LIVING SHORELINE – DETAIL
SCALE: NOT TO SCALE

Positives

1. The foundation makes the weir elevation essentially fixed since the load of the toe is equal to or less than the existing wall. Any changes of the slope would not impact the vegetation or upland infrastructure
2. Existing stone may be salvaged for reuse in the park
3. Provides habitat for marine/mammal organisms
4. Slope will be planted with vegetation to prevent erosion. Once plantings are established the segment behind the weir will have the appearance of a more natural shoreline

Negatives:

1. Frequent maintenance for cleaning (river debris) and slope adjustment or replacing damaged vegetation may be required, particularly in first few years after construction
2. Requires full removal and replacement of the existing historic seawall and its associated feature; the wall will not be replaced.
3. This and other non-wall solutions will have the greatest impact on the historic park setting which will draw criticism from SHPO and NCPC.
4. 10 to 1 slope will impact roadway and lighting if used in many areas
5. Segmented gives a disjointed appearance and complicates construction due to transitions
6. Leaves no area for pedestrian walkway unless it moves to other side of roadway in these areas while areas between segments could have sidewalk and railing thereby forcing pedestrians to loop around each segment, likely requiring them to cross the roadway.
7. Animal use of the slope (i.e. muskrats) will increase and may undermine slope, including damage to geotechnical fabric.
8. Easy access by water to park or park to water/up/down the slope in the segment area
9. Park Patrons tempted to launch small watercraft like canoes from land side over the face of the slope.

## G. SEAWALL ELEVATION OPTIONS & RECOMMENDATIONS

The selection of a repair option or several different options for different conditions along the existing seawall must weigh a variety of factors including durability, compatibility with historic character of the park, operations & maintenance, safety & security, and of course cost. As demonstrated in Section D there is virtually no change in the top of wall elevation between the surveys done in 1988 and 2009, except where obvious washout or other failure mechanisms are governing. From historical documents and even the difference in top of wall elevation between the 1950 and 1977 surveys consolidation settlement was still an issue. We believe that if the recommended wall height is within one foot of the existing seawall height there is no need to incur the expense of installing a deep foundation; however, where the recommended wall height is greater than a foot higher than the current seawall a deep foundation should be used since the new, higher wall will increase the surcharge on the underlying soils and settlement will again be a problem.

The initial statement of work indicated that the seawall should be rehabilitated by increasing its height to provide flood protection for the 50-year flood event. As stated previously, this level of protection if applied over the entire seawall length would have enormous impact on trees, roadways and drainage infrastructure and would create significant drainage issues even at flood levels short of those that would overtop the wall. In short, as discussed earlier we firmly believe it would not be feasible to have a 50-year flood wall from a benefit-cost perspective. Our analysis of the situation indicates that there are several major factors that must be considered when recommending a top-of-wall height. The various categories Dewberry used to determine the design seawall elevation included:

- Event Based
- Probability Based
- Park Management
- Affected Features

**Event Based Records** – Based on these records, the design elevation should be in a range from approximately 6 feet to 10 feet (referenced to MSL).

**Probability Based** –Based on these records, the design elevation should be in a range from approximately 6 feet to 9 feet (referenced to NAVD88), which would protect for events ranging from 10-year to 50-year frequencies.

**Park Management** – Based on previous meeting with Dewberry and NPS park rangers, design criteria should also include management preferences for the park. As is the case with historic preservation objectives, these would be more concerned with the management preferences of the shoreline areas versus “protecting” to some level of inundation or prevention of wave overtopping. In addition, these preferences lean more towards “softer” solutions and natural stabilization techniques versus traditional “brick and mortar”, or engineered “hard” solutions. However, as previously noted for historic preservation goals, any “soft” solutions should consider event or probabilistic based design criteria mentioned previously in order to be sustainable (i.e., withstand some level of expected flooding, wave overtopping, or erosion).

In order to evaluate the most suitable seawall crest elevation, Dewberry conducted an incremental inundation damage assessment. This involved simulating inundation boundaries according to approximate inundation levels of 6-9 feet. Designing to levels below 6 feet would barely exceed current seawall elevations and would not be cost effective. Likewise, the benefits to be gained designing to higher elevations (e.g., above 9 feet) would not be effective based on benefits (or damages reduced for such low-probability events) versus high costs not only of the wall but of the impacts on infrastructure and trees. The optimum design elevation is based on a reasonable seawall crest elevation, which protects features during future events (i.e., reduces future expected damages for more frequent, or more probable events), preserves historic and park management values, and is cost effective to construct.

**Affected Features (Damages)** – Numerous features exist in the parks that are worth protecting. A reasonable approach to narrow design choices involves an evaluation of the incremental benefits and costs to protect some of the larger, or more significant features subject to the hazards and deteriorating conditions associated with the seawall. These features include the trees (habitats), golf course fairways (recreation), drainage inlets (utilities), buildings (structures), and roadways (transportation). Appendix 6 presents "screen shots" showing incremental damages to these features for each level of potential inundation from 6 feet to 9 feet. Table 3 summarizes affected (i.e., damaged) features for each level of inundation. In addition, the incremental inundation images were used to develop inundation animations, which depict increasing levels of impact as magnitudes of flooding increase. The video loops have been included on the CD submitted with this Report.

**Affected and Unaffected Features**

| Flood Stage (ft) | Trees | | Golf Course Fairways | | Drainage Inlets | | Buildings | | Park Rds / Prkg Lots (Ac) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 4,644 | | 36 | | 272 | | 17 | | 34.2 | |
| | Affected | Unaffected | Affected | Unaffected | Affected | Unaffected | Affected | Unaffected | Affected (Ac) | Unaffected (Ac) |
| 6 | 1,462 | 3,182 | 22 | 14 | 152 | 120 | 2 | 15 | 10.0 | 24.2 |
| 7 | 2,193 | 2,451 | 27 | 9 | 203 | 69 | 2 | 15 | 18.2 | 16.0 |
| 8 | 2,935 | 1,709 | 31 | 5 | 218 | 54 | 9 | 8 | 22.1 | 12.2 |
| 9 | 3,402 | 1,242 | 36 | 0 | 236 | 36 | 10 | 7 | 24.5 | 9.8 |

| Flood Stage (ft) | Trees | | Golf Course Fairways | | Drainage Inlets | | Buildings | | Park Rds / Prkg Lots (Ac) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 4,644 | | 36 | | 272 | | 17 | | 34.2 | |
| | Affected | Unaffected | Affected | Unaffected | Affected | Unaffected | Affected | Unaffected | Affected (Ac) | Unaffected (Ac) |
| 6 | 31.5% | 68.5% | 61.1% | 38.9% | 55.9% | 44.1% | 11.8% | 88.2% | 29.3% | 70.7% |
| 7 | 47.2% | 52.8% | 75.0% | 25.0% | 74.6% | 25.4% | 11.8% | 88.2% | 53.3% | 46.7% |
| 8 | 63.2% | 36.8% | 86.1% | 13.9% | 80.1% | 19.9% | 52.9% | 47.1% | 64.5% | 35.5% |
| 9 | 73.3% | 26.7% | 100.0% | 0.0% | 86.8% | 13.2% | 58.8% | 41.2% | 71.5% | 28.5% |

**Table 1** – Affected park features at incremental levels of flooding.

With the exception of buildings, approximately 30% (~one third) or more of the features (i.e., trees, golf fairways, drainage inlets, parking lots, and roads) are affected by inundation equal or

greater than 6 feet. These impacts are considered minor (based on a damage scale of Some→Minor→Major→Significant→Catastrophic). With one more foot of flooding, or at 7 feet of inundation, approximately a 50% or half of these features are affected by inundation, a major level of impact. Significant impacts occur with further levels of inundation at 8 feet, where over 50% of the buildings are inundated and approximately two-thirds or more of other features are impacted. At 9 feet of flooding, significant to catastrophic inundation occurs including up to 10 of the 17 buildings.

Based on the Effected Park Features, Table 1 above the following observations can be made:

1. At a flood elevation of 6' = 88% of the buildings are at an elevation higher than 6 feet and would be unaffected (a wall at 6' protects the remaining 12% of the buildings for 100% protection for a 6 foot above MSL flood event)
2. At a flood elevation of 7' = 88% of the buildings are at an elevation higher than 7 feet and would be unaffected. Note that the added wall height did not protect any additional structures.
3. At a flood elevation of 8' = 47% of the East Potomac Park's buildings are at an elevation higher than that and would be unaffected (a wall at 8' protects the remaining 53% for 100% for a 8 foot above MSL flood event)
4. At a flood elevation of 9' = 40% of the East Potomac Park's buildings would be unaffected (a wall at 9' would protect the remaining 60% for 100% for a 9 foot above MSL flood event)

The required wall height gets a different answer depending on the approach. Based on historical data back to 1936 the top-of-wall elevation should be at 10'. Based on probability the elevation should be at 9' for a 50 year event. Based on affected hard structures (buildings) the elevation should be 8' or greater. The 8' elevation provides our lower bound to prevent impacts to buildings in the park, but would have significant impacts on trees and infrastructure.

The existing top of wall maximum elevation is 5.66' above MSL and the existing minimum top of wall elevation is 1.9' above MSL. Due to the differential settlement which has taken place over time the highest elevation of 5.66' is near the railroad bridge over the Potomac river and it gradually descends along the Potomac toward Hains Point. From Hains Point it gradually rises to a little over 4' along the Washington Channel near station 10282. From there it gradually descends until it is as low as 1.9' near the Central Headquarters Building at 900 Ohio Drive.

The existing road system pavement elevation ranges from 7.67 to 3. In order to raise the seawall to elevation 9 we would add from 3.5' to 7' to the existing wall height. This would require one or more of the following actions:

1. Increase the height of the backfill, existing pavement, existing light fixtures, existing manholes, remove all the trees and replant at the new elevation.
2. Increase the height of the backfill and slope in toward the center of the park (edge of curb), remove and replant all the trees on the perimeter between the road and seawall, raise all affected manholes. Add pump system to drain storm water from the park.
3. Leave elevation of park perimeter essentially unchanged by creating a free standing wall that is higher than the infrastructure behind the wall and add a pump system to drain storm

water from park. Most of the views of the river and channel will be blocked by the seawall, and a "fortress" appearance would result.

4. Provide a raised platform walk way behind the seawall for pedestrians with stairs every 100 feet to access the park or provide periodic "viewing platforms", and provide a pump system to drain storm water from the park.

The existing elevations drain water from the center toward the perimeter and toward Hains Point. A one size elevation does not fit all parts of the park perimeter. Based on the Affected Park Features, a wall elevation of 6 will protect all but 2 buildings from a 6' flood stage. A wall elevation of 9 will protect all of the buildings from a 9' flood stage. Rather than build a seawall high enough to protect the entire park, we would suggest building lower separate concrete walls to protect the individual buildings or clusters of buildings, nearly half of which are already above the 100 year flood stage and would not need such a secondary wall. In this case, the storm sewer system, open to the river, must have back flow preventers installed to prevent the river from back flooding within the protective walls. This would be more economical than trying to raise the perimeter seawall. Our recommendation is to vary the elevations of the top of the seawall from 6.3 to 4 based on the existing drainage patterns as listed in Appendix 7. Essentially storms larger than 6 feet above MSL would overtop the wall but would naturally drain toward the point as the flood waters recede. Most of the buildings are above the 50-year flood level elevation, but those that are not could be protected with a berm or wall that provided the additional protection at a lesser cost than raising the entire seawall and installing a pump system.

One possible alternative for wall heights which is also presented in Appendix 7 is to provide a wall that is higher than the surrounding infrastructure on the Washington Channel from the railroad bridge to about station 10220 at the golf course parking area. These alternative wall heights are listed on a separate table and graphic in Appendix 7. As stated above this would have a free standing wall section above the ground surface. The portion of seawall behind the Park Headquarters and immediately adjacent to that area does not have sidewalk adjoining the wall. From review of the inundation maps that were created it appears that a 6.3 foot high wall in this area would provide protection to a flood up to that level. However, if this alternative were selected it would make the backflow devices on the storm drains in the Capital Police HQ area critical features. The entire area has settled to the point where it would be well below the top of wall and if the backflow devices did not work, it would flood the entire area. As noted above, it would also require a pump system to remove water from behind the wall. The pumps would be necessary not only when the wall was actually overtopped, but also when the gravity head from the storm drains in this area is less than the head on the backflow device from the channel. The ROM estimate for the higher wall and pumping system would be a premium of 25% over the ROM costs listed for the recommended wall option.

## H. SEAWALL REPAIR RECOMMENDATION

The selection of the wall rehabilitation option is predominately independent of the recommendation for the top of wall elevation, which is why that is a separate discussion in the previous section. It is also feasible to use different options for different sections of seawall; however, there could be issues at the transition between wall types, particularly if one section has a deep micro-pile foundation and the adjacent section does not.

In making a recommendation, it is instructive to look at what the major failure modes of the existing wall have been. The major failure mode seen virtually everywhere along the existing seawall is settlement of underlying soils. Bedrock or at least highly consolidated, competent soils are 90 feet below mean sea level (MSL) or greater and any deep foundation would have to penetrate well into this layer to develop the required bearing capacity. As section C describes there is organic material and dredge spoils that were highly compressible (e.g., unconsolidated muds, silts, and sands); however, as the comparison data in Appendix 1 shows settlement has essentially stopped. If the new wall height is no more than 1 foot higher than the existing seawall then settlement will not be an issue since the new wall will place essentially the same load on the underlying soils and further consolidation at this load level will be minimal.

Historically, settlement rates have been as high as ½ inch per year, and likely much higher than that in the first ten years after construction. If the recommended wall height is greater than one foot higher than the existing seawall then a deep foundation should be strongly considered. For new wall heights more than one foot greater than the existing wall consolidation will occur from the increased surcharge on the underlying soils which have proven to be highly compressible. Not only will there be settlement, but likely differential settlement which would be even more likely to cause damage to the new wall. The recommended solution to sections with higher recommended wall heights is to have a micro-pile foundation that is drilled through the existing stone foundation and jacketed in this zone to prevent down drag on the micro pile due to settlement of the rip rap and the high friction factor of the rip rap. The piles will provide either a point-bearing pile on bedrock (most likely on the west end of the park) or friction in highly consolidated underlying competent soils. Depth of penetration in the competent soils will be determined in final design but based on the preliminary geotechnical information would appear to be at least 10 feet into this layer and likely 15 feet or more to develop the required pile capacity. Drilling may stop when the competent material is reached and the pile driven to a prescribed blow count. Alternatively drilling could continue at a smaller diameter in the competent material and then driven so that the installed pile will develop maximum friction capacity in this layer. Options 1 and 6 have this type of foundation which addresses the settlement solution and will be the most permanent; however, not unexpectedly, they are more expensive options. In addition to drilled micro-piles would be soldier piles in Option 2. Soldier piles use pre-cast concrete piles which have the greatest durability, but are difficult to splice and this option requires accurate depth determination so that the masonry ledge will be at a consistent height.

Another significant failure mode is wash out of material from behind the wall. This has been the primary cause of damage in the time between the 1988 and 2009 surveys. This occurs due to water passing through the wall and carrying soil with it. As mortar is lost or stones are displaced, wash out is accelerated. Burrowing animals also contribute to this failure mode. To mitigate this failure mode, all of the options presented include the use of two layers of geotechnical fabric

directly behind the wall. This fabric allows water to pass through but not soil. The material is quite tough – resistant to deterioration over time - and is difficult to puncture. Two layers are used at the wall as added assurance that laps or holes caused during construction in one layer do not create a potential spot for washout to occur. The single layer between native soil and backfill behind the wall is not to prevent washout, but to prevent migration of fines from the native soil on the point – predominately dredge fill which is fine grained – into the select fill placed as part of the rehabilitation..

Another major source for washout in the existing wall has been utility penetrations through the wall. Cable crossings as well as the sanitary line should ideally be at or below the foundation of the rehabilitated wall section. If a pile foundation is used, this would actually tend to protect the utility from having the wall impinge on it and potentially shear the utility. For storm drains or other features that must penetrate the wall, protection is primarily an issue of having a good design detail and ensuring that the construction contractor's quality control installs the penetration in accordance with the design. Penetrations must be fully grouted and the geotechnical fabric behind the wall firmly bound to the pipe or cable penetrating the wall to give a continuous filter which allows water to pass but prevents washout, even if there are cracks or subsequent failure of the grout around the penetration. This is a concern that is common to all of the rehab options. The filter fabric should be wrapped around storm pipes as far back as they are exposed by the construction activity. Wrapping the storm water pipes is important because there are often leaks at the joints of the pipe, or suck leaks will occur in the future. When there is a gap in the joint it allows soil to seep into the storm water pipe and be washed out into the river or channel.

For storm drains in the western end of the park, it will be necessary to have check valves in the storm drains. It is of little value to build up the wall to prevent flooding if the storm drains themselves become a flow path for flood water to get behind the wall.

There are over 20,000 lineal feet of seawall in East Potomac Park. Even with the lower cost solutions the rehabilitation of the entire seawall is a major undertaking and will likely be done in many phases. Our phasing recommendations are discussed in Section J. Since the phased repairs could take many years to accomplish, one consideration is to choose a rehabilitation option where the first phase is still in reasonable condition when the last phase of the project is completed. All the deep foundation options are permanent solutions and the spread footing foundations are also permanent solutions if the new wall height is no more than one foot higher than the existing wall. That tends to recommend a deep foundation for the west end of the park where the recommended wall heights are higher and allow for the use of less costly spread footings where the wall height is similar to the existing – basically 1,000 feet from Hains Point on the Potomac side and 2,000 feet from the point on the Washington Channel side.

We do not recommend any of the "non-wall" solutions (options 5, 6 and 7). Besides the relatively short useful life of option 5, all of these solutions will require higher maintenance efforts and costs (e.g., they are "debris catchers" that will require maintenance attention immediately following every significant rain event even if well below the level that would overtop the wall). There are a number of locations in the greater Washington area that use a shoreline solution similar to each of the non-wall options, but they are not replacing a historic seawall.

Although option 6 could be applied in higher wall height areas since it has a deep pile foundation, all of the non-wall options are significant deviations from the existing historic wall. Under the National Environmental Policy Act (NEPA) a repair of the wall by any of the "hard" solutions should qualify as a Categorical Exclusion under NEPA since they are a restoration of the original design intent, so long as the Section 106 consultation agrees that the final recommended solution is sufficiently similar to the historic wall. For the various wall solutions the worst case (from a cost perspective) would be to require the reuse of the stone from the historic seawall as a façade for the new wall. If this is a requirement it is estimated to add $310 per lineal foot to the construction cost of the wall.

The NCPC Framework Plan calls for a sustainable shoreline on the Washington Channel side, and Option 7A could be applied. The option proposes placing the weir on the alignment of the current wall and the 1 to 10 slope would essentially take the slope back to the curb as the "wall height" to resist inundation (the curb elevations are equal or higher than the recommended wall heights in almost all areas). Parking areas would be lost in the 1 to 10 slope, and some grade changes would be required. A large number of current trees would be lost since they would be in the area to be cut to provide the slope. Alternatively a hybrid solution of Options 5 and 7A could be applied in this area. Option 5 with rock rip-rap at from the current channel bottom to the mean higher high water line to take tidal cycles, wave run up and boat wakes, and then the living shoreline 1 to 10 slope from mean higher high water to the intended wall height (curb).

In a hybrid Option 5/Option 7A solution it might be possible to move the rock rip rap outboard of the existing seawall alignment. The area outboard of the existing seawall has not been previously loaded and would see substantial primary consolidation. However, the rock rip rap would only extend up to mean high water so the loading would be moderate. Additional stone could be added in the future to provide the shoreline protection if settlement exposes too much of the slope. The 7A portion of 1 vertical to 10 horizontal slope would generally place no new load since the slope would continue back to current roadway curbs and those are already at the desired elevation. If the permit allows moving outboard of the current wall alignment it may be possible to retain parking, perhaps some diagonal spaces instead of the pull off areas that now exist. This would be a design issue during detailed design.

The two photos below are from another project and indicate what the cast-block block concrete finish would look like such as is proposed in all the wall options. Contractor quality control will be important to a finish that is acceptable as a simulation of the historical stone. Part of this quality control would be the requirement that the contractor provide a mock-up of the wall section that can reviewed and approved by NPS and other interested stakeholders before actually placing any in the final wall construction. NCPC and/or SHPO may make review and approval of the mock-up a condition before giving final approval. In many ways quality control of the cast-face block is not as difficult a quality issue of reusing the existing stone either as whole blocks or a cut face veneer. There is also the issue with reuse that with many sections damaged it may be difficult to recover sufficient stone from the existing wall to complete the entire façade.



**Figure 16 – Cast Face Block Facing can be used on all Wall Options**

## RECOMMENDED REHABILITATION OPTION

Based on the discussion above, we recommend Option 1 as the preferred solution for the rehabilitation of the historic seawall on the west end of the park. This would be from station 10048+50 at the inlet bridge by the Tidal basin to station 10137+00 on the Potomac River side of the park and from station 170+00 (about 2,000 feet from Hains Point) to the inlet at station 253. From a structural and longevity standpoint, this is the best option. Option 1 is a permanent solution that will give generations of satisfactory service for the visitors to the park. We believe that this is the lowest maintenance cost option. The wall will repel debris until it is overtopped. The cast-face block can be tied into the gravity wall by reinforcing dowels so that this option should not lose individual blocks as may be the case if the existing historic stone blocks were reused either as blocks or cut face veneer. Therefore, we believe the appearance will be acceptable relative to the historic seawall, yet be less costly and at least provide equal or better performance for the face of the wall.

For the section near the point (from station 10137 to station 170+00) where the recommended wall height is just 4 feet above mean low water, the lowest recommended, so that the entire park will drain following a flood event. For this section we recommend Option 3 with cast face block. This is essentially the same wall as option 1 but with a shallow, spread footing rather than the more costly deep micro-pile foundation. This has the added advantage that the appearance of adjacent sections should have exactly the same camber and appearance and make placement of construction joints between wall sections straight forward.

## ALTERNATIVE REHABILITATION RECOMMENDATION

As discussed previously we do not recommend use of a non-wall solution; however, the NCPC Framework Plan seems to favor an option 7A type approach on the Washington Channel side. If the Park Service feels strongly that a "soft" solution should be part of the rehabilitation plan, the alternative recommendation would be to place a Continuous Living Shoreline, Option 7A, from station 10155 (500 feet on the Washington Channel side of Hains Point) to station 10170+00. The low wall height of this section would allow the Living Shore Line to be built without impacting any parking or street lighting. If more Living Seawall is desired and the Park is willing to give up the pull-off parking area between stations 10170 and 10173 then the Continuous Living Shoreline could be used from station 10155 all the way to station 10178+50.

To extend any further to the west would impact the roadway and lighting since the wall recommended wall height is greater and, therefore, the 10 to 1 slope behind the Living Shoreline would extend to or beyond the curb on the roadway. If USACE will approve encroachment into the Washington Channel the hybrid Option 5/ Option 7A solution could be extended all the way to Buckeley Drive. Due to the low elevation of the Park Headquarters it is really not feasible to extend the living shoreline concept further than Buckeley Drive. As discussed in Section G there are alternative wall heights possible for the area near the Park Headquarters, but due to the close proximity of the building to the seawall a "hard solution" is required for this area. The primary determinants are whether the wall will be higher to provide greater flood protection versus the cost of an active (pump) solution to clear water when the water level rises. Such a pumping system with check valves to prevent backflow would have to handle any rainfall when the water level in the channel was within 12 inches below the current top of wall elevation since at that point normal gravity storm drains would not be effective and may make flooding more frequent than it is currently.

# I. DEMONSTRATION AREA RECOMMENDATIONS

The statement of work suggested recommending a demonstration project area of approximately 500 feet that could be completed to verify design and cost estimates and be used to build support for full funding of rehabilitation for the entire seawall. The condition assessment in Task 3 made it abundantly clear that the entire seawall needs rehabilitation. The goals for a demonstration project are:

1. The section recommended should be in egregious condition needing immediate attention to mitigate losses or eliminate safety hazards
2. Located in a high visibility area where park visitors will see the project and the benefits that would be achieved if more of the seawall were rehabilitated.

**Figure 17 – 500 Foot Stations with Sheet Number Key Plan**




500 FOOT STATIONS WITH SHEET NUMBER KEY PLAN

Station 10124+50 to 10134+14.8

1. The **first area** we recommend to be repaired is from station 10124+50 on plan sheet 28 to the beginning of the pre-cast cap at station 10134+14.8 on plan sheet 31b. This is approximately 964.8 linear feet of seawall. This area is not only severely deteriorated but the top of wall elevation varies from 1.9 to 3.22. The land approximately 20 feet behind the wall is being eroded into the river and there are concrete barriers in place to prevent additional erosion. This area floods on a daily basis and the precast cap portion of the seawall is 2.25 feet higher than the top of the seawall prior to station 10134+14.8. The top and elevation of seawall at this location is shown in photos below:

**Figure 18 – Typical Damage Station 10124+50 to 10134+14.8 – Potential Demo Area 1**












Station 10243+50 to 10253+07.5

2. The **second area** we recommend to be repaired is from station 10243+50 on plan sheet 61a to the beginning of the Railroad Bridge abutment at station 10253+07.5 on plan sheet 4 from the Jefferson Memorial plans. This is approximately 957.5 linear feet of seawall. This area is not only severely deteriorated but the top of wall elevation varies from 1.9 to 3.66. The sidewalk was previously removed from a portion of this area. This area floods on a daily basis and is directly behind the Headquarters Building. The top and elevation of seawall at this location is shown in photos below:

**Figure 19 – Typical Damage Station 10243+50 to 10253+07.5 – Potential Demo Area 2**



Headquarters Building and end of sidewalk



View toward Railroad Bridge








Station 10048+50 to 10058+50

3. The **third area** we recommend to be repaired is from station 10048+50 on plan sheet 8a of the Jefferson Memorial Plans at the Inlet Bridge abutment to station 10058+50 on plan sheet 5a. This is approximately 1000 linear feet of seawall. This area is not only severely deteriorated below the sidewalk but the seawall face has lost many masonry stones. The sidewalk has been asphalted in large patches to fill in sink holes. This area is also a very visible by

pedestrians because of its location adjacent to the Inlet Bridge. The top and elevation of seawall at this location is shown in photos below:

**Figure 20 – Typical Damage Station 10048+50 to 10058+50 – Potential Demo Area 3**






<u>Station 10148+00 to 10153+50</u>

4. The **fourth area** we recommend to be repaired is from station 10148+00 to station 10153+00 on plan sheet 34a. This is approximately 500 linear feet of seawall. Hains Point is centered at station 10150+50 and a sewer force main tunnels under the foundation and across the river at this point. The sidewalk area has collapsed into a void below the slab. This area of the seawall is one which was repaired using a pre-cast concrete

cap, this area is also where the largest exposed height of wall is located (deepest water depth). The top and elevation of seawall at this location is shown in photos below:

**Figure 21 – Typical Damage Station 10148+00 to 10153+50 – Potential Demo Area 4**





Hains Point and Sewer Force Main area








## DEMONSTRATION AREA RECOMMENDATION

Of the demonstration area candidates, area 1 is arguably in the worst condition. Erosion has extended

well behind the wall forcing jersey barriers to be placed to try to mitigate the erosion. On the other hand, area 1 is well out on the point and would not be as visible to visitors or commuters as areas 2 or 3, which are at the two entrances of the park. As a "show case" project area 1 is particularly difficult since vehicular traffic is one way so you must transit three quarters of the way around the park to get to the project site.

Area 2 is at the Park Headquarters building at 900 Ohio Avenue near the railroad bridge. As the photos on page 52 above document, this area is in very poor condition, and its proximity to the Jefferson Memorial and the entrance of the park definitely make it a high visibility area. One drawback for this area as the demonstration project is that the topography of the area is so low due to past settlement. With the recommended wall heights for this area the benefits of a completed project might not be judged worth the investment since the area would still be subject to significant flooding as even minor floods would "end run" the new section of wall and inundate the area. If the alternative wall height solution is chosen then area 2 is not a good candidate as a demonstration project. For the alternative wall height solution to work the entire section of wall from the railroad bridge to the golf course parking area as well as the associated backflow devices and pumping system must be placed as a system or flood waters would simply "end run" the wall and once trapped the flood waters would be very slow to recede.

Area 3 is also at the entrance of the park on the Potomac side. As the photos on page 53 above document, this area is also in very poor condition and is routinely inundated due to its low present elevation. Even though the wall in this area is very low, the land and infrastructure behind it is not low like it is by the Park HQ. If the demonstration area were built a small berm perpendicular to the seawall at the end of the new construction could prevent the "end run" of the new wall. Its location makes it one of the most highly used pedestrian areas in the park which makes it one of the highest visibility areas for a demonstration project. Being at the entrance of the park, site visits for officials that might have budget or programming authority or other interested parties can easily and quickly be arranged.

Area 4 is the very tip of Hains Point. As the photos document this area is in very poor condition, so much so that barricades have been placed to restrict pedestrian traffic due to undermining of the sidewalk. Although the point is a prominent feature from a boat off shore this area probably gets less pedestrian traffic than any of the other candidate demonstration areas and is some distance from the road which would make it difficult to "show case" unless drive on mats were placed to protect the grass to allow vehicular traffic to the area.

Dewberry's recommendation for a demonstration project is area 3. In addition to being a high visibility area, it is a logical starting point if the repair of the seawall can be placed on a relative fast track which would provide the lowest overall rehabilitation cost by keeping work in progress until completed.

## J. REHABILITATION PHASING PLAN

As the Task 3 report documented the entire seawall in East Potomac Park requires rehabilitation as soon as funds can be made available. As discussed in section G above, the candidate sections for the demonstration project all demonstrate incipient failure. Several have barricades to prevent approaching the wall in parts of these areas due to the level of deterioration. Despite the need, the cost of the rehabilitation will necessitate phasing of the project to complete the work. We have considered two phasing approaches. In the preferred phasing we have split the entire replacement into five phases, hoping to secure funding in five consecutive fiscal years. The other approach splits the entire seawall into nineteen roughly equal phases. In this approach multiple phases could be constructed in the same fiscal year or in the worst case construction might be limited to a single phase in a fiscal year or even skipping a year. These two phasing plans are shown in tabular and graphical form in Appendix 9.

TABLE 2 PREFERRED PHASING PLAN W/ RECOMMENDED WALL HEIGHTS

| Phase | Beginning Station | Ending Station | Length of Phase | Drawing Sheets | Top of Wall Elev | ROM Cost Preferred Option |
|---|---|---|---|---|---|---|
| | | | | | | |
| 1 | 10048+50 | 10058+50 | 1,000 | 3a to 5a | 6.3 | $4,226,000 |
| 2 | 10058+50 | 10107+15 | 4,865 | 5a to 21a | 6.3 | $20,560,000 |
| 3 | 10204+42 | 10253+07 | 4,865 | 47a to 64 | 4.5 to 6.3 | $20,560,000 |
| 4 | 10107+15 | 10155+80 | 4,865 | 21a to 35a | 6.3 to 4.0 | $16,645,000 |
| 5 | 10155+80 | 10204+42 | 4,862 | 35a to 47a | 4.0 to 6.3 | $17,424,000 |
| | | | | | | |
| | | | 20,457 | | | $79,414,000 |

In the preferred phasing plan we would start with the recommended demonstration area discussed in section H. This area is 1,000 lineal feet from station 10048+50 on plan sheet 8a of the Jefferson Memorial Plans at the Inlet Bridge abutment to station 10058+50 on plan sheet 5a. The rest of the phases are approximately one fourth of the remaining seawall in each phase. The second phase is immediately adjacent to phase 1 from station 10058+50 to station 10107+15, a length of 4,865 lineal feet. To maximize the protection of the buildings at the park the 3rd phase is from the railroad bridge at station 10253+07 to approximately 1,000 feet beyond the golf course parking lot to station 10204+42,

Phase 3 can be built to the recommended wall heights which minimizes the impact on infrastructure and trees behind the wall or to the alternative wall heights discussed in Section G. Only in the preferred phasing will allow the alternative wall height to be used. Since much of the area behind the wall in this phase is very low, if the wall is built to the higher levels the entire section as well as the pumping system must be built as a single project to be effective. If the higher wall section did not extend all the way past the golf parking structure rising flood water would simply go around the wall. By extending past the golf course parking lot the natural topography of the park will keep inundation from going around the wall as was shown in the inundation study which is included in Appendix 6.

Phase 4 would move back to the Potomac side of the park picking up at the end of where phase 2 ended at station 10107+15 and extending to station 1055+80. This phase completes the Potomac side of the park and wraps around Hains Point. Phase 4 is also 4,865 feet. The final phase fills all the remaining rehabilitation between the ends of phases 2 and 4 from station 10155+80 to station 10204+42,

**EXTENDED PHASING**

Table 3 EXTENDED PHASING PLAN

| Phase | Beginning Station | Ending Station | Length of Phase | Drawing Sheets | Top of Wall Elev | ROM Cost Preferred Option |
|---|---|---|---|---|---|---|
| | | | | | | |
| 1 | 10048+50 | 10058+50 | 1,000 | 3a to 5a | 6.3 | $4,226,000 |
| 2 | 10243+50 | 10253+07 | 957 | 61a to 64 | 4.5 | $4,045,000 |
| 3 | 10124+50 | 10137+00 | 1,250 | 28a to 31a | 4.5 | $5,283,000 |
| 4 | 10147+00 | 10155+15 | 815 | 31a & 34a | 4.0 | $3,448,000 |
| 5 | 10058+50 | 10068+50 | 1,000 | 5a to 8a | 6.3 | $4,226,000 |
| 6 | 10068+50 | 10078+50 | 1,000 | 8a to 11a | 6.3 | $4,226,000 |
| 7 | 10078+50 | 10088+50 | 1,000 | 11a to 15a | 6.3 | $4,226,000 |
| 8 | 10088+50 | 10098+50 | 1,000 | 15a to 19a | 6.3 | $4,226,000 |
| 9 | 10098+50 | 10108+50 | 1,000 | 19a to 21a | 6.3 to 6.0 | $4,226,000 |
| 10 | 10108+50 | 10118+50 | 1,000 | 21a to 25a | 6.0 to 5.5 | $4,226,000 |
| 11 | 10118+50 | 10124+50 | 600 | 25a to 28a | 5.5 | $2,536,000 |
| 11A | 10137+00 | 10147+00 | 1,000 | 31a & 34a | 4.0 | $2,030,000 |
| 12 | 10232+50 | 10243+50 | 1,100 | 56a to 61a | 4.5 to 5.5 | $4,660,000 |
| 13 | 10221+50 | 10232+50 | 1,100 | 54a to 56a | 5.5 to 6.0 | $4,660,000 |
| 14 | 10210+50 | 10221+50 | 1,100 | 48a to 54a | 6.0 to 6.3 | $4,660,000 |
| 15 | 10199+50 | 10210+50 | 1,100 | 46a to 48a | 6.3 to 6.0 | $4,660,000 |
| 16 | 10188+50 | 10199+50 | 1,100 | 43a to 46a | 6.0 | $4,660,000 |
| 17 | 10177+50 | 10188+50 | 1,100 | 40a to 43a | 6.0 to 4.5 | $4,660,000 |
| 18 | 10166+50 | 10177+50 | 1,100 | 37a to 40a | 4.5 to 4.0 | $2,230,000 |
| 19 | 10155+15 | 10166+50 | 1,135 | 35a to 37a | 4.0 | $2,300,000 |
| | | | | | | |
| | | | 20,457 | | | $79,414,000 |

While the preferred phasing has a total of five phases the extended phasing plan has nineteen phases. This plan is not necessarily intended to indicate that it will take 19 years or longer to complete all phases. Phases can be combined in a single construction contract, or made as options to give flexibility for the acquisition strategy. For rehabilitation of a long wall section one approach would be to start at one end and work on adjacent sections until the entire wall is completed. Since all four of the candidate demonstration areas are already badly deteriorated and present a risk of even more severe damage as well as safety concerns for park visitors these four areas were made the first four phases even though they are not adjacent. Demonstration area 4, the tip of Hains Point,

was increased from the area designated in Section I and Appendix 8 to make it more consistent in size with the other phases in this phasing plan.

Since the Potomac side of the park is the more aggressive environment for flow and wave run-up, that side is systematically phased after the four demonstration areas are completed. Phases 5 through 11 are the 5,600 lineal feet between the end of phase 1 (demonstration area 3) and phase 3 (demonstration area 1). Phase 11A is the in-fill between phase 3 (demonstration area 1) and phase 4 (an enlarged demonstration area 4 including the tip of Hains Point) and 11A can either be done with 11 or as a separate phase.

Following completion of the Potomac side of the park the phasing plan moves back to pick up at the end of phase 2 by the Park Headquarters building (demonstration area 2) and systematically moves from phase 12 through 19 to complete the Washington Channel side of the park. As noted above unless phase 2, 12, 13 and 14 are completed as a single project the alternative wall height solution discussed in Section H cannot be used.

An alternative for the extended phasing approach to maximize flood protection to the buildings at the west end of the park would be as follows:

- Phases 1-4 still go first as these areas are already in failure
- Phases 5-7 to maximize protection of buildings on the Potomac side of the park
- Phases 12-14 to maximize protection of buildings on the Washington Channel side of the park
- Phases 8-11 to complete the Potomac side of the park
- Phases 15-19 to complete the Washington Channel side of the park