**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DC PRESERVATION LEAGUE, *et al.*,**

*Plaintiffs,*

v.

**UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,**

*Defendants.*

Civil Action No. 1:26-cv-00477 (ACR)

The Hon. Ana C. Reyes

# BRIEF OF *AMICUS CURIAE* WASHINGTON AREA BICYCLIST ASSOCIATION IN SUPPORT OF PLAINTIFFS

# TABLE OF CONTENTS


INTEREST OF AMICUS CURIAE ........ 1

SUMMARY OF ARGUMENT ........ 2

ARGUMENT ........ 3

I. EAST POTOMAC PARK'S BICYCLE LOOP IS AN INTEGRAL PART OF THE PUBLIC RECREATIONAL RESOURCE THAT CONGRESS PROTECTED. ........ 3

A. Congress preserved the Park for public recreation, not for the exclusive benefit of any one use. ........ 3

B. NPS's own bicycle-safety improvements recognize that the loop's configuration matters. ........ 5

II. DEFENDANTS' IMPLEMENTATION OF THE REDEVELOPMENT WITHOUT MEANINGFUL REVIEW VIOLATES NEPA AND THE APA. ........ 6

A. NEPA requires consideration of the actual federal undertaking, not artificially isolated steps. ........ 6

B. A categorical exclusion does not apply to this extraordinary situation. ........ 7

C. The Park's circulation, historic setting, and public access require review before project approval or construction. ........ 9

III. THE NHPA, ORGANIC ACT, AND 1897 ACT REINFORCE THE DUTY TO PROTECT THE PARK'S HISTORIC AND RECREATIONAL CHARACTER. ........ 10

IV. PRELIMINARY RELIEF IS NECESSARY TO PREVENT IRREPARABLE HARM AND SERVES THE PUBLIC INTEREST. ........ 11

A. The threatened injury is imminent and cannot be remedied after judgment. ........ 11

B. The balance of equities and the public interest favor preserving the Park pending lawful review. ........ 12

CONCLUSION ........ 13

# TABLE OF AUTHORITIES

## CASES

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
462 U.S. 87 (1983) .......... 6

*Davis v. Latschar*,
202 F.3d 359 (D.C. Cir. 2000) .......... 10

*Delaware Riverkeeper Network v. FERC*,
753 F.3d 1304 (D.C. Cir. 2014) .......... 6, 7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 9

*Open Communities Alliance v. Carson*,
286 F. Supp. 3d 148 (D.D.C. 2017) .......... 12

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) .......... 6, 11

*Seven County Infrastructure Coalition v. Eagle County*,
605 U.S. 168 (2025) .......... 7

*Washington Area Bicyclist Ass'n, Inc. v. Burgum*,
2026 WL 1078218 (D.D.C. Apr. 21, 2026) .......... 9

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 11

## STATUTES

5 U.S.C. § 705 .......... 12-13

Act of Mar. 3, 1897, ch. 375, 29 Stat. 624 .......... 2-3, 10

Administrative Procedure Act .......... 3, 6, 9

National Environmental Policy Act .......... 3, 6, 9-11

National Historic Preservation Act, 54 U.S.C. § 306108 .......... 3, 10

National Park Service Organic Act, 54 U.S.C. § 100101(a) .......... 3, 10

## REGULATIONS

43 C.F.R. § 46.215(b), (f) .......... 8

## INTEREST OF AMICUS CURIAE[1]

The Washington Area Bicyclist Association ("WABA") is a nonprofit regional organization that works to empower people to ride bikes, build connections, and transform places to make transportation safer for all. Its work includes advocacy for safer streets and trails, bicycle education, community organizing, public events, and stewardship of Washington D.C.'s regional trail networks. WABA represents approximately 5,000 members and has nearly 25,000 regional advocacy supporters. WABA members ride the Hains Point loop, a critical part of East Potomac Park, for fitness, group training, casual recreation, family outings, commuting, enjoyment of the natural environment, and access to the National Mall and other trail networks.

WABA submits this brief for a limited purpose. Plaintiffs have developed the broader history of the golf courses and the legal defects in Defendants' actions. WABA writes separately to explain East Potomac Park's role as an established and historic public cycling resource. WABA's perspective is distinct from, and complementary to, the Plaintiffs' motion.

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund the preparation or submission of this brief. No person other than WABA, its members, or its counsel contributed money intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

Congress declared that East Potomac Park must be "forever held and used as a park for the recreation and pleasure of the people." Act of Mar. 3, 1897, ch. 375, 29 Stat. 624. Bicycling is among those protected public uses. National Register documentation expressly identifies the Park's walkways and roadways as bicycling and jogging trails. ECF No. 84-1, Ex. A, at 23. After a public meeting and comment period, the National Park Service ("NPS") itself recently improved the Ohio Drive loop for bicyclists and pedestrians through a dedicated, bidirectional shared-use facility. NPS's stated purpose was to reduce conflicts while "continuing to provide for the fullest range of uses of East Potomac Park." Nat'l. Park Serv., *National Park Service to implement traffic safety improvements in East Potomac Park,* https://www.nps.gov/nama/learn/news/eppsafety.htm (last visited Aug. 20, 2026). A redesign that disregards this loop would disregard an established, federally recognized recreational use of the Park.

The danger is immediate. In October 2025, NPS approved the transport and temporary storage of approximately 30,000 cubic yards of excavated East Wing material at East Potomac Park under a categorical exclusion ("CE") for "landscaping and landscape maintenance." ECF No. 1-7 at 2. It then implemented that decision by accepting, stockpiling, and grading the material in East Potomac Park. ECF No. 1-7; ECF No. 1-8. NPS's project description stated that the material would later be incorporated into golf-course improvements.[2] *Id.* at 1–3. Next, NPS began cutting down hundreds of trees on October 10, 2026, and now estimates that its project will remove approximately 729 trees in total, with roughly 300 still slated for removal when the Court intervened. Griess Decl. ¶¶ 33–43, ECF No. 84-1. On October 18, the President announced a championship golf course design and a November 15 closure of the existing course; the next day he announced that work was scheduled to

---

[2] The companion historic assessment identified Ohio Drive, internal roads, paths, tree rows, open spaces, and viewsheds as contributing or potentially affected components of the historic district, but used streamlined "routine grounds maintenance" review to find no adverse effect. ECF 1-8 at 1–5.

begin "IMMEDIATELY!" ECF Nos. 91, 96. These events belie any suggestion that the Court is being asked to review a purely abstract possibility of future work.

Defendants insist that the mass tree removal is independent maintenance unrelated to the championship-course redevelopment. ECF No. 84 at 27–32. But the coincidence of location, timing, physical changes, and announced objectives warrants review of the actual project being implemented, not acceptance of labels chosen by the agency. The National Environmental Policy Act ("NEPA"), the Administrative Procedure Act ("APA"), the National Historic Preservation Act ("NHPA"), the NPS Organic Act, and the 1897 Act creating East Potomac Park all preclude Defendants' precipitous actions. Defendants cannot proceed through irreversible steps while postponing meaningful examination of the cumulative consequences for this public park and its established users. An injunction should preserve the landscape, paths, facilities, and amenities of the Park until the required review occurs.

WABA therefore respectfully asks the Court to grant the relief requested by Plaintiffs to the extent necessary to prevent Defendants from regrading the Park, altering roads and paths, further removing vegetation, or otherwise foreclosing reasonable alternatives before NPS defines and reviews the full planned action. A pause preserves lawful options for the agency and meaningful review for the public. NPS's construction first and review later approach would do the opposite.

## ARGUMENT

### I. EAST POTOMAC PARK'S BICYCLE LOOP IS AN INTEGRAL PART OF THE PUBLIC RECREATIONAL RESOURCE THAT CONGRESS PROTECTED.

#### A. Congress preserved the Park for public recreation, not for the exclusive benefit of any one use.

East Potomac Park was created as a public place for the "recreation and pleasure of the people." Act of Mar. 3, 1897, ch. 375, 29 Stat. 624. The Park's history confirms the breadth of that promise. After the park was transferred to the Office of Public Buildings and Grounds in 1912, the

government constructed a roadway around its perimeter, which is now Ohio Drive SW, and planted cherry trees along it. HABS No. DC-692, at 6. A waterfront promenade, begun in the late 1910s, eventually extended approximately four miles around the island. *Id.* During World War II, when the government encouraged alternatives to automobile travel, a bicycle-rental facility in the Park "thrived" on business from wartime workers. *Id.* at 6–8. Cyclists have enjoyed the area ever since. The 1973 National Register nomination describes roadways and walkways used as bicycling and jogging trails and as routes for sightseeing. ECF No. 84-1, Ex. A, at 23. NPS's historic documentation further identifies East Potomac Park as primarily developed for active recreation. *Id.*, Ex. A, at 39–40. Those uses are part of the Park's historic identity, not incidental amenities subordinate to golf.

Ohio Drive follows the waterfront around Hains Point, providing a continuous recreational circuit in the heart of the nation's capital. Cyclists, including many of WABA's members, regularly use and enjoy not just the cycling lane, but the Park's scenic views, nature, and birding. People experience the rivers, cherry trees, open lawn, wildlife, and historic landscape while walking, running, and bicycling around the island. In 2023, the NPS completed installation of the 2.5-mile dedicated bicycle and pedestrian lane on Ohio Drive. Nat'l. Park Serv., *National Park Service to implement traffic safety improvements in East Potomac Park,* https://www.nps.gov/nama/learn/news/eppsafety.htm (last visited Aug. 20, 2026).[3]

For cyclists, all these elements operate as a single resource. The route's relatively flat and legible configuration supports repeated training laps, but it also makes the Park unusually accessible to families and less-experienced riders. The continuous loop allows people to ride without repeatedly navigating signalized intersections or turning across traffic. Its location provides views and a sense of

---

[3] The purpose of this development was to improve traffic safety, especially in light of a fatal accident which killed two pedestrians at Hains Point in 2021. NBC Washington, *Pickup Strikes, Kills 2 Pedestrians at Hains Point: Police* https://www.nbcwashington.com/news/local/2-pedestrians-struck-killed-at-hains-point-police/2650842/ (last visited Aug. 20, 2026).

separation from the rest of urban Washington D.C. Its value to cyclists, including WABA's members, depends on its uninterrupted geometry, manageable grades, separation from conflicting traffic, accessibility, and the setting through which it passes. A route that is severed by construction, converted into a service road, crossed by frequent construction vehicles, or stripped of the landscape that gives it character is not the same recreational resource merely because some pavement remains.

**B. NPS's own bicycle-safety improvements recognize that the loop's configuration matters.**

NPS's recent project converting a lane of Ohio Drive into a bidirectional bicycle and pedestrian facility reflected a deliberate decision to accommodate multiple public uses and reduce conflicts between people walking, riding, and driving. The process involved public engagement and refinement of the proposed layout. NPS identified the relevant user groups and conflict points, presented a concept to the public, received comments, revised the design, and coordinated with transportation agencies. Nat'l. Park Serv., *National Park Service to implement traffic safety improvements in East Potomac Park*. The result is a functioning shared-use corridor that permits bicyclists to enjoy the Park.[4]

That history exposes a fundamental omission in the announced redevelopment. The October 18 rendering depicts a new golf course occupying the peninsula, but it is not a circulation plan. ECF No. 91 at 1–2. It supplies no analysis of how the existing shared-use facility would operate during extensive construction, how trucks and equipment would cross or occupy recreational routes, whether continuous public access would survive, or how any final layout would accommodate the users NPS previously sought to protect. Defendants cannot treat the public's use of the perimeter loop as an

[4] The final project established distinct operating spaces: a bidirectional shared-use path for pedestrians and many cyclists, and a motor-vehicle lane marked to accommodate experienced cyclists. It changed parking geometry to protect the path, prohibited buses from the loop, added six-foot bicycle lanes near Long Bridge, and improved the connection at Inlet Bridge toward the regional bicycle network. *See National Park Service to implement traffic safety improvements in East Potomac Park,* https://www.nps.gov/nama/learn/news/eppsafety.htm (last visited Oct. 23, 2026).

afterthought when those uses are integral to the Park's function. Nor should NPS disregard in a far larger project the same circulation and safety interests that it considered important enough to study, disclose, and address only three years ago.

## II. DEFENDANTS' IMPLEMENTATION OF THE REDEVELOPMENT WITHOUT MEANINGFUL REVIEW VIOLATES NEPA AND THE APA.

### A. NEPA requires consideration of the actual federal undertaking, not artificially isolated steps.

NEPA requires an agency to take a hard look at the environmental consequences of its proposed action before irretrievable commitments foreclose meaningful choices. *See Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 97 (1983); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). An agency may not evade that obligation by splitting a single undertaking into smaller pieces. *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313–16 (D.C. Cir. 2014). The question is not whether placing 30,000 cubic yards of waste material or removal of hundreds of trees at the Park can be described in isolation as landscape maintenance, but whether the decisions and work are genuinely independent of the redevelopment now being pursued at the same site.

The government relies on a 2019 Cultural Landscape Report recommending restoration of the golf course's links-style features, including reduction of some trees. Griess Decl. ¶¶ 11–14, ECF No. 84-1. But that report existed for seven years before NPS suddenly approved a plan to remove hundreds of trees within days, just as the Administration publicly advanced a new championship-course project. The October 9 categorical exclusion contemplated removal of 529 trees; the operation immediately exceeded the anticipated count by approximately 200 smaller trees. *Id.* ¶¶ 22–26, 33–37. The record also contains public announcements of a redesigned course, an architect's concept, and a projected construction schedule. ECF Nos. 91, 96. These are concrete circumstances that call for

scrutiny of whether the purportedly separate work is an implementation phase of the same redevelopment.

*Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168, 190–91 (2025), does not give agencies a license to redefine a single on-site project into disconnected components. Although courts defer to reasonable agency line-drawing, *Seven County* expressly recognizes that closely related activities may be one project within the same agency's authority. Here, the same federal land manager controls the tree removal and the proposed redesign, and both concern physical transformation of the same historic landscape. Defendants are not entitled to deference for arbitrarily drawing a line that excludes the very project the work appears to advance. *See also Delaware Riverkeeper*, 753 F.3d at 1315–16.

The substantial-independent-utility inquiry reinforces the problem. Defendants maintain that the trees would be removed even if the championship redesign never occurs. ECF No. 84 at 29–32. Yet the abrupt implementation of only one aspect of the 2019 cultural landscape recommendations, in the precise location of the announced reconstruction, cannot be divorced from the surrounding facts. At a minimum, Defendants have failed to demonstrate that their narrow project definition reasonably accounts for the actions actually underway. And the destruction of hundreds of trees before broader review (or any meaningful review at all) forecloses alternatives that would preserve those trees, their associated habitat and shade, and the Park's existing recreational setting.

**B. A categorical exclusion does not apply to this extraordinary situation.**

NPS invoked a categorical exclusion for routine maintenance and repair of cultural-resource grounds, finding no extraordinary circumstances. Griess Decl. ¶¶ 22–25, ECF No. 84-1. Yet placing 30,000 cubic yards[5] of contaminated material or removing hundreds of trees from a nationally significant historic park in a single operation is not routine in any ordinary sense. For example, NPS's

[5] 30,000 cubic yards of material would fill between 2100-3000 standard dump trucks. It is a huge volume of material by any standard.

own initial inventory materially underestimated the tree removals, and its supplemental determination was prepared only after the additional trees had already been cut. *Id.* ¶¶ 34–37. The timing and magnitude of this operation undermine the premise that the agency had adequately evaluated its environmental consequences before acting.

Moreover, with respect to the fill material (waste from the destroyed East Wing of the White House), NPS stated in its categorical exclusion form that the material would be tested and verified as clean before placement, that the activity would be temporary and easily reversible, and that no significant environmental effects or relationship to another action existed. ECF No. 1-7 at 1–3. The final sampling report shows that representative sampling occurred during active deliveries and after grading, not entirely before placement. *See Jacobs Engineering Group, Final Sampling Report, East Potomac Park Soil Storage Project*, 1–2 (June 17, 2026). The report identified arsenic, lead, and polycyclic aromatic hydrocarbons as human-health constituents of potential concern under its preliminary screening; identified multiple metals, pesticides or herbicides, and PAHs as constituents of potential ecological concern; and recommended a more detailed human-health risk assessment and additional ecological risk assessment. *Id.* All of these make clear that the agency's decision to apply a categorical exclusion was an error.

The Interior Department's extraordinary-circumstances regulation requires attention to significant impacts on park and recreation lands and National Register properties. 43 C.F.R. § 46.215(b), (f). The Park is both. Defendants' analysis focused on whether the trees contributed to a particular historic golf-course design, while giving inadequate attention to the loss of mature vegetation, effects on other recreational users, and the possibility that the cutting facilitates an entirely different course layout. A finding that trees are noncontributing to a historic links-style golf course does not establish that their removal has no meaningful environmental or recreational consequences.

This Court has already addressed the reviewability of NPS action affecting an established bicycle facility in *Washington Area Bicyclist Ass'n, Inc. v. Burgum*, 2026 WL 1078218 (D.D.C. Apr. 21, 2026). The agency cannot avoid APA scrutiny merely by characterizing an impactful change to infrastructure as ordinary management. Here too, the issue is whether NPS provided the reasoned analysis the APA requires. An agency acts arbitrarily when it "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). The established bicycle loop and the recreational consequences of this sweeping redevelopment are important aspects of the problem that NPS cannot ignore. The fact that the agency has not adequately defined the "project" is not determinative of whether NEPA or any other statutory requirement applies to the agency's actions. If it were otherwise, an agency could simply refuse to identify a project and claim "routine maintenance" or ordinary management to avoid *ever* having to comply with NEPA.

### C. The Park's circulation, historic setting, and public access require review before project approval or construction.

President Trump's October 18 announcement described a championship course and stated that the existing golf course would close November 15 for approximately fifteen months. ECF No. 91 at 1–2. On October 19, the President announced that work would begin immediately. ECF No. 96 at 1. Defendants nevertheless continue to insist that the design is not final and that agency review is ongoing. ECF No. 94 at 1. That position cannot justify physical implementation first and environmental review later. The immediate threat is that construction decisions will become irreversible before NPS analyzes their consequences.

The relevant effects extend beyond the footprint of fairways and greens. Truck movements, staging areas, altered grades, excavation, stockpiled fill, drainage work, new crossings, temporary closures, and changes in vegetation can each affect bicyclists and pedestrians. A lawful environmental analysis must address the functional continuity and safety of the Ohio Drive loop

during construction and afterward, as well as reasonable alternatives that retain established public access. NEPA does not permit NPS to disregard those consequences simply because the proposed project is described as a golf course improvement.

## III. THE NHPA, ORGANIC ACT, AND 1897 ACT REINFORCE THE DUTY TO PROTECT THE PARK'S HISTORIC AND RECREATIONAL CHARACTER.

Section 106 of the NHPA requires federal agencies to consider effects on historic properties before approving an undertaking. 54 U.S.C. § 306108. East Potomac Golf Course is a contributing site in the East and West Potomac Parks Historic District, and NPS's own historic materials recognize the significance of roads, circulation, landscapes, and recreational uses. Griess Decl. ¶ 5 & Ex. A, ECF No. 84-1. The agency's October 9 assessment addressed its discrete tree-removal plan and concluded that there would be no adverse effect. *Id.* ¶¶ 24–25. It did not constitute a comprehensive Section 106 assessment of the newly announced championship redevelopment or of its effects on Ohio Drive and the historic park as a whole.

The National Park Service Organic Act directs NPS to conserve scenery, natural and historic objects, and wildlife while providing for their enjoyment in a manner that leaves them unimpaired for future generations. 54 U.S.C. § 100101(a). NPS Management Policies identify as unacceptable impacts those that create unsafe or unhealthful conditions, diminish opportunities for current or future enjoyment, or unreasonably interfere with appropriate park uses. ECF No. 8-17 at 11.[6] The 1897 Act independently directs that this particular land remain a park for the recreation and pleasure of the people. Those statutory commitments cannot be satisfied by examining only whether a redesigned golf course would be more prestigious or commercially attractive. NPS must address what its plans will do to the shared public landscape and to the users whose access and enjoyment Congress sought to preserve.

[6] This circuit has found actions taken inconsistent with NPS Management Policies can bind the agency's discretion. *See, e.g.*, *Davis v. Latschar*, 202 F.3d 359, 366 (D.C. Cir. 2000).

A process that removes hundreds of trees, imports huge volumes of contaminated waste, and advances construction before evaluating the Park's historic circulation and other established recreational uses inverts the statutory sequence. Section 106 and NEPA review are meant to inform choices while meaningful alternatives remain available. *See Robertson*, 490 U.S. at 349. Here, preserving the status quo is necessary to ensure that the agency's eventual analysis is not merely an account of damage already accomplished.

## IV. PRELIMINARY RELIEF IS NECESSARY TO PREVENT IRREPARABLE HARM AND SERVES THE PUBLIC INTEREST.

### A. The threatened injury is imminent and cannot be remedied after judgment.

Under *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), the Court considers likelihood of success, irreparable harm, the balance of equities, and the public interest. The threatened injuries here are not speculative dissatisfaction with a design. The agency has already placed tens of thousands of cubic yards of contaminated waste at the Park. ECF No. 1-7, at 1-3; *Jacobs Engineering Group, Final Sampling Report, East Potomac Park Soil Storage Project*, 1–2 (June 17, 2026). NPS has already cut hundreds of trees, and its superintendent identified approximately 300 additional trees slated for removal, requiring only another one or two days of felling. Griess Decl. ¶¶ 39–42, ECF No. 84-1. The President has announced both a construction schedule and an intention to begin immediately. ECF Nos. 91, 96. Without relief, the government can make irreversible physical changes before this litigation is resolved.

Trees cut down today cannot be restored by a judgment tomorrow. Nor can an injunction entered after the fact return a historic landscape to its prior condition, undo grading, or restore months of lost public access to the loop. The injury to people who use and enjoy the affected parkland is concrete and recreational, not merely an abstract interest in agency procedure. The historic record identifies bicycling as an established use of these roads and paths; the anticipated physical changes threaten the conditions that make that use possible. ECF No. 84-1, Ex. A, at 23. Once the Park is

reconfigured, the opportunity to choose alternatives preserving the current loop, landscape, and access will have been diminished or lost.

**B. The balance of equities and the public interest favor preserving the Park pending lawful review.**

The requested injunction protects the public from irreversible loss while preserving Defendants' ability to carry out any lawful redevelopment after the required process. The government has not identified a comparable irreparable harm from postponing further mass tree removal or other nonroutine work. Indeed, the asserted historic-restoration rationale derives from a 2019 report, and the government's superintendent estimated that only one or two additional days of tree felling would be required. Griess Decl. ¶¶ 11–14, 42, ECF No. 84-1. A short pause does not extinguish the government's planning authority; it preserves the possibility of exercising that authority lawfully.

The public interest is broader than any proposed championship course. East Potomac Park is used by cyclists, walkers, runners, golfers, families, and visitors. Congress preserved it for their recreation and pleasure, and NPS has invested in accommodating those uses. Protecting the existing loop and landscape until the environmental and historic-preservation consequences are evaluated advances the public's interest in open parkland, safe access, and lawful federal decision-making. The public should not lose a long-established recreational resource through a sequence of irreversible acts carried out before the agency has completed its review. The government has no legitimate interest in obtaining an irreversible head start through action taken before required procedures are complete. *See Open Communities Alliance v. Carson,* 286 F. Supp. 3d 148, 179 (D.D.C. 2017).

WABA therefore supports Plaintiffs' requested preliminary injunction or, alternatively, a stay under 5 U.S.C. § 705, to prevent further large-scale tree removal and other irreversible implementation of the challenged redevelopment, including grading, excavation, incorporation of fill, and material alteration of existing roads and bicycle facilities, pending the Court's resolution of the

claims. Such relief preserves the status quo without dictating the ultimate design of the Park or preventing emergency safety measures and ordinary maintenance.

## CONCLUSION

East Potomac Park is a shared public landscape whose recreational value extends beyond any single activity. For nearly 130 years, East Potomac Park has belonged to the people as a place for recreation and pleasure. Its cycling loop, historic landscape, and open public access are part of that promise. Defendants may not irreversibly remake the Park while withholding the environmental and historic review necessary to protect those interests. The Court should preserve the status quo and grant Plaintiffs' motion for preliminary injunction or, alternatively, stay the challenged agency action under 5 U.S.C. § 705.

Dated: October 23, 2026

Respectfully submitted,

Nessa Horewitch Coppinger
(D.C. Bar No. 477467)
BEVERIDGE & DIAMOND PC