**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DC PRESERVATION LEAGUE,

DAVE ROBERTS,

and

ALEX DICKSON,

*Plaintiffs*,

*vs.*

UNITED STATES DEPARTMENT OF THE INTERIOR;

DOUG BURGUM, in his official capacity as Secretary of the Interior;

NATIONAL PARK SERVICE;

and

JESSICA BOWRON, in her official capacity as "Comptroller Exercising the Delegated Authority of the Director" of the National Park Service,

*Defendants*.

Case No. 1:26-cv-477-ACR

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR A TEMPORARY RESTRAINING ORDER**
**OR, ALTERNATIVELY, A 14-DAY STAY UNDER 5 U.S.C. § 705**
**AGAINST CLOSURE OF EAST POTOMAC PARK**

## TABLE OF CONTENTS


INTRODUCTION .......... 1

BACKGROUND .......... 2

ARGUMENT .......... 7

I. Plaintiffs are Likely to Succeed on the Merits. .......... 7

A. Plaintiffs Have Standing. .......... 7

B. The Washington National Plan Is Final Agency Action. .......... 8

C. Closing East Potomac Without Reviewing the Washington National Plan's Environmental Impacts Will Violate NEPA. .......... 8

D. Closing East Potomac Without Considering The Effects of the Washington National Plan On Historic Resources Will Violate the National Historic Preservation Act. .......... 16

E. Closing East Potomac Park is Arbitrary and Capricious. .......... 18

F. Implementing the Washington National Plan By Closing East Potomac Park Will Violate the National Park Service Organic Act. .......... 23

II. Plaintiffs Will Suffer Irreparable Injury Without a Temporary Restraining Order. .......... 27

A. The Harm Is Imminent. .......... 27

B. Plaintiffs And The Public Will Lose All Use of the Course And The Park. .......... 28

C. Closure Continues the Permanent Transformation of a Historic Landscape .......... 30

D. Closing First Forecloses Meaningful Review. .......... 31

III. The Balance of the Equities and the Public Interest Weigh Overwhelmingly in Favor of Restraining East Potomac's Closure. .......... 33

CONCLUSION .......... 34

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) ....................31

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
462 U.S. 87 (1983) ....................12

*Brady Campaign to Prevent Gun Violence v. Salazar*,
612 F. Supp. 2d 1 (D.D.C. 2009) ....................31

*C.G.B. v. Wolf*,
464 F. Supp. 3d 174 (D.D.C. 2020) ....................33

*Citizens Action Coal. of Ind., Inc. v. FERC*,
125 F.4th 229 (D.C. Cir. 2025) ....................15

*City of Phoenix v. Huerta*,
869 F.3d 963 (D.C. Cir. 2017) ....................17

*Coal. on Sensible Transp., Inc. v. Dole*,
826 F.2d 60 (D.C. Cir. 1987) ....................12, 13

*Comm. for Auto. Resp. v. Solomon*,
603 F.2d 992 (D.C. Cir. 1979) ....................11

*Del. Riverkeeper Network v. FERC*,
753 F.3d 1304 (D.C. Cir. 2014) ....................12, 13

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ....................9, 22

*District of Columbia v. Trump*,
810 F. Supp. 3d 19 (D.D.C. 2025) ....................7

*Earthworks v. Dep't of the Interior*,
105 F.4th 449 (D.C. Cir. 2024) ....................11

*Friends of the Earth, Bluewater Network Div. v. U.S. Dep't of Interior*,
478 F. Supp. 2d 11 (D.D.C. 2007) ....................20

*Ft. Funston Dog Walkers v. Babbitt*,
96 F. Supp. 2d 1021 (N.D. Cal. 2000) ........................................ 20, 21

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ........................................ 7

**Greater Yellowstone Coal. v. Kempthorne*,
577 F. Supp. 2d 183 (D.D.C. 2008) ........................................ 23, 24, 25

*Ill. Com. Comm'n v. ICC*,
848 F.2d 1246 (D.C. Cir. 1988) ........................................ 16

*Jackson Cnty., N.C. v. FERC*,
589 F.3d 1284 (D.C. Cir. 2009) ........................................ 12

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ........................................ 27, 33

*Mashack v. Jewell*,
149 F. Supp. 3d 11 (D.D.C. 2016) ........................................ 19, 20

*Massachusetts v. Watt*,
716 F.2d 946 (1st Cir. 1983) ........................................ 32

*Minisink Residents for Env't Pres. & Safety v. FERC*,
762 F.3d 97 (D.C. Cir. 2014) ........................................ 12

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................ 22

*Mytych v. Nat'l Park Serv.*,
No. 1:25-cv-4291, 2026 WL 310029 (D.D.C. Feb. 5, 2026) ........................................ 18

*Nat'l Park Serv. v. Nat'l Tr. for Historic Pres.*,
609 U.S. 1068 (2026) (per curiam) ........................................ 29

*Nat'l Rifle Ass'n of Am. v. Potter*,
628 F. Supp. 903 (D.D.C. 1986) ........................................ 24

*Nat'l Tr. for Historic Pres. in U.S. v. FDIC*,
No. 93-0904, 1993 WL 328134 (D.D.C. May 7, 1993) ........................................ 33

*Nat'l Tr. for Hist. Pres. in the U.S. v. Nat'l Park Serv.*,
185 F.4th 1185 (D.C. Cir. 2026) ........................................ 24

*Nat'l Wildlife Fed'n v. Burford*,
835 F.2d 305 (D.C. Cir. 1987) ....................................................................29, 30

*Nat. Res. Def. Council v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988) ....................................................................12

*Nken v. Holder*,
556 U.S. 418 (2009) ....................................................................33

*Oak Ridge Env't Peace All. v. Perry*,
412 F. Supp. 3d 786 (E.D. Tenn. 2019) ....................................................................12

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
45 F.4th 291 (D.C. Cir. 2022) ....................................................................17

*Open Cmtys. All. v. Carson*,
286 F. Supp. 3d 148 (D.D.C. 2017) ....................................................................33

*River Runners for Wilderness v. Martin*,
593 F.3d 1064 (9th Cir. 2010)....................................................................25

*S. Utah Wilderness All. v. Dabney*,
222 F.3d 819 (10th Cir. 2000)....................................................................24

**Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) ....................................................................13

*Sierra Club v. U.S. Army Corps of Eng'rs*,
990 F. Supp. 2d 9 (D.D.C. 2013) ....................................................................31

*Sierra Club v. U.S. Dep't of the Interior*,
899 F.3d 260 (4th Cir. 2018)....................................................................24

*Spiegel v. Babbitt*,
855 F. Supp. 402 (D.D.C. 1994) ....................................................................20

*Taxpayers Watchdog, Inc. v. Stanley*,
819 F.2d 294 (D.C. Cir. 1987) ....................................................................14

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954) ....................................................................18

*WildEarth Guardians v. Jewell*,
738 F.3d 298 (D.C. Cir. 2013) ....................................................................32

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) .......... 7, 33

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) .......... 27

**Statutes**

5 U.S.C. § 551 *et seq.* .......... 19

5 U.S.C. § 553 .......... 19

5 U.S.C. § 705 .......... 1, 34

42 U.S.C. § 4332(2)(C) .......... 11

54 U.S.C. § 100101(a) .......... 23, 24, 29

54 U.S.C. § 306108 .......... 16, 18, 32

Act of Mar. 3, 1897, ch. 375, 29 Stat. 624 .......... 29

**Regulations**

36 C.F.R. § 1.5 .......... 18, 19, 20, 21, 22

36 C.F.R. § 1.7 .......... 18

36 C.F.R. pt. 68 .......... 16

36 C.F.R. § 800.1 .......... 16, 32

36 C.F.R. § 800.2 .......... 17

36 C.F.R. § 800.3 .......... 32

36 C.F.R. § 800.4 .......... 17, 18, 32

36 C.F.R. § 800.5 .......... 16, 17, 32

36 C.F.R. § 800.6 .......... 17, 32

General Regulations for Areas Administered by the National Park Service, 48 Fed. Reg. 30,252 (June 30, 1983) ... 19

**Other Authorities**

Alan Bastable, *Inside President Trump's D.C. muni plan–from the guy who's building it*, GOLF (May 21, 2026), https://perma.cc/9DC5-XNX9 ... 5

Eric Wilson, *What Are the Different Types of Golf Courses: 8 Different Types*, Keiser Univ. Coll. of Golf, https://perma.cc/59WZ-9BPG ... 5

Jessica Albert, *Costumed demonstrators hold Halloween protest to save East Potomac Park*, NBC Washington (Oct. 31, 2026), https://perma.cc/2DZT-WD4G ... 21

Leydis Torres Quintero, *33,000 Marathoners Take on 51st MCM, Fourth Victory for King*, U.S. Marine Corps (Oct. 27, 2026), https://perma.cc/RRX9-4CTG ... 10

Marine Corps Marathon, *Course Map* (2022), https://perma.cc/E87G-YZ39 ... 10

Nat'l Park Serv., *Management Policies* (2006) ... 25, 26, 27

Nat'l Park Serv., *National Park Serv. Begins Reconstruction of Tidal Basin and West Potomac Seawalls* (Aug. 15, 2024), https://perma.cc/VHN8-8KB9 ... 14, 15, 21

Nat'l Park Serv., *Rehabilitate Tidal Basin and West Potomac Park Seawalls: Environmental Assessment* (Feb. 2023), https://perma.cc/LQ96-AH2U ... 9

Nat'l Park Serv., *Rehabilitation of Tidal Basin and West Potomac Park Seawalls: Section 106 Assessment of Effects* (Dec. 2022), https://perma.cc/T9FA-SSF3 ... 9

Nat'l Park Serv., *Tidal Basin Revised Dev. Concept Plan: Consulting Party Mtg.* (Oct. 19, 2026), https://perma.cc/F4ZJ-QJRQ ... 29

Rick Maese, *Park Serv. works to fortify sea wall key to East Potomac golf project*, The Washington Post (Sept. 12, 2026), https://perma.cc/KK2D-YZ3X ... 9

Rick Maese, *As Trump derides judge again, officials say golf course will soon close*, The Washington Post (Oct. 29, 2026), https://perma.cc/9LTF-JGMH ... 21

## INTRODUCTION

The Court rightly notes that this case "has become much more" than "a case about golf." Mem. Op. 1, ECF 103. At its heart, this case is about the federal government's responsibility as caretaker for America's national parkland and its respect for the rule of law. That responsibility is not left to the whims of a deputy chief of staff, a cabinet secretary, or even a president. If Defendants can destroy East Potomac Park and reshape it in whatever image they like without regard for law or process, then they—or any other administration—can do it at any other national park, too. This case is also about the integrity of the judicial process, counsel's duty of candor to the Court, and the government's role in protecting these goals. Just as the Court found that Defendants sought to justify their recent tree "management" plan ("TMP") on pretextual grounds when it was in fact a further step toward implementing the Washington National Plan ("WNP"), so too have Defendants now purported to justify the imminent closure of East Potomac Park on the basis of an asserted "safety" rationale that is so risible that even their declarant does not endorse it.

Instead, by declaring their intention to close East Potomac Park on November 15—a date that just happens to be the same date President Trump has repeatedly announced as the day Defendants will close the Park "in order to renovate and rebuild" the Golf Course, *see* Min. Order, Oct. 27, 2026—Defendants are poised to take another step in implementing the WNP, and in doing so, they will irreparably injure Plaintiffs and the public interest. That warrants issuance of a temporary restraining order or, alternatively, a 14-day stay under 5 U.S.C. § 705 in advance of proceedings on a motion for preliminary injunction.

## BACKGROUND

The Court's memorandum opinion enjoining further felling of trees on East Potomac Park recites the case's facts at length, and Plaintiffs do not repeat them all here. That decision reached three important conclusions.

First, Defendants have adopted the WNP—a plan to destroy East Potomac Golf Course and to replace its three historic layouts with a single, ahistorical, championship-style venue for professional tournaments, ECF 103 at 27—and in implementing that Plan will significantly harm Plaintiffs' recreational, aesthetic, and historic interests, *id.* at 42-47.

Second, Defendants have begun implementing the Plan. *Id.* at 34-35.

Third, Defendants have already made one attempt to carve off one piece of the WNP—the TMP—to implement piecemeal without a full environmental review while feigning an unrelated pretextual motive for executing that step. *Id.* at 59-62.

Against that backdrop, Defendants' latest effort looks familiar.

On October 18, President Trump announced on social media that East Potomac Golf Course "will be closed" "on November 15th," when "[r]estoration work will begin on the [Tom] Fazio [d]esign," Min. Order, Oct. 18, 2026. Defendants nevertheless continued to resist confirming in court what the President said and everyone else already knew—that the course was indeed slated to close. *See* Min. Order, Oct. 27, 2026 (quoting Defendants' counsel as telling the Court that "[w]ith regard to the November 15th date . . . there is no plan to close the course"). On October 26, President Trump announced again that "[w]e are closing the East Potomac Golf Course Site as scheduled on November 15th in order to renovate and rebuild." *See id.* (quoting social media post). Finally, on October 28, ten days after the President first announced the November 15 closure, Defendants "acknowledge[d] the President has twice directed Interior and the National Park Service to close [East Potomac] by November 15," Defs.' Resp. to O.S.C. 4, ECF 107; that

Defendants are "working to develop a plan to implement that direction," *id.*; and that "on November 15, 2026, the National Park Service will close East Potomac Park south of Buckeye Drive, including the Golf Course, consistent with the President's directive." Defs.' Notice 2, ECF 111.

Despite acknowledging in those filings that the planned closure is "consistent with" the WNP and serves to implement the "President's directive," ECF 107 at 4; ECF 111 at 2—*i.e.*, the directive to close the Park on November 15 "*in order to renovate and rebuild*," Min. Order, Oct. 27, 2026 (emphasis added)—Defendants also stated in their notice that the closure of the Park on November 15 would be necessary due to "significant safety hazards at East Potomac Park" resulting from "the deteriorated sea wall that is currently crumbling into the Potomac River and is a safety hazard in a state of significant disrepair" and that closure would therefore "occur in all events" regardless of plans to renovate East Potomac Golf Course. ECF 111 at 2. In support, Defendants submitted a declaration from Acting NPS Director Jessica Bowron, dated October 28, that describes the longstanding deterioration of the seawall surrounding East Potomac Park and recounts several proposals for repairing it that date back to at least 2011. Third Suppl. Decl. of Jessica Bowron ¶¶ 7-17, ECF 111-2; *id.* Exs. A-D, ECF 111-3 to 111-6.

Notably, Ms. Bowron's October 28 declaration does not attest that the condition of the seawall creates a safety hazard requiring closure of the Park.[1] Ms. Bowron instead attests that seawall deterioration has caused hazardous conditions over the last several years in several areas

[1] While the Court's November 3 Minute Order states that there will be no witnesses at the November 13, 2026 hearing, in coming proceedings Plaintiffs believe hearing from Ms. Bowron and obtaining certain discovery (e.g., into communications between Gregory Wischer and the Fazios and between NPS and the National Links Trust) would be crucial to complete the record in this case. *See* Min. Order, Oct. 22, 2026 ("Plaintiffs may renew their Motion to Resume Testimony in advance of a permanent injunction hearing.").

around the perimeter of the Park that have had to be fenced off for visitor safety. ECF 111-2 ¶¶ 14-16. Only Defendants' cover notice, ECF 111, represents that "significant safety hazards" associated with the seawall require closure of the entire Park. Moreover, neither the cover notice nor the Bowron declaration suggests that any work to repair the seawall is actually slated to begin any time soon or otherwise offers any explanation for Defendants' selection of November 15—the very day the President directed Defendants to close East Potomac "in order to renovate and rebuild" the Golf Course, Min. Order, Oct. 27, 2026—as the day when alleged safety concerns will coincidentally require the Park's closure.[2]

Two days later, on Friday, October 30, Defendants submitted the WNP to the National Capital Planning Commission. Ex. A at 35 ("NCPC Proposal"). That submission confirms, again, Defendants' decision to "comprehensive[ly] redevelop[]" East Potomac Golf Course into a championship-style course suitable for major tournaments. *Id.* at 4, 34. The design of the new Fazio-designed course appears to be identical to that posted by President Trump on social media on October 18. *Id.* at 1.

As anticipated, that new design will destroy East Potomac's existing historic layout and the original Walter Travis design. Most obviously, the three-course arrangement is gone: the existing novice-skill White Course and the beginner-skill Red Course both are wiped out in favor of the

[2] The October 28 Bowron declaration also explains that, on that same day, NPS secured a new lease agreement with the National Links Trust under which NLT will no longer operate in a holdover status at East Potomac and will "cease operations at East Potomac Golf Course" on or before November 15. ECF 111-2 ¶ 6. Defendants' cover notice—but not the Bowron declaration—states that the November 15 closure will include East Potomac Golf Course "because there will be no company to operate that course." ECF 111 at 2. Neither the cover notice nor the Bowron declaration, however, suggests that NPS is incapable of operating the golf course itself or identifying another vendor to do so. Further, neither provides any facts excluding the possibility—indeed, the probability—that NPS secured NLT's ouster as of November 15 precisely because the purpose of closing on November 15 is to begin "renovat[ing] and rebuild[ing]" the golf course in accordance with the Fazio design, just as the President directed.

WNP's ahistoric, championship-style arrangement. The new plan's layout and footprint, routing, bunkering arrangement, use of trees, and water hazards confirm Defendants' decision to abandon the design that has defined East Potomac for more than 100 years. In fairness, Fazio—the WNP's designer—never promised a Travis restoration. To the contrary, Fazio has repeatedly rejected preserving the existing design. As he told *GOLF.com* in a May 2026 profile, "[t]here won't be any holes that are exactly the way they are now because they're not acceptable in today's golf standards."[3] "People talk about designing or preserving the old golf courses. If Donald Ross or [A.W.] Tillinghast, the famous great old designers, if they would have had the budgets and equipment we had today, they would've done a whole lot of things differently than they did."[4]

The Travis design's routing consists of two "out and back" loops, with the first nine holes departing from the field house in a southeasterly direction, then returning in counterclockwise fashion, and the second nine traveling southwest from the clubhouse before looping back counterclockwise. Fazio's design, though, begins with its first two holes occupying space currently used for the White Course, with the remaining 16 holes zig-zagging throughout the island—including three holes slated to overtake Hains Point, which has never been part of East Potomac Golf Course. Fazio's design is not a links-style design; it is a parkland layout.[5] Fazio's design calls for two large water features; the Travis design, consistent with the links-style tradition, has none. The Fazio design's bunkering is also inconsistent with Travis's and with the links-style tradition that makes East Potomac Golf Course's current layout accessible to players of varying

---

[3] Alan Bastable, Inside President Trump's D.C. muni plan–from the guy who's building it, GOLF (May 21, 2026), https://perma.cc/9DC5-XNX9.
[4] *Id*.
[5] Eric Wilson, What Are the Different Types of Golf Courses: 8 Different Types, Keiser Univ. Coll. of Golf, https://perma.cc/59WZ-9BPG ("Links courses are typically located around coastal areas and have firm fairways and natural contours. Parkland courses, by contrast, feature lush grass, tree-lined fairways, and more manicured landscapes.").

skill levels. As to trees, the Fazio design confirms why Defendants removed the trees they selected for removal in the TMP. For example, the design shows a new water hazard slated to occupy the land that had been filled with trees in "Zone A" of the TMP, as well as a clear corridor with relatively few trees running from roughly the north edge of the 15th fairway to the 7th green aligning with "Zone C" of the TMP. *Compare* NCPC Proposal 35 *with* Mot. for TRO, Ex. 1 Categorical Exclusion 6, ECF 76-2. *See also* Am. & Suppl. Compl. ¶ 103, ECF 98 (alleging the WNP would necessarily require removal or relocation of hundreds of trees); Compl. ¶ 85, ECF 1 (same). Indeed, as measured by the 2019 Cultural Landscape Report (CLR)'s call for a return to the Travis design's open, links-style feel, the Fazio design in fact calls for far too many trees, further confirming that Defendants never had any intention of implementing the 2019 CLR's recommendation.

Defendants' NCPC submission also addresses the seawall, describing deteriorating conditions that have existed for decades around the perimeter of East Potomac Park, NCPC Proposal 12, 14, 15, 27-29, 55, and explaining that a key component of the redevelopment of East Potomac Golf Course will be construction of a new seawall for East Potomac Park comparable to the seawall that NPS recently repaired at the Tidal Basin and West Potomac Park, *id.* at 38-39, 55. Indeed, unlike East Potomac Golf Course's current footprint, which does not extend out to the edge of the East Potomac peninsula, the Fazio design for the WNP occupies the entire peninsula to the water's edge (including by eliminating the perimeter promenade and Ohio Drive), *id.* at 1, and thus necessarily depends on repairing the seawall—a project NPS has otherwise failed to address for years.

Finally, Defendants' NCPC submission acknowledges that although East Potomac Park has been home to a "century of public recreation," *id.* at 11, the WNP will completely "displace[]" the

Park's existing recreational opportunities, including for biking, walking, running, fishing, and picnicking, and that people who would otherwise engage in those activities at East Potomac will have to look elsewhere. *Id.* at 36-37. The NCPC submission asserts that Defendants anticipate completing a Section 106 review process, an environmental assessment, and review or consultation with the Commission of Fine Arts, the NCPC, interested Tribes, and the U.S. Fish and Wildlife Service. *Id.* at 54. It does not, however, indicate a timeline for those reviews or when seawall repairs or other work will begin.

## ARGUMENT

A party seeking either a temporary restraining order or a Section 705 stay faces identical requirements: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). Where the government opposes preliminary relief, the third and fourth factors merge. *Id.* "The same factors governing the issuance of a preliminary injunction [and TRO] govern the issuance of relief under section 705." *District of Columbia v. Trump*, 810 F. Supp. 3d 19, 35 (D.D.C. 2025). Here, each factor favors temporary relief.

### I. Plaintiffs are Likely to Succeed on the Merits.

#### A. Plaintiffs Have Standing.

When the Court ruled on Plaintiffs' first motion for a preliminary injunction, it concluded that the present record is not currently sufficient to support some of Plaintiffs' asserted injuries. ECF 103 at 47. Plaintiffs respectfully continue to assert those grounds on which the Court disagreed and preserve them here. *See* Mem. in Supp. of Mot. for Prelim. Inj. 10-18, ECF 80-1. However, the Court also held that Plaintiffs have standing on other grounds: namely, based on

injuries to their recreational, aesthetic, and historic interests in East Potomac Golf Course. ECF 103 at 47. That remains true. And those injuries are even more imminent now that Defendants have announced their plan to close East Potomac Park on November 15. If that closure goes forward as planned, Plaintiffs will be completely blocked from enjoying the recreational, aesthetic, and historic resources they currently enjoy at East Potomac.

### B. The Washington National Plan Is Final Agency Action.

Likewise, for the same reasons the Court found final agency action in its October 26 opinion, Defendants' adoption and implementation of the WNP constitute final agency action. *Id.* at 32. As the Court held, "DOI had, before October 15, decided to destroy East Potomac Golf Course and replace it with a Fazio-designed championship-style course," *id.* at 35, and legal consequences have flowed from that decision ("includ[ing] the cancellation of the NLT lease, the preparation of NEPA compliance documents in connection with the [tree-clearing] and dumping projects, and the creation of contracts with third parties," *id.* at 34-35). Indeed, as Plaintiffs have contended previously in briefs they incorporate here by reference, Defendants adopted that decision as long ago as the autumn of 2025 and have been implementing it ever since even while denying its existence. *See, e.g.*, Mem. in Supp. of Pls.' Mot. for Stay 7, ECF 8-1.

### C. Closing East Potomac Without Reviewing the Washington National Plan's Environmental Impacts Will Violate NEPA.

Defendants have played themselves into a familiar hazard.

In Defendants' telling, closure of East Potomac Park is necessary due to "significant safety hazards" resulting from the "deteriorated sea wall that is currently crumbling into the Potomac River" and would have to occur regardless of Defendants' plans to renovate the golf course, ECF 111 at 2. But as the Court noted in its October 26 opinion, "the Court is 'not required to exhibit a naiveté from which ordinary citizens are free. . . . Accepting contrived reasons would defeat the

purpose' of the reasoned explanation requirement of administrative law." ECF 103 at 32-33 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019)). And here, just like the TMP, Defendants' "safety" rationale is a contrived justification for taking yet another significant step toward implementation of the WNP.

The deterioration of the East Potomac seawall is not new—as Defendants acknowledge, the wall has required repairs for decades. *See* ECF 111-2 ¶ 14; ECF 111-4 (discussing the 2011 Phased Rehabilitation Plan). Yet NPS has not acted to address those repairs for years and has not indicated that work will actually begin on seawall repairs any time soon.[6] And throughout that time, NPS has never suggested the condition of the seawall posed a safety threat requiring closure of the Park.[7] Even Ms. Bowron's carefully worded October 28 declaration studiously avoids averring that safety hazards associated with the seawall actually require closure of the Park. ECF 111-2 ¶ 14 (describing only limited areas that had to be "fenced for visitor safety"); *id.* ¶ 18 ("Based on these facts . . . I plan to close East Potomac Park . . . .").

Defendants' newfound concern for visitor safety is belied by their own recent actions and statements. On October 6, Acting Director Bowron signed a declaration attesting that NPS was

---

[6] By comparison, when NPS undertook to repair the seawall at the Tidal Basin and West Potomac Park, it first completed extensive legal compliance steps including NEPA and NHPA review. Nat'l Park Service, Rehabilitate Tidal Basin and West Potomac Park Seawalls: Environmental Assessment (Feb. 2023), https://perma.cc/LQ96-AH2U; Nat'l Park Service, Rehabilitation of Tidal Basin and West Potomac Park Seawalls: Section 106 Assessment of Effects (Dec. 2022), https://perma.cc/T9FA-SSF3. There is no indication NPS has yet completed any such review for repairs on the East Potomac seawall or will have done so by November 15. Ex. B ¶ 12 ("Third Miller Decl."); Rick Maese, Park Serv. works to fortify sea wall key to East Potomac golf project, The Washington Post (Sept. 12, 2026), https://perma.cc/KK2D-YZ3X.

[7] When NPS conducted extensive seawall repairs around the nearby Tidal Basin and West Potomac Park, it never closed the entire park to visitors. NPS instead strove to minimize disruption to recreation and other activities in West Potomac Park by phasing construction and limiting cordoned-off areas so that only small portions of the park would be inaccessible to the public at any given time. Nat'l Park Service, Rehabilitate Tidal Basin and West Potomac Park Seawalls: Environmental Assessment (Feb. 2023), https://perma.cc/LQ96-AH2U

continuing "to address outstanding deferred maintenance and repair issues at the Golf Course," including "tree pruning; removal of dead, dying, hazardous or invasive trees; and removal of the fence surrounding the golf course, which was in poor condition." Second Suppl. Decl. of Jessica Bowron ¶ 9, ECF 75-3. Ms. Bowron did not even mention the seawall or any associated hazards, let alone suggest that the condition of the seawall might imminently require closure of East Potomac Park. On October 16, Superintendent Griess signed a declaration attesting that NPS was "currently evaluating options to repair the seawall surrounding East Potomac Park, which was recommended in a 2011 Initial Rehabilitation Plan for the seawall," Decl. of Dr. Kevin Greiss ¶ 18, ECF 84-1, yet Dr. Griess never suggested that repairing the seawall would require closing the Park or that the seawall's condition posed such a danger to visitors as to require closing the Park.[8] And on October 25, just three days before Defendants announced the closure of East Potomac Park for alleged safety reasons, NPS allowed more than 30,000 people to run in the Marine Corps Marathon on Ohio Drive around the entire perimeter of East Potomac Park as thousands of spectators lined the course.[9]

What changed? Simple: the President issued a directive to "clos[e] the East Potomac Golf Course Site as scheduled on November 15th *in order to renovate and rebuild*" the golf course. *See* Min. Order, Oct. 27, 2026 (quoting social media post) (emphasis added). Defendants' own filings acknowledge they are closing the course "consistent with [that] directive," ECF 111 at 2—*i.e.*, to "implement [the President's] direction" to "close the park by November 15," ECF 107 at 4. As

---

[8] To the contrary, Dr. Griess stated that if Defendants' tree-felling work moved forward, "any temporary closures of portions of the Golf Course will be limited to that which is necessary to ensure public safety in the immediate area of work being performed." ECF 84-1 ¶ 41.

[9] *See* Leydis Torres Quintero, 33,000 Marathoners Take on 51st MCM, Fourth Victory for King, U.S. Marine Corps (Oct. 27, 2026), https://perma.cc/RRX9-4CTG; *see* Marine Corps Marathon, Course Map (2022), https://perma.cc/E87G-YZ39.

with the October 10 tree-clearing operation, "[i]t asks too much of coincidence to accept" that old problems suddenly pose a safety threat requiring closure of the Park on the very same day the President directed Defendants to close the park "in order to renovate and rebuild" the golf course in accordance with the WNP. ECF 103 at 30. And it "asks too much of coincidence" to overlook Defendants' admission in their NCPC submission that repairing the seawall is a critical step in building the Fazio-designed championship-style golf course. NCPC Proposal 38-39, 55. The design renderings indicate why that is so: unlike East Potomac Golf Course's current footprint, which does not extend to the seawalls, the Fazio design for the WNP occupies the entire peninsula to the water's edge, swallowing the perimeter promenade, Hains Point, and Ohio Drive, *id.* at 1, and cannot be built without repairs to the seawall.

It is thus far more plausible—and, if the President of the United States is to be taken at his word, it is unequivocally true—that like the tree-clearing program before it, closing East Potomac Golf Course is a step toward implementing the WNP. The WNP in turn is a major federal action subject to review under the National Environmental Policy Act. ECF 103 at 39. Defendants have not performed a NEPA review for the WNP. *Id.* at 59. Taking a step to implement the WNP without first reviewing the full plan's environmental impacts is impermissible NEPA segmentation. *Id.*

NEPA requires agencies to prepare a "detailed" environmental impact statement for "major Federal actions significantly affecting the quality of the human environment." *Earthworks v. Dep't of the Interior*, 105 F.4th 449, 458 (D.C. Cir. 2024) (quoting 42 U.S.C. § 4332(2)(C)). *See Comm. for Auto. Resp. v. Solomon*, 603 F.2d 992, 1002-03 (D.C. Cir. 1979) (NEPA review "normally is triggered when there is a proposal to change the status quo"). Its "dual mission" is "to generate federal attention to environmental concerns and to reveal that federal consideration for public

scrutiny." *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 112 (D.C. Cir. 2014) (internal quotation marks and citation omitted). To accomplish that mission, NEPA requires federal agencies to "take a 'hard look' at the environmental consequences *before* taking a major action." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983) (emphasis added).

As the Court explained in enjoining the TMP, "[a]n agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014); *see* ECF 103 at 55-59. As another court put it, "[t]he rule against segmentation prevents agencies from evading their responsibilities under NEPA by artificially dividing a federal action into smaller components so the action would no longer be considered 'major,' or so that no significant environmental impacts would be detected . . . ." *Oak Ridge Env't Peace All. v. Perry*, 412 F. Supp. 3d 786, 805 (E.D. Tenn. 2019) (citing *Jackson Cnty., N.C. v. FERC*, 589 F.3d 1284, 1290 (D.C. Cir. 2009)). *Accord Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 68 (D.C. Cir. 1987) ("Agencies may not evade their responsibilities under NEPA by artificially dividing a major federal action into smaller components, each without 'significant' impact."). Importantly, the point of forbidding segmentation is not that the segmented action carries unevaluated environmental impacts; the point of forbidding segmentation is to prevent agencies from executing an unevaluated project piecemeal. Even for "individual actions . . . which individually ha[ve] an insignificant environmental impact," *Del. Riverkeeper*, 753 F.3d at 1314 (quoting *Nat. Res. Def. Council v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988)), if that action is part of a broader "single project within the authority of the agency in question," the agency must consider the environmental

effects of the project as a whole, *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 190 (2025); *see also* ECF 103 at 56.

Here, Defendants have not drawn a "reasonable," "manageable" line between the closure of East Potomac Park and the WNP. *Seven Cnty.*, 605 U.S. at 190. As this Court has already found, "the Washington National Plan, in toto, constitutes one final agency action." ECF 103 at 59. Defendants have regulatory authority over all parts of the WNP and over the management of East Potomac Park; and the closure of East Potomac Park is both geographically and temporally aligned with the WNP. Defendants' decision to close the Park without evaluating the environmental effects of the WNP as a whole thus merits no deference under *Seven County*. *Id.* at 59-60.

Circuit precedent likewise confirms the closure of East Potomac Park constitutes impermissible segmentation. The D.C. Circuit applies a four-factor test to identify segmentation: "whether the proposed segment '(1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives[;] and (4) does not irretrievably commit federal funds for closely related projects.'" ECF 103 at 60-61 (quoting *Del. Riverkeeper*, 753 F.3d at 1315). These factors are designed to ferret out truly separate projects from projects that have no independent justification apart from the larger plan. These factors do not always receive equal weight—that is, one factor can outweigh another. *See Coal. on Sensible Transp.*, 826 F.2d at 69. And as the Court demonstrated in its October 26 opinion, not all the factors need weigh toward segmentation in order to justify a finding of segmentation. ECF 103 at 61 (three of four factors indicated segmentation). As with the tree-clearing, applying the factors here confirms that closing the golf course is not separate from the WNP but is a step toward implementing that Plan and

therefore had to be preceded by an Environmental Impact Statement or Environmental Assessment that considered the effects of the WNP as a whole.

**1. No Logical Termini: Closing The Park Is Inseparable From The Washington National Plan And Cannot Be Justified By Pretextual Safety Concerns.**

First, Defendants' plan to close East Potomac Park does not have logical termini—its "endpoints" are not "logical." *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 299 (D.C. Cir. 1987). As explained above, the imminent closure of East Potomac Park due to alleged "safety" concerns with the sea wall "makes no sense" because those concerns are plainly pretextual. ECF 103 at 60. In contrast, closing the Park *is* a necessary step to destroying East Potomac Golf Course and beginning "restoration work . . . on the Fazio design." *See* Min. Order Oct. 18, 2026 (President's social media post that East Potomac Golf Course "will be closed" "on November 15th," when "[r]estoration work will begin on the [Tom] Fazio design").

**2. No or Little Independent Utility Outside Major Golf Course Renovation.**

Similarly, given that Defendants' safety assertions are pretextual and they have not established that closing the Park on November 15 (or ever) is necessary to accommodate repair work on the seawalls, *supra* pp. 10, closing the Park has no independent utility aside from preparing to destroy the golf course. ECF 103 at 61 (no substantial independent utility where no justification for segmented action "other than as part of a more robust renovation to the Course"). It certainly bears no rational connection to the condition of the seawall. *Supra* pp. 8-9. And as with the tree-clearing project before it, the timing between President Trump's announced closure date to renovate the golf course and the Defendants' plan to close the Park is too great a coincidence to overlook. As occurred at West Potomac Park, the seawall can be repaired without closing the Park. Nat'l Park Serv., Nat'l Park Serv. Begins Reconstruction of Tidal Basin and

West Potomac Seawalls (Aug. 15, 2024), https://perma.cc/VHN8-8KB9; *supra* 9 n.7. Closure of the Park logically serves one goal: destruction of the Golf Course and installation of the Fazio design unencumbered by outside interference.

**3. Moving Forward Will Thwart NEPA's No-Action Alternative.**

Third, closing the Park forecloses the opportunity to consider alternatives – namely, alternatives that do not involve eliminating the public's access to the Park. One of NEPA's chief purposes is to require agencies to consider reasonable alternatives to their plan, "including a no-action alternative." *Citizens Action Coal. of Ind., Inc. v. FERC*, 125 F.4th 229, 239 (D.C. Cir. 2025). If Defendants close the Park without conducting a NEPA review of the WNP, then they will have deprived Plaintiffs and the public of access to a national park for implausible, pretextual reasons when consideration of a no-action alternative might have preserved public access.

**4. Closing the Park Irretrievably Commits Federal Resources to a Project Closely Related to the Washington National Plan.**

The Court concluded in its October 26 opinion that "[t]he evidence so far does not address how federal funds . . . will be used to implement the Washington National Plan," ECF 103 at 61, and that as a result, "[t]he Court cannot yet assess this factor," *id.* Though no budget for the WNP is, as of yet, publicly available, it seems very likely it will require the expenditure of significant federal funds.

In this respect, the record has not evolved. (This, among many other reasons, underscores Plaintiffs' continuing need for additional discovery.) At worst, then, this factor does not weigh in either Plaintiffs' or Defendants' favor.

However, two points are worth making. First, if the purpose of this factor is to demonstrate a financial commitment to the plan, then it cannot be overlooked that while the Park is closed, NPS will lose the revenue it would otherwise have earned from the golf course. There will be a financial

impact. Second, non-financial resources are at stake. If Defendants close East Potomac Park, they will eliminate the existing recreational use of the property. Even if the Park reopens, the public's lost enjoyment during the closure will be irretrievable. These impacts are precisely what NEPA is supposed to forestall until the agency has conducted a proper analysis of the harmful effects of the whole project on the human environment.

### D. Closing East Potomac Without Considering The Effects of the Washington National Plan On Historic Resources Will Violate the National Historic Preservation Act.

Just like NEPA segmentation, an agency cannot evade its obligations under the National Historic Preservation Act by compartmentalizing an undertaking into distinct phases and forgoing consultation with the public and interested parties or disregarding the cumulative effects of the project as a whole.

Like NEPA, the NHPA "is a 'stop, look, and listen' provision" that "requires federal agencies to take into account the effect of their actions" on historic properties, including "structures eligible for inclusion in the National Register of Historic Places." *Ill. Com. Comm'n v. ICC*, 848 F.2d 1246, 1261 (D.C. Cir. 1988). Under the NHPA, "[t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking . . . prior to the approval of the expenditure of any Federal funds on the undertaking . . . shall take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108. *See also* 36 C.F.R. § 800.1(a) (NHPA review should "commenc[e] at the early stages of project planning").

Accordingly, federal regulations require agencies to assess whether an action will have an "adverse effect" on historic property. 36 C.F.R. § 800.5(a)(1). This includes undertakings that "may alter, directly or indirectly, any of the characteristics of a historic property," *id.*, including "[p]hysical destruction of or damage to all or part of the property," *id.* § 800.5(a)(2)(i); "[a]lteration of a property, including restoration [or] rehabilitation . . . that is not consistent with" 36 CFR pt. 68,

*id.* § 800.5(a)(2)(ii); or effects on the property's "location, design, setting, materials, workmanship, feeling, or association." *Id.* § 800.5(a)(1). Examples of adverse effects include "[p]hysical destruction of or damage to all or part of the property," *id.* § 800.5(a)(2)(i); and "[c]hange of the character of the property's use or of physical features within the property's setting that contribute to its historic significance." *Id.* § 800.5(a)(2)(iv).

The cornerstone of review under Section 106 is consultation with interested parties and the public. NHPA-implementing regulations explain that "[t]he views of the public are essential to informed Federal decisionmaking in the section 106 process." 36 C.F.R. § 800.2(d)(1). Agencies are required to "seek and consider the views of the public." *Id.* They must "seek public comment and input," *id.* § 800.2(d)(2), and "provide the public with information about an undertaking and its effects on historic properties," *id.* *See also id.* § 800.2(d)(3) (agencies must "provide adequate opportunities for public involvement"). And they must "involve" consulting parties, *id.* § 800.2(a)(4), including "[c]ertain individuals and organizations with a demonstrated interest in the undertaking." *Id.* § 800.2(c)(5). When an adverse effect is found, agencies must consult with (among others) consulting parties to resolve the adverse effect. 36 C.F.R. § 800.6. And even "[i]f any agency determines that no historic structures will be adversely affected, it still has to 'notify all consulting parties' . . . and give them any relevant documentation." *City of Phoenix v. Huerta*, 869 F.3d 963, 971 (D.C. Cir. 2017), *opinion amended on reh'g*, 881 F.3d 932 (D.C. Cir. 2018) (citing 36 C.F.R. § 800.5(c)).

Those obligations apply even where an agency breaks an undertaking down into discrete phases. In some instances, agencies may use limited "phased" "identification and evaluation efforts" in NHPA reviews. 36 C.F.R. § 800.4(b)(2); *see Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 306 (D.C. Cir. 2022). Even then, however, the review process must "tak[e]

into account . . . the views of . . . consulting parties." 36 C.F.R. § 800.4(b)(2). And the statutory obligation remains that the agency must consider the undertaking's effects "prior to the approval of the expenditure of any Federal funds on the undertaking," 54 U.S.C. § 306108.

Here, as Defendants have acknowledged, the WNP is an undertaking subject to Section 106 review, *see, e.g.*, Decl. of Jessica Bowron ¶ 16, ECF 26-4, and adopting and implementing that plan without considering its adverse effects on historic properties violates the NHPA. Defendants admit that they have not reviewed the WNP under Section 106. NCPC Proposal 54 (DOI has not yet "prepare[d] a draft Assessment of Effects" and has not "consult[ed] the public"). After President Trump confirmed the plan's adoption in June 2026, NPS scheduled a Section 106 stakeholders meeting for August 13, 2026. Third Miller Decl. ¶ 8. Before the meeting, though, NPS delayed it before simply canceling it. It has not been rescheduled. Defendants cannot implement the WNP further by closing East Potomac Park, even under a phased approach, without "taking into account . . . the views of . . . consulting parties." 36 C.F.R. § 800.4(b)(2).

### E. Closing East Potomac Park is Arbitrary and Capricious.

#### 1. The Closure Will Violate NPS's Own Regulations.

An agency acts arbitrarily and capriciously when it violates its own regulations. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). Here, Defendants' plan to close East Potomac Park without notice and comment, or even a written justification, violates multiple provisions of the relevant regulations. Where a proposed closure is "highly controversial" or of a "nature, magnitude, and duration that will result in a significant alteration in the public use pattern of the park area," it "shall be published as rulemaking in the Federal Register." 36 C.F.R. § 1.5(b). Further, NPS must give notice to the public of the closure, including through conspicuous signage, newspaper publication, or similar methods. *Id.* § 1.7. *See Mytych v. Nat'l Park Serv.*, No. 1:25-

cv-4291, 2026 WL 310029, at *1 (D.D.C. Feb. 5, 2026) ("Before closing a park, NPS must provide a written justification for its decision, except in emergencies").

Defendants' announced plan to close East Potomac Park falls squarely within the requirements of that provision. Defendants intend to close a national park unit, East Potomac Park, and to restrict its use in a manner that will significantly alter the current pattern of public use of the park and undermine its "natural, aesthetic, scenic [and] cultural values." 36 C.F.R. § 1.5(b). Defendants' own NCPC submission acknowledges the significant harm this will cause to the recreating public, whose use of and activities on East Potomac Park will have to be diverted elsewhere. *See* NCPC Proposal.

When NPS published these regulations in 1983, it explained its intent to follow notice and comment rulemaking procedures to allow for fulsome public involvement. *General Regulations for Areas Administered by the National Park Service*, 48 Fed. Reg. 30,252, 30,254 (June 30, 1983). As the preamble explained, § 1.5(b) "was drafted to more closely pattern the notice and comment procedures of the Administrative Procedure Act." 48 Fed. Reg. at 30,254 (citing 5 U.S.C. § 551 et seq.). NPS repeatedly referenced the importance of the "notice and comment rulemaking" procedures when explaining the purpose and function of 36 C.F.R. § 1.5 as well as other provisions issued in that rulemaking. *See, e.g.*, 48 Fed. Reg. at 30,254 ("This section requires superintendents to rely on notice and comment rulemaking[.]"); *id.* at 30,261 ("except when there is a serious threat to public health and safety or park resources, the superintendent shall rely on notice and comment rulemaking procedures").

Accordingly, the phrase "published as rulemaking in the Federal Register" in § 1.5(b) has been treated by both courts and NPS as requiring full informal rulemaking in accordance with the rulemaking provisions of the APA, 5 U.S.C. § 553, not merely the act of placing a document in the

Federal Register. *See Mashack v. Jewell*, 149 F. Supp. 3d 11, 38 (D.D.C. 2016) (recognizing that, because closure was merely temporary and well-supported by the record, it did not trigger "the notice and comment obligation"); *Spiegel v. Babbitt*, 855 F. Supp. 402, 404 (D.D.C. 1994) (relying on NPS preamble and agreeing with NPS argument that limited docking restrictions "does not require the use of notice and comment procedures"); *see also Friends of the Earth, Bluewater Network Div. v. U.S. Dep't of Interior*, 478 F. Supp. 2d 11, 14 (D.D.C. 2007) (describing the process as akin to promulgating "special regulations").

Defendants have disregarded these procedural requirements as they move towards closing East Potomac Park, starting November 15, for a 15-month period. They neither initiated rulemaking in the Federal Register nor published any determination that rulemaking was unnecessary on grounds that closure of the park was not "highly controversial" or of a "nature, magnitude, and duration that will result in a significant alteration in the public use pattern of the park area." *Compare Ft. Funston Dog Walkers v. Babbitt*, 96 F. Supp. 2d 1021, 1032-33 (N.D. Cal. 2000) (declining to excuse agency's failure to publish rulemaking concerning its closure of park to off-leash dogs where it failed to publish a pre-closure determination that such action was neither controversial nor a substantial alteration of public use patterns) *with Mashack*, 149 F. Supp. 3d at 36-37 (upholding agency's decision to close a national park marina where agency issued a "record of determination" that rulemaking was unnecessary because closure was limited in duration, impacted a small number of boaters, and other adjacent marinas remained open to the public). Any unpublished "implicit" determination by Defendants that the rulemaking process was inapplicable merits no deference. *Ft. Funston*, 96 F. Supp. 2d at 1032. Defendants do not—and cannot—meaningfully dispute that the closure of the Park will "result in a significant alteration in the public use pattern of the park area." 36 C.F.R. § 1.5(b).

The closure is also "highly controversial," as evidenced by (among many examples) the latest of several demonstrations protesting Defendants' plans to close East Potomac Park and destroy East Potomac Golf Course.[10] *See Ft. Funston*, 96 F. Supp. 2d at 1032 (rulemaking required for park closures that are either "highly controversial" or involve a "significant alteration").

"Emergency" circumstances likewise do not excuse Defendants' failure to abide by these procedures. 36 C.F.R. § 1.5(c). If there were an "emergency," Defendants would not have announced the closure 18 days in advance without taking any measures to restrict public use of the Park in the interim. As explained, Defendants' asserted "safety" rationale does not withstand scrutiny. *See supra* pp. 9-10. In neither their October 28 notice of closure, ECF 111, nor any other submission have Defendants identified any ongoing or impending "emergency." Rather, they assert the seawall around the park is deteriorating but articulate no reason why the park cannot remain open while repairs are underway. *Id.* at 27-28. Indeed, NPS carried out seawall rehabilitation at the Tidal Basin and West Potomac Park in recent years without corresponding park closures. *See* Nat'l Park Serv. Begins Reconstruction of Tidal Basin and West Potomac Seawalls, https://perma.cc/VHN8-8KB9. And as noted above, Defendants permitted tens of thousands of runners to race through the park during the Marine Corps Marathon on October 25, a decision inconsistent with the existence of any exigency justifying an immediate and prolonged shutdown without adherence to federal notice requirements.

As an even more basic failure, Defendants issued no written justification for the East Potomac Park closure setting out reasons that "less restrictive measures will not suffice." 36

---

[10] Jessica Albert, Costumed demonstrators hold Halloween protest to save East Potomac Park, NBC Washington (Oct. 31, 2026), https://perma.cc/2DZT-WD4G; Rick Maese, As Trump derides judge again, officials say golf course will soon close, The Washington Post (Oct. 29, 2026), https://perma.cc/9LTF-JGMH.

C.F.R. § 1.5(c). The October 30 "concept proposal" for an overhaul of the park Defendant NPS submitted to the National Capital Planning Commission (NCPC) falls far short of meeting this requirement. Nowhere does it state—much less explain why—NPS will close the park on November 15 for 15 months; Defendants acknowledged these plans only in filings and hearings before this Court. *See* ECF 111-2; Oct. 30, 2026 Hr'g Tr., ECF 123. By failing to advise the public of the closure, much less justify it in comparison to "less restrictive measures," the NCPC filing does not fulfill the notice and explanation requirements of § 1.5(c).

NPS's violation of its own regulations renders the decision to close the Park arbitrary and capricious.

**2. NPS Has Not Explained the Park Closure Rationally.**

Agency action is arbitrary and capricious in violation of the APA when, among other things, the agency "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency" or where the agency action is "so implausible that it [can]not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court need not "ignore the disconnect between the decision made and the explanation given" where the agency's stated explanation of its action appears "contrived" and "pretextual." *Dep't of Com. v. New York*, 588 U.S. 752, 780, 785 (2019).

Here, Defendants' asserted basis for closing East Potomac Park—"significant safety hazards" relating to the deteriorating condition of the seawall—is an irrational, pretextual explanation that does not justify the closure. The seawall has been in disrepair for decades, *see* Admin. R. 11, ECF 40-2 (Dewberry Report at 8). Yet NPS has never previously suggested the seawall's deterioration required closure of East Potomac Park, and as recently as three days before Defendants announced the Park's imminent closure, NPS allowed tens of thousands of people to

run the Marine Corps Marathon around East Potomac Park in close proximity to the seawall. *Supra* p. 10 n.9. No evidence supports Defendants' asserted purpose for closing the Park, including the October 28 Bowron declaration. *Supra* p. 10. Defendants also have not explained why any necessary repairs could not be done, as in West Potomac Park, without a complete closure. In actual fact, Defendants decided to close East Potomac Park "to implement [the President's] direction," ECF 107 at 4, to close the Park "in order to renovate and rebuild" the Golf Course, Min. Order, Oct. 27, 2026. But by relying on a contrived "safety" rationale without acknowledging their purpose to implement the WNP, Defendants failed entirely to consider the harmful consequences of the WNP. Defendants have never offered a reasoned explanation for their decision to abandon the historic design of East Potomac Golf Course and the "century of public recreation" East Potomac Park has offered. NCPC Proposal 11. The APA does not permit the further implementation of that Plan through closure of the Park on the basis of an incredible explanation that ignores every important aspect of the problem.

### F. Implementing the Washington National Plan By Closing East Potomac Park Will Violate the National Park Service Organic Act.

NPS's paramount duty is to "promote and regulate the use of the National Park System by means and measures that . . . conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). Courts have held that this is an enforceable standard. *Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 194 (D.D.C. 2008). Closing East Potomac Park in order to destroy the golf court violates these mandates.

The spirit that drove the creation of national parks was one of protecting NPS units in their existing character. NPS must "conserve the scenery, natural and historic objects, and wild life"

within national parks, and to "leave" their natural and historic objects "unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). These mandates are phrased broadly because they are broad. "In the Organic Act[,] Congress speaks of but a single purpose, namely, conservation[.]" *Nat'l Rifle Ass'n of Am. v. Potter*, 628 F. Supp. 903, 909 (D.D.C. 1986). Although the Act "permit[s] the NPS to balance the sometimes conflicting policies of resource conservation and visitor enjoyment in determining what activities should be permitted or prohibited," NPS must strike a balance that still "leaves the resources 'unimpaired for the enjoyment of future generations.'" *S. Utah Wilderness All. v. Dabney*, 222 F.3d 819, 825, 827 (10th Cir. 2000) (quoting 54 U.S.C. § 100101(a)).

To conserve is "to keep from being damaged, lost or wasted; save," or "'[t]o protect from loss or depletion." *Nat'l Tr. for Hist. Pres. in the U.S. v. Nat'l Park Serv.*, 185 F.4th 1185, 1221 (D.C. Cir. 2026), *stayed on other grounds*, 609 U.S. 1068, 1071 (2026). Conservation does not allow gratuitous alteration. Said differently, "a fundamental principle that undergirds every aspect of NPS's management of the National Park System" is that the "agency is forbidden from taking any action that is not consistent with its conservation mission unless Congress has 'directly and specifically' authorized the harmful activity." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 290-91 (4th Cir. 2018) (quoting 54 U.S.C. § 100101(a), (b)(2)).

There could be no greater failure "to protect" East Potomac Park "from loss or depletion," *Nat'l Park Serv.,* 185 F.4th at 1221, than to close it in order to destroy East Potomac Golf Course. Whatever discretion NPS has under the Organic Act "to provide for the enjoyment of the scenery, natural and historic objects, and wild life," it must exercise that discretion "in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). And "enjoyment" is qualified by the Organic Act's conservation mandate. *Greater*

*Yellowstone Coal.*, 577 F. Supp. 2d at 192. Even assuming some visitors might "enjoy" Defendants' new design for East Potomac Golf Course, "the 'enjoyment' referenced in the Organic Act is not enjoyment for its own sake, or even enjoyment of the parks generally, but rather the enjoyment of 'the scenery and natural and historic objects and the wild life' in the parks in a manner that will allow future generations to enjoy them as well." *Id*. at 193. Closing East Potomac Park in order to destroy its key features will preclude future generations from enjoying the Park's natural and historic objects, in violation of NPS's obligations. *Id.*

NPS's Management Policies confirm that closing East Potomac Park in order to destroy the golf course violates the Organic Act. Applying the Organic Act's mandate traditionally has relied, in part, on the interpretation set forth in NPS's Management Policies. *Greater Yellowstone Coal.*, 577 F. Supp. 2d at 194. Among other things, the Management Policies provide that an impact on park resources or values is "more likely to constitute impairment" if the resource is "key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park," or is "identified in the park's general management plan or other relevant NPS planning documents as being of significance." Ex. C Nat'l Park Serv., Management Policies, Section 1.4.5 (2006) ("Management Policies"). But in any event, "[b]efore approving a proposed action that could lead to an impairment of park resources and values," NPS must at the very least issue a determination of non-impairment. *Id.* Section 1.4.7.[11]

[11] In opposing Plaintiffs' initial motion for preliminary relief, Defendants suggested that one out-of-circuit decision "confirmed" that NPS's Management Policies are not enforceable. Defs.' Resp. in Opp. 14 n.10, ECF 26 (citing *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1071-73 (9th Cir. 2010)). But the Organic Act itself is undoubtedly enforceable, and the Management Policies reflect interpretations of its statutory duties that NPS has held for two decades. If nothing else, the Management Policies are highly persuasive. *Greater Yellowstone Coal.*, 577 F. Supp. 2d at 206. And where, as here, NPS has offered no explanation for its decision to deviate so dramatically from century-long practice, the Management Policies illustrate even further how wildly Defendants' plan departs from the law.

The key principles underlying the Policies include "prevent[ing] impairment of park resources and values" and "ensur[ing] that conservation will be predominant when there is a conflict between the protection of resources and their use." *Id.* at 2. Destroying East Potomac Golf Course would violate a multitude of the Policies. For example, the Policies' instructions concerning Park Management (*id.* Section 1.4, *et seq.*) prohibit impacts that diminish opportunities for current or future generations to enjoy park resources and values.[12] The Policies' rules for Treatment of Cultural Resources (*id.* Section 5.3.5) require preservation, rehabilitation, or restoration of park lands consistent with their existing integrity and character.[13] And the Policies' rules on New Construction (*id.* Section 5.3.5.2.7) prohibit changes to a cultural landscape that would "radically change, obscure, or destroy its significant spatial organization, materials, and features.[14] Closing East Potomac Park in order to destroy East Potomac Golf Course would violate these prohibitions and requirements. Likewise, the Cultural Landscape Inventory[15] and Cultural

---

[12] *See, e.g.*, Management Policies Section 1.4.3 (forbidding impacts "constitut[ing] impairment of the affected resources and values," which at East Potomac include its "eligib[ility] for listing in the National Register . . . in the areas of Recreation and Ethnic (Black) Heritage," Ex. D at 78 ("CLR"); Management Policies Section 1.4.5 ("An impact would be less likely to constitute an impairment if it is an unavoidable result of an action necessary to preserve or restore the integrity of park resources or values and it cannot be further mitigated."); *id.* Section 1.4.7.1 (unacceptable impacts include "impacts that, individually or cumulatively, would . . . diminish opportunities for current or future generations to enjoy, learn about, or be inspired by park resources or values");

[13] "With some differences by type, cultural resources are subject to several basic treatments, including (1) preservation in their existing states; (2) rehabilitation to serve contemporary uses, consistent with their integrity and character; and (3) restoration to earlier appearances by the removal of later additions and replacement of missing elements."

[14] "Contemporary alterations and additions to a cultural landscape must not radically change, obscure, or destroy its significant spatial organization, materials, and features."

[15] *See, e.g.*, Ex. E at 21 ("CLI") (factors in East Potomac's significance include "an 18-hole links-style course, designed by noted golf course architect Walter J. Travis, as well as two additional 9-hole courses"); *id.* at 45 ("The choice of Walter J. Travis as the architect of East Potomac Park is a testament to the importance of the course."); *id.* at 74 ("[T]he overall landscape retains nearly all of the essential features present during that period [of significance]. Among those features are: three golf courses, totaling 36 holes . . . open, relatively flat fairways . . . a central fieldhouse used

Landscape Report[16] catalog and prescribe caretaking for a host of elements contributing to East Potomac's significance, all of which must be done consistent with the Management Policies. The WNP cannot be implemented without flouting these provisions.

On the present record, Plaintiffs are thus likely succeed in establishing that Defendants' plan to close East Potomac Park is unlawful.

## II. Plaintiffs Will Suffer Irreparable Injury Without a Temporary Restraining Order.

Defendants announced their intention to close East Potomac Park, including East Potomac Golf Course, to implement the WNP starting November 15, 2026. By the Government's own submission to the National Capital Planning Commission (NCPC), the Plan is a ground-up rebuild: it destroys the historic three current courses in favor of a single championship layout, adds large water features, and extends play to the seawall and the southern tip of Hains Point. *See*, e.g., NCPC Proposal 35-38.

Absent a TRO, closure of the Park to implement the WNP will cause harm that is "certain and great," "actual and not theoretical," *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), and "beyond remediation," *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016).

### A. The Harm Is Imminent.

November 15 is ten days away. Closure alone will irremediably deprive Plaintiffs of the opportunity to continue golfing at East Potomac Golf Course and enjoy the recreational, cultural,

---

as a starting and ending point for play on all three courses; and a miniature golf course designed and built in the early 1930s.");

[16] *See, e.g.*, CLR xiii ("[T]hese treatment guidelines have been developed to support modernization that is consistent with the original design intent for each course."); *id.* at 92 (features contributing to cultural landscape's character include "thirty-six holes of play," "the miniature golf course," and "Practice Putting Green Number 1"); *id.* at 163 ("While it is understood that . . . changes may be appropriate to accommodate modern developments, they *must* be accomplished in a historically sympathetic way for these significant cultural resources.") (emphasis added).

historical, and communal benefits it offers. And the Park's closure in turn will raise the specter that Defendants will follow the same playbook that they used for the TMP: act first by breaking ground on the WNP, conduct review and seek approval later. ECF 103 at 61 (Defendants employed a "chop-first, review-later approach"). *See also id.* at 63 (citing "[Government's] shell game: even if Plaintiffs may suffer irreparable harm from the Washington National Plan, they will not suffer any such harm from" the segmented action, i.e. the closure). NCPC will not consider the WNP until December, many weeks after the closure. NCPC Proposal 54. The submission concedes that an environmental assessment will be required, yet none has been prepared. *Id.* And although Section 106 review purportedly began July 17, not a single consultation meeting has occurred. Third Miller Decl. ¶ 12.

Defendants' track record removes any doubt about what will happen absent an order enjoining closure. Mere weeks ago, Defendants gave notice to Plaintiffs at 4:55 p.m. on a Friday that they would begin removing hundreds of trees from the Course, and they had equipment bulldozing those trees the next morning. Mem. Op. 8, ECF 79. A TRO is the only way to prevent another *fait accompli*.

**B. Plaintiffs And The Public Will Lose All Use of the Course And The Park.**

The environmental and recreational harm to Plaintiffs has been set out in previous filings and found by this Court. ECF 103 at 62-64. The announced closure will create new ones as well. Closure will strip Plaintiffs of their use of the Course and Park entirely, displace the broader public from the Park, and do so for (even by Defendants' reckoning) more than one year, after which Plaintiffs may return to a course that is no longer the historic, links-style they have long enjoyed. Absent immediate relief, even if Plaintiffs ultimately prevail in establishing the unlawfulness of Defendants' actions, no remedy will be available to restore what Plaintiffs lost in the interim if the

Golf Course is closed and they can no longer take advantage of the recreational, aesthetic, historic, and communal opportunities it offers.

This Court has recognized that Plaintiffs Dickson and Roberts suffer concrete recreational injury from interference with their regular play at the Course, alone, with friends, and with their children. ECF 79 at 10-11; ECF 103 at 45-46, 62-63. Closure does not diminish that use; it eliminates it. That is not "mere offense" at the redesign. *Nat'l Park Serv. v. Nat'l Tr. for Historic Pres.*, 609 U.S. 1068, 1072 (2026) (per curiam). It is the loss of a place Plaintiffs use, for every round they would have played and day they would have spent at the park with their loved ones and other members of the community.

The harm extends far beyond golf. Closing the Park will also displace walking, biking, fishing, and picnicking along Ohio Drive and the waterfront promenade—displacement that will become permanent if Defendants are able to carry out the WNP under cover of the Park's closure. NCPC Proposal 34-37; *See also* ECF 103 at 59 n.59 (design appears to eliminate the Ohio Drive perimeter roadway); *id.* at 52-53 (DCPL member Plaintiff Miller visits East Potomac Park with family). Defendants' NCPC submission suggests visitors can be displaced to West Potomac Park and the Tidal Basin, but those areas are themselves slated for major redevelopment. NCPC Proposal 36-37; Nat'l Park Service, Tidal Basin Revised Dev. Concept Plan: Consulting Party Mtg. (Oct. 19, 2026), https://perma.cc/F4ZJ-QJRQ. Congress set aside East Potomac Park for the recreation of the people, Act of Mar. 3, 1897, ch. 375, 29 Stat. 624, and directed that its "scenery [and] natural and historic objects" be left "unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). Agency action threatening the "permanent loss of those lands to public access and enjoyment" is irreparable harm. *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 324 (D.C. Cir. 1987).

Nor should the Court accept Defendants' unsupported assertion that the closure will last only 15 months. Defendants' NCPC submission estimates that the seawall repair will take two and a half to three and a half years "from funding to completion." NCPC Proposal 38. And no evidence exists to suggest that Defendants have even retained a contractor to carry out work on the seawall.

Even when the Park eventually reopens under the WNP, the historic, broadly accessible, affordable course that Plaintiffs have used for years will be gone forever, as will Hains Point, Ohio Drive, and the other Park features that Plaintiffs, their families, and the public have long used for bicycling, running, and other recreation.

**C. Closure Continues the Permanent Transformation of a Historic Landscape.**

The Government has already inflicted irreparable harm on this landscape in at least two ways. First, in a single day last month, it razed roughly 430 healthy, non-invasive trees, a loss this Court found irreparable. ECF 79 at 1, 19-20; ECF 103 at 34, 63-64. Second, it has dumped approximately 37,000 cubic yards of debris from the East Wing demolition project at East Potomac, material containing arsenic, lead, and mercury, on reclaimed land with a high-water table adjoining a major waterway.[17] ECF 103 at 12, 54 (citing ECF 72-8 at 2). Debris integrated into the soil cannot be recalled, and this is exactly what Defendants intend to do with this debris. Oct. 16, 2025 CE Form 2, ECF 72-8; *see* ECF 103 at 34, 54. *See also* ECF 72-1 Am. Compl. ¶ 11; ECF 72-12 Foos Report 8. That is "immediate and direct physical damage to public lands." *Burford*, 835 F.2d at 324. Closing the Park in furtherance of the WNP would carry that damage across the entire Course and further into East Potomac Park.

---

[17] *See,* e.g. NCPC Proposal 14, 27.

"[A]n established NEPA violation might rise to the level of irreparable harm when coupled with sufficient evidence of environmental injury." ECF 79 at 19 (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013)); *see also Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009) ("When a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury."). The Plan requires tree removal, large-scale earthmoving, and new water features across a landscape that has existed in its historical condition for more than a century. NCPC Proposal 35-38. "Environmental injury, by its nature, . . . is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

The historical harm is equally imminent and permanent. The Course is a contributing site to the East and West Potomac Park Historic District, and this Court has already credited the threat to that status. ECF 79 at 19-20. Defendants' own submission highlights the park's historical features, including a 1920s miniature golf course (the first the National Park Service built on federal land), the historic Field House that now serves as the clubhouse, and the scenic Ohio Drive. NCPC Proposal 11. Yet none of them appears in the submission's rendering of the new course, and the submission never says whether any will survive.

These are not abstractions to Plaintiffs: The Course's history and character are central to why they play there. Decl. of Dave Roberts ¶¶ 12, 14, 16, 22, 25, 27, ECF 8-6; Decl. of Alex Dickson ¶¶ 12, 14, 17-19, ECF 8-4; *see* ECF 103 at 46-47, 62-63.

### D. Closing First Forecloses Meaningful Review.

As discussed above, *supra* 16, NEPA and the NHPA both require federal agencies to look before they leap. NEPA requires a hard look at environmental consequences, and Section 106 of the NHPA requires consultation on effects to historic properties, before an agency commits to an

undertaking. Closing the Course now would defeat both. Section 106 consultation has not even begun, and Defendants have shown a disregard for NEPA compliance through their improper use of categorical exclusions for compliance for both their debris dumping and tree-felling.

NEPA review matters because it can influence the outcome; if Defendants are required to adequately consider the Plan's environmental consequences, it "'could change its mind.'" ECF 79 at 13 (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013)). But once the Course is closed and construction begins, that possibility is gone. Review conducted after the fact cannot change a decision already carried out. This Court has already found that the Government's last attempt at NEPA compliance at the Course, a categorical exclusion completed in days, likely fell short. ECF 79 at 17-18.

So too, NHPA Section 106 requires an agency to take into account an undertaking's effects on historic properties before approving the expenditure of federal funds on it or prior to the issuance of any license for it. *See* 54 U.S.C. § 306108; *see also* 36 C.F.R. § 800.1(c). That review follows a certain sequence: identifying consulting parties and historic properties, assessing adverse effects, and resolving those effects through consultation. 36 C.F.R. §§ 800.3-800.6. Defendants say Section 106 review began July 17. NCPC Proposal 54. But in the three and a half months since, not one consultation meeting has occurred. Third Miller Decl. ¶ 12. Meanwhile, Defendants removed hundreds of trees under a "routine maintenance" categorical exclusion, only to concede afterward that Section 106 review may be warranted. ECF 79 at 18. Closing the Course now would put implementation of the WNP ahead of every substantive step of Section 106, rendering later compliance a formality. That is irreparable harm. See *Nat'l Tr. for Historic Pres. in U.S. v. FDIC*, No. 93-0904, 1993 WL 328134, at *3 (D.D.C. May 7, 1993); *Massachusetts v. Watt*, 716

F.2d 946, 952 (1st Cir. 1983) (Breyer, J.) ("It is far easier to influence an initial choice than to change a mind already made up.").

The harm falls with particular force on Plaintiff DC Preservation League. Participating in historic preservation review is DCPL's core work, not a side interest. Decl. of Rebecca Miller ¶¶ 34, 22, ECF 8-5; *see* ECF 103 at 52-53. Section 106 exists to give stakeholders like DCPL a voice before an agency commits to an undertaking. Closing the Course before a single consultation meeting has occurred would make DCPL's participation not merely "more difficult," but meaningless. *See Newby*, 838 F.3d at 9. And the Plan threatens the Course's status as a contributing site to the Historic District. That status is precisely what DCPL exists to protect. Once lost, neither the landscape nor its designation can be restored.

### III. The Balance of the Equities and the Public Interest Weigh Overwhelmingly in Favor of Restraining East Potomac's Closure.

The final two considerations—the balance of the equities and the public interest—"merge" where the moving party seeks to enjoin action by the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). To assess these factors, the Court "balance[s] the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). "[T]he Government cannot suffer harm from an injunction that merely ends an unlawful practice," *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (cleaned up), and "[t]here is generally no public interest in the perpetuation of unlawful agency action," *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (citing *Newby*, 838 F.3d at 12). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws . . . that govern their existence and operations." *Id.* (cleaned up).

Here, Defendants' closure of East Potomac Park violates federal law and thus furthers no legitimate public interest. To the contrary, it deprives the public of the use and enjoyment of the Park, and further execution of the WNP once the Park has been closed will permanently destroy the historic Travis course and its beginner-friendly, publicly accessible design. And having failed to credibly claim any emergency or hazard making continued public access to the Park unsafe , Defendants' asserted purpose for closing the Park does not outweigh the public's interest in keeping it open.

Nor would Defendants be harmed by the relief requested. Defendants' notice and supporting declaration do not credibly establish that closure of the Park is necessary either due to dangers posed by the seawall's current condition or to accommodate repair work. As noted, NPS recently completed restoration of the seawall around the Tidal Basin and West Potomac Park without implementing any long-term park-wide closure of those areas, confirming that closure is also not necessary for safety or to complete the repairs at East Potomac Park. *See supra* p. 21. And, as Defendants' counsel noted in the October 30 hearing, many repairs can and have been done without closing the Park, including the removal of diseased and invasive trees and the removal of the old chain link fencing. Oct. 30, 2026 Hr'g Tr. 62:7-9, ECF 123. Even if the repairs to the seawall are delayed—beyond the several years NPS has already delayed them—the inconvenience of that delay is far outweighed by the permanent, irreversible injury that would be inflicted on Plaintiffs and on other local residents who regularly enjoy use of the Park and Golf Course.

## CONCLUSION

The Court should grant a temporary restraining order enjoining the imminent closure of East Potomac Park, or, alternatively, a stay of the closure's effective date under 5 U.S.C. § 705,

until the record can be completed sufficiently to allow consideration of a motion for preliminary injunction.

Dated: November 5, 2026

RESPECTFULLY SUBMITTED,

<u>*/s/Will Bardwell*</u>

Will Bardwell (Bar No. 90006120)
Mark B. Samburg (Bar No. 1018533)
Kevin E. Friedl (Bar No. 90033814)
Anna L. Deffebach (Bar No. 241346)
Catherine M.A. Carroll (Bar No. 497890)
Robin F. Thurston (Bar No. 7268942)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
T: (202) 448-9090
wbardwell@democracyforward.org
msamburg@democracyforward.org
kfriedl@democracyforward.org
adeffebach@democracyforward.org
ccarroll@democracyforward.org
rthurston@democracyforward.org

Abbe David Lowell (Bar No. 358651)
Caleb Hayes-Deats (Bar No. 1653213)
Jack Bolen (Bar No. 90031046)
Angela Reilly (*pro hac vice*)
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowelland associates.com
Chayes-Deats@lowellandassociates.com
JBolen@lowellandassociates.com
AReilly@lowellandassociates.com

Norman L. Eisen (Bar No. 435051)
Lindsay Zimliki (Bar No. 475890)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
T: (202) 601-8678
Norman@democracydefenders.org
Lindsay@democracydefenders.org

*Counsel for Plaintiffs*