# EXHIBIT C

# Management Policies 2006

NATIONAL PARK SERVICE

Abraham Lincoln Birthplace Acadia Adams African Burial Ground Agate Fossil Beds Alagnak River Alibates Flint Quarries Allegheny Portage Railroad Amistad Andersonville Andrew Johnson Aniakchak Antietam Apostle Islands Appalachian Trail Appomattox Court House Arches Arkansas Post Arlington House Assateague Island Aztec Ruins Badlands Bandelier Bent's Old Fort Bering Land Bridge Big Bend Big Cypress Big Hole Big South Fork River Big Thicket Bighorn Canyon Biscayne Black Canyon of the Gunnison Blue Ridge Parkway Bluestone River Booker T. Washington Boston Boston African American Boston Harbor Islands Brices Cross Roads Brown v. Board of Education Bryce Canyon Buck Island Reef Buffalo River Cabrillo Canaveral Cane River Creole Canyon de Chelly Canyonlands Cape Cod Cape Hatteras Cape Krusenstern Cape Lookout Capitol Reef Capulin Volcano Carl Sandburg Home Carlsbad Caverns Carter G. Woodson Home Casa Grande Ruins Castillo de San Marcos Castle Clinton Catoctin Mountain Cedar Breaks Cedar Creek & Belle Grove Chaco Culture Chamizal Channel Islands Charles Pinckney Chattahoochee River Chesapeake & Ohio Canal Chickamauga & Chattanooga Christiansted City of Rocks Clara Barton Colonial Colorado Congaree Constitution Gardens Lake Craters of the Moon Cumberland Gap Cumberland Island Curecanti Cuyahoga Valley De Soto Death Valley Delaware River Delaware Water Gap Denali Ebey's Landing Edgar Allan Poe Edison Effigy Mounds Eisenhower Eugene O'Neill Everglades Federal Hall Fire Island First Ladies Flight 93 Fort Caroline Fort Davis Fort Donelson Fort Frederica Fort Laramie Fort Necessity Fort Point Fort Pulaski Fort Raleigh Fort Scott Fort Smith Fort Union Trading Post Fort Vancouver Fort Washington Fossil Butte Frederick Douglass Frederick Law Olmsted Fredericksburg & Spotsylvania County Gates of the Arctic Gateway Gauley River General Grant George Rogers Clark George Washington Carver George Washington Memorial Parkway Gettysburg Glen Canyon Golden Gate Golden Spike Governors Island Grand Canyon Great Basin Great Egg Harbor River Great Sand Dunes Great Smoky Mountains Guilford Courthouse Gulf Islands Hagerman Fossil Beds Haleakalā Harry S Truman Hawai'i Volcanoes Herbert Hoover Hohokam Pima Homestead NM of America Hopewell Culture Hopewell Furnace Horseshoe Bend Hot Springs Trading Post Independence Indiana Dunes Isle Royale James A. Garfield Jean Lafitte National Expansion Jewel Cave Jimmy Carter John D. Rockefeller Jr. Memorial Parkway John Fitzgerald Kennedy John Muir Johnstown Flood Joshua Tree Kalaupapa Kaloko Honokohau Kennesaw Mountain Keweenaw Kings Canyon Kings Mountain Klondike Gold Rush Knife River Indian Korean War Veterans Lake Clark Lake Mead Lake Meredith Lake Roosevelt Lassen Volcanic Lewis & Clark Lewis & Clark Trail Lincoln Boyhood Lincoln Home Lincoln Memorial Little Bighorn Battlefield Little River Canyon Little Rock Central High School Longfellow Lowell Lyndon B. Johnson Lyndon Baines Johnson Memorial Grove Maggie L. Walker Mammoth Cave Manassas Manzanar Marsh Billings-Rockefeller Martin Luther King, Jr. Martin Van Buren Mary McLeod Bethune Council House Mesa Verde Minidoka Internment Minute Man Minuteman Missile Mississippi River Missouri River Mojave Monocacy Montezuma Castle Moores Creek Morristown Mount Rainier Mount Rushmore Muir Woods Natchez Natchez Trace Parkway Natchez Trace Trail National Capital Parks National Mall NP of American Samoa Natural Bridges Navajo New Bedford Whaling New Orleans Jazz New River Gorge Nez Perce Nicodemus Ninety Six Niobrara River Noatak North Cascades Obed River Ocmulgee Olympic Oregon Caves Organ Pipe Cactus Ozark Riverways Padre Island Palo Alto Battlefield Pea Ridge Pecos Pennsylvania Avenue Perry's Victory Petersburg Petrified Forest Petroglyph Pictured Rocks Pinnacles Pipe Spring Pipestone Piscataway Point Reyes Potomac Heritage Trail Poverty Point Prince William Forest Pu'uhonua o Hōnaunau Puukoholā Heiau Rainbow Bridge Redwood Richmond Rio Grande River Rock Creek Rocky Mountain Roger Williams Rosie the Riveter/World War II Home Front Ross Lake Russell Cave Sagamore Hill Saguaro Saint Croix Island Saint Croix Riverway Saint Gaudens Saint Paul's Church Salem Maritime Salinas Pueblo Missions Salt River Bay San Antonio Missions San Francisco Maritime San Juan San Juan Island Santa Monica Mountains Saratoga Saugus Iron Works Scotts Bluff Sequoia Shenandoah Shiloh Sitka Sleeping Bear Dunes Springfield Armory Statue of Liberty Steamtown Stones River Sunset Crater Volcano Tallgrass Prairie Thaddeus Kosciuszko Theodore Roosevelt Theodore Roosevelt Birthplace Theodore Roosevelt Inaugural Theodore Roosevelt Island Thomas Jefferson Memorial Thomas Stone Timpanogos Cave Timucuan Tonto Tumacacori Tupelo Tuskegee Airmen Tuskegee Institute Tuzigoot Ulysses S. Grant Upper Delaware River USS Arizona Memorial Valley Forge Vanderbilt Mansion Vicksburg Vietnam Veterans Memorial Virgin Islands Virgin Islands Coral Reef Voyageurs Walnut Canyon War in the Pacific Washington Monument Washita Battlefield Weir Farm Whiskeytown Unit White House

## Management of National Park Service Programs

This volume of *Management Policies* focuses exclusively on management of the national park system. Beyond managing the national park system, the National Park Service administers a broad range of programs that serve the conservation and recreation needs of the nation and the world. Examples include the following:

- National Register of Historic Places
- National Historic Landmarks Program
- National Natural Landmarks Program
- Land and Water Conservation Fund Grants Program
- Historic American Buildings Survey
- Historic American Engineering Record
- Historic American Landscapes Survey
- American Battlefield Protection Program
- National Maritime Heritage Grants Program
- Rivers, Trails and Conservation Assistance Program
- Tribal Heritage Preservation Grants Program
- Preserve America Grants Program
- National Heritage Areas Program

Although these programs operate mainly outside the national parks, they form a vital part of the National Park Service mission. Information about the policies and procedures that govern these programs may be obtained from the appropriate NPS program managers (who are generally located in Washington, D.C.), or by visiting the NPS web site at ***www.nps.gov***.

## U.S. Department of the Interior

The Department of the Interior protects and manages the nation's natural resources and cultural heritage; provides scientific and other information about those resources; and honors its special responsibilities to American Indians, Alaska Natives, and affiliated Island Communities.

## National Park Service

The National Park Service preserves unimpaired the natural and cultural resources and values of the national park system for the enjoyment, education, and inspiration of this and future generations. The National Park Service cooperates with partners to extend the benefits of natural and cultural resource conservation and outdoor recreation throughout this country and the world.

# Management Policies 2006



U.S. Department of the Interior | National Park Service



# Management Policies

## The Guide to Managing the National Park System

*The national park system was created to conserve unimpaired many of the world's most magnificent landscapes, places that enshrine our nation's enduring principles, and places that remind us of the tremendous sacrifices Americans have made on behalf of those principles. They are the most remarkable collection of places in America for recreation and learning. Visitors can immerse themselves in places where events actually happened and enjoy some of the most significant natural and historic places in America. These are places that offer renewal for the body, the spirit and the mind. As required by the 1916 Organic Act, these special places must be managed in a special way—a way that allows them to be enjoyed not just by those who are here today, but also by generations that follow. Enjoyment by present and future generations can be assured only if these special places are passed on to them in an unimpaired condition. And that is the challenge that faces all the employees of the National Park Service. It is a challenge eagerly embraced, but employees must have the tools required to perform the job successfully. The policies contained in these pages represent one of the most important tools available. Through their judicious and consistent application, these policies will set a firm foundation for stewardship that will continue to earn the trust and confidence of the American people.*



## Underlying Principles

The National Park Service adhered to a number of principles in preparing this 2006 edition of *Management Policies*. The key principles were that the policies must:

- comply with current laws, regulations and executive orders;
- prevent impairment of park resources and values;
- ensure that conservation will be predominant when there is a conflict between the protection of resources and their use;
- maintain NPS responsibility for making decisions and for exercising key authorities;
- emphasize consultation and cooperation with local/state/tribal/federal entities;
- support pursuit of the best contemporary business practices and sustainability;
- encourage consistency across the system —"one national park system";
- reflect NPS goals and a commitment to cooperative conservation and civic engagement;
- employ a tone that leaves no room for misunderstanding the National Park Service's commitment to the public's appropriate use and enjoyment, including education and interpretation, of park resources, while preventing unacceptable impacts;
- pass on to future generations natural, cultural, and physical resources that meet desired conditions better than they do today, along with improved opportunities for enjoyment.

# Introduction

## Law, Policy, and Other Guidance



*This volume is the basic Service-wide policy document of the National Park Service. Adherence to policy is mandatory unless specifically waived or modified by the Secretary, the Assistant Secretary, or the Director.*

In carrying out their responsibilities under the 1916 National Park Service[1] Organic Act and other pertinent statutes, all NPS officials and employees must be knowledgeable about the laws, regulations, and policies that pertain to their work. The property clause of the U.S. Constitution, which is the supreme law of the United States, gives Congress the authority to develop laws governing the management of the national park system. The property clause specifically directs that "The Congress will have the Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States" (article IV, section 3). Once laws are enacted, authority for interpreting and implementing them is delegated to appropriate levels of government. In carrying out this function, the National Park Service, like other federal agencies, develops policy to interpret the ambiguities of the law and to fill in the details left unaddressed by Congress in the statutes.

## Hierarchy of Authorities

The management of the national park system and NPS programs is guided by the Constitution, public laws, treaties, proclamations, executive orders, regulations, and directives of the Secretary of the Interior and the Assistant Secretary for Fish and Wildlife and Parks. NPS policy must be consistent with these higher authorities and with appropriate delegations of authority. Many of the public laws and other guidance affecting the various facets of NPS administration and management are cited for reference purposes throughout these *Management Policies*. Other laws, regulations, and policies related to the administration of federal programs, although not cited, may also apply. For example, many, but not all, of the legislative requirements of the Alaska National Interest Lands Conservation Act (ANILCA) are cited at different places throughout these *Management Policies*. The additional legislative requirements of ANILCA, although not cited, must also be considered in the interpretation and application of these policies, as must all other applicable legislative requirements. It is especially important that superintendents and other park staff review their park's enabling legislation to determine whether it contains explicit guidance that would prevail over Service-wide policy.

## Policy Development

Policy sets the framework and provides direction for all management decisions. This direction may be general or specific; it may prescribe the process through which decisions are made, how an action is to be accomplished, or the results to be achieved. Policy initiatives may originate as a sudden, urgent response to an unanticipated problem or issue, or through a slow, evolutionary process as the Park Service gains increased experience or insight regarding a problem or issue. Sometimes the initiative does not originate within the Park Service, but rather with persons or organizations outside the Park Service who have a strong interest in how the Service manages the parks. However, NPS policy is usually developed through a concerted workgroup and consensus-building team effort involving extensive field review, consultation with NPS senior managers, and review and comment by affected parties and the general public.

All policy must be articulated in writing and must be approved by an NPS official who has been delegated authority to issue the policy. Policy must be published or otherwise made available to the public—particularly those whom it affects—and those who must implement it in the Washington office, regional offices, and parks. Unwritten or informal "policy," and various understandings of NPS traditional practices, will not be recognized as official policy.

## Compliance, Accountability, and Enforceability

Service-wide policy is articulated by the Director of the National Park Service. NPS employees must follow these policies unless specifically waived or modified in writing by the Secretary, the Assistant Secretary, or the Director. Waivers and modifications will be considered on a case-by-case basis, and previous waivers or modifications will not necessarily be regarded as precedents for future waivers or modifications. A request for a waiver or modification of policy must include a written justification and be submitted to the Director through the Office of Policy, which will coordinate with appropriate program offices.

The policies contained within this document are intended only to improve the internal management of the National Park Service; they are not intended to, and do not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person. Park superintendents will be held accountable for their and their staff's, adherence to Service-wide policy.

## The Directives System

This volume of NPS *Management Policies* is the basic Service-wide policy document of the National Park Service, superseding the 2001 edition. It is the highest of three levels of guidance documents in the NPS Directives System. The Directives System is designed to provide NPS management and staff with clear and continuously updated information on NPS policy and required and/or recommended actions, as well as any other information that will help them manage parks and programs effectively.

The *Management Policies* will be revised at appropriate intervals to consolidate Service-wide policy decisions, or to respond to new laws and technologies, new understandings of park resources and the factors that affect them, or changes in American society. Interim updates or amendments may be accomplished through director's orders (the second level of the Directives System), which also serve as a vehicle to clarify or supplement the

1 The terms "National Park Service," "Park Service," "Service," and "NPS" are used interchangeably in this document.

*Management Policies* to meet the needs of NPS managers. Any previously dated statement of policy not consistent with these *Management Policies*, or with a director's order that updates, amends, or clarifies policy, is to be disregarded.

Under the Directives System, the most detailed and comprehensive guidance on implementing Service-wide policy is found in "level 3" documents, which are usually in the form of handbooks or reference manuals issued by associate directors. These documents provide NPS field employees with compilations of legal references, operating policies, standards, procedures, general information, recommendations, and examples to assist them in carrying out *Management Policies* and director's orders. Level 3 documents may not impose any new Service-wide requirements unless the Director has specifically authorized them to do so, but they may reiterate or compile requirements (for example, laws, regulations, and policies) that have been imposed by higher authorities.

This document is intended to be read in its entirety. While certain chapters or sections provide important guidance by themselves, that guidance must be supplemented by the overriding principles listed below, which provide insight into the reading of this document. In addition there is an interrelationship among the chapters that provides for clarity and continuity for the management of the national park system. Also, the glossary contains important terms that apply throughout the document and should be incorporated into the reading of the document.

Whenever *Management Policies* are revised in the future they should

- comply with current laws, regulations, and executive orders;
- prevent impairment of park resources and values;
- ensure that conservation will be predominant when there is a conflict between the protection of resources and their use;
- maintain NPS responsibility for making decisions and for exercising key authorities;
- emphasize consultation and cooperation with local/state/tribal/federal entities;
- support pursuit of the best contemporary business practices and sustainability;
- encourage consistency across the system — "one national park system";
- reflect NPS goals and a commitment to cooperative conservation and civic engagement;
- employ a tone that leaves no room for misunderstanding the Park Service's commitment to the public's appropriate use and enjoyment, including education and interpretation, of park resources, while preventing unacceptable impacts;
- pass on to future generations natural, cultural and physical resources that meet desired conditions better than they do today, along with improved opportunities for enjoyment.

## Other Sources of Guidance

Instructions, guidance, and directives of regional or otherwise-limited application supplementary to and in conformance with Service-wide policies may be issued by regional directors or associate directors within formal delegations of authority. Superintendents may issue, within formal delegations of authority, park-specific instructions, procedures, directives, and other supplementary guidance (such as hours of operation or dates for seasonal openings), provided that the guidance does not conflict with Service-wide policy.

## NPS Program Policies

This volume addresses only those policies applicable to management of the national park system. It does not address policies applicable to NPS-administered programs that serve the conservation and recreation needs of the nation, but are not directly related to the national park system. Examples include the National Register of Historic Places; the National Historic Landmarks Program; the National Natural Landmarks Program; the Land and Water Conservation Fund Grants Program; the Historic American Buildings Survey; the Historic American Engineering Record; the Historic American Landscapes Survey; the American Battlefield Protection Program; the National Maritime Heritage Grants Program; the Rivers, Trails and Conservation Assistance Program; the Tribal Heritage Preservation Grants Program; the Preserve America Grants Program; and the National Heritage Areas Program.

1

# The Foundation



The idea of a national park was an American invention of historic consequences, marking the beginning of a worldwide movement that has subsequently spread to more than one hundred countries.

*Beginning with Yellowstone, the idea of a national park was an American invention of historic consequences. The areas that now make up the national park system, and those that will be added in years to come, are cumulative expressions of a single national heritage. The National Park Service must manage park resources and values in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.*

## 1.1 The National Park Idea

The world's first national park—Yellowstone—was created in 1872, at which time Congress set aside more than one million acres as "a public park or pleasuring ground for the benefit and enjoyment of the people." The legislation assigned control of the new park to the Secretary of the Interior, who would be responsible for issuing regulations to provide for the "preservation, from injury or spoliation, of all timber, mineral deposits, natural curiosities, or wonders, within the park, and their retention in their natural condition." Other park management functions were to include the development of visitor accommodations, the construction of roads and bridle trails, the removal of trespassers, and protection "against the wanton destruction of the fish and game found within the park" (16 United States Code 21-22).

This idea of a national park was an American invention of historic consequences, marking the beginning of a worldwide movement that has subsequently spread to more than 100 countries. However, when Yellowstone National Park was created, no concept or plan existed upon which to build a system of such parks. The concept now described as the national park system, which embraces, nationwide, a wide variety of natural and cultural resources, evolved slowly over the years—often through the consolidation of federal land management responsibilities.

As interest grew in preserving the great scenic wonders of the West, efforts were also underway to protect the sites and structures associated with early Native American culture, particularly in the Southwest. The Antiquities Act of 1906 authorized the President "to declare by public proclamation [as national monuments] historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated upon the lands owned or controlled" by the U.S. government (16 USC 431).

In 1916 Congress created the National Park Service in the Department of the Interior to promote and regulate the use of the federal areas known as national parks, monuments, and reservations (16 USC 1). (As noted in the Introduction, the terms "National Park Service," "Park Service," "Service," and "NPS" are used interchangeably in this document.)

## 1.2 The National Park System

The number and diversity of parks within the national park system grew as a result of a government reorganization in 1933, another following World War II, and yet another during the 1960s. Today there are nearly 400 units in the national park system. These units are variously designated as national parks, monuments, preserves, lakeshores, seashores, wild and scenic rivers, trails, historic sites, military parks, battlefields, historical parks, recreation areas, memorials, and parkways. Regardless of the many names and official designations of the park units that make up the national park system, all represent some nationally significant aspect of our natural or cultural heritage. They are the physical remnants of our past—great scenic and natural places that continue to evolve, repositories of outstanding recreational opportunities, classrooms of our heritage, and the legacy we leave to future generations—and they warrant the highest standard of protection.

It should be noted that, in accordance with provisions of the Wild and Scenic Rivers Act, any component of the National Wild and Scenic Rivers System that is administered by the Park Service is automatically a part of the national park system. Although there is no analogous provision in the National Trails System Act, several national trails managed by the Service have been included in the national park system. These national rivers and trails that are part of the national park system are subject to the policies contained herein, as well as to any other requirements specified in the Wild and Scenic Rivers Act or the National Trails System Act.

## 1.3 Criteria for Inclusion

Congress declared in the National Park System General Authorities Act of 1970 that areas comprising the national park system are cumulative expressions of a single national heritage. Potential additions to the national park system should therefore contribute in their own special way to a system that fully represents the broad spectrum of natural and cultural resources that characterize our nation. The National Park Service is responsible for conducting professional studies of potential additions to the national park system when specifically authorized by an act of Congress, and for making recommendations to the Secretary of the Interior, the President, and Congress. Several laws outline criteria for units of the national park system and for additions to the National Wild and Scenic Rivers System and the National Trails System.

To receive a favorable recommendation from the Service, a proposed addition to the national park system must (1) possess nationally significant natural or cultural resources, (2) be a suitable addition to the system, (3) be a feasible addition to the system, and (4) require direct NPS management instead of protection by other public agencies or the private sector. These criteria are designed to ensure that the national park system includes only the most outstanding examples of the nation's natural and cultural resources. These criteria also recognize that there are other management alternatives for preserving the nation's outstanding resources.

### 1.3.1 National Significance

NPS professionals, in consultation with subject-matter experts, scholars, and scientists, will determine whether a resource is nationally significant. An area will be considered nationally significant if it meets all of the following criteria:

- It is an outstanding example of a particular type of resource.
- It possesses exceptional value or quality in illustrating or interpreting the natural or cultural themes of our nation's heritage.

- It offers superlative opportunities for public enjoyment or for scientific study.
- It retains a high degree of integrity as a true, accurate, and relatively unspoiled example of a resource.

National significance for cultural resources will be evaluated by applying the National Historic Landmarks criteria contained in 36 CFR Part 65 (*Code of Federal Regulations*).

### 1.3.2 Suitability

An area is considered suitable for addition to the national park system if it represents a natural or cultural resource type that is not already adequately represented in the national park system, or is not comparably represented and protected for public enjoyment by other federal agencies; tribal, state, or local governments; or the private sector.

Adequacy of representation is determined on a case-by-case basis by comparing the potential addition to other comparably managed areas representing the same resource type, while considering differences or similarities in the character, quality, quantity, or combination of resource values. The comparative analysis also addresses rarity of the resources, interpretive and educational potential, and similar resources already protected in the national park system or in other public or private ownership. The comparison results in a determination of whether the proposed new area would expand, enhance, or duplicate resource protection or visitor use opportunities found in other comparably managed areas.

### 1.3.3 Feasibility

To be feasible as a new unit of the national park system, an area must be (1) of sufficient size and appropriate configuration to ensure sustainable resource protection and visitor enjoyment (taking into account current and potential impacts from sources beyond proposed park boundaries), and (2) capable of efficient administration by the Service at a reasonable cost.

In evaluating feasibility, the Service considers a variety of factors for a study area, such as the following:

- size
- boundary configurations
- current and potential uses of the study area and surrounding lands
- landownership patterns
- public enjoyment potential
- costs associated with acquisition, development, restoration, and operation
- access
- current and potential threats to the resources
- existing degradation of resources
- staffing requirements
- local planning and zoning
- the level of local and general public support (including landowners)
- the economic/socioeconomic impacts of designation as a unit of the national park system

The feasibility evaluation also considers the ability of the National Park Service to undertake new management responsibilities in light of current and projected availability of funding and personnel.

An overall evaluation of feasibility will be made after taking into account all of the above factors. However, evaluations may sometimes identify concerns or conditions, rather than simply reach a yes or no conclusion. For example, some new areas may be feasible additions to the national park system only if landowners are willing to sell, or the boundary encompasses specific areas necessary for visitor access, or state or local governments will provide appropriate assurances that adjacent land uses will remain compatible with the study area's resources and values.

### 1.3.4 Direct NPS Management

There are many excellent examples of the successful management of important natural and cultural resources by other public agencies, private conservation organizations, and individuals. The National Park Service applauds these accomplishments and actively encourages the expansion of conservation activities by state, local, and private entities and by other federal agencies. Unless direct NPS management of a studied area is identified as the clearly superior alternative, the Service will recommend that one or more of these other entities assume a lead management role, and that the area not receive national park system status.

Studies will evaluate an appropriate range of management alternatives and will identify which alternative or combination of alternatives would, in the professional judgment of the Director, be most effective and efficient in protecting significant resources and providing opportunities for appropriate public enjoyment. Alternatives for NPS management will not be developed for study areas that fail to meet any one of the four criteria for inclusion listed in section 1.3.

In cases where a study area's resources meet criteria for national significance but do not meet other criteria for inclusion in the national park system, the Service may instead recommend an alternative status, such as "affiliated area." To be eligible for affiliated area status, the area's resources must (1) meet the same standards for significance and suitability that apply to units of the national park system; (2) require some special recognition or technical assistance beyond what is available through existing NPS programs; (3) be managed in accordance with the policies and standards that apply to units of the national park system; and (4) be assured of sustained resource protection, as documented in a formal agreement between the Service and the nonfederal management entity. Designation as a "heritage area" is another option that may be recommended. Heritage areas have a nationally important, distinctive assemblage of resources that is best managed for

conservation, recreation, education, and continued use through partnerships among public and private entities at the local or regional level. Either of these two alternatives (and others as well) would recognize an area's importance to the nation without requiring or implying management by the National Park Service.

*(See National Significance 1.3.1; Suitability 1.3.2)*

## 1.4 Park Management

### 1.4.1 The Laws Generally Governing Park Management

The most important statutory directive for the National Park Service is provided by interrelated provisions of the NPS Organic Act of 1916 and the NPS General Authorities Act of 1970, including amendments to the latter law enacted in 1978.

The key management-related provision of the Organic Act is as follows:

> [The National Park Service] shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified… by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations. (16 USC 1)

Congress supplemented and clarified these provisions through enactment of the General Authorities Act in 1970, and again through enactment of a 1978 amendment to that act (the "Redwood amendment," contained in a bill expanding Redwood National Park), which added the last two sentences in the following provision. The key part of that act, as amended, is as follows:

> Congress declares that the national park system, which began with establishment of Yellowstone National Park in 1872, has since grown to include superlative natural, historic, and recreation areas in every major region of the United States, its territories and island possessions; that these areas, though distinct in character, are united through their inter-related purposes and resources into one national park system as cumulative expressions of a single national heritage; that, individually and collectively, these areas derive increased national dignity and recognition of their superlative environmental quality through their inclusion jointly with each other in one national park system preserved and managed for the benefit and inspiration of all the people of the United States; and that it is the purpose of this Act to include all such areas in the System and to clarify the authorities applicable to the system. Congress further reaffirms, declares, and directs that the promotion and regulation of the various areas of the National Park System, as defined in section 1c of this title, shall be consistent with and founded in the purpose established by section 1 of this title [the Organic Act provision quoted above], to the common benefit of all the people of the United States. The authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established, except as may have been or shall be directly and specifically provided by Congress. (16 USC 1a-1)

This section 1.4 of *Management Policies* represents the agency's interpretation of these key statutory provisions.

### 1.4.2 "Impairment" and "Derogation": One Standard

Congress intended the language of the Redwood amendment to the General Authorities Act to reiterate the provisions of the Organic Act, not create a substantively different management standard. The House committee report described the Redwood amendment as a "declaration by Congress" that the promotion and regulation of the national park system is to be consistent with the Organic Act. The Senate committee report stated that under the Redwood amendment, "The Secretary has an absolute duty, which is not to be compromised, to fulfill the mandate of the 1916 Act to take whatever actions and seek whatever relief as will safeguard the units of the national park system." So, although the Organic Act and the General Authorities Act, as amended by the Redwood amendment, use different wording ("unimpaired" and "derogation") to describe what the National Park Service must avoid, they define a single standard for the management of the national park system—not two different standards. For simplicity, *Management Policies* uses "impairment" (or a variation thereof), not both statutory phrases, to refer to that single standard.

### 1.4.3 The NPS Obligation to Conserve and Provide for Enjoyment of Park Resources and Values

The fundamental purpose of the national park system, established by the Organic Act and reaffirmed by the General Authorities Act, as amended, begins with a mandate to conserve park resources and values. This mandate is independent of the separate prohibition on impairment and applies all the time with respect to all park resources and values, even when there is no risk that any park resources or values may be impaired. NPS managers must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values. However, the laws do give the Service the management discretion to allow impacts to park resources and values when necessary and appropriate to fulfill the purposes of a park, so long as the impact does not constitute impairment of the affected resources and values.

The fundamental purpose of all parks also includes providing for the enjoyment of park resources and values by the people of the United States. The enjoyment that is contemplated by the statute is broad; it is the enjoyment of all the people of the United States and includes enjoyment both by people who visit parks and by those who appreciate

them from afar. It also includes deriving benefit (including scientific knowledge) and inspiration from parks, as well as other forms of enjoyment and inspiration. Congress, recognizing that the enjoyment by future generations of the national parks can be ensured only if the superb quality of park resources and values is left unimpaired, has provided that when there is a conflict between conserving resources and values and providing for enjoyment of them, conservation is to be predominant. This is how courts have consistently interpreted the Organic Act.

### 1.4.3.1 Park Purposes and Legislatively Authorized Uses

Park purposes are found in the general laws pertaining to the national park system, as well as the enabling legislation or proclamation establishing each unit. In addition to park purposes, in many cases the enabling legislation or proclamation for a park unit may also identify uses that are either mandated or authorized. In the administration of mandated uses, park managers must allow the use; however, they do have the authority to and must manage and regulate the use to ensure, to the extent possible, that impacts on park resources from that use are acceptable. In the administration of authorized uses, park managers have the discretionary authority to allow and manage the use, provided that the use will not cause impairment or unacceptable impacts. In determining whether or how to allow the use, park managers must consider the congressional or presidential interest, as expressed in the enabling legislation or proclamation, that the use or uses continue. Where there is strong public interest in a particular use, opportunities for civic engagement and cooperative conservation should be factored into the decision-making process.

*(See Unacceptable Impacts 1.4.7.1; Civic Engagement 1.7; Major Elements of NPS Park Planning and Decision-making 2.2; General 8.1)*

### 1.4.4 The Prohibition on Impairment of Park Resources and Values

While Congress has given the Service the management discretion to allow impacts within parks, that discretion is limited by the statutory requirement (generally enforceable by the federal courts) that the Park Service must leave park resources and values unimpaired unless a particular law directly and specifically provides otherwise. This, the cornerstone of the Organic Act, establishes the primary responsibility of the National Park Service. It ensures that park resources and values will continue to exist in a condition that will allow the American people to have present and future opportunities for enjoyment of them.

The impairment of park resources and values may not be allowed by the Service unless directly and specifically provided for by legislation or by the proclamation establishing the park. The relevant legislation or proclamation must provide explicitly (not by implication or inference) for the activity, in terms that keep the Service from having the authority to manage the activity so as to avoid the impairment.

### 1.4.5 What Constitutes Impairment of Park Resources and Values

The impairment that is prohibited by the Organic Act and the General Authorities Act is an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values. Whether an impact meets this definition depends on the particular resources and values that would be affected; the severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question and other impacts.

An impact to any park resource or value may, but does not necessarily, constitute an impairment. An impact would be more likely to constitute impairment to the extent that it affects a resource or value whose conservation is

- necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park, or
- key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park, or
- identified in the park's general management plan or other relevant NPS planning documents as being of significance.

An impact would be less likely to constitute an impairment if it is an unavoidable result of an action necessary to preserve or restore the integrity of park resources or values and it cannot be further mitigated.

An impact that may, but would not necessarily, lead to impairment may result from visitor activities; NPS administrative activities; or activities undertaken by concessioners, contractors, and others operating in the park. Impairment may also result from sources or activities outside the park. This will be addressed consistent with sections 1.6 and 1.7 on Cooperative Conservation and Civic Engagement.

*(See Unacceptable Impacts 1.4.7.1)*

### 1.4.6 What Constitutes Park Resources and Values

The "park resources and values" that are subject to the no-impairment standard include

- the park's scenery, natural and historic objects, and wildlife, and the processes and conditions that sustain them, including, to the extent present in the park: the ecological, biological, and physical processes that created the park and continue to act upon it; scenic features; natural visibility, both in daytime and at night; natural landscapes; natural soundscapes and smells; water and air resources; soils; geological resources; paleontological resources; archeological resources; cultural landscapes; ethnographic resources; historic and prehistoric sites, structures, and objects; museum collections; and native plants and animals;
- appropriate opportunities to experience enjoyment of the above resources, to the extent that can be done without impairing them;

- the park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system, and the benefit and inspiration provided to the American people by the national park system; and
- any additional attributes encompassed by the specific values and purposes for which the park was established.

*(See introduction to chapter 4)*

### 1.4.7 Decision-making Requirements to Identify and Avoid Impairments

Before approving a proposed action that could lead to an impairment of park resources and values, an NPS decision-maker must consider the impacts of the proposed action and determine, in writing, that the activity will not lead to an impairment of park resources and values. If there would be an impairment, the action must not be approved.

In making a determination of whether there would be an impairment, an NPS decision-maker must use his or her professional judgment. This means that the decision-maker must consider any environmental assessments or environmental impact statements required by the National Environmental Policy Act of 1969 (NEPA); consultations required under section 106 of the National Historic Preservation Act (NHPA), relevant scientific and scholarly studies; advice or insights offered by subject matter experts and others who have relevant knowledge or experience; and the results of civic engagement and public involvement activities relating to the decision. The same application of professional judgment applies when reaching conclusions about "unacceptable impacts."

When an NPS decision-maker becomes aware that an ongoing activity might have led or might be leading to an impairment of park resources or values, he or she must investigate and determine if there is or will be an impairment. This investigation and determination may be made independent of, or as part of, a park planning process undertaken for other purposes. If it is determined that there is, or will be, an impairment, the decision-maker must take appropriate action, to the extent possible within the Service's authorities and available resources, to eliminate the impairment. The action must eliminate the impairment as soon as reasonably possible, taking into consideration the nature, duration, magnitude, and other characteristics of the impacts on park resources and values, as well as the requirements of the National Environmental Policy Act, National Historic Preservation Act, the Administrative Procedure Act, and other applicable laws.

*(See Levels of Park Planning 2.3; Evaluating Impacts on Natural Resources 4.1.3; Planning 5.2; General 8.1; Visitor Use 8.2; General 9.1; Glossary definition of Professional Judgment. Also see Director's Order #12: Conservation Planning, Environmental Impact Analysis, and Decision-making)*

#### 1.4.7.1 Unacceptable Impacts

The impact threshold at which impairment occurs is not always readily apparent. Therefore, the Service will apply a standard that offers greater assurance that impairment will not occur. The Service will do this by avoiding impacts that it determines to be unacceptable. These are impacts that fall short of impairment, but are still not acceptable within a particular park's environment. Park managers must not allow uses that would cause unacceptable impacts; they must evaluate existing or proposed uses and determine whether the associated impacts on park resources and values are acceptable.

Virtually every form of human activity that takes place within a park has some degree of effect on park resources or values, but that does not mean the impact is unacceptable or that a particular use must be disallowed. Therefore, for the purposes of these policies, unacceptable impacts are impacts that, individually or cumulatively, would

- be inconsistent with a park's purposes or values, or
- impede the attainment of a park's desired future conditions for natural and cultural resources as identified through the park's planning process, or
- create an unsafe or unhealthful environment for visitors or employees, or
- diminish opportunities for current or future generations to enjoy, learn about, or be inspired by park resources or values, or
- unreasonably interfere with
  - park programs or activities, or
  - an appropriate use, or
  - the atmosphere of peace and tranquility, or the natural soundscape maintained in wilderness and natural, historic, or commemorative locations within the park.
  - NPS concessioner or contractor operations or services.

*The following graphic illustrates the relationship between appropriate use, unacceptable impacts and impairment.*

Managing for Resource Conservation




*(See Appropriate Use of the Parks 1.5; General 8.1)*

#### 1.4.7.2 Improving Resource Conditions within the Parks

The Service will also strive to ensure that park resources and values are passed on to future generations in a condition that is as good as, or better than, the conditions that exist today. In particular, the Service will strive to restore the integrity of park resources that have been damaged or

compromised in the past. Restoration activities will be guided by the natural and cultural resource-specific policies identified in chapters 4 and 5 of these *Management Policies*.

*(See Planning for Natural Resource Management 4.1.1; Restoration of Natural Systems 4.1.5; Compensation for Injuries to Natural Resources 4.1.6; Restoration of Native Plant and Animal Species 4.4.2.2; Restoration (of Cultural Landscapes) 5.3.5.2.3; Restoration (of Historic and Prehistoric Structures) 5.3.5.4.3; Restoration (of Museum Collections) 5.3.5.5.2. Also see Director's Order #12 and Handbook.)*

## 1.5 Appropriate Use of the Parks

The National Park Service embraces appropriate use of the parks because these uses are key to the enjoyment of the parks and the appreciation and inspiration derived from the resources. Park resources have profound effects on those who experience them through appropriate park uses. An "appropriate use" is a use that is suitable, proper, or fitting for a particular park, or to a particular location within a park. Not all uses are appropriate or allowable in units of the national park system, and what is appropriate may vary from one park to another and from one location to another within a park.

In its role as steward of park resources, the National Park Service must ensure that park uses that are allowed would not cause impairment of, or unacceptable impacts on, park resources and values. When proposed park uses and the protection of park resources and values come into conflict, the protection of resources and values must be predominant. A new form of park use may be allowed within a park only after a determination has been made in the professional judgment of the superintendent that it will not result in unacceptable impacts. The National Park Service will always consider allowing activities that are appropriate to the parks, although conditions may preclude certain activities or require that limitations be placed on them. Park superintendents must continually monitor all park uses to prevent unanticipated and unacceptable impacts. If unanticipated and unacceptable impacts emerge, the superintendent must engage in a thoughtful, deliberate process to further manage or constrain the use, or discontinue it.

Appropriate visitor enjoyment is often associated with the inspirational qualities of the parks. As a general matter, preferred forms of enjoyment are those that are uniquely suited to the superlative natural and cultural resources found in the parks and that (1) foster an understanding of and appreciation for park resources and values, or (2) promote enjoyment through a direct association with, interaction with, or relation to park resources.

These preferred forms of use contribute to the personal growth and well-being of visitors by taking advantage of the inherent educational value of parks. Equally important, many appropriate uses also contribute to the health and personal fitness of park visitors. These are the types of uses that the Service will actively promote, in accordance with the Organic Act. Other forms of park uses may be allowed within a park in accordance with the policies found in chapter 8.

*(See Park Purposes and Legislatively Authorized Uses 1.4.3.1; Chapter 2, Park System Planning; Process for Determining New Appropriate Uses 8.1.2. Also see Director's Order #17: National Park Service Tourism; 36 CFR 1.5)*

## 1.6 Cooperative Conservation Beyond Park Boundaries

Cooperative conservation beyond park boundaries is necessary as the National Park Service strives to fulfill its mandate to preserve the natural and cultural resources of parks unimpaired for future generations. Ecological processes cross park boundaries, and park boundaries may not incorporate all of the natural resources, cultural sites, and scenic vistas that relate to park resources or the quality of the visitor experience. Therefore, activities proposed for adjacent lands may significantly affect park programs, resources, and values. Conversely, NPS activities may have impacts outside park boundaries. Recognizing that parks are integral parts of larger regional environments, and to support its primary concern of protecting park resources and values, the Service will work cooperatively with others to

- anticipate, avoid, and resolve potential conflicts;
- protect park resources and values;
- provide for visitor enjoyment; and
- address mutual interests in the quality of life of community residents, including matters such as compatible economic development and resource and environmental protection.

Such local and regional cooperation may involve other federal agencies; tribal, state, and local governments; neighboring landowners; nongovernmental and private sector organizations; and all other concerned parties. The Service will do these things because cooperative conservation activities are a vital element in establishing relationships that will benefit the parks and in fostering decisions that are sustainable.

The Service will use all available tools to protect park resources and values from unacceptable impacts. The Service will also seek to advance opportunities for conservation partnerships. Superintendents will monitor land use proposals, changes to adjacent lands, and external activities for their potential impacts on park resources and values. It is appropriate for superintendents to engage constructively with the broader community in the same way that any good neighbor would. Superintendents will encourage compatible adjacent land uses and seek to avoid and mitigate potential adverse impacts on park resources and values by actively participating in the planning and regulatory processes of other federal agencies and tribal, state, and local governments having jurisdiction over property affecting, or affected by, the park. If a decision is

If a lease or cooperative agreement requires or allows the lessee or cooperator to maintain, repair, rehabilitate, restore, or build upon the property, the work must be done in accordance with applicable Secretary of the Interior's standards and guidelines and other NPS policies, guidelines, and standards.

*(See Leases 8.12. Also see Director's Order #38: Real Property Leasing; NHPA [16 USC 470h-3]; 16 USC 460l-22(a); Omnibus Consolidated Appropriations Act, 1997 [16 USC 1g]; 36 CFR Part 18)*

### 5.3.4 Stewardship of Human Remains and Burials

Marked and unmarked prehistoric and historic burial areas and graves will be identified, evaluated, and protected. Every effort will be made to avoid impacting burial areas and graves when planning park development and managing park operations. Such burial areas and graves will not knowingly be disturbed or archeologically investigated unless threatened with destruction.

The Service will consult with American Indian tribes, Alaska Natives, Native Hawaiians, and other individuals and groups linked by demonstrable ties of kinship or culture to potentially identifiable human remains when such remains may be disturbed or are inadvertently encountered on park lands. Reinterment at the same park may be permitted and may include remains that may have been removed from lands now within the park.

American Indian, Alaska Native, and Native Hawaiian human remains and photographs of such remains will not be exhibited. Drawings, renderings, or casts of such remains may be exhibited with the consent of culturally affiliated Indian tribes, Alaska Natives, and Native Hawaiian organizations. The exhibit of non-Native American human remains, or photographs, drawings, renderings, or casts of such remains, is allowed in consultation with traditionally associated peoples. The Service may allow access to and study, publication, and destructive analysis of human remains, but must consult with traditionally associated peoples and consider their opinions and concerns before making decisions on appropriate actions. In addition, such use of human remains will occur only with an approved research proposal that describes why the information cannot be obtained through other sources or analysis and why the research is important to the field of study and the general public.

*(See Cultural Resources 6.3.8; Consultation 7.5.6; Cemeteries and Burials 8.6.10. Also see ARPA; NAGPRA; 36 CFR Part 79; 43 CFR Part 10)*

### 5.3.5 Treatment of Cultural Resources

The Park Service will provide for the long-term preservation of, public access to, and appreciation of the features, materials, and qualities contributing to the significance of cultural resources. With some differences by type, cultural resources are subject to several basic treatments, including (1) preservation in their existing states; (2) rehabilitation to serve contemporary uses, consistent with their integrity and character; and (3) restoration to earlier appearances by the removal of later additions and replacement of missing elements. Decisions regarding which treatments will best ensure the preservation and public enjoyment of particular cultural resources will be reached through the planning and compliance process, taking into account

- the nature and significance of a resource and its condition and interpretive value
- the research potential of the resource
- the level of intervention required by treatment alternatives
- the availability of data and the terms of any binding restrictions
- the concerns of traditionally associated peoples and other groups and individuals

Except for emergencies that threaten irreparable loss without immediate action, no treatment project will be undertaken unless supported by an approved planning document appropriate to the proposed action.

The preservation of cultural resources in their existing states will always receive first consideration. Treatments entailing greater intervention will not proceed without the consideration of interpretive alternatives. The appearance and condition of resources before treatment and changes made during treatment will be documented. Such documentation will be shared with any appropriate state or tribal historic preservation office or certified local government and added to the park museum cataloging system. Pending treatment decisions reached through the planning process, all resources will be protected and preserved in their existing states.

As a basic principle, anything of historical appearance that the National Park Service presents to the public in a park will be either an authentic survival from the past or an accurate representation of that once existing there. Reconstructions and reproductions will be clearly identified as such.

The Service will holistically approach the treatment of related cultural resources in a park. All cultural resource and natural resource values will be considered in defining specific treatment and management goals. Research will be coordinated and sequenced so that decisions are not made in isolation. Each proposed action will be evaluated to ensure consistency or compatibility in the overall treatment of park resources. The relative importance and relationship of all values will be weighed to identify potential conflicts between and among resource preservation goals, park management and operation goals, and park user goals. Conflicts will be considered and resolved through the planning process, which will include any consultation required by 16 USC 470f.

Although each resource type is most closely associated with a particular discipline, an interdisciplinary approach is commonly needed to properly define specific treatment and management goals for cultural resources. Policies applicable to the various resource types follow.

*(See Park Management 1.4; Levels of Park Planning 2.3; Planning 5.2; Cultural Resources 6.3.8. Also see NEPA; Secretary of the Interior's Standards for the Treatment of Historic Properties)*

#### 5.3.5.1 Archeological Resources

Archeological resources will be managed in situ, unless the removal of artifacts or physical disturbance is justified by research, consultation, preservation, protection, or interpretive requirements. Preservation treatments will include proactive measures that protect resources from vandalism and looting, and will maintain or improve their condition by limiting damage due to natural and human agents. Data recovery actions will be taken only in the context of planning, consultation, and appropriate decision-making. Preservation treatments and data recovery activities will be conducted within the scope of an approved research design. Archeological research will use nondestructive methods of testing and analysis wherever possible. The Park Service will incorporate information about archeological resources into interpretive, educational, and preservation programs. Artifacts and specimens recovered from archeological resources, along with associated records and reports, will be maintained together in the park museum collection.

*(Also see Director's Order #28A: Archeology; 36 CFR Part 79; Secretary of the Interior's Standards and Guidelines for Archeological Documentation [48 FR 44734-737]; Museum Handbook)*

##### 5.3.5.1.1 Preservation

Archeological resources will be maintained and preserved in a stable condition to prevent degradation and loss. The condition of archeological resources will be documented, regularly monitored, and evaluated against initial baseline data. Parks are encouraged to enlist concerned local citizens in site stewardship programs to patrol and monitor the condition of archeological resources. The preservation of archeological components of cultural landscapes, structures, and ruins are also subject to the treatment policies for cultural landscapes, historic and prehistoric structures, and historic and prehistoric ruins.

*(See Volunteers in the Parks 1.9.1.6)*

##### 5.3.5.1.2 Stabilization

Archeological resources subject to erosion, slumping, subsidence, or other natural deterioration will be stabilized using the least intrusive and destructive methods. The methods used will protect natural resources and processes to the maximum extent feasible. Stabilization will occur only after sufficient research demonstrates the likely success of the proposed stabilizing action and after existing conditions are documented.

##### 5.3.5.1.3 Rehabilitation, Restoration, and Reconstruction

These terms are normally related to the treatment of historic structures and cultural landscapes. The Park Service will not normally undertake the rehabilitation, restoration, or reconstruction of archeological resources or features. Archeological studies undertaken in conjunction with the rehabilitation or restoration of cultural landscapes, structures, or ruins, or with the reconstruction of obliterated cultural landscapes or missing structures, will be guided by the treatment policies for archeological resources as well as those for the other associated resource types.

##### 5.3.5.1.4 Protection

Archeological resources will be protected against human agents of destruction and deterioration whenever practicable. Archeological resources subject to vandalism and looting will be periodically monitored and, if appropriate, fencing, warning signs, remote-sensing alarms, and other protective measures will be installed. Training and public education programs will be developed to make park staff and the public aware of the value of the park's archeological resources and the penalties for destroying them. For public safety reasons, local citizens who are monitoring resources under site stewardship programs will be instructed to report incidents of vandalism and looting to law enforcement personnel for response.

*(See Volunteers in Parks 7.6.1; Shared Responsibilities 8.3.3)*

##### 5.3.5.1.5 Archeological Data Recovery

Archeological data recovery is permitted if justified by research or interpretation needs. Significant archeological data that would otherwise be lost as a result of resource treatment projects or uncontrollable degradation or destruction will be recovered in accordance with appropriate research proposals and preserved in park museum collections. Data will be recovered to mitigate the loss of significant archeological data due to park development, but only after

- the redesign, relocation, and cancellation of the proposed development have all been considered and ruled out as infeasible through the planning process;
- the park development has been approved; and
- the project has provided for data recovery, cataloging, and the initial preservation of recovered collections.

*(See Planning 5.2)*

##### 5.3.5.1.6 Earthworks

Appropriate and, when feasible, native vegetation will be maintained when necessary to prevent the erosion of prehistoric and historic earthworks, even when the historic condition might have been bare earth. Because earthwork restorations and reconstructions can obliterate surviving remains and are often difficult to maintain, other means of representing and interpreting the original earthworks will receive first consideration.

*(See Management of Native Plants and Animals 4.4.2; Management of Exotic Species 4.4.4)*

#### 5.3.5.1.7 Submerged Cultural Resources

Historic shipwrecks and other submerged cultural resources will be protected, to the extent permitted by law, in the same manner as terrestrial archeological resources. Protection activities involve inventory, evaluation, monitoring, interpretation, and establishing partnerships to provide for the management of historic shipwrecks and other submerged cultural resources in units of the national park system. The Service will not allow treasure hunting or commercial salvage activities at or around historic shipwrecks or other submerged cultural resources located within park boundaries unless legally obligated to do so. Parks may provide recreational diving access to submerged cultural resources that are not susceptible to damage or the removal of artifacts. The Service will ensure that the activities of others in park waters do not adversely affect submerged cultural resources or the surrounding natural environment. The Service will consult with the owners of non-abandoned historic shipwrecks and enter into written agreements with them to clarify how the shipwrecks will be managed by the Park Service. Shipwrecks owned by a state government pursuant to the Abandoned Shipwreck Act of 1987 will be managed in accordance with the Abandoned Shipwreck Act Guidelines (55 FR 50116-145, 55 FR 51528, and 56 FR 7875).

*(See Recreational Activities 8.2.2. Also see 36 CFR Part 2; 485 DM 27; Director's Order #4: Diving Management)*

### 5.3.5.2 Cultural Landscapes

The treatment of a cultural landscape will preserve significant physical attributes, biotic systems, and uses when those uses contribute to historical significance. Treatment decisions will be based on a cultural landscape's historical significance over time, existing conditions, and use. Treatment decisions will consider both the natural and built characteristics and features of a landscape, the dynamics inherent in natural processes and continued use, and the concerns of traditionally associated peoples.

The treatment implemented will be based on sound preservation practices to enable long-term preservation of a resource's historic features, qualities, and materials. There are three types of treatment for extant cultural landscapes: preservation, rehabilitation, and restoration.

*(See Decision-making Requirements to Identify and Avoid Impairments 1.4.7. Also see Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for the Treatment of Cultural Landscapes)*

#### 5.3.5.2.1 Preservation

A cultural landscape will be preserved in its present condition if

- that condition allows for satisfactory protection, maintenance, use, and interpretation; or
- another treatment is warranted but cannot be accomplished until some future time.

#### 5.3.5.2.2 Rehabilitation

A cultural landscape may be rehabilitated for contemporary use if

- it cannot adequately serve an appropriate use in its present condition; and
- rehabilitation will retain its essential features and not alter its integrity and character or conflict with approved park management objectives.

#### 5.3.5.2.3 Restoration

A cultural landscape may be restored to an earlier appearance if

- all changes after the proposed restoration period have been professionally evaluated and the significance of those changes has been fully considered;
- restoration is essential to public understanding of the park's cultural associations;
- sufficient data about that landscape's earlier appearance exist to enable its accurate restoration; and
- the disturbance or loss of significant archeological resources is minimized and mitigated by data recovery.

#### 5.3.5.2.4 Reconstruction of Obliterated Landscapes

No matter how well conceived or executed, reconstructions are contemporary interpretations of the past rather than authentic survivals from it. The National Park Service will not reconstruct an obliterated cultural landscape unless

- there is no alternative that would accomplish the park's interpretive mission;
- sufficient data exist to enable its accurate reconstruction, based on the duplication of historic features substantiated by documentary or physical evidence, rather than on conjectural designs or features from other landscapes;
- reconstruction will occur in the original location;
- the disturbance or loss of significant archeological resources is minimized and mitigated by data recovery; and
- reconstruction is approved by the Director.

A landscape will not be reconstructed to appear damaged or ruined. General representations of typical landscapes will not be attempted.

#### 5.3.5.2.5 Biotic Cultural Resources

Biotic cultural resources, which include plant and animal communities associated with the significance of a cultural landscape, will be duly considered in treatment and management. The cultural resource and natural resource components of the park's resource stewardship strategy will jointly identify acceptable plans for the management and treatment of biotic cultural resources. The park's resource stewardship strategy will anticipate and plan for the natural and human-induced processes of change. Before any major treatment of a cultural landscape is undertaken, there must be an understanding of the degree to which change

contributes to or compromises the historic character of the landscape, and the way in which natural cycles influence the ecological processes within the landscape. Treatment and management of a cultural landscape will establish acceptable parameters for change and manage the biotic resources within those parameters.

*(See Maintenance of Altered Plant Communities 4.4.2.5)*

#### 5.3.5.2.6 Land Use and Ethnographic Value

Many cultural landscapes are significant because of their historic land use and practices. When land use is a primary reason for the significance of a landscape, the objective of treatment will be to balance the perpetuation of use with the retention of the tangible evidence that represents its history. The variety and arrangement of cultural and natural features in a landscape often have sacred or other continuing importance in the ethnic histories and cultural vigor of associated peoples. These features and their past and present-day uses will be identified, and the beliefs, attitudes, practices, traditions, and values of traditionally associated peoples will be considered in any treatment decisions.

Contemporary use of a cultural landscape is appropriate if it

- does not adversely affect significant landscape characteristics and features; and
- either follows the historic use or does not impede public appreciation of it.

All uses of cultural landscapes are subject to legal requirements, policy, guidelines, and standards for natural and cultural resource preservation, public safety, and special park uses.

#### 5.3.5.2.7 New Construction

Contemporary alterations and additions to a cultural landscape must not radically change, obscure, or destroy its significant spatial organization, materials, and features. New buildings, structures, landscape features, and utilities may be constructed in a cultural landscape if

- existing structures and improvements do not meet essential management needs;
- new construction is designed and sited to preserve the landscape's integrity and historic character; and
- the alterations, additions, or related new construction is differentiated from yet compatible with the landscape's historic character—unless associated with an approved restoration or reconstruction.

New additions will meet the Secretary of the Interior's Standards for Rehabilitation.

### 5.3.5.3 Ethnographic Resources

Park ethnographic resources are the cultural and natural features of a park that are of traditional significance to traditionally associated peoples. These peoples are the contemporary park neighbors and ethnic or occupational communities that have been associated with a park for two or more generations (40 years), and whose interests in the park's resources began before the park's establishment. Living peoples of many cultural backgrounds—American Indians, Inuit (Eskimos), Native Hawaiians, African Americans, Hispanics, Chinese Americans, Euro-Americans, and farmers, ranchers, and fishermen—may have a traditional association with a particular park.

Traditionally associated peoples generally differ as a group from other park visitors in that they typically assign significance to ethnographic resources—places closely linked with their own sense of purpose, existence as a community, and development as ethnically distinctive peoples. These places may be in urban or rural parks and support ceremonial activities or represent birthplaces of significant individuals, group origin sites, migration routes, or harvesting or collecting places. Although these places have historic attributes that are of great importance to the group, they may not necessarily have a direct association with the reason the park was established or be appropriate as a topic of general public interest. Some ethnographic resources might also be traditional cultural properties. A traditional cultural property is one that is eligible for inclusion in the National Register of Historic Places because of its association with cultural practices or beliefs of a living community that are (1) rooted in that community's history, and (2) important in maintaining the continuing cultural identity of the community.

The Service's primary interest in these places stems from its responsibilities under

- the NPS Organic Act—to conserve the natural and historic objects within parks unimpaired for the enjoyment of future generations;
- the National Historic Preservation Act (NHPA)—to preserve, conserve, and encourage the continuation of the diverse traditional prehistoric, historic, ethnic, and folk cultural traditions that underlie and are a living expression of our American heritage;
- the American Indian Religious Freedom Act (AIRFA)—to protect and preserve for American Indians access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites;
- the Archeological Resources Protection Act (ARPA)—to secure, for the present and future benefit of the American people, the protection of archeological resources and sites that are on public lands and Indian Lands;
- the National Environmental Policy Act (NEPA)—to preserve important historic, cultural, and natural aspects of our national heritage; and
- Executive Order 13007 (Indian Sacred Sites)—to accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and avoid adversely affecting the physical integrity of such sacred sites.

The Service must therefore be respectful of these ethnographic resources and carefully consider the effects