UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DC PRESERVATION LEAGUE, et al., *Plaintiffs*, v. DEPARTMENT OF INTERIOR, et al., *Defendants*. | Case No. 1:26-cv-477-ACR |

## MEMORANDUM OPINION AND ORDER

The Government complains of "intrusive judicial oversight" regarding the Department of the Interior and National Park Service's "management of a golf course."[1] And so on October 29, the Government moved the Court to stay the Preliminary Injunction.

If—as the Government has insisted since February—park officials had planned nothing more than to manage a golf course, the Court would have stayed in the gallery. As it had for months. The record, however, shows that during those same months DOI has been planning the opposite. Not to manage, but to destroy the historic East Potomac Golf Course.[2] And to replace it with a championship course designed by Tom Fazio, just as Plaintiffs have asserted.[3] The Court stepped in only after the Government removed hundreds of trees to execute that plan, and in so doing bypassed the National Environmental Policy Act.[4]

---

[1] Dkt. 112 at 8.

[2] *See* Dkt. 103 (PI Op.) at 27–29.

[3] *See id.* at 13–14, 27.

[4] *See id.* at 28, 53–62.

In enjoining further tree removal, the Court has made two factual findings. First, that the Washington National Plan exists. And second, that NPS removed hundreds of healthy, mature trees on East Potomac Golf Course to effectuate that Plan.[5] The Government ignores these findings. It insists that "tree removal" and "vegetation management" are "independent activities within NPS's management authority."[6] And it grounds its standing, final agency action, NEPA, and irreparable injury arguments on decoupling the tree removal from the course redesign.[7] Yet the Government nowhere explains how the Court erred in finding otherwise. Nor could it given the record before the Court. Or given what happened the day after it filed its motion.

On October 30, DOI submitted a "Concept Proposal for East Potomac Golf Links" to the National Capital Planning Commission (NCPC) for approval. In it, DOI announced a plan to replace the current course with "a championship course concept by Fazio Design."[8] DOI explained that this Fazio design required NPS to "selectively thin" trees to restore "historic views."[9] Which is to say, there is a plan to replace East Potomac with a Fazio-designed course. And DOI thinned (that is, removed) the trees as part of that plan. So the Plan exists and NPS removed trees to start implementing it.

Nonetheless the Government claims: "nothing to see here." Just routine golf maintenance. But there is plenty to see. And without an injunction, DOI will quickly finish what it started on October 10: remove hundreds more healthy trees without NEPA compliance and without opportunity for the Court to consider whether to enter a permanent injunction.

---

[5] *See id.* at 27–31.

[6] Dkt. 112 at 3.

[7] *See generally id.*

[8] Sound familiar? *See* Dkt. 128-1 at 7.

[9] *Id.* at 15, 32.

For the reasons stated in the Court's Preliminary Injunction Opinion, Dkt. 103, and for those discussed below, the Court **DENIES** the Government's Motion to Stay Pending Appeal.

## I. LEGAL STANDARD

A stay pending appeal is an "intrusion into the ordinary processes of administration and judicial review." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (cleaned up). As such, "[a] stay is not a matter of right." *Id.* at 433 (cleaned up). The movant must "justify the court's exercise of such an extraordinary remedy." *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985) (per curiam). When resolving a motion for stay pending appeal, a court considers "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (cleaned up).

## II. LIKELIHOOD OF SUCCESS ON THE MERITS

The Government's motion does little more than rehash legal arguments it has previously made. Worse, it rehashes them without meaningfully addressing the Court's factual findings or assessment of its legal arguments.[10]

***Standing.*** The Government starts by faulting the Court for concluding "that some of Plaintiffs' alleged injuries . . . are speculative while others are not." Dkt. 112 at 2. This is an odd complaint. Courts routinely find some injuries valid and others not. Whether prices will rise on the Course after renovation is, at this stage, speculative. That destroying three courses and turning them into one will impact Plaintiffs' recreational interests is not.

---

[10] In its likelihood of success analysis, the Court "relie[d] only upon the parties' written submissions, the record developed in those submissions, and legal argumentation," which the Government has conceded was appropriate. PI Op. at 31 n.52 (citing Dkt. 84 at 23).

The Government argues next that Plaintiffs' interests are not sufficiently concrete because they face harm only "*if* East Potomac Golf Course's Walter Travis design were to change." *Id.* But the record shows that the Government intends—imminently—to destroy the Travis Design and replace it with a modern championship-style course designed by Tom Fazio. And while the Government insists any resulting injury is based only on Plaintiffs finding "the government's design distasteful," the record shows otherwise. *Id.* at 3 (cleaned up). The current three-course design accommodates more skill levels and faster play than the proposed one-course championship-style design. *See* PI Op. at 45–47. Thus, the Government's continued citation to *NPS v. National Trust for Historic Preservation in the United States*, 609 U.S. 1068 (2026), remains inapposite for the reasons the Court has explained and the Government ignores. *See* PI Op. at 43–45.

The Government also contends that "these purported injuries, even if valid, reflect a fundamental disconnect with the basis for which the Court granted the injunction: the removal of trees pursuant to a separate agency decision." Dkt. 112 at 3. The only disconnect is between the Government's reasoning and what the Court found. The Court *rejected* the Government's contention that the Tree Management Plan (TMP) was independent from the Washington National Plan. *See* PI Op. at 28–29.

***Agency Action.*** The Government argues that "redesigning an existing public golf course into a different public golf course is not agency action at all, because it is not the sort of governmental power that the APA cares about." Dkt. 112 at 3. That argument conflicts with numerous representations the Government made to persuade the Court not to issue interim relief. *See* PI Op. at 36–37. And recall that the Acting Director of the National Park Service has declared that the redesign will be a "major [f]ederal action" that will require regulatory review

(such as NEPA compliance). Dkt. 26-4 ¶ 18. Nowhere does the Government explain why the Court should discredit that statement.

The Government's late-breaking alternative argument also fails on the law. *See* PI Op. at 38–39. To confirm this, look no further than the Government's primary case, *Independent Equipment Dealers Ass'n v. EPA*, 372 F.3d 420 (D.C. Cir. 2004). There, the D.C. Circuit acknowledged that "the term 'agency action' undoubtedly has a broad sweep." *Id.* at 427. The Government makes no attempt—nor could it with any degree of credibility—to explain how the wholesale destruction of a historic site, located within a National Historic District, listed in the National Register of Historic Places, which would concededly trigger fulsome NEPA compliance processes, is not within the "broad sweep" of the term "agency action." *Id.*; *see* Dkt. 41-4 at 99.

***Final Agency Action.*** The Government claims that "Plaintiffs have failed to identify any final agency action" because DOI and NPS have exercised only "management authority" to conduct "tree removal" and close East Potomac Park. Dkt. 112 at 3. And it claims that "any proposal is not yet final because the Park Service has not settled on or approved any such plan." *Id.* at 4. But that is not the test. If it were, agencies could avoid judicial review by doing what the Government attempts here: take a series of discrete steps and not make a "final" decision until the plan has already been carried out.

Final agency action occurs when some event marks the consummation of the agency's decisionmaking process, and when that event determines rights or obligations, or creates legal consequences. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Even "[a]n interim agency resolution counts as final agency action despite the potential for a different permanent decision," so long as it is the "final word from the agency on what will happen up to the time of any different permanent decision." *NRDC v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020). Here, the

Court concluded that the agency's "discernible course of agency conduct . . . reflects a discrete decision" by the agency that is subject to APA review. *Hennepin Cnty. v. HHS*, No. 26-cv-2460, 2026 WL 2426300, at *7 (D.D.C. Aug. 19, 2026). *See* PI Op. at 32–35; *see also R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 174–76 (D.D.C. 2015).

The tree removal—which the Court found was one part of the Washington National Plan—easily passes the *Bennett* test. The agency approved it, and it created legal rights and obligations through the hiring and payment of contractors, the disbursement of federal funds, the preparation of NEPA compliance documents, and the permanent destruction of trees. *See* PI Op. at 32–35. And DOI removed the trees to lay the groundwork—literally—for the Fazio redesign to begin. *See id.* at 28–29. That decision was neither "tentative," nor "interlocutory," nor "subject to further consideration by the agency." *NRDC*, 955 F.3d at 78.

***NEPA Segmentation.*** The Government abandons its claims that *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168, 180 (2025), and the repeal of certain NEPA implementing regulations in January 2026 foreclose NEPA segmentation claims as a matter of law. *See* Dkt. 112 at 4–5.

The Government argues instead that the Court failed to defer adequately to NPS's definition of the project at hand. *See id.* To do so, the Government is forced to assert, without any citation, that *Seven County* applies with equal force to cases involving NEPA compliance through categorical exclusion. *See id.* *Contra Wash. Area Bicyclist Ass'n v. Burgum*, 840 F. Supp. 3d 883, 917–18 (D.D.C. 2026) (declining to apply *Seven County* to a case involving categorical exclusions).

But the Court concluded that, even if *Seven County* did apply, NPS's definition of the "project at hand" was not "reasonable or manageable." PI Op. at 56, 59–60. The TMP and the

larger Washington National Plan are occurring at the same time, in the same place, and under the aegis of the same agency. *See id.* *Seven County* instructs courts to "defer to an agency *so long as* the agency drew a reasonable and manageable line." 605 U.S. at 190 (cleaned up) (emphasis added). The Court acted well within that instruction.

## III. IRREPARABLE INJURY

The Government argues that it suffers irreparable injury because the Court has issued "an excessive and overbroad preliminary injunction." Dkt. 112 at 5. In doing so, it misstates the Order's scope. *See* Dkt. 101.

The Government writes: "[T]he district court, in its fervor . . . took a preliminary injunction motion based on partial changes to the Golf Course (tree removal), and used it to enjoin not only more complete changes (complete redesign), but also any other partial changes." Dkt. 112 at 6. The Court enjoined only the tree removal. Nothing else.

The Government writes: "[T]he first part of the Court's Order would require a declaration from a senior National Park Service employee before a single tree that posed an imminent threat to public safety could be cut down." *Id.* at 5–6. The injunction states, "Defendants may take action to address an imminent threat to public safety, with notice to the Court within 24 hours." Dkt. 101 at 2. The Order requires notice only after action is taken.

Instead of dismissing the Government's overbreadth concerns, the Court instructed the parties to meet and confer and propose amendments to the injunction's scope. *See* First Min. Order (Oct. 30, 2026); Dkt. 129; Dkt. 133. The Government returned with some suggested changes that Plaintiffs do not oppose. The Court has accepted each one, save that the Court dissolve the injunction altogether, in an amended order. *See* Dkt. 129; Dkt. 143.

The Amended Order now states more explicitly that the 24-hour notice requirement for public safety begins after the public-safety threat is first addressed. *See* Dkt. 143. The Court also narrows the geographic scope of the Order to East Potomac Park, southeast of Buckeye Drive SW. *See id.* It strikes the requirement that the Government "inform the Court without delay if any entity or individual seeks to effectuate changes to East Potomac Park." *See id.*; Dkt. 101. And finally, the Court strikes the requirement that any notice provided to the Court contain "each individual, by name and title, who will be involved in carrying . . . out" the proposed change to East Potomac Park. *See* Dkt. 143; Dkt. 101.

The Amended Order's continued prohibition on the further destruction of trees flows directly from Plaintiffs' harm and requested relief. The Court did not "appoint[] itself as supervisor of the agency with authority to veto agency activities *before* they are approved." Dkt. 112 at 7. It acted to preserve the possibility of judicial review, given the clear and final plan to destroy the East Potomac Golf Course without—at this juncture—adequate NEPA review. Such an injunction is not overbroad and does not create irreparable harm to the Government. Nor does it constitute "judicial interference with the operation of the Executive Branch in violation of separation of powers principles." *Id.* at 5. The Court addressed why in its PI Opinion, an analysis the Government ignores altogether. PI Op. at 66–70.

On the other hand, for the reasons stated in the PI Opinion, Plaintiffs will experience irreparable harm absent this injunction. *See id.* at 62–64. "Once trees are down, they don't go back up. And replacing them is usually impossible, at least on any relevant timeline. . . . American courts have long held up downing trees as a prototypical irreparable injury, always on 'the principle of preserving the property, until a trial at law can be had.'" *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 886 (6th Cir. 2025) (quoting *Parker v.*

*Winnipiseogee Lake Cotton & Woolen Co.*, 67 U.S. (2 Black) 545, 552 (1862)); *see also Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 204–05 (D.D.C. 2015) (collecting cases).

## IV. BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST

The Government argues that granting a stay will permit government officials to focus on more important work. *See* Dkt. 112 at 8. The President of the United States, the Secretary of the Interior, the Acting Director of the National Park Service, and the Associate Attorney General, among others, have each dedicated considerable time to this golf course. The Court can only conclude that the redesign is a major priority for the administration. If some minimal manpower is needed to provide advance notice of certain permanent and irrevocable actions, the Government seems well-equipped to provide it.

And as Government witnesses have testified, there is no urgency, nor is there any public interest in the furtherance of likely unlawful agency action. *See* PI Op. at 64–65. The balance of the equities and the public interest do not favor a stay pending appeal.

## V. THE GOVERNMENT'S MOTION IS OUTDATED

The Government's motion fails for the reasons just discussed. That noted, events after the Court's entry of its preliminary injunction on October 26 further undermine it. The chronology and updates:

**October 26.** The Court entered its preliminary injunction. In that opinion, it flagged the many times that Government counsel represented to the Court that no plan to close the Course on November 15 existed. *See* PI Op. at 2–5. But just three hours after the Court ruled, the President posted on Truth Social that the Course will "clos[e] . . . as scheduled" to "renovate and rebuild for Competitive (with other such projects!), Safety, Modernization, and Aesthetic reasons" on November 15. Dkt. 114-2 at 2.

**October 28.** The Government told the Court that DOI was following the President's "directives"—found in his social media posts—and planned to close the Course on November 15. *See* Dkt. 111 at 2.

**October 29.** The Government filed its Motion to Stay. It said nothing of its U-turn on the November 15 closing date. *See generally* Dkt. 112. And while it continued to assert that no final agency action existed, it did not deny that DOI and NPS had decided to turn the Course into a championship-style course designed by Tom Fazio. *See id*. at 3.

**October 30.** At a hearing, the Government disclosed that DOI had begun "putting pen to paper . . . in the last few weeks" on a submission to the National Capital Planning Commission. October 30, 2026, Tr. 50:11–13. Later that day, it submitted the proposal to the NCPC. *See id.* at 75:6–7. The proposal confirmed the Court's finding that the Washington National Plan exists, and that it consists of creating a championship-style course designed by Tom Fazio that replaces the Travis-style design with an 18-hole course:


Case 1:26-cv-00477-ACR Document 128-1 Filed 11/03/26 Page 7 of 56

6

THE VISION: A WORLD-CLASS CHAMPIONSHIP COURSE

In the President's words (Truth Social): the new course

| | | |
|---|---|---|
| *"we will build one of the Greatest Golf Courses anywhere in the World"* June 28, 2026 | *"this Course will have the ability to host Major Golf Tournaments, including The U.S. Open"* June 28, 2026 | *"a plan to build a World Class Championship Golf Course"* October 18, 2026 |
| *"open to the Public while, at the same time, designed to the Highest Level of Golf"* October 18, 2026 | *"turn Trash Island into an Island of Beauty and Success!"* October 19, 2026 | *"one of the Most Wonderful and Spectacular Golf Courses anywhere in the World"* October 19, 2026 |

**The plan:** a championship course concept by Fazio Design, designed to host the U.S. Open and priced for local golfers.

**EAST POTOMAC GOLF LINKS:** Concept Proposal
October 30, 2026

Dkt. 128-1 at 7; *see also id.* at 36.

The submission also confirmed that the Washington National Plan is a major federal action that requires regulatory review under NEPA and NHPA:

Case 1:26-cv-00477-ACR Document 128-1 Filed 11/03/26 Page 55 of 56

54

**REGULATORY AND COMPLIANCE REQUIREMENTS**

**National Historic Preservation Act**

- Section 106 consultation began July 17, 2026
- NPS will prepare a draft Assessment of Effects and consult the public through meetings and PEPC (parkplanning.nps.gov)
- No determination of effect has been made

**National Environmental Policy Act**

- An Environmental Assessment (EA) is the anticipated level of NEPA review

**Agency Review**

- Commission of Fine Arts: November 2026 (anticipated)
- NCPC: December 2026 (anticipated)
- Consultation with interested Tribes and the U.S. Fish and Wildlife Service is ongoing

**EAST POTOMAC GOLF LINKS:** Concept Proposal
October 30, 2026

*Id.* at 55.

And it confirmed that NPS must remove trees pursuant to the 2019 Cultural Landscape Report (CLR) as part of the Course redesign:

Case 1:26-cv-00477-ACR Document 128-1 Filed 11/03/26 Page 32 of 56

31

**WHAT THE RECORD CALLS FOR**

**NPS studies point to four changes the concept delivers: two structural design changes, then two vegetation actions**

| STRUCTURAL DESIGN CHANGES | WHAT THE DOCUMENTS SAY | SOURCE |
|---|---|---|
| **Redesign the driving range** | 2026 assessments rate the driving range and its building Critical | 2026 NPS Condition Assessment |
| **Renew the playing surfaces** | Poor drainage, an inadequate irrigation system, and worn turf undermine playing conditions | 2019 CLR Treatment Guidelines |

| VEGETATION ACTIONS | WHAT THE DOCUMENTS SAY | SOURCE |
|---|---|---|
| **Reopen views to the water** | Selectively thin vegetation to reconnect the course to the Potomac River, Washington Channel, and monuments | 2019 CLR; 2017 CLI |
| **Thin trees that block the views** | Trees and screen plantings added over decades have hemmed in vistas and blocked water views | 2017 CLI; 2019 CLR |

**EAST POTOMAC GOLF LINKS:** Concept Proposal
October 30, 2026

*Id.* at 32.

These revelations are impossible to square with the Government's prior representations. The Government has declared, for example, that "NPS's implementation of the [TMP] focuses on maintenance; it is not intended to renovate or redesign the Golf Course." Dkt. 84 at 16. The NCPC submission shows the opposite.

The Government has also argued, "Plaintiffs cannot have it both ways: they cannot agree that tree maintenance has been long-recommended for the historic integrity of the course, but at the same time, presume without evidence that tree maintenance is not for that stated purpose." *Id.* at 40. But that is what the NCPC submission reflects. NPS has "long-recommended" tree removal for the Course's historic integrity, yes. But NPS removed the trees as an immediate precursor to destroying the Course's historic integrity.

And compare the NCPC submission with prior representations the Government made after Section 106 consultation began:

> **The Court:** Is there anything else planned or currently maybe being planned or in anyone's thought bubble about further renovations to the golf course pending NEPA review for the new course?
>
> **Government Counsel:** Well, there is—I am not aware of any additional activities on the golf course that would require NEPA review.
>
> **The Court:** Okay. Let me make this statement broader. Are there any other plans being contemplated for the golf course?
>
> **Government Counsel:** Your Honor, not that I'm aware of.

October 12, 2026, Tr. 14:9–19.

Kevin Griess, Superintendent of the National Mall and Memorial Parks, also decoupled the TMP from a full-Course redesign in a declaration the Government filed on October 16:

> The planned tree management and cultural landscape rehabilitation project is not a renovation of the Golf Course, is not a part of any potential project to redesign or renovate the Golf Course, and would be carried out irrespective of any future renovation or redesign. It is intended to further the NPS's resource management objectives for the Golf Course consistent with its historic character and its existing

> links-style design, to utilize available resources to complete long-deferred maintenance needs, and to implement the recommendations in the 2019 CLR.

Dkt. 84-1 ¶ 44.

The NCPC submission confirms the Court's preliminary findings of fact.

## VI. EXTRA-RECORD DISCOVERY

Before concluding, the Court addresses the Government's claim that it should not have permitted extra-record discovery in this APA case. *See, e.g.*, Dkt. 125 at 2; Dkt. 121 at 4–5; Dkt. 86 at 6–8; Dkt. 84 at 21–23. The complaint is misplaced, as the Court set out during the October 19, 2026, hearing, *see* October 19, 2026, Tr. 8:2–14:21, and recounts here.

### A. Courts Can Order Extra-Record Discovery

In *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989), the D.C. Circuit observed that "it may sometimes be appropriate to resort to extra-record information to enable judicial review to become effective." It listed eight situations in which courts "countenanc[e] use of extra-record evidence," three of which are particularly relevant here. *Id.* First, "when agency action is not adequately explained in the record before the court." *Id.* The Government filed the administrative record months before any plan to cut down healthy, mature trees existed, so the record never discusses the TMP. Second, "when an agency considered evidence which it failed to include in the record." *Id.* The Government conceded that it considered evidence not in the record, including social media posts by President Trump pertaining to the East Potomac Golf Course: "From the President's mouth to their ears, Your Honor." July 2, 2026, Tr. 9:4–5; *see also id.* at 6:12–9:11. Third, "in cases arising under the National Environmental Policy Act." *Id.* This case arises under NEPA.

To be sure, since *Esch*, the D.C. Circuit has cautioned courts to apply these exceptions to the APA's general rule narrowly. In *Theodore Roosevelt Conservation Partnership v. Salazar*, it

clarified that "[t]he APA limits judicial review to the administrative record except when there has been a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review." 616 F.3d 497, 514 (D.C. Cir. 2010) (cleaned up).

And so the Court's analysis did not stop with *Esch*. It also found that both *Theodore Roosevelt* factors apply. *See* PI Op. at 23; Oct. 19 Tr. at 10:8–12:20. To recap, for months Government counsel claimed DOI and NPS were not effecting a redesign of the Course. Then, suddenly, NPS removed hundreds of healthy trees. Quickly thereafter, the President claimed the Course would close and work would begin immediately. This timing evidences bad faith. As the Court stated at the October 19 hearing, "We did not go from zero to, 'work is scheduled to begin immediately,' in 60 seconds." Oct. 19 Tr. at 11:20–21. Instead, in apparent contradiction to counsel's representations, work had been progressing, as the NCPC submission shows, for months. *See* Dkt. 84-1 ¶ 44; Dkt. 128-1 at 55. Moreover, the speed at which the development and implementation of the TMP progressed, coupled with the timing of notice to the Court, also strongly suggests that the agency patterned its behavior to avoid judicial review.

Given this "strong showing of bad faith or improper behavior," the Court properly allowed "inquir[y] into the mental processes of administrative decisionmakers." *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (cleaned up).

Moving to the second *Theodore Roosevelt* factor, the administrative record here is devoid of information pertaining to the TMP. DOI and NPS developed the current administrative record before bulldozers destroyed hundreds of healthy and mature trees at the Course. *See* Dkts. 39–46. Because Plaintiffs predicated their motions for a temporary restraining order and preliminary injunction on the TMP, the Court needed to look beyond the record to understand the agency's explanation for its action. This is thus "the rare case in which the record is so bare as to frustrate

effective judicial review." *Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d 992, 998 (D.C. Cir. 1990).

**B. Courts Can Order Testimonial Evidence**

The Government has also argued that the Court could not "depose a high-level government official in the absence of 'extraordinary circumstances.'" Dkt. 84 at 22 (quoting *Simplex Time Recorder Co. v. Sec'y of Lab.*, 766 F.2d 575, 586 (D.C. Cir. 1985)). It argued that those "'extraordinary circumstances' exist only when the party seeking testimony from a high-level government official establishes that the information sought from that official is both 'essential to his case . . . [and] not obtainable from another source[,]' which means that 'the discovery sought is relevant and necessary and that it cannot otherwise be obtained.'" *Id.* (quoting *In re United States (Holder)*, 197 F.3d 310, 314 (8th Cir. 1999)). This is that case.

Only Jessica Bowron, as Acting Director of the NPS, is a "top executive department official[]" within the meaning of *Simplex*. 766 F.2d at 586. She is also one of the Government's primary declarants, personally reviewed and approved the TMP, and has extensive personal knowledge of the relevant facts and decisionmaking. And given the Court's bad-faith finding, her "mental process[]" is directly at issue. *New York*, 588 U.S. at 781.

Contrast this with *Simplex*, where the plaintiff "[did] not suggest[] any information in the possession of these officials . . . that it could not obtain from published reports and available agency documents." 766 F.2d at 587. Indeed, each of the other witnesses called to testify—Superintendent of the National Mall and Memorial Parks, Kevin Griess; Deputy Director of Operations for the NPS, Frank Lands; and Deputy Chief of Staff for the DOI Secretary, Gregory Wischer—has deep personal knowledge of the development and implementation of the TMP and the Washington National Plan.

The Court did not compel the testimony of Secretary Burgum. It did not order discovery of any presidential communications. It compelled the testimony of Gregory Wischer, who had personal knowledge of the agency's motivation for cutting down hundreds of trees on October 10, and who has been involved in NPS's management of East Potomac Golf Course to an unusual degree. And it compelled the testimony of the NPS employees who ordered, developed, approved, and implemented the at-issue plan, which was undertaken on an unusually fast timeline.

Each case the Government cites notes that although a general rule exists against permitting testimony in APA cases, extraordinary circumstances may counsel different outcomes. For the reasons above, and in the Court's PI Opinion, Dkt. 103, the Government's behavior in this case has been nothing if not extraordinary.

## VII. CONCLUSION

The Government asks the Court to revisit its ruling. But it does so by recycling arguments the Court has already rejected. By arguing from a record that does not exist. And by ignoring the Court's legal analysis. Without any basis to doubt its earlier ruling, the Court will not stay the injunction.

The Court **DENIES** the Government's Motion to Stay Pending Appeal, Dkt. 112.

**SO ORDERED.**

Date: November 9, 2026

ANA C. REYES
United States District Judge