**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DC PRESERVATION LEAGUE, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,

Defendants.

Civil Action No. 1:26-cv-477-ACR

**DEFENDANTS' COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR STAY PENDING APPEAL**

## TABLE OF CONTENTS

INTRODUCTION ........ 1

BACKGROUND ........ 2

I. Procedural Background ........ 2

II. Factual Background ........ 3

LEGAL STANDARD ........ 4

ARGUMENT ........ 6

I. Plaintiffs' Requested Relief Goes Beyond the Scope of Relief the Court May Provide ........ 6

II. Plaintiffs Continue to Lack Standing ........ 7

III. Plaintiffs Are Not Entitled to a Temporary Restraining Order or Preliminary Injunction ........ 10

A. Plaintiffs Cannot Show They Will be Irreparably Harmed from a Temporary Closure of East Potomac Park or the East Potomac Golf Course ........ 10

B. Plaintiffs Fail to Show a Likelihood of Success on the Merits ........ 14

1. Plaintiffs Do Not Challenge Any Final Agency Action ........ 14

2. Plaintiffs Cannot Show a Likelihood of Success on any Closure Claim ........ 17

3. Plaintiffs Cannot Show a Likelihood of Success on their NEPA Claim Based on a Segmentation Theory ........ 21

4. Plaintiffs Cannot Otherwise Show a Likelihood of Success on their NEPA, NHPA, and NPS Organic Act Claims Because those Claims are Unripe ........ 24

C. The Balance of the Equities and Public Interest Do Not Favor Preliminary Relief ........ 27

IV. If the Court Grants Preliminary Injunctive Relief, it Should Stay Its Decision Pending Appeal ........ 28

CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) .......... 18, 25

*Aid for Women v. Foulston*,
441 F.3d 1101 (10th Cir. 2006) .......... 27

*Alcresta Therapeutics, Inc. v. Azar*,
318 F. Supp. 3d 321 (D.D.C. 2018) .......... 13

*Alley Cat Allies, Inc. v. U.S. Nat'l Park Serv.*,
No. 25-4269, 2026 WL 221343 (D.D.C. Jan. 28, 2026) .......... 12

*Am. Petroleum Inst. v. EPA*,
683 F.3d 382 (D.C. Cir. 2012) .......... 18, 25

*Apotex, Inc. v. FDA*,
449 F.3d 1249 (D.C. Cir. 2006) .......... 5

*Ark. Dairy Co-op. Ass'n, Inc. v. U.S. Dep't of Agric.*,
573 F.3d 815 (D.C. Cir. 2009) .......... 5

*Assoc. for Educ. Fin. & Policy, Inc. v. McMahon*,
786 F. Supp. 3d 13 (D.D.C. 2025) .......... 16

*Associated Dog Clubs of N.Y. State, Inc. v. Vilsack*,
75 F. Supp. 3d 83 (D.D.C. 2014) .......... 20

*Atl. States Legal Found. v. EPA*,
325 F.3d 281 (D.C. Cir. 2003) .......... 25

*Badger Helicopters Inc. v. FAA*,
154 F.4th 902 (8th Cir. 2025) .......... 23

*Beberman v. Blinken*,
61 F.4th 978 (D.C. Cir. 2023) .......... 29

*Bellinger v. Bowser*,
288 F. Supp. 3d 71 (D.D.C. 2017) .......... 11

*Bird v. Barr*,
No. 19-cv-1581 (KBJ), 2020 WL 4219784 (D.D.C. July 23, 2020) .......... 6

*Cascadia Wildlands v. United States Bureau of Land Mgmt.*,
153 F.4th 869 (9th Cir. 2025) .......... 23

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .......... 5

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984) .......... 1

*Committee of 100 on Fed. City v. Foxx*,
87 F. Supp. 3d 191 (D.D.C. 2015) .......... 12, 16

*Cook v. Trump*,
804 F. Supp. 3d 14 (D.D.C. 2025) .......... 4

*Corp. for Pub. Broadcasting v. Fed. Emergency Mgmt. Agency*,
792 F. Supp. 3d 67 (D.D.C. 2025) .......... 13

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
563 F.3d 466 (D.C. Cir. 2009) .......... 16

*Dalton v. Specter*,
511 U.S. 462 (1994) .......... 15

*Davis v. Latschar*,
202 F.3d 359 (D.C. Cir. 2000) .......... 26

*Delaware Riverkeeper Network v. FERC*,
753 F.3d 1304 (D.C. Cir.) .......... 21

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019) .......... 21

*Douglas v. Nat'l Park Serv.*,
835 F. Supp. 3d 159 (D.D.C. 2026) .......... 13

*FDA v. All. For Hippocratic Med.*,
602 U.S. 367 (2024) .......... 9, 10

*Fisheries Survival Fund v. Jewell*,
236 F. Supp. 3d 332 (D.D.C. 2017) .......... 10

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......... 15

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) .......... 11

*Harris Cnty. v. Kennedy*,
786 F. Supp. 3d 194 (D.D.C. 2025) .......... 5

*Hilton v. Braunskill*,
481 U.S. 770 (1987) .......... 6, 28

*K.G. ex rel. Garrido v. Dudek*,
839 F. Supp. 2d 1254 (S.D. Fla. 2011) .......... 27

*Kleppe v. Sierra Club*,
472 U.S. 390 (1976) .......... 22

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) .......... 21

*Make the Road N.Y. v. Mullin*,
149 F.4th 16 (D.C. Cir. 2026) .................................................................................... 5

*Mashack v. Jewell*,
149 F. Supp. 3d 11 (D.D.C. 2016) ....................................................................... passim

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*,
498 U.S. 211 (1991) ................................................................................................ 23

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
783 F.3d 1301 (D.C. Cir. 2015) ................................................................................ 24

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
783 F. Supp. 3d 290 (D.D.C. 2025) .......................................................................... 27

*Nat'l Park Serv. v. Nat'l Trust for Historic Pres.*,
609 U.S. 1068 (2026) ....................................................................................... 8, 9, 10

*Nat'l Trust for Historic Pres. v. Nat'l Park Serv.*,
185 F.4th 1185 (D.C. Cir. 2026) ........................................................................... 9, 10

*Natural Resources Defense Council v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988) ............................................................................. 21, 22

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................................................... 5, 6

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .................................................................................................. 16

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
810 F.3d 631 (9th Cir. 2015) ...................................................................................... 6

*Pennsylvania v. DeVos*,
480 F. Supp. 3d 47 (D.D.C. 2020) .............................................................................. 5

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016) .................................................................................. 27

*Safari Club Int'l v. Jewell*,
47 F. Supp. 3d 29 (D.D.C. 2014) ................................................................................ 4

*Save the Sound, Inc. v. FAA*,
183 F.4th 763 (D.C. Cir. 2026) ............................................................................ 22, 23

*Schindler Elevator Corp. v. Wash. Metro. Transit Auth.*,
514 F. Supp. 3d 197 (D.D.C. 2020) ............................................................................ 5

*Seven County Infrastructure Coalition v. Eagle County, Colo.*,
605 U.S. 168 (2025) ....................................................................................... 22, 23, 24

*Sierra Club v. FERC*,
145 F.4th 74 (D.C. Cir. 2025) ................................................................................... 23

*Sierra Club v. U.S. Dep't of Energy*,
825 F. Supp. 2d 142 (D.D.C. 2011) .......... 15

*Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*,
No. 3:23-cv-00058, 2023 WL 8358239 (D. Alaska Dec. 1, 2023) .......... 12

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 7

*State v. Musk*,
769 F. Supp. 3d 1 (D.D.C. 2025) .......... 10

*Sturgeon v. Frost*,
587 U.S. 28 (2019) .......... 1

*Toilet Goods Ass'n v. Gardner*,
387 U.S. 158 (1967) .......... 25

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 8

*Trump v. California*,
609 U.S. 1032 (2026) .......... 15

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 27

*U.S. Army Corps. of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) .......... 14

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) .......... 7

*Vt. Yankee Nuclear Power Corp. v. Nat'l Res. Def. Council, Inc.*,
435 U.S. 519 (1978) .......... 27

*West v. Nat'l Oceanic & Atmospheric Admin.*,
No. 24-cv-3143, 2026 WL 2937509 (D.D.C. Sept. 30, 2026) .......... 16

*Winter v. Nat. Res. Council, Inc.*,
555 U.S. 7 (2008) .......... 4, 5, 27

*Wisc. Gas Co. v. Fed. Energy Regul. Comm'n*,
758 F.2d 669 (D.C. Cir. 1985) .......... 11

**Statutes**

40 U.S.C. § 8711 .......... 4

40 U.S.C. §§ 9101-9104 .......... 4

42 U.S.C. § 4332(2)(C) .......... 22

54 U.S.C. § 100101(a) .......... 26

54 U.S.C. § 100751 .......... 17

**Regulations**

36 C.F.R. § 1.5 .......... 13

36 C.F.R. § 1.5(a)(1) .......... 17

36 C.F.R. § 1.5(b) .......... 17, 18

36 C.F.R. § 1.5(c) .......... 17, 19

36 C.F.R. § 1.5(e) .......... 18

36 C.F.R. § 1.7(a)(1)-(4) .......... 18

45 C.F.R. §§ 2100-2199 .......... 4

**Other Authorities**

91 Fed. Reg. 618 (Jan. 8, 2026) .......... 22

## INTRODUCTION

The National Park Service announced that it would close East Potomac Park south of Buckeye Drive SW, including the East Potomac Golf Course, subject to all requisite compliance and documentation. It gave two reasons for the closure: *one*, the golf course would close because the National Park Service no longer had an operator for the Golf Course; and *two*, because of the safety hazards associated with the surrounding seawall. Plaintiffs argue they are entitled to an order staying or enjoining the closure, because separately, Defendants are considering a redesign of the golf course that remains under deliberation by the National Park Service and is progressing through the compliance processes. Plaintiffs have not met their burden of demonstrating their entitlement to an order mandating that the course remain open.

Congress has granted the Secretary of the Interior, acting through the Director of the National Park Service, broad authority to manage and maintain units within the National Park System under the National Park Service Organic Act. *Sturgeon v. Frost*, 587 U.S. 28, 38 (2019); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 289 (1984). Defendants have sought to exercise that authority as to one such area that contains a golf course. Defendants have stockpiled soil for future maintenance. Defendants have removed trees and managed vegetation in a way that is consistent with longstanding National Park Service recommendations. Now, looking ahead, the National Park Service has stated that it intends to close the golf course because of the lack of an operator and for safety reasons. Meanwhile, Defendants have also been deliberating over how to renovate or redesign the golf course in its entirety, and, as part of that decision making process, have recently submitted a proposal to the National Capital Planning Commission and Commission on Fine Arts.

The Court, however, has enjoined Defendants from carrying out their current management obligations (in the form of enjoining any further tree removal or other modifications), and Plaintiffs now seek to further enjoin Defendants from temporarily closing the course pursuant to their statutory and regulatory authority. But Plaintiffs lack standing and are otherwise not entitled to injunctive relief. They cannot show irreparable harm from the future closure, they are not likely to succeed on the merits of their claim because there is no final agency action and their claims are flawed and unripe, they will not suffer irreparable injury, and the balance of equities and public interest weigh against preliminary relief.

Accordingly, for the reasons stated herein, Defendants oppose Plaintiffs' Motion. Should the Court grant Plaintiffs' Motion, Defendants respectfully request that the Court immediately enter a preliminary injunction rather than a temporary restraining order, and that the Court stay any order pending appeal.

## BACKGROUND

### I. Procedural Background

In February 2026, Plaintiffs filed an eight-count complaint challenging an alleged future redesign of East Potomac Golf Course and the stockpiling of soil between three holes of the Course. Dkt. No. 5-1. On February 23, 2026, they filed their first motion for a preliminary injunction. Dkt. No. 8. Roughly six and a half months later, the Court denied Plaintiffs' motion as moot. *See* Sept. 4, 2026, Minute Order.

On October 14, 2026, Plaintiffs filed a second motion for preliminary injunction to enjoin Defendants from maintaining the course in the form of "any further tree felling at East Potomac Park" and sought to further enjoin Defendants by seeking the imposition of "written advance notice

before any irreparable modification to any permanent forms or features of East Potomac Park." Dkt. No. 80.

The Court granted Plaintiffs' motion by Order and Memorandum Opinion. Dkt. Nos. 101, 103. The Court enjoined Defendants from conducting various tree maintenance activities and making irreversible modifications to East Potomac Park, and ordered Defendants to take other affirmative steps.

Defendants filed a timely notice of appeal, Dkt. No. 105, and a motion to stay the Court's preliminary injunction order pending appeal. Dkt. No. 112.

## II. Factual Background[1]

On October 28, 2026, Defendants notified the Court that the NPS would close East Potomac Golf Course and East Potomac Park south of Buckeye Drive SW, subject to all requisite compliance and documentation. Dkt. No. 111.

Defendants informed the Court that the NPS had entered into a new lease agreement with National Links Trust, under which National Links Trust will cease operating the East Potomac Golf Course as of close of business on or before November 15, 2026. *Id.* at 2. Defendants also informed the Court that the seawall surrounding East Potomac Park is in a significant state of disrepair and poses a safety hazard. Accordingly, Defendants informed the Court that Defendants would close East Potomac Park south of Buckeye Drive SW, including the East Potomac Golf Course. *Id.*; Third Suppl. Decl. of Jessica Bowron, ¶ 18, Dkt. No. 111-2.

[1] Defendants incorporate by reference the factual background underlying this case and East Potomac Golf Course detailed in previous filings. For purposes of the present Memorandum, Defendants note the factual developments since the entry of the Court's preliminary injunction order on October 26, 2026.

Defendants also informed the Court that the NPS would submit a rendering of East Potomac Park Golf Course designed by Tom Fazio (the "Submission") to the National Capital Planning Commission ("NCPC") for review. Notice at 1; *see* National Capital Planning Act, 40 U.S.C. § 8711.[2] Later that week, the NPS presented the Submission to the NCPC.

On November 4, 2026, the Department of the Interior requested concept review of a proposal with the Commission on Fine Arts ("CFA") at the CFA's November 19, 2026, meeting.[3] *See* 40 U.S.C. §§ 9101-04; 45 C.F.R. §§ 2101-2106.7.

On November 5, 2026, Plaintiffs filed the present Motion for a Temporary Restraining Order or, Alternatively, a 14-Day Stay Under 5 U.S.C. § 705 Against Closure of East Potomac Park ("Motion"). Dkt. No. 139.

## LEGAL STANDARD

The Court may construe Plaintiffs' Motion as one for a preliminary injunction because the standards are the same and the Court is holding an adversarial hearing with appropriate briefing. *E.g.*, *Cook v. Trump*, 804 F. Supp. 3d 14, 17 (D.D.C. 2025). For the avoidance of any doubt, Defendants consent to the Court construing the present Motion as a motion for a preliminary injunction, and request that the Court do so.

A preliminary injunction "is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 32 (D.D.C. 2014) (citing *Winter v. Nat. Res. Council, Inc.*, 555 U.S. 7, 22 (2008)). An injunction must be denied unless the moving party demonstrates (1) that it is likely to succeed on the merits of its claims; (2) it is likely to suffer an irreparable injury in the absence of injunctive

[2] *See also* Submission Guidelines, National Capital Planning Commission, Chapter 2 p. 5, https://www.ncpc.gov/review/guidelines/.
[3] The submission to the CFA is attached as Exhibit 1.

relief; (3) the balance of equities tips in its favor; and (4) the proposed injunction is in the public interest. *Winter*, 555 U.S. at 20. "The last two factors merge when the government is a party." *Harris Cnty. v. Kennedy*, 786 F. Supp. 3d 194, 203 (D.D.C. 2025) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The factors governing the issuance of a preliminary injunction "also govern the issuance of a stay under Section 705 of the APA." *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 58 (D.D.C. 2020) (citation omitted).

Failure to show a likelihood of success on the merits is sufficient to defeat a motion for a preliminary injunction, *Ark. Dairy Co-op. Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009); *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253–54 (D.C. Cir. 2006), as is failure to demonstrate irreparable injury, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see also Make the Road N.Y. v. Mullin*, 179 F.4th 16, 25 (D.C. Cir. 2026). When considering a motion for a preliminary injunction, if it becomes apparent to the court that it lacks jurisdiction, the court may dismiss the claims. *See, e.g.*, *Schindler Elevator Corp. v. Wash. Metro. Transit Auth.*, 514 F. Supp. 3d 197, 212 (D.D.C. 2020) (denying plaintiff's motion for preliminary injunction and dismissing plaintiff's claims sua sponte).

On the flip side, once a preliminary injunction is entered, a party may request a stay of the injunction but bears the burden of showing that circumstances justify a stay. *Nken v. Holder*, 556 U.S. 418, 433-34 (2009). Similar to the factors for issuance of a preliminary injunction, the factors courts consider when determining whether to stay that injunction include "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest

lies." *Id.* at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The first two factors are the most critical. *Id.*

## ARGUMENT[4]

### I. Plaintiffs' Requested Relief Goes Beyond the Scope of Relief the Court May Provide

As an initial matter, neither a temporary restraining order nor preliminary injunctive relief is warranted because there is a fundamental mismatch between the scope of relief Plaintiffs request in their Motion and the scope of the relief available based on the allegations in their Complaint. Courts are only empowered to issue injunctive relief that enjoins the action the complaint alleges is unlawful. *See, e.g.*, *Bird v. Barr*, No. 19-cv-1581 (KBJ), 2020 WL 4219784, at *2 (D.D.C. July 23, 2020) ("[A] proper motion for a preliminary injunction seeks to enjoin *the action that the complaint alleges is unlawful* prior to the completion of the litigation, and without such a connection between the claim and requested injunction, there is simply no jurisdictional basis for the Court to grant preliminary relief." (citing *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015)).

Here, Plaintiffs have brought claims challenging a future redesign of East Potomac Golf Course. *See* Am. & Suppl. Compl. ¶¶ 9, 11 (describing potential changes to East Potomac Golf Course as what Plaintiffs refer to as the "Washington National plan"), Dkt. No. 98; *id.* ¶¶ 124-61. If Defendants, at the end of their decisionmaking and compliance processes, decide to implement a golf course redesign, enjoining that effort would fall within the scope of Plaintiffs' requested relief. But enjoining Defendants from carrying out other management responsibilities, whether that be maintaining the facilities, removing trees, or, as is the case here, closing a portion of East

[4] Defendants acknowledge that the Court has previously considered and rejected many of the arguments Defendants present herein. Defendants respectfully resubmit these arguments for the Court's consideration and to preserve them for appeal.

Potomac Park, including the East Potomac Golf Course, because of safety concerns and because the course will lack a continuing operator are beyond the scope of Plaintiffs' Amended and Supplemental Complaint and beyond the scope of relief the Court can provide. *See, e.g.*, *Mashack v. Jewell*, 149 F. Supp. 3d 11, 38 n.9 (D.D.C. 2016) ("[T]he Court cannot force the government to continue to contract with a concessioner[.]"). So, while Defendants maintain that no injunctive relief is warranted in this case at all, any such relief must at a minimum be limited to the actual implementation of a new golf course redesign that is the subject of Plaintiffs' operative complaint. *See, e.g.*, Am. & Suppl. Compl. ¶¶ 102 (alleging harm from "[d]emolishing East Potomac Golf Course and replacing it with a 'championship-style' course"); *see also id.* at ¶¶ 103, 109-10, 115, 121, 123. There is no basis for Plaintiffs to obtain relief beyond the scope of their allegations and obtain an injunction against other activity they have not challenged.

## II. Plaintiffs Continue to Lack Standing

Article III confines federal courts to deciding "Cases" and "Controversies," so that legal questions are resolved "in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). To invoke that power, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016).

Defendants continue to maintain that Plaintiffs lacked standing at the time they filed their original Complaint and lacked standing at the time they filed their Amended and Supplemental Complaint. In ruling on Plaintiffs' most recent preliminary injunction motion, the Court correctly concluded that the D.C. Preservation League lacked organizational standing and individual

Plaintiffs Roberts and Dickson failed to establish standing based on either an increased-risk-of-harm theory or Plaintiffs' fears that, if the golf course is one day renovated, it will be more expensive to play. Mem. & Op. 46-48, 51, Dkt. No. 103.[5] To the extent the Court found Plaintiffs otherwise had standing, Defendants preserve their arguments that Plaintiffs have failed to either allege or establish Article III standing as required to obtain any relief from this Court. *See, e.g.*, Mot. to Stay 2-3, Dkt. No. 112; Mem. in Opp'n 14-24, Dkt. No. 84; Mem. in Supp. of Summ. J. 14-28, Dkt. No. 75-1.

Plaintiffs' standing defects extend to their present motion, too. It is black-letter law that a plaintiff "must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Applied here, Plaintiffs must therefore establish Article III standing, including injury-in-fact, to enjoin temporary closure of East Potomac Park and to force NPS to operate the East Potomac Golf Course until a new lessor can be identified. But Plaintiffs do not allege (and their declarations do not establish) any concrete, non-speculative injury caused by a temporary closure of the Golf Course. Instead, the individual Plaintiffs assert aesthetic injuries arising from the *renovation* of the East Potomac Golf Course into a world-class championship course. *See* Decl. of Alex Dickson ¶¶ 14-15, 19-21, Dkt. No. 8-4; Decl. of Dave Roberts ¶¶ 12, 21, 25-26, Dkt. No. 8-6. None of the individual Plaintiffs asserts injury of any kind—aesthetic or otherwise—purely as a result of the Golf Course (or East Potomac Park) closing—*e.g.*, because of there is no longer

[5] The Court's ruling is fatal to Plaintiffs' independent soil stockpiling claims found in Counts 7-11 of their Amended and Supplemental Complaint. *See* Am. & Suppl. Compl. ¶¶ 162-196. Plaintiffs' standing arguments as to those claims rested purely on an increased-risk-of-harm theory and on aesthetic harms of the type precluded by the Supreme Court's decision in *National Park Service v. National Trust for Historic Preservation in the United States*, 609 U.S. 1068 (2026). The Court may dismiss those claims *sua sponte*.

a lessee operating the course. Indeed, both individual plaintiffs have asserted that they *welcome* changes to East Potomac Golf Course that could temporarily impair their access to the course. *See* Dickson Decl. ¶ 13 ("Restoring the Blue Course to the reversible routing designed by original architect Walter Travis is a priority I fully support."); *accord* Roberts Decl. ¶ 12 (expressing excitement as to NLT's "plans to improve" the three NPS golf courses, even though NLT's plans required the redesign and rebuild of the White Course and Red Course at East Potomac Golf Course (*see* NLT Lease, Dkt. No. 26-5, ECF p.37)); *id.* ¶ 14 (expressing approval of tree and vegetation removal "opening up views" and making "a ball hit slightly out of play is still findable.").

As for Plaintiffs' alleged injury from redesign of the course, that should be deemed an aesthetic injury foreclosed by the Supreme Court's decision in *National Park Service v. National Trust for Historic Preservation in the United States*, 609 U.S. 1068 (2026). The golfer-plaintiffs here are akin to Alison Hoagland, who, according to the D.C. Circuit, had standing to challenge the ballroom construction because, among other things, she "routinely recreates by walking in front of the White House and in Lafayette Square." *Nat'l Trust for Historic Pres. v. Nat'l Park Serv.*, 185 F.4th 1185, 1208 (D.C. Cir. 2026); *see id.* (Hoagland "uses, enjoys, and derives benefit from President's Park" (cleaned up)). Just as the golfers complain that redesigning the golf course will ruin their experience and cause aesthetic and recreational injuries, the D.C. Circuit held that the ballroom construction would injure Hoagland's "aesthetic and recreational" interests. *Id.* at 1210 (cleaned up). But the Supreme Court rejected that theory, holding that Hoagland's allegations amounted to mere "distress at or disagreement with the activities of [the Government]," which cannot support standing. 609 U.S. at 1071 (quoting *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 390 n.3 (2024)). Allowing standing under the "'unprecedented and limitless' view that offense

alone suffices to establish a concrete and particularized injury would seemingly usher in a world where 'virtually every citizen had standing to challenge virtually every government action that they do not like.'" *Id.* (quoting *All. For Hippocratic Med.*, 602 U.S. at 391–92). That is an "approach to standing that [the] Court has consistently rejected as flatly inconsistent with Article III." *Id.*; *see also* Mem. in Opp'n 15-16, Dkt. No. 84 (arguing that the individual plaintiffs' aesthetic injuries are foreclosed by *National Park Service*). Here, although the golfers allege that they use the course to play golf, that should not be considered any different than Alison Hoagland, who "routinely recreates," "uses, enjoys, and derives benefit from President's Park." *Nat'l Trust*, 185 F.4th at 1208 (cleaned up). Neither Hoagland nor the golfers will be prevented from using President's Park or East Potomac Park by the ballroom or the course redesign. And something more than a desire to have a park look a certain way or have a certain layout is needed to establish standing.

## III. Plaintiffs Are Not Entitled to a Temporary Restraining Order or Preliminary Injunction

### A. Plaintiffs Cannot Show They Will be Irreparably Harmed from a Temporary Closure of East Potomac Park or the East Potomac Golf Course.

Even if Plaintiffs have Article III standing, they must show more than mere injury-in-fact to obtain a temporary restraining order or a preliminary injunction—they must show irreparable harm. The "standard for irreparable harm is particularly high in the D.C. Circuit." *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017). A plaintiff's alleged injury "must be both certain and great, actual and not theoretical, beyond remediation, *and of such imminence* that there is a clear and present need for equitable relief." *State v. Musk*, 769 F. Supp. 3d 1, 5 (D.D.C. 2025) (citation modified). "The possibility of irreparable harm is not enough." *Id.* (citation modified). Plaintiffs "must demonstrate injury that is sufficiently certain, persuasively demonstrated, and so clearly irremediable that it warrants a court reaching out to alter the status

quo before the merits are resolved." *Hanson v. District of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024).

Plaintiffs fall far short of this high standard for several reasons.

*First*, to secure a preliminary injunction, a "movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Wisc. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). Plaintiffs fail this threshold requirement. They conflate the purported harm they must show here—harm directly resulting from temporary closure of the Golf Course and adjoining portions of East Potomac Park—with purported speculative harms from the implementation of a future golf course redesign. *See e.g.*, Mem. in Supp. of Pls.' Mot. for a TRO ("Mem.") 27, Dkt. No. 139-1 (arguing "closure of the Park *to implement* the WNP will cause harm" (emphasis added)); *id.* at 30 (claiming closure "*in furtherance of* the WNP" would cause damage (emphasis added)). Nearly the entirety of their purported harms stems *not* from the closure itself, but from their speculative fears about what the implementation of a future redesign might do to the Golf Course. *See, e.g.*, *id.* at 31 (claiming harm not because the closure will have any effect, but because supposedly "[t]he Plan requires tree removal, large-scale earthmoving, and new water features" and because their desired features do not appear in the NCPC "submission's rendering of the new course"). Indeed, Plaintiffs make this clear by arguing that NEPA review must be conducted before "the Course is closed *and construction begins.*" *Id.* at 32 (emphasis added). They do not—and cannot—make any argument that NEPA review must be conducted before the temporary closure *alone*. Plaintiffs cannot preliminarily enjoin one activity based simply on alleged indirect harms from another. *See Bellinger v. Bowser*, 288 F. Supp. 3d 71, 88 (D.D.C. 2017) ("[T]here is no obvious reason why any

of these harms, if later proven, could not be the subject of adequate . . . corrective relief in the normal course of this litigation.").

*Second*, the *only* alleged harm Plaintiffs can identify attributable to a *closure* is their inability to play the Golf Course or enjoy the Park on their preferred days at their preferred times. Mem. 29 (claiming harm in the form of "loss of a place Plaintiffs use, for every round they would have played and day they would have spent at the park"). But temporarily closing portions of a park, by definition, is not irreparable harm. This Court has already made clear that "a temporary closure of a park or recreation area," while perhaps "an inconvenience," does not "constitute irreparable harm for purposes of a preliminary injunction." *Committee of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 204 (D.D.C. 2015); *see also Alley Cat Allies, Inc. v. U.S. Nat'l Park Serv.*, No. 25-4269, 2026 WL 221343, at *13 (D.D.C. Jan. 28, 2026) (concluding that temporary closure of portion of recreational trail could not establish irreparable harm); *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, No. 3:23-cv-00058, 2023 WL 8358239, at *6 n.54 (D. Alaska Dec. 1, 2023) (recognizing that any harm from short term road closure was not irreparable).

The NPS temporarily closes facilities, trails, and other features of its 434 units frequently for all manner of reasons. As just a few examples, the eastern section of the Beech Mountain Loop Trail in Acadia National Park is closed for repairs;[6] the Adams' Farm at the birthplaces of John Adams and John Quincy Adams is closed due to a major landscape treatment project;[7] Alcatraz Island is closed while crews replace piling that secure the ferry dock to the island;[8] multiple closures remain associated with the Appalachian National Scenic Trail after the damage from

[6] https://www.nps.gov/acad/planyourvisit/conditions.htm.

[7] https://www.nps.gov/adam/planyourvisit/2026-tour-season.htm.

[8] https://www.nps.gov/goga/learn/news/alcatraz-island-to-temporarily-close-for-dock-repairs-this-fall.htm.

Hurricane Helene;[9] the Edgar Allan Poe National Historic Site is temporarily closed for a utilities improvement project;[10] and here in Washington D.C., the Carter G. Woodson Home National Historic Site temporarily closed due to a full renovation project.[11] Might it be possible for an individual to walk around part of a trail under active construction, enter one room in a historic building while others are renovated, or visit any one of these locations while work is underway and neither injure themselves nor interfere with construction activities? Perhaps. But the NPS is not required to draw closure lines with such exactitude. Deference must be given to the NPS in determining the appropriate scope and length of closures necessary to address the problem necessitating the closure. *See* 36 C.F.R. § 1.5.

According to Plaintiffs, expressing a desire to visit one of these locations on a particular day when a closure is planned is sufficient to establish irreparable harm and enjoin the closure in its entirety. But such "temporary" and "ephemeral" harms "are not irreparable," and the "President's musings . . . do[] not move the dial." *Douglas v. Nat'l Park Serv.*, 835 F. Supp. 3d 159, 170-71 (D.D.C. 2026) (also concluding plaintiffs failed to show a substantial likelihood of standing).

*Finally*, "ordinarily, a plaintiff cannot loop in harm suffered by third parties to obtain a preliminary injunction." *Corp. for Pub. Broadcasting v. Fed. Emergency Mgmt. Agency*, 792 F. Supp. 3d 67, 79 (D.D.C. 2025). Here, Plaintiffs repeatedly seek to transform purported harms to others or even the "landscape" as irreparable harm *to them*. *See* Mem. 29 (asserting injuries to those who "walk[], bik[e], fish[], and picnic[]");*id.* at 30 (asserting "irreparable harm on this

[9] https://www.nps.gov/appa/planyourvisit/conditions.htm.

[10] https://www.nps.gov/edal/planyourvisit/conditions.htm.

[11] https://www.nps.gov/cawo/planyourvisit/conditions.htm.

landscape"). This they may not do; rather, the irreparable harm necessary to support preliminary injunctive relief (or a temporary restraining order) must be harm *to the plaintiff*. *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018) ("[I]njuries to third parties are not a basis to find irreparable harm."). Thus, to the extent that Plaintiffs rest on purported harms suffered by others from a closure, those alleged harms cannot serve as a basis to preliminarily enjoin the closure.

### B. Plaintiffs Fail to Show a Likelihood of Success on the Merits

#### 1. Plaintiffs Do Not Challenge Any Final Agency Action

As discussed above, Plaintiffs do not seek to merely enjoin the temporary closure of a portion of East Potomac Park (as well as East Potomac Golf Course), but more fundamentally to enjoin any approved plan to redesign or renovate East Potomac Golf Course. Neither one is final agency action.

An action is "final" under the APA if (1) it "mark[s] the consummation of the agency's decisionmaking process" and (2) "rights or obligations have been determined" by it or "legal consequences will flow" from it. *U.S. Army Corps. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (citation modified). Plaintiffs identify no final agency action here.

Nor is there final agency action to redesign or renovate East Potomac Golf Course. Here, Plaintiffs have challenged a proposal to pursue renovations to East Potomac Park Golf Course. But that decisionmaking process is not at its consummation such that rights have been determined or legal consequences will flow. Defendants have consistently maintained that the consummation of any such process will follow NEPA compliance, compliance with Section 106 of the NHPA, compliance with other applicable statutes, and review by the NCPC and CFA. *See* Decl. of Jessica Bowron, ¶ 16, Dkt. No. 26-4; Suppl. Decl. of Jessica Bowron, ¶¶ 11-12, Dkt. No. 38-2; Second

Suppl. Decl. of Jessica Bowron, ¶¶ 6-7, Dkt. No. 75-3. Defendants have now submitted materials to the NCPC and CFA. *See* NCPC Submission, Dkt. No. 139-2. Indeed, even the NCPC Submission itself insists that Section 106 consultation under the NHPA, NEPA review, and other compliance measures will be taken. *Id.* at 54. Plaintiffs' request for preliminary injunctive relief or a stay is unavailable until there is final agency action that can be enjoined.

In its Memorandum Opinion, Dkt. No. 103, the Court found final agency action primarily for three reasons. *See id.* at 33-35. Respectfully, the Court was incorrect.

*First*, the Court gleaned final agency action from social media posts from the President and the Secretary of the Interior. But the President is not an agency subject to the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). Like an executive order that directs an agency to take *future* final agency action, the President's statements "are not reviewable under the APA." *Dalton v. Specter*, 511 U.S. 462, 470 (1994); *see also Trump v. California*, 609 U.S. 1032 (2026) (per curiam).

And while such statements may "spark" future agency action, the APA is concerned only with the final flame. At most, the President's statements indicate an action *will* occur, but cannot support a conclusion that it already has. The same is true of the Secretary's announcement of a partnership established with the goal of renovating and restoring East Potomac Golf Course. Dkt. No. 49-1. And the rendering posted by the Secretary in May, Dkt. No. 50-1, is noticeably different from the rendering submitted alongside the Submission to the NCPC. Dkt. No. 111-1. The proposal, having undergone changes at least once during the decisionmaking process, may do so again, precluding any conclusion that the agency has reached the *consummation* of this process.

*Second*, the Court determined the agency's stockpiling of soil and removal of trees constituted an "irreversible and irretrievable commitment of resources" indicative of final agency

action ripe for review. Mem. Op. 34 (citation omitted). But "it is not relevant that [DOI] has committed other resources" to the Golf Course or that DOI "seems to [Plaintiffs] to have made up its mind." *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 155 (D.D.C. 2011); *id.* at 156 (recognizing that the ripeness and final agency action tests are "essentially the same"). A commitment of resources to *other* actions, is not an "irreversible and irretrievable commitment of resources," *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009) (citation modified), to the subject action, a redesign of East Potomac Golf Course. *See also West v. Nat'l Oceanic & Atmospheric Admin.*, No. 24-cv-3143, 2026 WL 2937509, at *12 (D.D.C. Sept. 30, 2026) (concluding NEPA claim unripe for review where resources only committed to "preliminary design work, not to any later construction"). Even if the course redesign never happens, the stockpiling of soil and tree removal could be used for independent purposes, and therefore have their own independent utility.

*Third*, the Court found obligations had been determined and legal consequences flowed from an agency decision to redesign the Golf Course by virtue of the cancellation of the NLT lease, preparation of NEPA documents for other projects, and contracts with third parties. Mem. Op. 35. But agencies are free to authorize or fund activities without turning a project under consideration into a final agency action ripe for review, so long as such activities are not "solely designed to support the project." *Comm. of 100 on Fed. City*, 87 F. Supp. 3d at 206 (recognizing that "ancillary steps towards a project" like the entering of contracts that may facilitate the project's development are not irreversible and irretrievable commitments of resources). And plaintiffs may not "bundl[e] together a collection of discrete actions, present[] them as facets of a single event, and then challeng[e] that event instead of the individual actions." *Assoc. for Educ. Fin. & Policy, Inc. v. McMahon*, 786 F. Supp. 3d 13, 23 (D.D.C. 2025). But the Court's finding of final agency action

on this basis impermissibly reads out the APA's limited application to only "circumscribed, discrete agency actions." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).

**2. Plaintiffs Cannot Show a Likelihood of Success on any Closure Claim**

It is worth reiterating that Plaintiffs have not asserted a claim that a future temporary closure failed to comply with appropriate compliance measures, such as NEPA and Section 106 of the NHPA. Thus, they cannot obtain a temporary restraining order or a preliminary injunction against the closure of a portion of East Potomac Park (or Golf Course) on those grounds. Even so, Plaintiffs' argument that Defendants' decision to close this area of East Potomac Park is arbitrary and capricious is without merit. *See* Mem. 18-21, Dkt. 139-1.

a. Congress directed that the Secretary of the Interior "shall prescribe such regulations as the Secretary considers necessary or proper for the use and management of System units." 54 U.S.C. § 100751. The National Park Service has promulgated regulations relevant here concerning closures and the required notice at 36 C.F.R. §§ 1.5 and 1.7. Section 1.5 provides in relevant part that "upon a determination that such action is necessary for [one of several purposes]," a "superintendent may: (1) . . . close all or a portion of a park area to all public use . . . ." 36 C.F.R. § 1.5(a)(1). Generally, when issuing a closure, except in emergency situations, the superintendent "shall prepare a written determination justifying the action." *Id.* § 1.5(c). That written determination need not be published when the decision is made. It need not even be drafted when the decision is made. Rather, the written determination justifying the closure need only be prepared "prior to implementing . . . a . . . closure." *Id.* And even then, the determination need only "be available to the public upon request." *Id.*

The regulations also provide that some closures, if they satisfy certain subjective criteria, "shall be published as rulemaking in the Federal Register." *Id.* § 1.5(b). Those circumstances

include closures "of a nature, magnitude and duration that will result in a significant alteration in the public use pattern of the park area" and those "of a highly controversial nature," among others. *Id.*

Section 1.5(e) directs that with respect to non-emergency closures, the public will be informed in accordance with § 1.7. *Id.* § 1.5(e). 1.7 in turn requires that when "designat[ing] all or a portion of a park area as . . . closed," the NPS shall notify the public by at least one of various methods, including posting signs, in maps, through publication in a newspaper, and via other appropriate methods, including use of electronic media. *Id.* § 1.7(a)(1)-(4). Again, the regulations do not direct when the notice shall be posted.

b. Here, Plaintiffs claim that closure of East Potomac Park would be contrary to § 1.5(b)'s publishing requirement and § 1.5(c)'s written determination requirement. *See* Mem. 19 (arguing closure "falls squarely within the requirements of" § 1.5(b)); *id.* at 21 (criticizing Defendants because they "issued no written justification"). Those arguments that such decision is arbitrary and capricious are flawed for several reasons.

To start, Plaintiffs' argument that Defendants' closure of East Potomac Park violates § 1.5(c)'s written determination requirement is premature. Plaintiffs' strategy throughout this case has been to insert themselves prematurely into agency processes and argue steps that lie ahead, should have been taken in the past. "In the context of agency decision making, letting the administrative process run its course before binding parties to a judicial decision prevents courts from 'entangling themselves in abstract disagreements over administrative policies, and . . . protect[s] the agencies from judicial interference' in an ongoing decision-making process." *See Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). Defendants have consistently argued that Plaintiffs' claims concerning

a future redesign of the Golf Course are unripe. Their arguments regarding the written determination requirement are no different.

Here, on October 28, 2026, Defendants submitted a declaration from the Comptroller of the National Park Service. She described the fact that East Potomac Golf Course's operator "will cease operations at East Potomac Golf Course on or before November 15, 2026." Third Suppl. Decl. of Jessica Bowron ¶ 6, Dkt. 111-2. She also described the deteriorated condition of the East Potomac Seawall and damage to trees caused by flooding along the seawall. *Id.* at ¶¶ 7-17. Based on these facts, she is "plan[ning] to close East Potomac Park south of Buckeye Drive SW, including East Potomac Golf Course, effective November 15, 2026." *Id.* at ¶¶ 18. But nowhere in that declaration or the accompanying Notice did Defendants state they were not going to prepare a written determination per § 1.5(c) nor did they claim that Ms. Bowron's declaration served as that written determination. Defendants must "prepare a written determination justifying the [closure]" of East Potomac Park, but they are free to do so at any time "prior to implementing" the closure. 36 C.F.R. § 1.5(c).

This Court's decision in *Mashack v. Jewell*, 149 F. Supp. 3d 11 (D.D.C. 2016), is once again directly on point. There, the Court was concerned not with the temporary closure of a golf course, but with the temporary closure of a marina. The NPS's written "Record of Determination" stated "marina concession operations . . . will be discontinued and the marina closed." *Id.* at 17. The NPS "explained that the marina would be temporarily closed . . . 'to ensure public health and safety while the area undergoes facility stabilization, maintenance, and safety related projects and activities.'" *Id.* (quoting Record of Determination). The same reasons, at minimum, would justify temporary closure of East Potomac Park here.

Further, as in *Mashack*, Defendants can likely show that the temporary closure at issue here would not trigger § 1.5(b)'s rulemaking requirement. There, this Court correctly concluded that no rulemaking was required because of both the limited duration of the closure and the fact that nearby alternatives remained available. 149 F. Supp. 3d at 37-38. So too here. The proposed closure would be temporary and other golf courses managed by the NPS—Rock Creek Park and Langston Hughes—remain available as do numerous other opportunities for cycling and recreation on nearby NPS lands. And like in *Mashack*, if and when Defendants make a determination to "permanently" close East Potomac Golf Course, they will have to perform the analysis required by § 1.5(b), and if necessary, conduct rulemaking at that time. *Id.* at 38. But Plaintiffs cannot "blend[] the temporary closure decision" with potential future changes to the Golf Course that may trigger rulemaking then, to demand rulemaking now. *Id.*

c. Separately, Plaintiffs argue that NPS's decision to close East Potomac Park south of Buckeye Drive SW is arbitrary and capricious because it is not adequately explained. Mem. 22-23. Plaintiffs argue that closure could not rationally be based solely on the "deteriorating condition of the seawall" because "[t]he seawall has been in disrepair for decades." Mem. 22. But a persisting and escalating problem does not become immune from agency action because the agency has failed to address it before. *See Associated Dog Clubs of N.Y. State, Inc. v. Vilsack*, 75 F. Supp. 3d 83, 91 (D.D.C. 2014) ("An agency can change its prior position . . . and can decide that a growing problem warrants more oversight than was previously necessary."). Moreover, NPS did not rely *solely* on the disrepair of the seawall to justify closure of East Potomac Park; the October 28 Bowron Declaration also noted the closure decision was based on the absence of an operator under lease for East Potomac Golf Course after November 15, 2026. Third Suppl. Decl.

of Jessica Bowron ¶¶ 4-6. There is no rule against agencies having multiple reasons for their actions.

Plaintiffs argue that NPS's action is improperly influenced by the President's desire to rehabilitate the East Potomac Golf Course, but the APA does not render agency action unlawful "because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019). "Agency policymaking is not a 'rarified technocratic process, unaffected by political considerations or the presence of Presidential power.'" *Id.* So long as an agency identifies a rational basis for a decision, it makes no difference that the agency was aware of political considerations or the Administration's priorities or even that the agency decision was dictated by "Presidential power." *Id.*; *see Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 685 (2020) (rejecting requirement that agency have a "flexible and open-minded attitude").

### 3. Plaintiffs Cannot Show a Likelihood of Success on their NEPA Claim Based on a Segmentation Theory

Because Plaintiffs have not brought an independent claim challenging Defendants' decision to close East Potomac Park south of Buckeye Drive SW, they must rely on a segmentation theory to support their NEPA claim. But Plaintiffs' NEPA claim fails because their segmentation theory is no longer good law, and even if it were, they fail to satisfy this obsolete test.

Plaintiffs' segmentation theory rests on cases like *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304 (D.C. Cir.), and *Natural Resources Defense Council v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988). But those cases in turn rest on regulations that have been rescinded. *See Del. Riverkeeper Network*, 753 F.3d at 1313 (quoting and relying on 1978 regulations, which were

repealed in January 2026, 91 Fed. Reg. 618).[12] Without those regulations, any segmentation theory must be traced back to *Kleppe v. Sierra Club*, 427 U.S. 390 (1976). *See Hodel*, 865 F.2d at 297. There, in considering NEPA's environmental impact statement requirement, 42 U.S.C. § 4332(2)(C), the Supreme Court held that "when several proposals for []related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together." 427 U.S. at 410.

But the Supreme Court abrogated that part of *Kleppe* in *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S. 168 (2025). There, the Court made crystal clear that NEPA does not require agencies to "address environmental effects from projects that are separate in time or place from the . . . project at hand." 605 U.S. at 186. That's because "the textually mandated focus of NEPA is the 'proposed action'—that is, the project at hand—not other future or geographically separate projects," *id.* at 186-87. The Court squarely held, contrary to the obsolete regulations, that NEPA does not require agencies to assess the combined effects of connected actions, cumulative actions, or similar actions. *Id.* at 186–91. "Therefore, when the effects of an agency action arise from a separate project … NEPA does not require the agency to evaluate the effects of that separate project." *Id.* at 187.

After *Seven County*, the relevant question is not segmentation, but rather whether the agency properly identified the "project at hand." *Save the Sound, Inc. v. FAA*, 183 F.4th 763, 771 (D.C. Cir. 2026) (quoting *Seven County*, 605 U.S. at 190).[13] And on that question, NEPA "gives

---

[12] DOI published a NEPA handbook in February 2026. *See* https://www.doi.gov/media/document/doi-handbook-nepa-procedures.

[13] *Save the Sound* applied the old regulations because the agency's decision was issued when those regulations were still in effect.

agencies wide latitude to define the relevant project: Even 'interrelated' projects that are 'close in time and place to the project at hand' are not necessarily a single project." *Id.* As the Supreme Court emphasized, the court's "review 'must remain deferential,' particularly as to the 'gray area in defining the project at hand.'" *Id.* (quoting *Seven Cnty.*, 605 U.S at 190–91). And of course, agencies may consider multiple projects (like tree removal, temporary closure, and redesign of a golf course), all at once. *See Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 231 (1991) ("[A]n agency need not solve every problem before it in the same proceeding[,] . . . even where the initial solution to one problem has adverse consequences for another area that the agency was addressing.").

The deference point warrants emphasis: *Seven County* repeatedly admonished lower courts that "the central principle of judicial review in NEPA cases is deference." 605 U.S. at 179. Thus, all NEPA allows a court to ask is whether the agency has "drawn a reasonable and manageable line," not whether "NEPA would support drawing a different line," and not whether this Court or the Plaintiffs would like the agency to draw a different line. *Id.* So long as the agency has defined the project in a rational way, Courts must defer. *Seven County* certainly does not allow courts to interrogate agency witnesses regarding their subjective motives in defining the "project at hand." Quite to the contrary. "The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id.* at 185.[14]

Even if the segmentation doctrine were available, it is inapplicable here for the same reasons this Court recognized in *Mashack*. The segmentation doctrine's purpose was "to prevent

[14] That deference is not limited to the EIS context. *See Save the Sound, Inc. v. FAA*, 183 F.4th 763, 774 (D.C. Cir. 2026) (environmental assessment); *Sierra Club v. FERC*, 145 F.4th 74, 87-88 (D.C. Cir. 2025) (same); *Badger Helicopters Inc. v. FAA*, 154 F.4th 902, 913 n.2 (8th Cir. 2025) (same); *Cascadia Wildlands v. United States Bureau of Land Mgmt.*, 153 F.4th 869, 903 (9th Cir. 2025) (same).

agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'" 149 F. Supp. 3d at 30-31 (quoting *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1326 (D.C. Cir. 2015)). "There is no risk of that here: the single 'project' that might have a significant environmental or historical impact—the permanent closure of the [current golf course] and the removal of [the existing golf course] infrastructure," through the implementation of a new design, "will be subject to the applicable NEPA and NHPA analysis in its entirety," *id.* at 31, as the Defendants have repeatedly stated and as the NCPC submission itself reaffirms. And "that project is independent of the decisions to forego a new contract [with an operator] and to temporarily close the [golf course] in the absence of a[n operator]"—not to mention independent of the decision to remove trees consistent with the CLR. *Id.*

In effect, Plaintiffs' segmentation theory—that the NPS cannot stockpile soil, cannot conduct tree removal, cannot terminate its operator, and cannot temporarily close the Park while a potential plan to redesign the Golf Course is also under consideration—would prohibit the NPS from doing *anything* to a National Park if there were also future, hypothetical plans in that same park under consideration. Nothing under the APA or NEPA places agencies within such an operational straitjacket.

Here, the action challenged in this request for preliminary relief is the temporary closure of East Potomac Park, including the East Potomac Golf Course. That is a rational framing of the "project at hand." The Court must defer to that judgment. *Seven Cnty.*, 605 U.S. at 185, 190.

#### 4. Plaintiffs Cannot Otherwise Show a Likelihood of Success on their NEPA, NHPA, and NPS Organic Act Claims Because those Claims are Unripe

Plaintiffs *make no effort* to argue a temporary closure of East Potomac Park or the Golf Course, on its own, violates NEPA, Section 106 of the NHPA, or the NPS's Organic Act. Instead,

Plaintiffs' NHPA and Organic Act claims rest on the same flawed segmentation theory as their NEPA claim. Mem. 18 (conceding that only "adopting and implementing" a plan to redesign the Golf Course could be subject to the NHPA); Mem. 25 (arguing only that closing the Park, if for the purpose of "destroy[ing] its key features" would violate NPS's Organic Act obligations).

But for the same reasons as stated in Defendants' Memorandum in Support of Motion for Summary Judgment 28-35, Dkt. No. 75-1, Plaintiffs' premature NEPA, NHPA, and Organic Act claims fail. As discussed above, Plaintiffs' claims fail to identify final agency action for purposes of the APA. *Supra*, pp. 14-16. But even if the Court concludes that a discrete final agency action has occurred to redesign East Potomac Golf Course (albeit at some indeterminate time in some indeterminate manner), Plaintiffs' claims would still be unripe for adjudication.

"[T]he doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to, and then, only once." *Am. Petroleum Inst.*, 683 F.3d at 387. Courts look to "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs v. Gardner*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Under the fitness prong of this test, courts must consider "[1] whether [the claim] is 'purely legal, [2] whether consideration of the issue would benefit from a more concrete setting, and [3] whether the agency's action is sufficiently final.'" *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (citation omitted). Under the hardship prong, courts must ask whether the challenged administrative action is likely to have a direct and immediate effect on the "primary conduct" of the plaintiff. *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967).

Both the fitness and hardship prongs demonstrate Plaintiffs' claims are unripe for decision. All sides agree Defendants must conduct NEPA review and Section 106 consultation before

implementing any potential redesign of East Potomac Golf Course. And all sides agree that any such redesign must comport with the NPS's directive to "conserve the scenery, natural and historic objects, and wild life" in a manner that "will leave [the Park] unimpaired for the enjoyment of future generations," 54 U.S.C. § 100101(a), pursuant to the NPS's "especially broad discretion" in satisfying this mandate. *Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000).[15] Specifically, before NPS could undertake a renovation of the East Potomac Golf Course it would need to prepare a "non-impairment determination" to show that the action "will not result in impairment to park resources or values." *Guidance for Non-Impairment Determinations and the NPS NEPA Process*, National Park Service (Apr. 2025).[16]

Ultimately, Plaintiffs have brought this challenge before the NPS has had an opportunity to issue an appropriate NEPA document, conduct consultation under Section 106 of the NHPA, or prepare a non-impairment determination to comply with the Organic Act. And Plaintiffs cannot seriously dispute that none of the activities conducted to date, nor the planned closure, have in any way irreparably harmed *historic* features of the Golf Course. The layout of the Course remains the same. The clubhouse remains the same. If anything, the tree removal has enhanced the historic features of the Golf Course by further aligning the Course with its original links-style design. What may change the Golf Course's character and features, however, is if a new design with such changes is approved and implemented by NPS. But that has not yet occurred. Accordingly, Plaintiffs' claims are unlikely to succeed on the merits because the Court should withhold

---

[15] Ripeness concerns aside, Plaintiffs' Organic Act claim fails on its face where East Potomac Golf Course has undergone repeated modifications, CLR xi, Dkt. No. 139-5, was constructed for the purpose of providing a public golf recreation facility, *id*. at 91, and would continue to serve that purpose after any renovation. In short, like past modifications, any impact from a redesign would not impair park resources or values.

[16] https://www.nps.gov/subjects/nepa/upload/Guidance-for-Non-Impairment-Determinations-and-the-NEPA-Process-Apr-2025_508.pdf.

consideration until these claims have matured, a plan to redesign the Golf Course has been approved, and Plaintiffs' claims become ripe for adjudication.

### C. The Balance of the Equities and Public Interest Do Not Favor Preliminary Relief

Because Plaintiffs have not shown a likelihood of success on the merits, the Court need not consider the balance of harms and the public interest in issuance of an injunction. However, because Plaintiffs failed to show they are irreparably injured by a temporary closure, the balance of equities does not tip in their favor.

In assessing the balance of equities and public interest factors, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Where a "movant seeks to enjoin the government, the final two factors merge 'because the government's interest is the public interest.'" *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 314 (D.D.C. 2025) (quoting *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Here, Plaintiffs have alleged no irreparable injury from the temporary closure of East Potomac Park. Thus, there is no harm to balance. By contrast, Defendants and the public have an interest in ensuring that courts abide their jurisdictional limits, including by enforcing the doctrines of standing and ripeness, and that they uphold the separation of powers under the Constitution, which precludes improper infringement on presidential authority. *See Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025); *see also Vt. Yankee Nuclear Power Corp. v. Nat'l Res. Def. Council, Inc.*, 435 U.S. 519, 525 (1978) (courts may not "improperly intrude[] into the agency's decisionmaking process"). Further, as one court has explained, "governmental action pursuant to a statutory scheme is 'taken in the public interest.'" *Aid for Women v. Foulston*, 441 F.3d 1101, 1115 n.15 (10th Cir. 2006); *see also K.G. ex rel. Garrido v. Dudek*, 839 F. Supp. 2d 1254, 1279 (S.D. Fla.

2011). The governmental action—to temporarily close East Potomac Park south of Buckeye Drive SW—is taken in the public interest.

For these reasons, the balance of the harms and the public interest also weigh against preliminary injunctive relief.

## IV. If the Court Grants Preliminary Injunctive Relief, it Should Stay Its Decision Pending Appeal

The factors governing whether to issue a stay include: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Here, these factors weigh in favor of a stay. Defendants have strong arguments for appeal, and the equities and public interest weigh against suspending Defendants' activities in the interim.

*First*, as noted above, Defendants have made a strong showing that they are likely to succeed on the merits. Plaintiffs' claims suffer from several fatal flaws. They lack standing, fail to identify final agency action, bring statutory claims that are unripe for adjudication, and even if their claims were ripe, they rely on an obsolete theory of segmentation, which, even if it had viability, would be inapplicable here.

*Second*, absent a stay, Defendants will be irreparably harmed if the NPS's temporary closure is enjoined. Enjoining closure of the Course absent a stay would effectively force the NPS to continue retaining NLT as a lessee in holdover status, potentially force the NPS to operate the Golf Course itself, or take some other extraordinary measures. *See Beberman v. Blinken*, 61 F.4th 978, 983 (D.C. Cir. 2023) (courts "cannot order an agency to exceed its statutory authority).

*Third*, issuance of a stay will not substantially injure Plaintiffs. Plaintiffs' alleged interests pertain to maintaining the current nature and character of East Potomac Golf Course. Simply closing East Potomac Park will do nothing to harm those interests. Moreover, staying a preliminary injunction here would have no effect on the preliminary injunction already in place. Dkt. No. 101. Indeed, if it was not before, it is now clear Plaintiffs have suffered no harm at all from Defendants' removal of trees pursuant to its Tree Management Plan. Plaintiffs have made clear their feared injury is a change to East Potomac Golf Course such that it "is no longer the historic, links-style they have long enjoyed." Mem. 28. But they concede that implementation of recommendations in the 2019 Cultural Landscape Report "call[ed] for a return the [course] design's open, links-style feel." *Id.* 6. And they concede that links-style courses have fewer trees—not more. *See id.* 5 n.5. Whether Defendants remove one tree or a thousand, it defies credulity that Plaintiffs could in any way be harmed by an activity that helps return East Potomac Golf Course to its open, links-style design when the very thing they allegedly wish to enjoy is the historic, links-style design of the Course, in particular when they have already expressed approval of tree removal that furthers this purpose. Dickson Decl. ¶ 17, Dkt. No. 8-4; Roberts Decl. ¶ 14, Dkt. No. 8-6.

*Fourth*, a stay would serve the public interest. Staying any order enjoining Defendants from temporarily closing East Potomac Park would serve the public interest by avoiding any unnecessary interference in agency affairs.

Accordingly, the Court should stay any preliminary injunction order and permit East Potomac Park south of Buckey Drive SW to temporarily close during the pendency of this litigation.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a temporary restraining order. If the Court were to grant the motion, it should convert it into a preliminary injunction and stay that injunction, pending appeal.

Respectfully submitted this 9th of November 2026.

**STANLEY E. WOODWARD, JR.**
Associate Attorney General

**ANDREW BLOCK**
Senior Counsel
Office of the Associate Attorney General
950 Pennsylvania Avenue
Washington, DC 20530
(202) 514-9500
stanley.woodward@usdoj.gov

**ADAM R. F. GUSTAFSON**
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Energy & Natural Resources Division

**BENJAMIN HAYES**
Deputy Assistant Attorney General

**MARISSA A. PIROPATO**
Deputy Chief (MA Bar No. 651630)

*/s/ Michael K. Robertson*
**MICHAEL K. ROBERTSON**
Trial Attorney (DC Bar No. 1017183)
U.S. Department of Justice
Energy & Natural Resources Division
Natural Resources Section
4 Constitution Square
150 M Street NE
Washington, DC 20002
Tel: (202) 598-3835
Email: michael.robertson@usdoj.gov

*Attorneys for Defendants*