**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DC PRESERVATION LEAGUE,

DAVE ROBERTS,

and

ALEX DICKSON,

*Plaintiffs*,

*vs.*

UNITED STATES DEPARTMENT OF THE INTERIOR;

DOUG BURGUM, in his official capacity as Secretary of the Interior;

NATIONAL PARK SERVICE;

and

JESSICA BOWRON, in her official capacity as "Comptroller Exercising the Delegated Authority of the Director" of the National Park Service,

*Defendants*.

Case No. 1:26-cv-477-ACR

**PLAINTIFFS' REPLY IN SUPPORT OF**
**MOTION FOR A TEMPORARY RESTRAINING ORDER**
**OR, ALTERNATIVELY, A 14-DAY STAY UNDER 5 U.S.C. § 705**
**AGAINST CLOSURE OF EAST POTOMAC PARK**

# TABLE OF CONTENTS


INTRODUCTION .......... 1

ARGUMENT .......... 3

I. Plaintiffs Are Likely to Succeed on the Merits .......... 3

A. Plaintiffs' Requested Relief Aligns With the Scope of the Amended Complaint .......... 3

B. Plaintiffs Have Standing .......... 4

C. Plaintiffs Have Established a Final Agency Action .......... 7

D. Closing East Potomac Without Evaluating the WNP's Environmental Effects Will Violate NEPA .......... 10

E. Plaintiffs' Claims Under the National Historic Preservation Act and the National Park Service Organic Act Are Ripe and Uncontested .......... 11

F. Plaintiffs Are Likely to Succeed on Their Claim That the Closure is Arbitrary and Capricious .......... 13

II. Plaintiffs Will Suffer Irreparable Injury Without a Temporary Restraining Order .......... 16

III. Defendants Establish No Public Interest Supporting Closure of the Park, Tipping the Balance of the Equities in Plaintiffs' Favor .......... 19

IV. Defendants' Request for a Stay Pending Appeal Is Both Premature and Meritless .......... 20

CONCLUSION .......... 21

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967) ............ 12

*Alley Cat Allies, Inc. v. U.S. Nat'l Park Serv.*,
No. 25-4269, 2026 WL 221343 (D.D.C. Jan. 28, 2026) ............ 6, 17

*Am. Petroleum Inst. v. EPA*,
683 F.3d 382 (D.C. Cir. 2012) ............ 12

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) ............ 17

*Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*,
786 F. Supp. 3d 13 (D.D.C. 2025) ............ 8

*Comm. of 100 on the Fed. City v. Foxx*,
87 F. Supp. 3d 191 (D.D.C. 2015) ............ 6, 8, 17

*Ctr. for Biological Diversity v. Dep't of Interior*,
144 F.4th 296 (D.C. Cir. 2025) ............ 5

*Del. Riverkeeper Network v. FERC*,
753 F.3d 1304 (D.C. Cir. 2014) ............ 10, 11

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ............ 15, 16

*Elec. Frontier Found. v. Off. of Dir. of Nat'l Intel.*,
No. 08-cv-01023, 2009 WL 10710750 (N.D. Cal. Oct. 7, 2009) ............ 21

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ............ 6

*Ft. Funston Dog Walkers v. Babbitt*,
96 F. Supp. 2d 1021 (N.D. Cal. 2000) ............ 17

*Galusha v. N.Y. State Dep't of Env't Conservation*,
27 F. Supp. 2d 117 (N.D.N.Y. 1998) ............ 17

*Henke v. Dep't of the Interior*,
842 F. Supp. 2d 54 (D.D.C. 2012) .......... 14

*Hennepin Cnty. v. U.S. Dep't of Health & Hum. Servs.*,
No. 26-cv-2460, 2026 WL 2426300 (D.D.C. Aug. 19, 2026) .......... 8

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 16, 20

*Lemmon v. Trump*,
No. 26-cv-544 (D.D.C. Nov. 5, 2026), ECF No. 111 .......... 9

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 8

*Mashack v. Jewell*,
149 F. Supp. 3d 11 (D.D.C. 2016) .......... 11, 14

*Nat'l Council of Nonprofits v. OMB*,
775 F. Supp. 3d 100 (D.D.C. 2025), *vacated as moot*, 188 F.4th 400 (D.C. Cir. 2026) .... 21

*Nat'l Park Serv. v. Nat'l Tr. for Historic Pres.*,
609 U.S. 1068 (2026) (per curiam) .......... 6

*Nat'l Tr. for Historic Pres. in the U.S. v. FDIC*,
No. 93-0904, 1993 WL 328134 (D.D.C. May 7, 1993) .......... 18

*Nat'l Wildlife Fed'n v. Burford*,
835 F.2d 305 (D.C. Cir. 1987) .......... 16

*Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*,
435 F.3d 326 (D.C. Cir. 2006) .......... 3

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......... 8

*NPR, Inc. v. Trump*,
827 F. Supp. 3d 48 (D.D.C. 2026) .......... 12

*Open Cmtys. All. v. Carson*,
286 F. Supp. 3d 148 (D.D.C. 2017) .......... 20

*Racing Enthusiasts & Suppliers Coal. v. EPA*,
45 F.4th 353 (D.C. Cir. 2022) .......... 7,8

*Rivera v. United States*,
910 F. Supp. 239 (D.V.I. 1996) ........ 18

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) ........ 10, 11

*Sierra Club v. EPA*,
955 F.3d 56 (D.C. Cir. 2020) ........ 8

*Sierra Club v. U.S. Army Corps of Eng'rs*,
990 F. Supp. 2d 9 (D.D.C. 2013) ........ 18

*Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*,
No. 3:23-cv-00058, 2023 WL 8358239 (D. Alaska Dec. 1, 2023) ........ 17

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ........ 6

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ........ 12

*Texas v. United States*,
798 F.3d 1108 (D.C. Cir. 2015) ........ 11

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 4

*U.S. Ass'n of Reptile Keepers v. Jewell*,
106 F. Supp. 3d 125 (D.D.C. 2015) ........ 3

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ........ 16

**STATUTES**

5 U.S.C. § 705 ........ 21

Act of Mar. 3, 1897, ch. 375, 29 Stat. 624 ........ 9

**REGULATIONS**

36 C.F.R. § 1.5 ........ 13, 14

36 C.F.R. § 1.7 ........ 14

**RULES**

Fed. R. Civ. P. 56(d)........................................................................................................................7

## INTRODUCTION

Defendants rely, as they have for months, on the litigation equivalent of a mulligan: attempting the same shot, over and over again, hoping for a better result. *See, e.g.*, Mem. Op. & Order 3, ECF 144 ("The Government's motion does little more than rehash legal arguments it has previously made."). Defendants still miss their target. They cling to the fiction that their decision to close East Potomac Park on November 15, like the tree "management" plan ("TMP") before it, has nothing to do with the Washington National Plan ("WNP"), which Defendants insist "remains under deliberation." Defs.' Opp'n 1, ECF 147. Yet despite staking all of their arguments on that implausible factual premise, Defendants make almost no effort to defend it. They do not dispute that East Potomac's seawalls have been deteriorating for decades yet never posed a threat requiring closure of the Park. They do not dispute that NPS just completed extensive seawall repairs at the Tidal Basin and West Potomac Park without closing those parks. They do not dispute that, just three days before they announced the closure of the Park, NPS had no problem allowing more than 30,000 runners to race in the Marine Corps Marathon within yards of the seawall's edge. And they do not dispute that Acting Director Bowron's October 28 declaration does not actually assert, as Defendants claimed in their notice of closure, Defs.' Notice 2, ECF 111, that closure of the Park is "necessary" due to "significant safety hazards." *See* Third Suppl. Decl. of Jessica Bowron ¶¶ 7–17, ECF 111-2.

What Defendants have instead made clear is that they are closing the Park because the President "direct[ed]" them to do so "in order to renovate and rebuild" the Golf Course. Defs.' Resp. to O.S.C. 4, ECF 107; ECF 111 at 2; Min. Order, Oct. 27, 2026. *See* ECF 144 at 10. As with the Court's determination that the TMP was not motivated by the Cultural Landscape Report but was rather a further step in implementing the WNP, Mem. Op. 31, ECF 103, the imminent

closure of East Potomac Park and the WNP are not, in fact, "separate[ ]." ECF 147 at 1. Defendants are closing East Potomac as another step in implementing the WNP.

That fact, along with this Court's decision preliminarily enjoining the TMP, disposes of Defendants' arguments here and warrants a temporary restraining order. Defendants rehash their view that there has been no final agency action, ECF 147 at 14, and that Plaintiffs lack standing, ECF 147 at 7. They argue that Plaintiffs' claims under the National Environmental Policy Act, the National Historic Preservation Act, and the National Park Service Organic Act are not yet ripe, ECF 147 at 24, and that even if the NEPA claim is ripe, segmentation is no longer a valid basis for a NEPA challenge, ECF 147 at 21. And they contend that NPS reasonably exercised authority to direct a "temporary" closure of the Park based on an implausible rationale that disregarded NPS's own regulatory requirements. ECF 147 at 17-21. Throughout these arguments, Defendants mischaracterize or ignore Plaintiffs' central contention: that the closure is another step in implementing the WNP. *See* ECF 147 at 1.

For much the same reasons that the Court enjoined Defendants from implementing the WNP through the TMP, the Court should temporarily restrain Defendants from closing East Potomac Park. The Court should then enter a schedule for briefing and a hearing on a motion for a preliminary injunction. The pending motion should not be construed as a motion for a preliminary injunction because Defendants' opposition rests on factual points that Plaintiffs should have the opportunity to develop in a more complete record. In particular, apart from testing Defendants' facially implausible "safety" excuse for the closure, Plaintiffs should be permitted an opportunity to probe the circumstances of Defendants' ouster of the National Links Trust ("NLT"), including by issuing a subpoena for testimony from NLT. Defendants cannot decide to destroy the Golf Course, secure NLT's departure, and then throw up their hands and lament that they must close the

Golf Course for want of an operator without allowing Plaintiffs to explore that factual proposition in an evidentiary hearing.

As it did in regard to the TMP, the Court should take this in two steps. The Court should first preserve the status quo by temporarily enjoining the closure of the Park on November 15 and then allow Plaintiffs to complete the record that they contend will support a motion for preliminary injunction. That record should include at a minimum testimony from NLT management and further testimony from Acting Director Bowron. Once that record is more complete, the case will be ripe for entry of a preliminary injunction. For now, the Court should restrain Defendants from closing East Potomac Park to avert imminent irreparable harm to Plaintiffs and the public interest.

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits.

#### A. Plaintiffs' Requested Relief Aligns With the Scope of the Amended Complaint.

There is no "mismatch" between the Amended Complaint and the scope of relief Plaintiffs seek in this TRO. ECF 147 at 6. The Amended Complaint challenges Defendants' decision to destroy East Potomac Golf Course and to replace it with a championship-style course. *See, e.g.*, ECF 98 ¶¶ 19, 54-56 (Prayer for Relief). Closing East Potomac Park is not, as Defendants characterize it, simply a "management responsibilit[y]," ECF 147 at 6—it is yet another a step toward implementing the decision challenged by the Amended Complaint. The operative complaint thus expressly asks the Court to enjoin "Defendants from closing East Potomac Golf Course" as part of the WNP's implementation. ECF 98, Prayer for Relief ¶ 2(f). Restraining Defendants from closing the Park is an appropriately tailored remedy that falls within the scope of Plaintiffs' requested relief. *See U.S. Ass'n of Reptile Keepers v. Jewell*, 106 F. Supp. 3d 125, 126 (D.D.C. 2015) ("an injunction must be 'narrowly tailored to remedy the specific harm shown'") (quoting *Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330

(D.C. Cir. 2006)). Indeed, Defendants concede that an injunction against implementation of the WNP "*would* fall within the scope of Plaintiffs' requested relief" "if Defendants, at the end of their decisionmaking and compliance process, decide to implement a golf course redesign." ECF 147 at 6 (emphasis added). That is exactly what has happened. As the Court found in preliminarily enjoining the TMP, the WNP exists, ECF 103 at 27–29, and Defendants have begun to implement it, including by announcing the imminent closure of East Potomac Park, *id.* at 34–35. Enjoining Defendants from taking yet another step in their effort to make that plan a *fait accompli* falls squarely within the scope of the Amended Complaint.

**B. Plaintiffs Have Standing.**

Defendants continue to recycle the same arguments on standing, yet none has merit and all have been squarely rejected by this Court. *See* ECF 103; ECF 144. Less than three weeks ago, the Court held that Plaintiffs established injury-in-fact, causation, and redressability based on harm to their recreational, aesthetic, and historic interests that will occur if East Potomac Golf Course is destroyed and replaced as Defendants intend. ECF 103 at 45–49 (harm to individual Plaintiffs); *id.* at 49, 52–53 (associational Plaintiff). Nothing in Defendants' opposition disturbs those holdings.

Defendants' only new argument is that Plaintiffs lack standing to challenge the closure specifically, because no declarant "asserts injury of any kind . . . purely as a result of the Golf Course (or East Potomac Park) closing." ECF 147 at 8 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). That argument fails. Closing the Park is a necessary step in implementing the WNP. And, as discussed above, Plaintiffs will be injured by the destruction of East Potomac Golf Course and the implementation of the WNP. As this Court has already concluded, Plaintiffs need not "play a game of legal whack-a-mole" by amending their complaint each time Defendants take a further step in implementing the WNP. ECF 103 at 41.

Moreover, this Court's prior conclusion that Plaintiffs have standing to challenge the WNP confirms they have standing specifically with respect to the closure as well. For example, this Court has already found that Plaintiff Roberts plays the Course "at least once per month," including the Red Course with his son and daughter. *Id.* at 45 (citing Decl. of Dave Roberts ¶¶ 2, 11, 17, ECF 8-6). It found that Plaintiff Dickson plays "frequently, usually with [his] 10-year-old son." *Id.* (citing Decl. of Alex Dickson, ¶ 6 ECF 8-4). And it found that both intend to keep playing. *Id.* at 62 (citing ECF 8-6 ¶¶ 17, 26; ECF 8-4 ¶¶ 6, 14, 19). Plaintiffs thus "use the affected area and are persons for whom the . . . recreational value[] of the area will be lessened by" implementation of the WNP. *Id.* at 46 (quoting *Ctr. for Biological Diversity v. Dep't of Interior*, 144 F.4th 296, 305 (D.C. Cir. 2025)). Closing the Park does not merely lessen that value; it eliminates it. By Defendants' own metric, then, Plaintiffs have standing because they in fact "*will* be prevented from using" the Golf Course once the Park is closed. ECF 147 at 10 (emphasis added).

Defendants err in suggesting that Plaintiffs "welcome changes to East Potomac Golf Course that could temporarily impair their access to the course." *Id.* at 9. The improvements Plaintiffs welcomed in their declarations would have maintained East Potomac's historic design and the recreational and communal values the Course offers. *See, e.g.*, *id.* (quoting ECF 8-4 ¶ 13) (supporting "[r]estoring the Blue Course to the reversible routing designed by original architect Walter Travis"). That is a historic restoration, and it is the very commitment NPS abandoned when it terminated National Links Trust's lease and decided to implement the WNP. Supporting a historic restoration is not acquiescence to the permanent closure and wholesale destruction of the three-course layout to implement the WNP.

Regardless, Plaintiffs' harms trace directly to the closure, not just to concern about future destruction. Plaintiffs Roberts and Dickson frequently play golf on East Potomac's historic three

courses, by themselves and with their children, enjoying the design "as it is now." ECF 103 at 62. DCPL's Executive Director, Rebecca Miller, visits East Potomac Park and appreciates its historic layout and design. *Id.*; *see also id.* at 52–53. Closing East Potomac Park will prevent Plaintiffs from continuing those activities for at least 15 months under Defendants' own estimate, and possibly for years if reopening must await reconstruction of the seawall. *See* NCPC Proposal 38, ECF 139-2.

Finally, Defendants' reliance on *National Park Service v. National Trust for Historic Preservation*, 609 U.S. 1068 (2026) (per curiam), repeats an argument the Court has already considered and rejected. *See* ECF 103 at 43–47. This case is not about an aesthetic objection to the new design of the golf course (*cf.* ECF 147 at 8), but about the wholesale destruction of the existing course, where Plaintiffs and DCPL members regularly golf and enjoy the course's historic and communal values. *See* ECF 8-6 ¶¶ 2, 11, 17, 26; ECF 76-3 ¶¶ 20-22. *National Trust* expressly distinguishes recreational injuries, like those the Supreme Court found sufficient in *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 181, 183 (2000) and *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009), from "mere offense." ECF 103 at 43–45. And in preliminarily enjoining the TMP, this Court correctly concluded that replacing the beginner-friendly, three-course design with a "championship-style" course would cause concrete and particularized injuries to Plaintiffs by lessening the Course's recreational value. *Id.* at 45–46. Unlike the cases dealing with "temporary closure[s]" of parks or portions of parks that Defendants rely on, *see* ECF 147 at 12 (citing *Comm. of 100 on the Fed. City v. Foxx*, 87 F. Supp. 3d 191, 204 (D.D.C. 2015) (temporary closure, after which park would return to regular public use in the same form) and *Alley Cat Allies, Inc. v. U.S. Nat'l Park Serv.*, No. 25-4269, 2026 WL 221343, at *13 (D.D.C. Jan. 28,

2026) (temporary closure of only a portion of the park containing 3 out of 6 cat-feeding stations) the WNP calls for the destruction of East Potomac Course as it currently exists.[1]

**C. Plaintiffs Have Established a Final Agency Action.**

As Defendants concede, their final-agency-action argument asks the Court to revisit arguments it has "previously considered and rejected." ECF 147 at 6 n.4. The Court should decline to do so. As a factual matter, this Court correctly found that Defendants have made a final decision to destroy East Potomac Golf Course as it currently exists and replace it with "a modern, championship-style course designed by Tom Fazio." ECF 103 at 27–28. Defendants identify no error in that factual finding.

Instead, Defendants continue to insist that the WNP is not final agency action because they intend to go through the motions of compliance with legal requirements to finalize the new course's design. But, as this Court has recognized, the finality analysis is a pragmatic one. "The agency need not have publicly settled on a final design for the Fazio course, so long as it has made the final decision to replace the current Course." *Id.* at 35. The record confirms they have done so. And as the Court found, Defendants have already begun implementing the WNP, including by announcing the long-term closure of East Potomac Park, in ways that carry significant "concrete consequences" for Plaintiffs, who will be permanently deprived of the use and enjoyment of the historic three-course layout of East Potomac Golf Course and the surrounding Park. *See Racing*

---

[1] Defendants' suggestion the Court should dismiss Plaintiffs' claims addressed to the dumping of East Wing debris at East Potomac is baseless. The allegations of the operative complaint, supported by two expert reports, are more than adequate to plausibly allege injury from the stockpiling activity, *see* Am. & Suppl. Compl. ¶¶ 162–196, ECF 98—so much so that Defendants skipped straight to a motion for summary judgment in responding to that pleading, *see* Mot. for Summ. J., ECF 75. Plaintiffs will respond to that motion in due course, including by seeking appropriate discovery. *See* Fed. R. Civ. P. 56(d). Likewise, Plaintiffs preserve their remaining theories of standing. Although this Court found the record does not yet support those theories "at this stage," ECF 103 at 47, the Court did not suggest those theories will fail once the record has been adequately developed.

*Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022) (quoting *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020)).

The Court's finality analysis, and Plaintiffs' claims, do not merely "bundl[e] together a collection of discrete actions," ECF 147 at 16–17 (quoting *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, 786 F. Supp. 3d 13, 23 (D.D.C. 2025)). Plaintiffs do not challenge a program or an aggregation of day-to-day management. They challenge a discrete decision to eliminate East Potomac's existing historic design and intent and replace it with a championship-style layout intended for major tournaments. This is a far cry from the day-to-day agency management in the cases Defendants rely on and represents the exact kind of discrete agency action subject to APA review. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990). As this Court found, Defendants' "discernible course of agency conduct . . . reflects a discrete decision." ECF 103 at 33 (quoting *Hennepin Cnty. v. U.S. Dep't of Health & Hum. Servs.*, No. 26-cv-2460, 2026 WL 2426300, at *7 (D.D.C. Aug. 19, 2026)). Defendants do not address that holding.

Defendants' reliance on *Committee of 100 on the Federal City*, 87 F. Supp. 3d at 206, is likewise misplaced. The court in that case explained that, while an agency may take ancillary steps toward a project before completing environmental review, those steps cannot entail any "irretrievable commitment of resources." 87 F. Supp. 3d at 206. Here, Defendants have made irretrievable commitments of resources in implementing the WNP—resources expended in dumping the dirt, razing the trees, terminating NLT's contract, and, if the Park is closed, forgoing the revenue they would otherwise have earned by continuing to operate the golf course. Those are not "other" actions independent of the WNP, ECF 147 at 16, but are all part and parcel of the WNP. Defendants' approach would allow Defendants to close the Park and clear the land for construction

of the new course, "with no possibility of pre-destruction judicial review," ECF 103 at 35, so long as they claim they still intend to check the boxes on legal compliance. That is the result the Court has already rejected.

Finally, Defendants' single-sentence assertion that "Plaintiffs identify no final agency action" as to the closure itself, in isolation, ECF 147 at 14, again disregards that the final agency action Plaintiffs challenge is, and always has been, Defendants' "adoption and implementation of the Washington National plan." *E.g.*, Am. & Suppl. Compl. ¶¶ 107, 126, 132, ECF 72-1. The closure is the latest step in implementing that decision, not a free-standing action requiring its own finality analysis. Mem. in Supp. of Mot. for TRO 8, ECF 139-1. The same Truth Social posts that directed Defendants to close East Potomac Golf Couse by November 15, which Defendants have conceded they are "working to develop a plan to implement," ECF 107 at 4, further directed Defendants to completely redesign the course, Notice of Factual Dev. Ex. A, ECF 91-1; Notice of Factual Dev. Ex. A, ECF 114-2. Those posts, and Defendants' subsequent submissions to the NCPC and CFA, unequivocally show "what the implementation of a future redesign" will do to the Golf Course. ECF 147 at 11.

In any event, Defendants do not dispute that a final decision has been made to close the Park. NPS has announced that it will close East Potomac Park south of Buckeye Drive SW as of November 15, 2026. *Id.* at 3 (citing ECF 111 at 2; ECF 111-2 ¶ 18). That is a decision with a fixed date and fixed terms, not a tentative proposal. And concrete legal consequences will flow directly from that decision, including depriving the public of access to federal parkland that Congress dictated should be "forever held and used as a park for the recreation and pleasure of the people." *See* Act of Mar. 3, 1897, Ch. 375, 29 Stat. 624; *Cf.* Memorandum Opinion at 18, *Lemmon v. Trump*, No. 26-cv-544 (D.D.C. Nov. 5, 2026), ECF No. 111 (finding the second *Bennett* prong

satisfied where agency action would "authorize the exclusion of the public from the construction area").

### D. Closing East Potomac Without Evaluating the WNP's Environmental Effects Will Violate NEPA.

As this Court has determined, the WNP is a major federal action subject to review under NEPA, and Defendants have not performed a NEPA review of the WNP. ECF 103 at 39, 59. Taking further steps to implement the WNP amounts to impermissible NEPA segmentation. *Id.* at 59. And as Plaintiffs have demonstrated, the imminent closure of East Potomac Park has nothing to do with any alleged "safety" concerns or Defendants' self-inflicted ouster of NLT, but is instead a further step in implementing the WNP. ECF 139-1 at 8–11. By their own admission, Defendants are closing the Park, "consistent with the President's directive," "in order to renovate and rebuild" the Golf Course. ECF 107 at 4; ECF 111 at 2; Min. Order, Oct. 27, 2026.

Defendants' principal response—that segmentation is no longer a viable NEPA theory following the Supreme Court's decision in *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168 (2025), ECF 147 at 21–22—repeats an argument this Court has already rightly rejected. ECF 103 at 55. As that decision put it: "The best reading of *Seven County*, as it pertains to segmentation claims, is then not that those claims are 'eliminated . . . as a statutory matter.' It is instead that courts should ordinarily defer to the agency's definition of the 'proposed action' when the agency undertakes NEPA compliance. . . . But it does not foreclose review altogether." *Id.* at 56–57 (quoting Mem. in Opp'n to Mot. for Prelim. Inj. 36, ECF 84).

Here, Defendants' "definition of the 'proposed action'" is utterly untenable. Whether an agency has committed NEPA segmentation is necessarily a fact-dependent question. *Id.*, *see also Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1319 (D.C. Cir. 2014) (finding segmentation "[o]n the record before us"). The record here shows that closure of East Potomac Park is not an

independent project "separate in time or place" from the WNP, *Seven County*, 605 U.S. at 182, but an inextricable step in carrying out the WNP. Plaintiffs' motion demonstrated that the rationale asserted in Defendants' notice of closure, ECF 111—that the condition of the seawall in several places around the perimeter of the peninsula suddenly poses a clear and present danger to anyone setting foot in East Potomac's 330 acres—is not remotely credible. ECF 139-1 at 8–11. Defendants now barely acknowledge that rationale let alone defend it. And as to NLT's withdrawal from East Potomac Golf Course, that appears to be a self-inflicted wound Defendants seem to acknowledge they could remedy. *See* ECF 147 at 28 (acknowledging that if closure of the course is enjoined, NPS could "continue retaining NLT as a lessee in holdover status" or "operate the Golf Course itself").

"On the record before us," *Del. Riverkeeper*, 753 F.3d at 1319, closing East Potomac Park is not part of a seawall repair, and it is not driven by the lack of a concessionaire. It is part of the WNP.[2] As such, the closure cannot occur until Defendants have performed a comprehensive NEPA review of the WNP.

**E. Plaintiffs' Claims Under the National Historic Preservation Act and the National Park Service Organic Act Are Ripe and Uncontested.**

Closing East Potomac Park in furtherance of the WNP will likewise violate the National Historic Preservation Act and the National Park Service Organic Act. ECF 139-1 at 16–18, 23–27. Defendants do not dispute the merits of those claims and have therefore forfeited any merits response. *See, e.g.*, *Texas v. United States*, 798 F.3d 1108, 1113–15 (D.C. Cir. 2015) (recognizing

---

[2] These facts distinguish *Mashack v. Jewell*, 149 F. Supp. 3d 11 (D.D.C. 2016). *Contra* ECF 147 23–24. There, the court had not concluded that any of Defendants' justifications were pretextual, and they were all logical and well-supported by the record. Moreover, Plaintiffs had challenged agency inaction—the decision to allow a concessionaire contract to expire at the end of its term—rather than agency action, as is the case here. *Mashack*, 149 F. Supp. 3d at 31.

that the district court may treat as conceded an argument to which the opposing party fails to respond). Defendants argue only that these claims, as well as the NEPA claim, are not ripe because Defendants have not yet completed any NEPA or Section 106 review process and have not yet issued a non-impairment determination under the Organic Act. ECF 147 at 24–27. But that is the whole point: Defendants are proceeding with implementing the WNP, including by announcing the closure of East Potomac Park, without having yet done the review those statutes require. That does not make Plaintiffs' claims unripe; it makes Defendants' actions unlawful.

"The prudential ripeness doctrine directs federal courts to consider 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *NPR, Inc. v. Trump*, 827 F. Supp. 3d 48, 78-79 (D.D.C. 2026) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967)). "[T]he fitness of an issue 'depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.'" *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012).

Even assuming the doctrine retains vitality, *but see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) ("To the extent respondents would have us deem petitions' claims nonjusticiable 'on grounds that are "prudential" rather than constitutional,' '[t]hat request is in some tension with our recent reaffirmation of the principle that "a federal court's obligation to hear and decide" cases within its jurisdiction "is virtually unflagging."'"), that test is easily met here. Defendants' contrary argument rests again on the fiction that closing East Potomac Park—just like razing trees, dumping dirt, and ousting NLT before it—is separate from the WNP. Defendants concede that they must comply with NEPA, NHPA, and the Organic Act "*before* implementing" the WNP. ECF 147 at 25–26 (emphasis added). Here, though, they have already begun implementing the WNP. The problem here is not that Plaintiffs "brought this challenge before the

NPS has had an opportunity" to evaluate the WNP's harmful consequences to the environment, to historic properties, and to national park land. *Id.* at 26. The problem is that Defendants began executing the WNP before fulfilling those legal obligations and now stand poised to continue doing so by closing East Potomac Park. Those claims are thus ripe for adjudication now, and Plaintiffs' likelihood of success on the merits of those claims stands undisputed. ECF 139-1 at 16–18 (NHPA), 23–27 (Organic Act).

### F. Plaintiffs Are Likely to Succeed on Their Claim That the Closure is Arbitrary and Capricious.

Plaintiffs' motion explained that closure of East Potomac Park as part of Defendants' further implementation of the Washington National Plan is arbitrary and capricious because it would violate Defendants' own regulations and because, in place of the reasoned explanation required under the APA, Defendants have offered a purely pretextual rationale. Defendants' response largely fails to engage with—and certainly does not defeat—these charges.

First, with respect to the regulations, Defendants do not dispute, and thus have conceded, that 36 C.F.R. § 1.5(b) requires that they engage in notice-and-comment rulemaking before undertaking a non-emergency closure of the park where—as here—the closure "will result in a significant alteration in the public use pattern of the park area, adversely affect the park's natural, aesthetic, scenic or cultural values, . . . or is of a highly controversial nature." Defendants also do not dispute that they have not engaged in such a rulemaking, and they do not contend that they plan to. And while Defendants claim (ECF 147 at 20) they "can likely show that the temporary closure at issue here would not trigger § 1.5(b)'s rulemaking requirement," they fail to engage with the test set out in their own regulation. As Plaintiffs have demonstrated, the closure and transformation of the national park that Defendants have decided to pursue plainly meet that test. *See* ECF 139-1 at 19, 20–21.

Defendants cite *Mashack v. Jewell*, 149 F. Supp. 3d 11 (D.D.C. 2016), but the differences between *Mashack* and this case only underscore Defendants' error here. *Mashack*, unlike this case, did not involve any final decision to close the relevant park facility, and the court found that the (genuinely) temporary closure of that facility (while similar facilities nearby remained open) did not meet the standard set out in Section 1.5(b) and thus did not trigger the rulemaking requirement. *Id.* at 37-38. The closure here will be anything but short-term: Defendants represent that it will last for 15 months, even while their own submission to the National Capital Planning Commission indicates that seawall repair alone would take 2-3 years and that Defendants intend to undertake the wholesale replacement of the golf course as well. That is effectively a permanent closure of the historic three-course layout of East Potomac Golf Course. *Mashack* also involved a genuine safety concern that—as Plaintiffs have explained and Defendants have entirely failed to rebut—is transparently pretextual here. *See id.* at 35, 37.

As to Section 1.5(c), Defendants correctly do not dispute that they are required to produce the explanation described there and to notify the public before closing the park. *See also* 36 C.F.R. §§ 1.5(e), 1.7 (elaborating on the notice requirement). Defendants do contest that they have violated that requirement—or that any such claim is yet ripe—arguing (at 19) that they can provide notice "at any time" before closure. That argument would defeat the regulation's clear purpose that the public receive notice *before* NPS makes significant closures of national parks. Under Defendants' interpretation, they could satisfy the rule by posting notice 10 minutes—or 10 seconds—before shutting down a major national park. *But see Henke v. Dep't of the Interior*, 842 F. Supp. 2d 54, 64 (D.D.C. 2012) (explaining that these notice requirements would provide the plaintiffs with "ample opportunity to return to Court in order to challenge or enjoin any future decision by NPS to close the park").

Second, Defendants are unable to rehabilitate their lack of reasoned explanation for the closure, which itself provides an independent basis to conclude that Plaintiffs are likely to succeed on the merits of this claim. Defendants again point (ECF 147 at 20–21) to "the disrepair of the seawall" as an excuse for closing the park, but they entirely fail to answer Plaintiffs' points that the seawall has been in poor condition for decades; that its condition has not prevented routine use of the park by the public, including tens of thousands of participants and spectators in the recent Marine Corps Marathon; that repairing the seawall does not require closing the park; and that the announced closure just happens to fall on the same date the President had already announced as the start of the renovation and rebuilding of the golf course. Nor do Defendants grapple with the fact that their own declarant does not actually assert that the condition of the seawall requires closing the Park. Accepting such contrived reasons for agency action would defeat the purpose of the APA's central requirement that agency action be reasonably explained. *See, e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

Defendants attempt to pivot (ECF 147 at 20) by blaming their own termination of National Links Trust's lease to operate East Potomac Golf Course. But the October 28 Bowron declaration does not support that argument, nor does termination of that lease explain the closure. NPS ran the course by itself or with the help of other vendors for nearly a century before entering the lease with NLT in 2020, and Defendants have made no suggestion that they could not do the same now. To the contrary, they appear to concede the viability of those options. *Id.* at 28. Moreover, the status of that lease as to management of the Golf Course provides no basis for closing the Park as a whole. In any case, the reason for and effects of the lease termination are now relevant disputed facts Plaintiffs should have the opportunity to explore in proceedings on a motion for a preliminary injunction.

Defendants fall even farther from the green in claiming that Plaintiffs merely object to NPS taking into account "political considerations" or "Administration priorities." ECF 147 at 21 (quoting *Dep't of Com.*, 588 U.S. at 781). That misconstrues Plaintiffs claims and their basis for invoking the President's statements. The relevant point, as the Court itself has now repeatedly observed, is that the President has directed and announced a plan to destroy and replace the existing golf course, and Defendants have acknowledged that their purpose in closing East Potomac Park is to "implement [the President's] direction" to close the course "in order to renovate and rebuild." ECF 107 at 4; Min. Order, Oct. 27, 2026. Defendants themselves have thus acknowledged that the closure is the next step before the bulldozers.

## II. Plaintiffs Will Suffer Irreparable Injury Without a Temporary Restraining Order.

Plaintiffs have established that implementation of the Washington National Plan will cause them irreparable harm that is "certain and great," "actual and not theoretical," *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), and "beyond remediation," *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016). Defendants respond only with a "now-familiar shell game," ECF 103 at 63, characterizing their actions as mere "temporary closure" unrelated to the WNP, ECF 147. 10–14. Defendants' arguments about irreparable harm rely on the same mistaken premise that dooms their arguments regarding likelihood of success. And they do not contest that Plaintiffs also suffer irreparable harm from Defendants' violations of NEPA and NHPA have been established.

Although Defendants repeatedly describe the closure of East Potomac Park as "temporary," *see, e.g.*, ECF 147 10–14, it is not "temporary" in any meaningful sense of the word. Absent a temporary restraining order, the Golf Course as it currently exists will never reopen. Such "permanent loss" of historic courses to "public access and enjoyment" is irreparable harm. *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 324 (D.C. Cir. 1987). And the so-called "temporary"

closure will result in a single, professional course, not the three courses for players of different levels that Plaintiffs have explained are integral to their use and enjoyment of East Potomac Park. ECF 103 at 62.

Even if the current design did reopen after several years, despite Defendants' stated intentions, a closure of such "long duration" would still cause irreparable harm. *Cf. Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Defendants' citations are not to the contrary. In *Committee of 100 on Federal City*, agencies conducted a multiyear environmental review before temporarily closing parks to support construction on a nearby railway, but the plaintiffs in that case—unlike Plaintiffs here—appears not have pled any special interest in those particular parks or argued that alternative options were not readily available. 87 F. Supp. 3d 191, 199-200, 204-05 (D.D.C. 2015); *see also Alley Cat Allies, Inc. v. U.S. Nat'l Park Serv.*, No. 25-4269, 2026 WL 221343, at *13-16 (D.D.C. Jan. 28, 2026) (agency conducted environmental assessment, closed only part of a park, and identified alternative that protected plaintiff's interests); *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, No. 3:23-cv-00058, 2023 WL 8358239, at *6 n.54 (D. Alaska Dec. 1, 2023) (plaintiff had "not averred" she would have used the closed area, which was closed for only one season).

The closure of a park, and attendant loss of access to and enjoyment of treasured national parkland and recreation is irreparable and is not compensable by the mere payment of money. *See Ft. Funston Dog Walkers v. Babbitt*, 96 F. Supp. 2d 1021, 1039–40 (N.D. Cal. 2000) (holding that plaintiffs, dog-walkers who sought "continued access to recreation that improves the quality of their lives," faced harm that was "substantial and irreparable."); *Galusha v. N.Y. State Dep't of Env't Conservation*, 27 F. Supp. 2d 117, 122 (N.D.N.Y. 1998) (holding that that every day the plaintiffs missed in the park constituted irreparable harm because no amount of money could

compensate for the plaintiffs' loss); *Rivera v. United States*, 910 F. Supp. 239, 242–43 (D.V.I. 1996) (finding Plaintiff had sufficiently demonstrated irreparable harm where plaintiffs' loss of the use of Buck Island and "enjoyment of a treasured natural resource" was "not a loss for which money may compensate" or "a mere inconvenience that this Court should treat as de minimis."). No case holds that the mere possibility that a historic national park might someday reopen in its current form years later, despite the agency's contrary plans, remedies the irreparable harm that immediate closure (without any procedure) causes to a plaintiff who frequently enjoys that park in its current design. Defendants urge that "NPS temporarily closes facilities, trails, and other features of its 434 units frequently for all manner of reasons." ECF 147 at 12–13 & nn.6–11. But not one of the cited closures is for the stated purpose of destroying a historically significant park, without any required analyses, to rebuild something completely different in its stead.

Defendants do not dispute that Plaintiffs will also suffer irreparable harm based on Defendants' violation of NEPA and the NHPA. *See* ECF 139-1 at 31–33. "[A]n established NEPA violation might rise to the level of irreparable harm when coupled with sufficient evidence of environmental injury." *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013) (emphasis omitted). The plan Defendants have begun to implement requires both the tree-cutting that the Court previously found to constitute irreparable harm, ECF 103 at 63–64, as well as other environmental injuries such as large-scale earthmoving and creation of new water features, ECF 139-2 at 35–38. But Defendants have not completed any NEPA review or NCPC consultation, Third Decl. of Rebecca Miller ¶ 12, ECF 139-3, and the law is clear that they cannot act first and review later. *See Nat'l Tr. for Historic Pres. in the U.S. v. FDIC*, No. 93-0904, 1993 WL 328134, at *3 (D.D.C. May 7, 1993).

Finally, Plaintiffs rely on harms they will suffer personally, not those of others. *Contra* ECF 147 at 13–14. Plaintiffs use East Potomac Golf Course; they have done so in the past and, if closure is enjoined, intend to do so after November 15 and beyond. ECF 103 at 62. Following the closure, they will no longer be able to use it. *Id.* Plaintiffs' reference to the many other walkers, bikers, fishers, and picnickers whom the closure with also injure, ECF 139-1 at 29; Amicus Br., ECF 135; Mot. for Leave to File Suppl. Br., ECF 141, does not supplant Plaintiffs' own harms.

The closure of East Potomac Park is scheduled for November 15. Plaintiffs' harms are as imminent as imminent can be. Only a temporary restraining order can prevent those harms.

### III. Defendants Establish No Public Interest Supporting Closure of the Park, Tipping the Balance of the Equities in Plaintiffs' Favor.

Defendants allege that the Court need not balance harms and consider the public interest because Plaintiffs have not shown a likelihood of success or irreparable harm. ECF 147 at 27. Plaintiffs have shown above that this is incorrect. Yet Defendants say little else on the equities.

Indeed, what is most telling about Defendant's argument regarding the balance of the harms is what is noticeably absent. Despite their emphatic representations that East Potomac Park's deteriorating seawall threatens the safety of the visiting public, ECF 111 at 2, Defendants do not claim that closing the Park serves any safety-related public interest. ECF 147 at 29 ("Accordingly, the Court should stay any preliminary injunction order and permit East Potomac Park south of Buckey [*sic*] Drive SW to temporarily close during the pendency of this litigation."). Nor could they on this record. Defendants do not dispute that they can and have performed maintenance in East Potomac Park while keeping it open. Many a golfer over the last few months has teed off to the sounds off dump trucks, chain saws, and clanging metal as Defendants dumped construction debris, uprooted trees, and removed old fences. Likewise, Defendants do not dispute that they restored the seawall around the nearby Tidal Basin and West Potomac Park without months-long

closures of those areas. ECF 139-1 at 6, 9, 21, 34. Nor can Defendants explain why deterioration in areas of the seawall poses a danger requiring closure of the entire Park when, on October 25, NPS allowed more than 30,000 runners to pound the perimeter of the park in the Marine Corps Marathon. *Id.* at 10, 21, 22–23. One would have thought that if "significant safety hazards" actually required closure of the Park, ECF 111 at 2, Defendants would have mentioned this in addressing the public interest. That they did not speaks volumes.

Instead, Defendants resort to the claim that an injunction would improperly intrude on their authority. ECF 147 at 27. But as demonstrated, Defendants' closure of the Park as part of the implementation of the Washington National Plan violates federal law. The public generally has no interest in those legal violations. *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (citing *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action") (cleaned up). As this Court has observed, "'separation of powers' is not a talismanic incantation that permits the Executive to run amok, unchecked." ECF 103 at 66.

## IV. Defendants' Request for a Stay Pending Appeal Is Both Premature and Meritless.

The Court should deny Defendants' closing request (ECF 147 at 28–29) for a stay pending appeal for at least three reasons. First, Plaintiffs respectfully submit that the Court should resolve this motion as Plaintiffs have framed it: as a request for a temporary restraining order. As Plaintiffs have explained, the Court's resolution of the issues raised by Defendants' planned closure would be materially aided by additional fact development—in particular, about Defendants' termination of the NLT lease. *See supra* p. 2-3. Proceeding deliberately by first resolving this request for a TRO and then considering any subsequent motion for a preliminary injunction would allow the Court to consider that motion with the benefit of a fuller evidentiary record. If the Court proceeds

accordingly, there would be no need to even reach Defendants' request for a stay pending appeal. *See* ECF 147 at 29 (urging Court to stay "any *preliminary injunction* order" (emphasis added)).

Second, even if the Court were to convert this proceeding into one for a preliminary injunction, Defendants request to stay an order they have not even seen is premature and should be denied without prejudice to renew once the Court has issued a decision. *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 130 n.14 (D.D.C. 2025) (denying similar request as "premature" and stating that defendants may renew their request "after reviewing this opinion and its accompanying order"), *vacated as moot*, 188 F.4th 400 (D.C. Cir. 2026); *Elec. Frontier Found. v. Off. of Dir. of Nat'l Intel.*, No. 08-cv-01023, 2009 WL 10710750, at *1 (N.D. Cal. Oct. 7, 2009) (denying stay request as premature where government had not yet appealed).

Finally, Defendants' request for a stay pending appeal fails on the merits, for substantially the same reasons the Court set out in its recent opinion declining to stay the order barring Defendants from felling additional trees in East Potomac, ECF 144, including that Defendants continue to ignore the Court's central factual findings that the WNP exists and that Defendants are already taking steps to implement it. As the Court concluded, all of the relevant factors cut against Defendants' request for a stay. *See id.*

## CONCLUSION

The Court should grant a temporary restraining order enjoining the imminent closure of East Potomac Park, or, alternatively, a stay of the closure's effective date under 5 U.S.C. § 705.

Dated: November 10, 2026

RESPECTFULLY SUBMITTED,

<u>/s/Will Bardwell</u>

Will Bardwell (Bar No. 90006120)
Mark B. Samburg (Bar No. 1018533)

Abbe David Lowell (Bar No. 358651)
Caleb Hayes-Deats (Bar No. 1653213)

Jack Bolen (Bar No. 90031046)
Angela Reilly (*pro hac vice*)
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowelland associates.com
Chayes-Deats@lowellandassociates.com
JBolen@lowellandassociates.com
AReilly@lowellandassociates.com

Norman L. Eisen (Bar No. 435051)
Lindsay Zimliki (Bar No. 475890)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
T: (202) 601-8678
Norman@democracydefenders.org
Lindsay@democracydefenders.org

Kevin E. Friedl (Bar No. 90033814)
Anna L. Deffebach (Bar No. 241346)
Catherine M.A. Carroll (Bar No. 497890)
Robin F. Thurston (Bar No. 7268942)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
T: (202) 448-9090
wbardwell@democracyforward.org
msamburg@democracyforward.org
kfriedl@democracyforward.org
adeffebach@democracyforward.org
ccarroll@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*