**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DC PRESERVATION LEAGUE, et al.,<br>*Plaintiffs*,<br>v.<br>DEPARTMENT OF INTERIOR, et al.,<br>*Defendants*. | Case No. 1:26-cv-477-ACR |

## TEMPORARY RESTRAINING ORDER

The Department of the Interior has progressed from removing the trees to removing the people from East Potomac Park. On October 18 and October 26, 2026, President Trump directed the Government to close East Potomac as of November 15.[1] Two days later, DOI announced it would follow that "directive."[2] This means closing miles of paved roadway; trails and multi-use paths; fishing areas along the Potomac River and Washington Channel; the Hains Point picnic areas, playgrounds, and associated open spaces; a miniature golf course and three other golf courses; the seawall promenade; and the East Potomac Dock and Wharf Jitney.[3]

President Trump directed this closure for one reason: so that work could begin on a new Fazio Design to replace the current East Potomac Golf Course.[4] This placed DOI in a legal bind.

[1] *See* Dkt. 91-1 at 3; Dkt. 114-2 at 2.

[2] Dkt. 111 at 2.

[3] NPS, *Record of Determination for the Temporary Closure of East Potomac Park South of Buckeye Drive*, https://perma.cc/DH99-SUH3 (last visited Nov. 13, 2026) (Record of Determination).

[4] *See* Dkt. 91-1 at 3; Dkt. 114-2 at 2.

It has maintained for months, and—all record evidence to the contrary—continues to maintain, that no final plan to redesign the Course exists.[5] It cannot well admit that it proposes to close the Park solely to begin work on a redesign for which, it insists, no final plan exists. And so in its Record of Determination announcing the need for the closure, the National Park Service does not mention the President's directive.[6] Instead, it claims closure is necessary on November 15 because as of that date no operator will be on site to manage the Course and escalating safety issues require cordoning off the entire Park.[7]

Plaintiffs have moved for a temporary restraining order, claiming these reasons are pretext and that the closure violates a spate of federal laws.[8] As to the former, NPS *sua sponte* terminated National Links Trust's continued operation of the Course as of November 15.[9] It now cites the lack of an operator as of that date to claim closure is necessary. But that reverses cause and effect—by design. And the Government concedes this is not the full story. It has acknowledged that DOI terminated NLT's work, in part, to follow the President's directive to close the Park.[10]

As to safety, NPS has determined that the seawall on the Park's perimeter presents such a hazard that it must close the Park on, again, November 15.[11] But NPS has identified the entire

---

[5] *See* November 13, 2026, Rough Tr. I at 6 ("There's no final agency action to redesign the course, as we've made clear, that would require completion of NEPA and NHPA processes." (cleaned up)).

[6] *See generally* Record of Determination.

[7] *Id.*

[8] *See* Dkt. 139.

[9] *See* Dkt. 111 at 2.

[10] *See* Nov. 13 Rough Tr. I at 37–38; Nov. 13 Rough Tr. II at 34.

[11] *See* Record of Determination.

seawall perimeter as a safety hazard since 2019.[12] Instead of closing the Park, NPS previously has addressed that concern by fencing off the zone around the seawall's unsafe portions.[13] It has not adequately explained why that tried-and-true method will not work now. More telling, just three days before making the closure decision, NPS permitted over thirty thousand people to run a marathon around that same perimeter.[14]

A disconnect to which Government counsel responded:

> [A] well-organized a race with thousands of people in broad daylight does not pose the kind of hazard that is posed by children walking in the dark on the deteriorating seawall, or lovebirds strolling in the evening, or anything of the other things that could happen there are fewer crowds, where there's less supervision, where there's less organization.[15]

Maybe. But, even so, this does not explain why NPS now chooses to close almost the entire Park, at all hours, for an indefinite period. And chooses to do so as of November 15, the same date President Trump directed closure.

The Court, based on the current record, readily finds that these explanations are pretextual. But that alone does not require granting Plaintiffs' motion. What does is that in its haste to meet an arbitrary deadline, the Government has likely violated at least the National Environmental Policy Act and the Administrative Procedure Act. The Court analyzed the former at length in its Preliminary Injunction Opinion.[16] As to the APA, NPS's regulations require, absent exceptions not present here, notice-and-comment rulemaking prior to the closure of a

---

[12] *See id.*

[13] *See* Dkt. 111-2 at 4, 7, 8.

[14] *See* Dkt. 139-1 at 17.

[15] Nov. 13 Rough Tr. I at 31.

[16] *See* Dkt. 103 at 53–62.

national park. No such notice and comment has occurred. Moreover, the pretextual nature of the Government's reasoning also likely renders the closure arbitrary and capricious under the APA.

The Government proposes to close a historic park, daily enjoyed by Washingtonians of all stripes, indefinitely. This closure would irreparably harm Plaintiffs, who use the Park regularly for recreational activities. It runs counter to the public interest in utilizing national parkland. And the Government has not plausibly identified any harm it would suffer from a temporary restraining order that preserves the status quo pending further proceedings.

For the reasons stated in its October 26, 2026, Preliminary Injunction Opinion, Dkt. 103, and those below, the Court **GRANTS** Plaintiffs' Motion for Temporary Restraining Order, Dkt. 139. It **ENJOINS** the Government from closing East Potomac Park and the East Potomac Golf Course during the daily hours in which they were open as of November 14, 2026. It does not order the Government to undertake any active management of either. Further, for the avoidance of any doubt, the Government remains free, as it has since the onset of this litigation, to conduct repairs on any part of the Park and Course with any notice required by the existing Preliminary Injunction.

## BACKGROUND

The Court assumes the reader's familiarity with the Background set out in its previous Preliminary Injunction Opinion, *see* Dkt. 103 at 7–23. It runs through only the factual developments that have occurred since it issued that opinion.

**October 26.** At 8:28 p.m., the Court issued its Preliminary Injunction, enjoining tree removal on the Course and requiring notification before DOI or NPS took certain other actions there. *See* Dkt. 103. About three hours later, President Trump posted to Truth Social: "We are closing the East Potomac Golf Course Site as scheduled on November 15th," and, "[t]he

Development of this World Championship Public Facility must begin, immediately, if it is to be completed in a timely and seasonal manner." Dkt. 114-2 at 2.

**October 28.** The Government informed the Court that it planned to shut down East Potomac Park, including East Potomac Golf Course, south of Buckeye Drive on November 15, "consistent with the President's directive." Dkt. 111 at 2. On October 18, the President directed DOI and NPS to close the Course on November 15. *See* Dkt. 91-1 at 3. He reiterated that directive on October 26, as stated above. Despite the Government's notification that it would close the Course to comply with the President's directive, it submitted a declaration by Jessica Bowron, Acting Director of NPS, that she planned to close the Park, in part, to repair the seawall. *See* Dkt. 111-2 at 3–9.

On the same day, NPS entered into a new lease agreement with National Links Trust, the Course's current operator. *See* Dkt. 111 at 2. Under it, NLT will cease operating the Course as of close of business on November 15, 2026, but will continue to operate two other municipal courses in Washington, D.C. *See id.* In her declaration, Bowron stated that she also decided to close the Park because of NLT's termination. *See* Dkt. 111-2 at 2–3. She did not explain, however, why NPS decided to terminate NLT's holdover lease, why NPS does not have or cannot obtain a replacement operator, or why NPS cannot operate the Course itself. *See id.*

**October 30 and November 3.** NPS submitted similar Concept Proposals for a redesigned East Potomac Golf Links to the National Capital Planning Commission (on October 30) and to the U.S. Commission of Fine Arts (on November 3). *See* Dkt. 128-1 (NCPC Proposal); Dkt. 147-1 (CFA Proposal). Those Proposals feature renderings of a redesigned East Potomac Golf Course identical to the "Fazio Design" shared by President Trump on Truth Social on October 18. *Compare* Dkt. 91-1 at 4, *with* Dkt. 128-1 at 1 *and* Dkt. 147-1 at 1. The Concept

Proposals confirm that implementing the Fazio Design requires "[t]hin[ning] interior trees to reopen monument views" and "thin[ning] vegetation" pursuant to the 2019 Cultural Landscape Report. Dkt. 147-1 at 47; Dkt. 128-1 at 32. That is the same type of thinning that NPS carried out on October 10, and which led to the Court's first entry of a temporary restraining order. *See* Dkt. 79.

**November 12 and 13.** On the evening of November 12, NPS informed the Court that it published on its website a Record of Determination for the Temporary Closure of East Potomac Park South of Buckeye Drive. *See* Dkt. 155 at 1. It submitted the Record of Determination to the Federal Register on November 13, and the Notice will be published on Monday, November 16.[17] The Record of Determination stated that NPS will close the Park "temporarily," but did not provide any timeline. It stated only that the closure will "remain in effect until modified or rescinded by the Superintendent." *Id.* The closure would include "all parkland and public-use facilities south of Buckeye Drive, SW." *Id.*

As justification for the closure, the Record of Determination listed (1) the unsafe conditions of access to the Course after the cessation of golf operations by National Links Trust; (2) an "escalating trend" of unsafe conditions on the Course's buildings and grounds; and (3) the deteriorated seawall and adjacent walkways at the Park. It did not state, as the Government had announced on October 28, *see* Dkt. 111 at 2, that it planned to close the Park to follow the President's directive, *see generally* Record of Determination.

It considered, but dismissed, four less-restrictive alternatives: "[n]o action"; "[c]losure of buildings and recreational facilities only"; "[c]losure of the golf course while retaining roadway,

[17] NPS, *Temporary Closure: East Potomac Park South of Buckeye Drive; Record of Decision*, Federal Register: Public Inspection, https://perma.cc/A2UK-883X (scheduled for publication Nov. 16, 2026) (last visited Nov. 13, 2026).

picnic, playground, or shoreline access"; and "[s]igns, warnings, and periodic patrols without broader closure." *Id.* It did not consider extending NLT's management of the Course, finding a new operator, or operating the Course itself. *See id.*

**November 14.** The Government notified the Court that it published a Categorical Exclusion Documentation Form, for purposes of NEPA compliance, and an Assessment of Actions Having an Effect on Historic Properties, for purposes of NHPA compliance. *See* Dkt. 158. Each document quotes the reasons for closure as stated in the Record of Determination. *See id.*

## PRELIMINARY FINDINGS OF FACT

The Court, on this preliminary posture, concludes that the justifications presented by NPS for the closure of East Potomac Park are pretextual. Acting Director of the National Park Service Jessica Bowron, in her fourth sworn declaration, informed the Court that she plans to "close East Potomac Park south of Buckeye Drive, including East Potomac Golf Course, effective November 15, 2026." Dkt. 111-2 at 9. She did so, she stated, because the Course lacks an operator and the seawall surrounding the Park needs repair. *See id.* at 2–9. Later, the agency published a Record of Determination reiterating that closure is necessary for those same reasons.

### 1. DOI and NPS Plan to Close the Park to Further the Washington National Plan

The Court concludes that DOI and NPS plan to close the Park to further the Washington National Plan. And it need not dig deep to do so. The Government concedes that the closure is "consistent with the President's directive." Dkt. 111 at 2. That directive came in the President's Truth Social posts of October 18 and October 26. *See* Dkt. 91-1 at 3; Dkt. 114-2 at 2. As Government counsel explained, "when the President issued his Truth Social post[s] . . . Interior

saw that as a directive to close the Course, and they have taken steps to do so." October 30, 2026, Tr. 28 (cleaned up).

So the Court looks to those directives. On October 18, the President wrote, "Restoration work will begin on the Fazio Design on November 15th, when the old Course will be closed to play. The new Course will be opened in approximately 15 months." Dkt. 91-1 at 3. On October 26, he wrote, "We are closing the East Potomac Golf Course Site as scheduled on November 15th in order to renovate and rebuild for Competitive (with other such projects!), Safety, Modernization, and Aesthetic reasons." Dkt. 114-2 at 2. He clarified that DOI will "renovate and rebuild" in furtherance of "[t]he Development of [a] World Championship Public Facility" that will be "fully capable of holding Major Events such as The U.S. Open, The PGA Championship, The Ryder Cup, and The Presidents Cup." *Id.*

These posts present a problem for the Government. They indicate that the Washington National Plan is final and that NPS will close the Park to implement it. Both points favor granting Plaintiffs' motion for another temporary restraining order. And so the Government reverse-engineers additional justifications for the Park's closure: "because of safety concerns and because the course will lack a continuing operator." Dkt. 147 at 14. All while it continues to assert that it will close the Park to follow the President's directive:

> **THE COURT:** You're carrying out the President's directive; right?
> **GOV'T COUNSEL:** Uh-huh, and that's the way the government works.

Nov. 13 Rough Tr. I at 38 (cleaned up).

### 2. The Justifications for Closure Stated in the Record of Determination Are Pretextual

At the November 13 hearing, the Government represented that NPS plans to close the Park for three reasons: the President's directives, the lack of an operator, and safety concerns on

the Course and along the seawall. *See id.* at 37–38. To start, the agency's Record of Determination—which must state the bases for the agency's closure decision, *see* 36 C.F.R. § 1.5(c)—says nothing about the President's directive to close the Park to effectuate the Fazio Design. At a minimum, then, the Record of Determination is incomplete, if not misleading by omission.

It is also transparently pretextual.

**The Lack of a Golf Course Operator.** Recall that, without any explanation for doing so, NPS terminated NLT's role as the Course operator as of November 15. *See* Dkt. 111 at 2. In the Record of Determination then relied on the safety consequences of this termination to justify closing the Course. But why did NPS terminate NLT's holdover lease in the first place? And why as of November 15? The answers:

> **THE COURT:** In stopping and ending the NLT work on the Course as of November 15th, [did] they do that as part of implementing the President's desire to have the Course close on November 15th?
>
> **GOV'T COUNSEL:** They did it consistent with the President's direction that the Park close on November 15, but they did it for the purposes outlined in the closure order itself.

Nov. 13 Rough Tr. II at 34 (cleaned up).

And so the Court finds, as a matter of fact, that NPS terminated NLT's lease as of November 15 so that it could close the Park to effectuate President Trump's directive to begin work on the Fazio Design immediately. And this explains why the Record of Determination did not consider, as a less-restrictive alternative, either extending NLT's holdover lease or finding a new operator to alleviate the safety concerns it identifies.

**Escalating Safety Concerns on the Golf Course.** The Record of Determination stated that NPS must close the Course because "[r]ecent NPS inspections document that the golf course's buildings and grounds present numerous safety concerns due to their poor condition."

In support, it cited a May 2026 East Potomac Park Condition Assessment that recorded 110 deficiencies at East Potomac Golf Course, including 69 rated Critical or Urgent. *See* Record of Determination. Sounds unsafe. Except Dr. Kevin Griess, Superintendent of the National Mall and Memorial Parks—who attested in May that he "plan[ned] to prioritize maintenance by critical needs," Dkt. 48-1 at 9—testified in October that NPS had not addressed any of them, *see* October 19, 2026, Tr. 165. Indeed, since May, NPS has only removed trees and vegetation, fixed a fence, and discarded some trash. *See* Oct. 30 Tr. at 61–62.

If safety issues in fact required closure, NPS would have closed the Course months ago. Yet NPS has kept the Course open unabated as usual since May, with conservatively over thirty thousand rounds of golf played. *See* Nov. 13 Rough Tr. II at 43. At a minimum, if public safety were at risk, NPS would have taken a step—any step—to address the safety issues it knew about. Recall that within just ten days, NPS was able to plan, muster the resources and staff, and execute felling over 400 healthy trees. *See* Dkt. 103 at 20–22. So NPS was not without ability or resources. And presumably would not prioritize removing healthy trees over the public's safety.

The Government's response is that the "escalating trend" of critical safety concerns on the Course now demands its closure. Record of Determination; *see also* Nov. 13 Rough Tr. II at 38–40. But it cannot identify a single safety issue that has emerged since May that moved NPS to conclude that closure is required on November 15. *See generally* Record of Determination. And, again, had any truly threatening safety issue arisen, NPS would not have announced on October 28 a closure on November 15, the same date President Trump directed for the closure. It would have closed the Course immediately.

***The Seawall.*** Move next to the seawall. The Record of Determination stated that "[t]he East Potomac Park seawall and adjacent walkways are also in deteriorated and hazardous condition." True. But the seawall's condition did not materialize overnight. NPS noted the need for repairs as far back as 2011. *See* Dkt. 111-4 (2011 Report) at 15–21. And yet from 2011 until October 28, NPS never suggested that repairs to the seawall would require the closure of East Potomac Park south of Buckeye Drive. *See generally id.*[18] It did not close the Park even though a 2019 report found that "[t]he entirety of the perimeter walkway at East Potomac Park is a safety hazard for visitors and staff." Dkt. 111-5 at 9. And even though a 2023 report recorded repeated flooding. *See* Dkt. 111-3 at 134. Indeed, even Acting Director Bowron's October 28 declaration, discussed further below, does not state that such a widespread closure is necessary for repairs. *See* Dkt. 111-2 at 9.

The Government can limit closures to the immediate area surrounding repair work. NPS has repaired seawalls at the Tidal Basin and West Potomac Park without indefinitely closing those parks to all public use. *See* Dkt. 139-1 at 16 n.7.[19] And consider the tree cutting. Dr. Griess told the Court that NPS would limit "any temporary closures of portions of the Golf Course . . . to that which is necessary to ensure public safety in the immediate area of work being performed." Dkt. 84-1 at 14.

The Government's conduct and prior representations undermine its claim that repairing the seawall requires the immediate closure of East Potomac Park. Acting Director Bowron has submitted four declarations in this case. She makes no mention of the seawall in the first three.

---

[18] *See also* Dkt. 111-5 (2019 Project Scoping Assessment Report); Dkt. 111-3 (2023 Cultural Landscapes Inventory); Dkt. 111-6 (July 29, 2026, Seawall Promenade Condition Survey).

[19] Dkt. 139-1 at 16 n.7 (citing NPS, *Rehabilitate Tidal Basin and West Potomac Park Seawalls: Environmental Assessment* (Feb. 2023), https://perma.cc/LQ96-AH2U).

*See* Dkt. 26-4; Dkt. 38-2; Dkt. 75-3. None. She does so only in her fourth declaration, filed on October 28. *See* Dkt. 111-2 at 3–9. That timing is important. It comes only three days after the running of the Marine Corps Marathon, a marathon in which, with NPS's authorization, over thirty thousand runners circumnavigated the Park. *See* Dkt. 139-1 at 17. It comes only two days after President Trump's second directive to close the Park. *See* Dkt. 114-2 at 2. And it comes on the same day that the Government gave notice that it plans to close the Park, consistent with President Trump's directive to do so. *See* Dkt. 111 at 2.

It cannot be that NPS permitted thirty thousand runners to risk—as Government counsel described it—"life and limb" by running on a road near the seawall. Nov. 13 Rough Tr. I at 43. To be sure, all agree that the seawall is deteriorating and needs repair. But the Government does not explain how the seawall's condition affects Ohio Drive SW, much less the Course. Nor does it explain why it requires closing the entire Park—for potentially as long as three and a half years—instead of cordoning off areas that create safety concerns, as the agency's photos demonstrate NPS has routinely done before November 15. *See* Dkt. 147-1 at 54; Dkt. 111-2 at 4, 7, 8.

* * *

At argument, Government counsel resisted the observation that federal agencies would not knowingly put American lives at risk for no good reason.

> **THE COURT:** If there was an issue that the Government could fix, that would alleviate safety risk for individuals going about their daily lives, and they had the funds [to] do so and the ability do so, they wouldn't let those safety issues [linger], they would fix the safety issues.
>
> **GOV'T COUNSEL:** It would depend on the nature of the safety issue, the cost of fixing it, [and] the number of people affected.

Nov. 13 Rough Tr. II at 37 (cleaned up). The Court, hopefully not naively, has more faith in the federal government than that. If the safety issues NPS identified in the Record of Determination

in fact required the Park's closure, NPS would have closed the Park or addressed the issues months ago.

What explains the need to close the entire Park? President Trump has told the public: "Restoration work will begin on the Fazio Design on November 15th, when the old Course will be closed to play." Dkt. 91-1 at 3. And, "[t]he Development of this World Championship Public Facility must begin, immediately, if it is to be completed in a timely and seasonal manner." Dkt. 114-2 at 2. This work requires NPS to raze a substantial public roadway (Ohio Drive SW), reconfigure the Park's picnic and recreation areas, and redo the entire Course. *See* Dkt. 147-1 at 1, 53, 55. All this, of course, requires closing the entire Park.

## LEGAL STANDARD

To obtain a temporary restraining order, a plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Where, as here, a movant seeks to enjoin the government, the final two factors merge "because the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## DISCUSSION

The Court incorporates by reference its prior reasoning in its Preliminary Injunction Memorandum Opinion in its discussion of the identical temporary restraining order factors below. *See* Dkt. 103 at 31–70. The Court summarizes its prior holdings under each prong. Where additional analysis is warranted, the Court supplements its prior analysis.

## I. Likelihood of Success on the Merits

### A. Standing

For standing, plaintiffs must show (1) a concrete, particularized, and imminent injury; (2) caused by the challenged conduct; (3) that is likely to be redressed by a favorable decision. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025). At the temporary restraining order stage, plaintiffs must establish "a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (cleaned up). "If at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023).

Plaintiffs must also "demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). The relief Plaintiffs seek in this case—an order prohibiting the closure of East Potomac Park—is different from the relief they sought in their prior motions. *See* Dkt. 139-1 at 41. And Plaintiffs raise new claims supporting their motion. *See generally* Dkt. 139. So the Court supplements its prior standing analysis as follows.

#### 1. NEPA Claim

**Injury-in-Fact.** In claiming that the Government failed to follow a statutorily required procedure (adequate NEPA review), Plaintiffs allege an "archetypal procedural injury." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013). But Plaintiffs must also show that their procedural injury is "tethered to some concrete interest adversely affected by the procedural deprivation." *Id.*

Plaintiffs, the Court has already preliminarily found, have concrete recreational, aesthetic, and historic interests in East Potomac Golf Course. *See* Dkt. 103 at 42–47, 52–53. The Government's plan to close the Course harms these interests. It prevents the individual plaintiffs, Dave Roberts and Alex Dickson, from playing golf. *See* Dkt. 8-4 ¶ 19; Dkt. 8-6 ¶ 26. And it would deprive them of their aesthetic and historic enjoyment of the Course. *See* Dkt. 8-4 ¶ 19; Dkt. 8-6 ¶ 26.

Plaintiffs' recreational, aesthetic, and historic interests also extend to East Potomac Park. For example, Dickson "often" visits to "drive around Hains Point to take photographs." Dkt. 8-4 ¶ 6. He appreciates the "beauty" and "inherent appearance of the park," including its "sight lines" and "360-degree view" of D.C. landmarks. *Id.* ¶¶ 17–18. And DCPL's member Rebecca Miller "enjoy[s] going to East Potomac Park with [her] son." Dkt. 8-5 ¶ 22. She "plan[s] to continue visiting East Potomac Park," including to take her son bicycling, admire the cherry trees, and view the Park's sightlines of historic landmarks. *Id.* Closing the Park in furtherance of the Washington National Plan would harm these interests as well. *See id.*

**Causation.** Plaintiffs readily establish causation. The Government's "failure to comply with its [NEPA] obligations is plainly connected" to its fast-tracked implementation of the Washington National Plan, including the Park's closure, and the Government "might have [reconsidered the closure] if [it] had complied" with those obligations. *Growth Energy v. EPA*, 5 F.4th 1, 29 (D.C. Cir. 2021) (per curiam). And, as just discussed, the closure will harm Plaintiffs' recreational, aesthetic, and historic interests. *See id.*

**Redressability.** Plaintiffs also meet the relaxed redressability requirement for procedural injuries. *See Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 595 (D.C. Cir. 2019) (per curiam). There is "at least the possibility" that the Government could change its decision to

implement the Washington National Plan, including by closing the Park, after conducting proper NEPA review. *Id.* (cleaned up).

**2. APA Claims**

Plaintiffs also have standing as to their APA claims. Plaintiffs establish injury-in-fact based on the harm to their concrete recreational, aesthetic, and historic interests in East Potomac Park. The Government's decision to implement the Washington National Plan by closing the Park caused these injuries, and an injunction prohibiting the closure would redress them.

**B. Final Agency Action**

Plaintiffs may sue under the Administrative Procedure Act for failure to comply with statutory requirements so long as the agency has undertaken a final agency action. *See* 5 U.S.C. §§ 704, 706(2)(C)–(D). A final action "mark[s] the consummation of the agency's decisionmaking process" and is the mechanism "by which rights or obligations have been determined" or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

The Court has already concluded "without hesitation"—and reiterates here—that final agency action "occurred at some point well before October 15, 2026." Dkt. 103 at 35. It found that the "discernible course of agency conduct . . . reflects a discrete decision" by the agency that is subject to APA review. *Hennepin Cnty. v. HHS*, No. 26-cv-2460, 2026 WL 2426300, at *7 (D.D.C. Aug. 19, 2026); *see also R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 174–76 (D.D.C. 2015); Dkt. 103 at 32–35.

The Washington National Plan—although the National Capital Planning Commission and the Commission of Fine Arts have not yet approved it—has been proceeding apace. In October 2025, the agency dumped over 30,000 cubic yards of fill onto the Course, in preparation for its

future renovation. *See* Dkt. 103 at 28, 34. In December 2025, the Government terminated NLT's lease, which allowed NPS to directly oversee Course design and maintenance. *See id.* at 28. In October 2026, NPS cut down hundreds of healthy, mature trees pursuant to the Tree Management Plan. *See id.* at 28–31, 34. And NPS has now canceled NLT's holdover lease and will close the Park to the public—even Ohio Drive SW, a public road far from the damaged seawall and not on East Potomac Golf Course—pursuant to the President's directive to renovate the Course. *See* Dkt. 111 at 1–2.

Each of those actions determines rights or obligations, or has legal consequences, and each action is an "irreversible and irretrievable commitment of resources." *Wyo. Outdoor Council v. USFS*, 165 F.3d 43, 50 (D.C. Cir. 1999). The Court reaffirms its finding that the Washington National Plan is final agency action. *See* Dkt. 103 at 32–35.

**C. NEPA Claim**

Plaintiffs are likely to succeed on the merits of their NEPA claim as to the closure of the Park. As discussed in the Court's prior opinion, *see* Dkt. 103 at 53–62, NEPA "imposes upon federal agencies a statutory duty to include in all proposals for major Federal actions significantly affecting the quality of the human environment, a detailed environmental impact statement by the responsible official." *Earthworks v. DOI*, 105 F.4th 449, 458 (D.C. Cir. 2024) (cleaned up). Alternatively, the agency must prepare an "environmental assessment" if it concludes that the action will not have a reasonably foreseeable significant environmental impact. 42 U.S.C. § 4336(b)(2).

NPS has not prepared an environmental assessment or an environmental impact statement for the Washington National Plan. Unless and until such NEPA compliance is complete, the agency violates NEPA when it implements piecemeal parts of the Plan. This is so even when

those parts have their own NEPA compliance documentation, so long as those sub-parts of the plan (1) lack logical termini, (2) lack substantial independent utility, (3) foreclose the opportunity to consider alternatives, or (4) irretrievably commit federal funds for closely related projects. *See Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1314–15 (D.C. Cir. 2014); *see also* Dkt. 103 at 59–62.

For the reasons already stated in the Preliminary Injunction Memorandum Opinion, the Court need not defer to an agency's definition of the "project at hand" where the agency has not drawn a "reasonable and manageable line." *See* Dkt. 103 at 55–59 (discussing *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 190 (2025)). The agency has not done so here: the various components of the Washington National Plan that the agency seeks to carry out have occurred or will occur at around the same time, in the same place, and under the aegis of the same agency. *See id.*

As discussed above, the imminent closure of the Park is one further step in the implementation of the Washington National Plan. So the Court turns to evaluation of the segmentation factors. The Government has offered two reasons for the closure purportedly unrelated to the Washington National Plan: the lack of an operator for the Course and repair of the seawall. Dkt. 111-2 at 2–9. There is no logical terminus to the plan to close the Park, because it does not logically follow that construction on the seawall, or closure of the whole Course, requires the closure of most of East Potomac Park. The Court has already determined that the Government's explanation for the closure's independent utility, increased safety, is pretextual—at least as an explanation for closing the Park, rather than the areas surrounding immediate safety concerns. Closing the Park also forecloses the no-action alternative, in which the Park and Course remain open to the public while seawall construction occurs. And finally,

NPS will lose revenue while the Park is closed. *See* Dkt. 139-1 at 22. Closure of the entire Park—which is in furtherance of the Washington National Plan—likely does not survive NEPA segmentation scrutiny.

**D. APA Claims**

Plaintiffs argue that the closure of East Potomac Park is arbitrary and capricious because (1) it violates certain NPS regulations, and (2) the Government's reasons for doing so are irrational. *See* Dkt. 139-1 at 25–30. Plaintiffs are likely to succeed on both claims.

**1. Violation of NPS Regulations**

"[I]t is axiomatic that an agency is bound by its own regulations." *Alon Refin. Krotz Springs, Inc. v. EPA*, 172 F.4th 12, 17 (D.C. Cir. 2026) (cleaned up). And so an agency acts arbitrarily and capriciously if it "fails to comply with its own regulations." *Id.* (cleaned up).

NPS's regulations permit it to close a park to public use "based upon a determination that such action is necessary" for one of several purposes. 36 C.F.R. § 1.5(a). But NPS must follow certain procedures in exercising this authority. First, "prior to implementing . . . [a] closure," NPS must "prepare a written determination justifying the action." *Id.* § 1.5(c). Second, "except in emergency situations," it must inform the public of the closure. *Id.* §§ 1.5(c), 1.7. And third, NPS "shall . . . publish[] as rulemaking in the Federal Register" certain closures, including those "of a nature, magnitude and duration that will result in a significant alteration in the public use pattern of the park area, adversely affect the park's natural, aesthetic, scenic or cultural values, . . . or [are] of a highly controversial nature." *Id.* § 1.5(b).

About twelve hours before the Court held a hearing on Plaintiffs' newest motion, NPS published a late-breaking "Record of Determination for the Temporary Closure of East Potomac

Park South of Buckeye Drive." *See* Dkt. 155.[20] That Record did not explain why the closure of East Potomac Park did not require rulemaking. Nor did it explain how the closure would not "result in a significant alteration in the public use pattern of the park area." 36 C.F.R. § 1.5(b). Or how it would not "adversely affect the park's natural, aesthetic, scenic or cultural values." *Id.* Or even how the closure was not "of a highly controversial nature." *Id.*

Nor could it. NPS intends to close indefinitely almost the entire Park to all public use, including golfing, walking, picnicking, fishing, and biking. *See* Record of Determination. And by NPS's own estimate, repairing the seawall—one of many purported safety hazards at East Potomac necessitating the closure—would take 2.5 to 3.5 years. *See* Dkt. 147-1 at 54. Government counsel could provide no potential date for the Park's reopening. Nov. 13 Rough Tr. III at 30–31. Inescapably then, the "nature, magnitude and duration" of the closure would "result in a significant alteration in the public use" of the Park. 36 C.F.R. § 1.5(b). And because NPS is closing the Park to further the Washington National Plan, a plan to destroy the current historical course and replace it with a championship-style course, it will harm the Park's "natural, aesthetic, scenic or cultural values." *See id.* Last but not least, the closure "is of a highly controversial nature." *See id.* As the Government has put it, "[t]he case at hand is a highly publicized matter which has drawn national attention" and "outrage." Dkt. 151 at 5.

NPS does not argue that an "emergency situation[]" justifies the closure. Dkt. 147 at 24; *see also* Dkt. 151 at 5. For good reason. Its conduct leading up to the closure announcement belies any such claim. For the same reasons the Court concludes that NPS's stated reasons for

---

[20] *See also* Dkt. 155 (citing Kevin Griess, *Record of Determination for the Temporary Closure of East Potomac Park South of Buckeye Drive*, NPS (Nov. 12, 2026), https://perma.cc/73XJ-MSBK).

closing the Park are pretextual, the Court concludes that there is no emergency excusing NPS's failure to engage in rulemaking.

NPS offers a single case supporting its claim that the Park's closure would not trigger § 1.5(b)'s rulemaking requirement.[21] *See* Dkt. 147 at 26–27. In *Mashack v. Jewell*, 149 F. Supp. 3d 11, 15–17, 20 (D.D.C. 2016), NPS temporarily closed a marina to public use after its concessioner contract expired on its own terms and it decided not to solicit a new contract. NPS also planned to close the marina permanently and remove marina infrastructure. Before the temporary closure, NPS issued a record of determination explaining that the temporary closure did not require rulemaking under § 1.5(b). *See id.* at 17. The court agreed because it found that the closure was temporary, affected only a small number of boat owners who could move their boats to other nearby marinas (including one 5 miles downriver), and was independent of any decision to close the marina permanently or remove marina infrastructure. *See id.* at 36–38.

*Mashack* is inapposite. At the outset, unlike NPS's record of determination in *Mashack*, NPS's Record of Determination for the Park's closure here nowhere explains why § 1.5(b)'s rulemaking requirement is inapplicable. Further, *Mashack* stressed the temporary nature of the marina's closure, whereas here NPS intends to close the Park for an indefinite period. *See* Dkt. 155. At argument, NPS could not provide a date for the Park's reopening. Nov. 13 Rough Tr.

[21] The Government cited two additional cases in the Record of Determination. *See* Dkt. 155. They are even further afield than *Mashack*. *Spiegel v. Babbit*, 855 F. Supp. 402, 403–04 (D.D.C. 1994) (subsequent history omitted), involved a docking restriction that affected "a small number of boat owners . . . during a few summer months." And *Voyageurs National Park Association v. Norton*, 381 F.3d 759, 764 (8th Cir. 2004), involved a decision affecting only eleven snowmobile bays in a "vast" snowmobile system. Neither was a "significant alteration" requiring notice and comment under § 1.5(b). The indefinite closure of the entire area south of Buckeye Drive bears little resemblance to the modest restrictions in those cases. Of note, Government counsel conceded at argument that it did not have an on-point D.C. Circuit case. *See* Nov. 13 Rough Tr. III at 70.

III at 30–31. By NPS's own estimates, repairing the seawall alone could take up to 3.5 years. *See* Dkt. 147-1 at 54. And the closure of a national park to thousands of visitors is markedly different than the closure of a marina to a few boat owners. Crucially, unlike in *Mashack*, there is ample evidence that the agency's stated reasons for acting are pretextual—meaning the Court cannot separate the closure of the Park from the Washington National Plan.

When pressed at argument about the lack of rulemaking, NPS lobbed a new argument: it would engage in "direct rulemaking" before November 15. Nov. 13 Rough Tr. III at 1–2. In general, agencies must follow the APA's familiar notice-and-comment procedures to promulgate a final rule. *See* 5 U.S.C. § 553(b)–(c). But under the APA's good-cause exception, agencies need not engage in notice-and-comment rulemaking where it would be "impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b)(B).

The D.C. Circuit has "repeatedly made clear that the good cause exception is to be narrowly construed and only reluctantly countenanced." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (cleaned up) (collecting cases). In general, "[t]he exception excuses notice and comment in emergency situations, or where delay could result in serious harm." *Id.* (cleaned up).

NPS cannot invoke that exception here. Notice-and-comment rulemaking is not impracticable merely because NPS wishes to accommodate President Trump and close the Park by November 15. As the D.C. Circuit recently reiterated, "[a] tight statutory, judicial, or administrative deadline alone by no means warrants invocation of the good cause exception." *Am. Pub. Gas Ass'n v. DOE*, 72 F.4th 1324, 1339 (D.C. Cir. 2023) (cleaned up). This case shows why. No one has explained why NPS cannot move the November 15 closure date to follow rulemaking.

Further, notice-and-comment rulemaking is necessary here. The unnecessary prong of the good cause exception applies only to "those situations in which the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public." *Mack Trucks*, 682 F.3d at 94. The indefinite closure of East Potomac Park south of Buckeye Drive is neither routine nor insignificant. And because members of the public, including Plaintiffs, are "greatly interested" in the Park's closure, that act is not inconsequential. *Id.* (cleaned up); *see also* Dkt. 151 at 5.

Nor does the public interest prong of the exception apply here. The question posed by the public interest prong "is not whether *dispensing* with notice and comment would be contrary to the public interest, but whether *providing* notice and comment would be contrary to the public interest." *Mack Trucks*, 682 F.3d at 95. The prong "is met only in the rare circumstance when ordinary procedures—generally presumed to serve the public interest—would in fact harm that interest." *Id.* For example, where the "announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent." *Id.* (cleaned up). Allowing the public to weigh in on the proposed closure of the Park would plainly not harm the public interest.

Even if the good cause exception applied, it is impossible for NPS to publish a direct final rule before the slated November 15 closure. The only Federal Register publication concerning the Park's closure is a November 13 "unpublished Notice" in the Federal Register's Public Inspection Issue.[22] The notice states that it is scheduled to be published in the Federal Register on November 16. *Id.* Even if this "notice" counts as a "rule" that could satisfy § 1.5(b), its publication would fall after NPS's closure of the Park.

[22] NPS, *Temporary Closure: East Potomac Park South of Buckeye Drive; Record of Decision*, Federal Register: Public Inspection, https://perma.cc/A2UK-883X (accessed Nov. 13, 2026).

NPS's regulations required it to engage in rulemaking to close the Park. By failing to do so, NPS acted arbitrarily and capriciously in violation of the APA. *See Alon Refin. Krotz Springs, Inc.*, 172 F.4th at 17. Plaintiffs are likely to succeed on this claim.

**2. Irrational Explanation**

An agency acts arbitrarily and capriciously when it fails to consider an "important aspect of the problem" and when it "offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

The Government offers two reasons unrelated to the Washington National Plan for closing the Park on November 15: (1) the absence of an operator for the Course, and (2) repairing the deteriorated seawall. *See* Dkt. 111 at 1–2; *see also* Nov. 13 Rough Tr. I at 38. Neither reason sufficiently explains its decision to close the vast majority of East Potomac Park to all public use for an indefinite period.

According to the Government, because DOI will terminate NLT's management of East Potomac Golf Course by November 15, it must close the majority of East Potomac Park. *See* Record of Determination. NPS claims that it would be unable to safely manage the course itself. *See id.* In other words, the Government's hands are tied. But the Government tied the knot itself: The cancellation of NLT's management of the Course is an entirely self-inflicted and self-serving injury. And as the D.C. Circuit has explained, "[a]n agency should not be allowed to claim that the confusion resulting from its own improper action weighs against an injunction against that action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 14 (D.C. Cir. 2016).

Even setting this aside, however, the termination of NLT's lease does not explain the Government's decision to close East Potomac Park south of Buckeye Drive. NLT managed only the Course—not the entirety of the Park. So, even if NLT (or NPS) is unable to manage the Course, it is unclear why this warrants closing more than the Course itself. Moreover, NPS has not explained why it is unable to find another lessee to manage the Course. *See* Dkt. 147 at 35.

Although the Government claimed in the Record of Determination that NPS must close the Park because NLT will no longer be able to prevent Park visitors from accessing the Course, it did not sufficiently explain why this necessitates closing the Park. It did not explain how NLT prevented Park visitors from accessing the Course in the past. *See* Dkt. 155. And it did not explain why NPS itself cannot restrict access to the Course. *See id.* Plaintiffs noted at argument that Government staff, including the author of the Record of Determination and the U.S. Park Police, have offices on the Park. Nov. 13 Rough Tr. III at 38–39.

Plaintiffs are likely to succeed on their claim that the Government's proposed closure is arbitrary and capricious because the Government has not reasonably explained its decision. The Government's explanation fails to adequately "consider an important aspect of the problem," namely the less-restrictive alternatives of (1) closing only those areas necessary for seawall repair or impacted by NLT's lease cancellation, or (2) finding another vendor to manage the Course. *State Farm*, 463 U.S. at 43. It "runs counter to the evidence before" it because no prior Government publication or declaration found that closure of East Potomac Park south of Buckeye Drive was necessary to repair the seawall. *Id.* And, for the same reasons the Court finds the Government's explanation pretextual, it "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

The Government's second justification for closing the Park fares no better. For the same reasons the Court finds the seawall explanation pretextual, the Court concludes that the Government does not rationally explain the decision to close the Park on November 15. *See supra*.

## II. Irreparable Harm

Irreparable harm is a high bar. *See Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 56 (D.D.C. 2025). Plaintiffs must demonstrate that the harm they will suffer is "beyond remediation," "both certain and great," "actual and not theoretical," and "of such imminence that there is a clear and present need for equitable relief." *Id.* (cleaned up).

Plaintiffs clear that bar. NPS plans to close East Potomac Park on Sunday, November 15. Indefinitely. *See* Nov. 13 Rough Tr. III at 1–14. No amount of money can compensate Plaintiffs for the "loss of access to and enjoyment of treasured national parkland and recreation." Dkt. 149 at 23. And the Washington National Plan, which the closure would advance, will destroy the Course in its current form. That is a harm "for which there can be no do over." *Nat'l Council of Nonprofits*, 763 F. Supp. 3d at 57 (cleaned up).

The Government pushes back in two ways.[23] First, relying on *Committee of 100 on the Federal City v. Foxx*, 87 F. Supp. 3d 191, 204 (D.D.C. 2015), it contends that a "temporary" park closure cannot be irreparable harm. Dkt. 147 at 19. The parks at issue in *Committee of 100* were closed after a year-long environmental assessment; were set to be closed for a discrete period; the park operators disclosed that period to the public in advance; and full access to the park

[23] The Government did not counter Plaintiffs' argument that they will suffer irreparable harm based on NEPA and NHPA violations. *See* Dkt. 139-1 at 38–40; Dkt. 149 at 24. So the Court treats that argument as conceded. *See Am. Waterways Operators v. Regan*, 590 F. Supp. 3d 126, 138 (D.D.C. 2022).

would be restored once construction was complete. *See* 87 F. Supp. 3d at 204. None of this is true of the Government's plan to shutter East Potomac south of Buckeye Drive. The Government also points to comparable recreational spaces in Washington, D.C. *See* Dkt. 147 at 27. But Plaintiffs' harms are tied to "East Potomac's beauty, historic layout, and historic designs." Dkt. 103 at 62 (cleaned up). While there are other parks in Washington, D.C., there is no other East Potomac Park.

## III. Balance of the Equities and the Public Interest

The balance of the equities and the public interest also favor Plaintiffs. The Court has found that Plaintiffs are likely to succeed on the merits of their NEPA and APA claims. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. As amici Hains Point Runners and Cherry Blossom, Inc., have described, the closure of Ohio Drive SW would harm many members of the public—including runners, cyclists, and triathletes—because "the perimeter roadway's relatively flat terrain, long straightaways, extended loop, and separation from urban congestion make it particularly useful for long runs, repeated laps, and sustained workouts." Dkt. 141-1 at 13.

Nor will an injunction preventing the Park's closure harm the Government: The Government has identified no imminent plan to begin construction on seawall repair that would be hindered by continued public access to the Park, *see* Nov. 13 Rough Tr. III at 9. And in similar construction projects in West Potomac Park, the agency has been able to address safety concerns without eliminating, for years, public access to the Park.[24]

---

[24] Dkt. 139-1 at 16 n.7 (citing NPS, *Rehabilitate Tidal Basin and West Potomac Park Seawalls: Environmental Assessment* (Feb. 2023), https://perma.cc/LQ96-AH2U).

The public has a strong interest in maintaining access to East Potomac Park. The balance of the equities tips in Plaintiffs' favor.

**ORDER**

For the reasons stated above, the Court **GRANTS** Plaintiffs' Motion for Temporary Restraining Order, Dkt. 139. A temporary restraining order is "an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion." *State v. Musk*, 769 F. Supp. 3d 1, 4 (D.D.C. 2025) (cleaned up). Plaintiffs have done so here: they have demonstrated a likelihood of success on the merits, at least on their NEPA and APA claims, irreparable harm absent injunctive relief, and that the balance of the equities tips in their favor.

"The purpose of a temporary restraining order . . . is to preserve the status quo while the court considers the merits of the case." *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 13, 16 (D.D.C. 2025). The status quo is "the last uncontested status which preceded the pending controversy." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (cleaned up). Here, that means when East Potomac Park—including East Potomac Golf Course—was open to the public.

Accordingly, and to maintain the status quo, the Court **ORDERS**:

1. East Potomac Golf Course shall remain open and accessible to the public, except for routine, temporary closures consistent with the Course's historical operating practices, and except as needed to address articulated, imminent threats to public safety. Nothing in this Order requires Defendants to (1) operate East Potomac Golf Course for play, or (2) enter into any contract with any concessioner to operate East Potomac Golf Course for play. Whether and how Defendants do so is solely within

their discretion, but Defendants cannot use the absence of golf operations as a reason to exclude the public from the Course;

2. All other portions of East Potomac Park south of Buckeye Drive SW, including Ohio Drive SW, shall remain open to the public, except in areas in the immediate vicinity of active seawall repair where repair necessitates temporary restrictions on public access to protect public safety, and except as needed to address articulated, imminent threats to public safety. Any temporary closure for seawall repair or to address an imminent public safety threat shall be only to the extent and for the duration reasonably necessary to protect public safety during the completion of the repair or resolution of the threat;
3. If an imminent threat to public safety requires closure of any part of the Course or any part of East Potomac Park south of Buckeye Drive SW, or requires any restriction of public access to any part of the Course or any part of East Potomac Park south of Buckeye Drive SW, Defendants may close or restrict the area immediately surrounding the hazard without advance notice to the Court, but with written notice to the Court and Plaintiffs within 24 hours of initiating any closure or access restriction. Such notice shall contain a description of the public safety threat, the scope and duration of the closure or restriction, and an explanation of the need for the closure or restriction. Such notice shall include a sworn declaration from a senior National Park Service employee attesting to the threat and the need for the taken action to address it;
4. On or before November 15, 2026, at 12:00 p.m., Defendants must distribute this Order to all DOI and NPS employees, officers, agents, and contractors who are likely to be impacted by this Order.

The Court **ORDERS** that this Temporary Restraining Order shall be in full force and effect through November 28, 2026, or further order from the Court, whichever comes first. If any provision of this Order is stayed, vacated, or modified, the remaining provisions shall remain in effect. The Court's Preliminary Injunction Order, *see* Dkt. 101, remains in effect. Plaintiffs shall post a $1.00 bond in accordance with Federal Rule of Civil Procedure 65(c) by Friday, November 20, 2026.

The Court is available on Sunday, November 15, 2026, should Plaintiffs or Defendants require any emergency clarification of this Order. Counsel can alert the Court through an email to the Chambers inbox.

Date: November 14, 2026

ANA C. REYES
United States District Judge